# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEHRANGIZ KAR,<br><br>   and<br><br>AZADEH POURZAND<br><br>       Plaintiffs,<br><br>   v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br><br>   and<br><br>THE ISLAMIC REVOLUTIONARY GUARD CORPS<br><br>c/o Ministry of Foreign Affairs<br>Khomeni Avenue,<br>United Nations Street<br>Tehran, Iran<br><br>       Defendants. | Case#: **1:19-cv-2070** |

## **COMPLAINT**

1. Plaintiffs Ms. Mehrangiz Kar, a well-known Iranian Human Rights lawyer and human rights activist, and her daughter, Ms. Azadeh Pourzand (collectively, the "Pourzands" or "Pourzand family" or "Plaintiffs") bring suit against Defendants the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or "Iranian Government" or "Defendants") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage taking, extrajudicial killing, and other torts against Plaintiff and against Mr. Siamak Pourzand, the husband and father of the Plaintiffs.

2. Plaintiffs Ms. Mehrangiz Kar and Ms. Azadeh Pourzand bring this complaint in order to recover for the actions of the Iranian government in torturing, wrongfully imprisoning, and ultimately killing Mr. Siamak Pourzand. Mr. Pourzand was taken as a political hostage in order to hurt and limit the activities of Ms. Mehrangiz Kar in her fight for human rights and to discredit Ms. Mehrangiz Kar and other opposition activists from challenging the leadership of the government of Iran. Plaintiffs bring this action under

section $1605A of the Foreign Sovereign Immunities Act, which provides for private cause action against a state sponsor of terrorism, in this case Islamic Republic of Iran, for personal injury and death caused by an act of torture, and extrajudicial killing.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter and over Defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject matter jurisdiction and personal jurisdiction for civil actions for personal injuries against State Sponsors of Terrorism and their officials, employees, and agents.

4. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for personal injury and related torts.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

## PARTIES

6. Plaintiff Mehrangiz Kar, a well-known Iranian human rights lawyer and activist, was born in Ahvaz, Iran and immigrated to the United States in 2001, becoming a U.S. citizen in 2006. In 1969, Mrs. Kar married journalist Siamak Pourzand with whom she has two daughters, Plaintiff Azadeh Pourzand and Lily Pourzand. In November of 2001, the Iranian government arrested and imprisoned Ms. Kar's husband, journalist Siamak Pourzand. Over the next ten years, Mr. Pourzand was incarcerated, terrorized, and tortured by Iranian officials. Throughout her husband's imprisonment, Mrs. Kar continuously worked to free Mr. Pourzand and advocate for human rights. In recognition of Mrs. Kar's activism, First Lady Laura Bush honored her with the National Endowment for Democracy's Democracy Award in 2002. Since immigrating to the United States, Mrs. Kar has been recognized as a Scholar at Risk through an international network of universities and colleges working to promote academic freedom and to defend the human rights of scholars worldwide. Mrs. Kar has worked as a Radcliffe Fellow at Harvard University's John F. Kennedy School of Government, Carr Center for Human Rights, as well as at Brown University's Pembroke Center for Teaching and Research on Women. In 2011, after years of both physical and mental abuse, Mr. Pourzand was killed while he

was under house arrest in Tehran, Iran. The wrongful death of Siamak Pourzand is a direct and proximate result of the willful, wrongful, intentional, and reckless acts of IRGC and its agents, whose acts were funded and directed by the Islamic Republic of Iran. Ms. Kar has been tortured and injured directly by the acts of Iranian government against her husband, Mr. Siamak Pourzand. Ms. Kar requests compensatory damages including economic damages, solatium, and pain and suffering. In addition, Ms. Kar is requesting punitive damages.

7. Plaintiff Azadeh Pourzand was born in Iran and became a U.S. citizen in 2009. Ms. Azadeh Pourzand is the daughter of Plaintiff Ms. Mehrangiz Kar and Mr. Siamak Pourzand. Ms. Azadeh Pourzand immigrated to the United States in 2001 in order to escape persecution from Iranian authorities with her mother. Since her father's death, she has been promoting human rights and freedom of expression in Iran. She has been injured by the Iranian actions against her father and mother, and requests compensatory damages including economic damages, solatium, and pain and suffering. Further, Ms. Azadeh Pourzand is requesting punitive damages.

