# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

Mehrangiz Kar and Azadeh Pourzand,

     *Plaintiffs*,

vs.

The Islamic Republic of Iran et al.;

     *Defendants*.

**Case Number:  1:19-cv-02070-JDB**

Plaintiff Ms. Mehrangiz Kar, a well-known Iranian human rights lawyer and activist, and her daughter, Plaintiff Ms. Azadeh Pourzand (collectively, the "Pourzands" or "Pourzand family" or "Plaintiffs"), hereby respectfully move this Court to enter Default Judgment against Defendants, the Islamic Republic of Iran et al., for the hostage taking, torture, and extrajudicial killing of Mr. Siamak Pourzand. In support thereof, Plaintiffs aver as follows:

## I. FACTUAL BACKGROUND

### A. Introduction

Plaintiffs filed this action against Defendants the Islamic Republic of Iran, Iran's Supreme Leader Ali Husseini Khamenei, and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or "Iranian Government" or "Defendants") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), to recover for severe personal injuries and other irreparable harm suffered as a result of Defendants' acts of hostage taking, torture, and extrajudicial killing of their husband and father, Mr. Siamak Pourzand. Plaintiffs bring this action

under section 28 U.S.C. §1605A of the FSIA, which provides for a private cause of action against a state sponsor of terrorism, in this case the Islamic Republic of Iran.

## B. Statement of Facts

Prior to the 1979 Iranian revolution, Mr. Pourzand was a renowned Iranian journalist, cultural figure, and recipient of numerous awards from international institutions. He gained a network of intellectuals and artists from around the world whose objectives did not align with that of Iran's revolutionary government. He became a target of the government due to his criticism of it and his work in the United States, where he interviewed American cultural figures. After the revolution, artists and journalists were marginalized and labeled by Iran as westerners who planned to destroy revolutionary values. The government monitored and restricted their activities. As a result, many reformist Iranian publications were closed down and Mr. Pourzand was unable to continue work as a journalist. In 2000 he was able to work again, this time as a manager of the Tehran Cultural Center where he could exchange views with like-minded activists. *See* Lily Pourzand Declaration, Ex. 11, ¶5-9; "Mockery of Justice" Report, Ex. 37, p. 8-9.

During political reform in Iran between 1997 and 2001, Plaintiff Kar was a prominent human rights lawyer and activist pursuing constitutional reform in Iran to limit the power of the Supreme Leader and empower democratic institutions. When presenting at a conference in Berlin in April 2000, she publicly criticized the Iranian regime and emphasized its need for constitutional reform and secularism. Upon her return to Iran, government authorities arrested her at the airport and detained her in Evin Prison. She was later convicted of acting against national security and disseminating propaganda against the Islamic regime and, on January 13, 2001, sentenced to four years' imprisonment. After 54 days in prison, she was released on bond as a result of extensive international pressure to obtain medical treatment in the U.S. for her breast cancer diagnosis.

Plaintiffs went to the U.S., expecting to be temporarily separated from Mr. Pourzand. *See* Mehangriz Kar Declaration, Ex. 9, ¶10-2; and Ex. 37, p. 9.

However, in November 2001, when Plaintiffs were still in the U.S., 71-year-old Mr. Pourzand was abducted by Iranian officials and held in a series of secret detention facilities without any communication with his family for months, uninformed of the charges against him, denied legal representation, and tortured. *See* Ex. 9, ¶16-20.

In May 2002, Mr. Pourzand was sentenced to 11 years in prison for numerous false crimes, including i) using propaganda against the Islamic Republic, ii) spying for a foreign country that had harmed Iran's national and cultural security, iii) provoking and deceiving the masses to disrupt the security of the country, iv) encouragement and persuasion to commit acts of corruption and moral turpitude, v) illegitimate affair, and vi) consumption of alcohol. Post-conviction, Iran maintained a charge against him for "apostacy," which carried the death penalty. Moreover, Mr. Pourzand's purported trial lacked due process. He was denied his attorney of choice and no evidence or witnesses were presented. To this day, Iran has not disclosed the full terms of his convictions. *See* Ali Arab Declaration, Ex. 13, p. 30; Ex. 37, p. 21-8.

On July 24, 2002, Iranian state television broadcast an egregious press conference in which authorities forced Mr. Pourzand to confess to crimes he did not commit and condemn family and friends for false crimes. *See* Ex. 37, p. 29-30. Even so, his torture continued.

When the European Union pressured Iran to release Mr. Pourzand amidst political negotiations in 2002, Iran temporarily released him that November but he had not recovered from the constant torture he endured prior to his release. It was debilitating for the Pourzand family to learn about the effects of Mr. Pourzand's treatment in detention. *See* Ex. 11, ¶16-21.

When the E.U. lifted its pressure on Iran, government authorities returned Mr. Pourzand to detention, this time to Evin Prison, notorious for the torture of its prisoners. Mr. Pourzand

continued to endure interrogations, during which he suffered verbal and physical assaults and was threatened with execution. Mr. Pourzand's health continued to deteriorate as a result of the torture he suffered, but he was repeatedly denied medical attention. *See* Ex. 11, ¶22.

In 2004, after being hospitalized for a heart attack he suffered in prison, authorities transferred Mr. Pourzand to home confinement and told him: "You are not physically in jail, but you will face such a hard condition that you will wish to die, and you will." *See* Ex. 18, ¶19. There, authorities continued to psychologically torture him until his death by harassing, threatening, and surveilling him, making him feel unsafe and isolated at all times. *See* Azadeh Pourzand Declaration, Ex. 10, ¶25-6; Ex. 11, ¶28. Between 2009 and 2011, he was twice admitted to a psychiatric treatment center and diagnosed with "insomnia, [i]solation and lack of social activity, sometimes staring at a point and in some cases urinary and fecal incontinence." *See* Medical Report, Ex. 20.

On April 29, 2011, the government informed the Pourzand family that Mr. Pourzand committed suicide by jumping off his balcony. *See* Siamak Pourzand Death Certificate, Ex. 8. However, details of his death remain unclear as the government prohibited an independent investigation. He died while under full custody and control of the IRGC. Plaintiffs were forced to accept the government's narrative of his death in order for him to be buried. *See* Ex. 11, ¶35.

Throughout Mr. Pourzand's detention, Plaintiffs were continuously threatened and intimidated by Defendants. *See* Ex. 9, ¶59-60; and 10, ¶30. Even so, Plaintiff Kar worked tirelessly to free him. She received awards for her advocacy work, which helped bring international media coverage to Mr. Pourzand's circumstances. *See* Media Articles, Ex.'s 40-3. Leading human rights organizations, journalist associations, and governments condemned his imprisonment. *See* Appeals; Ex.'s 28-36. In February 2002, the U.N. Working Group on Arbitrary Detention concluded that his detention was arbitrary. *See* WGAD Opinion No. 8/2003, Ex. 53, p. 45-6.

As this motion will demonstrate, for nearly 10 years—from November 2001 until his death in April 2011 at 80 years old—Defendants arbitrarily took hostage and tortured Mr. Pourzand, which resulted in his wrongful death and extrajudicial killing.

## C. Parties

### 1. Plaintiff Mehrangiz Kar

Plaintiff Kar was born in Ahvaz, Iran. *See* Mehrangiz Kar Birth Certificate, Ex. 1. In 1969, she married Mr. Pourzand with whom she has two daughters, Plaintiff Pourzand and Ms. Lily Pourzand. She is an internationally recognized human rights lawyer and activist. She immigrated to the United States in 2001 and became a U.S. citizen in 2007. In 2005, she was recognized as a Scholar at Risk through an international network of universities and colleges promoting academic freedom and defending the human rights of scholars worldwide.[1] Plaintiff Kar has worked as a Radcliffe Fellow at Harvard University's Carr Center for Human Rights and at Brown University's Pembroke Center for Teaching and Research on Women. She has received numerous awards from prestigious institutions for her human rights advocacy and for her own struggles to continue this work in the "face of oppression and brutality".[2] *See* Mehrangiz Kar CV, Ex. 4, p. 6-7.

### 2. Plaintiff Azadeh Pourzand

Plaintiff Pourzand was born in Iran in 1985 to Plaintiff Kar and Mr. Pourzand. *See* Azadeh Pourzand Birth Certificate, Ex. 5. She immigrated to the U.S. with Plaintiff Kar in 2001 to escape

---

[1] *See* Scholar Rescue Fund, Featured Scholars, https://www.scholarrescuefund.org/featured_scholar/mehrangiz-kar/#:~:text=Professor%2520Kar%2520was%2520awarded%2520a,published%2520numerous%2520articles%2520and%2520essays.

[2] *See* Mehranghiz Kar CV, Ex. 4, p. 6-7 (e.g. 2000 PEN/NOVIB Award of the International PEN Club (Netherlands), for writers who have lost their liberty for political and ideological reasons; and 2002 Democracy Award of the National Endowment for Democracy (U.S.), for advancing human rights and democracy).

persecution from Iranian authorities and became a U.S. citizen in 2009. After her father's death, she founded the Siamak Pourzand Foundation, a non-profit promoting human rights in Iran.

3. **Defendants the Islamic Republic of Iran, Iran's Supreme Leader Ali Husseini Khamenei, the IRGC, and its Instrumentalities**

Defendant the Islamic Republic of Iran is a foreign state, currently designated by the U.S. Department of State as a state sponsor of terrorism. Iran is a theocratic republic with an elected head of government and a head of state—the Ayatollah or Supreme Leader—appointed for life by a council of theologians. The Supreme Leader controls all three branches of the government, the country's major policies, and the country's military forces. Defendant Ali Husseini Khamenei has been the Supreme Leader of Iran since 1989.

