IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mehrangiz Kar and Azadeh Pourzand, <br><br> *Plaintiffs*, <br><br> vs. <br><br> The Islamic Republic of Iran et al.; <br><br> *Defendants*. | Case Number:  1:19-cv-02070-JDB |

### DECLARATION OF MEHRANGIZ KAR

COMES NOW Mehrangiz Kar and states as follows:

1. I was born in Ahvaz, Iran on October 10th, 1944.
2. I am a naturalized citizen of the United States and of the state of Maryland since June 22, 2006.
3. I married Siamak Pourzand on November 19, 1969 in Tehran, Iran. We had two daughters, Lily and Azadeh Pourzand. Azadeh is also a citizen of the United States.
4. In 2011, after years of both physical and mental abuse, my husband Siamak was killed while he was under house arrest in Tehran, Iran. The wrongful death of Siamak Pourzand is a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the IRGC and its agents, whose acts were funded and directed by the Islamic Republic of Iran. I have suffered and been injured directly by the acts of the Iranian government against my husband, Mr. Siamak Pourzand.
5. I am a human rights attorney; I have dedicated my life to protecting and enhancing human rights, including women's rights, in Iran.
6. Before I left Iran, I was among a handful of attorneys promoting and defending human rights in Iran's revolutionary courts. I also wrote many articles and books to promote human rights values in Iran.

7. I received the following awards for my human rights work over the years:
    a. 2004 Recipient of the annual Human Rights First (formerly Lawyers Committee for Human Rights) Human Rights Award
    b. 2002 Ludovic-Trarieux International Human Rights Prize (France) awarded to lawyers working to promote women's rights, awarded jointly by the Human Rights Institute of the Bar of Bordeaux and the European Lawyers Union
    c. 2002 Democracy Award of the National Endowment for Democracy (U.S.) for advancing human rights and democracy, presented by First Lady Laura Bush
    d. 2002 Hellman/Hammett Grant from Human Rights Watch (International) for a writer who is a target of political persecution
    e. 2001 Vasyl Stus Freedom-to-Write Award of PEN New England (Massachusetts, U.S.) for a writer who has struggled in the face of oppression and brutality to make her voice heard
    f. 2000 Oxfam Novib/PEN Award of PEN Clube (Netherlands), for writers who have lost their liberty for political and ideological reasons
    g. 2000 Donna Dell'anno Award of the Conseil De Lavallee Consiglio Regionale Della Valle D'aosta (Italy), for persevering in the fight for freedom and the defense of women's rights
    h. 2000 Latifeh Yarshater Award of the Society for Iranian Studies (U.S.), for the best book on Iranian women
8. Since immigrating to the United States, I have been recognized as a Scholar at Risk through an international network of universities and colleges working to promote academic freedom and to defend the human rights of scholars worldwide.
9. I worked as a Radcliffe Fellow at Harvard University's John F. Kennedy School of Government at their Carr Center for Human Rights Policy as well as at Brown University's Pembroke Center for Teaching and Research on Women.
10. After 1997's presidential election, I was able to openly promote women's rights and publish more freely about the necessary reform for Iranian society. The Iranian regime was not happy about my activities and was looking for an excuse to arrest me. In April of 2000, I and sixteen other Iranian journalists, activists, and intellectuals attended a conference held at the Heinrich Boll Institute in Berlin entitled "Iran after the Elections." There, I made

remarks about the urgent need for constitutional reform in Iran. When I returned to Iran, I was arrested at the airport and taken to Evin Prison. The government levelled several charges against me, such as "acting against national security" and "spreading propaganda against the regime of the Islamic Republic." On January 13, 2001, I was sentenced to four years of imprisonment.

11. After two months in prison, I was diagnosed with breast cancer. My cancer was used by international organizations and European countries to pressure Iranian authorities to allow me to receive medical leave to travel to the Netherlands for medical treatment. The international pressure was successful, I was granted leave from Iran, however my jail time and new charges were pending against me for different cases. After I left Iran, I decided to come to the United States for treatment.

