<u>EXPERT STATEMENT</u>

This expert statement has been prepared in support of the private cause of action brought by the plaintiffs, Ms. Mehrangiz Kar and her daughter Azadeh Pourzand, against the Islamic Republic of Iran and its affiliates under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage taking, extrajudicial killing, and other torts committed in connection with their treatment of Ms. Kar's late husband Mr. Siamak Pourzand. The case is currently before the United States District Court for the District of Columbia.

**1. Qualifications of Professor Payam Akhavan**

I am currently Senior Fellow at Massey College and Distinguished Visiting Professor at the Faculty of Law, University of Toronto, in Canada. I was previously Full Professor at the Faculty of Law, McGill University, in Montreal, Canada (2005-20) and Senior Fellow at Yale Law School in New Haven, Connecticut (2003-05). I received my Master of Law (LLM, 1990) and Doctor of the Science of Jurisprudence (SJD, 2001) from Harvard Law School, specializing in international law and human rights. I have also served as Legal Advisor to the Office of the Prosecutor of the International Criminal Tribunal for the former Yugoslavia at The Hague, Netherlands (1994-2000).

I am a co-founder of the Iran Human Rights Documentation Centre (IHRDC) which is based in New Haven, Connecticut, and have served on its Board of Directors since its establishment (2004-present). I have testified regarding the human rights situation in Iran on numerous occasions, including before the Sub-Committee on International Human Rights of the

Canadian House of Commons, the Standing Committee on Human Rights of the Senate of Canada, and the United States Commission on International Religious Freedom. My curriculum vitae, which includes a more complete account of my experience, is attached.

It is on the basis of this expertise in international law and human rights, especially in connection with the situation in Iran, that I have prepared this statement. My testimony is based, in part, on information from authoritative secondary sources including reports prepared by IHRDC (e.g., *Mockery of Justice: The Framing of Siamak Pourzand*)[1], as well as reports published by the United Nations Human Rights Council's Special Procedures mandate holders and non-governmental organizations including Human Rights Watch and Amnesty International. These reports cover the critical period between 1997 and 2005 which coincided with the administration of former Iranian President Mohammad Khatami, and during which Ms. Kar, her daughter Azadeh, and her late husband Siamak Pourzand were subject to the events described further below.

## 2. Treatment of Plaintiff Mehrangiz Kar and Azadeh Pourzand

Plaintiff Mehrangiz Kar, the widow of the late Siamak Pourzand, is an Iranian-born attorney and human rights activist. Her daughter, plaintiff Azadeh Pourzand, was a minor during initial arrest of Mr. Pourzand.

Based on the materials provided to me by plaintiffs and authoritative public information (including reports by the UN Special Rapporteur on the situation of human rights in the Islamic Republic of Iran), it is my understanding that Ms. Kar participated in an academic conference

---

[1] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/. This report includes interviews with, and first-person testimonies from, Mr. Pourzand's closest family members including the plaintiffs in this case (Mehrangiz Kar and Azadeh Pourzand) and Lily Pourzand.

titled "Iran After the Elections" at the Heinrich Böll Institute in Berlin, Germany on April 7-8, 2000. The organizers convened the conference to discuss the prospects of political, social, and cultural reform during President Khatami's presidency. Attendees included prominent Iranians including secular intellectuals, journalists, lawyers, religious figures, cultural figures, and banned or exiled political activists. In April 2000, upon her return to Iran, security forces arrested Ms. Kar. Shortly, thereafter, Iran's judiciary charged her with various crimes including acting against national security, spreading propaganda against the regime of the Islamic Republic, violating the Islamic dress code at the Berlin conference, denying the commands of Sharia law, and abusing sacred principles. A Revolutionary Court eventually tried and convicted Ms. Kar behind closed doors. She was sentenced to four years imprisonment and held in Tehran's notorious Evin Prison torture and abuse of political prisoners.

