**Declaration of Professor Ali Arab (Ph. D.)**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

Civil Action No.: 1:19-cv-02070-JDB

**Associate Professor**
**Department of Mathematics and Statistics**
**Georgetown University**

# Human Rights Conditions in the Islamic Republic of Iran

## Table of Contents

*I. Introduction* ....................................................................................................... .......3

*II. Educational Background and Professional Qualifications* ................................................. 3

*III.  Overview of the Islamic Republic of Iran* ........................................................ 6

    **a.  Political Structure** ........................................................................................................... 7

    **b.  Judiciary and Legal System** ..................................................................................... 10

*IV.  Human Rights Conditions in Iran* ..................................................................... 12

    **a.  Arbitrary Detentions and Extrajudicial Killings** ................................................. 16

    **b.  Irregularities and Systematic Issues in Due Process of Law** ............................... 21

    **c.  Torture** ....................................................................................................................... 21

    **d.  Forced Confessions** ................................................................................................... 24

    **e.  Harassment of Victims and Their Relatives** ......................................................... 25

*V. Summary of Conclusions* ..................................................................................... 30

*Appendix A: CV Report* ............................................................................................. 32

*Appendix B: References* ............................................................................................ 33

# I.   Introduction

I have been requested by Mehrangiz Kar and Azadeh Pourzand and their counsel to provide my declaration on the conditions of human rights in Iran as it pertains to their case versus the Islamic Republic of Iran (IRI). Specifically, I have been asked to provide my declaration on the situation detainees face in prisons in Iran, IRI's use of torture and forced confessions, and the violations of legal standards and due processes of law by the IRI's judiciary system.

In preparation of this report, I have carefully reviewed the Statement of Facts which was provided to me by the Plaintiff's counsel. I have also reviewed and researched several additional documents related to the case which I have listed in Appendix B under References. These include reports from human rights organizations including Amnesty International and Human Rights Watch among others, and scholarly work related to the topic, as well as media reports.

# II.   Educational Background and Professional Qualifications

I am a full-time faculty member of the Department of Mathematics and Statistics of Georgetown University as an Associate Professor (with Tenure) of Statistics. I have served in the current position since 2007 (2007-2014 as Assistant Professor, and since 2014 as Associate Professor). I completed my undergraduate studies in Iran in 1999 and I graduated with a Bachelor of Science degree in Applied Mathematics from the Iran University of Science and Technology[1].  After moving to the United States, I completed a Master of Science degree in Applied Mathematics and Statistics at Southern Illinois University Edwardsville[2]. I graduated with a Ph.D. degree in Statistics from the University of Missouri-Columbia[3] in August 2007. My area of expertise includes applied statistics, statistical modeling with focus on environmental, ecological, and epidemiological applications, climate- and conflict-driven forced migration, as well as topics related to science and human rights.

---

[1] http://www.iust.ac.ir/en
[2] https://www.siue.edu/
[3] https://missouri.edu/

Since 2010, I have actively collaborated with the American Association for the Advancement of Science (AAAS) Science and Human Rights Coalition with focus on topics at the intersection of science and human rights including campaigning for human rights cases related to students, scientists and scholars around the world with focus on Iran cases, role of science and scientists in human rights cases, and human rights education. I have co-Chaired a committee on membership and outreach with the mission to promote topics of science and human rights and empower students and scholars to engage in conversations around human rights. Since 2014, I have served as one of the two representatives of the American Statistical Association (ASA) to the AAAS Science and Human Rights Coalition[4]. In this capacity, I sit on the Council for the AAAS Science and Human Rights Coalition and liaise between the two organizations on related topics.

I'm an active member of Amnesty International. I'm a member of the Amnesty International local Group 82 in Rockville, Maryland. Since 2016, I have served as a member of the Board of Directors of Amnesty International USA[5]. Currently, I serve as the Deputy Treasurer for the Board. Given the complex structure of Amnesty International as an international movement with multiple organizational levels (regional offices and country sections, volunteer groups including student groups), Board members participate in strategic planning for human rights campaigns as well as monitoring and planning the growth of the organization globally and domestically, and oversee financial, operational and strategic issues.

I'm a founding member and a member of the Board of Directors of Hostage Aid Worldwide[6], an organization formed by several former hostages with the mission to assist hostage victims and their families by providing insights on their cases, coordination with governments and the UN bodies, and a strategy to disrupt the hostage business model and the emerging threat of hostage diplomacy through combining global advocacy with empirical data driven methods and extensive research.

---

[4] https://www.aaas.org/programs/science-and-human-rights-coalition
[5] https://www.amnestyusa.org/about-us/who-we-are/board-of-directors/ali-arab/
[6] https://hostageaid.org/our-team.html

I also serve on the Board of Directors of Journalism for Change, a media organization with the mission to promote citizen journalism through a multilingual online platform IranWire, empower citizen journalists, and to advocate for journalism freedom (including the "Journalism is Not a Crime" campaign) and religious freedoms. I should note that one of the Plaintiffs on the current case, Mehrangiz Kar, serves with me on the Board of Directors of Journalism for Change.

At Georgetown University, I teach undergraduate and graduate level courses on mathematical statistics, applied statistical methods, regression methods and generalized linear models, time series, business statistics, and business forecasting. I have also mentored several undergraduate and graduate (Masters and Ph.D.) students in conducting research on applied statistical methods in different fields. Currently, I'm co-advising two Ph.D. students as well as several Masters and undergraduate senior students.

I am a member of the American Statistical Association (ASA) and the Institute of Mathematical Statistics (IMS). I am also a member of the Washington Statistical Society (WSS), which is a local organization of statistics professionals in the metropolitan Washington DC area.

Over the last 16 years, I have served as statistical consultant on several projects in a wide range of topics and disciplines including environmental research (U.S. Geological Survey), water resources research (District of Columbia Water Resources Research Institute), transplant surgery (Georgetown University Medical Center), and urban ecology (Casey Trees Organization), spatial analysis and advanced statistical modeling for a long term environmental monitoring program PWSSC (Prince William Sound Science Center), DCAA (Defense Contract Audit Agency), among others.

In 2012 -2013, I served as an expert witness for the United States Department of Justice (United States Court of Federal Claims, Nos. 09-844C & No. 741C) and provided expert testimony in the United States Court of Federal Claims (Judge Charles F. Lettow). I was found qualified by Judge Lettow as an expert on statistics and statistical modeling and provided expert testimony at trial. Since 2019, I have served as a statistical consultant and expert witness for the Defense Contract Audit Agency (DCAA) of Department of Defense. In this capacity, I oversee the accuracy of the

5

Agency's statistical methodology in accordance with government policies and accounting accepted principles, and consult with the legal team on potential and ongoing cases.

As it relates to this case, I have advised several organizations on conducting surveys and analysis of data related to human rights issues. These experiences include an advisory role for conducting international surveys on science and human rights. I have also advised on using quantitative methods for analyzing human rights cases as well as evaluating the impact of advocacy and education programs.

