IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Mehrangiz Kar and Azadeh Pourzand,

*Plaintiffs*,

vs.      Case Number:  1:19-cv-02070-JDB

The Islamic Republic of Iran et al.;

*Defendants*.

## DECLARATION OF DREWERY DYKE

I, Drewery Dyke declare as follows:

1. I am a dual Canada-United Kingdom national and reside in London, United Kingdom. I maintain, at the time of writing, a moderately active public profile, including on Twitter and in relation to part-time roles I fulfill with human rights-focused NGOs such as Salam for Democracy and Human Rights.[1]
2. Between 1999-2017 I worked as a Researcher in Amnesty International's International Secretariat, where I researched and produced human rights-focused campaign and advocacy material on Iran and other countries according to my country and thematic portfolio assignment. I have published, in my name and under pseudonyms, commentary on political and human rights issues in Turkey, Iran, Saudi Arabia and Bahrain as well as other parts of the Middle East and have undertaken short-term contractual work (e.g., for UNESCO) translating Iranian government documentation into English.
3. Between 14 -16 June, 2004 I visited Tehran, Iran as a member of the NGO component of a European Union delegation. The visit was part of the then EU-Iran Human Rights Dialogue.[2]
4. On 15 or 16 June 2004, I visited Siamak Pourzand in a hospital in Tehran. Two photos (*See* Exhibit A) were taken of the visit. At the time of writing, I do not recall the name of the hospital nor how I know at which hospital he was being kept.
5. On account of my role as the Iran Researcher at Amnesty International, I was well-acquainted with Siamak Pourzand's plight and experience. I wrote, for example, the first Amnesty International Appeal[3] on 27 November 2001, in relation to Iranian officials'

---

[1] *See*, for example, the June 2020 Report I authored on behalf of Ceasefire Centre for Civilian Rights and Minority Rights Group, "In the Name of Security: Human Rights Violations Under Iran's National Security Laws." https://www.ceasefire.org/wp-content/uploads/2020/06/In-the-Name-of-Security_Iran_EN_June20.pdf

[2] *See*, for example, Human Rights Watch – Iran: Europe needs a tougher stance, 9 June 2004, accessed 19 March 2021 at: https://www.hrw.org/news/2004/06/09/iran-europe-needs-tougher-stance or the European Parliament's June 2007 assessment: https://www.europarl.europa.eu/RegData/etudes/note/join/2007/381396/EXPO-DROI_NT(2007)381396_EN.pdf

[3] "Iran: Dissapearance/ Possible Extrajudicial Execution, Siamak Pourzand," Amnesty International, 27 November 2001, https://www.amnesty.org/en/documents/MDE13/046/2001/en/.

     arbitrary arrest of Siamak Pourzand.  At the time, I was in contact with, mainly, Lily Pourzand and, to a lesser extent, Banafsheh Zand-Bonazzi. Later, I was also in contact with Azadeh Pourzand. I researched and wrote Amnesty International's five subsequent documents[4] relating to Siamak Pourzand. These five exclude references in Amnesty International's annual reports.[5]
6. Separately, as part of my work at the time, in the course of 2000 and 2001, I had been in contact with Siamak Pourzand's wife, the lawyer and human rights activist, Mehrangiz Kar. I met with her for the first time in Berlin, in April 2000, in the context of a conference on Iranian politics hosted by the Heinrich Böll Foundation.

The following part of this statement sets out (7) other, credible sources relating to Siamak Pourzand's plight; and (8) some recollections about my June 2004 visit with Siamak Pourzand and (9) my assessment of individual and state conduct towards Siamak Pourzand and others.

