

**IRAN HUMAN RIGHTS**
Documentation Center



# Mockery of Justice
## The Framing of Siamak Pourzand



**Iran Human Rights Documentation Center**

The Iran Human Rights Documentation Center (IHRDC) is an independent and nonpartisan scholarly undertaking to establish a comprehensive and objective historical record of the human rights situation in the Islamic Republic of Iran since the 1979 revolution. This evolving historical record includes the collection and analysis of a broad range of documents and testimonies in an archive that is accessible to the public for research and educational purposes. Based on the principle that accounting for past abuses is essential for future social progress and democratic transformation, the IHRDC encourages an informed dialogue on the human rights situation in Iran. The IHRDC collaborates with a wide range of scholars and experts in human rights documentation and various other disciplines and projects.

**IHRDC Mission**

To investigate and document human rights abuses in Iran;

To raise international awareness of human rights violations in Iran and bring pressure to bear on the Iranian government to end these abuses;

To raise local awareness of human rights violations and international human rights standards inside Iran;

To establish an online archive of human rights documents that can one day be used to develop and support a reckoning process in Iran.

**Iran Human Rights Documentation Center**
129 Church Street
New Haven, Connecticut 06510, USA
Tel: +1-(203)-772-2218
Fax: +1-(203)-772-1782
Email: info@iranhrdc.org
Web: http://www.iranhrdc.org

Photographs:
The front cover photograph was taken by an independent photojournalist in Ghezel Hesar Prison on the outskirts of Tehran. The picture of Mohammad Ghalibaf was taken from Iran News Broadcasting website at http://iranews.biz/.

The image of Siamak Pourzand on the back cover is taken from Mr. Pourzand's televised confession and was obtained from the Iranian Student News Agency, ISNA, at http://isna.ir/isna/PicView.aspx?Pic=Pic-143558-1&Lang=P.

Photographs used throughout the report were obtained from Lily Pourzand and from ISNA's website.

© 2008 All Rights Reserved.
Iran Human Rights Documentation Center, New Haven, Connecticut

# Mockery of Justice:
## The Framing of Siamak Pourzand

## Iran Human Rights Documentation Center

August 2008

**TABLE OF CONTENTS**

1. INTRODUCTION .................................................................................................. 2

2. EXECUTIVE SUMMARY ....................................................................................... 3

3. POLITICAL BACKGROUND .................................................................................. 5

4. THE DISAPPEARANCE OF SIAMAK POURZAND ................................................ 8

    4.1. A GROWING THREAT .................................................................................. 10
    4.2. ABDUCTION .............................................................................................. 11
    4.3. WHERE IS SIAMAK POURZAND? ................................................................. 11
    4.4. THE FIGHT FOR ACCESS ............................................................................ 14
    4.5. RELATED ARRESTS .................................................................................... 15
    4.6. APPEALS TO THE MAJLIS ........................................................................... 16
    4.7. ATTEMPT AT BLACKMAIL ......................................................................... 17

5. THE SECRET PRISONS ........................................................................................ 18

    5.1. AMAKEN ................................................................................................... 19
    5.2. PRISON 59 ................................................................................................ 20
    5.3. KHATAM-UL ANBIYA ................................................................................ 20

6. SIAMAK POURZAND ON TRIAL ......................................................................... 21

    6.1. THE NATURE OF THE TRIAL ...................................................................... 21
    6.2. THE FAMILY AGAIN APPEALS FOR HELP .................................................... 23
    6.3. SENTENCING ............................................................................................. 25
    6.4. FURTHER ARRESTS .................................................................................... 28
    6.5. TELEVISED CONFESSION ............................................................................ 29
    6.6. "THE SUITE" ............................................................................................ 30

7. POLITICAL REACTION ....................................................................................... 31

8. TEMPORARY RELEASE ....................................................................................... 34

9. EVIN PRISON ...................................................................................................... 35

    9.1. UN WORKING GROUP ON ARBITRARY DETENTION REPORT ........................ 36
    9.2. FAILING HEALTH ...................................................................................... 37

10. VIOLATIONS OF NATIONAL AND INTERNATIONAL LAW ............................... 38

    10.1. VIOLATIONS OF IRANIAN LAW ................................................................ 38
    10.2. VIOLATIONS OF INTERNATIONAL HUMAN RIGHTS LAW ............................ 40

11. CONCLUSION .................................................................................................... 41

METHODOLOGY ..................................................................................................... 43

ABBREVIATIONS ..................................................................................................... 44

# 1. Introduction

This report documents the abduction and trial of Siamak Pourzand, a seventy-year-old journalist who was held in a number of illegal detention facilities during President Khatami's second term in office (2001-2005). During the reform era, the conservative clerical establishment headed by Supreme Leader Ayatollah Ali Khamenei continued to exercise great influence over Iranian public life through a network of agencies and institutions that operated in parallel to the official state. Mr. Pourzand was a victim of this system.

Siamak Pourzand's case is particularly significant as it was leveraged by the conservative establishment to push back against journalists promoting the reform movement. This surprisingly well-documented case provides valuable insights into an ordeal to which many other opposition and dissident figures were also subjected. It demonstrates in compelling detail the degree to which the rule of law has been subverted in Iran by members of the clerical establishment.

In pursuing Siamak Pourzand, the conservative establishment flouted both the rules and procedures of the Iranian judicial system and international human rights standards. Mr. Pourzand was held illegally in a series of undisclosed locations and was not informed of the reasons for his arrest; he was not informed of the precise charges against him; he was denied the legal counsel of his choice; his family's access to him was restricted; he was detained without charge longer than Iranian law permits; he was not able to challenge the lawfulness of his arrest; and he was denied access to appropriate medical care. Throughout his ordeal, the courts colluded in his mistreatment.

Siamak Pourzand's case sheds much needed light on the parallel state run by the conservative establishment during the reform era. Mr. Pourzand's human rights were abused for political purposes. He was vilified in Iran's government-controlled media, imprisoned unlawfully, denied due process, denied a fair trial and forced into self-incrimination. His case is emblematic of the manner in which the conservative clerical establishment cynically undermined institutions of their own creation to maintain their influence over Iranian society, despite the clearly expressed will of the Iranian electorate for greater freedom in their daily lives.

# 2. Executive Summary

Siamak Pourzand was an independent cultural commentator on the fringes of the reform movement. He is also the husband of the prominent Iranian human rights campaigner, Mrs. Mehrangiz Kar. Seventy-years-old at the time of his initial disappearance in 2001, the case manufactured against him was used by the conservative clerical establishment to undermine popular support for the reform movement and to intimidate prominent reformers.

- Conservative hard-liners used a relatively obscure branch of the Iranian Law Enforcement Agency (NAJA), known variously as the Bureau of Premises (*Amaken*) or the Committee for the Propagation of Virtue and the Prohibition of Vice, to advance their agenda. They then manipulated the judicial process to ensure that Siamak Pourzand's case was heard by a judge, Ja'far Sabiri Zafarqandi, who was sympathetic to their plans.

- The case against Siamak Pourzand was fabricated by coercing a secretary at his office, Ms. Venus Farimehr, into confessing that they were having an illicit relationship. Ms. Farimehr, who ended up in hospital after her ordeal, did her best to warn Mr. Pourzand and his family that he was at risk.

- Siamak Pourzand was abducted from outside his sister's home on November 24, 2001, and it was two weeks before his family received any news of what had happened to him. Mr. Pourzand was not presented with an arrest warrant nor was he advised of the charges against him. He was held in a succession of undeclared detention facilities operating outside Iran's official State Prisons Organization. His family was never told where, or by whom, or why he was being held.

- The manner in which Siamak Pourzand was treated violated the Constitution of the Islamic Republic of Iran, Iran's Code of Criminal Procedure, and international standards of due process. As a secret prisoner thrown into a maze of undeclared detention facilities, he was quite literally at the mercy of the parallel state maintained by the conservative clerical establishment during Iran's reform era. His subsequent confession to the charges ultimately brought against him reflects the duress to which he was subjected in this period.

- Siamak Pourzand was denied access to the legal counsel of his choice, future Nobel laureate Mrs. Shirin Ebadi, who was warned off the case in threatening terms by Judge Zafarqandi. The performance of Mr. Pourzand's court-appointed defense attorney, Mr. Dabir Daryabigi, was such to suggest a degree of complicity between the lawyer and those holding his client.

- Siamak Pourzand was ultimately convicted of a range of offenses, mostly relating to national security rather than the alleged moral offenses for which he was originally detained. He was falsely accused and convicted of spreading anti-regime propaganda, collaborating with anti-regime elements, and distributing foreign funds to reformist newspapers. Having been sentenced to eleven years in prison and seventy-four lashes, Mr. Pourzand was brought out of detention to participate in a tightly controlled televised press conference in which he was compelled to publicly confess his guilt. His confession was used to justify the arrests of prominent members of the reform movement.

- In the judgment of the United Nations Commission on Human Rights Working Group on Arbitrary Detention, which reviewed Siamak Pourzand's case in 2003, his detention by the Iranian Government was indeed arbitrary. The Working Group concluded that he had been detained because of his beliefs and his free expression of those beliefs, and, as such, his detention was a breach of Article 19 of the Universal Declaration of Human Rights and Article 19 of the International Covenant on Civil and Political Rights. The Islamic Republic of Iran is a State Party to both instruments.

- While in prison, Siamak Pourzand's health deteriorated dramatically to the point that he suffered a severe heart attack in April 2004. At the time of this writing, Mr. Pourzand has been conditionally released from prison as he recuperates from successive rounds of surgery, but he still remains under house arrest in Tehran.

# 3. Political Background

Mohammad Khatami's landslide victory in the 1997 presidential election sharpened the factional rivalry inside the Islamic Republic of Iran.  Political and ideological differences came to the fore more forcefully and the contest over the future direction of the society intensified.[1]

The power struggle was primarily between two main factions within the clerical establishment: reformists and conservatives.[2] Khatami recognized the strength of the reformist movement and sought to appeal to reformers by coming out against certain restrictions on individual freedoms under the Islamic Republic. He advocated for a degree of social liberalization and repeatedly pledged during his election campaign to uphold the constitution, protect the rights it guaranteed, and instill the rule of law.[3]

Although the election signaled the strength of popular demands for reform, it did not change the basic framework of the Islamic revolutionary system, and the electoral victory did not translate into deeper social reforms. The Supreme Leader, Ayatollah Seyyed Ali Khamene'i, remained the most powerful political figure in the country and the conservative bloc within the clerical establishment retained control over many state institutions through which they sought to pursue an anti-reform agenda.

The Iranian constitution vests absolute authority in the person of the Supreme Leader under a theocratic doctrine known as the Guardianship of the Jurist.[4] The Supreme Leader is constitutionally responsible for overseeing the general policies of the Islamic Regime of Iran,[5] leaving the President to exercise only the day-to-day authority. The Supreme Leader exercises his power through a network of special representatives[6] who have the authority to intervene in any state matter on behalf of the Supreme Leader.[7]

During President Khatami's first term in office, reformists and conservatives within the religious establishment vied for control of the various levers of state. In 1998, a number of Iranian dissident intellectuals had been brutally murdered in an apparently coordinated campaign that

---

[1] *See* MEHDI MOSLEM, FACTIONAL POLITICS IN POST-KHOMEINI IRAN (2002); REZA AFSHARI, HUMAN RIGHTS IN IRAN: THE ABUSE OF CULTURAL RELATIVISM (2001); PATRICK CLAWSON, MICHAEL EISENSTADT, ELIYAHU KANOVSKY, DAVID MENASHRI, IRAN UNDER KHATAMI (1998); DAVID MENASHRI, POST REVOLUTIONARY POLITICS IN IRAN: RELIGION, SOCIETY AND POWER (2001); ALI GHEISSARI AND VALI NASR, DEMOCRACY IN IRAN 128-145 (2006).

[2] The terms "conservative" and "reformist" can be problematic in the context of Iranian politics. We have used the term "reformist" in this report to refer to the political groupings inside the regime who were pushing for reform from within – groupings that would later become known as *Duvvum-i Khordad-i ha* (The May 23rd Front). The interaction between reformist and conservative elements within Iran's clerical establishment is fluid and complex. IHRDC uses these terms for the sake of simplification, but it must be acknowledged that there are points of division and agreement between both camps on a wide range of issues and such complexities are not easily captured by simple labels. For greater detail on the Iranian political scene during this period see generally MEHDI MOSLEM, FACTIONAL POLITICS IN POST-KHOMEINI IRAN (2002); REZA AFSHARI, HUMAN RIGHTS IN IRAN: THE ABUSE OF CULTURAL RELATIVISM (2001); PATRICK CLAWSON, MICHAEL EISENSTADT, ELIYAHU KANOVSKY, DAVID MENASHRI, IRAN UNDER KHATAMI (1998); DAVID MENASHRI, POST REVOLUTIONARY POLITICS IN IRAN: RELIGION, SOCIETY AND POWER (2001); International Crisis Group (ICG), *Iran: The Struggle for the Revolution's Soul*, August 5, 2002, *available at* http://www.crisisgroup.org/home/index.cfm?id=1673&l=1 (last visited on May 15, 2008).

[3] *See* DAVID MENASHRI, POST-REVOLUTIONARY POLITICS IN IRAN, RELIGION, SOCIETY AND POWER, 80-82 (2001).

[4] *See* QANUN-I ASSASIYIH JUMHURIYIH ISLAMIYIH IRAN [Constitution of the Islamic Republic of Iran] article 2 (adopted 1979, amended 1989) (hereinafter Constitution of Iran).

[5] *See* Constitution of Iran, *supra* note 4, article 5 and article 110.

[6] *See* Constitution of Iran, *supra* note 4, article 110.

[7] DANIEL BYMAN, SHAHRAM CHUBIN, ANOUSHIRVAN EHTESHAMI, JARROLD GREEN, IRAN'S SECURITY POLICY IN THE POST REVOLUTIONARY ERA 24 (2001).

became known as the 'Chain Murders' and was ultimately linked to the Ministry of Intelligence.[8] The Minister of Intelligence serving at the time of the 'Chain Murders' was the conservative cleric Dorri Najafabadi, who was considered to be close to the Supreme Leader.[9] In 2000, President Khatami took advantage of the popular outcry provoked by the 'Chain Murders' to appoint a reformist cleric, Ali Younesi, in Najafabadi's place. Younesi purged the Ministry of elements associated with the 'Chain Murders.' The resulting diminution of their influence within the Ministry led conservatives to seek to extend their influence through the other state intelligence organs.[10]

A number of military and government institutions in Iran maintain an intelligence capability that is independent of the Ministry of Intelligence. The Ministry of Intelligence has primacy in all national security issues while the other intelligence units act primarily in support of their parent institutions.[11] Collectively these subsidiary intelligence units are often known by the shorthand term "parallel institutions" (*Nahadhayih Muvazi*)[12]. Although the Minster of Intelligence is appointed by the President, in conjunction with the *Majlis* (Iran's parliament), the heads of the Intelligence Protection Organization of IRGC, the Intelligence Protection Center of NAJA,[13] the Intelligence Protection Organization of the Army,[14] and the Intelligence Protection Center of the Judiciary are all appointed by the Supreme Leader consolidating conservative control over these

---

[8] See Iranian Student News Agency (ISNA)'s interview with Mohsen Mirdamadi, the head of the National Security and Foreign Policy Commission of Majlis in ISNA, *Hushdar-i Ra'is-i Commission-i Amniyat-i Milliyih Majlis dar Murid-i Bazsaziyih Sitad-i Qatalhayih Zanjirih-i* [Warning of the Head of the National Security Commission of Majlis about the Reformation of the Board of the Chain Murders], 10/14/1380 (January 4, 2002), available at http://isna.ir/isna/NewsView.aspx?ID=News-96091 (last visited June 27, 2008); *Tarik Khanihyih Ashbah*, *Asib Shinasiyyih Guzar bih Dawlat-i Democratic Tawsi'igara* [DUNGEON OF GHOSTS, PATHOLOGY OF TRANSITION TO A DEVELOPMENTAL DEMOCRATIC STATE], 13, 18, 30 and 41 (Akbar Ganji, Tarh-e No, 1999) [hereinafter GANJI: DUNGEON OF GHOSTS].

[9] Akbar Ganji argues that Dorri Najafabadi was appointed Minister of Intelligence contrary to President Khatami's will in 1997. He claims that Khatami introduced him as Minister of Intelligence in his cabinet under pressure from the Supreme Leader. For more information see generally GANJI: DUNGEON OF GHOSTS at 47 and 48].

[10] Mirdamadi claimed in the interview with ISNA that "the *Chain Murder* committee has reconfigured and revived itself after its nuclei was targeted earlier." *See* ISNA, *Hushdar-i Ra'is-i Commission-i Amniyat-i Milliyih Majlis dar Murid-i Bazsaziyih Sitad-i Qatalhayih Zanjirih-i* [Warning of the Head of the National Security Commission of Majlis about the Reformation of the Chain Murder Nuclei], 10/14/1380, (January 4, 2002), *available at* http://isna.ir/isna/NewsView.aspx?ID=News-96091 (last visited June 27, 2008); IHRDC phone interview with a former member of the Office of Intelligence Protection of the Army in Iran (Witness A), United States, May 2, 2008 (on file with IHRDC); IHRDC interview with Mohsen Sazegara, a founding member of the IRGC, United States, February 14, 2008 (on file with IHRDC); IHRDC interview with Ardeshir Zarezadeh, a political dissident who was arrested by the Parallel Intelligence Agency, United States, February 15, 2008 (on file with IHRDC); and Gooya News, *Darbariyih Sazman-i Ittila't-i Muvazi, Qismat-i Aval* [About the Parallel Intelligence System, Part One], 19/2/1384 (May 9, 2005) (accessed on May 22, 2005).

[11] *See* the QANUN-I NIRUYIH INTIZAMIYIH JUMHOURIYIH ISLAMIYIH IRAN [Law of the Law Enforcement Forces of the Islamic Republic of Iran (NAJA)] articles 2, 4.4, 4.7, and 5, available at http://www.police.ir/Portal/Home/Default.aspx?CategoryID=d851787c-8912-4fef-ac2c-dc9bca7f2b6b (last visited on June 26, 2008).

[12] Gooya News, *Darbariyih Sazman-i Ittila't-i Muvazi, Qismat-i Aval* [About the Parallel Intelligence System, Part One], 19/2/1384 (May 9, 2005) (accessed on May 22, 2005).

[13] *See* QANUN-I NIRUYIH INTIZAMIYIH JUMHOURIYIH ISLAMIYIH IRAN [Law of the Law Enforcement Forces of the Islamic Republic of Iran (NAJA)] article 5, *available at* http://www.police.ir/Portal/Home/Default.aspx?CategoryID=d851787c-8912-4fef-ac2c-dc9bca7f2b6b (last visited on June 26, 2008).

[14] QANUN-I ARTISH-I JUMHURIYIH ISLAMIYIH IRAN [Law of the Military of the Islamic Republic of Iran] article 16, comment 1 (1987).

"parallel institutions." Many of those purged from the Ministry of Intelligence by Ali Younesi found new positions in the parallel intelligence units.[15]

The "parallel institutions" gave conservative clerics a base from which to push back against the reform movement. Lacking the sweeping jurisdiction enjoyed by the Ministry of Intelligence, the "parallel institutions" were forced to carefully coordinate their activities, and a secret committee of the heads of the "parallel institutions" was established to this end. This committee reported directly to the Supreme Leader. In addition to the various intelligence units still under conservative control, the Committee also included representatives of the two most important state-controlled media institutions, Islamic Republic of Iran Broadcasting and the *Kayhan* newspaper. The state-controlled media would play a key role in the campaign waged against the reformists, blackening reputations and broadcasting public confessions.[16]

The conservative establishment also continued to exert substantial influence over the judiciary. The Supreme Leader controlled the judiciary by appointing and dismissing the head of the Judiciary.[17] The head of the judiciary in turn had the authority to appoint the head of the Supreme Court and the Chief Public Prosecutor, who had the managerial authority to appoint and dismiss their subordinates. The judiciary was structured in such a way as to ensure that it was subordinated to political considerations and could thus be easily controlled by the clerical establishment.[18]

The conservatives sought to undermine the legitimacy of the reformist movement by linking it to western governments plotting to undermine the Islamic revolution with the tone set by Ayatollah Khamenei's statement that "today, the enemy is striking Islam from home."[19] To this end, the conservatives used the parallel security institutions to collect and, in some cases, manufacture material incriminating individuals linked to the reform movement. The "parallel institutions" operated illegal detention facilities outside the control of the State Prisons Organization[20] where political prisoners were abused and intimidated with impunity. The judiciary not only ignored violations of law by the parallel security forces but also sanctioned their illegal activities by accepting confessions obtained under duress in illegal facilities.[21]

The conservatives exploited the powers granted to the judicial authorities to give a patina of legality to their activities.[22] The conservatives thus used sympathetic judges and law enforcement

---

[15] IHRDC phone interview with a former member of the Office of Intelligence Protection of the Army in Iran (Witness A), United States, May 2, 2008 (on file with IHRDC).

[16] IHRDC interview with Mohsen Sazegara, United States, February 14, 2008 (on file with IHRDC) and Gooya News, *Darbariyih Sazman-i Ittila't-i Muvazi, Qismat-i Aval* [About the Parallel Intelligence System, Part One], 19/2/1384 (May 9, 2005) (accessed on May 22, 2005).

[17] *See* QANUN-I ASSASIYIH JUMHURIYIH ISLAMIYIH IRAN [Constitution of the Islamic Republic of Iran] article 175 (adopted 1979, amended 1989).

[18] MAJID MOHAMMADI, JUDICIAL REFORM AND REORGANIZATION IN 20TH CENTURY, STATE-BUILDING, MODERNIZATION, AND ISLAMICIZATION 163, 197, 126-136 (2008).

[19] Ayatollah Seyyed Ali Khamenei as quoted in MEHDI MOSLEM, FACTIONAL POLITICS IN POST – KHOMEINI IRAN 258 and 262 (2002). *See also* REZA AFSHARI, HUMAN RIGHTS IN IRAN: THE ABUSE OF CULTURAL RELATIVISM, 208 (2001); MENASHRI, *supra* note 3, at 154-155; GANJI: DUNGEON OF GHOSTS at 352, 425-434.

[20] The State Prison Organization is an independent state body that is responsible for monitoring all the prisons in Iran and operates directly under the supervision of the Head of the Judiciary. See A'YIN NAMIYIH IJRA'IYIH SAZMAN-I ZINDANHA VA IQDAMAT-I TA'MINI VA TARBIYATIYIH KISHVAR [Executive Procedure for the Organization for State Prisons and Security and Corrective Measures] article 1 (2005).

[21] MAJID MOHAMMADI, JUDICIAL REFORM AND REORGANIZATION IN 20TH CENTURY, STATE-BUILDING, MODERNIZATION, AND ISLAMICIZATION 163 (2008)

[22] *Id*. at 182-190 (2008); MENASHRI, *supra* note 3, at 148.

officials to advance their agenda.[23] Article 26 of Iran's Code of Criminal Procedure authorizes the head of each legal division to assign a case to relevant branches.[24] Although the law provides strict guidelines on how cases can be referred to a court, it gives prosecutors discretion to decide which type of court shall have the jurisdiction to rule over a case.[25] One court in particular, the Special Court of Mehrabad (Branch 1610), was especially sympathetic to the conservative agenda.[26] Presiding over the Special Court of Mehrabad was Judge Sabiri Zafarqandi.[27] The first victim of this elaborate conspiracy was a liberal journalist named Siamak Pourzand.

## 4. The Disappearance of Siamak Pourzand



Siamak Pourzand serving as a war correspondent in the Sinai desert

Mr. Siamak Pourzand was born in September 1931 and spent his professional career as a journalist and film critic. Prior to his disappearance, Mr. Pourzand was the manager of the Tehran Cultural Center (*Majmuiyyih Farrhang-i Hunariyih Tehran*)[28] and the chief editor of an internal bulletin for the Iranian Civil Engineering Association, *Payam-i Abadgaran*. Between 1998 and 2001, he had been an occasional contributor to a number of reformist newspapers and foreign-based Farsi language media outlet. He was well known for his public criticism of the Islamic Republic's policy toward culture and the arts.[29]

In the immediate aftermath of the Iranian revolution, Siamak Pourzand was banned from working in journalism. Mr. Pourzand was a cosmopolitan and liberal figure who had worked in the United States from 1964-1969 as a foreign correspondent for the pre-revolutionary incarnation of *Kayhan*. He had interviewed U.S.

---

[23] The judicial authorities can order law enforcement agencies to arrest suspects and conduct primary investigations under the Law of the Law Enforcement Forces. See QANUN-I NIRUYIH INTIZAMIYIH JUMHOURIYIH ISLAMIYIH IRAN [Law of the Law Enforcement Forces of the Islamic Republic of Iran (NAJA)] article 4.8, *available at* http://www.police.ir/Portal/Home/Default.aspx?CategoryID=d851787c-8912-4fef-ac2c-dc9bca7f2b6b (last visited on June 26, 2008). For more information, see Section 4 through 9 of this report and Human Rights Watch, *Like the Dead in Their Coffins; Torture, Detention, and the Crushing of Dissent in Iran,* June 2004, *available at* http://hrw.org/reports/2004/iran0604/ (last visited June 15, 2008).

[24] AY'IN-I DADRASIYIH KAYFARI [Iranian Criminal Procedure] article 26 (1997).

[25] *Id.*

[26] Nazanin Namdar, *Dadsarayih Furudgah, Qanuni ya Qayr-i Qanuni?* [Is the Airport Prosecution Office Legal or Illegal?] Rooz Online, September 19, 2005.

