Case 1:19-cv-02070-JDB   Document 20-51   Filed 09/02/21   Page 1 of 22

United Nations



# General Assembly

Distr.: General
20 March 2020

Original: English

**Human Rights Council**
**Forty-third session**
24 February–20 March 2020
Agenda item 3
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## Torture and other cruel, inhuman or degrading treatment or punishment

### Report of the Special Rapporteur*

*Summary*

      In the present report, the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment examines conceptual, definitional and interpretative questions arising in relation to the notion of "psychological torture" under human rights law.

---

   * The present report was submitted after the deadline so as to include the most recent information.

GE.20-04273(E)




Please recycle



# Contents

*Page*

I. Introduction ............................................................................................................................... 3

II. Activities relating to the mandate ............................................................................................. 3

III. Psychological torture ................................................................................................................. 3

    A. Background ......................................................................................................................... 3

    B. Concept of psychological torture ....................................................................................... 6

    C. Applying the constitutive elements .................................................................................... 8

    D. Predominant methods of psychological torture ................................................................. 12

    E. Cybertorture ....................................................................................................................... 18

IV. Conclusions and recommendations ........................................................................................... 20

# I.    Introduction

1.      The present report was prepared pursuant to Human Rights Council resolution 34/19.

# II.    Activities relating to the mandate

2.      In 2019, the Special Rapporteur transmitted 114 communications, jointly with other mandate holders or individually, on behalf of individuals exposed to torture and other ill-treatment.

3.      Since his previous report to the Human Rights Council in March 2019, the Special Rapporteur has participated in various consultations, workshops and events on issues relating to his mandate, the most notable of which are listed below.

4.      On 9 and 10 May 2019, the Special Rapporteur and his medical team conducted a visit to meet with Julian Assange, detained at Belmarsh prison in London, and with relevant British authorities, in order to assess Mr. Assange's state of health and conditions of detention, as well as alleged risks or torture or ill-treatment arising in relation to his possible extradition to the United States of America.

5.      On 5 June, the Special Rapporteur participated in a conference on "Effective multilateralism in the fight against torture: trends in the Organization for Security and Cooperation in Europe (OSCE) region and the way forward" organized by the OSCE Office for Democratic Institutions and Human Rights in Vienna.

6.      From 12 to 15 June, the Special Rapporteur conducted a country visit to Comoros (A/HRC/43/49/Add.1).

7.      On 26 June, in support of the International Day in Support of Victims of Torture, the Special Rapporteur co-organized a side event at the forty-first session of the Human Rights Council on the "Fault lines between non-coercive investigation and psychological torture".

8.      On 15 October, the Special Rapporteur presented his thematic report (A/74/148) to the General Assembly on the relevance of the prohibition of torture and ill-treatment to the context of domestic violence.

9.      On 18 October, the Special Rapporteur participated in a high-level conference on tackling ill-treatment by police, held in Bečići, Montenegro, and organized by the Council of Europe.

10.      From 17 to 24 November, the Special Rapporteur conducted a country visit to Maldives. The Special Rapporteur issued extensive preliminary observations after the visit and will present his report to the Human Rights Council in March 2021.

# III.    Psychological torture

## A.    Background

11.      The universal prohibition of torture is recognized to be of an absolute, non-derogable and peremptory character and has been restated in numerous international instruments of human rights, humanitarian and criminal law. Since its first proclamation in article 5 of the Universal Declaration of Human Rights, the international community has established an impressive normative and institutional framework for its implementation (A/73/207, paras. 5–18). At the same time, however, numerous States have invested significant resources towards developing methods of torture which can achieve purposes of

A/HRC/43/49

coercion, intimidation, punishment, humiliation or discrimination without causing readily identifiable physical harm or traces (A/73/207, para. 45).[1]

12.     In continuation of experiments conducted by the Nazi regime on concentration camp inmates during the Second World War,[2] the cold war era saw the emergence of classified large-scale and long-term projects involving systematic "mind control" experimentation with thousands of prisoners, psychiatric patients and volunteers unaware of the true nature and purpose of these trials and the grave health risks generated by them.[3] These experiments resulted in the adoption and international proliferation of interrogation methodologies which – despite their euphemistic description as "enhanced", "deep", "non-standard" or "special" interrogation, "moderate physical pressure", "conditioning techniques", "human resource exploitation", and even "clean" or "white" torture – were clearly incompatible with both medical ethics and the prohibition of torture and other cruel, inhuman or degrading treatment or punishment.[4] While some of these methods involved significant physical violence, others were of a specifically psychological nature. In the recent past, some of these approaches have resurfaced most prominently in connection with interrogational torture in the context of counter-terrorism,[5] "deterrence"-based detention of "irregular migrants" (see A/HRC/37/50), alleged mass internment for purposes of political "re-education",[6] and the abuse of individual prisoners of conscience.[7] New and emerging technologies also give rise to unprecedented tools and environments of non-physical interaction which must be duly considered in the contemporary interpretation of the prohibition of torture.

13.     Mandate holders have long recognized "psychological" or "mental" torture as an analytical concept distinct from physical torture (see E/CN.4/1986/15), have addressed specific methods or contexts of psychological torture,[8] and have pointed to specific challenges arising in connection with the investigation and redress of this type of abuse (A/HRC/13/39/Add.5, para. 55), as well as to the inextricable link between psychological torture and coercive interrogation (A/71/298, paras. 37–45). They have also dedicated a full thematic report to the practice of solitary confinement (A/66/268), advocated the development of guidelines for non-coercive interviewing (see A/71/298), supported the recent update of the Manual on the Effective Investigation and Documentation of Torture

---

[1]  Linda Piwowarczyk, Alejandro Moreno and Michael Grodin, "Health care of torture survivors", *Journal of the American Medical Association* (*JAMA*), vol. 284, No. 5 (2 August 2000).

[2]  Jonathan D. Moreno, "Acid brothers: Henry Beecher, Timothy Leary, and the psychedelic of the century", *Perspectives in Biology and Medicine*, vol. 59, No. 1 (Winter 2016), pp. 108–109.

[3]  Most notably, "Project MKUltra, the CIA's Programme of Research in Behavioural Modification" (1953–1973).

[4]  United States of America, Central Intelligence Agency, *KUBARK Counterintelligence Interrogation* (1963), sect. IX; United States, Central Intelligence Agency; *Human Resource Exploitation Training Manual* (1983); United Kingdom of Great Britain and Northern Ireland, "Deep interrogation (five techniques)", litigated at the European Court of Human Rights, *Ireland v. the United Kingdom*, Application No. 5310/71, Judgment, 18 January 1978; President of France, Emmanuel Macron, statement on the death of Maurice Audin, 13 September 2018, recognizing that successive French Governments had operated a system of political torture and disappearances in Algeria; Lawrence E. Hinkle, Jr. and Harold G. Wolff, "Communist interrogation and indoctrination of 'enemies of the state': analysis of methods used by the communist state police – a special report", *American Medical Association Archives of Neurology and Psychiatry*, vol. 76, No. 2 (August 1956); and Scott Shane, "U.S. interrogators were taught Chinese coercion techniques", *New York Times*, 2 July 2008.

[5]  United States, Senate Select Committee on Intelligence, *Committee Study of the Central Intelligence Agency's Detention and Interrogation Program* (2014).

[6]  CAT/C/CHN/CO/5, para. 42; as well as two communications co-signed by the Special Rapporteur, communications Nos. OL/CHN18/2019, 1 November 2019, and OL/CHN15/2018, 24 August 2018. See also "China cables", available at www.icij.org/investigations/china-cables/read-the-china-cables-documents/.

[7]  See, most prominently, the communications sent by the Special Rapporteur and his predecessor in the cases of Bradley/Chelsea Manning, communications Nos. UA G/SO 214 (53-24) USA 8/2011, 15 June 2011; and No. AL USA 22/2019, 1 November 2019); and Julian Assange, communications No. UA/GBR/3/2019, 27 May 2019; and No. UA GBR 6/2019, 29 October 2019).