8. Defendant the Islamic Republic of Iran is a foreign state. Iran is a theocratic republic with an elected head of government and a head of state—the Ayatollah or Supreme Leader—appointed for life by a council of theologians. The Supreme Leader controls the Guardian Council of the Constitution, which interprets the Iranian Constitution, supervises elections (including by determining which candidates may run), and exercises significant influence over the legislative, executive, and judicial branches of government, as well as the military and IRGC.

9. Defendant the Iranian Revolutionary Guard Corps or IRGC is a military organization under the control of the Guardian Council. The IRGC was established in the wake of the Islamic Revolution to act as the country's "ideological custodian"[1] and is generally understood to be one of the most reactionary, powerful, and oppressive factions of the Iranian Government. The IRGC fields an army, navy, air force, and intelligence service, and it conducts foreign operations through its paramilitary arm, the Quds Force. In addition, the Judiciary branch of Iranian Government works as an arm of the IRGC to

---

1. Greg Bruno et al., *Iran's Revolutionary Guard*, COUNCIL ON FOREIGN RELATIONS (Jun. 14, 2013), www.cfr.org/iran/irans-revolutionary-guards/p14324.

prosecute domestic targets referred to the Judiciary by IRGC. Judiciary branch prosecutes, torture, interrogate, and detains individuals by order of IRGC security apparatus. Then the case will be sent to Revolutionary Courts for trials. IRGC has been designated by the U.S. Department of Treasury as a sponsor and supporter of terrorism and human rights violations.[2] IRGC's domestic intelligence apparatus was responsible for injuries and death of Mr. Siamak Pourzand.

## STATEMENT OF FACTS

**I.   Overview**

10. Ms. Mehrangiz Kar, an attorney and human rights activist, was arrested by Iranian authorities in 2001 after making statements against the conservative Iranian government at a conference in Berlin, Germany. Ms. Kar was imprisoned by Iran for several months and was convicted on false charges for multiple crimes against the Iranian government. While in prison, Ms. Kar was diagnosed with cancer and eventually granted medical parole to seek treatment in the United States. However, the Iranian government was determined to prevent Ms. Kar from discussing human rights violations in Iran. In an attempt to censure Mrs. Kar from abroad, the Iranian Government targeted and arrested Ms. Kar's husband and the father of her two daughters, Mr. Siamak Pourzand, Iranian agents held and tortured Mr. Pourzand for nearly ten years for the unlawful purposes of covering up their own crimes and suppressing information about the Islamic Republic of Iran. These actions eventually resulted in the wrongful death or extrajudicial killing of Mr. Pourzand.

11. While Mr. Pourzand was a citizen of Iran at the time of his arrest and throughout his detention, his wife, Ms. Mehrangiz Kar, and his daughter, Ms. Azadeh Pourzand were citizens of the United States during the time of Mr. Pourzand's incarceration and eventual death. Ms. Kar became a United States citizen in 2006 and Ms. Azadeh Pourzand became a United States citizen in 2009. The Plaintiffs were forced to flee from their home country of Iran in order to avoid the same persecution their husband and father suffered.

---

2. U.S. Dep't of Treasury, *Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism*, www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.

12. After fleeing Iran and immigrating to the United States, Ms. Kar constantly worked to free her husband while simultaneously building her career as a human rights activist. In 2002, Ms. Kar was awarded for her advocacy by First Lady Laura Bush with the National Endowment for Democracy's Democracy award. She has been recognized as a Scholar at Risk through an international network of universities and colleges working to promote academic freedom and to defend the human rights of scholars worldwide. Vice President Biden introduced her to the audience, when Mrs. Kar stated that she has no idea of whereabouts of her husband. Few days after, the Iranian government released the forced confessions of Mr. Siamak Pourzand in National T.V. against Ms. Kar, and himself as agents of CIA. Ms. Kar has also worked at both Harvard University and Brown University as a professor and scholar in the fields of human rights and women's rights.