Defendant the Iranian Revolutionary Guard Corps ("IRGC") is a military organization under the control of the Supreme Leader. The IRGC was established in 1979 in the wake of the Islamic Revolution to act as the country's "ideological custodian".[3] In addition, the Judiciary branch of the Iranian government detains, prosecutes, interrogates, and tortures domestic targets by order of the IRGC security apparatus. The U.S. Department of Treasury has designated the IRGC as a sponsor and supporter of terrorism and human rights violations.[4] The IRGC's domestic intelligence apparatus and Iran's Judiciary branch, which are instrumentalities of the Iranian government as defined under 28 U.S.C. § 1605A, were responsible for the hostage taking, torture, and extrajudicial killing of Mr. Pourzand. All such acts were conducted by an agent of the Islamic Republic of Iran.

## II. PERSONAL JURISDICTION OVER IRAN AND SERVICE OF PROCESS

---

[3] CFR.org Editors, *Iran's Revolutionary Guards*, COUNCIL ON FOREIGN RELATIONS (May 6, 2019), https://www.cfr.org/backgrounder/irans-revolutionary-guards.

[4] U.S. Dep't of Treasury, *Sanctions Programs and Country Information*, www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.

Courts of the United States have personal jurisdiction over a foreign state when that state has been served in accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 196, 199 (D.C. Cir. 2005); *see also* Fed. R. Civ. P. 4(j)(1) (requiring that foreign states be served in accordance with 28 U.S.C. § 1608).

In this case, service of process on Iran was obtained pursuant to 28 U.S.C. § 1608(a)(4) by diplomatic note forwarded by the U.S. Department of State to the Foreign Interests Section of the Embassy of Switzerland. Specifically, the U.S. Department of State coordinated with the Swiss government to effect service of the lawsuit papers on Defendants. Because the United States does not maintain diplomatic relations with the government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. The documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1145-IE, dated August 16, 2020, and delivered on August 19, 2020. (ECF No.'s 16). *See* Service of Process, Ex. 60. As a result of the above-described service of process, this Court has personal jurisdiction over Defendants. On August 26, 2021, the Clerk of Court entered a default against Defendants. (ECF. No 19). *See* Entry of Default, Ex. 59.

### III. EVIDENTIARY STANDARD

In order for Plaintiffs to prove Defendants committed acts of hostage taking, torture, and extrajudicial killing pursuant to 28 U.S.C. § 1605A(a)(1), the statute requires that a claimant "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 784-85 (D.C. Cir. 2017) (describing claimants' burden as a "rather modest burden of production"). In meeting this standard, Plaintiffs are not limited to evidence that would be admissible at trial. In *Owens*, this Court stated:

"The district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism. For example we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial . . . Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Owens*, supra, at 785-86.

The Court is also obligated to adjust evidentiary requirements to the particular circumstances of each case. In *Kim v. Democratic People's Republic of Korea*, the Court described the reasoning behind the loosened evidentiary standard under the FSIA's terrorism exception: "[…] Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir 2014); *Owens*, supra, at 787-88 (requiring firsthand evidence under the FSIA would "'effectively immunize' the regime from responsibility for its crimes"). For this reason, courts have loosened the evidentiary standard for FSIA cases where firsthand accounts may be difficult or impossible to obtain, as "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Owens*, supra, at 787, quoted in *Warmbier v. Democratic People's Republic of Korea*, 365 F.Supp 3d 30, 43 (D.D.C. 2017).

Accordingly, "[w]ith a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Owens*, supra, at 787; *see also Kim*, supra, at 1049 ("[W]here a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim."). Further, "[i]n these circumstances, requiring that the [plaintiff] prove exactly what happened to the [victim] and when would defeat the Act's very purpose" of

"punish[ing] foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Kim*, supra, at 1048.

The case before the Court is similar to the *Warmbier* case. This action involves the abduction and forced confessions by a regime notorious for torture and its resistance to outside inquiry. Thus, the evidentiary standard described in *Warmbier*, *Kim* and *Owen*s is applicable.

Here, Plaintiffs meet the evidentiary standard of proof for hostage taking, torture, and extrajudicial killing. Testimonial accounts and other available evidence corroborate Iran's harsh mistreatment of Mr. Pourzand and the resulting impact. In a report from 2011, the year of Mr. Pourzand's death, the U.S. Department of State states he suffered torture and was held in "solitary confinement for months." *See* 2011 U.S. State Department Report, Ex. 44b, p. 23. Numerous government and human rights reports document that Iran's actions against Mr. Pourzand are typical practices of the Iranian government against political dissidents, which this Circuit has further determined. *See, e.g.,* 2021 Special Rapporteur Report, Ex. 48; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 149 (D.C. Cir. 2017); *Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40 (D.D.C. 2007); and *Azadeh v. Islamic Republic of Iran*, Civil Action No. 1:16-cv-1467 (KBJ) (D.D.C. 2018). Furthermore, declarations from Professors Ali Arab and Payam Akhavan detail political prisoners' torture in Iranian prisons, typical of prisoners like Mr. Pourzand held in Evin Prison and secret detention centers. *See e.g.* Payam Akhavan Declaration, Ex. 12, p. 10-21; Ex. 13, p. 11-24.

## IV. SUBJECT MATTER JURISDICTION

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign states. 28 U.S.C. §§ 1330, 1602-1611. Section 1604 of Title 28 provides that foreign states are "immune from the jurisdiction of the courts of the United States except as provided in section 1605-1607 of this

chapter." The exception applicable to this case is found in 28 U.S.C. § 1605A(a)(1), which provides that foreign states are not immune from the jurisdiction of U.S. courts where a claimant seeks money damages for personal injury or death that was "caused by an act of torture, extrajudicial killing, [or] ... hostage taking" and the injury or death is attributable to the foreign state's employees or agents or the foreign state's material support of such acts.

In addition, federal courts shall hear a claim under 28 U.S.C. § 1605A if the following three subject matter jurisdictional criteria are met:

i.      The foreign state was designated as a state sponsor of terrorism at the time the act occurred and remains so designated when a claim is filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(I).;

ii.     The claimant or victim was, at the time of the foreign state's act, a national of the United States. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) and (III).; and

iii.    In cases in which the act occurred in the foreign state, the claimant has "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  28 U.S.C. 1605A(a)(2)(A)(iii).

Each of these jurisdictional prerequisites has been met in this case.

## A. Hostage Taking, Torture, and Extrajudicial Killing of Mr. Siamak Pourzand Pursuant To 28 U.S.C. § 1605A(a)(1)

Plaintiffs were injured by Iran's hostage taking, torture, and extrajudicial killing of Mr. Pourzand, as defined under 28 U.S.C. § 1605A(a)(1). Iranian agents of the IRGC, Ministry of Intelligence, and/or Judiciary were the direct cause of injuries to Mr. Pourzand and Plaintiffs.

### 1. **Mr. Siamak Pourzand Was A Victim of Hostage Taking by Iran Under 28 U.S.C. § 1605(A)(a)(1)**

Defendants abducted Mr. Pourzand on November 24, 2001, and continuously detained him in both prison and home confinement until his death in 2011. Defendants continued to detain Mr. Pourzand during this time to compel the European Union to act in political negotiations and dissidents to refrain from acting out against Iran, both as implicit conditions for his release.

The FSIA derives its definition of hostage taking from Article 1 of the International Convention Against the Taking of Hostages. *See* 28 U.S.C. § 1605(A)(a)(1) and (A)(h)(2). The Convention defines hostage taking as "seiz[ing] or detain[ing] and threaten[ing] to kill, injure, or to continue to detain another person… in order to compel a third party… to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage."[5] Hostage taking thus has two elements: (1) the seizure or detention, and (2) the purpose of achieving "the sort of third-party compulsion described in the [C]onvention." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 235 (D.C. Cir. 2003).

The first element of hostage taking is satisfied as Defendants seized and detained Mr. Pourzand on November 24, 2001 and continued detaining Mr. Pourzand until his death in 2011. On the night of his seizure, Mr. Pourzand was escorting guests out of his sister's apartment when he was arrested and taken away by armed men without a warrant or charges declared against him. *See* Ex. 9, ¶16-8. While the following section will discuss his detention conditions, there are particular accounts that confirm his detention. For example, while Mr. Pourzand's whereabouts were initially unknown, his sister received an anonymous call on December 7, 2001, and was instructed to bring clothes to him at the *Amaken* office, which is a government office responsible

---

[5] International Convention against the taking of hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205.

for investigating crimes concerning morality. While she was not allowed to see him upon arrival, she was later entitled to a few brief visits. *See Id.*, ¶18. Mr. Pourzand was then placed in different Iranian detention facilities until he was transferred to a hospital in 2004 for life-threatening health conditions. He was subsequently transferred to home confinement, where he remained in detention under Iranian control and custody until his death. *See* Ex. 12, p. 8-9.

Defendants' actions also satisfy the second element of hostage taking. Prior caselaw under the FSIA affirms that there must be a "quid pro quo" arrangement whereby the hostage would have been released "upon performance or non-performance of any action by that third party." *Price v. Socialist People's Libyan Arab Jamarihiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002). To satisfy the purpose element, "[t]he plaintiff must 'point to [a] nexus between what happened to [the hostages] in [the foreign state] and any concrete concession that [the foreign state] *may* have hoped to extract from the outside world." *Simpson v. Socialist People's Libyan Arab Jamahiriya II,* 470 F.3d 356, 360 (D.C. Cir. 2006) ["*Simpson II*"]. However, the hostage-taker need not communicate their purpose to the outside world. *Id.* Here, the purpose element is satisfied by how the Iranian authorities continued to hold Mr. Pourzand in detention in Iran to compel (1) the European Union to act in political negotiations, and (2) Plaintiff Kar and other political dissidents to refrain from acting out against Iran, both as implicit conditions for his release.