12. While I was under treatment in the United States, I thought I was living in a safe environment, and I hoped I could sort out my legal issues in Iran while outside the country. However, I soon realized that was not the case.

13. My husband, Siamak Pourzand, was a journalist and film critic. In the 1960's, Siamak worked in the United States as a foreign correspondent for an Iranian publication. As part of his work, he had interviewed US president Richard Nixon, as well as other American politicians and cultural figures, which created suspicion in the eyes of the new Iranian regime. For over ten years, he wrote articles for reformist newspapers and foreign-based Farsi language media outlets. As a result, he had created a reputation as an outspoken critic of the Islamic Republic's policy towards culture and the arts.

14. At home, Siamak was very involved with raising our two daughters. He and Azadeh shared an inseparable bond, especially when I was busy working or traveling for work.

15. Siamak's most recent job was working at the Tehran Cultural Center (*Majmuiyyih Farrhang-i Hunariyih Tehran*) and the chief editor of the Iranian Civil Engineering Association, Payam-i Abadgaran. The Cultural Center served as a forum where intellectuals and social activists could exchange views on political and social issues.

16. Our family's lives were completely derailed and destroyed on November 24, 2001, when I was living in the U.S. with Azadeh. At approximately 9:00 p.m. that night, Siamak was approached by two men in civilian clothing while escorting guests out of his sister's apartment. When Siamak returned, he rang the apartment intercom and requested his house

keys, car keys, shoes, and medicine. His sister thought it was strange, but she assumed Siamak was with friends or acquaintances. She brought him the items he requested downstairs along with his address book, which she thought he may need. Siamak then left with the men. The men arrested Siamak without a warrant or reason for the arrest at night, all of which are illegal in Iran. The men then raided our apartment and seized my computer hard drive and 400 Swedish Kronor without a warrant.

17. For at least two weeks after his disappearance, we had no news of Siamak. No government authorities assumed responsibility for his arrest. I was terrified for his safety. I was going crazy wondering what could have happened. I did not know if he was alive or dead.

18. On December 7, 2001, Siamak's sister finally received an anonymous phone call instructing her to bring him a change of clothes to the *Amaken* office, a branch of the government responsible for investigating moral crimes. She did as she was instructed. When she arrived at the office, the officials refused to allow her to see her brother. When she asked about Siamak's whereabouts and his charges, the officials told her it was none of her business.

19. I had a particularly clear idea of the treatment Siamak was enduring because of my personal experience on both sides of the Iranian justice system – as public defender for years and later as a prisoner myself, detained for months in the infamous Evin Prison. I knew he was facing unspeakable pain and torture.

20. Many questions remained. For months, our family did not know where and under what conditions Siamak was being held, who was holding him, and what the charges were against him. He was still not being allowed legal representation. We believe Siamak was being held in secret detention centers at various times and have substantial evidence, though Iranian authorities have never confirmed this.

21. While he was imprisoned, Siamak was only allowed a couple brief visits with his sister. During her second visit, Siamak explained to her that the Iranian authorities wanted to "blackmail," "humiliate," and "disgrace" the family. By the third time Siamak's sister was allowed to visit her brother, his appearance had changed. He had lost weight and he looked frail and frightened. He informed his sister that it was his last visit without any further explanation.

22. Iranian authorities used Siamak as an example to try to accuse others. About a month after Siamak's forced confession, Iranian authorities began summoning writers, journalists, filmmakers, and other intellectuals to appear, where they interrogated them about their work as well as their political and religious beliefs. In many cases, Iranian authorities used Siamak's alleged confessions to try to force others to admit to anti-revolutionary activities.

23. My family and I set on a campaign to inform the international human rights community of Siamak's plight, which began right after his arrest and has continued well after his death.

24. When he was first arrested, we immediately wrote to and pleaded with top Iranian politicians and government officials for information about Siamak's whereabouts, the charges against him, and for his release. I appealed to the Iranian representative at the United Nations multiple times, who told me there was nothing they could do for me. My daughter Azadeh wrote multiple letters to President Khatami asking to follow up on Siamak's case. I also sent a letter to the President asking him to guarantee my safety so that I could return to Iran to visit Siamak. My other daughter Lily sent similar appeals to the president of Iran, the Iranian Minister of Foreign Affairs, and Iran's Permanent Representative to the United Nations.