In May 2000, Maurice Copithorne, the Special Representative on the Commission of Human Rights on the situation of human rights in the Islamic Republic of Iran joined three other UN Special Procedures mandate holders in an urgent appeal expressing concern at the arrest of Ms. Kar and two other activists who had attended the Berlin conference.[2] In January 2001, he joined the UN Special Rapporteur on on the promotion of the right to freedom of opinion and expression in addressing an urgent letter to the Minister for Foreign Affairs concerning the verdicts issued against Ms. Kar by the revolutionary court in Tehran. In the letter, the UN mandate holders expressed their concern over the charges and urged government authorities to use all resources at its disposal to make sure the charges were reviewed and dropped upon appeal.[3] In fact, the UN Special Representative reported extensively on the trial of all those who

---

[2] UN General Assembly, *Report of the Special Representative of the Commission on Human Rights on the situation of human rights in the Islamic Republic of Iran,* 8 September 2000, A/55/363

participated in the Berlin conference participants and called on the government to "vacate all…

judgments rendered in this case."[4]

Ms. Kar spent several months in prison. Following repeated diplomatic interventions by

the European Union and the Netherlands, the authorities eventually granted her temporary

medical leave from prison to receive cancer treatment abroad. She left Iran in August 2001 and

travelled to the United States, where she ultimately settled. While in the United States, Ms. Kar

appealed her conviction and succeeded in reducing her sentence from four years to six months

imprisonment (dismissed due to time served) and the payment of fines. While she was

discharged by the Iranian court for her time already served, two of the charges against her remain

open.[5] She remains in the United States and have not returned to Iran since 2001.

### 3. Treatment of Siamak Pourzand

Siamak Pourzand is the late husband of plaintiff Mehrangiz Kar. Mr. Pourzand was an

Iranian journalist and cultural critic renowned for his contributions to liberal and reformist

newspapers. Prior to the 1979 Iranian revolution, he worked as a foreign correspondent in the

United States for the pre-revolutionary incarnation of *Kayhan* (a popular newspaper). In 2001,

prior to his arrest, he was the manager of the Tehran Arts and Cultural Center and the chief

editor of an internal bulletin for the Iranian Civil Engineering Association. Approximately two

months after his wife's release, while Ms. Kar was still on medical leave in the United States,

security forces arrested Mr. Pourzand and transferred him to an unknown detention facility.

---

[3] UN General Assembly, *Report of the Special Representative Representative of the Commission on Human Rights on the situation of human rights in the Islamic Republic of Iran,* 10 August 2001, A/56/278

[4] UN Commission on Human Rights, *Report on the situation of human rights in the Islamic Republic of Iran,* 16 January 2002, E/CN.4/2002/42

[5] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 9

Plaintiffs believe that Iranian government officials targeted Mr. Pourzand and unlawfully arrested him in an effort to undermine Ms. Kar's human rights advocacy efforts abroad.[6]

The details regarding his arrest and imprisonment are as follows: On November 24, 2001, approximately three months after Ms. Kar left Iran for treatment abroad, plainclothes security officials abducted 71-year-old Siamak Pourzand outside of his sister's home in Tehran. For close to two weeks, his family had no information regarding his exact whereabouts and no government agency assumed responsibility for his disappearance. On December 7, Mr. Pourzand's sister received a call from an anonymous source requesting that she take a change of clothes to a police station usually operated by a division of NAJA—*Edareyeh Amaken-e Omumi*[7]—charged with enforcing morality and vice crimes such as inappropriate mixing of men and women. The authorities refused to provide Mr. Pourzand's sister with information regarding her brother's whereabouts.[8]

The family was finally allowed an in-person visit with Mr. Pourzand on January 13, 2002 at the same Amaken-controlled police station. A second visit took place on February 3 and lasted about ten minutes. During this visit, Mr. Pourzand informed his sister that the authorities want to blackmail him and the family. On February 22, Mr. Pourzand's sister was allowed to visit him a third time. She reportedly had difficulty recognizing him because he had lost a lot of weight and looked frightened. During this meeting, Mr. Pourzand reportedly told his sister not to talk to the media about his arrest and said this may be their last visit. After the third visit, Mr. Pourzand and

---

[6] Second Amended Complaint (para 2)
[7] *Like the Dead in their Coffins*, Human Rights Watch (June 2004), https://www.hrw.org/reports/2004/iran0604/iran0604.pdf pg. 18
[8] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 12

his sister reportedly called Ms. Kar and the family in the United States on several occasions and begged them to stop their continued advocacy and press efforts on his behalf.[9]

During each of these three visits, plainclothes officers arrived from another location with Mr. Pourzand, monitored his conversations with his sister, and then escorted him back to the car and drove away to a seemingly different location. Each time the authorities refused to provide answers regarding the reasons for Mr. Pourzand's arrest and the location of his detention.[10] According to Human Rights Watch, the Amaken facility on Motahari Street in Tehran became a regular location for plainclothes officers believed to be affiliated with parallel intelligence units, including ones controlled by the judiciary, to summon, interrogate, and detain political activists, writers, and journalists in an effort to intimidate them.[11]