As someone with academic, activism and organizational expertise on human rights issues, I have been interviewed by the media, I have written opinion articles, I have also moderated events, and served in panels and discussions related to thematic issues as well as advocacy and campaigning on individual cases. For a complete list of related activities, please see a copy of my curriculum vitae (CV).

I have authored (and co-authored) several articles in peer-reviewed scientific journals, as well as, several technical reports. I'm also currently working on a book on modeling complex count data (contracted by CRC Press, Taylor & Francis Group) which includes discussions on analysis of human rights data including data on cases of torture, mass executions, arbitrary detentions, and forced migration, among others.

For a detailed list of publications please find a copy of my CV attached to this document (See Appendix A).

## III. Overview of the Islamic Republic of Iran

Iran is a country in the Middle East, bordering the Gulf of Oman, the Persian Gulf, and the Caspian Sea, between Iraq and Pakistan. Iran shares borders with seven countries (Afghanistan, Armenia, Azerbaijan, Iraq, Pakistan, Turkey, and Turkmenistan). With an area slightly smaller than Alaska, it has a diverse climate (arid or semiarid, subtropical along Caspian coast), and a plethora of natural resources (petroleum, natural gas, coal, chromium, copper, iron ore, lead, manganese, zinc, sulfur). Iran with a population of over 85 million is the 17th most populated

country in the world and is home to several ethnic groups (Persian, Azeri, Kurd, Lur, Baloch, Arab, Turkmen and Turkic tribes), languages (Persian Farsi (official), Azeri and other Turkic dialects, Kurdish, Gilaki and Mazandarani, Luri, Balochi, Arabic), and religions (Shia and Sunni Islam, Christianity, Jewism, and Zoroastrianism.[7]

### a. Political Structure

Currently, Iran's political system is an Islamic republic, a quasi-democratic political system based on a combination of elements of theocracy and presidential democracy.

The Islamic Republic of Iran (IRI) was established in April of 1979 following the 1979 Revolution (later known as the Islamic Revolution) which resulted in the overthrow of Mohammad Reza Shah and termination of the Pahlavi Dynasty. The Islamic Republic was the form of government that was decided through a referendum held on March 30 and 31, 1979[8]. The referendum was claimed to have a very high turnout (approximately 98% of the eligible population) with a very high support for the Islamic Republic (more than 99% voted "Yes" to changing the political system to an Islamic Republic versus only less than 1%  "No" votes). Despite some concerns[9] raised regarding possible irregularities and systematic exclusion of certain subsets of the population (in particular, several ethnic minority groups including Kurds and Turkmans either did not have the chance to participate due to ongoing armed conflicts in their regions or boycotted the referendum), the results of the referendum were considered to be legitimate by international observers and majority of political groups. Consequently, the 1906 Constitution was declared invalid, and a new constitution codified according to Shia Islam rules and guidelines was created and ratified through a second referendum in December 1979 (reported participation rate was over 75% of the eligible population out of which 99.5% voted "Yes" to the proposed constitution[10]).

---

[7] CIA The World Factbook: Iran, Last updated: March 02, 2021

[8] The New York Times: *"Khomeini Declares Victory in Vote For a 'Government of God' in Iran"* by Gregory Jaynes. Published on April 2, 1979.

[9]  Washington Post: *"Khomeini Decrees Islamic Republic After Vote in Iran"*. By Ronald Koven. *Published on April 2, 1979.*

[10]  Nohlen, D., Grotz, F., and C. Hartmann (2001). Elections in Asia and the Pacific: A Data Handbook: Volume I: Middle East, Central Asia, and South Asia. Oxford University Press.

The IRI while entailing elements from a presidential democracy effectively operates as a theocracy, mandated by the principles of Twelver Shia Islam and enforced by an extensive military, para-military, and security apparatus.

Under the Constitution of the Islamic Republic of Iran[11], the Supreme Leader is the head of state and the highest spiritual and political authority. The Supreme Leader is a Faqih (Jurisconsult) and  as the Vali-e Faqih (Guardian Islamic Jurist) in accordance with the Shia Islamic principle of Velayat-e Faqih (Guardianship of the Islamic Jurist) provides guardianship over the nation and can enshrine new laws. Articles 4 and 5 of the Constitution emphasize the importance of the Shia clergy in Iran's system of governance. Article 107 describes the role of the Leadership Khobregan (Assembly of Experts)  the only government body in charge of overseeing, choosing and dismissing the Supreme Leader. Since its inception in 1979, the Islamic Republic of Iran has had two Supreme Leaders: Ruhollah Khomeini (1979-1989) and Ali Khamenei (1989-Present).

The democratic components of the IRI's political system including the elected President, executive and legislative branch officials are strongly undermined by the unelected institutions including the Supreme Leader and the Guardian Council. For instance, the Guardian Council which comprises senior Shia clerics,  oversees the approval/disapproval of the qualification of candidates for the Parliament or has authority to veto the acts of the Parliament based on misalignment with the Islamic law.

 Another important factor in the IRI political system is the role of intelligence apparatus which has direct relevance to the current case and similar cases. In the following section, I provide a brief overview of Iran's intelligence establishment and its history of arbitrary detentions and extrajudicial killings of dissidents.

Iran's Ministry of Intelligence and Security (MOIS), or *Vezarat-e Ettela'at Jomhuri-ye Eslami-ye Iran* (VAJA) in Farsi, is the primary government entity in charge of the

---

[11] https://en.parliran.ir/eng/en/Constitution

intelligence service. However, the intelligence establishment includes several parallel agencies including the Intelligence Organization of the Islamic Revolutionary Guard Corps which is an intelligence agency within the Islamic Revolutionary Guard Corps (IRGC). In 2014, Fars News a news agency closely associated with Iran's intelligence community announced that the IRI's intelligence establishment includes 16 intelligence-security agencies that are coordinated through the Council for Intelligence Coordination[12].

There is actually very little public information available about the IRI's intelligence establishment, as it is a highly secretive community. In December of 2012, Library of Congress published a report on the profile of the MOIS[13]. This report provides an in-depth profile of the MOIS including its organizational structure, membership and recruitment, its methods of operation and tactics, and its intelligence capabilities. However, the report identifies the gaps in resources:

> *Because MOIS does not have an official Web site, collecting data about its organizational structure, its personnel and their duties, and how it operates is difficult. There is no information about some of the current high officials and directors of the various MOIS directorates in opensource materials, and it is not clear who issues directions to MOIS or how those directions are carried out.*

> *Another important question about MOIS that is not well answered in open-source material is the ministry's relationship with the IRGC and how they interact. Observers speculate that MOIS and the IRGC have disagreements. If this allegation is true, available information does not clearly indicate the source or the degree of the disagreement.[14]*

---

[12] Rooz Online (via Payvand), Iran Has 16 Intelligence Agencies, by Arash Bahmani, October 30, 2014 (link to Fars News story)

[13] "Iran's Ministry of Intelligence and Security: A Profile," Library of Congress under an Interagency Agreement with the Combating Terrorism Technical Support Office's Irregular War- fare Support Program, December 2012

[14] Ibid. Page 45.