7. A detailed timeline of the Government of Iran's (GoI) arbitrary arrest and detention, unfair trial, torture and ill treatment of Siamak Pourzand can be built upon the documents I wrote at the time for Amnesty International, but also upon other, credible, well-documented and sourced human rights research, including that issued by Human Rights Watch, such as the 12 March, 2002 statement, *Iran: "Trial" a Mockery of the Law*[6] and, in particular, the Iran Human Rights Documentation Center's 4 February 2011 report entitled *Mockery of Justice - The Framing of Siamak Pourzand*[7], as well as Iran-based news reports at the time. A timeline of the administration of justice in Siamak Pourzand's case shows, I believe, that the purported case against him was politically motivated and was one in which the GoI treated him not for what the authorities alleged that he did but rather who he was, that is, his identity.
8. The manner of Siamak Pourzand's death was so exceptional that Amnesty International, *exceptionally*, posted to the internet, on 6 May 2011, a personal statement written by me and entitled *Siamak Pourzand: Persecuted to death, harassed after death*[8]. It was, to the best of my recollection, the first time I had commented publicly on my June 2004 visit with Siamak Pourzand. He was not, as I recall, aware that I was going to visit (though it is possible that Azadeh or Lily managed to reach him to let him know - I did not recall), and due to his treatment, he may not have been there, but he was. In 2011, I wrote that he was wrapped from head to toe in gauze. This was - again, as I recall - to prevent his blood

---

[4] See Amnesty International, https://www.amnesty.org/en/search/?q=siamak+pourzand.
[5] See, for example, Amnesty International - Annual Report 2003 (covering events in 2002), in the Iran entry, where it states: *Siamak Pourzand, aged 72, was sentenced to 11 years' imprisonment in April following an unfair trial. He had reportedly admitted to a range of accusations, including "having links with monarchists and counterrevolutionaries" and "creating disillusionment among young people". Also in April he made a televised "confession". The same month he reportedly suffered a heart attack and may have been denied effective medical treatment. AI feared that he was coerced into not lodging an appeal against the sentence, which was upheld in early July. He continued to be held in a secret location until his temporary release in December* [2002], accessed 19 March 2021 at: https://www.amnesty.org/download/Documents/POL1000032003ENGLISH.PDF
[6] "Iran: 'Trial' a Mockery of the Law, Human Rights Watch, March 12, 2002. https://www.hrw.org/news/2002/03/12/iran-trial-mockery-law#.
[7] "Mockery of Justice: The Framing of Siamak Pourzand," Iran Human Rights Documentation Centre, February 4, 2011, https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/.
[8] "Siamak Pourzand: Persecuted to Death, Harassed After Death," Amnesty International, 6 May 2011, https://www.amnesty.org/en/latest/campaigns/2011/05/siamak-pourzand-persecuted-to-death-harassed-after-death/.

pressure from dropping and to manage his multitude of ailments. He looked extremely weak, not only because of his advanced age, even at that time, but he was, rather, suffering from a long list of severe medical complications arising from his treatment (and the absence of adequate medical attention and care), including in connection with his heart and an acute spinal condition. Siamak Pourzand was suffering from enduring years of physical and mental torture in Evin Prison. The cocktail of medicines that he took constituted, in retrospect, a palliative against the fundamental 'illness' of the manner in which the GoI treated him. When I arrived and I introduced myself, he exerted himself to make me feel 'at home' in keeping with the graciousness of a distinguished gentleman receiving guests at his home. In 2011, I noted that he was clearly in pain and discomfort and yet this appeared to be overtaken by his thirst to ask and learn about current developments in politics. As I noted in 2011, a former cellmate - a supporter of constitutional monarchy - stopped by to pay his own respects to the distinguished journalist and patron of the arts, and they talked about mutual friends and the prospect for change - however small, or local it could be. Later, too, a sister visited. She was very shy but his ease with me appeared to coax from her a feeling that she could also relax: like so many families in Iran at the time, one could never be sure about who other people were in the same room. In what I saw of his engagement with his sister at the hospital and how he spoke about Banafsheh, Lily and Azadeh as well as Mehrangiz Kar, he appeared at the time devoted to his family; they certainly seemed to be a source of strength for him. As I wrote in 2011, he was quick to smile and make light of what was a grave situation. In short, he exhibited the dignity and honour in measures that exceeded the absence of such qualities in terms of how the GoI had treated him.