[27] Unlike Iran's Revolutionary and Public Courts, the Special Courts have territorially limited and legally narrow jurisdiction. For example, some Special Courts have jurisdiction over specific kinds of crimes such as embezzlement, economic crimes, and Internet crimes. The Special Court of Mehrabad has jurisdiction over the crimes committed inside Mehrabad Airport, Tehran's previous international airport, which would normally relate to customs violations and drug trafficking. *See id.*

[28] The Tehran Cultural Center for Writers, Artists, and Intellectuals provided facilities for artists, writers and other intellectuals to perform, display and discuss their work. The Center also provided a forum for well-known civil society and women's rights activists to talk about the role arts and culture could play in promoting individual rights in Iran. Mr. Pourzand encouraged such discussions.

[29] *See* Pen America's Statement, *Honorary Member, Siamak Pourzand, available at* http://www.pen.org/freedom/hm/pourzand.htm (last visited on July 16, 2008).

President Richard Nixon, as well as a number of other American political and cultural figures,[30] which made him somewhat suspect in the eyes of the new regime – as did the fact that in 1978 he had served briefly as the deputy of the General Manager of the Ministry of Education, and that his brother had been a colonel in the Shah's armed forces.[31] However, Mr. Pourzand was eventually allowed to resume his journalistic career working primarily for *Payam-i Abadgaran*, *Shafa* (a health magazine), and *Fazilat* (a cultural publication).

In 2001 Siamak Pourzand was appointed to manage the Tehran Arts and Cultural Center. The Center had been established as a forum for intellectuals and civil society activists to exchange views on a wide range of issues, including women's rights and freedom of expression. Mr. Pourzand is also the husband of Mehrangiz Kar, a writer, lawyer and prominent women's rights campaigner. Mrs. Kar was sentenced to four years' imprisonment on April 29, 2000, for her participation in a conference entitled *Iran after the Elections* held at Berlin's Heinrich Böll Institute in April 2000.[32]

Mrs. Kar spent 54 days in prison before being released on bail for medical treatment. She left Iran in August 2001 and eventually settled in the United States. From the United States, Mrs. Kar appealed against her conviction, which was partially overturned, and she was discharged by the court with time served. However, three charges still remain open against her, and she has not returned to Iran since 2001. The couple have two daughters, Lily and Azadeh, who were both living in North America by the end of 2001.

Siamak Pourzand's first wife, Manda Zand-Ervin,[33] is also living in the United States. Mrs. Zand-Ervin fled Iran after the revolution. She is the founder and president of the Alliance of Iranian Women, an advocacy group promoting women's rights, and is an active member of the Constitutionalist Movement of Iran, an expatriate political party that supports the restoration of a constitutional monarchy in Iran. Banafshéh Zand-Bonazzi,[34] Mr. Pourzand's daughter from his first marriage, is a long-term resident of the United States, and an active human rights campaigner and critic of the Iranian regime. Mohammad Bagher Ghalibaf, head of the NAJA, would later cite

---

[30] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[31] *Id*

[32] "Iran after the Elections" was a conference on human rights, reform and secularism held in Berlin in the aftermath of the February 2000 election in which the reformists scored a sweeping victory in the *Majlis*. The conference was organized by the Heinrich Böll Institute, which is associated with the German Green Party, on April 7 and 8, 2000. A number of prominent Iranian liberal journalists traveled from Tehran to take part in it. The conference broke up in public disarray and mutual recrimination. One hundred and forty members of the *Majlis* signed a letter to the Supreme Leader condemning the reformists taking part in the conference. Mrs. Kar had prominently criticized the Islamic Republic for violating women rights during the conference, and she was arrested after her return to Iran. She was sent to Evin Prison on April 29, 2000. *See* Human Rights Watch, *Iran: Trial for Conference Attendees*, November 2, 2000, available at http://hrw.org/english/docs/2000/11/02/iran610.htm (last visited on July 22, 2008); and BBC, *Iran bails 'Berlin conference' women*, June 21, 2000, *available at* http://news.bbc.co.uk/2/hi/middle_east/800435.stm (last visited on July 22, 2008).

[33] Prior to the Iranian revolution, Mrs. Zand-Ervin served in Iran's Ministry of Economics and Finance, rising to be Managing Director of the Customs Administration. She fled Iran in June 1979 and ultimately settled in the United States. She is the president of the Alliance of Iranian Women and is a regular television commentator in the U.S. In 2002 she was elected to the Central Council of the Constitutionalist Movement of Iran. In July 2006 Mrs. Zand-Ervin participated in a meeting of Iranian pro-democracy activists hosted by the White House.

[34] Banafshéh Zand-Bonazzi left Iran in 1982. She writes for a number of U.S. publications including The *National Review*, *Defense & Foreign Affairs* and *Front Page Magazine*, and also appears as a television commentator. She is the editor of the English department of the website Iran Press News and is active in the Alliance of Iranian Women.

Mr. Pourzand's relationship with his first wife and their daughter as proof of his "anti-revolutionary activities."[35]

## 4.1. A Growing Threat

At the beginning of November 2001, agents from *Amaken* (literally the Bureau of Premises), a branch of the NAJA responsible for investigating vice crimes committed on both public and private property,[36] raided the home of Siamak Pourzand's sister, Mahin.[37] The agents claimed that they had received reports that her apartment was being used for illegal gambling. During this raid, the agents seized some boxes that were full of clippings and articles that Siamak Pourzand had kept since the 1950s.[38] The boxes also contained a number of photographs taken by Mr. Pourzand during his journalistic career, as well as many private family photos. He later told his family that articles from the seized collection were used against him in interrogations after his arrest.[39]

A few days later, Ms. Venus Farimehr, who worked at the Tehran Cultural Center as the secretary of the Executive Director Mr. Jami'i, was abducted on a street in Tehran.[40] She was missing for twenty-four hours. After her release, she was admitted to hospital in a state of severe physical and emotional shock. She sent a message to Mahin Pourzand urgently seeking a meeting. When Mahin Pourzand visited Ms. Farimehr in hospital, Ms. Farimehr told her that she had been beaten and forced to confess to having a sexual relationship with Mr. Pourzand.[41] Ms. Farimehr said that her abductors had threatened her with being stoned to death – the penalty for committing adultery – if she refused to cooperate.[42]

In mid-November 2001, Siamak Pourzand told his family that he was being followed around Tehran by two men on motorcycles.[43] He also reported that on one occasion a car had pulled up

---

[35] *Parvandiyih Pourzand Ra Bih Dastur-i Ra'is Jumhur Paygiri Kardim* [We Pursued the Pourzand Case at the Order of the President] KAYHAN, 07/11/1380 (October 3, 2002).

[36] See Amnesty International, *Further Information: Disappearance / Possible Extra-judicial Execution, Fear of Possible Ill Treatment or Torture Siamak Pourzand*, May 10, 2002, *available at* http://www.amnesty.org/en/library/asset/MDE13/007/2002/en/dom-MDE130072002en.html (last visited June 10, 2008) (hereinafter AI Press Release of May 10, 2002) and the Amaken page on the Law Enforcement Forces website, *available at* http://www.police.ir/Portal/Home/Default.aspx?CategoryID=8cbfe6bc-6e7e-4010-9131-8ac8897b4254#1 (last visited on June 20, 2008).

[37] Mahin Pourzand was the elder sister of Siamak Pourzand. She was the only member of the family to have face-to-face contact with Mr. Pourzand while he was in prison. She died on November 16, 2006.

[38] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[39] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[40] Human Rights Watch, *Iran: Journalist at Risk,* December 22. 2001, *available at* http://hrw.org/english/docs/2001/12/22/iran3449.htm (last visited on May 15, 2008) (hereinafter *HRW: Journalist at Risk).*

[41] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC). Mr. Jami'i was also present when Ms. Farimehr told her story to Mahin Pourzand.

[42] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC). Also see the Iranian government response to UN Working Group on arbitrary detention that alleges Siamak Pourzand was arrested following a complaint submitted by Mrs. Venus Farimehr, who claimed she was sexually abused by Siamak Pourzand. For more information, see United Nations Comm'n on Human Rights, Working Group on Arbitrary Det., *Opinion No. 8. 2003 (Islamic Republic of Iran),* U.N. Doc. E/CN.4/2004/3/Add.1.at 45 (May 9, 2003) (hereinafter Working Group Report). **[attached as Appendix 1]** *See also HRW: Journalist at Risk, supra* note 40.

[43] *See* BBC interview with Azadeh Pourzand in BBC Persian, *Bi Ittila'-i Az Vaz'iyat-i Pourzand* [No News of Siamak Pourzand's Conditions], December 28, 2001, *available at* http://www.bbc.co.uk/persian/news/011228_h-pourzand.shtml (last visited on June 27, 2008); Amnesty International, *Disappearance / Possible Extra-judicial Execution, Siamak Pourzand*, November 27, 2001, *available at* http://www.amnesty.org/en/library/asset/MDE13/046/2001/en/dom-MDE130462001en.html (last visited on May 15, 2008) (hereinafter AI Press Release of November 27, 2001); *Namiyih Lily Pourzand Bih Kamal Kharrazi, Vazir-i*

next to him on the street and the passenger, who was wearing a helmet to hide his face, showed him a gun though the half-opened tinted window and threatened to kill him. Siamak Pourzand was too frightened to record the license plate of the car, and he saw little point in reporting the incident to the police.[44]

## 4.2. Abduction

At 9:00 pm on November 24, 2001, Siamak Pourzand was accosted outside his sister's apartment in central Tehran by two men in civilian clothing as he was seeing off a guest.[45] Mahin Pourzand watched this encounter from a window.[46] Mr. Pourzand then buzzed her on the apartment's intercom and asked her to bring down his house keys, car keys, shoes, and medicine. She took these down to him, along with his address book, which she thought he might need, and Mr. Pourzand then left with the men outside.[47]

Law enforcement agencies in Iran are required by law to present the suspect with an arrest warrant that describes the cause of the suspect and to conduct any search and arrest in daylight [see Section 10.1 below]. However, those detaining Siamak Pourzand did not produce an arrest warrant, did not identify themselves, and waited to seize him on the street after dark.[48]

Mr. Pourzand was taken to his apartment, which his captors then searched. They seized the hard drive of a computer belonging to Mrs. Kar and 400 Swedish Kronor.[49]

## 4.3. Where is Siamak Pourzand?

There was no news of Siamak Pourzand for two weeks following his disappearance. No governmental agency assumed responsibility for arresting him.[50] His family did not know whether he was alive or dead but, hoping for the best, began a campaign to inform the international human rights community of his plight.

---

*Umur-i Kharijiyih Iran* [Letter of Lily Pourzand to Kamal Kharrazi, the Iranian Minister of Foreign Affairs], (December 22, 2001) (on file with IHRDC); *Namiyih Azadeh Pourzand Bih Hassan Zia'i-Far, Ra'is-i Commission-i Huquq-i Bashar-i Islami*, [Letter of Azadeh Pourzand to Mr. Mohammad Hassan Zia'i-Far, Head of IHRCI], (December 21, 2001) (on file with IHRDC).

[44] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[45] AI Press Release of November 27, 2001, *supra* note 43; IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC). *See also Namiyih Mehrangiz Kar Bih Musavi Khu'iniha, Namayandihyih Majlis* [Letter of Mrs. Kar to Musavi Khu'iniha, Representative of *Majlis*], (April 5, 2002) (on file with IHRDC).

[46] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC). For more information, see also BBC, *Iran: Husband of Human Rights Lawyer arrested*, November 28, 2001.

[47] The narration in this part of the report is based on the recollections of two credible sources, namely Mrs. Mehrangiz Kar, wife of Siamak Pourzand, and Lily Pourzand, daughter of Siamak Pourzand. Both Lily Pourzand and Mrs. Kar had direct contact with Mahin Pourzand regularly from the time of Siamak Pourzand's arrest until Mahin Pourzand's death in 2006. The Iran Human Rights Documentation Center has interviewed both Ms. Lily Pourzand and Mrs. Mehrangiz Kar and has reconstructed the sequence of the events based on their interviews.

[48] IHRDC's Interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC). *See also* Working Group Report, *supra* note 42.

[49] Interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[50] Law enforcement agencies are required to hand over the detainees to relevant courts within 24 hours with their findings. It is illegal to keep the detainees more than 24 hours in custody. For more information see AY'IN-I DADRASIYIH KAYFARI [Iranian Criminal Procedure] article 24, 123, and 123.1 (1991).



Siamak Pourzand pictured shortly before his arrest

International interest in Mr. Pourzand's case prompted Mr. Mohammad Hassan Zia'i-Far, the Legal Director of the Islamic Human Rights Commission of Iran (IHRCI),[51] to write to the General Director of the Ministry of Justice in Tehran on December 6, 2001, seeking answers about Siamak Pourzand's whereabouts.[52] The IHRCI received oral confirmation from the General Director's staff that his office was aware of Siamak Pourzand's case but had no information about who had arrested him or where he was being held.[53] However, the General Director's Office did inform IHRCI that Siamak Pourzand's charges were "apolitical" and he had been arrested because of allegations of "moral offenses."[54]

On December 7, 2001, Mrs. Mahin Pourzand received an anonymous telephone call instructing her to bring a change of clothes for Siamak Pourzand to the *Amaken* office on *Ostad Motahari* Street in Tehran. Mrs. Pourzand did as she was instructed. The officials who accepted the clothes refused to allow her access to see Siamak Pourzand. When she asked them where her brother was being held and what he had been charged with, she was told that it was none of her business.[55]

On December 30, 2001, Siamak Pourzand's youngest daughter, Azadeh, wrote directly to President Khatami seeking his help.[56] She explained in the letter that her father had been detained by unknown agents and requested that the President make an official inquiry to establish his physical and psychological health.[57] The Pourzand family continued their efforts by sending letters to various other officials, including Iran's Foreign Minister, Mr. Kamal Kharrazi,[58] Iran's ambassador to the United Nations at the time, Mr. Nejad Hosseinian,[59] and the Supreme Leader, Ayatollah Khamene'i.[60] None of the recipients replied.

---

[51] The Islamic Human Rights Commission of Iran was established in 1995, during the Presidency of Akbar Hashemi Rafsanjani, by the Head of the Judiciary, Ayatollah Mohammad Yazdi. The Head of the Judiciary sits on the board of the IHRCI as an observer. It should also be noted that the IHRCI is an entirely separate entity from the Human Rights Committee established in the *Majlis* in 1996. Professor Reza Afshari has described this commission as a "smoke and mirrors" effort to demonstrate regime's responsiveness to human rights issues. See REZA AFSHARI, HUMAN RIGHTS IN IRAN: THE ABUSE OF CULTURAL RELATIVISM, 279 (2001).

[52] *Dadgustari dar Jaryan-i Dastgiriyih Pourzand Ast* [Ministry of Justice Is Aware of Pourzand's Arrest], NOUROOZ, 11/10/1380, (January 1, 2002).

[53] *Id.*

[54] *Id.*

[55] Amnesty International, *Further Information: Disappearance / Possible Extra-judicial Execution, Siamak Pourzand*, December 12, 2001.

[56] *Namiyih Azadeh Pourzand bih Mohammad Khatami* [Letter from Azadeh Pourzand to President Khatami], (February 2002) (on file with the IHRDC).

[57] Azadeh Pourzand letter to Khatami, *Tell me where is my father*, WASHINGTON POST, December 30, 2001 **[attached as Appendix 4]**; Lily Pourzand sent a separate letter to President Khatami echoing the same sentiments. See *Namiyih Lily Pourzand bih Mohammad Khatami* [Letter from Lily Pourzand to President Khatami], 10/01/1380 (January 1, 2002) (On file with IHRDC).

[58] *Namiyih Lily Pourzand bih Kamal Kharrazi, Vazir-i Umur-i Kharijiyih Iran* [Lily Pourzand's letter to Kamal Kharrazi, the Iranian Minister of Foreign Affairs], (December 22, 2001) (on file with IHRDC). The letter was sent through Mr. Mehrabadi at the Interest Section of the Islamic Republic of Iran in Washington D.C.

[59] Lily Pourzand sent her letters to Mr. Nejad Hosseinian, in charge of the interest section of the Islamic Republic of Iran in Washington DC to forward them to officials in Iran. She personally requested from him that he would forward her letters to those the letters were addressed to. *Namiyih Lily Pourzand bih Aqayih Nejad Hosseinian, Namayandiyih Da'im-i Iran dar Sazman-i Milal* [Letter of Lily Pourzand to Mr. Nejad Hosseinian, Iran's Permanent Representative to the United Nation], (December 22, 2001).

[60] *Namiyih Azadeh Pourzand bih Rahbar-i Inqilab, Ayatollah Khamenei* [Letter of Azadeh Pourzand to the Supreme Leader, Ayatollah Khamenei], (August 6, 2003) (on file with IHRDC).

On January 3, 2002, the government-controlled newspaper *Iran* reported that Siamak Pourzand was being held in "Prison 59" under the supervision of the State Prison Organization.[61] The newspaper seemed intent on rebutting claims in the reformist press that Siamak Pourzand was being held illegally in one of *Amaken*'s offices. [62] Mr. Pourzand's family was unable to obtain official confirmation of the *Iran* report.[63]

On January 4, 2002, the reformist head of the National Security Commission of the *Majlis*, Mr. Mohsen Mirdamadi, voiced his concern about Siamak Pourzand's reported situation, attacking conservative control of the judicial system and accusing the judiciary of lacking accountability.[64] Mr. Mirdamadi said:

> Now things are happening in the country and the media is reporting events that no governmental institution will take responsibility for. During my recent trip to Ireland, I learned that a person named Siamak Pourzand had disappeared or had been kidnapped in Iran. While no governmental bodies in Iran have taken the responsibility for his arrest or detention, and while his family does not know about his whereabouts, some newspapers allude to a confession. Will the judiciary not take the responsibility for this act? Why does it not inform the family what has happened to this man![65]

On January 6, 2002, the newspaper *Nourooz* reported that *Jam*, a conservative weekly journal, had announced that "Siamak Pourzand, husband of Mehrangiz Kar, confessed to having received millions of dollars from the American-Iranian Council."[66] The paper also claimed that Mr. Pourzand had distributed this money among the "so-called" reformist newspapers.[67] No official confirmation of the accuracy of the story was forthcoming. Mrs. Kar recalls:

> We had mixed feelings when we heard details about the alleged confession. We were happy that Siamak was still alive and scared because the charges were very severe and entailed a severe penalty.[68]

Responding to the story in *Jam*, the Chairman of the American Iranian Council (AIC), Dr. Hushang Amir Ahmadi, denied the allegations made in the piece, commenting: "How can *Jam* have the audacity to publish such lies?" Dr. Ahmadi added that not only did he not know Siamak

---

[61] See Section 5.2. of this report.

[62] *Siamak Pourzand dar Zindan-i 59 Taht-i Nazar-i Sazman-i Zindanha bih Sar Mibarad,* [Siamak Pourzand Is In Prison 59, under the Supervision of the State Prison Organization], IRAN, 10/13/1380 (January 3, 2002).

[63] Peyk-e Iran, *Ibraz-i bi Ittila'-i az Vaziyat-i Siamak Pourzand* [No Information about Siamak Pourzand], 11/30/1380 (February 19, 2002) (accessed February 19, 2002).

[64] ISNA, *Hushdar-i Ra'is-i Commission-i Amniyat-i Milliyih Majlis dar Murid-i Bazsaziyih Sitad-i Qatalhayih Zanjirih-i* [Warning of the National Security Commission of Majlis regarding the re-establishment of Chain Murder nuclei], 10/14/1380 (January 4, 2002) *available at* http://isna.ir/isna/NewsView.aspx?ID=News-96091 (last visited on June 10, 2008).

[65] ISNA, *Hushdar-i Ra'is-i Commission-i Amniyat-i Milliyih Majlis dar Murid-i Bazsaziyih Sitad-i Qatalhayih Zanjirih-i* [Warning of the National Security Commission of *Majlis* regarding the re-establishment of Chain Murder nuclei], 10/14/1380 (January 4, 2002) *available at* http://isna.ir/isna/NewsView.aspx?ID=News-96091 (last visited on June 10, 2008).

[66] *Iddi'a-i Darbariyih Siamak Pourzand* [A Claim About Siamak Pourzand], NOUROOZ, 16/10/1380 (January 6, 2002) quoting Jam.

[67] *Id.*

[68] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

Pourzand, the AIC had never worked with any journalist inside Iran.[69] He emphasized that AIC was a non-governmental organization that conducted its financial activities transparently.[70]

On January 13, 2002, the IHRCI informed Siamak Pourzand's family that it had finally succeeded in getting the General Director of the Ministry of Justice in Tehran to grant them permission to visit him.[71]

## 4.4. The Fight for Access

On January 13, 2002, Mrs. Mahin Pourzand received a phone call and was told to come to the *Amaken* Office on *Ostad Motahari* Street the following morning to visit her brother.[72] This would be the first occasion on which a member of his family had been granted access to him since his disappearance on November 24, 2001. Mrs. Pourzand recalled:

> Siamak was brought from somewhere else to the *Amaken* Office. Four guards accompanied him from a car to the Office. He was very weak and frightened. Our visit lasted 10 minutes and a plainclothesman was monitoring us all the time. After the visit, he was taken back to the car. I don't know where they took him.[73]

Many questions still remained unanswered after the visit. The family still did not know where and under what conditions Siamak Pourzand was being held, who was holding him, and what the charges against him were. He was still being denied legal representation.

On February 3, 2002, Mahin Pourzand was summoned for a second visit with her brother.[74] Afterwards she told Mrs. Kar:

> I went to the *Amaken* office on *Motahari* Street. It is under the command of Sergeant Sadiqi but he was not present. A man called Kaykavusi was in charge of the office. I waited some time there and then he [Siamak] was brought from somewhere else in a car. Two persons who did not have uniforms were watching us all the time. One of them video recorded our conversations. We talked for almost half an hour and then he was driven back to somewhere else.[75]

During the visit Mrs. Pourzand gained her first insight into why her brother was being held when, according to Mrs. Kar, he told her:

> Sister, they want to blackmail us. They want to disgrace us. We have lived with honor in this country. They want to deny us this honorable life and ruin our public image. They want to humiliate us publicly.[76]

---

[69] Gooya News, *Tawzih Ra'is shawrayih Irani Amrica-i Darbariyih Tawzi' Millionha Dollar Az Tariq-i Siamak Pourzand*, [Explanation of the Head of the American Iranian Council Regarding Distribution of Millions of Dollars Through Siamak Pourzand], January 8, 2002, *available at*  http://news.gooya.com/2002/01/08/0801-1.php.

[70] *Id.*

[71] *Khanivadihyih Pourzand ba Vay Mulaqat Mikunand*, [Pourzand's Family Visit Him], Nᴏᴜʀᴏᴏᴢ, 10/23/1380, (January 13, 2002).

[72] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[73] *Id.*  Mrs. Kar recalls her talk with Ms. Pourzand who met Siamak Pourzand in Amaken office on January 14, 2002.

[74] Pars Mass Media in its news section reported that Mrs. Pourzand visited Siamak Pourzand at Ostad Motahari Street on February 3, 2002, Pars Mass Media, *Khabar* [News], undated (on file with IHRDC).

[75] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC) and Mehrangiz Kar's Notes in Her Calendar, 14 Bahman 1380 (February 3, 2002).

[76] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC). See also *Namiyih Mehrangiz Kar bih Comission-i Asl-i 90* [Letter of Mrs. Kar to the Article 90 Commission], (April 9, 2002) (on file with IHRDC).

When Mrs. Kar later inquired if Mrs. Pourzand knew who was responsible for Siamak Pourzand's case, she said she still did not know.[77]

Mrs. Pourzand was summoned for a third visit on February 22, 2002, in the same *Amaken* office as before. However, on this occasion she barely recognized her brother:

> [Siamak] was not like the last two times. He had lost weight and was very thin and very frightened. He had a long unkempt beard. He repeatedly asked me not to talk with the media about his situation. He told me that it might be our last visit. He did not explain what he meant by this. But he said so. He was worn out. He kept looking over his shoulder like someone might attack him.[78]

The visit was reportedly monitored by plainclothesmen.[79] Siamak Pourzand was taken to another location in a car after the visit.[80]

## 4.5. Related Arrests

Starting about a month after Siamak Pourzand's disappearance, *Amaken* started summoning writers, journalists, filmmakers, and other intellectuals to appear in its office on *Motahari* Street.[81] The summonses were conveyed by phone to the accused, contrary to Iran's Code of Criminal Procedure that requires all law enforcement agencies to summon the accused in writing.[82] All those who were summoned to *Amaken* were interrogated about their work and their political and religious beliefs.[83] In most cases, the interrogators used Siamak Pourzand's alleged confession as a tool to threaten and coerce those summoned to admit to anti-revolutionary activities.[84]

Those summoned most often returned home after a day of interrogations without being detained any longer. Some were asked to provide written confessions and others were threatened with imprisonment if they did not cease their political activities. Reformists objected to the *Amaken* campaign. Ali Asghar Hadizadeh, a reformist member of *Majlis*, accused Ayatollah Shahroudi, the head of the judiciary, of knowingly allowing the law to be violated by his subordinates.[85]

---

[77] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[78] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC). See also Pars Mass Media, *Akharin Vaz'iyat-i Siamak Pourzand* [Latest News About Siamak Pourzand's Conditions] February 25, 2002 (on file with IHRDC).

[79] AI Press Release of May 10, 2002, *supra* note 36.