[8]  See, for example, A/74/148, paras. 32–34; A/59/324, para. 17; and E/CN.4/2006/120, para. 52.

and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol) and raised awareness of the challenges of psychological torture in numerous individual communications. On 26 June 2019, on the occasion of the International Day in Support of Victims of Torture, the Special Rapporteur launched his thematic consultations on the topic at a side event of the forty-first session of the Human Rights Council including an expert panel on the "Fault lines between non-coercive investigation and psychological torture" and the screening of "Eminent Monsters", a documentary film on the origins and devastating effects of contemporary psychological torture.[9]

14.     Although these initiatives have been generally well received by States, national practice still tends to deny, neglect, misinterpret or trivialize psychological torture as what could be euphemistically described as "torture light", whereas "real torture" is still predominantly understood to require the infliction of physical pain or suffering (so-called "materialist bias").[10] Some States have even adopted national definitions of torture excluding mental pain or suffering, or interpretations requiring that, in order to constitute torture, mental pain or suffering must be caused by the threat or infliction of physical pain or suffering, threats of imminent death, or profound mental disruption. Both the Committee against Torture and mandate holders have rejected these approaches as contrary to the Convention against Torture.[11] Beyond that, however, the use of the term "psychological torture" in jurisprudence and human rights advocacy remains fragmented, and both legal and medical experts have long called for its clarification.[12]

15.     In the light of these considerations, in the present report, the Special Rapporteur:

(a)     Examines the predominant conceptual discrepancies arising in relation to the notion of "psychological torture";

(b)     Proposes working definitions of "psychological" and "physical" torture from the perspective of international human rights law;

(c)     Offers recommendations regarding the interpretation of the constitutive elements of torture in the context of psychological torture;

(d)     Proposes a non-exhaustive, needs-based analytical framework facilitating the identification of specific methods, techniques or circumstances amounting or contributing to psychological torture;

(e)     Illustrates how various combinations of methods, techniques and circumstances – not all of which may amount to torture if taken in isolation and out of context – can form "torturous environments" violating the prohibition of torture;

(f)     Encourages the interpretation of the prohibition of torture in line with contemporary possibilities and challenges arising from emerging technologies and explores, in a preliminary manner, the conceivability and basic contours of what could be described as "cybertorture".

---

[9]   See www.hopscotchfilms.co.uk/news/2019/7/26/eminent-monsters-to-be-screened-at-a-united-nations-side-event.

[10]   David Luban and Henry Shue, "Mental torture: a critique of erasures in U.S. law", *Georgetown Law Journal*, vol. 100, No. 3 (March 2012).

[11]   A/HRC/13/39/Add.5, para. 74; CAT/C/USA/CO/3-5, para. 9; CAT/C/GAB/CO/1, para. 7; CAT/C/RWA/CO/1, para. 7; CAT/C/CHN/CO/4, para. 33; and CAT/C/CHN/CO/5, para. 7.

[12]   See, for example, Pau Pérez-Sales, *Psychological Torture: Definition, Evaluation and Measurement* (London, Routledge, 2017); Hernán Reyes, "The worst scars are in the mind: psychological torture", *International Review of the Red Cross*, vol. 89, No. 867 (September 2007); Ergun Cakal, "Debility, dependency and dread: on the conceptual and evidentiary dimensions of psychological torture", *Torture*, vol. 28, No. 2 (2018); Almerindo E. Ojeda, ed., *The Trauma of Psychological Torture* (West Port, Connecticut, Praeger Publishers, 2008); Nora Sveaass, "Destroying minds: psychological pain and the crime of torture", City University of New York Law Review, vol. 11, No. 2 (Summer 2008), p. 303; and Metin Başoğlu, ed., *Torture and its Definition in International Law: An Interdisciplinary Approach* (New York, Oxford University Press, 2017), pp. 397 and 492.

16.    The Special Rapporteur has conducted extensive research and stakeholder consultations, including through an open call for contributions by questionnaire.[13] The present report reflects the resulting conclusions and recommendations of the Special Rapporteur. Given the substantive scope and complexity of the topic and the applicable constraints in terms of time and word-count, he examines the notion of psychological "torture" only. As, in practice, "torture" and "other cruel, inhuman or degrading treatment or punishment" are often closely interlinked, further research efforts should be undertaken to clarify the broader topic of psychological ill-treatment.

## B.    Concept of psychological torture

### 1.    Working definition

17.    "Psychological torture" is not a technical term in international law, but has been used in various disciplines, including legal, medical, psychological, ethical, philosophical, historical and sociological, for different purposes and with varying interpretations. The Special Rapporteur acknowledges that all these understandings have their own legitimacy, validity and purpose in their respective fields. In line with the mandate bestowed upon him, in the present report he examines the concept of "psychological torture" from the perspective of international human rights law.

18.    According to article 1 of the Convention against Torture, the substantive concept of "torture" comprises, most notably, the intentional and purposeful infliction of severe pain or suffering "whether physical or mental". It is this explicit juxtaposition of "mental" and "physical" pain or suffering which is generally referred to as the legal basis for the concept of psychological torture. Accordingly, in human rights law, "psychological" torture is most commonly understood as referring to the infliction of "mental" pain or suffering, whereas "physical" torture is generally associated with the infliction of "physical" pain or suffering.[14]

19.    In line with this position, shared by previous mandate holders (E/CN.4/1986/15, para. 118), the Special Rapporteur is of the view that, under human rights law, "psychological torture" should be interpreted to include all methods, techniques and circumstances which are intended or designed to purposefully inflict severe mental pain or suffering without using the conduit or effect of severe physical pain or suffering. The Special Rapporteur is further of the view that "physical torture" should be interpreted to include all methods, techniques and environments intended or designed to purposefully inflict severe physical pain or suffering, regardless of the parallel infliction of mental pain or suffering.

### 2.    Distinguishing "methods" from "effects" and "rationales"

20.    Although the proposed distinction between "physical" and "psychological" methods of torture appears fairly straightforward and to flow directly from the text of the Convention, its consistent and coherent application is subject to a number of caveats arising from the fact that the broader discussion of the psychological dimension of torture can be divided into at least three parallel and equally important strands, which relate to the psychological methods (i.e., techniques), psychological effects (i.e., sequelae) and psychological rationale (i.e., target) of torture.

21.    First, the distinction between psychological and physical methods of torture should not obscure the fact that, as a matter of law, "torture" is a unified concept. All methods of torture are subject to the same prohibition and give rise to the same legal obligations, regardless of whether the inflicted pain or suffering is of a "physical" or "mental" character, or a combination thereof. Thus, the aim of the distinction between "psychological" and "physical" methods of torture is not to suggest any difference in terms of legal implications

---

[13]  See www.ohchr.org/Documents/Issues/Torture/Call/QuestionnairePsychologicalTorture.docx.

[14]  Luban and Shue, "Mental torture".

or wrongfulness, but to clarify to what extent the generic prohibition of torture covers methods not using the conduit or effect of severe physical pain or suffering.

22.     Second, the discussion of psychological methods (i.e., techniques) of torture should not be conflated with that of the psychological effects (i.e., sequelae) of torture. In reality, both physical and psychological methods of torture each have both physical and psychological effects (E/CN.4/1986/15, para. 118). Thus, the infliction of physical pain or suffering almost invariably also causes mental suffering, including severe trauma, anxiety, depression and other forms of mental and emotional harm. Likewise, the infliction of mental pain or suffering also affects bodily functions and, depending on intensity and duration, can cause irreparable physical harm or even death, including through nervous collapse or cardiovascular failure. In terms of severity, psychological and physical stressors have been shown to inflict equally severe suffering (A/HRC/13/39, para. 46).[15] From a psychophysiological perspective, therefore, the distinction between "physical" and "psychological" torture is of predominantly conceptual, analytical and pedagogic benefit and does not suggest the parallel existence, in practice, of two separate and mutually exclusive dimensions of torture, or of any hierarchy of severity between "physical" and "psychological" torture.