13. At the time of his arrest in 2001, Mr. Pourzand was a well-known Iranian journalist having worked as a United States news correspondent prior to the Iranian revolution of the late 1970s. In 2001, Mr. Pourzand, was working as the manager of the Tehran Arts and Cultural Center (Majmu-ye Farhangi Honari-ye Tehran).[3] Mr. Pourzand's initial arrest and imprisonment came just two months after his wife, Plaintiff Ms. Kar, was released from prison in Tehran for medical treatment in the United States. For the duration of Mr. Pourzand's imprisonment, the Iranian government sought to reprimand both Ms. Kar and Mr. Pourzand for their support of western culture and influence abroad. The Iranian government continued to hold Mr. Pourzand as a hostage in an attempt to prevent Mrs. Kar from bringing Iranian human rights violations to the forefront of the world stage. Iran had no legal basis to arrest or imprison Mr. Siamak Pourzand.

## II. Iran's Arrest, Imprisonment, and Eventual Release of Mehrangiz Kar

14. In April 2000, Mrs. Kar and sixteen other Iranian journalists, activists and intellectuals attended a conference entitled Iran after the Elections at the Heinrich Böll Institute in Berlin, Germany in order to discuss the urgent need for constitutional reform and secularity within Iran. Upon returning to Iran from the conference, Mrs. Kar was arrested and taken to Evin Prison near Tehran. Mrs. Kar was charged with numerous offenses

---

3. *Biography*, SIAMAK POURZAND FOUNDATION, www.pourzandfoundation.org/pourzand/biography (last visited Jun. 18, 2019).

including acting against national security, spreading propaganda against the regime of the Islamic Republic, violating the Islamic dress code at the Berlin conference, denying the commands of the sharia law, and abusing sacred principles.

15. On April 29, 2000, Mrs. Kar was convicted and sentenced to four years imprisonment on charges of acting against national security and disseminating propaganda against the Islamic regime. Mrs. Kar spent 54 days in prison before doctors learned that she had developed cancer.

16. Under pressure from the European Union and the government of the Netherlands in particular, Mrs. Kar was temporarily released on bail for treatment in the United States. Mrs. Kar left Iran in August 2001 and eventually settled in the United States to receive treatment for her cancer.

17. From the United States in 2002, Mrs. Kar appealed against her Iranian conviction. Mrs. Kar's conviction was partially overturned, and her sentence was reduced from four years to six months jail time and monetary damages. However, she had two open cases without final judgment as of the date of this Complaint. She was discharged by the Iranian court for time served. However, three charges against Mrs. Kar still remain open against her within the Iranian Judiciary and she has therefore not returned to Iran since 2001. The couple's two daughters, Plaintiff Azadeh Pourzand and Lily Pourzand were both living in North America by the end of 2001, with Azadeh settling in the United States.

### III. Iran's Arrest and Imprisonment of Siamak Pourzand

18. Plaintiffs' distress over Mr. Pourzand began at 9:00 pm on November 24, 2002, when he was accosted and taken hostage on the street in Tehran by agents of Defendant IRGC. While Iranian law requires law enforcement agencies to present a suspect with an arrest warrant and to conduct any search and arrest in daylight, Mr. Pourzand was not afforded these rights. After seizing Mr. Pourzand, his captors then took him to his apartment where they searched the premises and seized the hard drive of a computer belonging to Mrs. Kar and 400 Swedish Kronor.

19. There was no news of Mr. Siamak Pourzand for two weeks following his disappearance and no government agency claimed responsibility for arresting him. His family did not know whether he was alive or dead and began a campaign to inform the international

human rights community of his plight. The Legal Director of the Islamic Human Rights Commission of Iran (IHRCI) wrote to the General Director of the Ministry of Justice in Tehran on December 6, 2001, seeking information of Mr. Pourzand's arrest and whereabouts. The IHRCI was only informed that Mr. Pourzand's charges were apolitical and that he had been arrested for allegations of moral offenses.