First, the purpose element can be satisfied by using a hostage as political leverage, as this Court found in *Frost* that "[p]olitical leverage in the context of a country's relationship with the United States is a sufficiently coercive purpose to establish hostage-taking." *See Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 46 (D.D.C. 2019); *see also Warmbier*, supra, at 50-1. Similarly, Iran used Mr. Pourzand's detention as political leverage to influence negotiations with the European Union. In 1997, the E.U. agreed to renew its relationship with Iran on the condition of continued critical dialogue on Iran's approach to human rights. In 2002, the E.U. reiterated its

condemnation of the human rights situation in Iran and that it would not sponsor U.N resolutions on Iran until progress was made.[6] In August 2002, the E.U. raised Mr. Pourzand's case with the Iranian government with concern, and Mr. Pourzand was placed on the U.K.'s priority list of the top 10 journalists at risk worldwide. In November 2002, one week prior to Iran's scheduled visit with E.U. delegates in Iran, Mr. Pourzand was temporarily released from prison. Iranian authorities permitted E.U. envoys to visit Mr. Pourzand at his sister's home to persuade the E.U. that they were treating him well. Soon after this visit, Iran returned him to physical custody in Evin Prison. *See* May 2004 Amnesty Int'l Appeal, Ex. 29(e); Letter from UK Gov't, Ex. 36; Ex. 37, p. 34-5. These events indicate that Defendants used Mr. Pourzand as political leverage to influence negotiations with the E.U., implicitly conditioning his release on the E.U.'s diplomatic decisions.

Second, the purpose element is also satisfied by how the Iranian authorities continued to detain Mr. Pourzand after his written and televised forced confessions to compel Plaintiff Kar and other dissidents from acting out against the government. Human rights organizations have documented Iran's widespread use of coercion and torture to extract forced confessions. These confessions often occur through an entirely scripted process and are broadcast by the Islamic Republic of Iran Broadcasting ("IRIB"), a network directly controlled by the Defendant Supreme Leader Khamenei. These broadcasts aim to silence opposition voices, justify the suppression of dissidents, and apply psychological pressure on victims and their supporters no matter how far away. *See* 2020 FIDH Report, Ex. 46, p. 27-40, 48-52. Mr. Pourzand's confessions were used by Defendant the IRGC to open more than forty cases against individuals whom he mentioned in his written and televised confessions. To name a few, Iran interrogated "Mr. Omid Rohani, Mr.

---

[6] *See* European Parliament, Resolution on the human rights dialogue with Iran (Oct. 24, 2002), https://www.europarl.europa.eu/sides/getDoc.do?reference=P5-TA-2002-0522&type=TA&language=EN&redirect.

Shamsol Vaeizin, Ahamd Zeidabadi, Saeid Leylaz, Shahla Lahiji, Leili Farhadpour, Hooshang Golmakani, Bahram Beyzaei, and Parvin Ardalan." Ex 9. ¶37. These interrogations were so brutal that, for example, Mr. Mohammad Ali Safari, a popular attorney and journalist summoned for interrogation, suffered a heart attack immediately after his release. Mr. Safari never recovered, and he died in a hospital in February 2002. Consequently, "some [e]scaped Iran, and some faced sever[e] treatments and convictions based on the false confessions of Siamak." *Id*.

On July 24, 2002, just two weeks after Plaintiff Kar was recognized for her activism with the National Endowment for Democracy's 2002 Democracy Award in the U.S., Mr. Pourzand's forced confession—in which he falsely accused Plaintiff Kar of crimes against Iran—was televised to discredit and silence Plaintiff Kar. *See* Ex. 9, ¶33-5. However, throughout the remainder of Mr. Pourzand's nearly 10-year detention, Plaintiff Kar led a relentless campaign to seek answers and justice in his case. These efforts led to widespread international media coverage and, in February 2002, the U.N. Working Group on Arbitrary Detention wrote to the Iranian government and requested clarification on Mr. Pourzand's situation. In response, Plaintiff Kar received a voicemail message from her husband: "Please, please with no one, no one…not you or anyone…from the family interview with anyone…You do not know, I do not know…so do not talk with anyone." This message indicates that "the Iranian government pressured [Mr. Pourzand] to try to stop [Plaintiff Kar's] advocacy campaign", to intimidate Plaintiff Kar into halting her advocacy efforts. *See* Ex. 9, ¶25-8. The causal relationship between Plaintiff Kar's advocacy campaign against Defendants and Defendants' continued seizure of Mr. Pourzand is further evident in appeals from international organizations. For example, in May 2004, Amnesty International expressed its fears that Plaintiff Kar's advocacy work "exacerbated the treatment of [Mr. Pourzand]." *See* Ex. 29(e). According to human rights experts like Professor Ali Arab, "given [Plaintiff] Kar's activities as a

lawyer and human rights activist, it is clear that Siamak Pourzand was targeted and harassed at least partially due to the regime's issues with [her]." *See* Ex. 13, p. 29.

In conclusion, Mr. Pourzand was a victim of hostage taking by Iran. Defendants abducted him on November 24, 2001, and continuously detained him in both prison and home confinement until his death in 2011. Defendants continued to detain Mr. Pourzand during this time to compel the European Union to act in political negotiations and Plaintiff Kar and other dissidents to refrain from acting out against Iran, both as implicit conditions for his release.

## 2. Siamak Pourzand Was A Victim of Torture by Iran Under 28 U.S.C. § 1605(A)(a)(1)

Defendants tortured Mr. Pourzand for nearly 10 years while he was detained in their custody from November 24, 2001, until his death on April 29, 2011. Their torture of Mr. Pourzand is well-documented and confirmed by countless international human rights institutions and experts and by Iranian news reports. *See* Ex. 14, ¶7.

The FSIA imports the definition of torture found in the Torture Victim Protection Act ("TVPA"). 28 USC 1605A(h)(7). That definition states in pertinent part:

> (1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind . . . 28 U.S.C. § 1350.

Caselaw under the FSIA has recognized acts with both physical and psychological effects as torture. *See, e.g., Frost*, supra, at 94-5. In a February 2020 report, the U.N. Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment ("Special Rapporteur") noted that "[t]he mandate of the Special Rapporteur has long recognized 'psychological' or

'mental' torture as an analytical concept distinct from physical torture", and offers the following definition:

> "[P]sychological torture" should be interpreted to include all methods, techniques and circumstances which are intended or designed to purposefully inflict severe mental pain or suffering without using the conduit or effect of severe physical pain or suffering. […] "physical torture" should be interpreted to include all methods, techniques and environments intended or designed to purposefully inflict severe physical pain or suffering, regardless of the parallel infliction of mental pain or suffering." 2020 Special Rapporteur Report, Ex. 45, para. 19.

The Special Rapporteur identified the following classifications of psychological torture:

- Security (inducing fear, phobia and anxiety);
- Self-determination (domination and subjugation);
- Dignity and identity (humiliation, breach of privacy and sexual integrity);
- Environmental orientation (sensory manipulation);
- Social and emotional rapport (isolation, exclusion, betrayal);
- Communal trust (institutional arbitrariness and persecution); and
- Torturous environments (accumulation of stressors). *See* Ex. 45, ¶85-6.

Furthermore, methods of psychological torture can often overlap with forms of physical torture:

> "A distinctive feature of torture in Iran is the level of psychological torture. […] While we distinguish between physical, sexual and psychological/environmental torture, it is important to note that these labels are, to an extent, artificial. This is because forms of physical torture often have a strong psychological component, for example sexual assault, while psychological or environmental torture may have physical components." 2017 Freedom From Torture report, Ex. 55, p. 9, 37.

Defendants' conduct against Mr. Pourzand satisfies all elements of torture as defined under the TVPA and as recognized by the Special Rapporteur and this Court.

    i. **Mr. Pourzand Was Under Custody Or Physical Control Of Iran From The Date Of His Arrest Until His Time Of Death.** Custody or physical control refers to acts of arrest and detention in prisons or comparable facilities, but also extends to the deprivation of liberty or coercion by "serious and immediate threats." Ex. 45*,* ¶40. The Special Rapporteur defines the standard under the Convention against Torture as facts giving rise to the de facto "powerlessness" of the torture victim. *Id.,* ¶30, 39-40.

The Special Rapporteur asserts that "powerlessness" is a prerequisite of torture and refers to when a victim is "'at least under the factual power or control of the person inflicting the pain or suffering', and where the perpetrator uses this unequal and powerful situation to achieve a certain effect, such as the extraction of information, intimidation, or punishment". The Special Rapporteur notes that "powerlessness" can arise through either physical or non-physical custody. *Id.,* ¶39; 2010 Special Rapporteur Report, Ex. 51, ¶60; 2008 U.N. Secretary-General Note, Ex. 50, ¶50.

In the case of Mr. Pourzand, since the time of his arrest until his death, Iran exercised its power and control over his life, both when he was under the physical custody of Iran in different detention facilities and during his home confinement. Mr. Pourzand was arrested on November 29, 2001, and sentenced to 11 years imprisonment in May 2002. He was incarcerated in secret detention facilities and in Evin Prison, where he was under the exclusive custody and physical control of the Iranian government, specifically the IRGC. *See* Ex. 12, p. 6-7. This control continued between 2004, when Mr. Pourzand was transferred from a detention facility to a hospital and then to home confinement, and 2011, when he died in home confinement.

Mr. Pourzand's situation satisfies the "powerlessness" test; in the absence of physical custody, "powerlessness" can also result from the "complete subjugation of the victim irrespective of physical distance". *See* 2017 U.N. Secretary-General Note, Ex. 49, ¶51. This can take various forms, including victims wearing body-worn devices, the deprivation of legal capacity, "when one's exercise of decision-making […] is taken away", serious and immediate threats or coercive control, incapacitating medication, and "state-sponsored persecution depriving victims of any possibility to effectively resis[t] or escap[e] their abuse". *See* Ex. 45, ¶ 40; Ex. 50, ¶50; 2019 U.N. Secretary-General Note, Ex. 52, ¶32-4.