25. No government officials answered our appeals, but we continued our campaign for answers and justice in Siamak's case. My daughters and I conducted numerous interviews with Persian language and foreign media outlets.

26. Siamak's disappearance received widespread coverage in both Iranian and international media. Human rights organizations around the world condemned his arrest.

27. On February 14, 2002, the United Nations Working Group on Arbitrary Detention formally wrote to the Iranian government requesting clarification regarding Siamak's situation.

28. As a result of the UN's call for answers, the Iranian government pressured Siamak to try to stop our advocacy campaign. I received a message on my home answering machine from Siamak: "Please, please with no one, no one… not you or anyone… from the family interview with anyone… You do not know, I do not know… so do not talk with anyone."

29. However, I refused to be intimidated. I had to keep fighting for answers and for Siamak's release. It was the only thing I could do to keep going. So we continued our media campaign. It was our only means to try to ensure Siamak's freedom from the hell that he was suffering.

30. In 2006, Khatami who was attending a party at Harvard University, to which I was also invited, and recognized me. He loudly told me that "it was not us who arrested Pourzand". I replied politely, "Does it make any difference? A family has been brought to the brink of obliteration. It is not important whether you [and your team] arrested him or others". In the same party, he promised that within three months, he would contact me on the phone and facilitate my safe return to Iran so that once again the wandering members of the family could join together. That promise was never kept.

31. Siamak faced a sham trial, where he was forced to confess to crimes he did not commit. On March 6, 2002, Siamak's court proceedings began. My husband was denied the representation of his choice. I asked former judge and Iranian human rights activist Shirin Ebadi to represent my husband and she accepted the case, but the Judge in Siamak's case denied her the right. He received her very rudely and alleged that she was an abettor and a suspect in the case. She told me that she had never been more scared in her whole life. Moreover, formal charges were never presented against Siamak. The trial was a flagrant breach of international and domestic legal standards.

32. On May 15, 2002, *Iran* newspaper reported Siamak had been sentenced to eleven years' imprisonment. However, in early June, it was reported he was also facing the death penalty for *irtidad* (apostacy).

33. On July 24, 2002, Siamak was forced to participate in a press conference that was broadcast to the entire country on Iranian state television. During that conference, he was forced to confess to crimes which he had not committed.

34. When I later saw footage of the taped confession, I could see the fear in Siamak's expressions and hear it in his voice. He was afraid that he would be tortured if he did not give the expected answers to the questions asked by his torturers. In that tape, I saw Siamak's haggard and gaunt face on the computer's monitor. I noticed he had probably lost 70 pounds. He had injury marks on his face and appeared very angry. He answered the questions of journalist-interrogators the way they had asked him to do, but with an unspeakable rage. Finally, he turned his head all of a sudden to the left and asked an individual outside range, "Did I say the right things?" It was clear he was being fed answers to a scripted interview.

35. The televised confessions were damaging to Siamak and our entire family. He was forced to say awful things about himself and me, which are not true. He made false claims that he was receiving money from the CIA and western services to topple the regime. Based on his confessions, a new case was opened against me, creating another obstacle for my return to Iran. Our reputations were shattered, and our lives were left in disarray.

36. Because of Siamak's forced written and televised confession about forty individuals were summoned to Revolutionary court. Among those called directly, I can name Mr. Omid Rohani, Mr. Shamsol Vaeizin, Ahamd Zeidabadi, Saeid Leylaz, Shahla Lahiji, Leili Farhadpour, Hooshang Golmakani, Bahram Beyzaei, and Parvin Ardalan. The sad case was Mr. Mohammad Ali Safari, a popular attorney and journalist, who was summoned for interrogation but immediately after his release, he suffered a heart attack. He did not recover and died in hospital in late February 2002. Consequently, some scaped Iran, and some faced sever treatments and convictions based on the false confessions of Siamak.