Both during and after this period, security officials detained Mr. Pourzand in a number of undisclosed and illegal detention facilities where they subjected him to long interrogations, beatings, and other forms of physical and psychological torture. IHRDC believes that the authorities interrogated and/or detained Mr. Pourzand in several secret locations outside the control of the State Prisons Organization. These included, but were not limited to Amaken, Prison 59 (which at the time was believed to have been under the control of the Intelligence Services of the IRGC and was later shut down), and Khatam al-Anbiya (which was under the control of NAJA).[12] The authorities eventually transferred Mr. Pourzand to Evin Prison after his conviction in May 2002. The parliament's Article 90 Commission, constitutionally mandated to

---

[9] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pgs. 15; 17
[10] Ibid., 14-15
[11] *Like the Dead in their Coffins*, Human Rights Watch (June 2004), https://www.hrw.org/reports/2004/iran0604/iran0604.pdf pgs. 2-3
[12] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pgs. 19-20

address private complaints against the three branches of government, launched investigations into secret prisons operated by parallel institutions in early 2001. At the behest of Ms. Kar, they also looked into Mr. Pourzand's detention and intervened on his behalf several times after his arrest and detention.[13]

After four months in pretrial detention during which the authorities deprived Mr. Pourzand of access to a lawyer, subjected him to long periods of interrogations and incommunicado detention, and refused to bring formal charges against him, the judiciary put him on trial. The trial began on March 6, 2002 before the Special Court of Mehrabad (Branch 1610), headed by Judge Saberi Zafarqandi. The authorities deprived Mr. Pourzand's family from retaining a lawyer of their choosing and instead provided him a court-appointed lawyer. Mr. Pourzand made at least three separate court appearances behind closed doors in March 2002. According to several conservative newspapers, the judiciary charged him with national security-related crimes for which he reportedly confessed and for which he asked forgiveness. The crimes reportedly included acting against national security, having a relationship with "anti-revolutionary elements" and spying, though some of the "charges remain a mystery to this day."[14]

After his trial, there were conflicting news reports about the nature of several of the remaining charges against Mr. Pourzand, including lashes for an allegedly illicit relationship and punishment for alcohol consumption. There were also reports that he had been charged with the crimes of *mohareeb* (an ill-defined law literally meaning "enmity against God") and apostasy, both of which carry the death penalty. Similar unverified reports provide conflicting accounts

---

[13] Ibid., 23-24

[14] Ibid., 23

regarding where authorities had held Mr. Pourzand since his initial arrest. The trial court eventually sentenced Mr. Pourzand to eleven years imprisonment, and an appellate court upheld that sentence in June 2002.[15] A month later, Iranian state television broadcast a staged press conference at the Mehrabad Special Court which included Mr. Pourzand, his court-appointed lawyer, Judge Saberi Zafarqandi, and several other government officials. During the press conference, he denounced his past activities, challenged some aspects of it, denied that he had been tortured, and sobbed uncontrollably at times.[16]

In April 2004, Mr. Pourzand suffered a heart attack in prison. In 2006, he was transferred to house arrest in light of his deteriorating health. Though he was serving his sentence at home, he was kept at home, Mr. Pourzand was still under continued detention and surveillance. He had to present himself weekly at prison with a bag of clothes, not knowing if he would be returned to prison every time. Mr. Pourzand's interrogator and prosecutor paying regular visits to Mr. Pourzand or phoning him. The government monitored his telephone calls. As a result, he suffered from extreme anxiety, depression, and paranoia on top of his already-existing and urgent medical conditions such as heart and spinal conditions. Mr. Pourzand was under physical torture from the date of his arrest until his date of death on April 29, 2021.