In the late 1990s, the role of members of the intelligence community in extrajudicial killings of dissidents, intellectuals and political activists was revealed by the media and became a major reputational issue for the IRI and its intelligence community[15]. These killings are often known as the Chain Murders and to this date, there are lots of unknowns about the extent of involvement of regime officials and the exact number of cases. Numbers as high as 80 individuals are believed to have been victims to these killings between 1988-1999. Shirin Ebadi, a prominent lawyer, human rights activist, and Nobel Peace Laureate, lists the methods used in these killings according to a variety of means such as car crashes, stabbings, shootings in staged robberies, and injections with potassium to simulate heart attack[16].

## b. Judiciary and Legal System

Iran's current legal system is based on Shia Islamic law and consequently, clerics are highly abundant in the judiciary branch of the government. Public courts deal with civil and criminal offenses. Special clerical courts deal with offenses of clerics. Revolutionary courts try other categories of offenses, such as crimes against national security or offenses that threaten the Islamic republic. The cases of prominent figures including political dissidents, human rights activists, and cultural personalities often end up in the Revolutionary courts due to sensitivities around these cases.

Since the early days of the 1979 Revolution and especially with the start of the Iran-Iraq War, the judiciary system has been heavily securitized under the guise of the "national security imperative", in which non-security issues are approached through a security lens. The United States Institute of Peace's "The Iran Primer" succinctly describes the role of the judiciary system and the Revolutionary courts in suppressing dissent:

---

[15] BBC, Iran's Chain Murders: A wave of killings that shook a nation, by Sarah Fowler. December 2, 2018.
[16] Ebadi, Shirin, *Iran Awakening*, Random House New York, 2006, p. 131-2

*"The judiciary plays the paramount role in suppressing dissent and prosecuting dissidents, often on charges of "acting against national security." Working closely with intelligence services, the judiciary has for decades tried a wide range of opponents and critics, from students and street protestors to civil society activists and political reformers.*

*Trials are often criticized for lack of evidence and not conforming to fundamental standards of due process. Detainees can be held for long periods in solitary confinement. Many are denied access to their lawyers. Verdicts are often based on "confessions" extracted during interrogations. And many are sentenced to lengthy prison terms.*

*Iran's Revolutionary Courts are primarily in charge of prosecutions involving acts against national security, as well as drug smuggling and espionage. After the disputed 2009 presidential election, the judiciary emerged as a key instrument to intimidate protestors and remove many leading activists and opinion makers, steps that were both critical to the regime's survival.*

*The Revolutionary Courts conducted a series of show-trials that included televised confessions. Among the more than 250 defendants were protestors, prominent journalists, human rights defenders and reformist politicians. They included former Vice President Mohammad Abtahi and former Member of Parliament Mohsen Mirdamadi, who headed the Islamic Participation Front, the largest reform party in Iran. The sentences ranged from floggings to prison terms of up to 10 years and executions. Much of the evidence was produced in "confessions" by defendants. Since the majority of defendants were held in solitary confinement before the trial and had no access to their lawyers, many confessions appeared to have been coerced."*[17]

---

[17] USIP, The Iran Primer, The Islamic Judiciary, by Hadi Ghaemi, October 6, 2010.

# IV.  Human Rights Conditions in Iran

Iran is a signatory to the Universal Declaration of Human Rights. In 1975, Iran ratified the International Covenant on Civil and Political Rights and therefore it has committed to the promotion and protection of guarantees including freedom of expression, assembly, association and religion, all of which are recognized as integral to the promotion and protection of democratic ideals. However, under the IRI, Iran's human rights conditions have been substantially problematic. The range of human rights issues includes many areas of rights including the right to life, the right to freedom from torture, the right to a free trial, minority rights, among others.

The atrocious condition of human rights in Iran under the Islamic Republic regime has necessitated the U.N. to appoint several Special Rapporteurs to Iran over the past four decades. The Islamic Republic does not cooperate with the Special Rapporteurs and categorically rejects this function. For example, the current U.N. Special Rapporteur to Iran, Mr. Rehman has not been allowed to visit Iran. Since 1984, and among the six U.N. Special Rapporteurs to Iran only Maurice Copithorne and Galindo Pohl were allowed to visit Iran. Galindo Pohl was allowed to visit Iran three times between 1990 and 1992 (and after his last visit he was barred from visiting Iran due to his critical reports[18] on the conditions of human rights in Iran). Maurice Copithorne[19] visited Iran only once in the beginning of his term in 1996 and was never allowed to go back to Iran after he published his first report which the regime was not happy to read[20].

In 2011, due to increasing and concerning trends in human rights violations in Iran, in particular, the massive human rights violations and crackdown of protestors in the aftermath of the disputed election of 2009, the UN Human Rights Council appointed a special rapporteur for Iran. Human Rights Watch in its World Report 2012 on Iran describes the international reactions to the human rights situation in Iran as follows:

---

[18] Galindo Pohl's reports may be accessed through the Impact Iran website: http://impactiran.org/mr-reynaldo-galindo-pohl/
[19] Copithorne's report may be accessed through the Impact Iran website: http://impactiran.org/mr-maurice-danby-copithorne/
[20] Radio Free Europe Radio Liberty, interview with Copithorne, March 25, 2011

*In March the UN Human Rights Council appointed a special rapporteur for Iran. In July 2011 the Iranian government announced it would not cooperate with or allow the special rapporteur access. On September 23 the special rapporteur submitted his first report on Iran in which he highlighted a "pattern of systematic violations of … human rights" and repeated his call on the government to allow him to visit the country.*

*Iran continued to refuse access to UN special procedures, despite their longstanding and repeated requests for invitations to visit. No special rapporteurs have visited the country since 2005.*

*On September 15 the UN secretary-general submitted a report to the UN General Assembly in which he said he was "deeply troubled by reports of increased numbers of executions, amputations, arbitrary arrest and detention, unfair trials, torture and ill-treatment" and bemoaned "the crackdown on human rights activists, lawyers, journalists and opposition activists." On November 3 the UN Human Rights Committee issued its concluding observations following its review of Iran's implementation of the International Covenant on Civil and Political Rights. The committee concluded "that the status of international human rights treaties in domestic law is not specified in the legal system, which hinders the full implementation of the rights contained in the Covenant."*

*On April 14 the European Union imposed asset freezes and travel bans on 32 Iranian officials, including members of Iran's judiciary, who have committed rights abuses.*

*In June the United States extended individuals sanctions against additional members of the Revolutionary Guards, the Basij militia, and Iran's security forces involved in rights violations. Later that month the US sanctioned companies with ties to the Revolutionary Guards and military.[21]*

In his most recent report published on January 11, 2021, Mr. Javaid Rahman, the current U.N. Special Rapporteur on the situation of human rights in the Islamic Republic of Iran raises

---

[21] Human Rights Watch World Report 2012: Iran, Events of 2011.