9. The GoI is a state party to, *inter alia*, the International Covenant on Civil and Political Rights.[9] Yet, the laws and practices governing the administration of justice shaped - in broad measure - the officials' conduct towards him during the successive injustices Siamak Pourzand faced. Agents of the GoI subjected him to:
    - Arbitrary arrest
    - Arbitrary detention
    - Cruel, inhuman and degrading treatment
    - Torture and other forms of ill treatment, including of a psychological character

9.1 One (of a variety) of interpretations as to who could held responsible for the internationally recognised violations of human rights standards, as well as violations in terms of the GoI's own Constitution, could be the *qazi-ye parvandeh*, the case judge, Sabir Zafarqandi.[10] Article 171 of the Constitution places, rightly or wrongly, the burden

---

[9] "International Covenant on Civil and Political Rights," The United Nations Human Rights Office of the High Commissioner, https://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx.

[10] Parliament of Iran - Constitution, accessed 20 March 2021 at: https://en.parliran.ir/eng/en/Constitution - The relevant articles cited here are: *Article 168 - Political and press offences will be tried by jury in open courts. The manner of the selection of the jury, its qualifications and powers, and the definition of political offences, will be determined by law in accordance with Islamic criteria; Article 170 - Judges are obliged to refrain from enforcing the government's decrees and regulations that are in conflict with Islamic laws and norms, or which lie outside the competence of the Executive. Everyone has a duty to demand the annulment of any such regulation from the Court of Administrative Justice; Article 171 - Whenever an individual suffers moral or material harm or loss as a result of a judge's default or error regarding the subject matter of a case, or the law applicable, or in the application of law to a particular case, the defaulting judge is liable for the reparations in accordance with Islamic criteria. Otherwise, losses will be compensated by the State, and in all such cases, the repute and good standing of the accused will be restored.*

     of redress squarely upon judges. Insofar as the conduct meted out to Siamak Pourzand did, in fact, deviate from the treatment provided for under law - including international human rights laws - at the time of his arrest and detention, the case judge could be seen as having failed to adhere to Article 170 of the Constitution. Article 168 provides, in addition, for trial in an open court in respect to allegations of a political nature.

9.2 The moral, ethical and legal facets of the conduct of individual GoI agent towards Siamak Pourzand notwithstanding, I believe that an analysis *in the round* regarding the conduct of agents - including those with arresting power, prosecutorial and judicial functions - towards scores of cases, indeed whole categories of cases would reveal that the treatment faced by Siamak Pourzand was structural and, in effect, systematic in nature. In other words, I suggest that institutions under the formal or effective control of the Office of the Supreme Leader, at least at that time, treated categories of people in the same way as they did Siamak Pourzand, and therefore responsibility for the implementation of such policies falls on the shoulders of the Office of the Supreme Leader and the Supreme Leader himself.

10. The GoI's failure to possess dignity and its drive to harass Siamak Pourzand extended even beyond his passing. On the morning of 5 May 2011, friends and family had gathered at the Nour Mosque in Fatemi Square, Tehran for the funeral service when security officials prevented the ceremony from taking place. While I no longer conduct daily research on the human rights situation in Iran, evidence arising from my June 2020 report (see above) as well as a casual perusal of the output of Iran-focused human rights organisations indicates that analogous injustice continues in Iran today. The GoI continues to hold and ill-treat political prisoners and its agents' conduct appears to constitute a structural, systematic violation of international human rights standards. There is a growing sense, even in wider society, it seems to me, that the GoI and specific political figures or officials must be held accountable.

I declare and can competently testify under penalty of perjury that the foregoing is true and correct.

Executed this 22 June, 2021.

_____
Drewery Dyke