[80] IHRDC Interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[81] On February 17, 2002, *Iran* newspaper published names of those who were recently summoned to Amaken without giving details of how they were treated. The list included: Mohammad Haydari (editor-in-chief of monthly journal *Ghuzarish*), Kaveh Golestan (photojournalist), Firuz Goran (editor-in-Chief of Jam'iyih Salim [Healthy Society]) Ali Dahbashi (editor-in-chief of *Bukhara* magazine), Omid Rohani, Mohammad Ali Safari, Mohammad Boloori, Daryoush Shayegan and Bahram Beizaee. See *Akharin Guzarish-ha az Majarayih Ihzarhayih Akhir bih Idariyih Amaken* [The Latest Reports Concerning the Recent Summons to Amaken Office], IRAN, 11/28/1380 (February 17, 2002).

[82] See AY'IN-I DADRASIYIH KAYFARI [Iranian Criminal Procedure] article 112-113, (1999).

[83] *See* RSF, *Mawj-i Ihzar va Bazju'iyih Ruznamih Nigaran-i Irani Tavasut-i Niruyih Intizami*, [A New Wave of Summoning of the Iranian Journalists by NAJA], February 2, 2002.

[84] *Ihzar-i Ruznamih Nigaran Bih Idariyih Amaken Qayr-i Qanuni Ast* [Summoning of Journalists to the Amaken Office is Illegal], NOUROOZ, 28/11/1380 (February 13, 2002).

[85] BBC Persian, *Itiraz bih Ihzar-i Rawshanfikaran bih Marakiz-i Intizami*, [Protest Against Summoning of the Free Thinkers to NAJA Offices], February 2, 2002, *available at* http://www.bbc.co.uk/persian/business/020213_amajlis.shtml (last visited on May 15, 2008).

Seyyed Mohammad Ali Abtahi, Legal Advisor to President Khatami, noted that *Amaken* and the NAJA did not have a mandate to summon the journalists.[86]

The journalists and writers who were summoned to *Amaken* were warned not to reveal the identity of their interrogators.[87] Few of them talked publicly about how they were treated by *Amaken*. Those who talked invariably complained of threat and intimidation, insults and an environment of fear in which they were threatened to confess to crimes they had not committed. Firuz Goran, a journalist who was summoned by *Amaken*, told *Nourooz*:

> Upon arrival at the *Amaken* office, I was taken to the basement … I was called to a room where two persons were sitting. One interrogator tried to provoke and frustrate me with his choice of words and insults. The interrogators asked questions that had nothing to do with *Amaken*'s mandate. Both men wore plain clothes. My impression is that they were not NAJA officers … [They] asked me questions about my recent interviews with the foreign media.[88]

On January 31, 2002, Mohammad Ali Safari, a popular attorney and journalist, was summoned by *Amaken*. Immediately after his release, he suffered a heart attack. He did not recover and died in hospital in late February 2002. Before he died, Mr. Safari wrote a complaint to the Article 90 Commission, a commission composed of *Majlis* members constitutionally mandated to address private complaints filed against the three branches of government.[89] In his letter, Mr. Safari alleged that his rights had been violated by *Amaken* and that he was mistreated, insulted, and aggressively interrogated by plainclothes interrogators.[90]

Despite all the evidence to the contrary, Mr. Sajadiyan, the head of *Amaken*, assured the Media Deputy of the Ministry of Culture and Islamic Guidance that the summonses did not have a political nature.[91]

## 4.6. Appeals to the Majlis

In early January 2002, Mahin Pourzand was able to arrange a meeting with Ayatollah Mehdi Karrubi, the Speaker of the *Majlis*, and spoke to him about her brother's situation for several hours. She found him sympathetic to Mr. Pourzand's plight.[92] Mehrangiz Kar also appealed to Ayatollah Karrubi, telephoning his office on January 26, 2002. Mrs. Kar spoke with a man named Mr. Khudavirdi about her husband:

> I talked with Mr. Khudavirdi in the office of Mehdi Karrubi and expressed my deepest concern about my husband's situation. Then I pleaded for help. I asked Mr. Khudavirdi to

---

[86] *Ihzar-i Ruznamih Nigaran bih Idariyih Amaken Qayr-i Qanuni Ast* [Summoning of Journalists to the Amaken Office is Illegal], Nourooz, 28/11/1380 (February 13, 2002).

[87] *Hard-liners put Iranian Journalist on Trial on Spying Charge*, The New York Times, March 14, 2002.

[88] *See* Firuz Goran interview with Nourooz, *Ihzar-i Ruznamih Nigaran bih Idariyih Amaken Qayr-i Qanuni Ast* [Summoning of Journalists to the Amaken Office is Illegal], Nourooz, 28/11/1380 (February 13, 2002).

[89] *See* Qanun-i Assasiyih Jumhuriyih Islamiyih Iran [Constitution of the Islamic Republic of Iran] article 90 (adopted 1979, amended 1989).

[90] Gooya News, *Taftish-i Aqayid, Tahdid va Shikanjiyih Ruhi dar Idariyih Amaken, Namiyih Zindiyad Mohammad Ali Safari bih Commission-i Asl-i 90* [Inquisition, Coercion and Torture in Amaken Office, the Letter of Late Mohammad Ali Safari to the Article 90 Commission], May 22, 2002, (accessed May 22, 2002).

[91] *Ihzar-i Ruznamih Nigaran bih Idariyih Amaken Qayr-i Qanuni Ast* [Summoning of Journalists to the Amaken Office is Illegal], Nourooz, 28/11/1380 (February 13, 2002).

[92] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

> convey my message to Karrubi and he said that he had a recording of our conversation and would play it to Karrubi.[93]

The next day, the *Majlis* discussed Siamak Pourzand's case in a closed session. [94] *Kayhan* reported a sharp division between the conservatives and the reformists in the *Majlis* about Mr. Pourzand's case. Ali Younesi, the Minister of Intelligence, asserted again in *Majlis* that Mr. Pourzand's case was "apolitical," and he alleged that Mr. Pourzand was charged with "moral crimes." Thus, he succeeded in diverting attention from his case and silenced the reformists in the *Majlis.*[95]

In early February 2002, Mehrangiz Kar wrote a letter to the head of the Article 90 Commission complaining that some of her husband's fundamental rights were violated by the NAJA, in particular by *Amaken*. She asked the Commission to stop the violation of her husband's rights and to investigate *Amaken*'s conduct. She also detailed in the letter how her husband's rights had been violated since his abduction.[96]

## *4.7. Attempt at Blackmail*

Siamak Pourzand's disappearance received widespread coverage in both the Iranian and international media. Human rights organizations and journalists' associations throughout the world condemned Mr. Pourzand's arrest.[97] On February 14, 2002, the United Nations Commission on Human Rights Working Group on Arbitrary Detention wrote formally to the Government of the Islamic Republic of Iran requesting clarification regarding Siamak Pourzand's situation.[98]

The conservatives reacted by pressuring Siamak Pourzand to make his family stop pursuing his case. On March 8, 2002, Mahin Pourzand called Mr. Pourzand's family in the United States and Canada and asked them to stay at home to wait for a telephone call from him. The calls came through a short while later. Lily Pourzand recalls her father telling her in a trembling voice:

> Please do not interview with any media. Please do not talk with radio and the press. Assume I'm dead. Do not try to help me.[99]

Mr. Pourzand added that he had finally appeared in court and sarcastically commented that he had received the "good news" that he would soon be transferred to Evin Prison, Iran's most notorious public prison.[100] Mrs. Mehrangiz Kar commented in an interview with *The New York Times* on March 14, 2002, that one could deduce from her husband's tone the intolerable ordeal he was

---

[93] *Id. See also* Mehrangiz Kar's Notes in Her Calendar, 6 Bahman 1380 (January 26, 2002).

[94] Nowrooz Newspaper, *Khabarha-i az Jalasiyih Qayr-i Alaniyih Majlis, Dadgah-i "Siamak Pourzand"* [News from the Closed Session of the Majlis, Trial of "Siamak Pourzand"] NOUROOZ, 11/11/1380 (January 31, 2002).

[95] *Nuktih-hayih Khandani az Jalasiyih Qayr-i Alaniyih Majlis* [Interesting Points from the Closed Session of the Majlis] KAYHAN, 11/11/1380 (January 31, 2002).

[96] *See Namiyih Mehrangiz Kar bih Ra'is-i Commission-i Asl-i 90* [Letter from Mehrangiz Kar to the Head of Article 90 Comission] (February 2002) (on file with IHRDC).

[97] *See* AI Press Release of November 27, 2001, *supra* note 43; BBC Persian, *Bi Ittila'-i az Vaz'iyat-i Siamak Pourzand* [No News of Siamak Pourzand's Conditions], December 28, 2001, *available at* http://www.bbc.co.uk/persian/news/011228_h-pourzand.shtml (last visited on May 30, 2008).

[98] Working Group Report, *supra* note 42.

[99] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[100] Nazila Fathi, *Hard-liners Put Iranian Journalists on Trial on Spying Charges*, THE NEW YORK TIMES, March 14, 2002.

suffering in detention, adding that one could only imagine "the extent of torture and pressure on him that going to Evin has become a dream and a better place for him."[101]

Despite the conservatives' attempts at intimidation, Siamak Pourzand's family continued their media campaign. After giving an interview to the BBC's Persian Service, Mrs. Kar received a call from Siamak Pourzand. He left a message for her on her home answering machine:

> Please, please with no one, no one … not you or anyone … from the family interview with anyone … You do not know, I do not know… so do not talk with anyone.[102]

Siamak Pourzand then called his daughter Lily in Canada and left a similar message:

> Please do not, I emphasize, do not, interview with anyone at any condition and at any cost. You cannot understand me and you don't know what my situation is. So please do not interview with anyone.[103]

Mrs. Mahin Pourzand also called Azadeh Pourzand to add her voice to her brother's:

> Please, I beg you, do not talk with anyone. Say you know nothing, nothing. Because you indeed know nothing about what is going on here. It has a repercussion here. So please, do not talk with anyone … Let it end. Let it end. Otherwise, it gets worse. So please, do not talk and ask your mother as well not to talk with anyone.[104]

The Pourzand family refused to be intimidated and kept up their media campaign. On March 14, 2002, Siamak Pourzand again called Mrs. Kar from detention. On this occasion an unidentified third party mediated the conversation, insisting that it was for the good of all concerned that the conversation be conducted by him:

> The man kept pressing me to tell lie about Siamak. He wanted me to do an interview with the media and to declare everything was normal, that Siamak was not mistreated, that he was in good health, that his rights were not violated. I did not accept it. Siamak then also asked me to tell lies to media – I am confident that he only asked me to do this because he was under pressure. Siamak told me that it would be good if I were to lie to the media because it would improve his situation. I said I could not do it. Then he said, "If you do not do the interview, they will blackmail us and will publish whatever they have against us." To which I said, "To hell, let them do it. You also confess to whatever they want. Who will believe it? We'll do what we must, no matter what."[105]

## 5. The Secret Prisons

In early 2001, members of the *Majlis* learned that the conservative establishment was using a series of secret prisons to hold political detainees. The Article 90 Commission investigated these reports. At a press conference in October 2002, Commission member Ali Akbar Musavi-Khu'ini announced: "As you know, various intelligence, security, military and law enforcement agencies had special and sometimes secret detention facilities in the past. They were not monitored and sometimes they created trouble. [For instance,] for long periods of time families of the detainees

---

[101] *Id*. See also BBC Persian, *Mara Murdih Farz Kunid* [Consider Me Dead], March 9, 2002, *available at* http://www.bbc.co.uk/persian/news/020309_1-pourzand.shtml (last visited on June 27, 2008).
[102] Text of the message left on Mehrangiz Kar's answering machine (March 8, 2002).
[103] Text of the message left on Lily Pourzand's answering machine (March 8, 2002).
[104] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).
[105] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

had no information about them and there was not one individual authority responsible and accountable for these locations. In fact, the law gives the State Prison Organization (SPO) the responsibility to monitor and administer these prisons and requires each prison to be registered with the SPO."[106] He named several of the detention centers concerned including Prison 59, *Amaken*, *Towhid*, *Hishmatiyih*, *Natib* and *Vuzara*. He added that both the IRGC and the Ministry of Intelligence had given a commitment that they would close these facilities and transfer their prisoners to Evin Prison.[107] While the IHRDC has not been able to establish a complete chronological record of Siamak Pourzand's detention, we have reason to believe that he was held in at least three of these so-called "secret prisons" before his eventual transfer to Evin.

## 5.1. Amaken

The parallel intelligence services used *Amaken*'s offices as secret facilities to carry out interrogations and to detain intellectuals and dissidents. In 2002, many journalists and government critics were detained and interrogated in one of *Amaken*'s main offices located on *Motahari* Street in Tehran.

It was in the *Motahari* Street office that Siamak Pourzand met with his sister, Mahin Pourzand. The first lawyer engaged by the family to represent Mr. Pourzand, future Nobel laureate Mrs. Shirin Ebadi, twice visited the *Amaken* office in an attempt to gain access to her client. On both occasions Mrs. Ebadi was told by the guards that while Mr. Pourzand had been held in the building for a few days, he had now been transferred elsewhere.[108] She was not told where Mr. Pourzand was taken or who took him.

Detainees who were held at this location describe it as a basement on two floors run by plainclothesmen. Typically, the detainees are held in the same cells as ordinary criminals arrested by the *Amaken* in the course of its statutory duties. Several political detainees have spoken about the fear they experienced being held together with criminal offenders. One detainee commented:

> I was very scared by the people I was held with. They were criminals and killing for them was a very easy thing. Some of them had stabbed each other inside the prison and the authorities were lashing them there.[109]

Ali Akbar Musavi-Khu'ini was able to gain access to *Amaken*'s *Ostad Motahari* Street detention facility during the course of the Article 90 Commission's investigation:

> At the time of our visit, we announced that it was an improper place for a detention center. [Our recommendation] was supposed to be followed up. Unfortunately, the problem still exists. There is serious confusion concerning the management of this facility. It has been announced that this complex is managed by the Intelligence Protection Organization of the Judiciary. The media has reported that many people have been summoned to this facility for interrogation.[110]

---

[106] ISNA, *Izharat-i Seyyed Ali Akbar Musavi Khu'ini Darbarihyih Vaz'iyat-i Zindanha va Bazdashtgahhayih Tehran* [Ali Akbar Musavi Khu'ini's, Majlis Representative, Makes Statement about Tehran's Prison and Detention Facilities], 07/27/1381, (October 19, 2002), *available at* http://www.isna.ir/Main/NewsView.aspx?ID=News-166055, (last visited on June 28, 2005) (hereinafter Statement of Tehran Representative) **[attached as Appendix 2]**.

[107] *Id.*

[108] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

[109] IHRDC phone interview with a former member of the Office of Intelligence Protection of the Army in Iran (Witness A), United States, May 2, 2008 (on file with IHRDC).

[110] Statement of Tehran Representative, *supra* note 106. ,

## 5.2. Prison 59

On January 3, 2002, the conservative newspaper *Iran* reported that Siamak Pourzand was being held in Prison 59 of *Ishratabad*.[111] Human Rights Watch has described Prison 59 as "one of the more notorious illegal prisons" in Iran and has reported that it is used for extracting confessions from the detainees that do not confess in Evin Prison.[112] Detainees are subjected to solitary confinement in order to cut them off from information and break them psychologically:

> Prison 59 is controlled by the intelligence service of the IRGC and is located in their compound in Vali Asr, Tehran. Prison 59 is composed of a series of small cells and interrogation rooms. There are also two large holding areas equipped with video cameras. Prisoners held in Prison 59 report being kept in absolute solitary confinement and facing the harshest interrogation methods that they have experienced.[113]

The IHRDC has received information suggesting that Siamak Pourzand was held in Prison 59 for the period in January and February 2002, most likely coinciding with Mahin Pourzand's third meeting with him on February 22, 2002.

## 5.3. Khatam-ul Anbiya

Siamak Pourzand was subsequently transferred to a third undeclared detention facility known as *Khatam-ul Anbiya*. The existence of this facility was not addressed by the Article 90 Commission. The prison is located in a residential complex that belongs to the NAJA on Seoul Street in north Tehran. A section of this residential complex is used by the military, and *Khatam-ul Anbiya* prison is located in this section of the complex. It has been suggested that the parallel intelligence agencies established *Khatam-ul Anbiya* prison after senior members of the IRGC promised the *Majlis* that they would shut down Prison 59.[114]

Former detainee Hassan Zarezadeh Ardeshir told the IHRDC that Siamak Pourzand had been held in *Khatam-ul Anbiya* shortly before his own arrival at the facility on May 11, 2002.[115] Mr. Zarehzadeh told IHRDC that a criminal detainee who was in *Khatam-ul Anbiya* at the same time as Mr. Pourzand described how the elderly journalist had been treated by his captors:

> Pourzand was severely mistreated in *Khatam* [-*ul Anbiya*]. The interrogators were insulting him, abusing him, and making him stand with arms raised facing the wall for hours and hours. He was weak and could not bear this pressure. His waist was aching and he was asking for mercy, but the interrogators were pressuring him further and made him stand even longer. He was interrogated for hours and hours, and during interrogation, the authorities were insulting him. He was told that if he did not cooperate, they would blackmail him by threatening to charge him with sex offenses. He was made to sweep the prison. He was under huge pressure. He wanted to take his life and attempted to commit suicide.[116]

---

[111] *Siamak Pourzand dar Zindan-i 59 Taht-i Nizarat-i Sazman-i Zindanha Bih Sar Mibarad* [Siamak Pourzand is in Prison 59 Under the Control of the State Prison Organization] IRAN, 13/10/1380 (January 3, 2002).

[112] *See* Human Rights Watch, *Like the Dead in Their Coffins; Torture, Detention, and the Crushing of Dissent in Iran,* June 2004, *available at* http://hrw.org/reports/2004/iran0604/ (last visited June 15, 2008).

[113] *Id.*

[114] IHRDC interview with Hassan Zarezadeh Ardeshir, United States, February 15, 2008 (on file with IHRDC).

[115] *Id.*

[116] *Id.*

Mr. Zarehzadeh, a political prisoner like Siamak Pourzand, described his own treatment at *Khatam-ul Anbiya* prison, which he believed was used to extract confessions from particularly stubborn prisoners:

> I had been arrested five times before and each time I was held in secret prisons like Prison 59… and mistreated in those locations for months. But none of those locations were as horrible as this one. I was held in *Khatam* [-*ul Anbiya*] for one month and in one month my hair turned gray. *Khatam* [-*ul Anbiya*] was the worst of all the secret prisons I had been in ... the interrogators crush you until you believe you are not a human being anymore and not worth a penny.[117]

# 6. Siamak Pourzand on Trial

## 6.1. The Nature of the Trial

On March 6, 2002, the judiciary began court proceedings against Siamak Pourzand.[118] Mr. Pourzand did not have access to defense lawyers during the four months he had been held in secret prisons, nor was he represented in court by a lawyer of his own choosing. The authorities did not bring any formal charges against him. A trial held in such circumstances was a flagrant breach of both widely recognized international legal standards and of domestic Iranian law [see Section 10 below].[119]

On March 9, 2002, the conservative newspaper *Iran* announced that Siamak Pourzand's trial on charges of committing "crimes against national security" [120] had begun two days previously. The paper reported that the trial was held at the Special Court of Mehrabad, Branch 1610, under the auspices of Judge Ja'far Sabiri Zafarqandi. The newspaper further reported that Mr. Pourzand was represented by a lawyer and had confessed to the charges filed against him in the first session of the trial.[121]

None of the charges against Mr. Pourzand were made public before the trial. Moreover, prior to the trial, the authorities had made contradictory public statements concerning the case against him. Ali Younesi, Minister of Intelligence, had told the *Majlis* that the charges against Mr. Pourzand were "apolitical."[122] The office of the General Director of the Ministry of Justice in

---

[117] *Id.*

[118] Human Rights Watch (HRW), *Iran: "Trial" A Mockery of the Law*, March 13, 2002, *available at* http://hrw.org/english/docs/2002/03/13/iran3809.htm (last visited on May 15, 2008).

[119] Mr. Pourzand's family did not receive any prior notification of his appearance in court. Typically, it is the responsibility of the defense attorney to keep the family appraised of developments in a suspect's case. *See* Nazila Fathi, *Hard-liners Put Iranian Journalists on Trial on Spying Charges*, THE NEW YORK TIMES, March 14, 2002.

[120] Crimes against national security have a broad definition in Iran. For instance, article 498 of the Islamic Penal Code of Iran defines the crime of national security as: "Anyone with any intention who establishes or controls a group, organization, or a branch that has more than two members inside or outside the country, under any name, that disrupt the national security of the country provided that the person is not guilty of the crime of *Maharib*, would be sentenced to two to eleven years of imprisonment." For more information see QANUN-I MUJAZAT-I ISLAMI [Islamic Penal Code] Book Five, Crimes against the National and International Security of Iran, (1996).

[121] *Nukhustin Jalasiyih Muhakimiyih "Siamak Pourzand" Barguzar Shud* [First Session of Siamak Pourzand's Trial Convened], IRAN, 18/12/1380 (March 9, 2002).

[122] *Nuktih-hayih Khandani az Jalasiyih Qayr-i Alaniyih Majlis* [Interesting Points from the Closed Session of the Majlis], KAYHAN, 11/11/1380 (January 31, 2002).

Tehran made a similar assertion when contacted by the IHRCI.[123] The authorities never explained why the Pourzand investigation had been spearheaded by *Amaken* with its limited mandate to monitor moral crimes when the charges ultimately brought against him proved to be mostly of a political nature.

The Pourzand family has rejected the authorities' claim that Siamak Pourzand had received the legal representation to which he was entitled. Mrs. Kar said that the judge presiding over Mr. Pourzand's case had excluded the lawyer the family had engaged on his behalf.[124] On December 3, 2001, Mrs. Kar had asked Mrs. Shirin Ebadi, already a well-known human rights lawyer in Iran, to defend her husband.[125] Judge Sabir Zafarqandi barred Mrs. Ebadi from representing Mr. Pourzand:

> I asked Shirin Ebadi to represent my husband and she accepted the case … When she submitted her legal representation forms to the court, Judge Zafarqandi denied her the right to represent Siamak. She told me that Judge Zafarqandi received her very rudely and alleged her that she was an abettor and a suspect in the case. She told me that she had never been scared in her whole life as much as she was scared by the threatening words of Judge Zafarqandi.[126]


Mr. Dabir Daryabeigi, Siamak Pourzand's court-appointed attorney

The Pourzand family then tried to introduce another defense lawyer, Qulam Ali Riyahi, but Mr. Pourzand refused to permit Mr. Riyahi to defend him, stating publicly that he was happy with his court-appointed lawyer, Mr. Dabir Daryabigi. Mr. Pourzand was reported as saying: "Since I have confessed to my crimes, it doesn't matter whether I have my own lawyer or one assigned by the court."[127] Mahin Pourzand learned from a former inmate held with Mr. Pourzand that Judge Zafarqandi had personally pressured him to reject Mr. Riyahi.[128]

On March 12, 2002, *Iran* reported that Siamak Pourzand had made a second appearance in court.[129] According to the newspaper, Mr. Pourzand was asked if he wanted to offer a defense to the nine charges brought against him, and he had simply repeated his confession in the court, asserting that he had no defense and he was guilty of all the crimes he was charged with.[130] According to the report, Mr. Pourzand admitted that he had acted against Iran's national security by providing news and information to anti-regime elements, that he had provided information about the country to his brother in France, that he had spied and collaborated with SAVAK (the former Shah's intelligence service), that he had contacts with senior anti-regime figures outside the country and had relayed information to them, and that he had direct contact with Reza

---

[123] *Dadgustari dar Jaryan-i Dastgiriyih Pourzand Ast* [Ministry of Justice Is Aware of Pourzand's Arrest], NOUROOZ, 11/10/1380, (January 1, 2001).

[124] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

[125] *See Vikalatnamiyih Mehrangiz Kar bih Shirin Ebadi* [Request of Mehrangiz Kar from Shirin Ebadi for Legal Representation] 09/12/1380, (December 3, 2002).

[126] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

[127] Melli-Mazhabi Website, *Pourzand Vakil-i Ta'ini ra Rad Kard* [Pourzand Rejected the Elected Attorney], March 12, 2002 (accessed on March 13,2002) quoting from *Nourooz* newspaper.

[128] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

[129] *Duvvumin Jalasihyih Dadgah-i Siamak Pourzand Barguzar Shud* [Second Session of Siamak Pourzand Trial Was Held], IRAN, 12/21/1380, (March 12, 2002).

[130] *Id.*

Pahlavi, the eldest son of the former Shah. The only allegation, according to the paper, that Mr. Pourzand rejected was the charge of receiving money from Reza Pahlavi.[131] The newspaper only listed five of the nine charges he was facing.