23.     A third, distinct aspect of the psychological dimension of torture is its inherently psychological rationale (i.e., target). From a functional perspective, any form of torture deliberately instrumentalizes severe pain and suffering as a vehicle for achieving a particular purpose (A/72/178, para. 31). Methodologically, these purposes can be pursued through the infliction of "physical" or "mental" pain or suffering, or a combination thereof, and in each case will cause varying combinations of physical and psychological effects. Functionally, however, torture is never of an exclusively physical character, but always aimed at affecting the minds and emotions of victims or targeted third persons.[16] Many methods of physical torture deliberately create and exploit debilitating inner conflicts, for example by instructing captives to remain in physically painful stress positions under the threat of rape in case of disobedience. A similar inner conflict can be induced without physical pain, for example, by instructing the detainee to masturbate in front of guards and inmates, again under threat of rape in case of disobedience. Thus, the distinction between "physical" and "psychological" torture does not imply any difference in functional rationale but, rather, refers to the methodological avenue through which that rationale is being pursued by the torturer.

3.     **Distinguishing psychological from physical "no marks" and "no touch" torture**

24.     While methods of torture entailing visible bodily injury are generally not referred to as "psychological torture", the term is sometimes conflated with "no marks" torture, the aim of which is to avoid visible traces on the victim's body, and with "no touch" torture, the aim of which is to avoid inflicting pain or suffering through direct physical interaction. In reality, however, both "no marks" torture and "no touch" torture may also be of a physical nature and, in that case, are distinct from psychological torture.

25.     More specifically, although the aim of physical "no-marks" torture is to avoid visible traces on the victim's body, its purposes are still pursued through the deliberate infliction of severe physical pain or suffering. Some physical "no marks" techniques achieve the intended physical pain or suffering immediately and directly, such as beatings with insulated objects on selected parts of the body, simulated drowning ("waterboarding" or "wet submarine") or asphyxiation with plastic bags ("dry submarine"). Other physical "no marks" techniques involve the prolonged and/or cumulative infliction of initially "low intensity" physical pain or suffering, calculated to gradually evolve to unbearable levels of severity, such as forced standing or crouching, or shackling in stress positions. While all these techniques are calculated to avoid physical marks visible to the naked eye and inexpert observer, many of them still produce physical sequelae – such as swellings, abrasions, contusions and irritations – which experienced forensic experts can reliably

---

[15]  Başoğlu, "Torture and its definition in international law", p. 37.
[16]  Sveaass, "Destroying minds", pp. 313–314.

detect and document for periods ranging from days to several weeks. In practice, however, obstruction and delays, as well as lack of expertise, capacity and willingness on the part of the investigative authorities, entail that the vast majority of allegations regarding "no marks" torture are either not investigated at all, or are easily dismissed for lack of evidence.

26.     Likewise, physical "no-touch" torture avoids direct physical interaction, but still intentionally manipulates or instrumentalizes physiological needs, functions and reactions to inflict physical pain or suffering. It typically includes pain inflicted through threat-imposed stress positions, or powerful sensory or physiological irritation through extreme temperatures, loud noise, bright light or bad smells, deprivation of sleep, food or drink, prevention or provocation of urination, defecation or vomiting, or exposure to pharmaceutical substances or drug-withdrawal symptoms. Although these techniques deliberately use the conduit of the victim's body for the infliction of pain and suffering, they are sometimes discussed as psychological torture, mainly because of their psychological rationale and intended destabilizing effect on the human mind and emotions, and the limited physical contact between the torturer and the victim. If "no-touch" techniques inflict severe physical pain or suffering of any kind, however, they should be regarded as physical torture.

## C.     Applying the constitutive elements

27.     The concept of psychological torture as defined above gives rise to a number of questions concerning the interpretation of the defining elements constitutive of torture beyond what has been stated in previous reports (A/72/178, para. 31; A/73/207, paras. 6–7; and E/CN.4/2006/6, paras. 38–41). All these questions relate to the "substantive" components of the definition, which define conduct that amounts to torture, whereas the "attributive" component, which defines the level of State agent involvement required in order for torture to give rise to State responsibility, has been discussed in depth in previous reports and does not need to be re-examined here (A/74/148, para. 5).

### 1.     Severe pain or suffering

28.     International anti-torture mechanisms have left no doubt that the definition of torture does not necessarily require the infliction of physical pain or suffering but may also encompass mental pain or suffering.[17] It is worth underlining, however, that the devastating effects of psychological torture are frequently underestimated.

29.     More controversial than this basic dichotomy between physical and mental is the interpretation of the required level of "severity" of the pain inflicted. While the objective measurement of physical pain or suffering gives rise to insurmountable difficulties and has entailed numerous unsatisfactory attempts at authoritatively categorizing methods of torture on the basis of resulting physical injuries and irreversible impairment, these problems are further exacerbated when trying to objectively evaluate mental or emotional pain or suffering.[18] It has been emphasized that the term "severe" does not require pain or suffering comparable to the pain accompanying serious physical injury, such as organ failure or impairment of bodily functions or even death (E/CN.4/2006/6; and A/HRC/13/39, para. 54). However, the term "torture" should also not be used to refer to mere inconvenience or discomfort clearly incapable of achieving the purposes listed in the definition.

30.     Whether the required threshold of severity is reached in a particular case may depend on a wide range of factors that are endogenous and exogenous to the individual, such as age, gender, health and vulnerability, but also duration of exposure and accumulation with other physical or mental stressors and conditions, personal motivation

---

[17]   Human Rights Committee, general comment No. 20 (1992) on the prohibition of torture, or other cruel, inhuman or degrading treatment or punishment, para. 5; see also Committee against Torture, case law, cited in footnote 11 above.

[18]   Pérez-Sales, *Psychological Torture*, p. 284.

and resilience and contextual circumstances.[19] All these elements must be holistically evaluated on a case-by-case basis and in the light of the specific purpose pursued by the treatment or punishment in question. For instance, the threat of overnight detention combined with verbal abuse may be sufficiently severe to coerce or intimidate a child, whereas the same act may have little or no effect on an adult, and even less on a hardened offender. The severity of pain or suffering resulting from a particular type of ill-treatment is not necessarily constant but tends to increase or fluctuate with the duration of exposure and the multiplication of stressors. Also, while torture constitutes an "aggravated" form of cruel, inhuman or degrading treatment or punishment,[20] "aggravation" does not necessarily refer to aggravated pain and suffering, but to aggravated wrong in terms of the intentional and purposeful instrumentalization of pain and suffering for ulterior purposes. Thus, the distinguishing factor between torture and other forms of ill-treatment is not the intensity of the suffering inflicted, but rather the purpose of the conduct, the intention of the perpetrator and the powerlessness of the victim (A/72/178, para. 30; and A/HRC/13/39, para. 60).[21]

31.    Several treaty provisions even suggest that the concept of torture includes conduct which, at least potentially, does not involve any subjectively experienced pain or suffering at all. Thus, article 7 of the International Covenant on Civil and Political Rights expressly prohibits "medical or scientific experimentation without free consent". Although the provision does not clarify whether such conduct would amount to "torture" or to other "cruel, inhuman or degrading treatment", its explicit mention suggests that it was regarded as a particularly grave violation of the prohibition. Even more explicit in this respect, but only of regional applicability, is article 2 of the Inter-American Convention to Prevent and Punish Torture, which expressly defines "torture" as including "methods intended to obliterate the personality of the victim or to diminish his physical or mental capacities, even if they do not cause physical pain or mental anguish". Relatedly, upon ratification of the Convention against Torture, the United States expressed its understanding that "mental pain or suffering" refers to "prolonged mental harm" caused by, inter alia, the threatened or actual "administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality", wording intended to ban some of the interrogation methods developed by the United States Central Intelligence Agency (CIA) during the cold war, but also to deliberately narrow the definition established in the Convention.[22] Although the Committee rejected this interpretation as too narrow and stated that psychological torture cannot be limited to "prolonged mental harm" (CAT/C/USA/CO/2, para. 13; and CAT/C/USA/CO/3-5, para. 9), it did not clarify whether the use of "procedures calculated to disrupt profoundly the senses or the personality" could amount to torture even in the absence of subjectively experienced pain or suffering. While this was already a salient question for the drafters of the various treaty texts during the cold war era, its practical relevance has increased exponentially in present times.