20. Mr. Pourzand was then held for several months in multiple illegal detention facilities where he was interrogated, beaten, and tortured in numerous ways. While there were no charges initially filed against Mr. Pourzand after his seizure, he was eventually tried and convicted for numerous offenses against the Iranian government, which he was forced to plead guilty for in court.

21. After the trial, the Pourzand family continued their efforts to free Siamak Pourzand. Mr. Pourzand's daughter, Plaintiff Azadeh Pourzand wrote to Iranian President Khatami pleading with him to follow up on her father's case. Mr. Pourzand's wife, Plaintiff Mehrangiz Kar sent a series of letters to several senior Iranian government officials on her husband's behalf. In the letters, Mrs. Kar detailed the illegality of her husband's arrest and treatment prior to his conviction.

22. On May 15, 2002, Mr. Pourzand was sentenced to eleven years in prison for committing the following crimes against the Islamic Republic: i) using propaganda against the Islamic Republic, ii) spying for a foreign country that had harmed Iran's national and cultural security, iii) provoking and deception of the masses to disrupt the security of the country, iv) encouragement and persuasion to commit acts of corruption and moral turpitude, v) illegitimate affair, and vi) consumption of alcohol. The Judge explained that Mr. Pourzand still potentially faced that charge of Maharib—meaning literally "at war with God"—and that he still remained under investigation.

23. In early June 2002, another Iranian newspaper reported that Siamak Pourzand was also being investigated for the previously undisclosed offense of irtidad (apostasy), which like Maharib could potentially carry the death penalty. Mrs. Kar concluded then that the authorities could not convince Mr. Pourzand to confess to a crime that carried the death penalty, so they continuously changed the charges against him in order to find a way to execute Mr. Pourzand.

24. After a failed appeal, Mr. Pourzand was officially sentenced to eleven years confinement for his alleged crimes and was again held and tortured at several illegal detention facilities for interrogation purposes. On July 24, 2002, Iranian state television broadcasted a press conference with Siamak Pourzand. The press conference was staged at the Mehrabad Special Court with Judge Zafarqandi and other government officials present. The Iranian Student News Agency (ISNA) reported that questions had been distributed to the media prior to the press conference and that reporters had been forced to only ask questions from the provided list. However, Mr. Pourzand's court-appointed attorney told media at the press conference that the conference had been staged at Mr. Pourzand's request in order to refute false reports concerning his situation. During the press conference, Mr. Pourzand renounced his past activities while tentatively challenging certain aspects of his conviction. He denied receiving money from any individual with the aim of promoting a non-conformist agenda and he denied receiving funding from abroad to promote western culture in Iran.

25. Mr. Pourzand was held in secret and dark IRGC detention facilities, these places are worst than Evin Prison on the outskirts of Tehran—a notorious facility where hostages and other political prisoners are kept in deplorable conditions, brutally interrogated, and subjected to physical distress, psychological abuse and in the words of the U.S. Department of State, "cruel and prolonged torture." The conviction against Mr. Pourzand served as Iran's means to justify its crimes and to continue to hold Mr. Pourzand hostage. The charges against Mr. Pourzand were blatant lies, fabricated by Iran in order to put Mr. Pourzand on trial, convict him of several high crimes, and thereby continue to hold Mr. Pourzand in an attempt to prevent Plaintiffs, specifically Mrs. Kar, from speaking out against the Iranian government.

26. Iran made little effort to hide the fact that the criminal case against Mr. Pourzand was pure pretext for taking and keeping him as a hostage. At the so-called "trial," Iran proffered no real evidence or witnesses to support any of the charges against him. The trial proceedings were a sham, with no due process of law. Iran denied Mr. Pourzand his right to counsel of his choice, threatening two attorneys Plaintiff Mrs. Kar hired to represent Mr. Pourzand and assigning Mr. Pourzand a court-appointed attorney with no authorization to prepare a defense. Iran forced Mr. Pourzand to plead guilty for the

charges against him, barred him from presenting any witnesses or evidence, and failed to produce a single piece of real evidence against him. To this day, Iran has not disclosed the full terms of Mr. Pourzand's supposed conviction and sentence.