As Mr. Pourzand's family has testified, Iran exercised full control over Mr. Pourzand while he was in home confinement, where he was serving his sentence and unable to escape Defendants'

mistreatment. Upon entering home confinement, his interrogator told him that "you are not physically in jail, but you will face such a hard condition that you will wish to die, and you will." *See Id.*, ¶14; and Ex. 11, ¶28. Specifically, he had to report all of his interactions to his interrogator and prosecutor on an hourly basis, despite the fact that his activities and phone were under surveillance. This constant reporting to those who tortured him, in additional to at least weekly visits from his interrogators and prosecutors, was very stressful for him. *See* Ex. 18, ¶13. Further, "[h]e knew his apartment was watched and listened in on. He was well aware that the building bellman was an informant. He knew his nurse and caregiver were also agents or informants. He felt trapped, watched, naked, and very close to going back to the same brutal interrogation when they tortured him 24 hours a day." *See* Ex. 11, ¶29-30. Plaintiff Pourzand witnessed this dynamic firsthand when she visited her father in home confinement in 2005. She explained that "[h]e was scared of his neighbors as potential spies. He would lock the door multiple times and would often refuse to even step out in his building as he was sure something bad was going to happen. He was ordered to call his interrogator and inform him of even the smallest things, which he complied with out of fear. His phones were all surveilled. His house was closely monitored by undercover agents. He was weak, ill, lonely, and simply scared." *See* Ex. 10, ¶30.

Prior caselaw under the FSIA has indicated that in order to constitute "custody" or "physical control," a plaintiff must demonstrate at minimum a restriction on movement. For example, in *Valore v. Iran*, this Court found that defendants did not engage in torture in carrying out a terrorist bombing because they never had custody or physical control over the victims. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010). In *Radmanesh v. Iran*, the plaintiff alleged he was tortured by the Iranian government during a time when he was barred from leaving Iran. This Court found that the defendant did not torture the plaintiff because there was no evidence that he was in the custody or under the physical control of the defendant or its agents;

plaintiff was able to attend school and move freely within and outside of his community. *Radmanesh v. Islamic Republic of Iran*, Case No. 17-cv-1708, p. 12 (GMH) (D.D.C. 2019).

Unlike Mr. Radmanesh, Iran's purposeful control over and physical and non-physical custody of Mr. Pourzand meets the Special Rapporteur's definition of "powerlessness" and the FSIA's minimum standard of such. This control was constant between 2001 and 2004, when Mr. Pourzand was detained in secret detention facilities and Evin Prison, and between 2004 and 2011, when he was transferred from a detention facility to a hospital and then to home confinement. *See* Ex. 12, p. 6-7.

When Mr. Pourzand was transferred to non-physical custody in home confinement, he continued to serve his sentence under constant and strict surveillance, with Iranian agents placed in his building to monitor his conduct. *See* Ex. 10, ¶26, 30. He could only leave his apartment briefly because his government-appointed "lawyer," who was also his interrogator, constantly called him and showed up at his apartment unannounced. *See Id.*; and Ex. 9, ¶40-1. Further, Iran maintained open charges against him that carried the death penalty. *See* Ex. 37, p. 27. He and his family lived in fear knowing that he could be recalled to physical custody at any time.

Therefore, whether detained in prison or at home, Mr. Pourzand was under Iran's custody between his time of arrest in 2001 and his time of death in 2011.

**ii. Mr. Pourzand endured severe pain and suffering by Iranian agents while he was under Iran's custody.** Under the FSIA, an act amounts to torture only if it causes severe pain and suffering. In *Price v. Socialist People's Libyan Arab Jamarihiriya*, the D.C. Circuit analyzed the drafting history of the TVPA, which showed that the term "torture" must be used only for acts of a certain gravity, "usually reserved for extreme, deliberate, and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *See Price*, supra, at 92-3.

19

Severity of pain and suffering under the FSIA has been assessed as a matter of degree: "[T]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.*, at 93. Mr. Pourzand's severe pain and suffering caused by Iran lasted nearly 10 years, beginning at the start of his detention in solitary confinement in a bathroom; he was forced to use the toilet where he ate and slept. The space was so small that he had to sleep in a curled-up or sitting position. At times, authorities would spray him and fill the floor of his cell with scalding hot water. For extended periods, he was not allowed to wash himself. When authorities finally allowed him to shower, they gave him a chemical cream that severely burned his skin. He further endured beatings, hanging from the ceiling for hours, being held in cold "freezer" rooms for hours until fainting, and being forced to write false confessions for over 12 hours per day, causing his body to ache and swell. Further, after the Pourzand family stated in an interview that he was being deprived of nutritious food, authorities force-fed him cucumbers as his only food intake for 10 days while guards would sit on his chest. If he refused to eat them, they would beat him. *See* Ex.'s 9, ¶38; 10, ¶20, 22, 40; 11, ¶13-9; 18, ¶8-12; May 2002 Amnesty Int'l Appeal, Ex. 29(c); 37, p. 29, 30-6.

A former prisoner who was detained with Mr. Pourzand in Khatam detention facility later described to the Pourzand family how their father and husband was treated:

> "The interrogators were insulting him, abusing him, and making him stand with arms raised facing the wall for hours and hours. He was weak and could not bear this pressure. His waist was aching and he was asking for mercy, but interrogators were pressuring him further and made him stand even longer." *See* Ex. 37, p. 20.

Another prisoner formerly detained in Khatam detention facility declared that it was:

> "the worst of all the secret prisons I had been in … the interrogators crush you until you believe you are not a human being anymore and not worth a penny." *See* Ex. 37, p. 21.

Furthermore, 24 hours prior to his televised false confession in July 2002, authorities injected Mr. Pourzand with an undisclosed drug without his consent. *See* Ex. 11, ¶16. During the false confession, Plaintiffs and Mr. Pourzand's brother observed him to appear "haggard and

gaunt," "sickly and fragile," "sad, depressed and timid," with injury marks on his face and appearing to have lost approximately 70 pounds. *See* Ex.'s 9, ¶34; 10, ¶21; and 18, ¶13.

Throughout his detention, Mr. Pourzand also endured severe mental pain and suffering. In addition to daily interrogations, authorities forced him to watch the torture of other detainees as they were beaten, lashed, hung, and burned, causing him to suffer nightmares. Ex. 11, ¶13.

When he was released to home confinement, authorities threatened him,

"We will not kill you. We will even release you, but we will do something to you so that you kill yourself during the pleasant period of freedom" and "You are not physically in jail, but you will face such a hard condition that you will wish to die, and you will." *See* Ex. 9, 46; and 18, ¶19.

When Mr. Pourzand was in home confinement, his mental suffering became undeniable. During his first medical release in 2002, he was disoriented and confused about his surroundings. He refused to use the bathroom or shower, reflecting the lasting effects of being detained in a bathroom, deprived of washing himself, and severely burned in the shower. It became impossible to communicate with him, as he was often panicking, screaming, crying, and exhibiting erratic behavior, paranoid that authorities were coming to take him into physical custody. He was also unable to perform basic functions, so his daughter Lily guided him over the phone through feeding himself and using the bathroom. *See* Ex. 10, ¶23; and Ex. 11, ¶20-1.

During a 10-day trip to visit her father in January 2005 in home confinement, Plaintiff Azadeh Pourzand observed him to be weak, ill, lonely, scared, and paranoid. She observed authorities making surprise visits and calling him at all hours. She observed that his phones were surveilled and his home closely monitored by agents, making it impossible to speak openly to loved ones. He was also required to constantly report to his interrogator at Evin Prison to review his activities, communications, and surveillance tapes. *See* Ex. 10, ¶29-30.

Mr. Pourzand's brother, Mr. Lohrasseb Pourzand, further described Mr. Pourzand's suffering in home confinement:

> "[My brother] had to report all of his interactions with his interrogator and prosecutor, on an hourly basis. Despite the fact that his activities and phone were under surveillance, he had the duty to report his interactions immediately. This constant reporting was very stressful for him. He had to answer to those who tortured him about the content of his conversations with his family. His interrogators and prosecutors were visiting him at least weekly, if not 4 times per week." Ex. 18, ¶13.

Ms. Lily Pourzand, who was in constant contact with her father while in home confinement, wrote that he at times preferred to return to jail given the suffering he endured. She wrote:

> "He was never sure if he acted properly, or whether he had done something wrong. This constant state of fear and anxiety caused […] his health [to] deteriorate significantly. There were few times that […] he said that he would be better off in jail since he would no longer have the fear of the unknown. […] He knew his nurse and caregiver were also agents or informants. He felt trapped, watched, naked, and very close to going back to the same brutal interrogation when they tortured him 24 hours a day. […] He always woke up at dawn because that's the time his torture used to either restart or take a new form. He was so scared of dawn. I had to call him to talk to him, make sure he is calm, and only then would he sleep for a few hours. […] I did this every day." Ex. 11, ¶28-31.

As the result of harsh treatment by Defendants, Mr. Pourzand was diagnosed with numerous illnesses. While repeatedly denied medical treatment in detention, including after a heart attack in May 2002, he was admitted to the hospital on five occasions between 2004 and 2007. Doctors determined he was in a state of "physical disability," suffering from heart, vascular, and urinary diseases, severe weight loss, and spinal arthritis. *See* Doctor's Note, Ex. 19; Ex. 29(c). A U.S.-based doctor reviewed his medical records and concluded that without surgery and rehab, his condition would "progress to a wheelchair-dependent status in the very near future" and result in organ failure. *See* Medical Note, Ex. 23. After being admitted to the hospital in April 2004 following a heart attack in Evin Prison, he underwent spinal surgery, as without it he could have been paralyzed for life. Doctors also found him to be in "very poor mental condition," diagnosing

him with major depressive disease and prescribing him three medications for his psychological condition. *See* Ex.'s 9, ¶39; 19; and 20.

In June 2005, then-researcher on Iran for Amnesty International Drewery Dyke visited Mr. Pourzand in the hospital. He observed him "wrapped from head to toe in gauze" to manage "his multitude of ailments." He looked "extremely weak, not only because of his advanced age […] but because he was suffering from a long list of severe medical complications rising from his mistreatment by [the Government of Iran], and the absence of adequate medical attention and care." *See* Drewery Dyke Declaration, Ex. 14, ¶8; Amnesty International Article, Ex. 38.

In October 2009, he was admitted to a mental hospital due to a nervous breakdown. Hospital records described: "The patient is a 79-year-old man with 6 months of feeling absurd especially with depressed mood, loss of energy, anhedonia, anxiety, insomnia, isolation and lack of social activity, sometimes staring at a point and in some cases urinary and fecal incontinence." *See* Ex. 20. Furthermore, beginning in January 2010, Mr. Pourzand received treatment for breathing problems, kidney disorders, and the deterioration of his overall health and motor skills. In September 2010, doctors recommended he have 24-hour nursing care. *See* Hospital Certification, Ex. 21. His severe physical and mental pain and suffering by Iran lasted from the start of his detention until his death, and each day his pain and suffering increased.