37. Over the years, Siamak suffered unspeakable torture while in detention, which culminated in severe physical and mental health problems, threatening his life. Whenever we received such news, we were all collectively feeling Siamak's pain and torture.

38. For the first few months of imprisonment, Siamak was kept in solitary confinement. During his entire imprisonment, he suffered various forms of physical torture and intimidation including beatings, freezing, burning, hanging from the ceiling, and daily interrogations. Psychologically, he suffered from constant fear, anxiety, depression, and paranoia. Due to the torture they inflicted upon him, Siamak became incontinent. He suffered multiple medical problems in prison, including multiple heart attacks, bladder problems, and spine problems.

39. Siamak was kept in the notorious Evin Prison until suffering a severe heart attack in April 2004, when he was sent to the hospital. During that stay, he told me that if he did not receive surgery on his spine, he could be paralyzed for the rest of his life.

40. After multiple surgeries, Siamak was "released" for medical treatment under a form of house arrest in 2004. Siamak was still a prisoner, serving his time during his years of medical leave. During that time, Siamak had to send his medical report to the prison on a weekly basis, so he did not have the right to leave Tehran. His private life was under constant surveillance, so Siamak lived in constant fear and paranoia.

41. During house arrest, I spoke often with Siamak. It was the only way to keep him alive during that time. However, our conversations were severely limited because we knew that we were being constantly monitored by government authorities as he faced the risk of being sent back to jail. Therefore, we could never speak freely to each other. We were only hearing each other's voices without being able to freely share the content of our hearts and minds. Sometimes after a phone call subject to so much self-censorship, I would feel such intense pain at our situation and cry alone.

42. On April 29, 2011, while he was in house arrest, we received news that Siamak had jumped out the window of his sixth-floor apartment and passed away instantly. I was in complete shock at the news. Words cannot describe the pain I felt at that moment. I was heartbroken and completely lost in the pain and grief that ensued. I felt like I too died that day with Siamak.

43. My daughters and I wanted to return to Iran to attend his funeral, but our negotiations to facilitate a safe return and stay in Iran yielded no positive results. Friends and colleagues inside Iran warned us not to return, knowing our lies would be in danger. Therefore, we never even felt we could properly mourn his death or say goodbye.

44. My daughters and I never really came in terms with the grief and the shock of Siamak's political death. The tragedy still weighs heavy on our shoulders. Even grief counselors and psychologists have not been able to soothe our heavy pain.

45. At times I was so consumed with pain, I felt I was going mad. I didn't know how to deal with the tragedy. But I had to pretend to be strong in order to set an example for my daughters.

46. I know Siamak's death was not a simple suicide, as the Iranian authorities have reported. It is clear that the powerful regime apparatus and institutions directly or indirectly murdered Siamak. Years before, while he was still detained, the authorities told him, "We will not kill you; we will even release you, but we will do something to you so that you kill yourself during the pleasant period of freedom."

47. Over the years, Siamak's detention and subsequent death have affected my life and that of my daughters in innumerable ways. After my cancer surgery in the United States in 2002, I could not return to Iran, for fear that my life would be in danger. All of us were forced into exile in a foreign country, away from the man we all loved.