After five years of house arrest, while still under the surveillance of the Islamic Revolutionary Guard Corps (IRGC), Mr. Pourzand died due to injuries sustained after falling from his sixth-floor balcony. While the government of Iran has officially declared his cause of death to be suicide, his family was denied access to his body and no independent sources were

---

[15] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pgs. 26-27
[16] Ibid, 29-30

able to confirm the cause of death. According to plaintiffs, Iranian authorities forced them to publicly accept the government's narrative or forfeit Mr. Pourzand's right to a proper burial.[17]

Mr. Pourzand's case garnered international attention, including from human rights Special Procedures mandate holders. On December 4, 2001, UN Special Representative Copithorne appealed to Iranian authorities to provide information on his whereabouts and ensure that his "right to physical and mental integrity… was protected."[18]

The Islamic Republic committed the following human rights abuses against Siamak Pourzand: In violation of Article 19 of the International Covenant of Civil and Political Rights (ICCPR), Mr. Pourzand was denied his right to freedom of expression and prosecuted due to his convictions. In violation of Article 9 of the ICCPR, Mr. Pourzand was victim to arbitrary arrest and detention. In violation of Article 9(2), Mr. Pourzand was not informed of the reason for his arrest and the charges he faced. In violation of Articles 10(1), 10(2)(a), and 7 of the ICCPR, Mr. Pourzand was subject to ill-treatment and underwent physical and psychological torture at the hands of the authorities. In violation of Article 12 of the International Covenant on Economic, Social and Cultural Rights, Mr. Pourzand was denied medical attention by authorities and suffered from a heart attack while in detention.[19]

Siamak Pourzand's arrest, detention and sentencing were also in violation of international standards of due process as stipulated by Article 14 of the ICCPR. In violation of Article 14(3)(a), Mr. Pourzand was not clearly informed of the cause and nature of the charges against

---

[17] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pgs. 37-38

[18] UN Commission on Human Rights, *Report on the situation of human rights in the Islamic Republic of Iran,* 16 January 2002, E/CN.4/2002/42

[19] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 41

him. In violation of Article 14(2)(d), he was denied access to legal representation of his choice. In violation of Article 14(3)(e), he was not given the chance to examine the witnesses against him. Most significantly, in violation of Article 14(3)(g), he was coerced to confess his guilt while under extreme duress. [20]

### 4. Summary of Systematic Human Rights Violations in Iran

The treatment of Ms. Kar, Mr. Pourzand, and their family is consistent with a wider pattern of widespread and systematic human rights abuses characterizing the Islamic Republic of Iran since its establishment in 1979. This includes disappearances, arbitrary arrests and detentions (akin to hostage-taking), denial of due process, coerced confessions, torture and ill-treatment, long prisons sentences for lawful or human rights-related activities, and extrajudicial killings.[21]

In many ways, Ms. Kar and Mr. Pourzand became among the first victims of what human rights groups would call "parallel" security and intelligence institutions which began to flex their muscles in the early 2000s. The specific modes and mechanisms of repression used by these institutions—the use of pretextual or trumped up moral (consumption of alcohol, illicit relationships, etc.) and political crimes (e.g., national security-related); long periods of pretrial detention in secret prisons outside official control; televised or broadcast coerced confessions requiring coordination between security and intelligence units, the judiciary, and state-controlled media; and hostage-taking aimed at exerting pressure on families and loved ones abroad—would eventually become the Iranian government's *modus operandi.* Today, although some of the

---

[20] Ibid.
[21] UN Commission on Human Rights, *Report on the Fifty-Eighth Session,* 2002, E/2002/23 E/CN.4/2002/200

parallel institutions and detention facilities no longer operate, Iranian government officials continue to use the blueprint to put pressure on dissidents abroad and stifle reform at home.

## 4.1. Background

The 1997 presidential election of Mohammad Khatami signalled the beginning of what some called the reform era in Iran. According to IHRDC, "President Khatami recognized the strength of the reformist movement and sought to appeal to reformers by coming out against certain restrictions on individual freedoms under the Islamic Republic."[22] His political agenda sought to deliver on his election campaign promises to usher in a degree of social liberalization that operated within the confines of Iran's constitution and the rule of law.

Despite popular demands for political and social reform, the conservative establishment, led by Supreme Leader Ayatollah Ali Khamenei, maintained considerable authority over the country. Iran's constitution vests absolute authority in the person of the Supreme Leader under a theocratic doctrine known as *velayat-e faqih* or "Guardianship of the Jurist". The Supreme Leader is thus constitutionally mandated with the responsibility of "overseeing the general policies of the Islamic Regime of Iran, leaving the President to exercise only the day-to-day authority."[23] Part of this control stems from explicit provisions in the constitution, including Article 110, which give the Supreme Leader de jure (and de facto) control over the military (including the regular army and the Islamic Revolutionary Guard Corps), state-controlled press, and the judiciary.