13

ongoing concerns regarding death penalty, unfair trials, arbitrary detentions, systematic torture and forced confessions:

> *The Special Rapporteur remains deeply concerned at the high number of death sentences and executions in the Islamic Republic of Iran, including for acts that do not amount to the "most serious crimes" and following unfair trials. The Human Rights Committee has consistently interpreted the most serious crimes as those involving intentional killing. Between 1 January and 1 December 2020, at least 233 people were reportedly executed; 18 of the executions were for drug-related charges and 11 for moharebeh (taking up arms to take lives or property or to create fear in the public) or efsad-e fel-arz ("corruption on Earth"). Executions carried out in violation of international human rights law after an unfair trial constitute arbitrary deprivation of life.*[22]

Furthermore, the Special Rapporteur raises concerns regarding the systematic issues and violations of the right to a fair trial, torture and forced confessions:

> *The Special Rapporteur is alarmed by reports of secret executions in connection with protests, with death sentences issued in these cases following unfair trials and after the systematic use of torture to extract forced confessions. On 12 September 2020, Navid Afkari was secretly executed without prior notice in contravention of Iranian law. Mr. Afkari had participated in the August 2018 protests in Shiraz, and was subsequently arrested, convicted and given two death sentences for an alleged murder and for moharabeh. He denied the accusations and stated he had been tortured to confess. The confession was later used against him in court, with the judge failing to investigate his torture claim. The Government rejected the torture allegations. On 5 August 2020, Mostafa Salehi was secretly executed for an alleged murder, following his participation in protests that took place in December 2017 and January 2018. Despite denying the charges, he was reportedly held for over a year in*

---

[22] Situation of human rights in the Islamic Republic of Iran: report of the Special Rapporteur on the Situation of Human Rights in the Islamic Republic of Iran, Javaid Rehman

*solitary confinement in an attempt to force a confession, an allegation the Government rejected. The main evidence reportedly used against him was a forced statement from another individual. The Government claimed that Mr. Salehi had confessed and that other evidence had supported the verdict, and that the executions of Mr. Afkari and Mr. Salehi complied with domestic law. With regard to recommendations made during the State's third universal periodic review, the Government supported 1, partially supported 3, noted 2 and did not support 16 recommendations on prohibiting torture, and partially supported 2 and did not support 38 recommendations on death penalty reduction or elimination (A/HRC/43/12/Add.1).* [23]

For example, the United Nations Human Rights Report (2019) raises concerns regarding the execution of child offenders in Iran, a clear violation of international law:

*In his March report, the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran undertook an in-depth analysis on the execution of child offenders in Iran and made a variety of specific recommendations that were addressed to the Iranian Parliament and the judiciary on steps that needed to be taken to end this practice. This led to enhanced engagement between the Special Rapporteur with the Permanent Missions of Iran in Geneva and New York, including during discussions regarding the report's recommendations. In the context of his mission to Brussels, in February, the Special Rapporteur reiterated his recommendations on abolishing the death penalty for child offenders in Iran. These and other outreach efforts that were undertaken with States during the year led nine States to intervene at the General Assembly's Third Committee meeting, in New York, in October. A total of 34 States intervened during Iran's UPR session, in November, recommending changes concerning the application of the death penalty, particularly in relation to child offenders. NGOs and HRDs strongly supported the recommendations of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran in their advocacy on human rights in that country, often*

---

[23] Situation of human rights in the Islamic Republic of Iran: report of the Special Rapporteur on the Situation of Human Rights in the Islamic Republic of Iran, Javaid Rehman

*referring to his reports and recommendations when speaking out on issues*
*concerning child offender executions, the death penalty and minority rights.*

In his book titled "Human Rights in Iran", Professor Reza Afshari provides a comprehensive investigation of human rights conditions in Iran. Afshari's book is focused on the abuse of cultural relativism and to this end, he examines the human rights conditions in Iran in light of the IRI's claimed cultural exception to the universality of human rights. This is an important aspect that clarifies  how the IRI regime uses the Islamic law and culture to justify its violations of human rights.

After examining UN reports and volumes of memories of prisoners, Afshari reviews the human rights violations in Iran during the 1980s and 1990s (the book was originally published in 2001, and published in 2011 with the addition of an afterword which cover).

In  the following section, I highlight, and provide in-depth discussion on, several violations of human rights in Iran that I believe are directly related to the case of Mr. Pourzand. The discussions on each of the topics will include examples of cases.

### a.  Arbitrary Detentions and Extrajudicial Killings

Arbitrary and unlawful arrests, especially those which do not provide information to relatives of the victims, have been part of the IRI history from the early days of the 1979 Revolution. During the first few months of the revolution, many former officials, including the former Prime Minister Amir Abbas Hoveyda, and military leaders were detained, hastily tried by the Revolutionary Court, charged, and executed. In the case of Hoveyda, he was shot in a hallway after one of his trial sessions before any sentence was announced by the court.

Religious minority groups, and in particular, the Baha'is were also among the victims of the regime in its early years. The harassment of Baha'is continues to this date with a range of issues from arbitrary detention to denial of the right to education (mainly, Baha'is are barred from attending higher education institutions). In a well-known case, on August 21, 1980,

nine members of the National Spiritual Assembly of the Bahai faith including Dr. Kambiz Sadeghzadeh Milani[24] and two other colleagues were abducted during an assembly meeting. More than forty years later, their families have still no information on what happened to their loved ones. They are all believed to have been executed but their bodies were never handed over to their families and no entities have taken responsibility. The families are unaware of their burial sites.

In the 1980s, arbitrary detentions and extrajudicial killings continued as a systematic tool for the regime to oppress dissent, and re-establish itself within its base of supporters through propaganda, and inflict the violent coercion of opposition groups. It is believed that during the first decade of establishment of the Islamic Republic, tens of thousands of Iranians were arrested, tortured, jailed, disappeared and executed by the security forces, with the oversight of the Revolutionary Courts, a relic of the 1979 Islamic Revolution. The 1988 massacre of political prisoners is a well-known case in which the Iranian authorities forcibly disappeared and extrajudicially executed thousands of imprisoned political dissidents in secret and buried their bodies mostly in unmarked mass graves. While the exact number of those killed is unknown, minimum estimates put the death toll at around 5,000. In 2018, Amnesty International published a detailed report on Iran's 1988 massacre and framed the unlawful disappearances and extrajudicial killings as crimes against humanity:

> *Amnesty International's research leaves the organization in no doubt that, during the course of several weeks between late July and early September 1988, thousands of political dissidents were systematically subjected to enforced disappearance in Iranian detention facilities across the country and extrajudicially executed pursuant to an order issued by the Supreme Leader of Iran and implemented across prisons in the country. Many of those killed were subjected to torture and other cruel, inhuman and degrading treatment or punishment in the process.* [25]

---

[24] IranWire, "I hope my father was killed by a firing squad", https://iranwire.com/en/features/6257.
[25] Amnesty International Blood-Soaked Secrets: Why Iran's 1988 Prison Massacres Are Ongoing Crimes Against Humanity, December 4, 2018.