Reza Pahlavi officially denied the allegation that Siamak Pourzand had been in contact or received money from him. In an interview with an Iranian journal in Toronto, he said:

> I firmly deny this allegation. I have never had any direct contact or any financial relationship with this innocent and unfortunate person.[132]

The leading conservative newspaper, *Kayhan*, whose editorial line is set by the Office of the Supreme Leader, published an editorial on March 13, 2002, commenting on Mr. Pourzand's appearance in court under the headline: "There You Go, Here Is an Example."[133] *Kayhan* challenged the reformists to explain their position regarding Mr. Pourzand, whom the newspaper noted had confessed to acting against national security, having a relationship with "anti-revolutionary elements," spying, and collaborating with SAVAK. *Kayhan* speculated that the reformists were supporting Mr. Pourzand because they shared his agenda.[134]

On March 19, 2002, *Iran* reported that Mr. Pourzand had made a third and final appearance in Court.[135] The newspaper, however, still did not detail all nine charges brought against him, and four of these charges remain a mystery to this day.[136] According to the paper, Mr. Pourzand asked for clemency and forgiveness.[137] In his closing remarks, Judge Zafarqandi stated that NAJA would continue to summon those mentioned in Mr. Pourzand's confession to account for their actions and that any outstanding cases would be dealt with after the Iranian New Year (*Nawruz*).[138]

## 6.2. The Family Again Appeals for Help

The Pourzand family continued their efforts on Siamak Pourzand's behalf, despite his conviction. On March 20, 2002, Azadeh Pourzand again wrote to President Khatami asking him to follow up on her father's case.[139] Mrs. Kar sent a series of letters to senior governmental officials, including Seyyed Mohammad Ali Abtahi, Legal Advisor to the President; Mr. Mehdi Karrubi, the Speaker of the *Majlis*; Mr. Musavi Khu'ini, *Majlis* Representative; and Mr. Mirdamadi, Head of the National Security Commission of the *Majlis*.  In each letter, Mrs. Kar highlighted the illegal

---

[131] *Id.*

[132] *Reza Pahlavi Pardakht-i Pul bih Pourzand ra Takzib Kard*, [Reza Pahlavi Denied Having Paid Money to Pourzand], SHAHRVAND Toronto, April 2, 2002.

[133] *Bifarma'id, In Ham Yik Nimunih* [There You Go, Here Is an Example], KAYHAN, 12/22/1380 (March 13, 2002).

[134] *Id.*

[135] *Akharin Jalasiyih Muhakimiyih Siamak Pourzand Da'ir Shud* [The Last Session of Siamak Pourzand's Trial Was Held], IRAN, 12/28/1380 (March 19, 2002).

[136] The family does not have the charge sheet, but the five charges were all mentioned in Iran on March 12, 2002.

[137] *Akharin Jalasiyih Muhakimiyih Siamak Pourzand Da'ir Shud* [The Last Session of Siamak Pourzand's Trial Was Held], IRAN, 12/28/1380 (March 19, 2002).

[138] *Id.*

[139] BBC Persian, *Namiyih Dukhtar-i Siamak Pourzand Bih Mohammad Khatami*, [Letter of Siamak Pourzand's Daughter to Mohammad Khatami], March 21, 2002, *available at* http://www.bbc.co.uk/persian/news/020321_a-pourzand.shtml (last visited May 15, 2008).

nature of her husband's arrest and the way he had been treated from the time of his arrest until the time of his conviction.[140]

Mrs. Kar also sent President Khatami a letter asking him to guarantee her safety so that she could return to Iran to visit her husband. The President replied by discouraging the visit. He later told Mrs. Kar in a September 2006 conversation at Harvard University:[141]

> After I received your letter asking me to ensure your safe return to the country, I discussed your request with the National Security Commission, the Interior Ministry, and the head of the judiciary. They all agreed to ensure your safe return to the country. However, the head of the judiciary, although he wanted you to return to the country, could not ensure that you would not be arrested by others. Since he did not give me strong assurances for your safety, I told you not to come.[142]

At the Harvard meeting, President Khatami also told Mrs. Kar directly that he had played no part in her husband's arrest:

> "My administration" he said "did not have a hand in Pourzand's arrest." He added "[T]here were other forces inside the regime that arrested him and it was the job of the parallel intelligence agencies' work." He told me: "My administration had nothing to do with it." Then I said to him, "Mr. President! What difference does it make to him and his desperate family?"[143]

The family was initially unable to gain access to Siamak Pourzand after his conviction. Finally, after the intercession of the Article 90 Commission, Mahin Pourzand was allowed to see her brother on May 3, 2002.[144] The meeting again took place in the *Amaken* office on *Motahari* Street. As usual, Mr. Pourzand was brought from an unknown location for the visit and was taken away afterwards. Mr. Pourzand's cousin, Forouz, also went with Mrs. Pourzand but was refused access to him. Mahin Pourzand told Mrs. Kar that he looked extremely weary and complained of a toothache.[145] He spoke very little.[146]

---

[140] *See Namiyih Mehrangiz Kar bih Mohammad Ali Abtahi, Mushavir-i Huquqiyih Mohammad Khatami* [Letter of Mehrangiz Kar to Mohammad Ali Abtahi, the legal advisor to President Khatami], (April 5, 2002) (on file with IHRDC); *Namiyih Mehrangiz Kar bih Mehdi Karrubi, Sukhanguyih Majlis* [Letter of Mehrangiz Kar to Mehdi Karrubi, the Speaker of the *Majlis*], (April 5, 2002) (on file with IHRDC); *Namiyih Mehrangiz Kar bih Musavi Khu'ini, Namayandihyih Majlis* [Letter of Mehrangiz Kar to Musavi Khi'ini, Representative of *Majlis*], (April 25, 2002) (on file with IHRDC); *Namiyih Mehrangiz Kar bih Comission-i Asl-i Navad* [Letter of Mrs. Kar to the Article 90 Commission], (May 16, 2002) (on file with IHRDC) **[attached as Appendix 3]**; *Namiyih Mehrangiz Kar bih Mohsen Mirdamadi, Ra'is-i Commission-i Amniyat-i Milli va Siasat-i Kharijiyih Majlis* [Letters of Mehrangiz Kar to Mohsen Mirdamadi, the Head of the National Security and Foreign Policy Commissions of Majlis], (April 5, 2002) (on file with IHRDC).

[141] Former President Khatami was invited to speak on the "Ethics of Tolerance in the Age of Violence" and answer audience questions at the Kennedy School of Government's John F. Kennedy Jr. Forum on Sunday September 10, 2006. For more information see Alvin Powell, *Khatami praises democracy, slams U.S. action*, Harvard University Gazette, September 10, 2006, *available at* www.news.harvard.edu/gazette/2006/09.14/99-khatami.html (last visited July 23, 2008).

[142] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[143] *Id.*

[144] AI Press Release of May 10, 2002, *supra* note 36.

[145] *Id. See also* Gooya News, *Ittila'iyih Khanivadiyih Pourzand Darbariyih Vaz'iyat-i Siamak Pourzand* [Statement of Pourzand's family about Siamak Pourzand's Situation], May 9, 2002 (accessed June 10, 2002).

[146] Gooya News, *Ittila'iyih Khanivadiyih Pourzand Darbariyih Vaz'iyat-i Siamak Pourzand* [Statement of Pourzand's family about Siamak Pourzand's Situation], May 9, 2002 (accessed June 10, 2002) See also *Vazi'yat-i Namusa'id-i Siamak Pourzand* [Unfavorable Condition of Siamak Pourzand], SHAHRVAND, May 10, 2002.

### 6.3. Sentencing

On May 4, 2002, *Iran* newspaper reported that Siamak Pourzand had been sentenced to eight years' imprisonment.[147] The paper also reported that Mr. Pourzand had "expressed deep remorse," adding that he had told the court that he "had manipulated his friends for his own purposes" intending "to change the mindset of the Iranian people."[148] Mr. Pourzand had received a comparatively light sentence, in the paper's opinion, because he was "an old man who had expressed remorse and regret."[149] On May 6, 2002, *Iran* reported that Mr. Pourzand had been transferred to Evin prison, noting that he had apparently been held "in *Amaken*'s detention center" during his trial. The paper also reported that his sentence would likely be revised upwards by a higher court.[150]

On May 15, 2002, the Iranian Student News Agency (ISNA) carried an interview with Judge Sabiri Zafarqandi, head of the Mehrabad Special Court that had tried Siamak Pourzand. Judge Zafarqandi contradicted several details given in the previous media coverage of Mr. Pourzand's trial.[151] He stated that Mr. Pourzand had been sentenced to eleven years' imprisonment – not eight.[152] Judge Zafarqandi also added that Mr. Pourzand still potentially faced the serious charge of *Maharib*[153] - literally at war with God – and that he remained under investigation.[154]

The charges Siamak Pourzand was convicted of in May 2002 each carried maximum penalties of no more than ten years' imprisonment – including the crimes against the national security that Judge Zafarqandi described as "establishing a group or a society with more than two members inside or outside the country and directing it with the intention to disrupt the security of the

---

[147] *Siamak Pourzand bih 8 Sal Zindan Mahkum Shud* [Siamak Pourzand Was Sentenced to 8 Years' Imprisonment], IRAN, 2/14/1381 (May 4, 2002). See also BBC Persian, *Mahkumiyat-i Siamak Pourzand bih 8 Sal Habs* [Siamak Pourzand Sentenced to 8 Years' Imprisonment], May 4, 2002, available at http://www.bbc.co.uk/persian/news/020504_h-pourzand.shtml (last visited on May 15, 2008).

[148] *Id.*

[149] *Id.*

[150] *Siamak Pourzand Tahvil-i Zindan-i Evin Shud* [Siamak Pourzand Was Handed Over to Evin Prison], IRAN, 2/16/1381 (May 6, 2002).

[151] ISNA, *Dadgah-i Badvi Siamak Pourzand ra bih 11 Sal Habs Mahkum Kard*, [The Primary Court Sentenced Siamak Pourzand to 11 Years' Imprisonment], 2/25/1381 (May 16, 2002) available at http://www.isna.ir/isna/NewsView.aspx?ID=News-127196 (last visited July, 24, 2008).

[152] Judge Zafarqandi stated that Siamak Pourzand had been convicted of the following crimes: *i*) propaganda against the Islamic Republic, *ii*) spying for a foreign country that had harmed Iran's national and cultural security, *iii*) provoking and deception of the masses to disrupt the security of the country, *iv*) encouragement and persuasion to commit acts of corruption and moral turpitude, *v*) illegitimate affair, and *vi*) consumption of alcohol. For more information, see *id*.

[153] Article 183 of the Islamic Penal Code of Iran defines *Maharib* as "Anyone who pulls weapons with the intention to intimidate, create fear, denies freedom to the public and disrupts public security is *Maharib*"; Article 187 defines Maharib as "Anyone or any group that plans to overthrow the Islamic Republic and for this purpose arranges weapons and ammunition, and also anyone that cooperates with any one or any group that intends to overthrow the Islamic Republic or arranges financial assistance and weapons and other necessary tools for them is *Maharib*;" Article 190 states that the crime of Maharib is punishable by (1) killing, (2) hanging, (3) amputation of first the right hand then left leg, or (4) *Nafyih balad* [Exile]; Article 195 also prescribes crucifixion for the crime of *Maharib*. For more information, see QANUN-I MUJAZAT-I ISLAMI [Islamic Penal Code] articles 183 and 190 (1991).

[154] ISNA, *Dadgah-i Badvi Siamak Pourzand ra bih 11 Sal Habs Mahkum Kard*, [The Primary Court Sentenced Siamak Pourzand to 11 Years' Imprisonment], 2/25/1381 (May 16, 2002) available at http://www.isna.ir/isna/NewsView.aspx?ID=News-127196 (last visited July, 24, 2008).

country."[155] The charge of *Maharib*, which can potentially be a capital crime, was substantially more serious.[156]

Judge Zafarqandi told the ISNA that Mr. Pourzand had been transferred "to a military base for further interrogation"[157] and that a number of individuals named in his confession had yet to be interviewed. Judge Zafarqandi added that Mr. Pourzand would not be subjected to the physical punishment prescribed for offenses of a sexual nature – ninety-nine lashes – but would be fined instead because of his age.[158] However, Judge Zafarqandi explained that the physical punishment for consuming alcohol could not similarly be commuted because this was a *hadd* offense (a crime against God rather than society).[159] The ISNA reported that Mr. Pourzand's defense lawyer planned to lodge an appeal.

In a separate development on May 14, 2002, the head of the State Prison Organization, Mr. Morteza Bakhtiyari, told the newspaper *Nourooz* that he did not know where Siamak Pourzand was being held nor who was holding him, and recommended that *Nourooz*'s reporter contact the court that had sentenced Siamak Pourzand for this information.[160] The State Prison Organization later clarified Mr. Bakhtiyari's statement in a letter written to *Nourooz* on May 19, 2002, confirming that Siamak Pourzand was being held in a prison under the control of the State Prison Organization but withholding precise details of his whereabouts.[161]

On May 27, 2002, Siamak Pourzand was brought back to the Mehrabad Special Court, to answer unspecified further questions from Judge Zafarqandi. He had recently suffered a heart attack and was still in the process of recovering.[162] The ISNA reported that Mr. Pourzand had once more admitted the charge against him and had confessed to the crime he was charged with.[163] In an interview granted to an ISNA reporter during the course of the day, Mr. Pourzand said that he did not know where he was held during the first few months of his detention. He added that now he was being kept in solitary confinement but did not indicate where.[164] Mr. Pourzand's court-appointed lawyer, Mr. Dariabigi, also told the ISNA that Mr. Pourzand had not been transferred to Evin prison. He did not name the facility in which he was being held but added that Mr. Pourzand would be transferred to Evin once the *Maharib* investigation was closed.[165] At the time of writing, this investigation appears to remain open and continues to hang over Mr. Pourzand.

---

[155] *See* QAVANIN-I JAZA'I [Iranian Criminal Law] Chapter 1: Crime Against National Security, article 498- 500, 501, and 508 (1991).

[156] *See id.*, article 190-191, 195 (1991).

[157] ISNA, *Dadgah-i Badvi Siamak Pourzand ra bih 11 Sal Habs Mahkum Kard*, [The Primary Court Sentenced Siamak Pourzand to 11 Years' Imprisonment], 2/25/1381 (May 16, 2002) available at http://www.isna.ir/isna/NewsView.aspx?ID=News-127196 (last visited July, 24, 2008).

[158] *Id.*

[159] *Id. See also* Islamic Penal Code of Iran, Chapter 28: Consumption of Alcoholic Drink and Gambling, article 702, (1991).

[160] *See Izhar-i Bi Itilla'iyih Ra'is-i Zindanha az Vaziyat-i Siamak Pourzand* [Head of the State Prison Organization Expresses Having No Knowledge of Siamak Pourzand's Condition], NOUROOZ, 2/24/1381 (May 14,2002).

[161] *Siamak Pourzand dar Bazdashtgah-i Sazman-i Zindanha Nigahdari Mishavad* [Siamak Pourzand Is Being Kept in the State Prison Organization's Detention Center], NOUROOZ, 2/29/1381 (May 19, 2002).

[162] Pourzand Family's Statement: *Siamak Pourzand had a heart attack*, May 10, 2002 (on file with IHRDC).

[163] ISNA, *Pourzand: Itihamat-i Varidih ra Pazirufti'am* [Pourzand: I've Accepted the Charges Against Me], 3/06/1381 (May 27,2002) *available at* http://isna.ir/isna/NewsView.aspx?ID=News-130644 (last visited on June 6, 2008).

[164] *Id.*

[165] ISNA, *Vakil Mudafi'i Siamak Pourzand: Dadgah Dar Khusus-i Ittiham-i Digar-i Pourzand Dar Hal-i Tahqiq Ast* [Siamak Pourzand's Defense Attorney: The Court Is Still Investigating Pourzand's Other Charge], 04/25/1381, (July 22, 2002) *available at* http://isna.ir/isna/NewsView.aspx?ID=News-141374 (last visited on June 10, 2008).

In early June 2002, *Yaletharit Al-Hussayn,* the official newspaper of the paramilitary organization *Ansar-i Hizbullah,* reported that Siamak Pourzand was now being investigated for a previously undisclosed offense, *irtidad* (apostasy),[166] which like *Maharib*, can potentially carry the death penalty.[167] The newspaper condemned Mr. Pourzand's former journalistic activities and objected to his previous sentence as being too light when weighed against "his plethora of crimes." Mrs. Kar said that when she heard of these new investigations she concluded:

> Apparently, they were not able to get him to confess to a crime that carried the death penalty. Since they were determined to kill him, they kept changing the charges against him to find a way to execute him.[168]

Hard-line conservatives kept up a drumbeat of criticism against Mr. Pourzand in advance of his appearance before Tehran's Court of Appeal, prejudicing any chance he had of receiving a fair hearing. One conservative newspaper, *Resalat,* even went so far as to publish a story ten days before the Court of Appeal met to consider Mr. Pourzand's case, stating that it had already upheld the lower court's findings.[169] Mrs. Kar immediately contacted Siamak Pourzand's court-appointed lawyer, Mr. Dabir Daryabigi:

> After the news was published by *Resalat*, I contacted Mr. Daryabigi. I asked him if the news was true. He said it could not be. As far as he knew, the verdict was not confirmed yet. He said that he was regularly in touch with the court and the court was debating the issue. The hard-line press had come to know about the decision before the defense. In principle, this act violated the suspect's right to a fair trial.[170]

When the Court of Appeal finally gave its ruling, the verdict was as *Resalat* had predicted. The sentence of eleven years' imprisonment was upheld:[171]

> It was the outcome the hard-liners wanted. The hard-liners were openly trying to influence the court decision. They were not simply expressing their opinion, but they were prescribing what the outcome should be.[172]

Some eight months after his original abduction and two months after being sentenced by the Mehrabad Special Court, Siamak Pourzand was still being held in an unknown location. The

---

[166] The interpretation of Shi'a law practiced by the Islamic Republic (based on interpretations of Khomeini's *Risalih*) defines conversion away from Islam into another faith – *irtidad* or apostasy – as an offense that under certain circumstances may be punishable by death. See AYATOLLAH RUHOLLAH KHOMEINI, TAHRIR AL-WASILAH (Beirut: Tawzi' Dar al-Ta'ruf lil-Matbu'aat) 366, 494-495 (1984).

[167] Gooya News, *Ansar-i Hizbullah, Ittihamat-i Siamak Pourzand-ha Boycott-i Khabari Mishavad* [Charges of People Like Siamak Pourzand Is Boycotted for Broadcasting by the Media], June 1, 2002 (accessed June3, 2002).

[168] IHRDC interview with Mrs. Mehrangiz Kar, United States, May 4, 2008 (on file with IHRDC). *See also Namiyih Mehrangiz Kar bih Comission-i Asl-i 90* [Letter of Mrs. Kar to the Article 90 Commission],  (May 16, 2002) (on file with IHRDC).

[169] Peyk-e Iran, *Dadgah-i Tajdid-i Nazar Pas az Barrisiyih Hukm-i Sadirih bar Alayhih Siamak Pourzand In Hukm ra Ta'id Kard* [The Appeal Court Upheld the Verdict Issued Against Siamak Pourzand], June 24, 2002 (accessed June 24, 2002) quoting *Jam-i Jam* and *Resalat* newspapers.

[170] IHRDC interview with Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC). See also *Namiyih Mehrangiz Kar bih Musavi Khu'ini, Namayandihyih Majlis* [Letter of Mehrangiz Kar to Musavi Khi'ini, Representative of *Majlis*], (July 11, 2002) (on file with IHRDC).

[171] *See* Peyk-e Iran, *Dadgah-i Tajdid-i Nazar Pas az Barrisiyih Hukm-i Sadirih bar Alayhih Siamak Pourzand In Hukm ra Ta'id Kard* [The Appeal Court Upheld the Verdict Issued Against Siamak Pourzand], June 24, 2002 (accessed June 24, 2002) quoting *Jam-e Jam* and *Resalat* newspapers.

[172] IHRDC interview with Mrs. Mehrangiz Kar, United States, Jan 4. 2002; see also *Namiyih Mehrangiz Kar bih Mehdi Karrubi, Ra'is-i Majlis* [Letter of Mehrangiz Kar to Mehdi Karrubi, Head of the Majlis], (July 11, 2002) (on file with IHRDC); and *Namiyih Mehrangiz Kar bih Musavi Khu'ini, Namayandihyih Majlis* [Letter of Mehrangiz Kar to Musavi Khu'ini, Representative of the Majlis], (July 11 2002) (on file with IHRDC).

authorities neither allowed the IHRCI nor the Article 90 Commission to meet Mr. Pourzand, nor did they inform either organization about his whereabouts.[173]

## *6.4. Further Arrests*

Siamak Pourzand's appearance at the Court of Appeal was followed by a second round of interviews and arrests led by *Amaken* agents. The film producer, Abbas Kiarustami; the filmmaker, Payam Fazlinejad; the former political editor of the pre-revolutionary incarnation of *Kayhan*, Alireza Farahmand; the chief editor of Asia Economic Journal, Iraj Jamshidi; the editor of *Gardun*, Isma'il Jamshidi; and the human rights lawyer, Shirin Ebadi[174] were all among those summoned to the offices of *Amaken*. The allegations laid against all of these figures were similar – membership in a network aspiring to culturally overthrow the Islamic Republic, revealed by Mr. Pourzand's confession.[175]

In response to criticism in the reformist press regarding *Amaken*'s actions, Mr. Hassan Zakeri, the NAJA's Deputy for Public Relations, said that *Amaken* was implementing an order given to it by the judiciary. He added that all those who had received a summons to be interviewed had been identified from Siamak Pourzand's confession.[176] The head of the public relations office of *Amaken* issued a similar statement in an interview with the *Emrooz* website claiming that the "summonses were ordered by Judge Sabiri Zafarqandi, head of the Mehrabad Special Court."[177]

 Although those summoned by *Amaken* were initially interviewed about alleged public morality offenses, most soon found the focus of their interviews shifting to crimes of a more political nature outside *Amaken's* jurisdiction, such as espionage and cooperating with anti-revolutionary elements. For instance, Payam Fazlinejad in an interview with *Shahrvand* newspaper said that he was first summoned to *Amaken* regarding an allegation that he had produced morally corrupt movies. At the end of his interrogation, he was instructed to return the following week. On his return to *Amaken* a week later, he was charged with spying and aiding and abetting acts of espionage. The charge related to his work as Siamak Pourzand's assistant at the Tehran Arts and Cultural Center.[178]

In another interview with the Toronto-based expatriate weekly, *Shahrvand,* Mr. Fazlinejad described how the *Amaken* agents had tried to bribe him to implicate other individuals who had

---

[173] *Id*. See also *Namiyih Mehrangiz Kar bih Mehdi Karrubi, Sukhanguyih Majlis* [Letter of Mehrangiz Kar to Mehdi Karrubi, Speaker of the Majlis], (July 11, 2002) (on file with IHRDC) (No-198); and *Namiyih Mehrangiz Kar bih Musavi Khuini, Namayandihyih Majlis* [Letter of Mehrangiz Kar to Musavi Khu'ini, Representative of the Majlis], (July 11 2002) (on file with IHRDC).

[174] Shirin Ebadi seems to be the last person who was summoned on July 23, 2002. *See Guftuguyih Ikhtisasiyih Shahrvand ba Payam-i Fazlinejad Piramun-i Ihzar Viy Bih Amaken,* [Exclusive Interview of Sharvand with Payam Fazlinejad About his Summoning to Amaken], SHAHRVAND, July 30, 2002.

[175] *See* Pyknet, *Mardum Mipursand, dar Tehran Hadisih'i dar Sharaf-i Vuqu' Ast,* [People Wonder If Something Is About to Happen in Tehran], July 3, 2002 (accessed July 3, 2002).

[176] *See Ihzar-i Ruzanihigaran bih Idariyih Kull-i Nizarat bar Amakin-i Umumi Rabti bih Niruyih Intizami Nadard,* [The Summoning of Journalists to the Central Office of Amaken Has Nothing to Do with the Law Enforcement Forces], NOUROOZ, 05/02/1381 (July 24, 2002). *See also Izharat-i Rais-i Markaz-i Ittila' Risaniyih NAJA darbariyih Libas Shakhsiha va Ihzar-i Ruznamih Nigaran* [Statement of the Head of NAJA's Information Office Regarding Summoning of Journalist and Plain-clothed Persons], INTIKHAB, 05/02/1381 (July 24, 2002).

[177] The newspaper does not mention the name of Amaken's public relations representative. *See Guftuguyih Ikhtisasiyih Shahrvand ba Payam-i Fazlinejad Piramun-i Ihzar-i Viy Bih Amaken,* [Exclusive Interview of Sharvand with Payam Fazlinejad About his Summoning to Amaken], SHAHRVAND, July 30, 2002.

[178] *See Guftuguyih Ikhtisasiyih Shahrvand ba Payam-i Fazlinejad Piramun-i Ihzar-i Viy Bih Amaken,* [Exclusive Interview of Sharvand with Payam Fazlinejad About his Summoning to Amaken], SHAHRVAND, July 30, 2002.

been named in Siamak Pourzand's confession. When he refused to cooperate with *Amaken*, the agents threatened to charge him with various political crimes before finally releasing him.[179] He said of his experience:

> In the Amaken Office they never tell you what you are suspected of and one never knows who one's talking to, what his position is or what title should be used to address him … [After I was released], because I had not been given any food the whole time, I was placed on an IV and could not work for the next three days.[180]

## 6.5. Televised Confession

On July 24, 2002, Iranian state television broadcasted a press conference with Siamak Pourzand.[181] The press conference was staged at the Mehrabad Special Court, and Judge Zafarqandi and several other government officials were present.[182] The ISNA reported that questions had been distributed in advance to the journalists present by the judicial authorities and that the reporters had been strictly enjoined to only ask questions from the prepared list. Mr. Pourzand's court-appointed lawyer, Dabir Daryabeigi, told the media that the press conference had been organized at Mr. Pourzand's



Siamak Pourzand's televised confession

request to refute false reports that had appeared in the media concerning his situation.[183] The press conference was one of the main news items that evening and was featured in news bulletins throughout the day.[184]

During the press conference, Siamak Pourzand denounced his past activities but also tentatively challenged aspects of his conviction. He admitted contact with Reza Shah with the aim of promoting a non-conformist agenda in the Iranian media but denied receiving money from him. He admitted promoting western culture but again denied receiving any funding from abroad to do so. When a journalist asked Mr. Pourzand if he had been tortured, he replied: "I was not tortured.