32.    Given the rapid advances in medical, pharmaceutical and neurotechnological science, as well as in cybernetics, robotics and artificial intelligence, it is difficult to predict to what extent future techniques and environments of torture, as well as the "human enhancement" of potential victims and perpetrators in terms of their mental and emotional resilience, may allow the subjective experience of pain and suffering to be circumvented, suppressed or otherwise manipulated while still achieving the purposes and the profoundly

---

[19]  Inter-American Court of Human Rights, *Lysias Fleury and Others v. Haiti*, Judgment, 23 November 2011, para. 73.

[20]  Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1.

[21]  Gerrit Zach, "Definition of torture", in Manfred Nowak, Moritz Birk and Giuliana Monina, eds., *The United Nations Convention against Torture and its Optional Protocols: A Commentary*, 2nd ed. (Oxford, United Kingdom of Great Britain and Northern Ireland, Oxford University Press, 2019), p. 47.

[22]  David Luban and Katherine S. Newell, "Personality disruption as mental torture: the CIA, interrogational abuse, and the U.S. Torture Act", *Georgetown Law Journal*, vol. 108, No. 2 (January 2020), pp. 335–336 and 373–374, referring to Title 18 of the United States Code, sect. 2340(2)(B), 2012.

dehumanizing, debilitating and incapacitating effects of torture.[23] Given that States must interpret and exercise their international obligations in relation to the prohibition of torture in good faith (Vienna Convention on the Law of Treaties, arts. 26 and 31) and in the light of the evolving values of democratic societies (A/HRC/22/53, para. 14),[24] it would appear irreconcilable with the object and purpose of the universal, absolute and non-derogable prohibition of torture, for example, to exclude from the definition of torture the profound disruption of a person's mental identity, capacity or autonomy only because the victim's subjective experience or recollection of "mental suffering" has been pharmaceutically, hypnotically or otherwise manipulated or suppressed.

33.     Previous Special Rapporteurs have stated that "assessing the level of suffering or pain, relative in its nature, requires considering the circumstances of the case, including … the acquisition or deterioration of impairment as result of the treatment or conditions of detention in the victim", and that "medical treatments of an intrusive and irreversible nature", when lacking a therapeutic purpose and enforced or administered without free and informed consent, may constitute torture or ill-treatment (A/63/175, paras. 40 and 47; and A/HRC/22/53, para. 32). Building on this legacy, the Special Rapporteur is of the view that the threshold of severe "mental suffering" can be reached not only through subjectively experienced suffering but, in the absence of subjectively experienced suffering, also through objectively inflicted mental harm alone. In any case, even below the threshold of torture, the intentional and purposeful infliction of mental harm would almost invariably amount to "other cruel, inhuman or degrading treatment or punishment".

## 2.   Intentionality

34.     Psychological torture requires the intentional infliction of mental pain or suffering and thus does not include purely negligent conduct. Intentionality does not require that the infliction of severe mental pain or suffering be subjectively desired by the perpetrator, but only that it be reasonably foreseeable as a result, in the ordinary course of events, of the purposeful conduct adopted by the perpetrator (A/HRC/40/59, para. 41; and A/HRC/37/50, para. 60). Further, intentionality does not require proactive conduct, but may also involve purposeful omissions, such as the exposure of substance-addicted detainees to severe withdrawal symptoms by making the replacement medication or therapy dependent on a confession, testimony or other cooperation (A/73/207, para. 7). Where the infliction of severe mental pain or suffering may result from the cumulative effect of multiple circumstances, acts or omissions on the part of several participants, such as in the case of mobbing, persecution and other forms of concerted or collective abuse, the required intentionality would have to be regarded as present for each State or individual knowingly and purposefully contributing to the prohibited outcome, whether through perpetration, attempt, complicity or participation (Convention, art. 4 (1)).

## 3.   Purposefulness

35.     In order to amount to psychological torture, severe mental pain or suffering must be inflicted not only intentionally, but also "for purposes such as obtaining from the victim or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person", or "for any reason based on discrimination of any kind" (Convention, art. 1). Although the listed purposes are only of an indicative nature and not exhaustive, relevant purposes should have "something in common with the purposes expressly listed" (A/HRC/13/39/Add.5, para. 35). At the same time, the listed purposes are phrased so broadly that it is difficult to envisage a realistic scenario of purposeful infliction of severe

---

[23] A/HRC/23/47, para. 54; Adam Henschke, '"Super soldiers': ethical concerns in human enhancement technologies", Humanitarian Law and Policy blog, 3 July 2017; and Nayef Al-Rodhan, "Inevitable transhumanism? How emerging strategic technologies will affect the future of humanity", Center for Security Studies blog, 29 October 2013.

[24] Office of the United Nations High Commissioner for Human Rights (OHCHR), "Interpretation of torture in light of the practice and jurisprudence of international bodies", 2011, p. 8.

mental pain or suffering on a powerless person that would escape the definition of torture (A/72/178, para. 31).

36.     While the interpretation of purposes such as "interrogation", "punishment", "intimidation" and "coercion" is fairly straightforward, the way "discrimination" is addressed in the Convention requires clarification, because it is the only qualifier not crafted in terms of a deliberate "purpose". In order for discriminatory measures to amount to torture, it is sufficient that they intentionally inflict severe pain or suffering "for reasons related to discrimination of any kind". It is therefore not required that the relevant conduct have a discriminatory "purpose", but only a discriminatory "nexus". As a matter of treaty law, this includes any distinction, exclusion or restriction on the basis of discrimination of any kind, which has either the purpose or the effect of impairing or nullifying the recognition, enjoyment or exercise, on an equal basis with others, of any human right or fundamental freedom in the political, economic, social, cultural, civil or any other field (A/63/175, para. 48).[25]

37.     It must be stressed that purportedly benevolent purposes cannot, per se, vindicate coercive or discriminatory measures. For example, practices such as involuntary abortion, sterilization, or psychiatric intervention on the grounds of "medical necessity" or the "best interests" of the patient (A/HRC/22/53, paras. 20 and 32–35; and A/63/175, para. 49), or forcible internment for the "re-education" of political or religious dissidents,[26] the "spiritual healing" of mental illnesses (A/HRC/25/60/Add.1, paras. 72–77), or for "conversion therapy" related to gender identity or sexual orientation (A/74/148, paras. 48–50), generally involve highly discriminatory and coercive attempts at controlling or "correcting" the victim's personality, behaviour or choices and almost always inflict severe pain or suffering. In the view of the Special Rapporteur, therefore, if all other defining elements are present, such practices may well amount to torture.

38.     Last but not least, given that information gathering is an intrinsic part of legitimate investigative and fact-finding processes, it is necessary to clarify the fault lines between permissible non-coercive investigative techniques and prohibited coercive interrogation. Although of great practical importance, this particular distinction will not be discussed in the present report, as it has already been examined in depth in a full thematic report submitted by the previous Special Rapporteur (A/71/298), triggering an important and ongoing process of developing international guidelines on investigative interviewing and associated safeguards.[27]

**4.     Powerlessness**

39.     Mandate holders have consistently held that, although not expressly mentioned in the treaty text, the "powerlessness" of the victim is a defining prerequisite of torture (A/63/175, para. 50; A/73/207, para. 7; and A/HRC/13/39, para. 60; and A/HRC/22/53, para. 31). As has been shown, "all purposes listed in article 1 of the Convention against Torture, as well as the *travaux préparatoires* of the Declaration and the Convention, refer to a situation where the victim of torture is a detainee or a person 'at least under the factual power or control of the person inflicting the pain or suffering', and where the perpetrator uses this unequal and powerful situation to achieve a certain effect, such as the extraction of information, intimidation, or punishment".[28]

---

[25]   Convention on the Rights of Persons with Disabilities, art. 2; Convention on the Elimination of All Forms of Discrimination against Women, art. 1; International Convention on the Elimination of All Forms of Racial Discrimination, art. 1; Universal Declaration of Human Rights, art. 7; and International Covenant on Civil and Political Rights, art. 26.

[26]   CAT/C/CHN/CO/5, para. 42; as well as two communications co-signed by the Special Rapporteur, communications Nos. OL/CHN18/2019, 1 November 2019, and OL/CHN15/2018, 24 August 2018. See also "China cables", available at www.icij.org/investigations/china-cables/read-the-china-cables-documents/.

[27]   See www.apt.ch/en/universal-protocol-on-non-coercive-interviews/.