27. For nearly ten terrifying years—from November of 2001 until his death in April of 2011—IRGC and other Iranian agents tortured and tormented Mr. Siamak Pourzand using a cruel combination of harsh physical mistreatment and extreme psychological abuse. They held him in prolonged solitary confinement, deprived him of sleep, aggressively and relentlessly interrogated him, denied him basic medical treatment for serious conditions, and threatened him with numerous other forms of cruel and unusual physical torture, including execution. They also threatened to harm and kill Mr. Pourzand's family, Plaintiffs as well as other family members located in Iran. For most of the nearly ten years, Mr. Pourzand suffered from various illnesses and infections, and other health complications, including rapid weight loss, sores and infections, heart problems, severe anxiety, paranoia, and major depression, all without adequate medical care or treatment.

28. After suffering a major heart attack in April of 2004, Mr. Pourzand was given limited medical attention. In 2006, he was placed on house arrest in his apartment in Tehran. However, Mr. Pourzand also suffered under house arrest as he was constantly watched, threatened, and mistreated by the IRGC and other Iranian agents. His family had to pay for medical treatment of Mr. Pourzand

29. On April 29, 2011, after five years of house arrest, Iran reported that Mr. Pourzand was died due to injuries caused by falling from his balcony. However no investigation report has been produced to his family. Mr. Siamak Pourzand death took place while he was under full surveillance of IRGC. Unfortunately, family never got an opportunity to examine the body of Mr. Pourzand independently, and to this date, the cause of death is unconfirmed.. Mr. Pourzand's death came as a shock to his family. Plaintiffs have not been able to return to Iran since 2001 and were unable to see Mr. Pourzand again prior to his death. The family had no chance to attend the funeral of Mr. Pourzand.

IV.  **Injuries to Plaintiffs**

30. Throughout Mr. Siamak Pourzand's nearly ten-year ordeal in Iran, Plaintiff Ms. Mehrangiz Kar and Ms. Azadeh Pourzand were continuously threatened and intimidated by the Iranian government as they sought to help Mr. Pourzand. Plaintiffs were told numerous times that Mr. Pourzand had committed crimes against the Iranian state and were made to believe that Mr. Pourzand would die in custody in Iran. During Mr. Pourzand's incarceration, Plaintiffs felt such terror, trauma, and desperation that they contacted both U.S. and Iranian government officials and organizations in an attempt to free their husband and father. Having been incarcerated in Tehran herself, Ms. Kar was desperate to free her husband and demonstrate to the world the tragic consequences of Iran's hostage taking, torture, and other crimes.

31. After Mr. Siamak Pourzand's tragic death in 2011, it became clear that Iran and the IRGC had inflicted deep and permanent injuries on his wife and daughter, Plaintiffs Ms. Mehrangiz Kar and Ms. Azadeh Pourzand. For nearly ten years, Mr. Pourzand suffered terrible physical and psychological mistreatment at the hands of Iranian officials, while his wife and daughter fought for his release from North America, unable to reach their husband and father. Throughout the duration, Plaintiffs were aware of the mistreatment Mr. Pourzand was being subjected to and the pain and consequential injuries. Plaintiffs will never be the same due to the events that led to Mr. Pourzand's death and the loss of their husband and father. While Plaintiffs escaped physical trauma by fleeing Iran, Ms. Kar and Ms. Azadeh Pourzand have each suffered their own extreme psychological trauma. For nearly ten years, they lived with the terror of knowing that Mr. Pourzand was being held in unthinkable conditions and that he might be tortured to death, executed, or held forever in detention. With the knowledge that Mr. Pourzand was being abused by authorities and might not survive, Plaintiffs were under severe psychological distress and suffered their own serious health problems as a result. The shock and grief that overcame Plaintiffs due to Mr. Pourzand's tragic death created further psychological distress.

32. Plaintiffs' pain, anguish, and anxiety are likely to persist for years to come. Plaintiffs live in constant fear that Iranian agents are spying on them, plotting additional acts of terrorism, and planning ways to hurt them and their family members again. Plaintiffs fear that Iran will retaliate in some fashion against them or their family members for filing this Complaint.