**iii. <u>Defendants intentionally inflicted severe pain and suffering on Mr. Pourzand to punish him for both his and a third person's acts, intimidate him and third persons, and extract confessions from him and third persons.</u>** The definition of torture under the TVPA, adopted by the FSIA, requires that the perpetrator intentionally inflicts severe pain and suffering for "such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason

based on discrimination of any kind". [7] To satisfy this requirement, "suffering alone is insufficient"; instead, "the defendant must have targeted the victim". *Kim,* supra, at 1050; quoted in *Radmanesh*, supra, at 17.

Iranian authorities intentionally inflicted severe pain and suffering on Mr. Pourzand to (1) punish him for his and Plaintiff Kar's acts; (2) intimidate him, the Pourzand family, and other dissidents to deter them from challenging the Iranian regime; and (3) extract confessions from Mr. Pourzand and other dissidents. Many of the authorities' acts against Mr. Pourzand were intentionally inflicted to achieve multiple of these ends simultaneously.

The initial circumstances of Mr. Pourzand's detention suggest that his torture was intended to punish him for his wife's acts. Plaintiff Kar was arrested in April 2000 for "spreading propaganda" against Defendants. A few months after she was released to receive medical treatment in the U.S. due to international pressure, Iranian authorities arrested Mr. Pourzand in an attempt to, in part, censure her abroad. As a result of his arrest, Plaintiff Kar was forced to remain in the U.S. in exile. She wrote to then-President Mohammad Khatami requesting a guarantee of safe return to visit her husband, but he replied by discouraging her visit. *See* Ex. 9, ¶¶24-5.; 37, p. 24.

Additionally, authorities' ruthless acts against Mr. Pourzand were intended to extract confessions from him. Authorities would force Mr. Pourzand into cold "freezer" rooms and refuse to release him until he confessed to his alleged crimes, at times until he fainted. *See* Ex.'s 11, ¶17; and 18, ¶9. Further, 24 hours prior to his televised forced confession in July 2002, authorities injected him with an undisclosed drug without his consent. *See* Ex. 11, ¶16. During the confession itself, he was observed to be "sickly" and "fragile," and was seen asking an individual out of range, "Did I say the rights things?" and "What should I say?". *See* Ex.'s 9, ¶34; 10, ¶21; 18, ¶13; and

---

[7] *See* Torture Victim Protection Act of 1991, 28 U.S.C. § 1350(3)(b)(1) (1991).

37, p. 29-30. There are innumerable reports and personal accounts of detainees in IRGC-controlled prisons injected or threatened to be injected with unidentified liquids by authorities without detainees' consent and in connection with forced confessions. In 2018, eight activists in Iran were, similarly to Mr. Pourzand, accused of "espionage" and "spreading corruption on earth," and endured solitary confinement and torture in Evin Prison. One of these activists, Niloufar Bayani, has recounted how IRGC agents threatened to inject her with "ampoules" and forced her to write false confessions. *See* CHRI Article, Ex. 54. While the drug with which Mr. Pourzand was injected is unknown, it can reasonably be inferred that it was intended to force him into compliance.

His televised confession was subsequently used by authorities to extract confessions from other dissidents. On multiple occasions, including after his initial disappearance in November 2001 and after his televised confession in July 2002 in which he falsely accused named individuals of crimes against Iran, authorities interrogated these dissidents about their work and beliefs, and subsequently arrested and imprisoned many of them. Defendant Supreme Leader Khamenei stated that Mr. Pourzand's televised confession "confirmed the warnings we have been receiving for many years about the cultural invasion and the efforts of the enemy's agents to promote cultural transformation inside our country." *See* Ex. 18, ¶23; and 37, p. 15-6, 28, 31.

These acts were also carried out to spread propaganda to intimidate, discredit, and deter the Pourzand family and other dissidents from calling for reform in Iran. In the televised confession, Mr. Pourzand falsely stated that Plaintiff Kar and other dissidents were guilty of crimes against Iran. These statements caused a new case in Iran to open against Plaintiff Kar, which increased the risks of associating with her and limited her professional opportunities. *See* Ex.'s 9, ¶35; 18, ¶13-5; and 40. She even received warnings from the U.S. Federal Bureau of Investigation that she was a potential target due to her speaking out against Iran. *See* Ex. 9, ¶59. These threats have intimidated the Pourzand family, causing them to fear for their safety. Furthermore, Iran

continues to broadcast the forced confession, which acts as an intimidating reminder to Plaintiffs of the control that Iran has over them. *See* Ali Hamedani Declaration, Ex. 16, ¶13.

Following his forced confession, the authorities continued to punish Mr. Pourzand and intimidate his family. As discussed in the previous section, the Pourzand family stated in an interview that Mr. Pourzand was being deprived of nutritious food in detention. Authorities responded by force-feeding him bags of cucumbers as his only food intake for 10 days while guards sat on his chest. If he refused to eat the cucumbers, they beat him. *See* Ex. 10, ¶22; and 11, ¶13-14. Here, authorities caused Mr. Pourzand severe suffering to punish him for his family speaking publicly about his detention conditions and intimidate them into not doing so again.

With increasing international attention brought on his case by Plaintiff Kar, Defendants did not want Mr. Pourzand to die in prison. Upon transferring him to home confinement, authorities threatened, "We will not kill you. We will even release you, but we will do something to you so that you kill yourself during the pleasant period of freedom." *See* Ex. 9, ¶46. While in home confinement, authorities continued to cause Mr. Pourzand severe psychological suffering by keeping him under constant surveillance and in constant isolation to intimidate and punish him. His suffering was so severe that he begged authorities to return him to a prison cell. To Mr. Pourzand, staying in a cell would have been less torturous and punishing than living in constant fear of being returned to an interrogation room or executed at any moment. *See* Ex. 11, ¶23, 27.

After nearly 10 years of this treatment, Defendants' hope of "do[ing] something to you so that you kill yourself" became ever clear through one final form of punishment—Mr. Pourzand falling to his death off his balcony while under Defendants' control in home confinement. *See* Ex. 9, ¶42, 59. While Defendants maintain that he died by suicide, this is just one of numerous instances identified by the U.S. Department of State as suspicious "suicides" of political prisoners in Iran, all of which were denied credible investigation. *See* Ex. 44, p. 11, 39. Irrespective of the

surrounding facts, Mr. Pourzand's death was caused by Defendants' relentless and intentional infliction of severe pain and suffering on him for nearly 10 years with the purpose of punishing, intimidating, and forcing confession from him, the Pourzand family, and other dissidents.

      **iv. <u>As Defendants have not appeared to answer for their conduct, the Court may infer that Mr. Pourzand was tortured from the "compelling, admissible evidence" that the Iranian regime routinely tortures its prisoners.</u>** The D.C. Circuit has recognized that where a hostage has not been released from captivity, there is often little direct evidence about how the hostage was treated by their abductors. In such cases, the Circuit has held that when the hostage-takers have not appeared to answer for their conduct, the Court may infer that a victim was tortured from "compelling, admissible evidence" that the regime at issue routinely tortures its prisoners. *Kim*, supra, at 1048; *see also Owens*, supra, at 787–89.

      In addition to human rights organizations consistently documenting Iran's torture of its prisoners, the U.S. continues to confirm Iran's systematic abuses. *See* 2019 U.S. State Department Report, Ex. 44, p. 2; Ex.'s 47a-e. In a 2019 report, the U.S. State Department described "significant human rights issues" in Iran including "systematic use of arbitrary detention and imprisonment; harsh and life-threatening prison conditions; hundreds of political prisoners"; and "torture by government agents". The State Department elaborated on credible reports of torture, describing how "security forces and prison personnel tortured and abused detainees and prisoners throughout the year". The State Department specifically mentioned Evin Prison as an IRGC-controlled facility that employs "cruel and prolonged torture of political opponents". *See* Ex. 44, p. 6-7.

      Given the length of Mr. Pourzand's detention as a political opponent of the Iranian regime, it is likely that he was tortured in detention due to Iran's systematic practices alone, even without the substantial indirect evidence presented throughout this motion.

### 3. **Mr. Siamak Pourzand is a Victim of Extrajudicial Killing by Iran Under 28 U.S.C. § 1605(A)(a)(1)**

Defendants extrajudicially killed Mr. Pourzand on April 29, 2011, while he was under their exclusive control and in their non-physical custody in home confinement. As experts on human rights and Iran have detailed, Mr. Pourzand's extrajudicial killing was a result of a "problematic chain of events and processes" and part of a larger systematic practice by the Iranian government. *See* Ex. 13, p. 20; and Ex. 38.

The FSIA imports the TVPA's definition of "extrajudicial killing", defined as,

(a) (…) a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation. 28 U.S.C. § 1350(2)(a).

This definition contains three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, supra, at 770. As to the second element, "[a] 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Owens v. Republic of Sudan II*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citing Webster's Third New [*102] International Dictionary [**34] 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), aff'd, 864 F.3d 751, 431 U.S. App. D.C. 163.

According to the D.C. Circuit, jurisdictional causation in an extrajudicial killing is evaluated under a proximate cause standard, which requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," such that the act was a "substantial factor," and the victim's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's act." *Owens*, supra, at 794, quoted in *Warmbier*, supra, at 52. In the event that the proximate cause standard is not satisfied, the Court

28

may follow the negligence standard, as recognized under customary international law as the requisite causation for extrajudicial killing.

      **i. <u>Defendants deliberately killed Mr. Pourzand without previous authorization of a judgment pronounced by a regularly constituted court pursuant to the Proximate Cause Standard.</u>** The circumstances of Mr. Pourzand's death satisfy all three elements of extrajudicial killing. As to the first element, there is no dispute as to the fact that Mr. Pourzand was killed. While it is disputed as to who directly killed him—Defendants or Mr. Pourzand himself—Defendants' acts intentionally causing Mr. Pourzand severe pain and suffering for the entirety of his detention were at minimum a substantial factor in, and proximate cause of, his death.