48. Mostly, I could see that the move to the United States was particularly difficult on my daughter, Azadeh. While she got to speak to her father on the phone when we first moved, it was not consistent. Since the two were so close, it was particularly hard on her to be so far away from him.
49. Once Siamak was arrested, she lost all contact with her father, who was her idol. As a young girl, she needed a father figure. That pain grew almost too hard to bear when we found out Siamak was arrested, imprisoned, and tortured.
50. Siamak's years of detention and torture absolutely destroyed both of us. We both suffered from constant anxiety, worry, and fear over Siamak's condition while in prison. I worried constantly about Azadeh's safety and wellbeing. Azadeh and I suffered nightmares, which left no place for a peaceful sleep. The two of us were gripped by fear and paranoia, and I'm sure my sometimes hysteric conduct at home was affecting Azadeh as well. She was not the same. She would lock herself in the closet for hours at a time just to experience the type of isolation her father was enduring.
51. With Siamak's arrest and death, I lost my lifelong partner and companion as well as the family, life, and identity I had created in Iran. We had worked hard to build a life that was brutally taken away from us.
52. When I came to the United States, I was carrying the burden of three family members who had been broken by the Iranian security forces. When Siamak was arrested, I was struggling with an advanced cancer and I was very worried about our family's financial situation while my 71-year-old husband was languishing alone in jail on the other side of the world. I was left without my husband - sick, alone, and afraid.
53. Physically, my health is fragile, largely due to what I suffered witnessing my husband Siamak suffer over the years. I came to the United States for cancer treatment which continued after Siamak's arrest. My poor health condition only made the situation more difficult. While in treatment, I had to pretend to be strong for our family's advocacy campaign for Siamak and for my daughters, who were still young.
54. Psychologically, I have suffered from constant anxiety and depression ever since Siamak was arrested. Since I had to stay strong for my family, I felt isolated in my grief because I didn't speak to anyone about it. To whom could I confide in about the ten long, painful years of hope for a happy ending that never came, of the spark of hope in my heart which

would drive me to knock on any door so that once more, just one more time, somewhere on this planet, the four of us could sit together and drink tea, like old times in Tehran? This was the only hope I was nesting in my heart and it was what I had guaranteed my girls at times when they were overwhelmed with the absence of their father.

55. Among other things, the Iranian government's persecution of Siamak and myself has completely destroyed the career I worked hard to build. In Iran, I was a well-respected and recognized human rights lawyer, author, and journalist after having practiced for 22 years. I had been working hard to create positive changes in the Iranian legal system, but I was unable to continue that work to the full extent from abroad.

56. Moreover, my Iranian bar license expired in 2009 and Iranian authorities did not allow me to renew it unless I did so in person, but they provided no guarantees for my personal safety. As a result, lost my license to practice law, which caused more damages to my life, as a direct result I lost my right to access my retirement fund, to which I had been contributing money during my 22-year legal career in Iran. In addition, when I decided to apply for Foreign Law Consultant License in District of Columbia, I was found not qualified since I could not present the Bar examiners with my valid foreign (Iranian) bar license. This issue significantly reduced my option to earn income appropriate to my legal expertise.

57. Today, as a 77 year-old woman, I still have to work because the Iranian regime ruined my family's life and our destiny.

58. I have no stability here in the United States. There were frequent periods here in the U.S. where I had no job. While I managed to find fellowships at various universities and institutions, they were all temporary posts that did not provide the financial stability I needed to be able to support my family. Additionally, the stipends attached to fellowships did not compare to what a stable legal career would have provided in the United States. Since becoming a U.S. citizen in 2007, I have earned an average of $45,000 each year. I needed to earn money for not only myself, but for my daughter Azadeh while she was in school, and for my husband's expenses to keep him alive while imprisoned. When Siamak was under house arrest, I worked hard to send him whatever money I could for his rent and living expenses. Even before his house arrest, I sent money to his sister to pay for things he needed while in prison, such as medication or transportation for his sister to visit because

Evin Prison was far from Tehran. Meanwhile, back in Iran, the government had confiscated all of our personal property. I paid between $350 to $600 per month between Siamak's arrest and his death.

59. Even today in the United States, my life continues to be in danger. I face real and constant intimidations from the Iranian regime. The Iranian media continues to criticize me and my family. To this day, the Iranian state broadcasting channel IRIB continues to run Siamak's televised forced confessions to persecute and intimidate my family. I have received recent calls from the FBI alerting me of potential web dangers because of speaking out against Iran – proof that I am still an actual target from the government.

60. The Iranian regime ended my husband's life and has completely ruined my family's lives, as they intended to do. Iran's behavior regarding arbitrary detentions, forced confessions, torture, and extrajudicial killings continues today as a means of controlling and intimidating civil society and maintaining power. They will continue to do so and they must be stopped. I have devoted my life to fighting for human rights in Iran and I cannot stop. This case is a crucial step towards justice for not only my family, but others who have and will continue to suffer the same fate in Iran as well.

I declare and can competently testify under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of August, 2021.

_____M. KAR_____
Mehrangiz Kar