Khamenei exerts his power through his expansive Office of the Supreme Leader which is tied to a tight network of top-level military, security, intelligence, media, and judicial authorities

---

[22] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 5
[23] Ibid.

"who have the authority to intervene in any state matter on behalf of the Supreme Leader."[24] Under the constitution the president is empowered to form his own government and appoint his own ministers, including key security and intelligence positions such as the Minister of Defense, the Minister of Interior (responsible for the management of the national police, also known as NAJA), and the Minister of Intelligence. In reality, however, the Office of Supreme Leader exercises great authority in vetting, and vetoing, the president's picks for sensitive security and intelligence positions. And the heads of these ministries often answer to the Supreme Leader.

President Khatami's modest agenda of political and social reform, which lasted during his eight-year term from 1997 to 2005, operated within the confines of the aforementioned legal constraints. Soon after his electoral victory, the country witnessed the rise of a power struggle between reformists and the conservative factions often aligned with the clerical establishment. Soon the President Khatami era would be marked by an increasing clampdown on government critics and political dissent that targeted individuals sympathetic to the pro-reform agenda, namely journalists, students, intellectuals, lawyers, and rights activists. The main strategy of the conservatives was to "undermine the legitimacy of the reformist movement by linking it to western governments plotting to undermine the Islamic revolution."[25]

The struggle spilled out in the open in 1998, when a number of Iranian dissident intellectuals were brutally murdered in an apparently coordinated campaign that became known as the "Chain Murders." Investigations eventually led to the Intelligence Ministry and resulted in the removal of the ministry's head, conservative cleric Dorri Najafabadi, who was considered to be close to the Supreme Leader. In 2000, President Khatami replaced Najafabadi with, Ali

---

[24] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 5
[25] Ibid, 7

Younesi, who was believed to be more sympathetic to reformist causes. According to IHRDC, Younesi purged the ministry which ultimately "led conservatives to seek to extend their influence through [] other state intelligence organs."[26]

These other state intelligence organs, often referred to *nahadhayeh movazi* or "parallel institutions," were often units affiliated with agencies outside of the Intelligence Ministry (and therefore direct control of the president). These units include the Intelligence Protection Organization of IRGC, the Intelligence Protection Center of NAJA, the Intelligence Protection Organization of the Army, and the Intelligence Protection Center of the Judiciary.[27] The heads of these units are all appointed by the Supreme Leader. According to IHRDC, "[m]any of those purged from the Ministry of Intelligence by Ali Younesi found new positions in the aforementioned parallel intelligence units."[28] Research conducted by IHRDC and other human rights organizations suggests that the heads of these "parallel institutions" often coordinated their activities and collaborated with important state-controlled media institutions such as Islamic Republic of Iran Broadcasting and *Kayhan* newspaper. The two outlets often played (and continue to play) a key role in smearing dissidents and activists, including by broadcasting their coerced confessions.[29]

But the linchpin of the strategy was the conservative establishment's substantial control over the judiciary. According to IHRDC, the conservatives then "exploited the powers granted to

---

[26] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 6

[27] *Like the Dead in their Coffins*, Human Rights Watch (June 2004), https://www.hrw.org/reports/2004/iran0604/iran0604.pdf pgs. 13-18

[28] *Mockery of Justice: The Framing of Siamak Pourzand*, Iran Human Rights Documentation Center (Feb. 4, 2011), https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ pg. 6

[29] Ibid., 7

the judicial authorities to give a patina of legality to their activities."[30] The conservatives thus used sympathetic judges and law enforcement officials to advance their agenda. On one end, the parallel security and intelligence units targeted dissidents by monitoring their activities, arbitrarily arresting and detaining them, and fabricating case files meant to undermine the reform movement. On the other end, they worked closely with the judiciary to ensure that sympathetic judges "not only ignored violations of law by the parallel security forces but also sanctioned their illegal activities by accepting confessions obtained under duress in illegal facilities."[31] The Special Court of Mehrabad (Branch 1610), which was headed by Judge Saberi Zafarqandi who tried and convicted Mr. Pourzand, was one such example among many.