This trend continued well into the early 1990s with many cases of extrajudicial killings inside Iran as well as including the killings of many prominent members of the opposition groups abroad including Shahpour Bakhtiar (the last Prime Minister of Pahlavi), Abdolrahman Boroumand, and Shahriar Shafigh in France, Fereydoun Farokhzad (artist and political activist), and several Kurdish political activists and dissidents[26] in Germany.

In the 1990's, in a series of abductions, arbitrary detentions, and extrajudicial killings resulted in the killing of a large number of political and social activists, writers and poets, These killing, as they are popularly named the Chain Murders, include many well-known names including Ali-Akbar Sa'idi Sirjani, Dariush Forouhar and Parvaneh Eskandari Forouhar, Mohammad Mokhtari, Mohammad-Ja'far Pouyandeh, among others.

One of the most recent cases of abduction and extrajudicial killing is the case of Ruhollah Zam, an Iranian activist and journalist (and French resident,) who was abducted in Iraq, extradited to Iran, and unlawfully held in detention in Iran. His trial and eventual execution in December of 2020 follow the same familiar pattern of unlawful detentions, and violation of access to counsel and a fair trial[27].

The IRI regime also practices the arbitrary and unlawful detention of foreigners and dual nationals, often as part of its hostage diplomacy strategy. Karim Sadjadpour, a prominent Iranian-American and Iran specialist with the Carnegie Endowment for International Peace articulates this best:

> *"Iran has been using hostage-taking as a tool of statecraft for four decades now. The Revolutionary Guards are blatant about it and believe it delivers results," said Karim Sadjadpour, a senior fellow with the Middle East program at the Carnegie Endowment for International Peace. "Among the tragedies of modern Iran is a*

---

[26] The New York Times, Berlin Court Says Top Iran Leaders Ordered Killings, by Alan Cowell, April 11, 1997.
[27] BBC: "Ruhollah Zam: Iran executes journalist accused of fanning unrest". Published on December 12, 2020.

*society that is famous for its hospitality to foreigners, and a regime which views them as potential assets to be traded."[28]*

The U.N. Working Group on Arbitrary Detention[29] addressed the case of Mr. Pourzand. In a communication on February 14, 2002 (adopted on May 9, 2003), the U.N. Working Group on Arbitrary Detention expressed its dismay of the process by which Mr. Pourzand was detained, tried, and sentenced:

*"The Working Group deplores the fact that the Government has failed to provide it with the text of the penal legislation applicable in the case against Mr. Pourzand, despite having been requested to do so by the Chairman-Rapporteur in his letter of 14 February 2002. Nor was the judgement of 13 April 2002 of the General Court of Teheran convicting Syamak Pourzand submitted. The Working Group notes that the text of the criminal law provisions - which was not produced, and only referred to by the Government in very general terms - was the basis for the conviction of Mr. Pourzand. The reference to "propaganda against the Islamic Republic of Iran" gives rise to serious doubts about the real nature of and the motivation for the charges brought against him. It should be borne in mind that, according to information available to the Working Group, Mr. Pourzand, a journalist and manager of the Teheran Cultural Centre, has the reputation of being critical of the Government.*

*Therefore, in the absence of any argument to the contrary submitted by the Government, the Working Group cannot but conclude that Mr. Pourzand was prosecuted, convicted and sentenced to a prison term because of his convictions and the expression of his opinions."[30]*

Subsequently, the report expresses the opinion of the Working Group as:

---

[28] New York Times, Iran Frees British-Australian Scholar in Prisoner Swap, by Farnaz Fassihi, November 25, 2020.
[29] Opinions adopted by the Working Group on Arbitrary Detention (U.N.), E/CN.4/2004/3/Add.1 26 November 2003
[30] Ibid.

19

> *"The detention of Syamak Pourzand, being in contravention of article 19 of the Universal Declaration of Human Rights and of article 19 of the International Covenant on Civil and Political Rights, is arbitrary and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group."*

> *"Consequent upon this opinion, the Working Group requests the Government of the Islamic Republic of Iran to take the necessary steps to remedy the situation of Syamak Pourzand in order to bring it into conformity with the provisions and principles incorporated in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is a party."*[31]

In addition to confirming his arbitrary detention by Iran, numerous institutions hold Iran responsible for Mr. Pourzand's death. In 2011, Amnesty International published an article entitled, *Siamak Pourzand: Persecuted to death, harassed after death,* by its then-researcher on Iran Mr. Drewery Dyke. In the article, Mr. Dyke wrote,

> "Unfair justice systems… purposefully wear [prisoners] down, and by delaying and denying medical care, they hasten their death. […] In truth, [Mr. Pourzand] was killed by the repeated human rights violations he endured, which lead to chronic ill health, at the hands of a judicial system in which human dignity had been lost."[32]

Further, Reporters Without Borders, which documented and reported on Mr. Pourzand's case from his initial detention until his death, stated in response to the news of his death, "We hold the Iranian authorities responsible for this gesture of despair."[33]

---

[31] Ibid.

[32] Amnesty International, <u>Siamak Pourzand: Persecuted to death, harassed after death.</u> May, 6, 2011.

[33] Reporters Without Borders, <u>Iranian authorities responsible for Siamak Pourzand's death.</u> May 2, 2011 (Updated Jan. 20, 2016).

### b.  Irregularities and Systematic Issues in Due Process of Law

Irregularities and systematic issues in due process of law are well-known and well documented issues in the IRI. There are many examples of these cases over more than four decades of the history of the IRI including the mass executions of thousands of political prisoners in the 1980's, executions of child offenders, extrajudicial killings of intellectuals, political activists, writers and poets in the 1990s, torture and forced confessions of hundreds of protestors of contested presidential election in 2009, torture and execution of protesters in 2018 and 2019, among many other examples.

Typically, in cases of dissidents, intellectuals, and prominent personalities such as Mr. Pourzand's, the pattern observed is based on a problematic chain of events and processes. Often, the victims are prone to extrajudicial and unlawful detentions during which families of the victims are unaware of their whereabouts. During the arbitrary detention, victims are tortured and coerced into forced confessions which are then used by the intelligence apparatus to build a case against the victims. In cases of prominent and well-known personalities (such as Mr. Pourzand), this process may include highly publicized confessions (often the victims' confessions are televised and/or published through other media outlets). During this process, victims often either do not have access to an attorney or do not have access to an attorney of their choice.