---

[179] *Id.*

[180] *Id.*

[181] Amnesty International, *Further Information, Disappearance, Possible Extra-judicial Execution, Fear of Possible Ill Treatment, or Torture, Siamak Pourzand*, July 31, 2002, available at http://www.amnesty.org/en/library/asset/MDE13/011/2002/en/dom-MDE130112002en.html (last visited on May 15, 2008).

[182] The Confession show was staged a few weeks after Mrs. Kar was awarded the National Endowment for Democracy's 2002 Democracy Award by Laura Bush at a Capitol Hill reception on July 9, 2002. *See* Democracy newsletter, *Laura Bush Presents 2002 Democracy Award to Muslim Women Activists*, Summer 2002 newsletter, *available at* http://www.ned.org/publications/newsletters/summer02.html (last visited on May 15, 2002); *See* BBC Persian, *I'tirafat-i Matbu'atiyih Siamak Pourzand*, [Media Confession of Siamak Pourzand], July 25, 2002, *available at* http://www.bbc.co.uk/persian/news/020724_he-purzand.shtml (last visited on May 15, 2008).

[183] *Id.* See also *Izharat-i Tazihyih Siamak Pourzand dar Dadgah*, [New Confessions of Siamak Pourzand in Court], IRAN, 05/04/1381 (July 26, 2002); *Siamak Pourzand Savabiq-i Khud ra Ifsha Kard*, [Siamak Pourzand Exposed his Past], INTIKHAB, 05/05/1381 (July 27, 2002); ISNA, *Siamak Pourzand Fa'liyathayih Siyasi va Matbu'atiyih Khud ra Tashrih Kard* [Siamak Pourzand Described his Political and Press Activities], 05/02/1381 (July 24, 2002) available at http://isna.ir/isna/NewsView.aspx?ID=News-143553 (last visited July 23, 2008).

[184] *Iran TV shows dissident 'confessing' to be Spy*, REUTER, July 25, 2002.

There was no need for it. I had confessed to my crimes."[185] He concluded the press conference by expressing remorse for his past acts and asking for forgiveness.[186]

Mr. Pourzand seemed very upset during the press conference, at one point sobbing uncontrollably.[187] He seemed frightened, frequently glancing off camera as if concerned that he had made a mistake. When a reporter posed a question that Mr. Pourzand had apparently not been expecting, he turned to his lawyer and said: "This was not one of the questions – what should I say?" He became particularly agitated when journalists put similar questions to him for a second time. He seemed concerned that he was not adequately performing the role expected of him, pleading with journalists: "Please, ask again if you want me to elaborate on something or if there is something ambiguous."[188]

Watching footage of the press conference, Mrs. Kar commented:

> He was afraid that he would be tortured if he did not give the expected answers to the questions. Perhaps that is why he kept asking the journalists to ask a follow-up question – he wanted to make sure he had answered the questions put to him to the authorities' satisfaction. I was also stunned to see his attorney participating in such a farce. It is a defense lawyer's duty to protect his client's rights – not to sit next to him on a TV show.[189]

## 6.6. "The Suite"

After the July 2002 press conference, Siamak Pourzand was transferred to another unidentified detention facility, which he has referred to in conversations with his family only as "the suite."[190] Prisoners held in "the suite" describe it as a huge, dark cell, 12 meters in length and 4 meters in width, that is monitored by a video camera.[191]

Siamak Pourzand's mistreatment did not stop after his appearance on television. In one of the interviews they gave to the media, his family complained that he was being badly fed and physically beaten. They specifically mentioned that he was not being given any fresh fruit. The guards responded to this criticism by forcing Mr. Pourzand to eat a huge amount of cucumber every day, a diet that soon made him ill. His daughter, Lily Pourzand, explains:

> My father was suffering from diarrhea from being forced to eat cucumber every day. We said in an interview that money taken from him by the authorities was not being used to cover his expenses.  The authorities then created more trouble for my father. We specifically mentioned in our interview that my father was not given fruit, then the authorities, instead of giving him fruit, forced him to eat only cucumbers. As far as I know, they were placing cucumber inside his small refrigerator inside his room. They were making fun of him and were telling him by saying "[E]at and eat. Your family had complained you were not given fruit." They were not allowing him to throw the cucumbers away. They were even checking his toilet to see if he had not thrown the

---

[185] Text of Siamak Pourzand's Televised Confessions (on file with IHRDC).
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).
[190] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).
[191] Interview with Witness B, United States, February 25, 2008.

cucumber away. So he was chewing the cucumber and then was spitting the remnants secretly in the toilet.[192]

In a phone call from the prison made in the presence of his court-appointed lawyer, Mr. Daryabeigi, Siamak Pourzand told Mrs. Kar that she had exacerbated his situation:

> What a problem you have caused for me! You have complained I was not given fruit, now I'm forced to eat huge piles of cucumber every day.[193]

According to his daughter Lily, Siamak Pourzand eventually attempted to commit suicide while being held in "the suite" by using his trousers as a noose, but the guards were sufficiently vigilant to prevent his attempt from being successful. He was reportedly physically beaten by the guards after his failed suicide attempt.[194]

# 7. Political Reaction

Siamak Pourzand's confession was exploited as a political lever by Iran's conservative clerical establishment. The conservatives used the confession to call into question the patriotism and religious *bona fides* of the reform movement by labeling them as the defenders of a man proven by the courts to be "morally corrupt and on the payroll of the West." This campaign was waged at the very highest level. Iran's Supreme Leader, Ayatollah Khamenei, was quoted by the BBC's Persian Service as stating in July 2002:

> This [Pourzand's] confession confirmed the warnings we have been receiving for many years about the cultural invasion and the efforts of the enemy's agents to promote cultural transformation inside our country.[195]

Ayatollah Ahmad Jannati, Secretary of the Guardians' Council, also condemned the reformists for taking up Mr. Pourzand's case. At a sermon delivered during Friday prayers in Tehran on July 27, 2002, he said:

> When [Siamak] Pourzand was arrested, the reformist newspapers reported the incident as if a freedom fighter had been arrested. After his confession, it has become clear to what centers these newspapers are connected and what plans they hope to execute with American dollars.[196]

Jannati also asked Islamic Republic of Iran Broadcasting (IRIB) to show the press conference featuring Siamak Pourzand's confession as many times as possible.[197] Ali Larijani, then head of IRIB and one of the most influential figures among the conservative movement,[198] suggested that

---

[192] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[193] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 28, 2008 (on file with IHRDC).

[194] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[195] BBC Persian, *Nishanh-hayih Napayda dar Parvandihyih Pourzand* [Invisible Signs in Pourzand's Case File], July 31, 2002, *available at* http://www.bbc.co.uk/persian/news/020731_a-jb-pourzand.shtml (last visited on May 15, 2008).

[196] *Jannti dar Khutbih Hayih Namaz-i Jum'i: Khat-i Nifaq dar Astaniyih Rusva'i Ast* [Jannati in the Speech of the Friday Prayer: The Dissent Plan is on the Verge of Being Exposed], RESALAT, 05/05/1381 (July 27, 2002).

[197] *Sida va Sima Harchih Mitavanad Itirafat Pourzand ra Pakhsh Kunad* [IRIB Should Broadcast Pourzand's Confession As Much As Possible], AFTAB, 05/05/1381 (July 27, 2008).

[198] Ali Larijani is the son of Ayatollah Hashem Amoli and the son-in-law of late Ayatollah Morteza Motahari. He is a former member of the Revolutionary Guards Corps. He served as Minister of Culture and Islamic Guidance under President Rafsanjani and as president of Islamic Republic of Iran Broadcasting (IRIB) from 1994 to 2004. He left the IRIB to become a security adviser to Supreme Leader Ayatollah Ali Khamenei and in 2005 was appointed secretary of the Supreme National Security Council in which capacity he acted as Iran's nuclear negotiator in its discussions with

it might even be necessary to bring Mr. Pourzand back in front of the cameras to answer a second round of questions:

> With respect to the ongoing political discussion these days, it might be better if Siamak Pourzand is allowed to publicly talk again and clarify the situation more.[199]

The leading conservative newspaper *Kayhan* published a prominent editorial following Mr. Pourzand's press conference criticizing the judiciary and intelligence services for waiting so long to act and ignoring the newspaper's repeated warnings that the "USA's fifth column" was very active in Iran's media. The paper then recommended that since Mr. Pourzand was not the only member of this "fifth column," the judiciary and intelligence services should actively pursue and arrest the rest of the group.[200] In the words of the Chief Editor of *Kayhan*, Hossein Shariatmadari:

> Not only do we not deny that Pourzand's confession was based on a scenario we have been writing about, but *Kayhan* takes pride that, for a while now, we have been speaking of this western plot and exposing it by providing undeniable evidence and documents showing the role played by western espionage networks in Iran's political and cultural arenas.[201]

The conservatives did not stop at simply dwelling at length on the nature of Siamak Pourzand's confession but also published a series of articles in the conservative press further defaming his character. In early December 2002, *Kayhan* published a series of articles purporting to expose unsavory details about Mr. Pourzand's private life.[202]

A number of prominent members of the reformist movement did initially continue to defend Mr. Pourzand after his televised appearance, even though he was not himself a political figure. Reformists questioned the legitimacy and admissibility of Mr. Pourzand's public confession, which they dismissed as an invention of the conservative "propaganda machine."[203] Ahmad Zaydabadi, a member of the Board of Directors of the Journalists Union, told the Islamic Republic News Agency (IRNA) on July 27, 2002:

> Pourzand's confessions revealed a plan prepared a long time ago … Propaganda was repeated by Pourzand to the satisfaction of those who prepared it … The executive parts of the plan started a while ago with summoning certain journalists, artists and writers to the *Amaken* office and interrogating them … Pourzand's confession did not finalize this plan; it just exposed it.[204]

---

the international community. Larijani ran unsuccessfully as a conservative candidate for the presidency in 2005, losing to Mahmoud Ahmadinejad.

[199] BBC Persian, *Nishanih-hayih Napayda dar Parvandihyih Pourzand* [Invisible Signs in Pourzand's Case File], July 31, 2002, *available at* http://www.bbc.co.uk/persian/news/020731_a-jb-pourzand.shtml (last visited on May 15, 2008).

[200] *Dar Piy'i Izharat-i Sarih-i Siamak Pourzand Irtibat-i Ruznamih-hayih Zanjir'i ba Mahafil-i Biganih Ifsha Shud*, [Pursuant to Siamak Pourzand's Confession the Relationship of the Chain Newspapers with the Foreign Assemblies Are Exposed], KAYHAN, 04/31/1381 (July 22, 2002).

[201] BBC Persian, *Nishanih-hayih Napayda dar Parvandihyih Pourzand* [Invisible Signs in Pourzand's Case File], July 31, 2002, *available at* http://www.bbc.co.uk/persian/news/020731_a-jb-pourzand.shtml (last visited on May 15, 2008).

[202] Lalih Yarahmadi, *Siamak Pourzand, Karnamihyih Yik Dallal-i Vabastih bih Biganih az Nazparvardihgi ta Kuditayih Farhangi* [Siamak Pourzand: Biography of a Middleman Who Relied on Foreign Forces, from Living a Luxurious Life to the Cultural Coup], KAYHAN, 09/18-25/1381 (December 2-9, 2002).

[203] Peyk-e Iran, *Ahmad Zaydabadi Guft: Itirafat-i "Siamak Pourzand" az Sinariyuh-i kih Mah-ha Pish Tahiyih Shudih Bud Pardih Bardasht va Anra Ifsha Kard* [Ahmad Zaydabadi Said: Siamak Pourzand's Confessions Disclosed and Exposed a Scenario that Was in the Make for Many Months], 05/05/1381 (July 27, 2002) (accessed on July 30, 2002) quoting Islamic Republic News Agency, IRNA.

[204] *Id.*

Similarly, Reza Yusufiyan, a reformist member of the *Majlis*, noted:

> Extracting confessions is an old and untrustworthy method … These confessions are more likely to be part of a political project and scenario than a national security issue.[205]

Ansari Rad, head of the Article 90 Commission, issued a statement arguing that since Siamak Pourzand's detention was unknown and his trial was not public, "the condition under which the confession was taken is not clear and so the confession does not have any legal standing."[206] Mohammad Ali Abtahi, President Khatami's Legal Advisor, commented, "the way Siamak Pourzand's confession was taken is unacceptable to the majority of the population."[207] Another of President Khatami's advisors, Ata'ullah Muhajirani, also rejected Siamak Pourzand's confession, telling the newspaper *I'timad*:

> I personally do not trust the confessions taken in prison. I believe a confession is only valid when the person confessing or interviewed is in an open and free environment, far from the dominance of a security and disciplinary force.[208]

However, the conservatives gradually gained the upper hand, and reformist politicians began to disassociate themselves from Siamak Pourzand. The spokesman for President Khatami's government, Abdullah Ramizanzadih, told reporters on July 31, 2002:

> Pourzand's confession is admissible with respect to his own crimes, and the judicial authorities should treat him accordingly. As far as what he has said about others, until competent judicial courts form an opinion regarding this, we should avoid making judgments.[209]

The following day a representative of the Article 90 Commission, Dr. Davud Hassanzadigan, told the reformist newspaper *Resalat*:

> In my opinion, Pourzand's confessions have more of a historical relevance; his connection to anti-revolutionary elements is undeniable. However, there is not any document supporting his claim that he had the ability to influence the reformist publications. Pourzand is a wayward and corrupt individual; unfortunately, our intelligence agencies did not stop him even though they knew of his situation.[210]

---

[205] Peyk-e Iran, *Reza Yusufiyan, Yik Uzv-i Firaksiyun-I Musharikat dar Majlis-i Shurayih Islami Guft: Itirafgiri Yik Ravish-i Qadimi va Gayr-i Qabil-i Itimad Ast* [Reza Yusufiyan, a Member of the Majlis' Partnership Fraction Said: Extracting Confessions Is an Old and Untrustworthy Method.], 05/06/1381 (July 28, 2002) (accessed on July 29, 2002), quoting Islamic Republic News Agency, IRNA.

[206] Emrooz, *Ra'is-i Comission-i Asl-i Navad-i Majlis: Malum Nist Itirafat-i Pourzand dar Chih Sharayiti Giriftih Shudih Ast* [Head of the Article 90 Commission of Majlis: It Is Not Known Under What Circumstances Siamak Pourzand's Confessions Were Taken], 05/07/1381 (July 29, 2002) (accessed on July 29, 2002).

[207] Peyk-e Iran, *Mohammad Ali Abtahi dar Yaddashti kih dar Shumariyih Ruz-i Dushanbihyih Ruznamih Iran Chap Shudih bih Ira'iyih Ittila't-I Muhimmi Darbarihyih Parvandihyih Siamak Pourzand Pardakhtih Ast* [In his Note Published in the Monday Issue of Iran Newspaper, Mohammad Ali Abtahi Provided Important Information Regarding Pourzand's Case File], 05/07/1381 (July 29, 2002) (accessed on July 29, 2002), as quoting IRNA; *Didgah-i Abtahi Darbarihyih Itirafat-i Pourzand* [Abtahi's Opinion Regarding Pourzand's Confessions], INTIKHAB, 05/08/1381 (July 30, 2002).

[208] Pyknet, *Imruz Bayad ba America Muzakirih Kard, Farda Dir Ast,* [We Must Negotiate with United States Today, Tomorrow Is Too Late], 05/23/1381 (August 14, 2002) (accessed on august 14, 2002), quoting *Itimad* newspaper.

[209] BBC Persian *Nishanih-hayih Napayda dar Parvandihyih Pourzand* [Invisible Signs in Pourzand's Case File], July 31, 2002, available at http://www.bbc.co.uk/persian/news/020731_a-jb-pourzand.shtml (last visited on May 15, 2008).

[210] *Hassanzadigan Mokhbir-i Commission-i Asl-i 90: Irtibat-i Pourzand ba Anasur-i Zidd-i Inqilab Qay-i Qabil-i Inkar Ast,* [Hassanzadigan, Rapporteur of the Article 90 Commission: Relationship of Siamak Pourzand with Anti-Revolutionary Elements is Undeniable], RESALAT, 05/10/1381 (August 1, 2002).

Siamak Pourzand had been abandoned by the reformists. Mrs. Kar later noted bitterly that her husband was a political outsider and so this "was an outcome that was expected."[211]

# 8. Temporary Release

On November 30, 2002, Siamak Pourzand was temporarily released from custody.[212] His release came a week before the scheduled visit of European Union delegates to Iran.[213] The European Union's High Representative for Common Foreign and Security Policy, Javier Solana, had reportedly raised Mr. Pourzand's case with President Khatami during a preliminary meeting on August 2, 2002.[214] Mr. Pourzand's daughter, Lily Pourzand, takes up the story:

> One day when my father was being held in "the suite," he was ordered to pack his clothes and other items and leave the room. He was told that he was free and he could go home. But my father did not want to leave. He was not sure why he was being released and why authorities wanted him to leave his cell without any previous notice. So he was suspicious of their intentions. But finally, they made him to pack his clothes and took him to Evin prison. In Evin prison he was handed over to his step-sister, Minoo Pourzand, because Mahin Pourzand was out of the country at that time.[215]

Once back at his step-sister's house Mr. Pourzand began exhibiting signs of serious physical and mental distress:

> He was 45kg when he was released and he had not been allowed to bathe for a long time. He was afraid of taking shower. It was so unnatural that we believe he might have been subjected to mistreatment. He was scared of water. He did not want to shave his beard or have his hair cut.[216]

Mr. Pourzand had also become incontinent in prison:

> He was soiling himself. He had never had such a problem before his detention. He had many surgeries after his release for conditions that had developed while he was detained, and one of them was related to this problem.[217]

On December 17, 2002, the Iranian authorities granted the European Union envoys access to visit Mr. Pourzand at his stepsister's home.[218] However, he did not remain free for long after their visit. Within three months, he had been rearrested and transferred to Evin prison.

---

[211] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

[212] Amnesty International, *Prisoner of Conscience Appeal Case - Siamak Pourzand: A Case Study of Flagrant Human Rights Violations*, May 2004, available at http://www.amnesty.org/en/library/asset/MDE13/025/2004/en/dom-MDE130252004en.html (last visited on May 15, 2008) (hereinafter *Amnesty: Prisoner of Conscience Appeal*)..

[213] Amnesty International, Iran Country Report 2003, AI Index POL 10/003/2003, *available at* http://asiapacific.amnesty.org/report2003/irn-summary-eng (Last accessed July 24, 2008).

[214] Peyk-e Iran, *Akhbar* [News], August 2, 2002 (accessed on August 2, 2002).

[215] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[216] IHRDC interview with Mrs. Mehrangiz Kar, United State, January 4, 2008 (on file with IHRDC).

[217] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

[218] *Id.*

## 9. Evin Prison

In March 2003, Siamak Pourzand was summoned to Evin Prison. He obeyed the summons and was met at the prison by his court-appointed attorney, Dabir Daryabeigi, and by Judge Ja'far Sabiri Zafarqandi. He was urged to implicate further individuals and he refused.[219] Judge Zafarqandi asked him to write a book based on his confession.[220] Siamak Pourzand demurred, saying that he was too old, and too sick, and thus physically unable to write a book. Then Judge Zafarqandi suggested that the authorities write the book under his name and he simply stand behind it. Siamak Pourzand refused to do this as well.[221] In April 2003, he was summoned back to Court, where he was again instructed to cooperate with the authorities. He once more refused and he was sent back to Evin prison.[222]

Student activist Ali Afshari was being held in Evin when Siamak Pourzand arrived at the prison. He recalled:

> He was very quiet and dispirited. He was not talking and was very scared and fearful. We tried to raise his spirits and get him out of his depression but he was very scared.[223]

Meanwhile, Mr. Pourzand's court-appointed attorney, Dabir Daryabeigi, gave an interview to the ISNA in which he confirmed that Mr. Pourzand had been detained at Evin. He claimed that he was trying to secure Mr. Pourzand's temporary release on bail but added, "since Pourzand has no family here and his [immediate] family lives abroad, and also considering that his physical condition is not very favorable due to his old age, he preferred to stay in prison."[224] Mrs. Kar vigorously rejected Daryabeigi's claim:

> The conservatives had reached to the end of their game. Siamak's presence was not useful any more for them. He was an old man and they wanted to get rid of him.[225]

Former Evin detainee Kianoosh Sanjari echoed Mrs. Kar's comments in an article published on the website *Gooya* that alleged that the Iranian authorities had been deliberately denying Mr. Pourzand the medical care he needed in the hope that he would succumb to his illnesses. He described Mr. Pourzand's poor state of health:

> While I was in Block 7 of Evin Prison, I clearly witnessed the extent of Mr. Pourzand's ailments and incapacity. In those days he could barely walk and his consumption of pain-killers had exacerbated this condition. At the time, he should have been taken out of prison for an MRI but it didn't happen. A fall, a winter and a spring passed … before he was transferred to a hospital, Siamak Pourzand could not even stand on his feet … he had suffered many heart problems in prison. Dr. Farzad Hamidi, [another political prisoner],

---

[219] IHRDC interview with Lily Pourzand, February 28, 2008 (on file with IHRDC). *See also* Amnesty: Prisoner of Conscience Appeal, *supra* note 212.
[220] IHRDC interview with Lily Pourzand, February 28, 2008 (on file with IHRDC).
[221] *Id.*
[222] Amnesty: Prisoner of Conscience Appeal, *supra* note 212.
[223] IHRDC interview with Ali Afshari, United States, February 16, 2008 (on file with IHRDC).
[224] ISNA, *Vakil Mudafi'-i Siamak Pourzand: Umidvaram Muvakilam Murid-i U'tufat-i Islami Qara Girad va Afv Shavad* [Siamak Pourzand's Defense Attorney: I hope that my Client is Subject to Islamic Kindness and Pardoned], 12/15/1381 (March 5, 2004).
[225] IHRDC interview with Mrs. Mehrangiz Kar, United States, January 4, 2008 (on file with IHRDC).

would come to his aid and, with the help of others, would take Pourzand to the prison clinic, which had no medical equipment.[226]

Another fellow prisoner, Ahmad Batebi, also spoke to reporters about Mr. Pourzand's condition:

> Siamak Pourzand is suffering from a number of physical ailments such as spinal pain, heart problems, high blood pressure, and blood clots in his legs, which are very visible. [There are] bruises on his calves, hamstrings, and arms. [Siamak] showed his various physician's statements to us and on one of them I saw that his physician had strongly recommended that he should be under constant observation by a specialist for a year.[227]

## 9.1. UN Working Group on Arbitrary Detention Report

On May 9, 2003, the United Nations Commission on Human Rights Working Group on Arbitrary Detention issued an opinion regarding Siamak Pourzand's case.[228] The government of Iran had responded to the Working Group's February 2002 request for information regarding Mr. Pourzand's arrest and detention, stating that he had been arrested following a complaint submitted by a secretary at the Tehran Cultural Center, Ms. Venus Farimehr.[229] The Iranian authorities confirmed that his arrest had been ordered by the General Court of Tehran on November 22, 2001, and that he had been brought before the court on November 24, 2001. The Iranian authorities claimed that he had been held in preventive detention in a facility controlled by the State Prison Organization, which was not the case. They also stated that he had been transferred to Evin prison on May 27, 2002, which was also untrue.

The Iranian authorities finally confirmed details of the charges brought against Mr. Pourzand, stating that he had been convicted of moral infractions and abuses according to article 637 and 639 of the Penal Code, spreading propaganda against the Islamic Republic of Iran according to Article 500 of the Penal Code, spying against the Iranian State under Articles 501 and 505 of the Penal Code, and undermining State security under Article 512 of the Penal Code.[230] The Iranian government added in its response that Mr. Pourzand had been found guilty of all charges and was condemned to eleven years' imprisonment, a fine of one million rials, and to suffer eighty lashes. The Iranian government also claimed that the Tehran Court of Appeal confirmed this judgment on May 21, 2002, although contemporary reports in the government-controlled Iranian media place this event toward the end of June 2002.[231] There was no mention made of the possibility of further charges being brought against Mr. Pourzand.