[28]   Zach, "Definition of torture", pp. 56–59. See also, Rome Statute of the International Criminal Court, art. 7 (2) (e).

40.     In practice, "powerlessness" arises whenever someone has come under the direct physical or equivalent control of the perpetrator and has effectively lost the capacity to resist or escape the infliction of pain or suffering (A/72/178, para. 31). This is typically the case in situations of physical custody, such as arrest and detention, institutionalization, hospitalization or internment, or any other form of deprivation of liberty. In the absence of physical custody, powerlessness can also arise through the use of body-worn devices capable of delivering electric shocks through remote control, given that they cause the "complete subjugation of the victim irrespective of physical distance" (A/72/178, para. 51). A situation of effective powerlessness can further be achieved through "deprivation of legal capacity, when a person's exercise of decision-making is taken away and given to others" (A/63/175, para. 50; and A/HRC/22/53, para. 31), through serious and immediate threats, or through coercive control in contexts such as domestic violence (A/74/148, paras. 32–34), through incapacitating medication and, depending on the circumstances, in collective social contexts of mobbing, cyberbullying and State-sponsored persecution depriving victims of any possibility of effectively resisting or escaping their abuse.

## 5.    "Lawful sanctions" exception

41.     The definition of torture in the Convention explicitly excludes "pain or suffering arising only from, inherent in or incidental to lawful sanctions" (art. 1 (1) ). At the same time, the saving clause in article 1 (2) of the Convention makes clear that this exception may not be interpreted in a manner prejudicial to other international instruments or national legislation which does or may define torture more widely. The term "international instrument" has been shown to cover both binding international treaties as well as non-binding declarations, principles and other "soft law" documents.[29] Most notably, the "lawful sanctions" clause can be accurately understood only in conjunction with the 1975 Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, from which it is directly derived, and which excludes only those lawful sanctions from the definition of torture that are "consistent with the Standard Minimum Rules for the Treatment of Prisoners" (art. 1). For example, therefore, even if permitted by domestic law, none of the following methods of inflicting mental pain or suffering can be regarded as "lawful sanctions": prolonged or indefinite solitary confinement; placement in a dark or constantly lit cell; collective punishment; and prohibition of family contacts.[30]

42.     Importantly, in order to be "lawful", sanctions cannot be open-ended, indefinite or grossly excessive to their purpose, but must be clearly defined, circumscribed and proportionate. For example, while it may be lawful to punish a witness for refusing to testify in court with a fixed monetary fine or even imprisonment of a pre-defined length, the use of open-ended detention and accumulation of monetary fines as a progressively severe means to coerce the recalcitrant witness to testify would defeat the very object and purpose of the Convention and, therefore, amount to psychological torture irrespective of its "lawfulness" under national law.[31] More generally, the Special Rapporteur aligns with the understanding that the word "lawful" refers to both domestic and international law.[32]

## D.    Predominant methods of psychological torture

43.     In the present section, the Special Rapporteur aims to provide an overview of the characteristics, rationale and effects of some of the most predominant methods of psychological torture. In contrast to physical torture, which uses the body and its physiological needs as a conduit for affecting the victim's mind and emotions, psychological torture does so by directly targeting basic psychological needs, such as

---

[29]  Zach, "Definition of torture", pp. 56—59.

[30]  United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), rule 43.

[31]  See, most notably, the individual communication sent by the Special Rapporteur in the case of Chelsea Manning, communication No. AL USA 22/2019, 1 November 2019.

[32]  Zach, "Definition of torture", note 147.

security, self-determination, dignity and identity, environmental orientation, emotional rapport and communal trust.

44.    The aim of the following, separate discussion of specific methods, as well as their categorization based on commonly experienced psychological needs, is not to be authoritative, comprehensive or free from overlaps, or to exhaust the ways in which methods of psychological torture could or should be described or classified for a variety of purposes.[33] Rather, it is to provide an easily accessible, basic analytical framework facilitating the identification of individual methods, techniques or circumstances which, without using the conduit or effect of severe physical pain or suffering, may amount or contribute to torture as prohibited under international human rights law, whether alone or in conjunction with other psychological or physical methods, techniques and circumstances.

45.    Given the virtually unlimited forms that torture can take, the selected examples are for illustrative purposes only. Various methods of torture may have similar or overlapping effects or reinforce each other in various other ways. In practice, specific methods of torture are rarely applied in isolation, but almost always in combination with other methods, techniques and circumstances, forming what has aptly been described as a "torturing environment".[34] The following, separate discussion of specific methods therefore has primarily didactic and analytical purposes and should not be taken as suggesting that any such rigid classification maps neatly onto the varied practical manifestations of torture.

1.    **Security (inducing fear, phobia and anxiety)**

46.    Perhaps the most rudimentary method of psychological torture is the deliberate and purposeful infliction of fear. The fact that the infliction of fear itself can amount to torture has been widely recognized, not only by mandate holders[35] but also by the Committee against Torture,[36] the European Court of Human Rights,[37] the Human Rights Committee,[38] the Inter-American Court[39] and other mechanisms.

47.    In practice, fear can be induced through a virtually limitless variety of techniques; some of the most common include the following:

        (a)    Direct or indirect threats of inflicting, repeating, or escalating acts of torture, mutilation, sexual violence or other abuse, including against relatives, friends or other inmates;

        (b)    Withholding or misrepresenting information about the fate of the victims or their loved ones, mock executions, witnessing the real or purported killing or torture of others;

        (c)    Provoking personal or cultural phobia through actual or threatened exposure to insects, snakes, dogs, rats, infectious diseases, etc.;

        (d)    Inducing claustrophobia through mock burials or confinement in boxes, coffins, bags and other cramped spaces (depending on the circumstances, these methods may also inflict progressively severe physical pain or suffering);

48.    The extreme psychological distress and enormous inner conflicts triggered by fear are often underestimated. In reality, the prolonged experience of fear, in particular, can be

---

[33]   For other categorizations see, for example, Almerindo E. Ojeda, "What Is psychological torture?", in Ojeda, ed., *The Trauma of Psychological Torture*, pp.1–2; and Pérez-Sales, *Psychological Torture*, pp. 257–258.

[34]   Pérez-Sales, *Psychological Torture*, p. 284.

[35]   A/56/156, paras. 3 and 7–8; E/CN.4/1986/15, para. 119; and E/CN.4/1998/38, para. 208.

[36]   CAT/C/KAZ/CO/2, para. 7; and CAT/C/USA/CO/2, para. 24.

[37]   European Court of Human Rights, Grand Chamber, *Gäfgen v. Germany*, Application No. 22978/05, Judgment, 1 June 2010, para. 108.

[38]   Human Rights Committee, communication No. 74/1980, views of the Committee in the case of *Miguel Angel Estrella v. Uruguay*, para. 8.3.

[39]   Inter-American Court of Human Rights, *Baldeón-García v. Perú*, Judgment, 6 April 2006, para. 119; and Inter-American Court of Human Rights, *Tibi v. Ecuador*, Judgment, 7 September 2004, paras. 147–149).

more debilitating and agonizing than the actual materialization of that fear, and even the experience of physical torture can be experienced as less traumatizing than the indefinite psychological torment of constant fear and anxiety. In particular, credible and immediate threats have been associated with severe mental suffering, post-traumatic stress disorder, but also chronic pain and other somatic (i.e., physical) symptoms.

**2.    Self-determination (domination and subjugation)**

49.    A psychological method applied in virtually all situations of torture is to purposefully deprive victims of their control over as many aspects of their lives as possible, to demonstrate complete dominance over them, and to instil a profound sense of helplessness, hopelessness and total dependency on the torturer. In practice, this is achieved through a wide range of techniques including, most notably:

(a)    Arbitrarily providing, withholding or withdrawing access to information, reading material, personal items, clothing, bedding, fresh air, light, food, water, heating or ventilation;

(b)    Creating and maintaining an unpredictable environment with constantly changing and erratically disrupted, prolonged or delayed schedules for meals, sleep, hygiene, urination and defecation and interrogations;

(c)    Imposing absurd, illogical or contradictory rules of behaviour, sanctions and rewards;

(d)    Imposing impossible choices forcing victims to participate in their own torture.