33. Plaintiffs' injuries extend well beyond the deep and lasting psychological impacts of Iran's crimes. As a direct result of her own mistreatment by Iran and its agents, Ms. Kar will never feel safe living, working, or even visiting Iran or nearby countries as long as the current regime remains in power. Ms. Azadeh Pourzand is also fearful of the Iranian regime and carries this fear everyday, since she will most likely never be able to return to her home country. Plaintiffs also must struggle with the fact that they will never see Mr. Siamak Pourzand again and that the Pourzand family will never be wholly reunited.

34. Despite the severity of their injuries, Plaintiffs are committed to putting their lives back together. One critical element of this effort is holding Defendants accountable in this Court for the terrorism, torture, and other abuses they committed against Mr. Siamak Pourzand. Congress enacted the "terrorism exception" to the FSIA for exactly this circumstance—to provide plaintiffs with an "economic weapon" against rogue states that "consider terrorism a legitimate instrument of achieving their foreign policy goals." H.R. Rep. No. 104-383, at 62 (1995). For nearly ten years, Iran held and terrorized Mr. Pourzand for the purpose of controlling media coverage of the Iranian government and preventing the truth about terrorism and human rights violations occurring in Iran from spreading to the world stage. Plaintiffs seek justice and redress from this Court in order to compensate Plaintiffs for their pain and suffering and to hold Iran accountable for its heinous and unlawful acts of terrorism, torture, and abuse.

## COUNT I
## 28 U.S.C. 1605A(c), PRIVATE RIGHT OF ACTION
## HOSTAGE TAKING, TORTURE, AND EXTRAJUDICIAL KILLING

35. Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

36. Iran was a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

37. Defendants and their agents were acting within the scope of their office, employment, or agency in committing the acts alleged herein, including hostage taking, torture, and extrajudicial killing of Mr. Siamak Pourzand.

38. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of IRGC and its agents, whose acts were funded and directed by the Islamic Republic of

Iran, Plaintiffs suffered, inter alia, death, physical pain and suffering, mental anguish, emotional pain and suffering, and/or economic losses resulting from Defendants' acts.

39. Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs, who are foreign national employees of the U.S. Government and their family members, may assert a cause of action against Defendants for personal injury or death that was caused by an act of extrajudicial killing or the provision of material support or resources for such an act, if performed or provided by an official, employee, or agent of Defendants while acting within the scope of his or her office, employment, or agency.

40. Accordingly, as a result of Defendants' actions, Plaintiffs seek compensatory damages. WHEREFORE, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants in the amount of SIXTY MILLION US DOLLARS ($60,000,000.00).

## COUNT II
## ASSAULT AND BATTERY

41. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

42. "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21 (Am. Law Inst. 1965).

43. Hostage taking and torture under the FSIA constitute assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

44. Siamak was held hostage and tortured by Defendants, resulting in harmful contact and fear of such harmful contact.

45. While in Defendants' custody, Siamak was routinely subjected to harmful and offensive contact, including being forcibly moved at gunpoint, being forced to wear a blindfold, and other forms of torture.

46. While in Defendants' custody, Siamak was frequently threatened with harmful and offensive physical contact, including death and dismemberment. These threats caused Siamak to experience imminent apprehension that he could be killed, tortured, abused, or otherwise physically and emotionally injured. He constantly feared for his health and safety.

## COUNT III
## FALSE IMPRISONMENT

47. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

48. "(1) An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." Restatement (Second) of Torts § 35.

49. The unlawful arrest and imprisonment of Siamak Pourzand by Defendants constitutes false imprisonment. See, e.g., Jenco, 154 F. Supp. 2d at 34; Sutherland, 151 F. Supp. 2d at 49.

50. Defendants unlawfully detained Siamak Pourzand in Evin Prison, an institution that is known in Iran and internationally for its brutal mistreatment of hostages, political prisoners, and human rights defenders. Siamak also was under house arrest. Siamak was aware of this illegal detention. Siamak has suffered physical, economic, emotional, and psychological harm as a result of this illegal detention.