      It is further evident through the second element of extrajudicial killing—Defendants' deliberated plan to kill Mr. Pourzand—that Defendants' acts constituted a substantial factor in killing Mr. Pourzand. First, it is likely that Mr. Pourzand did not commit suicide but was deliberately, directly killed by Iranian authorities, who were constantly surveilling him at the time of his death. During the night of his death, he spoke with his daughter Lily over the phone because he could not sleep due to "terrible anxiety"; they agreed that he would try to sleep and call her back in two hours. When she did not receive a call back from him, she repeatedly called his phone for hours. The caretaker of Mr. Pourzand's apartment building eventually answered Mr. Pourzand's phone and informed Lily that "he threw himself off the balcony." *See* Ex. 11, ¶32-4.

      However, to this day the details of his death remain unclear, as Defendants have tenaciously prevented an independent investigation. Plaintiffs consented to Iran's official report that Mr. Pourzand jumped from his balcony for two reasons: first, Plaintiffs wanted to prevent the government from hurting more innocent people during sham interrogations; and, second, so they could bury Mr. Pourzand as the government would not allow his burial until the conclusion of any investigation. *See* Ex. 11, ¶35. Plaintiff Kar wrote: "I know Siamak's death was not a simple

suicide, as the Iranian authorities have reported. It is clear that the powerful regime apparatus and institutions directly or indirectly murdered Siamak." *See* Ex. 9, ¶46. If an independent investigation had been conducted, it is likely that investigators would have discovered that Defendatns deliberately and directly killed Mr. Pourzand. As Dr. Ali Arab declared: "Mr. Pourzand's death is directly related and caused by acts of government of Iran." *See* Ex. 13, p. 30.

Second, even if Mr. Pourzand committed suicide and Defendants did not directly cause his death, they remain responsible for deliberately planning and creating the circumstances that drove him to his death. As Plaintiff Kar testified, the Iranian authorities threatened to drive Mr. Pourzand to his death on numerous occasions. Years before his death when he was transferred to home confinement, authorities told Mr. Pourzand, "We will not kill you. We will even release you, but we will do something to you so that you kill yourself during the pleasant period of freedom" and, as his brother testified, "You are not physically in jail, but you will face such a hard condition that you will wish to die, and you will." *See* Ex. 9, ¶46; and Ex. 18, ¶19.

Additionally, authorities tortured Mr. Pourzand and repeatedly delayed and denied him medical treatment. As Amnesty International researcher Mr. Drewery Dyke wrote in reference to Iran, "Unfair justice systems… purposefully wear [prisoners] down, and by delaying and denying medical care, they hasten their death." See Ex. 38. Amnesty International holds Iran accountable for Mr. Pourzand's death, stating "[i]n truth, he was killed by the repeated human rights violations he endured, which lead to chronic ill health, at the hands of a judicial system in which human dignity had been lost." *Id*; *See* Reporters Without Borders Statement, Ex. 39. Defendants' conduct demonstrates a "carefully considered" intent to cause death, even if by indirect action.

Furthermore, Defendants orchestrated the prevention of an independent investigation of Mr. Pourzand's death. In turn for the government renouncing custody of his body, authorities required the Pourzand family to agree to not formally investigate his death and to publicly agree

that he died by suicide. *See* Ex. 11, ¶35. This agreement indicates that Defendants wanted to conceal how they deliberately killed Mr. Pourzand, either by direct action or through the substantial and foreseeable contribution of nearly 10 years of physical and psychological torture.

As to the third and last element of extrajudicial killing, Defendants deliberately killed Mr. Pourzand without authorization of a previous judgment pronounced by a regularly constituted court since Defendants publicly claim he died by suicide and deny involvement in his death.

     **ii.**  **Additionally, pursuant to the negligence standard, Defendants are liable for the extrajudicial killing of Mr. Pourzand.** Iran is also accountable for the extrajudicial killing of Mr. Pourzand under customary international law, which follows the negligence standard.[8] While the legislative history of the TVPA does not make clear the standard of scienter that extrajudicial killing requires, it does indicate that the drafters intended to comply with customary international law.[9] Here, Iran demonstrated negligence, at a minimum, in its treatment of Mr. Pourzand until his death by torturing him, denying him necessary and adequate medical treatment, and arbitrarily denying him freedom. This relentless, intentional treatment caused him to suffer urgent and complex physical and mental health complications and, at the very least, negligently led to his death. Regardless of which standard applies, it is reasonably foreseeable that Mr. Pourzand's death would have resulted as a natural consequence of Defendants' intentional, knowing treatment.

In conclusion, as argued above, Defendants are liable for the extrajudicial killing of Mr. Siamak Pourzand as defined under 28 U.S.C. § 1605A(a).

### B. Other Prerequisites for Subject Matter Jurisdiction

---

[8] *See* Lindsay Bailey, *Can There Be an Accidental Extrajudicial Killing? Understanding standards of intent in the Torture Victim Protection Act*, HARVARD INT'L L. J. (2018), https://harvardilj.org/2018/08/can-there-be-an-accidental-extrajudicial-killing-understanding-standards-of-intent-in-the-torture-victim-protection-act/.
[9] *Id.*

The other requirements for this Court's subject matter jurisdiction under 28 U.S.C. § 1605A are fully satisfied in this action. Iran is a state sponsor of terrorism, Plaintiffs are nationals of the United States, and Iran was properly provided an opportunity to arbitrate.

### 1. Iran is a State Sponsor of Terrorism
### (28 U.S.C. § 1605A(a)(2)(A)(i)(I))

Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by Secretary of State George Schultz, in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App 2405(j). *See* 49 Fed. Reg. 2836-02; 22 U.S.C. §2656f(a). Iran has been continuously listed by the U.S. Department of State as a state sponsor of terrorism since 1984 until present day.[10] From 2007, when Plaintiff Kar became a U.S. citizen, to 2011, the year of Mr. Pourzand's death, the Secretary of State's Country Reports on Terrorism stated, "Iran remained the most active state sponsor of terrorism." *See* U.S. DOS Country Reports on Terrorism, Ex. 47a, p. 172; 47b, p. 182; 47c, p. 192; 47d, p. 149; and 47e, p. 6, 92, 172-73.

### 2. Claimants are Nationals of the United States
### (28 U.S.C. § 1605A(a)(2)(A)(ii)(I))

Plaintiffs are both nationals of the United States. Plaintiff Kar became a U.S. citizen on June 20, 2007. *See* Mehrangiz Kar Naturalization Certificate, Ex. 2. Plaintiff Pourzand became a U.S. citizen on January 8, 2009. *See* Azadeh Pourzand Naturalization Certificate, Ex. 6. Mr. Pourzand was a hostage of and tortured by Defendants beginning November 2001 until his extrajudicial killing by Defendants in April 2011. Plaintiffs were U.S. citizens for the latter portion of Mr. Pourzand's hostage taking and torture, and during his extrajudicial killing. Plaintiffs have standing to file suit under the FSIA.

### 3. Claimants Afforded Iran an Opportunity to Arbitrate
### (28 U.S.C. § 1605A(a)(2)(A)(iii))

---

[10] *See* U.S. DOS, State Sponsors of Terrorism, https://www.state.gov/j/ct/list/c14151.htm.

Plaintiffs offered Iran a reasonable opportunity to arbitrate the claims in this action. The offer to arbitrate required by the FSIA "need not precede the filing of the complaint." *See Simpson*, supra, at 232; *Hekmati,* supra, at 158. An Offer to Arbitrate was included with the Complaint and served on Iran on September 28, 2020. *See* Electronic U.S.P.S. Certified Receipt, Ex. 58(a-b).

On September 25, 2020, counsel for Plaintiffs sent an Offer to Arbitrate via certified mail to Iran's ambassador to the United Nations and to the Interests Section of the Islamic Republic of Iran in Washington, DC.  The Offer to Arbitrate stated:

> Pursuant to 28 U.S.C. § 1605A(a)(2)(iii), Plaintiffs offer to submit the claims in this action to arbitration in accordance with accepted international rules of arbitration. Defendants may accept this offer to arbitrate within fifty (50) days of receipt of this offer by:
>
> 1.  Notifying the undersigned counsel, in writing, of Defendants' acceptance; or
> 2.  Filing a written acceptance with the Clerk of this Court.
>
> Defendants' failure to comply with the acceptance procedures set forth above shall constitute a rejection by the Islamic Republic of Iran of a reasonable opportunity to arbitrate these claims. *See* Offer to Arbitrate, Ex. 57.

These offers fully satisfy the offer to arbitrate requirement under the FSIA. *See Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003) (finding that service of an offer to arbitrate on the Pakistani embassy's Iranian interest section in Washington, D.C. is sufficient).

## V. LIABILITY AND SCOPE OF DAMAGES

The FSIA authorizes a private right of action against a foreign state that is a state sponsor of terrorism. It provides that the foreign state shall be liable to a U.S. national or the legal representative of such person for personal injury or death caused by the foreign state's hostage taking, torture, or extrajudicial killing. It extends liability to the foreign state if these acts are committed by an official, employee or agent of the foreign state. The statute allows the recovery of money damages for a variety of claims, including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. §1605A(a)(2)(A)(i) and (c).

Plaintiffs have brought claims to recover for solatium, economic, and punitive damages. Factors to be considered in determining an appropriate award of damages include the cause of action, each claimant's individual circumstances, and the history of awards in the D.C. Circuit for similarly situated claimants. *See, e.g., Kim v. Democratic Republic of Korea*, 87 F. Supp. 3d 286, 290-91 (D.C. Cir. 2015) ["*Kim II*"].

## A.  Liability for Solatium Damages

### 1. <u>Legal Standard</u>

Under the FSIA, claims for solatium damages "are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). They provide compensation "for mental anguish, bereavement and grief that those with a close personal relationship" to a decedent or person held and tortured endured. They are also appropriate to compensate those closely-related persons for "harm caused by the loss of the decedent's society and comfort." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015), quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011).