The following sections address some aspects of the context within which the present case is situated, with a specific focus on the modes and mechanisms of human rights violations perpetrated by various security organs of the state and their "parallel institutions." Although some of these institutions and the detention facilities they controlled between 2000 to 2011 (from the time of Mr. Pourzand's initial arrest to his death), the general pattern of systematic abuses has stayed relatively constant.

## 4.2 Arbitrary Arrests and Abductions

In the early 2000s, Human Rights Watch documented the existence of parallel institutions in Iran. These organs operate outside of the official state apparatus and contribute to the widespread repression of political dissidents such as students, activists, writers and journalists. In the early 2000s, operatives under these parallel institutions, known as plainclothes agents,

---

[30] Ibid.

[31] Ibid.

engaged in activities including the abduction of dissidents, the transfer of arrestees to detention centers, violence against protesters during demonstrations, and widespread home and work searches without judicial orders.[32] According to Human Rights Watch, between the years 2000 and 2004, the deployment of plainclothes security agents became institutionalized, with agents regularly armed, violent, and in possession of advanced communication and transportation technologies provided by the government.[33] Groups, such as *Ansar-e Hizbollah* and the *Basij* were known to operate under the control of the Office of the Supreme Leader, and had a reputation for carrying out assaults against students, writers, and political reformists.[34]

### 4.3. Torture and Ill-Treatment

The Judiciary and National (or State) Prisons Organization of Iran have failed to meet the standards stipulated by the UN provisions of the Standard Minimum Rules for the Treatment of Prisoners, the Body of Principles for the Protection of All Prisoners Under Any Form of Detention or Imprisonment, and the Basic Principles for the Treatment of Prisoners.[35] Most significantly, despite being a signatory of the United Nations Convention Against Torture, political dissidents of the Islamic Republic are routinely subject to torture as a means of punishment, intimidation, coercion or with the intent to extract information or a confession.[36]

Political detainees of Iran's notorious Evin Prison are often subject to cruel, inhuman and degrading treatment. Following the establishment of the Islamic Republic, the new government arrested and detained political affiliates of the monarchy at Evin. Soon thereafter, any political

---

[32] *"Like the Dead in Their Coffins" Torture, Detention, and the Crushing of Dissent in Iran,* 16 No. 2(E), Human Rights Watch 1-67 (2004)

[33] Ibid.

[34] Human Rights Watch, *World Report 2005: Iran,* 2004.

[35] UN Commission on Human Rights, *Report on the situation of human rights in the Islamic Republic of Iran,* 16 January 2002, E/CN.4/2002/42

[36] UN General Assembly, *Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 9 December 1975, A/RES/3452(XXX)

opponents of the Islamic Republic were also sent to Evin Prison[37] Political detainees often interact with different authorities and are subject to more frequent interrogations than those charged with common crimes. Authorities regularly subject detainees to threats of torture, indefinite imprisonment, and the torture of loved ones and family members. They regularly subject detainees to deception and humiliation through daily interrogations lasting several hours. They deny detainees medical care and forbid family visitation.

In addition to plainclothes agents, another component of Iran's parallel institutions are the illegal detention centers run by intelligence and security agencies operating outside of Iran's official State Prisons Organization. In the early 2000s, plainclothes agents would come to be associated with this secretive, underground prison establishment. Political detainees at these sites often undergo the most brutal forms of abuse, intimidation and torture.[38]

Prison 59 is one of the well-known illegal prisons in Iran, reportedly used as a base to force confessions from prisoners who fail to confess at Evin Prison. Detainees are subject to solitary confinement for indefinite periods of time, and experience some of the most brutal interrogation methods by the intelligence service of the IRGC. [39]

In 2003, Zahra Kazemi, an Iranian-Canadian dual national and freelance photojournalist, was arrested and later died of injuries arising from torture under custody.[40] Kazemi had been arrested for photographing demonstrations at Evin Prison in June 2003, in support of political prisoners. On July 11, 2003, she died in custody.  Initial reports on her cause of death conflicted

---

[37] Human Rights Watch, *World Report 2005: Iran,* 2004.