### c.  Torture

In his book, Afshari reviews the systematic use of torture in Iran's prisons and by the interrogators to force prisoners to provide untrue confessions against themselves as well as others. To this end, Afshari reviews the scope and intensity of physical and psychological torture methods as documented in prison memoirs as well as several prominent cases. Afshari describes the issue of torture in Iranian prisons while formally prohibited by law:

> "Article 38 of the Constitution proudly prohibited torture in the Islamic Republic of Iran, but the regime's interrogators cavalierly resorted to the most familiar forms of torture, mainly for the purpose of extracting confessions. Prison wardens also continued inflicting pain on the captives for disciplinary punishment—or just out of

*sadism. Islamic punishments like flogging and amputation of limbs and fingers*
*revived ancient forms of torture and gave them judicial standings within the nation-*
*state."*

The human rights community have constantly raised concerns about the Iranian regime's use
of torture. For example, the most recent report by Human Rights Watch on Iran (as part of
the World Report 2021[34]) describes the continuation of patterns of lack of free trials, forced
confessions, and torture by the IRI:

> *"Iranian courts, and particularly revolutionary courts, regularly fall far short of*
> *providing fair trials and use confessions likely obtained under torture as evidence in*
> *court. Authorities have failed to meaningfully investigate numerous allegations of*
> *torture against detainees. Authorities routinely restrict detainees' access to legal*
> *counsel, particularly during the initial investigation period."*

The case of Zahra Kazemi[35] is a well-known case of use of torture and deadly force during
interrogations in the regime's prisons. Zahra Kazemi,[36] an Iranian-Canadian journalist, was
arbitrarily arrested for photographing outside the Evin prison. She was tortured in detention
which led to her death due to head injuries, as reported by the medical examiner when in
2003 then-President Khatami initiated a ministerial inquiry into the circumstances
surrounding Kazemi's death in response to international pressure[37].

In his book, "Prisoner: My 544 Days in an Iranian Prison," Jason Rezaian, the former
correspondent of *The Washington Post* in Iran described the ordeal he and his family went
through during his 544 days in the Evin prison. Rezaian writes that while his captors did not
physically torture him, he was mentally tortured as they held him in solitary confinement
with a light that never turned off and threatened to cut off his arms and legs.[38] In an interview

[34] Human Rights Watch World Report 2021: Iran events of 2020
[35] Reporters Without Borders, Impunity continues seven years after Zahra Kazemi's death in detention. July 11,
2010 (Updated January 20, 2016)
[36] New York Times, Iran admits that journalist was murdered while detained. by the Associated Press, July 31, 2003.
[37] The Guardian, Killer Images, by Andréa Schmidt, November 18, 2005.
[38] The New York Times, Jason Rezaian Recounts His 544 Days of Captivity in Iran, By Michael J. Totten
January 14, 2019

with National Public Radio's Terry Gross, Jason Rezaian elaborates on the torture he went through at the hands of his captors at Evin prison and the long-term impact of the experience he went through on his life:

> *Solitary confinement is torture. Putting somebody on a sham trial, compelling them to confess to things that they didn't do, depriving them of sleep — these are all signs of torture.*
>
> *Was I physically attacked, violently abused in a physical way? No. There is a level of stress that one cannot comprehend if they haven't been put through this sort of situation. Solitary confinement in a confined space that's very small and impossible to move around in — and you have no say over when the door opens — is one of the worst things that you can do to a human being.*
>
> *I still have a problem in those kinds of moments and situations where I'm locked in a room or locked out of a room. It's going to linger with me forever. It was a fear that was built into me throughout that time, even when I came out of solitary. You're always worried about going back into it. I also had a range of infections in my body, in my eyes, in more private parts of my body, and these things were not addressed for many months — and then addressed in the most perfunctory ways. I came out physically not the same person I walked in as, and I'm not sure I ever will be that person again.*[39]

In his documentary "In the Interrogation Room", Vahid Pourostad through interviews with several former prisoners, portrays the scope and the extent of torture techniques used by interrogators in Iranian prisons, including both physical and psychological torture to extract forced confessions. The interviews entail striking accounts of torture including forcing the prisoners to eat human feces/urine, forcing prisoners to admit to having sexual relationships, hitting the body with electric shock, among others. The documentary also includes footage

---

[39] Journalist Recounts the Absurdity and Torture Of 544 Days in Iran's Evin Prison, January 22, 2019

leaked from the Ministry of Intelligence, where agents interrogate and physically attack the wife of a former intelligence officer (Saeed Emami) who was allegedly involve in a series of murders of intellectuals (the Chain Murders).

### d.  Forced Confessions

Iranian security forces and interrogators often use intimidation, ill-treatment and torture to force individuals to appear on televised programs and "confess" to crimes dictated to them by their interrogators, to speak against themselves and others, to "repent," and to ask for the forgiveness of the Supreme Leader. Prisoners provide these false and incriminating confessions under the pretense of promises of leniency by the interrogators to reduce their charges or end their imprisonment, or in some cases in order to protect their family and associates from threats of harmful actions against them by the security forces. For example, in the case of Ahmadreza Djalali, an Iranian-Swedish academic and medical doctor who was sentenced to death for "corruption on earth" (efsad-e fel-arz) in October 2017 after a grossly unfair trial before Branch 15 of the Revolutionary Court in Tehran, the court relied primarily on "confessions" that were obtained under torture and other ill-treatment including threats to execute him, kill or otherwise harm his children, who live in Sweden, and his mother, who lives in Iran. These confessions were extracted while Djalali was held in prolonged solitary confinement without access to a lawyer.[40]

A recent report by two organizations the International Federation for Human Rights (FIDH) and Justice for Iran released on the occasion of the International Day in Support of Victims of Torture, June 26, highlights and provides an in-depth look at the phenomenon of forced confessions in Iran:

> *Between 2009 and 2019, Iranian state-owned media broadcast the forced confessions of at least 355 individuals and defamatory content against at least 505 individuals,*

---

[40] Amnesty International Urgent Action 38.17, January 13, 2021.

*according to a new report published today by FIDH and its member organization*
*Justice for Iran (JFI).[41]*

In July 2002, Siamak Pourzand under torture was forced to provide confessions in a televised session:

> *IRAN: TV DISPLAYS A DISSIDENT'S CONFESSION State television broadcast what*
> *it called confessions of espionage by a liberal dissident jailed serving an 11-year jail*
> *sentence for trying to undermine the Islamic Republic. The dissident, Siamak*
> *Pourzand, was arrested last year and convicted of having ties to opposition groups in*
> *the United States, trying to spread corruption and poisoning the minds of young*
> *people. Mr. Pourzand, 73, appeared frail but animated during an interview with*
> *journalists from state media. Human Rights Watch has called Mr. Pourzand's trial "a*
> *continuation of a pattern of repression against reformist and independent figures."[42]*

In 2012, Maziar Bahari the former Iran correspondent for Newsweek in Iran who was arrested and imprisoned in Iran after the 2009 protests made a documentary film on the topic of forced confessions[43]. Bahari was interrogated, tortured and he was forced to provide false confessions. The documentary reveals details of the organized torture and forced confessions with focus on the case of six prominent former prisoners including Siamak Pourzand. Through interviews with some of the former prisoners or their families (in case of Mr. Pourzand, his wife Ms. Kar and her daughter Lily Pourzand were interviewed) the film explores the plethora of brutal torture techniques that victims had undergone and resulted in providing forced confessions based on pre-written scenarios by their interrogators.