The Working Group was not persuaded by the government of Iran's submission, noting that "the reference to 'propaganda' against the Islamic Republic of Iran gives rise to serious doubts about the real nature and the motivation of the charges brought against [Siamak Pourzand]."[232] The Working Group concluded that "Mr. Pourzand was prosecuted against and convicted to a prison term because of his convictions and the expression of his opinion"[233] and requested the government of Iran take "the necessary steps to remedy the situation of Syamak [sic] Pourzand in

---

[226] Gooya News, *Zindaniyan-i Siyasi va Aqidati, Usarayih Jumhuriyih Islami* [The Political and Conscious Prisoners, Hostages of the Islamic Republic], April 20, 2004 (accessed April 21, 2004).
[227] Peyk-e Iran, *Musahiabih Ahmad Batebi Darbarihyih Vaziyat-i Zindan* [Interview with Ahmad Batebi About the Prison Conditions], August 25, 2004 (accessed on August, 25, 2004).
[228] Working Group Report, supra note 42.
[229] *Id.*
[230] *Id.*
[231] *Id.*
[232] *Id.*
[233] *Id.*

order to bring it into conformity with the provisions and principles incorporated in the Universal Declaration of Human Rights and in the International Covenant of Civil and Political Rights, to which the Islamic Republic of Iran is a Party."[234]

## 9.2. Failing Health



Siamak Pourzand in hospital

Siamak Pourzand was kept in Ward Three of Evin Prison until he suffered a severe heart attack in April 2004. The prison authorities wanted to send Mr. Pourzand to a government-run hospital, but he refused, declaring that he would not go to a hospital run by the IRGC or the government because he was afraid he "might be injected with lethal medicine or an air bubble in those facilities."[235] The Iranian news agency *Peik net* reported that Mr. Pourzand had requested he be given the right to select his own doctor. According to the news agency, Mr. Pourzand had said:

> "I would rather die in prison than in the *Sepah*'s Baqiyat'ullah hospital!"[236]

Despite Mr. Pourzand's critical condition, his request to consult a doctor of his own choosing was rejected. When his sister paid him a visit in Evin on April 19, 2004, she found he was unable to walk unaided into the visiting room.[237]

Later that night Siamak Pourzand was hospitalized in the critical care unit of *Sa'databad* Hospital. The guards accompanying him refused to let reporters speak to him.[238] The Islamic Human Rights Commission of Iran was also refused access to him.[239] Only his sister was allowed to visit him. She later told *Peyk-e Iran* that during her visit "the guards kept monitoring our conversation."[240] Mr. Pourzand was chained to the hospital bed at both the wrists and ankles.[241]

*Peyk-e Iran* also recounted that doctors were not hopeful for Mr. Pourzand's recovery as they had discovered that he was suffering from a number of additional ailments, including bladder

---

[234] *Id.*

[235] Pyknet, *Siamak Pourzand: Bray-i Marg Haziram Ama dar Zindan, Na dar Bimiristan-i Baqiyat'ullah-i Sepah* [Siamak Pourzand: I Would Rather Die in Prison than in *Sepah*'s Baqiyat'ullah Hospital], April 20, 2004 (accessed on April 20, 2004).

[236] *Id.   See also* RSF, *Reporters Without Borders outraged at Siamak Pourzand's treatment in hospital, The organization will hold the Iranian authorities responsible for the deterioration in the journalist's state of health*, April 20, 2004, *available at* http://www.rsf.org/article.php3?id_article=9821 (last visited on May 15, 2008).

[237] RSF, *Reporters Without Borders outraged at Siamak Pourzand's treatment in hospital, The organization will hold the Iranian authorities responsible for the deterioration in the journalist's state of health*, April 20, 2004, available at http://www.rsf.org/article.php3?id_article=9821 (last visited on May 15, 2008).

[238] On April 20, 2004, Islamic Republic News Agency (IRNA) reported that Siamak Pourzand's guard did not allow him to speak to its reporters. See also BBC Persian, *Siamak Pourzand dar Bimaristan Bastari Shud* [Siamak Pourzand Was Hospitalized], April 20, 2004, *available at* http://www.bbc.co.uk/persian/iran/story/2004/04/040420_he-pourzand.shtml (last visited on May 15, 2008), quoting IRNA.

[239] Gooya News, *Pourzand Mamnu'ul Mulaqat Shud* [Siamak Pourzand Is Prohibited from Having Visitors], April 21, 2004 (accessed April 21, 2004).

[240] Peyk-e Iran, *Dar Utaq Mamur-i Police Huzur Darad va Mulaqatha ba Huzur-i Mamur-i Police Anjam Mishavad* [There Is a Police Officer in the Rooms and Visits are Monitored by Him], April 20, 2004 (accessed on April 20, 2004).

[241] IHRDC interview with Lily Pourzand, United States, February 28, 2008 (on file with IHRDC).

problems.[242] Reporters Without Borders issued a press release stating that the organization was "revolted" by Mr. Pourzand's treatment and promising to hold the Iranian authorities responsible for any further deterioration in his condition.[243]

On April 20, 2004, Judge Zafarqandi ordered the hospital authorities not to allow anyone to visit Mr. Pourzand at the hospital,[244] although he was allowed to speak to his wife and daughter on the telephone. In a conversation on April 22, Mr. Pourzand told them that if he didn't receive surgery on his spine immediately there was a real chance that he would be paralyzed for the rest of his life.[245]

The authorities finally relented, and Siamak Pourzand was temporarily discharged from Evin prison to receive treatment at a better equipped facility.[246] After multiple surgeries, he was sent home to recuperate, where he still remains at the time of writing. However, Mr. Pourzand has not completed his sentence and continues to live under the constant threat of being returned to Evin to serve out his term. Mr. Pourzand remains in poor health. His wife and daughters cannot return to Iran to care for him for fear of arrest, and he has been denied permission to travel abroad for further medical treatment. As he lost both of his former jobs after his arrest, he has no source of income to sustain himself.

# 10. Violations of National and International Law

One of the most striking aspects of Siamak Pourzand's case is the degree to which the conservative clerical establishment was prepared to subvert the rule of law within Iran by ignoring Siamak Pourzand's constitutional rights and the Islamic Republic's own judicial rules, as well as international human rights law.

## 10.1. Violations of Iranian Law

Siamak Pourzand's method of arrest, detention, and trial violated aspects of the Constitution of the Islamic Republic, as well as Iran's Code of Criminal Procedure. When Siamak Pourzand was arrested, he was not shown an arrest warrant. He was abducted outside his sister's house by plainclothesmen who did not publicly identify themselves. Such an act is prohibited by Article 32 of the Iranian Constitution,[247] and Articles 112[248] and 119[249] of Iran's Code of Criminal

---

[242] Gooya News, *Siamak Pourzand dar Astanihyih Marg Ast* [Siamak Pourzand Is on the Verge of Death], April 18, 2004 (accessed April 18, 2004).

[243] Peyk-e Iran, *Guzarishgaran-i Bidun-i Marz: Vaziyat-i Salamat-i Siamak Pourzand Nigran Kunandih Ast* [Reporters Without Boarders: Siamak Pourzand's Health Condition is Deeply Concerning], April 18, 2004 (accessed on April 18, 2004).

[244] Gooya News, *Siamak Pourzand Mamnu'ul Mulaqat Shud* [Siamak Pourzand Is Prohibited from Having Visitors], April 21, 2004 (accessed April 21, 2004); *Hal-i Siamak Pourzand Bihbud Yaft* [Siamak Pourzand's Health Is Improving], SHARQ, 02/02/1381 (April 22, 2004).

[245] IHRDC interview with Mrs. Mehrangiz Kar, United States, February 4, 2008 (on file with IHRDC).

[246] Gooya News, *Khabarnamih* [News Bulletin], April 23, 2004 (accessed April 23, 2004).

[247] Article 32 Of the Iranian Constitution asserts that "No one may be arrested except by the order and in accordance with the procedure laid down by law. In case of arrest, charges with the reasons for accusation must, without delay, be communicated and explained to the accused in writing, and a provisional dossier must be forwarded to the competent judicial authorities within a maximum of twenty-four hours so that the preliminaries to the trial can be completed as swiftly as possible. The violation of this article will be liable to punishment in accordance with the law." *See* Constitution of Iran, *supra* note 4, article 32.

[248] Iran's Code of Criminal Procedure, article 112 says: "The accused shall be summoned by an arrest warrant. There should be two copies of the arrest warrant; one is served to the accused and the other must be signed by the accused and

Procedure. Article 121 of the Code of Criminal Procedure also requires such arrests to be carried out during the daylight hours, and Mr. Pourzand was detained at night.[250]

Siamak Pourzand was not informed of the charges against him and was not handed over to the relevant court within 24 hours as prescribed by Article 123 of Iran's Code of Criminal Procedure.[251] He was also denied legal representations of his choice, a right granted to every Iranian citizen by Article 35 of Iranian Constitution[252] and Article 185 of the Code of Criminal Procedure.[253]

Siamak Pourzand was eventually tried primarily for offenses relating to his journalistic activities. Article 168[254] of the Iranian Constitution prescribes that press offenses shall be tried in public and in the presence of a jury. Siamak Pourzand's case was not heard by a jury.

Article 38[255] of the Iranian Constitution prohibits all forms of mistreatment and torture carried out for the purposes of extracting a confession. The Constitution invalidates testimony obtained by compulsion or duress, and it prescribes a penalty for those violating this law. No disciplinary action has been taken against those who coerced Siamak Pourzand's confession, and his forced testimony was admitted as evidence at his trial.

Siamak Pourzand's trial did not meet the due process requirements of Iranian law in another important respect. Article 55 of the Iran's Code of Criminal Procedure states: "If a person has committed multiple crimes that fall under the concurrent jurisdiction of the public courts, revolutionary courts, and military courts, he or she should be tried first for the more serious crime in a court that has jurisdiction over that crime and then he or she should be handed over to the court that has jurisdiction over the lesser charge. Furthermore, if the crimes carry equal punishments, the accused would be tried by relevant courts in order of offenses committed."[256] Judge Zafarqandi charged Siamak Pourzand with lesser offenses while keeping two more serious

---

handed back to the serving officer." *See* AY'IN-I DADRASIYIH KAYFARI [Iran's Code of Criminal Procedure], article 112.

[249] Iran's Code of Criminal Procedure, article 119 states: "The accused shall be summoned by an arrest warrant. The arrest warrant, which contains the reasons for the summons, must be read to the accused." *Id.*, article 119.

[250] Iran's Code of Criminal Procedure, article 121 states: "Accused should be summoned during the day, except in the case of an emergency." *Id.*, article 121.

[251] Iran's Code of Criminal Procedure, article 123 states: "The accused shall be accompanied and monitored from the time of summoning to the time he or she is presented to a judge. Comment: The officers are responsible for presenting the summoned person immediately to a judge. The accused can only be detained if there is the possibility of flight or the destruction of evidence; notwithstanding these two conditions, officers do not have the right to detain an individual for more than 24 hours." *Id.*, article 123.

[252] Article 35 of the Iranian Constitution explains: "Both parties to a lawsuit have the right in all courts of law to select an attorney, and if they are unable to do so, arrangements must be made to provide them with legal counsel." Constitution of Iran, *supra* note 4, article 35.

[253] Iran's Code of Criminal Procedure, article 185: "All parties to a criminal dispute have the right to select and introduce their own legal counsel(s) to a court of law. The date and the time of the court appearance will be announced to the accused, plaintiffs, defendants and their attorneys. If the disputing parties have multiple lawyers, presence of one lawyer from each side is sufficient for the court to proceed." AY'IN-I DADRASIYIH KAYFARI [Iran's Code of Criminal Procedure], article 185.

[254] Iranian Constitution, article 168 states: "Political and press offenses will be tried openly and in the presence of a jury, in courts of justice. The manner of the selection of the jury, its powers, and the definition of political offenses, will be determined by law in accordance with the Islamic criteria." Constitution of Iran, *supra* note 4, article 168 [Political and Press Offenses].

[255] Article 38 of the Constitution states: "All forms of torture for the purpose of extracting confession or acquiring information are forbidden. Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid of value and credence. Violation of this article is liable to punishment in accordance with the law." *Id.*, article 38.

[256] AY'IN-I DADRASIYIH KAYFARI [Iran's Code of Criminal Procedure], article 55.

charges – *Maharib* (at war with God) and *Murtad* (apostate) – suspended over him. This implicit threat appears designed to compel Siamak Pourzand's continued cooperation.

Finally, Siamak Pourzand was also held in an unknown location for an extended period of time before he was brought to trial. Article 33 of the Iran's Code of Criminal Procedure requires a court order authorizing a suspect's pre-trial detention beyond one month.[257]   Siamak Pourzand was held for four months prior to trial without the required court authorization.

## 10.2. Violations of International Human Rights Law

The Pourzand case reveals a profound disregard for international due process norms and human rights law on the part of the conservative clerical establishment in Iran. Siamak Pourzand was subjected to arbitrary detention in contravention of Article 9 of the International Covenant of Civil and Political Rights (ICCPR). Specifically, Siamak Pourzand was not informed of the reasons for his arrest and was not promptly, or indeed accurately, informed of the charges against him, a direct contravention of Article 9(2).

Article 10 of the ICCPR requires states to treat persons in detention with humanity and dignity. The ill treatment described by Witness A to which Siamak Pourzand was subjected by his jailers prior to his trial was a clear violation of Articles 10(1) and 10(2)(a). Furthermore, the use of stress positions as a coercive tool in particular has been widely condemned as a breach of human rights. Article 7 of the ICCPR prohibits torture and cruel, inhuman, and degrading treatment. Article 1 of the Convention Against Torture (CAT) defines 'torture' as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on an individual for the purposes of *inter alia*, gaining a confession. Although Iran is not a signatory to the CAT, freedom from torture is an absolute right in customary international law and is not subject to derogation in any circumstances.

Incommunicado detention – in which one is denied access to family, friends and others – has also been identified by the UN Human Rights Committee, the international body of experts that monitors the application of the ICCPR, as a potential breach of both Article 7 and Article 10 of the Covenant. The shortest period of incommunicado detention found to be in breach of Article 10(1) by the Human Rights Committee was just fifteen days.[258] Seven weeks passed before any member of Siamak Pourzand's family was allowed to see him, and even then they were not told where he was being held. The Committee has also found that instances of forced disappearance that last for eight months or more pass the threshold for "cruel and inhuman treatment" established under Article 7.[259] Siamak Pourzand was held in detention facilities operated by the so-called 'parallel institutions' outside the official state prison system for 12 months after his arrest.

Siamak Pourzand was denied a fair trial as defined by Article 14 of the ICCPR. He was not brought to trial without "undue delay," a violation of Article 14(3)(c). The manner in which the

---

[257] Iran's Code of Criminal Procedure, article 33 states: "The arrest shall be ordered by a judge and approved by the head of the district court or his deputy. The arrest could be appealed in the provincial court within 10 days. This review will be conducted immediately. Either way, the status of the accused must be determined within a month. If the judge deems it necessary to hold the accused in custody any longer, he must have the case reviewed as specified above." *Id.*, article 33.

[258] Arzuaga Gilboa v. Uruguay, U.N. Human Rights Comm., Comm'c'n No. 147/1983, U.N. Doc. CCPR/C/OP/2 (1990).

[259] Laureano v. Peru, U.N. Human Rights Comm., Comm'c'n No. 540/1993, U.N. Doc. CCPR/C/56/D/540/1993 (1996); Tshishimbi v. Zaire, U.N. Human Rights Comm., Comm'c'n No. 542/1993, U.N. Doc. CCPR/C/53/D/542/1993 (1996).

charges brought against him kept changing made it impossible for him to fully understand the "nature and cause" of charges he faced, a violation of Article 14(3)(a).  He was refused access to a legal representative of his own choosing, a violation of Article 14(3)(d). He was not given the opportunity to examine, or have examined, the witnesses against him, a violation of Article 14(3)(e). Most serious of all, he was forced to confess to crimes he had not committed in highly coercive circumstances, a violation of Article 14(3)(g).

The United Nations Commission on Human Rights Working Group on Arbitrary Detention found that Siamak Pourzand was prosecuted because of his convictions, and the expression of his opinion highlights an additional violation of Article 19 of the ICCPR – his right to freedom of expression.

In December 2006, the United Nations General Assembly formally adopted the International Convention for the Protection of All Persons from Enforced Disappearance. Article 2 of the Convention defines enforced disappearance as the "arrest, detention, abduction or any other form of deprivation of liberty by agents of the State… followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which place such a person outside the protection of the law."[260] The treatment suffered by Siamak Pourzand meets the criteria for enforced disappearance established by the Convention.

Finally, Siamak Pourzand was denied any medical attention for an extended period, and he suffered a heart attack while he was in prison. The denial of medical attention is a violation of Article 12 of the International Covenant on Economic, Social and Cultural Rights, to which Iran is also a State Party.

# 11. Conclusion

Siamak Pourzand's case was at the center of a pivotal moment in recent Iranian history. He was cynically framed by hard-line conservative elements within the Iranian political and judicial establishment as a warning to others in the reform movement that the clerical establishment would not allow them to liberalize conditions in the Islamic Republic.

The evidence manufactured against Siamak Pourzand and his subsequent confession, obtained in circumstances which unquestionably amount to duress, were used to discredit the reformist media and to divert attention away from legitimate calls for reform. The fact that Mr. Pourzand could be linked, no matter how spuriously, to exiled monarchists through his first wife, and the reform movement through his second wife, made him an ideal candidate for such a strategy.

In a wider sense, Siamak Pourzand's treatment also discredits claims that the Islamic Republic offers some democratic space for the people of Iran to influence events in their country. Despite elections that invested the government of President Mohammad Khatami with a clear mandate to implement reform, hard-line conservatives schemed and maneuvered to thwart the will of the Iranian people. Siamak Pourzand was the innocent victim they exploited for this purpose.

Siamak Pourzand's case also highlights the fragility of the rule of law inside the Islamic Republic of Iran. Hard-line conservatives subverted the judicial system, stretched the jurisdictional boundaries of *Amaken* beyond their intended limits, ignored the due process protections in the

---

[260] International Convention for the Protection of All Persons from Enforced Disappearance, *opened for signature* February 6, 2007, U.N. Doc. A/RES/61/77, *available at* http://www2.ohchr.org/english/law/disappearance-convention.htm (Iran is not yet a state party to the convention.)

Iranian legal code, denied Siamak Pourzand's right to amount a defense to the charges against him, and paraded their victim before the cameras.

Siamak Pourzand began his ordeal as a secret prisoner, arbitrarily detained for purely political reasons. He is now a very public victim of a callous regime that acts against its own citizens with impunity. Arbitrary detention and televised confessions are the unmistakable tools of an authoritarian state. The Pourzand case clearly exposes the lengths to which Iran's clerical establishment will go to hold on to power.

# Methodology

The IHRDC gathered information for this report from the following sources:

- *Testimony of victims and witnesses.* These include witness statements taken by IHRDC attorneys from former detainees of the secret prison system or their family members. We have withheld the names of two witnesses – witness A, who was a former member of the Iranian intelligence community, and witness B, who is still living inside Iran – at the witnesses' request. The IHRDC has not spoken directly with Siamak Pourzand himself.

- *Government documents.* These include recorded public statements by state officials, court documents, official reports by organizations such as the United Nations Commission for Human Rights, statements released by Iranian government agencies, and published legal instruments.

- *Documents issued by non-governmental organizations.* These include reports and press releases written by organizations such as Human Rights Watch and Reporters Without Borders.

- *Academic articles.* These include the works of historians and political scientists who have written on the reform era.

- *Media reporting.* These include articles published in newspapers both inside Iran and in the foreign media.

- The IHRDC particularly wishes to thank the Library of Congress for its invaluable assistance in researching this project.

Where the report cites or relies on information provided by government actors or other involved parties, it specifies the source of such information and evaluates the information in light of the relative reliability of each source. The IHRDC has meticulously cross-checked all the sources of information used to compiled this report to ensure their credibility and accuracy.

All names of places, people, organizations, etc. originally written in Farsi have been transliterated using the system of the International Journal of Middle Eastern Studies (IJMES), available at http://assets.cambridge.org/MES/mes_ifc.pdf. Under the IJMES system, names of places with an accepted English spelling and names of prominent cultural or political figures may be spelled according to the English norm.

# Abbreviations

AIC…………………………………………………………...American Iranian Council

CAT.......................................................................................Convention Against Torture

ICCPR………………………………International Covenant of Civil and Political Rights

IHRCI...............................................................Islamic Human Rights Commission of Iran

IRGC………………………………………..Iran Revolutionary Guard Council (*Sepah*)

IRIB………………………………………..Islamic Republic of Iran Broadcasting

IRNA…………………………………………………...Islamic Republic News Agency

ISNA……………………………………………………..Iranian Student News Agency

NAJA………………………………………………...Iranian Law Enforcement Agency

SAVAK...………………………………………….The former Shah's intelligence service

SPO……………………………………………………...State Prison Organization

# A Mockery of Justice:
## The Framing of Siamak Pourzand

## **Appendices**

# APPENDICES TABLE OF CONTENTS

**Appendix 1** – United Nations Commission on Human Rights, Working Group on Arbitrary Detention, *Opinion No. 8. 2003 (Islamic Republic of Iran)*, U.N. Doc. E/CN.4/2004/3/Add.1.at 45 (May 9, 2003)

**Appendix 2** – ISNA, *Izharat-i Seyyed Ali Akbar Musavi Khu'ini Darbarihyih Vaz'iyat-i Zindanha va Bazdashtgahhayih Tehran* [Ali Akbar Musavi Khu'ini, Majlis Representative, Makes Statement about Tehran's Prison and Detention Facilities], 07/27/1381, (October 19, 2002)

**Appendix 3** – *Namiyih Mehrangiz Kar bih Comission-i Asl-i Navad* [Letter of Mrs. Mehrangiz Kar to the Article 90 Commission], (May 16, 2002)

**Appendix 4** – Azadeh Pourzand letter to Khatami, *Tell Me Where Is My Father*, WASHINGTON POST, (December 30, 2001)

## Appendix 1

United Nations Commission on Human Rights, Working Group on Arbitrary Detention, *Opinion No. 8. 2003 (Islamic Republic of Iran)*, U.N. Doc. E/CN.4/2004/3/Add.1.at 45 (May 9, 2003)

**UNITED
NATIONS**

**E**





**Economic and Social
Council**

Distr.
GENERAL

E/CN.4/2004/3/Add.1
26 November 2003

Original:  ENGLISH/FRENCH/
SPANISH

COMMISSION ON HUMAN RIGHTS
Sixtieth session
Item 11 (b) of the provisional agenda

### CIVIL AND POLITICAL RIGHTS, INCLUDING THE
### QUESTION OF TORTURE AND DETENTION

**Opinions adopted by the Working Group on Arbitrary Detention**

The present document contains the opinions adopted by the Working Group on
Arbitrary Detention at its thirty-fifth, thirty-sixth and thirty-seventh sessions, held in
November/December 2002, May 2003 and September 2003, respectively.  A table listing all
the opinions adopted by the Working Group and statistical data concerning these opinions are
included in the report of the Working Group to the Commission on Human Rights at its
sixtieth session (E/CN.4/2004/3).

GE.03-16900 (E)   291203   090104

### OPINION No. 8/2003 (ISLAMIC REPUBLIC OF IRAN)

Communication addressed to the Government on 14 February 2002.

Concerning: Syamak Pourzand.

**The State has ratified the International Covenant on Civil and Political Rights**

1.    (Same text as paragraph 1 of opinion No. 15/2000.)

2.    The Working Group conveys its appreciation to the Government for having provided the requested information.

3.    (Same text as paragraph 3 of opinion No.15/2002.)

4.    In the light of the allegations made, the Working Group welcomes the cooperation of the Government. The Working Group transmitted the reply provided by the Government to the source, which made comments on it. The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.    According to the information submitted by the source, Syamak Pourzand, aged 72, is a journalist and manager of the *Majmue-ye Farhangi-ye Honari-ye Tehran* (Tehran Cultural Centre) and is married to Mehranguiz Kar, a lawyer. Mr. Pourzand was arrested on 24 November 2001, at the residence of Mahin Pourzand (his sister), in Tehran, by four militiamen who presented no warrant or explanation. On 7 December 2001, Ms. Pourzand was allegedly requested to take him a change of clothes. Mr. Pourzand was at the time the communication was submitted and is at present detained on the orders of the Islamic Revolutionary Court of Tehran.

6.    On 12 or 13 January 2002, Ms. Pourzand was permitted to meet with her brother at the *Edare-ye Amaken*, or Bureau of Premises, also known as the Committee for the Propagation of Virtue and Prohibition of Vice, for a meeting that lasted 10 minutes. Mr. Pourzand's wife, who is undergoing medical treatment in the United States, and his sister in Tehran have reportedly filed complaints with police and judicial authorities and have written to the Presidency of the Republic, to no avail.

7.    The Government provided the Working Group with the following information. Mr. Pourzand was arrested following a complaint submitted by Ms. Venus Farimer, who claimed that she had been the victim of abuse and sexual harassment by him, and charged with several offences:  infractions against morality and abuses according to articles 637 and 639 of the Penal Code; propaganda against the Islamic Republic of Iran (art. 500); spying against the State (arts. 501 and 505); and undermining State security (art. 512). The arrest was ordered on 22 November 2001 by the General Court of Tehran. On 24 November 2001, he was presented before the court. On the same date, the court ordered a preliminary investigation and returned the file to the police. Later, the court ordered the release of the accused on bail. Not having been able to pay bail, Mr. Pourzand was kept in detention and sent to a prison under the authority of the Organization of Prisons. On 27 May 2002, Mr. Pourzand was transferred to Evin prison in Tehran. Once the investigations were finished, Mr. Pourzand's trial started and

several hearings took place in the presence of the accused and his defence lawyer. The court determined the accusations to be true and on 13 April 2002, issued verdict No. 10, finding Mr. Pourzand guilty of the above-mentioned offences sentencing him to 11 years' imprisonment (the sentence to take into account the time already spent in prison); payment of a fine of 1 million rials and 80 lashes. Mr. Pourzand appealed, but on 21 May 2002, the Tehran Appeal Court confirmed the judgement.

8.      The Working Group deplores the fact that the Government has failed to provide it with the text of the penal legislation applicable in the case against Mr. Pourzand, despite having been requested to do so by the Chairman-Rapporteur in his letter of 14 February 2002. Nor was the judgement of 13 April 2002 of the General Court of Teheran convicting Syamak Pourzand submitted. The Working Group notes that the text of the criminal law provisions - which was not produced, and only referred to by the Government in very general terms - was the basis for the conviction of Mr. Pourzand. The reference to "propaganda against the Islamic Republic of Iran" gives rise to serious doubts about the real nature of and the motivation for the charges brought against him. It should be borne in mind that, according to information available to the Working Group, Mr. Pourzand, a journalist and manager of the Teheran Cultural Centre, has the reputation of being critical of the Government.