50.    All these techniques have in common that they disrupt the victim's sense of control, autonomy and self-determination and, with time, consolidate in total despair and complete physical, mental and emotional dependency on the torturer ("learned helplessness").

**3.    Dignity and identity (humiliation, breach of privacy and sexual integrity)**

51.    Closely related to the suppression of personal control, autonomy and self-determination, but even more transgressive, is the proactive targeting of victims' sense of self-worth and identity through the systematic and deliberate violation of their privacy, dignity and sexual integrity. This may include, for example:

(a)    Constant audiovisual surveillance, through cameras, microphones, one-way glass, caging and other relevant means, including during social, legal and medical visits and during sleep and personal hygiene, including urination and defecation;

(b)    Systematic derogatory or feral treatment, ridicule, insults, verbal abuse, personal, ethnic, racial, sexual, religious or cultural humiliation;

(c)    Public shaming, defamation, calumny, vilification or exposure of intimate details of the victim's private and family life;

(d)    Forced nudity or masturbation, often in front of officials of the opposite gender;

(e)    Sexual harassment through insinuation, jokes, insults, allegations, threats or exposing genitalia;

(f)    Breach of cultural or sexual taboos, including the involvement of relatives, friends or animals;

(g)    Dissemination of photographs or audio/video recordings showing the victim being tortured or sexually abused, making a confession or otherwise in compromising situations.

52.    It must be stressed that the humiliating and degrading nature of abuse does not necessarily relegate it to the realm of "other cruel, inhuman or degrading treatment", which is sometimes (incorrectly) regarded as a "lesser" wrong than torture. Systematic and prolonged violations of privacy, dignity and sexual integrity are known to instil severe mental suffering, including emotions of profound vulnerability, humiliation, shame and

guilt, often exacerbated by anxiety about social exclusion, self-hatred and suicidal tendencies. As with other methods, therefore, it is the intentionality and purposefulness of degrading treatment, and the powerlessness of the victim, which are decisive for its categorization as either torture or other ill-treatment.[40]

**4.   Environmental orientation (sensory manipulation)**

53.   Sensory stimuli and environmental control are a basic human need. Deliberate sensory manipulation and disorientation through sensory deprivation or hyperstimulation involves both the sensory organs and the cognitive processing of sensory perception. Sensory hyperstimulation, in particular, is thus at the very interface between physical and psychological torture.

54.   While short-term sensory deprivation alone can trigger extreme mental torment, prolonged deprivation generally produces apathy, followed by progressively severe disorientation, confusion and, ultimately, delusional, hallucinatory and psychotic symptoms. Accordingly, the Body of Principles for Protection of All Persons under Any Form of Detention or Imprisonment explicitly prohibits holding a detainee "in conditions which deprive him, temporarily or permanently, of the use of any of his natural senses, such as sight or hearing, or of his awareness of place and the passing of time".[41] In practice, such deprivation involves the partial or complete elimination of sensory stimulation through an accumulation of measures such as:

- Suppression of oral communication with the victim
- Constant monotonous light
- Visually sterile environment
- Sound-proof insulation of the cell
- Hooding
- Blindfolding
- Use of gloves
- Use of facial masks
- Use of earmuffs

55.   Sensory hyperstimulation below the threshold of physical pain, such as through constant bright light, loud music, bad odours, uncomfortable temperatures or intrusive white noise, induces progressively severe mental stress and anxiety, inability to think clearly, followed by increasing irritability, outbursts of anger and, ultimately, total exhaustion and despair. Extreme sensory hyperstimulation which, immediately or with the passage of time, causes actual physical pain or injury should be regarded as physical torture. This may include, for example, blinding victims with extremely bright light, or exposing them to extremely loud noise or music, or to extreme temperatures causing burns or hypothermia.

**5.   Social and emotional rapport (isolation, exclusion, betrayal)**

56.   A routine method of psychological torture is to attack the victim's need for social and emotional rapport, through isolation, social exclusion, mobbing and betrayal. Persons deprived of meaningful social contact and subjected to emotional manipulation can quickly become deeply destabilized and debilitated.

57.   The predominant method of isolation and social exclusion is solitary confinement, which is defined as "the confinement of prisoners for 22 hours or more a day without meaningful human contact".[42] Under international law, solitary confinement may be

---

[40]  See also, Cakal, "Debility, dependency and dread", pp. 23–24.
[41]  General Assembly resolution 43/173, annex.
[42]  The Nelson Mandela Rules, rule 44.

imposed only in exceptional circumstances, and "prolonged" solitary confinement, in excess of 15 consecutive days, is regarded as a form of torture or ill-treatment.[43] The same applies to frequently renewed measures which, in conjunction, amount to prolonged solitary confinement.[44] Even more extreme than solitary confinement is "incommunicado detention", which deprives the inmate of any contact with the outside world, in particular with medical doctors, lawyers and relatives and has repeatedly been recognized as a form of torture.[45]

58.　Other methods of targeting the victim's need for social rapport include deliberate medical, linguistic, religious or cultural isolation within a group of inmates, as well as the instigation, encouragement or tolerance for oppressive situations of harassment, bullying or mobbing against targeted individuals or groups. For example, the discriminatory or punitive detention of individual homosexual men in collective cells with violent, homophobic inmates will foreseeably create a situation of mobbing involving social isolation, threats, humiliation and sexual harassment and inflict severe levels of constant stress and anxiety likely to amount to torture regardless of the occurrence of physical violence.

59.　The severe psychological and physical effects of incommunicado detention, solitary confinement and social exclusion, including mobbing, are well documented and, depending on the circumstances, can range from progressively severe forms of anxiety, stress and depression to cognitive impairment and suicidal tendencies. Particularly if prolonged or indefinite, or combined with the death row syndrome, isolation and social exclusion can also cause serious and irreparable mental and physical harm.

60.　Apart from, and generally in combination with, isolation and social exclusion, torturers frequently target victims' need for emotional rapport through deliberate emotional manipulation. This may include methods such as:

- Fostering and then betraying emotional rapport and personal trust

- Provoking "misconduct" through "guilty/guilty" choices and then inducing emotions of guilt or shame for betraying the torturer's trust

- Destroying emotional ties by forcing victims to betray or participate in the abuse of other prisoners, relatives and friends, or vice versa

- Deceptive, disorienting or otherwise confusing information or role play

### 6.　Communal trust (institutional arbitrariness and persecution)

61.　Every human being has the inherent need for communal trust. Confronted with the overwhelming power of the State, individuals must be able to compensate for their own powerlessness by relying on the community's ability and willingness to exercise self-restraint, most notably through adherence to the rule of law and the principles of due process. As long as administrative or judicial error, negligence or arbitrariness can be effectively, if at times imperfectly, addressed and corrected through a regular system of institutional complaints and remedies, the resulting inconveniences, injustices and frustrations may have to be tolerated as an inevitable side effect of the constitutional processes that govern democratic societies.

62.　As discussed in detail in the Special Rapporteur report on the interrelation between corruption and torture (A/HRC/40/59, paras. 16 and 48–60), these constitutional processes are fatally corrupted when administrative or judicial power is deliberately misused for arbitrary purpose, and when the relevant institutional oversight mechanisms are complacent, complicit, inaccessible or paralysed to the point of effectively removing any prospect of due process and the rule of law.

---

[43] Ibid., rule 43 (1) (b); and A/66/268, para. 26.

[44] A/68/295, para. 61.

[45] A/HRC/13/42, paras. 28 and 32; Inter-American Court of Human Rights, *Velásquez Rodríguez v. Honduras*, Judgement, 29 July 1988, para. 187; CCPR/C/51/D/458/1991, annex, para. 9.4; and CCPR/C/61/D/577/1994, para. 8.4.

63.     Typical of contexts marked by systemic governance failures, or by the persecution of individual or groups, sustained institutional arbitrariness fundamentally betrays the human need for communal trust and, depending on the circumstances, can cause severe mental suffering, profound emotional destabilization and lasting individual and collective trauma. In the view of the Special Rapporteur, when institutional arbitrariness or persecution intentionally and purposefully inflicts severe mental pain or suffering on powerless persons, it can constitute or contribute to psychological torture. In practice, this question is of particular, but not exclusive, relevance in relation to the deliberate instrumentalization of arbitrary detention and related judicial or administrative arbitrariness.