## COUNT IV
## HOSTAGE TAKING

51. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

52. The FSIA confers jurisdiction on the courts and creates an independent federal cause of action to recover for injuries sustained as a result of terrorist acts, such as hostage taking or torture. Under the statute, Plaintiffs must prove that (1) there was an act of "hostage taking" or "torture"; (2) the act was committed by the foreign state or "an official, employee, or agent of such foreign state"; (3) the act "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(a)(1) & (c); accord Valencia v. Islamic Republic of Iran, 774 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

53. Seizing an individual in an effort to extract information against himself and others is hostage taking within the definition of the FSIA.

54. Siamak Pourzand was seized by Defendants on 2001, when unidentified agents of Defendants entered the home he shared with Mehrangiz Kar and Azadeh Pourzand, held him at gunpoint while they ransacked the home. He was detained in Evin Prison, a

facility notorious for its brutal mistreatment of political prisoners and other individuals imprisoned without due process. Siamak Pourzand was not allowed access to counsel during this time, much of which he spent in solitary confinement.

55. There is significant and compelling evidence that Siamak Pourzand was tortured to be compelled to present forced and falsified testimony against the United States, Mehrangiz Kar, and her political activities.

56. Siamak Pourzand's prolonged detention resulted in physical injuries, including respiratory, cardiac, and sever depression. He was denied necessary medical care and medication. During his detention, he may have been exposed to asbestos, mold, and other environmental toxins, with unknown health effects.

57. Siamak Pourzand suffered from acute psychological and emotional injury and other pain and suffering as a direct result of his detention and abuse—including solitary confinement, lack of medical care, inadequate nutrition, relentless interrogations, physical distress, intimidation and disorientation, and denial of due process. While in prison and house arrest, Siamak Pourzand experienced depression, hallucinations, and suicidal ideations. He had trouble sleeping and has experienced issues with concentration as well as other symptoms of post-traumatic stress disorder. His relationships with his family have been permanently compromised by his experiences during his unjust and illegal imprisonment.

58. Finally Mr. Siamak Pourzand died, either by direct act of government or as a consequence of prolonged torture and his captivity.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/ SOLATIUM

59. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

60. "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm." Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46; accord Valencia, 774 F. Supp. 2d at 14; Acosta, 574 F. Supp. 2d at 28.

61. When a defendant's conduct is directed at a third person, the Restatement generally requires that a plaintiff be a "close family member" and have "contemporaneously

perceive[d] the event." Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46 cmt. m; accord Valencia, 774 F. Supp. 2d at 14.

62. "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." Heiser, 659 F. Supp. 2d at 27 (quoting Stethem, 201 F. Supp. 2d at 89).

63. Because Siamak Pourzand was taken hostage and tortured, Plaintiffs need only demonstrate that they are close family members, and that emotional distress did result, in order to state a valid theory of recovery for intentional infliction of emotional distress. See Roth, 78 F. Supp. 3d at 401.

64. Defendants' extreme and outrageous conduct in holding Siamak hostage and inflicting torture upon him, and taking his life caused Mehragiz Kar (Siamak's wife) and Azadeh (Siamak's daughter) to suffer from severe emotional harm, including depression, persistent feelings of guilt, loss of sleep, paranoia, loss of focus, and other symptoms of post-traumatic stress disorder, including thoughts of suicide.

## COUNT VI
## LOSS OF PROPERTY

65. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

66. The FSIA allows for recovery for "reasonably foreseeable property loss … by reason of the same acts on which the action … is based." 28 U.S.C. § 1605A(d). Section 1605A(d) "contains two causation elements: (1) the property loss must come 'by reason of' the [hostage taking or torture], and (2) the property loss must be a 'reasonably foreseeable' result of [hostage taking or torture]." Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 57 (D.D.C. 2012).

67. As a result of his unlawful arrest and detention, Siamak was unable to work and removed from his positions. Siamak has incurred significant expenses, including the loss of rent, property, and deposits, as a result. These losses occurred "by reason of" and were a "reasonably foreseeable" result of his arrest and detention.