In awarding solatium damages, "[c]ourts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages". *Kim II*, supra, at 290; *see also Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000) (awarding solatium damages to both the wife and daughter of a victim who was tortured and held for six and a half years); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998) (awarding solatium damages to the wife of a torture victim held for 44 months). Plaintiffs meet all of the statutory requirements for such compensation.

### 2. <u>Quantum of Solatium Damages</u>

#### a. Solatium Damages for Plaintiff Kar

Plaintiff Kar was married to Mr. Pourzand for 42 years until his death and deprived of his love and companionship for the last 10 years of his life. During those years, she suffered knowing her husband was enduring extreme physical and psychological torture by the Iranian government, with his torturers as his nearly exclusive contact. Once he was in home confinement and she was able to speak with him, they could not speak freely as their phone calls were surveilled. After these calls, she "would feel such intense pain" and "cry alone." When she finally saw him in his televised forced confession, she observed him fearful and powerless, making her feel the same. She was constantly "terrified for his safety." For almost a decade, she worked tirelessly for his release and to remain strong for her family, which caused her to feel severe isolation. *See* Ex. 9, ¶17, 23, 29, 34, 41, 45; Plaintiff Kar's Letters, Ex.'s 26-7. Referring to the pain and loneliness she endured during this time, Plaintiff Kar writes: "To whom could I confide in about the ten long, painful years of hope for a happy ending that never came, of the spark of hope in my heart which would drive me to knock on any door so that once more, just one more time, somewhere on this planet, the four of us could sit together and drink tea, like old times in Tehran? This was the only hope I was nesting in my heart […]". *See* Ex. 9, ¶54. It is difficult to imagine more painful circumstances.

As a result of witnessing him suffer from afar, her physical and mental health declined. Upon learning of his death, her fear for him turned into immense grief—"heartbroken" and "completely lost in the pain". She worked with grief counsellors and psychologists, but they "have not been able to soothe [he]r heavy pain" of not being able to "mourn his death or say goodbye." She continues to endure anxiety, depression, paranoia, and trauma. *See Id.*, ¶43-4, 50**.**

To this day, Plaintiff Kar still fears for her safety as Iranian authorities continue to intimidate her and her family. The IRIB continues to broadcast Mr. Pourzand's televised forced confession, which includes false accusations against Plaintiff Kar. These broadcasts constantly remind her of the power that Defendants had over her husband and that she remains a target of the

regime. Even recently, the U.S. Federal Bureau of Investigation warned Plaintiff Kar that she was a target of foreign cyber threats by the Iranian regime. *See* Ex. 9, ¶59; and 16, ¶13.

In determining appropriate damages awards in FSIA cases, courts have regularly considered claims in similar cases and then adjusted them to fit the particular circumstances of the case before them. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017). There are two cases that most closely approximate the circumstances of this case—*Cicippio* and *Anderson*—in which Iran kidnapped, tortured, and then released U.S citizens. In *Cicippio*, the two prisoners' wives were each awarded $10 million for their husbands' imprisonment of just over five years. *Cicippio*, supra, at 70. In *Anderson*, the prisoner's wife was awarded $10 million for her husband's imprisonment of just over six and a half years. *Anderson*, supra, at 114. Given Plaintiff Kar's suffering during her husband's nearly 10-year imprisonment from which he was never released but extrajudicially killed, $20 million would be an appropriate award for her.

### b. Solatium Damages for Plaintiff Pourzand

Since the age of 17, Plaintiff Pourzand has been forced to live without her father—her "best friend" with whom she shared an "inseparable bond." When her father was in Defendants' custody, she did everything she could to sustain their relationship. She would write him letters in prison and speak with him on the phone for hours in home confinement, no matter the time difference between them. However, not only were these calls surveilled, but she worried constantly for her father as she could hear the fear and sadness in his voice. *See* Ex. 9, ¶14; and 10, ¶7, 16, 24-8, 30. Like her mother, she worked tirelessly for her father's release, writing letters to public officials and participating in media interviews. *See* Plaintiff Pourzand's Letters, Ex.'s 24-5, 27.

Plaintiff Pourzand was able to see her father only once during these 10 years, on a trip she describes as "terrifying," as she "risked [her] freedom, life, and residency in the US". During her 10-day visit to her father in home confinement, she observed him paranoid, "weak, ill, lonely, and

simply scared." While there, she was repeatedly taken and interrogated by Iranian authorities who asked her to spy on her mother, Plaintiff Kar, and her sister and convince them to return to Iran. They threatened that she would never see her father again if she spoke negatively about her trip and instructed her to tell the media that her family lied about her father's condition and that she saw for herself that he was doing well. *See* Ex. 10, ¶29-30. In part as a result of these threats, Plaintiffs could not return to Iran to have a proper funeral or mourning for her father, which added to her pain and suffering. *See* Ex. 9, ¶43.

The trauma she endured for nearly 10 years has manifested in many ways, including through anxiety and depression. *See* Ex. 10, ¶4, 19, 31, 38-45, 47, 54, 56; Gleb Zukhov Declaration, Ex. 15, ¶9-13. She also suffers from disorders directly related to the facts of her father's torture and death. For example, she has suffered from self-harm; for years after her father's death, she would take extremely hot showers, imaging the torture her father endured by water and chemicals burning his skin. She also developed a form of Lichen Planus autoimmune disease, which appears in people who have undergone a major shock, such as being subjected to torture or severe anxiety. *See* Ex. 10, ¶40-2.

One of her closest friends, Ali Hamedani, stated that his time in an Iranian prison was nothing compared to what Plaintiff Pourzand has endured. Ex. 16, ¶9-11. Mr. Hamedani describes,

> *When I speak to [Azadeh], I still see a little girl with immeasurable anxiety. She lives with the pain of losing her father. I can see that little Azadeh still looking for her father. [...] she suffers from depression, anxiety, and frequent emotional outbursts. Layers of abuse and destruction forced on Azadeh by the Iranian Regime is enormous. [...] That pain is not fading away; it's only getting worse. Every single time we speak, there is a mention of her father. He is there - his spirit and memory is still living with the family all the time. Id. ¶14.*

Courts in the D.C. Circuit have presumed "that those in direct lineal relationships with victims of terror suffer compensable mental anguish . . ." *Kim II,* supra at 290. In *Kim*, the child of North Korea's victim was awarded $15 million in damages for suffering he endured during his

father's detention for an unknown period of time. *Id.,* 290-91. In *Anderson*, the child of Iran's victim was awarded $6.7 million for her suffering during her father's 6.5-year detention. *Anderson*, supra, at 114. Given Plaintiff Pourzand's similar suffering during her father's nearly 10-year detention, $15 million would be an appropriate award for her.

## B. Liability for Economic Damages

### 1. Legal Standard

The FSIA further provides for economic damages. The purpose of its terrorism exception is to "give American citizens an important economic and financial weapon," and "compensat[e] the victims of terrorism [and] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Kim*, supra, at 1048; *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 352 (D.C. Cir. 2018).

In this case, the economic damages are comprised of Plaintiff Kar's seized property, Plaintiff Kar's financial expenses due to her husband's detention, and Plaintiffs' lost financial opportunities. Courts have routinely awarded similar economic damages under section 1605A(c) and uniformly agree that "lost earnings—past and future—are compensable economic damages" under the FSIA. *See Rezaian v. Islamic Republic of Iran*, 422 F.Supp. 3d 164, 181 (D.D.C. 2019); *Azadeh*, supra, at 51; *Hekmati*, supra, at 164; and *Warmbier*, supra, at 55. They also agree that the ability to recover lost earnings damages extends to family members of FSIA victims. *See Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 101 (D.D.C. 2003), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).

Courts have readily considered the broad financial impact of a plaintiff's inability to return to a promising and lucrative career overseas, such as that of Plaintiff Kar's, when determining such awards. *See Rezaian,* supra, at 181-83; *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 26 (D.D.C. 2001). In cases like *Daliberti* and *Regier*, courts were mindful that plaintiffs who directly

or indirectly endured torture and hostage taking could no longer "continue the same type of work" in the U.S. and replicate the earning capacity they possessed in their home country. The courts factor this disparity in earning capacity into their economic damages awards. *See Daliberti*, supra, at 24-6; *Regier*, supra, at 100 (calculating lost earnings as the difference between the "real income" the plaintiff enjoyed in their home country and then later in the U.S.). Courts have further found that neglecting professional obligations in order to advocate for a loved one's release, as Plaintiff Pourzand did, merit an award for economic damages. *Rezaian*, supra, at 182-83.

### 2. Quantum of Damages

#### a. Economic Damages for Plaintiff Kar

Economic damages for Plaintiff Kar are comprised of her seized property, her financial expenses due to her husband's imprisonment, and her lost financial opportunities caused by Defendants' actions. First, upon initially taking Mr. Pourzand hostage, the Iranian government confiscated his and Plaintiff Kar's personal property from inside their apartment without a warrant, including Plaintiff Kar's computer hard drive and 400 Swedish Krona. *See* Ex. 9, ¶16.

Second, during Mr. Pourzand's nearly 10-year detention, Plaintiff Kar incurred excessive financial expenses as the provider for her suffering husband and Plaintiff Pourzand. Plaintiff Kar paid for Mr. Pourzand's medical expenses and, while in home confinement, his rent and living expenses as he no longer had any means to support himself. *See* Ex. 9, ¶58.

Last, these expenses are compounded by Plaintiff Kar's lost financial opportunities due to living in the U.S. Defendants' actions forced her to leave Iran, which brought her established 22-year career as a lawyer to a halt and significantly diminished her earning capacity. While she was able to obtain jobs in the U.S., they were temporary roles that lacked the stability she had earned in Iran. *Id*. Her salaries in the U.S were more valuable in Tehran than her new hometown of the District of Columbia due to Tehran's lower cost of living.