[39] *"Like the Dead in Their Coffins" Torture, Detention, and the Crushing of Dissent in Iran,* 16 No. 2(E), Human Rights Watch 1-67 (2004)

[40] *Impunity in Iran: The Death of Photojournalist Zahra Kazemi*, Iran Human Rights Documentation Center (Feb 3, 2011), https://iranhrdc.org/impunity-in-iran-the-death-of-photojournalist-zahra-kazemi/

and Chief Prosecutor Said Mortazavi is said to have been involved in a cover-up of her death.[41] Several years later, a former staff physician in Iran's Defense Ministry published a statement in which he admitted to having examined Kazemi's body following her death and found evidence of brutal rape and torture.[42]

In both state and parallel institutions, prison administrators regularly deny detainees adequate medical care. Preventing access to health services serves as an instrument of intimidation, punishment, humiliation and even torture. Amnesty International has identified the following methods which Iranian prison administrators use against detainees to withhold medical care: denial of time-sensitive medical care outside of prisons, withholding medication, denial of release on medical grounds, intentional interruption or discontinuation of treatments, abuse and betrayal by medical professionals, and gender-specific abuses.[43]

## 4.4 Coerced Confessions & Unfair Trials

The Islamic Republic has failed to adhere to and implement international standards for non-coercive interviewing methods and procedural safeguards.[44] While Iran's constitution forbids extracting confessions through torture and mandates that statements obtained under coercion are legally void, these practices are regularly used against political dissidents. Notably, the UN Working Group on Arbitrary Detention has identified the Islamic Republic's systematic use of large-scale implementation of solitary confinement as a strategy for extracting public confessions from political dissidents. These statements are often accompanied by a televised

---

[41] *"Like the Dead in Their Coffins" Torture, Detention, and the Crushing of Dissent in Iran,* 16 No. 2(E), Human Rights Watch 1-67 (2004)
[42] Anne McIlroy, '*Strange Marks of Violence',* The Guardian, 5 April 2005
[43] *Health Taken Hostage: Cruel Denial of Medical Care in Iran's Prisons*, Amnesty International, 2016.
[44] *Constitution of the Islamic Republic of Iran*, 24 October 1979

public repentance, which the Working Group denounced as inadmissible as evidence.[45] Human Rights Watch has similarly denounced solitary confinement as a method "designed to break the resolve of detainees such that they capitulate and agree to be videotaped, sign confessions, and give information regarding their political affiliations and associates."[46]

The systematic violation of basic due process is present at every level in the judicial system in Iran.[47] While Article 9 of the ICCPR protects individuals against arbitrary arrest and detention, these practices are embedded in the judicial system of the Islamic Republic.[48][49] Further, the lack of transparency on the part of judiciary officials makes it difficult for international observers to lead an accurate and comprehensive probe into investigative matters surrounding political dissidents.[50]

While the constitution of the Islamic Republic mandates that detainees be brought before a judge and informed of their charges within one day of their detention, this is rarely practiced. Political dissidents are regularly denied the right to counsel. Attorneys are frequently unable to privately meet with detainees or are denied access to criminal files. Further, defense attorneys are at risk of being arrested and detained themselves.[51] Those convicted of a crime in Iran have the right to appeal to a higher court within ten days of their conviction notice. Few convicted of

---

[45] UN Commission on Human Rights, *Report of the U.N. Working Group on Arbitrary Detention, Visit to the Islamic Republic of Iran,* 2004, E/CN.4/2004

[46] *"Like the Dead in Their Coffins" Torture, Detention, and the Crushing of Dissent in Iran,* 16 No. 2(E), Human Rights Watch 1-67 (2004)

[47] *"Like the Dead in Their Coffins" Torture, Detention, and the Crushing of Dissent in Iran,* 16 No. 2(E), Human Rights Watch 1-67 (2004)

[48] UN General Assembly, *International Covenant on Civil and Political Rights*, 16 December 1966, United Nations, Treaty Series, vol. 999, p. 171

[49] UN General Assembly, *International Covenant on Civil and Political Rights*, 16 December 1966, United Nations, Treaty Series, vol. 999, p. 171

[50] UN Commission on Human Rights, *Situation of human rights in the Islamic Republic of Iran,* 22 April 1998, C.H.R. res. 1998/80, ESCOR Supp. (No. 3) at 270, U.N. Doc. E/CN.4/1998/80

[51] UN Commission on Human Rights, *Report on the situation of human rights in the Islamic Republic of Iran,* 16 January 2002, E/CN.4/2002/42

political crimes, however, have the chance to appeal, and are often told that any attempt at appeal will be met with additional charges. Under Iranian law, all trials are required to be public. For political dissidents, however, it is common for members of the judiciary to meet privately with prisoners through informal sessions in chambers. During these sessions, judges often urge prisoners to confess or cooperate.