### e.  Harassment of Victims and Their Relatives

---

[41] Orwellian State: The Islamic Republic of Iran's State Media as a Weapon of Mass Suppression, FIDH and Justice for Iran (June 25, 2020)
[42] The New York Times. *World Briefing: Middle East.* July 26, 2002
[43] Forced Confessions a documentary by Maziar Bahari (2012)

IRI has a track record for the harassment of victims and their families prior to, during, and after imprisonment. For instance, security forces continue to harass the families and intervene in memorial events for the victims of the Chain Murders of Iran. Parastou Forouhar, a prominent Iranian-German artist and daughter of Dariush Forouhar and Parvaneh Eskandari Forouhar, and her family were banned from holding memorials for several years[44]. Families of other victims of the Chain Murders have been going through similar experiences including the family of another victim of the Chain Murders, the poet Mohammad Mokhtari[45]

In one case, in 2003, Sina Motallebi, a journalist and blogger, was arrested on the charges of "undermining national security through cultural activities". The charges were related to his weblog rooznegar.com where on several occasions he had raised awareness regarding the cases of imprisoned journalists, featured his interviews with the foreign media, and published a cartoon that the authorities found offensive[46]. He was freed after several months in prison and sought asylum in The Netherlands. In response, the judiciary arrested his father, Saeed Motallebi, a well-known film director and screenplay writer, for 10 days despite the fact that Sina had left Iran legally in order to pressure Sina and in retribution to his critical public statements on blogging regulations in Iran and details of his prior interrogations[47]. Mohammad Ali Abtahi, a Vice President to President Khatami, condemned the arrest and labeled it as part of a disturbing trend of "family arrests". Abtahi himself was arrested in 2009 during the contested presidential election in Iran and ,along with several other prominent former officials, provided forced confessions[48].

Another well-known case is the case of an Iranian-Canadian sociology professor and environmentalist, Kavous Seyed-Emami who was arrested in January 2018 (among a team of conservation environmentalists) on fabricated charges of "spying for the enemy" through the environmental monitoring and endangered species preservation projects he and his team were

[44] Qantara, Iranian Society in Shock, December 9, 2019.
[45] RadioFarda, Mohammad Mokhtari's Son Recalls the Murder of His Father in 1988, December 24, 2020.
[46] Iranian journalist faces manslaughter charge. May 9, 2003.
[47] Bucar, E., & Fazaeli, R. (2008). Free Speech in Weblogistan? The Offline Consequences of Online Communication. International Journal of Middle East Studies, 40(3), 403-419.
[48] The New York Times: "Iran Broadcasts Confessions by 2 Opposition Figures on Trial" by Robert F. Worth and Nazila Fathi. August 2, 2009.

running in Iran through his organization the Persian Wildlife Heritage Foundation. Seyed-Emami was found dead in Evin prison a few weeks after his arrest. Iranian authorities announced his death as a suicide, a claim his family and friends have publicly and strongly challenged [49]. His family, and in particular, his wife Maryam Mombeini, suffered tremendously during this ordeal[50]. Authorities detained Maryam, an Iranian-Canadian citizen, and confiscated her passport as she tried to leave Iran with her sons in March 2018. She was not allowed to leave Iran for 582 days:

> *"...Mombeini was briefly detained by Iranian officials before being returned to Tehran. Her sons said she relied on family and friends for financial support over the following 18 months, as authorities in Iran had long since seized the deeds to the family home and the other assets.*
>
> *Ramin and Mehran fought to bring their mother to Canada in the months after their arrival, imploring Justin Trudeau's government to intervene in the case and investigate their father's death. Ramin, Mehran and Mombeini had all previously lived in Vancouver and Toronto."[51]*

Maryam was finally allowed to leave Iran and join her sons in Vancouver, Canada on October 11, 2019. Seyed-Emami's team members including a dual national (Iranian-American) Morad Tahbaz, remain imprisoned to this date.

Another case of harassment of family members involves Shirin Ebadi, an Iranian political activist, lawyer, a former judge and human rights activist, and the 2003 Nobel Peace laureate. Ebadi was constantly harassed by the Iranian regime due to her internationally recognized legal and human rights work and finally left Iran in 2009. In 2016, in an article in *The New York Times*[52], Ebadi revealed the ordeal she went through in her personal life when her husband Javad Tavassolian was tricked into cheating and videotaped by security agents. He

---

[49] BBC, Kavous Seyed-Emami: Iran Environmentalists' Death Was Suicide, Iran Says. February 11, 2018.
[50] The New York Times, Iran finally let her see her husband. He was dead by Thomas Erdbrink, February 22, 2018.
[51] CBC, After 582 days, woman detained in Iran after husband's death reunites with sons in Vancouver, by Rianna Schmunk, October 11, 2019.
[52] The New York Times, Tricked Into Cheating and Sentenced to Death, by Shirin Ebadi, March 3, 2016.

was arrested, flogged for having consumed alcohol, and was sentenced to death by stoning for committing adultery. In order to gain his freedom, the security agents forced Tavassolian to denounce his wife as a Western agent in a video message[53].

The Iranian regime constantly uses family members, including children, as pawns to force prisoners into accepting fabricated charges, agreeing to provide confessions, or simply as a means of psychological torture. For example, Narges Mohammadi, a prominent human rights activist, was deprived of seeing her twin son and daughter for many years[54]. In 2015, in a letter from prison[55], Narges wrote about the pain and suffering she and her family went through.

Mahdieh Golrou, a prominent activist, and a number of other protesters on October 25, 2014 several days after participating in a demonstration against the acid attacks on women in Isfahan arrested by Iranian authorities. In order to pressure Golrou to cooperate with the intelligence agents, they arrested her husband Vahid La'alipour although he was not politically active. Agents arrested La'alipour several times before a court eventually sentenced him to a year in prison.[56]

In a recent case related to the prominent human rights lawyer, Nasrin Sotoudeh, her daughter Mehraveh Khandan was arrested, tried, and charged on bogus charges. She was subsequently released on bail. Sotoudeh's family is believed to be targeted and harassed to intimidate her and to force the family into silence. In addition to the arrest of her daughter, the family's bank account was also blocked[57]. The Center for Human Rights in Iran articulates the pattern of targeting and harassment of prisoners and their families:

---

[53] Radio Free Europe/Radio Liberty, Ebadi: Iranian Agents Tricked Her Husband Into Cheating. March 3, 2016.
[54] Center for Human Rights in Iran, Political Prisoner Narges Mohammadi Has Been Separated from Her Children for Five Years and Counting, October 15, 2019.
[55] Amnesty International, "Tearing My Heart to Pieces"—A Mother's Story from Prison in Iran, by Narges Mohammadi, August 4, 2015.
[56] IranWire, Call for Release of Acid Attack Activist, by Parvaneh Masoumi, January 21, 2015.
[57] Center for human Rights in Iran, Judiciary Blocks Nasrin Sotoudeh's Bank Account, Cutting Off Funds for Family, July 28, 2020.