9.      Therefore, in the absence of any argument to the contrary submitted by the Government, the Working Group cannot but conclude that Mr. Pourzand was prosecuted, convicted and sentenced to a prison term because of his convictions and the expression of his opinions.

10.     In the light of the foregoing, the Working Group expresses the following opinion:

        The detention of Syamak Pourzand, being in contravention of article 19 of the Universal Declaration of Human Rights and of article 19 of the International Covenant on Civil and Political Rights, is arbitrary and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

11.     Consequent upon this opinion, the Working Group requests the Government of the Islamic Republic of Iran to take the necessary steps to remedy the situation of Syamak Pourzand in order to bring it into conformity with the provisions and principles incorporated in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is a party.

Adopted on 9 May 2003

## Appendix 2

ISNA, *Izharat-i Seyyed Ali Akbar Musavi Khu'ini Darbarihyih Vaz'iyat-i Zindanha va Bazdashtgahhayih Tehran* [Ali Akbar Musavi Khu'ini, Majlis Representative, Makes Statement about Tehran's Prison and Detention Facilities], 07/27/1381, (October 19, 2002)

(Followed by Translation)





[ صفحه اصلي ] [ سرويس مجلس ] [ عناوين كل اخبار سرويس مجلس ] [ عناوين كل اخبار ] [ چاپگر ] [ دريافت فايل متن خبر ] [
دريافت فايل XML ] [ نسخه چاپي ]

سرويس: مجلس
1381/07/27
10-19-2002
18:37:23
8107-07: كد خبر

/ پارلماني/
اظهارات سيدعلي‌اكبر موسوي خوييني درباره‌ي وضعيت زندان‌ها
بازداشتگاه‌هاي تهران

خبرگزاري دانشجويان ايران - تهران
سرويس: مجلس

سيد علي‌اكبر موسوي (خوئيني) ـ نماينده‌ي مردم تهران در مجلس شوراي اسلامي ـ امروز در گفت‌وگو با
خبرنگاران پارلماني مطبوعات و رسانه‌ها، گزارشي از وضعيت زندان‌ها و بازداشتگاه‌هاي شهر تهران ارايه
كرد.

به گزارش خبرنگار پارلماني ايسنا، موسوي خوئيني يادآور شد: چنانچه مي‌دانيد در گذشته دستگاه‌هاي مختلف
اطلاعاتي، امنيتي، نظامي و انتظامي، بازداشتگاه‌هايي به صورت اختصاصي و بعضا مخفي داشتند كه بر آن‌ها
نظارتي نمي‌شد و گاهي مشكلاتي هم به وجود مي‌آورد؛ مثل اين‌كه در مواردي خانواده‌هاي بازداشت‌شدگان
مدت‌ها از آن‌ها اطلاعي نداشتند و پاسخگوي مناسب و متولي واحدي در اين مورد وجود نداشت؛ اين در حالي
بود كه به صراحت قانون، سازمان زندان‌ها متولي نظارت و مديريت بر اين بازداشتگاه‌ها و زندان‌هاست و بايد اين
مجموعه‌ها داراي شناسنامه باشند.

نماينده‌ي تهران با برشمردن برخي از بازداشتگاه‌ها گفت: در اولين گام مثبت در ساماندهي اين بازداشتگاه‌ها
وزير اطلاعات ـ علي يونسي ـ دستور تعطيلي بازداشتگاه توحيد را صادر كرد و بعد از آن اين وزارتخانه براي
نگهداري متهمان ذيربط خود از اوين استفاده مي‌كند، از سوي ديگر، محل بازداشتگاه توحيد به موزه‌ي تاريخ
اطلاعات كشور تبديل شد و پيشنهاد شده است كه خبرنگاران پارلماني از آن‌جا ديدن نمايند.

وي درباره‌ي بازداشتگاه 59 سپاه، معروف به 59 عشيره‌آباد گفت: پس از پي‌گيري‌ها قبلي طي جلسه‌اي در
مجلس با حضور نمايندگان تام‌الاختيار سپاه، وزارت دفاع و سازمان زندان‌ها ابتدا توافق‌نامه‌اي به امضا رسيد و
دوستان سپاه، اصل نظارت سازمان زندان‌ها را پذيرفتند و بعدها اعلام شد كه پس از آماده شدن بازداشتگاه
امنيتي سپاه در درون زندان اوين، اين بازداشتگاه تعطيل مي‌شود.

طبق آخرين اخبار و اطلاعات، اعلام شده است كه اين بازداشتگاه تعطيل شده و سپاه هم مثل وزارت اطلاعات
متهمان قرار بازداشتي خود را در اوين نگه‌داري مي‌كند، تعطيلي اين بازداشتگاه را يكي از مقامات ارشد سازمان
زندان‌ها در بازديد خود از بازداشتگاه 59 تاييد و اعلام كرد كه در بازديد يادشده هيچ متهمي در آن وجود نداشته
است و با توجه به اتمام مهلت اعتبار توافق‌نامه‌ي قبلي نگهداري هر متهم در اين مجموعه غيرقانوني است. ما
از اين حركت استقبال مي‌كنيم و و آن را گامي در جهت ضابطه‌مند شدن امور مي‌دانيم.

موسوي خوئيني ادامه داد: زندان حشمتيه در چهارراه قصر، در اختيار ارتش بود و تحت نظارت سازمان زندان‌ها
نبود كه پس از پي‌گيري‌هاي طولاني و طبق توافق بين ارتش و سازمان زندان‌ها اين زندان اخيرا تحت نظارت
سازمان زندان‌ها قرار گرفت. البته ارتش روي اصل نظارت سازمان زندان‌ها بحثي نداشت بلكه برخي مسائل
حقوقي مانند مالكيت محل اين زندان مطرح بود.

نماينده‌ي مردم تهران به بازديدهاي نمايندگان مجلس از بازداشتگاه‌هاي نيروي انتظامي نيز اشاره كرد و افزود:
سال گذشته بازديدهايي از بازداشتگاه‌هاي نيروهاي مسلح داشتيم كه در بخش نيروي انتظامي از بازداشتگاه
اطلاعات نيروي انتظامي (ناتب) بازديد كرديم كه به نظر مي‌آمد وضعيت مناسبي نداشت و البته نيروي انتظامي
نيز اين بازداشتگاه را موقت مي‌دانست. سال گذشته در قالب لايحه بودجه‌اي كه از طرف دولت مشخص شد

مبلغي مقرر شد که با توجه به متصل بودن ساختمان اين بازداشتگاه به سازمان وزارت امور خارجه، اين ساختمان از سوي وزارت امور خارجه خريداري شود و عملا اين بازداشتگاه تعطيل گرديدند.

موسوي خوئيني به بازداشتگاهي در خيابان شهيد مطهري اشاره کرد که طبق بازديد سابق، دو طبقه در زيرزمين واقع شده بود و يادآور شد: همان زمان بازديد اعلام کرديم که اينجا محل مناسبي براي بازداشتگاه نيست. بنا شد در اينباره پيگيري شود. متاسفانه اين موضوع هنوز حل نشده است. به نظر ميرسد در ادارهي اين مجموعه ابهام جدي وجود دارد و اعلام شده است که اين بازداشتگاه از طرف حفاظت قوه قضايیه مورد استفاده ميگيرد. در رسانهها هم منعکس شده که عدهاي از افراد که براي بازجويي يا سوال جواب، اينجا احضار ميشوند.

نمايندهي مردم تهران تصريح کرد: دو بازداشتگاه ديگر نيز اخيرا با نمايندگان تهران آقاي شمس وهابي و خانمها کولايي و حقيقتجو از آنها بازديد کرديم که يکي از آنها معاونت مبارزه با مفاسد اجتماعي معروف به "وزرا" است و در ايام بازديدمان جلسهاي با سردار طلايي، فرمانده نيروي انتظامي تهران بزرگ، و مسوول جديد اين مجموعه که برنامههاي تازهي خود را اعلام کردند. با توجه به تجربهي مثبت و موفقيت نسبي مسوول جديد اين مجموعه ـ سرهنگ صدوقي ـ به نظر ميرسد ايشان بتواند با رويکرد جديد در اين مجموعه تحولي ايجاد کنند.

وي خاطرنشان کرد: دومين بخشي که به نيروي انتظامي مربوط بود و ما از آن بازديد کرديم، بازداشتگاه مربوط به مواد مخدر در تهران بود که در شمال پادگان عشرتآباد قرار دارد، اين بازديد همزمان با باکساري جنگلهاي لويزان انجام شد؛ در اين بازديد، قاضي و دستياران رسيدگيکننده به اين موضوع در محل حضور داشتند و ما از نزديک با زحمات اين دوستان آشنا شديم.

در کنار اين بازداشتگاه و بخش آقايان، بند زنان هم بود که در جانب سلولي بود که بنيانگذار فقيد جمهوري اسلامي - حضرت امام (ره) - چند روزي را به صورت موقت در آنجا بازاشت بودند. به نظر ميآمد که اين مجموعه محل مناسبي براي استفاده تحت عنوان بازداشتگاه نبود. البته دوستان نيروي انتظامي هم اذعان داشتند که درگير مسائل بودجهاي و اعتبارات اينجا هستند که اين محل هم به نوعي جابهجا شود. ما نيز مکاتبهاي با دبير جديد ستاد مبارزه با مواد مخدر داشتيم و از ايشان تقاضا کرديم که در اسرع وقت کمک کنند تا اين جابهجايي صورت گيرد. پرسنل فعال آنجا هم به شدت در مضيقه هستند.

وي به بازديد چند ماه قبل نمايندگاه تهران اشاره کرد و گفت: با توجه به اينکه بخشي از موضوع امور زندانها مربوط به زندانبانها و مراقبين زندانها است بايد به مسائلي نظير بازنشستگي پيش از موعد و زيانآور بودن شغل زندانباني و وضعيت معيشتي آنها توجه بيشتر شود تا وظايف خود را بهتر انجام دهند. در اين جلسه که آقاي واعظ مهدوي ـ معاونت اجتماعي سازمان مديريتي و برنامهريزي ـ و آقاي بختياري ـ رييس سازمان زندانها ـ حضور داشتند نتايج مثبتي به دست آمد.

وي از کميسيون برنامه و بودجه و رييس آن که برنامههاي ويژهاي دربارهي امور زندانها در کنار کميسيون قضايي و حقوقي مجلس که نسبت به اين مسائل حساسيت نشان ميدهند، تقدير و تشکر کرد.

نمايندهي مردم تهران دربارهي بند نسوان اوين گفت: تعدادي از زنان شکايت و انتقادهايي را از برخي دستاندرکاران مجتمع قضايي ارشاد مطرح کردند که بعضا باعث شگفتي و تأسف نمايندگان مجلس شد.

وي با اشاره به اين موضوع که شکايت اين زندانيان را طي ملاقاتي با يکي از مسؤولان قوهي قضايیه مطرح کرده است ، گفت: بعدها اعلام شد که مجتمع مذکور تعطيل شده است، اين نمايندهي مجلس از ارائهي توضيحات بيشتر در اين زمينه خودداري و در عين حال از حساسيتهاي رييس قوهي قضايیه در اين زمينه تشکر کرد.

وي دربارهي بازداشتگاههاي کلانتري و ادارهي کل آگاهي اين موضوع را از ديگر برنامههاي نمايندگان مجلس اعلام و از استقبال از اين موضوع خبر داد.

وي در پاسخ به سؤالي مبني بر وجود بازداشتگاههاي اختصاصي ديگر گفت: با توجه به اقدام وزارت اطلاعات، سپاه پاسداران در تعطيلي بازداشتگاه اختصاصي خود و نگهداري متهمين در اوين اميدواريم که ظرف ماههاي آينده معدودي از بازداشتگاههاي حفاظت اطلاعات وزارت دفاع، بازداشتگاه حفاظت اطلاعات نيروي انتظامي، بازداشتگاه حفاظت اطلاعات ارتش که در شهر بوده است را به اوين منتقل کنيم تا ضمن لحاظ تدابير امنيتي نيروهاي مسلح مديريت و نظارت دائمي بر آنها اعمال گردد.

موسوي خوئيني در بخش ديگري از سخنان خود درباره‌ي انتقال زندان‌هاي داخل شهر تهران به حاشيه‌ي آن، از جمله مشکلات ايجاد شده در انتقال زندان‌ها از داخل شهر به بيرون را نبود اعتبارات و بودجه عنوان کرد و تصريح نمود که مهم‌ترين اين انتقال‌ها ، انتقال زندان قصر به جايي در حاشيه‌ي جنوبي شهر تهران است که قرار است مرحله به مرحله به محل جديد که در حال احداث است انتقال يابد.

به گفته‌ي وي از جمله ديگر زندان‌هايي که بايد به بيرون از شهر منتقل شود، زندان حشمتيه است.

در ادامه نماينده‌ي مردم تهران به تعداد زيادي از زندانيان مالي اشاره کرد که در انتظار تغيير قانون چک و ماده‌ي قانوني يوم‌الادا به سر مي‌برند و گفت: اصلاح قانون چک به صورت يك لايحه از سوي دولت ارائه شده و به زودي در مجلس مطرح خواهد شد و قانون يوم‌الادا نيز با اشکالاتي که شوراي نگهبان از آن گرفته مواجه است؛ البته اميدواريم که با تغييراتي تصويب گردد البته قانون‌گذاران ضمن توجه به وضعيت زندانيان مالي بايد به حق طلبکاراني که اين زندانيان به آنها مفروضند هم توجه کنند.

نماينده‌ي مردم تهران يکي از مشکلات زندانيان سياسي را عدم تفکيک آنها از مجرمان امنيتي به دليل نبود قانون جرم سياسي دانست و از اين که برخي از اين‌ها با مجرمان جرايم ديگر در يك جا نگهداري مي‌شوند ابراز نارضايتي کرد.

وي درباره‌ي زندانيان کوي دانشگاه گفت: از اين‌ها، اکبر و منوچهر محمدي، عباس دلدار، مهرداد لهراسبي، جاويد تهراني و احمد باطبي در زندان هستند، که اميدواريم با اقدامات صورت گرفته به ويژه پيگيري نهاد محترم نمايندگي رهبري در دانشگاه‌ها آزادي آنها قطعي شود.

موسوي خوئيني، درباره‌ي روحانيون زنداني، گفت: درباره‌ي عبدالله نوري انتظار مي‌رفت که آزاد شود ولي به دليل مقاومت‌هايي که وجود دارد، اين انتظار برآورده نشد و براي يوسفي اشکوري نيز حکم جديدي ابلاغ شده است که دليل آن هنوز معلوم نيست.

وي همچنين نسبت به برخورد با ناصر زرافشان - وکيل خانواده‌هاي مقتولان قتل‌هاي زنجيره‌اي - ابراز نگراني کرد.

موسوي خوئيني به طرحي اشاره کرد که طبق آن وکلا در کلانتري‌ها حاضر مي‌شوند، و با مثبت ارزيابي کردن آن گفت: در ظرف سال‌هاي اخير در برخي موارد حرمت وکلا ناديده انگاشته شده است و جايگاه آنها تضعيف شده است؛ ما ضمن تأکيد بر جبران اين بي‌حرمتي‌ها و برخوردها، اين طرح را مثبت ارزيابي مي‌کنيم و در کل حضور وکلا در جاهايي که مملو از متهماني است که کمترين آگاهي نسبت به وضعيت و حقوق خود ندارند را مناسب مي‌دانيم.

موسوي خوئيني در پايان از همکاري دستگاه قضايي، سپاه، ارتش و نيروي انتظامي و سازمان زندان‌ها تشکر کرد.

انتهاي پيام

کد خبر: 8107-07170

[ صفحه اصلي ] [ سرويس مجلس ] [ عناوين کل اخبار سرويس مجلس ] [ عناوين کل اخبار ] [ چاپگر ] [ دريافت فايل متن خبر ] [ دريافت فايل XML ] [ نسخه چاپي ]

نظر شما در مورد اين خبر

نام

پست الکترونيک

**Ali Akbar Musavi-Khu'ini, *Majlis* Representative, Makes Statement about Tehran's Prison and Detention Facilities**

*Iran Student News Agency – ISNA*
*Parliamentary correspondent*

ISNA's Parliamentary correspondent reports that Musavi-Khu'ini, the representative of the people of Tehran in the Islamic Consultative Assembly (*Majlis*), spoke with the media today about the situation of prisons and detention facilities in Tehran.

Musavi-Khu'ini stated: "As you know, various intelligence, security, military and law enforcement agencies had special and sometimes secret detention facilities in the past. They were not monitored and sometimes they created trouble. [For instance,] for long periods of time families of the detainees had no information about them and there was not one individual authority responsible and accountable for these locations. In fact, the law gives the State Prison Organization (SPO) the responsibility to monitor and administer these prisons and requires each prison to be registered with the SPO."

Mentioning the names of some of these facilities, the representative of Tehran said: "To show his eagerness to administer these facilities properly, Ali Younesi, the Minister of Intelligence, has ordered that the *Towhid* prison be closed down. Henceforth, the Ministry of Intelligence will use Evin prison for detaining suspects. *Towhid* prison has been converted into a museum for the Ministry of Intelligence and it has been suggested to the *Majlis* that newspaper reporters can visit this site."

In reference to Prison 59, also known as Prison 59 of *Ishratabad*, which is administered by the IRGC [the Iranian Revolutionary Guard Corps], Musavi-Khu'ini said: "Pursuant to several inquiries, we reached an agreement in the *Majlis* with the authorized representative of the IRGC, the Minister of Defense, and the SPO. The IRGC accepted the authority of the SPO and later it was announced that Prison 59 would be closed when a security prison for IRGC is established in Evin prison.

"According to the latest information, Prison 59 has been shut down, and like the Ministry of Intelligence, the IRGC now keeps its detainees in Evin prison. An SPO officer has confirmed the closing of Prison 59 and announced that no detainees had been seen in the facility during his visit. Since the expiration of the deadline agreed to by the IRGC, it is now illegal to detain any person in that facility. We welcome this move. We consider it a step toward the implementation of the rule of law."

Musavi-Khu'ini continued: "*Hishmatiyih* prison, located on the *Qasr* crossroads, was administered by the Army. The SPO did not have access to it. After many meetings, an agreement was signed between the Army and the SPO. Based on that agreement, this prison is now administered by the SPO. The Army had no problem with the SPO overseeing the prison, but the Army maintained an ownership claim to the property."

The representative of Tehran referred to the visits of the *Majlis* delegates to the Law Enforcement Agency (NAJA) detention facilities and said: "We visited the armed forces detention facilities. We visited *Natib* prison, which is run by the Intelligence Protection Organization of NAJA. The prison was in poor condition. NAJA considered it a temporary prison. A bill was passed last year that allowed a budget for the facility to be purchased by the Foreign Ministry last year; therefore, it is no longer active."

Musavi-Khu'ini mentioned a prison on *Motahari* Street: "It was a prison located in a basement on two floors. At the time of our visit, we announced that it was an improper place for a detention center. [Our recommendation] was supposed to be followed up. Unfortunately, the problem still exists. There is serious confusion concerning the management of this facility. It has been announced that this complex is managed by the Intelligence Protection Organization of the Judiciary. The media has reported that many people have been summoned to this facility for interrogation."

The representative of Tehran further explained: "Recently I visited two other prisons with Mr. Shams Wahabi, Mrs. Kolali and Mrs. Haqiqatjo, the three other representatives of Tehran. One of these prisons was the office of the deputy of the Vice and Virtue Committee, known as '*Vuzara.*' We had a meeting with Sardar Talai, head of Tehran police, and Sergeant Sadiqi, the new head of this facility, about this prison. Sergeant Sadiqi discussed his plans for the facility. We hope that he brings positive changes to this place."

He continued: "We visited a second facility that was run by NAJA. It was located in the north of *Ishratabad* military base and was used to detain criminals charged with drug offenses. We visited the facility while the deforestation of the Louzan Jungle was taking place. We were accompanied by judges and their assistants. We saw how hard the responsible authorities were working there at the time.

"In addition to male wards, the prison had a female ward too. This ward was next to the cell in which the founder of the Islamic Republic of Iran had been detained for a few days. This facility was not a proper place to hold detainees, and the head of NAJA agreed with us. However, NAJA could not relocate the detainees due to a budgeting problem. We had corresponded with the new head of the anti-drug office and requested that he relocate the detainees to some other place. The employees were also in a very difficult situation there [due to the budgeting problem]."

In reference to a visit by the representative of Tehran a few months earlier, Musavi-Khu'ini said: "Because part of the problem of the prison lays with the wardens and the prison personnel, we recommend that special attention be paid to the employees' retirement, salary and living conditions. We reached a positive agreement with Bakhtiyari, the head of the SPO, and Waiz Mahdavi, deputy of President Strategic Planning and Control in regards to this issue."

He expressed his appreciation for the Budget and Planning Commission because of their special attention to the prison situation.

In reference to the women's section in Evin prison, the representative of Tehran said: "Many women have complained and criticized the judicial authority of the Irshad Judicial Center (Court). The representatives were stunned and regretted these grievances."

He continued: "The issue was discussed with the judicial authorities and they later announced that the facility had been closed." Musavi-Khu'ini did not elaborate about the nature of the women's complaints but expressed his gratitude for the quick response of the head of the judiciary.

He spoke of the detention centers for the Police Headquarters and the Central Office for Criminal Investigation as being part of the plan of the *Majlis* representatives and welcomed the plan.

In response to a question concerning other special [secret] detention centers, he said: "With respect to Ministry of Intelligence and the IRGC, we have received promises that they will close their special detention facilities and transfer their detainees to Evin Prison. We hope that the Intelligence Protection Organization of the Defense Ministry, the Intelligence Protection Center of NAJA, and the Intelligence Protection Organization of the Army, which all have detention

centers in the city, will do the same. This would be a good solution because the armed forces would ensure the security and monitoring of the facility."

In another part of his speech, Musavi Khu'ini talked about moving the prisons inside Tehran to the outskirts of the city, and he noted that, at present, a lack of sufficient resources is preventing the move. He also asserted that the most important of these moves would be the relocation of Qasr prison to the southern outskirts of the city, which will be done gradually over time.

He also stated that another prison that must be moved to the outskirts is *Hishmatiyih* prison.

The representative of Tehran continued by referring to those prisoners who are charged with financial offences and are awaiting the amendment of the Check Laws and the Legal provisions for *Yum al-Ada* [Payment Day], stating: "A bill amending the Check Law has been presented to the *Majlis* by the government and will soon be discussed in the *Majlis*. The law pertaining to *Yum al-Ada* is faced with the problems expressed by the Guardian Council. However, we are hopeful that the changes that will ultimately be made will address the needs of both the prisoners and those individuals to whom the prisoner owes money."

The representative of Tehran said that one of the major problems faced by political prisoners is the absence of a legal distinction between political prisoners and ordinary criminals. He expressed his dissatisfaction with the practice of holding both categories of prisoners in one location.

Regarding the university dormitory prisoners, Musavi Khu'ini said: "Akbar and Manuchehr Mohammadi, Abbas Deldar, Mehrdad Lohrasbi, Javid Tehrani, and Ahmad Batebi are still in prison, but we are hopeful that following the action taken on their behalf, especially by the Organization of the Representatives of the Leader in the Universities, their release will soon be secured."

About the imprisoned Clergy, Musavi Khu'ini said: "Regarding Abdollah Nuri, it had been anticipated that he would soon be freed, but because of opposition to his release, this expectation has not been met. A new verdict has been issued for Yusofi Eshkevari, the reasons for which are not yet clear."

He also expressed his concerns regarding the treatment of Nassir Zarafshan, the lawyer representing the victims of the Chain Murders.

Musavi Khu'ini spoke positively of a plan to have lawyers present in the Gendarmeries and said: "During the past few years, the respect paid to our lawyers has diminished and their place in the society has been weakened. We insist on repairing these slights and consider this plan to be a positive one. In general, we consider the presence of the lawyers in places filled with suspects who have no idea of their rights under the law to be very appropriate."

Finally, Musavi Khu'ini praised the collaboration of the Judiciary, *Sepah*, the Armed forces, the Law Enforcement Forces and the State Prison Organization.

# Appendix 3

*Namiyih Mehrangiz Kar bih Comission-i Asl-i Navad* [Letter of Mrs. Mehrangiz Kar to the Article 90 Commission], (May 16, 2002)

(Followed by Translation)

بسم الله الرحمن الرحیم

پنجشنبه ۲۴ اردیبهشت ۱۳۸۱

اعضا و محترم کمیسیون اصل ۹۰ مجلس شورای اسلامی

به طوریکه استحضار دارید از تاریخ طرح شکایت اینجانب مهرانگیز کار درباره

همسرم سیامک پورزند مدتها گذشته است . خبرهای منتشره در مطبوعات

ایران مبنی از شبیخون نگران کننده شده است و سکوت سنگین آن نهاد

ما نوعی که مطلع است تا حج رسیدگی خود را به طور علنی در اختیار محترم

کلیارد ، برنگرانی ها افزوده است .

اطلاعاتی که از درون کشور به دست می رسد ، همین اطلاعات منتشره

تو سط سازمان های جهانی گزارشگر این است که :

سیامک پورزند را دارند در بازداشتگاه های

نامعلوم ، به اتمام جرایم مرتکب نشده ،

زیرفشار بازجویی تو فیل می رسانند . او

در محیال آزادان نیمه جان شده است .