64.     Apart from incommunicado detention and solitary confinement, discussed above, some of the most notable forms of arbitrary detention include:

•   **Enforced disappearance.** This involves the arrest, detention, abduction or any other form of deprivation of liberty by or with the authorization, support or acquiescence of State officials, followed by a refusal to acknowledge such detention or by concealment of the fate or whereabouts of the disappeared persons, which places them outside the protection of the law.[46] Enforced disappearance can amount to a form of torture in relation both to the disappeared person and to their relatives (A/56/156, paras. 9–16).[47]

•   **Coercive detention.** This involves the deliberate instrumentalization of the progressively severe suffering inflicted by prolonged arbitrary detention for the purpose of coercing, intimidating, deterring or otherwise "breaking" the detainee or third persons.

•   **Cruel, inhuman or degrading punishment.** This involves excessively long or harsh prison sentences, imposed for the purpose of deterrence, intimidation and punishment, but grossly disproportionate to the seriousness of the offence and incompatible with fundamental principles of justice and humanity. It can also include the severe mental and emotional suffering inflicted by "death row syndrome".[48]

65.     Whether a particular situation of confinement qualifies as "detention" depends not only on whether persons concerned have a de jure right to leave, but also on whether they are de facto able to exercise that right without exposing themselves to serious human rights violations (principle of non-refoulement).

66.     Whether arbitrary detention and related judicial or administrative arbitrariness amount to psychological torture must be determined on a case-by-case basis. As a general rule, the longer a situation of arbitrary detention lasts and the less detainees can do to influence their own situation, the more severe their suffering and desperation will become. Victims of prolonged arbitrary confinement have demonstrated post-traumatic symptoms and other severe and persistent mental and physical health consequences. In particular, the constant exposure to uncertainty and judicial arbitrariness and the lack of restrained or insufficient communication with lawyers, doctors, relatives and friends induces a growing sense of helplessness and hopelessness and, over time, may lead to chronic anxiety and depression.

67.     Therefore, as the Special Rapporteur has repeatedly stressed both in the context of irregular migration (A/HRC/37/50, paras. 25–27) and in individual communications,[49] where arbitrary detention and judicial arbitrariness is intentionally imposed or perpetuated

---

[46]   International Convention for the Protection of All Persons from Enforced Disappearance, art. 2.

[47]   CAT/C/54/D/456/2011, para. 6.4.

[48]   A/67/279, para. 42. European Court of Human Rights, *Soering v. the United Kingdom*, Application No. 14038/88, Judgment, 7 July 1989, para. 111.

[49]   See, most prominently, individual communications sent by the Special Rapporteur in the cases of Chelsea Manning, communication No. AL USA 22/2019, 1 November 2019; and Julian Assange, communications Nos. UA/GBR/3/2019, 27 May 2019; and UA GBR 6/2019, 29 October 2019.

for purposes such as coercion, intimidation, deterrence or punishment, or for reasons related to discrimination of any kind, it may amount to psychological torture.

### 7.   Torturous environments (accumulation of stressors)

68.     The above outline of specific methods should not obscure the fact that, in practice, torture victims are almost always exposed to a combination of methods, techniques and circumstances deliberately designed to inflict both mental and physical pain or suffering. If applied in isolation or for a short period of time, some of these techniques and circumstances may not necessarily amount to torture. In combination and with increasing duration, however, they have a devastating effect.[50] Thus, a finding of torture may depend not only on the specific characteristics of particular techniques or circumstances, but also on their cumulative and/or prolonged effect, sometimes in conjunction with external stress factors or individual vulnerabilities that are not under the control of the torturer and may not even be consciously instrumentalized by him. As aptly stated by the International Tribunal for the Former Yugoslavia, torture "may be committed in one single act or can result from a combination or accumulation of several acts, which, taken individually and out of context, may seem harmless ... The period of time, the repetition and various forms of mistreatment and severity should be assessed as a whole".[51]

69.     Particularly in the absence of physical pain and suffering, due consideration must always be given to the context in which certain methods are used. For example, while in normal circumstances, publicly expressed insults and defamation may amount to a criminal offence, but not to torture, such an assessment might change significantly when the same conduct becomes a matter of systematic, State-sponsored vilification and persecution involving additional measures such as arbitrary detention, constant surveillance, systematic denial of justice and serious threats or intimidation.[52] Moreover, each person may react differently to a particular method of torture. In practice, therefore, torture techniques must always be evaluated by reference to the targeted victim's individual vulnerabilities (A/73/152), whether attributable to disability (A/63/175), migration status (A/HRC/37/50) or any other reason.

70.     In such situations, rather than looking at each factor in isolation and asking which ones cross the "severity" threshold, it is more appropriate to speak of a "torturous environment", that is to say, a combination of circumstances and/or practices designed or of a nature, as a whole, to intentionally inflict pain or suffering of sufficient severity to achieve the desired torturous purpose.[53] This reflects the reality that victims tend to experience and respond to torture holistically, and not as a series of isolated techniques and circumstances, each of which may or may not amount to torture.[54]

## E.   Cybertorture

71.     A particular area of concern, which does not appear to have received sufficient attention, is the possible use of various forms of information and communication technology ("cybertechnology") for the purposes of torture. Although the promotion, protection and enjoyment of human rights on the Internet has been repeatedly addressed by the Human Rights Council (see A/HRC/32/L.20; and A/HRC/38/L.10/Rev.1), torture has

---

[50]  Physicians for Human Rights and Human Rights First, *Leave No Marks: Enhanced Interrogation Techniques and the Risk of Criminality* (2007), p. 6.

[51]  International Criminal Tribunal for the former Yugoslavia, Trial Chamber II, *Prosecutor v. Milorad Krnojelac*, Case No. IT-97-25, Judgment, 15 March 2002, para. 182; see also, European Court of Human Rights, *Ireland v. the United Kingdom*, Application No. 5310/71, para. 168.

[52]  Large-scale historical examples of such abuse were the so-called "struggle sessions" used during the Chinese Cultural Revolution (1966–1976) to publicly humiliate, abuse and torture political dissidents. See Tom Phillips, "The cultural revolution: all you need to know about China's political convulsion", *The Guardian*, 10 May 2016. For a recent individual case, see OHCHR, "UN expert says 'collective persecution' of Julian Assange must end now", 31 May 2019.

[53]  Pérez-Sales, *Psychological Torture*, p. 284.

[54]  Luban and Newell, "Personality disruption as mental torture", pp. 363 and 374.

been understood primarily as a tool used to obstruct the exercise of the right to freedom of expression on the Internet, and not as a violation of human rights that could be committed through the use of cybertechnology.

72.     This seems surprising given that some of the characteristics of cyberspace make it an environment highly conducive to abuse and exploitation, most notably a vast power asymmetry, virtually guaranteed anonymity and almost complete impunity. States, corporate actors and organized criminals not only have the capacity to conduct cyberoperations inflicting severe suffering on countless individuals, but may well decide to do so for any of the purposes of torture. It is therefore necessary to briefly explore, in a preliminary manner, the conceivability and basic contours of what could be described as "cybertorture".

73.     In practice, cybertechnology already plays the role of an "enabler" in the perpetration of both physical and psychological forms of torture, most notably through the collection and transmission of surveillance information and instructions to interrogators, through the dissemination of audio or video recordings of torture or murder for the purposes of intimidation, or even live streaming of child sexual abuse "on demand" of voyeuristic clients (A/HRC/28/56, para. 71), and increasingly also through the remote control or manipulation of stun belts (A/72/178, para. 51), medical implants and, conceivably, nanotechnological or neurotechnological devices.[55] Cybertechnology can also be used to inflict, or contribute to, severe mental suffering while avoiding the conduit of the physical body, most notably through intimidation, harassment, surveillance, public shaming and defamation, as well as appropriation, deletion or manipulation of information.