68. Mehrangiz and Azadeh expended significant time and resources in order to secure Siamak's release, and provide Siamak with legal and financial support while under arrest. These expenses and opportunity costs occurred "by reason of" and were a "reasonably foreseeable" consequence of Defendants' hostage taking and torture of Jason.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

69. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

70. By establishing that he was taken hostage or tortured by Defendants and that emotional distress resulted, Siamak Pourzand (or his family) has established his right to recovery for intentional infliction of emotional distress. See Roth, 78 F. Supp. 3d at 400-401; Valencia, 774 F. Supp. 2d at 14.

71. Defendants' conduct in holding Siamak hostage and inflicting torture upon him caused Siamak to suffer severe emotional harm, including depression, suicidal ideation, symptoms of post-traumatic stress disorder, and irreparable harm to his relationships with his wife, his daughters, and other friends and family.

## COUNT VIII
## WRONGFUL DEATH

72. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

73. As a direct and proximate result of the above described acts of Defendant the Decedent, Siamak Pourzand, suffered an untimely death on April 29, 2011.

74. As a direct and proximate result of the wrongful death of Siamak Pourzand, the Plaintiff, Mehragniz Kar, has been deprived of her husband's society, companionship, comfort, protection, care, advice, attention, counsel, support, financial support, economic loss, guidance and suffered and continues to suffer mental anguish and emotional pain and suffering as well as all other damages recoverable under state and federal law.

75. As a direct and proximate result of the wrongful death of Siamak Pourzand, the Plaintiff, Azadeh Pourzand, has been deprived of her father's society, companionship, comfort, protection, care, advice, attention, counsel, support, financial support, economic loss, guidance and suffered and continues to suffer mental anguish and emotional pain and suffering as well as all other damages recoverable under state and federal law.

## COUNT IX
## PUNITIVE DAMAGES

76. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

77. The actions of the Islamic Republic of Iran, who has been committing, sponsoring, and supporting acts of international terror against international and domestic target, and was designated as a State Sponsor of Terror for decades.

78. The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result by each Defendant. Mr. Pourzand and each of his family members are each victims of the acts of terror committed by Iran with the material support of each of the Defendants. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

79. Iran, as a country with history of human rights abuses and sever violations of International law, caused pain to many who were promoting internationally acceptable norms and human rights. Many Iranian and foreigners, including Americans, lost life, liberty, health, and property due to continued act of terror conducted by Iran.

80. This case is among few bringing light to domestic act of terror by Iran against human right activists and those fighting the brutal regime of Iran. The punitive penalty of such activities should be so high to prevent Iran from violating international human rights, torturing individuals, taking hostages, and extrajudicial killings.  Iran has a defenseless record of human right abuses, it has been condemned internationally by each and every United Nation Commission. Unfortunately, there was no penalty imposed to Iran for its violation, for similar cases in hand.

81. WHEREFORE, the Plaintiffs pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran, on behalf of each Plaintiff, in the amount of One Billion US Dollars ($1,000,000,000) for each of them, as against each of the Defendants, jointly and severally, and their costs herein expended.

### **REQUEST FOR RELIEF**

82. WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

83. Siamak Pourzand's family is entitled to compensatory damages for personal injury, assault, battery, unjust imprisonment, and extrajudicial killing (wrongful death) suffered as a result of hostage taking and torture.

84. 196. Siamak Pourzand and defendants are entitled to solatium damages for Siamak's detention (under 28 U.S.C. § 1605A(c)).

85. All Plaintiffs are entitled to special damages and other compensation for property loss suffered as a result of Siamak Pourzand detention, torture, and extrajudicial killing.

86. All Plaintiffs are entitled to consequential damages for their lost earning potential and other long-term damages.

87. All Plaintiffs are entitled to aggravated damages for Defendants' cruelty, torture, and abuse.

88. All Plaintiffs are otherwise entitled to general damages and all other applicable damages.

89. Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

90. The Court should award Plaintiffs their full costs and attorneys' fees as incidental damages and as otherwise appropriate.

91. The Court should grant such further and other relief as this Court deems just and proper.

Dated: JULY 11, 2019

Respectfully submitted.

__/s/ *Ali Herischi*_____

Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 450
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
Attorney for Plaintiffs