Furthermore, in 2009, Plaintiff Kar's Iranian bar license expired. *See* Mehrangiz Kar Bar License, Ex. 3. The Iranian government prohibited her from renewing it without returning to Iran in-person, which, as discussed in this motion, would have been a risk to her life. Upon losing her license, she lost access to her retirement fund, to which she contributed for 22 years. Without her license, she has also lost professional opportunities as a legal consultant. *See* Ex. 9, ¶56.

These losses entitle Plaintiff Kar to an economic damages award, consistent with this Court's precedent and the tort principles this Court relies upon when awarding damages under the FSIA. As caselaw supports, Plaintiff Kar requests that Defendants be held liable for the wealth she loses each year due to the District of Columbia's higher cost of living than Tehran's. *See Rezaian*, *supra*, at 182; *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 79 (D.D.C. 2011) (incorporating "appropriate cost of living adjustments" into an economic damages award). General tort principles further support this request: "compensatory damages [should] place [a plaintiff] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed." 6 Restatement (Second) of Torts § 903, cmt. a. Plaintiffs have no objection to the appointment of a Special Master to help analyze and calculate each sub-category of economic damages, which Plaintiffs are prepared to substantiate and defend.

Plaintiff Kar's has earned on average $45,000 per year for the past 14 years, since gaining her U.S. citizenship in 2007. Given her experience and expertise during this time, she was qualified for human rights law-related employment in the District of Columbia, to earn approximately $140,000 per year.[11] This disparity in her earnings was caused by Defendants' misconduct. She would therefore be entitled to $1,330,000 in economic loss.

---

[11] *See* Comparably, Human Rights Attorney Salary in Washington, DC, https://www.comparably.com/salaries/salaries-for-human-rights-attorney-in-washington-dc.; ZipRecruiter, International Human Rights Lawyer Salary in Washington, D.C.,

Plaintiff Kar is also entitled to prejudgment interest on this economic loss. "'[P]rejudgment interest is an element of complete compensation' and therefore plaintiffs would only be eligible for prejudgment interest on their non-solatium compensatory damages." *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 43 (D.D.C. 2012). The appropriate rate of interest is the prime rate. *Oldham v. Korean Air Lines Co., Inc.,* 127 F.3d 43, 54 (D.C. Cir. 1997). Using the numbers for her lost income and the prime rate, this calculation is simple mathematics. As reflected in the attached chart, prejudgment interest for the $1,330,000 in lost income would amount to $43,225, for a total economic damages award of $1,373,225. *See* J.P. Morgan prime rate chart, Ex. 56.

### b. Economic Damages for Plaintiff Pourzand

Plaintiff Pourzand is also entitled to economic damages for lost financial opportunities directly caused by Defendants' treatment of her father. Plaintiff Pourzand struggled for years in school while her father was detained. Her MBA program coincided with her father's death, which dramatically disrupted her studies and career track. She recalls that during this time, "[e]verything that was said in those classes suddenly felt irrelevant". She channeled her immense grief into a commitment to promoting human rights in her father's name. *See* Ex. 10, ¶56.

While preserving her father's legacy, she has faced many financial struggles. As a young professional, she learned the "Pourzand" name carried a political connotation, which prevented her from obtaining positions at international organizations for which she was qualified. Instead, she had to create her own work by founding the Siamak Pourzand Foundation. Additionally, she has had to support her mother through her own financial struggles. *See* Ex. 10, ¶56.

Since gaining full-time employment in 2014, she has earned an average of $60,000 per year as a human rights activist. If not for Defendants' actions against her father, and the resulting

---

https://www.ziprecruiter.com/Salaries/International-Human-Rights-Lawyer-Salary-in-Washington,DC.

suffering they caused her, she would not have left her business consulting career path to advocate for her father's release and to further preserve his legacy. Instead, she would have been qualified to earn an average of $90,000 per year as a business consultant during this time.[12] Therefore, Plaintiff Pourzand would be entitled to $210,000 for her economic losses. Additionally, as reflected in the attached chart, prejudgment interest for this lost income would amount to $6,825, for a total economic damages award of $216,825. *See* J.P. Morgan prime rate chart, Ex. 54.

### C. Liability for Punitive Damages

#### 1. <u>Legal Standard</u>

The FSIA also provides for punitive damages, which are intended to "punish and deter the actions for which they are awarded." 28 U.S.C. § 1605(A)(c); *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-6 (D.D.C. 2012) [*"Oveissi II"*]. While courts have routinely awarded punitive damages in FSIA cases, they have used different methods in determining an appropriate amount. *See, e.g., Warmbier*, supra, at 59-60; *Braun*, supra, at 86-7. To determine both an appropriate method and amount, the Court must consider: "(1) the character of the defendant's act (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause (3) the need for deterrence, and (4) the wealth of the defendants." *Warmbier*, supra, at 59. In this case, each of these factors weighs in favor of a substantial punitive damages award.[13]

#### 2. <u>Quantum of Punitive Damages</u>

---

[12] *See* Glassdoor, Business Consultant Salaries in Washington, D.C., https://www.glassdoor.com/Salaries/washington-dc-business-consultant-salary-SRCH_IL.0,13_IM911_KO14,33.htm.; Indeed, How much does a business consultant make in Washington, DC?, https://www.indeed.com/career/business-consultant/salaries/Washington--DC?from=top_sb.

[13] *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012) (In FSIA cases, "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards.").

First, the character of Defendants' actions in this case is abhorrent and has been characterized by this Court as "the height of barbarism," *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 52 (D.D.C. 2001), and "the quintessential embodiment of outrageousness," *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001). Experts on human rights and Iran affirm that Iran's actions in this case were human rights violations and carried out as part of decades-long "widespread and systematic" government practices. *See* Ex. 12, p. 9-10, 14-22; and Ex. 13, p. 15-6, 20. Actions characterized by such systematic "barbarism" must be punished.

Second, the nature and extent of harm Defendants caused to Plaintiffs is severe, prolonged, and immeasurable. For the entirety of Mr. Pourzand's detention and torture, and in response to his extrajudicial killing, Plaintiffs suffered and continue to suffer trauma. Their trauma has been exacerbated by threats by Iran both before and after Mr. Pourzand's extrajudicial killing. *See* Ex. 9, ¶44, 59; 10, ¶4, 19, 30, 44, 49-50, 54. Plaintiffs must live with this pain for the rest of their lives.

Third, there is an urgent and ongoing need to deter Defendants' behavior. Their behavior is part of a long pattern of arbitrary conduct that violates international law. As experts have testified, Iran's behavior will continue unless it is sufficiently punished and deterred. Indeed, several Iranian dissidents continue to be arbitrarily detained and tortured in Iranian custody today. *See* Ex.'s 12 and 13. As Mr. Drewery Dyke chronicles in his statement,

> *[…] I believe that […] the treatment faced by Siamak Pourzand was structural and, in effect, systematic in nature. […] institutions under the formal or effective control of the Office of the Supreme Leader, at least at that time, treated categories of people in the same way as they did Siamak Pourzand, and therefore responsibility for the implementation of such policies falls on […] the Supreme Leader himself.* Ex. 14, ¶9.2.

Furthermore, as a condition for releasing Mr. Pourzand's body from Defendants' custody, Defendants forced Plaintiffs to agree publicly that he died by suicide and that they would not allow an investigation into the cause of his death. *See* Ex. 10, ¶32. Iran should be punished for this behavior and deterred from repeating it.

Last, Iran is a vast nation with substantial resources and spends enormous amounts of its wealth, estimated between $300 million and $1 billion, on terrorism-related activities. *Oveissi II*, supra, at 56 (awarding $300 million after taking judicial notice that Iran then provided between $300 and $500 million in material support for terrorism). Only a substantial punitive damages award has the capability of punishing and deterring Defendants' behavior.

In a recent case with similarly egregious acts of torture, hostage taking, and extrajudicial killing, this Court awarded punitive damages of $150,000,000 each to the mother, father and estate of the victim for a total punitive damages award of $450,000,000. *Warmbier,* supra, at 59-60. The Court chose that amount because the acts committed by North Korea were "awful and worthy of the gravest condemnation" and because "North Korea is 'keenly aware' of the 'political environment' in the United States, including judgments issued by United States courts." *Id.* at 60. Here, the same is true of Iran's actions and political awareness. In another similar case, *Rezaian*, Iran arrested, held in solitary confinement, and tortured the victim into falsely confessing to crimes. The Court rendered an additional award of punitive damages because Iran used Rezaian as leverage for political bargaining with the U.S. Each claimant in *Rezaian* received punitive damages of $150,000,000. *Rezaian*, supra, at 184.; *Moradi*, supra, at 60-4. Therefore, a punitive damages award of $150,000,000 to Plaintiff Kar and $150,000,000 to Plaintiff Pourzand for a total punitive damages award of $300,000,000 would be appropriate.

## VI. CONCLUSION

Plaintiffs respectfully request that this Court enter a default final judgment against Defendants. This Court has personal jurisdiction over Defendants and subject matter jurisdiction over the claims in this action. Defendants, despite being provided notice and an opportunity to be heard, have declined to defend this action. Their silence says volumes about their culpability.

Mr. Pourzand was abducted, held hostage, and tortured for nearly a decade until he was killed outside of the law. Defendants' actions similarly held the Pourzand family hostage to the hope that they might see their husband and father again and subjected them to a different form of psychological torture. The facts before the Court demonstrate that Plaintiffs are fully entitled to recover sizeable monetary damages for Defendants' outrageous actions.

Accordingly, Plaintiffs request that this Court award the following monetary damages:

A.   To Plaintiff Mehrangiz Kar:

    1.   Non-Economic Damages:      $20,000,000

    2.   Economic Damages:      $1,373,225

    3.   Punitive Damages:      $150,000,000

B.   To Plaintiff Azadeh Pourzand:

    1.   Non-Economic Damages:      $15,000,000

    2.   Economic Damages:      $216,825

    3.   Punitive Damages:      $150,000,000

C.   Total Damages Award:      $336,590,050

Respectfully submitted,

_____
Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave. Ste. 440
Bethesda, MD 20814
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
Fax: 301.363.4538

*Counsel for Plaintiff*