The case of Massoud Behnoud is one such example which underscores the extent of arbitrary arrest, denial of due process and the complicity of the judiciary throughout this process.[52] On August 8, 2000, Behnoud, a well-known  journalist, was tipped off by a newspaper reporter that officials were preparing to publicly announce his arrest the following day. To avoid confrontation with plainclothes agents, Behnoud turned himself in to the authorities, specifically at the courtroom of Judge Said Mortazavi. Behnoud was brought to the basement of Branch 1410, where his belongings were confiscated. He was forced into a car without being told where he was going, ultimately arriving at his own home. Without presenting a search warrant and after bringing a locksmith to open the door to his home, officials searched his belongings in an attempt to locate illegal substances. Throughout the ordeal, they remained in contact with Judge Mortazavi over the phone, updating him on the progress of the search. Behnoud was then brought to his second home, where aggressive searches continued. When the officials were unable to find any incriminating evidence, Behnoud recalled the agents producing a false inventory of illegal substances in his home. He was later told that Judge Mortazavi would dismiss the fabricated evidence should he cooperate with his interrogators.[53]


**4.5 Hostage-Taking**

---

[52] Ibid.
[53] Ibid.

The Islamic Republic's extraction of forced confessions has extended to its dealings with family members of political dissidents. According to Human Rights Watch, there is evidence that authorities detain the family members of dissidents and often keep them hostage. In 2001, for example, prominent writer Khalil Rostamkhani was arrested in order to force his wife, a reformist, to return to Iran and turn herself in.[54]

Prominent human rights lawyer and Nobel Peace Prize laureate Shirin Ebadi has documented her own experience with government blackmail. In a New York Times op-ed titled "Tricked Into Cheating and Sentenced to Death", Shirin Ebadi describes an event of sexual blackmail against her husband, Javad Tavassolian.[55]

According to her op-ed, Ebadi's husband had been courted and seduced by a former romantic partner while his wife was in the United States. The two had been set up by a mutual acquaintance and left alone in the latter's apartment. Unbeknown to Tavassolian, Iranian intelligence agents and cameramen had coordinated the rendezvous and recorded the incident. Tavalossian was taken to Evin Prison, where he was subjected to flogging, pursuant to Iranian laws that forbid alcohol consumption. He was then brought to a solitary confinement cell, where he was left for two days. On his third day, he was brought to a courtroom where a cleric informed him that pursuant to Article 225 of the Islamic Penal Code, he would be sentenced to death by stoning two days later.

According to Ebadi, Tavassolian was told that his arrest was specifically a consequence of his wife's activities. The authorities eventually agreed to pardon Tavalossian from execution

---

[54] Ibid.
[55] Shirin Ebadi, *Tricked Into Cheating and Sentenced to Death*, NY Times, 3 March 2016

under the condition that he read a short statement in front of television cameras denouncing his wife.[56]

## 5. Conclusion

Mr. Pourzand's unlawful arrest, detention, torture, and forced confession are consistent with previous patterns of human rights abuses practiced by the government of the Islamic Republic of Iran between 1997 and 2011. While the foregoing analysis has relied on reports relevant to cases within the specific time period the patterns of documented human rights abuses in the Islamic Republic have remained consistent since the Iranian Revolution of 1979. Indeed, the plaintiffs' claim that Mr. Pourzand was detained in an effort by government officials to undermine and coerce his wife is consistent with other instances of blackmail against family members of political dissidents in the Islamic Republic. Moreover, Mr. Pourzand's cause of death remains unverified by independent sources. Given the previous patterns of government cover-ups, most notably in the case of Zahra Kazemi, it is more likely than not that Mr. Pourzand's cause of death is the direct and proximate result of the Defendants' actions.

In many ways, Ms. Kar and Mr. Pourzand became among the first victims of what human rights groups would call "parallel" security and intelligence institutions which began to flex their muscles in the early 2000s. The specific modes and mechanisms of repression used by these institutions would eventually become the Iranian government's *modus operandi.* Today, although some of the parallel institutions and detention facilities no longer operate, Iranian

---

[56] Ibid.

government officials continue to use the blueprint to put pressure on dissidents abroad and stifle reform at home.

I declare under penalty of perjury under the law of the United States of America, that the foregoing is true and correct.

17 August 2021

_____                    _____

Date                                                                Dr. Payam Akhavan