> *"The harassment of the family members of political prisoners, activists and other*
> *human rights defenders, as well as the those of journalists and dissidents who are*
> *based abroad, is a longstanding policy of the authorities in Iran.*
>
> *Threats and other forms of intimidation, as well as prosecutions on manufactured*
> *charges are among the tactics, along with explicit warnings for family members not*
> *to speak to the media."[58]*

This is also well documented by other organizations[59].

Clearly, Siamak Pourzand's family was not an exception to the described patterns of harassment and targeting. In reviewing the patterns of harassment of families, one can easily recognize similarities between the case of Mr. Pourzand with many of the other cases described above. In fact, given Mehrangiz Kar's activities as a lawyer and human rights activist, it is clear that Siamak Pourzand was targeted and harassed at least partially due to the regime's issues with Ms. Kar. Regardless, the family and, in particular, Mr. Pourzand and Ms. Kar's children, were doubly impacted in this process.

As Mehrangiz Kar, mentioned to *The Boston Globe*[60] in 2006, she went through an ordeal of going through breast cancer treatment and struggled to keep her family together:

> *"After bringing her younger daughter, Azadeh Pourzand, now 21, to Maryland, Kar*
> *had hoped to return to Iran. But after her husband's arrest, she decided she could be*
> *of more use publicizing his predicament outside the country.*
>
> *Now Kar struggles to keep together a family in four parts of the world. She worries*
> *about her husband, who since she left the country has been arrested twice, fallen into*
> *a coma, had a heart attack, and suffered a spinal condition that left him barely able*

---

[58] Center for human Rights in Iran, Sotoudeh's Daughter Defends Herself in Court against Bogus Charges, October 27, 2020.
[59] Human Rights Watch, Iran: Activists' Families Facing Harassment, August 9, 2018.
[60] Boston Globe: "I would like to die in my country" by Vanessa E. Jones. Published on March 21, 2006

*to walk. Her eldest daughter, Lily Pourzand, 31, moved to Canada in 1999 after getting her law degree in Iran because she knew that a person from a political family like hers could never pass the country's bar exam."[61]*

As a teenager, Azadeh Pourzand suffered through the trauma of her mother's imprisonment followed by the ordeal of her father's disappearance.

## V.   Summary of Conclusions

My report is focused on identifying and highlighting the patterns of unlawful detention, torture, forced confessions, and extrajudicial killings as well as systematic issues of due process of law by the IRI. As it relates to Mr. Pourzand's case, I have summarized the following:

- Unlawful detentions, due process issues, and the denial of victims to a fair trial are commonly observed in the cases of Iranian dissidents. Based on documents reported by human rights organizations and news media, Mr. Pourzand's case follows these patterns.

- Torture and forced confessions are commonly practiced by the IRI intelligence apparatus to produce "evidence" against the victims. The IRI judiciary system has been generally receptible of evidences produced through these illegal practices and continues to issue charges on the basis of victims' confessions under torture albeit serious concerns raised by current and former victims, legal experts and practitioners, and the human rights community. Mr. Pourzand is among the well-known and well-documented cases of forced confessions obtained under torture and coercion.

- Studying this case leaves little doubt for me that Mr. Pourzand suffered through an almost 10-year long ordeal and was victim to physical and emotional torture. Mr. Pourzand was victim of brutal physical torture while he was kept in different detention facilities, and when he was under house arrest. Mr. Pourzand's family (including the Plaintiffs) suffered through this ordeal and were victims to emotional and economic abuse.

---

[61] Ibid.

- Mr. Pourzand's death is directly related and caused by the acts of the government of Iran.

My review of Mr. Pourzand's case identifies familiar patterns of violation of rights by the IRI; arbitrary detention, forced confession, emotional and physical torture, pressure on the family, lack of due process of law and access to lawyer of choice and a free trial.

As a scholar and an activist familiar with human rights matters, and in particular, human rights violations in Iran, I can confidently attest to the severity of the ordeal and the injustice suffered by Mr. Pourzand and his family, and in particular, the Plaintiffs Ms. Mehrangiz Kar and Ms. Azadeh Pourzand.

I reserve the right to modify or add to these opinions to address new information and documents that may come to light during these proceedings.

I have provided my report on a *pro bono* basis.

Ali Arab, Ph.D.
March 7, 2021

## Appendix A: CV Report

[INSERT CV HERE]

# Appendix B: References

**Amnesty International**

Iran: Detainees Flogged, Sexually Abused and Given Electric Shocks in Gruesome Post-Protest Crackdown, 2 September 2020

Human Rights in Iran: Review of 2019, 18 February 2020

Blood-Soaked Secrets: Why Iran's 1988 Prison Massacres Are Ongoing Crimes Against Humanity, 4 December 2018.

Siamak Pourzand: Persecuted to death, harassed after death, 6 May 2011

Prisoner of Conscience Appeal Case: Siamak Pourzand: a Case Study of Flagrant Human Rights Violations, 12 May 2004

Further Information on Health Concern/ Possible Torture or Ill-Treatment and New Concern: Fear for Safety, Siamak Pourzand, 5 April 2004

Further Information: Disappearance / Possible Extrajudicial Execution, Fear of Possible Ill Treatment or Torture Siamak Pourzand, 30 July 2002

9 May 2002
https://www.amnesty.org/en/documents/mde13/007/2002/en/

1 February 2002
https://www.amnesty.org/en/documents/mde13/001/2002/en/

12 December 2001
https://www.amnesty.org/en/documents/MDE13/014/2001/en/

Disappearance / Possible Extra Judicial Execution, Siamak Pourzand, 27 November 2001

**Human Rights Watch**

HRW World Report 2021: Iran

Iran: "Trial" a Mockery of the Law, March 12, 2002

Iran: Journalist at Risk, December 21, 2001

**Iran Human Rights Documentation Center**

Mockery of Justice: The Framing of Siamak Pourzand, February 4, 2011

**Pen America Center**

Pen American Center Mourns Suicide of Iranian Journalist Siamak Pourzand

May 3, 2011

https://pen.org/press-release/pen-american-center-mourns-suicide-of-iranian-journalist-siamak-pourzand/

https://pen.org/advocacy-case/siamak-pourzand/

**Reporters Without Borders**

May 2, 2011
https://rsf.org/en/news/iranian-authorities-responsible-siamak-pourzands-death
Appeal for release of 11 imprisoned journalists to mark UN envoy's visit

November 4, 2003
https://rsf.org/en/news/appeal-release-11-imprisoned-journalists-mark-un-envoys-visit

**The United Nations Office of the High Commissioner for Human Rights (UN Human Rights)**

Human Rights Conditions in Islamic Republic of Iran
https://www.ohchr.org/EN/Countries/MENARegion/Pages/IRIndex.aspx

Afshari, R. (2011). *Human rights in Iran: The abuse of cultural relativism*. University of Pennsylvania Press.