بعد از هفت ماه که از نا پدید شدن سیامک پورزند می گذرد و در شرایطی که دیگر

امید به ادامه حیات او کمرنگ شده است ، تازه تماشی صابری طفره فندی

ریاست محترم شعبه ۱۶۱۰ دادگاه‌های عمومی که زیر نام روشن به دفرودگاه

موگاباد مستقر است ، اعلام کرده است نامبرده (سیامک می‌زنند) را برای

احراز جرم بیاید ، منیان در یکان نظامی خاصی (که گویا نام و

نشانی ندارد) بازجویی می‌کنند . مطالعهٔ اخبار رسمی این دادگاه در

روزنامهٔ ایران ( تریبون دولت) و روزنامهٔ نوروز بسیار

نگفت آمیز است . گویا درمورد سیامک می‌زنند انواع احکام

صادر شده است و هربار تناسب با شرایط روز ، یکی از

احکام را منتشر می‌کنند . متأسفانه وکیل محترم پرونده نشر که

وکیل تعیینی دادگاه است به هردلیل که برما معلوم نیست ، مجری

اوامر دادگاه شده و برای ت خدمات دادگاه ، هربار عامل یکی از

احکام است . تا خبه روزینی روی ۷ سال و سپس ۸ سال

محکومیت یافت که می شد . محکومیت ۸ سال توسط روزنامه

ایران منتشر شد . آما روز ۲۵ اردیبهشت جاری کشتی بان

را سیاستی دگر انتا و حکم به ۱۱ سال حبس ، انفاع و اقسام

شلاق ودست آخر محاربه (با الفاظ تهدید آمیزکه اهل فن آن را

می شناسند) تبدیل شد.

گویا بیش از ۷ ماه آمران مرتبط با این پرونده تصمیم گرفته اند کارها

از اول شروع کنند و آنچه را از علم انداخته اند و حتی زیرنویسها هم

نتوانسته اند درباره آن اظهارات کذب اخذ کنند، عنی جرم

«محاربه» را به انداع اتهامات وجرایم بفزایند تا برای مرگ

او توجیه شرعی داشته باشند.

گویا مقرر شده است تمام مواد خشونت آمیز علیه مبارزات ایران

روی پرمرد ۷۱ ساله ای آزادی طلب بود. آن هم مبارز سالها از

تعقیب آن می گذرد !!

گویا سیاک پیرزن در تمام مدت ۲۴ سال مبارزانقلاب در مخفی گاه ه

پرده و آشیانه اورا پیدا کرده اند. حضور دایم سیاک پیرزند و ایران

وفعالیت علنی او در حوزه های فرهنگی و مطبوعاتی کلی نادیده

گرفته شده و گناهان اورا درجای علل و عوامل ناکامی ها و

شکست ها پیدا کرده اند و می خواهند به دار مجازاً بیاویزند.

من ٤

اینجانب درجایگاه وکیل دادگستری مبرزه اسلامی ایران با ٢٠ سال فعالیت

وکالتی ومطبوعاتی وفرهنگی ، خوب میدانم آن حضرات نیز برای

دستیابی بهحقوق فردی خود در تمام وکلای مجلس (استثنای حقوق

مندرج دراصل ٨٤ راجع به مصونیت اعضا ، پارلمان ) همین برای

انفای تکالیف خود در مجموعهٔ مجلس همواره گرفتار کارشکنی گروه

وهستههای خاصی بوده وهستید . بهعلاوه وظائف نظارتی آن معطل شده است

اینجانب خوب میدانم مراجع مأذون پاسخگوی پرسشهای شما

نیستند ، میرسد به کاذن های خود سر و غیرمأذونی که همه از

آنها می ترسند و نمیخواهند تحریک شان کند .

بنابراین محتمل است شمانیز زیر سلطهٔ آنان که ابتدا پشایعه »

میسازند ، آن را در بازوهای مطبوعاتی خود  پرورش میدهند

سپس پروندهٔ شایعاتی با تبدیل به پروندهٔ قضائی میکنند ،

نتوانند کاری ببید . اما این واقعیت چیزی از حقوق ربایک

دیگر ندو فرزندان او نمی کاهد وسکوت سنگین شما را توجیه نمی کند .

ص ۵

لذا برای خذمین با رهٔ دارهٔ دهم ، خیانۂ درخصوص علیۂ مفتوح شدن

این پروندۀ شایعاتی ،، به ضرورت چمتی والا بخرج نخهید ، مرگ

او درٮنکال مجریان اوامر متهم است .

دهۂ سوم انقلاب ومسایل وآلام مبتلا به جامعه ایران وشرایط

بین المللی ، بخصوص ضرورت توجه به تعریف دقیق امنیتملی ،

ایجاب میکند تا در تمام نامنگ دان منتسب مردم ، مرزهای

«خودی» و «غیرخودی ،، را پیرامون خود بکُفید . باور نفرمائید

اگر مردم ایران را بیک هشم نگاه کرده بودید ، انگ به

هشم نمیدیدید اصلا هات راکه در من بیتقرارفته است .

کشور ایران ، این مجموعۂ مضوع نگروانذتی با حفظ وایدانت

مرزهای خودی ،، وغیرخودی ،، به سامان نمی رسد .

آقایان :

گویا اوراق با طلاعای ازین پروندۀ شایعاتی را بجای اوراق

بازجویی که تابع ضوابط وشرایط قانونی است ، پیش روی تان

نهاده اند. و شما را تسلیم نظرات گروهی و هستیِ خود کرده اند. این نیز راه و روشی است که انتخاب شده تا به اثبات برسد نگهبانان مجلس شورای اسلامی نمی توانند حافظ حقوق شهروندان و قربانیان خشونت بوده و دست کم به محل بازداشت گروگان ها و اسیر. ناظر و نماینده فرستند.

با وجود آگاهی بر مراتب فوق به آلیزه حق خواهان از شما می پرسم:

آنکه سازمان زندانها از وجود سیاهک می رنجد در زندانهای تحت پوشش خود اقدام به اعدام می کند (نگاه کنید به نوروز ۲۵/۲/۸۱ مصاحبه آقای نجات ریس سازمان زندانها) و مزمان با آن ماضی ها بر لفظ قند می صریحاً می گوید و را دوباره به همان یکان نظامی بر ده اند که زیر نظر سازمان زندانها ست به ما می گلا می ک از وجوه اطلاع رسانی است؟ این تناقض چدین را چگونه توضیح می دهند؟

آقایان :

سیاست بوردند کلی از قمار بایان سیاست حذف است . از سالها پیش نسبت به آن برنامه ریزی و سناریونویسی شده است . مطبوعات همسو با این حذف طی ده سال گذشته حتی لحظه ای خان دارهٔ اورا راحت نگذاشته اند و آنچه نسبت و افترا برده با هدف سلب حیثیت از آنها انتساب داده اند . همهٔ آن نسبت ها در رأی اعلام شده توسط قاضی ها برای "طرف مند" جا سازی شده است .

یکبار دیگر توجه ما دهم آمران و مجریان سیاست حذف اراده کرده اند سیاست بوردند را در مرکز بزنامهٔ حدیدی قرار دهند و به بهانهٔ اظهارات او (یعنی اظهارات یک مرد ۷۱ ساله که بدان ۷ ماه تحمل بازداشتگاه و نظامی و انواع فشارهای روحی نیمه جان شده و تازه دارند از اد آماده آن را می گیرند تا در حالی عمایب مرتب اش را توجیه کنند ) گروهی از مذالات و فعل و مطبوعات ما ندگار در ایران را در اختیار مجریان سیاست حذف قرار دهند . نام این افراد در لیست آمران این حذف است که وانمود می شود که از آنها سیامک بوردند نام برده است . اگرهم به راستی سیامک بوردند از آنها

نام برده باشد، برحسب خواست بازجو عمل کرده است، بیضرب شکنجه.

امیدوارم اگر اعضاء محترم کمیسیون اصل ۹۰ که ذینفع از سوی اسلام

ایران نمی‌توانند نیم جان سلامت مورث ند، راه جنجال خود میرگاها

وخود محورد کی بیرون کشند و اورا زنده به فرزندانش برگند،

بتوانند با همت والای خود از فاجعه ای که درراه است

ودامان اهل اندیشه وفرهنگ را خواهد گرفت، بجلوگیری

کنند.

با وجود دشواری کار، امیدوارم دراتمای تکالیف و

مسئولیت های خود بموجب اصولی از ذی نفع آن اسکا و برایتر

آراء مردم وبه تیوانید آن همت نموده وبه رسالت

خود بیش ازبیش بند شید. بسوگندخود اندیشه کنیدکه

وقت تنگ است.

بااحترام: مهاطیر کار ....
وکیل پایه یک دادگستری
جمهوری اسلامی ایران

**In the name of Allah, the Compassionate, the Merciful**


Thursday, 26th of Ordibehesht 1381
[May 16, 2002]

Honorable members of the Article 90 Commission of the Islamic Consultative Assembly (*Majlis*)

As you are fully aware, it has been many months since I, Mehrangiz Kar, submitted a complaint regarding the situation of my husband, Siamak Pourzand. The news published since inside Iran has become more and more alarming, and the heavy silence of the legal body that has the responsibility of publicly announcing the results of its investigation is a source of further concern.

Information received from inside Iran, as well as the publications of international organizations, reveals that:

> Siamak Pourzand is slowly being tortured to death, in an unknown detention center, for crimes he has not committed. In the hands of his captors he is wasting away.

Seven months after Pourzand's disappearance, and at a time when all hopes of his survival are fading, Judge Saber Zafarqandi, honorable head of Branch 1610 of the General Courts that operates under the title of Special Court of Mehrabad Airport, has announced that Pourzand is being interrogated in a special military unit (apparently one without a name or an address) to prove his crime of "being at war with God." Reading the official news regarding this court in *Iran* Newspaper (government's tribune) is quite wondrous. It appears that in the case of Siamak Pourzand all kinds of verdicts have been reached, and that from time to time, depending on the prevailing conditions of the moment, one of them is published. Unfortunately, the honorable attorney in charge of the case, who is appointed by the court, for reasons unbeknownst to us, has become the bearer of the news of the verdicts issued by the court. Until a few days ago, the emphasis was on the seven to eight years of imprisonment announced in *Iran* newspaper. Yet on the 25th of Ordibehesht [May 15th], the tide changed and the verdict was changed to eleven years imprisonment, various types of lashing, and finally, it changed to "at war with God" (using threatening terminology only familiar to the more experienced amongst us.)

It appears that after 7 months those who prosecute the case have decided to start over and add the crime of "at war with god" to the list of crimes, even though they have thus far not been able to extract a false confession to this charge, even under pressure, so that they can have a legitimate reason to execute him.

Apparently it was decided that, many years after its ratification, all the violent punishments in the Islamic penal code should be vested upon a seventy-one year old man.

It seems as if Siamak Pourzand has been hidden in a cave for the twenty-four years since the revolution and has just reappeared. Siamak Pourzand's continuous presence in Iran and his open activities in the cultural and press arenas have been ignored for years and now suddenly he has been made the scapegoat for all the defeats and shortcomings of the past and must be hanged.

As a bar-certified attorney in Iran with twenty years' experience in the legal, publishing and cultural fields, I am well aware that you gentlemen face many obstacles from different groups and

organizations as you try to pursue your mandate as *Majlis* Representatives (as per article 86 of the Constitution), and fulfill your duties in the *Majlis*, perhaps to the point that your oversight role has effectively been cancelled. I am fully aware that even the legitimate authorities do not respond to your questions, let alone those illegal and arbitrary entities that everyone fears and is careful not to provoke.

There may not be much that you can do against those who plant a rumor, blow it out of proportion in their own press services, and then make a legal case out of the rumor. But this fact does not diminish the rights of Siamak Pourzand and his daughters, nor does it explain your profound silence.

Once more I warn you that if you do not exert a necessary effort to find out how this "rumor" case was opened, [Pourzand's] death at the hands of those holding him is inevitable.

We are now in the third decade of the revolution. The problems and ailments of the Iranian society, Iran's reputation abroad, and the importance of not allowing the term 'national security' to be abused, must force you, as representatives of the people, to break down the barriers that exist between the privileged regime 'insiders' and those on the 'outside' Believe it, if you had seen the Iranians all as equals, the reform movement would not have faced the obstacles it is facing right now. Iran is a melting pot of opinions and thoughts, and it will get nowhere if we continue to maintain these barriers.

Gentlemen:

You have succumbed to the agenda of those who are promoting these worthless rumors instead of conducting a proper investigation. Part of this agenda is to demonstrate that *Majlis* representatives are not capable of protecting the rights of citizens and the victims of violence, or of even sending representatives to the location where these prisoners are being held.

Knowing that I ask for Siamak's rights:

> What value can the evidence used have when the State Prison Organization claims to have no knowledge of Siamak Pourzand being held in the prisons under their jurisdiction (see Nourooz, 25/2/81, interview with the head of the State Prison Organization, Mr. Bakhtiyari) – especially when Judge Zafarqandi plainly stated that [Pourzand] was being held by the State Prison Organization? How can this contradiction be explained?

Gentlemen:

Siamak Pourzand is a victim of a deliberate policy of elimination. The scenario was written and plans were laid many years ago. The media collaborating with this policy have even gone after his family and have accused them of all types of wrong and have threatened to ruin their public reputation. All these accusations were somehow squeezed in the verdict issued by judge Zafarqandi.

I warn you one last time that those carrying out the elimination policy have decided to place Siamak Pourzand at the heart of their plan and to use his confessions (meaning the confessions of a seventy-one-year-old man who, after seven months of custody and all kinds of psychological pressures, is fading away and who even now they are squeezing to confess to being "at war with god" so that they can justify his execution) to deliver a group of Iranian cultural and press

activists into their power. The names of these people have been part of this program of elimination from the beginning, but it is being portrayed as if Pourzand mentioned them in his confessions. Even if Pourzand did name them, it would have been under the direction of his interrogators, through torture. I hope that, if the honorable members of the Article 90 Commission are not able to deliver the dying Pourzand from the clutches of those who act with such impunity and return him to his daughters, they are at least able to exert enough pressure to prevent the coming catastrophe that threatens to engulf the entire cultural community.

In spite of the obstacles, I hope that you will fulfill your duties and responsibilities, as noted by the constitution and supported by people's vote, and think ever more about your mission. Remember the oath of office that you have taken; time is short.


Respectfully,

**Mehrangiz Kar** [signed]
Bar Certified Barrister

**Appendix 4**

Azadeh Pourzand letter to Khatami, *Tell Me Where Is My Father*, WASHINGTON POST, (December 30, 2001)

(Followed by Farsi version of the letter)

## Azadeh Pourzand

# Tell Me, Where Is My Father?

*An open letter to His Excellency Seyed Mohammad Khatami, president of the Islamic Republic of Iran.*

Dear Mr. President:

I am a 17-year-old Iranian girl. My introduction to politics came through hearing your televised campaign interview when I was 12. On Election Day, I accompanied my parents to vote. Full of hope and great expectations, we drove across town while my father told us stories about the past and my mother looked at the gathering crowds in the street with her writer's eyes. My sister boasted that she was old enough to vote, and I felt like becoming a political activist but had to struggle with my birthdate.

When I was a year old, my father was imprisoned for the first time. He was not a thief, he was not a smuggler, he had committed no crime. Like so many other law-abiding Iranians, he became a prisoner who had no idea why he was in prison.

When I was 6 he was hauled off to prison a second time. I remember banging my white child's shoes against the wall and shouting,

"Don't tell me my father is traveling. He is in Evin Prison. Don't tell me about his room, he is in a solitary cell." Once again he was freed—a thin, tired, quiet man. Once a vibrant, gregarious talker, he had turned into a passive and indifferent listener.

I was 15 when my mother, Mehrangiz Kar, a lawyer and women's rights activist, was imprisoned. A few months earlier, my sister, Leily, had hurriedly left the country, leaving all her hopes and dreams in Iran. Government agents, or those who pretended to be government agents, had driven sleep from her eyes and peace from her heart.

So it was that my father and I were left alone to keep each other company. Family and friends spoke of me as a strong young woman. Only the walls in my room shared my fear and frustration as I sobbed uncontrollably and banged them with my fists.

When my mother was finally released, I still wanted to see your smiling face and hear your words on government television, Mr. President—no matter that it was the

same government television that had so recklessly distorted my mother's statements and slandered and insulted her.

Not long after she had secured her release from prison by posting back-breaking bail, my mother was diagnosed with cancer. I was 16 and could hardly wait now that I could vote for your election to a second term. Casting a ballot for the first time in my life was a thrill. I carefully wrote "Seyed Mohammad Khatami" and became an adult. I am now accompanying my mother, who has traveled abroad to seek treatment for her illness.

A month ago we heard the news of my father's disappearance. Mr. President, my father, Siamak Pourzand, born Nov. 24, 1931, was taken by unknown agents as he was sent, ther, Siamak Pourzand, born Nov. 24, 1931, ing off some guests at his sister's house. He has not been heard from since. The last time my mother and I spoke with him, he told us that he was being followed by men on motorcycles and that he was in danger. We hadn't known what to do to help, and we feel helpless now.

My mother sits in a corner quietly and

waits for the phone to ring. I know well that a cancer patient has no hope of survival if she is tense and agitated. I don't know what to do for either of my parents.

This morning I woke up terrified. I had dreamed that an interrogator had slashed my father's neck, and I was running around hysterically trying to find a way to keep him alive. He called me back to him saying, "It is no use, stay with me for a few more moments."

The road to Evin Prison has a sharp turn called "the repentance curve." If I ever pass that road, I will repent crimes that I have not committed so that I will not be taken in innocent and come out guilty. My only request of you, Mr. President, and fortunately you are still president, is to make an inquiry about my 70-year-old father's physical and psychological health and let me know how he is and where he is being held. I impatiently await a reply from your office.

Respectfully,
Azadeh Pourzand
First-time voter

SP00021

« به نام خدا »

با سلام و عرض ادب خدمت رییس جمهور محترم ایران ؛

جناب آقای سید محمد خاتمی :

دختری هستم که تا چند روز دیگر با رسیدن هفته سالگی می گذارم. آن هنگام که شما با لحظه ای انتخابی قدم به خانه ما گذاشتید ، من دوازده ساله بودم . من آن شب با چشم های کودک پراز خاطره ام به دنیای سیاست نزدیک شدم .

پدرم خوشحال و شادان من و خواهرم را بوسید و دست ما را گرفت تا با هم به خیابان برویم . تا دم در رفته بودیم که مادم هم بر ما پیوست . یمگی به راه افتادیم .

آن شب من سکوت و راضی نگاه می کردم و در ذهن م مبارزه سیاسی حضوری می ماندم که به جمعیت می پیوند . خیابان مرشار بود از جوانی و امید ا . پدرم از شمال شهر حزب شهر راننده گی کرده ، تمام راه را می خندید و خاطره می گفت . مادرم با چشم های نریسنده اش زبان را بی شکافت . خواهرم به من می فروخت که می توانند رای بدید . و من همین طور با سال تولدم کلنجار می رفتم که شاید زودتر باشم .

صفحه ۱

یک سال بودم که پدرم به زندان رفت. دزد نبود، دلال سود، چک برگشتی

نداشت. نه آقای رئیس جمهور، مثل آدم های مثری که به زندان می روند دارم رفت.

من از ترس درتب می سوختم و شب ها با چشمانی درخشان و ملتهب، به جای خواب

همیشگی پدرم خیره می شدم.

بعد از چند ماه او از زندان آزاد شد ومن به آغوش او بازگشتم.

شش سال بودم، که او برای دومین بار به زندان رفت. به یاد دارم که بارها

با کفش های سپید و فرانهام، پا به زمین می کوبیدم و کودکانه فریاد می زدم:

" به من بگویید پدرم مسافرت است. پدرم زندانی زندان این است. "

می گفتم، نه بگویید اتاق، او دریک سلول انفرادی است.

این بار هم او از زندان آزاد شد. لاغرو فرسوده. مردی که همواره موت می زد

و وجود داشت، این بار شنونده ای بی تفاوت به مشنیده ها شده بود. حی مدتها

که با پدرم در کوچه های خلوت قدم زدم و کودکانه کوشیدم که او حرف بزند.

پانزده سال بودم که مادرم به دانشگاه و به زندان رفت. چند ماه پیش از آن،

مسعود ۳

خواهرم ـ لیلی بوزنید ـ تمام امیدها و آرزوهایش را در خاک ایران جا گذاشت و بی امید و هراسان مهاجرت کرد، چراکه مأموران وزارت اطلاعات، دائق یا درویش، خواب را از چشمانش ندیده بودند.

من ماندم و پدرم. آقای رئیس جمهور، چه روزها که برمن گذشت دوستان می گفتند که « آزاده » دختری با جرم و مقام است. ولی من می گریگی و نوجوانی ام را فقط بر دیوار اتاقم می گفتم. اینقدر این دیوار مشت خورد و گریه کشیده تا مادرم هم آزاد شد. دیگر من، در نظرها همچون یک مبارز کوچک بودم. با وجود آن چه برمن گذشت، بازهم منتظر شنیدن سخنرانی های شما از « صدا و سیمای جمهوری ایران » بودم که ـ مادرم توهین کرده بود. روزنامه « کیهان » اگر عکسی از شما داشت، برای من با روزنامه ـ جامعه ـ تفاوتی نداشت. آن را هم می خواندم.

مادرم بعد از آزاد شدن از زندان و سپردن پناه سلسون و شنیده ـ دادگاه انقلاب اسلامی، به سرطان مبتلا شد. ده ۴ شب، بیماه او زار زدم و به نزدی نگاه کردم که در عمق شب کمرنگ می شد.

صفحهٔ ٤

شانزده ساله بودم که روزها را برای روز انتخابات می‌شمردم . آن روز رسید و من

اولین رأی رایم تجربه کردم . روز رأی گیری ، روز خوب و حالی از اسـیـدی بود .

در حالی که دستانم می‌لرزیدند ، با دقت نوشتم بـسـیّد محمد خاتمی - و بزرگ شدم !

اکنون به همراه مادرم و برای ادامهٔ درمان سرطان به خارج از ایران سفر کرده‌ام .

چند روز دیگر ، هفده ساله می‌شوم . امروز یک ماه است که پدرم ناپدید شده .

آقای رییس جمهور، پدرم «سیامک پورزند» متولد سال هزار و سیصد و ده هجری شمسی ،

سوم آذرماه هزار و سیصد و هشتاد ، در حالی که دوستی را از در خانهٔ خواهرش بدرقه می‌کرد ،

به ناچار همراه نأمردانی ناشناس رفته است و از آن تاریخ تاکنون که تلفن هر خبری از

او در دست نیست .

امروز صبح با چشمانی خیس و ترسی مبهم از جا پریدم . خواب می‌دیدم که یک

بازجو خراشی به گردن پدرم داده و من گریان و دستپوش‌کنان به دنبال راهی می‌گردم که

او زنده بماند . او با چهره‌ای مهربان ، آرام می‌گفت که بی‌نا به است . مرا به

آغوشش فرا می‌خواند تا چند لحظه‌ای را با او بگذرانم . و من زار می‌زدم .

سمز ۵

بیم، پیش از ناپید شدن، پراسان از موقودرسواران سخن، بی گفت که او را در
خیابان های شهر تهران دنبال بی کنند. او سراسیمه هشدار بی داد که درحظ است.
ماه بیم روزها است که از رسانه های داخلی، ایرانی و خارجی گر براد است و در
گوشه ای از دنیا آرام نشسته و نکر بی کند.

ما هم خوب بی دانم که درمان بیماری سرطان بدون آرامش ، تلاشی بس بیهوده است !
پیرامون زندان این شیب تندی هست که «پیج نو به» نام دارد اگر من روزی از
آن جا عبور کنم، حتماً از سرآنجه جرم ناسیده می شود، نزد خواهر گرد که سا را بی گناه
به زندان بردیم و گناهکار آزاد شدیم.

تنها درخواست من از رئیس جمهوری که خوشبختانه هنوز هم رئیس جمهور است، پیگیری
وضعیت روحی ، جسمی و محل نگهداری پدرخشاد سالدام و سیامک پورزند است . آنای
رئیس جمهور، بی صبرانه در انتظار جوابی از دفتر ریاست جمهوری خواهم ماند.

با احترام
یک رأی اولی
آزاده پورزند
۱۳۸۰،۱۰،۲

**The Aadel Collection**

Aadel is the Persian word for "just."  The Aadel Collection is a growing repository of documents recovered by the IHRDC that relate to human rights issues in Iran.  This archive, dedicated to the victims of human rights abuse, promotes accountability by facilitating research on human rights violations in Iran.

The IHRDC accepts documents and multimedia materials relating to human rights in Iran from donors around the world.  The IHRDC has a secure storage facility to accommodate more sensitive documents.

The Center takes full responsibility for authenticating all documents archived in the Aadel Collection.  We do not archive documents that we cannot authenticate.

Selected material from the Aadel Collection can be accessed through the Center's online database at www.IranHRDC.org.

To submit materials to the Aadel Collection, please contact the Center at info@IranHRDC.org.



Siamak Pourzand (born 1931) was detained illegally in November 2001 by the Iranian authorities. He was held for over a year in undeclared detention facilities, refused his basic legal rights, framed for a series of offenses that he had not committed and ultimately forced into making a public confession on state television. The case manufactured against Mr. Pourzand was used by hard-line conservatives within Iran's clerical establishment to discredit the reform movement. Sentenced to eleven years in prison, he was temporarily released on medical grounds in April 2004.