74.     The delivery of serious threats through anonymous phone calls has long been a widespread method of remotely inflicting fear. With the advent of the Internet, State security services in particular have been reported to use cybertechnology, both in their own territory and abroad, for the systematic surveillance of a wide range of individuals and/or for direct interference with their unhindered access to cybertechnology.[56] Electronic communication services, social media platforms and search engines provide an ideal environment both for the anonymous delivery of targeted threats, sexual harassment and extortion and for the mass dissemination of intimidating, defamatory, degrading, deceptive or discriminatory narratives.

75.     Individuals or groups systematically targeted by cybersurveillance and cyberharassment are generally left without any effective means of defence, escape or self-protection and, at least in this respect, often find themselves in a situation of "powerlessness" comparable to physical custody. Depending on the circumstances, the physical absence and anonymity of the perpetrator may even exacerbate the victim's emotions of helplessness, loss of control and vulnerability, not unlike the stress-augmenting effect of blindfolding or hooding during physical torture. Likewise, the generalized shame inflicted by public exposure, defamation and degradation can be just as traumatic as direct humiliation by perpetrators in a closed environment.[57] As various studies on cyberbullying have shown, harassment alone in comparatively limited environments can expose targeted individuals to extremely elevated and prolonged levels of anxiety, stress, social isolation and depression and significantly increases the risk of suicide.[58] Arguably, therefore, much more systematic, government-sponsored threats and harassment delivered through cyber-technologies not only entail a situation of effective powerlessness but may well inflict

---

[55]  Al Elmondi, "Next-generation nonsurgical neurotechnology", Defense Advanced Research Projects Agency, available at www.darpa.mil/program/next-generation-nonsurgical-neurotechnology.

[56]  See Human Rights Council resolutions 32/13 and 38/7. See, most notably, the 2013 disclosures by Edward Snowden of the global surveillance activities conducted by the United States National Security Agency and its international partners, see Ewan Macaskill and Gabriel Dance, "NSA files: decoded – what the revelations mean for you", *The Guardian*, 1 November 2013.

[57]  Pau Pérez-Sales, "Internet and torture" (forthcoming).

[58]  Ann John and others, "Self-harm, suicidal behaviours, and cyberbullying in children and young people: systematic review", *Journal of Medical Internet Research*, vol. 20, No. 4 (2018); Rosario Ortega and others, "The emotional impact of bullying and cyberbullying on victims: a European cross-national study", *Aggressive Behavior*, vol. 38, No. 5 (September/October 2012).

levels of anxiety, stress, shame and guilt amounting to "severe mental suffering", as required for a finding of torture.[59]

76.    More generally, in order to ensure the adequate implementation of the prohibition of torture and related legal obligations in present and future circumstances, its interpretation should evolve in line with new challenges and capabilities arising in relation to emerging technologies not only in cyberspace, but also in areas such as artificial intelligence, robotics, nanotechnology and neurotechnology, or pharmaceutical and biomedical sciences, including so-called "human enhancement".

## IV.    Conclusions and recommendations

77.    **On the basis of the above observations and considerations on the substantive dimensions of the concept of "psychological torture", and informed by broad stakeholder consultations, the Special Rapporteur, to the best of his knowledge and judgment, proposes the conclusions and recommendations set out below.**

78.    **Prevalence. Psychological torture occurs in a wide variety of contexts, including ordinary criminal investigations, police detention, "stop-and-search" operations, intelligence gathering, medical, psychiatric and social care, immigration, administrative and coercive detention, as well as in social contexts such as domestic violence, mobbing, cyberbullying and political or discriminatory persecution.**

79.    **General recommendations. Psychological torture constituting a subcategory to the generic concept of torture, the Special Rapporteur herewith reiterates the general recommendations of his mandate (E/CN.4/2003/68, para. 26) and emphasizes their full applicability, mutatis mutandis, to methods, techniques and circumstances amounting to "psychological torture".**

80.    **Non-coercive investigation. Given the practical importance of continuing to clarify the fault lines between permissible non-coercive investigative techniques and prohibited coercive interrogation, the Special Rapporteur reaffirms the conclusions and recommendations in the thematic report submitted by his predecessor (A/71/298) and invites States to actively support the ongoing process towards developing international guidelines on investigative interviewing and associated safeguards.**

81.    **Istanbul Protocol. Personnel tasked with medical examinations, the determination of migration status or the judicial adjudication of potential cases of torture should be provided with function-specific training in the identification and documentation of the signs of torture and ill-treatment, in accordance with the updated Protocol.**

82.    **Specific recommendations. More specifically with regard to the notion of "psychological torture", the Special Rapporteur recommends that States adopt, incorporate and implement the following definitions, interpretations and understandings throughout their national normative, institutional and policy frameworks, including, in particular, their training and instruction of medical, judicial, administrative, military and law enforcement personnel.**

83.    **Working definitions. For the purposes of human rights law, "psychological torture" should be interpreted to include all methods, techniques and circumstances which are intended or designed to purposefully inflict severe mental pain or suffering without using the conduit or effect of severe physical pain or suffering. Conversely, "physical torture" should be interpreted to include all methods, techniques and environments which are intended or designed to purposefully inflict severe physical pain or suffering, regardless of the parallel infliction of mental pain or suffering.**

84.    **Constitutive elements: In the context of psychological torture,**

---

[59]  Samantha Newbery and Ali Dehghantanha, "A torture-free cyber space: a human right", 2017.

(a)    "Mental suffering" refers primarily to subjectively experienced mental suffering but, in its absence, can also refer to objectively inflicted mental harm alone;

(b)    "Severity" of mental pain or suffering depends on a wide range of factors that are endogenous and exogenous to the individual, all of which must be holistically evaluated on a case-by-case basis and in the light of the specific purpose pursued by the treatment or punishment in question;

(c)    "Powerlessness" refers to the victim's inability to escape or resist the infliction of mental pain or suffering, and can be achieved not only through physical custody but also, for example, through incapacitating medication, deprivation of legal capacity, serious and immediate threats and social contexts marked by coercive control, mobbing, cyberbullying and persecution;

(d)    "Intentionality" is present where the perpetrator knew or should have known that, in the ordinary course of events, his or her acts or omissions would result in the infliction of severe mental pain or suffering, whether alone or in conjunction with other factors and circumstances;

(e)    "Purposefulness" is present when mental pain or suffering is inflicted for purposes such as interrogation, punishment, intimidation and coercion of the victim or a third person, or with a discriminatory nexus, regardless of purportedly benevolent purposes such as "medical necessity", "re-education", "spiritual healing", or "conversion therapy";

(f)    "Lawful sanctions" cannot include any sanctions or measures prohibited by relevant international instruments or national legislation, such as prolonged or indefinite solitary confinement, sensory manipulation, collective punishment, prohibition of family contacts, or detention for purposes of coercion, intimidation, or for reasons related to discrimination of any kind.

85.    **Predominant methods.** In contrast to physical torture, which uses the body and its physiological needs as a conduit for affecting the victim's mind and emotions, psychological torture does so by directly targeting one or several basic psychological needs, such as:

(a)    Security (inducing fear, phobia and anxiety);

(b)    Self-determination (domination and submission);

(c)    Dignity and identity (humiliation, breach of privacy and sexual integrity);

(d)    Environmental orientation (sensory manipulation);

(e)    Social and emotional rapport (isolation, exclusion and emotional manipulation);

(f)    Communal trust (institutional arbitrariness and persecution).

86.    **Torturous environments.** In practice, torture victims are almost always exposed to a combination of techniques and circumstances inflicting both mental and physical pain or suffering, the severity of which depends on factors such as duration, accumulation and personal vulnerability. Victims tend to experience and respond to torture holistically, and not as a series of isolated techniques and circumstances, each of which may or may not amount to torture. Accordingly, psychological torture may be committed in one single act or omission or can result from a combination or accumulation of several factors which, taken individually and out of context, may seem harmless. The intentionality, purposefulness and severity of the inflicted pain or suffering must always be assessed as a whole and in the light of the circumstances prevailing in the given environment.

87.    **Challenges of new technologies.** In order to ensure the adequate implementation of the prohibition of torture and related international legal obligations in present and future circumstances, its interpretation should evolve in line with new challenges and capabilities arising in relation to emerging technologies

not only in cyberspace, but also in areas such as artificial intelligence, robotics, nanotechnology and neurotechnology, or pharmaceutical and biomedical sciences including so-called "human enhancement".

_____