# Country Reports on Terrorism 2007

**April 2008**

United States Department of State Publication
Office of the Coordinator for Counterterrorism
Released April 2008

*Country Reports on Terrorism 2007* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

# COUNTRY REPORTS ON TERRORISM 2007

## Table of Contents

**Chapter 1.  Strategic Assessment**

**Chapter 2.  Country Reports**

**Africa Overview**
Trans-Sahara Counterterrorism Partnership
The African Union
Angola
Botswana
Burkina Faso
Burundi
Comoros
Cote D'Ivoire
Djibouti
Eritrea
Ethiopia
Kenya
Liberia
Madagascar
Mali
Mauritania
Nigeria
Rwanda
Senegal
Somalia
South Africa
Tanzania
Uganda
Zambia
Zimbabwe

**East Asia and Pacific Overview**
Australia
Burma
Cambodia
China
o   Hong Kong

    ○   Macau
Indonesia
Japan
Republic of Korea
Laos
Malaysia
Mongolia
New Zealand
Philippines
Singapore
Taiwan
Thailand

**Europe Overview**
Albania
Armenia
Austria
Azerbaijan
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Kosovo
Latvia
Lithuania
Macedonia
Malta
Moldova
The Netherlands
Norway
Poland
Portugal
Romania

Russia
Serbia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Turkey
Ukraine
United Kingdom
o   Northern Ireland

**Middle East and North Africa Overview**
Algeria
Bahrain
Egypt
Iraq
Israel, West Bank, and Gaza
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**South and Central Asia Overview**
Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyzstan
Nepal
Pakistan
Sri Lanka
Tajikistan
Turkmenistan
Uzbekistan

**Western Hemisphere Overview**
Tri-Border Area
Argentina

Belize
Bolivia
Brazil
Canada
Chile
Colombia
Dominican Republic
Ecuador
El Salvador
Guatemala
Honduras
Mexico
Nicaragua
Panama
Paraguay
Peru
Suriname
Trinidad and Tobago
Uruguay
Venezuela

**Chapter 3.  State Sponsors of Terrorism Overview**

Cuba
Iran
North Korea
Sudan
Syria

**Chapter 4. The Global Challenge of  WMD Terrorism**

**Chapter 5. Terrorist Safe Havens (7120 Report)**

1. Terrorist Safe Havens/Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
    1a. International Conventions and Protocols Matrix
2. Support for Pakistan
3. Collaboration with Saudi Arabia
4. Struggle of Ideas in the Islamic World
5. Outreach through Foreign Broadcast Media
6. Visas for Participants in United States Programs
7. Basic Education in Muslim Countries
8. Economic Reform

**Chapter 6.  Terrorist Organizations**

Abu Nidal Organization (ANO)
Abu Sayyaf Group
Al-Aqsa Martyrs Brigade

Ansar al-Sunnah
Armed Islamic Group (GIA)
Asbat al-Ansar
Aum Shinrikyo
Basque Fatherland and Liberty (ETA)
Communist Party of Philippines/New People's Army (CPP/NPA)
Continuity Irish Republican Army (CIRA)
Gama'a al-Islamiyya (IG)
HAMAS
Harakat ul-Mujahadin (HUM)
Hizballah
Islamic Jihad Group (IJG)
Islamic Movement of Uzbekistan (IMU)
Jaish-e-Mohammed (JEM)
Jemaah Islamiya Organization (JI)
Al-Jihad
Kahane Chai (Kach)
Kongra-Gel (formerly PKK)/People's Defense Force Lashkar e-Tayyiba
Lashkar i Jhangvi (LJ)
Liberation Tigers of Tamil Eelam (LTTE)
Libyan Islamic Fighting Group (LIFG)
Moroccan Islamic Combatant Group (GICM)
Mujahadin-e Khalq Organization (MEK)
National Liberation Army (ELN)
Palestine Liberation Front (PLF)
Palestinian Islamic Jihad (PIJ)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)
Al-Qa'ida
Al-Qa'ida in Iraq
Al-Qa'ida in the Islamic Maghreb (AQIM)
Real IRA (RIRA)
Revolutionary Armed Forces of Colombia (FARC)
Revolutionary Nuclei (RN)
Revolutionary Organization 17 November (17N)
Revolutionary People's Liberation Party/Front (DHKP/C)
Shining Path (SL)
United Self-Defense Forces of Colombia (AUC)

**Chapter 7. Legislative Requirements and Key Terms**

**NCTC Statistical Annex**

**Supplement on Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens**

# Chapter 1
# Strategic Assessment

This chapter highlights terrorism trends and ongoing issues in 2007 to provide a framework for detailed discussion in later chapters.

## TRENDS IN 2007

**AL-QA'IDA AND ASSOCIATED TRENDS:**  Al-Qa'ida (AQ) and associated networks remained the greatest terrorist threat to the United States and its partners in 2007. It has reconstituted some of its pre-9/11 operational capabilities through the exploitation of Pakistan's Federally Administered Tribal Areas (FATA), replacement of captured or killed operational lieutenants, and the restoration of some central control by its top leadership, in particular Ayman al-Zawahiri. Although Usama bin Ladin remained the group's ideological figurehead, Zawahiri has emerged as AQ's strategic and operational planner.

AQ and its affiliates seek to exploit local grievances for their own local and global purposes. They pursue their own goals, often at large personal cost to the local population. These networks are adaptive, quickly evolving new methods in response to countermeasures. AQ utilizes terrorism, as well as subversion, propaganda, and open warfare; it seeks weapons of mass destruction in order to inflict the maximum possible damage on anyone who stands in its way, including other Muslims and/or elders, women, and children.

Despite the efforts of both Afghan and Pakistani security forces, instability, coupled with the Islamabad brokered ceasefire agreement in effect for the first half of 2007 along the Pakistan-Afghanistan frontier, appeared to have provided AQ leadership greater mobility and ability to conduct training and operational planning, particularly that targeting Western Europe and the United States. Numerous senior AQ operatives have been captured or killed, but AQ leaders continued to plot attacks and to cultivate stronger operational connections that radiated outward from Pakistan to affiliates throughout the Middle East, North Africa, and Europe.

2007 was marked by the affiliation of regional insurgent groups with AQ, notably the growing threat in North Africa posed by the Algerian Salafist Group for Preaching and Combat's (GSPC) September 2006 merger with AQ, which resulted in GSPC renaming itself al-Qa'ida in the Islamic Maghreb (AQIM). AQIM is still primarily focused on the Algerian government, but its target set is broader than it was prior to the merger. For example, AQIM claimed responsibility for the near-simultaneous December 11 bombings of the Algerian Constitutional Council and the United Nations headquarters in Algeria; building upon previous attacks on foreign vehicles and AQIM statements, the attack on the UN underlined that AQIM now considers foreign interests to be attractive targets. In April, AQIM launched suicide attacks for the first time and vowed to use them as a primary tactic against their enemies. In 2007, AQIM carried out eight suicide attacks that resulted in large numbers of government and civilian casualties. The suicide bombers used by AQIM are typically recruited from easily exploitable groups, such as teenagers in the July 11 and September 8 attacks, or the elderly and terminally ill, as in the December 11 UN attack. The Libyan Islamic Fighting Group's (LIFG) November 2007 merger with AQ, on the other hand,

has yielded few successful attacks to date, reflecting the depleted capabilities of LIFG within Libya. *(See Chapter 6, Terrorist Organizations, for further information on AQIM and LIFG.)*

At the same time, the alliance of convenience and mutual exploitation between al-Qa'ida in Iraq (AQI) and many Sunni populations there has deteriorated. The Baghdad Security Plan, initiated in February, along with assistance from primarily Sunni tribal and local groups has succeeded in reducing violence to late 2005 levels, has disrupted and diminished AQI infrastructure, and has driven some surviving AQI fighters from Baghdad and Al Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. While AQI remained a threat, new initiatives to cooperate with tribal and local leaders in Iraq have led to Sunni tribes' and local citizens' rejection of AQI and its extremist ideology. The continued growth and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar, Diyala Provinces, and elsewhere have turned against the terrorist group and were cooperating with the Iraqi government and Coalition Forces to defeat AQI.

The late 2006 Ethiopian invasion of Somalia and subsequent deployment of AU forces there have kept AQ East Africa leadership, and elements of the Council of Islamic Courts that harbored them, on the run. Intense militancy against the Ethiopian and Transitional Federal Government (TFG) forces continued, reinforcing the early 2007 call to action by AQ through Ayman al-Zawahiri. In an Internet video released in January 2007, al-Zawahiri urged all mujahedin, specifically those in the Maghreb, to extend support to Somali Muslims in a holy war against the occupying Ethiopian forces.

Throughout 2007, AQ increased propaganda efforts seeking to inspire support in Muslim populations, undermine Western confidence, and enhance the perception of a powerful worldwide movement. Terrorists consider information operations a principal part of their effort. Use of the Internet for propaganda, recruiting, fundraising and, increasingly, training, has made the Internet a "virtual safe haven." International intervention in Iraq continued to be exploited by AQ as a rallying cry for radicalization and terrorist activity, as were other conflicts such as Afghanistan and Sudan. The international community has yet to muster a coordinated and effectively resourced program to counter extremist propaganda.

2007 witnessed the continuation of the transition from expeditionary to guerilla terrorism highlighted in *Country Reports on Terrorism 2006*. Through intermediaries, web-based propaganda, exploitation of local grievances, and subversion of immigrant and expatriate populations, terrorists inspired local cells to carry out attacks which they then exploit for propaganda purposes. We have seen a substantial increase in the number of self-identified groups with links (communications, training, and financial) to AQ leadership in Pakistan. These "guerilla" terrorist groups harbor ambitions of a spectacular attack, including acquisition and use of Weapons of Mass Destruction.

**TALIBAN and other insurgent groups and criminal gangs**:  Afghanistan remained threatened by Taliban and other insurgent groups and criminal gangs, some of whom were linked to AQ and terrorist sponsors outside the country. Taliban insurgents murdered local leaders and attacked Pakistani government outposts in the Federally Administered Tribal Areas (FATA) of Pakistan. The Government of Pakistan's long term three-pronged (security, economic and political) FATA

Strategy was designed to eliminate Taliban and AQ safe havens along the Pakistan-Afghanistan frontier.

The Government of Afghanistan continued to strengthen its national institutions and polls indicated the majority of Afghans believed they were better off than they were under the Taliban. The international community's assistance to the Afghan government to build counterinsurgency capabilities, ensure legitimate and effective governance, and counter the surge in narcotics cultivation is essential to the effort to defeat the Taliban and other insurgent groups and criminal gangs.

**STATE SPONSORS OF TERRORISM**:  State sponsorship of terrorism continued to undermine efforts to eliminate terrorism. Iran remained the most significant state sponsor of terrorism. A critically important element of Iranian national security strategy is its ability to conduct terrorist operations abroad. Iranian leaders believe this capability helps safeguard the regime by deterring United States or Israeli attacks, distracting and weakening the United States, enhancing Iran's regional influence through intimidation, and helping to drive the United States from the Middle East. Hizballah, a designated Foreign Terrorist Organization, is key to Iran's terrorism strategy. Iran also continued to threaten its neighbors and destabilize Iraq by providing weapons, training, and funding to select Iraqi Shia militants. These proxy groups perpetrate violence and cause American casualties in Iraq. Hizballah, supported by Iran and Syria, continued to undermine the elected Government of Lebanon and remained a serious security threat. Foreign terrorists continued to transit Syria en route to and from Iraq; a report to Congress stated that nearly 90 percent of all foreign fighters entering Iraq are transiting from Syria. In addition, the Government of Iran has recently begun an effort to expand commercial and diplomatic ties throughout the Western Hemisphere. Iran has, in the past, used diplomatic missions to support the activities of Hizballah operatives.

**OTHER TERRORIST GROUPS**:  The ongoing political stalemate in Lebanon has contributed to enabling suspected foreign extremist militants to set up operational cells within the Palestinian refugee camps, such as Fatah al Islam (FAI) in Nahr el-Barid. While the Lebanese Armed Forces defeated FAI militants after a three-month battle (May 20 – September 2), some of its members remained at large while other Palestinian militant groups continued to capitalize on the lack of government control within the camps. Some of these groups, such as the al-Qa'ida-associated Asbat al-Ansar and Jund al-Sham, were able to find a safe haven within the camps, most notably in the Ain el-Hilwah camp.

Terrorist activity emanating from the the Palestinian territories also remained a key destabilizing factor and a cause for concern.

In Colombia, the FARC exemplified another trend: growing links between terrorist and other criminal activity. The FARC, which continued to hold hundreds of hostages, including three American citizens captive for more than four years, raised more than an estimated $60 million per year from narcotics trafficking. Terrorist activities and support for terrorist infrastructure are funded by contributions from individuals, false charities and front organizations, but also increasingly through other illicit activities such as trafficking in persons, smuggling, and

narcotrafficking. We also have seen increasing evidence of trafficking in persons network facilitators being employed to facilitate terrorist movement, particularly into Iraq.

## DEFEATING AN AGILE TERRORIST ENEMY

Responding to terrorist groups that have many of the characteristics of a global insurgency – propaganda campaigns, grass roots support, and political and territorial ambitions, though ill-defined, requires a comprehensive response. Successful methods include a focus on protecting and securing the population; and politically and physically marginalizing the insurgents, winning the support and cooperation of at-risk populations by targeted political and development measures, and conducting precise intelligence-led special operations to eliminate critical enemy elements with minimal collateral damage.

There were significant achievements in this area this year against terrorist leadership targets, notably the capture or killing of key terrorist leaders in Pakistan, Ethiopia, Iraq, and the Philippines. These efforts buy us time to carry out the most important elements of a comprehensive counterterrorist strategy: disrupting terrorist operations, including their communications, propaganda and subversion efforts; planning and fundraising; and eliminating the conditions that terrorists exploit. We must seek to build trusted networks of governments, multilateral institutions, business organizations, and private citizens and organizations that work collaboratively to defeat the threat from violent extremism.

Working with allies and partners across the world, we have created a less permissive operating environment for terrorists, keeping leaders on the move or in hiding, and degrading their ability to plan and mount attacks. Canada, Australia, the United Kingdom, Germany, Spain, Jordan, the Philippines, Pakistan, Afghanistan, Iraq, and many other partners played major roles in this success. Dozens of countries have passed new counterterrorism legislation or strengthened pre-existing laws that provide their law enforcement and judicial authorities with new tools to bring terrorists to justice. The United States has expanded the number of foreign partners for the sharing of terrorist screening information, which is a concrete tool for disrupting and tracking travel of known and suspected terrorists. Saudi Arabia has implemented an effective model rehabilitation program for returning jihadis to turn them against violent extremism and to reintegrate them as peaceful citizens.

Through the Regional Strategic Initiative, the State Department and other United States agencies are working with Ambassadors overseas in key terrorist theaters of operation to assess the threat and devise collaborative strategies, action plans, and policy recommendations. We have made progress in organizing regional responses to terrorists who operate in ungoverned spaces or across national borders. This initiative has produced better intra-governmental coordination among United States government agencies, greater cooperation with and between regional partners, and improved strategic planning and prioritization, allowing us to use all tools of statecraft to establish long-term measures to marginalize terrorists. (*See Chapter 5, Terrorist Safe Havens (7120 Report) for further information on the Regional Strategic Initiative and on the tools we are using to address the conditions that terrorists exploit.*)  2007 witnessed improvement in capacity and cooperation on such key issues as de-radicalization, border

controls, document security, interdiction of cash couriers, and biometrics and other travel data sharing. (*See Chapter 2, Country Reports, for further details on counterterrorism efforts taken by individual countries*).

Radicalization of immigrant populations, youth and alienated minorities in Europe, the Middle East, and Africa continued. But it became increasingly clear that radicalization to violent extremism does not occur by accident, or because such populations are innately prone to extremism. Rather, we saw increasing evidence of terrorists and extremists manipulating the grievances of alienated youth or immigrant populations, and then cynically exploiting those grievances to subvert legitimate authority and create unrest. We also note a "self-radicalization" process of youths reaching out to extremists in order to become involved in the broader AQ fight.

Such efforts to manipulate grievances represent a "conveyor belt" through which terrorists seek to convert alienated or aggrieved populations, by stages, to increasingly radicalized and extremist viewpoints, turning them into sympathizers, supporters, and ultimately, in some cases, members of terrorist networks. In some regions, this includes efforts by AQ and other terrorists to exploit insurgency and communal conflict as radicalization and recruitment tools, especially using the Internet to convey their message.

Counter-radicalization is a key policy priority for the United States, particularly in Europe, given the potential of Europe-based violent extremism to threaten the United States and its key interests directly. The leaders of AQ and its affiliates are extremely interested in recruiting terrorists from and deploying terrorists to Europe, people familiar with Western cultures who can travel freely. Countering such efforts demands that we treat immigrant and youth populations not as a source of threat to be defended against, but as a target of enemy subversion to be protected and supported. It requires community leaders to take responsibility for the actions of members within their communities and to act to counteract extremist propaganda and subversion, and also requires bilateral, regional, and multilateral cooperation.

Because the enemy is a non-state actor that thrives among disaffected populations, private sector efforts are as important as government activity. We have yet to fully harness the power of the private sector, which offers enormous potential, such as economic might and fast and flexible responses to market and security conditions. We need to find better ways to deploy this strength against terrorists. The private sector, of course, has a vested interest in partnering against violent extremists to secure its existing and future investments/economic opportunities. In addition, grassroots and community groups can play an important role in supporting immigrant and youth populations as described above, strengthening their resistance to extremist approaches. Citizen diplomacy, cultural activity, person-to-person contact, economic cooperation and development, and the application of media and academic resources are key components of our response to the threat.

The key success factor in confronting violent extremism is the commitment by governments to work with each other, with the international community, with private sector organizations, and with their citizens and immigrant populations. Local communities are also a vital part of countering radicalization strategies.

Where governments cooperate, build trusted networks, seek active, informed support from their people, provide responsive, effective, and legitimate governance, and engage closely with the international community, the threat from terrorism has been significantly reduced. Where governments have lacked commitment in working with their neighbors and engaging the support of their citizens, terrorism and the instability and conflict that terrorists exploit, have remained key sources of threat.

This chapter sets the scene for the detailed analysis that follows. Significant achievements in border security, information sharing, transportation security, financial controls, and the killing or capture of numerous terrorist leaders have reduced the threat. But the threat remains, and state sponsorship, improved terrorist propaganda capabilities, the pursuit of weapons of mass destruction by some terrorist groups as well as by state sponsors of terrorism, and terrorist exploitation of grievances represent ongoing challenges.

## Chapter 2
## Country Reports on Terrorism

| AFRICA OVERVIEW |
| --- |

> "Emergent threats, such as terrorism, climate change, and illegal exploitation of natural resources, equally demand vigilance and decisive action. The good news is that the African Union and its member nations are resolved to take the initiative tackling these problems, and are in fact making progress."
>
> –John Agyekum Kufuor, President of Ghana
> Statement, 62nd UN General Assembly; New York
> September 25, 2007

Al-Qa'ida (AQ) operatives in East Africa and al-Shabaab militants in Somalia continued to pose the most serious threat to American and allied interests in the region. The late 2006 defeat of the Council of Islamic Courts (CIC) as a governing force in Mogadishu by Ethiopian and Transitional Federal Government (TFG) forces, and the ensuing insurgency that engulfed Mogadishu and parts of south central Somalia for the remainder of the year continued to make Somalia a permissive operating environment and a potential safe haven for both Somali and foreign terrorists already in the region. Somalia remains a concern, as its unsecured borders and continued political instability provide opportunities for terrorist transit and/or organization. AQ is likely to keep making common cause with cells of Somali extremists in an attempt to disrupt international peacemaking efforts in Somalia.

There were few significant international terrorist incidents in Africa, but civil conflict, ethnic violence, and activity amongst domestic terrorist groups continued in a number of countries. The Salafist Group for Preaching and Combat (GSPC) officially merged with AQ in September 2006 and subsequently, in early 2007, changed its name to al-Qa'ida in the Islamic Maghreb (AQIM). This event signaled the importance of a comprehensive and coordinated approach to the threats posed in the region. The huge swath of largely open territory in the Sahel provides AQIM with an important base for smuggling, logistics, recruiting, and training fighters. AQIM focused its major attacks on Algeria, but continued to operate in the Sahel region, crossing difficult-to-patrol borders between Mali, Mauritania, Niger, Algeria, and Chad to recruit extremists within the region for training and terrorist operations in the Trans-Sahara and, possibly, for operations outside the region.

Hizballah continued to engage in fundraising activities in Africa, particularly in West Africa, but did not engage in any terrorist attacks within the region.

Many African governments improved their cooperation and strengthened their counterterrorism efforts. Both the African Union (AU) and African regional organizations continued initiatives to improve counterterrorism cooperation and information sharing.

**Trans-Sahara Counterterrorism Partnership (TSCTP)**

The Trans-Sahara Counterterrorism Partnership (TSCTP) is a multi-faceted, multi-year strategy to combat violent extremism and defeat terrorist organizations by strengthening individual-country and regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security and intelligence organizations, promoting democratic governance, and discrediting terrorist ideology. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the trans-Sahara, and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) .

TSCTP was developed as a follow-on to the Pan-Sahel Initiative, which focused solely on the Sahel. Ongoing concern that extremists continued to seek to create safe havens and support networks in the Maghreb and Sahel, as well as recognition that AQ and others were seeking to impose radical ideologies on traditionally moderate Muslim populations in the region highlighted the urgency of creating an integrated approach to addressing current threats and preventing conditions that could foster persistent threats in the future.

TSCTP's main elements include:

- Continued specialized Antiterrorism Assistance Training (ATA), Terrorist Interdiction Program (TIP), and Counterterrorism Finance (CTF) activities in the trans-Sahara region and possible regional expansion of those programs;

- Public diplomacy programs that expand outreach efforts in the trans-Sahara region and seek to develop regional programming embracing this vast and diverse region. Emphasis is on preserving the traditional tolerance and moderation displayed in most African Muslim communities and countering the development of extremism, particularly in youth and rural populations;

- Democratic governance programs that strive, in particular, to provide adequate levels of USG support for democratic and economic development in the Sahel, strengthening those states to withstand internal threats; and,

- Military programs intended to expand military-to-military cooperation, to ensure adequate resources are available to train, advise, and assist regional forces, and to establish institutions promoting better regional cooperation, communication, and intelligence sharing.

**The African Union**

The African Union (AU) has several counterterrorism legal instruments including a Convention on the Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention and a 2004 Plan of Action. The Addis Ababa-based AU Commission provided guidance to its 53

member states and coordinated limited technical assistance to cover member states' counterterrorism capability gaps.

The Algiers-based *African Center for Study and Research in Terrorism* (ACSRT) was approved and inaugurated in October 2004 to serve as a think tank, an information collection and dissemination center, and a regional training center. The AU is working with member states to eliminate redundancies between the ACSRT and the Committee on Intelligence and Security Services in Africa (CISSA), which was first established at the AU Summit in Abuja, Nigeria, in January 2005. The Department of State and the National Defense University's Africa Center for Strategic Studies (ACSS) have collaborated with the AU to run counterterrorism workshops.

In 2005, with Danish funding, the AU hired a consultant to draft a counterterrorism Model Law to serve as a template to assist member states in drafting language to implement counterterrorism commitments. In December 2006, an AU-sponsored group of experts drafted counterterrorism language, which was in the process of being legislated. The group of experts decided to retain options for both broad and specific laws and determined that new legislation was needed to combat money laundering and other financial crimes.

Some AU member states maintained that Africa's colonial legacy made it difficult to accept a definition of terrorism that excluded an exception for "freedom fighters." Nonetheless, the AU is on record strongly condemning acts of terrorism.

Although the AU Commission had the strong political will to act as an effective counterterrorism partner, AU staffing remained below requisite levels; consequently, capacity remained relatively weak. The AU created a counterterrorism unit at its Addis Ababa headquarters to coordinate and promote member state counterterrorism efforts more effectively. The AU welcomed technical and financial assistance from international partners/donors to bolster both AU headquarters and ACSRT activities approved by member states.

## Angola

Angola's borders remained porous and vulnerable to movements of small arms, diamonds, and other sources of terrorist financing. Angola's high rate of dollar cash flow makes its financial system an attractive site for money laundering. The Government of Angola's capacity to detect financial crimes is limited, although it did make several high-profile arrests of dollar counterfeiters in 2007. Angola has not signed the UN International Convention for the Suppression of the Financing of Terrorism. The government's limited law enforcement resources were directed towards border control and stemming the flow of illegal immigrants into the country, which increased exponentially since the 2002 peace treaty ending Angola's protracted civil war. Lack of infrastructure, corruption, and insufficient capacity continued to hinder Angola's border control and law enforcement capabilities.

## Botswana

The Botswana government was cooperative in international counterterrorism efforts. The Botswana government established the National Counter Terrorism Committee to address

terrorism issues and weapons of mass destruction. In December, President Festus Mogae signed a law creating a new intelligence agency responsible for domestic and foreign intelligence gathering. The Botswana Defense Force designated a squadron as its counterterrorist unit and sent several officers to IMET-sponsored counterterrorism training.

Terrorists may use Botswana as a transit point due to its porous borders as evidenced by a 2006 report of organized smuggling of immigrants from Bangladesh and Pakistan, and the number of illegal Zimbabwean immigrants living in Botswana. Individuals suspected of providing financial support to terrorist groups may have business interests in Botswana companies.

The Bank of Botswana lists suspected terrorist assets and keeps all banking institutions in the country informed by circulating an updated list of suspicious accounts. Although there is no Financial Intelligence Unit, the Directorate on Corruption and Economic Crimes had a unit that investigated suspicious transactions.

**Burkina Faso**

Burkina Faso continued to lack the resources necessary to protect its borders and to monitor movement of terrorists. There was no formal method for tracking movement into and out of the country at border checkpoints, or at either of the country's two commercial airports. Burkina Faso was not a safe haven for any terrorist groups, but had the potential of becoming a safe haven owing to its close proximity to several countries where terrorist groups operate and because its borders are porous, especially in the sparsely populated north.

Despite its lack of resources, Burkina Faso was serious about fighting terrorism, cooperated with the United States where possible, and participated in training, seminars, and exercises, such as the regional Flintlock Exercises held in Mali this past year. The government participated in regional efforts at combating terrorism with the Economic Community of West African States (ECOWAS), the African Union (AU), and other international organizations, such as INTERPOL (it participated in an Interpol General Assembly meeting that was held in November). In 2007, Burkina Faso submitted a request to the USG to train their existing, approximately 150-person antiterrorism unit under the President's Security Force.

**Burundi**

Burundi's counterterrorism efforts were hindered by domestic ethnic tension, the unsteadiness of a transitional period after a decade plus of civil war, a lack of mature governmental institutions, considerable corruption, and porous borders that enabled various rebel groups in Tanzania and Eastern Congo to freely enter Burundi. Due to Burundi's small size and overtly Christian identity, it is likely that any radical Muslim influence would be quickly noted and reported to both Burundian government institutions and the international diplomatic community. The Burundi National Police's financial crimes unit was severely crippled by both a lack of resources and trained investigators, resulting in little or no oversight of Burundi's financial community by law enforcement officials, which could be exploited by terrorists for financing terrorism. Transnational criminals, for example, laundered illegal drug money through Burundian front companies.

**Comoros**

International terrorism concerns in Comoros focused on Comorian national Fazul Abdullah Mohammed (a.k.a. Harun Fazul), who is suspected of involvement in the 1998 bombings of the U.S. embassies in Nairobi and Dar es Salaam. His whereabouts were unknown, but he was believed to have maintained contacts in the Comoros. The Comorian government's security forces had limited resources and training in counterterrorism and maritime security, so the country remained vulnerable to terrorist transit. Comorian police and security forces participated in USG antiterrorism assistance programs and cooperated with the Rewards for Justice Program.

President Sambi, a devout Muslim democratically elected in May 2006, reconfirmed Comoros' rejection of terrorism and, with Comoros' religious leaders, publicly rejected Islamist extremism. In September, military and port officials participated in a USG-hosted Maritime Security Conference in Mombasa, Kenya. President Sambi has sought close partnership with the United States to develop Comoros and to create opportunities for the country's youth. In April, Foreign Minister Jaffar hosted a joint committee to improve bilateral relations, which included counterterrorism cooperation.

The Government of the Union of the Comoros did not provide safe haven to terrorist organizations on the islands of Grande Comore and Moheli. Colonel Mohamed Bacar, former island president of Anjouan and current illegitimate leader, runs his island for personal profit outside the authority of the Union. Among Bacar's illicit activities were licensing for shell banks. The extent of his dealings and contacts with criminal or terrorist networks in the Indian Ocean Region was unknown.

**Cote d'Ivoire**

Cote d'Ivoire has been in the throes of a political-military crisis since 2002, leaving the country politically and, until recently, geographically divided.[1] Despite this instability, violence associated with the country's crisis has not been linked with any international terrorist organizations, and there was little evidence to indicate a threat of terrorist attacks. While some Lebanese private communities living in Cote d'Ivoire were known to be active in donating personal income to Hizballah, it is unlikely that the Government of Cote d'Ivoire supported or subsidized it, although it was likely that it was aware of this.

**Djibouti**

Djibouti hosted the only military base in Sub-Saharan Africa for United States and Coalition Forces and was one of the most forward-leaning Arab League members supporting ongoing efforts against terrorism. President Ismail Omar Guelleh and many top leaders in Djibouti repeatedly expressed their country's full and unqualified support for the War on Terror.

United States security personnel continued to work closely with Djiboutian counterparts to monitor intelligence and follow up on prospective terrorism-related leads. Although the

---

[1] A March 2007 political agreement has made significant inroads towards peace.

government's capabilities were limited, Djiboutian counterparts were very proactive, and were highly receptive and responsive to United States requests for cooperation. The Djiboutian National Security Services took extraordinary measures with its limited resources to ensure the safety and security of American citizens, the U.S. embassy, and the U.S. military base at Camp Lemonier.

**Eritrea**

The Government of Eritrea was not an active partner on counterterrorism programs. The government linked broader cooperation in USG counterterrorism programs to the unresolved border dispute with Ethiopia, publicly stating that cooperation will occur only after the final demarcation of the border. During the March kidnapping of British diplomats in Ethiopia by an ethnic Afari rebel group, the Eritrean government played a role in securing their release.

Sheikh Hassan Dahir Aweys, designated under both UN Security Council Resolution 1267 and Executive Order 13224, was publicly reported as being in Asmara as recently as November.

**Ethiopia**

The Government of Ethiopia, after conducting a counter offensive in late 2006 in response to threats against its security and in support of the internationally recognized Transitional Federal Government of Somalia, battled insurgents and extremists that were formerly affiliated with the Council of Islamic Courts, including the AQ-affiliated al-Shabaab militia. Ethiopian forces provided critical support in the stand up of the African Union Mission in Somalia (AMISOM) peacekeeping force which was also targeted by extremist elements. In addition, Ethiopian forces countered Somali-based extremists who attempted to conduct attacks inside Ethiopia.

Ethiopia's location within the Horn of Africa made it vulnerable to money laundering activities perpetrated by transnational criminal organizations, terrorists and narcotics traffickers. As the economy continued to grow and become more liberalized, federal police investigation sources reported expectations that bank fraud, electronic/computer crimes, and laundering activities would continue to rise. On November 6, the National Bank of Ethiopia (NBE) and the United States Department of the Treasury signed the terms of reference and work plan for a technical assistance package to strengthen Ethiopia's anti-money laundering and counterterrorist financing regimes. The assistance will aid the NBE in establishing a financial intelligence unit and provide training to Ethiopia's government-owned and private banks.

Ethiopia's National Intelligence and Security Service (NISS), with broad authority for intelligence, border security, and criminal investigation; was responsible for overall counterterrorism management. Federal and local police counterterrorism capabilities were primarily focused on being able to respond to terrorist incidents. Draft counterterrorism legislation was submitted to Parliament in late 2006, but there was no legislative action in 2007.

Ethiopia was an active participant in AU counterterrorism efforts, served as a focal point for the AU's Center for Study and Research on Terrorism, and participated in meetings of the Committee of Intelligence and Security Services of Africa.

**Kenya**

Following the late 2006 Ethiopian action to remove the radical Council of Islamic Courts (CIC) in Somalia, Kenyan Ministry of Defense efforts largely prevented the flight of violent extremists across the Somalia-Kenya border. The Kenyan military drastically increased its numbers on the Somalia border, and worked closely with police elements in the region to block CIC forces and associated individuals from infiltrating Kenyan territory. Kenyan security forces apprehended several suspected extremist leaders during these operations. However, human rights organizations criticized the Kenyan government for closing the border and claimed that large numbers of refugees fleeing the fighting were forcibly returned to Somalia. At the same time, the Kenyan government suspended all flights to and from Somalia except for humanitarian aid flights and flights to the Transitional Federal Government's (TFG) seat in Baidoa. The Kenyan government ended the suspension in August, but continued to require all flights from Somalia to first stop at Wajir Airport for immigration, customs, and security processing before proceeding to their final destinations in Kenya.

The Government of Kenya did not knowingly provide safe haven for terrorists or terrorist organizations. However, Kenya's borders remained porous and vulnerable to movement of potential terrorists as well as small arms and other contraband. Supporters of AQ and other extremist groups were active in the East Africa region. As a result of the continuing conflict in Somalia, many members of these organizations have sought to relocate elsewhere in the region and some were believed to have traveled to Kenya.

Kenya continued to lack the counterterrorism legislation necessary to comply with the UN conventions it has signed. In addition, it was difficult to detain terror suspects and prosecute them effectively under existing laws. The issue of counterterrorism legislation remained highly controversial in Kenya with elements of the press, the human rights community, and Muslim leadership criticizing proposed legislation as anti-Muslim and giving the government too much power to potentially abuse human rights. The Kenyan government wrote a revised draft of the defeated 2003 "Suppression of Terrorism Bill" in 2006, but the new bill was sharply criticized and subsequently did not pass. Progress also stalled on legislation for combating money laundering and terrorist financing. The "Proceeds of Crime and Money Laundering Bill" was submitted in March but the Parliament did not debate it.

Political and bureaucratic resistance remained to the formation of an interagency Kenyan Joint Terrorism Task Force (JTTF). Senior Kenyan officials sharply criticized the U.S. Public Announcement regarding the possibility of a terrorist threat to the Cross-Country World Championships in Mombasa in March, seeing this as an unfriendly act and a threat to the country's vital tourism industry.

**Liberia**

Despite limited resources, inadequately trained personnel, and a weak judicial system – products of 14 years of civil war – the Government of Liberia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism. Through rule of law

and security sector reform assistance programs, the United States supported a number of initiatives that addressed Liberia's vulnerabilities, which included porous borders, rampant identification document fraud, lax immigration controls, wide-scale corruption, and underpaid law enforcement, security, and customs personnel.

There have never been any acts of transnational terrorism in Liberia. Of concern, however, were reports that hundreds of Middle Eastern businessmen purchased legitimately issued but fraudulently obtained Liberian diplomatic passports from Ministry of Foreign Affairs (MFA) officials. These documents would permit free movement between the Middle East and West Africa. The government took steps to stop this Charles Taylor-era practice by requiring that diplomatic passports be issued only by the Ministry of Foreign Affairs in Monrovia. New restrictions on who qualified for Liberian diplomatic or official passports were being implemented by the new head of the Foreign Ministry's passport office.

Since 2003, there has been resurgence in the number of visits to Liberia by foreign Islamic proselytizing groups, overwhelmingly Sunni organizations from Pakistan, Egypt, and South Africa. However, Liberian security services reported that none of these groups publicly espoused militant or anti-American messages. Liberia's indigenous, war-weary, and predominantly Sunni Muslim community, which represented at least 20 percent of the country's population, has demonstrated no interest in militant strains of Islam to date. That said, outstanding land disputes negatively affecting large numbers of Muslim land owners in Nimba and other counties could fan ethnic and religious tensions with the predominantly Christian central government. As in other West African states, reports surfaced that Lebanese businessmen in Liberia provided financial support and engaged in fundraising activities for Hizballah. There were no other terrorist groups known to be operating within Liberia.

**Madagascar**

International terrorism was a concern in Madagascar because of the island nation's inadequately monitored 3,000 mile coastline. Limited equipment, personnel, and training for border control increased the risks of penetration. Following the International Maritime Conference in 2006, hosted by the Ministry of Defense and the U.S. Embassy, Madagascar military and port officials participated in a similar event in Mombassa in September. Malagasy police, military, intelligence, and security forces have not had much training in counterterrorism and maritime surveillance. Despite limited resources, government officials were willing to cooperate with the United States; international maritime conferences and the Rewards for Justice Program were two examples of cooperative ventures. At the main port in Tamatave, which handled 80 percent of maritime traffic and more than 90 percent of container traffic, access control and overall security improved substantially. The U.S. Coast Guard Port Security Liaison removed Tamatave Port from its Port Security Advisory for Madagascar, with an acknowledgement that the Port met minimum standards under the International Ship and Port Facility Security (ISPS) Code.

**Mali**

Inadequate resources continued to hamper the Malian government's ability to control its long and porous borders, thus limiting the effectiveness of military patrols and border control measures.

Mali is currently more threatened by tribal insurgencies than by terrorist threats, but cooperated with United States counterterrorism efforts, and remained one of the largest recipients in the sub-region of military training and assistance through the Trans-Sahara Counterterrorism Partnership and other United States assistance programs. Northern Mali served as a potential safe haven for terrorists, traffickers, and smugglers due to the region's remoteness, harsh desert climate, and size. AQIM maintained a regular, small-scale presence, moving essentially without hindrance in the northern part of Malian territory, although it did not maintain any permanent facilities and was constantly on the move. There were no confrontations between the Malian military and the AQIM this year.

**Mauritania**

The December 2007 murder of four French tourists and the attack on a military checkpoint were both low-level attacks, but highlighted the fact that AQIM was active in the country despite the newly elected government's significantly increased level of cooperation with the United States on counterterrorism. The Mauritanian Government actively pursued the perpetrators of the December attacks. The government embarked on an ambitious political agenda to build national unity.

In June, 24 of 25 individuals accused of ties to AQIM were acquitted, and the remaining defendant sentenced in absentia to two years in prison. On July 31, the court acquitted 14 of 19 persons accused of complicity in the 2005 AQIM attack on a Mauritanian military base, for lack of evidence. The remaining five defendants received sentences from two to five years. In late October, the government arrested five other individuals for suspected ties to AQIM. Three of the five were released with the remaining two currently awaiting trial on terrorism and explosives charges.

The Government of Mauritania continued working to prevent terrorist organizations, notably AQIM, from using its territory. These efforts remained constrained, however, by limited resources and training, and by the inherent challenges of controlling the sparsely-populated and porous regions bordering Algeria and Mali. The government continued to identify and respond to AQIM cells operating in country. Western Missions warned their citizens of AQIM efforts to target westerners in Mauritania, particularly those involved in the petroleum industry.

The new government established a new counterterrorism force which, despite USG assistance, was not fully functional at year's end. The Mauritanian Army Camel Corps, responsible for patrolling the eastern border regions of the country, participated in USG antiterrorism training and the Mauritanian military participated in USG-sponsored regional counterterrorism exercises.

**Nigeria**

The apprehensions and trials of extremists by the Nigerian government seemed to indicate not just recognition of potential threats to itself and its citizens, but a responsiveness and willingness to act to protect American interests, including facilities and personnel. These arrests also suggested some degree of cooperation and facilitation among extremist groups in the Sahel, which were made possible by porous borders with minimal controls, and the logistical

difficulties inherent in patrolling the Sahara desert. Since 2005, the Nigerian Taliban (which has no connection to the Taliban of Afghanistan) has been suspected of having connections to AQIM in Mali and AQ affiliates. To date, no conclusive links have been definitively proven, although bin Ladin went on record in 2003 saying that Nigeria was fertile ground for action.

In December 2006, Mohammed Yusuf, a Maiduguri-based imam and alleged "Nigerian Taliban" leader was charged with five counts of illegally receiving foreign currency. His trial was still ongoing at the end of 2007.

Also in December 2006, Mohammed Ashafa of Kano was charged with receiving funds in 2004 from two AQ operatives based in Lahore, Pakistan to "identify and carry out terrorist attacks" on American residences in Nigeria. Deported from Pakistan for alleged ties to AQ, and said to have undergone terrorist training in Mauritania, Ashafa was charged in a Nigerian court with recruiting 21 fighters who were sent to Camp Agwan in Niger for terrorist training with AQIM. Ashafa also stood accused of being a courier for AQ from 2003 to 2004, who passed coded messages from Pakistan to Nigerian Taliban members on how to carry out terrorist activities against American interests in Nigeria. In addition, Nigerian authorities alleged that Ashafa's home was used as an AQ safe house, and that he rendered logistical and intelligence support to AQ operatives.

On January 16, 2007, Mohammed Bello Ilyas Damagun, a Nigerian cleric described by prosecutors as a primary sponsor of the Nigerian Taliban, was arraigned on three counts of terrorism. Damagun was accused of receiving the sum of 300,000 USD from Sudanese extremists or an AQ affiliate in Sudan "with the intent that said money shall be used in the execution of acts of terrorism." He also allegedly sent three young men to train with AQIM in Mauritania. The final count in Damagun's indictment was for aiding terrorist activities in Nigeria. This trial was ongoing with the defendant out on bail. These trials were still in progress due to a combination of procedural appeals, lengthy adjournments, and the additional time necessary to translate the proceedings from English to Hausa and back.

There was an attack in April that was likely perpetrated by the Nigerian Taliban, however this was not proven. On April 17, a police station in Panshekera, a small village outside Kano city, was attacked by militants subsequently described by the media as the "Nigerian Taliban," though the exact identities of the militants and their ideological affiliations (if any) remain unknown. While reports are conflicting, it was widely believed that the attackers were targeting the state and its uniformed security.

On July 27, the Government of Nigeria introduced e-passports containing a data chip, which will allow for easier passport authentication and fraudulent documentation detection. Besides enhanced security, the system will provide the country's first electronic database of biometric information.

The U.S. Embassy issued a warden message to American citizens on September 7, advising that American and other Western interests in Lagos and Abuja, both official and commercial, were at risk for terrorist attack. In an October 31 press report about the arrest of two men in Kano, "a

senior officer" of the Nigerian State Security Service said that the men detained were the individuals whose activities had prompted the U.S. warden message.

On November 12, Nigerian law enforcement announced the arrests in Kano, Kaduna, and Yobe states of at least 10 suspected terrorists with alleged ties to AQIM, which included the two men from the October 31 report. On November 22, five of these individuals were charged with conspiracy and planning to commit a terrorist act. Two were also charged with attempted murder. The defendants were denied bail and the case was adjourned. The others were allegedly in custody, undergoing interrogation. Local news reports described a collaborative effort between Nigerian and American intelligence services.

The Sultan of Sokoto, the supreme Muslim authority in the country, has stated "There is no AQ cell of Taliban in Nigeria." The Sultan received information from a longstanding network of traditional local and regional leaders (emirs), and maintained that it would be extremely difficult for terrorist groups to operate without detection by this network. Nonetheless, poverty and unemployment, especially acute in the Muslim-majority north, helped create a climate potentially conducive to the radicalization of marginalized individuals.

In September 2005, a draft antiterrorism bill was approved by the Nigerian cabinet and sent to the National Assembly. The bill provided for sentences of up to 35 years for those convicted of a terrorist offense. Membership in a banned organization carried lighter jail sentences that could be replaced by a fine of up to 50,000 naira (400 USD). The bill was withdrawn, however, the day of its second reading in the Senate due to opposition from northern Senators who argued that the motivation for such a bill was anti-Muslim sentiment.

**Rwanda**

The Government of Rwanda combated terrorist financing and reinforced border control measures to identify potential terrorists and to prevent entry of armed groups operating in the Democratic Republic of Congo (DRC). Rwanda had an intergovernmental counterterrorism committee and a counterterrorism reaction team in the police intelligence unit. Rwandan police and marines conducted anti-narcotrafficking patrols on Lake Kivu. Central Bank and Ministry of Finance officials provided outstanding cooperation on terrorist financing issues. While the Government of Rwanda had not yet fully developed its laws and regulations in accordance with international conventions and protocols concerning terrorism, it had the authority under local law to identify, freeze, and seize terrorist-related financial assets. Rwanda participated in regional initiatives on international counterterrorism cooperation, including the East African Standby Brigade. In November, Rwanda hosted a meeting of the Committee of Intelligence and Security Services of Africa, which brought intelligence and security officials together to address security challenges faced by members of the African Union through information sharing and strategic intelligence coordination. Also in November, Rwanda hosted a six-week training course for East African police commanders in cooperation with the United Kingdom.

Besides reinforcing border security, the Government of Rwanda developed terrorism response strategies. The Rwandan national tourist office hired a consultant to develop a communications policy to alert embassies should their citizens be harmed in Rwanda's national parks, and to

increase disaster preparedness. The national Civil Aviation Authority worked to develop a crisis plan to address terrorist attacks and/or other disasters, and installed more cameras at Kigali International Airport to increase surveillance capability.

## Senegal

The Government of Senegal cooperated with the United States to identify terrorist groups operating in Senegalese territory. More work remained to be done, however, to develop first responder services, to facilitate the quick sharing of information between agencies, and to control porous borders where police and security services are undermanned and ill-equipped to prevent illicit crossborder trafficking. The Government of Senegal affirmed its commitment to United States government-assisted efforts to augment its border security.

Senegal continued to enhance its ability to combat terrorism, prosecute terror suspects, and respond to emergencies. Despite advances, however, Senegal lacked specific counterterrorism Legislation, and current laws made it difficult to prosecute terror suspects. As participants in the Trans-Saharan Counterterrorism Partnership, more than 318 Senegalese government officials participated in ATA programs. Senegalese military officials attended a counterterrorism seminar in Rabat and attended the Chiefs of Defense and Directors of Military Intelligence conferences. The Defense International Institute of Legal Studies, the Department of Justice, the Department of the Treasury's Office of Technical Assistance, and the UN Office on Drugs and Crime (UNODC) gave separate seminars on the legal aspects of fighting terrorism.

Senegal did not provide safe haven for terrorists or terrorist organizations. However, five Mauritanians, two of whom claimed to be members of al-Qa'ida, were allegedly involved in the December 24 murder of four French tourists in Mauritania; the five traveled through Senegal before being captured in a hotel in Guinea-Bissau by Bissau-Guinean police, aided by French authorities. The Mauritanians were able to cross four Senegalese borders without being stopped by Senegalese authorities. This event demonstrated Senegal's porous borders and its lack of capacity to identify and combat terrorist threats and the need for further training.

## Somalia

Somalia's fragile central government, protracted state of violent instability, long unguarded coastline, porous borders, and proximity to the Arabian Peninsula made the country an attractive location for international terrorists seeking a transit or launching point for conducting operations in Somalia or elsewhere. Despite the late 2006 defeat of the Council of Islamic Courts (CIC) in Mogadishu by Ethiopian and Transitional Federal Government (TFG) forces, the ensuing low-level conflict that engulfed Mogadishu and parts of south central Somalia for the remainder of the year continued to make Somalia a permissive operating environment and safe haven for both Somali and foreign terrorists. The extremist al-Shabaab (The Youth), the militant "shock troops" of the CIC whose radicalism and violent means led to the CIC's undoing, initially dispersed and fled south along the Kenyan border. Al-Shabaab, some of whom are affiliated with AQ, consists of radicalized young men, between 20 and 30 years of age. A few of its senior leaders are believed to have trained and fought with AQ in Afghanistan. Al-Shabaab extremists participated in attacks against Ethiopian and TFG security forces. Al-Shabaab and other extremists were also

behind suicide bombings, the use of landmines, remote controlled roadside bombs, and targeted assassinations against Ethiopian and TFG security forces, other government officials, journalists, and civil society leaders. The African Union Peace Support Mission (AMISOM), which deployed in March to secure the air and sea ports and presidential compound, lost six soldiers to extremist attacks during the year.

Among the foreign AQ operatives believed to have enjoyed protection by the former CIC and al-Shabaab leadership were individuals wanted for the 1998 embassy bombings in Kenya and Tanzania and a 2002 hotel bombing in Kenya, including Fazul Abdallah Mohammed (aka Harun Fazul), and Saleh Ali Saleh Nabhan. At the end of the year, Ethiopian and TFG forces remained nominally in control of Mogadishu and southern and central Somalia, though institutions of government remained weak and ineffective. Regional efforts to bring about national reconciliation and establish peace and stability in Somalia are ongoing. The capability of the TFG and other Somali local and regional authorities to carry out counterterrorism activities was limited.

**South Africa**

South Africa supported efforts to counter international terrorism and shared financial, law enforcement, and limited intelligence information with the United States. The South African government adopted broad counterterrorism legislation under the title "Protection of Constitutional Democracy against Terrorist and Related Activities Bill" in 2004.

It was unclear to what extent foreign terrorist groups were present in South Africa. Some analysts held the view that AQ or other extremist groups had a presence within South Africa's generally moderate Muslim community. In January, the Department of the Treasury designated South African nationals Farhad and Junaid Dockrat as AQ financiers and facilitators, subjecting them to United States sanctions.

Border security challenges and document fraud negatively affected the government's efforts to pursue counterterrorism initiatives. South African documents often included good security measures, but because of corruption within the immigration services, thousands of South African identity cards, passports, and work/residence permits were fraudulently issued.

**Sudan**
*See Chapter 5, State Sponsors of Terrorism*.

**Tanzania**

Tanzania took significant steps to establish a National Counterterrorism Center to build its capacity to prevent and respond to terrorist attacks, and worked closely with the United States to disrupt terrorist networks. Tanzania law enforcement cooperated with the United States to exchange evidence and testimony on cases related to the 1998 bombing of the U.S. Embassy in Dar Es Salaam.

Tanzania continued its participation in several multi-year programs to strengthen its law enforcement and military capacity, improve aviation and border security, and combat money laundering and terrorist financing. The Ministry of Finance and the Bank of Tanzania showed ongoing willingness to combat terrorist financing. In December 2006, the Tanzanian Parliament passed the Anti-Money Laundering (AML) Bill, ending a legislative process that began in 2002 with support from the United States. The AML Bill created a Financial Intelligence Unit (FIU) and bolstered Tanzania's ability to combat financial crime, including counterterrorist financing.

With the Millennium Challenge Account Threshold Program, the United States supported Tanzania as it equipped and staffed the FIU. Tanzanian law enforcement and security forces attempted to identify and monitor terrorist activities and deny use of Tanzanian territory as a safe haven for terrorists. The government was aware that terrorists could use its territory for transit purposes and did not provide any kind of material assistance to terrorists or terrorist groups.

**Uganda**

Porous borders in a region rife with insecurity have left Uganda vulnerable to terrorist activity. In response, the Government of Uganda stepped up efforts to track, capture, and hold suspected terror suspects. Uganda also worked with the United States to push forward on peace and security initiatives in the Great Lakes Region. While the Ugandan government was a strong advocate for crossborder solutions to persistent problems, resource limitations and corruption hampered more effective measures. In March, the Ugandan military's counterterrorism units engaged some 100 Allied Defense Force (ADF) rebels, killing 60-80 and capturing 10-20. The Ugandan government engaged the Democratic Republic of Congo on the ADF through various regional mechanisms.

**Zambia**

Zambia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism. In June, Zambia endorsed the U.S. Global Initiative to Combat Nuclear Terrorism. In July, the government submitted an Antiterrorism Bill to Parliament. The Bill criminalized acts of terrorism, including terrorist training and incitement; and granted the government significant authority to investigate, prevent, and prosecute acts of terrorism. Inadequate resources and training impeded Zambia's law enforcement agencies' counterterrorism capabilities. Zambia's borders are long and porous, and its ports of entry are vulnerable transit points for human trafficking and international crime.

Zambia made no progress in ratifying the counterterrorism conventions listed in UNSC 1373. In November, Zambia participated in an African regional workshop on implementing UNSC 1540. Despite offers of assistance from the United States, the Zambian government does not have an internationally-compliant antimoney laundering or counterterrorist financing regime. The Cabinet is reviewing a national antimoney laundering policy and draft antimoney laundering and asset forfeiture bills.

**Zimbabwe**

Despite the Government of Zimbabwe's self-imposed isolation on most diplomatic issues, local intelligence and criminal investigative agencies were responsive to our counterterrorism needs. Government agencies routinely provided assistance by conducting investigative inquiries, traces, and border checks of individuals thought to be threats to USG facilities or personnel.

During the year, the government attempted to strengthen its ability to prevent and suppress terrorism and money laundering activities. On August 3, Parliament passed the Suppression of Foreign and International Terrorism Bill, which provided a maximum punishment of life in prison for engaging in or recruiting for foreign or international terrorist activities. It also contained penalties for harboring, concealing, or failing to report foreign or international terrorists. An enactment date for the Bill had not been set by the end of 2007.

The Reserve Bank of Zimbabwe installed a new IT system that provided enhanced capability to detect, analyze, and disseminate information on suspicious financial transactions. Working with law enforcement and other government agencies, the Reserve Bank maintained export/import desks at ports of entry and conducted audits of mining entities to detect and prevent illegal mineral smuggling and money laundering activities. An increase in suspicious transaction reports and prosecutions of financial crime cases was attributed to these efforts.

The Government of Zimbabwe entered into talks with several other countries in the region to sign MOUs, similar to the MOU signed with South Africa last year, to combat money laundering and the financing of terrorism.

## EAST ASIA AND PACIFIC OVERVIEW

"We fight terrorism. It threatens our sovereign, democratic, compassionate, and decent way of life. Therefore, in the fight against lawless violence, we must uphold these values. It is never right and always wrong to fight terror with terror."

–Gloria Macapagal-Arroyo, President of the Philippines
July 23, 2007

The Jemaah Islamiya regional terrorist network (JI) remained a serious threat to Western and regional interests, particularly in Indonesia and the Southern Philippines, although its capabilities were degraded in large part as a result of regional counterterrorism successes in 2005-2007. The Government of Indonesia continued to create a legal and law enforcement environment conducive to fighting terrorism, and the Indonesian National Police scored major successes in breaking up terrorist cells linked to Jemaah Islamiya (JI) and other violent Islamic extremist organizations. In January, DNA analysis conducted by the FBI confirmed the death of Abu Sayyaf Group's (ASG) nominal leader, Khaddafy Janjalani, at the hands of the Armed Forces of the Philippines. Philippine forces also killed ASG spokesperson Abu Solaiman, while Indonesian

police broke up JI cells in Sulawesi and Central Java. These actions represented major blows to JI and the ASG, but did not eliminate the overall threat to United States interests in the region. JI bombers Dulmatin and Patek remained on the run, probably on Jolo Island. Other terrorists remained at large, such as key JI operative Noordin Mohammad Top, in Indonesia.

Geography made effective border control problematic for archipelagic states like Indonesia and the Philippines. Monitoring remote locations among the thousands of islands in the Sulawesi Sea and Sulu Archipelago that span the boundaries between Indonesia, Malaysia, and the Philippines was extremely difficult, which made this tri-border area accessible for such terrorist activities as movement of personnel, equipment, and funds. This made building regional capacity a priority goal, in addition to bilateral cooperation and national capacity-building. Institutes like the United States-Thailand International Law Enforcement Academy (ILEA) in Bangkok, the Australian-Indonesian Jakarta Center for Law Enforcement Cooperation (JCLEC), and the Southeast Asia Regional Center for Counterterrorism (SEARCCT) in Malaysia, sought to expand their activities to provide effective counterterrorism training to law enforcement officers throughout the region. Multilateral fora, including the UN Security Council's Counterterrorism Committee (UNCTC), the G8's Roma-Lyon Group and Counterterrorism Action Group (CTAG), the Asia-Pacific Economic Cooperation (APEC) forum, the Association of Southeast Asian Nations (ASEAN), which adopted a new ASEAN Convention on Counterterrorism pending ratification, and the ASEAN Regional Forum (ARF), also promoted regional counterterrorism cooperation.

Australia maintained its position as a regional leader in the fight against terrorism and worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of bilateral and regional initiatives, in fora such as APEC, the ASEAN ARF, and the Pacific Island Forum (PIF).

China increased its efforts to build its domestic counterterrorism capabilities to improve security for the 2008 Beijing Olympics. In 2007, Beijing expressed concern that terrorists operated on Chinese territory and asserted that some members of the Uighur minority in Xinjiang Province posed a threat to China's domestic stability.

Japan strengthened its own security by contributing to counterterrorism capacity-building among Asian countries. Japan used Official Development Assistance (ODA) grants to expand counterterrorism capacity in Southeast Asia. The Ministry of Foreign Affairs Economic Cooperation Bureau increased funding for the annual Cooperation on Counterterrorism and Security Enhancement grant aid program. This FY-2007 65 million USD program included projects aimed at bolstering piracy prevention, increasing maritime and port security, and preventing weapons proliferation.

Traditionally focused on potential terrorism from the Democratic People's Republic of Korea (DPRK or North Korea), the South Korean government broadened its attention to acts of terror beyond the Korean Peninsula, and continued its active participation in regional training and capacity-building programs.

Counterterrorism cooperation with the Government of Thailand remained strong. Thai and USG officials were concerned that transnational terror groups could establish links with southern Thailand-based separatist groups. However, there were no indications that transnational terrorist

groups were directly involved in the violence in the south, and there was no evidence of direct operational links between southern Thai separatist groups and regional terror networks.

**Australia**

Australia maintained its position as a regional leader in the fight against terrorism. In June, Australia hosted the Trilateral Counterterrorism Consultations in Sydney and pushed for concrete measures to broaden the relationship between the Trilateral partners (Australia, Japan, and the United States) and regional stakeholders. Australia hosted a subregional ministerial conference on counterterrorism and the Asia-Pacific seminar on combating nuclear terrorism, and proposed that the partners develop and implement a special policy and operational "Combating Bioterrorism" workshop for Southeast Asian nations. The proposed workshop would strengthen local capacity to combat bioterrorism and improve the overall counterterrorism infrastructure in Southeast Asia by ensuring early detection of and effective response to bioterrorism.

The Jakarta Center for Law Enforcement Cooperation (JCLEC), continued to reap benefits for Australia and its regional partners. At the Counterterrorism Trilateral in Sydney, the partners proposed that JCLEC be expanded and serve as a platform for more diverse training. There were over 100 courses of training in place at JCLEC. Australia also continued its commitment to the designation of terrorist organizations; it has designated a total of 19 terrorist organizations under its domestic criminal code.

The Australian Federal Police (AFP) received further funding to expand its investigative and specialist training, currently delivered to regional law enforcement partners through facilities like JCLEC. Funding was targeted toward:
- conducting offshore exercises and training with regional partners,
- increasing the number of counterterrorism advisers working in AFP's international liaison officer network,
- introducing to high priority locations a custom-built Case Management and Information System developed for use in overseas jurisdictions, and
- enhancing specialist forensic and technical training for law enforcement agencies in the region.

In 2007, 350 officers of the AFP's International Deployment Group (IDG) were deployed overseas, many in counterterrorism technical assistance and operational/liaison roles. The AFP Operational Response Group was designed to respond on short notice to emerging law and order issues and to conduct stabilization operations to head off lawless situations that terrorists could exploit. Australia continued to provide legal drafting assistance to regional states, including the South Pacific islands, seeking to adopt international conventions and protocols against terrorism, and to bring domestic laws into conformity with these conventions.

The Australian Transaction Reports Analysis Centre (AUSTRAC), which monitors financial transactions, serves as the national AML/CTF regulator with supervisory, monitoring, and enforcement functions over a diverse range of industry sectors. A new set of regulatory reforms, introduced in draft legislation made public in August,  included new regulations regarding real estate, precious gems and stones; and specified legal, accounting, and trust services. Australia

continued to seek and fund additional staff and technical capabilities, and established identity security strike teams to investigate and prosecute people and syndicates involved in manufacturing false identities.

In May, Australia (with New Zealand, Indonesia, and the Philippines) cosponsored the Third Asia-Pacific Interfaith Dialogue, held in New Zealand. The Dialogue, involving religious and community leaders from 15 South East Asia and Pacific countries, aims to foster mutual respect, understanding, and tolerance, and to isolate religious extremism.

Australia is a partner with both the United States in exchanging information on known and suspected terrorists using the Terrorist Screening Center as the operational hub for encounter management; and with the United States in APEC's Regional Movement Alert System (RMAS). Both programs enhance our joint ability to disrupt travel by known and suspected terrorists.

In Afghanistan, Australia continued its support of a Dutch-led provincial reconstruction team. By year's end, there were 960 and 970 Australian troops in Iraq and Afghanistan, respectively.

**Burma**

Bilateral relations between Burma and the United States remained strained. The government defined almost all anti-regime activities as "acts of terrorism" and made little distinction between peaceful political dissent and violent attacks by insurgents or criminals. The Burmese government was quick to characterize dissident groups as aligned with terrorist organizations and used this as justification to scrutinize and disrupt their activities. In the past several years, bombs have exploded in Rangoon and other parts of Burma. In most incidents, the Government of Burma claimed the incidents were a subversive act, "committed by a group of insurgent destructive elements who wanted to disturb and destroy stability of the state." Authorities did not make public any evidence of a genuine investigation or identify the specific perpetrator(s). Requests by the U.S. Embassy to view either the scenes or remaining fragments of the explosive devices were consistently denied.

**Cambodia**

Cambodia's political leadership demonstrated a strong commitment to take aggressive legal action against terrorists. However, Cambodia's ability to investigate potential terrorist activities was limited by a lack of training and resources. The government passed a counterterrorism law and a law to combat terrorist financing, and comprehensive domestic legislation has been promulgated and implemented. To date, the Cambodian government has fully cooperated with United States counterterrorism efforts on many levels, despite its limited resources.

Conditions in Cambodia, such as porous borders, endemic corruption, massive poverty, high unemployment, a poor education system, and disaffected elements within the Cham Muslim population, which makes up approximately five percent of the population, could make the country vulnerable to terrorists and terrorist influence. Although the Cham were not generally politically active, the Cambodian government feared that Cham areas might provide safe haven to terrorists. For example, Hambali, the Indonesian national and key member of Jemaah Islamiya

accused of involvement in the 2002 Bali nightclub bombings, took refuge in a Muslim school in Kandal Province in 2002-2003.

One violent group among the many peaceful and law-abiding Kampuchea Khmer Krom groups attempted to blow up the Vietnam-Cambodia Friendship memorial using three improvised explosive devices in July, providing evidence that terrorist groups were capable of conducting domestic attacks in Cambodia. Although no one was injured, the Cambodian government thoroughly investigated this case, and eventually arrested and jailed the responsible individuals.

Cambodia's National Counterterrorism Committee (NCTC), a policy level decision making body established by the government in 2005 and chaired by the prime minister, continued to develop its resources. In December, several NCTC officials traveled to the United States for USG consultations.

In July, Cambodia's Senate approved a Counterterrorism Law after it was passed by Cambodia's National Assembly on June 26. On July 20, following the Senate's approval, the King enacted the law, which addressed aircraft safety, maritime navigation safety, the protection of nuclear materials, the financing and provision of material support to terrorism, and other important issues affecting national security and safety. It also implemented measures to enhance international cooperation regarding terrorism offenses.

In June, the Cambodian government enacted the Law on Anti-Money Laundering and Combating the Financing of Terrorism. The government was also working on decrees and sub-decrees to bring these counterterrorism laws fully into effect. In addition, the National Bank of Cambodia (NBC) circulated nationwide the UN Security Council lists of individuals and entities involved in global terrorism. The NBC officially instructed all financial and banking institutions operating in Cambodia to scrutinize and freeze assets of these persons and entities.

The Australian and Cambodian governments jointly sponsored a Maritime Security seminar in November to train Cambodian military, police, and other officials. At this seminar, Prime Minister Hun Sen stated that Cambodia's maritime security is a priority in fighting against drug trafficking, human trafficking, terrorism, crossborder crimes, and piracy. He added that cooperation with international partners to combat terrorism and crossborder criminals had improved. As part of ongoing cooperation on counterterrorism capacity-building, training was conducted with elements of the U.S. military in conjunction with the USS Essex ship visit to Cambodia.

In June, the Royal Government of Cambodia designated three government focal points to work on the multilateral Global Initiative to Combat Nuclear Terrorism, co-chaired by the United States and the Russian Federation. The government strictly controlled the use of weapons, explosive devices, chemical substances, and radioactive materials.

With U.S. assistance, the Government of Cambodia installed computerized border control systems at Phnom Penh and Siem Reap airports, and at the land border crossing of Poipet and Koh Kong. There are 20 land border checkpoints. During a November International Ship and Port Facility Security Code (ISPS Code) assessment visit by the U.S. Coast Guard, various Port

security officials expressed a need for additional USG-funded training, tactical equipment, and technical materials in order to continue improving security standards. The Cambodian government also cooperated fully with U.S. requests to monitor terrorists and terrorist entities listed as supporters of terrorist financing.

The Cambodian government cooperated with a number of other governments on counterterrorism issues. The FBI conducted a "Major Case Management" course in Cambodia which reviewed Cambodia's new Criminal Procedures Law, instructed best practices in evaluating evidence, and increased the government's investigative capacity. Counterterrorism training was also provided by Singapore, Australia, Russia, Thailand, and Vietnam.

The Germans, as G8 President, convened a local CTAG (the G8's Counterterrorism Action Group) meeting December 13, to exchange views on the nature of the terrorist threat in Cambodia and the region; to share information about assistance programs in Cambodia building capacity and countering terrorist threats; to discuss the question of whether the UN Office of Drugs and Crime (UNODC) "menu of services" included any activities of interest to donors; to hear a readout of the Australian-sponsored maritime security seminar; and to exchange information on the National Counterterrorism Committee.

**China**

In the lead up to the 2008 Olympics, China continued to boost counterterrorism cooperation with the United States and other nations. China participated in the UN Security Council's Fifth Special Meeting of the Counterterrorism Committee held in Nairobi, Kenya, and attended a United Nations, Organization of Islamic Conference (OIC), and Islamic Educational, Scientific, and Cultural Organization Antiterrorism conference held in Tunis, Tunisia. China, a founding member of the Shanghai Cooperation Organization (SCO), has made counterterrorism one of the group's main objectives. In August, troops from the six SCO member states conducted an "antiterrorist operation" joint military exercise in Russia. In December, Chinese and Indian troops conducted joint antiterrorism training in Kunming, China.

China selected Yangshan Deepwater Port in Shanghai as the pilot port for the Megaports Initiative, designed to detect and interdict illicit nuclear and radiological materials that could be smuggled in United States-bound cargo.

In February, at the second meeting of the Global Initiative to Combat Nuclear Terrorism in Ankara, China offered to host a workshop on radiation emergency response. Fifteen countries attended this workshop, which was hosted by the Chinese Ministry of Foreign Affairs in Beijing in December. China continued its participation in the Container Security Initiative with United States Customs and Border Protection inspectors stationed at the ports of Shanghai and Shenzhen.

China's new Anti-Money Laundering Law took effect January 1. The law expanded the criminalization of money laundering-related offenses and broadened the scope of existing anti-money laundering regulations to hold a greater range of financial institutions accountable for recording customer information and reporting suspicious transactions. It also firmly established

the People's Bank of China (PBOC) as the lead agency for all anti-money laundering activities in China. The Ministry of Public Security (MPS) Anti-Money Laundering Division and Anti-Terrorism Bureau are responsible for criminal investigations.

China's cash-based economy and robust crossborder trade contributed to a high volume of difficult-to-track cash transactions. While mechanisms were in place for tracking financial transactions in the formal banking sector, the large size of the informal economy, prevalence of counterfeit identity documents, and vast numbers of underground banks presented major obstacles to law enforcement authorities. According to International Monetary Fund (IMF) statistics, money laundering in China may account for as much as $24 billion dollars per year.

Terrorist financing is a criminal offense in China, and the government had the authority to identify, freeze, and seize terrorist financial assets, but laws defining terrorist financing were not yet consistent with international standards, according to reporting by the Financial Action Task Force. China's Financial Intelligence Unit (FIU), housed by PBOC, worked closely with the Financial Crimes Enforcement Network (FINCEN) in the United States to develop its capabilities. In addition to its domestic collection and analysis activities, the FIU exchanged information with foreign FIUs on a case-by-case basis, but coordination in this area could be enhanced through membership in the Egmont Group, an umbrella body that coordinates the activities of over 100 FIUs worldwide. China applied for membership in the Egmont Group, but domestic political concerns about Taiwan's participation in the organization have reportedly hampered membership discussions.

China expanded its role in international efforts to combat terrorist finance and money laundering by becoming a full member of the Financial Action Task Force (FATF) in June. Since 2004, China has also been a member of the Eurasian Group (EAG), a FATF-style regional grouping that includes China, Russia, and several Central Asian countries.

Human rights organizations have accused China of using counterterrorism as a pretext to suppress Uighurs, a predominantly Muslim ethnic group composed of the majority of the population of the Xinjiang Uighur Autonomous Region (XUAR) of western China. In January, Chinese authorities raided an alleged terrorist camp affiliated with the East Turkestan Islamic Movement (ETIM) in the XUAR, killing 18 and arresting 17.

According to police reports, Chinese police seized hand grenades, unassembled explosives, detonators, and the equivalent of $38,705 dollars in cash. Six of the 17 arrested were sentenced in November: three were sentenced to death, two received suspended death sentences, and another was given life imprisonment. In August 2006, upon Chinese request, Uzbekistan extradited a Canadian citizen of Uighur ethnicity to China where he was convicted for alleged involvement in East Turkistan terrorist activities. In November 2006, China gave Canada assurances that he would not be executed for his alleged crimes, and in September 2007, China denied the appeal of his life imprisonment sentence; at year's end he remained in prison.

Formally established in 2002, the FBI Legal Attaché Office in Beijing bolstered United States-China cooperation on counterterrorism investigations. China provided substantive intelligence in

some counterterrorism cases, but more work remained to be done in terms of the depth and overall responsiveness to United States requests.

In 2006, Chinese Air Marshals completed their first mission to the United States, and in July 2007, United States Air Marshals made inaugural trips to Shanghai and Guangzhou. The CAAC sent the Commander of the Air Marshals to attend an International In-Flight Security Officer Conference held in Miami in September. In October, the Administrator of the Transportation Security Administration (TSA) made the first high-level TSA visit to Beijing to discuss future formal collaboration on security matters in both the aviation and mass transit sectors.

Although not publicly attributing any particular incident to terrorism, Chinese authorities asserted that terrorists, primarily based in Xinjiang, continued to operate clandestinely on Chinese territory. The Chinese government increased the number of deployed security personnel in response to perceived terrorist activities in Xinjiang.

Hong Kong

Hong Kong's position as a major transit point for cargo, finances, and people and its open trade and financial regime made it a potential site for money laundering and terrorist financing activities. The high level of cooperation and the successful implementation of the Container Security Initiative (CSI) by Hong Kong Customs officials received continued praise from visiting USG delegations, which described it as a model for CSI implementation. In cooperation with Hong Kong Customs and one of Hong Kong's port terminal operators, the United States began implementation of a the Strategic Freight Initiative (SFI) pilot project to screen 100 percent of U.S.-bound containers using non-invasive inspection techniques to scan for nuclear and radiological materials.

Hong Kong law enforcement agencies provided full support and cooperation to their overseas counterparts in tracing financial transactions suspected of being linked to terrorist activities.

Hong Kong actively participated in various anti-money laundering and counterterrorist financing initiatives, including the Financial Action Task Force (FATF) and the Asia/Pacific Group (APG) on Money Laundering. Hong Kong's Joint Financial Intelligence Unit (JFIU), operated by Hong Kong Police and the Customs and Excises Department, is a member of the Egmont Group. Hong Kong completed a mutual evaluation by the FATF and APG in November; the results of this review will be announced in mid-2008.

Macau

The Macau Special Administrative Region is a member of the Asia Pacific Group (APG) and completed a mutual evaluation of its Anti-Money Laundering Regime in 2007. APG examiners reviewed Macau government regulations, suspicious transaction reporting; bank record-keeping and reporting requirements; and also interviewed frontline staff, senior management, and money laundering compliance officers. The APG report, published in September, made a series of recommendations including making the FIO a permanent body, establishing disclosure or

declaration systems for crossborder transport of currency, and tighter due-diligence requirements for casinos.

The Government of Macau continued to exchange information with the Hong Kong Special Administrative Region and counterparts in mainland China. Additionally, Macau continued to cooperate internationally in counterterrorism efforts, through INTERPOL and other security-focused organizations within the Asia Pacific Region. Macau was considering information sharing mechanisms that would allow it to join the Egmont Group.

**Indonesia**

Indonesia experienced its second consecutive year of no major terrorist incidents. Radical groups in Indonesia had their ability to carry out attacks further diminished as a result of the Indonesian government's counterterrorism efforts. The Indonesian National Police (INP) scored major successes in breaking up terrorist cells linked to Jemaah Islamiya (JI) and other violent Islamic extremist organizations. While JI cells in Java and Central Sulawesi were weakened, JI and its radical associates remained a security threat to both Western and domestic targets. The Attorney General's Office made some strides toward conducting more efficient and effective counterterrorism prosecutions despite weaknesses in Indonesia's counterterrorism law. The Government of Indonesia continued to create a legal and law enforcement environment conducive to fighting terrorism within its borders, and numerous terrorists were convicted of crimes. One measure of the successful efforts to curb terrorism was the return of tourists to the country. In 2007, the number of tourists to Indonesia increased 14 percent; Bali, where tourists have been the target of terrorist attacks, experienced a 32 percent increase in tourism.

In January, the INP conducted two raids against a radical stronghold in Poso, Central Sulawesi. The second raid used 500 security force personnel against a large group of terrorists and their supporters, who were armed with small arms and Improvised Explosive Devices (IEDs). The raids ended with 18 dead, 18 injured, and 28 captured. Subsequent operations netted five more suspects. While the Poso operation was criticized as "heavy-handed" by some members of the local community, it calmed the previously tense situation in Central Sulawesi. There were no reprisal attacks following the raids. In March, information gained from the Poso suspects helped the INP initiate a series of raids in Central and East Java which resulted in the arrest of several members of the so-called "military wing" of JI and several cell leaders and the seizure of a large cache of explosives in East Java. In June, INP's Special Detachment 88 (SD-88) in Central Java, arrested several key JI terrorist operatives, including alleged JI Emir Ustad Syahroni (aka Zarkasih) and senior JI operative Abu Dujana (aka Ainul Bahri). As the JI Emir, Afghanistan-veteran Zarkasih, a former JI leader, is thought to be senior to Dujana in the JI hierarchy. Dujana, also an Afghanistan-veteran, was part of JI's central command and was involved in several JI attacks in recent years.

The arrests in January, March, and June removed several key JI leaders. To create sympathy for these radical groups and to discredit the INP (especially SD-88), lawsuits were brought against the INP by Abu Dujana's wife and by JI cofounder and spiritual leader, Abu Bakar Ba'asyir. The two lawsuits did not create the expected groundswell of public attention and were eventually thrown out of court.

The newly formed USG-funded Attorney General's Task Force on Terrorism and Transnational Crime took the leading role in handling prosecutions of terrorists. The Task Force won convictions against: Hasanuddin, a JI leader in Poso; four men who participated in the 2005 schoolgirl beheadings; and three others who were involved in the 2005 Tentena market bombings. The Attorney General also won convictions against 17 Poso Christians who had murdered two Muslims in revenge killings in September 2006. The Task Force is currently prosecuting a dozen members of JI's military unit who were arrested in the March and June raids, including Dujana and Zarkasih.

Other Indonesian legal institutions took a hard line against terrorists. In September, the Supreme Court rejected the final appeals of three men on death row for carrying out the 2002 Bali bombings. The Court also upheld the life sentence imposed on JI trainer/recruiter Subur Sugiyarto. In October, the Ministry of Law and Human Rights announced that convicted terrorists would no longer be given automatic sentence remissions at major holidays. The new policy came too late to prevent the early release of some 20 convicted terrorists in 2007, but most of these were minor figures.

The Indonesian government made genuine efforts to develop an effective anti-money laundering system for investigations and prosecutions. Indonesian police froze terrorist financial assets uncovered during investigations. However, the government's implementation of the UNSCR 1267 sanctions was hampered by poor interagency coordination and by continued lack of human and technical capacity within both the government and financial institutions. It remains to be seen whether or not the Government of Indonesia has the political will to do what is necessary to implement UNSCR 1267.

USAID is promoting capacity-building through its Financial Crimes Prevention Project, a multi-year program to provide technical advisors and support to Indonesia's effort to develop an effective and credible regime against money laundering and terrorism finance. Other donors are also providing assistance to the Financial Crimes Transaction and Analysis Center (PPATK). The unit receives Suspicious Transaction Reports (STRs) and Cash Transaction Reports. PPATK has dramatically increased the number of STRs from 10 per month in 2002 to 483 per month in 2007 and these reports have led to 32 successful prosecutions to date. While only one of these had a terrorist component, strengthened financial oversight will assist the Indonesian government in tracking potential terrorist financial transactions.

The Indonesian National Police (INP) continued a program to "de-radicalize" convicted terrorists. The program identified individuals who may be open to more moderate teachings and INP officials work with them while they are in prison. The program focuses on providing spiritual support to the men and modest financial support to their families. By providing this support, the police attempt to gain the trust of the men and receive valuable information about terrorist networks. The program aims to reduce terrorist recruitment inside prisons.

While Indonesia's counterterrorism efforts have been impressive, more could be done in some areas. Despite the successes in Sulawesi and Central Java, JI networks and "sleeper" cells may remain intact  and have the capacity to go operational with little warning. Moreover, Malaysian

JI operative and recruiter Noordin Mohammed Top, who is suspected of involvement in every anti-Western terrorist attack in Indonesia since 2002,  remains at large.

**Japan**

Domestically, Japan bolstered its defenses against terrorism by improving crisis management and first responder capabilities and took steps to strengthen border security. In 2007, 98 percent of local governments adopted plans to better protect the public from terrorist attacks. Japan held local drills simulating terrorist attacks to boost response capabilities. In January, Japan made it mandatory for both ship and air carriers to provide manifest information prior to the arrival of the conveyance.

In November, immigration officials began to collect and electronically store finger prints and facial imagery from foreigners under the revised Immigration and Refugee Control Act. The Ministry of Justice Immigration Bureau continued testing that began in 2004 on a biometric fingerprint and facial recognition system at Narita and Kansai airports with the aim of identifying people trying to enter Japan on fake passports.

Japan used Official Development Assistance (ODA) grants to expand counterterrorism capacity in Southeast Asia. The Ministry of Foreign Affairs (MOFA) Economic Cooperation Bureau increased funding for the annual Cooperation on Counterterrorism and Security Enhancement grant aid program. This FY-2007 65 million USD program included projects aimed at bolstering piracy prevention, increasing maritime and port security, and preventing weapons proliferation.

Japan made valuable contributions to building counterterrorism capacity among Asian countries. In May, Japan hosted a two-day Asia-Europe Meeting (ASEM) conference aimed at battling terrorism in Asia, Europe, and beyond. Participants shared threat assessments and discussed ways to increase counterterrorism capacity-building. Japan provided assistance to the G8 Counterterrorism Action Group (CTAG) and maintained momentum on improving port security via the G8 adopted Secure and Facilitated International Travel Initiative (SAFTI). Japanese experts participated in G8 bioterrorism workshops on forensic epidemiology and decontamination. In March, Japan hosted a seminar in which  several Southeast Asian countries, as well as the United States and Australia, participated to promote accession and ratification of international counterterrorism treaties. In September, Japan hosted the ASEAN-Japan Counterterrorism Dialogue. In October, Japan became a partner nation in the U.S. Global Initiative to Combat Nuclear Terrorism.

Japan increased efforts to combat terrorist financing. On April 1, 2007, the Japanese government promulgated a new anti-money laundering law, the Law for Prevention of Transfer of Criminal Proceeds, which expanded the scope of businesses and professions under the previous law's jurisdiction, and moved the financial intelligence unit from the Financial Regulatory Agency to the National Police Agency (NPA) in accordance with FATF recommendations. Furthermore, the Foreign Exchange and Foreign Trade Law's January revision now requires Japanese financial institutions  to confirm the identity of customers sending 100,000 yen ($900) or more overseas. The Financial Services Agency announced a similar change for domestic remittances; in an

amendment to the Customer Identification by Financial Institutions rule, financial institutions are now required to identify the originators of wire transfers over 100,000 yen.

In June, Japan implemented revised infectious disease legislation aimed at tightening control of harmful pathogens that could be used for terrorism. In July, the Japanese government held a seminar on the prevention and crisis management of bioterrorism to strengthen mechanisms to combat CBRN (chemical, biological, radiological, nuclear) terrorism in the Asia Pacific. Participants included ASEAN countries, China, Korea, and the Southeast Asia Regional Centre for Counterterrorism (SEARCCT). In August, Japan ratified the International Convention for the Suppression of Acts of Nuclear Terrorism.

Japan continued to reach beyond the region in its fight against terrorism; its trilateral counterterrorism cooperation with the United States and Australia remained strong. In June, Japan participated in a counterterrorism trilateral meeting in Australia to better synchronize regional activities.

Japan Air Self-Defense Forces, based in Kuwait, continued to provide airlift operations in support of Iraq. In July, the Cabinet approved a one-year extension of the deployment. During January thru October, the Maritime Self-Defense Forces provided approximately 5.7 million gallons of fuel to U.S. and allied naval vessels engaged in Operation Enduring Freedom (but ended refueling operations in the Indian Ocean in November).

Bilaterally, Japan was a responsive counterterrorism partner. In January, Japan and the United States initiated a pilot Immigration Advisory Program (IAP) at Narita Airport to identify high risk travelers before they board flights destined for the United States. The IAP pilot has been extended until July 2008; negotiations were underway to convert the pilot IAP into a longterm program.

Japan and the United States continued to improve the preparedness and interoperability of U.S. and Japanese armed forces and civilian entities to respond to and sustain operations during a CBRN attack. The bilateral CBRN Defense Working Group (CDWG), established under the U.S.-Japan Security Consultative Committee (SCC), held plenary meetings, conducted seminars on decontamination and medical response and engaged in table top exercises in the United States and Japan. Representatives from the Ministries of Defense and Foreign Affairs, the Japanese Self Defense Forces, Cabinet Secretariat, the NPA, the Fire and Disaster Management Agency, and the Nuclear Safety Commission, and other government agencies, participated in the CDWG.

The NPA and the Public Security Intelligence Agency (PSIA) continued to monitor the activities of Aum Shinrikyo, renamed Aleph. In May, Fumihiro Joyu, a former spokesman and Aum leader, along with approximately 200 Aleph members, split and formed a new organization called Hikari No Wa (Ring of Light). PSIA and NPA continued to monitor both groups and inspected their facilities in 2007. The Tokyo High Court, in June, upheld the death sentence for Seiichi Endo for his involvement in the Matsumoto and Tokyo sarin attacks. In July, the Tokyo Court upheld the death sentence for former senior Aum member Tomomasa Nakagawa for his role in 11 crimes, including the 1995 Tokyo subway sarin gas attack. In August, the Supreme Court upheld the death sentence for Masato Yokoyama for his involvement in the 1995 attack;

he is not eligible for future appeals. The Supreme Court, in October, upheld the death sentence for Aum Shinrikyo member Satoru Hashimoto, who carried out the 1994 sarin gas attack in Matsumoto. In November, the Supreme Court upheld the death sentence for Satoru Hashimoto, for his involvement in the 1994 attack.

In April, police arrested suspected former Japan Red Army member Yu Kikumura upon reentry to Japan following deportation from the United States; Kikumura was deported after his release from U.S. prison for serving time for transporting home made bombs. In May, the Tokyo High Court upheld the life in prison sentence for Haruo Wako, for his role in both the 1974 seizure of the French Embassy in The Hague and the 1975 seizure of the U.S. Embassy in Kuala Lumpur. The Tokyo District Court sentenced Jun Nishikawa to life in prison for his role in the 1974 seizure of the French Embassy in The Hague and the 1977 hijacking of a Japan Airlines plane.

**Korea, North**
*See Chapter 5, State Sponsors of Terrorism*.

**Korea, South**

The Republic of Korea (ROK) demonstrated excellent law enforcement and intelligence capabilities, and provided terrorism-related training to law enforcement officials from various developing countries. Traditionally focused on potential terrorism from the Democratic People's Republic of Korea (DPRK or North Korea), the South Korean government broadened its attention to acts of terror beyond the Korean Peninsula. South Korean citizens were victims of terrorism in Afghanistan, Nigeria, and Somalia. Seoul supported U.S. goals in Afghanistan and maintained the third-largest foreign troop contingent in Iraq through most of 2007. Additionally, Seoul leads a Coalition Provincial Reconstruction Team in Irbil Province. The South Korean government remained a valued international partner in the fight against terror financing and money laundering.

In recognition of its regional efforts to combat terrorism, the Republic of Korea held the position of Chair Economy of the Asia-Pacific Economic Cooperation (APEC) Counterterrorism Task Force (CTTF) in 2007. The South Korean Ambassador for International Counterterrorism Cooperation presided over three CTTF meetings. The ASEAN Regional Forum's (ARF) 4th Seminar of Cyber Terrorism was held in October in Busan, Korea. The seminar, cohosted by the Ministry of Foreign Affairs and Trade (MOFAT) and the National Cyber Security Center, welcomed 90 officials and experts from 24 ARF participating countries. The South Korean government also held bilateral consultations with Mexico, Germany, and France.

South Korean immigration and law enforcement agencies had an excellent record of tracking suspicious individuals entering their territory and reacting quickly to thwart potential terrorist acts. The government is on schedule to begin issuing e-passports that will further protect the identity of lawful travelers and prevent terrorists from using counterfeit passports. In November, the National Assembly passed Anti-Terrorist Financing legislation to further curb money laundering by terrorist organizations in and through the country.

Seoul continued its active participation in regional training and capacity-building programs. The South Korean government hosted representatives from Vietnam and other Southeast Asian countries for training in crime prevention, criminal justice, counterterrorism, forensic science, prevention of money laundering, narcotics law enforcement, and antipiracy and terrorism management.

**Laos**

Since 2002, the Government of Laos has consistently denounced international terrorism and expressed a willingness to cooperate with the international community on counterterrorism, but has taken little proactive action to combat terrorism. In addition to a lack of resources, Lao officials at many levels believed that Laos, a small and neutral country, would not be targeted or exploited by international terrorists.

Laos did not have a separate counterterrorism law, but recent amendments to the criminal code sought to strengthen counterterrorism sanctions. Laos' border security was weak. Border officials could not effectively control access to the country even at its most sophisticated border checkpoints. Illegal border crossing along the Mekong River into the surrounding countries of Burma, Thailand, and Cambodia could be accomplished easily and without detection. Border delineation remained poor in more remote sections of the country, especially along the land borders with Vietnam and China; it is likely that unmonitored border crossings by locals occurred on a daily basis. Since 9/11, Lao authorities have strengthened airport security, and airport security forces participated in U.S. supported security seminars in an effort to raise their standards, but security procedures at land immigration points remained lax compared with most other countries in the region. In addition, official Lao identity documents, including passports and ID cards, were easy to obtain.

When requested, the Bank of Laos has vetted government and commercial bank holdings for possible terrorist assets, as identified by U.S.-provided lists of terrorist organizations and individuals, and issued freeze orders for assets of organizations and individuals named on these lists. However, the Bank has yet to require the freezing of assets of individuals and entities included on the UN 1267 Sanctions Committee consolidated list. In accordance with its obligations under UNSCR 1373, the Bank of Lao issued freeze orders for assets of organizations and individuals named in lists provided by the United States. Lao authorities issued orders limiting the amount of cash that could be withdrawn from local banks or carried into or out of the country and strengthened reporting requirements of state and privately owned commercial banks. Banking regulation remained extremely weak, however, and the banking system was vulnerable to money laundering and other illegal transactions. Cooperation between USG officials and the Bank of Laos remained cordial and cooperative.

**Malaysia**

New provisions to Malaysia's Penal Code and Criminal Procedures Code came into effect in March. They included clearer definitions of terrorism and related crimes and penalties including the death penalty or life in prison for terrorist-related crimes. The police forces in Malaysia continued to conduct all counterterrorist investigations and operations.

Malaysian police fall under the authority of the Ministry of Internal Security, headed by Prime Minister Abdullah Badawi. To date, no suspected terrorists were brought to trial under either the new or previous legal provisions. At year's end, 29 terrorist suspects linked to Jemaah Islamiya and 17 linked to Darul Islam Sabah were held in detention under the country's Internal Security Act (ISA), where they undergo a program of rehabilitation. Two-year ISA sentences can be renewed if the Malaysian government determines that a detainee remains a threat to national security. On average, the Malaysian government has held suspected terrorists and suspected terrorist supporters in ISA detention for two to six years.

Amendments to the Anti-Money Laundering and Anti-Terrorism Financing Act, the Subordinate Courts Act, and the Courts of Judicature Act also came into effect in March. These provisions provide for the forfeiture of terrorist-related assets, allow for the prosecution of those who materially support terrorists, and expanded surveillance of suspects. The Financial Action Task Force/Asia Pacific Group on Money Laundering (FATF/APG) conducted a Mutual Evaluation of Malaysia in February. While otherwise in compliance, FATF found ineffective enforcement of Malaysian laws on the import and export of cash. The Malaysian government responded by setting up an interagency task force to issue recommendations to bring Malaysia into compliance with international standards.

The Malaysian government engaged with its neighbors on issues related to counterterrorism and transnational crime. It continued to operate the Southeast Asian Regional Center for Counterterrorism (SEARCCT), which conducts training for Malaysian officials and to a lesser extent for officials from countries in the region.

Malaysian mediators continued to work in the southern Philippines to help end the conflict between the Philippines government and the separatist Moro Islamic Liberation Front (MILF). With the "Eyes in the Sky" program, Malaysian military forces worked with Singapore and Indonesia to provide enhanced security to the Strait of Malacca, the world's busiest shipping lane.

Malaysia's Financial Intelligence Unit (FIU) signed memoranda of understanding on the sharing of financial intelligence with the FIUs of the United States, the United Kingdom, Japan, the Republic of Korea, Sweden, and the Republic of Chile. Malaysia's FIU provided training and evaluation assistance throughout the region. In late June, Malaysia's accession to the UN Convention for the Suppression of the Financing of Terrorism came into force.

**Mongolia**

There were no known terrorist groups operating in Mongolia and no known bases of support. Nonetheless, Mongolian government officials cited more than 6,000 kilometers of porous borders, easy entry for foreign travelers, and poverty as conditions that terrorists could exploit, and moved to increase awareness of terrorism and to consider new laws. In August, Mongolia's Border Force, State Specialized Inspection Agency, Customs Authority and other agencies worked with a visiting "Second Line of Defense" team from the U.S. Department of Energy to improve systems for detecting the movement of nuclear and radiological materials that could be

used as weapons of mass destruction. The Mongolian police, the Ministry of Justice, and the General Intelligence Agency's counterterrorism branch also cooperated with the United States. As a result of resource and technical limitations, counterterrorism law enforcement capacities remained modest. Mongolia deployed an eighth rotation of 100 Mongolian soldiers to Iraq in October in support of Operation Iraqi Freedom, as well as a seventh rotation of 21 Mongolian soldiers to Afghanistan to train the Afghan National Army.

**New Zealand**

In November, New Zealand passed a further amendment to the Terrorism Suppression Act 2002. The main amendments created a generic offense for committing a terrorist act; streamlined the process for designating terrorists (UN terrorist list entities are now automatically designated as terrorists under New Zealand law) and created two new offenses involving nuclear material. To date, New Zealand has designated more than 480 UN listed terrorist entities. The FIU processed over 4,090 Suspicious Transaction Reports (STRs) and referred 615 of these to various law enforcement agencies and units for investigations[2]. Over the same twelve month period, the FIU received five Suspicious Property Reports pursuant to the Suppression of Terrorism Act 2002, none of which were found to have connections to terrorist entities or associated individuals.

New Zealand's counterterrorism efforts were reinforced by its engagement in interfaith and inter-cultural initiatives aimed at countering radicalization and terrorist recruitment. With Australia, Indonesia, and the Philippines, New Zealand co-sponsored the Asia-Pacific Regional Interfaith Dialogue. The Dialogue involved religious and community leaders from 15 countries from South East Asia and the Pacific, and aimed to foster tolerance, reinforce moderate religious views, and isolate religious extremism. In May, New Zealand hosted the third Dialogue at Waitangi, New Zealand. New Zealand also supports the UN-led Alliance of Civilizations (AOC) initiative, which has developed a framework for practical action to bridge differences and improve relations between faiths, societies and cultures, particularly between Islam and the West. New Zealand convened a Symposium in May to focus regional attention on the AOC Report's recommendations in the four "fields of action": education, youth, media, and migration.

New Zealand is a partner with both the United States in exchanging information on known and suspected terrorists using the Terrorist Screening Center as the operational hub for encounter management,  and with the United States in APEC's Regional Movement Alert System (RMAS). Both of these programs enhance our joint ability to disrupt travel by known and suspected terrorists.

On October 15, New Zealand police arrested 17 people and seized a number of weapons, including semiautomatic weapons and petrol bombs, during a series of raids throughout the country and referred evidence against 12 of the 17 people for additional possible prosecution under the Terrorism Suppression Act (TSA), the first time the Act has been evoked since it

---

[2] Under the Financial Transaction Reporting Act 1996, financial institutions (note: which includes banks, money exchanges and casinos) are required to report transactions suspected of being linked to money laundering or proceeds of crime enforcement to the New Zealand Police Financial Intelligence Unit based at Police National Headquarters in Wellington.

became law in 2002. Solicitor-General Dr. David declined TSA prosecution; 16 still faced charges.

Also in mid-October, amendments to the TSA legislation were before Parliament. The Terrorism Suppression Amendment Bill corrected inconsistencies in the TSA with New Zealand's obligations under the Charter of the United Nations and the United Nations Security Council resolutions on terrorism. It contained proposals on the designation of UN-listed terrorist entities, the High Court extension of designations for those entities, the freezing of terrorists' assets, the terrorist financing offenses, the offenses of committing a terrorist act and participating in a terrorist group. The Bill also introduced new offenses involving nuclear material.

New Zealand closed the security risk immigration case against an asylum seeker, Ahmed Zaoui, after five years of blocking his claim for refugee status on the grounds that he represented a threat to national security (he has convictions in Belgium and France for links to terror groups). On September 13, the Security Intelligence Service (SIS) determined that Zaoui was no longer a security risk and removed the security risk certificate it placed upon him.

New Zealand remained active in Operation Enduring Freedom in Afghanistan, working with coalition partners in undertaking Maritime Security Operations. New Zealand commands the Provincial Reconstruction Team (PRT) in Afghanistan's Bamiyan Province, as part of NATO's International Security Assistance Force (ISAF).

New Zealand continued to provide assistance to Pacific Islands Forum member countries to help them submit reports pursuant to UN Security Council Resolutions 1267, 1373, and 1540. Assistance was provided to five Pacific Island Countries (PICs) to date, and of these, four have submitted completed reports to the UN. New Zealand convened and chaired the annual Pacific Islands Forum Working Group on Counterterrorism (WGCT) which provided an opportunity for Pacific Island countries to receive up-to-date information on the international counterterrorism regime and to coordinate technical assistance projects to assist their compliance with UN Security Council reporting obligations. The last WGCT meeting was held in Nadi in June, preceding the annual Forum Regional Security Committee meeting.

New Zealand promoted counterterrorism capacity-building and a range of regional security initiatives through the Asia Security Fund. The Fund supported projects implemented by a range of partners, including regional counterterrorism centers such as the Jakarta Centre for Law Enforcement Cooperation in Indonesia and the South East Asia Regional Centre for Counter Terrorism in Malaysia.

## Philippines

The Philippines continued to face numerous threats from terrorism. Operating within the country were the Abu Sayyaf Group (ASG), Communist Party of the Philippines/New Peoples Army (CPP/NPA), and Jemaah Islamiya (JI), all of whom are designated as Foreign Terrorist Organizations (FTOs) by the United States. In addition, the Alex Boncayao Brigade (ABB) and the Pentagon Gang are on the U.S. Terrorist Exclusion List.

Philippines military and law enforcement conducted intensive civil-military and internal security operations  to eliminate terrorist safe havens in the Sulu Archipelago and central Mindanao. This year they captured and arrested 38 ASG members and killed 127. The ASG's release in October of an Internet video soliciting funds is an indication of the group's financial constraints. Courts sentenced 14 members of the ASG to life imprisonment for their role in the May 2001 Dos Palmas kidnapping of 20 persons, including three Americans. President Arroyo signed landmark antiterrorism legislation to improve the Philippine government's ability to investigate and prosecute terrorism crimes.

The Government of the Philippines includes the following among its numerous successes against terrorists this year:

- On January 13, Philippine law enforcement authorities arrested Kule Mamagong in North Cotabato for his involvement in three bombings that left six dead and 36 injured.

- On March 11, Philippine military officials captured ASG member Abu Usman for his role in a January 2001 kidnapping in Lantawan, Basilan.

- On March 16, Philippine security forces on Basilan captured ASG member Merang Abate for his involvement in several kidnappings.

- In late March, the Philippine police arrested Pentagon Gang members, Alimona Cali and Beru Mendoza, for their role in a 1997 kidnapping of five civilians.

- On May 9, the Philippine police arrested Taya Kulat for his involvement in a bombing in Tacurong City.

- On May 11, Philippine security forces raided an ASG safe house on Simunul Island, Tawi Tawi, and arrested four children of fugitive JI bomber, Dulmatin, and deported them to Indonesia.

- In September, Philippine security officials arrested eight ASG members on Palawan Island and in Zamboanga.

- On November 12, Philippine security officials arrested Demaatol Guialal in Sultan Kudarat for his involvement in two bombings that left six dead and over 20 injured.

- On December 6, 14 ASG members were sentenced to life imprisonment for the May 2001 Dos Palmas kidnapping of 20 people, including three Americans.

- On December 10, Philippine authorities arrested ASG member Abdel Kamala in Zamboanga City for his role in the 2001 Dos Palmas kidnapping and June 2001 attack on Lamitan, Basilan.

-  On January 6, the Philippine military killed five ASG terrorists and one suspected JI operative near the southern island of Tawi-Tawi.

- On January 7, the Philippine military killed ASG bomb expert, Binang Sali, in a firefight on Jolo.

- On January 16, Philippine military forces killed ASG spokesman Jainal Sali a.k.a. Abu Solaiman during an armed encounter on Jolo.

- On August 18, the Philippine military killed ASG members, Furuji and Umair Indama, who were involved in the 2001 beheading of U.S. citizen Guillermo Sobero, an October 2002 bombing that killed a U.S. serviceman, and the July 10 beheadings of 10 Philippine Marines on Basilan.

-  In the aftermath of a November 13 bombing at Congress that left five dead and nine injured, Philippine law enforcement authorities killed ASG member, Abu Jandal, during a raid of a safe house in Manila.

- On December 15, Philippine security forces killed ASG member Mubin Sakandal in Tawi-Tawi.

USG and Philippine authorities also effectively used rewards programs to target terrorist groups. The U.S. Department of State paid $5 million in June through its Rewards for Justice Program to informants who provided information that led to the killings of ASG leaders Khadaffy Janjalani and Jainal Sali a.k.a Abu Solaiman. The U.S. Department of Defense, meanwhile, rewarded informants whose information led to the capture of: Khair Malvan Mundos (April), Mohammad Yusuf Karim, April), Redendo Dellosa (April), Mariano Lomarda April), Abubakar Delos Reyes (April), Binang Andang Sali (April), Jundam Jamalul ( April), Ismin Sahiron June), Alnaser Parad, June), and Itting and Omar Sailani (November). In total, the United States paid out $10,302,500 for information leading to the arrest or killing of 13 ASG members.

The passage of the Human Security Act (HSA) was a major step forward in the modernization of Philippine law enforcement tools for use against terrorists. It permits wiretapping of members of judicially designated terrorist organizations and financial investigations of individuals connected to terrorist organizations. Tight restrictions in the law, however, have prevented it from being used in actual cases.

Limited financial resources, inadequate salaries, corruption, low morale,  limited cooperation between police and prosecutors, and other problems in law enforcement have hampered bringing terrorists to justice. In December, U.S prosecutors and FBI agents provided training to 34 representatives of the Philippine Anti-Terrorism Council. The training was directed at assisting the Philippines in HSA implementation, and focused on ways to use electronic surveillance authority and procedures to obtain judicial designation of organizations as terrorist under the HSA.

The Anti-Money Laundering Council (AMLC), operating under the Philippine Anti-Money Laundering Act of 2001 (AMLA), as amended in 2003,  investigated and prosecuted money laundering and took the lead in implementing the asset freeze measures called for by the UN

Security Council 1267 Sanctions Committee. The AMLA was used as the legislative basis for financial actions against AQ and the Taliban. Under the law, however, the AMLC could not take direct action against suspected terrorists or those supporting terrorism; instead it had to apply for a court order to inquire into bank accounts and direct the freezing of assets and transactions.

The American Embassy received excellent cooperation from Philippine law enforcement officials in obtaining access to terrorist detainees and witnesses for FBI interviews, and access to criminal, immigration, financial, and biographic records via the mechanisms established in the U.S.-Philippine Mutual Legal Assistance Treaty. The Philippine Security Engagement Board was the primary mechanism for planning and coordination of nontraditional security issues, including counterterrorism and maritime security. This watershed agreement served as the foundation for the "Kapit Bisig" (Arm-In-Arm) counterterrorism framework that focused on civil affairs, capability upgrades, and support for AFP operations.

The United States helped the Philippines establish interagency intelligence fusion centers to support maritime interdictions against transnational criminal/terrorist organizations and a "Coast Watch" system in Mindanao. The Maritime Drug Enforcement Center is located at the Philippines Drug Enforcement Agency Headquarters in Quezon City. Three satellite centers, called Maritime Information Coordination Centers, are located at the headquarters of the Philippine Naval Forces-Western Mindanao in Zamboanga del Sur (southwestern Mindanao), the Coast Guard Station in General Santos City (southcentral Mindanao), and at Poro Point, San Fernando, La Union (northwestern Luzon). The United States also provided equipment valued at $120,000 to establish a bomb data center on Mindanao.

The Philippine Department of Foreign Affairs began issuing digitized, machine-readable passports in June. While the Philippines cooperated with USG requests for prosecuting persons who had tampered with or altered travel documents, the prosecutions carried low-level penalties. In addition, law enforcement officials were reluctant to investigate or charge vendors or users of false documents when the Philippine government was not the issuing authority.

**Singapore**

Singapore continued its bilateral and multilateral intelligence and law enforcement cooperation to investigate terrorist groups with a focus on Jemaah Islamiya (JI). In June, Singapore announced that it had detained, under the Internal Security Act (ISA), a "self-radicalized" (i.e., through the Internet) Muslim attorney who had traveled abroad in an effort to join an extremist group and fight alongside the Taliban. Also in June, Singapore announced the detention of four suspected JI members who had fled Singapore in 2001 following the arrest of other JI members by the Internal Security Department (ISD).

As of November, Singapore held in detention 32 people with links to terrorist groups. Detainees included members of JI who had plotted to carry out attacks in Singapore in the past and members of the Moro Islamic Liberation Front (MILF). Under detention orders, the detainees were required to undergo a program of religious counseling with a group of volunteer religious counselors. Singapore enlisted the support of religious teachers and scholars to study JI's

ideology, to develop teachings to counter the group's spread within Singapore's Muslim community, and to provide counseling to detainees.

Singapore adopted revised regulations and guidelines for banks, other financial institutions, and non-financial businesses and professions that for the first time prescribed measures in accordance with Financial Action Task Force (FATF) recommendations for countering the financing of terrorism (CFT.) The government moved to implement regulations to require inbound and outbound travelers to report cash and cash-equivalent instruments of greater than $20,700 (S$30,000). In October, Parliament approved the Terrorism (Suppression of Bombings) Act, which gives effect to the International Convention for the Suppression of Terrorist Bombings.

In March, Singapore's Ministry of Home Affairs and the U.S. Department of Homeland Security signed a Science and Technology Agreement to provide a framework to expand cooperation and carry out collaborative projects to enhance border security. After endorsing the Secure Freight Initiative (SFI) in December 2006, Singapore agreed in 2007 to participate in the Phase I deployment of SFI to improve the scanning of maritime container cargo, which will leverage Singapore's participation in the Container Security Initiative (CSI) and the Megaports Initiative.

Singaporean officials took strong measures to enhance maritime security in nearby waters, especially the Strait of Malacca, which included countering terrorist threats, piracy, and other criminal attacks. The three littoral states (Indonesia, Malaysia, and Singapore) continued their surface naval and air patrols in and over the Strait of Malacca. In March, Singapore broke ground on construction of the Changi Command and Control Centre, which will enhance Singapore's maritime security capabilities by co-locating the interagency Singapore Maritime Security Centre, the Information Fusion Centre, and the Multinational Operations and Exercises Centre.

In September, Singapore hosted the third and final International Maritime Organization (IMO)-sponsored meeting on "The Straits of Malacca and Singapore: Enhancing Safety, Security and Environmental Protection." Delegates from the three littoral states and 35 other countries and 16 international observer organizations and NGOs attended the conference. The Regional Cooperation Agreement on Combating Piracy and Armed Robbery against Ships in Asia (ReCAAP) Information Sharing Centre (ISC) continued its operations, connecting 14 governments in Asia to enhance piracy-related information sharing. The Republic of Singapore Navy and Police Coast Guard worked closely on measures to secure the Singapore Strait and port from a maritime terrorist attack.

Singapore actively participated in counterterrorism efforts through various international fora, including the ASEAN Regional Forum (ARF), and continued to take part in the Proliferation Security Initiative (PSI), including the "Pacific Shield 07" exercise hosted by Japan. The Singaporean authorities regularly conducted emergency exercise drills to prepare for a potential terrorist attack in the country, bringing together relevant government agencies and civil society organizations.

**Taiwan**

Taiwan is not a member of the United Nations and, therefore, is not subject to UNSC Resolutions and cannot join UN conventions and protocols related to terrorist financing. Nonetheless, Taiwan sought to implement, to the maximum extent possible, all UN resolutions relating to combating terrorism and terrorist finance issues. Taiwan continued to provide rapid and thorough responses on terrorism financing issues to the American Institute in Taiwan (AIT). In 2006, Taiwan's Executive Yuan submitted an "Antiterrorist Action Law" to the Legislative Yuan. This bill would empower the Financial Supervisory Commission to seize assets of entities involved in terrorist activities, and employ a package of trade, travel, and financial sanctions against North Korea in response to UNSCR 1718. These items were under review at year's end.

The cabinet-level Counterterrorism Office (CTO) conducted several large-scale training exercises. In December, the CTO conducted its most recent exercise in Kaohsiung in preparation for the 2009 World Games. While the primary focus of this exercise was counterterrorism, it also included crisis management, disaster preparedness, and island-wide civilian military mobilization. Taiwan is currently engaged in seeking ways to harden and protect its critical infrastructure, in order to maintain continuity of operations and government in the event of an attack or a disaster.

**Thailand**

Counterterrorism cooperation with the Government of Thailand remained strong despite the September 2006 coup and preoccupation of the interim government with domestic political issues. Thai security forces continued to cooperate with the United States and other countries to deny safe haven for terrorists within their territory. No major incidents of international terrorism occurred in Thailand this year, though insurgency-related violence in Thailand's southern provinces of Pattani, Narathiwat, Yala, and Songkhla continued unabated, with acts of violence occurring daily.

The December 31, 2006 bomb attacks in Bangkok, which killed three Thai and injured dozens, including six foreign tourists, remained unsolved. Thai officials contended the bombing was related to domestic political issues. The locations targeted in the attacks were not specifically identified with foreign interests or tourists. On October 1, 2007, a bomb exploded outside Army headquarters in Bangkok. Two bomb disposal personnel were wounded. No suspects have been apprehended and Thai officials contended that this attack, like the December 31 bombings, was related to domestic issues.

Thailand's biggest domestic security challenge remained the ongoing separatist movement in the far southern provinces of Narathiwat, Yala, Pattani, and Songkhla. This region, bordering Malaysia, has experienced episodic, separatist-related violence for decades among the predominantly ethnic Malay-Muslim population. Since January 2004, violence increased dramatically and continued on a near daily basis. Suspected separatist militants carried out assassinations, beheadings, and coordinated bombings using improvised explosive devices.

A particularly brutal series of attacks commenced on March 14 in Yala province when suspected insurgents ambushed a civilian passenger van and executed the eight Buddhist passengers on board. Subsequently, on March 15, a mosque and a tea shop frequented by Muslims were

attacked with grenades by unknown assailants. Thai press reports and security forces attribute nearly all the attacks in the south to militant separatists, but human rights watchers believe attacks are committed by both Buddhist and Muslim groups.

Interim Prime Minister Surayud's efforts at conciliation have had only a limited impact, and attacks continued to occur regularly. In June, Thai security forces adopted a more aggressive approach to dealing with the militants. Security forces began large scale operations to arrest and detain anyone suspected of having links to the insurgency. In late October, General Anupong Paochinda, the newly appointed commander-in-chief of the Royal Thai Army, reorganized security forces operating in the South to ensure better coordination of security operations.

Legal mechanisms to counter the insurgency lagged behind security efforts. Government prosecutors struggled to develop cases that could stand up in court and relied chiefly on confessions in order to bring prosecutions. Police forensics and ballistics work often failed to produce evidence that led to arrests following separatist attacks. Because of the difficulties in bringing cases to court, security forces engaging in operations to arrest militants relied instead on their powers under martial law and the 2005 Emergency Decree to detain suspects without trial.

Prosecutors have had some success in bringing cases to court, however. On July 2, after an investigation into bombing incidents, security forces arrested seven suspected bomb makers at an Islamic boarding school. This case remained in the court system; the prosecution is based on the confession of the suspects. In November, police were able to arrest six suspects after a series of bombings in Yala province, based on forensic investigations.

Thai authorities believe the Barisan Revolusi Nasional Coordinate (BRN-C) is behind most of the violence in the south. The operational arm of this group is the Ruanda Kumpulan Kecil (RKK). Other militant groups active in southern Thailand include the Pattani United Liberation Organization (PULO), and the Pattani Islamic Mujahideen Movement (GMIP). Because of the transnational nature of the ethnic Malay-Muslim community in southern Thailand, all the separatist groups active in the South may have connections throughout maritime Southeast Asia. Some of these groups may share elements of ideology and general rejection of Western influence held by international Islamic terrorists, but by all indications they remained primarily focused on seeking autonomy for the far southern provinces and historical grievances against the Thai state.

Thailand's southern border with Malaysia remained an issue of concern because of the difficulty both Thailand and Malaysia have had in controlling it. In the past, former Prime Minister Thaksin alleged militants were traveling across the border to training camps in Kalantan, and interim Prime Minister Surayud claimed militants in southern Thailand funded their activities through business operations in Malaysia – an allegation that Malaysia strenuously denied.

Relations between Thailand and Malaysia improved after a series of meetings between Surayud and Malaysian Prime Minister Abdullah Badawi in January and February, in which the two leaders agreed to a series of measures to tighten security along the border. These measures included resolving issues of recognizing dual nationality, sharing information, and initiating joint patrols between Thai and Malaysian security forces.

Thai security forces cooperated with the United States and with other countries to deny safe haven to terrorists within their territory. In the past, Thailand has served as a transit point for regional terrorists, as evidenced by the 2003 capture in central Thailand of Nurjaman Riduan bin Isomuddin (a.k.a. Hambali), JI's operations chief and the architect behind the 2002 Bali bombings. Thai and USG officials were concerned that transnational terror groups could establish links with southern Thailand-based separatist groups. However, there were no indications that transnational terrorist groups were directly involved in the violence in the south, and there was no evidence of direct operational links between southern Thai separatist groups and regional terror networks.

There was no evidence that foreign governments provided financial, military, or diplomatic support for militant separatist operations in the South of Thailand. However, PULO reportedly operated openly in Syria, and a number of self-declared separatist leaders received asylum in Europe or were believed to be hiding in Malaysia.

Thai police and security officials participated in USG training programs, and the U.S. and Thai militaries conducted a number of joint exercises that supported counterterrorism. Thailand is a co-sponsor of the International Law Enforcement Academy (ILEA) in Bangkok. It continued to run training modules for Thai security officials and police that included post-blast and crime scene investigation courses.

Under the auspices of the Container Security Initiative (CSI) and the Megaports Initiative, Thailand participated in a range of port security programs, including programs to ensure that Thailand has proper controls on the export of munitions, dual use goods, and related technologies.

The Thai Anti-Money Laundering Office (AMLO) acted as the center for interdicting terrorist finance. On October 28, The Ministry of Finance issued new regulations governing cross border cash carrying, bringing the Thai government into line with the Financial Action Task Force Special Recommendation on Terrorist Financing. UN 1267 resolutions were quickly implemented by Thai banks under instructions from AMLO. Thailand engaged with the G8 Counterterrorism Action Group on increasing penalties for document fraud, an ongoing problem in Thailand.

Thailand participated actively in international counterterrorism efforts through Asia Pacific Economic Cooperation (APEC), the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum (ARF), and other fora, and in January became a signatory to the ASEAN Convention on Counterterrorism. Thailand has not endorsed the Proliferation Security Initiative (PSI).

## EUROPE OVERVIEW

"Since the attacks of July 7, 2005, communities in Britain and across the world have come together in a common front against terrorism and against the propaganda that fuels it. And this requires not just the security measures I have outlined but that we work with all communities and all countries through debate, discussion, dialogue, and education as we tackle at root the evils that risk driving people, particularly vulnerable young people, into the hands of violent extremists."

–Gordon Brown, Prime Minister of the United Kingdom,
July 5, 2007

European countries continued to improve their capabilities to counter the terrorist threat, foiled several significant terrorist plots, and continued to prosecute and jail terrorist suspects. European governments were increasingly concerned about radicalization among their populations and sought greater understanding of the process of "radicalization" and how to prevent it. Several governments increased outreach to Muslim communities living within their countries and made attempts to gain support from within those communities to counter the appeal of extremist ideology.

European nations continued to work in close partnership with the United States against a terrorist threat characterized by both external and, increasingly, internal components. The contributions of European countries in sharing intelligence, arresting members of terrorist cells, and interdicting terrorist financing and logistics were vital elements in the War on Terror.

At the June 2004 U.S.-EU Summit, the sides agreed on a Declaration on Combating Terrorism that renewed the transatlantic commitment to develop measures to maximize capacities to detect, investigate, and prosecute terrorists; prevent terrorist attacks; prevent access by terrorists to financial and other economic resources; enhance information sharing and cooperation among law enforcement agencies; and to improve the effectiveness of border information systems. These commitments were reaffirmed at the 2007 Summit, and work continued on implementation.

European nations were active participants in a variety of multilateral organizations that contribute to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF), the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). During its G8 Presidency, Germany placed a particular emphasis on supporting UN counterterrorism activities and topics such as terrorist use of the Internet, protecting critical energy infrastructure, and countering radicalization and recruitment to terrorism. The United States worked with its international partners through multilateral organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and help counter terrorism globally. OSCE members committed themselves to becoming parties to the 13

international terrorism conventions and protocols, to work together to modernize travel documents and shipping container security, to prevent and suppress the financing of terrorist organizations, and to implement UNSC Resolution 1540 to counter WMD (related materials and the means of delivery) proliferation. *(See Chapter 5, Terrorist Safe Havens (7120 Report) for further information on the G8, NATO, FATF, and OSCE, and on the tools we are using to address the conditions that terrorists exploit.)*

Terrorist activity and the presence of terrorist support networks in Europe remained a source of concern. Efforts to combat the threat in Europe were sometimes slowed by legal protections that made it difficult to take firm judicial action against suspected terrorists, asylum laws that afforded loopholes, the absence of adequate legislation, or standards of evidence that limited the use of classified information in holding terrorist suspects. Terrorists also sought to take advantage of the ease of travel among Schengen countries. At times, some European states have not been able to prosecute successfully or hold some of the suspected terrorists brought before their courts – a product, in part, of insufficient measures to use intelligence information in judicial proceedings. The EU as a whole remained reluctant to take steps to block the assets of charities associated with HAMAS and Hizballah.

Cooperation with and among European law enforcement agencies remained vital for counterterrorism successes. France and Spain continued to cooperate effectively against Basque Fatherland and Liberty (ETA). Germany led Europe in maintaining action against the militant Kurdish separatist group Kongra Gel/Kurdistan Workers' Party (KGK/PKK), which raised funds, often through illicit activity, to fund violence in Turkey, but coordination problems across borders in Europe blunted some successful arrests. Portuguese authorities worked with security services of several other European countries to arrest and extradite to Italy a person suspected of associating with and recruiting for an international terrorist organization. Eight other suspects were also arrested during similar operations across Europe. The Swiss Parliament ratified the U.S.-Swiss Operative Working Agreement, which entered into force in December.

No major terrorist attacks took place in Europe in 2007, but several plots were disrupted that could have resulted in a serious loss of life. In June, terrorists attempted attacks in London and, a day later, terrorists drove a burning car into Glasgow airport. A total of seven individuals, including the two suspected perpetrators in Glasgow, were arrested in connection with the attacks. In Germany, a major terrorist plot was disrupted in September with the arrests of two ethnic Germans and a Turkish citizen resident in Germany. The plotters, who German officials said were connected to the Islamic Jihad Group (IJG), had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb attacks. Also in September, Danish police in Copenhagen arrested eight alleged militant Islamists with al-Qa'ida (AQ) links on suspicion that they were preparing explosives for use in a terrorist attack. Earlier in the year, Revolutionary Struggle claimed responsibility for a rocket propelled grenade (RPG) attack against the U.S. Embassy in Athens; no one was hurt.

Judicial proceedings in countries across Europe resulted in the convictions of terrorist suspects. In Belgium, hearings began in the case of Bilal Soughir and five other men suspected of having recruited and trained terrorists for suicide attacks in Iraq. In Bosnia, three persons were convicted on terrorism charges in that country's first state-level terrorism trial, and in February, a Danish

court convicted four men charged with planning a terrorist attack—the country's first trial under 2002 counterterrorism legislation. Members of the Moroccan Islamic Combatant Group (GICM) were convicted in France for providing material support to a terrorist organization in connection with the 2003 terrorist bombings in Casablanca. In May, the Athens Court of Appeals in Greece issued consolidated sentences in the November 17 (N17) appeals trial. Of the 219 counts remaining, convictions were sustained on 218. The six members of the operational core of N17 received a total of 44 life sentences. In October, Spain's National Court returned guilty verdicts on 21 of 29 individuals suspected of involvement in the 2003 Madrid train bombings that killed 191 people and wounded hundreds of others, and handed down sentences ranging from three years to almost 43,000 years in prison (although the maximum time they can serve under Spanish law is 40 years).

## Albania

Albania pledged to increase its contribution of troops to both Afghanistan and Iraq, maintained frozen bank accounts related to money laundering and terrorism financing, and aggressively worked with the United States and other countries to combat terrorism. Albania made progress in identifying vulnerabilities at land and sea borders, but the government and police forces continued to face substantial challenges to enforce fully border security and combat organized crime and corruption.

In December, Hamzeh Abu Rayyan, the administrator for UNSCR 1267 Committee-designated terrorist financier Yassin Al-Kadi, was charged with hiding funds used to finance terror. This marked the first criminal terror finance-related case charged in Albania. A civil suit filed by al-Kadi to release his assets from seizure was originally dismissed for technical reasons but was refiled in July.

Although no new groups' assets were frozen this year under Albania's Terrorism Financing Freeze (TFF) law enacted in 2004, as of October, the Ministry of Finance claimed that it maintained asset freezes against six individuals and fourteen foundations and companies on the UNSCR 1267 list. Despite this progress, the effectiveness of the government's counterterrorist financing effort was undermined by a lack of data-processing infrastructure and an inadequate capability to track and manage cases properly.

## Armenia

Armenia's counterterrorism contribution included its continued commitment to overflight and landing rights of U.S. military aircraft, additional security support to U.S. facilities in Armenia during times of terrorist alert, and the renewed deployment of peacekeeping forces in Iraq. In addition, Armenia joined the Global Initiative to Combat Nuclear Terrorism, and expressed interest in joining the Convention for Suppression of Acts of Nuclear Terrorism.

In September, a delegation of inspectors from the UN Counterterrorism Committee Executive Directorate visited Armenia to ascertain its progress in complying with UNSCR 1372, and found that 12 of the 13 legal counterterrorism instruments had already been implemented or were soon

to be implemented. And in July, the Armenian government succeeded in adapting the EU export control list of "dual-use" commodities to its own national control list.

The Financial Monitoring Center (FMC), a U.S.-supported financial intelligence unit within the Central Bank of Armenia (CBA), continued to make investigative strides against money-laundering. During the first nine months of the year, the FMC received twenty-four suspicious transaction reports (STRs), compared to twenty-three STRs during the same period in 2006, and six STRs in 2005. Under its current mandate, the CBA can freeze temporarily financial assets while referring the STRs to the competent authorities for further investigation. However, it must rely on private financial institutions to self-monitor and lacked an integrated IT system to store information on financial entities or individuals of concern. At the end of the year, no cases involving terrorist financing were uncovered or prosecuted. The FMC received Egmont Group membership this year.

Armenia improved border security by maintaining an automated Border Management Information System (BMIS) that documented and stored the names of travelers at nearly all official points of entry, and contained criminal and terrorist watchlists as updated by the Republic of Armenia Police (RAP) and National Security Service (NSS). While Armenia has no bilateral agreement with the United States governing the sharing of information on travelers, the NSS and RAP shared information with the U.S. Embassy when they discovered fraudulent U.S. visas or other documents of interest to the United States

Armenia's warming relations with neighboring Iran continued, with Armenia hosting official visits by Iranian President Ahmadinejad (October) and Iranian Defense Minister Najjar (November). In addition to fostering closer diplomatic ties, these visits served to solidify previous bilateral commitments to develop joint energy and transportation projects. This closer cooperation has made Armenia more reluctant to criticize publicly objectionable Iranian conduct or join other UN member states in advocating for sanctions on the Iranian regime.

Although Armenia continued to strengthen its counterterrorism capabilities and enhanced its counterterrorism cooperation with the United States and other international security organizations, its geographic location, porous borders, and loose visa regime still provided ample opportunities for traffickers of illicit materials, persons, and finances. Furthermore, endemic governmental corruption, a significant organized crime presence, and a large shadow economy made the country potentially vulnerable to money laundering and terrorist financing schemes.

**Austria**

Austria experienced two concrete, Internet-based terror threats from second generation Muslim immigrants who were subsequently arrested. A national "integration platform" launched in the autumn sought to mobilize both the Austrian government and society to promote social and economic integration, prevent the isolation of ethnic and religious groups, and stop radicalization.

Austria made modest contributions to stability in Afghanistan and Iraq, with its contribution of three liaison officers at the International Security Assistance Force (ISAF) headquarters in Kabul, after having completed two larger in-and-out missions in Afghanistan since 2002.

However, Austria failed to coordinate fully law enforcement activities with other states against the militant Kurdish separatist group, Kongra Gel/Kurdistan Workers' Party (KGK/PKK), an EU- and U.S.-designated terrorist group. For example, in mid-year, Austria initially detained and quickly released KGK/PKK operative Riza Altun and allowed him to board a plane for northern Iraq, despite the fact that he had fake documents and faced charges in France and an extradition request from Turkey. In November, Austria failed to detain Remzi Kartal, a KGK/PKK leader known to be traveling to Austria who was wanted by INTERPOL.

Austria's legal framework to combat terrorism includes legislation making the planning of intended terrorist acts a criminal offense, but the 2005 terrorism law is untested. Austria also has policies in place to combat terrorism financing and money laundering.

## Azerbaijan

Over the past five years, the Government of Azerbaijan has aggressively apprehended and prosecuted members of suspected terrorist groups. It has closed organizations that were suspected of supporting terrorist groups and arrested at least 39 persons from three separate terrorist-associated groups, on terrorism-related charges.

Azerbaijan has granted blanket overflight clearance, engaged in information sharing and law-enforcement cooperation, and has approved numerous landings and refueling operations at its civilian airport in support of U.S. military operations in Afghanistan. Since August 2003, Azerbaijan has supported peacekeeping operations in Iraq with an infantry company of approximately 150 soldiers stationed at the Haditha Dam. A platoon of Azerbaijani soldiers has worked with the Turkish peacekeeping contingent in Afghanistan since November 2002.

While Azerbaijan has taken steps to combat terrorist financing and identify possible terrorist-related funding by distributing lists of suspected terrorist groups and individuals to local banks, comprehensive legislation to counter terrorist financing has not yet passed parliament. In December 2006, an inter-ministerial experts group responsible for drafting anti-money laundering and counterterrorist finance legislation through the President's office provided its most recent draft to the U.S. Department of Justice and the Council of Europe; the Department of Justice provided comments on the law and discussed it with Azerbaijani government officials. The government has not yet presented the draft law to parliament, nor has it taken steps to create a Financial Intelligence Unit. In anticipation of future adoption of this law, the USG has trained prosecutors, investigators, and judges on implementing anti-money laundering and anti-terrorist financing law enforcement techniques.

In February, Azerbaijani authorities arrested a group of 15 Azerbaijani citizens in Baku who called themselves the Northern Mahdi Army. The group was charged with having ties to Iran's Islamic Revolutionary Guards Corps (IRGC). In October, the group went before a closed trial on charges of cooperation with a foreign intelligence service, high treason, possession of illegal

weapons and robbery. According to the Azerbaijani Ministry of National Security (MNS), the group was organized to establish a state ruled by Sharia (Islamic) law. According to published reports, the MNS said that one of the group members had met an IRGC officer in Qom, Iran, and was offered money to fight against the United States, Israel, and other Western countries. According to published reports, the group received training in Iran and Azerbaijan.

During security sweeps in late October and early November, a group of twelve Azerbaijanis, reportedly led by an ethnic Arab named Abu Jafar, were arrested in Sumgayit, Azerbaijan on terrorism-related charges. A large quantity of arms and ammunition, a map of Sumgayit, and other equipment were confiscated from members of the group. Criminal cases are pending.

Separately, in November, 11 Azerbaijani citizens were arrested over a number of days in connection with a late October threat against the U.S. Embassy in Baku, which resulted in the embassy working at limited staffing for two days. The group consisted of Azerbaijani citizens led by a renegade radicalized Azerbaijani army officer, Kamran Asadov, who left his unit without permission, taking four assault rifles, a machine gun, 20 grenades, and a large amount of cartridges on October 24. The fugitives from the group robbed a Lukoil gas station in Baku on October 30. According to press reports, members of the groups told the MNS that they planned to attack the U.S. Embassy. All the weapons and known members of the group have been seized and criminal charges are pending.

**Belgium**

Belgium continued to strengthen its response to the threat of terrorism, fashioning new institutions in its security services, improving internal coordination among antiterrorism offices, promulgating new laws to deal with terrorism and money laundering more aggressively, and strengthening agencies that confront terrorist financing.

In 2006, under Belgium's 2003 antiterrorism law, members of the Revolutionary People's Liberation Party/Front (DHKP/C), a far left militant Turkish group, were convicted for membership in a terror organization and for providing material support to a terrorist group. The Belgian Court of Appeals upheld the DHKP/C convictions and imposed stiffer sentences in November 2006. In April 2007, Belgium's Supreme Court cited technical grounds in quashing the Court of Appeals ruling; at year's end the case was being retried in the Antwerp Appellate Court.

On October 15, hearings began in the case of Bilal Soughir and five other men suspected of recruiting and training terrorists for suicide attacks in Iraq, including Muriel Degauque, a Belgian national who, in 2005, blew herself up in a failed bomb attack in Iraq. Federal authorities planned ongoing reviews of court rulings to gauge what acts and groups could be prosecuted successfully under the 2003 legislation and what types of sentences could be imposed.

Recently-enacted legislation that loosened restrictions on police surveillance of alleged extremists and clarified procedures for authorizing searches, wiretaps, and use of informants also facilitated action against suspected terrorists. Belgian authorities continued to strengthen their

internal capabilities to combat terrorism and made its Coordinating Body for Threat Analysis (OCAM/CODA) more fully operational.[3] OCAM aims to facilitate the exchange of information among all governmental counterterrorism bodies and make a common threat analysis on the basis of such information exchanges. The new agency operated under the joint authority of the Justice and Interior Ministers and included representatives from the external and internal services, the Federal Police, Customs, and the Ministries of Transport, Finance, and Foreign Affairs.

Belgium also granted authorities the ability to create a national list of terrorist entities, separate from UN and EU lists, to be coordinated by OCAM, and to include financiers and suspected financiers of terrorism. This information will allow Belgian authorities to develop and apply a national capacity to freeze assets (in addition to UN- and EU-mandated asset freezes that Belgium already implements). In addition, Belgian cooperation on security programs such as the Container Security Initiative (CSI), Megaports, and export controls has been generally excellent.

Belgian emergency action plans have been reviewed and updated to prepare for and respond to potential attacks, including bioterrorism. On a local level, authorities have instituted drills of rapid alert systems, and reviewed critical infrastructure support and civil protection and medical assistance procedures. Federal and local authorities have participated in a EUCOM WMD Consequence Management exercise, furthering U.S.-Belgian cooperation in this area. Police and private sector working groups have been formed to target terrorists, the financing of terrorism, and terrorist use of the Internet.

Belgium made a significant military contribution to the International Security Assistance Force (ISAF) in Afghanistan, where it maintains a ground presence of about 400 troops, mainly at Kabul airport, with some personnel at the Provisional Reconstruction Team (PRT) in Konduz. Belgium contributed approximately $33 million euros toward Afghan reconstruction and promised to boost its support for reconstruction and development, totaling approximately 45 million euros, to be disbursed over the next four years. Assistance to Iraq included expanded participation in the Jordan International Police Training Center in Amman (which subsequently closed in September), training for Iraqi diplomats and magistrates in Belgium, and training for Iraqi servicemen in Abu Dhabi, in cooperation with Germany.

Belgian authorities remained concerned about potential terror activities involving groups from Algeria and North Africa, and have investigated groups such as the Moroccan Islamic Combatant Group (GICM), the DHKP/C, a far right group with links to neo-Nazi groups, and a cell suspected of training members for attacks in Iraq. The KGK/PKK is a known presence, with television production studios in Brussels. The KGK/PKK continued to exploit Belgium to raise illicit financing for violence in Turkey and its camps in northern Iraq.

Belgium continued to take action in response to EU and UN Security Council actions to freeze suspected terrorist assets and to study steps to improve its ability to combat and control terrorist financing. Based upon a mutual evaluation review by the Financial Action Task Force (FATF) in June 2005, Belgium was working to implement FATF's recommendations.

---

[3]By law, it became operational on December 1, 2006, but the start up was delayed while budget and personnel issues were worked out.

**Bosnia and Herzegovina**

Despite increased ethnic polarization and disputes among Bosnian political leaders that hindered the functioning of state government for most of the year, Bosnia and Herzegovina's law enforcement organizations cooperated with the United States on international counterterrorism issues. Bosnia remained a weak, decentralized state and ethnically-based political confrontations continued to undermine national government. As a result of weak interagency communication, competing security structures, and political interference in law enforcement, Bosnia is vulnerable to exploitation as a potential staging ground for terrorist operations in Europe. The dysfunctional Bosnian state government and efforts by Republika Srpska officials to undermine state-level institutions contributed to a slowdown, and in some cases, setbacks in efforts to improve operational capabilities to combat terrorism and terrorism finance.

The State Investigation and Protection Agency (SIPA) is the Bosnia agency with primary responsibility for counterterrorism operations. The position of SIPA Director was unfilled for most of the year and the agency's readiness and capabilities suffered as a result. In addition, the head of the Ministry of Security, parent organization to SIPA, politicized the Ministry's terrorism threat analysis and counterterrorism operations. Although Bosnian capabilities and potential for independent action were degraded over the year, Bosnian authorities were generally effective and responsive to U.S. counterterrorism cooperation requests.

The Citizenship Review Commission (CRC), formed to review the status of foreign mujahedin fighters and others who obtained Bosnian citizenship during and after the 1992-95 war, completed its review of approximately 1200 cases. The CRC withdrew citizenship from 612 individuals it deemed to have obtained Bosnian citizenship unlawfully.

On January 10, the Bosnian State Court handed down a fifteen and a half year prison sentence for Mirsad Bektasevic, a lead defendant in the country's first state-level terrorism trial.  Two co-defendants received thirteen and a half, and eight year sentences, respectively. The three defendants were arrested in October 2005, on terrorism charges, and two others were charged with illegal possession of explosives. Lead defendants Mirsad Bektasevic (a Swedish citizen) and Abdulkadir Cesur were linked to terrorist networks elsewhere in Europe. In June 2007, a State Court appellate panel upheld the convictions but substantially reduced the sentences.

The Bosnian organization Aktivna Islamska Omladina (Active Islamic Youth, or AIO) spread extremist and anti-American rhetoric through its weekly print and online publication *SAFF Magazine*. AIO was founded in Zenica in 1995 by individuals with ties to the so-called "El Mujahid Brigade," a wartime unit comprised mainly of foreign extremists. AIO conducts youth outreach in Bosnia and maintains a presence in Western Europe.

Bosnia and Herzegovina continued its deployments in support of MNF-I. In September, the sixth rotation of the Armed Forces' 36-member Explosive Ordnance Disposal Unit deployed to Iraq. The Armed Forces also undertook specialized training that would allow for further deployments to either Iraq or to support Operation Enduring Freedom.

**Bulgaria**

Bulgaria's Financial Intelligence Agency (FIA) remained vigilant against terrorist financing and cooperated with the United States on identifying and investigating terrorist assets. The FIA regularly distributed lists of individuals and organizations linked to terrorism to all banks in Bulgaria, the Ministry of Interior, Customs, and the Border Police. The FIA was active in efforts against all mandated UNSCR-designated terrorists and terrorist organizations, and cooperated on USG-designated individuals and organizations. The FIA advised the banking sector to use the Department of Treasury's Office of Foreign Assets Control (OFAC) website as a reliable information resource for individuals and organizations associated with terrorism. The FIA provided feedback, including information on the response level of Bulgaria's banks, to the U.S. Treasury Department's Financial Crimes Enforcement Network (FINCEN).

In 2006, the Bulgarian Parliament passed amendments that further strengthened the FIA's investigative powers, enabling it to obtain bank information without a court order or a Suspicious Transaction Report (STR). In late 2007, as part of legislation creating the new State Agency for National Security (DANS), the FIA was transferred from the Finance Ministry to DANS. The legislation lacked clarity on the independent and investigatory powers of the FIA, potentially complicating its Egmont compliance and undermining its ability to execute its mission and uphold its international commitments. Aware of the issue, Bulgarian officials were considering additional legislative and regulatory measures at year's end.

In December, the Bulgarian parliament adopted the State Agency for National Security Act, under which DANS will consist of four chief directorates:  Internal Security, Counterintelligence, Technical Operations, and Economic and Financial Security. It will split off the current National Security Service from the Interior Ministry, Military Counterintelligence from the Defense Ministry, and the Financial Intelligence Agency from the Finance Ministry. These services will be incorporated into DANS. The new agency will exercise control over the stay of foreigners in Bulgaria, which was previously handled by the National Security Service.

Bulgaria signed and ratified the Council of Europe's new Convention on the Prevention of Terrorism in 2006, which entered into force on June 1, 2007. Bulgaria's religious leaders, including leaders of the nation's Muslim community, spoke out strongly against terrorism.

The Bulgarian government continued its high level of cooperation with the United States in preventing acts of terrorism against U.S. citizens in Bulgaria and elsewhere. This included sharing information on potential terrorist threats and a heightened level of protection for USG facilities. Bulgaria's Defense Ministry, Interior Ministry, Nuclear Regulatory Agency, Ports Authorities, and Civil Protection Agency participated in a multinational field exercise and command post exercise led by the Department of Defense's Defense Threat Reduction Agency (DTRA) and the FBI on handling a terrorist attack scenario involving WMD.

Bulgaria has contributed approximately 150 troops to Operation Iraqi Freedom and 400 troops to the International Security Assistance Force (ISAF) in Afghanistan.

**Croatia**

The Croatian government increased its contribution to the International Security Assistance Force (ISAF) in Afghanistan from 150 to 200 soldiers who served in military police, medical support, force security, and liaison and training roles. In addition, Croatia maintained a small civilian and police team deployment to the German-led Provincial Reconstruction Team in Feyzabad. Croatia's long land and sea borders presented a monitoring and enforcement challenge and guided continued efforts to improve its border integrity and its export control regime.

## Cyprus

Cyprus took a clear stand against international terrorism and supported United States counterterrorism efforts. The Government of Cyprus continued to allow blanket overflight and landing rights to U.S. military aircraft supporting operations in Iraq and Afghanistan. Cyprus was responsive to international efforts to block and freeze terrorist assets, implemented the Financial Action Task Force's (FATF) recommendations, and conformed to EU counterterrorism directives.

Cyprus's legal framework for investigating and prosecuting terrorist-related activity remained relatively weak. The United States and the Republic of Cyprus cooperated closely on terrorist finance and money laundering issues. The Cypriot Anti-Money Laundering Authority (MOKAS) implemented new UNSCR 1267 Committee decisions immediately and informally tracked names listed under U.S. Executive Orders.

In the area administered by Turkish Cypriots, issues of status and recognition inevitably restricted the ability of authorities to cooperate on counterterrorism. Turkish Cypriots cannot sign treaties, UN conventions, or other international agreements, for example. Moreover, the Turkish Cypriot-administered area lacked the legal and institutional framework necessary to combat money laundering and terrorist financing effectively. Within these limitations, Turkish Cypriots cooperated in pursuing specific counterterrorism objectives. They shuttered the First Merchant Bank after receiving evidence of illicit financial activity there and conducted a successful criminal investigation into the bank's activities, bringing together law enforcement, financial crimes investigators, and "central bankers" to revoke First Merchant's operating license and seize its assets.

Kurdish-origin communities exist on both sides of the island. The KGK/PKK has a presence in Cyprus, although its activities generally were limited to fundraising and transit en route to third countries; authorities believed there was little risk the group would conduct operations there. Cyprus maintained that it was fulfilling all responsibilities with respect to the EU designation of the KGK/PKK as a terrorist organization.

A large volume of container traffic moves through ports in the government-controlled area, making Cyprus an attractive and convenient venue for terrorist organizations seeking transshipment points for weapons and other items of concern. While Cypriot agencies responsible for nonproliferation assess only a small risk of illicit materials moving through transit cargo, the United States continued to push for increased maritime cooperation. The

American Embassy organized and executed training programs to assist Cyprus to create a stronger export control regime and to pursue more proactive nonproliferation enforcement.

While the Turkish Cypriot community took some steps to prevent terrorist financing within its banking institutions, authorities lacked the legal and institutional framework to meet minimum international standards with regard to combating money laundering and terrorist finance. The "TRNC Central Bank" regularly asked financial institutions to search for assets linked to individuals or entities whom the United States and/or the UNSCR 1267 Committee has designated as terrorists. However, the north lacked modern audit control technology, relying instead on antiquated paper-based systems. Consequently, the Turkish Cypriot community's financial sector is vulnerable to abuse by criminals and terrorists. Authorities in the north are aware of the problem and "parliament" recently passed anti-money laundering legislation. Authorities are now looking to the international community for assistance with training and organizing a Financial Crimes Unit that would significantly improve their ability to combat illicit financial activity.

**Czech Republic**

Whether protecting the Prague headquarters of Radio Free Europe/Radio Liberty and other facilities, providing critical military assistance in Iraq and Afghanistan, or cooperating in criminal investigations, the Czech Republic remained a steadfast U.S. ally in the War on Terror.

The Czech Republic contributed significant numbers of troops to Coalition efforts in Iraq and Afghanistan. In Afghanistan, the Czech government is establishing a Provincial Reconstruction Team in Logar Province, and has decided to nearly double the size of its military force there, to over 400 soldiers. In Iraq, it maintained approximately 100 personnel, but will withdraw all but 20 by June 2008.

Pursuant to a U.S. request, Czech authorities extradited Oussama Kassir to the United States on September 25. Kassir, a Lebanese-born Swedish national, was alleged to have conspired to provide material support to terrorists through the planned operation of a terrorist training camp in Oregon. Kassir had requested political asylum, which the Czech government denied.

**Denmark**

Denmark completed implementation of two counterterrorism legislation packages that were passed by Parliament in 2006. These new measures criminalized the recruitment of persons to terrorism and the training of others to assist in committing terrorist acts, including financing terrorism. These new counterterrorism measures enhanced the Danish government's ability to investigate and prevent terrorism and other serious crimes. In March, Parliament passed additional legislation that prohibited private persons from purchasing fertilizer with ammonium nitrate levels of more than 28 percent, which could be used for improvised explosive devices. Denmark worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force (FATF), and in international nonproliferation groups, such as PSI and the Global Initiative to Combat Nuclear Terrorism. We note however, that Roj-TV, a KGK/PKK affiliated media outlet, continued to operate in Denmark.

During the year, Danish law enforcement authorities arrested a number of individuals suspected of involvement in terrorism. Prominent new actions and arrests included:

- On September 4, Danish police arrested eight alleged militant Islamists in Copenhagen with al-Qa'ida (AQ) links on suspicion that they were preparing explosives for use in a terror attack. Police raided 11 homes in the greater Copenhagen area during the sweep. Six of the men were released from custody, while two await trial and face possible life in prison, if convicted.

- On November 11, Danish police arrested a foreign-born resident in Copenhagen on charges of urging terror groups abroad to kidnap Danish nationals. The 22-year-old suspect had links to two men arrested on terrorism charges in Copenhagen on September 4 (see above). Danish officials stated that the man arrested in the Nørrebro district of Copenhagen had apparently hoped that by kidnapping Danish citizens abroad, pressure could be exerted on Danish authorities to release the two suspects. The man remained in police custody awaiting trial.

Key judicial proceedings involving Islamic terrorism related crimes included:

- In January, the State Prosecutor's office dropped charges against a group of Danish imams who traveled to the Middle East in 2005, due to lack of evidence that they broke any laws in their alleged efforts to convince Muslims to protest against the publication of the Mohammed cartoons. The decision to drop the charges cleared the group of any responsibility for attacks on Danish embassies in Syria and Lebanon at the start of 2006.

- In February, a Danish court convicted four men charged with planning a terrorist attack, which marked the country's first trial under 2002 counterterrorism legislation. The men, all Muslims born in Denmark, were arrested in 2005 in the Copenhagen suburb of Glostrup, on charges of attempting to conduct terrorist acts in cooperation with two men arrested in Bosnia. On February 15th, 2007, however, a panel of judges overturned the verdict for three of the suspects due to insufficient evidence. The guilty verdict for the fourth suspect, 17-year-old Abdul Basit Abu-Lifa, was upheld. Abu-Lifa was sentenced to seven years' imprisonment, which was upheld by a Danish Supreme Court decision in October. In July, the public prosecutor in Copenhagen decided to proceed with a re-trial for one of the three suspects whose conviction had been overruled by the judges.

- On March 28, Copenhagen City Court acquitted two leading members of the Danish branch of the Al-Aqsa Foundation of charges of supporting terrorism. The men were indicted in 2003 for funneling money collected in Denmark, ostensibly for humanitarian purposes, to terrorist-related groups abroad. Danish authorities seized approximately $89,406 in funds from the organization. The court ruled that the evidence against the group's president and treasurer was insufficient to establish a connection between the funds collected by Al-Aqsa in Denmark and HAMAS.

- On April 11, Copenhagen City Court convicted Said Mansour of inciting terrorism and sentenced him to three years and six months in prison. Mansour, a Danish citizen originally from Morocco, was arrested in September 2005 by Danish police for making and distributing DVDs and videos throughout Europe that showed beheadings and killings and called for a violent jihad against the Western world. The case marked the first conviction under 2002 counterterrorism legislation prohibiting the promotion of terrorism on Danish soil. Mansour previously served a 90-day sentence from December 2004 on weapons possession charges.

- On November 23, the Danish High Court convicted three men under national counterterrorism legislation for planning terrorist acts. Two foreign-born residents received 11-year prison sentences, while a Danish convert to Islam received a four-year sentence. A fourth defendant was acquitted after the presiding judge refused to consider a lesser charge. The men were among nine individuals arrested in September 2006, in Vollsmose, a suburb of Denmark's third-largest city, Odense, on suspicion of planning a terrorist attack. Prosecutors charged four of the nine with plotting acts of terrorism after finding laboratory equipment, chemicals, and explosives in their possession.

- On December 20, a Copenhagen municipal court acquitted seven people accused of supporting terrorism by transferring a portion of the proceeds of the sale of T-shirts to the Popular Front for the Liberation of Palestine (PFLP) and the Revolutionary Armed Forces of Colombia (FARC), both of which are EU- and U.S.-listed terrorist groups. Two of the three presiding judges in the case ruled that, while there was evidence to show that the FARC and the PFLP had carried out criminal actions, it was not possible to determine whether they were terrorist groups. The dissenting judge stated that the FARC did constitute a terrorist organization. The accused included five employees of "Fighters+Lovers", the clothing company that made the T-shirts, a man who owned the server that hosted its website, and a hot dog vendor who posted an advertisement for the shirts. Danish police shut down the company in February 2006, a month after it began selling T-shirts with PFLP and FARC logos, and confiscated all intended donations to the two groups. Prosecutors appealed the ruling in late December.

- Danish authorities concluded their terror-finance case against Patrick MacManus, the spokesman of the Danish NGO, "Oprør" (Revolt), and await a ruling by the Danish High Court. MacManus was indicted in October 2005 for violating Danish counterterrorism legislation by transferring approximately $17,000 to the FARC and the PFLP. In 2005, MacManus informed local media that the group's actions were a means to challenge Denmark's counterterrorism laws.

Denmark withdrew nearly all of its 450 troops from southern Iraq at the end of 2007. The Danish government increased its contribution to Afghanistan, raising its forces to more than 750 as part of the International Security Assistance Force (ISAF). Most of these are engaged in challenging Helmand Province in Southern Afghanistan.

**Estonia**

As a member of the International Security Assistance Force (ISAF) in Afghanistan, Estonia contributed 120 soldiers to the UK-led Provincial Reconstruction Team in Helmand Province. The Estonian contribution consisted of an infantry company, an explosive ordnance disposal team, the national support element, a cross-service team, a human intelligence team, a close protection team, and staff officers to various headquarters in Kabul and Kandahar. Estonia also sent 37 soldiers to participate in combat operations in Iraq.

On December 21, Estonia joined the EU Schengen Area for land and sea border controls, making it one of the easternmost border checkpoints of the EU. This means that EU and non-EU citizens alike who cross Estonia's borders will be entering common European space, and will not face further border controls when traveling to any other Schengen country. In December 2007, Estonia signed an arrangement for the exchange of terrorist screening information pursuant to Homeland Security Presidential Directive #6.

**Finland**

Finland continued its support of the War on Terror, as evidenced by the approximately 100 Finnish troops deployed in Afghanistan in support of ongoing NATO/ISAF operations. Government officials and the general population focused on economic, social, and development aid projects aimed at addressing the conditions that terrorists exploit. Finland maintained its annual contribution of approximately $15 million in development assistance to Afghanistan, and announced new law enforcement, humanitarian, and counternarcotics assistance initiatives.

Finnish and American officials shared counterterrorism information effectively, including a wide range of information on threat assessments, terrorist networks, and government responses to both. Following its EU Presidency in the second half of 2006, when it made counterterrorism and combating terrorist financing top priorities, the Finnish government continued to participate actively in ongoing EU efforts to remove institutional barriers to counterterrorism cooperation.

Finland pressed for EU cooperation with the U.S and the international community on counterterrorism issues. The Government of Finland maintained legislative and regulatory mechanisms to keep close watch over potential terrorist cells or financial support operations and to interdict their activities within the country. Finland effectively implemented new regulations requiring ships to submit security-related information prior to entry into port. In cases when another government presented a legal request for action or when an individual or organization was suspected of having committed an offense within Finland's borders, Finland implemented regulations that allowed it to freeze assets without prior UN or EU action.

Finland engaged in significant efforts to mitigate the social and economic factors that might lead members of the country's extremely small (less than 2 percent) population of foreign-born residents to adopt extremist ideologies. It carried out programs to help Muslim and other immigrants find jobs and integrate into Finnish society, and it encouraged religious and ethnic tolerance through a variety of legislation, government-funded social programs, and ombudsmen's offices.

**France**

France dismantled terror networks on its territory and successfully convicted or extradited a number of high profile terrorists and their supporters. French authorities detained people with connections to a number of different terrorist groups, including Islamic terrorists, Corsican nationalists, Basque Fatherland and Liberty (ETA) members, 17 members of the Liberation Tigers of Tamil Eelam (LTTE), and 16 Kurds with links to the Kongra-Gel/Kurdistan Worker's Party (KGK/PKK). The French government undertook several counterterrorism operations during the year against Islamic terrorism targets in coordination with other countries including the UK, Germany, Italy, Spain, Belgium, and Portugal. France's efforts to avoid homegrown radicalization and extremism increased in 2007, and included administrative and judicial action against people who incite violence or hatred, and social and economic initiatives to prevent the susceptibility of at-risk populations. Increasing Islamic radicalization in the prison system continued to worry French officials.

Several public announcements by al-Qa'ida (AQ) reiterated that France and French interests remain key targets of al-Qa'ida in the Islamic Maghreb (AQIM). In December, French police arrested a group of eight people in Paris suspected of providing material support to AQIM. In September, AQIM injured two Frenchmen in an attack in Algeria, and in December, it killed four French tourists in Mauritania. In February, AQ members were also suspected of killing four French nationals in Saudi Arabia.

In February, counterterrorism police detained 16 Kurds suspected of links to the KGK/PKK; all were charged with various crimes including extortion, money laundering, and terrorism financing; and were suspected of providing financial support to the KGK/PKK to fund terrorist attacks in Turkey. Riza Altun, who has been wanted in Turkey for many years on terrorism charges, was among those arrested. After being released on bail, he fled France for Austria and was allowed to depart Austria for northern Iraq. Altun is still wanted in France and is being prosecuted in absentia.

In April, authorities arrested 17 people suspected of extorting funds from the Tamil community in France, and illegally transferring the money to Sri Lanka for use by the Liberation Tigers of Tamil Eelam (LTTE). Unofficial reports noted that the LTTE raises as much as six million euros per year in France.

The French government increased its efforts to obtain the release of French-Colombian hostage Ingrid Betancourt (detained since 2002), and other hostages held by the Revolutionary Armed Forces of Colombia (FARC). Both President Sarkozy and Foreign Minister Kouchner engaged Colombian President Uribe and Venezuelan President Chavez to work towards Betancourt's release. In November, Colombian authorities seized FARC materials that provided proof of life of Betancourt for the first time since 2003.

France's most recent counterterrorism legislation was adopted January 23, 2006. Preliminary detention for terrorism suspects in France is six days. The state may thereafter place suspects in pre-trial detention for up to four years when the evidence is compelling or when the suspect presents an imminent threat. In conjunction with local government, the national government increased video surveillance in major cities. French law also allowed for freezing of assets, video

and telephone surveillance, monitoring of public transport records, and broad powers of official access to connection data held by Internet cafes and to various personal data records. The sentence for a convicted terrorist is up to 30 years for leading or organizing an attack, and from ten to twenty years for assisting a terrorist organization or operation. French nationality may be revoked, leading to eventual expulsion from French territory if the terrorist became a citizen through naturalization within the preceding 15 years.

France continued its active engagement with the UN Security Council (UNSC) Counterterrorism Committee (CTC), the G8's Counterterrorism Action Group (CTAG), the UNSCR 1267 Sanctions Committee (for the Taliban and AQ), and the European Council's Antiterrorism Strategy action plan. France is an original member of the Global Initiative to Combat Nuclear Terrorism and continued to participate actively. France remained a member and contributor to both the Proliferation and Container Security Initiatives.

In March, French Justice Minister Pascal Clement inaugurated an international justice network on terrorism. The network brought together justice officials from nine different countries[4] whose legal systems have centralized terrorism-related cases. The concept was to create a dialogue among nations' experts about how to use the judicial system to counter terrorism.

On the military front, France contributed three additional Operational Mentoring and Liaison Teams (OMLTs) to Afghanistan and transferred six Mirage fighter jets to Kandahar. France continued its participation in Coalition Task Force (CTF) 150, a multinational naval force that patrolled the Red Sea and Gulf of Yemen to interdict the movement of suspected terrorists between Afghanistan, the Arabian Peninsula and the Horn of Africa. It has twice commanded the Task Force. France maintained its overall contributions to both the International Security Assistance Force (ISAF) in Afghanistan and Operational Iraqi Freedom (OIF), with approximately 1,200 and 750 troops, respectively.

Following the assassinations of two Spanish police in southern France in December, French and Spanish officials announced the creation of permanent joint police units to combat Basque Fatherland and Liberty (ETA). The assassinations marked the first killings by ETA in France since 1976. A number of arrests of Basque Fatherland and Liberty (ETA) suspects were made throughout the year, several of whom were extradited to Spain. Police also arrested 13 people with ties to ETA in September in connection with the June 2006 attack against the Hotel Ostape in the French Basque region.

France continued to develop competencies and capabilities of TRACFIN, the Ministry of Finance's terrorism financing coordination and investigation unit. Within the European Union, France played an active role in the Clearinghouse, the EU process for designation of terrorist organizations. France did not designate HAMAS-affiliated charities, such as the French based Comite de Bienfaisance et Secours aux Palestiniens (Committee for the Well-Being and Assistance to Palestinians), arguing that this institution had no proven links to terrorism. France also opposed EU designation of Lebanese Hizballah as a terrorist organization, although it

---

[4] The nine member countries are: France, U.S., UK, Netherlands, Germany, Indonesia, Morocco, Belgium, and Spain.

supported Hizballah's eventual disarmament, maintaining that disarmament would result in Hizballah's gradual integration into Lebanese politics.

Attacks on the French island of Corsica decreased in 2007, totaling 180. The government had a widespread police presence in the region and arrested dozens of people throughout the year in connection with various attacks. No deaths were reported and only a handful of minor injuries resulted from the attacks. The December conviction of Corsican extremist Yvan Colonna (convicted of the 1998 assassination of the highest ranking national government representative in Corsica), however fueled a rise in attacks at the end of 2007.

Key judicial proceedings involving Islamic terrorism related crimes included:

- The French government continued its policy of expelling non-French citizens engaged in terrorist activities or speech that promoted hate or incited violence. Among those ordered expelled from France were as many as 18 foreign imams who preached values determined to incite hate or violence.

- In April, France expelled Rachid Benmessahel to Algeria, and permanently banned him from entering France. Benmessahel was a French citizen who was sentenced in March 2005 on terrorism-related charges. His nationality was revoked in accordance with French law.

- In May police arrested Kamel Bouchentouf, a French citizen collaborating via the Internet with AQIM. Bouchentouf confessed to planning attacks against multiple targets including the American Embassy in Luxembourg.

- On December 19, five of six French former Guantanamo detainees expelled to France in 2004 and 2005 were convicted on terrorism related charges and sentenced to several years in prison. The judge ordered the majority of their sentences suspended, however, reducing jail time to time already served based on their incarceration in France upon return from Guantanamo. One detainee, Achhab Kanouni, was acquitted of all charges.

- On June 19, Djamel Beghal, convicted in 2003 for planning a terrorist attack against the U.S. Embassy in Paris, was ordered by an Expulsion Commission to be expelled from France upon the completion of his prison term. Beghal was sentenced to ten years prison in 2003, but is eligible for "parole" as early as mid-2008. Beghal had his French nationality revoked by French courts in 2005. He is an Algerian national and, under the current order, would be sent back to Algeria once released.

- On June 20, eight members of the Moroccan Islamic Combatant Group (GICM) were convicted in France for providing material support to a terrorist organization in connection with the May 16, 2003 terrorist bombings in Casablanca. Mustapha Baouchi, sentenced to ten years, was considered the leader of the French cell and the key link to the group.

- In March, French citizen Willie Brigitte was sentenced to nine years in prison for planning a 2003 terrorist attack against a nuclear plant in Australia and for ties to Islamic radicals. Brigitte was held in pre-trial detention in Paris since his expulsion from Australia in 2003.

**Georgia**

The Georgian government improved border security operations and worked to eliminate corruption at border checkpoints, focusing its efforts on stopping the smuggling of contraband, including money, illegal drugs, and all types of weapons (chemical, nuclear and biological) that could support terrorism. There were significant improvements in infrastructure at the major border crossing checkpoints: new facilities were opened at Sadakhlo, an important land border crossing between Georgia and Armenia, which greatly enhanced controls at that port of entry. The Georgian Coast Guard installed a new coastal radar station at Chakvi, improving that facility's ability to guard Georgia's coastline. The U.S.-funded Georgia Border Security and Law Enforcement program facilitated an expansion of Georgia's Passport Identification Registration System to a total of 15 land border, railroad, and airport ports of entry. The land border between Russia and Georgia proper remained closed throughout the year. Border crossings into Russia from the separatist regions of Abkhazia and South Ossetia operated, but were not under the control of the Government of Georgia. This situation allowed for the unrestricted and unidentified flow of people, goods, and other items from Russia into these regions.

Georgia contributed over 2,000 troops to counterterrorism efforts in Iraq and became a contributing nation to the International Security Assistance Force (ISAF) in Afghanistan.

In January, the Georgian government sentenced a Russian citizen from North Ossetia to eight years in prison for a 2006 attempt to sell 100 grams of weapons-grade highly enriched uranium to Georgian undercover agents. In June, radiation sensors at the Red Bridge border crossing detected a load of contaminated metal originating in Azerbaijan, indicating those sensors were operational.

In the Pankisi Gorge in northeastern Georgia, the U.S.-funded Georgia Train and Equip Program (2002-2004) assisted Georgia in regaining control of the area by raising the combat effectiveness of the Georgian armed forces. According to the latest official reports, there were 1300 Chechen refugees in the Pankisi Gorge, down from 7000 in 1999. Anatoly Zabrodin, head of the Border Protection Department of the Russian Federal Security Service, noted publicly that there were no attempts by militants to infiltrate Russia from Georgia in 2007.

**Germany**

Germany participated in counterterrorism military operations overseas, provided leadership in multilateral settings, and fought terrorism within its borders. Although no terrorist attacks took place in Germany, a major terrorist plot was disrupted on September 4. The three individuals arrested in the plot included two ethnic Germans and a Turkish citizen resident in Germany. The group had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb

attacks. German officials said that the suspects were connected to the designated Foreign Terrorist Organization, the Islamic Jihad Group (IJG).

Concerned about the threat from radicalization, the government reached out to at-risk communities, in particular youth, through programs designed to foster integration, including German language classes, after school sports, etc. The government also made efforts to work with Muslim organizations to encourage and motivate opinion leaders within the Muslim community to counter extremist messages. The Ministry of Interior continued the Islam Conference that it began in 2006. The conference is made up of several working groups that meet on a regular basis, one of which discussed issues related to radicalization.

Germany was the third largest troop contributor to the International Security Assistance Force (ISAF) in Afghanistan, with more than 3,000 troops deployed. Germany led the ISAF Provincial Reconstruction Teams (PRT) in Kunduz and Feyzabad, provided a forward support base in Mazar-e-Sharif, and commanded ISAF's northern region, which encompassed nine provinces and five PRTs. Germany was the top European contributor to the EU police training mission in Afghanistan, EUPOL; and made available 100 Special Forces to operate in Afghanistan under Operation Enduring Freedom (OEF). The German Navy participated in OEF off the Horn of Africa and Operation Active Endeavour in the Mediterranean Sea. Germany's contribution to these naval operations included fast patrol boats that sought to prevent the movement of terrorists and weapons of mass destruction.

Germany was especially active in multilateral fora to promote counterterrorism cooperation; Germany held the EU Presidency during the first half of the year and the G8 Presidency for all of 2007. In January, German Federal Interior Minister Wolfgang Schaeuble pushed for EU-wide adoption of the main provisions of the Pruem Treaty, an agreement signed in 2005 by seven European states that provides for greater cross-border law enforcement and judicial cooperation. Germany also used its EU Presidency to establish the "Check the Web" initiative that allows EU member states to submit and retrieve information from a central Europol-managed facility on Internet sites used by terrorist and extremist groups for radicalization, recruitment, and training purposes. As EU President, Germany took the initiative to hold EU troika meetings with Pakistan and Indonesia to expand EU counterterrorism cooperation with these two nations.

During its G8 Presidency, Germany placed a particular emphasis on supporting UN counterterrorism activities and topics such as terrorist use of the Internet, protecting critical energy infrastructure, and countering radicalization and recruitment to terrorism. These priorities were reflected in the G8 Heiligendamm Summit Statement on Counterterrorism and the Report on the G8 Support to the UN Counterterrorism Efforts. Germany's chairmanship of the G8 Roma-Lyon Anti-Crime and Counterterrorism Subgroup saw a record number of project proposals being addressed and new initiatives being agreed upon to tackle issues such as bulk cash smuggling used to finance terrorism.

In September, Germany's Foreign Office co-organized an international seminar in Berlin with key negotiating parties to discuss outstanding issues related to the UN Comprehensive Convention on International Terrorism and ways that the negotiations might be advanced. The Germans remained steadfast advocates of the UNSCR 1267 sanctions regime and played an

active role in suggesting the development of mechanisms to ensure due process in the regime. The United States works actively and cooperatively with the Germans on UN Security Council 1267 Committee listing and de-listing issues.

The German government implemented legislation and established new facilities to strengthen its ability to fight terrorism. On January 11, an extension of the 2002 Terrorism Prevention Law came into effect which extended for another five years the counterterrorism provisions contained in the 2002 law. The legislation also better defined the role of intelligence services in counterterrorism activities and broadened and simplified the ability of German security agencies to obtain travel, financial, and telephone data. In January, a Joint Internet Center was established in Berlin to monitor Islamic terrorist and extremist websites that are used for radicalization, recruitment, and training purposes. The center was staffed by representatives from domestic and foreign intelligence offices, law enforcement agencies, and the office of the public prosecutor. On March 30, a unified terrorism database was established and came into operation which combines information on members and supporters of terrorist and violence-prone groups from nearly 40 federal and state law enforcement and intelligence agencies.

During the year, German law enforcement authorities arrested a number of individuals suspected of involvement in terrorism. Prominent new actions and arrests included:

- The September 4 arrests of three individuals suspected of planning large-scale terrorist attacks. The suspects are alleged to have attended terrorism training camps in Pakistan.

- The August 14 arrest of German-Turkish citizen Tolga Duerbin who was deported from Pakistan to Germany by Pakistani security forces following his arrest there. Duerbin is alleged to have attended a terrorist training camp in Pakistan. After nearly four months incarceration, Duerbin was released on December 10 following a plea agreement.

German courts began trials or reached verdicts in some notable counterterrorism cases:

- In December, the trial of Youssef Mohammad El-Hajdib began at the Dusseldorf Higher Regional Court. Lebanese national El-Hajdib is charged with attempted murder and attempting to cause an explosion by placing bombs hidden in suitcases on commuter trains in Cologne in July 2006.

- On December 5, the Dusseldorf Higher Regional Court convicted Syrian national Ibrahim Mohamed Khalil and two Palestinian defendants (brothers Yasser Abu Shaweesh and Ismail Abu Shaweesh) of membership in and/or support of AQ, insurance fraud, and attempted procurement of enriched uranium for a "dirty bomb." The defendants received prison sentences of seven, six, and three and one half years, respectively.

- In September, the trial of Ibrahim Rashid started at the Celle Higher Regional Court. This was Germany's first trial in which the defendant's actions were carried out solely on the Internet. Rashid was charged with 28 counts of having promoted membership in, and support of, al-Qa'ida.

- The Bavarian Supreme Court sentenced two individuals to prison for supporting a foreign terrorist organization (Ansar al-Islam) and violating Germany's foreign trade law (for transferring money to Ansar al-Islam members in Iraq). Dieman Abdulkadir Izzat was sentenced on June 25 to three years and three months in prison and Farhad Kanabi Ahmad was sentenced on July 9 to five years and six months in prison. Izzat was also found guilty of fraud for having illegally obtained payments from the Nuremberg welfare office.

- In July, the trial of suspected AQ supporter Redouane El-Habhab began. El-Habhab, a dual German-Moroccan national, is accused of supporting al-Qa'ida, violating the German Foreign Trade Law, and assisting in the founding of a terrorist organization abroad.

- On January 8, the Hamburg Regional Court convicted Mounir el-Motassadeq of membership in a terrorist organization and of 246 counts of accessory to murder in connection with the September 11, 2001 terrorist attacks. The court sentenced Motassadeq to a 15-year prison sentence, which is the maximum sentence that can be imposed under the German Penal Code for this crime. Motassadeq's lawyers appealed the sentence, but on May 11, the German Federal High Court in Karlsruhe rejected the appeal.

- The trial of three Iraqi alleged members of Ansar al-Islam, Ata Abdoulaziz Rashid, Rafik Mohamad Yousef, and Mazen al-Hussein, continued. German prosecutors have charged the three, who have been in detention since December 2004, with a plot to assassinate former Iraqi Prime Minister Allawi during his visit to Berlin. Prosecutors also charged them with financial crimes and membership in, financing, and recruiting for a foreign terrorist organization. The trial started in 2006.

German–U.S. bilateral counterterrorism cooperation is strong. Germany participated in several USG programs to combat terrorism, including the Customs and Border Protection's Container Security Initiative in the ports of Hamburg and Bremerhaven. The Transportation Security Administration's presence in Frankfurt, together with U.S. and German air marshals, formed key parts of bilateral efforts to provide air transport security for the seven German airports with flights to the United States.

**Greece**

With improved counterterrorism infrastructure in place following the 2004 summer Olympic Games in Athens, Greece continued to fight international and domestic terrorism. There was concern that Greece, because of its long coast line and proximity to the Middle East, could be used as a transit route for terrorists traveling to Europe and the United States. Greek authorities cooperated with U.S. officials to address the problem. Cooperative efforts included information sharing, training of Greek security and customs officials, training of judicial personnel, and improving border and cargo-container security through such programs as the Container Security Initiative (CSI). Greece was also an active participant in the Proliferation Security Initiative (PSI). A bilateral PSI ship boarding agreement was under consideration at year's end. Greece

sustained its participation in the International Security Assistance Force (ISAF) in Afghanistan by providing engineers and ISAF Headquarters personnel totaling about 130 troops. Greek forces were limited to operating in the Kabul region. Greece has also offered to provide an embedded Operational Mentoring and Liaison Team to train the Afghan Army.

From the mid-1970s until earlier this decade, the domestic Marxist terrorist group November 17 (N17) targeted Greek officials, as well as officials from NATO countries residing in Greece. During that period, five employees of the U.S. Embassy were murdered by N17, which was responsible for 23 killings altogether. Many of the N17 terrorists were apprehended by Greek authorities in 2002 and tried for their crimes. In 2003, Greek courts handed down multiple life sentences to key N17 members. A group appeals trial for the N17 convicts and two previously acquitted individuals opened in December 2005. The appeals trial essentially represented a new trial for the convicts, since the Greek judicial system allows new facts and evidence to be introduced in the appeals phase. The appeals trial lasted far longer than the original trial, in part due to the defense team's tactics and the court's decisions allowing defendants great leeway to make statements and interrupt witnesses.

On May 14, the Athens Court of Appeals issued consolidated sentences in the N17 appeals trial. There were 226 counts of major felonies (murder, attempted murder, attacks with explosives) in the original trial, resulting in convictions on 224 counts. The appeal proceedings involved de novo review of 225 counts (the public prosecutor appealed one acquittal on behalf of the United States). During the appeal proceedings, six counts became time-barred under Greek law. Of the 219 counts remaining, convictions were sustained on 218. The six members of the operational core of N17 received a total of 44 life sentences. Seven members received various prison terms. Six of those originally charged were either acquitted or prosecutions were time-barred under Greek law.

During the original N17 trial, a new domestic terrorism group calling itself Revolutionary Struggle (RS) emerged. RS is a radical leftist group, which aligned itself with the ideology of N17 and may have incorporated some previous members of N17. RS was believed responsible for nine violent terrorist attacks since 2003, including the 2004 murder of a Greek guard outside the British Defense Attaché's residence. In 2006, RS claimed responsibility for triggering a remote-controlled explosive device placed along the vehicle route of the Greek Minister of Culture (formerly the Greek Minister of Public Order). The Minister was not injured in the attack. RS claimed responsibility for the rocket propelled grenade attack against the U.S. Embassy on January 12, 2007. The attack took place before normal working hours and no Embassy personnel were injured. The Hellenic National Police and the Embassy continued to work together on the investigation. No arrests were made.

Throughout the year, self-styled "anarchists" attacked banks, police stations, and other "imperialist-capitalist targets" with tools such as firebombs and Molotov cocktails. Since these attacks usually occurred at night, few persons were seriously injured and there were no deaths. Several U.S. businesses were targeted. Police officials pursued a more proactive approach to deterring these violent attacks and arrested perpetrators. No damage to the Embassy or injuries to personnel were noted in the last several years.

## Hungary

Hungary made a long-term commitment to continue its leadership of a Provincial Reconstruction Team in Afghanistan and proceeded with plans to increase its deployments there to more than 200. The Hungarian government continued to implement fully domestic legislation to ensure compliance with EU norms regarding financial transactions and money laundering. Cooperation on border security issues remained excellent in both the bilateral and regional context. Hungary assumed responsibility for its part of the EU's Schengen border in December. Its preparations for this responsibility, including the merger of the Border Guards into the National Police, should further enhance its ability to monitor the border for individuals and items of concern.

## Iceland

The Government of Iceland worked to strengthen domestic border security and counterterrorism capabilities and increased links with neighboring states and in international bodies. The government signed bilateral security agreements in April with Norway and Denmark pledging to increase regional counterterrorism cooperation. The Icelandic Coast Guard (ICG) continued its capacity-building efforts with contracts for the purchase of new air and sea assets and was a founding member of the North Atlantic Coast Guard Forum in October.

In August and September, Iceland hosted two NATO exercises, each involving a counterterrorism component: NORTHERN VIKING 2007 featured separate air defense and ground-based counterterrorism elements; NORTHERN CHALLENGE 2007 was an ICG-hosted event focusing on Explosive Ordnance Disposal and counterterrorism scenarios.

The United States and Iceland held the first post-Naval Air Station Keflavik (NASKEF) round of high level security dialogue talks in June. Iceland-U.S. counterterrorism cooperation increased through the establishment of a formal linkage between the ICG and the U.S. Coast Guard (USCG) First District in Boston. In April, Iceland hosted a USCG International Ship and Port Security (ISPS) Program assessment visit.

The Icelandic government supported multilateral counterterrorism efforts. In May, Iceland joined the Global Initiative to Combat Nuclear Terrorism. Support for the NATO mission in Afghanistan remained strong. While Iceland withdrew its Mobile Liaison and Observation Team from a NATO Provincial Reconstruction Team in May, it continued its deployment at Kabul International Airport and supported NATO/ISAF operations through funding for airlift and other means.

In July, the FATF released an assessment of Iceland's anti-money laundering and terrorist financing regime.

## Ireland

Strong counterterrorism measures implemented in previous years were sustained and relations between USG and Irish law enforcement officials continued to be positive. The Irish government permitted the transit of U.S. military personnel and materiel though Irish airspace and airports for

deployment to theaters in Iraq, the broader Middle East, and elsewhere. Ireland has continued a modest troop commitment to the International Security Assistance Force (ISAF) in Afghanistan.

In July, the European Commission criticized Ireland for failing to implement properly the European Arrest Warrant, which enables EU states to ask other member states to arrest and surrender criminal suspects and is a useful instrument for fighting terrorism. The European Commission alleged that Ireland often takes more than the specified 90 days to execute the warrants.

## Italy

Italy aggressively investigated and prosecuted terrorism suspects, dismantled terrorist-related cells within its borders and maintained high-level professional cooperation with its international partners. In December 2007, Italy and the United States signed an Aide Memoire for the exchange of terrorist screening information. Italy's law enforcement and judicial authorities continued counterterrorism efforts with several noteworthy cases during the reporting period. In June, authorities issued arrest warrants in Milan for nine Tunisian nationals, including Ben Khemais Essid Sami, for recruiting militants for training in Afghanistan and providing logistical and financial support for a Milan-based Salafist terror cell from 1997 to 2001. In July, police arrested three Moroccan nationals in Perugia on terrorism charges, the culmination of a two-year investigation. The individuals, who included the Imam of the local mosque, were in possession of terrorist training items and chemicals used in explosives making.

In October, police arrested Iraqi national Saber Fadhil Hussein on charges of leading a cell that sought to procure ultra light aircraft and anti-tank rockets from Italian and other sources for use in attacks against coalition forces in Iraq. Also in October, a Milan court resentenced Mohammed Daki, a Moroccan immigrant accused in 2003 of recruiting suicide bombers for Iraq, to four years imprisonment in absentia.[5] Maher Bouyahia and Ali Ben Saffi Toumi, both Tunisian, were sentenced in the same ruling to six years imprisonment, overturning a January 2005 decision by a Milan judge that acquitted Daki and the others on the grounds that they were "guerilla fighters" and not terrorists.

In October, a Spanish court acquitted Rabei Osman Sayed Ahmed, an Egyptian national currently serving an eight-year prison term in Milan, of involvement in the Madrid train bombings. This verdict did not affect his sentence in Italy, where he was found guilty in 2006 of subversive association with international terrorism for having recruited suicide bombers in Italy for Iraq. In November, as part of an international sweep involving British, French, and Portuguese authorities, police arrested 11 suspects (primarily Tunisians and Algerians) across Northern Italy and charged them with having been members of a Milan-based cell that recruited and sent suicide bombers to Iraq and Afghanistan. In December, a Milan court convicted Egyptian-born Imam Abu Imad and ten others of promoting jihad and recruiting potential suicide bombers. The members of the group received sentences ranging from two to ten years.

---

[5] He had been expelled to Morocco in 2005 under the so-called Pisanu decree allowing the Interior Ministry to expel terror suspects.

Domestic anarchist-inspired and extreme-left terrorist groups presented a continued (albeit small-scale) threat despite Italian authorities' continued efforts to dismantle their organizations. In February, in a string of simultaneous raids across northern Italy, police arrested 15 people suspected of membership in the operational wing of the Red Brigades. Police found arms caches during searches and determined that the cells were planning attacks on leading political figures, including former Prime Minister Berlusconi.

Italian authorities have stated publicly that many radical Islamist groups in Italy were inspired by or connected to al-Qa'ida in the Islamic Maghreb (AQIM) and other terrorist groups, and used Italy as a logistical and financial base. KGK/PKK affiliated organizations maintained a presence in Italy and were thought to have links with affiliated charitable organizations that maintained Italian branches. Italy worked closely with the United States on money laundering matters and information sharing.

Italy aggressively identified and blocked financial resources destined for suspected terrorist individuals and groups. Italy was one of the most active countries in the world with regard to the number of individuals and organizations submitted for designation to the UNSCR 1267 Sanctions Committee against al-Qa'ida (AQ) and the Taliban (73 individuals and 15 organizations). Since 2001, Italian authorities have frozen Euro 500,000 (ca. 720,000 USD) in assets belonging to individuals or entities in Italy suspected of financing terror activities. Italy worked closely with the United States on money laundering matters and information sharing. As an active member of the Financial Action Task Force (FATF) and the Egmont Group, Italy cooperated actively with other foreign governments.

As a non-permanent member of the UN Security Council, Italy played an active role in the UNSC Counterterrorism Committee and in UNSCR 1267 Committee deliberations and was a strong proponent of multilateral cooperation in countering terrorism. Italy was also a leading financial contributor to the UN Office on Drugs and Crime (UNODC) Counterterrorism Prevention Branch.

Italy was an important partner in the Proliferation Security Initiative (PSI) and the Container Security Initiative (CSI), and was an initial partner nation of the Global Initiative to Combat Nuclear Terrorism. On December 4, The United States and Italy concluded initial negotiations on an HSPD-6 data sharing agreement and signed an Aide Memoire on data sharing.

Italy was a vital participant in NATO's Active Endeavour naval mission against terrorism in the Mediterranean, and contributed to the International Security Assistance Force (ISAF) in Afghanistan, where it held Regional Command-West and rotating command of the Kabul Region, and in Iraq, where it played a lead role in the NATO Training Mission. Italy contributed training personnel to various regional counterterrorism training centers such as the South East Asia Regional Centre on Counterterrorism (SEARCCT) in Malaysia, the Joint Centre on Law Enforcement Cooperation (JCLEC) in Indonesia, and the African Union's Anti-Terrorism Centre in Algeria.

**Kosovo**

The United Nations Mission in Kosovo (UNMIK) continued to monitor suspected terrorist activity with the Provisional Institutions of Self-Government (PISG). Officials believed that a few of the more than 400 NGOs operating in Kosovo were involved in suspicious activities, and sought to prevent extremists from using NGOs to gain a foothold in Kosovo. Consequently, municipalities authorized NGO use of public facilities for religious gatherings only if the relevant religious community consented.

The Kosovo Police Service (KPS) and UNMIK Police Counterterrorism Units (CTUs) were primarily responsible for Kosovo's counterterrorism efforts, but were small and lacked resources. They received information and analysis support from the UNMIK Central Intelligence Unit (CIU) and the UNMIK Police Intelligence Liaison Unit (ILU), but also relied on the KPS CTU's intelligence, surveillance, and investigations units. The KPS established its CTU in October 2006 and incorporated it into UNMIK Police's CTU in January 2007. Consequently, it focused on building up its unit, training and equipping its officers, and collecting information on potential terrorist threats. UNMIK Police CTU monitored, mentored, and advised their KPS CTU counterparts, and exercised executive authority over them.

Porous boundary lines that were easily crossed by individuals trafficking in people, weapons, and narcotics hampered Kosovo's counterterrorism efforts. The Kosovo border police service lacked basic equipment, and only had a mandate to patrol the green border (areas that lack official, manned border, or administrative boundary line gates) from two to three kilometers beyond the actual border and boundary lines. NATO-KFOR roving teams patrolled the green border right up to the actual border and administrative boundary lines, but numerous passable roads and trails that lead to Kosovo lack border or boundary gates. Moreover, poorly paid border and customs officials were susceptible to corruption.

Witness intimidation was also an obstacle to combating terrorism in Kosovo. UNMIK's Department of Justice reported that it created a Witness Protection Task Force to address this issue. The Task Force reportedly worked on constructing a new safe house in Kosovo, encouraged the use of video conferencing equipment now in place in Kosovo's district courts, and increased efforts to secure relocation agreements with other jurisdictions.

According to the UNMIK Department of Justice (DOJ), there were three terrorism-related convictions, and seven terrorism cases underway with local judges and prosecutors. International prosecutors and the Kosovo Special Prosecutor's Office (KSPO) also initiated four terrorism-related investigations and filed two indictments, which were pending confirmation at year's end. One of the indictments was related to Albanian National Army (AKSH) activity, and one of the investigations involved the Front for Albanian National Unification (FBKSH), the AKSH's political wing.

The AKSH, which UNMIK designated as a terrorist organization in 2003, continued to intimidate Kosovo citizens. In June, its Tirana-based spokesman, Gafurr Adili, told Kosovo media that AKSH members in several Kosovo towns had distributed leaflets threatening violence if the Serbian paramilitary group Tsar Lazar Guard ventured into Kosovo for the annual June 28th commemoration of the 1389 Battle of Kosovo. Kosovo Liberation Army (KLA) war veteran leader Abdyl Mushkolaj also made similar threats, adding to concerns over the commemoration.

As a result, the Special Representative of the UN Secretary General (SRSG) issued an executive decision prohibiting the Tsar Lazar Guard or any paramilitary group from carrying out activities in Kosovo. The commemoration passed without incident.

In an October interview on Radio Television Kosovo (RTK), heavily armed, masked individuals in black uniforms bearing the AKSH insignia appeared from an undisclosed location described as an AKSH training facility near the administrative boundary line with Serbia. One of them told viewers the "boys of former wars" wanted to show they were ready to counter the threat of Serbian paramilitaries. Adili later claimed that the people RTK featured were AKSH and that they were "filling a void" created by KFOR's alleged abandonment of several villages near Serbia proper in the municipalities of Podujevo and Kamenica. AKSH had long claimed to operate only in areas outside of KFOR or Kosovo Protection Corps control, and was reportedly also active in southern Serbia and western Macedonia.

**Latvia**

Latvia's Financial Intelligence Unit continued to maintain a terrorist financing database that it shared with local banks. Since the May 2005 U.S. Treasury designation of two Latvian banks as institutions of "primary money laundering concern" under Section 311 of the Patriot Act, Latvian government and regulatory agencies have worked very closely with the United States to enhance their legislative and regulatory framework. There have been no further sanctions on Latvian banks. In 2006, Treasury lifted the proposed sanction against one bank. In the case of the second bank, the issue is specific to the bank and its ownership structure, and does not reflect Latvian regulatory efforts.

On May 15-16, the counterterrorism exercise "Seajack" was conducted within the NATO international search and rescue exercise "Bold Mercy". Seajack was organized by the Coast Guard Service of the Latvian Naval Force together with the Counterterrorism Center of the Security Police. On October 25, a national exercise was conducted at the International Airport Riga, organized by the Security Police and International Airport Riga in cooperation with the Counterterrorism Unit OMEGA and other Latvian governmental agencies.

Latvia contributed 98 soldiers to support the International Security Assistance Force (ISAF) in Afghanistan. In October, the team's mandate was renewed for one year and is now scheduled to expire the same day that the UNSCR mission mandate expires (October 23, 2008). In Iraq, Latvia had two officers under Polish command. In December, the Latvian Parliament renewed the authority for Iraq deployment until December 31, 2008.

**Lithuania**

President Adamkus introduced a Lithuanian-Belarusian intergovernmental agreement to combat organized crime and trafficking in narcotics and psychotropic substances, terrorism, and other crimes (Decree No. 616), which came into force in February. In May, Lithuania ratified the International Convention on the Fight Against Nuclear Terrorism. The Lithuanian military was an active participant in multinational operations against terrorist and insurgent elements. At year's end, Lithuania had approximately 50 troops in Iraq, including an infantry platoon serving

in Multinational Division Center (MND-C) near Al Kut and trainers in the NATO Training Mission-Iraq (NTM-I). In Afghanistan, Lithuania led a provincial reconstruction team in remote Ghor Province. This element consisted of approximately 150 Lithuanian troops and civilians responsible for maintaining a stable environment throughout the province to enable reconstruction efforts. An additional 50 Lithuanian Special Forces troops operated under NATO's International Security Assistance Force (ISAF) in Southern Afghanistan.

**Macedonia**

Macedonia passed legislation on nuclear security and terrorism, chemical weapons, and entered into bilateral law enforcement, security, and extradition agreements. Macedonia supported troop rotations to Afghanistan and Iraq. The government trained several hundred police and military personnel in counterterrorism techniques, technologies, and methods. The commitment of Macedonia in Iraq was increased by an additional platoon.

Macedonia provided adequate security on potential terrorist weapons with annual inventories and worked to improve security on its weapons facilities. With USG assistance, the Macedonian government destroyed 156 shoulder-fired surface-to-air missiles (SA-7's), an important counterterrorism achievement. The Macedonian Ministry of Defense provided support to the Ministry of Interior for actions against domestic and regional terrorist groups.

The Government of Macedonia continued its close coordination with the United States on counterterrorism matters, which included intelligence sharing on potential terrorist groups operating in or transiting the country. The government also cooperated with its regional and European Union partners, and worked closely with INTERPOL and other international law enforcement agencies. Macedonia's efforts were hampered by the porous nature of the Kosovo border.

**Malta**

The Government of Malta continued to freeze assets of organizations on the consolidated list promulgated by the UNSCR 1267 Committee. Since its accession to the EU in 2004, Malta has actively participated in the EU Clearing House and cooperates with other Member States and third states to prevent and suppress terrorist acts, including the preparation and financing of any acts of terrorism, denying safe havens to terrorists, and exchanging information in order to prevent the commission of terrorist acts.

Some of the most significant Maltese contributions to international counterterrorism efforts were in support of U.S. military operations, including approval of requests for overflight and emergency landing for all military aircraft including those with hazardous material, use of the Malta Shipyards for repairs of U.S. Navy ships, and full security support for visiting U.S. Navy ships. Malta also demonstrated a commitment to interdiction operations and compliance with international requests.

While the Government of Malta was responsive to requests for action in support of the War on Terror, a lack of financial resources, dedicated training, and specialist staff sometimes hampered

their efforts. Malta made significant progress in the area of customs inspection and border security procedures, however. Improvements included establishment of both the authority for Maltese Customs to inspect goods transiting the container port (Malta Freeport) and the necessary procedures to prevent the transshipment of WMD material through the Freeport. Maltese police and intelligence service officials have provided timely assistance to the Embassy's requests for investigation of potential suspects or groups within or transiting Malta as well as other terrorism related intelligence.

The United States affirmed its commitment to developing Malta's counterterrorism efforts by committing a 2005 earmark of $2,976,000 in the International Narcotics and Law Enforcement Affairs (INL) budget toward the purchase of a helicopter to enhance Malta's ability to control its borders and deter terrorists. Final acquisition will require the Government of Malta to more than match the U.S. contribution.

The Maltese criminal code included specific provisions on terrorism. The law addressed "acts of terror" and "terrorism" and enumerated actions that constitute the offense. Malta criminalized terrorist financing. Recently, Malta's Prevention of Money Laundering Act was expanded to include provisions on the "funding of terrorism." In addition, the Act broadened the money laundering mission of Malta's Financial Intelligence Unit (FIU) and gave it the authority to focus on terrorism funding. In February 2006, the Prevention of Money Laundering Regulations was extended to include "financing of terrorism," which criminalized terrorist financing and imposed additional obligations, namely customer due diligence, record keeping, reporting, and training procedures.

With Malta's entry into the EU in 2004, and its geographic location between northern Africa and the European mainland, Malta could become increasingly attractive to terrorist organizations seeking entry into Europe. The Government of Malta has become increasingly concerned about migrant discontent and the possibility of radicalization within the detention centers. Maltese government officials received training last summer from the EU on recognizing the signs of radicalization, and from the FBI on the radicalization process, indicators, and infiltration.

**Moldova**

Moldovan support for counterterrorism included deploying servicemen to Iraq for humanitarian demining operations. In June, Moldova deployed its fifth contingent to Iraq. Returning in December, the contingent consisted of eleven personnel. To date, 87 Moldovan servicemen have served in Iraq. The Moldovan Ministry of Defense (MOD) also deployed two liaison officers to CENTCOM headquarters. One officer is Moldova's Senior Representative to CENTCOM while the other officer is attached to CENTCOM's Coalition Planning Group.

In October, in an effort to establish communication and response protocols and to evaluate the capabilities of the Moldovan national SWAT team, Embassy Chisinau and the Ministry of Internal Affairs (MIA) conducted a day-long, joint counterterrorism training exercise at the Quality Schools International (QSI) campus in Chisinau. This exercise simulated a terrorist attack against the school and a corresponding hostage situation. Approximately 25 U.S. Embassy

children attend QSI and participated in this drill. The MIA performed well and new emergency assistance protocols were established between the Embassy and the Government of Moldova.

Moldova continued to work on implementation of obligations under UNSCR 1373 (and E.O. 13224, the Terrorism Finance Executive Order) and provisions related to terrorist financing. The Moldovan government continued to manage a counterterrorism strategy based on its 2003-2008 National Action Plan on Combating Terrorism.

The separatist-controlled Transnistria region of Moldova remained a potential area of concern. Moldovan law enforcement worked hard to track the whereabouts and activities of individuals moving in and out of Transnistria, an area where Moldovan police and security services do not have the authority to operate. Many of these individuals were foreign students who remained in Moldova illegally, as the government lacked the resources to deport them when their visas expired. Corruption was endemic, and it was easy to obtain false travel documents. The U.S. Embassy does not maintain liaison relationships or contacts with Transnistrian law enforcement and/or security service personnel. To date, the United States has not obtained any information about known terrorist organizations or terrorists operating from or within this region.

The following counterterrorism laws and "governmental decisions" were enacted:

- November 14: Information and Security Service of the Government of Moldova, Decree no. 75 constituting the publication/identification of known or wanted international terrorists and terrorist organizations (designation of foreign terrorist subjects and organizations);

- September 3: Government Decision no. 990 constituting the approval of the Cooperative Agreement between the Governments of Georgia, Ukraine, Azerbaijan, and Moldova in combating terrorism, organized crime, and other severe crimes;

- July 26: Law (190-XVI) on Preventing and Combating Money Laundering and Terrorism Financing;

- June 5: Government Decision no. 632 constituting the approval of the National Strategy and Action Plan for preventing and combating money laundering and terrorism financing; and

- April 6: Government Decision no. 372 constituting the approval of the Memorandum of Cooperation between the Center for Combating Economic Crimes and Corruption and the Government of Georgia's Financial Monitoring Service in combating money laundering and terrorism financing.

Law enforcement and intelligence officials had the authority to intercept wire, oral, and electronic communications, with the investigator required to obtain prosecutorial concurrence and authorization from a judge. A specific section in the Prosecutor General's Office would handle any terrorism-related case. The primary investigative body in counterterrorism cases is the Information and Security Service (SIS), Moldova's intelligence service. In 2006, SIS was

given the governmental lead to establish and manage a special Counterterrorism Center. Substantial assistance from the American Embassy's law enforcement assistance programs aid Moldovan efforts to impede the ability of terrorists and other citizens without proper immigration documents to cross national borders. The programs also facilitated automation at ports of entry to ensure greater security of passports and travel documents.[6]

**The Netherlands**

The Dutch responded to the global terrorist threat with leadership and energy in the areas of border and transportation security, terrorist financing, bilateral counterterrorism cooperation, and Coalition efforts in Afghanistan. The Netherlands deployed over 1700 troops to Afghanistan as part of the International Security Assistance Force (ISAF). The Dutch led a Provincial Reconstruction Team (PRT) in Uruzgan province, headed the rotational command in Kandahar of NATO's efforts in southern Afghanistan for six months (ending in May), and provided in extremis support for Iraq. The Netherlands deployed as many as 14 trainers and security guards in support of the NATO Training Mission in Iraq, and pledged approximately 40 million USD for Iraqi reconstruction.

In an April quarterly terrorism threat analysis, the Dutch National Counterterrorism Coordinator (NCTb) lowered the threat level from "substantial," where it had been since the government began producing the quarterly assessments in 2005, to "limited." The second lowest of the four levels, "limited" means that the identified threat from individuals or networks is relatively slight, but cannot be ruled out entirely. In the October threat assessment, the NCTb cited events in Denmark and Germany, and concern about continuing internationalization of the violent jihad in Afghanistan as the rationale for maintaining the level at "limited." It also noted a significant drop in the number of reports about possible Islamic radicalization among the Dutch population, citing growing resistance among the Muslim population to terrorist actions.

Nevertheless, the assessment warned about growing support for Salafism. According to an October report by the AIVD intelligence service, the Netherlands had approximately 20,000 to 30,000 Muslims who are susceptible to extremist ideology. As concern over possible radicalization mounted, the government launched efforts meant to foster integration and to combat the appeal of violent extremists, including teaching imams the Dutch language and culture. In 2007, the Dutch government devoted millions of euros and reorganized some offices in order to take on these issues in a more concerted way.

In November, the Justice Ministry launched a new phase in the "Netherlands against Terrorism" campaign that began in 2006, with a particular focus on the prevention of radicalization. In November, the Interior Ministry's National Advisory Center for Vital Infrastructure Protection (NAVI) was opened. The government's terror alert system, initiated in June 2005, now includes 14 economic sectors: the financial sector, seaports, airports, drinking water, railway, natural gas,

---

[6] Embassy's EXBS program closed permanently in September 2006. However, the current INL Law Enforcement Capacity Development Project provides technical assistance in the areas of border security and money laundering/terrorism financing. This project directly complements the law enforcement and security goals of Moldova's EU Action Plan and National Strategy.

oil, electricity, nuclear, chemical, municipal and regional transport, hotels, public events, and tunnels and flood defense systems. This early-warning system was designed to trigger a clear and rapid response to terrorist threats by both the public and private sectors. It linked sector-specific measures to be taken in response to the latest threat information from the National Counterterrorism Coordinator. In June, the Port Security Act came into force, expanding the definition of a "port" to include all works and facilities in the port area, including both seagoing and inland commercial maritime transportation-related facilities. In October, a biannual national disaster exercise, known as "Voyager," was held in and around the port of Rotterdam.

There were three major terrorism-related cases this year. In the Hofstad group appeal case, the public prosecutor's office sought 18-year prison sentences for both Jason Walters (a dual U.S. - Dutch national) and Ismael Aknikh, who were sentenced to 15 and 13 years imprisonment, respectively, for attempted murder and weapons violations in the trial court's March 2006 verdict. The prosecution argued that the two had acted with terrorist intent when they threw a hand grenade at police officers in The Hague in November 2004. The prosecution further argued that all Hofstad Group members acted with terrorist intent in sowing hatred and threatening politicians. The trial court ruled, in March 2006, that the Hofstad Group was a criminal organization "with terrorist intent," and found nine of the 14 defendants guilty of membership in a criminal and terrorist organization, but that there was insufficient evidence to convict the individual defendants of acting with "terrorist intent" in committing the criminal offences with which they were charged.

After two previous acquittals, the Amsterdam appeals court sentenced Samir Azzouz to four years imprisonment for having prepared terrorist attacks on government buildings in 2004. Azzouz was currently serving an eight-year sentence in the separate "Piranha" terrorism case. In October, the Rotterdam district court acquitted five of the six suspects arrested in November 2006 on suspicion of terrorist recruitment, participating in a terrorist organization, and obtaining false travel documents. The court ruled that there was insufficient evidence that the defendants had "ideologically prepared" each other or other persons to fight in Afghanistan or Iraq to convict them on terrorist recruitment charges. One female defendant in the case was sentenced to one month imprisonment for distributing subversive documents.

Dutch officials remained committed to active cooperation with the United States in designating known terrorist organizations, and interdicting and freezing their assets, and supported the continued exchange of information on financial transactions. The Dutch government worked with the United States to emphasize the importance of balancing security, the effectiveness of the financial system, and data protection concerns in the debate over SWIFT, an international messaging service for cross-border money transfers that provided information to track terrorist financing.

In October, the Cabinet approved a bill to make participation and cooperation in a terrorist training camp a serious punishable offence, even if the training takes place outside the Netherlands; the offense would carry a maximum prison sentence of eight years. The bill, currently before the Council of State for review prior to submission to Parliament, would implement Article 7 of the Council of Europe Convention on the Prevention of Terrorism. In March, the lower house of Parliament approved the Bill on Administrative National Security

Measures, which would allow the Interior Minister to issue restraining orders to prohibit a terrorist suspect's physical proximity to specific locations or persons. At year's end the bill was awaiting action by the upper house of Parliament.

The port of Rotterdam completed the installation of 31 radiological portal monitors at container facilities. The radiological monitoring program was initiated in 2004 as a pilot project under the U.S. Department of Energy's Megaport/Second Line of Defense Initiative. In October, a new mobile container scanner became operational in the port of Rotterdam. The scanner has a processing capacity of 20 containers per hour, or 175,000 per year.

During bilateral law enforcement consultations in October, the United States and the Netherlands agreed to continue operational cooperation on counterterrorism, including the exchange of information on terrorism-related investigations. In October, three Dutch government officials observed the U.S. Top Officials (TOPOFF 4) national crisis management exercises.

In January, Wasem al Delaema, an Iraqi-born Dutch citizen was extradited to the United States for trial on charges of conspiring to attack U.S. troops in Iraq in 2003. Al Dalaema was the first Dutch citizen extradited on charges of terrorism, and the first person to be indicted in the United States for terrorist activities in Iraq.

**Norway**

Norwegian authorities considered the threat of terrorist attacks in Norway low and the widespread belief among the general public was that no one would attack Norway. However, the continued presence of Mullah Krekar in Norway and preparations for the upcoming trial of Arfan Bhatti highlighted gaps in Norway's existing legal system that the government was moving to address.

Alleged Ansar al-Islam leader Mullah Krekar, an Iraqi Kurd listed in December 2006 under UNSCR 1267, lost his final appeal of the government's expulsion order in Norway's Supreme Court this fall. Despite this ruling, Krekar will remain in Norway for the foreseeable future as the government still is unable to receive sufficient human rights assurances from Iraq to proceed with deportation. This situation brought to light the limited tools the police have to detain individuals deemed a danger to society. The government introduced legislation that would allow stricter controls over movements of suspected terrorists, including possible house arrest. Budget shortfalls limited the ability of the police to monitor dangerous individuals' activities, but to the extent possible, the police have put a high priority on counterterrorism activities.

Arfan Bhatti, a Pakistani Norwegian, remained the only individual in custody after the September 2006 arrest of four individuals suspected of shooting at an Oslo synagogue and planning attacks on the U.S. and Israeli embassies. In the summer, the government presented a revised version of the 2002 terror law designed to improve the law and bring it in line with international obligations. Questions were raised, however, whether the new law will be too restrictive in its definition of a terrorist act and of what constitutes aiding and abetting or financing terrorism.

Norway has contributed more than 500 troops to International Security Assistance Force (ISAF) efforts in Afghanistan.

**Poland**

Poland supported international counterterrorist efforts with vigorous participation in foreign missions. About 1,000 Polish troops served the International Security Assistance Force (ISAF) in Afghanistan. In Iraq, Poland commanded the MND-CS, headquartered in Ad Diwaniyah, provided approximately 900 troops engaged in active patrolling, and trained and advised Iraq's 8th Army Division.

Through participation in initiatives such as the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism, Poland was actively engaged in many international fora combating terrorist threats. Poland's December integration into the Schengen zone also served as another strong argument for close collaboration with European neighbors on counterterrorism.

The bilateral Counterterrorism Working Group (CTWG), formed in 2005 to further U.S.-Polish collaboration on counterterrorism by synchronizing counterterrorism policy and training counterterrorism specialists, held its most recent meeting in March. We agreed to collaborate on identifying ideal candidates for training under the Combating Terrorism Fellowship Program (CTFP).[7] Under the Combating Terrorism Fellowship Program (CTFP), Embassy Warsaw provided Poland with $430,000 for special operations officer training, regional seminars, and terrorism focused programs.

The Government of Poland continued to recognize that terrorist threats can emanate from two sources: traditional migrant groups entering Poland from the east, such as Chechen refugees who may become radicalized, but also from western neighbors who have previously experienced threats or attacks stemming from radical Islamic groups. Groups with ties to organized crime also constituted a significant concern as a result of their experience with money laundering and access to fake documentation and weapons.

**Portugal**

Portugal supported international efforts to combat terrorist networks and actively pursued indications of extremist group activity in Portugal. Portuguese government agencies took steps to minimize exploitation of its financial sector by implementing European Community directives against money-laundering and illicit transfer of funds.

On November 6, Portugal's Judicial Police (PJ) arrested Algerian Samir Boussaha on charges of associating with, and recruiting for, an international terrorist organization. Eight other suspects were also arrested during similar operations across Europe. The Judicial Police coordinated its efforts closely with Italian officials and extradited Boussaha to Italy within one week of his arrest.

---

[7] Until that time, we had difficulty obtaining candidates at the working level with appropriate English proficiency. As a direct result of our agreement, a State Secretary at the Ministry of Interior gave this effort priority and soon after filled five slots in the CTFP with fully qualified candidates.

In another international case, Portuguese and Spanish law enforcement officers seized a car with 130 kilograms of explosives on June 22, which had been rented by members of the Basque terrorist group, ETA. The car was reportedly rented in Lisbon, and driven to Spain for a couple of days. On the way back into Portugal with the explosives, the driver saw a police outpost near the Spanish town of Ayamonte and abandoned the vehicle, fleeing with assistance on the highway towards Seville. Portugal's border with Spain runs over 1,200 kilometers, and Portugal was studied as a possible staging location for ETA since 2003, according to press accounts.

In September, Portuguese officials announced plans to establish a Secretary General for Internal Security, to facilitate communication between the Judicial Police (FBI-equivalent), Public Security Police (national uniformed police), and a National Republican Guard (paramilitary police force).

Portugal supported International Security Assistance Force (ISAF) efforts in Afghanistan with more than 150 troops.

**Romania**

Romania provided a full range of public and diplomatic support to counterterrorism efforts. Approximately 500 Romanian troops are serving in Iraq and 500 in Afghanistan as part of coalition and NATO Alliance efforts. In April, the Supreme Council for National Defense confirmed Romania's commitment of troops deployed in Iraq and Afghanistan through 2008. Romania has made its airspace, ground infrastructure, and naval facilities available to U.S. and NATO forces.

The Romanian government has established internal mechanisms to combat terrorism, including the development of a "National Anti-Terrorism Strategy" and guidelines to prevent the use of Romanian financial institutions, including its banking system, for the purpose of financing terrorist-related activities.

Bucharest is the headquarters for the Southeast European Cooperation Initiative (SECI), a regional center that provided law enforcement training and intelligence sharing on transborder criminal activities, including terrorist-related activities, for the 12 member countries in South Eastern and Central Europe.

- In March, the Romanian Parliament ratified the Accord (originally signed in Bucharest in 2006) between the Indonesian and Romanian governments in the field of prevention and combating transnational organized criminality, terrorism, and other crimes.

- In April, the Government of Romania formally subscribed to the Statement of Principles for the Global Initiative to Combat Nuclear Terrorism.

- In August, the Chief of the Romanian Military Prosecutors, Dan Voinea, finalized the penal file regarding the 1981 terrorist attack against the Radio Free Europe Romanian service in Munich. Many Romanian journalists working at Romania Libera station were

injured from the bombing, and sought civil damages in the penal file. The principal defendant in this case, the infamous Carlos "The Jackal", remained imprisoned in France.

- In October, terrorist suspects Tariq Mousa al Ghazi and Luis Felipe Moreno were handed over to the Drug Enforcement Administration by Romanian authorities. They were arrested in Bucharest in June, after attempting to sell weapons to U.S. undercover informers, and were extradited following the issuance of an international arrest warrant.

- Also in October, the Romanian Parliament's Chamber of Deputies adopted a draft law regarding cooperation in combating terrorism and organized crime, which ratified the Accord between the Romanian Government and the Bosnia and Herzegovina Council of Ministers, signed in Bucharest in June. The Chamber forwarded the document to the Senate for approval.

**Russia**

The Russian government continued to view counterterrorism as a top priority, and considered cooperation with the United States a pillar of bilateral relations. The scope of the Russian government's authority continued to grow, resulting in a greater number of terrorist acts being foiled and the continued weakening of formerly powerful terrorist groups. The majority of terrorist attacks continued to occur in the North Caucasus, where the pacification of much of Chechnya has correlated with an increase in terrorism in Dagestan and Ingushetia. Russia did not offer safe haven to terrorists, but there was evidence of a foreign terrorist presence in the North Caucasus with international financial and ideological ties. As in 2006, there were no high-profile terrorist incidents in Russia involving a large number of civilian casualties.

According to Minister of Interior Rashid Nurgaliyev, there were 38 terrorist attacks in Russia in the first nine months of the year, compared to 561 terrorist acts committed in 2003.

Major terrorist acts included the following incidents:

- On August 13, a Moscow-St. Petersburg train was derailed in the Novgorod region, injuring sixty. Three members of the St. Petersburg League of Anarchists were arrested.

- On October 31, a suicide bomber blew up a bus in the Samara region, killing eight and wounding fifty, although Russian officials had not determined by the end of the year if the incident was terrorism or organized crime-related. They were investigating a Caucasus trail, Russian ultranationalists, and Chechen-based organized crime.

- On November 22, five people were killed and thirteen injured in a bomb explosion on a passenger bus in Stavropol; on December 9 another bus was blown up in the same region, killing two and injuring thirteen. Law enforcement agencies suspected the same terrorist group carried out both incidents.

- In May, the Federal Security Service (FSB) announced that it thwarted a terrorist attack planned for the Russia-EU summit in Samara.

- Other security incidents, such as a vehicle-borne improvised explosive device (VBIED) that exploded near the Krasnopresnenskaya Metro, and a VBIED that was located and disarmed just prior to the May 9 Victory Day celebrations, both in the Moscow area, may have been terrorist acts.

In Chechnya, from 2005-2007, mass attacks on civilians diminished in favor of increased targeted attacks on policemen, local interior ministry officials, and departments responsible for fighting the insurgency, although an increasing number of attacks failed or were prevented by Russian and Chechen special services. In January, more than 500 militants surrendered to authorities as part of an amnesty following the 2006 death of Shamil Basayev, the militant Islamist leader of the Chechen separatist movement. The incidence of violent acts increased in Dagestan and Ingushetia, but it was often difficult to characterize whether they were the result of terrorism, political violence, or criminal activities. In September, Rappani Khalilov (the "Emir" for Dagestan), whom the Russians had described as a terrorist, was killed by Russian forces. The FSB stated that special attention will be paid to the prevention of terrorist attacks in the North Caucasus.

The 1998 federal law "On Fighting Terrorism" and the 2006 federal law "On Countering Terrorism" remained the main counterterrorism legal authorities. The National Antiterrorism Committee, organized in 2006, was the main government body coordinating the Russian government's response to the terrorist threat.

The United States and Russian Counterterrorism Coordinators met in November to advance cooperation within the context of the United States-Russia Counterterrorism Working Group. Cooperation continued on a broad range of counterterrorism issues, including efforts to destroy, safeguard, and prevent the proliferation of weapons of mass destruction. Russian law enforcement agencies also cooperated closely with U.S. agencies. Past participation led to the release of a hostage victim and the conviction of a U.S.-based subject attempting to purchase shoulder-to-air missiles.

Regulating and investigating terrorist websites was a major concern with numerous requests to the United States for assistance from both the FSB and the Cybercrime Directorate.

At the St. Petersburg G8 Summit in July 2006, the United States and Russia jointly announced the Global Initiative to Combat Nuclear Terrorism and invited other nations to join. The Initiative demonstrated Russia's effort to take a leadership role in establishing a partnership among nations to accelerate efforts to combat nuclear terrorism. It includes 66 partner nations committed to combating nuclear terrorism in a variety of ways, including safeguarding radioactive and nuclear materials, preventing nuclear smuggling, and sharing information. The third meeting of the Initiative took place in Kazakhstan in June. (*See Chapter 4, The Global Challenge of Nuclear Terrorism, for further information on the Global Initiative to Combat Nuclear Terrorism.*)

Russia increased its commitment to fighting terrorism in Afghanistan. Through the Collective Security Treaty Organization (CSTO), Russia committed financial and technical resources and

also supported the OSCE's initiative to develop projects aimed at strengthening security along Tajikistan's border with Afghanistan.

In September, Russia hosted the Sixth International Meeting of the Heads of special services, security agencies, and law-enforcement organizations, which FBI, CIA, DOE, and NCTC attended. Russia participated in the OSCE Public-Private Partnership Counterterrorism Conference, which focused on partnerships between state authorities, civil society, and the business community in combating terrorism. Russia has also expanded counterterrorism activities into newer regional groups. The scenario for the August 9-17 Shanghai Cooperation Organization (SCO) "Peace Mission 2007" exercise in Chelyabinsk involved combating a terrorist takeover of a village. Under the scenario, approximately 6,500 troops from all six SCO countries, but primarily Russia and China, worked together to defeat terrorists and free hostages. The SCO also signed an agreement with the CSTO on the joint fight against terrorism.

Russia is a member of the Financial Action Task Force on Money Laundering and Terrorist Financing (FATF). It is also a leading member, chair, and primary funding source of the FATF-style body known as The Eurasian Group on Money Laundering (EAG). EAG members include Russia, China, Belarus, Kazakhstan, Kyrgyzstan, Uzbekistan, and Tajikistan. Russia, through EAG, provided technical assistance and funding towards establishing legislative and regulatory frameworks.

**Serbia**

Serbia cooperated with the United States on a wide range of terrorism issues, including border security, information sharing, terrorist financing, and export controls.

In December, the Government of Serbia agreed to join the Global Initiative to Combat Nuclear Terrorism. Serbia, however, has not yet ratified the bilateral Weapons of Mass Destruction Agreement, which it signed in 2006. Failure of the Serbian Parliament to ratify the agreement prohibited the duty free import and donation of equipment that could be used to counter terrorism.

Serbia's law enforcement and security agencies, particularly the Customs Administration, Criminal Police, Security Information Agency, and Border Police, continued bilateral counterterrorism cooperation. Serbia had two police organizations that operated as counterterrorism tactical response units, the Special Antiterrorist Unit (SAJ) and the Counterterrorist Unit (PTJ). The Serbian government also began developing a third Counterterrorist force, an investigative unit within the Ministry of Interior's Criminal Investigation Directorate.

The U.S. International Criminal Investigative Assistance Training Program's Organized Crime Advisor, in conjunction with Serbia's new Counterterrorist force, conducted an antiterrorism workshop in Serbia in November. The workshop covered trends in international terrorism, the formation of a Joint Terrorist Task Force, investigative techniques, vulnerability assessments, crime scene management, case studies, and practical exercise problems.

In March, police raided a mountain cave near the town of Novi Pazar in the Sandzak region of Serbia. Large quantities of plastic explosives, ammunition, face masks, military uniforms, bombs, and other supplies were found at the site, which authorities believed was a training camp for Muslim fighters. Police found terrorist propaganda materials, military survival manuals, and maps. In April, during a search of another suspected terrorist hideout, Serbian police killed Ismail Prentic, the suspected leader of the local terror group. In total, police took 15 suspects into custody in connection with this operation.

**Slovakia**

In March, Slovakia hosted a Counterterrorism Fellowship Program seminar that was a follow-on to a 2005 seminar. Participants from law enforcement, judicial, military, and foreign affairs agencies in ten Central and East European countries participated.

Although Slovakia withdrew its last two officers from Operation Iraqi Freedom (OIF), the Minister of Defense and Prime Minister said publicly that this was part of a larger plan to focus efforts on three larger missions, including the International Security Assistance Force (ISAF) in Afghanistan. In December, the Slovak Parliament approved a plan to send 56 additional soldiers to Afghanistan, nearly doubling Slovakia's contribution to the NATO mission, albeit with caveats on their deployment. Domestically, Slovakia's Ministry of Defense took the lead in developing a cross-agency Counterterrorism Training Facility in Lest, which is also used by both the Ministries of Interior and Finance.

Slovakia officially acceded to Europe's border-free Schengen zone on December 21. Although not directly involved in Slovakia's preparation for Schengen, the United States provided assistance to Slovakia's efforts to secure its borders against terrorist threats.

In December, Slovak police arrested three men near the border with Ukraine, who were attempting to sell 400 grams of what was later evaluated as not being highly enriched uranium. Slovak police announced that they had worked cooperatively with Hungarian counterparts for a number of months in advance of the arrests, and had both the sellers and potential buyers under surveillance.

A suspected terrorist, Mustapha Labsi, has been held in Slovak custody since May. In November, the Bratislava Regional Court approved a Slovak Government request to extradite him to Algeria where he was convicted in absentia to life in prison, but the verdict was on hold pending an appeal to the Supreme Court. Slovakia's Justice Minister said that he personally will take the final decision on extradition in light of stated concerns that Labsi could be subject to torture in Algeria.

**Slovenia**

Slovenia participated in three Internal Control Program training sessions, which concluded the Export Control and Border Security Program in Slovenia. It also hosted a regional Proliferation Security Initiative exercise, and continued to provide instructors as part of the NATO training

mission in Iraq. Slovenia also contributed 65 troops to International Security Assistance Force (ISAF) efforts in Afghanistan.

**Spain**

The Government of Spain and its citizens were concerned that their country has been and remained a principal target of Islamic extremism and acts of international terrorism. Al-Qa'ida (AQ) leaders Usama bin Ladin and Ayman al-Zawahiri routinely called for the recapture of the former Muslim-controlled region in Spain they still call "al-Andalus." Almost four years have passed since the March 11, 2004, Madrid train bombings without another successful Islamic extremist terrorist attack on Spanish soil, but the Spanish government remained on a heightened state of alert. Spain cooperated closely with the United States to investigate and prosecute acts of terrorism and to prevent future attacks, and worked hard to disrupt terrorist acts that possibly were directed against U.S. interests. Spain was the first EU country to sign an arrangement for the exchange of screening information on known and suspected terrorists.

Spain remained an important transit point and logistical base for terrorist organizations operating in Western Europe. Its geographic location, large population of immigrants from North Africa, and the ease of travel to other countries in Europe, made Spain a strategic crossroads for international terrorist groups and an important staging point for North African extremists heading to Iraq to join the insurgency. The Spanish government feared that experienced terrorists may soon make their way back to Spain in a reverse terrorist pipeline. Spanish media reported in July that the Iraqi terrorist group Ansar al-Islam had established a recruiting cell in Catalonia to route would-be suicide bombers from Spain to Iraq.

Spain aggressively targeted terrorist recruiters and facilitators and arrested 47 suspected terrorists in 2007, according to the Ministry of Interior. The National Court Chief Prosecutor reported that as of November, Spain held a total of 139 terrorist suspects, either under a prison sentence or awaiting trial. Many of these individuals were believed to be supporters of terrorist groups such as AQ, al-Qa'ida in the Islamic Maghreb (AQIM), and the Moroccan Islamic Combat Group (GICM).

For much of the year, Spain was focused on the trial of 29 individuals suspected of involvement in the Madrid train bombings that killed 191 people and wounded hundreds of others. On October 31, Spain's National Court returned guilty verdicts on 21 individuals and handed down sentences ranging from three years to almost 43,000 years in prison. Under Spanish law, the maximum jail term an individual can serve for terrorist crimes is 40 years. Only three of the individuals were convicted of complicity in the Madrid attacks; the rest were convicted for belonging to a terrorist organization, cooperating with a terrorist organization, trafficking in explosives, and/or document forgery. The Spanish government, including its law enforcement and intelligence services, government ministries, and national prosecutors and judges, came together to carry out an in-depth and comprehensive investigation, prosecution, and trial on an issue of supreme national security and political importance. The Spanish government was able to energize and bring together its interagency community in a focused and highly-effective manner. The entire process was carried out in an open, transparent, and public way, despite the emotional

circumstances of the attacks and the heightened political tensions and controversies surrounding its aftermath.

Since the 1960s, Spain has battled the Basque terrorist group Basque Fatherland and Liberty (ETA). The Spanish government began 2007 sifting through the rubble of a parking garage at Madrid's Barajas Airport that was destroyed by an ETA bomb on December 30, 2006, killing two individuals and effectively ending a "permanent ceasefire" the group had declared the previous March. ETA officially ended the ceasefire on June 6, 2007, and threatened to reopen its activities "on all fronts in defense of the Basque homeland." Good police work allowed Spanish security forces to thwart a number of potentially large attacks, but ETA was able to carry out a series of smaller strikes. On October 9, an off-duty police officer was the victim of an ETA attack when a bomb attached to his vehicle exploded at mid-day in a residential section of Bilbao. The officer survived with severe burns, and two bystanders were injured in the attack. This act was noteworthy because ETA had previously taken pains to avoid innocent victims when directing attacks against governmental targets. On December 1, alleged ETA gunmen shot and killed two Spanish Civil Guard officers in southwest France, the first such assassinations since December 2002. Spain has collaborated successfully with the Governments of France and Portugal to further squeeze ETA from all sides and limit its room to maneuver. As of early December, security services had arrested 122 alleged ETA members (76 in Spain, 40 in France, six in other countries).

In February, the Spanish National Court sentenced five individuals to 13 years in jail for belonging to a terrorist organization believed to have been planning a 2006 attack against a military base in southern Spain. These individuals are known in Spain as "The Detergent Command," due to their possession of large quantities of detergents that police believed were to serve as ingredients for explosive devices.

Spain participated in the Megaports and Container Security Initiatives, and worked hard to deny terrorists access to Spanish financial institutions. Spain maintained a robust law enforcement and intelligence posture against terrorist finance. In July, Spanish police arrested two Syrian nationals on money laundering and terrorism finance charges. Spain and the United States co-chaired the OECD's Financial Action Task Force on Money Laundering and Terrorist Financing. Spain was a member of the G8's Counterterrorism Action Group and provided technical assistance to other countries to help build their institutions to counter terrorist finance. Spain and France collaborated on a project to establish a Financial Intelligence Unit in Morocco.

Spain contributed more than 700 troops to the International Security Assistance Force (ISAF) in Afghanistan.

**Sweden**

The Government of Sweden placed a high priority on increasing international cooperation against terrorism. Swedish authorities considered the threat of terrorist attacks inside Sweden to be low, but they monitored a number of known terrorists and terrorist organizations within their borders, including al-Qa'ida (AQ), Ansar al-Islam/Sunna, the Revolutionary Armed Forces of Colombia (FARC), Hizb Al-Tahrir, Hizballah, Islamic Jihad, and the Kongra-Gel/Kurdistan

Worker's Party (KGK/PKK). They provided logistical and financial support to their respective organizations abroad.

In August, the Swedish artist Lars Vilks published a picture of the prophet Muhammed depicted as a dog in the local Swedish newspaper *Nerikes Allehanda*, as part of an article on freedom of speech. Several Muslim organizations condemned the picture. Al-Qa'ida in Iraq (AQI) offered a bounty to encourage the assassination of Mr. Vilks and his editor for having published the drawings. Following this incident, a group claiming to be supporters of AQ published a video on an Islamic website attacking Sweden and Swedish companies.

In January, the government participated in the NATO-led operation Active Endeavour focusing on maritime antiterrorism measures such as boarding procedures and smuggled weapons searches. Building upon a 2006 initiative to better prepare the military to assist law enforcement in responding to terrorist incidents in 2007, the police began training military pilots and marine commanders on providing such assistance.

The Government of Sweden did not provide safe haven to terrorists or terrorist organizations. Terrorist organizations, however, exploited Sweden's considerable legal protections of personal freedoms and civil liberties to maintain a presence in the country. Sweden's political asylum policy attracted individuals from areas of conflict. Although these numbers have not been verified, authorities on the subject have estimated there are approximately 1,500 members and supporters and 100 persons with ties to terrorist organizations in Sweden.

According to Swedish terrorism experts, members of terrorist groups, such as Ansar al-Islam, Ansar al-Sunna, and Hizballah, earned money in Sweden to finance terrorist activities in other countries. The Swedish government shut down the al-Aqsa Foundation in Malmo when it was suspected of facilitating such activity for Hizballah.

Swedish law does not provide the government independent national authority to freeze or seize assets, unless in connection with an ongoing criminal investigation. However, once the EU takes action, the government can and does freeze assets of entities and persons listed on the UN 1267 Sanctions Committee list. This procedure is managed through the Sanctions Act (1995). Sweden can also take action against entities designated by the EU clearinghouse process, although Sweden has not yet proposed individuals or entities for inclusion on such lists.

Sweden implemented UN Security Council Resolutions 1267 and 1373 sanctions against AQ and the Taliban. Without a designation by the UN or EU however, Swedish authorities only have the right to seize assets once a criminal investigation has been initiated. Efforts to create a national authority and address existing shortcomings are underway.

Sweden played an active role in UN and EU deliberations to develop legal instruments for the listing and de-listing of terrorist organizations and an appeals process after the freezing of financial assets.

Sweden's ties to terrorism cases included:

- In January, three Swedes, accused of participating in Somali Islamist militia activity targeting Ethiopian troops, were apprehended in Kenya and taken to a prison in Addis Ababa. They were later released and returned to Sweden.

- In April, authorities in Bosnia and Herzegovina sentenced 19 year-old, Bosnian-born Swedish citizen Mirsad Bektasevic to 15 years in prison on charges, inter alia, of conspiracy to commit terrorist acts against western targets.

- In September, the 41-year old Lebanese-born Swedish citizen Oussama Kassir, arrested in the Czech Republic in 2005 pursuant to a U.S. arrest warrant and INTERPOL Red Notice, was extradited to the United States. He was accused of conspiracy to provide material support to terrorists in connection with the planned establishment of an Islamist terrorist training camp in Bly, Oregon.

- Ahmed Essafri, a Moroccan-born Swedish citizen, was arrested in Morocco in December 2006 for allegedly having ties to the Moroccan Combatant Group and for participating in a recruitment network for foreign jihadis in Iraq. In September 2007, he was tried in Morocco on terrorism related charges.

- In 2005, the Swedish Court of Appeal found Ali Berzengi and Ferman Abdullah, Iraqi citizens with Swedish residency permits, guilty of financially supporting Ansar al-Sunna terrorist actions in Irbil, Iraq. They remained in custody awaiting a government decision on deportation.

Through the European Common Foreign and Security Policy (EFSP), Sweden contributed to capacity-building projects in Morocco, Algeria, and Indonesia. Sweden participated in EUROPOL and EUROJUST, European law enforcement institutions that coordinated member states' counterterrorism cooperation and activities. Additionally, it participated in the Nordic Council of Ministers Regional Forum for Nordic Governmental Cooperation.

Sweden drafted a development cooperation policy that identified ways that assistance could contribute to strengthening the recipient state's ability to prevent terrorism. Sweden contributed $575,000 to the Terrorism Prevention Branch of the UN Office on Drugs and Crime, $160,000 to the UN Counterterrorism Implementation Taskforce, and $150,000 to two intergovernmental organizations concentrating on counterterrorism capacity-building programs in Africa. Sweden also contributed $150,000 to legal counterterrorism education efforts at the Jakarta Center for Law Enforcement Cooperation and initiated a dialogue with Pakistan on the possibility of providing greater training to Pakistani officials on terrorism financing methods.

Sweden has contributed 350 troops to the International Security Assistance Force (ISAF) in Afghanistan.

**Switzerland**

The United States worked closely with the Government of Switzerland, the Swiss Bankers' Association, the financial community, and cantonal law enforcement authorities. Senior U.S.

Treasury officials met frequently with Swiss officials throughout the year. Swiss security services continued to monitor activities of terrorist groups with a presence in Switzerland and coordinated with appropriate USG officials, although the scope of the coordination was limited. Swiss law severely restricts the level of information-sharing possible on banking issues.

The Swiss Parliament ratified the United States-Swiss Operative Working Agreement, which entered into force on December 1 and should facilitate more bilateral law enforcement and intelligence cooperation. The Swiss Department of Foreign Affairs also agreed to co-sponsor a second Bioterrorism Workshop (Black Ice II), with the State Department.

The Swiss have grown more conscious of the presence of terrorist groups on Swiss soil. Authorities tightened measures to curb terrorist use of telecommunications and banking services. The Swiss Federal Police (FEDPOL) once again described Switzerland as a "Jihadi field of operations." The Federal Council, Switzerland's Cabinet, extended its ban on al-Qa'ida (AQ) and kept frozen approximately $28 million in AQ and Taliban assets in 82 separate accounts. This total amount of frozen assets is among the highest of any nation. During the past year, Swiss banks reported eight terrorist-related money laundering transactions, down from 20 reports a year ago.

On June 15 the Federal Council modified Switzerland's money laundering legislation to bring it into compliance with the recommendations of the FATF. All financial institutions, not just banks, now are required to report suspicious transactions. Also on June 15, the Federal Council decided to transfer the Special Tasks Service (STS) of the Federal Department of the Environment, Transport, Energy, and Communications (DETEC) to the Federal Department of Justice and Police (FDJP). The STS serves as an intermediary between the criminal prosecution authorities and telecommunication service providers when it comes to the monitoring of correspondence by post and telecommunications. The surveillance measures must first be authorized by a judge. Telecom companies usually submit the required data to the STS, which forwards them to the criminal prosecution authorities for analysis. The STS does not undertake any surveillance nor does it have access to the monitoring results.

Swiss companies are slowly increasing the pressure on the Swiss government to allow them to participate in the Customs Trade Partnership Against Terrorism (C-TPAT) initiative, but Swiss legal barriers preventing Swiss firms from being active participants remained in place. Article 271, paragraph 1 of the Swiss Penal Code forbids foreign government agencies, such as the U.S. Department of Homeland Security, from validating or contacting Swiss companies that export. Strict Swiss privacy laws also make initiatives such as C-TPAT difficult to implement.

Due in part to increased antiterrorism activities in neighboring EU countries, several terrorist organizations, including the Liberation Tigers of Tamil Eelam (LTTE), Kongra-Gel/Kurdistan Worker's Party (KGK/PKK), and the Revolutionary Armed Forces of Colombia (FARC), have a presence in Switzerland. Existing Swiss law and practice prevent the government from listing these entities as terrorist organizations.

Switzerland has already ratified the Council of Europe's Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime, and is a party to the UN International Convention for the Suppression of the Financing of Terrorism.

The new "Pass 06" Swiss passport features electronically-stored data. The passport was introduced in September 2006 and provides greater reliability in identifying a person and is more tamper-resistant.

The Swiss government, recognizing the potential for terrorists to grow links in Switzerland, organized a meeting on November 26 between representatives of more than thirty Swiss-based Muslim organizations and the Federal Office of Police (FEDPOL) to address global issues related to internal security. Participants presented their views on internal security and stressed that it was important for them and condemned all forms of violence.

The Federal Council also took legislative steps to improve the nation's national security posture. On June 15, the Federal Council revised legislation enabling authorities to monitor terrorist suspects, spies and those involved with the proliferation of weapons of mass destruction via telephone tapping, mail screening, video cameras, and bugs. The new measures must be approved by the Federal Administrative Court, the Justice Ministry, and the Defense Ministry.

In September, Justice Ministers from Germany, Austria, Liechtenstein, and Switzerland created a working group to fight terrorism. The ministers also discussed the German-Austrian Pruem agreement on transborder exchange of DNA information, fingerprints, and data storage. Switzerland's Federal Office of Police is evaluating the conditions under which Switzerland could participate. The Swiss Justice Minister reemphasized that Switzerland was no haven for terrorists, and that Swiss bank secrecy provided no room for criminal money.

On July 12, 2006, then Swiss Justice Minister Christoph Blocher and then U.S. Attorney General Alberto Gonzales signed a formal revision of the 2002 "Operative Working Agreement (OWA)". The new OWA was approved by parliament in June and entered into force on December 1, 2007. It will permit the exchange of law enforcement officials to create joint teams of investigators, though with restrictions on the use of information gathered by investigators. The new OWA extended the scope of the original, which was set up to regulate judicial cooperation in the wake of the 2001 terrorist attacks in the United States It provided the legal basis for joint investigations on terrorism and terrorism financing. These would only be set up once criminal proceedings had been launched in both countries and handed to a prosecutor. Unlike the initial OWA, cooperation was no longer limited to investigations related to AQ and the September 11 attacks, but extended to all terrorist groups linked to AQ. There has not yet been a formal investigation initiated under the scope of the OWA.

**Turkey**

Domestic and transnational terrorist groups have targeted Turkish nationals and foreigners, including, on occasion, USG personnel, in Turkey, for more than 40 years. Terrorist groups that operated in Turkey included Kurdish separatist, Marxist-Leninist, radical Islamist, and pro-Chechen groups. Terrorism in Turkey is defined in the Anti-Terror Law #3713 (TMK, 1991).

"Terrorist" activities are composed primarily of crimes outlined in the Penal Code committed within the context of terrorist group activities, which target the structure of the state, changing or destroying the principles of the state, and aiming to create panic and terror in society. Thus, Turkish law defines terrorism as attacks against Turkish citizens and the Turkish state, and hampers Turkey's ability to interdict those who would target non-combatants globally.

Most prominent among terrorist groups in Turkey is the Kongra-Gel/Kurdistan Worker's Party (KGK/PKK). Composed primarily of Kurds with a separatist agenda, the KGK/PKK operated from bases in northern Iraq and directed its forces to target mainly Turkish security forces. In 2005 and 2006, KGK/PKK violence claimed hundreds of Turkish lives. This persisted in 2007, when the KGK/PKK continued its terrorist tactics. The Kurdistan Freedom Falcons (TAK), a group designated under E.O. 13224, is affiliated with the KGK/PKK and has claimed responsibility for a series of deadly attacks on Turkish and foreign citizens in Turkish cities in recent years. KGK/PKK and TAK-linked individuals were discovered in late May in Istanbul, Adana, Konya, and Mardin with explosive materials designed to carry out suicide attacks. On May 25, the KGK/PKK claimed responsibility for the bombing of a cargo train in Bingol Province.

In the midst of weeks of violence, during which KGK/PKK attacks claimed scores of killed or wounded Turkish soldiers and citizens, the Turkish parliament on October 17 overwhelmingly passed a motion authorizing cross-border military operations against KGK/PKK targets in northern Iraq. Turkish forces carried out extensive operations along the Turkey-Iraq border in the latter part of the year. On November 5th, President Bush committed to provide Turkey "real-time, actionable intelligence" to counter the KGK/PKK in northern Iraq.

Other prominent terrorist groups in Turkey included the Revolutionary People's Liberation Party/Front (DHKP/C), a militant Marxist-Leninist group with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state; and Turkish Hizballah (not affiliated with Lebanese Hizballah), an organization of Sunni Kurds with a violent history. The Great Eastern Islamic Raiders Front (IBDA-C) is a decentralized Islamic revivalist group that was particularly active in the 1990s; it claimed ties with AQ.

A criminal trial for the 74 defendants allegedly involved in the four November 2003 Istanbul bombings concluded on February 16, with 48 of the 74 receiving jail sentences. Seven of those, including Syrian financier and operative Luay Sakka, were sentenced to life in prison; 26 were acquitted. The lead defendants admitted to contacts with AQ and warned of further attacks. Most of the other defendants denied responsibility for, or knowledge of, the bombings.

In January, the courts jailed seven Ansar al-Islam members for their role in the foiled 2004 assassination plot against President Bush, who was attending the Istanbul NATO summit. In June, the 13-year trial of Turkish Hizballah suspects for the murders of 24 people from 1992 to 1994 concluded with the acquittal of one and conviction and sentence of life imprisonment for ten. A local leader of the legal, Democratic Society Party (DTP) was jailed in April for aiding and abetting the KGK/PKK.

The Turkish National Police (TNP) and the National Intelligence Organization (MIT) conducted an aggressive counterterrorist campaign and detained numerous suspected terrorists in a number of raids, at least temporarily disrupting these groups before terrorist acts could be carried out, although prosecutions did not always follow the arrests. For example:

- In January, a multi-city crackdown netted 47 suspected terrorists associated with AQ;

- In March, 48 suspected Islamic terrorists were arrested in Konya;

- In June, a concentrated effort in Bursa resulted in 23 arrests;

- In November, in response to a German request, authorities arrested a German citizen in Konya allegedly involved in a disrupted terrorist plot.

Turkey has consistently supported Coalition efforts in Afghanistan. After commanding International Security Assistance Force (ISAF) II in 2002 and ISAF VII in 2005, Turkey led the joint rotational command of the ISAF in Afghanistan for the Capital Regional Command from April to December. Turkey was fielding a civilian Provincial Reconstruction Team (PRT) in Wardak Province and pledged $100 million in humanitarian assistance for the reconstruction and operation of schools and hospitals.

Turkey has provided significant logistical support to Coalition operations in Afghanistan and Iraq, authorizing the use of Incirlik Air Base as an air-refueling hub for OEF and OIF and as a cargo hub to transport non-lethal cargo to U.S. troops in Afghanistan and Iraq. Almost 60 percent of air cargo for U.S. troops in Iraq transits Incirlik. Establishment of this hub allows six C-17 aircraft to transport the amount of goods it took nine to ten aircraft to move from Germany, and saves the United States almost $160 million per year. Between one third and two thirds of the fuel destined for the Iraqi people and more than 25 percent of fuel for Coalition Forces transits from Turkey into Iraq via the Habur Gate border crossing. Turkey was active in reconstruction efforts, including providing electricity to Iraq. Turkey contributed headquarters personnel to the NATO Training Mission in Iraq (NTM-I), helped train Iraqi diplomats and political parties, and completed military leadership training in Turkey for 90 Iraqi officers as a further contribution to the NATO NTM-I.

In October 2006, a new law went into place giving MASAK, Turkey's Financial Crimes Investigation Board, sole responsibility for financial investigation of money laundering and financing of terrorism (ML/FT). In its February peer review report, the Financial Action Task Force (FATF) evaluated Turkish standards to combat ML/FT. Among its major findings were that although the new legislation has been in place only a short time, the number of convictions for money laundering was relatively low; confiscation measures have not yet produced substantial results; and the number of suspicious transaction reports was also relatively low.

Pursuant to its obligations under UNSCR 1267 and subsequent resolutions, Turkish officials continued to circulate UN and U.S.-designated names of terrorists to all law enforcement and intelligence agencies, and to financial institutions. Only UN-listed names, however, were subjected to asset freezes enforced through a Council of Ministers decree. This legal mechanism

for enforcing sanctions under UNSCR 1267 was challenged in Turkish courts by UN-designated terrorist financier Yasin al-Kadi. A lower-court reversed the ruling, but the appeals court upheld the Council's authority to freeze. In the meantime, al-Kadi's assets remained frozen.

## Ukraine

Ukraine did not suffer from domestic terrorism incidents, although law enforcement authorities sometimes labeled ordinary criminal activity as terrorist acts. The Ukrainian government instituted legislative and regulatory changes to improve its ability to investigate and prosecute acts of terrorism. On May 24, the Ukrainian Parliament amended the Criminal and Criminal Proceedings Codes of Ukraine to conform to commitments resulting from Ukraine's ratification of the International Convention for the Suppression of Acts of Nuclear Terrorism. The new law implemented criminal sanctions for actions in support of nuclear terrorism. On January 31, the Ukrainian Cabinet of Ministers approved an action plan for countering terrorism financing. The Ukrainian State Financial Monitoring Agency continued to pass information to the Security Service of Ukraine (SBU) to investigate whether organizations possibly engaged in terrorism financing activity were active in Ukraine, but the SBU found no evidence of such activity in Ukraine. From June 25-26, the SBU and the NATO Special Committee hosted a joint seminar on "organized crime and financing terrorism" in Odessa that brought together experts from 13 nations and NATO International Staff. Ukraine has made contributions to efforts in both Iraq and Afghanistan.

## United Kingdom

On June 29, three days after Prime Minister Gordon Brown took office, terrorists attempted attacks in London and, a day later, terrorists drove a vehicle into Glasgow airport, which caught fire. The terrorist plots were disrupted by the British police, the British public, and, in the London attempt, the failure of the explosive material to detonate. The first attempts took place in London, where the terrorists had left two cars filled with explosive materials outside popular nightclubs. A paramedic became suspicious of the contents of one of the vehicles, (the other had already been towed for parking illegally), which led to discovery of the plot. Neither vehicle detonated. The following day, two terror suspects, believed to have fled from London, attempted to drive a vehicle into an entrance of Glasgow airport. The vehicle caught fire and did limited damage to the building. One of the suspects did not survive the fire and a passer-by, who worked at the airport, apprehended the other suspect as he exited the burning vehicle.

A total of seven individuals were arrested in connection with the June attempted attacks. Among them were an Iraqi and other nationals from the Middle East, several of whom worked in the UK in health professions. These attempted attacks followed the pattern of a spike in attempted terror activity in the summer, beginning in 2005 with the July 7 and July 21 London subway and bus attacks (in which 52 civilians died) and the foiled transatlantic airline plot disrupted in August 2006, though there were no AQ core-inspired plots in 2007. Of the seven individuals arrested in connection with the June attempted attacks, one died, three were released without being charged, and three are awaiting trial.

Seventeen individuals were arrested and charged with various aspects of the airline plot disrupted in August 2006. This plot involved preparations for the detonation of explosives on aircraft traveling between the UK and the United States. One individual has been convicted, charges against one individual were dropped, and 15 are awaiting trial.

As to the attacks of July 7, 2005, four individuals have been arrested and are awaiting trial (four suicide bombers died). Regarding the failed attacks of July 21, 2005, on July 9 four of the would-be suicide bombers were found guilty of conspiracy to commit murder and received life sentences. One defendant was acquitted. An additional 16 suspects were arrested for aiding and abetting; two have been convicted and fourteen await trial.

In November, the head of the domestic Security Service told the press that the number of individuals residing in the UK whose support for terrorism posed a direct threat to national security and public safety was at least 2,000. This figure represented an increase of 400 individuals from 2006, an increase attributable to both the government's greater coverage of terrorist networks and the steady flow of recruits to the extremist cause. Deeply concerned about growing extremism, HMG sought through the "Prevent" portion of its Counterterrorism Strategy to prevent the radicalization of vulnerable populations by exerting influence on both extremists and their audiences, addressing structural problems that cause radicalization, and disrupting extremists' ability to gain access that means of communications such as websites, blogsites, and other forms of new media. HMG also made efforts to stimulate self-regulation from the mosques and imams.

The domestic Security Service official noted that over the course of the last five years, attack planning had derived from AQ leadership in Pakistan, often using young British citizens to mount the attacks. In 2007, the government's assessment of the threat against the UK never fell below "severe," which is defined as "an attack is highly likely." The threat level was raised briefly in June and early July, around the time of the London/Glasgow incidents, to "critical," defined as "an attack is expected imminently."

After the attempted attacks of June, which were carried out by resident foreigners working in the UK health field, the British government pledged to review how it vets foreign-born personnel working in the National Health Service (the main, state-run health care employer in the UK). In December, the British government announced it had allocated $14 million to secure and dispose of used radiological and other materials from British hospitals (that could be used as ingredients for a radiological weapon or "dirty bomb").

The British government reorganized its governmental structures to better address terrorism. Changes included creation of an office of security and counterterrorism to coordinate all intra-governmental counterterrorism efforts, and the establishment of a research, intelligence, and communication unit (RICU) to lead British efforts to develop coherent messaging for domestic and international audiences on terrorist issues. The number of people working on counterterrorism was increased in both the Home Office and the domestic Security Service. The government increased its efforts to engage local communities through the establishment of a new ministerial position. In addition, the government announced its intention to meld the immigration and border control agencies into a single agency, a move meant to increase the government's

ability to track movements of individuals entering and exiting the country. In November, the government said it would improve physical security for key infrastructure, including major train and air transportation hubs. The government announced it will increase education campaigns to teach private sector businesses how to improve their security.

Individuals were prosecuted under UK terror legislation on charges of "incitement to terrorism." On November 8, a Muslim woman, known as the "Lyrical Terrorist," was convicted under the Terrorism Act in the UK. The woman, arrested in October 2006, had a "library" of material useful to terrorists in her apartment. She was found guilty of possessing records likely to be used for terrorism, but not guilty of the more serious charge of possessing an article for a terrorist purpose. On December 6, she was given a nine-month suspended sentence, ordered to do 100 hours of unpaid work within the community, and will remain under supervision for 18 months. The government's prosecution on the grounds of "incitement to terrorism" were contested by some Muslim community organizations as amounting to "conviction for thought."

The UK provided assistance to U.S. extradition requests for three individuals charged with attacks of terrorism in the United States or against U.S. citizens. Khalid Al Fawwaz, Adel Mohammed Aboul Almagid Abdul Bary, and Ibrahim Hussein Abdelhidi Eidarous are wanted for alleged involvement in the bombing of American Embassies in East Africa. Two of the three await decisions by the Home Secretary as to whether to extradite them to the United States. They remained in custody. The Home Secretary declined to extradite one individual on humanitarian, medical-related grounds. Also in UK custody, where the Home Secretary is considering his extradition to the United States, is Mustafa Kamel Mustafa, aka Abu Hamza, who was found extraditable in November. The Home Secretary subsequently concurred with this decision. Abu Hamza has been found guilty in the UK of offenses relating to incitement to commit terrorist acts, has been sentenced to seven years, and is wanted in the United States on a variety of charges including conspiring to take hostages in Yemen in 1998. In May, the UK extradited Syed Hashmi to the United States; Hashmi is wanted for conspiring to provide and providing material support to terrorist activities in Afghanistan.

The United States and the UK worked closely within the UN and the FATF to deny terrorists, and their supporters, access to the international financial system. The UK had strong legal provisions in place for freezing assets related to terrorist financing, including the Terrorism Act 2000, the Anti-Terrorism Crime and Security Act 2001, the Proceeds of Crime Act 2002, the Terrorism (United Nations Measures) Order 2006, and to further restrict the flow of funds to anyone HM Treasury designates as involved in terrorism, the AQ and Taliban (United Nations Measures) Order 2006. The Brown government is currently proposing language in an upcoming Counterterrorism bill to authorize forfeiture of assets by anyone involved in any aspect of support for terrorism. Current law only allows forfeiture for those convicted of terrorist financing.

The UK has an arrangement with the United States for the exchange of screening information on known and suspected terrorists, pursuant to Homeland Security Presidential Directive #6.

The UK has consistently supported the International Security Assistance Force (ISAF) in Afghanistan, and is currently the second largest troop contributor. The UK increased its

contributions to more than 7,500 troops. The UK has also contributed approximately 4,000 troops to efforts in Iraq.

Northern Ireland

In October of 2006, representatives of Sinn Fein, the political wing of the IRA, and the Democratic Unionist Party (DUP) announced their support for the Ireland/UK-brokered "St. Andrews Agreement," which was implemented in the spring. The St. Andrews Agreement restored power to the Northern Ireland Assembly (NIA) and envisioned a power-sharing arrangement between the unionists and republicans.

Elections for the Assembly were held in March. On May 8th, the Democratic Unionist Party's Ian Paisley assumed office as First Minister, and Martin McGuiness of Sinn Fein became the Deputy First Minister. Two key decisions underpinned the restoration of the NIA. First, at a party conference in January, Sinn Fein agreed to endorse policing. Next, the DUP contested the election in March, signaling that it would agree to share power with Sinn Fein. The Independent Monitoring Commission (IMC), a four-person body established by the Irish and British governments in 2004, regularly releases reports on paramilitary activity in Northern Ireland and the Republic of Ireland. The most recent publication, the Sixteenth IMC report released in September, praised the British government's "amazing progress" on its dismantling of Northern Ireland's military structure.

British commitments were on schedule: all security watchtowers have been dismantled, and all soldiers assigned to counterterrorism duties were removed from Northern Ireland. Special counterterrorism legislation was gradually being rescinded. The IMC Commissioners expressed concern over the still-armed loyalist Ulster Defense Association's (UDA) lack of progress towards a strictly political existence and debated how long the UDA should be given to make the transition from paramilitary activity. The IMC Commissioners also stated that the IRA "has abandoned terrorism and violence and does not pose any form of threat relevant to security normalization." They also found that loyalist paramilitaries did not present a "terrorist type threat to the security forces," and were not likely to be a threat in the future. Republican dissidents did not have the resources to mount a major sustained violent effort. Nevertheless, dissident Republicans admitted responsibility for shooting two police officers in November, and were still considered a threat by security services.

## MIDDLE EAST AND NORTH AFRICA OVERVIEW

 "Terrorism kills civilians, journalists, actors, thinkers, and professionals; it attacks universities, marketplaces, and libraries; it blows up mosques and churches and destroys the infrastructure of State institutions. We consider terrorism an extension of the fallen dictatorship, whether it may vary in its outside form or by the gangs that carry it out. Terrorism aims at aborting the political process, and igniting sectarian dissension as a prelude to hijack Iraq back into the era of tyranny, oppression, and backwardness."

–Mr. Nuri Kamal Al-Maliki, Prime Minister of Iraq
Statement, 62nd UN General Assembly, New York;
September 26, 2007

Iraq remained at the center of the War on Terror battling al-Qa'ida in Iraq (AQI) and affiliated terrorist organizations, insurgent groups fighting against Coalition Forces (CF), militias and death squads engaged in sectarian as well as intra-communal violence, and criminal organizations. The Iraqi government, in coordination with the Coalition, made significant progress in combating AQI and affiliated terrorist organizations. There was a notable reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IED) attacks in the last quarter of the year. Terrorist organizations and insurgent groups continued their attacks on Coalition and Iraqi security forces using IEDs, vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers. The Iraqi government continued to emphasize national reconciliation and made progress in passing key pieces of reconciliation-related legislation. There were practical steps taken that helped to advance reconciliation at the provincial and local level. The United States continued its focused efforts to mitigate the threat posed by foreign fighters in Iraq. State sponsors of terrorism, Iran and Syria, continued to play destabilizing roles in the region. (*See Chapter 3, State Sponsors of Terrorism*.)

While the number and lethality of individual terrorist attacks in Israel declined in comparison to 2006, Israel nevertheless continued to suffer from terrorist threats emanating from the West Bank and Gaza, and was particularly vulnerable to rocket and mortar attacks launched against Israeli targets from inside Gaza. While there was an overall decrease in the number of successfully perpetrated terrorist attacks in comparison to previous years, Israeli security officials maintained that the decrease was not for lack of terrorists' efforts, but because the security services were able to keep terrorist planners and operators off balance and foil acts before they were carried out. Throughout the year, Israel's security services publicly reported several foiled attempts.

In Lebanon, a campaign of domestic political violence continued. Most notable were the June 13, September 19, and December 12 car bombing assassinations of MP Walid Eido, MP Antoine Ghanem, and General Francois Hajj, respectively. Both MPs were part of the pro-government March 14 coalition. Several political allies of the two MPs charged that the Syrian government

was responsible for the assassinations, which Syria strongly denied. These acts, the latest in a series of assassinations and attempted assassinations over the last three years, seemed designed to intimidate the pro-government forces and eliminate, through the process of killing MPs, their numerical majority in parliament.

There were several high profile attacks in Algiers, including the April 11 bombing of the Prime Minister's office and the December 11 near simultaneous bombing of the Constitutional Council and the UN headquarters in Algeria. These attacks underlined the substantial shifts in strategy made by al-Qa'ida in the Islamic Maghreb (AQIM) towards mass-casualty attacks employing suicide tactics and targeting Western interests. AQIM claimed responsibility for both attacks and touted them as major successes. In the latter case, AQIM inaccurately equated breaching the security in the heretofore highly protected Hydra neighborhood of Algiers with breaching the Green Zone in Baghdad.

Saudi Arabia suffered two high-profile terrorist incidents: the shooting of four French citizens and the violent murder of a high-ranking Saudi colonel. Saudi security forces managed to capture or kill most of the assailants involved in the two incidents and successive government roundups resulted in hundreds of arrests that likely disrupted terrorist cells planning to carry out attacks in the Kingdom.

A series of suicide bombing attacks shattered the relative lull in terrorist violence that had prevailed in Morocco since the 2003 Casablanca bombings. The attacks underscored that Morocco's greatest terrorist threat stems from numerous small "grassroots" Salafi Jihadist groups. The main external terrorism threat to Morocco was AQIM and its demonstrated willingness to train inexperienced Moroccan extremists. Morocco adopted a comprehensive counterterrorism strategy that emphasized vigilant security measures, counter-radicalization policies, and strong international cooperation. In the wake of the December AQIM double bombing in Algiers, King Mohamed VI summed up Moroccan cognizance of the AQIM threat in a condolence message, stating that "Algeria's security is linked to the security of the region."

On July 2 in Yemen, Abdu Mohamad Sad Ahmad Reheqa drove a suicide vehicle-borne improvised explosive device (SVBIED) into a group of western tourists in Marib, killing himself and ten others. Three days later, U.S.-trained Yemeni security forces killed the suspected leader of the SVBIED bombing Ahmed Basyouni Dwedar, an Egyptian wanted in Egypt. On August 8 and 13, Yemeni security forces raided two houses, arresting 17 and killing four AQ-affiliated suspects while suffering one casualty.

Most governments in the region cooperated with the United States in counterterrorist activities and undertook efforts to strengthen their capabilities to fight the War on Terror. These efforts included participation in USG-sponsored antiterrorism assistance (ATA) programs and taking steps to bolster banking and legal regimes to combat terrorist financing. Many countries continued to provide some form of assistance to Coalition efforts to bring peace and stability to Iraq and Afghanistan.

**Algeria**

The security situation in Algeria was marked by several high profile terrorist attacks throughout the country, an evolution of terror tactics and ongoing low-level terrorist activities in the countryside. Beginning in April, several high profile attacks were staged throughout Algeria, including the December 11 near simultaneous bombing of the Constitutional Council and the UN headquarters in Algiers. This attack against a Western hard target underlined the substantial shift in strategy by al-Qa'ida in the Islamic Maghreb (AQIM), who claimed responsibility for the attack and touted it as a major success. Previously, AQIM's predecessor, the Salafist Group for Preaching and Combat (GSPC), had preferred to target Algerian government interests and had been more averse to suicide attacks and civilian casualties. Although Algerian government interests remained the primary focus of AQIM, this attack confirmed that foreigners were included as targets.

Two events helped fuel terrorism concerns in Algeria: the September 2006 merger of elements of the GSPC with AQ to form AQIM, and the conclusion of the amnesty period for Algeria's Charter for Peace and National Reconciliation in August 2006. National Reconciliation remained an open wound for much of the Algerian population, which is divided over amnesty and re-integration on the one hand and a more aggressive, unforgiving approach to terrorism on the other. Although the Charter has officially expired, its terms may still be applied on a case by case basis at the exclusive discretion of the Presidency.

Following the AQ September 11, 2006, announcement of affiliation, AQIM began to make more threats against what it termed "crusading" westerners, particularly American and French citizens, although Russians have been targeted as well. Even before its affiliation with AQ, the GSPC was an organization whose regional ties were expanding. AQIM support cells have been discovered and dismantled in Spain, Italy, Morocco, Mauritania, and Mali, and it maintained training camps in northern Mali.

The year was punctuated with over half a dozen high profile terrorist attacks that included:

- On February 13, AQIM claimed responsibility for car bombings in the provinces of Tizi Ouzou and Boumerdes that claimed six lives and injured many.

- On April 11, AQIM conducted its trademark attack against multiple targets in the city of Algiers. The terrorists targeted government offices and a police station with suicide car bombs.

- On September 6, the first suicide vest attack targeted Algerian president Abdelaziz Bouteflika in Batna, 200 miles east of Algiers.

- On September 8, a suicide bomber attacked the coast guard barracks in Dellys.

- In December, a roadside bomb attack again targeted a Russian company bus west of Algiers.

- The December 11 double suicide bombing of the Algerian Constitutional Council building and UN Headquarters in Algiers.

The most alarming trend was the evolution of tactics to include the use of suicide bombers to conduct attacks in Algeria. We have witnessed a shift in Algeria to tactics that have been successfully employed by insurgents and terrorists in Iraq and Afghanistan. The use of suicide car bombs, suicide vests, and improvised explosive devices (IEDs) by Algerian terrorists indicated a greater level of cooperation and training by AQIM. Of greater concern was the degree that AQIM consistently changed its profile throughout the year. For example, the August 8 suicide bomber was a 15-year-old boy, the youngest suicide bomber in the history of Algeria. Meanwhile the suicide bomber who struck UN Headquarters on December 11 was a 64-year-old man, in the advanced stages of cancer, potentially the oldest. The proliferation of tactics used in Iraq has had a profound effect on the level of organization and sophistication employed by the terrorists in Algeria. The main sources of funding for AQIM remained kidnapping for ransom, muggings, and the narcotics trade in Southern Algeria/Northern Mali. Individual cells in Europe also provided support through small scale funding.

Algerian security services expressed a concern about AQIM using propaganda based on the call to fight in Iraq as a hook to recruit young people, many of whom never made it to Iraq but were redirected towards joining local groups. In previous years, the AQIM propaganda videos originating in Algeria were of amateur quality and poorly produced. This has changed dramatically. It was evident that AQIM has placed a greater emphasis on improving the quality of the videos, and that these videos and communiqués were orchestrated to attract Algerian youth to the AQIM "cause." Several videos posted on the Internet, such as the series "Shadows of the Sword" and "Apostate Hell," showed operations conducted against Algerian military and security targets that included preparations for the attacks and pre-briefings with the commanders that led the attacks. The ability to conduct an attack and claim responsibility via communiqué within hours demonstrated the importance AQIM placed in transmitting their message in an attempt to win the media war.

It was estimated that the Algerian security services killed and arrested upwards of 1100 terrorists, compared to the estimated combined killed and arrested figure of about 650 for 2006. Notable successes were the surrender of GSPC founder Hassan Hattab in late September and the September 6 killing of AQIM central zone emir Zohair Harek. On September 10, Harek's deputy Fateh Bouderbala was arrested, effectively removing the top leadership of the central zone. The counterterrorism successes of the Algerian services, combined with the public's continued rejection of terrorists, have possibly influenced AQIM's shift in tactics to the use of suicide bombers. AQIM was believed to have resorted to suicide attacks as a result of its operational weakness, and to demonstrate its AQ link by adopting the organization's trademark modus operandi. Suicide attacks were cheap and attracted media attention. The head of the Algerian External Intelligence Service confirmed that AQIM's membership was becoming more international. However, the service also noted that the recruitment of foreigners had been limited thus far as a result of the joint efforts of neighboring states.

AQIM, thanks in part to high unemployment among Algerian youth, was partially successful in replenishing its numbers after the arrests, surrenders, and deaths of over 1,000 terrorists. Those remaining appeared to be more hard-line and resistant to the government's amnesty offer. Despite the upsurge of AQIM activity toward the end of the year, overall, the government had greatly

improved security from the situation of the late 1990s. That said, the Algerian military and security forces were often perceived as slow to adapt to AQIM's changing tactics and have shown a resistance to accepting that they now face a better organized international threat in the form of AQIM. The Algerian security services and military remained capable of handling a prolonged effort against internal terrorist threats and were a reliable counterterrorism partner.

**Bahrain**

The Government of Bahrain actively monitored terrorist suspects, but domestic legal constraints at times hampered its ability to detain and prosecute suspects. Using the new 2006 counterterrorism law[8], security forces monitored the travels and activities of a Bahraini citizen and arrested him on August 8. His arrest and the subsequent investigation led to the arrest of a number of other men. Prosecutors charged each with membership in a terrorist organization, undergoing terrorist training, facilitating the travel of others abroad to receive terrorist training, and financing terrorism. Their trial began on October 23 and had not concluded at year's end.

Bahrain continued to host the Middle East and North Africa Financial Action Task Force (MENA FATF) secretariat. The MENA FATF concluded Bahrain's mutual evaluation in November 2006 and published it in early 2007.

**Egypt**

There were no successful terrorist attacks in Egypt, due mainly to the vigilance and effectiveness of Egypt's security services. The Egyptian government's active opposition to terrorism, and effective intelligence and security services, made Egypt an unattractive locale for terror groups. Nonetheless, Egypt's northern Sinai region remained a haven for smuggling weapons, explosives, funds, and people between Egypt, Gaza, and Israel. Criminal networks that smuggle weapons and other contraband through the Sinai into Israel and Gaza may be associated with or used by terrorist groups in the region. The apparent radicalization of some Sinai Bedouin may be linked in part to these smuggling networks and to the Bedouin's long-standing complaints of discriminatory and heavy-handed treatment by the central government.

In the past four years, Egypt has tightened its terror finance regulations in keeping with relevant UN Security Council Resolutions. Egypt passed anti-money laundering legislation in 2002, established a financial intelligence unit in 2003, and ratified the International Convention for the Suppression of the Financing of Terrorism. The Government of Egypt kept open, regular lines of communication with U.S. officials concerning terrorist finance information. Egypt maintained its

---

[8] The 2006 counterterrorism law was the first of its kind in Bahrain to specifically criminalize terrorism. It enumerated the types of crimes considered to be terrorism and established punishments, ranging up to and including the death penalty. The law also criminalized conspiracy to carry out an act of terrorism and outlawed membership in proscribed groups, including al-Qa'ida. Bahrain enacted amendments to an existing anti-money laundering law in 2006 that criminalized the undeclared transfer of money across international borders for the purpose of money laundering or in support of terrorism. Anyone convicted under the amended law of collecting or contributing funds, or otherwise providing financial support to a group or people who undertook terrorist acts, was subject to imprisonment and/or fine. The amendments also codified a legal basis for a disclosure system for cash couriers. The implementing regulations have not yet been enacted, however.

strengthened airport security measures and security for the Suez Canal, and continued to institute more stringent port security measures.

The Egyptian judicial system does not allow plea bargaining, and terrorists have historically been prosecuted to the full extent of the law. Terrorism defendants may be tried in military tribunals or emergency courts.

Many of the Egyptian president's far-reaching powers in the realm of counterterrorism come from a decades-old Emergency Law, which was renewed by Parliament for two years in 2006. President Mubarak has pledged to lift the Emergency Law by June 2008 and has called for new antiterrorism legislation to replace the Emergency Law, noting that Egypt should follow the example of other countries that have recently passed comprehensive laws to combat terrorism. Such legislation was being drafted by a governmental interagency committee at year's end.

The United States hosted the third session of the United States-Egypt Counterterrorism Joint Working Group.

The imprisoned former leader of Egyptian Islamic Jihad, Sayid Imam al-Sharif, issued a detailed "revision" of his previous ideology of violent jihad. His revised approach to jihad did not amount to a rejection of the concept, but an attempt to establish "rules of engagement" for conducting jihad, while also offering non-violent alternatives. He also denounced AQ's agenda and verbally attacked AQ's leaders Usama bin Ladin and Ayman al-Zawahiri.

**Iran**

*See Chapter 3, State Sponsors of Terrorism.*

**Iraq**

The Iraqi government, with support from Coalition Forces, made significant progress in combating al-Qa'ida in Iraq (AQI) and affiliated terrorist organizations. There was a significant reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IED) attacks in the last five months of the year.

Terrorist organizations and insurgent groups continued their attacks on Coalition and Iraqi security forces using IEDs, including vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers. The Iraqi government continued to emphasize national reconciliation and passed key pieces of reconciliation-related legislation. However, there was greater success taking practical steps that helped to advance reconciliation at the provincial and local level.

Coalition and Iraqi forces made their gains against AQI and like-minded extremists with much help from the grass-root engagement of Sunni and Shia tribal leaders and Concerned Local Citizens (CLC)/Sons of Iraq (SOI) groups. The Iraqi government took greater steps on both the bilateral and multilateral fronts to try to harness regional and international support against the common threat from AQI and like-minded extremists.

An improved security environment has resulted from the combined factors of Coalition troop surge and sustained presence, the declared ceasefire by Muqtada al-Sadr's Jaysh al-Mahdi militia in August, improved Iraqi Security Forces proficiency, and increasing popular support for the actions of Iraqi Forces against AQI and other extremist groups. CLC and SOI groups provided Coalition and Iraqi forces with valuable information that helped disrupt terrorist operations and expose large weapons caches. Tribal awakening movements, similar to the Anbar Awakening that emerged in western Iraq in 2006, gained momentum as both Sunni and Shia sheikhs formed alliances with the coalition against AQI and extremist groups. Ethno-sectarian related violence declined but remained a concern as Shia extremists and criminal organizations became an increasing threat to stability.

Iraqi and Coalition Forces forced AQI cells from their strongholds in western Iraq and the Baghdad area. With their bases of operations disrupted and with members detained or killed, AQI and like-minded extremist elements were forced into the eastern and northern parts of Iraq to look for more advantageous and secure operating areas. AQI has shifted its tactics from primarily Shia targets to focusing its attacks against Iraqi security forces, CLC groups, and tribal awakening movement members. Despite the improved security environment, AQI still possessed the means to launch high-profile attacks against Iraqi civilians and infrastructure.

Iraqi government officials continued to strongly condemn terrorists. On September 28, Iraq and Turkey concluded a counterterrorism agreement between its interior ministers to increase cooperation in countering the militant Kurdish separatist group, Kongra Gel/Kurdistan Workers' Party (KGK/PKK). Following an October 7 attack by the KGK/PKK that killed 13 Turkish soldiers in Southern Turkey, Prime Minister Maliki publicly stated that the KGK/PKK was a terrorist organization and would not be tolerated in Iraq. Kurdistan Regional Government (KRG) officials in northern Iraq also took concrete actions against the KGK/PKK presence there by closing off re-supply routes via additional checkpoints, increasing airport screening for KGK/PKK members, and directing the closure of KGK/PKK-affiliated offices.

The government's national reconciliation programs made incremental progress. The Iraqi Council of Representatives passed a unified pension law important to reconciliation efforts, and local working level reconciliation initiatives also successfully brought Sunni and Shia groups together to promote a message of unity. In October, Anbar and Karbala provincial government officials and tribal sheikhs met three times in two weeks to foster improved Sunni-Shia reconciliation.

Terrorism committed by illegal armed groups receiving weapons and training from Iran continued to endanger the security and stability of Iraq. Foreign terrorists from Saudi Arabia, North Africa, and other Middle Eastern countries continued to flow into Iraq, predominantly through Syria.

The Iraqi government increased its bilateral and multilateral efforts to garner regional and international support against the common threat from AQI and like-minded extremists. The Expanded Neighbors Process has emerged as a forum in which Iraq and its neighbors can address the political and security challenges facing Iraq. The first Expanded Neighbors of Iraq

Ministerial was convened in Sharm el Sheikh on May 4. At the ministerial, participants unanimously endorsed the creation of three working groups, including one on border security, which held its first meeting in Damascus later in the year. At the second Expanded Neighbors of Iraq Ministerial, hosted by Turkey on November 3, participants, including high-level representatives from all of Iraq's neighbors, issued a final communiqué that condemned all acts of terrorism in all its forms in Iraq. In August, Prime Minister Nuri al-Maliki met with Syrian President Bashar al-Asad and other top Syrian government officials to discuss improving bilateral cooperation on both the counterterrorism and border security fronts. Other senior Iraqi government officials also visited Syria in an effort to foster bilateral counterterrorism and border security cooperation.

Iraq remained a committed partner in counterterrorism efforts. The Iraqi security forces continued to build tactical and operational momentum and assumed responsibility for security in nine of Iraq's 18 provinces. Continued Coalition and other international support will be critical for the Iraqi government to continue building its capacity to fight terrorist organizations. Iraq's intelligence services continued to improve in both competency and confidence but will also require ongoing support before they will be able to adequately identify and respond to internal and external terrorist threats. The international community's support for investment and reconstruction are critically needed to ensure the success of the Government of Iraq's plans to reduce violence, improve services, and increase economic opportunities.

**Israel, the West Bank, and Gaza**

Israeli civilians were killed in six separate terrorist attacks during the year, the lowest number since the first Intifada broke out. While the lethality of individual terrorist attacks declined in comparison to 2006, Israel nevertheless continued to suffer from terrorist threats emanating from the West Bank and Gaza. Israeli security sources continued to express concern that AQ and other external Sunni extremists might infiltrate the West Bank and Gaza, especially after Palestinian gunmen claiming affiliation with AQ blew up a vacant resort in Gaza in January. Claims of actual AQ presence in the West Bank and Gaza have not been substantiated.

Israel responded to the terrorist threat as it has in recent years, with targeted operations directed at terrorist leaders and weapons experts, Israel Defense Forces (IDF) incursions into the West Bank and Gaza to conduct roundup operations, and other efforts designed to increase pressure on Palestinian terrorist organizations and their supporters. The Israeli security services also imposed strict and widespread closures and curfews in Palestinian areas, and continued constructing an extensive security barrier in the West Bank and Jerusalem that Israeli officials believe has played an important role in making terrorist attacks more difficult to undertake.

Perceiving the need to restore deterrence vis-à-vis Lebanese Hizballah and its backers in Syria and Iran, the IDF conducted extensive military exercises in northern Israel and the Golan Heights. Diplomatically, Israel continued to make the case at the UN, in its bilateral relations, and through public diplomacy that it faced threats from Hizballah, which was re-arming with Syrian and Iranian help, and from Palestinian terrorist groups receiving financial support from Iran. Israel contended that Egypt did not do enough to stop the smuggling of arms and explosives from the Sinai into Gaza through tunnels under the Gaza-Sinai border. In October, the Army

Corps of Engineers conducted a study of the situation, and Egypt agreed to utilize $23 million of its Foreign Military Funding budget this year to purchase anti-tunneling equipment. Egypt has also agreed to discuss coordination and constructive ways to address this problem with the United States, Israel, and the Palestinian Authority.

While rocket fire against Israeli civilian targets from Gaza by HAMAS and other terrorist organizations continued during the year, HAMAS did not otherwise take responsibility for terrorist attacks pursuant to a unilateral conditional cease-fire it announced in 2005. HAMAS likely aided other terrorist organizations in Gaza, including Palestinian Islamic Jihad (PIJ), the al-Aqsa Martyrs' Brigades (AAMB), and the Popular Resistance Committees (PRC), particularly after HAMAS seized power and expelled the legitimate Palestinian Authority government from Gaza in June.

Terrorist attacks that resulted in injuries and the Israeli responses included:

- On January 29, in the resort city of Eilat, a suicide bomber blew himself up in a bakery. Three Palestinian groups, PIJ, AAMB, and an unknown group calling itself "The Army of the Faithful", claimed responsibility for the attack.

- On February 25, the body of an Israeli settler was found in the Gush Etzion settlement bloc in the West Bank. The Israeli National Police said that he had been stabbed to death in a terrorist attack. No group claimed responsibility for the attack. Two young Palestinian men were subsequently arrested in a joint IDF-Israel Security Agency (ISA or Shin Bet) operation, and reportedly admitted to carrying out the attack based on religious grounds.

- On May 21 and 28, two Israeli civilians were killed when Qassam rockets launched from Gaza landed near them in the border community of Sderot.

- On November 19, an Israeli civilian was killed in a shooting incident near the West Bank settlement of Kedumim. The AAMB took responsibility for the attack. Two suspects were arrested the following day in a joint IDF-ISA operation. Palestinian security forces arrested a third suspect, who reportedly served previously in the Palestinian National Security Forces.

These incidents reflected an overall decrease in the number of successfully perpetrated terrorist attacks in comparison to previous years. Israeli security officials maintained that the decrease was not for lack of terrorists' efforts, but because the security services were able to keep terrorist planners and operators off balance. Throughout the year, Israel's security services publicly reported several foiled attempts.

Three nearly successful attempts, in particular, could have had disastrous consequences if they had been carried through to completion. The first attempt occurred on February 20 and involved a PIJ militant who carried an explosive backpack onto an Israeli bus in Tel Aviv. After failing to detonate the backpack, the man fled the scene. The man, his PIJ accomplices, and the backpack were subsequently found by the Israeli security services. The PIJ commander who ordered the

110

failed attempt was killed by IDF forces the following day in the West Bank. The second involved a truck bomb in Tel Aviv in March. For unknown reasons, the driver did not detonate the truck. The operation was discovered by the Shin Bet and suspected operators were subsequently detained. Press reports cite Shin Bet sources as alleging that HAMAS was behind the foiled attack. HAMAS never responded to the allegations. The third attack involved an explosive belt discovered in an apartment in Tel Aviv on September 22. According to Israeli security sources, the belt was intended to be used in an attack on the Yom Kippur holiday, to be carried out by a suicide bomber who had been arrested three days earlier in a joint IDF-ISA operation in the West Bank. A joint HAMAS-Popular Front for the Liberation of Palestine (PFLP) cell in the West Bank reportedly planned the attack.

On the law enforcement front, in March, a Tel Aviv court sentenced three Israelis to 13 years in jail for assisting a Palestinian who killed five Israeli civilians and wounded 30 in the July 2005 suicide bombing of a shopping mall in Netanya. Another Israeli was sentenced to seven years imprisonment in May for transporting a Palestinian suicide bomber to a Tel Aviv cafe, where the bomber carried out his attack in 2002, killing an Israeli civilian and wounding 28 others.

Despite the fact that Palestinian terrorists were relatively unsuccessful in carrying out suicide bombings and other attacks within Israel, they were nevertheless able to harass Israel throughout the year with mortar attacks against the Israeli-manned crossings between Gaza and Israel, and with Qassam rocket launches from Gaza towards Israeli communities abutting Gaza, the majority of which were targeted at the town of Sderot in the southern Negev desert. The Israeli Foreign Ministry claimed that from mid-June through mid-December, 428 Qassam rockets and 590 mortar shells were fired from Gaza towards Israeli civilians and soldiers. On October 7, militants fired a 122 mm Grad missile into Israel. It struck the town of Netivot, 15 kilometers inside Israel. PIJ, HAMAS, the AAMB, and the PRC claimed responsibility for the rocket and mortar attacks. On the eve of the November 27 Annapolis Conference, attended by the United States, Israel, the Palestinians, and representatives of other Middle Eastern countries, the PRC announced that it would begin "Operation Autumn Storm" and launch hundreds of rockets towards Sderot and western Negev communities during and after the conference. This threat was not carried out.

The Israeli security services assessed that the use of rockets and mortars reflected recognition by the groups launching them that their best chances for success were through asymmetrical warfare. The reliance on rockets also reflected technological advancements that allowed the groups to manufacture the rockets cheaply, stockpile them, and launch them greater distances. Prior to HAMAS' takeover of Gaza in June, Israeli security experts also assessed that rocket attacks were being carried out in order to draw Israel into Gaza, and force PA President Abbas' Fatah party to cooperate with HAMAS. Mortars were used mainly against Israeli targets within or on the very edge of the Gaza, to include crossings, which had the effect of closing the crossings to the detriment of Gaza's residents.

During the first half of the year, Israel undertook small-scale military operations against suspected launch teams and sites in Gaza. After HAMAS' June seizure of control in Gaza, the IDF sought to prevent launches by carrying out aerial attacks against vehicles it had identified as carrying rockets en route to launch sites in Gaza. The Israeli government also authorized targeted operations against terrorist leaders and operatives and the expansion of a buffer zone within Gaza

wherein the IDF could carry out counterterrorist operations. Throughout the year, the IDF struck at areas used for launch sites in northern Gaza to deter launches. Israeli Air Force (IAF) helicopters also deliberately struck HAMAS military headquarters and other HAMAS installations in response to Qassam rocket attacks that HAMAS claimed it carried out.

Press reports also highlighted numerous attempts by Palestinians to kidnap Israeli citizens or high-value targets of interest, including foreign diplomats and journalists. In January, a French diplomat and his two bodyguards were kidnapped by AAMB gunmen in the West Bank. On March 12, BBC reporter Alan Johnston was abducted in Gaza by gunmen belonging to a Palestinian group calling itself "The Army of Islam" and was held for 114 days until his release on July 4. While in captivity, an AQ-affiliated Palestinian organization calling itself "The Palestinian Jihad and Tawheed Brigades" claimed that it executed Johnston, and blamed the Palestinian Authority and the British government for his death. Two videos were also released that showed Johnston dressed in an explosive vest, and threatened his death unless Palestinian prisoners in the UK and Jordan were released. HAMAS brokered his release in an apparent bid to demonstrate its control over Gaza.

<u>Deterring the Threat from Hizballah and Syria</u>

Israel's security establishment remained concerned about the terrorist threat posed to Israel in the north by Hizballah and its Iranian and Syrian backers. Israeli security officials said that Hizballah continued to provide support to select Palestinian groups to augment their capacity to conduct attacks against Israel. Israeli politicians and security officials pointed to Hizballah's efforts to rebuild and re-arm after the previous summer's war as evidence that Hizballah remained a threat to Israel. Throughout the rest of the year, Israeli officials claimed publicly that Hizballah had completely replenished its ranks, possessed even more short and medium-range rockets than it had before the 2006 war, had moved arms back into southern Lebanon, and was providing training to HAMAS operatives from Gaza.

During the summer, Israeli officials and media outlets also filled Israel's airwaves with dire predictions of a summer war between Israel and Syria that was likely to be started by a kidnapping or terrorist operation in the vicinity of the Golan Heights. With a view to deterring such a provocation, the IDF carried out large-scale, comprehensive military exercises for several weeks in the Golan Heights, in clear view of UN Disengagement Observer Force observers, the Syrian military, and Hizballah. While some observers feared that the exercises themselves might lead to a misunderstanding and a subsequent conflict, Israel's northern border remained comparatively quiet.

<u>Increasing Pressure on HAMAS and Raising the Tunnel Problem</u>

Israel continued to face the problem of terrorists in Gaza receiving funds and supplies through cross-border smuggling either through the Egypt-Gaza border, or under the border via tunnels, or by sea. In June, Israeli Prime Minister Olmert publicly stated that the smuggling problem had become so serious that the international community should consider deploying a multinational force between Gaza and the Sinai Peninsula. HAMAS said it would treat such a force as an occupying power.

Israeli security sources claimed in August that arms smuggling into Gaza had reached a peak since HAMAS' June takeover of Gaza. Specifically, officials said that since June, 40 tons of explosives, as well as large quantities of ammunition and over 150 RPG launchers had been smuggled into Gaza from Egypt. Israeli security sources also alleged that HAMAS had smuggled hundreds of terrorists from Gaza to Iran for advanced training across the Gaza-Sinai border and through tunnels underneath. They claimed that HAMAS was amassing an arsenal of sophisticated anti-tank missiles and long-range rockets of the type used by Hizballah in the Summer 2006 Israel-Hizballah conflict.

Israel responded to the ongoing tunnel problem by taking unilateral military action to root out and destroy the tunnels, and by increasing diplomatic pressure on Egypt to enhance security on its side of the Egypt-Gaza and Egypt-Israel border. Throughout the year, small IDF units, backed by helicopters and armored combat vehicles, entered southern Gaza on missions to search for terrorist suspects and tunnels. By the end of the year, more than 40 tunnels had been discovered and destroyed.

At the same time, the Israeli government increased pressure on the Egyptian government to encourage it to address the problem of smuggling through tunnels and the Rafah crossing. On December 26, Israeli Defense Minister Barak met with Egyptian President Mubarak and his aides about the arms smuggling problem and the flow of Palestinians between Gaza and Sinai.

West Bank and Gaza

The Palestinian Authority's (PA) counterterrorism efforts improved in 2007, with a new PA Cabinet under PM Salam Fayyad undertaking serious efforts to fight incitement and terror in the second half of the year. Nevertheless, additional efforts will be required to dismantle terrorist groups and infrastructure in the West Bank and Gaza. In the first half of the year, PA counterterrorism efforts and USG assistance to support these efforts were greatly complicated by HAMAS' control of the PA government and by the creation of rival security forces in Gaza. In June, HAMAS militants captured PA offices and security bases in a violent takeover of Gaza. Subsequently, President Mahmud Abbas dismissed HAMAS Prime Minister Ismayil Haniyah and his cabinet. A new cabinet, appointed and led by PM Salam Fayyad, and USG security assistance to PA security forces in the West Bank, created new opportunities for PA action against terrorism.

The primary PA security forces (PASF) are the National Security Forces (NSF), police, Preventive Security Organization (PSO), Presidential Guard (PG), General Intelligence (GI, or Mukhabarat), and civil defense. While the GI, PG, and NSF are subordinate to the President, under Palestinian law all are under the jurisdiction of the Interior Minister. In Gaza, HAMAS has established separate police, coastal patrol, border guard, and "Executive Force" organizations under the former HAMAS Prime Minister's control. HAMAS military-wing members were often integrated into their ranks. Militias such as the HAMAS and PIJ military wings, the al-Aqsa Martyrs Brigade, and clan-based armed groups (especially in Gaza) also exercised significant control and carried out vigilante justice in areas where PASF were not present or were ineffective at delivering basic law enforcement.

There were no terrorist attacks against American citizens in the West Bank or Gaza during the reporting period. The PA made no progress in apprehending, prosecuting, or bringing to justice the perpetrators of the October 2003 attack on a U.S. Embassy convoy in Gaza that killed three USG contractors and critically injured a fourth.

While cooperation between the PA and Government of Israel security services improved in the second half of the year, local counterterrorism coordination remained weak. The PA protected and returned several Israelis, including IDF soldiers, who had entered Palestinian cities, including Jenin and Bethlehem.

In the West Bank, the PASF were hindered by a lack of resources and trained personnel, and an unclear chain of command and guidance. PASF officials frequently raised concerns about operational difficulties imposed by the Israeli government on PASF movement. Efforts to arrest and prosecute terrorists were also impeded by a disorganized legal system, a weak security apparatus, and inadequate prison infrastructure.

President Abbas and PM Fayyad put their weight behind a security program that included disarming fugitive militants and eventually dismantling armed groups. PM Fayyad has condemned violence against Israelis in harsh terms and has taken rapid action against those involved in attacks. Since becoming Prime Minister, Fayyad has condemned every attack against Israelis as contrary to Palestinian interests and commitments and has ordered immediate action, including planned prosecutions against the perpetrators.

The Fayyad-led PA government instituted stricter controls on media outlets and religious figures to reduce incitement. The Fayyad government's political platform was the first to omit language concerning "the right of resistance," and he and the PA government have actively criticized violence and terror as contrary to Palestinian interests.

The Palestinian Monetary Authority (PMA) continued building a Financial Follow-Up Unit (FFU) and developing capacity to track and deter financial transactions used to fund terrorist activity. The new PA Cabinet, formed in July, improved efforts to counter terrorist financing, and the Finance Ministry worked effectively with the Justice Ministry, Attorney General, and (as appropriate), with the Interior and Waqf Ministries to shut down illegal NGOs and charities. The PMA drafted an Anti-Money Laundering Law that was enacted as law by Presidential decree in November.

**Jordan**

In its public statements, new legislation, security measures, and court cases, the Government of Jordan continued to place a high priority on its fight against extremism and terrorism. Those efforts coincided with an apparent shift in public opinion against extremism as reflected in poll results. The 2007 Pew Research Center Global Attitudes survey indicated a marked turn against support for terrorism among Jordanians. Only a fifth of respondents expressed any confidence in Usama bin Ladin (down from 56 percent four years ago), and fewer than a quarter viewed suicide bombing as justified (down from 43 percent in 2002, and from 57 percent in 2005). A

common view among commentators was that antipathy toward extremism increased since terrorists killed 60 Jordanians in attacks on three hotels in Amman in 2005. According to the Pew data, while worries about terrorism fell in many countries since 2002, in Jordan concerns were up nearly threefold, from 15 percent to 42 percent.

King Abdullah used international fora, national addresses, and media interviews to denounce extremists and promote a tolerant, moderate brand of Islam. Speaking before the opening session of the new parliament in December, for example, the King promised to combat extremist Islam and "stand up to anybody who tries to abduct our religion or to monopolize fatwas for political reasons, for the purpose of using religion as a tool to subdue others for the sake of special or suspicious agenda."

Parliament passed new anti-money laundering legislation that began to address a key law enforcement deficiency in what is otherwise a strong counterterrorism environment. The new law, which went into effect in July, created an Anti-Money Laundering Unit (AMLU) that is the central receiving point for all suspicious transaction reports related to money laundering. Although the law did not specify terrorism and terrorism financing as a predicate offense for money laundering, the AMLU believes it will be able to resolve these ambiguities through the issuance of regulations and Central Bank of Jordan instructions to obligated entities. This approach has not yet been tested in the courts.

Jordan's security forces remained vigilant against terror threats. For example, the General Intelligence Directorate in February arrested members of al-Qa'ida in Iraq (AQI) who were attempting to infiltrate from Syria. Another member was killed in an armed confrontation in Irbid in January. Additionally, Jordan's State Security Court (SSC), a special tribunal for terrorism and other cases that had both civilian and military judges and attorneys, maintained a heavy caseload. Examples of SSC actions included:

- In November, it ratified a prior ruling against two men who were convicted of plotting to launch an attack on Israel via the Jordanian border.

- In September, 16 people were convicted and given prison terms ranging from 20 months to five years for recruiting people to fight Americans in Iraq and carry out suicide attacks. Five of them, including Fatah al-Islam leader Shaker al-Absi, were tried in absentia.

- In August, five men were sentenced to prison terms ranging from 20 months to five years after being convicted of plotting acts that undermine Jordan's relations with another country and subjecting the country to hostile acts.

- In July, two men were given prison sentences for plotting to kill Americans in Jordan "to avenge U.S. policies toward Muslims."

- In April, sentences were handed to six men who plotted AQ-linked terrorist attacks at Queen Alia International Airport and hotels in Aqaba and the Dead Sea.

The SSC continued to review the cases in the trial of the defendants accused of plotting to assassinate President Bush during his November 2006 visit to Jordan. The three Zarqa residents, Nidal Momani, Sattam Zawahra, and Tharwat Daraz, stand accused of conspiracy to carry out terrorist attacks with flammable substances in Jordan, and of possession of illegal weapons and explosive substances for illicit purposes.

Additionally, in January, the Court of Cassation upheld the death sentence imposed on would-be suicide bomber Sajida Rishawi, who, in 2006 was convicted of plotting terrorist attacks against three hotels in Amman; she was the first woman to receive the death penalty in a terror-related trial in Jordan.

**Kuwait**

In 2007, the Government of Kuwait did not enact stronger antiterrorism and money laundering legislation, and it continued to have difficulty prosecuting terrorists and terrorism financiers and facilitators. The risk of a terrorist attack in Kuwait remained high because of U.S. forces in the country, regional tensions, and the Kuwaiti government's reluctance to confront domestic extremists. Kuwait lacked legal provisions to deal with conspiracies to commit terrorist acts, a problem complicated by domestic politics. In the past, the Kuwaiti government took action against non-Kuwaiti residents involved in terror facilitation but was reluctant to take action against key local Sunni extremists unless there was a perception of clear and direct danger to Kuwaiti or U.S. interests. The Kuwaiti government was reluctant to support the designation of its nationals as terrorists or terrorism supporters under UNSCR 1267.

In April, the Kuwaiti government froze all financial accounts of terrorism financier Mubarak Al-Bathali and forbade him to open any further accounts in Kuwait. In July, Kuwaiti authorities arrested Jabir Al-Jalahmah for his role in facilitating the travel of jihadists to Iraq, but a Kuwaiti court later released him on bail.[9]  The Kuwaiti government had not prepared a case against Al-Jalahmah. Mohsen al-Fadhli, a U.S.-designated Kuwaiti terrorist, was believed to be in Jordan and remained at large. The Court of Cassation, Kuwait's highest court, ruled in March 2005 that it did not have jurisdiction over al-Fadhli's alleged financing of the terrorist attack on the USS Cole in October 2000.

The Kuwaiti government continued the prosecutions of the 36 members of the "Peninsula Lions" terrorist cell involved in January 2005 confrontations with police. In May, the Court of First Instance overturned the convictions of three defendants. In June, the Court of Cassation commuted the death sentences of four defendants to life sentences (equal to 25 years of imprisonment under Kuwaiti law). The Court of Cassation is reviewing the verdicts of the remaining 32 defendants in the Peninsula Lions case.

---

[9] In December 2006, the U.S. Department of the Treasury designated three Kuwaiti nationals as terrorist supporters within the U.S.: extremist cleric Hamid Abdallah Al-Ali, and terrorism facilitators Mubarak Al-Bathali and Jabir Al-Jalahmah. In December 2005, a Kuwaiti court acquitted Hamid Al-Ali for his role in inciting the Peninsula Lions attack of January 2005.

In 2002, twelve armed Kuwaitis attacked two U.S. service members outside a military base near Failaka Island. The Appeals Court acquitted five of the twelve defendants. In February 2007, the Court of Cassation reduced the fines of two of these defendants from 700,000 USD to 7,000 USD. Separately, in 2005, the Criminal Court convicted 18 Kuwaitis in absentia to three years in prison for recruiting jihadists to fight in Iraq. In October, the Appeals Court attempted to review the cases of seven of these individuals, but was unsuccessful since they remained at large.

In April and May, Kuwaiti courts upheld the not guilty verdicts of seven former Guantanamo detainees on terror-related charges. The Kuwaiti government had been appealing decisions previously rendered by lower Kuwaiti courts.

Nevertheless, Kuwait was an effective and reliable partner in providing security for U.S. military installations and convoys in Kuwait. In 2006, Kuwaiti police arrested three bidoons (stateless residents) for planning to attack U.S. military personnel. The Criminal Court convicted the bidoons in January 2007, and sentenced them each to ten years in prison, to be followed by deportation. The Court of Appeals was scheduled to review their case on December 31. Kuwait's reluctance to address the social and economic conditions of its bidoon residents has resulted in this segment of the population becoming vulnerable to radical ideologies and terrorist recruiters.

In response to AQ threats to attack oil facilities in the Gulf, Kuwait took some steps to improve security at its petroleum installations and export terminals. In March, a multi-agency U.S. Critical Energy Infrastructure Protection team visited and provided the Kuwaiti government with a number of recommendations to improve its energy infrastructure security. Kuwait responded by taking initial steps to enhance physical security at several locations.

The Kuwaiti government's legal regime for combating money laundering and terrorist financing lacked sufficient enforcement mechanisms, thus hindering its effectiveness. The Kuwaiti government implemented no cash reporting requirements for individuals leaving the country, and this was a significant vulnerability. While money laundering was a criminal offense, terrorist financing was not specifically prohibited. Kuwait had established an Anti-Money Laundering/Combating Terrorist Financing Committee (AML/CTF), with representation from a wide range of government ministries and domestic financial institutions. Kuwait was also an active member of the Middle East and North Africa Financial Action Task Force (MENA FATF). Although Kuwait had a Financial Intelligence Unit (FIU), it did not exercise independent authority in accordance with current international standards.

The Ministry of Social Affairs and Labor (MOSAL) took some steps to strengthen its domestic monitoring regime of Kuwait-based Islamic charities, but was less effective in monitoring the activities of these charities outside Kuwait. The Kuwaiti government needs to accelerate its efforts to pass counterterrorism legislation, strengthen charity oversight, empower its FIU, monitor cash couriers, and fully conform to international standards and conventions on terrorist financing.

In 2005, Kuwait's Ministry of Awqaf (religious endowments) and Islamic Affairs launched an initiative to spread moderation and to combat extremism within the Muslim community. The Ministry's World Moderation Center (WMC), tasked with implementing this program, offers a

45-day moderation course, which over 700 imams have completed thus far. The Center also began offering this course to high school Islamic studies teachers.

The moderation campaign has had some difficulty reaching the broader public, prompting the government to launch an awareness campaign on its behalf. The World Moderation Center sponsored international moderation conferences in London and Washington, D.C., and established a moderation center in Manchester, England.

**Lebanon**

Political violence continued throughout 2007. Most notable were the June 13, September 19, and December 12 car bombing assassinations of MP Walid Eido, MP Antoine Ghanem, and General Francois al-Hajj, respectively. The two MPs were part of the pro-government March 14 coalition, and several political allies of the two MPs charged that the Syrian government was responsible for the assassinations, which Syria strongly denied. These acts, the latest in a series of assassinations and attempted assassinations over the last three years, seemed designed to intimidate the pro-government forces and eliminate, through the process of killing MPs, their numerical majority in parliament.

On May 20, a conflict involving the Lebanese Armed Forces (LAF) and militant Islamic fundamentalist group Fatah al-Islam (FAI) erupted in Nahr el-Barid, a Palestinian refugee camp in the north. After a three-month battle, the Lebanese Army took control of the camp on September 2. The death toll was 168 LAF soldiers and an estimated 42 civilians. While the LAF were able to defeat FAI militants and secure the Nahr el-Barid camp, the Government of Lebanon still lacked control of the other eleven refugee camps in the country.

The assassinations of the MPs and the battle against FAI were followed by a December 12 car bombing that killed LAF Brigadier General Francois al-Hajj in the Christian town of Baabda, east of Beirut. General al-Hajj had been in charge of operations when Lebanon's army fought Islamic militants from Fatah al-Islam in Nahr el-Barid refugee camp. No one publicly claimed responsibility for the bombing, though potential suspects include FAI and its sympathizers.

On June 24, six soldiers in the Spanish contingent of the UN Interim Force in Lebanon (UNIFIL) were killed, and another two injured, when two improvised explosive devices (IEDs) exploded near their vehicle in southern Lebanon. While no organization claimed credit for the attack, it was widely viewed as an effort by those who oppose UNIFIL's efforts to prevent attacks against Israel launched from southern Lebanon.

During the last three years, there have been at least 12 assassinations and assassination attempts that resulted in more than 49 deaths, including that of former Prime Minister Rafiq Hariri. Other attacks targeted Lebanese journalists and politicians critical of Syrian interference in Lebanon. All of these attacks remained unsolved. The UN International Independent Investigation Commission (UNIIIC) continued its investigation of the Hariri assassination and its assistance to Lebanon in the Lebanese investigation of the other assassinations.

By confronting and defeating FAI in the Nahr el-Barid camp, the government of Prime Minister Fouad Siniora and the LAF took a strong incremental step in combating and preventing terrorist activities. The battle against FAI marked the first time in 40 years that the LAF fought a major conflict as a single entity, and it was the first time the army entered a Palestinian refugee camp to eliminate an Islamic militant terrorist group and reestablish order and security. Also, the LAF continued to strengthen its border presence and increased patrols in the south, with assistance from UNIFIL. Even with the conflict in north Lebanon, the LAF was able to maintain its deployment commitments in the south.

While the Lebanese government has made progress, there were still concerns about its ability to combat terrorism. The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah retains its strong influence among Lebanon's Shia community, which comprises about one-third of Lebanon's population. Hizballah maintained offices in Beirut and elsewhere in Lebanon.

The ongoing political stalemate over both the election of a president and the failure of Parliament to meet has contributed to enabling militant foreign Islamic extremists affiliated with or sympathetic to al-Qa'ida (AQ) to infiltrate Lebanon, and to set up operational cells. Palestinian militant groups continued to capitalize on the lack of government control within the camps. Some of these groups, such as AQ-affilated Asbat al-Ansar and Jund al-Sham, have been able to find safe haven within the camps to support their actions, most notably in the Ain el-Hilwah camp.

Although Syria withdrew its military forces from Lebanon in April 2005, it still maintains a covert intelligence presence. The Lebanese government has accused Syria of continuing to support and facilitate arms smuggling to Hizballah and Palestinian terrorist groups. Even with the continued LAF troop deployments, the Government of Lebanon still did not exercise full control over areas in the Hizballah-dominated south, the southern suburbs of Beirut, parts of the Bekaa Valley, and inside eleven Palestinian-controlled refugee camps. This lack of control provided opportunities for terrorist groups to operate relatively freely in some of these locations.

At the end of the year, the Lebanese government had not fully implemented provisions of UNSCR 1559, which called for respect for the sovereignty and political independence of Lebanon, the end of foreign interference in Lebanon, and the disarming and disbanding of all Lebanese and non-Lebanese militias. While the Lebanese government was committed to fulfilling the provisions of UNSCR 1559, it maintained that implementation of Hizballah's disarmament should be accomplished through "national dialogue" rather than force.

Lebanese authorities maintained that the amnesty for Lebanese individuals involved in acts of violence during the civil war prevented the government from prosecuting terrorist cases of concern to the United States. These cases included individuals involved in the 1985 hijacking of TWA Flight 847, during which a U.S. Navy diver was murdered, and the abduction, torture, and murder of U.S. hostages in Lebanon from 1984 to 1991. U.S. courts issued indictments against Lebanese Hizballah operatives responsible for a number of those crimes. Mohammad Ali Hamadi, who spent 18 years in a German prison for his role in the TWA hijacking, was released

in December 2005 and was believed to be in Lebanon. The United States continued its efforts to bring him to trial before a U.S. court and formally requested his extradition.

With regard to terrorism finance, Lebanese officials played an active leadership role in the Middle East and North Africa Financial Action Task Force (MENA/FATF). The Central Bank of Lebanon's Special Investigation Commission (SIC), an independent legal entity with judicial status that is empowered to investigate suspicious financial transactions, investigated 209 cases involving allegations of money laundering and terrorist financing activities. On two occasions, the SIC was unable to designate or freeze the assets of two groups affiliated with Hizballah, because the groups were affiliated with a political party participating in the Lebanese government, and thus, a decision to freeze their assets would have been a political, rather than a legal decision.

**Libya**

Since the United States rescinded Libya's designation as a state sponsor of terrorism in June 2006, Libya has continued to cooperate closely with the United States and the international community on counterterrorism efforts. Since renouncing terrorism in 2003, Libya has endeavored to show its commitment to the War on Terror.

On November 3, Egyptian cleric and AQ leader Ayman al-Zawahiri announced a merger between AQ and the Libyan Islamic Fighting Group (LIFG). In an audiotape, al-Zawahiri urged AQ fighters to topple the government of Libya, describing Libyan leader Muammar Qadhafi as an "enemy of Islam" and criticizing Qadhafi's 2003 decision to renounce WMD and terrorism. According to press accounts, LIFG maintained a limited presence in eastern Libya and has facilitated the transfer of foreign fighters to join insurgents fighting U.S.-led forces in Iraq.

A number of U.S. court cases seeking compensation from Libya for its past support for terrorism remained unresolved. Libyan officials are engaging with the courts and, at USG urging, are continuing settlement talks with the claimants, including the families of the victims of the 1988 bombing of Pam Am flight 103 in Lockerbie, Scotland, and the 1986 bombing of the La Belle nightclub in Berlin.

**Morocco**

A series of suicide bombing attacks shattered the relative lull in terrorist violence that had prevailed in Morocco since the 2003 Casablanca bombings. The attacks underscored that Morocco's greatest terrorist threat stems from numerous small "grassroots" Salafi Jihadist groups. The main external terrorism threat to Morocco was al-Qa'ida in the Islamic Maghreb (AQIM) and its demonstrated willingness to train inexperienced Moroccan extremists. Morocco adopted a comprehensive counterterrorism strategy that emphasized vigilant security measures, counter-radicalization policies, and strong international cooperation.

This year's violence was centered in the city of Casablanca, Morocco's commercial capital, but the last attack occurred in the city of Meknes.

- On March 11, an individual blew himself up in an Internet café.

- On April 10, three suicide bombers, cornered by police as a result of an investigation of the March bombing, blew themselves up to avoid capture, with a fourth being killed by the police.

- On April 14, two suicide bombers blew themselves up near the U.S. Consulate and the private American Language Center, respectively. Other than the attackers themselves, one person was wounded.

- In August, a fourth suicide bombing incident took place in Meknes when an individual unsuccessfully attacked a tourist bus with a crude improvised explosive device (IED), blowing his arm off but injuring no one else seriously.

Characteristics of the attacks supported previous analysis that Morocco's greatest terrorist threat stems from the existence of numerous small "grassroots" terrorist groups in Morocco willing to commit violent acts against the state, foreigners, and innocent civilians. However, these separate followings in Morocco remained small, separate, and disorganized groups without territorial safe haven. These attacks, which appeared to have been, at best, poorly coordinated events, contrasted sharply with the 2006 terrorist incidents, which had more elaborate plots, albeit thwarted by Moroccan authorities.

Morocco has several external terrorist threats, including AQIM, al-Qa'ida (AQ), and extremist veterans returning from Iraq.[10] The main threat from AQIM remained the knowledge transfer of AQIM operational capabilities to Morocco's committed, but relatively inexperienced, Salafi adherents. There were credible reports of Moroccans going to northern Mali and Algeria and returning to Morocco after training with AQIM. In the wake of the December AQIM double bombing in Algiers, King Mohamed VI summed up Moroccan cognizance of the AQIM threat in a condolence message, stating that "Algeria's security is linked to the security of the region."

AQ's information operations may have inspired the 2003 and 2007 bombings in Casablanca. AQ number two Ayman al-Zawahiri publicly threatened Moroccan and Western interests, and in December 2006 and November 2007, implicitly called for attacks on the two Spanish enclaves of Ceuta and Melilla, which, for many Moroccans, represent humiliating colonial legacies. In so doing, AQ demonstrated its ability to mix local grievances into its propaganda to increase its effectiveness.

Morocco's comprehensive counterterrorism strategy not only emphasized identifying and neutralizing existing terrorist threats through traditional law enforcement and security measures, but also engaged in preventative measures to discourage terrorist recruitment through political reform and policy measures. King Mohamed VI led this effort by unambiguously condemning

---

[10] While overall numbers of Moroccans fighting in Iraq are difficult to estimate, some press reporting puts the number at several hundred.  The precedent in the 1990s of Jihadists returning to North Africa after the conflict in Afghanistan also underscores this potential threat.

terrorism and those who espouse or conduct terrorism; he recently called terrorism something "alien to Islam and contrary to religion and law."

In September, Morocco held free and fair elections of its lower house of parliament. Turnout for the election was lower than many expected (approximately 37 percent of registered voters) and the parliament's institutional capacity remained limited. The parliament, however, has been a productive forum for moderate Islamists to air their views, in part offering a counterweight to extremist rhetoric.

The Moroccan government continued to implement internal reforms aimed at ameliorating socio-economic factors that terrorists exploit for recruitment and ideological purposes. The National Initiative for Human Development, launched by King Mohamed VI in 2005, is a $1.2 billion program designed to generate employment, combat poverty, and improve infrastructure, with a special focus on rural areas.

Morocco's Ministry of Religious Endowments and Islamic Affairs (MOIA) continued the reforms launched in 2004 to counter extremist ideology and promote religious moderation and tolerance. MOIA supervised revisions to the country's religious curriculum, broke with precedent by appointing 50 women as spiritual guides at mosques across the country, and installed a closed circuit television network that broadcast moderate religious sermons to 2,000 mosques per day.

Rabat continued to target aggressively and dismantle terrorist cells by enhancing policing techniques, coordinating and focusing the security services, and expanding and bolstering regional counterterrorism partnerships.

The Government of Morocco aggressively continued to pursue terrorism-related cases. Police investigations into the March 11 suicide bombings led police subsequently to capture Saad Houssaini, an individual linked to the 2003 Casablanca bombings who confessed to helping make the explosives for the March attacks.Police were also able to disrupt an attack in Casablanca a month later.  The police tracked down the four men involved in the April 10 bombing as a result of an investigation of the March bombing and a tip they had received from an undisclosed source, according to press reports. The Government of Morocco also disrupted numerous cells dedicated to sending Jihadi fighters to Iraq, including one based in the northern Moroccan city of Tetouan. The Tetouan cell appeared to be both a nascent domestic terror cell and a feeding point into the Iraq foreign fighter pipeline.

The Government of Morocco emphasized adherence to human rights standards and increased law enforcement transparency as part of its counterterrorism program. The government provided non-governmental organizations with unprecedented access to prisons where individuals convicted of terrorism-related crimes were being held. Counterterrorism investigations and arrests appeared to be better targeted and legal proceedings more transparent throughout the year. The government also demonstrated unprecedented frankness in presenting candid assessments of the terrorism threat and its response to the public. Government appeals for public support with counterterrorism investigations, in this regard, also appeared successful. Subsequent to the

March suicide bombing attacks, police were able to locate and raid a makeshift bomb making facility in Casablanca linked to the bombers after receiving tip-offs from local residents.

In May, Morocco implemented a comprehensive anti-money laundering bill that provided the legal basis for the monitoring, investigation, and prosecution of illegal financial activities. The law also called for the establishment of a centralized Financial Intelligence Unit. Both U.S. and EU assistance provided Moroccan police, customs, central bank, and government financial officials with training to recognize money laundering methodologies. Morocco had an effective system for disseminating U.S. and UN Security Council Resolution terrorist freeze lists to its financial sector and legal authorities. Morocco provided timely reports requested by the UNSC Sanctions Committee and, as a result, was able to freeze some terrorist-related accounts.

Transparent Moroccan court proceedings against detained terrorism suspects ended with prosecutorial successes. In March, Moroccan courts convicted eight individuals for plotting to conduct terrorist attacks in France, Italy, and Morocco. One of the defendants, believed to have ties to AQIM, received the maximum penalty of 15 years. The case of over 50 individuals linked to the Ansar al-Mahdi cell continued to move forward despite several delays. The judicial proceedings for six individuals allegedly linked to the 2007 Casablanca bombings began in May.

Another key to Morocco's counterterrorism success has been its emphasis on international counterterrorism cooperation. The United States and Morocco have built a valuable relationship based on cooperation and an ongoing exchange of information. Moroccan authorities continued to disrupt plots to attack Moroccan, U.S., and other Western-affiliated targets, and aggressively investigated numerous individuals associated with international terrorist groups. Morocco forged solid cooperative relationships with European partners such as Spain and France, and continued to work to increase existing counterterrorism relationships with its North African neighbors.

**Oman**

Oman remained proactive in its implementation of counterterrorism strategies and its cooperation with neighboring countries to prevent terrorists from moving freely throughout the Arabian Peninsula. The Omani government promoted religious moderation and tolerance in an effort to prevent the spread of extremist ideology. A new comprehensive antiterrorism law was promulgated in January, which established the National Committee for Combating Terrorism and strengthened the country's legal proscriptions against all forms of terrorist acts, including the furnishing of assistance to terrorists.

Oman is not a major financial center and did not have a significant money laundering problem. Nevertheless, it has adopted controls designed to prevent the use of its financial system to fund terrorist or other illicit activities. Following the launch of the "Oman Program for Anti-Money Laundering" (OPFAM) in 2006, the government sponsored two workshops to enhance the prevention, detection, investigation, and prosecution of money laundering. The Omani government continued to encourage information exchanges among relevant actors, standardize indicators to report suspicious transactions, and develop common guidelines to address the threat of money laundering.

Oman's long coastline and relatively porous borders offered significant security challenges as they remained vulnerable to illegal transit by migrant workers, smugglers, terrorists, and individuals involved in the traffic and sale of illegal drugs. The government was concerned by the steady flow of illegal immigrants throughout the year attempting to enter Oman, often in transit to other destinations in the Arabian Peninsula, particularly the United Arab Emirates. The majority of the illegal immigrants apprehended were from Pakistan and Afghanistan. An increasing amount of Somalis illegally attempted to cross the border into Oman from Yemen. No known terrorists were found during immigration enforcement operations.

The Omani government has been aggressive in seeking training and equipment through the U.S. military to support its efforts to control its land and maritime borders. United States military assistance, including the sale of night vision equipment and the provision of training on maritime interdiction operations, was used to bolster coastal patrol efforts, modernize Oman's coastal surveillance system, and made Oman's remote inland borders with Yemen, Saudi Arabia, and the UAE less porous and easier to observe.

## Qatar

Qatari security services maintained tight control over immigration and effective monitoring of possible extremist events. While counterterrorism cooperation remained positive, the United States continued to strive for increased cooperation with the Qatari government on information sharing and political engagement.

There has not been a terrorist attack in Qatar since the March 19, 2005, suicide vehicle-borne improvised explosive device (SVBIED) attack at an amateur theater playhouse that killed a British citizen. Cooperation with U.S. law enforcement authorities continued to improve during and after the course of the investigation of this case. Press reports indicated that up to 19 people of various nationalities, including one Qatari, were apprehended during the ensuing investigation. There were no reports of criminal prosecution in the case; however, many of the third country nationals who were apprehended were deported subsequent to the investigation.

The Qatar Authority for Charitable Activities is responsible for overseeing all domestic and international charitable activities, including approving international fund transfers by charities and monitoring overseas charitable, development, and humanitarian projects. The Authority reports annually to Qatari government ministries on their status.

Cooperation with U.S. authorities on counterterrorism finance continued to develop. Qatar's Financial Information Unit resides in the Qatar Central Bank. Local banks worked with the Central Bank and the FIU on counterterrorism finance and anti-money laundering issues, and bank officials attended U.S.-sponsored conferences.

As of December 2007, Qatar was the only country in the Gulf with an Attorney General (AG) independent of the Ministry of Interior or Ministry of Justice, and equivalent to a ministerial level position. The AG independently controlled and oversaw public prosecutions and appointed attorneys within the Public Prosecutors Office. The AG's office was created in 2002 and maintains a National Security Office responsible for prosecutions under the 2004 Combating

Terrorism Law. Prior to the creation of a separate AG office, the majority of public prosecutors were senior police officers, not trained lawyers.

Qatarwas the only Gulf country with a public prosecutor exchange program with the U.S. Department of Justice. In November, six Qatari attorneys from the Public Prosecutors' office attended a two-week exchange; one week was spent studying financial crimes at the Public Prosecutors Training Academy Federal Advocacy Center at the University of South Carolina School of Law, and the second week was devoted to shadowing U.S. federal attorneys in Boston and New Hampshire.

As of mid-December, Qatar and the United States were discussing a non-binding memorandum of understanding (MoU) regarding judicial assistance and cooperation between the two nations. The MoU would allow both nations to strengthen judicial cooperation and to exchange evidence and information for use in prosecutions.

The USG has provided law enforcement and counterterrorism training under various programs, including the State Department's Antiterrorism Assistance (ATA) program. The exchanges and training have had a positive effect in maintaining a good relationship with Qatari law enforcement agencies and increasing their ability to deter, disrupt, and defeat terrorist activity in Qatar. Operationally, however, this capability has yet to be fully tried, tested, or proven.

**Saudi Arabia**

The Government of Saudi Arabia continued to confront terrorism and extremist ideologies, though with varying degrees of success. The country suffered two high-profile terrorist incidents: the shooting of four French citizens and the violent murder of a high-ranking Saudi colonel. Saudi security forces managed to capture or kill most of the assailants involved in the two incidents and successive government roundups resulted in hundreds of arrests that likely disrupted terrorist cells planning to carry out attacks in the Kingdom. The Saudi government continued its efforts to disrupt terror-related financial flows. Cooperation with the United States resulted in the arrests of 16 Saudi-based terrorism financiers and the successful implementation of new Saudi Customs cash courier regulations. The United States continued to urge Saudi Arabia to establish a Charities Commission to oversee all private charitable activities.

In February, a group of armed men attacked nine French nationals traveling near the city of Medina. Four of the victims were killed, including one teenager. By June, security forces had captured or killed all individuals suspected of being involved in the attack. In mid-April, a police colonel serving in Al-Qasim was found decapitated at his family rest house in Al-Qusaiah. The murder was widely believed to have been carried out by terrorists. Security forces later detained 30 people in connection to the murder. This was not the first time that terrorists attacked and killed a member of the security forces. In June 2005, terrorists murdered a lieutenant colonel in Mecca just outside his home.

The Saudi security forces continued efforts to make Saudi Arabia inhospitable for terrorists and their supporters. The security forces arrested 380 individuals suspected of involvement in terrorism during operations conducted throughout 2007. The announcements were widely

reported in the press and may have bolstered a perception among the public that terrorism remained a threat but that the government continued to combat terrorism within the Kingdom actively. According to the Ministry of the Interior, these attacks neutralized several terror cells and prevented several planned attacks, including an imminent attack on an unnamed Saudi oil installation. Some of those arrested had allegedly received flight training abroad, while others planned to mount attacks against Saudi oil facilities or to murder public officials. Some of those arrested were planning to travel to Iraq or Afghanistan as foreign fighters.

To address the enduring concern over foreign fighters returning to Saudi Arabia from Iraq or Afghanistan, the Saudi government continued plans to construct a border security system. During the first half of the year, Saudi border guards seized large amounts of weapons and explosives from smugglers transiting the Saudi-Iraqi border and the Saudi-Yemeni border. They also apprehended a large number of individuals attempting to enter the Kingdom illegally and, through their investigations, located caches of weapons and explosives at undisclosed locations in the desert.

Saudi Arabia increased its efforts to disrupt terror-related financing in the Kingdom. In the past year, the Saudi government arrested more than thirty individuals suspected of financing terrorism. However, in the case of ten individuals arrested in February, some activists protested against the arrests and testified to the legitimate reform efforts of some of these individuals. Despite these steps, the United States continued to urge the Government of Saudi Arabia to pursue and prosecute terrorist financiers more vigorously. The Saudi Government took action against suspected terrorism financiers by freezing their accounts and confiscating their assets. Saudi Arabia continued to comply with obligations under the UNSCR 1267 Sanctions regime, which included freezing assets of and enforcing a travel ban on three Saudi nationals designated in October.

New cash courier regulations in Saudi Arabia were put in place to curb illegitimate cross-border cash flows. Travelers transiting all 17 Saudi ports of entry were now required to declare cash, jewels, and precious metals with a value in excess of 16,000 USD. In the weeks preceding Ramadan, the Ministry of Interior reiterated Saudi law prohibiting the placement of donation collection boxes in department stores, shopping centers, pharmacies, mosques, and hospitals. The Saudi government had still not established its National Committee for Relief and Charity Work Abroad (Charities Commission). As a stop-gap, the Saudi government decreed that no local charities could send funds abroad until the Charities Commission was established.

Over the past year, Sheikh Abdul Aziz Bin Muhammad Al-Asheikh, the Grand Mufti of Saudi Arabia, made statements undermining financial support for terrorism. During the Muslim holy month of Ramadan, the Grand Mufti delivered a sermon in which he cautioned young Saudis against traveling abroad under the pretext of jihad – a vague reference to joining the insurgency in Iraq. In the same speech, he urged Saudi citizens not to finance terrorism and be mindful of how their charitable contributions are distributed. In late November, the Grand Mufti declared that "deviant groups" guilty of corrupting society should be subject to severe punishment in accordance with Islamic law. Several Saudi Islamic scholars and officials including Dr. Saleh bin-Humaid, the Imam of the Grand Mosque in Mecca, voiced support for the Grand Mufti's words. While not a member of the Saudi government, the Grand Mufti is the most senior

religious scholar in Saudi Arabia and his moral authority plays an influential role in shaping public opinion in the Kingdom.

On a more basic level, the Ministry of Islamic Affairs launched an extensive media campaign to educate young Saudis on the "correct" teachings of Islam in order to prevent them from becoming drawn to extremist doctrines. The campaign included messages incorporated into Friday sermons at mosques, distribution of literature and tapes, and publication of articles on the Internet. As a part of the campaign, the government published a book in October entitled, "Guarding Against Terrorism." The government also recently began to issue identification cards to imams and religious leaders to curb instances of unauthorized persons delivering Friday sermons.

The Kingdom took several steps toward prosecuting its growing prison population of terror suspects. Senior Saudi officials, including the Minister of Interior, Minister of Justice, and Supreme Judicial Council Chairman all publicly supported aggressive legal action against terrorists but it remained unclear exactly how many detainees have faced formal charges in Saudi courts and how many were awaiting trial at year's end. During an address to the Shura Council on July 1, the Interior Minister stated that of some 9,000 suspected militants detained since 2003, 3,106 were still in detention.

The Saudi government also moved to reform its judicial system, including establishing a new state security court to try terrorism cases and expanding rehabilitation programs for terror-related prisoners. On October 1, King Abdullah issued a royal decree approving the restructuring of the judiciary to improve governance and efficiency of the Saudi court system. In addition, Saudi officials have announced the establishment of specialized state security courts to try terrorism cases. The Grand Mufti's October fatwa against supporting jihad abroad also added gravitas to pending legal actions against terror financiers and facilitators. The Grand Mufti and Supreme Judicial Council Chairman have urged the courts to follow a strict interpretation of Islamic law, including sentencing unrepentant terrorists to death. However, they continued to offer incentives for good behavior and said that terrorists who surrender themselves to the authorities and repent will be given special consideration in accordance with Islamic law.

Saudi officials acknowledged that the long-term solution must include an effective rehabilitation program to undermine detainees' adherence to extremist ideology. Accordingly, the government continued its extensive prisoner rehabilitation program aimed at addressing the social context within which individuals are recruited by terrorist groups. Officials involved with the rehabilitation program told the press that since the establishment of detainee counseling programs in 2004, the Interior Ministry had held more than 5,000 sessions to counsel more than 3,200 detainees and successfully rehabilitated and released more than 1,000 prisoners. Likewise, Saudi prisoners repatriated to Saudi Arabia from Guantanamo Bay underwent a similar rehabilitation program before reintegration into Saudi society.

**Syria**

*See Chapter 3*, *State Sponsors of Terrorism*.

**Tunisia**

Tunisian law enforcement organizations carefully monitored the activities of Tunisian extremists, both in Tunisia and abroad, which challenged the ability of terrorists to organize internally. In December 2006 and January 2007, government forces disrupted a terrorist cell that allegedly targeted domestic and foreign (including U.S. and UK) interests in Tunisia. Six of those involved allegedly entered Tunisia from Algeria, where they received training and support. Tunisian security forces killed 12 members of the group, reportedly called Assad Ibn Fourat's Army, and captured 15 others. In December 2007, 30 individuals allegedly associated with the cell were convicted by the Tunis Court of First Instance of various terrorism-related charges. Lawyers have appealed the sentences, which ranged from death to five years imprisonment.

The Tunisian government actively prevented the formation of terrorist groups inside Tunisia, including prohibiting the formation of religious-based political parties and groups that it believed would pose a terrorist threat. Hundreds of other suspected terrorists were reportedly detained, charged, and/or convicted under Tunisia's 2003 Terrorism Law and other relevant legislation.

Tunisian extremists were also involved in terrorist activities abroad, including in Algeria, Italy, Iraq, and Lebanon. Domestically, the government worked to improve security procedures at borders and airports. In April, 12 Tunisians were convicted of planning to travel to Algeria to join al-Qa'ida in the Islamic Maghreb (AQIM). A number of Tunisians suspected of involvement in terrorist incidents abroad were also repatriated and subsequently charged with or convicted of terrorist activities.

In November, Tunisia hosted an international conference on terrorism organized by the Islamic International Educational, Cultural, and Scientific Organization (ISESCO). The concluding statement of the conference, which was attended by over 100 international officials and opened by UN Secretary General Ban Ki-Moon and Tunisian President Ben Ali, stressed the role of education and economic development in defeating terrorism. During the year, Tunisia also hosted several meetings of Ministry of Interior officials from Arab League members, including ministers and chiefs of counterterrorism units, to review regional counterterrorism efforts and cooperation.

**United Arab Emirates**

The Government of the United Arab Emirates (UAE) repeatedly condemned terrorist acts in Iraq, Lebanon, and elsewhere in the region. In order to prevent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided prescribed guidelines for all Friday sermons, and required all 1,500 mosques that delivered sermons to record them each Friday to ensure that imams adhered to the guidelines.

The Container Security Initiative (CSI), which became operational at the ports of Port Rashid and Jebel Ali in the Emirate of Dubai in 2005, had five U.S. Customs officers co-located with the Dubai Customs Intelligence Unit at Port Rashid. On average, CSI reviewed approximately 250 bills of landing each week, resulting in 15-20 non-intrusive inspections of U.S.-bound containers; examinations were conducted jointly with Dubai Customs officers. In addition, Dubai

Customs made requests that most, if not all containers that originated in Iran be designated for inspection.

Although generally cooperative in counterterrorism, cooperation on law enforcement matters was hampered by the lack of a mutual legal assistance treaty (MLAT) between the United Arab Emirates and the United States. The UAE has a cyber-crime law criminalizing the use of the Internet for terrorist groups to "promote their ideologies and finance their activities." The UAE has established a National Security Council charged with formulating and implementing a national strategic plan.

The UAE continued its efforts to combat terror financing, but challenges remain. The United States-UAE Joint Terrorist Finance Coordinating Committee met three times during the year, directly resulting in affirmative changes to the UAE's anti-money laundering laws. The UAE Central Bank provided training programs to financial institutions on money laundering and terrorist financing. However, the Central Bank remained resistant to implementing operations targeting passengers suspected of Bulk Cash Smuggling arriving from terrorist source countries. The Central Bank initiated memoranda of understanding with regional financial intelligence units, and performed anti-money laundering training both locally and regionally. The Central Bank investigated financial transactions and froze accounts in response to internal investigations. Nine prosecutions for money laundering were in process at year's end. In December, the Department of Justice provided training for prosecutors on Bulk Cash Smuggling in Dubai.

**Yemen**

Yemen's 2007 counterterrorism record was mixed. The Republic of Yemen took action against al-Qa'ida (AQ) and local extremists, arresting and killing several individuals suspected of having AQ ties, and prosecuted the perpetrators of previous terrorist acts. However, significant setbacks included the June 22 announcement that Abu Basir Nasir al-Wahishi was the new head of al-Qa'ida in Yemen (AQY), and the July 2 terrorist attack in Marib that killed ten people. Despite United States pressure, Yemen continued to implement a surrender program with lenient requirements for terrorists it could not apprehend, which often led to their relatively lax incarceration. Yemen also released all returned Guantanamo detainees after short periods of assessment and rehabilitation, into a government monitoring program that lacked strict monitoring measures. U.S.S. Cole bomber Jamal al-Badawi's continued incarceration remained uncertain at the end of 2007.

On July 2, Abdu Mohamad Sad Ahmad Reheqa drove a suicide vehicle-borne improvised explosive device (SVBIED) into a group of western tourists in Marib, killing him and several others. AQY claimed responsibility. Three days later, U.S.-trained Yemeni security forces killed the suspected leader of the SVBIED bombing, Ahmed Basyouni Dwedar, an Egyptian wanted in Egypt for his ties to the Muslim Brotherhood. On August 8 and 13, Yemeni security forces raided two houses, arresting 17 and killing four AQ-affiliated suspects while suffering one casualty.

On June 22, AQ affiliate and February 2006 prison escapee Abu Basir Nasir al-Wahishi announced he was the new head of AQY, replacing Abdul Ali al-Harithi, who was killed in

2002. On August 23, the Yemeni Ministry of Interior instituted a gun ban in major cities throughout Yemen based on a 1992 gun control law. Security forces continued to report increasing numbers of weapons seized.

Despite Yemen's history of terrorist activity and repeated offers of assistance from the USG, Yemen lacked a comprehensive counterterrorism law. Current law as applied to counterterrorism was weak. In October, the government established a working group on drafting a comprehensive counterterrorism law. The Yemeni justice system was also ineffective. The courts did not set dates for the trials of suspects involved in the two September 2006 AQY-orchestrated attacks on oil facilities in eastern Yemen. In August 2006, the Sanaa Appellate Court returned to a lower court the case of two individuals accused of plotting in 2004 to assassinate the U.S. Ambassador, claiming the judge did not follow correct sentencing procedures. Consequently, the March 2006 convictions to five years in prison for Hizam al-Mass and Khalid al-Halilah were under appeal at year's end.

Yemeni security forces continued to arrest and try suspected members of AQ and other terrorist groups throughout the year. On November 12, a Yemeni court sentenced December 2006 U.S. Embassy shooter Saleh Alawi al-Ammari to five years in prison. On November 6, the government sentenced 23 suspected AQ affiliated individuals to between two and 15 years in prison.

Although the government lacked laws to criminalize or prevent foreign fighters going to Iraq, it applied available lesser laws to thwart foreign fighter activity. At year's end twenty-one individuals awaited the appeal of their July 2006 Special Penal Court conviction on fraudulent document charges relating to traveling to Iraq to attack U.S. forces. On August 22, a Yemeni court sentenced 19 individuals charged with conspiring to travel to Iraq to attack U.S. and Yemeni interests to 40 months in prison for falsifying documents, possession of arms and aiding AQ suspects.

On August 8, the courts sentenced two Yemenis to one year in prison for their part in the February 2006 escape from a maximum security prison of 23 suspected AQ supporters. Much of this sentence will be time served. The escapees included individuals convicted of participating in the 2000 U.S.S. Cole and 2002 M/V Limburg attacks. On January 15, the Yemeni security forces killed prison escapee Yasir Hamayqani in southern Yemen. In total, ten escapees returned to Yemeni custody and security forces killed six. The government could not account for seven of the escapees at year's end.

In May 2006, a security court convicted Mohammed Hamdi al-Ahdal, allegedly AQ's number two in Yemen, to 37 months in prison for financing terrorist groups associated with AQ.

The government had a surrender program for wanted terrorists that it believed it could not apprehend. The program provided lenient requirements for completion of convictions to those who surrendered. Most notably on October 15, mastermind of the U.S.S. Cole bombing and February 2006 prison escapee Jamal al-Badawi surrendered to Yemeni authorities. He was released to house arrest on October 17, under the terms of this program. Following substantial

USG pressure, he was back in jail by October 29. The Yemeni constitution precludes extradition of Yemeni citizens.

Yemen used its Islamic Dialogue Committee, headed by a leading judge who was also the Minister of Religious Guidance and Endowments, to continue its dialogue with detainees arrested for connections to terrorist groups. The government released detainees it considered rehabilitated after they pledged to uphold the Yemeni constitution and laws, the rights of non-Muslims, and the inviolability of foreign interests. The government also released all 12 returned Guantanamo detainees, lacking sufficient evidence for convictions after short periods of assessment and rehabilitation. The government monitoring program of released detainees was loose. The government considers this program to have a very high success rate, but this has not been independently corroborated.

The Government of Yemen's capacity for stemming terrorism financing remained limited. On November 6, the government presented a terrorism financing bill to parliament for approval, where it remained at year's end. On August 6, the UN agreed to a study at the behest of the Yemeni government to rescind the 2004 UN 1267 sanctions against Abdulmajeed al-Zindani, who was associated with promoting and supporting AQ. Yemen continued to take no action to bar his travel or freeze his assets in compliance with its UN obligations. Throughout the year, President Saleh continued to voice public support for al-Zindani and his Al-Iman University.

## SOUTH AND CENTRAL ASIA OVERVIEW

"May I emphasize, ladies and gentlemen, that we were the prime victim of terrorism and terrorism was never, nor is it today, a homegrown phenomenon in Afghanistan. Therefore, this threat can only be overcome if addressed appropriately across its regional international dimensions….Recognizing that constructive regional cooperation is vital to a successful counterterrorism strategy, we proposed the holding of Joint Peace Jirgas between Pakistan and Afghanistan, and we were pleased for the support that this initiative has received from our friends in the international community."

–Hamid Karzai, President of the Islamic Republic of Afghanistan
Statement, 62nd UN General Assembly, New York;
September 25, 2007

Terrorism remained a serious problem in the region, directly and indirectly threatening American interests and lives. Increasingly, South and Central Asian terrorists expanded their operations and networks across the region and beyond. To varying degrees, U.S. cooperation with regional partners on counterterrorism issues continued to increase, but much is left to be accomplished.

Despite progress in Afghanistan, the Taliban-led insurgency remained strong and resilient in the South and East. Although the insurgency absorbed heavy combat and leadership losses, its ability to recruit foot soldiers from its core base of rural Pashtuns remained undiminished.

Pakistan continued to suffer from rising militancy and extremism. The United States remained concerned that the Federally Administered Tribal Areas (FATA) of Pakistan were being used as a safe haven for AQ terrorists, Afghan insurgents, and other extremists.

Terrorists staged numerous attacks in India and continued to foment terrorist ideology. India continued to rank among the world's most terror-afflicted countries. Terrorists, separatists, and extremists took more than 2,300 lives this year. Although clearly committed to combating violent extremism, the Indian government's counterterrorism efforts were hampered by its outdated and overburdened law enforcement and legal systems.

Neighboring Bangladesh continued to arrest extremists, but porous borders and internal political strife threatened the progress made against violent extremists. Although the Caretaker Government made a concerted effort to crack down on corruption and address the root causes of violent extremism within its borders, mistrust between Bangladesh and India stymied potential counterterrorism cooperation between the two countries.

In Sri Lanka, both the Liberation Tigers of Tamil Eelam (LTTE) and the government engaged in numerous violations of the 2002 Ceasefire Agreement that left more than 5,000 people dead since hostilities started again in 2006. The LTTE reverted to targeting civilians in bus bombings and claymore mine attacks, while the government used anti-LTTE paramilitaries to terrorize citizens suspected of having ties to the Tigers. Both the LTTE and armed groups allied to the government engaged in wide-spread human rights abuses including extra-judicial killings, abductions, and extortion.

The Communist Party of Nepal (Maoists) briefly entered into a coalition with the government in the spring, withdrew from the coalition in September, and rejoined the government in December. The Maoists continued to engage in violence, extortion, and abductions, and tensions remained high throughout the year. Various separatist groups fought with the government as well as with each other as crime, abductions, and general lawlessness were evident throughout Nepal.

A sustained commitment to counterterrorism by Central Asian states resulted in relatively few terrorist attacks. With U.S. support, Central Asian states have undertaken to improve the capabilities of their border forces and build new border posts to impede terrorist movements and interdict drug smuggling, some of which financed terrorism in the region. The sheer length of the border and local corruption remained obstacles in Central Asia's efforts to control its borders, however. More widely, popular grievances over governance and poor economic growth enhanced the conditions that terrorists and other extremists could exploit to recruit and operate in some parts of the region, such as the Ferghana valley.

Central Asia's most significant terrorist organizations include the Islamic Movement of Uzbekistan (IMU) and a splinter group, the Islamic Jihad Group (IJG). However, radical extremist groups such as Hizbut-Tahrir (HT) foment an anti-Semitic, anti-Western ideology that

may indirectly generate support for terrorism. HT, an extremist political movement advocating the establishment of a borderless, theocratic Islamic state throughout the entire Muslim world, has followers in Kyrgyzstan, Kazakhstan, Tajikistan, Uzbekistan, and elsewhere. The United States has no evidence that HT has committed any acts of international terrorism, but the group's radical anti-American and anti-Semitic ideology is sympathetic to acts of violence against the United States and its allies. HT has publicly called on Muslims to travel to Iraq and Afghanistan to fight Coalition Forces.

**Afghanistan**

Afghanistan struggled to build a stable, democratic, and tolerant government in the face of vicious attacks by the Taliban and related groups on Coalition Forces, civilians, international NGOs, and other soft targets, most notably through suicide bombings. Supported by the international community, the Afghan government has made suppression of terrorism and establishment of effective law-enforcement mechanisms a high priority. The Afghan government reached out to neighboring Pakistan through a Joint Peace Jirga to find ways to root out economic and social factors contributing to terrorism. Reconciliation of low- and mid-level insurgents remained a high priority, and the Program for Strengthening Peace and Reconciliation (PTS) has brought in over 5,000 Taliban and other insurgents who have wearied from the violence and lack of opportunity offered by extremism. The Government of Afghanistan was exploring additional efforts to strengthen and expand PTS reconciliation efforts.

The Disbandment of Illegal Armed Groups (DIAG) program, the follow-on to the earlier Disarmament, Demobilization, and Reintegration (DDR) program, has disbanded 161 illegal armed groups and collected almost 36,000 weapons in 62 districts since its inception in March 2005. In April 2007, in an effort to achieve greater local government support, DIAG began offering development assistance to qualifying districts. DIAG operations expanded, intensifying efforts to build political will at the provincial and local levels to target the more threatening illegal armed groups.

In 2006, the Combined Joint Task Force (then CJTF-76), which had led the Coalition Forces' campaigns against terrorism, turned this responsibility over to the International Security Assistance Force (ISAF). The ISAF used a combination of effective counterinsurgency means and methods, including synchronized use of combat (air and ground forces) and non-combat means (building civil governance and aiding reconstruction and development) to fight terrorism, extremism, and attempts to undermine the constitutionally constituted government. The careful targeting of insurgent leaders and insurgent centers, and proactive operations against them, were aimed at eliminating terrorists and facilitating the flow of reconstruction and development. The increasingly professional and effective Afghan National Army (ANA), and to a lesser extent, the Afghan National Police (ANP), more often took the lead in counterterrorism operations and cooperated closely with the United States.  In December, the ANA combined with UK and U.S. forces to retake the Taliban-held town of Musa Qala in southern Helmand Province.

New integrated civilian-military counterinsurgency approaches in the east, particularly Nangarhar, have begun to yield successes. Despite progress, the Taliban-led insurgency remained a capable, determined, and resilient threat to stability and to the expansion of

government authority, particularly in the Pashtun south and east. The insurgency continued to suffer heavy combat losses, including senior leaders, but its ability to obtain AQ support and recruit soldiers from its core base of rural Pashtuns remained undiminished. Taliban information operations were increasingly aggressive and sophisticated.

Streams of Taliban financing from across the border in Pakistan, along with funds gained from narcotics trafficking and kidnapping, have allowed the insurgency to strengthen its military and technical capabilities. At a Joint Peace Jirga held in August, Pakistani President Musharraf acknowledged that support to the Afghanistan insurgency was being provided from within Pakistani territory.

The Taliban continued to target police, police recruits, government ministers, parliamentarians, civil servants, and civilians, including urban crowds, in numerous violent incidents. Having increased the use of improvised explosive devices, suicide bombings became both more numerous and more costly in terms of innocent lives lost. According to media reports of UN-compiled figures, terrorists launched approximately 140 suicide bombing attacks this year, inflicting large numbers of civilian casualties.

Terrorists, often supported by criminal gangs, have also increasingly turned to kidnapping foreigners, most notably the July abduction of South Korean missionary aid workers. This kidnapping was an attempt to extort ransom as well as to make a political point; the Taliban killed two hostages before releasing the remaining 21 after talks with the Afghan and South Korean governments.

Insurgents also targeted international NGOs, UN workers, and recipients of NGO assistance. They attacked teachers, pupils (especially girls), and schools. They also threatened and often brutally killed those who worked for religious tolerance, including ex-insurgents, tribal leaders, and moderate imams, mullahs, and religious scholars. The Taliban coupled threats and attacks against NGOs with continued targeting of Provincial Reconstruction Teams, de-mining teams, and construction crews on road and other infrastructure projects.

**Bangladesh**

Bangladesh continued to arrest dozens of alleged members of Jamaatul Mujahedin Bangladesh (JMB), the banned Islamic extremist group responsible for a wave of bombings and suicide attacks in late 2005, and recovered bomb-making materials and weapons from their hideouts. The arrests, combined with the execution in March of six senior JMB leaders, appeared to have depleted the membership of the organization. Although there was speculation that JMB remnants might try to reorganize to launch a new wave of attacks, no such terror campaign unfolded.

On May 1, three small bombs went off at railroad stations in the major cities of Dhaka, Chittagong, and Sylhet. Authorities found a message signed by "Zadid al-Qa'ida" at each of the sites threatening non-governmental agencies if they did not leave Bangladesh within ten days. The deadline passed without incident and it remained unclear who was responsible for the attacks.

Neighboring India continued to allege that the United Liberation Front of Assam (ULFA) and other anti-India insurgency groups operated from Bangladesh with the knowledge of senior Bangladeshi government officials. India also blamed the terrorist group Harakat ul-Jihadi-Islami-Bangladesh (HUJI-B) for bomb attacks in the city of Hyderabad in May and August. Bangladesh strongly denied these allegations. The absence of counterterrorism cooperation between India and Bangladesh fueled mutual allegations that each country facilitated terrorism inside the borders of the other.

Bangladesh's caretaker government pledged to pass a series of amendments that would strengthen Bangladesh's Anti-Money Laundering Act and a draft Anti-Terrorism Act, but failed to do so by the end of the year. The legislation would help Bangladesh enter Egmont, the international body of Financial Intelligence Units that plays a critical role in fighting terror financing.

The caretaker government took a strong stance against corruption and arrested many leading politicians and businessmen on graft charges. The United States launched a $20 million, five-year anti-corruption program in Bangladesh to further transparency and good governance efforts, necessary foundations for counterterrorism activity.

U.S. and Bangladeshi law enforcement agencies cooperated well on several cases related to domestic and international terrorism. The United States continued to fund Antiterrorism Assistance programs for Bangladeshi security forces. Bangladesh also continued cooperation with the United States to strengthen control of its borders and land, sea, and air ports of entry.

**India**

India continued to rank among the world's most terror-afflicted countries. The conflict in Jammu and Kashmir, attacks by extreme leftist Naxalites and Maoists in eastern and central India, assaults by ethno-linguistic nationalists in the northeastern states, and terrorist strikes nationwide by Islamic extremists took more than 2,300 lives this year. The Indian government's counterterrorism efforts remained hampered by outdated and overburdened law enforcement and legal systems. The Indian court system was slow, laborious, and prone to corruption; terrorism trials can take years to complete. Many of India's local police forces were poorly staffed, lacked training, and were ill-equipped to combat terrorism effectively.

The Indian government accused Islamic extremists for the following terrorist attacks:
- The February 19 attack on the Friendship Train service between New Delhi and Lahore, Pakistan that killed dozens;
- The May 18 bomb blast at the Mecca Masjid (Mosque) in Hyderabad that killed eleven;
- The August 25 nearly simultaneous explosions on at an amusement park and a market in Hyderabad that killed dozens;
- The October 11 blast at a Sufi mosque in Ajmer, Rajasthan, that killed three;
- The October 14 explosion in a cinema in Ludhiana, Punjab, that killed seven; and
- The November 23 three simultaneous explosions on in judicial complexes in Lucknow, Varanasi, and Faizabad (all in Uttar Pradesh) that killed 13.

These attacks, which killed and injured both Muslims and Hindus, were probably conducted by extremists hoping to incite anger between the Hindu and Muslim communities. Indian officials claim that the perpetrators of these attacks have links to groups based in Pakistan and Bangladesh, particularly Lashkar-e-Tayyiba, Jaish-e-Mohammad, and Harkat-ul-Jihad Islami, among others.

These groups also have links to terrorist activity in Jammu and Kashmir. The number of civilians killed were approximately half of that in the previous year. In May, the Indian government acknowledged that the level of infiltration across the Line of Control had fallen, but noted that insurgents had in some case shifted routes to enter India through Bangladesh and Nepal. Attacks in Kashmir continued. For example, on October 11, two civilians and five soldiers were killed by an improvised explosive device (IED), and on July 29, six people were killed when a bomb exploded on a tourist bus.

The Government of India is very concerned with the threat from leftist extremist (Maoist or agrarian Naxalite) groups to India's internal stability and democratic culture. Leftist extremist groups were very active in wide areas of impoverished rural eastern and central India, and also operated in parts of southern India. Hundreds of people were killed in conflicts between the government and various leftist extremist groups, such as the Naxalites and the Communist Party of India; Maoists (CPI-Maoists) and the government; and between the groups themselves. There were at least 971 Naxalite attacks in the first seven months of the year, approximately equal to that of the entire previous year. Leftist extremists were highly active across a wide swath of India, including the states of Jharkhand, Chattisgarh, Andhra Pradesh, Bihar, Uttarakhand, and West Bengal. They were also active in some areas of Orissa, Maharashtra, and Karnataka. Extremists have targeted elected officials: On March 4, CPI-Maoists shot a Member of Parliament from Jharkhand and five others during a soccer game, and on August 25, leftist extremists killed the son of a former Chief Minister of Andhra Pradesh during a cultural performance in the city of Hyderabad. Ethnic-linguistic separatist groups were responsible for numerous attacks in Northeastern India, particularly in the states of Assam, Nagaland, Manipur, Tripura, and Meghalaya.

Several proscribed terrorist groups operated in the northeast, including the United Liberation Front of Assam (ULFA) and the People's Liberation Army. At least 850 died in conflicts between dozens of insurgent groups and security forces, and in conflicts between the groups.

Lack of security, remoteness, and inhospitable terrain combined to prevent the government from providing security and other basic services in many of the areas in which the leftist extremists and the northeastern separatist groups operated. Both types of groups increased the level of sophistication of attacks this year by using satellite phones and sophisticated IEDs. In some districts, they took control of a large proportion of the territory, making it impossible for government service providers to enter the area. Infighting, particularly among groups in the northeast, may have slowed the increase in the attacks, but poverty and isolation combined to make the rural, mountainous, and forested areas of India vulnerable to both the Maoists and those who claimed to be fighting for liberation in the northeast.

The United States-India Counterterrorism Joint Working Group (CTJWG) has met nine times since its creation in 2000, most recently on November 28. India participated in CTJWGs with 15 other countries, and in multilateral CTJWGs with the EU and with the Bay of Bengal Initiative for Multisectoral Technical and Economic Cooperation, an organization that promotes economic cooperation among Bangladesh, India, Myanmar, Sri Lanka, Thailand, Bhutan, and Nepal. In October, the Indian government held the second round of consultations with Pakistan under the bilateral counterterrorism joint mechanism, and hosted a ministerial level meeting of the South Asia Association for Regional Cooperation on Counterterrorism.

**Kazakhstan**

Kazakhstan continued to aggressively combat terrorism and extremism locally and strengthened its cooperation and timeliness in sharing information with the United States. There was little movement, however, on counterterrorism legislation, and the long-delayed draft law on money laundering remained stalled in Parliament. In June, Kazakhstan hosted over 50 partners for the third meeting of the Global Initiative to Combat Nuclear Terrorism.

In April, authorities began Kazakhstan's first ever trial concerning the financing of terrorism. According to press reports, the trial involved two leaders of the banned East Turkistan Islamic Party and an unnamed organization in Central Asia. In April, authorities arrested approximately 20 people in Shymkent and other cities, accusing the individuals of organizing terrorist acts against Special Services' employees. In July, a trial began in the case of ten members of a radical Islamic Wahabi group suspected of organizing terrorist acts in and around Astana and Almaty. Also in July, an Almaty court sentenced ten individuals from the terrorist group Jamaat Muhadjir, who were detained in 2006, on allegations of planning a series of terrorist attacks. Nine of the individuals were sentenced to prison terms ranging from three to twenty-five years. According to press reports, there is one Kazakhstani national being detained in the Guantanamo Bay detention facility.

The Islamic extremist group Hizbut Tahrir (HT) remained the only group designated and outlawed as an "extremist" organization under the Law on Extremism. There were several instances of arrests of individuals associated with HT, as well as the confiscation of printed materials and electronic media. In August, a closed trial began against 30 members of HT arrested in December 2006 on accusations of activities in support of a banned extremist organization, the stirring of national and religious enmity, and establishing an organized criminal group. The list of fourteen banned terrorist organizations was unchanged from 2006.[11]

Kazakhstan, with China, Kyrgyzstan, Russia, Tajikistan, and Uzbekistan, is a member of the Shanghai Cooperation Organization (SCO), which established a Regional Antiterrorism Center

---

[11] The list of Kazakstan's fourteen banned terrorist organizations included al-Qa'ida, the East Turkistan Islamic Party, the East Turkistan Liberation Organization, the Kongra Gel/Kurdistan Workers' Party, Asbat al-Ansar, the Muslim Brotherhood, the Taliban, Aum Shinrikyo, the Boz Gurd, Jamaat of Central Asian Mujahidins, Lashkar-e-Tayyiba, the Social Reform Society, the Islamic Movement of Uzbekistan, and its splinter group, the Islamic Jihad Group.

in Tashkent. Kazakhstan is also a member of the CIS Collective Security Treaty Organization and the Eurasia Group, a regional anti-money laundering organization modeled on the Financial Action Task Force, with the objective of integrating Kazakhstan, Belarus, China, Kyrgyzstan, Tajikistan, Russia, and Uzbekistan into the global system of anti-money laundering and combating the financing of terrorism.

**Kyrgyzstan**

The Kyrgyz Republic took political, legislative, and law enforcement steps to disrupt and deter terrorism. Since 2001, Kyrgyzstan has hosted the Operation Enduring Freedom Coalition airbase at Manas International Airport near Bishkek. In October 2006, Kyrgyzstan adopted an antiterrorism law that provided for establishment of an antiterrorism center to coordinate the activities of state agencies and facilitate international cooperation. In November 2006, President Bakiyev signed a comprehensive law on "Counteracting Terrorist Financing and Legalization (Money Laundering) of Proceeds from Crime." The law obligates financial institutions to report any suspicious activity and bank transactions that exceed the threshold of $25,000. The law also established a Financial Intelligence Service, an administrative body charged with collecting and analyzing information related to financial transactions, developing systems to prevent and detect suspicious transactions, and submitting cases to the prosecutor's office for further action.

Kyrgyzstan's military and internal forces worked to improve their counterterrorism capabilities and to expand cooperation with regional partners. Kyrgyzstan is a member of the Shanghai Cooperation Organization and the Cooperative Security Treaty Organization (CSTO), which established lists of banned terrorist groups in an effort to streamline cooperation. With U.S. assistance, the Kyrgyz National Guard opened a counterterrorism training facility. Also in December, the Ministry of Defense opened a U.S.-funded facility to house a non-commissioned officers academy.

**Nepal**

While Nepal experienced no significant acts of international terrorism, several incidents of domestic terrorism and politically-motivated violence occurred in urban areas and in the Terai. In 2007, the Communist Party of Nepal (Maoists), a designated organization on the Terrorism Exclusion List (TEL), became part of the interim government. Despite ending their ten-year insurgency by signing the Comprehensive Peace Agreement in November 2006, and entering into the interim government in April 2007, the Maoists, the only U.S.-designated terrorist organization in Nepal, continued to engage in violence, extortion, and abductions. The Maoists withdrew their ministers from the interim government between September and December, but left their members in place in the interim Parliament. The government failed to hold the Maoists accountable for violating the peace process, and law enforcement efforts against terrorist activity were minimal. The Maoist People's Liberation Army (PLA) ostensibly settled into UN-monitored cantonments but at times attempted to circumvent the disarmament and combatant verification process. The Maoist-affiliated Young Communist League, which included former PLA members, grew increasingly prominent during the year, carrying on the Maoist militia's tactics of abuse, abduction, assassination, intimidation, and extortion in cities and villages.

Ethnic tensions increased in the southern Terai plains. From mid-January to early March, as Madhesis (Terai inhabitants culturally and linguistically close to India) protested against the failure of the interim constitution and the interim government to address their concerns, an occasionally-violent popular uprising, the Madhesi Andolan, left many dead. Over a dozen extremist groups in pursuit of independence or autonomy and some criminal elements followed the Maoist lead of "negotiation" via armed struggle. Competing factions of Madhesis clashed with each other, with the Maoists, with hill-origin Nepalis, and with police, instigating numerous strikes, demonstrations, and Indo-Nepal border road closures. The most violent of these groups were factions of the Janatantrik Terai Mukti Morcha (People's Terai Liberation Front), which had broken with the Maoist-affiliated Madhesi Mukti Morcha (Madhesi Liberation Front) insurgency in 2004 in order to bring about the secession of the Terai from the rest of Nepal. The Janatantrik Terai Mukti Morcha factions became increasingly more violent through 2007, despite splitting into five factions by the end of the year. The Maoists exacerbated bloodshed in the Terai in a scramble to regain influence it had lost in the region. On March 21, confrontation between Maoists and Madhesis at a rally in Gaur resulted in the massacre of over 25 people, most of them Maoists. The Government of Nepal largely ignored the conflict in the Terai.

Anti-money laundering legislation remained stalled in Parliament, although the government responded favorably to U.S. requests to be prepared to freeze the assets of individuals and entities involved in the financing of terrorism when or if such assets were discovered. The United States provided substantial antiterrorism assistance and training to Nepal's security forces, including courses on crisis management, post-blast investigations, and terrorist crime scene investigations.

**Pakistan**

International terror organizations, including al-Qa'ida (AQ) and its supporters, operated and carried out attacks in Pakistan. Violence stemming from Sunni-Shia sectarian strife and militant sub-nationalists also claimed civilian lives. Attacks occurred with greatest frequency in the regions bordering Afghanistan: Balochistan, the Northwest Frontier Province (NWFP), and the adjacent Federally Administered Tribal Areas (FATA), but militant attacks continued to grow and target urban centers including Karachi, Islamabad, and Rawalpindi.

The trend and sophistication of suicide bombings grew in Pakistan this year. The December 27 assassination of former Prime Minister Benazir Bhutto, in a suicide bombing after a political rally in Rawalpindi, was the most prominent suicide attack. Between 2002 and 2006, the Department recorded approximately 22 suicide attacks in the country, whereas in 2007 there were over 45 such attacks. These suicide attacks often resulted in large numbers of casualties, and several occurred in Islamabad and Rawalpindi. A number of these attacks targeted well-protected government targets and made use of coordinated and complex operations, such as the November 24 and September 4 suicide attacks in Rawalpindi. On October 18, the most deadly suicide attack in Pakistan's history took place against Bhutto's homecoming procession in Karachi, killing over 130, and injuring hundreds more. In separate suicide attacks in Peshawar and Charsadda, extremists targeted Federal Minister for Political Affairs Amir Muqam in November, and former Interior Minister Aftab Sherpao in December and April; neither were killed, although there were civilian casualties.

Extremists led by Baitullah Mehsud and other AQ-related extremists re-exerted their hold in areas of South Waziristan and captured over 200 government soldiers, who were later released after a local peace deal collapsed. Earlier this year, extremists took over the Lal Masjid (Red Mosque) in Islamabad for a number of months until they were ousted in July during a military operation. Extremists have also gained footholds in the settled areas bordering the FATA, including Swat, Tank, and DI Khan. The Taliban broke a peace agreement between the government and local leaders associated with the Taliban, which contributed to the increase in attacks. Maulana Hasan Jan, a prominent Islamic teacher who preached against the practice of suicide bombings, was assassinated in September. Taliban-linked extremists have closed barber shops and CD and music stores that were alleged to be anti-Islamic, through a series of bombings and threats in the NWFP. A number of girls' schools have closed due to similar threats. Pakistani security forces continued to fight militant leader Maulana Fazlullah in Swat, a settled area in NWFP, after his group tried to implement Sharia law there and displaced court and law enforcement authorities. As of early December, Pakistan's military was conducting enhanced operations against Fazlullah, although Islamabad will likely continue to face challenges to its ability to enforce its writ of law there.

The government's crackdown on banned organizations, hate material, and incitement by religious leaders continued unevenly. Madrassa registration, foreign student enrollment in madrassas, and financial disclosure requirements remained a source of friction between government and religious leaders.

AQ's continued public calls for the overthrow of President Musharraf remained a threat to Pakistan, despite government efforts to eliminate AQ elements. Pakistan continued to pursue AQ and its allies through nationwide police action and military operations in the FATA and elsewhere. Despite having approximately 80,000 to 100,000 troops in the FATA, including Army and Frontier Corps (FC) units, the Government of Pakistan's authority in the area continued to be challenged. While military operations caused disruptions in militant activities, there were no reports of the government capturing or killing any senior AQ leaders. Over 1,000 Pakistani military personnel have been killed since 2001 while carrying out counterterrorist operations.

Pakistani security services cooperated with the United States and other nations to fight terrorism within Pakistan and abroad. Hundreds of suspected AQ operatives have been killed or captured by Pakistani authorities since September 2001. Close cooperation between Pakistani, British, and American law enforcement agencies exposed the August 2006 London-Heathrow bomb plot, leading to the arrest in Pakistan of Rashid Rauf and other alleged conspirators connected to the case. On December 15, 2007, Rashid Rauf escaped from police custody in Rawalpindi and remained at large. Two of the police officers guarding him were arrested and questioned.

Pakistan's leaders took steps to prevent support to the Kashmiri militancy, and the number of violent attacks in Kashmir was down by approximately 50 percent from 2006, according to public statements made by the Indian Defense Minister. Meetings in September 2006 led to the March establishment of the Anti-Terrorism Mechanism to coordinate Pakistan-India exchange of information on terrorist threats.

Pakistan-based Lashkar-e-Tayyiba (LT) and other Kashmir-focused groups continued regional attack planning. In 2007, Kashmir-focused groups continued to support attacks in Afghanistan, and operatives trained by the groups continued to feature in AQ transnational attack planning.

Armed conflict between the government and militant Baloch nationalists continued. Pakistani press reported that the government killed the leader of the Balochistan Liberation Army (BLA), Nawabzada Balach Marri, in November, although the details remained unclear. The BLA and its sympathizers responded with violent protests and terrorist attacks against the government leaving more than 12 dead. (Pakistan declared the BLA a terrorist organization in April 2006.)

Sectarian violence claimed hundreds of lives this year and increased since 2006, according to data from the Institute for Conflict Management. In November, more than 100 people were killed in Sunni-Shia fighting in Parachinar. In April, approximately 80 people were killed in Kurram (in the FATA), when sectarian fighting broke out after a religious procession was attacked.

In 2006, President Musharraf and governmental agencies developed the FATA Sustainable Development Program (SDP) to accelerate economic and social development and strengthen political administration and security in the region. The government created a FATA Development Authority and filled all of its executive positions in November 2006. Pakistan allocated 120 million USD in its FY-2007 budget for FATA development programming, with the bulk going to education and infrastructure projects. While capacity remained a serious challenge, the government continued to build schools, enhance security, and provide training and education.

Although Pakistan continued to work with the UNSCR 1267 Committee to freeze the assets of individuals and groups identified as terrorist entities linked to AQ and the Taliban, several UN-sanctioned entities continued to operate in Pakistan. In September, the long-awaited anti-money-laundering (AML) ordinance was adopted by presidential decree. Unfortunately, parts of the ordinance did not meet international norms and Financial Action Task Force (FATF) recommendations, particularly in the areas of designated offense categories and the statutory definition of money laundering. The AML ordinance formally established a Financial Management Unit (FMU) to independently monitor suspicious transactions.

The State Bank of Pakistan required all informal money changers (or hawaladars) to register as authorized foreign exchange dealers and meet minimum capital requirements, although enforcement was uneven. The regulation had limited success in consolidating the national foreign exchange regime, subjecting it to more stringent regulation and accounting standards. Despite government efforts, unlicensed hawalas still operated illegally in parts of the country (particularly Peshawar and Karachi). The informal and secretive nature of the unlicensed hawalas made it difficult for regulators to effectively combat their operations. Most illicit funds were transacted through these unlicensed operators.

Pakistan arrested or detained several high-profile terrorist suspects, but faced significant challenges in prosecuting such cases. The government freed 28 militants in November, three of whom were convicted on terrorism charges, in exchange for the release of 213 Pakistani soldiers held by militant commander Baitullah Mehsud. In August, the government released Muhammad

Naem Noor Khan without formally charging him, even though the government claimed at the time of his arrest in July 2004 that he was a top AQ operative.

The United States and Pakistan engaged in a broad range of counterterrorism cooperative efforts including border security and criminal investigations, as well as several long-term training projects. Pakistan is the third largest recipient of U.S. military and economic assistance. (*See Chapter 5, Terrorist Safe Havens [7120 Report] for further information on U.S. Assistance for Pakistan.)*

**Sri Lanka**

Approximately 5,000 people were killed and many thousands more displaced as the conflict escalated between the Sri Lankan government and the Liberation Tigers of Tamil Eelam (LTTE), a designated Foreign Terrorist Organization. The Sri Lankan government took effective control of the Eastern Province in midyear, but the LTTE continued to control much of the north and carried out attacks throughout the country. The Sri Lankan Army remained deployed across the country in all areas it controlled to fight the insurgency. The Special Task Force (STF) police were deployed both in the east and in strategic locations in the west. Although a Ceasefire Agreement was nominally in effect, the level of violence rose to that associated with the period prior to the signing of the agreement in 2002.

The LTTE and government forces engaged in retaliatory attacks throughout the year. On November 28, an LTTE suicide bomber attempted to assassinate Minister for Social Services and Welfare Douglas Devananda. (This was at least the 11th attempt on the Tamil leader's life.) On the same day, a parcel bomb killed at least 19 in a shopping area in southern Colombo. The likely perpetrator was the LTTE, although there is some public speculation that this may have been a criminal, rather than LTTE, attack. Other major LTTE attacks included attacks on the Anuradhapura Air Base (October); the first-ever LTTE attacks by air of Katunayake Airport and a gas storage facility in Colombo (March), the Palaly Air Force Base in Jaffna (April), and parcel bombings of two intercity buses in southern Sri Lanka (January). Many of these attacks appeared to have been reprisals for offensive actions taken, or at least alleged to have been carried out, by the Government of Sri Lanka, such as attacks on busses and villages and the air raid on November 2 that killed LTTE political chief S.P. Tamilchelvan.

A breakaway group from the LTTE, the Karuna Faction, was also responsible for extrajudicial killings and attacks against the LTTE and its alleged civilian supporters in eastern Sri Lanka. Its former leader, Karuna Amman, was arrested in London on charges of immigration fraud in November. A rival leader, Pillayan, has since consolidated control of the Karuna faction and displaced cadres loyal to Karuna.

The government took control of Sri Lanka's eastern province by July, but was unable to move forward on elections, devolution of power, and economic development programs because of instability and the fragility of the national governing coalition. The LTTE maintained control of much of the north and retained the capacity to mount attacks throughout the country. In late November and December, government forces increased activity against targets in the north.

The LTTE continued to finance itself with contributions from the Tamil Diaspora in North America, Europe, and Australia, by imposing local "taxes" on businesses operating in the areas of Sri Lanka under its control, and reportedly by extortion operations in government-controlled areas. The LTTE also used Tamil charitable organizations as fronts for its fundraising. In November, the USG designated under Executive Order 13224 and froze the U.S.-held assets of the Tamils Rehabilitation Organization, a charity associated with the LTTE. The LTTE previously used such funds for weapons purchases on the international black market and also captured arms from Sri Lankan security forces. The Sri Lankan Navy sunk three LTTE supply ships in September and another in October.

Human rights groups and other observers have accused all parties to the conflict with carrying out abductions and extrajudicial killings. The LTTE and the Karuna faction were charged with forced conscription and child recruitment. In general, the LTTE did not intentionally target U.S. citizens or assets, limiting attacks to Sri Lankan security forces, political figures, civilians, and businesses. However, attacks occurred within the vicinity of the U.S. embassy and personnel; the U.S. Ambassador was traveling in a helicopter that came under mortar fire in February. The LTTE subsequently apologized for the incident.

Sri Lankan cooperation with the FBI resulted in arrests of persons charged with material support to terrorist groups. The U.S. provided training for relevant Sri Lankan government agencies and the banking sector. The Government of Sri Lanka cooperated with the United States to implement both the Container Security Initiative and the Megaports program at the port of Colombo.

**Tajikistan**

As the poorest of the former Soviet countries, the Tajik government's main impediment to counterterrorism remained its lack of resources. The government, particularly the Border Guards, lacked appropriate technical equipment, personnel, and training to effectively interdict illegal border crossings and to detect and analyze hazardous substances. As a result, Tajikistan could serve as a transit country for extremists and terrorists traveling to and from Afghanistan and Pakistan. The United States and other donors assisted the government of Tajikistan to secure its 1400 kilometer porous border with Afghanistan.

Assistance included a $5 million U.S. Department of Defense (DOD) radio program to improve Border Guard communications capability. DOD held four Joint Combined Exchange Training (JCET) sessions with Tajikistani security forces to improve their capacity to conduct counterterrorism operations. The U.S. Embassy administered training which included chemical weapons response and weapons of mass destruction (WMD) detection training. These programs will help Tajikistan stop potential terrorists who may attempt to cross the Tajikistani border, and will enable Tajikistan to better control its borders.

Tajikistan endorsed the joint U.S.-Russia co-chaired Global Initiative to Combat Nuclear Terrorism. In November, it hosted a regional conference to discuss with its neighbors more effective cooperation to counter WMD proliferation. The Tajikistani government also participated in regional security alliances, including the Shanghai Cooperation Organization.

Since September 11, 2001, the Government of Tajikistan has allowed its airspace to be used for counterterrorist actions in support of Operation Enduring Freedom (OEF). Tajikistan prohibited extremist-oriented activities and closely monitored groups it listed as terrorist organizations, such as the Islamic Movement of Uzbekistan (IMU) and Hizbut-Tahrir (HT). The Government of Tajikistan believed that HT, in particular, was active in the northern part of the country. Analysts believed that supporters of terrorist groups such as al-Qa'ida and the IMU were active in the region this year.

The Government of Tajikistan did not provide safe haven for terrorists or terrorist organizations. However, the country's poor economic climate and repressive government policies to restrict Islamic religious practice provided conditions that religious extremists could exploit. Events occurred in Tajikistan that may have been terrorism-related. A small bomb exploded outside the Supreme Court on June 17, causing no injuries or serious damage, and another bomb detonated at a conference hall on November 14, killing one person. These incidents remained under investigation at year's end.

Under the guise of fighting extremism, the Government of Tajikistan has taken increased measures against opposition parties in the country, particularly the Islamic Renaissance Party of Tajikistan (IRPT), the only legal Muslim opposition party in Central Asia.

**Turkmenistan**

Turkmenistan's longtime president, Saparmyrat Niyazov, died in late December 2006, and it remained too early in the presidency of Gurbanguly Berdimuhamedov to assess any change in the government's counterterrorism policy. The Government of Turkmenistan, while generally supportive of counterterrorism initiatives, increasingly was viewing counterterrorism through a domestic security lens and was receptive to international counterterrorism initiatives as they related to the country's effort to prevent terrorist activity on its own soil. The government cooperated with a variety of international organizations and partner countries in conducting counterterrorism training events for government personnel, including, for example, canine bomb detection training and professional seminars on terrorism and security studies.

While the government continued to strictly control access into and passage through Turkmenistan at official border crossings and along main roads, clandestine passage was still possible due to long and porous borders that stretch across mountain and desert terrain, as well as the small size and uneven quality of Turkmenistan's border guard and customs services. Turkmenistan's law enforcement and security agencies exert stringent security control over all aspects of society making it unlikely that Turkmenistan could easily be used as a terrorist refuge. The Government of Turkmenistan strictly controlled religious expression, and radical or extremist forms of Islam were not tolerated.

The government maintained a military-style counterterrorism unit with hostage rescue and explosives threat management capability, as well as a Department for the Prevention of Terrorism and Organized Crime in the Ministry of Internal Affairs. The Government of Turkmenistan continued to support humanitarian assistance related to the War on Terror and

Operation Enduring Freedom in Afghanistan. The government entered the names of individuals and organizations on terrorist financing lists into its banking system.

**Uzbekistan**

The Government of Uzbekistan did not provide safe haven for terrorists or terrorist organizations and continued to work aggressively to combat terrorist groups and other suspected Islamic radicals. Nevertheless, widespread poverty and the government's repressive security policies created conditions that religious extremists could exploit. In the past, Uzbekistan's porous borders, particularly in the Ferghana Valley, allowed for people and illicit goods to move in and out of the country with relative freedom. The government responded to these threats with impressive tightening of border controls, especially in the Ferghana Valley and increased its cooperation with Kyrgyzstan. It did not, however, systematically address the conditions terrorists might exploit to gain popular support and recruits for their cause.

Supporters of terrorist groups such as the Islamic Jihad Group (IJG), the Islamic Movement of Uzbekistan (IMU), the IMU-affiliated East Turkistan Islamic Movement (ETIM), and other al-Qa'ida (AQ)-affiliated groups were active in the region, and terrorist groups in the region continued to target both the Government of Uzbekistan and western interests. Members of these groups expressed anti-U.S. sentiments and some have attacked U.S. interests in the past, including a 2004 suicide bombing at the U.S. Embassy in Tashkent conducted by the IJG. USG personnel and facilities continued to operate at a heightened state of alert.

In contrast with 2005, when the Government of Uzbekistan ended virtually all counterterrorism cooperation with the United States, there were a few modest steps in resuming cooperation. In November, the government of Uzbekistan extended for another year a protocol giving over-flight rights to commercial aircraft contracted by the Department of Defense, and permitted several over-flights of such aircraft in 2007.

Tashkent hosts the Shanghai Cooperation Organization's (SCO) Regional Antiterrorist Structure (RATS), which said it had both facilitated combined counterterrorism exercises among SCO member states and begun work on developing a coordinated terrorist database. Uzbekistan is also a member of the Russian-led Collective Security Treaty Organization (CSTO), which said it held counterterrorism exercises and made progress in coordinating counterterrorism efforts. Nonetheless, the Government of Uzbekistan did not participate fully in the SCO or CSTO exercises. The government increased its participation in counterterrorism-themed UN Office of Drugs and Crime (UNODC) programs, and took part in two out of three regional terrorism prevention activities organized by UNODC.

## WESTERN HEMISPHERE OVERVIEW

> "With persistence and transparency, Colombia will overcome terrorism, which is financed by illicit drugs…To fight them (terrorists), we deepen democracy instead of restricting it, protect liberties instead of suppressing them, stimulate dissent instead of silencing it. Our fight against terrorism is observed by national and international critics, who can be in the country and say what they please without any restriction. Our democratic practice gives us the political authority to say that those who take up arms, financed by illicit drugs, are not insurgents against oppression but terrorists against liberty."
>
> –Mr. Alvaro Uribe Velez, President of Colombia
> Statement, 62nd UN General Assembly, New York;
> September 27, 2007

Regionally based Foreign Terrorist Organizations (FTOs) in Colombia, and remnants of radical leftist Andean groups were the primary perpetrators of terrorist acts in the Western Hemisphere. With the exception of the United States and Canada, where some prosecutions of suspected terrorists were underway, there were no known operational cells of Islamic terrorists in the hemisphere, although pockets of ideological sympathizers in South America and the Caribbean lent financial and moral support to terrorist groups in the Middle East.

In May 2007, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Rampant corruption with the Venezuelan government and military, ideological ties with the FARC, and lax counternarcotics policies have fueled a permissive operating environment for drug traffickers and an increase in drug trafficking to Europe, Africa, and the United States.  Cuba remained a state sponsor of terrorism.

On November 9, 2006, an Argentine judge issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah for their alleged role in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured over 150 people. On March 13, 2007, INTERPOL's Executive Committee unanimously decided to issue international "wanted" notices ("Red Notices") for five of the Iranians (including the former Minister of Intelligence and Security, Ali Fallahijan, and the commanders of the Islamic Revolutionary Guard Corps and the Qods force) and the one Lebanese national (Imad Mugniyah, recently deceased). The Government of Iran appealed that decision. On November 7, INTERPOL's General Assembly voted (78 for, 14 against, 26 abstentions) to uphold the Executive Committee's March 13 decision and the "Red Notices" were issued.

The threat of a transnational terrorist attack remained low for most countries in the hemisphere. Overall, governments took modest steps to improve their counterterrorism capabilities and tighten border security, but corruption, weak government institutions, ineffective or lack of interagency cooperation, weak or non-existent legislation, and reluctance to allocate sufficient resources limited progress. Some countries, like Argentina, Panama, Paraguay, Mexico, and El Salvador, made serious prevention and preparedness efforts. Others lacked urgency and resolve to address deficiencies in their counterterrorism posture. Caribbean and Central American nations, recognizing their vulnerability to attack or transit by terrorists, took steps to improve their border controls and to secure key infrastructure, especially air and maritime ports. The CARICOM nations have an on-going relationship with U.S. Customs and Border Protection (CBP) for the review of passengers traveling in the region which enables the United States to screen passengers against the terrorist screening database and review them for other suspected travel patterns. Most countries began to look seriously at possible connections between transnational criminal organizations and terrorist organizations. Colombia maintained and strengthened its "democratic security" strategy, directly confronting the convergence of threats from terrorism, newly emerging criminal groups, narcotics trafficking organizations, and the Revolutionary Armed Forces of Colombia (FARC). The Colombian government was increasingly successful in attacking mid-level FARC commanders engaged in narcotics trafficking and terrorist activities. The September 3 and October 25 deaths of commanders Tomas Medina Caracas "El Negro Acacio," and Gustavo Rueda Diaz, "Martin Caballero," respectively, represented serious blows.

In May, the U.S. Federal Bureau of Investigation uncovered a plot by two Guyanese, one Trinidadian, and one U.S. citizen to destroy a fuel pipeline at New York's JFK airport. The Government of Trinidad and Tobago cooperated in the effort to locate and detain those involved in the plot. Of the four suspects, three were arrested in Trinidad, where they remained in custody awaiting a judicial decision on their extradition to the United States The fourth suspect remained in detention in the United States.

The United States enjoyed solid cooperation on terror-related matters from most hemispheric partners, especially at the operational level, and maintained excellent intelligence, law enforcement, and legal assistance relations with most countries. The hemisphere boasts the OAS Inter-American Committee Against Terrorism, which is the only permanent regional multilateral organization focused exclusively on counterterrorism.

Mexico and Canada were key partners in the War on Terror and U.S. homeland security. Cooperation with them was broad and deep, involving all levels of government and virtually all agencies, in several initiatives. Recognizing the threat from terrorist transit, the Mexican government worked with the United States to enhance aviation, border, maritime, and transportation security, to secure critical infrastructure, and to combat terrorism financing. United States- Canadian counterterrorism cooperation took place in a number of established forums, including the terrorism subgroup of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group (BCG). The BCG brings together USG and Canadian counterterrorism officials from over a dozen agencies, on an annual basis, to coordinate policy on bioterrorism, information sharing, and joint counterterrorism training. Both Canada and Mexico have arrangements with the United States for the exchange of

terrorist screening information, pursuant to Homeland Security Presidential Directive (HSPD) No. 6.

The United States remained fully committed to supporting the Government of Colombia in its efforts to defeat Colombian-based Foreign Terrorist Organizations. President Alvaro Uribe continued vigorous law enforcement, intelligence, military, and economic measures against the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United Self-Defense Forces of Colombia (AUC) who have not demobilized or who have gravitated to newly-formed criminal groups. The Colombian government also increased its efforts with neighboring countries to thwart terrorist expansion, investigate terrorist activities inside and outside Colombia, seize assets, secure hostage release, and bring terrorists to justice. Colombia provided antiterrorism training to nations in the region.

Colombia's neighbors had varied reactions to the threat from Colombian based terrorists. While none condemned the terrorists or designated the groups for domestic purposes, they responded for the most part, positively to Colombian requests to arrest specific fugitives. Brazil and Peru improved cross-border cooperation with Colombia, which was often instituted at the local rather than national level. Ecuador demonstrated a willingness to militarily confront encroaching foreign narcoterrorists, while security forces in Brazil and Peru generally sought to avoid military confrontations with them. Forces in Peru pursued reemerging domestic terrorist groups aggressively. It remained unclear to what extent the Government of Venezuela provided support to Colombian terrorists. However, weapons and ammunition, some from official Venezuelan stocks and facilities, have turned up in the hands of Colombian terrorist organizations. Neither the Venezuelan nor Colombian governments systematically policed the 1400-mile Venezuelan-Colombian border to prevent the movement of groups of armed men or to interdict arms flows to narcoterrorists.

### Tri-Border Area
(Argentina, Brazil, and Paraguay)

The Governments of the Tri-Border Area (TBA), Argentina, Brazil, and Paraguay, have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early 1990s, they established a mechanism to address these illicit activities. In 2002, at their invitation, the United States joined them in what became the "3+1 Group on Tri-Border Area Security" to improve the capabilities of the three to address cross-border crime and thwart money laundering and potential terrorist financing activities. The United States remained concerned that Hizballah and HAMAS sympathizers were raising funds in the TBA by participating in illicit activities and soliciting donations from sympathizers within the sizable Muslim communities in the region. There was no corroborated information, however, that these or other Islamic extremist groups had an operational presence in the TBA.

### Argentina

Argentina cooperated well with the United States at the operational level, and addressed many of the legal and institutional weaknesses that previously hindered its counterterrorism efforts. In

2006 and 2007, the National Coordination Unit in the Ministry of Justice and Human Rights became fully functional, managing the government's anti-money laundering and counterterrorism finance efforts and representing Argentina to the Financial Action Task Force (FATF) and the Financial Action Task Force of South America (GAFISUD). The Attorney General's special investigative unit set up to handle money laundering and terrorism finance cases began operations this year. The Central Bank's specialized anti-money laundering and counterterrorism finance examination program was awaiting final authorization and was not operational at year's end. The Argentine government and Central Bank remained committed to freezing assets of terrorist groups identified by the United Nations if they were detected in Argentine financial institutions.

A noteworthy event was the Argentine Congress' passage in June of legislation penalizing the financing of terrorism ("Illegal Terrorist Associations and Terrorism Financing"), which brought Argentina into greater compliance with FATF standards. The law, which entered into effect in mid-July, amended the Penal Code (Law No. 25.246 "Cover-Up and Laundering of Assets Act") to criminalize acts of terror, terrorism financing, and money laundering for the purpose of financing terrorism. The new law provided a legal foundation for the financial intelligence unit (FIU), Central Bank, and other regulatory and law enforcement bodies to investigate and prosecute such crimes. Argentina joined Chile, Colombia, and Uruguay as the only countries in South America to have laws against financing terrorism. On September 11, the Argentine President signed into force the National Anti-Money Laundering and Counterterrorism Finance Agenda. The Agenda will serve as a road map to implement the existing money laundering and terrorism finance laws and regulations. The Agenda's 20 objectives focus on closing legal/regulatory loopholes and improving interagency cooperation. The next challenge is for Argentine law enforcement and regulatory institutions, including the Central Bank and FIU, to implement the National Agenda and aggressively enforce the newly strengthened and expanded legal, regulatory, and administrative measures available to them to combat financial crimes.

On November 9, 2006, an Argentine judge issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah, that were indicted in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured over 150 people. On March 13, 2007, the INTERPOL Executive Committee decided unanimously to issue international "wanted" notices ("Red Notices") for five of the Iranians (including the former Minister of Intelligence and Security, Ali Fallahijan, and the commanders of the Islamic Revolutionary Guard Corps and the Qods force) and the one Lebanese national (Imad Mugniyah, recently deceased). The Government of Iran appealed the Executive Committee's decision and requested that the INTERPOL General Assembly decide the matter. On November 7, the INTERPOL General Assembly voted (78 for, 14 against, 26 abstentions) to uphold the Executive Committee's March 13 decision and the Red Notices were issued.

**Belize**

The Government of Belize cooperated with the United States by sharing information and providing assistance to the extent that its limited resources allowed. The U.S. Embassy enjoyed a close and cooperative relationship with counterparts in the police force, particularly the Special Branch, immigration, customs, and prison officials. The Government of Belize cooperated with

U.S. law enforcement agencies to capture AQ associate Earnest James Umaama and return him to Washington State. The Belize Defense Force (880 total personnel) established a Counterterrorism Platoon to perform operations within Belize and its territorial waters.

**Bolivia**

With political instability, a weak and fluctuating legal framework, increasing coca cultivation, and the opening of diplomatic relations with Iran, Bolivia showed new potential as a possible site for terrorist activity. Supporters and actors from the National Liberation Army (ELN), the Revolutionary Armed Forces of Columbia (FARC), the Tupac Amaru Revolutionary Movement (MRTA), the Paraguayan Free Fatherland Party (PPL), and the Shining Path were thought to be present in Bolivia.

In December, following 16 months of deliberations within a Constituent Assembly, President Morales' Movement to Socialism (MAS) party approved a new draft constitution with little input from the political opposition. The government's actions divided the country with five out of nine departmental governors calling the new constitution illegal and illegitimate. Opposition departments (states) may hold autonomy votes in May and June. Bolivia's uncertain political and economic climate, and an increase in coca production, could lead to increased trafficking of illicit goods and money across Bolivia's borders.

In September, the Bolivian government announced the opening of diplomatic and commercial relations with Iran. The September 27 agreement pledged $1.1 billion in Iranian assistance to Bolivia over five years. In addition, Bolivia received continued medical and intelligence support from Cuba, with which it has had a close relationship since 2006. The Bolivian government's ineffective anti-money laundering regime failed to comply with international norms. In July, the Egmont Group suspended Bolivia's membership when it did not criminalize the financing of terrorism.

In October, the Peruvian government requested the extradition of Walter Chavez, a close advisor to the Bolivian government. In 1990, Chavez was arrested in Peru for alleged illegal activities and involvement with the MRTA, and was released on bail and disappeared before turning up in Bolivia in 1992. The Bolivian government vowed to defend and protect Chavez, arguing that he was a political refugee protected by international agreements.

**Brazil**

Elements of the Brazilian government continued counterterrorism cooperation, which included investigating potential terrorism financing, document forgery networks, and other illicit activity. Operationally, elements of the Brazilian government responsible for combating terrorism, such as the Federal Police, Customs, and the Brazilian Intelligence Agency, diligently worked with their U.S. counterparts to pursue investigative leads provided by U.S. intelligence, law enforcement, and financial agencies regarding terrorist suspects.

Brazil was increasingly capable of monitoring domestic financial operations and effectively utilized its financial intelligence unit, the Financial Activities Oversight Council (COAF), to

identify possible funding sources for terrorist groups. COAF carried out name checks for persons and entities on the UNSCR 1267 Committee's Consolidated List, but has not found any assets, accounts, or property in the names of persons or entities on the lists. COAF partnered with Customs to create a database called the Electronic Declaration of Cash Carriage (EDPV), which will assist in monitoring individuals who transfer funds abroad. Although the system is a prototype and is still being tested, Brazilian law enforcement officials were encouraged by initial results. The government recognized the connection between cash couriers and terrorism, and took the necessary steps to receive guidance from the Financial Action of South American (GAFISUD) and the Financial Action Task Force (FATF). At year's end, there was a bill before the Minister of Justice for approval that would increase training and the budget to counter illicit cash/drug smuggling regimes in Brazil.

Two key counterterrorism-related legislative initiatives continued to languish. Neither the antiterrorism nor the anti-money laundering bills, which have been pending since 2005, were introduced in Congress. If passed, the bills would criminalize terrorism and associated activities, and facilitate greater law enforcement access to financial and banking records during investigations, criminalize illicit enrichment, allow administrative freezing of assets, and facilitate prosecutions of money laundering cases by amending the legal definition of money laundering and making it an autonomous offense.

Brazil and the United States agreed to expand the Container Security Initiative (CSI) in Santos. The USG provided a variety of training courses in Brazil in combating money laundering, airport interdiction, container security, and maritime security. Brazilian authorities received seminars and courses on security and worked closely with U.S. law enforcement agencies to prepare for the 2007 Pan American Games.

The Government of Brazil continued to invest in border and law enforcement infrastructure with a view to gradually controlling the flow of goods, both legal and illegal, through the Tri-Border Area (TBA), the proceeds of which could be diverted to support terror groups. Tougher controls at the Brazilian Customs inspection station at the Friendship Bridge in the TBA enabled the government to crack down on contraband crossing the bridge, though law enforcement officials expected that traffickers would respond to the tougher controls by trying to move their goods clandestinely across the border elsewhere via boat. In 2007, a Joint Intelligence Center was built in the TBA in an effort to combat transborder criminal organizations with its neighbors.

**Canada**

The United States and Canada collaborated extensively on a broad array of counterterrorism initiatives that spanned virtually all agencies and every level of government. Canada continued stabilization and reconstruction operations in the Kandahar province of Afghanistan and led G8 efforts to improve border security to cut the flow of insurgents and terrorists into Afghanistan from Pakistan. The Canadian government submitted additional counterterrorism legislation and revised security certificate legislation to Parliament to strengthen the country's legal tools to combat terrorism. Through its Counterterrorism Capacity-building Program, Canada continued to implement a major effort to assist in training and technical assistance to partner nations in

terrorism financing, legislation, and border management. This year marked the tenth anniversary of the exchange of terrorist screening information between the United States and Canada.

In June 2006, Canadian law enforcement officials charged 18 individuals, all Canadian citizens or residents, with planning terror attacks in Canada. Among them, fourteen adults continued to face charges, three youths have had charges against them stayed or dropped, and a fourth youth was released on bail. Four of the fourteen adults charged were released on bail, subject to conditions. Only six of the fourteen faced the most serious charges of planning to storm Parliament Hill and take politicians hostage, and to bomb targets such as a Canadian Forces base and government offices in Toronto and Ottawa. The rest of the group faced lesser charges, including participation in alleged terrorist training and charges related to terrorist financing. This case, and that of Momin Khawaja, who was accused of conspiring with a British AQ cell in a thwarted plot to bomb targets in London in 2004, will be the first cases tried under Canada's 2001 Anti-Terrorism Act.

In October 2007, the Government of Canada introduced two important pieces of legislation, both of which were under debate in Parliament. One bill proposed to amend provisions of the Immigration and Refugee Protection Act to allow for continued application of "security certificates," which have been in use for several decades as a way to detain, pending deportation, foreign nationals deemed to be a security threat. In February, the Canadian Supreme Court ruled that the government's use of secret evidence in certificate proceedings and procedures for detention review were unconstitutional and gave the government until February 23, 2008 to amend the Act. The proposed legislation would provide for cleared "special advocates" to challenge the evidence on behalf of the accused and for an initial judicial review of detainees in the first 48 hours of arrest and at six-month intervals. Six individuals are still subject to security certificates; five of whom were released from detention on conditions and one who is in custody. The bill remained in the House of Commons upon its adjournment on December 13.

The second key bill is part of a mandatory review of the Anti-Terrorism Act. Two provisions of the Act – investigative hearings that would permit police to apply for an order requiring a witness to appear before a judge and answer questions; and preventive arrest, whereby peace officers may bring an individual before a judge in the early stages of terrorist activity to disrupt a potential terrorist attack – were subject to sunset clauses and lapsed in February. The Canadian government was committed to reinstating these provisions as part of its overall counterterrorism strategy and introduced the measures after an earlier motion to extend them was defeated in the House of Commons in February. In October, the government reintroduced the legislation first in the Senate, where it remained as of its adjournment in December.

In an effort to improve emergency management in the event of a disaster (such as a major terrorist attack), the Canadian parliament passed a bill in June that clarified responsibilities and lines of authority during an emergency. The bill also included a special provision "that the Minister may develop joint emergency management plans with the relevant USG authorities and, in accordance with those plans, coordinate Canada's response to emergencies in the United States and provide assistance in response to those emergencies."

United States-Canadian counterterrorism cooperation took place in a number of established forums, including the terrorism sub-group of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group (BCG). The BCG brings together U.S. and Canadian counterterrorism officials from over a dozen agencies, on an annual basis, to coordinate policy on bioterrorism, to share information, and for joint counterterrorism training. The United States and Canada continued to work on mechanisms to accommodate Canadian concerns about information sharing in the wake of a 2002 case in which a Canadian-Syrian citizen and terror suspect was removed from New York to Syria, where he claimed to have been tortured and subsequently received formal compensation from the Government of Canada.

In Afghanistan, Canada stood firm in fighting the insurgency in Kandahar province, where it provided a 2500-person battle group to ISAF Regional Command South and a Provincial Reconstruction Team for stabilization and development efforts. Canada also was leading a major initiative to improve cross border coordination between Afghan and Pakistani authorities, police, and military, and to enhance the capacities of the units that work to secure the border from insurgent and terrorist crossings. In October, Canada led two border assessment missions and held a Joint Border Management Workshop with Afghan and Pakistani experts in Dubai. To date, Canada has suffered 73 soldiers and one diplomat killed in Afghanistan, the highest proportion of casualties to troops deployed for any NATO member.

Canada also helped key countries address terrorism and terrorism financing with its Counterterrorism Capacity-building Program, a $15 million a year program to provide training, advice, and technical assistance to counterpart agencies. Through this program, Canada provided assistance to several countries in the Caribbean to draft new counterterrorism legislation, intelligence training for border officials on the Afghan-Pakistani border, and financial intelligence training to officials in India. Through its Cross Cultural Roundtable and Muslim Outreach program, Canada has been actively seeking to engage its citizens in a dialogue on a broad range of national security issues, including terrorism. The Muslim Communities Working Group in the Department of Foreign Affairs and International Trade is also engaged in efforts abroad to enhance Canada's relationships with the countries of the Muslim world, focusing on the promotion of democratic governance, pluralism, and human rights. In November, the Department of Foreign Affairs and International Trade led an effort to compare approaches and lessons learned among international partners on outreach to Muslim communities.

The Government of Canada extended its Chemical, Biological, Radiological, and Nuclear (CBRN) Research and Technology Initiative (CRTI), which aimed to bring people and knowledge from the Canadian and U.S. scientific, technology, intelligence, responder, and policy communities together in an integrated fashion to pursue new technologies and approaches to counterterrorism. Canada also worked with the United States under the 1995 Canada/U.S. Counterterrorism Research and Development Agreement to manage a robust joint program on counterterrorism research and development.

In late 2006, the Canadian government passed legislation that amended the Proceeds of Crime and Terrorist Financing Act to make Canada's anti-money laundering and anti-terrorist financing regime consistent with new Financial Action Task Force (FATF) standards. It allowed Canada to

enter into Memorandums of Understanding with international and third country law enforcement organizations to strengthen information sharing and to create penalties to improve compliance with the act. The bill also created a registration regime for money service businesses, expanding the number of reporting actions required to implement compliance, to include dealers in precious metals and stones and the real estate industry, and created an administrative and monetary penalties regime that could better enforce compliance.

## Chile

Chilean law enforcement actively cooperated in international terrorism investigations and with the United States to monitor and combat terrorist financing. Law Enforcement officials monitored possible links between extremists in Chile's Iquique Free Trade Zone and those in the Tri-Border Area, as trade links between these two areas are increasing. Chile's National Intelligence Agency remained mostly an analytical body, relying on law enforcement and investigative agencies for the vast majority of collection and operations.

Chile endorsed both the Proliferation Security Initiative (March) and the Global Initiative to Combat Nuclear Terrorism (May). In June, representatives from Chile's Foreign Relations Ministry and the two national police forces (the uniformed Carabiñeros and the Investigative Police) attended the FBI-sponsored Global Initiative to Combat Nuclear Terrorism Law Enforcement Conference in Miami. Chile was an active member of APEC's Counterterrorism Task Force.

Chileans requested FBI support on two domestic terrorism cases. Coordinadora Arauco Melleca (CAM), is a violent Mapuche Indian group in southern Chile that has burnt fields and attacked police while fighting for land it claims belongs to it. CAM appeared to have begun organizing itself more like a guerilla group; attacks late in the year demonstrated increased planning and a more professional use of weapons and tactics. Walter Wendelin, a representative of the Spain-based Basque Fatherland and Liberty (ETA) political branch, traveled to Chile to meet with CAM members. Chilean police were monitoring for possible contacts between Mapuche groups and armed political movements in Latin America.

Grupo de Operaciones Policiales Especiales (GOPE), a 300-person unit of the Carabiñeros police force, served as the nation's primary counterterrorist reaction force. The force was well-trained and participates annually in Exercise Fuerzas Comando, a U.S. Special Operations Command South (SOCSOUTH)-sponsored special operations seminar designed to refine the tactics, techniques, and procedures used by Special Operations counterterrorism forces. A GOPE commander attended a conference in Paraguay this year on "Combating Radical Ideology," sponsored by the Counterterrorism Fellowship Program (CTFP).

## Colombia

The Government of Colombia, facing domestic terrorist threats, continued vigorous law enforcement, intelligence, military, and economic measures against three designated Foreign Terrorist Organizations within Colombia: the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and remaining elements of the former United

Self-Defense Forces of Colombia (AUC). Colombia increased its counterterrorism efforts in the region to counter terrorist groups' operations, investigate terrorist activities inside and outside Colombia, seize assets, and bring terrorists to justice.

Colombia continued to expand its role as regional leader in counterterrorism, and provided some training to numerous countries. Leveraging experience gained from U.S. training, Colombia reached out to countries across the region to create AMERIPOL (a regional police cooperation institution similar to INTERPOL), which will allow more efficient coordination on counterterrorism and law enforcement issues in the region. The Colombian government continued to seek enhanced regional counterterrorism cooperation to target terrorist safe havens in vulnerable border areas, and provided counterterrorism training to officials from partner countries across the region. Colombia and Mexico significantly increased joint training and operations against narco-terrorist organizations operating in both countries.

The United States-Colombia extradition relationship remained the most successful such effort in the world. The Colombian government cooperated fully with U.S. efforts to recover U.S. citizen kidnapping victims, including three kidnapped by the FARC in February 2003 – Thomas Howes, Keith Stansell, and Marc Gonsalves – and remained open to third-party proposals for a hostage-prisoner exchange.

In November, President Alvaro Uribe agreed to a request of Venezuelan President Hugo Chavez and Colombian Senator Piedad Cordoba, to act as intermediaries for a possible "humanitarian exchange" of FARC-held hostages for FARC prisoners in Colombian jails. The Colombian government-sanctioned effort ended in November after Chavez and Cordoba repeatedly failed to adhere to Colombia's guidelines. Nevertheless, Chavez continued his efforts to gain the release of hostages including a failed effort at year's end involving the promised release of three Colombian hostages (Clara Rojas, her son Emmanuel, and Consuelo Gonzales de Perdomo) to an international delegation that included former-Argentine President Nestor Kirchner. The Government of Colombia revealed that the FARC had turned over Emmanuel to a sympathizer, who had in turn placed the child in Colombian social services. Confusion over Emmanuel's whereabouts coupled with FARC allegations that the Colombian military was operating in the area led the FARC to temporarily call off the release. The FARC, under intense public pressure, eventually turned over Rojas and Gonzales to President Chavez.

In December, the Colombian government intercepted three FARC operatives with video tapes showing twelve hostages, including Howes, Stansell, and Gonsalves, and former Colombian presidential candidate Ingrid Betancourt, who holds dual Colombian-French citizenship. French President Nicolas Sarkozy remained active in renewed efforts for the hostages' release, calling on leaders across the region to take up the cause.

In December, President Uribe announced a proposal to establish an "encounter zone" to negotiate an exchange that would be mediated by the Catholic Church. Though previous mediation attempts by the Church were unsuccessful, and the Colombian government had attempted a similar proposal in 2005, international pressure to free the hostages further increased. At year's end, the FARC has not responded President Uribe's offer.

The Uribe Administration maintained its focus on defeating and demobilizing Colombia's terrorist groups through its "democratic security" policy, which combined military, intelligence, police operations, efforts to demobilize combatants, and the provision of public services in rural areas. Colombian security forces captured or killed a number of mid-level FARC leaders, debriefed terrorist group deserters for detailed information on their terrorist cells, and reduced the amount of territory where terrorists could freely operate. The September 3 and October 25 deaths of commanders Tomas Medina Caracas "El Negro Acacio," and Gustavo Rueda Diaz, "Martin Caballero," respectively, represented serious blows to the FARC. Medina was a key figure in overseeing the FARC's drug trafficking and weapons procurement activities. Rueda led FARC fronts in the Caribbean coast, and was responsible for the 2003 kidnapping of current Foreign Minister Fernando Araujo, who escaped FARC custody during a military assault on his captors and was recovered in January 2007.

Colombia continued its close cooperation with the United States to block terrorists' assets. Financial institutions closed drug trafficking and terrorism-related accounts on Colombian government orders. Aerial and manual eradication of illicit drugs in Colombia, key to targeting terrorist group finances, covered about 220,000 hectares of illegal drug crops, thus depriving terrorist groups of potentially huge profits. At the same time, the Treasury Department through the Office of Foreign Assets Control pursued and blocked the assets of narcotics traffickers and terrorists it had placed on its Specially Designated Nationals List.

Colombia implemented a new law that defined and criminalized direct and indirect financing of terrorism for both national and international terrorist groups, in accordance with recommendations of both the Financial Action Task Force of South America (GAFISUD) and the Egmont Group. The new law authorized Colombia's Financial Intelligence Unit (UIAF) to freeze terrorists' assets immediately after their designation. Banks were held responsible for their client base and must immediately inform UIAF of any accounts held by newly designated terrorists. Banks also had to screen new clients against current lists of designated terrorists before they would be allowed to provide prospective clients with services. (Previously, banks were not legally required to comply with these regulations, although many had done so on a voluntary basis.)

The threat of extradition to the United States remained a strong weapon against drug traffickers and terrorists. Colombia extradited 164 defendants to the United States for prosecution, the vast majority Colombian nationals, surpassing its previous record. At the end of the year, the Uribe administration had extradited 581 individuals to the United States. Ex-FARC senior member Anayibe Rojas Valderrama, "Sonia," was sentenced in July to more than 16 years in prison for drug trafficking. AUC members Davinson Gomez Ocampo and Hector Rodriguez Acevedo were convicted of drug trafficking and providing material support to a terrorist organization, respectively. The Uribe administration suspended six extraditions of alleged-AUC members, who continued cooperating with the paramilitary peace process under the Colombian Justice and Peace Law. The United States continued to seek their extraditions.

Despite the ongoing military campaign against it, the FARC continued tactical-level terrorist, kidnapping for profit and narcotrafficking activities, and launched several bombings against military and civilian targets in urban areas. It also targeted numerous rural outposts,

infrastructure targets, and political adversaries in dozens of attacks. Examples of the FARC's 2007 terrorist activity included the following:

- In January, six people, including a child, were killed in a bomb attack in Buenaventura;

- In March, a bomb attack killed six people and injured over ten in Buenaventura;

- In March, a car bomb attack attempted but failed to assassinate Neiva Mayor Cielo Gonzalez.

- In April, a bomb detonated in front of the Cali police headquarters, killed one person, injured more than thirty, and destroyed the building.

- In June, eleven department legislators from Valle del Cauca held hostage since 2003 were murdered while in FARC custody;

- In October, a grenade attack at a campaign headquarters in Puerto Asís killed two people and injured six others.

- In December, the FARC again attempted but failed to assassinate Neiva Mayor Cielo Gonzalez in a rocket attack.

The Colombian government continued to seek the extradition of three Irish Republican Army (IRA) members, who were first acquitted and then sentenced after the prosecution appealed, to 17 years in prison for training the FARC on bomb tactics. The three fled Colombia while on bail and resurfaced in Ireland in August 2005. Colombia's extradition request remained under review before the Irish courts and the three fugitives remained at large.

The Government of Colombia and the ELN continued peace talks, but no agreements were reached. The ELN remained in the field, but with ever-limited resources, a dwindling membership, and reduced offensive capability. The ELN and FARC clashed over territory in northeastern Colombia, which further weakened the ELN.

Demobilized AUC members continued to be processed and investigated under the Justice and Peace Law, which offered judicial benefits and reduced prison sentences for qualifying demobilizing terrorists.[12] The law requires all participants to confess fully their crimes as members of a terrorist group and to return all illicit profits. More than 32,000 rank-in-file AUC members who did not commit serious crimes have demobilized, and many were receiving benefits through the government's reintegration program, including psychosocial attention, education, healthcare, and career development opportunities. Over 80,000 victims have

---

[12] Since 2002, more than 31,000 rank-in-file AUC members demobilized under the Justice and Peace Law, which offered judicial benefits and reduced prison sentences for qualifying demobilizing terrorists. As part of the Justice and Peace Law (JPL) process, the Colombian Prosecutor's office is taking what will be hundreds of sworn confessions from ex-AUC members, that have revealed the location of the graves of almost 1,200 paramilitary victims and provided information on 3,600 of the AUC's crimes.

registered under the JPL, and the Colombian government was working on measures to provide reparations. Some AUC renegades continued to engage in criminal activities after demobilization, mostly in drug trafficking, but the AUC as a formal organization remained inactive.

**Cuba**
*See Chapter 5, State Sponsors of Terrorism.*

**Dominican Republic**

The Dominican Armed Forces have a counterterrorism unit, but were unable to conduct complex special operations-type missions to counter terror. Despite good intentions, the Dominican government displayed a persistent inability to control its air, land, and sea borders. While many seaports and airports were considered permeable, three facilities, Caucedo, Haina, and La Romana, were certified by the International Maritime Organization as being compliant with the International Ship and Port Facility Security Code. In September, a new border control unit, the Cuerpo Especializado Fronterizo (CESFRONT), was deployed along the border with Haiti. Despite start-up problems, there was increased optimism that the unit will become increasingly productive in controlling the border with time, experience, and proper funding.

The United States has provided assistance in both training and equipment. A particularly large donation was four interceptor "go fast" boats from U.S. SOUTHCOM under the "Enduring Friendship" program. These boats will be used to intercept vessels carrying arms, narcotics, and individuals who were attempting to transit the territorial waters of the Dominican Republic. Another significant donation was the provision of biometric equipment to the Dominican government.

**Ecuador**

Ecuador's greatest counterterrorism and security challenge remained the presence of Colombian narcoterrorists on its Northern Border. In order to evade Colombian military operations, the Revolutionary Armed Forces of Colombia (FARC) regularly used Ecuadorian territory for rest, recuperation, resupply, and training, thereby involving significant numbers of Ecuadorians in direct or indirect ways. The Government of Ecuador faced challenges in patrolling a porous 400-mile border, and the lack of adequate licit employment opportunities for Ecuadorians in the region have made the area vulnerable to narcoterrorist influence. Ecuadorian officials along the border believed the FARC's economic impact allowed it to buy silence and compliance.

Ecuador's response to this threat historically has been uneven, but it has improved of late. The government shifted troops to the border region, continued efforts to improve military-to-military information sharing with Colombia, and launched a domestic Northern Border development agenda in concert with international donors to spur economic development in the area. The Correa Administration, while maintaining the country's traditional neutrality with respect to the Colombian conflict, has firmly opposed armed encroachments of any kind across its borders. It has publicly expressed its desire to eliminate FARC presence within Ecuadorian territory.

Despite some notable successes in this effort, insufficient resources and the challenging border region terrain have made it difficult to thwart cross-border incursions.

Despite constraints on their resources and limited capabilities, Ecuador's security forces conducted effective operations against FARC training and logistical resupply camps along the Northern Border. The Ecuadorian military significantly increased the number of operations along Ecuador's Northern border, especially at the end of the year. The Ecuadorian military destroyed FARC training, rest, and resupply camps; and confiscated weapons, communications equipment, explosives, explosives manufacturing equipment, and other support equipment. These operations also netted valuable information on FARC activities and infrastructure in and outside of Ecuador. Ecuadorian forces discovered and destroyed three cocaine producing laboratories and eradicated coca plants in at least two locations.

Ecuadorian police suspected several small and relatively minor Ecuadorian groups of domestic subversion and involvement in terrorism. A handful of other radical groups, including a radical self-proclaimed vestigial faction of the Alfaro Vive Carajo organization, were reputed to have ties with and support from Colombian narcoterrorists. As recently as June, Ecuadorian security forces conducted operations against this faction of the Alfaro Vive Carajo organization in an attempt to minimize their capacity to conduct subversive, disruptive, or terrorist activities.

The Ecuadorian legislature passed a landmark anti-money laundering law in 2005, criminalizing the laundering of illicit funds from any source, penalizing the undeclared entry of more than 10,000 USD in cash, and establishing a Financial Intelligence Unit (FIU) under the Superintendent of Banks. There was one major case in process as of December 2007.

Ecuador's judicial institutions remained weak, susceptible to corruption, and heavily backlogged with pending cases. While the military and police have made numerous arrests, the judicial system had a poor record of achieving convictions. The Government of Ecuador established a Ministry of Justice on November 15 to reform the penal code and improve the prison system.

**El Salvador**

El Salvador, the only Western Hemisphere country with troops serving alongside U.S. forces in Iraq, continued its support for the Coalition by dispatching a ninth contingent of troops to Iraq and approving a tenth rotation that will arrive in Iraq in early 2008. El Salvador also hosted a U.S. Department of Defense "Forward Operating Location" (FOL) at Comalapa International Airport, and a USG-funded International Law Enforcement Academy (ILEA).

The Government of El Salvador cooperated closely with the United States on counterterrorism efforts and took active steps to protect U.S. interests and citizens. The CA-4 agreement, recently implemented among El Salvador, Guatemala, Honduras, and Nicaragua, allowed for the inspection-free movement of citizens among these countries, and reduced overall inspection at land crossings. The agreement has raised concerns, however, that its implementation could possibly facilitate easier international movement of terrorists.

The National Civilian Police was well regarded by U.S. and international observers alike, and coordinated its work with the Immigration Service, the Office of the Attorney General, and the Office of State Intelligence.

In July, the Government of El Salvador used the 2006 terrorism statute[13] to file charges against several individuals who had taken part in a violent demonstration protesting the visit of Salvadoran President Tony Saca to the town of Suchitoto. This in turn led to numerous Salvadoran and U.S.-based non-governmental organizations alleging that the government was using the statute to suppress political opposition, and was guilty of backsliding on human rights. Given the violent nature of the demonstrations, in which several protestors blocked roads, set fire to debris, threw stones at the Presidential motorcade, and allegedly fired shots at a police helicopter, the government's decision to prosecute the protestors under the statute served to further blur the distinction between full-blown acts of terrorism and violent political protest subject to ordinary criminal sanction.

**Guatemala**

Guatemala continued to strengthen its anti-money laundering and terrorist financing regime since its 2004 removal from the Financial Action Task Force list of Non-Cooperative Countries. With U.S. assistance, Guatemala formed an interagency money laundering task force with representation from the Financial Intelligence Unit, the Guatemalan tax authority, and the Public Ministry (prosecutor's office). There was no credible evidence of terrorist financing in Guatemala.

In May/June, in cooperation with the U.S. Department of Defense, Guatemala inaugurated its first military counterterrorist unit. The Guatemalan Counterterrorist unit, primarily tasked with counterterrorism operations, also had counternarcotics operations and border enforcement capabilities.

Severe resource constraints, corruption, and an ineffective criminal justice system hampered efforts against transnational crime threats such as drug trafficking and alien smuggling, especially in remote areas of the country. Guatemala's northern and western borders with Mexico lacked effective coverage by police or military personnel, and controls of its southern and eastern borders with El Salvador have been relaxed as part of the Central American integration process. Nevertheless, Guatemalan civil aviation and port authorities provided strong cooperation to U.S. requests for assistance in investigating potential terrorism leads. The Guatemalan government was working to enhance overall maritime, aviation security, and counterterrorism capabilities to remain in compliance with rising international standards.

---

[13] The Salvadoran Legislative Assembly passed a new counterterrorism law in September 2006, which featured new sentencing requirements for certain terrorist-related crimes, but failed to distinguish terrorism from regular crime. Rather than define terrorism as politically motivated violence, the new legislation listed some 27 specific acts that would constitute terrorism. The various acts are punishable by a maximum sentence of 86 1/2 years in prison (in the case of aggravating circumstances). One of the more controversial provisions of the law provided for 25-30 years in prison for armed occupation of public buildings, a tactic favored by some militant groups affiliated with the opposition FMLN party.

## Honduras

Honduran cooperation with the United States on counterterrorism finance issues remained strong. The Honduran Banking and Insurance Commission, through instruction from the Ministry of Foreign Affairs, promptly sent freeze orders to the entire regulated financial sector every time the United States amended Executive Order lists. Financial entities, particularly the commercial banks, promptly undertook the requested searches for accounts by terrorist entities. No terrorist-related funds have been found to date in the Honduran financial system. The Honduran Congress was considering a change to the criminal code that would criminalize terrorist financing. While terrorism is a crime, terrorist financing is not listed as a separate crime.

There was a trend in Honduras towards closer regional intelligence cooperation with neighboring countries; this cooperation was aimed principally at organized crime, but it could potentially protect the country from terrorist threats. In September, the Honduran government announced the adoption of a National Security Strategy, which included counterterrorism as an objective, and stressed regional and international cooperation.

The United States assisted the Honduran Armed Forces (HOAF) with its counterterrorism efforts by providing training and equipment. With U.S. assistance, the Honduran Armed Forces created a Joint Task Force.

There was no indication of illegal immigration networks being used by terrorist groups. Over the past five years, however, smuggling rings were detected moving people from East Africa, the Middle East, and Southwest Asia to or through Honduras. There was an increase in the number of boats arriving on the north coast with people from all over the world seeking to enter the United States illegally via Guatemala and Mexico. Nationals of countries without Honduran visa requirements were involved in schemes to transit Honduras, often with the United States and Europe as their final destination. The Honduran government's ability to combat transnational crime was limited by sparsely populated and isolated jungle regions, limited resources, corruption, and poor control of the north coast and eastern border.

## Mexico

Since entering office in December 2006, President Calderón's Administration has demonstrated an unprecedented commitment to improve national security, which included taking a leadership role to improve the region's response to the threat posed by transnational crime. Moreover, the Mexican government has resolved to strengthen law enforcement and counterterrorism cooperation with the United States. The already strong relationships existing between U.S. and Mexican law enforcement agencies improved further. Mexico worked with the United States to secure critical infrastructure, combat terrorism financing, and enhance aviation, border, maritime, and transportation security.

Although the July and September attacks on oil and gas pipelines by a guerrilla group called the Popular Revolutionary Army (EPR) raised the specter of domestic terrorism, Mexico primarily represented a terrorist transit threat and our bilateral efforts focused squarely on minimizing that threat. The Mexican government made steady progress on counterterrorism and alien smuggling

in 2007. It restructured and strengthened the institutions directly responsible for fighting organized crime, and developed tools under the framework of the Security and Prosperity Partnership (SPP) to address national security threats more effectively.

Information sharing on counterterrorism issues in the first year of the Calderón Administration was strong. We will continue working with Mexico to improve existing information sharing initiatives. In particular, we will continue to support digitalization of the government's information-gathering procedures to build a database of usable biometric information and to strengthen our ability to analyze accurately the information provided by Mexico. In 2007, Mexico signed an arrangement pursuant to Homeland Security Presidential Directive (HSPD) No. 6, with the United States, for the exchange of terrorist screening information.

The continued exploitation of smuggling channels traversing the U.S.-Mexico border and the lack of enforcement along Mexico's border with Guatemala remained strategic concerns. The Government of Mexico acknowledged and responded thoughtfully to U.S. concerns regarding terrorist transit and the smuggling of aliens who may raise terrorism concerns. Mexico passed a federal law against human trafficking, which will aid in pursuing criminal proceedings against traffickers and smugglers. In a recent case, Mexican authorities provided substantial support to U.S. Immigration and Customs Enforcement in arresting a third country national wanted in the United States for alien smuggling.

One setback in United States-Mexico counterterrorism cooperation was a change in detention procedures. In 2005 and 2006, Mexico's Immigration Service (INM) maintained a policy of housing all detained aliens who may raise terrorism concerns in their detention facility near Mexico City. In March 2007, however, the INM began releasing such detainees from their point of arrest, thus hindering information sharing and the USG's ability to track the movement of these aliens.

Nevertheless, cooperation between Mexico and the United States was strong overall, especially in investigating individuals suspected of cooperation with alien smugglers. A particularly effective mechanism was the Operation Against Smugglers Initiative on Safety and Security (OASISS), which allowed Mexican and U.S. law enforcement officials to share real-time information regarding ongoing alien smuggling investigations on a regular basis. OASISS, which is operational in the United States in all four states along the southwest border, and in most of Mexico's northern Border States, enhanced the ability of both governments to prosecute alien smugglers and human traffickers who otherwise might elude justice. The program provided a model for bilateral information sharing in a variety of law enforcement and security areas. An essential next step will be to expand OASISS to all of Mexico's northern border states. At the same time, the United States will need to continue to support Mexican efforts to identify smuggling organizations operating along Mexico's southern border that may raise terrorist concerns.

The U.S.-Mexico Border Security and Public Safety Working Group, formed in March 2006, became another important tool for bilateral cooperation; it established protocols between both governments to respond cooperatively at a local level to critical incidents and emergencies along the border. The success of the pilot sites led to the expansion and formalization of the program.

These protocols are now in place along the entire U.S.-Mexico border. The United States was able to develop further its border security relationship with the Mexican government under President Calderón, through training programs, which focused on using non-intrusive inspection equipment, detecting weapons of mass destruction, and identifying fraudulent documents.

Mexico coordinated with the United States on the information sharing of air passenger data and the use of its Integrated System for Migratory Operations (SIOM). In addition, the United States and Mexican governments agreed to share, on a case by case basis, biometric data for comparison to the Integrated Automated Fingerprint Identification System (IAFIS).

In mid-2006, Mexico and the United States began negotiations on programs designed to deter terrorists from using Mexico's seaports to ship illicit materials, detect nuclear or radioactive materials if shipped via sea cargo, and to interdict harmful material before it could be used against the United States or one of our allies. The cooperative effort will include installation of specialized equipment to screen cargo containers for nuclear or other radioactive materials. If anything were detected, the equipment would alert Mexican port officials of the need to further examine the cargo and take appropriate action.

In the area of money laundering, the United States developed strong working relationships with the Financial Intelligence Unit of the Attorney General's Office (PGR), and its companion unit in the Mexican Treasury (Hacienda), to combat money laundering, terrorist financing, and narcotics trafficking.

On June 28, President Calderón signed legislation into law outlawing terrorist financing and associated money laundering. The new law established international terrorism and terror financing as serious criminal offenses, as called for in UN resolution 1373, and provided for up to 40-year prison sentences. The measure also incorporated several non-finance related provisions, including jail sentences for individuals who cover up the identities of terrorists and for those who recruit people to commit terrorist acts. The law was a significant step forward in suppressing those who plan, facilitate, finance, or commit terrorist acts, although it lacked some important provisions, such as assets forfeiture measures.

The Mexican Navy and Army continued to expand counterterrorism capabilities. The Mexican Navy improved control over ports of entry by deploying a newly constituted infantry force. The Navy was also looking to expand its still incomplete control over Mexico's vast maritime zone by better integrating radar, patrol craft, sea going vessels, air platforms, and land based platforms. If undertaken, such enhancements to Mexico's maritime air surveillance will allow the Navy to protect more effectively key national strategic facilities, including those related to oil production in the Bay of Campeche.

It remained difficult to assess the Mexican Army's counterterrorism capabilities due to the institution's closed nature. There have been improvements in U.S.-Mexico military-to-military cooperation in the past year, but the United States and Mexican armed forces had limited counterterrorism interoperability.

**Nicaragua**

In January, Daniel Ortega was inaugurated as the elected President of Nicaragua. Ortega reestablished formal diplomatic ties with Iran, which now has a resident, accredited Ambassador in the capital, and aggressively sought to expand relations with Cuba and Venezuela. In November, the government relaxed visa requirements for all travelers from Iran, permitting visa-free entry.  As a member of the Central American Four (CA4), with Guatemala, Honduras, and El Salvador, Nicaragua shared common immigration and customs policies with its CA4 partners. The Nicaraguan government's recent decision to grant visa-free entry for Iranians created consternation among the other CA4 members.

Nicaragua is the only Central American nation without a Financial Intelligence Unit. A counterterrorism bill, first proposed in 2004, remained moribund in the National Assembly. The new Penal Code, however, included language that specifically penalized terrorism financing and used an international definition of money laundering. The judicial system remained a vulnerability that could be exploited by international terrorist groups, because it was highly politicized, corrupt, and prone to manipulation by political elites and organized crime.

President Ortega has made several public statements supporting Iran's pursuit of nuclear weapons, including his September address to the UN General Assembly in New York. Ortega's statements questioned the authority of the UN, NATO, and other international actors to prevent any nation (namely Iran) from its "right" to develop nuclear weapons.

**Panama**

The Panama Canal remained Panama's most important economic asset. An act of terrorism that would close off the Canal would severely affect the economies of Panama, the United States, and other countries that rely heavily on the Canal for commerce. The Panamanian government continued to review the structure of its Public Forces and conducted exercises to ensure its ability to protect the Canal and residents of Panama against a possible terrorist act.

Panama's highly developed commercial transport sector and shared border with Colombia made it a transshipment point for arms, drugs, and smuggling of illegal aliens. The Revolutionary Armed Forces of Colombia (FARC) continued to be active in Panama's Darien Province and although they committed no significant terrorist acts, Panama's Public Forces (PPF) closely monitored its activities. Panama created a dedicated border patrol force for both the Colombian and Costa Rican borders, and took the first steps toward creating a stand-alone border protection force with its own command and headquarters under direction of the Panamanian National Police (PNP).

Panama provided enhanced force protection for U.S. military vessels, including submarines, during "high value transits" of the Canal; U.S. officials praised Panama's level of support and security. The Ministry of Government and Justice used classroom training, tabletop exercises, and field visits to improve coordination among the PPF agencies. Panama was the sponsor and host of the annual PANAMAX exercise, a multinational civil and military forces training exercise tailored to the defense of the Panama Canal. The exercise replicated real world threats to the Canal in order to develop appropriate responses and guarantee safe passage through the

waterway. Seventeen nations, including the United States, participated. On the margins of PANAMAX, Panama, for the first time, hosted a tabletop exercise specifically designed to examine its ability to address asymmetric threats.

Panama worked closely with the U.S. Department of Homeland Security to sign a Container Security Initiative agreement and to launch its activities, beginning with two operational scanners at two ports. Panamanian Public Force Counterterrorism units continued to benefit from the second year of SOUTHCOM-funded training provided by Navy Special Warfare South personnel.

In February, Panama hosted the General Assembly of the Inter-American Committee Against Terrorism (CICTE) multilateral conference. Subsequently, Panama headed this committee, whose work focused primarily on infrastructure security.

Panama is an international offshore banking center. While the government has taken extensive measures to combat money laundering in the banking system, the Colon Free Trade Zone served as a vehicle for illicit finance. Panama's Foreign Ministry, Council for Public Security and National Defense, Financial Analysis Unit, and the Superintendent of Banks were fully cooperative in reviewing terrorism finance lists.

## Paraguay

Paraguay was very cooperative in counterterrorism and law enforcement efforts, but its judicial system was hampered by a lack of strong anti-money laundering and counterterrorism legislation. On December 20, Paraguay's Congress passed improved anti-money laundering legislation as part of a major overhaul of the penal code; this statute will improve Paraguay's ability to effectively obstruct and prosecute money laundering and terrorist financing, particularly in Ciudad del Este. Counterterrorism legislation, introduced but not passed, will be critical to keep Paraguay current with its international obligations. The Congress Legal Reform Commission was also working on a criminal procedural code reform bill that would facilitate prosecution of money laundering and terrorism and modernize Paraguay's criminal justice system.

Paraguay did not exercise effective immigration or customs controls at its borders. Efforts to address illicit activity occurring in the Tri-Border Area were uneven due to a lack of resources and, more principally, corruption within customs, the police, and the judicial sector. Despite expanded cooperation with other government entities and significant USG assistance over the past several years, Paraguay's Secretariat for the Prevention of Money Laundering (SEPRELAD) did not demonstrate the ability to monitor and detect money laundering in the first half of the year. However, with a change in leadership in August, SEPRELAD made significant progress. In November it secured approval of important insurance and credit union regulations, and paid a portion of its past dues to the Financial Action Task Force of Latin America (GAFISUD), preserving its membership in that organization. Paraguay still lacked terrorist finance legislation, however, and without it, the Egmont Group, which facilitates information exchange among Financial Intelligence Units, will likely suspend Paraguay.

Despite pending constitutional appeals, the tax evasion case against Kassem Hijazi, a suspected Hizballah money launderer connected to 113 businesses, is at the trial stage. In a judicially suspect move, Hijazi's case was separated from related charges against forty-three defendants. The court excluded key evidence and summarily absolved all forty-three defendants in August. An appellate court reduced the 2006 sentence of suspected terrorist fundraiser Hatim Ahmad Barakat from six to three years.

The United States assisted Paraguay with training for judges, prosecutors, and police in bulk cash smuggling, document fraud, terrorist financing; and investigating, preventing, and prosecuting individuals involved in money laundering. Under the Millennium Challenge Account Threshold Program[14], the U.S. assisted Paraguay with training for judges, prosecutors, and police in investigation techniques that are critical to money laundering and terrorist finance cases. In December, Paraguay was invited to submit a proposal for a second phase Threshold program.

**Peru**

Peru's topmost counterterrorism concern remained preventing the reemergence of Sendero Luminoso (SL or Shining Path), a designated Foreign Terrorist Organization that devastated the country in the 1980s and 1990s. In 2007, SL remnants engaged in narcotrafficking and killed 11 police officers, 20 civilians, and one member of the military. SL in the Upper Huallaga River Valley (UHV) suffered significant setbacks with the arrests of several of their key members. Meanwhile, the SL organization in the Apurimac and Ene River Valley (VRAE) retained its control over the area.

Although the Peruvian government nearly eliminated SL in the 1990s, the organization, now entwined with narcotics trafficking, reemerged and remained a threat. Estimated to include up to several hundred armed combatants, SL conducted 80 terrorist acts in remote coca-growing areas this year. The reemergent SL is shorter on revolutionary zeal than it was in the past, but reports suggested it was attempting to rebuild support in the university system, where it exercised considerable influence in the 1980s. Meanwhile, involvement in drug production and trafficking provided SL with substantial funding to conduct operations, improve relations with local communities in remote areas, and to recruit new members. While the government made significant progress against SL in the UHV, insufficient government presence and ineffective security capabilities in the more remote VRAE allowed the SL to operate practically unhindered.

For example, on June 14, a SL ambush near Tocache in the UHV resulted in the deaths of a local anti-drug prosecutor and the three police officers protecting him. Two other police officers were seriously injured in the attack. On December 24, an estimated 20 heavily armed persons attacked a PNP patrol, killing two officers and wounding one near the town of Huanta in the Ayacucho region. Over 70 anti-personnel mines caused one death and 22 injuries, mostly to eradication workers in illegal coca plantations in the San Martin region. Authorities suspected SL remnants in the UHV were responsible.

---

[14] Paraguay qualified in 2006 for participation in the $35 million Millennium Challenge Account Threshold Program to address corruption problems of impunity and economic informality.

The "Huallaga Police Front" counterterrorism campaign in the UHV, initiated by then-President Toledo in 2006, was largely inactive. Implementation of the Garcia government's "Plan VRAE," which called for 2,000 troops and 19 counterterrorism bases operated under a central command, was slow because of the lack of an operational security plan. Plans for new health, education, and infrastructure investment in isolated communities where the state lacks presence were implemented spottily, if at all. The government's efforts to strengthen prosecutorial capacity and to improve interagency cooperation, especially in intelligence, were marginally successful. Police units specializing in counterterrorism and counternarcotics conducted some joint operations with the Peruvian Army in the Upper Huallaga Valley. There was no movement on President Garcia's 2006 proposal calling for the death penalty for those convicted of acts of terrorism.

President Garcia repeatedly reauthorized a 60-day state of emergency in parts of Peru's five departments where SL operated, which suspended some civil liberties and gave the armed forces additional authority to maintain public order.

In August, two Huallaga Front (PNP/Peruvian Army) operations captured 28 SL suspects, including two believed to be bodyguards of UHV SL Committee head "Artemio". Also apprehended were a number of suspected participants in the June ambush near Tocache that killed a prosecutor and three police.

During a November 27 PNP operation, Epifanio Espiritu Acosta, known as "Comrade JL," third in the UHV organization and leader of its forces on the western side of the Huallaga River, was killed. Eight suspects were captured including the organization's ideological chief, "Comrade Julian," as well as the head of personal security for the group's leader. UHV-SL leader "Comrade Artemio," is a top priority target of continuing PNP security operations.

Media and other sources continued to report that former SL members released from prison were rejoining leftist civic groups and political movements, and perhaps recruiting new members into the organization. SL founder and leader Abimael Guzman and key accomplices remained in prison facing charges stemming from crimes committed during the 1980s and 1990s.

The Revolutionary Armed Forces of Colombia (FARC) continued to use remote areas along the Colombian/Peruvian border for rest and to make arms purchases. There were reports that the FARC was funding coca cultivation and cocaine production among the Peruvian population in border areas.

**Suriname**

Suriname's lead agency for counterterrorism was the Central Intelligence and Security Agency (CIVD). The Ministry of Justice and Police (MOJP) had a police Anti-Terrorist Unit (ATU) and a 70-person "Arrest Team" (A-Team). At the end of the year, the Council of Ministers approved a new counterterrorism law that defined terrorism as a crime, and provided a framework for more effectively combating terrorism and the financing of terrorism. This legislation should bring Surinamese law in line with various international treaties dealing with terrorism and could help pave the way for Surinamese membership in the Egmont Group. The draft law will be presented

to the State Council and the President for their approval, after which it will be presented to the National Assembly. A criminal procedure law is expected to be approved by the Council of Ministers, which will provide the implementing legislation for the new counterterrorism law, as well as special investigative tools to assist law enforcement authorities in detecting and investigating terrorist activities.

Suriname began issuing Caribbean Community (CARICOM)-compliant machine-readable passports in 2004, yet there were still numerous valid old passports in circulation, which could easily be tampered with in order to assume a false identity to travel across borders. An unknown number of blank old-style passports remained unaccounted for. The United States provided watch lists of known terrorists to Surinamese police, but if any terrorists were present, the likelihood of apprehending them would be low because of the lack of border and immigration control by police and other Surinamese government officials, and because Suriname has no system for registering and monitoring visitors. According to police sources, the Revolutionary Armed Forces of Colombia (FARC) has conducted arms-for-drugs operations with criminal organizations in Suriname. In December, the Minister of Justice and Police told the media that his Ministry had received information that international criminal organizations were planning attacks in Suriname. According to the Minister, there were arrests over a two-week period late in the year, and investigations had pointed to involvement of the FARC and unspecified African crime organizations. As of late December, no further information was available on those allegations and no attacks had occurred.

**Trinidad and Tobago**

In May, the U.S. Federal Bureau of Investigation (FBI) uncovered a plot by two Guyanese, one Trinidadian, and one U.S. citizen to destroy a fuel pipeline at New York's JFK airport. The Government of Trinidad and Tobago supported the FBI effort to locate and detain those involved in the plot. Of the four suspects, three were arrested in Trinidad, where they remained in custody awaiting a judicial decision on their extradition to the United States

Imam Yasin Abu Bakr of Jamaat al Muslimeen (JAM) became the first person to be prosecuted under the 2005 Anti-Terrorism Act after delivering a seditious sermon in late 2005. Abu Bakr has a loyal following that was consumed with issues related to Trinidad and Tobago. His rhetoric has yet to become an international threat. His current trial continued to be delayed based on claims that Bakr would not receive a fair trial because of the publicity that still surrounded the JAM's 1990 attempted coup.

In February, Trinidad and Tobago implemented the Advance Passenger Information System (APIS) in preparation for the 2007 Cricket World Cup. Under the system, regional and international aircraft and vessels must submit Advance Passenger Information prior to arrival in and upon departure from any of the ten Member States. The system utilized a number of watch lists, including INTERPOL's Stolen and Lost Travel Documents (SLTD) database, to check every passenger arriving in the region or traveling throughout the region by air or by sea.

Recognizing Trinidad and Tobago's role as the United States' largest supplier of liquefied natural gas and as guarantor of energy security in the Caribbean region, the U.S. Department of Energy and the U.S. Department of Homeland Security provided the government with technical

assistance to conduct a vulnerability assessment of critical infrastructure in its energy sector under the umbrella of the Inter-American Committee against Terrorism (OAS/CICTE). In October and December, following preparatory meetings between officials of these agencies and participants in Trinidad and Tobago's public/private Energy Sector Security Initiative, a team of USG experts carried out an assessment and prepared a report for the government with recommendations on how best to improve and prioritize critical infrastructure protection efforts.

## Uruguay

The level of cooperation and intelligence sharing on counterterrorism related issues greatly improved in 2007, especially at the working level where officers in law enforcement and security services recognized the importance of conducting proactive investigations, sharing intelligence with the United States, and working cooperatively with its regional partners. The Government of Uruguay generally cooperated with the United States and international institutions on counterterrorism efforts, but has not devoted great resources to the effort. Uruguayan banking and law enforcement agencies professed to search for financial assets, individuals, and groups with links to terrorism, but discovered neither terrorist assets in Uruguayan financial institutions nor terrorist operatives in Uruguay.

While Uruguay supported the fight against international terrorism in principle, it has been hesitant for many years to permit joint military training on its soil. Part of the reluctance to engage in robust security cooperation can be explained by the painful experiences endured during a thirteen-year period of military dictatorship when security forces ruthlessly conducted a campaign against violent insurgents. Instead, the Government of Uruguay focused its participation on efforts to promote global security through collective action within multinational organizations such as the UN and OAS.

Uruguay provided the greatest number of UN peacekeepers, in per capita terms, of any UN member state. Although these efforts are not specifically focused on counterterrorism, Uruguay believed that using its diplomatic and military resources to fight global instability served to address the conditions that terrorists exploit, such as political, economic, and social instability.

Uruguay is a member of the MERCOSUR Permanent Working Group on Terrorism, together with Argentina, Brazil, Chile, Paraguay, and Bolivia. The group facilitated cooperation and information sharing among countries combating terrorism. The focus was expanding from the Tri-border region of Argentina, Paraguay, and Brazil, to include the Uruguayan-Brazilian border, although with limited tangible results. Uruguay was also active in a range of international counterterrorism efforts, particularly in the Rio Group and the OAS.

## Venezuela

In May 2007, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended (the "Act"). Pursuant to this certification, defense articles and services may not be sold or licensed for export to Venezuela from October 1, 2007 to September 30, 2008. This certification will lapse unless it is renewed by the Secretary of State by May 15, 2008.

President Hugo Chavez persisted in his public criticism of U.S. counterterrorism efforts and deepened Venezuelan relationships with state sponsors of terrorism Iran and Cuba. Chavez's ideological sympathy for the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), along with high levels of corruption among Venezuelan officials, limited Venezuelan cooperation with Colombia in combating terrorism. FARC and ELN units regularly crossed into Venezuelan territory to rest and regroup.

It remained unclear to what extent the Venezuelan government provided support to Colombian terrorist organizations. However, limited amounts of weapons and ammunition, some from official Venezuelan stocks and facilities, have turned up in the hands of Colombian terrorist organizations. The Venezuelan government did not systematically police the 1,400-mile Venezuelan-Colombian border to prevent the movement of groups of armed terrorists or to interdict arms or the flow of narcotics.

In another case, the trial began on February 22 for two self-proclaimed Islamic extremists that were arrested in October 2006 for placing a pair of pipe bombs outside the American Embassy in Caracas. At year's end, the Venezuelan government continued to prosecute both persons, and they remained in police custody.
.
In March, Iran and Venezuela began weekly Iran Airlines flights connecting Tehran and Damascus with Caracas. Passengers on these flights were not subject to immigration and customs controls at Simon Bolivar International Airport. On June 1, one of the JFK Airport bombing subjects, Abdul Kadir, was arrested at the airport in Port of Spain, Trinidad, on board a flight destined for Caracas, Venezuela. He had an onward ticket to Tehran. Venezuelan citizenship, identity, and travel documents remained easy to obtain, making Venezuela a potentially attractive way station for terrorists. International authorities remained suspicious of the integrity of Venezuelan documents and their issuance process.

# Chapter 3
# State Sponsors of Terrorism

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have greater difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. More worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

## STATE SPONSOR: IMPLICATIONS

Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3. Prohibitions on economic assistance.

4. Imposition of miscellaneous financial and other restrictions, including:

   - Requiring the United States to oppose loans by the World Bank and other international financial institutions;
   - Exception from the jurisdictional immunity in U.S. courts of state sponsor countries, and all former state sponsor countries (with the exception of Iraq), with respect to claims for money damages for personal injury or death caused by certain acts of terrorism, torture, or extrajudicial killing, or the provision of material support or resources for such acts;
   - Denying companies and individuals tax credits for income earned in terrorist-list countries;
   - Denial of duty-free treatment of goods exported to the United States;
   - Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
   - Prohibition of Defense Department contracts above $100,000 with companies in which a state sponsor government owns or controls a significant interest.

## CUBA

The Government of Cuba remained opposed to U.S. counterterrorism policy, and actively and publicly condemned many associated U.S. policies and actions. To U.S. knowledge, the Cuban government did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 Against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank. No new counterterrorism laws were enacted, nor were any executive orders or regulations issued in this regard. The Government of Cuba provided safe haven to members of ETA, the FARC, and the ELN.  It maintained close relationships with other state sponsors of terrorism such as Iran and Syria.

The Cuban government continued to permit more than 70 U.S. fugitives to live legally in Cuba and refused almost all U.S. requests for their return. These U.S. fugitives include convicted murderers (two of them killed police officers) as well as numerous hijackers, most of whom entered Cuba in the 1970s. The government returned one American citizen fugitive when that person sailed his boat into Cuban waters and it was determined that he was wanted on fraud charges in the state of Utah. The Cuban government stated in 2006 that it would no longer provide safe haven to new U.S. fugitives entering Cuba.

The Cuban government did not extradite suspected terrorists during the year.

## IRAN

Iran remained the most active state sponsor of terrorism. Elements of its Islamic Revolutionary Guard Corps (IRGC) were directly involved in the planning and support of terrorist acts throughout the region and continued to support a variety of groups in their use of terrorism to advance their common regional goals. Iran provides aid to Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan.

Iran remains a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups, such as HAMAS and Hizballah, and its efforts to undercut the democratic process in Lebanon, where it seeks to build Iran's and Hizballah's influence to the detriment of other Lebanese communities.

Iran is a principal supporter of groups that are implacably opposed to the Middle East Peace Process, and continues to maintain a high-profile role in encouraging anti-Israel terrorist activity – rhetorically, operationally, and financially. Supreme Leader Khamenei and President Ahmadinejad praised Palestinian terrorist operations, and Iran provided Lebanese Hizballah and Palestinian terrorist groups, notably HAMAS, Palestinian Islamic Jihad, the al-Aqsa Martyrs Brigades, and the Popular Front for the Liberation of Palestine-General Command, with extensive funding, training, and weapons.

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups

that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hizballah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hizballah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hizballah operative in Iraq in 2007.

Iran's IRGC-Qods Force continued to provide weapons and financial aid to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since 2006, Iran has arranged a number of shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives, possibly including man-portable air defense systems (MANPADs), to the Taliban.

Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members it has detained, and has refused to publicly identify those senior members in its custody. Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some AQ members who fled to Iran following the fall of the Taliban regime in Afghanistan.

## NORTH KOREA

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. The DPRK continued to harbor four Japanese Red Army members who participated in a jet hijacking in 1970. The Japanese government continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities; five such abductees have been repatriated to Japan since 2002. As part of the Six-Party Talks process, the United States reaffirmed its intent to fulfill its commitments regarding the removal of the designation of the DPRK as a state sponsor of terrorism in parallel with the DPRK's actions on denuclearization and in accordance with criteria set forth in U.S. law.

## SUDAN

During the past year, the Sudanese government continued to cooperate in the War on Terror, pursuing terrorist operations directly involving threats to U.S. interests and personnel in Sudan. While the U.S.-Sudanese counterterrorism relationship remained solid, hard-line Sudanese officials continued to express resentment and distrust over actions by the USG and questioned the benefits of continued cooperation. Their assessment reflected disappointment that Sudan's

counterterrorism cooperation has not warranted rescission of its designation as a state sponsor of terrorism.

AQ-inspired terrorist elements, elements of Palestinian Islamic Jihad (PIJ), HAMAS, and the Lord's Resistance Army (LRA), remained in Sudan. In light of the ongoing hybrid United Nations-African Union deployment to Darfur, various terrorist threats against these forces emerged, and AQ leadership has called for jihad against UN forces in Darfur. Further, Sudanese authorities uncovered and largely dismantled a large-scale terrorist organization targeting western interests in Khartoum in summer and fall of the year. The terrorist threat level remained high in Khartoum and Darfur, and potentially other parts of Sudan.

With the exception of HAMAS, the Sudanese government does not appear to openly support the presence of terrorist groups in Sudan. The Sudanese government has taken steps to limit the activities of these organizations. As an example, Sudanese officials have welcomed HAMAS members as representatives of the Palestinian Authority (PA), but have limited their activities to fundraising. The Sudanese government has also worked hard to disrupt foreign fighters from using Sudan as a logistics base and transit point for extremists going to Iraq.

The LRA, led by Joseph Kony, continued to operate from its base in the Democratic Republic of the Congo (DRC) and threatened the tri-border area (DRC, Sudan, and Uganda). The Government of Southern Sudan worked to mediate peace between the LRA and neighboring countries and has vowed to eliminate the presence of the LRA as an organization in Southern Sudan. The Sudanese People's Liberation Army made some progress in containing LRA activity. Negotiations between the LRA and the Ugandan People's Defense Forces (UPDF) continued, with occasional interruptions in Juba under the mediation of the Government of Southern Sudan.

## SYRIA

Since Syria's 1979 designation as a state sponsor of terrorism, it has continued to provide political support to Palestinian terrorist groups. Syria has also continued to provide political and material support to Hizballah since that group's creation. HAMAS, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, all have offices in Damascus and operate within Syria's borders. The Syrian government insisted that the Damascus-based groups are confined to political and informational activities, but Palestinian groups with leaders in Syria have claimed responsibility for anti-Israeli terrorist attacks.

As in 2006, President Bashar al-Asad expressed public support for Palestinian terrorist groups. HAMAS Politburo head Khalid Mishal and his deputies continued to reside in Syria, and the Syrian government provided security escorts for their motorcades. Additionally, Mishal led Friday prayers at various mosques throughout Syria and gave several public speeches expressing gratitude for Syria's support.

The regime in Damascus continued to undermine Lebanon's sovereignty and security through its proxies. Although Syrian officials publicly condemned some acts of international terrorism,

174

including bombing attacks that killed Lebanese government officials, it made a distinction between what it considered to be legitimate armed resistance by Palestinians in the occupied territories.

The Syrian government has not been implicated directly in an act of terrorism since 1986, although an ongoing UN investigation into the February 2005 assassination of former Lebanese Prime Minister Rafiq Hariri continued to examine Syrian involvement. The Syrian regime, Hizballah, and pro-Syrian opposition elements in Lebanon have attempted to stymie international efforts to bring to justice those responsible for the Hariri assassination, as well as efforts to disarm militia groups that constitute a challenge to Lebanese security and sovereignty.

Separately, four Syrian members of Fatah al-Islam were arrested in connection with the February 13 Ain Alaq bus bombings in Lebanon. In March, Syrian Interior Minister, Major General Bassam Abdul Majeed, spoke publicly on the matter and rejected suggestions that the Syrian regime was involved in the attack. Syrian-linked groups were involved in several attacks outside of the country in 2007, including a rocket-propelled grenade attack in Lebanon. Lebanese authorities also blame Syria for complicity in a September improvised explosive device (IED) attack that killed a member of the Lebanese parliament.

Syria continued to strengthen its ties with Iran, another state sponsor of terrorism.  Iranian President Ahmadinejad, accompanied by the Iranian Defense Minister and the Iranian Army Chief of Staff, met with Syrian President al-Asad and other senior Syrian officials in July. During this visit, Ahmadinejad also met with Palestinian terrorist groups, including two separate meetings with the leaders of HAMAS and PIJ and a collective meeting with leaders of PFLP, PFLP-GC, Democratic Front for the Liberation of Palestine (DFLP), and Fatah al-Intifada. Additionally, local media reported that Hizballah leader Nasrallah met with Ahmadinejad at the Iranian Embassy in Damascus. Syria and Iran worked successfully to rearm Hizballah after the July-August 2006 conflict between Hizballah and Israel.

Although the Syrian government suspended intelligence cooperation with the United States and several foreign governments in 2004, Damascus has taken some action against AQ-linked groups and individuals in 2007. Additionally, the Syrian government worked to increase security cooperation with Iraq. In July, Syria hosted a meeting of technical border security experts representing Iraq's neighbors, the United States, and other countries. Syria also participated in two ministerial-level Iraq Neighbors' Conferences in May and November, in Sharm el-Sheikh, Egypt, and Istanbul, respectively. In August, Syria hosted Iraqi Prime Minister Maliki and signed several security-related agreements. According to U.S. and Iraqi officials, 2007 witnessed a marked reduction in the flow of foreign terrorists transiting through Syria into Iraq.

Despite acknowledged reductions in foreign fighter flows, the scope of the problem remained large. According to the December "Measuring Stability and Security in Iraq" report to Congress, nearly 90 percent of all foreign terrorists known to be in Iraq had used Syria as an entry point. The Syrian government could do more to stop known terror networks and foreign fighter facilitators from operating within its borders. Separately, the Syrian government has cracked down on pro-Kongra-Gel/Kurdistan Worker's Party (KGK/PKK) sympathizers in northeastern

Syria, and President al-Asad expressed his public support of Turkish military action against KGK/PKK militants operating in southern Turkey and northern Iraq.

The Syrian government refused to implement mandatory visa requirements for citizens of Arab countries.

Syria remained a source of concern regarding terrorist financing. The Commercial Bank of Syria remained subject to U.S. sanctions. Industry experts reported that 70 percent of all business transactions were conducted in cash and only eight percent of all Syrians used formal banking services.

# Chapter 4
# The Global Challenge of WMD Terrorism

| INTRODUCTION |
| --- |

The nexus of weapons of mass destruction (WMD) and terrorism poses one of the gravest potential risks to the national security of the United States and its global partners. A successful major WMD terrorist attack could result in mass casualty events and produce far-reaching economic and political consequences that would affect all members of the international community. This chapter outlines:

- The key elements of the United States' National Strategy for Combating WMD Terrorism;

- The various types of materials terrorists may use in a WMD attack;

- The potential that resources of a state could be directed or diverted to facilitate WMD terrorism;

- The emerging WMD terrorism threat presented by non-state facilitators; and

- Transformational U.S. partnerships to combat this growing global risk.

The United States places the highest priority on working with a broad range of national governments, international organizations, local governments, and private sector organizations, to develop effective partnerships to confront the global challenge of WMD terrorism.

| DIPLOMATIC AND STRATEGIC PRIORITIES FOR COMBATING WMD TERRORISM |
| --- |

U.S. diplomatic priorities for combating WMD terrorism build on the comprehensive approach set forth in the U.S. National Strategy for Combating WMD Terrorism. Specifically, our strategic approach hinges on the six objectives outlined in the National Strategy. We work across all objectives simultaneously to maximize our ability to eliminate the threat.

- **Determine terrorists' intentions, capabilities, and plans to develop or acquire WMD.** We need to understand and assess the credibility of threat reporting and provide technical assessments of terrorists' WMD capabilities.

- **Deny terrorists access to the materials, expertise, and other enabling capabilities required to develop WMD,** with a particular focus on weapons-usable fissile materials, dangerous pathogens, and poisonous chemicals; as well as methods of transport, sources of funds, and other capabilities that facilitate the execution of a WMD attack. In addition to building upon existing initiatives to secure materials, we are developing innovative

approaches that blend classic counterproliferation, nonproliferation, and counterterrorism efforts.

- **Deter terrorists from employing WMD.**  A new deterrence calculus combines the need to deter terrorists, facilitators, and supporters from contemplating a WMD attack and, failing that, would need to dissuade them from actually conducting an attack. Traditional threats may not work because terrorists generally show a wanton disregard for the lives of innocents and, in some cases, for their own lives. We require a range of deterrence strategies that are tailored to the various WMD threats and the individual actors who facilitate or enable those threats. We will employ diplomatic strategies that seek to address extremism and defuse volatile conditions to discourage consideration of WMD as an appropriate tool to address perceived injustices.

- **Detect and disrupt terrorists' attempted movement of WMD-related materials, weapons, and personnel.** We will seek to expand our global capability for detecting illicit materials, weapons, and personnel transiting abroad. We will use our global partnerships, international agreements, and ongoing border security and interdiction efforts. We also will continue to work with countries to enact and enforce strict penalties for WMD trafficking and other suspect WMD-related activities.

- **Prevent and respond to a WMD-related terrorist attack.** Once the possibility of a WMD attack has been detected, we will seek to contain, interdict, and eliminate the threat. We will continue to develop requisite capabilities to eliminate the possibility of a WMD operation and to prevent a possible follow-on attack. We will prepare ourselves for possible WMD incidents by developing capabilities to manage the range of consequences that may result from such an attack.

- **Define the nature and source of a terrorist-employed WMD device.** Should a WMD terrorist attack occur, the rapid identification of the source and perpetrator of an attack would facilitate our response efforts and may be critical in disrupting follow-on attacks. We will maintain and improve our capability to determine responsibility for the intended or actual use of WMD via accurate attribution, using the rapid fusion of technical forensic data with intelligence and law enforcement information.

As we move forward in the implementation of our diplomatic strategic priorities for combating WMD terrorism, we will take special care to work closely with the full range of foreign partners to prioritize and to tailor our capacity-building approaches to the regional and local conditions we face across the world.

## THE MATERIAL THREATS

There are four generally accepted categories of weapons of mass destruction that terrorists may seek to acquire and use in a WMD terrorist attack: nuclear, radiological, biological, and chemical.

**Nuclear**

Some terrorist organizations, such as al-Qa'ida (AQ), have openly stated their desire to acquire and use nuclear weapons. The diffusion of scientific and technical information regarding the assembly of nuclear weapons, some of which is now available on the Internet, has increased the risk that a terrorist organization in possession of sufficient fissile material could develop its own crude nuclear weapon. The complete production of a nuclear weapon strongly depends on the terrorist group's access to fissile material and scientific expertise. Terrorists may, however, seek to link up with a variety of facilitators to develop their own nuclear capability. These facilitators include black market proliferators or transnational criminal networks that may seek to profit from the sale of nuclear material, a weaponized device, or technical knowledge gathered from nuclear experts involved in a national nuclear program.

**Radiological**

Some terrorists seek to acquire radioactive materials for use in a radiological dispersal device (RDD) or "dirty bomb." Most radioactive materials lack sufficient strength to present a significant public health risk once dispersed, and the materials posing the greatest hazard would require terrorists to have the expertise to handle them without getting radiation sickness and possibly dying or being detected. Public panic and economic disruption caused by setting off a radiological dispersal device, however, could be substantial, even if a weak radioactive source is used. Radioactive materials are used widely in industrial, medical, and research applications and include devices used for power supply in remote locations, cancer therapy, food and blood irradiation, and radiography. Their widespread use in nearly every country makes radioactive materials much more accessible than fissile material.

**Biological**

Bioterrorism, another deadly threat, is the deliberate dispersal of pathogens through food, air, water, or living organisms to cause disease and, potentially more devastating, trigger alarm in a population. If properly produced and released, biological agents can kill on a massive scale and, if terrorists use a pathogen that can be transmitted from person to person, the disease can quickly spread across oceans and continents through air travel before authorities realize their nations have been attacked.

Developing a bioterrorism capability presents some scientific and operational challenges. However, the required scientific capabilities are not beyond the expertise of motivated biologists with basic university-level training. And, unlike other types of WMD, the materials required to produce a weapon are widely available – some are even found in nature. Even a badly-designed weapon resulting in limited health impact can cause significant uncertainty. Even though a small-scale bioterrorism attack, such as the 2001 anthrax attacks in the United States, can produce a relatively small number of cases of the disease, the costs of decontamination, medical treatment for the "worried well," decreased commercial activity, social distress, and lost productivity can be considerable. The terrorists can often meet their objective of creating disruption and fear without large numbers of casualties.

Among present-day terrorist organizations, AQ is believed to have made the greatest effort to acquire and develop a bioterrorism program. U.S. forces discovered a partially built biological weapons laboratory near Kandahar after expelling the Taliban from Afghanistan. Although it was not conclusive that AQ succeeded in obtaining a biological weapon, the discovery demonstrated a concerted effort to acquire a biological weapons capability.

**Chemical**

Chemical weapons represent another highly dangerous potential tool in the hands of terrorists. Effectively dispersed and in sufficient dosages, chemical agents could cause mass casualties as demonstrated by the use of chemical weapons during World War I. Today's terrorist threat ranges from the potential acquisition and use of militarized chemical weapons and delivery systems, to the production and use of improvised chemical agents and dissemination systems like the 1995 attack conducted by Aum Shinrikyo in the Tokyo subway system.  Perpetrators of that attack employed an improvised nerve agent (sarin) with plastic bottles taped together, and the pointed end of an umbrella to puncture the containers, which caused mixing and dissemination of the materials. More recently, terrorists have concentrated on acquiring and employing chemical materials with dual uses, such as pesticides, poisons, and industrial chemicals, in their operations (*see below*). The growth and sophistication of the worldwide chemical industry, including the development of complex synthetic and dual-use materials, may make the task of preventing and protecting against this threat more difficult. Preventing chemical terrorism is particularly challenging as terrorists can, with relative ease, use commercial industrial toxins, pesticides, and other commonly available chemical agents and materials as low-cost alternatives to militarized weapons and delivery systems, though likely with more limited effects.

**Dual-Use Materials, Equipment, Research, and Technologies of Concern**

Reducing the risk of terrorist acquisition of, access to, and use of dual-use materials, equipment, research, and technologies also remains a critical challenge. Terrorists have shown an interest in developing improvised devices leveraging such capabilities, and the diffusion of information on the Internet regarding dual-use research has compounded this challenge. Recent attacks in Iraq involving improvised devices containing chlorine, a dual-use chemical used in water treatment facilities, offer a notable example. Effective partnerships with private sector organizations, industry, academia, and the scientific research community, as well as with local governments, will play an important role in mitigating the risk of dual-use capabilities falling into the wrong hands.

## STATE SPONSORSHIP OF TERRORISM: A KEY CONCERN

A state that directs WMD resources to terrorists, or one from which enabling resources are clandestinely diverted, may pose a potentially grave WMD terrorism threat. Although terrorist organizations will continue to seek a WMD capability independent of state programs, the sophisticated WMD knowledge and resources of a state could enable a terrorist capability. State sponsors of terrorism and all nations that fail to live up to their international counterterrorism and nonproliferation obligations deserve greater scrutiny as potential facilitators of WMD terrorism.

## NON-STATE FACILITATORS: AN EMERGING THREAT

State sponsors of terrorism represent just one facet of the overall risk of WMD terrorism. Non-state facilitators have emerged as a growing WMD proliferation threat in recent years, and could eventually provide terrorists with conduits to materials and expertise that are particularly hard to acquire. In 2003, the United States and its international partners succeeded in interdicting a shipment of WMD-related material destined for Libya's then-active nuclear weapons program. As facts emerged regarding this shipment and its origin, the United States gained insight into an emerging WMD terrorism risk. Pakistani nuclear scientist A.Q. Khan had developed a transnational nuclear proliferation network reaching from Southeast Asia to Europe, and was making available sensitive technology and WMD-related materials to nations willing to pay.

The dismantling of the A.Q. Khan network revealed an uncomfortable truth about globalization. The very trends driving globalization, improved communications and transportation links, can enable development of extended proliferation networks that may facilitate terrorist acquisition of WMD. Globalization requires that partner nations work together closely to prevent, detect, and disrupt linkages that may develop between terrorists and facilitators such as A.Q. Khan.

## TRANSFORMATIONAL PARTNERSHIPS TO COMBAT WMD TERRORISM

Since September 11, 2001, the international community has made significant strides in responding to the threat of WMD terrorism. States are working together bilaterally and multilaterally to address these threats and protect their populations. The United States has taken concrete measures to build a layered defense against the WMD terrorism threat. In 2003, the United States announced the first National Strategy to Combat Weapons of Mass Destruction. Through a variety of multinational initiatives such as the Global Partnership against the Spread of Weapons of Mass Destruction, the Global Threat Reduction Initiative, the Proliferation Security Initiative, and the Global Initiative to Combat Nuclear Terrorism, the United States has taken a leadership role in reducing the threat of WMD in the hands of non-state actors and terrorists.

**The Proliferation Security Initiative.**  Announced by President Bush in 2003, the Proliferation Security Initiative (PSI) deserves special mention as a particularly well received and effective international initiative. The PSI is a global effort that aims to stop the trafficking of WMD, WMD delivery systems, and related materials to and from states and non-state actors of proliferation concern worldwide. States that wish to join the PSI are asked to endorse its Statement of Interdiction Principles, which identifies specific measures participants intend to undertake for the interdiction of WMD and related materials. As of December 31, 2007, 86 states have endorsed the statement. PSI participants also conduct exercises to improve their operational capabilities to conduct interdictions and meet periodically to share information and develop new operational concepts. The PSI has led to a number of important interdictions over the last five years and is an important tool in the overall U.S. strategy to combat WMD terrorism.

**The Global Initiative to Combat Nuclear Terrorism.**  President Bush and Russian Federation President Putin announced the Global Initiative to Combat Nuclear Terrorism on July 15, 2006, to expand and accelerate the development of partnership capacity against one of the most serious

threats to international security. The Global Initiative offers a comprehensive approach to strengthening all defensive layers necessary to prevent, protect against, and respond comprehensively to the nuclear terrorist threat.

By agreeing to the Global Initiative's Statement of Principles, partner nations commit themselves to:

- Develop, if necessary, and improve accounting, control, and physical protection systems for nuclear and other radioactive materials and substances;

- Enhance security of civilian nuclear facilities;

- Improve the ability to detect nuclear and other radioactive materials and substances in order to prevent illicit trafficking in such materials and substances, to include cooperation in the research and development of national detection capabilities that would be interoperable;

- Improve capabilities of participants to search for, confiscate, and establish safe control over unlawfully held nuclear or other radioactive materials and substances or devices using them;

- Prevent the provision of safe haven and financial or economic resources to terrorists seeking to acquire or use nuclear and other radioactive materials and substances;

- Ensure respective national legal and regulatory frameworks, which are sufficient to provide for the implementation of appropriate criminal and, if applicable, civil liability for terrorists and those who facilitate acts of nuclear terrorism;

- Improve capabilities of participants for response, mitigation, and investigation in cases of terrorist attacks involving the use of nuclear and other radioactive materials and substances, including the development of technical means to identify nuclear and other radioactive materials and substances that are, or may be, involved in the incident; and

- Promote information sharing pertaining to the suppression of acts of nuclear terrorism and their facilitation, taking appropriate measures consistent with their national laws and international obligations to protect the confidentiality of any information which they exchange in confidence.

In the beginning of 2007, the partnership consisted of 13 nations; by December 31, the partnership had grown to 66 partner nations representing all regions of the world. The IAEA and the EU also participated as observers. Partner nations created a Plan of Work, committing themselves to host or co-sponsor events in furtherance of the goals in the Statement of Principles. In 2007, seven countries conducted nine Plan of Work activities implementing all eight of the Principles. The Global Initiative also engaged the private sector and local governments, both of which have an important role to play in preventing, protecting against, and responding to acts of nuclear terrorism.

**The Global Threat Reduction Initiative (GTRI).**  The goal of GTRI, announced by the United States on May 26, 2004, in Vienna, Austria, is to identify, secure, remove, or facilitate the disposition, as quickly and expeditiously as possible, of vulnerable nuclear and radioactive materials and equipment around the world that pose a potential threat to the international community. International partners are key participants in this initiative, and GTRI has undertaken cooperative activities in over 90 countries. In particular, GTRI seeks to facilitate globally the reduction or elimination of the use of highly enriched uranium in civilian nuclear applications and to remove or protect other vulnerable nuclear and radiological materials at civilian sites worldwide. Specific activities include the conversion of reactors used for research, testing, and medical-isotope production from the use of highly enriched uranium (HEU) fuel to low enriched (LEU); repatriation of fresh and spent HEU fuel to its country of origin (the United States or Russian Federation); enhancing the physical protection at sites utilizing such materials; and removal of unwanted radiological sources and other nuclear materials not otherwise covered by the fuel-return programs.

**Additional U.S. Efforts Supporting a Global Layered Defense.**  The United States has also worked with partner nations through the UN and the IAEA to reduce the threat of WMD in the hands of terrorists. The UN Security Council has passed two important resolutions related to the prevention of terrorism and the proliferation of WMD. In 2001, the Security Council adopted Resolution 1373, which requires all UN member states to refrain from providing any support, active or passive, to terrorists, and to work together to limit terrorist movement and safe haven. In 2004, the Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery. The United States remains committed to full implementation of both UN Security Council Resolutions 1373 and 1540.

The Convention on the Suppression of Acts of Nuclear Terrorism (Nuclear Terrorism Convention) entered into force on July 7, 2007. The USG submitted the Nuclear Terrorism Convention to the Senate for advice and consent to ratification in 2007, along with three other multilateral counterterrorism instruments: the Amendment to the Convention on the Physical Protection of Nuclear Material, the Protocol of 2005 to the Convention on the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, and the Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf. Collectively, these treaties will enhance international cooperation with regard to the prevention of WMD terrorism and proliferation of WMD, as well as the investigation and prosecution of such acts.

**Conclusion.**  The potential threat of terrorists acquiring and using WMD poses one of the greatest security challenges facing the United States and our international partners today. During the past year, the USG has built on a range of activities and launched new efforts to prevent, protect against, and respond to the threat or use of WMD. Together with partner nations and international organizations, the United States will continue to take the initiative to reduce the global risk of WMD terrorism.

# Chapter 5
# Terrorist Safe Havens (7120 Report)

## Update of Information Originally Reported Under Section 7120(b) of the Intelligence Reform and Terrorist Prevention Act of 2004

Title 22 of the United States Code, Section 2656f(b), requires that this report include "an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act" (also known as the Intelligence Reform and Terrorist Prevention Act of 2004, or "IRTPA"). Section 7120(b) of IRTPA includes certain reporting requirements relating to terrorist "sanctuaries," which are included in the present chapter. Since the term "sanctuary" is commonly associated with places of worship, we have, for greater clarity and for consistency with the terminology used elsewhere in *Country Reports on Terrorism*, referred instead here to terrorist "safe havens." We interpret terrorist "safe haven" to have the same meaning as terrorist "sanctuary" for the purposes of Section 7120(b).

The 7120 report includes:
1. Terrorist Safe Havens: Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
2. Support for Pakistan
3. Collaboration with Saudi Arabia
4. Struggle of Ideas in the Islamic World
5. Outreach through the Broadcast Media
6. Visas for Participants in USG Programs
7. Basic Education in Muslim Countries
8. Economic Reform

## 5.1. Terrorist Safe Havens

Terrorist safe havens are defined in this report as ungoverned, under-governed, or ill-governed areas of a country and non-physical areas where terrorists that constitute a threat to U.S. national security interests are able to organize, plan, raise funds, communicate, recruit, train, and operate in relative security because of inadequate governance capacity, political will, or both. Physical safe havens provide security for terrorist leaders, allowing them to plan acts of terrorism around the world.

Global communications and financial systems, especially those created by electronic infrastructure such as the Internet, global media, and unregulated economic activity, further allow terrorists to carry out activities, particularly the dissemination of propaganda and misinformation, without the need for a physical safe haven. These "virtual" havens are highly mobile, difficult to track, and difficult to control, and are not based in any particular state. This part of the report, however, will not address virtual safe havens, focusing instead on physical safe havens.

**AFRICA**

**Somalia.**  A small number of al-Qa'ida (AQ) operatives remain in East Africa, particularly Somalia, where they pose a serious threat to U.S. and allied interests in the region. Although these elements have been severely disrupted as a result of Ethiopian and Somali Transitional Federal Government military actions, AQ continues to operate in Somalia and elsewhere in East Africa. Somalia remains a concern given the country's long, unguarded coastline, porous borders, continued political instability, and proximity to the Arabian Peninsula, all of which provide opportunities for terrorist transit and/or safe haven. AQ remains likely to make common cause with Somali extremists.

**The Trans-Sahara.** Remote areas of the Sahel and Maghreb regions in Africa serve as terrorist safe havens because of little government control in sparsely populated regions. The threat to U.S. interests from Islamic extremists increased in 2007 as a result of AQ merging with two Islamic extremist organizations that operate in the region: al-Qa'ida in the Islamic Maghreb (AQIM), based in Algeria; and the Libyan Islamic Fighting Group (LIFG), although LIFG's November 2007 merger with AQ has yielded few successful attacks to date, reflecting the depleted capabilities of LIFG within Libya.

AQIM has used the Sahel to train Islamic militants in small arms, use of explosives, and guerilla tactics for the last several years. Training appears to take place on the move or in makeshift facilities in remote areas outside government control. While LIFG members have trained in AQIM-run and other camps, the goal of their preparations has been to join anti-Coalition fighting in Iraq. AQIM taps into already existing smuggling networks in the region to obtain weapons, explosives, and supplies to support its operations.

## EAST ASIA AND PACIFIC

**The Sulu/Sulawesi Seas Littoral.**  Southeast Asia includes a safe haven area composed of the Sulawesi Sea and Sulu Archipelago, which sit astride the maritime boundary between Indonesia, Malaysia, and the Philippines. The geography of the thousands of islands in the region made the area difficult for authorities to monitor. Worker migration, tourism, trade, and other non-terrorist activities, both licit and illicit, that occur in this maritime region pose another challenge to identifying and countering the terrorist threat. Although Indonesia, Malaysia, and the Philippines have improved their efforts to control their shared maritime boundaries, this expanse remains difficult to control. Surveillance is partial at best, and traditional smuggling and piracy groups provided an effective cover for terrorist activities, such as movement of personnel, equipment, and funds. The Sulu/Sulawesi Seas Littoral represents a safe haven for the AQ-linked Jemaah Islamiya (JI) organization and the Philippine Abu Sayyaf Group (ASG).

**The Southern Philippines**.  The southern Philippines, specifically the Sulu archipelago and Mindanao, serve as terrorist safe havens. The government's control in this area is weak due to rugged terrain, weak rule of law, poverty, and local Muslim minority resentment of central governmental policies. In addition to Jemaah Islamiya (JI) and the Abu Sayyaf Group (ASG), the area hosts several terrorist and insurgent groups including the Communist Party of the Philippines/New People's Army and the Rajah Solaiman Movement.

JI and the ASG pose a threat to U.S. interests, including the U.S. military forces supporting the Philippine Armed Forces that are conducting counterinsurgency operations in Jolo Island. JI maintains a presence in the southern Philippines where it conducts attack planning, but its capabilities in the region have decreased since 2006. It conducts training in some areas of Mindanao controlled by the Moro Islamic Liberation Front (MILF), though MILF's peace talks with the government may reduce ties (and therefore support capabilities) between the groups.

**Indonesia**.  Jemaah Islamiya (JI) poses the principal threat to U.S. and other Western interests in Indonesia. In 2007, the Indonesian government improved its counterterrorist capabilities and scored several successes against the group, such as the June arrest of the former acting JI emir Muhammad Naim (aka Zarkasih) and the former JI military commander Abu Dujana. JI's leadership operates largely in west and central Java where the group recruits, funds, trains, and plans operations, which in the past have included attacks on Western targets.

## THE MIDDLE EAST AND NORTH AFRICA

**Iraq.**  Iraq is not currently a terrorist safe haven, but terrorists, including Sunni groups like al-Qa'ida in Iraq (AQI), Ansar al-Islam (AI), and Ansar al-Sunna (AS), as well as Shia extremists and other groups, view Iraq as a potential safe haven and are attempting to make it a reality. The Iraqi government, in coordination with the Coalition, made significant progress in combating AQI and affiliated terrorist organizations in 2007.

The substantial degradation of AQI stems from a number of factors. The alliance of convenience and mutual exploitation between AQI and many Sunni populations has deteriorated. The Baghdad Security Plan, initiated in February, along with assistance from primarily Sunni tribal and local groups, has succeeded in reducing violence to late 2005 levels, has disrupted and diminished AQI infrastructure, and has driven some surviving AQI fighters from Baghdad and Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. While AQI remained a threat, new initiatives to cooperate with tribal and local leaders in Iraq have led to Sunni tribes' and local citizens' rejection of AQI and its extremist ideology. The continued growth, professionalism, and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar and Diyala Provinces, and elsewhere have turned against AQI and were cooperating with the Iraqi government and Coalition Forces to defeat it. The Coalition troop surge and its sustained presence and tactics, and the reduction in violence following the declared ceasefire by Muqtada al-Sadr's Jaysh al-Mahdi militia in August, also increased popular support for the actions of Coalition and Iraqi Forces against AQI and other terrorist groups.

AQI, although substantially degraded in 2007, retains some infrastructure that allows the group to use these areas for staging operations.

**Northern Iraq.** The Kongra Gel/Kurdistan Worker's Party (KGK/PKK) maintained an active presence in northern Iraq, from which it coordinated attacks in the predominantly ethnic Kurdish areas of southeastern Turkey and provided logistical support to forces that launched attacks into Turkey, primarily against Turkish security forces, local Turkish officials, and villagers who opposed the organization. On October 17, the Turkish Parliament

overwhelmingly passed a motion authorizing cross-border military operations against KGK/PKK encampments in northern Iraq. Turkish forces carried out extensive operations along the Turkey-Iraq border in the latter part of the year. The United States continued to work with Turkey and Iraq to counter the common threat from the KGK/PKK.

**Lebanon.**  Hizballah remained the most prominent and powerful terrorist group in Lebanon, with a strong influence among Lebanon's large Shia community. The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah retains its strong influence among Lebanon's Shia community, which comprises at least one third of Lebanon's population. Hizballah maintained offices in Beirut and elsewhere in the country, and was represented by elected deputies in parliament.

An increasing number of AQ-associated Sunni extremists are also operating within the country. AQ likely views Lebanon as an opportunity to expand its jihad into the Levant, especially after the 2006 conflict between Israel and Hizballah. The organization uses the refugee camps as staging grounds for recruitment, training, planning, and facilitating transit of foreign fighters to and from Iraq. On May 20, a conflict involving the Lebanese Armed Forces (LAF) and militant Islamic fundamentalist group Fatah al-Islam (FAI) erupted in Nahr el-Barid, a Palestinian refugee camp in the north. After a three-month battle, the Lebanese Army took control of the camp on September 2. The death toll was 168 LAF soldiers and an estimated 42 civilians. While the LAF were able to defeat FAI militants and secure the Nahr el-Barid camp, local Palestinian authorities still retained control of the other eleven refugee camps in the country.

*See Chapter 3, State Sponsors of Terrorism,* for information on Iran and Syria, which provided safe haven to Hizballah and Palestinian terrorist groups, and were used as safe havens by AQ-linked operatives and groups.

**Yemen**. Yemen experienced several setbacks to its counterterrorism efforts with the June 22 announcement that Abu Basir Nasir al-Wahishi was the new head of al-Qa'ida in Yemen (AQY), the July 2 terrorist attack which killed ten people, and the uncertainty of U.S.S. Cole bomber Jamal al-Badawi's continued incarceration. At the end of 2007, the Government of Yemen could not account for seven of the 23 AQ members that escaped from a prison in Sanaa in February 2006. AQY carried out several attacks against tourism targets, most notably the January and July 2007 attacks against foreign visitors to the Queen of Sheba Temple in Ma'rib and the country's oil infrastructure. Yemen continued to increase its maritime security capabilities, but land border security along the extensive frontier with Saudi Arabia remained a problem, despite increased Yemeni-Saudi cooperation on bilateral security issues.

## SOUTHWEST ASIA

**Afghan-Pakistan Border.**  Despite the efforts of both Afghan and Pakistani security forces, instability along the Pakistan-Afghanistan frontier appeared to have provided al-Qa'ida (AQ) leadership greater mobility and ability to conduct training and operational planning, particularly that targeting Western Europe and the United States. Numerous senior AQ operatives have been

captured or killed, but AQ leaders continue to plot attacks and to cultivate stronger operational connections that radiate outward from Pakistan to affiliates throughout the Middle East, North Africa, and Europe.

**Pakistan.**  Portions of the Federally Administered Tribal Areas (FATA) and the North-West Frontier Province (NWFP) of Pakistan have become a safe haven for AQ terrorists, Afghan insurgents, and other extremists. AQ uses the FATA to launch attacks in Afghanistan, plan operations worldwide, train, recruit, and provide propaganda. Other extremists, including Taliban and Kashmir-focused organizations such as Hizb-e-Islami Gulbuddin or Hizb-e-Islami Khalis, use the area for safe haven and share short term goals of eliminating Coalition presence in Afghanistan. They exploit the local sympathetic populations to recruit, train, and conduct cross-border raids and bombings in Afghanistan. Islamist Deobandi groups and many local tribesmen in the FATA continue to resist the government's efforts to improve governance and administrative control at the expense of longstanding local autonomy.

Extremists led by Taliban commander Baitullah Mehsud and other AQ-related extremists re-exerted their hold in areas of South Waziristan and captured over 200 government soldiers, who were later released after a local peace deal collapsed. Extremists have also gained footholds in the settled areas bordering the FATA, including Swat, Tank, and DI Khan. Pakistani security forces continue to fight militant leader Maulana Fazlullah in Swat, a settled area in NWFP. As of December, Pakistan's military was conducting increased operations in Swat. The Government of Pakistan maintains approximately 120,000 troops, including Army and Frontier Corps (FC) units, along the Afghanistan border. The United States plans to help modernize and increase the capacity of the FC so they can become a more effective force.

In order to increase the central government's writ in the FATA, the Government of Pakistan is implementing a comprehensive approach with three prongs: political, security, and development. For the political prong, the government seeks to bolster effective governance by empowering local officials. For the security prong, Pakistan's objective is to increase the capacity and efficacy of local security forces. For the development prong, the Government of Pakistan has designed a comprehensive sustainable development plan for the region. The plan concentrates on four sectors – basic human services, natural resources, communication/ infrastructure, and economic development – and, if fully implemented, would cost $2 billion. The plan was developed with the extensive grassroots participation of all stakeholders to provide essential economic and livelihood opportunities while upgrading and expanding social services to a population at risk for recruitment by terrorist organizations.

**Afghanistan.** The Afghan government, in concert with ISAF/NATO forces and the international community, continued efforts to bring and build security on the Afghan side of the border. The border areas remained contested, however, with ongoing insurgent and terrorist attacks, including AQ activity. Attacks by the Taliban and other insurgent groups and criminal networks, along with those of extremist movements such as Hizb-e-Islami Gulbuddin (HIG) and the Haqqani network, continued throughout Afghanistan. Criminal networks and narcotics cultivation remained particularly prevalent in the south and east of the country, constituting a source of funding for the insurgency in Afghanistan. In 2007, AQ expanded its Afghanistan-based leadership cadre and its support to militants inside the country, providing funding, training,

and personnel to facilitate terrorist and insurgent operations. Anti-Coalition organizations such as HIG continued to operate in coordination with AQ, Taliban, and other insurgent groups, primarily in the east.

## WESTERN HEMISPHERE

**Colombia Border Region**. The regions adjacent to Colombia's borders with Venezuela, Ecuador, Peru, Panama, and Brazil include rough terrain and dense forest cover. These conditions, coupled with low population densities and weak government presence, create areas of safe haven for insurgent and terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC). Brazil, Ecuador, Peru, and Panama have often adopted a tacit policy mix of containment and non-confrontation with Colombian narcoterrorist groups, although some confrontations do occur. Much depends on local decisions and cross-border relations. The FARC used areas in neighboring countries near Colombia's border to rest and regroup, procure supplies, and stage and train for terrorist attacks. These areas appeared to be more prevalent in Venezuela and Ecuador, less so in Brazil and Peru. In addition, the FARC and another designated terrorist organization, the National Liberation Army (ELN), regard Venezuelan territory near the border as a safe haven and often used the area for cross-border incursions.

**Venezuela**. Rampant corruption within the Venezuelan government and military, ideological ties with the FARC, and lax counternarcotics policies have fueled a permissive operating environment for drug traffickers and an increase in drug trafficking to Europe, Africa, and the United States. The United States is closely monitoring this situation.

**The Tri-Border Area (TBA) (Argentina, Brazil, and Paraguay).** Although no corroborated information shows that Hizballah, HAMAS, or other Islamic extremist groups used the TBA for military-type training or planning of terrorist operations, the United States remains concerned that these groups use the TBA as a safe haven to raise funds. Suspected supporters of Islamic terrorist groups, including Hizballah, take advantage of loosely regulated territory and the proximity of Ciudad del Este, Paraguay and Foz do Iguaçu, Brazil to participate in a wide range of illicit activities and to solicit donations from within the sizable Muslim communities in the region and elsewhere in Argentina, Brazil, and Paraguay. The governments of the TBA have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through this region. In the early years of this decade, the governments of Argentina, Brazil, and Paraguay invited the United States to participate in the Three Plus One Group on TBA Security to address these illicit activities.

## Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens

Corruption, poverty, a lack of civic institutions and social services, politically repressive governments, and inadequate or unjust law enforcement and legal systems are conditions terrorists exploit for recruitment, operational planning, or physical safe haven. Efforts to build partner capacity and encourage states to cooperate more effectively at the local and regional level are key to denying terrorists safe haven. U.S. Ambassadors, as the President's personal representatives abroad, are in charge of U.S. relations with host nations, with a unique

responsibility to bring all elements of national power to bear against the terrorist enemy. They lead interagency country teams that develop strategies to help host nations understand the threat and to strengthen their political will and capacity to counter it.

Defeating the terrorist enemy requires a comprehensive effort executed locally, nationally, regionally, and globally. Working with partner nations, we must eliminate terrorist leadership, but incarcerating or killing terrorists will not achieve an end to terrorism. We must simultaneously eliminate terrorist safe havens, tailoring regional strategies to disaggregate terrorist networks and break terrorist financial, travel, communications, and intelligence links. Finally, and most challenging, we must address the underlying conditions that terrorists exploit at the national and local levels to induce alienated or aggrieved populations to become sympathizers, supporters, and ultimately members of terrorist networks. We can marginalize violent extremists by addressing people's needs and grievances, by giving people a stake in their own political future, and by providing alternatives to what terrorists offer.

Economic development offers at-risk populations a better choice. Terrorists exploit despair and hopelessness to win recruits. Systems characterized by an absence of political choice, economic opportunities, and personal freedom can become unwitting incubators of extremism. Economically disadvantaged people are vulnerable to recruitment by extremists and by criminal "quick-fix" livelihoods, such as the poppy production that finances terrorism in Afghanistan.

Combating corruption and fostering good governance in host governments is indispensable to our efforts to strengthen host government law enforcement and oversight of terrorist financing, and the effectiveness of our other training programs, such as those that help border guards interdict dangerous goods and people.

Terrorists exploit weakness, most notably sectarian violence, to create greater instability and to piggyback onto the conflict for propaganda purposes. Fostering reconciliation and strengthening community mechanisms is vital to eliminating terrorism.

This is a long-term challenge. Over time, our global and regional cooperative efforts will reduce terrorists' capacity to harm us and our partners, while local security and development assistance will build our partners' capacity. We must continue to enlist the support and cooperation of a growing network of partners. If we are to be successful, we must all work together toward our common goal in a strategic and coordinated manner.

## REGIONAL STRATEGIC INITIATIVE

Building on this understanding, we have worked to develop the Regional Strategic Initiative (RSI), an effort to develop flexible regional networks. The State Department's Office of the Coordinator for Counterterrorism (S/CT) is working with ambassadors and interagency representatives in key terrorist theaters of operation to collectively assess the threat, pool resources, and devise collaborative strategies, action plans, and policy recommendations.

The RSI is a key tool in promoting cooperation between our partners in the War on Terror – for example, with Malaysia, Indonesia, and the Philippines as they confront terrorist transit across the Sulawesi Sea; or among Mauritania, Algeria, Morocco, Niger, Chad, and Mali, to counter al-Qa'ida in the Islamic Maghreb (AQIM), as it recruits and hides in the desert that sits astride national borders. Terrorists are highly adaptable; defeating them requires both centralized coordination and field authority. Resources and responses must be applied in a rapid, flexible, and focused manner. The RSI helps achieve this coordinated approach.

RSI strategy groups are in place for South East Asia, Iraq and its neighbors, the Eastern Mediterranean, the Western Mediterranean, East Africa, the Trans-Sahara, South Asia, and Latin America. These groups are chaired by Ambassadors, with interagency representatives participating. RSI programs focus on developing a common understanding of the strategic situation in a region. Using this shared perspective, networked country teams then identify opportunities for collaboration and pool resources not only to eliminate terrorism safe havens, but also to address the conditions that terrorists exploit for recruitment.

Terrorists operate without regard to national boundaries. To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships and increasingly operate in a regional context. Denying safe haven plays a major role in undermining terrorists' capacity to operate effectively and forms a key element of U.S. counterterrorism strategy.

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

Since the terrorist attacks of September 11, 2001, the United States has acted to block funding of terrorists and their supporters, and to promote international cooperation against them. On September 23, 2001, the President signed E.O. 13224, giving the United States a powerful tool to impede terrorist funding. This Executive Order (EO) provides a means to disrupt the financial support network for terrorists and terrorist organizations by authorizing the USG to designate and block assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism. In addition, because of the pervasiveness and expansiveness of the financial base of foreign terrorists, the order authorizes the USG to block the assets of individuals and entities that provide support, offer assistance to, or otherwise associate with designated terrorists and terrorist organizations. The order also covers their subsidiaries, front organizations, agents, and associates.

The Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, also has the authority to designate groups as Foreign Terrorist Organizations (FTOs) pursuant to Section 219 of the Immigration and Nationality Act, as amended. These designations play a critical role in U.S. counterterrorism efforts and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business. As a consequence of such a designation, it is unlawful for U.S. citizens or any persons subject to the jurisdiction of the United States to provide material support or resources to a designated FTO. U.S. financial institutions are also required to freeze the funds of designated FTOs.

EO and FTO designations support U.S. efforts to curb the financing of terrorism and encourage other nations to do the same. They internationally stigmatize and isolate designated terrorist entities and individuals. They also deter donations or contributions to, and economic transactions with, named entities and individuals. In addition, they heighten public awareness and knowledge of terrorist organizations, and signal U.S. concerns about named entities and individuals to other governments.

**In 2007, the United States designated a number of individuals and entities:**

- On January 26, the United States designated two South African individuals, Farhad Ahmed Dockrat and Junaid Ismail Dockrat, and a related entity for financing and facilitating al-Qa'ida, pursuant to Executive Order 13224.
  - o Farhad Dockrat both finances and facilitates al-Qa'ida. In one example, Dockrat in 2001 provided over 400,000 South African Rand (approximately $62,900) to the Taliban ambassador to Pakistan to be forwarded to al-Akhtar Trust, an Afghanistan-based fundraiser for al-Qa'ida.
  - o Al-Akhtar Trust was previously designated by the United States under E.O. 13224 for its support to al-Qa'ida. Al-Akhtar Trust is also on the United Nations Security Council 1267 Committee's list of sanctioned individuals and entities designated for providing support to al Qa'ida, Usama bin Ladin and the Taliban.
  - o Junaid Dockrat is an al-Qa'ida financier, recruiter, and facilitator. Junaid Dockrat in 2004 worked via phone and email with al-Qa'ida operations chief Hamza Rabi'a (now deceased) to coordinate the travel of South Africans to Pakistan in order for them to train with al Qa'ida. He is also responsible for raising $120,000 that Rabi'a received in the spring of 2004.

- On February 20, the United States designated Jihad al-Bina under Executive Order 13224 for its support to Hizballah. Jihad al-Bina is a Lebanon-based construction company formed and operated by Hizballah. Jihad al-Bina receives direct funding from Iran, is run by Hizballah members, and is overseen by Hizballah's Shura Council, at the head of which sits Hizballah Secretary General Hassan Nasrallah.

- On June 15, the United States designated `Ali Sulayman Mas'ud `Abd al-Sayyid, Sa'id Yusif Ali Abu Azizah, and Nur al-Din al-Dibiski under Executive Order 13224. `Abd al-Sayyid is one of al-Qa'ida's early members and is reportedly a member of the al-Qa'ida military committee. 'Abd al-Sayyid was assigned by al-Qa'ida's leadership to deliver messages to al-Qa'ida members in Libya that contained instructions for terrorist plots in Libya. `Abd al-Sayyid was also tasked by LIFG to enter Libya secretly, and was involved in arming an al-Qa'ida group in Libya. Sa'id Yusif Ali Abu Azizah is a member of and recruiter for al-Qa'ida, and was responsible for al-Qa'ida's publications and mass media operations. Azizah was identified as a member of al-Qa'ida in Canada in 2003, and became the leader of the LIFG in Canada in 2004. Nur al-Din al-Dibiski traveled to Afghanistan in the early 1990s, where he joined al-Qa'ida and received military training in al-Qa'ida's camps. Dibiski is believed to be a senior member of the LIFG and a member of that terrorist group's military committee.

- On July 24, the United States designated the Iran-based Martyrs Foundation, including its U.S. branch, the Goodwill Charitable Organization (GCO), and the finance firm al-Qard al-Hassan (AQAH) under Executive Order 13224 for their support to Hizballah. Two individuals, Qasem Aliq and Ahmad al-Shami, were also designated for the role they play in Hizballah's support network. The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah, HAMAS, and the Palestinian Islamic Jihad (PIJ). The designation included:

  o The Goodwill Charitable Organization (GCO), a fundraising office in Dearborn, Michigan, established by the Martyrs Foundation. GCO is a Hizballah front organization that reports directly to the leadership of the Martyrs Foundation in Lebanon.
  o The finance firm al-Qard al-Hassan (AQAH), which has been used by Hizballah as a cover to manage its financial activity. After the summer 2006 conflict, Hizballah transferred a portion of its financial activity to AQAH, giving Hizballah access to the international banking system.
  o Qasem Aliq, a Hizballah official who was previously the director for the Martyrs Foundation branch in Lebanon, and is responsible for overseeing Martyrs Foundation's operation. He worked closely with senior Hizballah officials.
  o Ahmad al-Shami, who has worked for the Martyrs Foundation in Lebanon and has been in frequent contact with GCO. Money raised by GCO was sent to al-Shami in Lebanon to be distributed to the Martyrs Foundation. Hizballah leadership placed al-Shami in his position at the Martyrs Foundation in Lebanon.

- On August 7, the United States designated the al-Salah Society and its director Ahmad al-Kurd under Executive Order 13224 for their support to HAMAS. Al-Salah is one of the largest and best-funded HAMAS charitable organizations in the Palestinian territories.

  o The al-Salah Society supported HAMAS-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support HAMAS' activities. It also financed commercial stores, kindergartens, and the purchase of land for HAMAS.
  o The al-Salah Society was included on a list of suspected HAMAS and Palestinian Islamic Jihad-affiliated NGOs whose accounts were frozen by the Palestinian Authority as of late August 2003. After freezing the bank accounts, PA officials confirmed that the al-Salah Society was a front for HAMAS.
  o Ahmad al-Kurd, Director of the al-Salah Society, is a recognized high-ranking HAMAS leader in Gaza.

- On August 13, the United States designated Fatah al-Islam under Executive Order 13224. Fatah al-Islam, an offshoot of the Syria-backed secular Palestinian terrorist group Fatah al-Intifada, was led by Shakir al-Absi, a well-known Palestinian-Jordanian militant who was sentenced to death in absentia in Jordan for his involvement in the 2002 murder of U.S. diplomat Laurence Foley. Fatah al-Islam initiated the hostilities in the Nahr al-Barid Palestinian refugee camp near Tripoli, Lebanon with an unprovoked attack on Lebanese

security forces in May, and used civilian refugees as human shields during the fighting. Over 130 Lebanese Armed Forces soldiers and civilians lost their lives in the conflict at Nahr al-Barid.

- On October 10, the United States designated Abdul Rahim al-Talhi, Muhammad `Abdallah Salih Sughayr, and Fahd Muhammad `Abd al-`Aziz al-Khashiban under Executive Order 13224 for providing support to the Abu Sayyaf Group (ASG), an al-Qa'ida-affiliated terrorist group responsible for multiple bombings, kidnappings, and other terrorist attacks in Southeast Asia. These three men have served as significant sources of financial and other support to individuals and entities in Southeast Asia previously named as Specially Designated Global Terrorists (SDGTs) and listed pursuant to UNSCR 1267.

- On October 25, the United States designated the IRGC-Qods Force (IRGC-QF) under Executive Order 13224 for its support to terrorist organizations. The Qods Force is a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), that provides material support to the Taliban, Lebanese Hizballah, HAMAS, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

  - The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged some shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and possibly man-portable defense systems to the Taliban.
  - The Qods Force has a long history of supporting Hizballah, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701. Through Qods Force material support to the Taliban, Iran is seeking to inflict casualties on U.S. and NATO forces. In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shia militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

- On October 25, the United States designated Bank Saderat, its branches, and subsidiaries under Executive Order 13224 for their support to terrorist organizations. Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups HAMAS, PFLP-GC, and Palestinian Islamic Jihad. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars to support the activities of HAMAS. As of early 2005, HAMAS had substantial assets

deposited in Bank Saderat, and in 2007, Bank Saderat has transferred several million dollars to HAMAS.

- On November 15, the United States designated the Tamils Rehabilitation Organization (TRO) under Executive Order 13224 for its support to the Liberation Tigers of Tamil Eelam (LTTE). The TRO is a charitable organization that acts as a front to facilitate fundraising and procurement for the LTTE through a network of individual representatives. In the United States, TRO has raised funds on behalf of LTTE and facilitated LTTE procurement operations in the United States. Operations included the purchase of munitions, equipment, communication devices, and other technology for the LTTE. TRO's efforts worldwide have reportedly allowed the LTTE to use humanitarian aid that it collected from the international community after the December 2004 Indian Ocean tsunami to launch new campaigns to strengthen LTTE military capacity.

- On December 4, the United States designated Abdelmalek Droukel, of al-Qa'ida in the Islamic Maghreb (AQIM), under Executive Order 13224. Droukel reportedly supervised the April 2007 AQIM bombings of the Algerian Prime Minister's office and police facilities in Algiers. In a May 2007 video announcement, Droukel publicly called on regional AQIM commanders to seek recruits and select targets for suicide bombings.

- On December 6, the United States designated Fawzi Mutlaq al-Rawi, the leader of the Iraqi wing of the Syrian Baath Party, under Executive Order 13224, for providing financial and material support to al-Qa'ida in Iraq (AQI). In November 2005, al-Rawi facilitated the provision of $300,000 to members of AQI, and provided AQI with vehicle-borne improvised explosive devices, rifles, and suicide bombers at the request of a senior AQI leader. As of March 2005, al-Rawi was present at regular meetings to plan funding for Muhammad Yunis Ahmad's network in Iraq. Muhammad Yunis Ahmad has provided guidance, financial support, and coordination for insurgent attacks throughout Iraq. Al-Rawi also ran a charity organization which was a front for funding the network.

## UN Security Council Resolution 1267

United Nations Security Council Resolution 1267 (1999) and successor resolutions require member states to impose financial and other sanctions on listed groups and individuals associated with Usama bin Ladin, the Taliban, or al-Qa'ida. The 1267 Sanctions Committee, also established by the Security Council, maintains a list of individuals and entities associated with al-Qa'ida, the Taliban, and/or Usama bin Ladin who are subject to the international sanctions, assets freeze, travel ban, and arms embargo that member states are obligated to implement. On July 29, 2005, the UN Security Council requested, through the adoption of Resolution 1617, that the UN Secretary General take the necessary steps to increase cooperation between the UN and INTERPOL in order to provide the Committee (established pursuant to Resolution 1267) with better tools to fulfill its mandate more effectively.

**In 2007, the United States and the UN Security Council 1267 Committee designated the following individuals and entities:**

- On June 8, the UN 1267 Sanctions Committee added `Ali Sulayman Mas'ud `Abd al-Sayyid, Sa'id Yusif Ali Abu Azizah, and Nur al-Din al-Dibiski to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. `Abd al-Sayyid is one of al-Qa'ida's early members and is reportedly a member of the al-Qa'ida military committee. 'Abd al-Sayyid was assigned by al-Qa'ida's leadership to deliver messages to al-Qa'ida members in Libya that contained instructions for terrorist plots in Libya. `Abd al-Sayyid was also tasked by LIFG to enter Libya secretly, and was involved in arming an al-Qa'ida group in Libya. Sa'id Yusif Ali Abu Azizah is a member of and recruiter for al-Qa'ida, and was responsible for al-Qa'ida's publications and mass media operations. Azizah was identified as a member of al-Qa'ida in Canada in 2003, and became the leader of the LIFG in Canada in 2004. Nur al-Din al-Dibiski traveled to Afghanistan in the early 1990s, where he joined al-Qa'ida and received military training in al-Qa'ida's camps. Dibiski is believed to be a senior member of the LIFG and a member of that terrorist group's military committee.

- On August 27, the UN 1267 Sanctions Committee added Abdelmalek Droukdel, the leader or emir of al-Qa'ida in the Lands of the Islamic Maghreb (AQIM), to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. Droukel reportedly supervised the April 2007 AQIM bombings of the Algerian Prime Minister's office and police facilities in Algiers. In a May 2007 video announcement, Droukel publicly called on regional AQIM commanders to seek recruits and select targets for suicide bombings.

- On September 13, the UN 1267 Sanctions Committee added Sirajuddin Jallaloudine Haqqani to its list of individuals or entities associate with Usama bin Ladin, the Taliban, or al-Qa'ida. Haqqani is a Taliban Deputy Commander who since 2004 has been a major operational commander in the southern and eastern regions of Afghanistan.

- On October 9, the UN 1267 Sanctions Committee added three individuals based in Saudi Arabia to its list of individuals and entities associated with Usama bin Ladin, the Taliban, or al-Qa'ida. Abdul Rahim al-Talhi, Muhammad `Abdallah Salih Sughayr, and Fahd Muhammad `Abd al-`Aziz al-Khashiban were listed for providing support to the Abu Sayyaf Group (ASG), an al-Qa'ida-affiliated terrorist group responsible for multiple bombings, kidnappings and other terrorist attacks in Southeast Asia. These three men have served as significant sources of financial and other support to individuals and entities in Southeast Asia previously named as SDGTs and listed pursuant to United Nations Security Council Resolution (UNSCR) 1267 and successor resolutions.

## DE-LISTING OF INDIVIDUALS AND/OR ENTITIES UNDER UNSCR 1267

Pursuant to the UN 1267 Committee guidelines, any individual(s), groups, undertakings, and/or entities on the Consolidated List may submit a petition for de-listing. The petitioner must provide justification for the de-listing request, offer relevant information, and request support for the de-listing. The Committee, in determining whether to remove names from the Consolidated List, may consider, among other things: whether the individual or entity was placed on the Consolidated List due to a mistake of identity, or whether the individual or entity no longer

meets the criteria set out in relevant resolutions. In evaluating whether an individual or entity no longer meets the criteria, the Committee may consider, among other things, whether the individual is deceased, or whether it has been affirmatively shown that the individual or entity has severed all association, as defined in paragraph 2 of Resolution 1617 (2005), with al-Qa'ida, Usama bin Ladin, the Taliban, and their supporters, including all individuals and entities on the Consolidated List.

**In 2007, the United States and the UN 1267 Committee de-listed the following individuals and entities:**

- On August 1, Momtaz Bank was de-listed as an entity from the 1267 Consolidated List.
- On September 17, Lokman Amin Mohammed (Hama Karim) was de-listed from the 1267 Consolidated List.
- On November 14, Ahmed Irdis Nasreddin was de-listed as an individual (and 12 entities associated with him were delisted as entities) from the consolidated list (al-Qa'ida section) of the UN 1267 Committee.

## BRINGING TERRORISTS TO JUSTICE: REWARDS FOR JUSTICE

Rewards for Justice (RFJ) is a valuable asset in the War on Terror. Through the RFJ program, the Secretary of State offers and pays rewards for information that prevents or successfully resolves an act of international terrorism against United States persons or property. Reward offers of up to $25 million have been authorized for information leading to the capture of Usama bin Ladin and other key terrorist leaders. Since its inception in 1984, RFJ has paid more than $77 million to over 50 people who provided credible information. In 2007, the United States gave out rewards totaling $15 million for the successful resolution of terrorist cases in the Philippines and the United States. This was the second highest payout year in the history of the RFJ program.

In June, U.S. Ambassador Kristie A. Kinney presided over a public reward ceremony jointly sponsored by the U.S. Embassy in Manila and the Government of the Philippines. The reward payment of $10 million to multiple sources was the largest Rewards for Justice payment in the Philippines since the program was launched in the country in 2002. The sources provided information that contributed to successful military operations against Khadaffy Janjalani and Abu Solaiman, leaders of the Abu Sayyaf Group, who were responsible for the kidnappings and deaths of American and Filipino citizens. Janjalani was killed during a battle with the Armed Forces of the Philippines (AFP) in October 2006, while Abu Solaiman was killed in similar circumstances by the AFP in January 2007.

In October, RFJ gave $5 million to an individual who was instrumental in bringing Zacarias Moussaoui, the so-called "20th hijacker" of the September 11, 2001 terrorist attack, to justice.

In 2007, new initiatives included adding six terrorists to the RFJ Most Wanted List and one new incident-based reward offer. In January, RFJ added three new terrorists with reward offers of up to $5 million to its list: Mohammad Ali Hamadei, a member of Lebanese Hizballah, who participated in the 1985 hijacking of TWA 847 and the murder of U.S. Navy diver Robert

Stethem; Ramadan Shallah, the Secretary-General and founding member of the Palestinian Islamic Jihad; and Mohammed Qari Zafar, a terrorist operative wanted for questioning in connection with the March 2006 attack against the Consulate in Karachi, which led to the death of U.S. Foreign Service Officer David Foy. In March, Zulkifli bin Hir (a.k.a. Marwan), a leader in Jemaah Islamiya (JI) in the Philippines, was added to the RFJ list with a reward offer of up to $5 million. In April, the Secretary of State approved a reward offer of up to $1 million for information regarding the January 2007 terrorist attack against the U.S. Embassy in Athens. Finally, in July, RFJ added JI leaders Noordin Top and Zulkarnaen to the list.

All of these reward offerings are listed in greater detail on the www.rewardsforjustice.net website, which was redesigned in July 2007.

## MULTILATERAL EFFORTS TO COMBAT TERRORISM

International cooperation remains essential to initiatives in fields ranging from intelligence and law enforcement coordination, to targeted financial sanctions, to norms and standards of financial regulation, because most funds used to support terrorism are located outside the jurisdiction of the United States.

Throughout the year, the United States worked closely with multilateral partners in numerous counterterrorist financing efforts, including the Counterterrorism Committee of the United Nations, the Egmont Group of Financial Intelligence Units, the Financial Action Task Force (FATF), the G8's Counterterrorism Assistance Group (CTAG), and international financial institutions. In addition, the United States continued its regular dialogue on terrorism finance with the European Union. Since its launch in September 2004, the dialogue has served as the framework for ongoing exchanges to promote information sharing and cooperation on the Financial Action Task Force (FATF), and on technical assistance issues.

European nations are active participants in a variety of multilateral organizations that contributed to counterterrorist efforts, including the G8, NATO, the FATF, MONEYVAL, the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO). The United States and its partners worked through these organizations to establish and implement best practices, build the counterterrorism capabilities of "weak but willing" states, and to institutionalize the War on Terror globally. The World Bank and International Monetary Fund have pledged to provide countries with training to increase their capacity to combat money laundering and terrorist financing.

**The United Nations (UN)**.  The Counter-Terrorism Committee (CTC) was established by Security Council Resolution 1373 after September 11, 2001, with the goal of enhancing the ability of UN member states to combat terrorism. The Counter-Terrorism Committee's Executive Directorate (CTED), established by Resolution 1535 in 2004, became fully operational in December 2005. CTED's mandate is to enhance the Committee's ability to monitor the implementation of Resolution 1373 and to advance capacity-building work by facilitating technical assistance to member states and promoting closer cooperation and coordination with

international, regional, and sub-regional organizations. It also conducts visits to member states to assess the implementation of Resolution 1373. CTED visited seven states in 2007 (Bosnia-Herzegovina, Bangladesh, Turkey, Georgia, Armenia, Nigeria, and Vietnam).

In 2007, UN Security Council Resolution 1787 (December 10), extended the mandate of the Counter-Terrorism Committee Executive Directorate (the Executive Directorate) until March 31, 2008. The resolution requested that the Executive Director of the Executive Directorate recommend appropriate changes and recommendations to the organization of CTED.

The Counterterrorism Implementation Task Force (CTITF) brought together 24 UN entities across the UN system, which work under mandates from the General Assembly, the Security Council, and various specialized agencies, funds, and programs to implement the historic Global Counterterrorism Strategy agreed to by all 192 member countries in September 2006. In 2007, the Task Force developed a program of work and established working groups to carry forward a first set of initiatives to implement the Strategy.

UN Specialized Agencies are also involved in the work of fighting terrorism. For example, the International Civil Aviation Organization (ICAO) adopted passport security standards, and the UN Office on Drugs and Crime's (UNODC's) Terrorism Prevention Branch continued to provide assistance to countries in the legal and related aspects of counterterrorism. This included an emphasis on building the legal framework necessary to become party to and implement the international counterterrorism conventions and protocols. The Terrorism Prevention Branch also focused on strengthening the capacity of the national criminal justice systems to apply the provisions of these instruments in compliance with the principles of rule of law, providing substantive input on counterterrorism issues to intergovernmental bodies.

The International Atomic Energy Agency (IAEA) continued to implement its Nuclear Security Plan (2006-2009) for combating the threat of terrorism involving nuclear and other radioactive material. IAEA promoted States' ratification and implementation of international instruments relating to nuclear security, including the Amendment to the Convention on the Physical Protection of Nuclear Material and the International Convention for the Suppression of Acts of Nuclear Terrorism, the latter of which entered into force in July. The IAEA Nuclear Security Series is a framework of guidance documents designed to help states establish a coherent nuclear security infrastructure.

In 2007:
⇒ The IAEA published Engineering Safety Aspects of the Protection of Nuclear Power Plants against Sabotage (NSS-4) and Identification of Sealed Radioactive Sources and Devices (NSS-5). It also brought other documents close to publication.
⇒ The IAEA continued to prioritize nuclear security training and support the development of mechanisms for nuclear security education.
⇒ More than 950 participants from 87 countries took part in IAEA nuclear security training in a total of 69 events.
⇒ In April, the IAEA inaugurated a Nuclear Security Support Centre (NSSC) in Islamabad, Pakistan.

⇒ The IAEA also procured equipment for the establishment of an NSSC in Ghana, and conducted initial discussions with Brazilian and Malaysian authorities on establishing NSSCs in those States.

⇒ In May, the IAEA transmitted a set of Practical Arrangements for enhancing cooperation between NAUSS and the Agency to Saudi Arabia's Naif Arab University for Security Services.

The IAEA continued to assist States in the removal and repatriation of vulnerable radioactive sources. In 2007:

⇒ The IAEA facilitated the repatriation of 127 such sources from Brazil to the United States.

⇒ In Nigeria, IAEA coordinated the recovery, conditioning, and repatriation two high-activity, disused sources, and also assisted Nigeria in the removal to secure storage of one very large disused source, one disused teletherapy source, and one disused brachytherapy machine.

⇒ To aid in the recovery, handling, and conditioning of spent high activity radioactive sources (SHARS), the IAEA developed a mobile hot cell enabling SHARS to be conditioned and readied for long-term storage.

⇒ In March, the pilot operation of the SHARS mobile hot cell was successfully carried out.

⇒ In November, the IAEA convened the International Conference on Illicit Nuclear Trafficking: Collective Experience and the Way Forward, hosted by the UK. The Conference reviewed global experience in combating illicit trafficking and suggested a range of actions through which international efforts in this area, including those under the Agency's auspices, could be strengthened.

⇒ Also during the year, participation in the IAEA Illicit Trafficking Database (ITDB) program expanded to 99 States. As of December 31, ITDB Participating States had reported or otherwise confirmed in total 1,340 incidents to the ITDB.

The IAEA continued, upon request, to assist States in developing and implementing measures to prevent incidents of nuclear terrorism at major public events. Drawing on ITDB reporting, the Agency provided information support and advice in the areas of detection, interdiction, and response. In addition, training courses, workshops, and exercises were conducted and detection equipment purchased and supplied. In 2007, the Agency conducted, in support of Brazilian authorities, a successful project to ensure the nuclear security of the Pan American Games in Rio de Janeiro, and began the implementation of a project for nuclear security at the 2008 Olympic Games, to be held in Beijing, China.

ITDB also continued to expand its membership, which now includes nearly 100 countries. The ITDB is a voluntary program whereby states confirm incidents of illicit trafficking or other unauthorized activities involving nuclear and radioactive material. The ITDB collects authoritative information on illicit trafficking events and helps participating states better understand illicit trafficking events and trends. Additionally, the ITDB is an authoritative database for tracking nuclear and radioactive materials that have fallen outside of legitimate control and that could be used in potential actions of terrorism.

**Group of Eight (G8) Counterterrorism Actions.**  The Group of Eight (G8), composed of Canada, France, Germany, Italy, Japan, Russia, the United Kingdom, and the United States, continued to develop and promote effective counterterrorism standards and best practices throughout 2007. Germany hosted the 2007 annual G8 Summit in Heiligendamm where leaders committed to take action on a range of counterterrorism issues, including countering cash smuggling used to finance terrorism and violent extremism by identifying key transshipment and courier routes; maximizing effective information exchange; enhancing law enforcement investigations; facilitating enforcement of cash declaration and disclosure standards; and offering training and capacity-building to partners. G8 Leaders welcomed the completion of 28 projects to improve transportation security and the completed efforts to protect critical energy infrastructure and sharing best practices of effective security responses. G8 Leaders committed to counter terrorism in the Afghanistan and Pakistan border regions and to work against terrorist radicalization and recruitment. In May, G8 Justice and Home Affairs Ministers met in Munich to increase judicial cooperation and joint efforts to combat international terrorism, including tackling terrorist misuse of the Internet, and sharing knowledge and experiences regarding the processes of some countries' residents becoming radical and violent, known as "homegrown" terrorism.

**Counterterrorism Action Group (CTAG).**  At the June 2003 Evian Summit, G8 leaders adopted a plan to build political will and capacity to combat terrorism globally, and established the Counterterrorism Action Group (CTAG) to implement this plan. CTAG supports the UN Counter-Terrorism Committee's efforts to monitor and promote implementation of UNSCR 1373 by developing an active forum for donors to coordinate counterterrorism cooperation with, and assistance to, third countries. It promotes counterterrorism by prioritizing needs and targeting and coordinating assistance to expand counterterrorism capacity in recipient countries; and encourages all countries to meet their obligations under UNSCR 1373 and, for states party to them, the 13 international counterterrorism conventions and protocols.

Under the leadership of the rotating G8 presidency, CTAG meets two times per year with the active participation of G8 member states, the European Commission, and other donor countries and organizations. Coordination meetings hosted by the local embassy of the G8 presidency were also held among CTAG members' diplomatic missions in recipient countries.

**Financial Action Task Force (FATF)**. Under the Department of Treasury's leadership, the United States played a strong role in developing new initiatives within FATF to meet evolving anti-money laundering and counterterrorism finance threats. The United States became a co-chair, with Italy, of the newly created International Cooperation Review Group to examine AML/CTF systemic threats and participated in major FATF studies (e.g., Trade-Based Money Laundering) and FATF mutual evaluations.

**European Union (EU).**  In September, the European Union appointed Council Secretariat Justice and Home Affairs Director Gilles de Kerchove as the new EU Counterterrorism Coordinator. Since then, he has participated in various meetings with U.S. counterterrorism officials. The United States and the EU's Judicial Cooperation Unit (Eurojust) have improved cooperation and information exchange among investigators and prosecutors. A U.S. Intermittent Liaison Prosecutor, resident in Brussels, currently liaises with Eurojust. Progress was made

towards ratification and entry into force of the U.S.-EU Extradition and Mutual Legal Assistance Agreements. Expert level discussions have begun and the U.S. and EU are working to establish a roadmap toward mutual recognition of the EU Authorized Economic Operator provisions and the U.S. Customs-Trade Partnership Against Terrorism, which are based on a risk management approach to cargo security. In August, we began a Container Security Initiative pilot project for feeder ports. We began a Secure Freight Initiative pilot project in Southampton, UK, which should provide data that will be useful in determining how best to implement 100 percent scanning of maritime cargo containers.

The United States and the EU continued to:
- ⇒ improve procedures for information sharing and for proactively implementing FATF Special Recommendations, including enforcing cash declaration regulations for travelers and working with private sector financial institutions to improve implementation of asset freeze measures;
- ⇒ exchange information and best practices in expert-level discussions;
- ⇒ Hold semi-annual senior-level meetings and practitioner workshops between the United States and EU on terrorism finance issues; and
- ⇒ In 2007, the United States and the EU completed a public outreach statement on fairness and transparency in the implementation of sanctions regimes.

**Organization for Security and Cooperation in Europe (OSCE).** The United States worked with the OSCE through its Anti-Terrorism Unit to encourage cooperation and to address existing gaps in the capabilities and legal framework of the OSCE's 56 participating states. In June, the OSCE organized a high-level political conference, a joint initiative of the United States and the Russian Federation, on Public-Private Partnerships (PPPs). The conference highlighted the fact that effective solutions to fighting terrorism required integrated approaches that harness the expertise of all sections of society by bringing them together in close public-private sector cooperation. Over 320 participants from 58 OSCE countries and Partners for Cooperation discussed ways to best draw upon the capacity of businesses and civil society to help governments fight terrorism.

The OSCE also continued its considerable efforts to provide technical capacity-building assistance to help participating states detect and prevent the use of fraudulent and counterfeit travel documents, to make it more difficult for terrorists and other criminals to forge or counterfeit them, and to encourage the reporting of lost and stolen travel documents to INTERPOL. Given the difficulties of mutual legal assistance cooperation in fighting terrorism, the OSCE, in cooperation with the United Nations Office on Drugs and Crime (UNODC), held a follow-up experts workshop in February which highlighted issues of extradition and promoted the use of UNODC's mutual legal assistance software. The OSCE also held a sub-regional event in Turkey, which gave participants more in-depth mutual legal assistance instruction. In addition, the OSCE also held events on victims of terrorism, incitement, and terrorist use of the Internet. The OSCE Madrid Ministerial issued a statement supporting the UN's Global Counterterrorism Strategy, called upon OSCE participating states to join the Global Initiative to Combat Nuclear Terrorism, and tasked the OSCE's Forum for Security Cooperation to produce a Best Practices Guide as a tool to help OSCE members implement UN Security Council Resolution 1540.

**North Atlantic Treaty Organization (NATO).**  First and foremost, NATO contributes to the War on Terror by leading International Security Assistance Force stability operations against radical insurgents in Afghanistan. NATO also conducts Operation Active Endeavor (OAE), a naval mission that aims to combat terrorism by monitoring Mediterranean maritime traffic. The Alliance is also engaged in a far-reaching transformation of its forces and capabilities to better deter and defend against 21st Century threats, including terrorism, and is working closely with partner countries and organizations to ensure interoperability of forces, enhance security, and broaden cooperation. NATO adopted its Military Concept against Terrorism in 2002, fielded a Chemical Biological Radiological and Nuclear (CBRN) defense battalion in 2004, and established a special Terrorist Threat Intelligence Unit. Efforts are underway to enhance Allied resilience against the potential disruption of critical infrastructure (energy, cyber) systems. Through NATO's Defense Against Terrorism (DAT) program, the Alliance is developing 11 cutting-edge technologies to protect troops and civilians against terrorist attacks.

NATO contributes to non-proliferation through the efforts of the Weapons of Mass Destruction Center, the Senior Political Committee, and the Senior Political-Military Group on Proliferation (which organizes the annual Seminar on Proliferation Issues, NATO's largest outreach event). NATO has opened a dialogue with the United Nation's 1540 Committee and is developing a framework for further cooperation. NATO's 26 Allies and 23 Euro-Atlantic Partnership Council Partners have all submitted initial reports as called for by UN Security Council Resolution 1540. NATO also supported a Defense Against Biological Terrorism regional workshop in Bucharest in Fall 2007.

**Trans-Sahara Counterterrorism Partnership (TSCTP).**  The TSCTP is a multi-faceted, multi-year strategy aimed at defeating terrorist organizations by strengthening regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security forces, promoting democratic governance, discrediting terrorist ideology, and reinforcing bilateral military ties with the United States. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria and Senegal) to confront the challenge posed by terrorist organizations in the region, and to facilitate cooperation between those countries and our Maghreb partners (Morocco, Algeria, and Tunisia) in combating terrorism. (*See Chapter 2, Country Reports, Africa, for further information on the TSCTP.)*

**The African Union (AU).** The AU has several counterterrorism legal instruments, including a Convention on Prevention and Combating of Terrorism (1999), a 2002 Protocol to the Convention, and a 2004 Plan of Action. *(See Chapter 2, Country Reports, Africa, for further information on the AU.)*

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF).** In January 2007, the Heads of State of the ten-member Association of Southeast Asian Nations (ASEAN), comprising Brunei, Burma, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand, and Vietnam, signed a new convention on counterterrorism cooperation. The new ASEAN treaty recognizes the importance of having a global legal framework to combat terrorism, as established by the universal conventions on terrorism, and further recognizes that terrorism offenses such as hijacking, hostage-taking, or bombing are not political offenses, and

terrorists cannot hide behind political justifications to evade justice. Under the new Convention, ASEAN members agree to cooperate to prevent terrorist attacks, the financing of terrorism, and terrorist movement across national borders. They will also cooperate to enhance intelligence exchanges, promote public participation in counterterrorism efforts and strengthen preparedness for dealing with chemical, biological, and nuclear terrorism.

The United States actively participates in counterterrorism-related activities of the 26-member ASEAN Regional Forum (ARF), including the annual meetings on counterterrorism and transnational crime. The United States has continued efforts to increase maritime security cooperation. In January 2007, ARF held a maritime security desktop exercise in Singapore. ARF continues to hold various capacity-building activities in counterterrorism and transnational crime.

**Asia Pacific Economic Cooperation (APEC).**  The 21 member economies of APEC (Australia, Brunei, Canada, Chile, China, Hong Kong, Indonesia, Japan, Republic of Korea, Malaysia, Mexico, New Zealand, Papua New Guinea, Peru, Philippines, Russia, Singapore, Chinese Taipei, Thailand, the United States, and Vietnam), are committed to creating a safe environment for the movement of goods, services, and people throughout the region. The APEC Counterterrorism Task Force (CTTF) was established in 2003 to coordinate implementation of Leaders' and Ministers' statements on counterterrorism and non-proliferation. The United States works within APEC to dismantle transnational terrorist groups and to eliminate the severe and growing danger posed by proliferation of weapons of mass destruction and their means of delivery.
In 2007, the United States continued its capacity-building work to counter biological and chemical terrorism. The second expert-level food defense workshop was held in Vietnam and built upon the success of the first workshop held in Bangkok in 2006. The USG-led bioterrorism initiative resulted in the first ever, APEC Food Defense Principles on prevention, preparedness, response, recovery, and effective communication. These principles will make an important contribution to international counterterrorism efforts to protect the food supply from deliberate contamination.

**OAS Inter-American Committee against Terrorism (CICTE).**  On March 1, 2007, at the CICTE Ministerial in Panama City, CICTE released the Declaration of Panama on the Protection of Critical Infrastructure in the Hemisphere in the Face of Terrorism, which acknowledged that terrorism is a threat to critical infrastructure and committed OAS members to take all necessary actions, in accordance with their domestic law and relevant international agreements, to prevent, mitigate, and deter potential terrorist threats to critical infrastructure, through the development and implementation of national measures and the strengthening of regional and international cooperation. In addition, CICTE delivered more than $5 million in counterterrorism capacity-building assistance in the region. During 2007, the Secretariat conducted 61 training courses and technical assistance missions, benefiting some 2,692 participants in the Hemisphere; this included training of nearly 500 port and airport security officials from 29 member states to help meet the requirements of the International Maritime Organization's International Ship and Port Facility Security (ISPS) code, and the International Civil Aviation Organization's (ICAO) new air security standards.

In addition, the Secretariat continued to solidify its position as a central point for facilitating international cooperation against terrorism. Following adoption of CICTE's aforementioned "Declaration of Panama on Protection of Critical Infrastructure in the Hemisphere" the Secretariat helped facilitate two instances of horizontal cooperation between the United States and OAS Member States: a vulnerability assessment of the energy sector in Trinidad and Tobago, and technical assistance on the first steps in identifying and protecting critical infrastructures in Paraguay. CICTE also provided security training to the Caribbean nations hosting the Cricket World Cup.

CICTE continued to advise its 34 member state governments on how to meet the requirements of UNSCR 1373, the 13 international conventions and protocols relating to terrorism, and the Inter-American Convention against Terrorism (IACAT), which complements and expands on international conventions and protocols. CICTE also organized its sixth annual regular session in Bogota, Colombia.

**Tri-Border Area (Argentina, Brazil, and Paraguay)**

The governments of Argentina, Brazil, and Paraguay have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods through the region where their territories meet, known as the Tri-Border Area (TBA). In the 1990s, they established the "Tripartite Commission of the Triple Frontier" to address these illicit activities. In 2002, at their invitation, the United States joined what became the "3+1 Group on Tri-Border Area Security," a regional mechanism focusing on practical steps to help the TBA states address cross-border crime through enhanced law enforcement and intelligence sharing and strengthened financial and border controls. The United States remains concerned that Hizballah and HAMAS are raising funds in the TBA by participating in illicit activities and soliciting donations from extremists within the sizable Muslim communities in the region and elsewhere in the territories of Argentina, Brazil, and Paraguay. However, there was no corroborated information that these or other Islamic extremist groups had an operational presence in the area.

## LONG-TERM GOALS AND PROGRAMS/ACTIONS DESIGNED TO REDUCE CONDITIONS THAT ALLOW TERRORIST SAFE HAVENS TO FORM

The **Antiterrorism Assistance Program (ATA)** provides partner countries with the training, equipment, and technology needed to increase their capabilities to find and arrest terrorists, and builds the kind of cooperation and interactivity between law enforcement officers that has a lasting impact. In 2007, ATA sponsored 266 training activities and technical consultations and trained over 4500 participants from 64 countries. In its two-decade long existence, ATA has trained more than 5850 students from 151 countries, providing programs tailored to the needs of each partner nation and to local conditions. Training included: crisis management and response, cyber terrorism, dignitary protection, bomb detection, airport security, border control, response to incidents involving weapons of mass destruction, countering terrorist finance, interdiction of terrorist organizations, and kidnap intervention and hostage negotiation and rescue. All courses emphasized law enforcement under the rule of law and respect for human rights.

Examples of ATA training include the following:

⇒ **Palestinian Authority**: A $5-million program to administer technical and leadership training, and operational support equipment, to build a professional VIP Protective Unit for the Palestinian Authority. With initial efforts focused on the Presidential Guards from the West Bank, 15 courses were offered in less than five months that trained 320 participants in VIP Protection, Surveillance Detection, and Vital Installation Security.

⇒ **Liberia**: With a $5-million budget, the State Department initiated training and provided equipment for the Special Security Service (SSS), the protective security detail of Liberia's President Ellen Johnson Sirleaf. Nine courses were offered and extensive support equipment was provided, building upon an existing DS/ATA program that has supported contracted mentors embedded in the SSS since early 2007. During this period, the local police called upon SSS personnel to assist with a hostage situation at the home of a former Liberian Minister. Three officers responded, safely extricated the hostages from the home, and shot the perpetrator as he fired on them while trying to escape.

⇒ **Colombia**: For the past several years, ATA has conducted numerous classes of antiterrorism instruction at a cutting-edge training facility known as Sibate, which has helped Columbia's anti-kidnapping units (known by their Spanish acronym GAULA) to reduce kidnappings in Colombia by 83 percent since 2002. None of the ATA-trained GAULAs have lost a hostage during rescue operations. Furthermore, Colombia is taking over responsibility for running the programs itself; the transition is expected to be complete by 2009, with Colombia funding the entire tactical portion of training. In 2007, the Colombian police hosted the head of the Serious Crime Unit from the Montevideo, Uruguay Police Department to explore the possibility of training his anti-kidnapping and counterterrorism units at that location. Training of the Brazilian Federal Police has already occurred.

⇒ **Afghanistan**: ATA programs worked to organize, train, equip, and mentor the protective detail and supporting tactical elements of the now regionally renowned Presidential Protective Service (PPS) responsible for the safety of President Karzai. As a result of the high degree of professionalism that it has achieved, the PPS began escorting President Karzai on overseas state visits without American mentor support.

⇒ **The Caribbean**: ATA training enabled officials from five Caribbean countries to develop strategies to manage security for the 2007 Cricket World Cup.

⇒ **Thailand**: A Royal Thai Police (RTP) tactical team conducted a successful raid in which they recovered unharmed a kidnapped American citizen and arrested eight suspects. The RTP Lieutenant Colonel who led the operation, the lead investigator, and four members of the tactical entry team had completed ATA training in Crisis Response Team, Hostage Negotiation, Officer Survival/High-Threat Incident, and the Police Role in Crisis Management.

⇒ **Pakistan**: The Federal Special Investigations Group's (SIG's) forensics laboratory used leads gleaned from a cell phone SIM card retrieved by Quetta Criminal Investigative Division personnel who had attended an ATA Post-Blast Investigation course. More than 33 messages were retrieved that outlined 14 bomb threats. Numerous suspects were identified, and two bombs were later seized. ATA had designed and funded the SIG's forensics laboratory and trained the staff.

⇒ **Persian Gulf**: In order to facilitate participation in the ATA program by the energy-rich nations of the Persian Gulf that would not otherwise be eligible for foreign assistance, ATA initiated the strategic Partner Nation Pre-Payment Program. Under this program, the State Department first obtains the required legal "determination" from the Office of Foreign Assistance authorizing a foreign nation's participation in the program; then determines the antiterrorism training needs of the Partner Nation; and enters into a Memorandum of Understanding (MOU) to provide training subsequent to receipt of their advance payment. Initial training deliveries are currently under negotiation with two Persian Gulf nations for the Preventing Attacks on Soft Targets course.

The **Terrorist Interdiction Program (TIP)** assisted priority countries at risk of terrorist activity to enhance their border security capabilities. TIP provided participating countries with a computerized watch listing system to identify suspect travelers at air, land, or sea ports of entry. TIP further promotes expanded cooperation and close liaison with host governments in the areas of rule of law, anticorruption, and law enforcement. Since 2001, the State Department has provided TIP assistance to more than 20 countries, assistance that was instrumental in impeding terrorist travel. High-priority countries participating in the program include Iraq, Pakistan, Afghanistan, Yemen, and Kenya. Hundreds of individuals traveling on stolen passports in Pakistan, as well as wanted criminals, narcotics smugglers, and human traffickers have been identified and intercepted worldwide. The TIP complements other counterterrorism-related U.S. efforts to enhance aviation, border, cyber, maritime, and transportation security.

**Counterterrorist Finance Training (CTFT)**.  The State Department chaired the interagency Terrorist Finance Working Group (TFWG), which meets biweekly to develop and coordinate USG CTF capacity-building efforts, and worked to expand its counterterrorism financing (CTF) capacity-building efforts in key partner nations. Under the auspices of the TFWG we have worked with the Department of Homeland Security (DHS) and our interagency partners to expand our bulk cash smuggling training programs, and thus provided regional or bilateral Bulk Cash Smuggling training to 45 countries. In addition, the CTF capacity-building program includes training and technical assistance in the legal, financial regulatory, financial intelligence, financial investigation, and judicial/prosecutorial fields. In 2007, CTF programs included the posting of five Resident Legal Advisors, the development of a Regional Operational Cash Courier program, Prosecutorial and Designation Workshops, Financial Intelligence Unit (FIU) Development, and terrorist financing analytical training for law enforcement authorities.

**Increasing Economic Development**.  Poverty, unemployment, weak institutions, and corruption can turn nations of great potential into recruiting grounds for terrorists. Development is central to the President's National Security Strategy and long-term U.S. economic growth. Well-conceived, targeted aid is a potential leveraging instrument that can help countries implement sound economic policies and improve the conditions that terrorists might otherwise exploit.

The Millennium Challenge Account (MCA), established by Congress in 2004, represents a new model for achieving transformational development by providing assistance to those countries that rule justly, invest in their people and encourage economic freedom. The prospect of an MCA Compact provides a powerful incentive for the poorest countries to reform. U.S. private sector flows to the developing world, including trade and investment ($685.4 billion in 2004), dwarf our foreign aid ($23.5 billion). Unutilized capital in developing countries, owing to weak policies and poor property rights, is estimated to be as high as $9 trillion.

Debt relief for the poorest is another element of our development strategy. Our long-standing support for the Heavily Indebted Poor Countries (HIPC) initiative, as well as for the Multilateral Debt Relief Initiative (MDRI) introduced in 2006, promotes debt sustainability, reduces the likelihood of debt distress and enables the poorest countries to devote additional resources to reducing poverty and promoting economic growth. Our aggressive multilateral and bilateral trade agenda to open agricultural and non-agricultural markets and liberalize financial services, transportation, telecommunications, and government procurement all support development.

USAID's humanitarian aid programs and its activities in the areas of economic growth, agriculture, trade, health, democracy, and conflict prevention help reduce the risk of countries becoming breeding grounds for terrorism. In Afghanistan, USAID is helping to build a safe, stable society that meets the needs of its people and eliminates an environment in which terrorist groups have flourished. USAID has been on the front lines of support to tsunami-affected countries, garnering goodwill toward the United States among people in the hardest-hit areas.

**The Middle East Partnership Initiative (MEPI)** Despite some setbacks to the freedom agenda, including attempts by authoritarian governments to limit basic rights for citizens, 2007 developments in the Middle East and North Africa region demonstrated that calls for greater political, economic, and educational opportunities; and women's empowerment are clear, indigenous, and growing.

In 2007, to support and amplify local demands for reform, MEPI provided tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from campaign schools to civic education to an Arab businesswomen's network. Examples of MEPI's work with reformers include the following:

**Political**
- MEPI supported programs to increase participation in the 2007 Majlis Al Shura elections in Oman, and in Parliamentary elections in Jordan, Algeria, and Morocco. While there is still more progress that needs to be made to truly make these electoral processes free and fair, it is significant nonetheless that elections are becoming institutionalized and that electorates expect a level of transparency and competition;
- Through training, technical assistance, and networking, MEPI supported programs that addressed media reform and the backsliding situation of press freedoms in Egypt, Morocco, Tunisia, and the Palestinian Territories; and

- Strengthened the role of civil society in the democratic process by supporting regional networks of grassroots activists that are advancing tangible reform initiatives in the areas of freedom of expression, women's political participation, and the legal environment for NGOs. Awarded direct grants to numerous Arab civil society organizations across the region to advance the Freedom Agenda. MEPI also supported dialogue between these civil society leaders and their respective governments within the framework of the G8's BMENA Initiative.

**Economic**
- Provided technical and other assistance in support of successfully completed free trade agreements with Bahrain and Oman; Trade and Investment agreements with Kuwait, Qatar, Tunisia, and Egypt; and, WTO accession support for Yemen, Algeria, and Lebanon;
- Expanded trade capacity of Arab countries with training and technical assistance; and assisted a number of Gulf and North African countries with revisions to their labor, intellectual property codes, customs codes, and agricultural import/export standards;
- Expanded efforts to strengthen indigenous labor and business organizations;
- Provided entrepreneurial training for more than 400 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 50 alumni going on to start or expand businesses. At least 1,000 new jobs have been created following their participation in MEPI programs;
- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations;
- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters; and
- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman; update commercial codes to meet international standards in Bahrain, Qatar, and Oman; and provide continuing education programs for the judiciary.

**Education**
- Empowered more than 300 young, highly motivated Arab men and women with leadership, problem-solving, and entrepreneurial skills through intensive five-week training institutes; most have started their own civic projects in their countries;
- Supported a regional civic-education network that promotes youth civic awareness and involvement. Examples of resulting youth-led projects included starting after-school classes for underprivileged students and improving health services at local hospitals. The program is being widely accepted and adopted; for example, education officials committed to adopting Project Citizen in all schools in Marrakesh, Morocco;
- Promoted critical thinking and independent reading with an initiative to provide over 8.2 million high-quality Arabic-language American children's books to more than 6,770 primary schools in more than 40,620 classrooms in four Middle Eastern countries; and
- Provided English language study to more than 4,500 underserved youth from 13 countries in the Middle East through a micro-scholarship program, bringing the total number of students reached with MEPI support to more than 12,000.

**Women**
- Strengthened the technology, business, and advocacy skills of women throughout the region, including the Gulf;
- Established the first U.S.-Middle East Partnership for Breast Cancer Awareness and Research, which enabled women across the region to join together in private-public partnerships, civic engagement, and networking;
- Created business network hubs in nine countries, focusing on training, professional development, and information sharing on laws, business opportunities, skills, and the global economy; and
- Supported legal reform and family law initiatives in the region that improve gender equality and economic rights for women.

## INTERNATIONAL CONVENTIONS AND PROTOCOLS

**1. Convention on Offences and Certain Other Acts Committed On Board Aircraft**
Signed in Tokyo on September 14, 1963.
Convention entered into force on December 4, 1969.
Status: 183 Parties

**2. Convention for the Suppression of Unlawful Seizure of Aircraft**
Signed in The Hague on December 16, 1970.
Convention entered into force on October 14, 1971.
Status: 182 Parties

**3. Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation**
Signed in Montreal on September 23, 1971.
Convention entered into force on January 26, 1973.
Status: 185 Parties

**4. Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents**
Adopted in New York on December 14, 1973.
Convention entered into force on February 20, 1977.
Status: 166 Parties

**5. International Convention Against the Taking of Hostages**
Adopted in New York on December 17, 1979.
Convention entered into force on June 3, 1983.
Status: 164 Parties

**6. Convention on the Physical Protection of Nuclear Material**
Signed in Vienna on October 26, 1979.
Convention entered into force on February 8, 1987.
Status: 130 Parties

**7. Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, Supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation**
Signed in Montreal on February 24, 1988.
Protocol entered into force on August 6, 1989.
Status: 161 Parties

**8. Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation**
Done in Rome on March 10, 1988.
Convention entered into force on March 1, 1992.
Status: 147 Parties

**9.  Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf**
Done in Rome on March 10, 1988.
Protocol entered into force on March 1, 1992.
Status: 136 Parties

**10. Convention on the Marking of Plastic Explosives for the Purpose of Detection**
Done in Montreal on March 1, 1991.
Convention entered into force on June 21, 1998.
Status: 137 Parties

**11.  International Convention for the Suppression of Terrorist Bombings**
Adopted in New York on December 15, 1997.
Convention entered into force on May 23, 2001.
Status: 153 Parties

**12.  International Convention for the Suppression of the Financing of Terrorism**
Adopted in New York on December 9, 1999.
Convention entered into force on April 10, 2002.
Status: 160 Parties

**13.  International Convention for the Suppression of Acts of Nuclear Terrorism**
Adopted in New York on April 13, 2005.
Convention entered into force on July 7, 2007.
Status: 115 Parties

**14.  2005 Amendment to the Convention on the Physical Protection of Nuclear Material**
Not yet entered into force
Status: 13 States have deposited instruments of ratification, acceptance or approval with the depositary.

**15. Protocol of 2005 to the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation**
Not yet entered into force
Status: Two States have deposited instruments of ratification, acceptance or approval with the depositary.

**16. Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf**
Not yet entered into force
Status: No States have deposited instruments of ratification, acceptance or approval with the depositary.

## 5.2. Support for Pakistan

The 9/11 Commission recommended the United States "make the difficult long-term commitment to the future of Pakistan" and "support Pakistan's government in its struggle against extremists with a comprehensive effort that extends from military aid to support for better education, so long as Pakistan's leaders remain willing to make difficult choices of their own."

**Composition and Levels of Assistance, Including Security and Other Assistance**

The United States commitment to a long-term relationship with Pakistan is highlighted by President Bush's pledge to Pakistani President Musharraf to seek from Congress $3 billion in Economic Support Funds (ESF) and Foreign Military Financing (FMF) for Pakistan during the five-year period from FY-2005 through FY-2009. Since 2002, U.S. assistance to Pakistan, including Coalition Support Funds (CSF), totals $9.92 billion. Approximately $1.24 billion in U.S. assistance, also including CSF, was provided to Pakistan from monies appropriated for FY-2007. The Administration requested $845 million in assistance for Pakistan for FY-2008 and is requesting $785 million for FY-2009, neither of which includes CSF.

In addition to Economic Support Funds and Foreign Military Financing, the United States is also providing other forms of assistance to Pakistan, including funding for Child Survival and Health (CSH), Development Assistance (DA), International Military Education and Training (IMET), International Narcotics and Law Enforcement (INCLE), Antiterrorism Assistance (NADR-ATA), Export Control and Border Security (NADR¬EXBS), Small Arms and Light Weapons (NADR-SALW), Terrorism Interdiction Programs (NADR-TIP), Food for Peace (P.L. 480 Title I & II), Emergency Refugee and Migration Assistance (ERMA), and International Disaster and Famine Assistance (IDFA). The chart below offers a comparison of selected types of assistance and does not include CSF.

| Account | FY-2006 | FY-2006 Supplemental | FY-2007 | FY-2007 Supplemental | FY-2008 Request | FY-2008 Supplemental | FY-2009 Request |
|---|---|---|---|---|---|---|---|
| CSH | 22,800 | 5,300 | 22,400 | | 39,800 | | 33,800 |
| DA | 27,000 | 10,500 | 95,300 | | 18,000 | | 18,000 |
| ESF | 296,600 | 40,500 | 283,700 | 110,000 | 382,900 | 60,000 | 388,900 |
| FMF | 297,000 | | 297,000 | | 300,000 | | 300,000 |
| IMET | 2,000 | | 2,000 | | 2,000 | | 2,000 |
| INCLE | 37,620 | | 21,350 | | 32,000 | | 32,000 |
| NADR | 8,600 | | 10,000 | | 10,300 | | 10,300 |
| P.L 480 TITLE I & II | 17,700 | | | | TBD | | TBD |
| ERMA | | | | | | | |
| IDFA | | 70,000 | | | | | |
| TOTAL | 709,320 | 126,300 | 731,750 | 110,000 | 785,000 | 60,000 | 785,000 |

The mix of U.S. assistance for Pakistan reflects the diverse ways the United States is cooperating with Pakistan in pursuit of critical USG policy goals. These include prosecuting the War on Terror; countering nuclear proliferation; building a stable and democratic Afghanistan; ensuring peace and stability in South Asia through the continuation of the India-Pakistan reconciliation process; supporting Pakistan's efforts to become a modern, prosperous, democratic state; and assisting it in reconstruction efforts from the October 8, 2005 earthquake.

U.S. Foreign Military Financing (FMF) funding for Pakistan is designed to enhance Pakistan's capabilities in the War on Terror; help it to better control its borders; meet its legitimate defense needs; and make Pakistan more secure so that it can more readily take the steps necessary to build a durable peace with all its neighbors-thus fostering security and stability throughout the South Asia region. FMF is being used by Pakistan to purchase helicopters, aircraft, weapons systems, munitions, and other equipment, which, inter alia, have enabled Pakistan's armed forces to operate against foreign terrorists and militants in the rugged border areas along the Pakistan-Afghanistan border. The Pakistani military is continuing military operations along that border. Since 2001, over 1,000 Pakistani military personnel have been killed carrying out operations in support of the War on Terror.

International Military Education and Training (IMET) assistance for Pakistan complements FMF by exposing Pakistani officers to U.S. doctrine, systems, and American culture, promoting military-to-military cooperation, increased professionalism, and enhanced military interoperability between Pakistan and the United States. IMET also assists Pakistan in developing expertise and systems to more effectively manage its defense establishment; builds technical skills for better operation and maintenance of U.S.-origin equipment; and promotes military subordination to democratic civilian rule and respect for human rights. For FY-2008, the Administration's International Military Education and Training request is just under $2.0 million, with post seeking sizable increases in the future to bridge the gap created during sanction years when no Pakistani military officials attended training in the United States

**Measures to Ensure that Assistance Has the Greatest Long-Term Positive Impact on the Welfare of Pakistani People and Their Ability to Cooperate Against Terror**

Economic Support Funds, Development Assistance, and Child Survival and Health assistance are being used to improve the lives of ordinary Pakistanis; lay the groundwork for the country's sustained economic growth; and strengthen social, political, and economic institutions, thus alleviating the conditions that breed extremism while demonstrating that the United States interest in Pakistan extends beyond the War on Terror to concern for the Pakistani people as a whole.

Approximately $60 million in FY-2008 Economic Support Funds and Development Assistance funds will be allocated to implement education reform programs in Pakistan and support the Government of Pakistan's initiative to improve the teaching and learning process in public schools. Pakistan's low literacy rate greatly hampers its ability to develop and expand its economic base. Literacy averages 54 percent nationwide, and in Pakistan's remote tribal areas

can be as low as 0.5 percent for women. The dearth of good public schools results in thousands of youth attending madrassas, schools that teach mainly religious subjects, some of which promote a radical, violent ideology. To tackle these problems, USG-funded education programs in Pakistan are aimed at improving the quality of education in Pakistani primary and secondary schools, especially in Baluchistan, Sindh, and the Federally Administered Tribal Areas (FATA); improving early childhood education; training teachers; increasing parental and community involvement in schools; ensuring teachers have adequate classroom materials; improving access to schools and promoting the development of a new generation of Pakistani leaders by providing scholarships for disadvantaged students to obtain a higher education. Adult and youth literacy education programs are targeting out-of-school youth and illiterate adult populations, with a focus on women and girls. In addition, student exchanges play a large part in our education efforts, with Pakistan's Fulbright program being the largest in the world.

Democratization is a key focus of USG assistance toward Pakistan. One of the fundamental tools for combating terrorism over the long-term is democracy. The programs include several mutually reinforcing components: legislative training to increase the effectiveness, transparency, and accountability of Pakistan's provincial and national parliaments; political party strengthening focused on identifying and training young reformers - tomorrow's political leadership; support for increased women's political participation; independent media training for journalists; and civil society development designed to increase the capacity of indigenous nongovernmental organizations to serve as policy watchdogs and promote human rights. In preparation for the 2008 elections, several USAID-funded non-governmental organizations are conducting security assessments in sensitive areas to ensure the safety of observers, monitors, and polling stations.

Pakistan trails its South Asian neighbors in almost all key health areas: maternal and infant mortality; safe affordable family planning; and control of infectious diseases. FY-2008 Child Survival and Health funds will be used to increase availability of maternal and child health services, especially in rural areas; to ensure that families who want to space births can access high quality family planning services; to help maintain Pakistan's low human immunodeficiency virus prevalence rate by increasing awareness; to eradicate polio, to support continued progress in TB diagnosis and treatment; and to increase communities' access to clean drinking water and their practice of adequate hygiene behaviors.

The United States supports Pakistan's economic growth. New programs are being developed to create jobs and increase incomes. Current programs providing microfinance and small business lending in rural and peri-urban areas will continue to enable enterprise development and smooth income streams for the poor. Programs improving the competitiveness of small and medium enterprises are assisting the growth of Pakistani exports and generating frequent, positive coverage in the local press, helping to improve the image of USG assistance.

Earthquake Reconstruction efforts will enter their third year in FY-2008, and will continue to rebuild, furnish, and supply health and education sector infrastructure and human resource capacities; to re-establish the livelihoods of earthquake victims; to resettle displaced victims; and to train skilled and unskilled individuals in vocational training, agriculture, and livestock development, asset formation, enterprise development, micro-credit, and market restoration.

The FY-2008 budget request for Economic Support Funds, Child Survival and Health, and Development Assistance (DA) is $500 million, which is $10 million less than the FY-2007 actual budget.  Part of the FY-2008 request is $60 million in ESF funds from the Global War on Terror Supplemental. This will help fund the government's Federally Administered Tribal Areas Sustainable Development Plan to improve governance and encourage economic development of the border area between Afghanistan and Pakistan.

International Narcotics and Law Enforcement funds for Pakistan continue to strengthen border security and enable law enforcement access to remote areas along the Pak-Afghan border - thus enhancing the country's capability to interdict traffickers in narcotics, arms, persons, and contraband, as well as terrorists. International Narcotics and Law Enforcement funds are used to reform, strengthen, and improve cooperation among Pakistan's law enforcement agencies, all of which play an important role in the War on Terror. International Narcotics and Law Enforcement funds support a counternarcotics Air Wing based in Quetta, Baluchistan, operated by Pakistan's Interior Ministry. The Wing includes C-208 Caravan fixed-wing surveillance aircraft and UH-2 Huey II helicopters.

International Narcotics and Law Enforcement funds are also used to procure vehicles and communications, surveillance, and related equipment for border control and counter-narcotics activities; fund infrastructure projects to enhance roads in inaccessible parts of FATA; fund an Automated Fingerprint Identification System and National Criminal Database; and for training and equipment to expand law enforcement investigative skills and forensic capacities. In tackling poppy cultivation, International Narcotics and Law Enforcement funds support crop control, alternative livelihood, and demand reduction programs.

Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security assistance strengthens Pakistan's export control system and thus prevents weapons of mass destruction and related technology transfers that raise proliferation concerns. Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security funds are used for nonproliferation export control training addressing legal/regulatory reform, export licensing systems, customs enforcement, general inspection, weapons of mass destruction detection training for border control personnel, and procuring specialized radiation/chemical detection equipment. The Administration's $500,000 FY-2008 request in Nonproliferation, Antiterrorism, Demining, and Related Programs/Export Control and Related Border Security assistance represents a slight decrease from the FY-2007 $600,000 request.

Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance funding for Pakistan enhances the capabilities of elite national police units responsible for counterterrorism investigations and tactical operations. Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance trained the Special Investigation Group and crisis response teams that were integral in making arrests after the December 2003 assassination attempts on President Musharraf and the May 2004 car bombs near the U.S Consulate in Karachi. The Administration's FY-2008 request of $8 million for Nonproliferation, Antiterrorism, Demining, and Related Programs/Antiterrorism Assistance represents a decrease from the FY-2007 $8.59 million request.

Nonproliferation, Antiterrorism, Demining, and Related Programs/Terrorism Interdiction Programs funding for Pakistan is being used to support the Personal Identification Secure Comparison Evaluation System automated border control system, including to sustain ongoing program operations and to expand coverage to additional Pakistani ports-of-entry. The Administration is requesting $900,000 in Nonproliferation, Antiterrorism, Demining, and Related Programs/Terrorism Interdiction Programs funds for Pakistan for FY-2008, a slight decrease from the $1 million requested for FY-2007.

## Measures to Alleviate Difficulties, Misunderstandings, and Complications in United States-Pakistani Relations

The United States and Pakistan engage in extensive consultations to ensure U.S. foreign assistance has the greatest long-term benefit for Pakistanis and also enhances the country's ability to cooperate in the War on Terror. This is exemplified by the annual consultations that result in mutually-agreed Shared Objectives for the Government of Pakistan's use of $200 million in Economic Support Funds in direct budget support. The United States participates in the annual Pakistan Development Forum, which brings together the Government of Pakistan and bilateral and multilateral donors to discuss Pakistan's development priorities and assistance needs. The United States holds regular consultations with major donors including Great Britain, the European Union, Japan, the Asian Development Bank, and the World Bank, to ensure that assistance to Pakistan is effectively coordinated for maximum impact.

The USAID Federally Administered Tribal Areas (FATA) Development Program supports the Government of Pakistan's FATA Sustainable Development Plan. The USAID program is focused on improving health, education, access to and availability of jobs, and capacity-building of FATA institutions. In education, USAID is improving access and quality of education for students by building and furnishing 65 primary, middle, and high schools; awarding scholarships to 37 women from this area to attend a one-year, pre-service teacher education program; and building or restoring water and sanitation facilities at 190 girls' primary schools and 90 villages. In health, USAID is improving the quality of drinking water, training health practitioners, providing polio vaccines, and immunizing children. To date, the United States has conducted 32 polio eradication campaigns in the FATA. USAID is promoting competitiveness initiatives to support both the marble and granite, and gems and jewelry sectors of the local economy, as well as provide jobs, training opportunities, and access to micro loans. Finally, the program is building the capacity of the FATA Secretariat and other Government of Pakistan institutions to improve their ability to deliver services to the people of the FATA and to ensure the sustainability of USAID's development efforts in the region.

## USAID GLOBAL EXPORT PROMOTION PROGRAMS

The Pakistan Initiative for Strategic Development and Competitiveness (PISDAC) project aims at increasing the competitiveness of Pakistani small- and medium-sized enterprises. Sectors currently covered under the project are gems, jewelry, dairy, horticulture, surgical supplies,

furniture, and marble granite. The project has focused on several prominent Pakistani industries and formed six strategic working groups composed of business people from the industries that develop sector-specific strategies. FY-2007 funding for PISDAC was $2.0 million.

USAID supports the Government of Pakistan's education reform strategy by: (1) strengthening education policy and planning; (2) improving the skills and performance of teachers and administrators; (3) increasing youth and adult literacy; (4) expanding public-private partnerships; and (5) providing school improvement grants and involving parents and communities in public schools.

## 5.3. Collaboration with Saudi Arabia

**Steps to Institutionalize and Make More Transparent
Government-to-Government Relations**

The United States-Saudi Strategic Dialogue, inaugurated in November 2005 by Secretary Rice and Foreign Minister Saud al-Faisal, and reporting to President Bush and King Abdullah, remains the highest level institutionalized forum for coordinating U.S. and Saudi interests. The Strategic Dialogue consists of six working groups focusing on human development, economy, energy, consular affairs, military cooperation, and counterterrorism. These Strategic Dialogue working groups meet periodically to address issues such as making government more accountable and participatory, human rights, visas, child custody cases, and security cooperation. Ministerial-level meetings, dealing with bilateral issues of strategic importance, are held as part of the Strategic Dialogue.

**Intelligence and Security Cooperation in the Fight against Islamic Terrorism**

The United States and Saudi Arabia have an ongoing dialogue on a full range of counterterrorism issues, which include regular high-level discussions and close working-level collaboration. Saudi cooperation in this area is significant, and U.S. law enforcement and intelligence agencies have benefited and continue to benefit from Saudi information and intelligence on individuals and organizations. U.S. law enforcement agencies have provided counterterrorism training to Saudi security services in both Saudi Arabia and in the United States.

Since May 2003, the Saudi government has killed or captured al-Qa'ida's (AQ's) operational Saudi-based senior leadership, as well as most of the network's key operatives and many of the Kingdom's most wanted individuals. This effort has disrupted AQ's efforts to prosecute its terrorist campaign against the government. During 2007, Saudi security forces continued to target terrorists and their supporters, and the Saudi government announced the arrest of more than 400 terrorists and their supporters, including terrorist financiers and those advocating extremist ideology over the Internet. Saudi officials claimed these arrests disrupted major attacks that were planned against Saudi government and economic targets. During an address to the Shura Council on July 1, Interior Minister Prince Nayif bin Abdulaziz Al Saud, stated that more than 9,000 suspected terrorists and their supporters have been arrested since 2003 and more than 3,100 remained in custody.

Recognizing that financiers of terrorism are key actors that allow terrorist groups to operate, the Saudi government continued to target such individuals and announced the arrest of more than 30 terrorist financiers in 2007. The United States continued to urge Saudi Arabia to take action against additional key terrorist financiers and facilitators in the Kingdom. While the government has not yet made operational a National Committee to oversee overseas charitable contributions, the government has prohibited Saudi charities from sending funds abroad until the Committee is established. Saudi Arabia took action against suspected terrorist financiers by freezing their accounts and confiscating their assets. In October, the Saudi government froze assets and accounts belonging to three Saudis who were designated by the 1267 committee, and also imposed the required travel ban on these individuals.

Grand Mufti Sheikh Abdulaziz al-Sheikh, Saudi Arabia's preeminent religious figure, made strong statements warning Saudis to be cautious when making charitable contributions, and the government continued to closely monitor charitable giving by Saudis. The government also implemented new customs regulations that restrict the free flow of money, precious metals, and gems across its borders.

## Saudi Contributions to Stability in the Middle East and Islamic World, Including the Middle East Peace Process, by Eliminating Support for Extremist Groups

Saudi Arabia has strengthened its border controls and security and, in particular, its border with Iraq to address travel by Saudis to Iraq to join terrorist groups fighting against Coalition Forces and the travel of non-Saudis through Saudi Arabia. The government announced a project to secure its border with Iraq as part of its larger border modernization program. The project will increase physical barriers and electronic surveillance of the northern border. In the interim, the Ministry of the Interior has deployed additional forces to the border area and has been successful in interdicting illicit movement of persons and equipment across the Saudi-Iraq border. The Saudi government announced the arrest of several hundred individuals who were planning to travel to Iraq or were actually en route, and increased its security cooperation with the Government of Iraq.

Senior Saudi leaders, including King Abdullah and Interior Minister Nayif, made strong statements against Saudis traveling to Iraq to join terrorist groups. On October 1, Grand Mufti Abdulaziz al-Sheikh issued a religious edict urging Saudi youth not to travel to Iraq to join terrorist organizations. This edict was repeated by other senior Saudi religious leaders as well.

The Saudi government continued its aggressive campaign to undercut the extremist ideologies that underpin support for terrorism and terrorist groups. Its publicity campaign includes using print media ads, billboards, text messages, and the Internet to oppose extremist thought. The government continues to monitor speeches and writings of religious leaders closely to ensure they do not advocate extremism and to conduct re-education training for religious leaders. Those who violate government decrees and regulations are fired or reassigned. In an effort to prevent unauthorized preaching, the Saudi government has recently taken steps to issue identification cards to imams authorized to speak in mosques. The government has stepped up its efforts to de-legitimize the extremist ideologies that glorify terrorism and undercut the so-called Islamic

underpinnings of these beliefs. Senior Saudi leaders have made strong statements criticizing the extremist ideology espoused by many terrorists as evil and "un-Islamic".

The government also operates a counter-radicalization/de-radicalization program designed to re-educate those arrested for supporting extremism or terrorism, including Saudis formerly held at the Guantanamo Bay detention facility. The program is designed to reintegrate individuals into society and includes educational, social, and religious components to undermine extremist messages and foster a more tolerant attitude. The program builds on family and tribal relations to reinforce the message and speed the reintegration process. Those who complete the program and show evidence of having been rehabilitated are eligible for consideration for release from custody, though not before they have served any prison sentence for their previous crimes. Employment, coupled with tribal and family re-integration, including marriage, in some cases, are important components of the post-release program, as are monitoring and follow-up by both extended families and the Saudi government. More than 1,000 Saudis have completed the program and the Saudi government states that the recidivism rate is very low. The USG is following the progress of this program closely, both to understand the program and monitor rates of recidivism, and will not hesitate to raise any concerns with the Saudi government.

The USG continued to urge the Saudis to make progress on revising their textbooks to remove hateful and intolerant references and to reform its educational system. Senior Saudi officials have acknowledged the need to combat extremism by addressing comprehensive education reform. In November 2006, the King Abdul Aziz Center for National Dialogue held the Sixth National Dialogue Forum in Al-Jawf called "Education: Reality and Promises." The Dialogue produced a "road map" for educational reform that included revision of textbooks, curricula, and teaching methods to promote tolerance. The government continued its National Campaign to Counter Terrorism, which includes publications, lectures, and workshops intended to educate school-age girls and boys about the evils of terrorism. Additionally, the Ministry of Education recently issued a new regulation that allows only Ministry-approved summer camps to operate.

## Political and Economic Reform in Saudi Arabia and Throughout the Islamic World

King Abdullah continued to pursue an incremental reform policy that aims to achieve a more tolerant society. Saudi Arabia is a conservative country and some societal elements are wary of this policy. The undercurrent against reform remains strong, albeit muted, and the government continued to move slowly in easing many social restrictions. The United States has encouraged the Government of Saudi Arabia to make legal, economic, political, and social reforms, with progress in such areas as local governance, economic reform, and religious and social freedoms.

The Saudi government has taken some steps to devolve power. In 2007, King Abdullah granted increased authority to the Majlis al-Shura, the Consultative Council, which can now offer some oversight on government actions and has the authority not only to review laws proposed by the Council of Ministers but to propose laws. King Abdullah also established a Succession Council that will guide the selection of future Crown Princes, a move to institutionalize the process more formally. The United States will continue to urge the Government of Saudi Arabia to promote political participation, increased transparency, and accountability in government.

Recognizing the need to better prepare Saudis for the challenges of the 21st century and to address some of the root causes of extremism, King Abdullah has directed a major overhaul of the Saudi education system. Saudi Arabia is now in the second year of a six-year $2.4 billion program to reform its educational system, which includes incorporating an updated and modernized curriculum, updated teacher training, and new textbooks. The government is expanding the number of colleges and universities and is examining possibilities for partial privatization of primary and secondary schools.

While Saudi Arabia continues to have a society strictly segregated by gender, women's rights and opportunities have increased. Saudi women are joining the workforce in larger numbers and there have been efforts to rein in the Mutawwa'in (religious police) and apply official sanctions for extremist acts. Recent government initiatives to allow women to stay alone at hotels and comments about granting women the right to drive have generated a strong backlash among religious conservatives, but demonstrate the King's commitment to moving forward slowly on women's rights. In October, the King announced a sweeping judicial reform including specialized criminal, commercial, labor, and family courts, which has the potential to modernize and improve the Saudi judicial system.

The United States sponsors a variety of initiatives focused on increasing freedom and opportunity for Saudi citizens. These include the Middle East Partnership Initiative (MEPI), support to the Middle East Democracy Assistance Dialogue, the Broader Middle East and North Africa (BMENA) Civil Society Dialogue, and a variety of public diplomacy educational, exchange, and outreach programs of the State Department's Bureaus of Educational and Cultural Affairs and International Information Programs. With MEPI support, Junior Achievement International, a program to educate youth on the benefits of free enterprise, business, and economics will focus on opening a new chapter in Saudi Arabia this summer. MEPI is supporting the creation of a women's business hub in the Kingdom to expand economic opportunities for women.

Higher oil prices bolstered the Saudi economy in 2007, resulting in a budget surplus of roughly $47.6 billion. In addition to reducing the national debt, Saudi Arabia is re-investing much of the surplus revenue in social development and large infrastructure projects and also has supported investments to diversify the economy away from petroleum and the petrochemical industry. The Kingdom announced plans to establish six Economic Cities to provide regional anchors to spur economic diversification and to move into greater value-added manufacturing. The King Abdullah Economic City in Rabigh will be the site for the King Abdullah University of Science and Technology, Saudi Arabia's flagship effort to establish a world-class university.

## Ways to Promote Greater Tolerance and Respect for Cultural and Religious Diversity in Saudi Arabia and Throughout the Islamic World

In November 2007, the Secretary of State re-designated Saudi Arabia a "Country of Particular Concern" pursuant to the International Religious Freedom Act. This is an important element of our bilateral dialogue with the Saudi government. The United States is working to promote religious and cultural tolerance in Saudi Arabia and to counter the spread of extremist ideology

through high-level engagement and exchange programs aimed at reaching key population groups. In 2007, 25 Saudis traveled to the United States on International Visitor programs designed for religious leaders in an effort to expose Saudis to American ideas of religious tolerance and civil society.

On April 25, 2005, following the visit of then-Crown Prince Abdullah to Crawford, Texas, the United States and Saudi Arabia issued a joint declaration noting that "future relations must rest on a foundation of broad cooperation. We must work to expand dialogue, understanding, and interactions between our citizens." The declaration noted that such cooperation would include programs designed to:

– Increase the number of young Saudi students traveling and studying in the United States;
– Increase military exchange programs so that more Saudi officers visit the United States for military training and education; and
– Increase the number of Americans traveling to work and study in Saudi Arabia.

In 2005, Saudi Arabia initiated a scholarship program to increase the number of young Saudi men and women pursuing undergraduate and graduate studies in the United States. By 2007, more than 15,000 Saudis were studying in the United States on Saudi government scholarships.

**Ways to Assist Saudi Arabia in Reversing the Impact of Financial, Moral, Intellectual, or Other Support to Extremist Groups in Saudi Arabia and Other Countries, and to Prevent this Support from Continuing in the Future**

The United States and Saudi Arabia worked closely together to combat terrorism in Saudi Arabia and abroad. The United States continued to urge the Saudi government to more vigorously pursue and prosecute terrorist financiers, and offered training to the Government of Saudi Arabia to help increase its capacity to detect and disrupt terrorist financing efforts.

While the Saudis have not yet made operational a High Commission for Charities to oversee all charities in Saudi Arabia, the government has imposed a ban on domestic charities sending money overseas except through this Commission. All international charitable work is carried out through the Saudi government agencies such as the Saudi Fund for Development or the Red Crescent Society.

The United States and Saudi Arabia have worked together to designate individuals and entities jointly to the UNSC 1267 Committee. More needs to be done in terms of reducing the flow of money and foreign fighters to Iraq. To combat terrorist financing, Saudi Arabia has instituted new anti-money laundering and counterterrorism finance laws and regulations including removing charity boxes from mosques, restricting the amount of cash that can be carried into or out of the Kingdom, and establishing a Financial Investigations Unit (FIU) in the Ministry of Interior to investigate money-laundering cases and to consolidate all counterterrorism financing operations, both analysis and investigations.

## 5.4. The Struggle of Ideas in the Islamic World

Public diplomacy is essential to a successful foreign policy and to America's national security. The United States recognizes that the global and generational challenge of countering terrorism is, at its heart, a contest of ideas and values. America is more secure when people around the world share the same hopes and freedoms.

| Goals for Winning the Struggle of Ideas |
|:---:|

The State Department's public diplomacy work is guided by three strategic imperatives. First and foremost, it offers a positive vision of hope and opportunity rooted in the enduring U.S. commitment to freedom. It promotes the fundamental and universal rights of free speech and assembly, the freedom to worship, the rule of law, and rights for women and minorities. It strives to isolate and marginalize violent extremists and undermine their efforts to exploit religion to rationalize their acts of terror. Finally, it fosters a sense of common interests and common values between Americans and people around the world.

| Tools to Accomplish Such Goals |
|:---:|

The United States advances these strategic objectives by vigorously engaging foreign publics to explain and advocate American policies. Reaching foreign audiences with core policy messages on democracy, tolerance, and the universal values of liberty, justice, and respect are at the center of U.S. efforts to counter extremist rhetoric and disinformation coming from hostile groups.

The United States is promoting increased exchanges, which exemplify the transformative power of American global engagement. The significance of people-to-people exchanges has never been more clear or compelling. The 9/11 Commission Report recognized the essential contribution exchanges make to national security. The National Intelligence Reform Act of 2004 reaffirmed the importance of America's commitment to exchanges.

The United States is expanding educational opportunities as the path to hope and opportunity. English language programs not only provide crucial skills but also open a window to information about the United States, its people, and its values. Americans must also better educate themselves about the world. The President's National Security Language Initiative will encourage more American students to study critical languages such as Chinese, Russian, Hindi, Persian, and Arabic.

Responding to and quickly debunking misinformation, conspiracy theories, and urban legends is crucial for success in the war of ideas. That is a key objective of the State Department's Digital Outreach Team, whose members post comments on well-trafficked Arabic, Persian, and Urdu language blogsites. Additionally, State maintains a public "Identifying Misinformation" website in both English and Arabic, which is devoted to countering false stories that appear in extremist and other web sources. The site focuses on disinformation likely to end up in the mainstream media. Embassies have used information from this site to counter disinformation in extremist print publications in Pakistan and other countries. One article, "A Trio of Disinformers," was the subject of a 1,100-word front-page article in an issue of the influential pan-Arab newspaper *al-*

*Sharq al-Awsat*. "Identifying Misinformation" is featured on the usinfo.state.gov website and is listed first of 17.6 million sites in a Google search for the term "misinformation." At least 49 websites have direct links to "Identifying Misinformation".

The Internet, radio, television, and video products remain powerful tools for bringing America's foreign policy message to worldwide audiences. The State Department produces a wide array of print and electronic materials describing for foreign audiences, in their own languages, the need to counter those who have committed or wish to commit terrorist acts, as well as achievements made in this area.

The State Department's premier web page to explain U.S. counterterrorism policy is "Response to Terrorism," created more than seven years ago and featured on usinfo.state.gov. The site is listed third out of 241 million sites in a Google search for the terms "terrorism U.S." At least 133 websites link directly to it. In addition to featuring articles, texts, and transcripts from key policymakers, this site provides valuable links to the Electronic Journals series, the National Strategy for Combating Terrorism, the designated Foreign Terrorist Organization list, and the State Department's Country Reports on Terrorism. "Response to Terrorism" is located on the Internet at: http://usinfo.state.gov/is/international_security/terrorism.html.

Support for and understanding of the United States go hand-in-hand with strengthening and empowering the voices most credible to speak out in favor of tolerance and rule of law to counter the violent extremists' message of hate and terror. One of public diplomacy's greatest assets is the American people. Empowerment of individuals and groups, from all walks of life, is a key aspect of the Department's public diplomacy efforts.

As we actively prosecute the struggle of ideas, we need to recognize that this will require a long-term effort spanning years and generations. For that reason, we are placing increased emphasis on programs directed at younger audiences, including undergraduate and, in select cases, high school students.

The USG's assistance programs, administered through USAID, the Middle East Partnership Initiative, the Millennium Challenge Corporation, and other U.S. entities, advance U.S. interests in this area directly through programs to increase access to education, improve health care, and empower people to build better lives. Civic engagement is an important component. Assistance programs to strengthen and professionalize independent media and civic society contribute to opening the "marketplace of ideas," as well as support development and reform across the board.

The United States appropriated $66 million in FY-2006 supplemental funds and almost $60 million in FY-2008 funds for civil society development, broadcasting, and exchange efforts related to Iran, allowing us to dramatically increase our ability to speak directly to the Iranian people. This funding supports efforts to clarify U.S. policy objectives to the Iranian people.

**Benchmarks for Measuring Success and Linking Resources to Accomplishments**

In 2004, State established the Public Diplomacy Evaluation Office (PDEO). Its mandate is to evaluate all major public diplomacy and exchange programs individually as well as provide an overall strategic framework for public diplomacy assessment.

Organizations as diverse as the Peace Corps, Department of Defense, the British Council, the World Bank, and non-profits in Italy, Japan, and the Netherlands have all consulted with the PDEO on how to measure public diplomacy activities.

The measures used by the PDEO are based upon recognized social and behavioral science methodologies and include measuring changes in audience attitudes (knowledge, skills, perceptions, and understanding), behavior, and condition. Examples include:

- Improved or increased understanding of the United States, its policies and values;
- Initiated or implemented "positive" change within an individual's organization (positive referring to changes that support U.S. ideals and values);
- Institutional partnerships and linkages and on-going collaboration; and
- Changes in editorial content in major media.

### Participation in International Institutions for the Promotion of Democracy and Economic Diversification

The United States is a leading participant in many international organizations, such as the United Nations and NATO. We also play a leading role in other initiatives, such as the Forum for the Future and the Community of Democracies, which stimulate cooperation with other nations to advance the agenda of freedom. For the first time since its creation in 2000 and in response to USG recommendations, the Community of Democracies created regional dialogues which brought together governmental and non-governmental organization representatives from each region to discuss the particular challenges and solutions unique to their area. We will continue to seek opportunities to build on the momentum coming out of the April ministerial, particularly in support of the Forum for the Future and the Broader Middle East and North Africa (BMENA) processes.

### U.S. Assistance Sufficient to Convince Allies and People in the Islamic World that the United States is Committed to Winning this Struggle

USG assistance programs are intended to improve economic conditions and opportunities in developing countries around the world, thereby serving the United States national interest in a more prosperous and secure international community. Our assistance can have the additional impact of demonstrating our commitment to help poorer countries or countries in special need, as we saw after the tsunami of 2004 and the Pakistan earthquake of 2005. There is, however, no set amount of money or time that we could identify as being sufficient to win the struggle of ideas.

## 5.5. Outreach through Broadcast Media
**This section is provided by the Broadcasting Board of Governors (BBG).**

**Broadcasting Board of Governors Initiatives: Outreach to Foreign Muslim Audiences**

**Overview.**  The Broadcasting Board of Governors (BBG) promotes freedom and democracy and seeks to enhance understanding through the broadcast of accurate, objective news and information about America and the world to foreign audiences. Since September 11, this mission has become more critical in the Muslim world and BBG programming has expanded accordingly. The result of BBG efforts, detailed below, has been to boost audiences in Muslim majority countries from under 15 million five years ago to over 60 million weekly today.

Four of the five broadcast entities under the supervision of the Board – the Voice of America, the Middle East Broadcasting Networks, Radio Free Europe/Radio Liberty, and Radio Free Asia – provide programming for Muslim audiences. From 24-hour broadcasting to large Muslim populations in the Middle East and South Asia, to programs heard by smaller Muslim audiences in Thailand, Russia, and Russian-speaking Central Asia, BBG programs are serving Muslim audiences and U.S. foreign policy goals.

In the past five years, a number of new or expanded broadcasts reflect the continued urgency of the broadcast priorities associated with U.S. counterterrorism efforts. For example, the programs of the Middle East Broadcasting Networks (*Radio Sawa* and *Al Hurra* television) are broadcast 24 hours a day in Arabic and reach audiences in 22 countries in the Middle East and Europe. In 2007, the agency charted a dramatic expansion of VOA's *Persian News Network* from the previous year, boosting production of original Persian language programming from two to six hours daily, with broadcasting into Iran 24 hours per day, up from only eight hours daily in 2006. "Radio Farda," a joint VOA and RFE/RL effort that also broadcasts 24/7, rounds out the Persian broadcast strategy by targeting a younger Iranian audience with a mix of music and information programs. Today, the BBG's Arabic and Persian broadcasts are available 24/7 and reach audiences in the broadcast media they prefer – radio, television, and the Internet.

To reflect the nation's critical foreign policy priorities since September 11, 2001, BBG resources have also shifted from areas of the world where the local media are increasingly free and strong to the Middle East and Central and South Asia. VOA has similarly reduced its broadcasts to Europe, increasing its focus on Iran, Afghanistan, Indonesia, Pakistan, and other critical nations. Eighteen of RFE/RL's broadcast languages, almost two-thirds of the total, are directed to countries or regions where the majority populations are Muslim. RFE/RL now broadcasts to Iran, Iraq, Afghanistan, Azerbaijan, Bosnia, Kazakhstan, Kyrgyzstan, Tajikistan, Turkmenistan, and Uzbekistan; the majority Muslim populations of Kosovo; and Tatarstan, Bashkortostan, and the North Caucasus in the Russian Federation.

The BBG's research indicates that these new programs resonate with audiences and are drawing listeners and viewers, even in environments where listening or seeking access to satellite broadcasts may be illegal. In Iraq, Al Hurra Television's audience has equaled that of Al Jazeera and competes increasingly well with Al Iraqia, Al Sharqiya, Al Arabiya, and MBC. Telephone surveys conducted in Iran indicate that the BBG's Persian language programming reaches 25

percent of Iranians on a weekly basis. Research indicates that these new programs have gained respect and trust since their relatively recent inception.

Programming in other key areas of the Muslim world continues to provide relevant news and information to populations who otherwise might not have access to unbiased reporting on key USG policy statements and reporting on local or international news. VOA's Urdu language service has expanded its broadcasts to Pakistan, and Pashto language broadcasts target the Waziristan region. Both VOA and RFE/RL provide blanket news and information coverage to Afghanistan in the Dari and Pashto languages. Listener rates are up to 69 percent weekly.

New technologies aid the transmission of programming to key audiences, and comprehensive Internet sites are vital to each language service. The Internet offers an exciting transmission opportunity to countries such as Iran, where the BBG's traditional broadcast technologies are jammed or blocked. Through the use of proxy sites and daily emails of news summaries, VOA Persian and Radio Farda bypass the Iranian government's censorship tools. Radio Farda has enhanced its website to improve the flow of information to viewers and to increase opportunities for interactivity.

Where Internet access is unfettered, BBG broadcasters are using the web to access audiences that increasingly use the Internet as their information lifeline. VOA's central English-language Internet site, VOANews.com, routinely carries news reports and special coverage of events relevant to Muslim viewers. For example, the site offered a special report entitled "Exploring Ramadan," which examined ways that Muslims around the world celebrate Islam's holiest month, as well as news reports and features from VOA correspondents around the world, audio and video reports focusing on Muslims in America, links to President Bush's Ramadan greeting, and special reports relevant to Muslims in Nigeria, Iraq, Pakistan, Somalia, and Sudan.

The agency's broadcast strategy focuses on building program reach and impact within the Islamic world with thematic content, which includes facilitating citizen discourse, engaging the world in conversations about America, and helping audiences understand the principles of democratic societies. Technical aspects emphasize enhanced program delivery and employ modern communication techniques. The rigorous use of research about audience and broadcast environments, more frequent program review and oversight, and more compelling broadcast formats that will resonate in competitive but critical international markets remain crucial to this strategy. Underlying these techniques, the journalistic product and integrity remain the same. BBG broadcasters provide accurate, objective, and comprehensive news and information as mandated under the U.S. International Broadcasting Act. Through the combined skills of its broadcasters, the BBG is securing a public diplomacy strategy that mirrors U.S. national security priorities and focuses on nations that may suffer from, or contribute to, the growth of terrorism.

During the past year, the agency's extensive journalistic resources reported on issues such as the Annapolis Peace Conference and the upcoming U.S. elections to provide a program perspective that is often lacking in media outlets abroad. BBG correspondents in the United States and around the world contribute to coverage available in 60 languages. Live, simultaneous interpretation of Congressional hearings and of Presidential speeches, such as the State of the

Union, allow Muslim audiences to hear both the President's message and the opposing party's response.

**Arabic Broadcasting.** To effectively communicate with the large, predominantly young audiences in the Middle East, the BBG launched Radio Sawa, a 24/7 network of stations specifically designed to reach the large segment of the Arabic-speaking population under the age of 35. Radio Sawa went on the air in March 2002, quickly attracting and sustaining a loyal audience throughout the Middle East as new transmission sites were added throughout the region. In 2007, Radio Sawa continued to broadcast accurate, authoritative, comprehensive, and timely news about the Middle East, the United States, and the world. In addition to 325 newscasts per week, Radio Sawa offers discussion and informational programs such as the popular "Sawa Chat" interactive feature and the "Free Zone," a weekly review and discussion of democracy and freedom as they relate specifically to the Middle East. Feature programs encouraged discussion of key social and political issues in a manner very different from indigenous Arab media.

Radio Sawa broadcasts on FM in Morocco (Rabat, Casablanca, Tangier, Meknes, Marrakesh, Agadir, and Fes), Jordan (Amman and Ajlun), the Palestinian Territories (Ramallah and Jenin), Kuwait (Kuwait City), Bahrain (Manama), Qatar (Doha), U.A.E. (Abu Dhabi and Dubai), Iraq (Baghdad, Nasiriya, Basra, Mosul, Kirkuk, Sulimaniya, Amara, Najaf, Samawa, and Erbil), Lebanon (Beirut, North Lebanon, South Lebanon, and Bekaa Valley), and Djibouti.

Radio Sawa expanded its FM coverage in 2007 by adding its first FM transmitter in Khartoum, and plans to further expand its FM coverage throughout Sudan. Radio Sawa broadcasts on medium wave to Egypt, Yemen, Saudi Arabia, and throughout Sudan.

Building on the success of Radio Sawa, the BBG launched Al Hurra Television on February 14, 2004, covering 22 countries in the Middle East via the same satellites used by major indigenous Arabic channels. In the four years Al Hurra has been broadcasting 24/7, it has provided in-depth coverage of historic events, such as the elections in Morocco and the renewed efforts to begin the Middle East peace process. Al Hurra was a consistent leader analyzing and reporting on democratic trends in the Middle East. Through objective and accurate reporting, Al Hurra has been an example of a free press to the region and has become a trusted source of news for its estimated 20 million weekly viewers.

Al Hurra also gives its audience insights into life in America and the American system of government. During both the United States midterm elections in 2006 and the road to the 2008 presidential elections, Al Hurra has provided daily coverage of the candidates and the issues that impact United States elections. Broad election coverage provided an opportunity to showcase the political institutions of the United States.

Al Hurra carried extensive live news coverage of events and speeches by President Bush, Secretary of State Rice, and members of Congress. Additionally, Al Hurra has reporters that cover the White House, Congress, State Department, and the Pentagon. Al Hurra's current affairs programs, such as *Inside Washington,* take viewers behind the scenes of the political process in Washington with guests such as Supreme Court Justice Antonin Scalia, and Representatives

Howard Berman, Ileana Ros-Lehtinen, and Peter Hoekstra. The network also included a series of reports within its newscasts examining Islam in America.

Al Hurra produces programs to provide a forum for discussion on sensitive issues such as women's rights and human rights. Current affairs programs, such as *Equality,* are unique in the region's media. Hosted by Saudi journalist Nadine Al-Bdair, the program addresses women's rights and tackles subjects such as young girls being forced into marriage. There has been positive feedback on this program and others, praising the programs' courageousness, while others condemn Al Hurra for raising these topics.

In 2007, Al Hurra launched a new program bringing together four women to discuss social and political issues that are largely regarded as taboo in the region. Each of the hosts brings a different perspective when they address issues such as sexual harassment, women in prison, discrimination of women, the psychological impact on women who marry at an early age, and domestic violence against women. Al Hurra also broadcasts *Eye on Democracy*, which focuses on democratic efforts throughout the Middle East.

Throughout its four-year history, Al Hurra has provided a forum for discussion of important topics by a wide variety of experts including the all-important voices of moderation. Al Hurra's talk shows, roundtables, and documentaries have routinely tackled vital topics that are taboo on many other stations in the region, including the struggle for human rights, the position of women in Arab society, religious freedom, freedom of the press, and freedom of expression.

Radio Sawa and Al Hurra Television now reach a total audience of 35 million adults 15 and older, according to international research firms such as ACNielsen and Ipsos. The surveys show that despite high levels of anti-American sentiment throughout the region, both Al Hurra and Radio Sawa are regarded as credible sources of news and information by their audiences.

## IRAQ

**Al Hurra Iraq**, a special television stream containing more concentrated news and information to and about Iraq, began broadcasting in April 2004. Through satellite and terrestrial broadcasting in Iraq, Al Hurra has gained a foothold in one of the most competitive TV marketplaces in the world. Al Hurra's goal is to help its viewers make educated and informed decisions about political, social, and economic events affecting their lives. During the historic elections in Iraq, Al Hurra produced and broadcast the first televised electoral debate in Iraq's history, featuring six candidates representing the major political parties. This historic debate brought about a candid discussion among the candidates and provided a forum for viewers to compare the various candidates.

RFE/RL's **Radio Free Iraq** (RFI) continues to provide the Iraqi people with breaking news and in-depth coverage of developments in Iraq and the Middle East. Because RFI is a surrogate broadcaster, the Iraqi people see it as "their radio" but with the reliability and reputation of a top-notch western operation. RFI appeals to a wide spectrum of listeners in Iraq by covering the most significant political issues in the country, including daily coverage of the activities of the Iraqi Cabinet and Parliament. RFI's extensive network of freelance reporters, based in the Baghdad

bureau, risk their lives to bring objective news to their compatriots. Two Radio Free Iraq correspondents, Khamail Khalaf and Nazar Abdulwahid Al-Radhi, were slain; a third, Jumana Al-Obaidi, was kidnapped and held for nearly two weeks before being released (her driver was shot and killed during the kidnapping). A September survey showed listening rates for RFI at a weekly level of 16.6 percent and revealed widespread appreciation of RFI's distinctly Iraqi sound.

This past year, Radio Free Iraq focused on subjects such as the campaign by Iraqi and coalition forces to make the city of Baghdad more secure, the mortar attack on the joint press conference by Iraqi Prime Minister Nuri al-Maliki and UN Secretary General Ban Ki-moon in Baghdad, and the December 16 Turkish military raid on KGK/PKK targets in Northern Iraq. RFI also broadcast interviews with a host of high-profile figures, including U.S. Ambassador Ryan Crocker, Iraqi National Security Advisor Muwaffaq al-Rubay'i, and Speaker of the Iraqi Parliament, Mahmoud al-Mashadani.

In June, RFE/RL analysts Daniel Kimmage and Kathleen Ridolfo released *Iraqi Insurgent Media: The War of Images and Ideas*, a 78-page report that provided an in-depth analysis of the media efforts of Sunni insurgents who are responsible for the majority of U.S. combat deaths in Iraq. On June 12, Kimmage testified before an open hearing of the Senate Select Committee on Intelligence on the findings of the report.

**Arabic in Europe.** Since August 2006, Al Hurra Europe has brought the best programs of Al Hurra and Al Hurra-Iraq to the Arabic-speaking population in Europe. Al Hurra Europe can be seen on the Hotbird satellite system that reaches all of Europe.

**Kurdish.** Broadcasting four hours of daily radio programming, VOA's Kurdish Service remains highly popular among Kurds in Iraq, Iran, Turkey, and Syria. According to surveys conducted by InterMedia Research, VOA occupies a unique position among Iraqi Kurds. It is the only major international broadcaster offering programs in the Kurdish language. VOA Kurdish focuses on the Iraqi scene through a network of stringers, with special programs and call-in shows devoted to combating extremism inside the country and the surrounding region. Special coverage highlighted the debate among Kurds on the role of Islam in the regional and national constitutions of Iraq. Some of the topics discussed in special programming by VOA Kurdish during the last year included the observance of Muslim holidays in the United States, Muslim students in U.S. colleges, and the role of religion in U.S. politics.

**Iran.** As noted above, broadcasting to Iran remains a key BBG priority. In 2007, VOA's Persian Service, once part of VOA's West and South Asia Division, became a separate unit and changed its name to the "Persian News Network" (PNN) to reflect this priority.

PNN's seven-hour program block opens with *Today in Washington*, a brief look at the latest news developments in Washington, as well as the content of PNN's upcoming programs. Other original programming includes:

- *Today's Woman*, PNN's newest program made its debut on September 27. The one-hour program features influential women from around the world discussing such topics as social issues, medical themes, human rights, the law, sports, and business.

- *News and Views*, PNN's flagship news program, is now two hours in length, and features live interviews and news coverage of the latest headlines from Washington, DC, Iran, and across the globe.

- *Roundtable with You* is a talk show with expert guests who discuss current events, politics, popular culture, and global health. Viewers and listeners from Iran and around the world participate in the show via phone calls and e-mails.

- *Late Edition* begins with a close look at the day's top story. This program is targeted to a younger demographic and features segments on Iran's student movement, health, technology, sports, entertainment, and culture.

- *NewsTalk* is a new journalists' roundtable discussion program that features an examination of the day's top stories and an in-depth look at issues relating to Iran.

This year, Persian television featured an impressive array of prominent guests including former Under Secretary of State Nicholas Burns, Assistant to the President and Deputy National Security Advisor James Jeffrey, U.S. Ambassador to the UN Zalmay Khalilizad, Nobel Peace Prize laureate Shirin Ebadi, several U.S. senators and representatives, and Christine Levinson, wife of ex-FBI agent Robert Levinson, who has been missing in Iran since March 2007.

Other programs included annual live coverage of the President's State of the Union address with simultaneous Farsi translation and post speech analysis, live coverage of the opening of the UN General Assembly in September, Iranian President Mahmoud Ahmadinejad's speech at the UN coupled with a special live hour of analysis and coverage, President Bush's June visit to the Islamic Center of Washington in commemoration of its 50th anniversary, live coverage from President Bush's May trip to Latin America, live coverage of an IAEA meeting in Vienna on Iran's nuclear program, and coverage of Commander of the Multinational Forces-Iraq, General David Petraeus and U.S. Ambassador to Iraq Ryan Crocker during their September testimony to Congress. VOA's Persian News Network has also covered Senate and House hearings on Iran and Iraq.

VOA devotes significant effort to hard-hitting topics on the role of religion in society, including the Iranian regime's abuse of Islam to solidify its control of power, to justify the oppression of women, and to limit free speech, free association, and freedom of religion. These stories generated considerable email response and other feedback from Iran, and from Persian-speaking populations in Kuwait, the UAE, Qatar, Saudi Arabia, Iraq, Turkey, Syria, Lebanon, Europe, and the United States.

**Radio Farda,** a joint service of RFE/RL and VOA, continued to broadcast to Iran 24 hours a day in 2007. As Radio Farda has matured, and as funding has supported the addition of larger blocks of news and information, it has done so in its tradition as a "surrogate" broadcaster, presenting

news about the country to which it broadcasts. Current broadcasts include over eight hours of news and information programming daily. Popular Persian and western music draws in the younger audience. Radio Farda finds direct sources of information within Iran in spite of the challenging environment for journalism.

The people of Iran turned to Radio Farda and its website for round-the-clock breaking news on stories of global interest, such as the ongoing standoff over Iran's nuclear program, the seizure and release of several British sailors, President Mahmoud Ahmadinejad's trip to New York, the arrest of three Iranian-Americans visiting Iran and court proceedings against a fourth who worked as a Radio Farda reporter. Their stories included the arrest of a prominent union leader and several women's rights activists; riots sparked by the imposition of gasoline rationing in May 2007; and the mistreatment of Azeri, Kurdish, Ahvazi Arab, and other ethnic minority populations of Iran. To enhance its coverage, Radio Farda has doubled the length of its main evening newscast to one hour and launched a revamped, news-oriented website.

Radio Farda reaches significant audiences in Iran, in spite of the government's consistent jamming. According to the last InterMedia survey conducted in November 2006, Radio Farda's weekly reach measured 10.3 percent – the highest weekly reach rate of any international radio broadcaster, and more than double that of the BBC's Persian service. Among a key target group, youth under 30, Farda's weekly reach was 14.8 percent.

Utilizing new resources provided by the Congress, Radio Farda augmented its website to expand its content, providing more stories to read, more images to view, and more opportunities to comment on news and information. It now receives over five million page views each month, despite the Iranian government's efforts to block it. Radio Farda's website is highly interactive, with features such as "Most Popular and Most Emailed Stories" and "Farda Club" for moderated discussions and blogsites.

**Afghanistan.**  After September 11, 2001, the BBG increased radio broadcasting to Afghanistan pursuant to the Radio Free Afghanistan Act, signed into law in March 2002. Together, RFE/RL and VOA provide a 24-hour daily radio stream in the Dari and Pashto languages that has a vast audience reach in Afghanistan.

**VOA's _Radio Ashna (Friend)_** continued to build on its reputation as a source of accurate and credible news for listeners in Afghanistan. The seamless daily 12-hour program includes daily call-in shows and in-country reporting from approximately 30 stringers. Program topics include reconstruction, security, continuing violence, disarmament, international counterterrorism efforts, drug trafficking, and human rights.

VOA continues to rank as one of the top three international broadcasters in Afghanistan. The most recent survey shows that VOA's one-hour daily _TV Ashna_ program in Dari and Pashto has become widely popular. The viewership rate increased from 9 percent in 2006 to 20 percent in 2007.

**_VOA's TV Ashna_** has taken advantage of Washington's large Islamic community to produce a number of original reports for Afghanistan and other Services in the South Asian Division. For

example, the program followed Rep. Keith Ellison, the first Muslim-American member of Congress, taking the oath of office using a Koran owned by Thomas Jefferson, and his activities during his first year in the House of Representatives. It also covered the opening of a new Islamic Center in Prince William County in Virginia, and obtained interviews with Governor Tim Kaine, Senators John Warner and Jim Webb, and Representative Tom Davis, who attended the center's ribbon cutting. Viewers were taken inside an Islamic Academy in Virginia to view how education and Muslim tradition coexist in the United States. Other coverage included an exclusive interview with President Karzai of Afghanistan.

**RFE/RL's Radio Free Afghanistan** has a weekly reach of 64.3 percent in the country, according to preliminary data from an August InterMedia survey. Afghanistan is the only country in the RFE/RL broadcast region where a USG-funded broadcaster is the dominant media outlet.

Radio Free Afghanistan delivers breaking news, in-depth reporting, and analysis to the people of Afghanistan on the struggles their young democracy faces, including a resurgent Taliban. With its dual-language programming and its tone of moderation, Radio Free Afghanistan works to promote national unity and religious tolerance. In January, a would-be suicide bomber credited a Radio Free Afghanistan series on suicide bombings with changing his mind about carrying out his deadly mission.

Reports from Washington, Prague, and Kabul, exclusive interviews and roundtables, and ongoing coverage of the efforts by Coalition Forces to subdue the insurgency made up the program offerings. In 2007, Radio Free Afghanistan celebrated its fifth anniversary. Throughout the year it provided its listeners with coverage of important stories such as the Taliban's execution of journalist Adjmal Naqshbandi, the accidental killing of 25 civilians by NATO air strikes in June, the Taliban's seizure of 23 Korean hostages and the negotiated release of the 21 who survived, the death of former Afghan king Mohammad Zahir Shah, the lives of Afghan expatriates living in Saudi Arabia, the massive bomb attack that took place in Baghlan province on November 6, the assassination of Pakistani politician Benazir Bhutto, and the recapture by NATO and Afghan forces of the Taliban stronghold of Musa Qala in southern Afghanistan. In addition, Radio Free Afghanistan uses the hundreds of letters it receives from listeners to find stories that deserve attention and to spur the government to act on them.

**Pakistan**. The Pakistani government's "state of emergency" crackdown on private media on November 3, 2007 darkened two VOA television affiliates in the country, foremost among them the privately-owned cable news operation GEO TV, which had carried VOA's 30-minute news and information Urdu-language, *Beyond the Headlines*. In response, VOA immediately stepped up its radio news and information programming in Urdu by shifting its TV staff to expand live daily radio news programming from five to 12.5 hours. Domestic TV stations currently face restrictions on the use of foreign broadcast material. However, VOA is aggressively working to regain access to the Pakistani TV Market with affiliates GEO and Aaj.

In covering the crisis, and U.S. and world reaction, the Urdu Service engaged its network of stringers in Islamabad, Peshawar, Quetta, Karachi, and Lahore, and interviewed government officials and Pakistani opposition figures, such as former Prime Ministers Nawaz Sharif and

Benazir Bhutto. The Service also provided timely, in-depth coverage of Benazir Bhutto's assassination, with stringers in Rawalpindi and Islamabad providing live coverage of events. One stringer in Islamabad was among a group of journalists who spoke with Benazir Bhutto just hours before her assassination, between her meeting with Afghan President Hamid Karzai and her final campaign rally.

Since VOA introduced its youth-oriented, 12/7 radio station called *Radio Aap ki Dunyaa* (Your World) in 2004, the station has continued to attract a growing number of listeners with its contemporary format that includes news, information, roundtable discussions, call-in shows, interviews, features, and music. The programs target Pakistani listeners between the ages of 15 and 39, which account for some 60 million of Pakistan's 150 million residents, as well as millions more potential listeners in India, the Gulf, and the Diaspora. To increase Radio Aap ki Dunyaa's reach, VOA introduced a bilingual web page that offers live audio streaming of news and entertainment programming.

**The Pakistan/Afghanistan Border Region.** VOA's *Deewa Radio* broadcasts reports, interviews, and call-in shows on events and issues about political Islam in and outside of the United States, Pakistan, and Afghanistan to Muslim audiences in Pakistan and Afghanistan. Scholars and leaders of religious parties in Pakistan participate in call-in shows to answer questions from listeners on their role in the local political scene.

Deewa Radio presented American views to people living in the target broadcast region. After the assassination of Pakistan's opposition leader Benazir Bhutto and the worsening political crisis, the Service obtained reactions from former U.S. ambassador to Pakistan Wendy Chamberlin, CSIS Director of South Asia Programs Teresita Schaffer, UNHR representative Hina Jilani, U.S.-based Pakistani analyst Michael Shank, and other prominent analysts.

Through interviews with religious and secular leaders, the station addressed critical issues such as terrorism, suicide attacks, religious extremism, the madrassa and its syllabus, the role of women in society, and the political future of the region. Noted personalities interviewed by Deewa included former Prime Ministers Benazir Bhutto and Nawaz Sharif, Imran Khan (leader of Tehrik Insaf party), Asfandyar wali Khan (Pashtun nationalist), Mehmood Khan Achakzai (nationalist leader), Farooq Laghari (former Pakistan president), sitting and former federal ministers Aftab Sherpao, Iftikhar Gilani, Mohammad Ali Durrani, Amir Muqam Khan, Saif Ali Khan, and Saleem Saifullah; as well as a number of provincial ministers in NWFP and Balochistan province.

**India.** With a Muslim population numbering close to 150 million, India has the second largest Muslim population after Indonesia. VOA's Hindi Service reaches this audience, with discussions about events in Pakistan and Kashmir, the recent India-Pakistan peace initiatives, Iran's nuclear ambitions, developments in Afghanistan, and the Iraq war. Hindi also offered exclusive TV interviews with USG senior officials, dozens of U.S. senators and representatives, the late Benazir Bhutto, and Muslim-American leaders and scholars. Topics addressed included developments in the region and India's relations with Iran, Pakistan, and the United States.

**Bangladesh.**  Bangladesh has one of the largest Muslim populations in the world. During the past year, VOA Bangla Radio and Television produced numerous features on Muslim youth, including a piece on Hasan Askari, a 20-year old Muslim student from Bangladesh who was honored by the Governor of New York for saving a Jewish youth from a beating during the holiday season in December. VOA Bangla also produced features on Islamic centers in the United States, Ramadan observances, and Eid festivals. Following the assassination of Benazir Bhutto, Bangla Service interviewed diplomats, scholars, and political analysts in the United States and abroad.

**Turkish.**  As part of the special coverage of the general election in Turkey, VOA's Turkish Service focused on the role of Islam in Turkish politics under the strictly secular Turkish constitution. Coverage included interviews with U.S. and Turkish officials, members of the U.S Congress, and other experts. VOA Turkish provided extensive coverage in radio and television programs and on the VOA Turkish website on the role of religion in U.S. society.

This year, VOA Turkish also expanded its TV affiliation in Turkey by launching daily live reports for TGRT News TV network, broadcast via web cam. TGRT News, a 24-hour nationwide news network with a weekly audience share of over 30 percent of Turkey's estimated 25 million regular viewers, carries twice-weekly a live, 15-minute news and current affairs program and a weekly 30-minute news and magazine program produced by the VOA Turkish Service. At the request of TGRT, VOA has produced a number of live or pre-recorded special programs on developments in U.S.-Turkish relations and on the U.S. image in the world.

**Indonesia.**  This year, the Indonesian Service produced nearly nine hours of original radio programming per day for over 200 affiliates throughout Indonesia. A new program called *Executive Lounge* is a daily 30-minute prime-time radio program for Indonesia's growing numbers of young professionals, and is aired on a new affiliate network, the Trijaya Radio Network. The new lifestyle program *Pop Notes* is a weekly 60-minute culture program for JakTV (Jakarta) and other regional TV stations. Warung VOA (Café VOA), a weekly 30-minute talk show, airs on JTV (East Java). The Service also developed four new regular short feature segments for Indonesian national TV stations. VOA Indonesian TV programming can now be seen regularly on five of the 11 national stations. In addition, the VOA Indonesian Service produced six special series and special events programs, including reports on the Virginia Tech shootings that claimed one Indonesian victim, reports on illegal arms exports, Indonesian immigrants in the United States, and U.S.-Indonesian military relations, as well as special serial programming for Indonesian Independence Day and Ramadan. The Service continued to develop its website, and sent out both a daily email with headline news and a weekly email-newsletter. VOA Headlines are also available for text message transmission to mobile phones.

**Uzbekistan.**  VOA's daily 30-minute radio broadcasts are carried on short wave, medium wave from Tajikistan, and two FM frequencies in Osh and Jalalabad, Kyrgyzstan. The Service's *Exploring America*, is a weekly half-hour TV show placed on a satellite network targeting Uzbek-speakers in Afghanistan and all of Central Asia. Two local stations in the Uzbek-speaking areas of Kyrgyzstan carry it live. All broadcasts reach the Ferghana Valley. VOA Uzbek features interviews with various U.S. and international sources discussing critical issues, such as the War on Terror, religious extremism, and U.S.-Uzbek relations. Interviews with Members of Congress

and key officials provide a unique perspective of U.S. policymaking. The Service also features reporting on Muslim life in the United States and serves as a window into religious tolerance and understanding in America.

RFE/RL's programming to Uzbekistan, Turkmenistan, Tajikistan, Kyrgyzstan, and Kazakhstan continued despite various forms of harassment and even repression against its correspondents and editors. A former correspondent for, and frequent contributor to, the Uzbek Service was murdered in Kyrgyzstan in October 2007. RFE/RL's Tashkent Bureau remained closed by Uzbek government order, but the Uzbek Service continued to provide news coverage and democracy promotion under harsh conditions reminiscent of the Soviet era. In Kyrgyzstan, RFE/RL was able to work with Kyrgyz National Television (KTR) to produce and air local television news.

**Azerbaijan.**  VOA's Azerbaijani Service provides extensive coverage on Muslims in America. In addition, the Service produces special programs on the occasion of Muslim holidays, featuring messages of congratulation by the President of the United States, administration officials, and Congressional leaders. Since the beginning of 2007, the Azerbaijani broadcasts of VOA and RFE/RL reached radio audiences in and around Baku, the capital, via a local 24/7 dedicated FM frequency. VOA has added two daily five-minute newscasts to its ongoing, daily 30-minute radio program. This programming also reached the Azerbaijani speaking audience in Iran via short wave frequencies. The Service also produces a 15-minute TV news program, which is rebroadcast by Azerbaijan TV network six days per week. VOA Azerbaijani maintains two websites, one in Persian-Arabic script to reach the large Azeri-speaking minority in Iran (estimated at more than 15 million). This year, the Service started to send out daily VOA newsletters in Latin and Arabic-Persian scripts to a number of subscribers via the Internet.

Following changes in rebroadcast partnerships, the weekly listenership of RFE/RL's Azerbaijani Service declined to 4.9 percent from 7.7 percent in 2006.  In 2007, however, the RFE/RL Service and VOA Azerbaijani secured re-broadcasting on a new FM frequency in Baku. Programming remains a mix of newscasts and democracy-related programming on political issues and civil society such as human rights, media rights, minorities, judicial rights, religion, and elections. Social issues of health care, pensions, public welfare, unemployment, and drugs increasingly became programming themes.

**Nigeria.**  VOA reaches a large percentage of the almost 250 million Muslims in Sub-Saharan Africa. One in every five Muslims in the world lives in Africa, and roughly one-third of Sub-Saharan Africa's population is Muslim. VOA's biggest audience is in Nigeria, with a weekly audience of more than 21 million adults tuning in to its Hausa or English-to-Africa broadcasts – up from 19 million in 2006. Among the primarily Muslim Hausa-speaking population of Nigeria, over 43 percent listen to VOA at least once a week.

In April, VOA's Central News, Hausa, and English-to-Africa provided on-the-ground coverage of the Nigerian presidential, gubernatorial, national and state assembly elections. VOA Hausa and English-to-Africa broadcasts included live hookups with VOA's three reporting centers in Nigeria, discussions with reporters and stringers on the scene, and interviews with leading political and election officials. VOA's Hausa reporter secured an exclusive interview with the winner of the controversial presidential election, Umaru Musa Yar'Adua, of the ruling People's

Democratic Party, and with opposition candidates. Prior to the elections, VOA Hausa organized two town hall meetings, featuring live panel discussions with politicians, government officials, and leaders of civil society in Kano and in Abuja. Using staff correspondents and 14 stringers throughout Nigeria, Hausa and English-to-Africa Services covered the aftermath of the elections, including violence and complaints of vote rigging.

**Somalia and the Horn of Africa**. VOA established its Somali Service on February 12, 2007, with an on-air promise to listeners that they would hear the voices of Somalis from all political persuasions and walks of life. What started as a 30-minute broadcast expanded to 60 minutes in July and to two hours in early December. One hour is also repeated for VOA's FM Horn Afrik affiliate in Mogadishu. Through its shortwave and medium wave transmissions and its network of 12 affiliate FM stations, the Somali Service reaches a large Muslim population in this critical region. VOA's Somali program is available through rebroadcast by some of the most widely listened-to FM stations in Somalia and the region, including HornAfrik, the network of stations run by Radio Daljir, the SBC in Puntland, and a VOA-leased FM station in Djibouti. HornAfrik's satellite service also broadcasts VOA Somali programs to the Diaspora throughout Europe. Somali websites worldwide provide links to the VOA Somali Service website.

The expanded VOA Somali broadcast has allowed for more interaction with listeners, more in-depth discussion segments, and more regular features on such topics as reconciliation, democratic ideals, development, health, youth, women's issues, American life, and Somali culture. After his recent appointment, Transitional Federal Government Prime Minister Nur Hassan Hussein gave his first broadcast interview to the VOA Somali Service. The Service has also conducted interviews with transitional government President Abdulahi Yusuf and opposition figures such as Islamic Courts leader Sheikh Sharif Sheikh Ahmed.

VOA's Amharic Service also covers news developments in Somalia as well as in Ethiopia and the sub-region. The service offers interviews with Horn of Africa newsmakers and U.S. policymakers and experts, as well as interviews with members of the Somali Diaspora, analysis, cultural features, and music.

**Bosnia and Herzegovina.** VOA broadcasts to Bosnia and Herzegovina include programming targeted to the 49 percent of the population that are Bosnian Muslims. VOA's Bosnian Service has a 15-minute daily live radio show; a half hour daily live television show (news and current affairs); and a variety of short programs aired by the best rated Bosnian television station, BHT1.

In October 2006, VOA Bosnian launched its interactive program segment in partnership with BHT1, Bosnia and Herzegovina's public broadcaster. The segment airs each Sunday during BHT1's primetime news program. Topics range from official Washington policy on Bosnian issues to medicine and technology reports. The Sarajevo-based BHT1 network is internationally funded and is the only station that reaches audiences in both the Bosnian-Croat Federation and Republika Srpska. Programs are also aired by 15 television and 15 radio affiliate stations throughout Bosnia, and are available via satellite.

The Service has worked to promote reconciliation between the three ethnic groups in Bosnia. VOA's news and current affairs programs are tailored to address concerns of the Muslim

population in Bosnia, and provide exclusive interviews with Bosnian political and religious leaders.

RFE/RL's South Slavic and Albanian Languages Service continued to fulfill a unique role in the Balkans with its regional programming. With bureaus in Sarajevo and Pristina, the Service reached Muslim listeners in Kosovo and in Bosnia and Herzegovina with programs that stressed the bonds among the peoples of the former Yugoslavia. The Service broadcasts two popular thirty-minute television programs in Bosnia, *TV Liberty* and *Open Parliament*.

**China**.  Radio Free Asia (RFA) provides service to Muslim audiences through its Uighur language service launched in December 1998. It is the only international radio service providing impartial news and information in the Uighur language to the potential audience of more than 16 million Uighur Muslims in Western China and Central Eurasia. The Xinjiang Uighur Autonomous Region (XUAR) alone comprises roughly one-sixth of China's territory and is estimated to have more than 10 million Uighur speakers.

Consistent with RFA's mandate, the Uighur service acts as a substitute for indigenous media reporting on local events in the region. The service broadcasts two hours daily, seven days a week, often breaking stories that go unreported by China's state-run media or foreign news organizations. RFA provides a forum for a variety of opinions and voices from within the XUAR with its programs, that include breaking news, analysis, interviews, commentary, a hotline call-in show, a weekly news review, and feature stories.

The Uighur Service news and stories feature important interviews with various U.S. and international sources, including officials, scholars, scientists, artists, historians, educators, and human rights activists, as well as Chinese and Uighur dissidents from all over the world. Programs address pressing issues like China's relationship with Central Asian countries, democratic development in Central Asia, Uighur history, literature, the arts, human rights, religious freedom, labor issues, official corruption, the environment, Internet control in China, and AIDS and other health issues. Additionally, RFA brings U.S. policy, debate, and Congressional resolutions on China to its listeners via interviews with members of Congress and other policymakers.

RFA's Uighur service website, launched in September 2004, provides continuously updated news in all three writing systems used to convey the Uighur language, Arabic, Latin, and Cyrillic. RFA's site is the only non-Chinese Uighur news website and the only Unicode Uighur news website. The site streams the daily RFA broadcast in Uighur and offers ongoing coverage of events in the XUAR in text, image, and video. The archived audio files can be retrieved on a special page or downloaded via podcast. RSS feeds are also available, making it possible for people to automatically update their news readers or web pages with RFA news content.

RFA continues to be confronted with unrelenting jamming of broadcasts and blocking of its website. RFA confronts Chinese censorship by broadcasting on multiple short-wave frequencies and by regularly e-mailing instructions on accessing the banned www.rfa.org through proxy web servers. Despite Chinese censorship and the dangers involved, research indicates that Uighur

listeners and web users consider RFA a lifeline in a controlled media environment – a station offering unique content worth taking risks to access.

**Transmission.** Since September 11, 2001, the Broadcasting Board of Governors (BBG) has modernized its transmission capabilities, continuing its move from a predominantly shortwave environment to one that uses AM, FM, satellite, and Internet capabilities to reach its audience. By bolstering transmission capabilities to the Muslim world, BBG has improved opportunities to deliver news and information clearly, reliably, and effectively. New transmission capabilities have been added, and assets reallocated from regions of lesser geopolitical importance and from technologies of declining effectiveness.

The BBG has worked to ensure that programming is delivered in the media that are most effective in reaching local populations. In the past year, transmission facilities in Ismaning, Germany and Delano, California were closed to shift available resources to more effective delivery media. Asiasat 3 replaced Asiasat 2 to deliver BBG TV and radio programs to large audiences throughout Asia on this more popular satellite service. An emergency back-up power system was installed at the IBB Djibouti transmitting facility to overcome erratic local electricity supply problems and to ensure more reliable delivery of BBG medium wave programs to audiences in Sudan and Somalia. A new high power leased medium wave transmitting service from the UAE significantly improved VOA radio transmissions to Pakistan. Higher capacity, more flexible, and cost-effective fiber optic circuits replaced satellite channels between the Far East and Washington. These circuits will facilitate video newsgathering in Asia. In the past year, new BBG FM transmitters came on the air in Ethiopia, Iraq, Lebanon, Sudan, and the West Bank/Gaza.

The BBG is currently supporting the construction of a number of additional FM transmitters in various locations and two high power medium wave radio transmitters that should come on the air in the coming year: one for Pashto programming in Afghanistan and one for Radio Farda programs to Iran. On the Internet, the recently launched VOA *Daily Download* provides a short, lively video feature of current information targeted toward a youthful audience. The use of webchats, blogsites, and other attractive Internet applications have also been expanded as the Internet becomes an increasingly viable information medium in both open and closed societies.

## Presenting the United States Point of View through Indigenous Broadcast Media

At the Department of State, the Bureau of Public Affairs, Office of Broadcast Services uses television and video products as strategic tools for bringing America's foreign policy message to Middle East and worldwide audiences. A state-of-the-art digital broadcast television facility enables the Department to deliver messages instantly, using the same technology as commercial broadcast television networks. Public Affairs facilitates live and taped interviews with the Secretary of State and other State Department principals to all the major Arab networks such as Middle East Broadcasting Corporation (MBC), Al Arabiya, Al Iraqiya, Abu Dhabi TV, Dubai Television, Arab Radio and Television Network (ART), Al Hurra, Kuwait TV, Egyptian TV (ETV), and the Lebanese Broadcasting Corporation (LBC). This investment in people and

technology was developed to give senior USG officials an opportunity to engage and inform the largest audiences possible about our foreign policy and public diplomacy objectives.

To enhance the capacity of the U.S. Embassy in Iraq, the Department of State operates a television studio inside the Embassy. This fully-functioning studio allows senior USG officials to conduct live interviews via satellite with national and international media on a range of topics related to the current situation and future of Iraq, as well as America's role in the broader Middle East.

The Bureau of Near Eastern Affairs, Press & Public Diplomacy Office, through its Arab and Regional Media Unit, has significantly expanded the Department's outreach to Arab and regional media outlets (i.e. print, broadcast, and web) through a strategy of proactive engagement. Since its creation, it has recorded an ever-increasing number of interviews with Arab and regional media outlets. In 2007, the Arab and Regional Media Unit, together with NEA posts, gave over 1,200 interviews to Arabic, Farsi, and Hebrew language media. Many of the broadcasts aired multiple times and were picked up by other regional media outlets and wire services. The Arab and Regional Media Unit has also inaugurated weekly web chats in an effort to utilize new media and reach Arab and regional audiences directly. The new Arabic language web chats allow Arab audiences to interact directly with USG policy makers on topics such as, "What is a Provincial Reconstruction Team (PRT)," "Muslims and Political Participation in the United States," and "Solving the Western Sahara Dilemma."

This capacity was further enhanced by the Office of the Under Secretary for Public Diplomacy and Public Affairs' creation of Regional Media Hubs in London, Brussels, and Dubai. In these key media markets, spokesmen advocate U.S. policies and actively encourage and facilitate a growing number of USG officials to appear on important Arabic, European, and other international media. For example, between November 2006 and November 2007, the Dubai Hub Director participated in 242 on-air interviews, talk shows, and panel discussions (more than 230 of them in Arabic) with Arab broadcast media, including Al Jazeera, Al Arabiya, MBC 1, LBC, Al Hurra, Sharqiyya, Nile TV, BBC Arabic, Radio Sawa, Sawt al Arab, and a number of smaller local and regional stations. The construction of a new broadcast studio at the Brussels Hub, combined with the existing studio used by the London Hub, enables Hub spokesmen and visiting USG officials to quickly reach media and audiences around the world. The London Hub also produces a weekday morning report on the pan-Arab media for readers throughout the USG, matched by the Brussels' Hub morning report on key European media.

A Rapid Response Unit (RRU) monitors and translates major world media in real-time, produces an early morning daily report on stories driving news around the world, and provides language to explain the U.S. position on these issues. It is distributed daily worldwide, to U.S. cabinet and sub-cabinet officials, U.S. ambassadors, public affairs officers, regional combatant commanders, and others across the USG.

**Presenting the U.S. Point of View through Internet-based Media**

The Department of State directly engages participants in online discussion forums on the Internet through the Digital Outreach Team. The Team participates in discussions of policy issues and

related developments on websites in Arabic, Persian, and Urdu. Openly representing the State Department, but using the more informal language of the discussion forums, the Team seeks to ensure that the U.S. perspective is heard in cyberspace, providing a counterpoint to extremist ideological arguments and misinformation. Other public diplomacy efforts of the Department of State and other agencies targeted at countering extremist use of the Internet are coordinated through the interagency Counterterrorism Communication Center, chaired by the Bureau of International Information Programs.

The Department has expanded its web presence via the State.gov website and the America.gov website in English, Arabic, Russian, Persian, French, and Spanish. The introduction of multimedia interactive products such as ads, videos, podcasts, web chats, blogging, and other interactive elements widen audience participation. Country-specific websites run by our Embassies overseas provide a wide range of information and advocate U.S. policies to foreign audiences.

In the absence of a U.S. embassy in Iran, the Bureau of International Information Programs manages a Persian-language website directing policy and general information into Iran. The website supports active engagement via web chats, webcasts, and listservs to connect U.S. policymakers and subject-matter experts with Iranian citizens. IIP's Arabic-language website provides information about U.S. policies, society, and values directly to audiences in the Middle East.

**Presenting the U.S. Point of View through U.S. Missions in the Field**

The Strategic Speakers Initiative (SSI) identifies, recruits, and programs prominent U.S. experts to engage foreign opinion leaders on key strategic themes such as democracy and rule of law, terrorism and security, energy, the environment, and trade and development. A subset of this program is the Citizen Dialogue Program, in which Muslim-American citizens share their personal stories with fellow Muslim cohorts in strategically important countries, many of whom are not aware of the strength and diversity of Muslim life in America. Such speakers can be deployed rapidly to focus IIP resources where the need is greatest to address the most crucial U.S. policy priorities. Strategic Speaker participants are often part of a bigger public diplomacy package that includes web chats, DVCs, and other outreach.

IIP's INFOCENTRAL website provides guidance and background information on U.S. policy priorities to U.S. embassies and military commands worldwide.

**Major Themes of Biased or False Media Coverage of the United States in Foreign Countries and Actions Taken to Address this Type of Media Coverage.**

The Department of State is taking a leading role to counter misinformation and falsehoods about the United States and its policies or intentions. The Department of State's actions to address these false allegations include:

- The Department of State's webpage entitled "Identifying Misinformation," which appears in English and Arabic, provides truthful information and analysis to the public to debunk

false allegations about the September 11 attacks, Iraq, and other issues. (English-language website url: http://usinfo.state.gov/media/misinformation.html.)

- The Department has instructed Public Affairs Officers at our embassies around the world to use information on the website to counter false stories in the local media, or to contact the Department's Counter-Misinformation Officer, who can rapidly provide research and guidance.

**Potential incentives for and costs associated with encouraging U.S. broadcasters to dub or subtitle into Arabic and other relevant languages their news and public affairs programs broadcast in the Muslim world in order to present those programs to a much broader Muslim audience than is currently reached.**

The single greatest incentive for U.S. broadcasters to dub or subtitle their news and public affairs programs would be evidence that there is adequate demand for the programming among the targeted foreign publics. The Office of the Under Secretary for Public Diplomacy and Public Affairs is working with the Bureau of Public Affairs and other elements within the Department to explore avenues to demonstrate that a potentially profitable market exists for this programming. If data emerges that indicates that this translation makes sense from a business standpoint, we will present this data to broadcasters in an effort to encourage this activity.

**Any recommendations the President may have for additional funding and legislation necessary to achieve the objectives of the strategy?**

The President's budget request for FY-2009, the FY-2008 appropriation, and the FY-2007 and supplemental request include a number of initiatives that would aid the strategic objectives of U.S. international broadcasting. The FY-2007 supplemental contained $10 million for the Middle East Broadcasting Networks. As part of the Administration's strategy to counter violent extremism, Al Hurra television is launching a signature three-hour daily program to provide additional information about American policies, people, institutions, and perspectives to its audiences across 22 countries in the Middle East. This program capitalizes on Al Hurra's unique perspective in a growing market of over 200 channels, and would provide a format and information mix unavailable in the region today. Programming would focus on the news of the day, compelling social issues, investigative reporting, and a range of information not presented in the region's media.

The FY-2008 appropriation and FY-2009 request provides ongoing support for this new Al Hurra programming effort, increases Al Hurra's newscast capability to 24 hours a day (expanding from the current 16 hour capability), and allows Radio Sawa to grow as a news source in the region. The FY-2008 budget also continues VOA's Somalia program initiative, and maintains program strength in Iran, Afghanistan, and Pakistan. The FY-2009 Administration budget request includes proposals to continue VOA Somali three-hour daily broadcasts and to launch a "RFE/RL Azerbaijani to Iran" program. Further, our pending legislative request to the Congress to permanently adopt the BBG's pilot program for personal services contracting (PSC) authority, up to a ceiling of 200 PSCs at any given time, would assure the agency the flexibility to meet staffing needs to respond quickly to broadcast requirements.

## 5.6. Visas for Participants in U.S. Programs

According to the State Department's Bureau of Consular Affairs, current visa processing guidelines are sufficient to meet any requirements for the issuance of appropriate visas to individuals from predominantly Muslim nations to participate in any new exchange program, as envisioned by the Intelligence Reform and Terrorism Protection Act of 2004.

The Bureau of Consular Affairs' policy is to expedite all student and exchange visitor applications, with the goal of giving every student and exchange visitor applicant the opportunity to meet their program start date in the United States. This policy is in place at every embassy and consulate worldwide. In countries with a significant waiting period for a visa appointment due to high demand, this policy reduces the wait time for students and exchange visitors from weeks to mere days. In all cases requiring a separate security clearance, the average processing time is now about 25 days. Processing can take longer, however, and applicants should allow additional time. Security clearances can be expedited when circumstances so warrant.

The most important factor in expediting visa applications is for the applicants, in conjunction with their program sponsors, to initiate their visa applications well in advance of their planned travel. Most problems in the visa process can be resolved given sufficient time. New exchange programs should be planned far enough in advance to allow the necessary time for visa processing. Candidates should be advised to obtain passports immediately, visit embassy websites for instructions on applying for U.S. visas, and ensure they follow instructions concerning required documents and procedures, as well as for information on how to complete an Electronic Visa Application Form (EVAF) and how to arrange an appointment.

## 5.7. Basic Education in Muslim Countries

The Department of State, USAID, and other U.S. agencies continued to support an increased focus on education in predominantly Muslim countries and those with significant Muslim populations. The United States' approach stresses mobilizing public and private resources as partners to improve access, quality, and the relevance of education, with a specific emphasis on developing civic-mindedness in young people. In many Muslim-majority countries, such as Afghanistan and Yemen, the challenge was to increase country capacity to provide universal access to primary education and literacy. Countries faced increasing enrollments and low education quality in the classroom while struggling with limited budgets.

In the Middle East, USAID and the Department of State's Middle East Partnership Initiative (MEPI) promoted quality education through improved policy, teacher training, education, finance/governance, and community participation. These U.S. efforts complemented investments of partner countries and other donors. Between FY-2002 and FY-2007, MEPI funding for projects in basic education totaled approximately $90 million.

**The U.S. Strategy to Meet Challenges in Education**

To promote transformational diplomacy and development, the Department of State and USAID have articulated a common Foreign Assistance Framework. In the framework's "Investing in People" objective, education is a major element with basic education as an important sub-element. This strategy is applied to programs worldwide, including Muslim countries.

**Basic Education:**  USAID has an agency-wide *Basic Education Strategy* that targets underserved populations and promotes free universal basic education. The goal is to help learners gain the general skills and knowledge needed to function effectively in life. Basic education programs focus on three areas, which also provide the strategic goals for the Middle East Partnership Initiative's (MEPI) education programming in the Middle East and North Africa:

- **Increasing Access:**  Targeting groups that have been marginalized in the education system such as minority, rural, out-of-school youth, girls, and young adults, and those who have been impacted by conflict or disaster, thus helping ensure equitable access to education.
- **Improving Quality:**  Improving the quality of education is pivotal for ensuring attendance and learning outcomes of basic education. Increasing attention is placed on curriculum reform and measuring learning outcomes.
- **Improving Relevance:**  Education programs develop human capacities and livelihood skills, and aim to link learning with skill development and employment opportunities, particularly in areas with high youth unemployment.

In designing and implementing basic education programs throughout the world, USAID works closely with host-country governments (national and local), non-governmental organizations, communities, and the private sector to maximize program impact and sustainability.

**Working with the International Community.**  The United States continued to be an active member of several international bodies and activities to achieve universal basic education, including the International Working Group on Education, which originally proposed the "Education for All" (EFA) initiative begun in the late 1980s.

**Coordination of the International Effort.**  USAID provides technical guidance to the EFA effort through the UNESCO-aligned International Institute for Educational Planning. The U.S. Director of Foreign Assistance represents the United States at the annual EFA high level group meeting.  The USAID Office of Education participates in the annual EFA working group meeting. USAID has participated in all Fast Track Initiative (FTI) meetings since its inception in 2000.

In engaging the G8 and Muslim country governments for Broader Middle East and North Africa (BMENA) initiatives, USAID collaborates closely with the State Department and key cooperating U.S. agencies, especially on literacy. At the June 2004 G8 Sea Island Summit, the G8 launched the BMENA Literacy Initiative aimed at halving illiteracy rates in the region by 2015. This initiative launched a series of Literacy Working Group and Education Ministerial Dialogues in the BMENA region. Education Ministers from the BMENA region and the G8 met in Jordan in May 2005 and in Egypt in May 2006, and confirmed their commitment to the process of cooperation under the umbrella of the Forum for the Future launched in Rabat in

December 2004. Following the Egypt Ministerial, USAID took over as G8 co-chair of the BMENA Literacy Task Force with Egypt as regional co-chair. As part of the USG contribution to this international effort, USAID is supporting literacy assessments in the region and has developed the BMENA 'Literacy Hub' database of global best practices in promoting literacy.

**Leveraging Other Donors.**  USAID coordinates closely with multilateral donors (e.g., the World Bank (WB) and the Asian Development Bank (ADB)) and other bilateral donors in each country, often extending the reach of USAID programs. In Indonesia, the Australian bilateral aid agency, AusAID, used USAID pilot education program as the basis for its new basic education project. Collaboration with AusAID, as well as other donors such as UNICEF, continued during implementation in the form of jointly-prepared training materials and activities in communities to avoid duplication as well as to combine approaches in working with local and national officials. This coordinated approach has extended donor program coverage in Indonesia in the education sector.

In Tajikistan, training modules on interactive learning and teaching methods and teacher trainers support the Government of Tajikistan's implementation of the EFA FTI, leveraging funds of approximately $1.6 million. The USAID basic education project also complements WB and ADB projects in the area of education finance, curriculum revision, teacher training, and strengthening capacity of teacher training institutes. In Kyrgyzstan, a USAID-supported independent testing organization won a WB tender to implement student assessments. USAID-developed teacher standards are used in revision of the teacher incentive system. The basic education project collaborates with the ADB project by providing training for textbook authors.

**Leveraging Contributions from the Private Sector and Civil Society Organizations.**  The USG uses its Official Development Assistance (ODA) to leverage other resources for education by developing alliances or partnerships with the private sector and NGOs, including civil society organizations. USAID's Global Development Alliances (GDAs), also known as public-private partnerships, are tailored to country-specific needs and the private sector partners' interests. Below are several examples of ongoing and new country-specific partnerships in the region:

- **Western and Central Mindanao, and the Autonomous Region of Muslim Mindanao in the Philippines.** There are currently six GDA partnerships, with the goals of: increasing educational opportunities for children by ensuring access to quality education; improving the capacity of teachers; raising math, science, and English skills among elementary school beneficiaries; increasing employment opportunities and engaging young leaders; providing business and skills training for out-of-school youth; and providing opportunity for school drop-outs and out-of-school youths to rejoin formal schooling through an accreditation and equivalency mechanism. With approximately $12 million in USAID funding, an additional $42.7 million was leveraged (more than a one-to-three leverage) from private businesses, local NGOs, foundations, and national government agencies.

- **Indonesia.** Public-private partnerships are being used to expand the reach of USAID activities and to respond in natural disaster situations. A partnership with BP is helping improve education quality in Papua, one of the most underserved and isolated areas of

Indonesia. An alliance with ConocoPhillips is helping restore education services in communities affected by the May 2006 earthquake that struck Yogyakarta and Central Java.

- **Morocco and Jordan**. USAID information technology partnerships with Cisco Systems, Inc., UNIFEM, and the Governments of Morocco and Jordan have introduced Cisco Certified Network Associate and job-readiness training to eleven Moroccan institutions (900 students, 49 percent women) and to over 600 students (all women) in Jordan. In both countries, there is a focus on job skills and placement for women. In Morocco, 900 students, more than 50 percent of whom are women, have benefited (or are still benefiting) from the Cisco Certificate programs and job-preparedness training. Fifty percent of the first group of students who completed the program found jobs within six months after graduation.

USAID's Office of Middle East Affairs recently finalized a new GDA that will engage and support emerging youth leaders in Egypt, Jordan, Lebanon, Yemen, and West Bank/Gaza. Save the Children International, in partnership with the Ford Foundation, will create a youth development tool kit and link emerging young leaders to a network of youth development workers and institutions that assist young people to build leadership capacity and exercise positive, moderate leadership behaviors within a community development context.

In cooperation with the Department of State's Middle East Partnership Initiative (MEPI), Scholastic Inc. is providing 8.2 million Arabic-language classroom libraries to more than 40,620 classrooms in more than 6,770 primary schools in the Middle East and North Africa. Scholastic's substantive contribution allows MEPI to leverage its $12 million investment in this critical-thinking and independent reading skills development program. In another example, MEPI's partnership with the CISCO Learning Institute developed on-line English language curricular materials to complement the efforts of the private sector-based World Economic Forum (WEF)-sponsored Jordan Education Initiative.

**USG Coordination to Reduce Duplication and Waste.**  The Department of State and USAID work closely together implementing their Foreign Assistance Framework, which includes education. Through this framework and a joint Operational Plan process, the Department of State and USAID coordinate to reduce duplication of effort and/or waste.

USAID collaborates actively with the Department of State's MEPI to promote education in Muslim countries within the Near East region, with a focus on civic education. The MEPI education pillar supports education systems that enable all people, especially girls, to acquire the knowledge and skills necessary to compete in today's economy, participate actively and effectively in the civic arena, and improve the quality of their lives and that of their families. MEPI and USAID coordinate to minimize any potential duplication of efforts and investments. A modest number of MEPI-funded education programs, notably the support for the Arab Civitas network, are implemented in conjunction with USAID. MEPI is also providing funding for an Arabic version of the Global Learning Portal, a project under the auspices of the BMENA initiative.  The Portal will provide new avenues of professional collaboration and benefit educators and idea leaders across the Arab world.

**Training and Exchange Programs.**  Bridging both basic and higher education, USAID and the State Department coordinate in the area of providing training and exchanges for students from Muslim-majority countries to the United States. In addition to the educational value of these kinds of interventions, participants are exposed to American values, culture, and democratic institutions. Many of these programs directly benefit basic education. In Egypt, 100 scholarships will be awarded to enhance the Education Ministry's technical college instructor capacity through "Train-the-Trainer" teacher preparation programs. In Pakistan, secondary school educators will attend a five-week program in the United States, focusing on mathematics, science, and classroom technology.

**Scholarship Programs.**  The Middle East Partnership Initiative (MEPI) has launched two new pilot scholarship programs, the basic-education based "MEPI Scholarship Program," and the higher-education based "Tomorrow's Leaders" program, using $9 million in FY-2006 funds. The MEPI Scholarship Program is providing disadvantaged youth with the opportunity to receive a democratic based education (grades 7–12) at American-sponsored schools abroad. The program was launched in Oman, Egypt, Morocco, and Jordan, for the September 2007 school year and was enthusiastically received by teachers, parents, students, and the communities. With an additional $2.7 million in FY-2007 funds, the program has grown to include more students at the initial pilot schools and has expanded to include the affiliate school in Lebanon. The "Tomorrow's Leaders" scholarship recipients will be selected from among the underserved around the Middle East and North Africa, and the scholarship will provide them with a four-year academic and internship/study-abroad opportunity with specialized curricula to develop their civic engagement, entrepreneurial, and leadership skills.

USAID's **Training Future Leaders** initiative highlights the importance of U.S.-trained scholars and their unique role in developing their nations upon returning home. A USAID analytical study on prior USG investments will inform future program design and provide a "best practices" framework for long-term training programs. Currently, field research is being done in Yemen, Egypt, Nepal, and Indonesia. This program complements ongoing efforts carried out by the Department of State's Bureau of Educational and Cultural Affairs and MEPI.

**Funds Needed to Achieve Universal Basic Education.** UNESCO estimates that $5.6 billion is needed per year to achieve EFA by 2015. Globally, UNESCO estimated that 103 million children were out of school in 2002/2003. For the countries in the Muslim world, this figure is estimated to be around 45 million. Estimating that it costs roughly $50 per year per child to complete basic education (six years of schooling), it would cost $2.2 billion per year in Muslim countries as a whole to achieve universal basic education.

**Efforts to Encourage Development and Implementation of a National Education Plan.**
In countries with predominantly Muslim populations, the effectiveness of basic education systems is at the crux of their development and of their potential to moderate the negative influence of low growth, joblessness, lagging social services, and despair. The USG encourages countries to develop and implement national education plans by offering assistance to support education, reform developments, and program funding once reforms have moved into the implementation phase. The United States has influenced national education plans and reform by

way of pilot programs that model best practices in education. These positive experiences galvanize support for broader change and can impact the education system beyond the pilot programs' localities. Model programs also potentially have an impact outside of targeted interventions. In Indonesia, for example, USAID helped the provincial government of Aceh with its new long-term education strategy, developed after decades of conflict and the 2004 tsunami. This strategic plan was recently endorsed by the Government of Indonesia's Ministry of National Education.

**Fulbright-Hays Programs.**  Under authority of the Mutual Educational and Cultural Exchange Act of 1961 (Fulbright-Hays Act), the State Department's Bureau of Educational and Cultural Affairs conducts a variety of programs designed to increase mutual understanding, promote international cooperation, and foster friendly and peaceful relations between the United States and other countries in the world.

Among the programs relevant to this report are the following:

The **English Access Microscholarship Program (Access)** provides English classes for deserving high school students from non-elite sectors in countries with significant Muslim populations and other key student audiences. Students receive language instruction in a civic education context and become more competitive for future job and educational opportunities. Access also prepares them to be considered for other U.S. exchange programs.

Through its **Youth Exchange and Study Program (YES)** and **Future Leaders Exchange Program (FLEX)**, the State Department brings high school students to live with American host families and attend American high schools for one academic year. Participants in the YES Program are from countries with significant Muslim populations, while FLEX students are from Eurasia. Both the YES and FLEX students perform community service while in the United States, and have the opportunity to take part in a number of enhancement activities designed to heighten their awareness of civic responsibility and leadership.

Under **Youth Leadership Programs,** high school students and educators from all regions of the world come to the United States for two to four-week programs that focus on specific themes related to science, cultural heritage, leadership development, civic education, conflict management, and community activism.

The **Teaching Excellence and Achievement Program** (TEA) provides secondary school teachers from Eurasia, South Asia, and Southeast Asia with unique opportunities to enhance their teaching skills and increase their knowledge about the United States. The participants attend a six-week professional teacher development program in the United States, which includes a three-week internship at a secondary school where participants actively engage with American teachers and students. Also, the TEA program provides follow-on grants to the international teachers to purchase essential materials for their schools, to offer follow-on training for other teachers, and to conduct other activities that will build on the exchange visits.

The State Department's **International Leaders in Education Program** is a semester-long program for secondary teachers that includes university coursework, intensive training in

teaching methodologies, leadership development, and use of computers as tools for teaching. The program includes an eight-week internship at U.S. secondary schools to engage participants in the American classroom experience. The program currently serves Algeria, Bangladesh, India, Indonesia, Jordan, Lebanon, Malaysia, Morocco, Tunisia, and Yemen.

The State Department's **Global Connections and Exchange Program** seeks to promote mutual understanding and civic education in countries with significant Muslim populations by bringing together more than 1,000 schools from 16 countries for online collaborative projects that focus on professional development, media literacy, and civic education. Teachers also develop skills needed to participate in collaborative activities with U.S. schools, and teachers and students are offered opportunities to travel to their partner schools as a way to strengthen mutual understanding and solidify virtual relationships through face-to-face meetings.

Since 2005, MEPI has worked in partnership with Ministries of Education in Yemen and Algeria to help them refine and implement their National Education Plans. Efforts in Yemen focused on developing a workable strategy by which to incorporate information technology into Yemen's broader education goals.

**Closing the Digital Divide and Expanding Vocational/Business Skills**

To "close the digital divide" and expand vocational/business skills, USAID, the Department of State, and other agencies implement public-private partnerships, information technology in the classroom, school-to-work and workforce training programs, improved quality of basic and secondary education programs, scholarships, and exchanges. A few programs are highlighted below.

- The **Education and Employment Alliance** promotes private sector participation in Egypt, Morocco, Pakistan, India, Indonesia, and the Philippines to enhance skills and improve education and employment opportunities among over one million underserved youth. In addition to local profit and non-profit partners, corporate partners include Chevron/Unocal, GE, Ink Media, Lucent, Microsoft, Nike, and Oracle.

- **The Middle East Partnership Initiative (MEPI)** is partnering with the Education for Employment Foundation (EFE) and with businesses, universities, and private organizations to create four highly scalable and replicable youth education and employment programs that offer real employment to 80 percent of all graduates. The programs are as follows: in Egypt, both a "Mini MBA" accounting training and a textile management and workplace for success training program; in Morocco, sales force training; in Jordan, vocational scholarships and workplace for success training; and in Yemen, IT training. EFE will also create an affiliate foundation in Yemen that will partner with business, universities, and civil society leaders that are dedicated to youth education and employment to develop employer-driven education and training linked to jobs. This initiative also supports broader education goals articulated under BMENA.

- **MEPI's** Partnership Schools Program in Algeria launched a pilot e-Math initiative to develop and implement a web-based math curriculum for primary school students. In the

first year of implementation, students in the pilot province of Ghardaia improved their success rates on end-of-year exams by an average of 20 percent. MEPI's **E-Enabled Civics** project in Jordan leverages the efforts underway through the Jordan Education Initiative and has developed new, on-line, interactive civics material to support the revised civics curriculum for grades 7-12.

- The USAID **Internet Access Training Program** (IATP), administered by the International Research and Exchanges Board (IREX) since 1995, provides free Internet access and training in 11 countries throughout Central Asia, the Caucasus, and Western Eurasia. From major cities to small communities, IATP encourages information sharing, network building, and collaboration among USG exchange alumni and other targeted audiences. IATP staff train alumni and other targeted audiences in the effective use of the Internet and sponsor the development of local language websites. The centers also conduct training in basic civics, entrepreneurship, and English.

- **USAID and the Intel Corporation** signed a Memorandum of Understanding in December 2006 to broaden access and usage of information and communications technologies (ICT) in developing communities around the world. This alliance envisions collaboration and partnership in the following areas: enabling "last mile" Internet connectivity and locally relevant applications; supporting ICT usage and deployment by small and medium-sized enterprises to enhance economic development opportunities; and increasing the use of ICTs to support education and health. Intel's prior experience in the education sector includes software development and teacher training programs for K-12.

**Countries Eligible for Assistance.** USAID education programs in Muslim-majority countries and countries with large Muslim populations potentially overlap with and reinforce those which might be targeted by the USG's International Youth Opportunity Fund [Section 7114(b)]. Below is a list, though not exhaustive, of programs in the Asia Near East, Africa, Europe, and Eurasia regions.

- **The Asia Near East region** contains several Muslim-majority countries with significant education needs. Basic education program highlights include:

  o **Afghanistan.** Students need to catch up to their appropriate grade level because many children and youth lost years of formal schooling. USAID created an accelerated learning program, compressing two years of study into a single year through innovative teaching techniques. This program has trained around 10,500 teachers and enrolled nearly 170,000 students. More than half the students are girls. In addition, USAID has printed and distributed nationwide 48.5 million textbooks for grades 1-12. Since 2002, USAID in conjunction with the Ministry of Education has built or refurbished 622 schools, mostly in remote areas.

  o In **Bangladesh**, Sesame Street Bangladesh, known locally as Sisimpur, is USAID's most recognized activity in the country. The program began airing in April 2005 and is the first show of its kind in Bangladesh. The half-hour television programs provide access to literacy, numeracy, and critical thinking

skills for almost half of the estimated nine million three to six-year-olds in Bangladesh. This prepares them for learning success and helps to combat traditionally low achievement and high drop out rates in the lower primary grades. USAID also supports the Early Learning for School Success Program (SUCCEED) operation of 1,800 preschools which prepare preschool-aged children for school by improving reading and math skills and expanding access to primary schools. A further aim of the program is to increase children's confidence and to reduce high dropout rates by enriching early learning opportunities prior to formal education. The program has established 1,800 preschools across the country (600 are based in schools and 1,200 are based in homes) and trained over 1,800 preschool teachers in new interactive methodologies.

o   USAID/Egypt supports the Government of **Egypt** in sustaining improvements in learning outcomes in grades K-12. The program focuses on improving teaching and learning, increasing equitable access to education, and strengthening management and governance in seven governorates. Activities include in-service teacher training, school libraries, information technology, and some school construction in remote and densely populated areas. To date, USAID has also provided 5 million books to over 5,000 Egyptian primary schools. Over 39,000 students now have access to computer technology. USAID has built 70 new girls schools serving almost 40,000 students. USAID supported the development of the Egyptian Sesame Street, which helps over 85 percent of all children under age eight acquire early literacy and numeracy skills.

o   The program in **Indonesia,** the world's largest Muslim country, works with over 100 districts (25 percent of the nation), providing training and technical assistance to school officials, communities, and local governments on education management and finance. This Presidential initiative also includes in-service teacher training, mentoring, and teacher resource centers to improve the quality of classroom instruction. Over 245,000 junior secondary students and out-of-school youth are learning employment-related life skills while working toward school completion or its equivalency. USAID supports an Indonesian version of *Sesame Street,* which went on the air in 2007. Through direct assistance and dissemination of best practices, education programs are expected to reach 9,000 public and private schools, 2.5 million students, 90,000 educators, and one million out-of-school youth by 2010.

o   In July 2003, the Government of **Jordan** launched a five-year, $380 million program, developed with USAID assistance, Education Reform for the Knowledge Economy (ERfKE) initiative. This initiative is one of the most ambitious education reform programs in the Arab region to date; its goal is to re-orient education policy, restructure education programs and practices, improve physical learning environments, and promote learning readiness through improved and more accessible early childhood education. USAID, in coordination with Jordan and eight other donor nations and multilateral organizations, will provide $80 million during this strategy period to support reform efforts through

ERfKE. USAID's efforts under this initiative:  assist the Government of Jordan's early child care initiative, creating 100 public kindergartens, field-test curriculum, and develop an accreditation system; develop school-to-work programs and an IT curriculum stream for high school students; connect 100 'Discovery' schools to broadband and test e-learning modules for all subject; expand youth and life skills programs to secondary schools in new underserved areas in Jordan; and, construct up to 28 new schools and rehabilitate another 100 schools to create the appropriate learning environment that supports the reform efforts and accommodates the recent influx of refugees from the region.

o   In **Pakistan**, USAID supports the government's education reform strategy by: strengthening education policy and planning; improving the skills and performance of teachers and administrators; increasing youth and adult literacy; expanding public-private partnerships; and, providing school improvement grants and involving parents and communities in public schools. Over 9,000 parent-teacher associations received school improvement grants helping communities to build over 3,000 new classrooms, reconstruct over 1,000 more classrooms, build over 1,200 toilets, and repair another 1,000. In addition, in the Federally Administered Tribal Areas (FATA), USAID is constructing and furnishing 65 primary, middle, and high schools. USAID is building or restoring water and sanitation facilities at 190 girls' schools. Scholarships have been awarded to 57 women from this area to attend a one-year, pre-service teacher education program.

South Asia also contains countries with significant Muslim populations though not in the majority, such as India with the second largest Muslim population in the world.

o   **USAID/India**'s pilot program introduces the formal curriculum in eleven Islamic religious schools (madrassas), complementing the Indian government's efforts to modernize madrassa education. The program reaches over 2,500 out-of-school youth and working children, particularly adolescent girls. A state government has decided to scale-up this model with its own resources, benefiting over 90,000 children in 1,200 madrassas by September 2008.

o   In the **Philippines (Mindanao)**, education programs aim at improving education quality and access, and providing livelihood skills training for out-of-school youth. USAID and the U.S. Peace Corps jointly help improve instruction in English, science, and math by training over 21,000 elementary and secondary school teachers, as well as mobilizing over 300 Parent-Teacher Community Associations. Computer and Internet education was also introduced.

o   **The sub-Saharan Africa region** includes a number of important Muslim and Muslim majority countries, in which support for basic education activities and improved learning opportunities for in-school and out-of-school youth figure prominently. While USAID has been working with predominately Muslim countries and communities in the education sector in Africa from the 1960s, since

the events of 9/11, the Africa Bureau's Office of Sustainable Development (AFR/SD) has re-evaluated the role of education and taken a more strategic approach to address the concerns of a post-9/11 society. USAID partners with Muslim communities to ensure that children in these communities are receiving the best and broadest education possible and that USAID is working collaboratively to create an enabling socio-economic environment that will ultimately lead to greater global peace, security, and understanding.

In support of President Bush's $100 million **East Africa Counterterrorism Initiative (EACTI)**, USAID initiated programs in East Africa in 2003 that provided basic education opportunities in marginalized Muslim communities. The targeted countries included Kenya, Uganda, Tanzania, and Ethiopia. Eritrea had been part of the original list, but was eliminated when USAID/Eritrea ended its operations. A summary of these programs include:

- o **USAID/Ethiopia** implements various activities in Muslim-dominated areas particularly in Somali, Afar, and Oromia regions. The activities include support to pre-service and in-service teacher training to improve the quality of primary education; provision of capacity-building training for Parent Teacher Associations (PTAs) and community members to increase parent and community involvement in school management; building the capacity of education officers to improve the planning and management of the education system; and establishment and expansion of alternative basic education centers to provide non-formal primary education to children, especially girls, and adult literacy classes for illiterate Muslim men and women.

- o **USAID/Kenya's** basic education program, Education for Marginalized Children in Kenya (EMACK), is concentrated in the North Eastern and Coast Provinces. Both Provinces have predominantly Muslim populations and the lowest education statistics in the country. This education portfolio began in 2004 with supplemental funding specifically targeted at Muslim communities. At the end of two years the project has had a tremendous impact on enrollment and retention. Over 100,000 children have been reached in the Coast Province. Approximately 250 Early Childhood Development Centers have been supported; over 2,000 teachers were trained in child-centered teaching methods. To date, the School Infrastructure Program has successfully built 107 classrooms, three dining halls, eight dormitories, and supplied 2,000 desks and 300 bunk-beds with mattresses.

- o **USAID/Tanzania's** program focuses on strengthening primary school performance in general and secondary school performance in math and sciences over the next five years. USAID will focus basic education activities for under-served children (especially girls in Muslim and pastoral areas). The U.S. basic education initiative will provide training and materials to teachers and students, allowing thousands of Tanzanian students to receive textbooks written in Kiswahili and allowing girls to receive scholarships. U.S. resources will enable two programs to lay the groundwork over the next five years to:  increase the number of girls receiving preschool, primary, and secondary education; improve

primary and secondary skills in math and science; and provide specialized training for teachers in math, science, English, and the needs of children with disabilities. USAID works with Muslim and pastoralist populations in geographic areas where there is little or no donor support.

USAID/Tanzania will continue enhancing service delivery in Zanzibar, while adding two pilot districts (Lindi Urban and Mtwara Urban) on the southern Tanzanian mainland. Over 36,000 secondary, 64,000 primary, and 7,000 pre-primary school students will benefit from U.S. support targeting education delivery systems at local, district, and regional levels. In addition, an innovative radio instruction activity will focus on pre-primary and primary-level education. The radio instruction activity will establish 100 informal learning centers, and pilot radio instruction in 40 primary-school classrooms in Zanzibar. In addition, isolated communities in pastoralist areas will establish 70 Community Learning Centers providing equitable access to education for 14,000 children by FY-2008. Children will benefit from quality basic education in Kiswahili, English, math, social studies, science, and life skills.

o **USAID/Uganda** supports Madrassa Early Childhood Development (ECD), which targets poor communities and builds on existing informal early child education at selected community mosques. Through the Madrassa Resource Centre, communities are supported to establish and manage their own pre-schools by using intense community participation in pre-primary education. The education activities follow a unique structure that was exclusively designed for Madrassas in the Ugandan context. The project seeks to provide access to high quality, culturally relevant, and affordable early childhood education in order to increase the chances children from underprivileged communities will access and succeed in later formal education. To date, the project has achieved the following: 15 community schools have been mobilized and are participating in the program; 13 community schools are being supported post graduation to ensure the long-term sustainability of the pre-schools; 1,207 children are currently enrolled in the new schools and other schools supported by the ECD activity; 282 Schools Management Committee members received training on how to manage their schools; 120 ECD teachers have been trained in ECD methodologies; and 1,810 parents have been mobilized to send their children to the community schools.

In support of the **Trans-Sahara Counterterrorism Partnership (TSCTP)**:

o **USAID/Mali's** basic education program focuses on supporting moderate madrassas and improving the quality of primary education for Mali's predominantly Muslim population. The program reinforces the Ministry of Education's management capacity; provides school-based and radio-based teacher training; develops interactive radio instruction for students; promotes adult literacy; and mobilizes communities to better manage and advocate for their local primary schools. In the three northern regions of the country, USAID provides scholarships for over 6,000 disadvantaged girls each year.

254

- o **USAID/Senegal's** program aims at improving basic education in Koranic schools and currently benefits approximately 4,800 vulnerable children living and studying in these schools. The pilot activity, funded by TSCTP, was launched in late 2005. It supports improvements in the living, health, nutrition, and learning conditions of children in Koranic schools. It accomplishes this through the provision of: hot meals; basic learning materials such as pens, books, and notebooks; and first aid kits. The program also provides training to teachers on how to effectively teach languages, math, life skills, and health education. Vocational training is also offered in the areas of carpentry, sewing, masonry, and tannery. Over the past few months, the leaders of these schools have become increasingly receptive to incorporating secular education in their curriculum and in promoting better nutrition and hygiene among their students.

- o USAID's efforts through the President's Africa Education Initiative (AEI) in **Niger, Chad, and Mauritania** complement the TSCTP's efforts to counter extremism and terrorism. In these countries, USAID has used the AEI's Ambassador Girls' Scholarship Program to improve access to quality education for girls and to engage parents and communities in the north of Mali and throughout Niger, Chad, and Mauritania.

While not part of EACTI or TSCTP, other countries have benefited from USAID's Africa Bureau's efforts to reach out to Muslim populations, including Somalia, Sudan, and Djibouti in the Horn of Africa and Nigeria in the West.

- **USAID/East Africa** has been supporting education programs in Somalia since 1994. The current education program uses radio to deliver high-quality, interactive instructional programs to marginalized children. The radio programs are currently being broadcast throughout Somalia, including in Mogadishu. The instructional radio program will target out-of-school youth and Koranic schools in Muslim communities.

- **USAID/Sudan** efforts are focused on the Three Areas and southern Sudan and engaging in national development. USAID continues to implement programs to enhance inter-religious peace-building through improving education access. Formal and non-formal programs focus on primary and girls' education, teacher training and institutional development, targeting out-of-school youth, women, girls, returnees, and other vulnerable groups. The USG is expediting the provision of primary education and adult literacy through radio-based instruction to provide a quality standard of learning both for students and teachers. Conflict resolution, recovery, and prevention are integrated to support the peace process.

- **USAID/Djibouti.** Since 2003, USAID has supported Djibouti's education reform program, to: increase access through school rehabilitation, renovating/building water and sanitation facilities, and the provision of textbooks, equipment and kits; improve quality through teacher training, development of teachers' and school principals' guides, provision of English Language teaching and teacher training for secondary and university

levels, and construction and equipment of pedagogic resources centers, as well as improving supervision; and, improve community participation and increase girls' education through the provision of scholarships to 1,000 girls and non-formal education programs for out-of-school youth, especially girls. USAID collaborates with the U.S. Embassy and the Combined Joint Task Force/ Horn of Africa.

- **USAID/Nigeria** began support to the education sector in 1999. The first three-year program: focused on increasing teachers' instructional skills in English literacy and numeracy; used interactive radio instruction; increased community/PTA involvement in schools' management; increased child-focused classroom instructional methods; and increased local and state government skills in school-based data collection and use (this aspect evolved into the current Government of Nigeria's National model). Some 25 percent of participating schools were Islamic, the balance were public. The current program integrates health and education activities, focusing on increasing teachers' instructional skills in English literacy and numeracy. The use of interactive radio instruction increases community/PTA involvement in school management and addresses school health and nutrition issues.

In **Europe and Eurasia** the dissolution of the Soviet Union, followed by the creation of new independent countries in place of the former Soviet republics, and the drastic deterioration of the economic situation during the 1990s, forced many of the new governments to reduce drastically the country's share of the Gross Domestic Product (GDP) allocated to the education sector. The economic downturn and the challenges of restructuring the economy and the education sector have been particularly severe in Tajikistan, which suffered from a five-year civil war (1992-97).

In 2003, to support the efforts of the Central Asian countries to reform the education sectors, USAID has implemented a regional education project in Tajikistan, Kyrgyzstan, Uzbekistan, and Turkmenistan. Although regional in implementation, the project takes into account the specific needs of each country and aims to utilize windows of opportunity as they arise. The **Basic Education Strengthening Program (PEAKS)** focuses on five major aspects of the education system: in-service teacher training; classroom-level learning materials and textbook development; parent and community involvement in education decision making; management and technical capacity at all levels of the education system; and, rehabilitation of school infrastructure. The program is implemented in close collaboration with the respective Ministries of Education, Ministry of Finance, teacher training institutes, and other pedagogical and research institutions. USAID also facilitates donor-host country dialogue and collaborates with other donors to ensure complementary design and delivery of education activities.

**USAID/E&E EDUCATION PROGRAM IMPACT IN FOUR MUSLIM MAJORITY CENTRAL ASIAN COUNTRIES (2002 - 2006)**

| TYPE OF PROGRAM | MAJOR PROGRAM COMPONENTS | REGIONAL IMPACT (approximate numbers) |
|---|---|---|
| **Increase Access to Education Opportunities** | • School and classroom construction and rehabilitation | • Rehabilitated 113 schools (Kyrgyzstan, Tajikistan, Uzbekistan) |

|  |  |  |
|---|---|---|
|  | • School finance | • Piloted new school finance mechanism based on per capita funding formula to improve efficiency. Results include more efficient student/teacher ratios in pilot areas (Kyrgyzstan, Tajikistan, Uzbekistan). |
| **Increase the Quality of Education** | • Teacher training | • 8,142 primary and secondary school teachers trained in interactive, student-centered methods with mentoring and other follow-up support (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan). |
|  | • Community and parental involvement | • 174 school community committees strengthened to support school quality improvements (Kyrgyzstan, Tajikistan, Uzbekistan). |
|  | • Model school program | • 300 "Model Schools" model best practices in the use of new teaching methods, management practices and community involvement (Kyrgyzstan, Tajikistan, Uzbekistan, Turkmenistan). |

**Kyrgyzstan.** Strengthening the ability of the education sector to deliver quality education relevant to the needs of market-based democracy will facilitate Kyrgyzstan's democratic transition and economic performance and competitiveness. USAID provides teacher training and resource development for 11 pilot schools, which in turn will serve as teacher training centers for 84 cluster schools. The Professional Development Schools (PDS) have been recognized by the Government of Kyrgyzstan as the alternate teacher training providers, a significant accomplishment in a country with a highly centralized educational system that does not readily look to alternate service providers. The Government of Kyrgyzstan pays a salary for a PDS coordinator. From the inception of the project, 90,268 students have benefited from this program and 12,062 teachers have received training. In addition, USAID funds the Kyrgyz National Scholarship Test, which helps to fight corruption by enabling high school graduates to receive merit-based scholarships for higher education.

**Tajikistan.** Keeping momentum towards democratic reform in Tajikistan is critical, and a strong education system is an important tool to support that goal. While the basic education project initially focused on primary grades that were considered in most urgent need of support, additional resources allowed the project to expand to cover grades 5-11 and to introduce the

Reading, Writing, and Critical Thinking Program. From the inception of the project, 53,105 students benefited from this program and 481 teachers received training.

In addition to the regionally implemented PEAKS project, USAID is also supporting a basic education project through the Aga Khan Foundation (AKF). This project works in remote, mountainous areas where teachers seldom have access to professional development activities. As a result of teacher training improvements, teachers report increased attendance, return to school of students who stopped attending, and new motivation to study among the students. From its inception, the USAID-AKF project has benefited 5,000 students and trained 1,057 teachers.

**Turkmenistan.**  Turkmenistan has taken the disturbing step of essentially eliminating upper secondary education by reducing the length of study to nine years instead of the standard ten years (under the Soviet system). In addition, the shift to the almost total reliance on the late President Niyazov's books (Rukhnama) as the primary curriculum, which emphasizes loyalty to the president and his spiritual teachings, has resulted in devastating deterioration of education quality and relevance and created a vast knowledge vacuum which will affect many generations to come. Young people under the age of 15 make up nearly 35 percent of the population in Turkmenistan - the second largest percentage of youth in the Europe and Eurasia region. As a result of the President Niyazov's education reforms, upper secondary enrollments have fallen from 67 % to 27 % since 1991. This means that approximately one in four students aged 15 to 18 is enrolled in school.

Besides a small-scale UNICEF initiative in primary and secondary education, USAID has been the only other donor involved in education. Although the Government of Turkmenistan has not formally endorsed the program, it has allowed interested schools to work with the USAID-funded project. Assistance-to-date has focused on teacher training in interactive teaching and learning methods. Up to now, 57,335 students have benefited from the project and 533 teachers received training.

The change of leadership following the death in 2006 of President Niyazov may create opportunities for broader engagement. President Berdimuhammedov announced that Turkmenistan will embark on reform to align the education system with international standards. If implemented, this may provide an opportunity for U.S. involvement in basic education reform.

## 5.8. Economic Reform

High unemployment and underemployment, often a result of slow economic growth, are among the most critical issues in predominantly Muslim countries. U.S. assistance programs attempt to address this issue with reforms to improve the investment climate. Such reforms could include business registration, dispute settlement, financial sector and agricultural reforms, combined with education, job training, and health programs.

The U.S. strategy of Total Economic Engagement pursues economic reform, rule of law, and global economic integration, including countries with predominantly Muslim populations. Total Economic Engagement includes:

- Regular bilateral discussions on these topics with host government officials, with both U.S. Embassy officials and officials from a wide range of U.S. agencies participating;
- Formal structured dialogues, high-level Economic Dialogues, and Trade and Investment Framework Agreement (TIFA) Councils;
- U.S. bilateral and multilateral assistance programs for economic reform, trade capacity-building, and rule of law managed chiefly through USAID, the Millennium Challenge Corporation (MCC), and the State Department's Middle East Partnership Initiative (MEPI). Programs are often complemented with technical assistance provided by specialized U.S. agencies and offices;
- Coordinated multilateral policies and assistance strategies to advance reform goals by working with such international organizations as the (IMF, WB, World Trade Organization (WTO), and OECD (MENA-OECD Investment), and other multilateral donors; and
- Working with NGOs, such as Transparency International, and U.S. and foreign business associations, such as American Chambers of Commerce and Business Councils, to advance reform issues of mutual concern.

**Integrating Predominantly Muslim Countries into the Global Trading System**
There are a number of USG-funded programs to promote predominantly Muslim countries' integration into the global trading system and promotion of regional trade and rule of law. The following table lists USG funding for trade and capacity-building programs. USAID/Asia and Near East Bureau currently funds 77 percent of these programs in these countries.

| USG Funding for Trade and Capacity-building | |
|---|---|
| **Country** | **USG FY-2007 Funding** |
| Afghanistan | $27,689,169 |
| Bangladesh | $775,088 |
| Egypt | $17,557,096 |
| Indonesia | $19,714,237 |
| Iraq | $2,896,080 |
| Jordan | $17,742,245 |
| Lebanon | $2,895,500 |
| Morocco | $8,626,500 |
| Pakistan | $7,406,217 |
| West Bank/Gaza | $0 |
| Yemen | $480,000 |
| **TOTAL TCB Funding** | **$105,782,132** |

**WTO Awareness and Accession.** FY-2007 USAID programs with components dealing with WTO awareness and accession are being implemented in Afghanistan ($9,000,000), Indonesia ($7,073,927), and Iraq ($2,222,830):

- **Afghanistan.** The Strengthening Private Sector through Capacity-building Project is designed to establish sound economic governance within the economic ministries and agencies of the Government of Afghanistan. Activities include customs operations and administration and other related reforms supporting progress toward WTO accession.

- **Indonesia.** The Trade Assistance Project focuses on legal support, economic research, public outreach, organizational development, information technology, and WTO awareness and agreements. The objective is to improve the Ministry of Trade's capacity to analyze and implement trade reforms that will lead to increased exports and a more attractive investment climate.

- **Iraq.** The Trade Policy and Market Access Support Project provides technical assistance to the Government of Iraq on legal, procedural, and practical matters pertaining to Iraq's bid to join the WTO. This includes technical assistance in completing key accession-relation documentation, in particular ACC4 (agriculture), ACC8 (sanitary and phytosanitary, technical barriers to trade), and ACC9 (intellectual property), and modifications and updates as WTO-related regulatory reforms progress.

**USAID Global Export Promotion Programs.** USAID global export promotion programs in FY-2007 include Afghanistan ($5,500,000), Bangladesh ($575,088), Indonesia ($3,131, 110), and Pakistan ($3,343,000):

- **Afghanistan.** The Small Medium Enterprise Development Project supports the development of the Afghan private sector by addressing non-governmental barriers to enterprise development. Key activities include strengthening business associations through support of trade fairs, trade missions, and participation of leading small and medium enterprises and associations.
- **Bangladesh.** The Shrimp Quality Support Project focuses on improving the quality and quantity of shrimp exports by Bangladesh in socially and environmentally acceptable ways by transferring appropriate applied research to farmers.
- **Indonesia.** The Enterprise and Agribusiness Development Activity supports the competitiveness of labor-intensive manufacturing industries, including footwear, furniture, auto parts, garments, home accessories, and information and communications technology. Competitiveness is strengthened by strengthening industry value chains, developing new industry-based standards to improve product quality and access to markets, and improving business skills, such as export readiness.
- **Pakistan.** The Initiative for Strategic Development and Competitiveness provides technical assistance and training to increase the competitiveness of Pakistani small and medium-sized enterprises. The project works with a number of sectors, including gems, jewelry, dairy, marble, horticulture, and furniture to improve their capacity to market and export their products. The project has formed six strategic working groups to develop

sector-specific strategies aimed at upgrading production and improving marketing and trade.

**Customs Reforms.** Customs reforms are supported by USAID FY-2007 programs in Egypt ($5,000,000), Afghanistan ($9,000,000, previously mentioned), and Indonesia ($7,073,927, previously mentioned).

**USAID Africa Bureau Programs.** Programs managed within the USAID Africa Bureau include Sub-Saharan integration into the global trading system, the driving forces of which are the African Growth and Opportunity Act (AGOA) and the President's Initiative - African Global Competitiveness Initiative (AGCI). Program efforts are focused on helping countries build a sound enabling environment including policies, laws, and regulations governing business and trade; improving infrastructure to facilitate trade; strengthening financial services to small and medium-sized enterprises and other businesses; and developing the energy sector to meet the needs of growing African economies.

**USAID Europe and Eurasia Bureau Programs.**

**Albania**. The objective in Albania is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID/Albania's programs worked with the government to improve the business climate for private sector growth and investment, and to improve private sector competitiveness to meet international export requirements. The Albanian Center for International Trade, founded in 2003, assists the Government of Albania to improve the quality of its trade policies. The Enterprise Development and Export Market Services Project, scheduled to run through September 2008, promotes the competitiveness of small and medium Albanian enterprises in domestic and foreign markets, and accelerates the entry of Albanian exports into global markets.

**Azerbaijan.** Azerbaijan's program emphasizes economic growth and reform, with a focus on developing the non-oil sectors of the economy.

**Bosnia and Herzegovina (BiH).** The program in BiH supports progress towards full integration into the EU. USAID/BiH worked to integrate the energy sector into the regional European framework and supported the development and implementation of a coherent direct taxation system that is regionally competitive. USAID's competitiveness projects promote trade and investment in agribusiness, wood processing, and tourism by improving the competitiveness of the firms, industries, and training firms to meet EU standards.

**Central Asia Region.** The Trade Facilitation and Investment (TFI) Project has been operating in Kazakhstan and the Kyrgyz Republic since 2001 and in Tajikistan and Uzbekistan since 2002. The project seeks to improve the trade and investment environment for small and medium-sized enterprises through the reduction of investment constraints, trade facilitation, and accession to and active participation in the WTO (Kyrgyz Republic joined in 1998).

Building on USAID's TFI Project, the **U.S. Central Asia Trade Facilitation Initiative** works to foster greater regional trade through reduced transaction costs for businesses by harmonizing, strengthening, and streamlining customs functions.

The Business Environment Improvement Project (BEI) was launched for Kazakhstan, the Kyrgyz Republic, and Tajikistan in October 2006. This program supports the streamlining of legal and regulatory processes, and facilitates multi-party engagement to improve the business, trade, and legal environment.

The Central Asia Infrastructure Integration Initiative, under the Regional Electricity Market Assistance Project (REMAP), helps to establish a transparent and competitive regional electricity market to increase regional electricity trade, stimulate economic growth, and provide market-based solutions for regional disputes related to hydro facilities and reservoirs.

**Kazakhstan.** The TFI Project operates five offices in Kazakhstan and was directly involved in the drafting of Kazakhstan's Customs Code, bringing the country into greater compliance with WTO principles and agreements. TFI is also financing the training of front-line customs officers in the identification and seizure of pirated goods to help Kazakhstan meet the standards of the Agreement on Trade Related Aspects of Intellectual Property Rights (TRIPS) and achieve removal from the Special 301 Watch List, both of which will help Kazakhstan's accession process to the WTO. The Kazakhstan Small Business Development Project, funded in October 2006, aims to promote development of small business, resulting in an increase of sales domestically and regionally.

**Kosovo.** The objective in Kosovo is to strengthen its integration into the Euro-Atlantic community and promote its contribution to ethnic integration in the region. USAID's goal is to help Kosovo make the transition from international administration to self-governance in an effective and peaceful manner. USAID provides training and expert counsel to ensure Kosovars quickly build capacity in the fiscal and economic policy sectors, private enterprise development, and energy management. One such program is the Cluster and Business Support Project, assisting businesses in the construction materials, livestock, and fruit and vegetables sectors by promoting productivity, trade and investment, identifying trade, marketing, and import-substitution opportunities; and providing training to meet EU standards.

**Kyrgyz Republic**. The TFI Project provides support to the WTO Department within the Kyrgyz Ministry of Economic Development and Industry & Trade (MEDIT), to increase its technical capacity in the legal and regulatory process. The Kyrgyz Agri-Enterprise Development Program works closely with the USAID Ferghana Valley Agribusiness Initiative, and provides development assistance to private agricultural-input suppliers that share the Ferghana Valley with Uzbekistan and Tajikistan.

**Tajikistan**. The TFI Project works directly with the Tajik government to prepare it to meet its WTO commitments by revising and updating the Legislative Action Plan to bring trade-related legislation into conformity with the provisions of WTO Agreements. Patent, copyright, trademark, and geographic indication legislation are revised to reach conformity with the provisions of the TRIPS Agreement. USAID's programs support small and medium enterprise

development, customs reform, and the creation of agricultural value chains. Fiscal reform projects focus on reducing regional disparities by increasing the effectiveness of local tax administration and increasing the capacity of local governments to develop and execute budgets.

**Turkmenistan**.  USAID works to foster trade advisory services and implement International Financial Reporting Standards in Turkmenistan.

**Stability Pact for Southeastern Europe (SP).**  The SP has several relevant programs related to global trade that affect parts of the region with significant Muslim populations, including Albania, BiH, and Kosovo. The SP's Trade Working Group has encouraged the negotiation, ratification, and implementation of a network of bilateral free trade agreements among the members of the SP and supports negotiation of a single regional trade agreement aimed at harmonizing the bilateral trade agreements to encompass all SP members. The United States supports this process by providing technical assistance to lower non-tariff barriers within the region, consistent with WTO principles.

Under SP auspices, the OECD Investment Compact for Southeastern Europe aims to improve the region's investment conditions, by setting out commitments for policy reform and to encourage increasing local and foreign direct investment. Albania and BiH (among other Southeastern Europe nations) are signatories.

**Possible Actions to Promote Intraregional Trade and Rule of Law in the Region**
Supporting intraregional trade and rule of law is a key aspect of U.S. policy in the Middle East and around the world.

**Intraregional Trade**

- The President's vision of a Middle East Free Trade Area (MEFTA) by 2013, linking countries in the region with each other and the United States, is the centerpiece of our effort to promote intraregional trade. Our strategy for attaining MEFTA includes:
  - Negotiating Free Trade Agreements (FTAs) with countries ready for that step. The United States has concluded FTAs with Israel, Jordan, Morocco, Bahrain, and Oman;
  - Working with additional countries through the TIFA process to advance readiness for FTA negotiations; and
  - Assisting reform-minded Middle East countries that are not yet in the WTO accession process.

- The MEPI, MCC, and USAID Missions in the Middle East, provide support for the MEFTA initiative through a variety of programs in trade capacity-building. MEPI and USAID missions in the Middle East are supporting the WTO accession efforts of Iraq, Yemen, and Lebanon. USG assistance programs assist FTA partners Jordan, Morocco, Bahrain, and Oman with free trade implementation with the United States.

- USAID/Jordan's Business Development Center supports implementation of the FTA between the United States and Jordan, and assists small and medium-sized firms to

modernize and improve their competitiveness so they can move into higher value sectors and take advantage of FTA export opportunities. FY-2007 funding is $840,220.

- USAID/Morocco's New Business Opportunities (NBO) Program helps export-oriented Moroccan firms to take advantage of new opportunities for entry and expansion into the United States created by the Morocco-U.S. Free Trade Agreement. NBO includes business development services that help exporting firms to identify new market opportunities, and then work to improve their marketing and promotion to turn these opportunities into exports to the United States. FY-2007 funding is $3,343,000.

**The Rule of Law**

- **The Middle East Partnership Initiative (MEPI)** will continue to support rule of law activities aimed at strengthening the capacity of regional governments to enact and implement commercial laws conducive to promoting economic growth. By working with legislators, judges, lawyers, and business persons, improvements in the commercial legal and regulatory environment focused on international best practices should lead to increased investment and employment across the region.
- **Egypt.** USAID's Administration of Justice Support II project promotes the rule of law by reforming and modernizing the commercial court system and improving the access to quality legal services.  FY-2007 funding is $3,700,000.
- **Indonesia.** USAID's Financial Crime Prevention Project (FCPP) is designed to strengthen Indonesia's ability to combat financial crimes. FCPP provides technical assistance to the FIU (PPATK), Supreme Audit Commission, Attorney General's Office, Corruption Eradication Commission, and Ministry of Finance-Inspector General Office. FCPP's work aids Indonesia's own efforts to build a more modern legal and institutional framework to detect and prosecute corruption and financial crimes. FY-2007 funding is $254,132.

**The Millennium Challenge Corporation (MCC).**  The MCC provides assistance for transformational development in countries that perform well on 17 independent, transparent policy indicators in the areas of ruling justly, investing in people, and economic freedom. Besides the financial support provided by MCC programs, MCC selection criteria creates an incentive for candidate countries to adopt related legal, policy, regulatory, and institutional reforms related to the MCC selection criteria. Such reforms will contribute to countries' efforts to reduce poverty and increase economic growth.

**Summary of MCC Activities in Predominantly Muslim Countries:**

**Compact-Eligible Countries.**  Based on their good performance on the 17 policy indicators mentioned above, Compact-Eligible countries are invited to apply for substantial grants from MCC for programs that they design and implement through a "Compact."

**Mali.** Mali signed a five-year, $460.8 million Compact with MCC in November 2006 which entered into force in September 2007. It aims to reduce rural poverty and help achieve national food security through a sustainable increase in the economic performance of the agricultural

sector, and to spur economic growth and reduce poverty by increasing the competitiveness of light industry and increasing the value-added of exports and tourism. These objectives will be met through investments that increase farmers' productivity, enhance agricultural supply chains, reduce transport costs, and create a platform for industry. The Compact focuses on improved infrastructure at the Bamako Airport, a key gateway for trade, and along the Niger River for irrigated agriculture.

**Burkina Faso.**  Burkina Faso submitted an initial Compact proposal to MCC in October 2006. It aims to promote economic growth in the rural sector by fostering land tenure security; investing in irrigation and watershed management infrastructure for agricultural purposes; constructing national roads, feeder roads, and market infrastructure; and improving existing agro-industrial supply chains. While MCC continues due diligence, it granted the government $9.43 million in pre-Compact assistance in December 2007 to cover preparatory work and fees.

**Morocco.**  Morocco signed a five-year, $697.5 million Compact with MCC on August 31, 2007. The Compact focuses on relieving constraints to growth in the agriculture, fishing, artisan, and small enterprise finance sectors. Entry into force is pending.

**Threshold Programs** are designed to assist countries that have demonstrated significant commitment to improving their performance on MCC selection criteria, but do not yet pass more than half the indicators in each of the three selection categories of ruling justly, investing in people, and encouraging economic freedom. A Threshold Program provides financial assistance to help improve a low score on at least one of MCC's policy indicators.

**Albania.**  Reducing corruption is the primary focus of the $13.8 million Albanian program that began in April 2006. Albania is receiving assistance from MCC to fund three programs designed to reform tax administration, public procurement, and business administration. The program anticipates reducing the extensive red tape and below-board payments needed to start a business while increasing the national tax base.

**Burkina Faso.**  The $12.9 million program, signed in July 2005, is a pilot program that seeks to improve performance on girls' primary education completion rates. Specific interventions include the construction of 132 "girl-friendly" schools, teacher training, providing take-home dry rations to girls who maintain a 90 percent school attendance rate, and providing literacy training for mothers. Burkina Faso is also eligible for Compact assistance.

**Indonesia**. The $55 million program with Indonesia, begun in November 2006, seeks to immunize at least 80 percent of children under the age of one for diphtheria, tetanus, and pertussis, and 90 percent of all children for measles. The Threshold Program also has a component aimed at curbing public corruption by reforming the judiciary and strengthening government institutions that fight corruption.

**Jordan.**  The $25 million Jordanian program, signed in October 2006, aims to strengthen democratic institutions by supporting Jordan's efforts to broaden public participation in the political and electoral process, increasing government transparency and accountability, and enhancing the efficiency and effectiveness of customs administration. The Threshold Program is

a part of Jordan's reform efforts focused on improvements in public administration, civil liberties, infrastructure, and the economy.

**Kyrgyz Republic.**  The Kyrgyz Republic $16 million Threshold Program was approved in August 2007 to help the Kyrgyz government fight corruption and improve the rule of law through judicial, criminal justice, and law enforcement reforms. As of December 2007, the implementing agreement (SOAG) was pending signature.

**Yemen.**  In February, the Republic of Yemen was reinstated into the Threshold Program based on the Yemeni government's efforts to address the country's performance on the MCC selection criteria. On September 12, the MCC Board approved a $20.6 million grant to Yemen to help it fight corruption and improve rule of law, political rights, and fiscal policy. However, signing of a Threshold agreement, originally scheduled for October 31, has been indefinitely deferred pending MCC review of Yemen's status.

**The Middle East Partnership Initiative (MEPI).**  In 2007, MEPI provided tangible support to reformers in the region so democracy could spread, education could thrive, economies could grow, and women could be empowered. Working in 16 countries and the Palestinian territories, MEPI invested in programs ranging from trade technical assistance to commercial code reform to a network for Arab businesswomen.

**Examples of MEPI's work with reformers include the following:**
- Provided technical and other assistance in support of successfully completed free trade agreements with Bahrain and Oman; Trade and Investment agreements with Kuwait, Qatar, Tunisia, and Egypt; and supported WTO accession for Yemen, Algeria, and Lebanon;
- Expanded trade capacity of Arab countries with training and technical assistance, including assisting a number of Gulf and North African countries with revising their labor codes, and updating intellectual property codes, customs codes, and agricultural import/export standards;
- Expanded efforts to strengthen indigenous labor and business organizations;
- Provided entrepreneurial training for more than 400 participants, almost half of them women, from 16 Middle Eastern and North African countries, with 50 alumni going on to start or expand businesses. These entrepreneurs created at least 1,000 new jobs following their participation in MEPI programs;
- Extended credit and services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations;
- Established self-sustaining Junior Achievement chapters in 12 countries throughout the Middle East, with more than 10,000 students participating. Created public-private partnerships that assisted in the sustainability of Junior Achievement chapters; and
- Expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at law schools in Qatar and Oman, update commercial codes to meet international standards in Bahrain, Qatar, and Oman, and provide continuing education programs for the judiciary.

# Chapter 6
# Terrorist Organizations

Foreign Terrorist Organization (FTO) aliases cited are consistent with and drawn from the Specially Designated Nationals list maintained by the Department of Treasury. The full list can be found at the following website:
http://www.treasury.gov/offices/enforcement/ofac/sdn/sdnlist.txt.

On October 15, 1999, pursuant to UNSCR 1267, the "al-Qa'ida and Taliban Sanctions Committee" was established. The 1267 sanctions regime has been modified and strengthened by subsequent resolutions so that the sanctions now cover individuals and entities associated with al-Qa'ida, Usama bin Ladin, and the Taliban. The targeted individuals and entities are placed on the Consolidated List. The full list can be found at the following website:
http://www.un.org/sc/committees/1267/consolist.shtml.

| USG Designated Foreign Terrorist Organizations |
|---|

**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group**
**Al-Aqsa Martyrs Brigade**
**Ansar al-Sunnah**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Mujahadin (HUM)**
**Hizballah**
**Islamic Jihad Group (IJG)**
**Islamic Movement of Uzbekistan (IMU)**
**Jaish-e-Mohammed (JEM)**
**Jemaah Islamiya Organization (JI)**
**Al-Jihad**
**Kahane Chai (Kach)**
**Kongra-Gel (formerly Kurdistan Worker's Party (PKK))**
**Lashkar e-Tayyiba**
**Lashkar i Jhangvi (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**
**Mujahadin-e Khalq Organization (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front (PLF)**

**Palestinian Islamic Jihad (PIJ)**
**Popular Front for the Liberation of Palestine (PFLP)**
**Popular Front for the Liberation of Palestine-General Command (PFLP-GC)**
**Al-Qa'ida**
**Al-Qa'ida in Iraq**
**Al-Qa'ida in the Islamic Maghreb (AQIM) [Formerly Salafist Group for Call and Combat (GSPC)]**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Nuclei (RN)**
**Revolutionary Organization 17 November (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia (AUC)**

---

## Abu Nidal Organization (ANO)

a.k.a. Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:** The Abu Nidal Organization (ANO), an international terrorist organization, was founded by Sabri al-Banna (a.k.a. Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974. The group's previous known structure consisted of various functional committees, including political, military, and financial. In August 2002, Abu Nidal died in Baghdad, probably at the hands of Iraqi security officials; the new leadership of the organization remains unclear.

**Activities:** The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons. The group has not staged a major attack against Western targets since the late 1980s. Major attacks included the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988. The ANO is suspected of assassinating PLO deputy chief Abu Iyad and PLO security Chief Abu Hul in Tunis in 1991. The ANO conducted no attacks in 2007.

**Strength:** Current strength is unknown.

**Location/Area of Operation:** The group is largely considered inactive, although former and possibly current ANO associates might be in Iraq and Lebanon.

**External Aid:** The ANO's current access to resources is unclear, but it is likely that the decline in state support has had a severe impact on its capabilities.

## Abu Sayyaf Group

a.k.a. Al Harakat al Islamiyya

**Description:** The Abu Sayyaf Group (ASG) is an Islamic terrorist group operating in the southern Philippines. Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamic teachings. The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998. His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group. In September 2006, Janjalani was killed in a gun battle with the Armed Forces of the Philippines. Radullah Sahiron is assumed to be the new ASG leader.

**Activities:** The ASG engages in kidnappings for ransom, bombings, beheadings, assassinations, and extortion. The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago, areas in the southern Philippines heavily populated by Muslims, but the ASG primarily has used terror for financial profit. Recent bombings may herald a return to a more radical, politicized agenda, at least among certain factions. In August 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadaffy Janjalani in September 2006 and his deputy, Abu Solaiman in January 2007. In July 2007, the ASG, and Moro Islamic Liberation Front (MILF) engaged a force of Philippine marines on Basilan Island, killing fourteen, of which ten were beheaded.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995. In April 2000, an ASG faction kidnapped 21 persons, including ten Western tourists, from a resort in Malaysia. In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines. Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered. A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham and Filipina Deborah Yap were killed.

U.S. and Philippine authorities blamed the ASG for a bomb near a Philippine military base in Zamboanga in October 2002 that killed a U.S. serviceman. In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132. In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila. The ASG also claimed responsibility for the 2005 Valentine's Day bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150. In November 2007, a motorcycle bomb exploded outside the Philippines Congress, killing a congressman and three staff members. While there was no definitive claim of responsibility, three suspected ASG members were arrested during a subsequent raid on a safe house.

**Strength**: ASG is estimated to have 200 to 500 members.

**Location/Area of Operation:** The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi. The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila. In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao. The ASG was expelled from Mindanao proper by the Moro Islamic Liberation Front in mid-2005. The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there.

**External Aid:** The ASG is funded through acts of ransom and extortion, and receives funding from both regional terrorist groups such as Jemaah Islamiya (JI), which is based mainly in Indonesia, and from Middle Eastern Islamic extremists. In October, the ASG appealed for funds and recruits on YouTube by featuring a video of the Janjalani brothers before they were killed.

## Al-Aqsa Martyrs Brigade

a.k.a. al-Aqsa Martyrs Battalion

**Description:** The al-Aqsa Martyrs Brigade consists of loose cells of Palestinian militants loyal to, but not under the direct control of the secular-nationalist Fatah movement. Al-Aqsa emerged at the outset of the 2000 Palestinian al-Aqsa intifada as a militant offshoot of the Fatah party to attack Israeli military targets and settlers with the aim of driving Israel from the West Bank and Gaza and establishing a Palestinian state. Al-Aqsa has no central leadership; the cells operate with autonomy, although they remained ideologically loyal to Palestinian Authority (PA) President and Fatah party head Yassir Arafat until his death in November 2004.

**Activities:** Al-Aqsa initially focused on small arms attacks against Israeli military personnel and settlers in the West Bank. In 2002, however, the group began to conduct suicide bombings against Israeli civilians. Al-Aqsa suspended most anti-Israel attacks as part of the broader unilateral Palestinian ceasefire agreement during 2004 but resumed them following HAMAS's victory in January 2006 Palestinian Legislative Council elections. Al-Aqsa members continued the anti-Israeli and intra-Palestinian violence that contributes to the overall chaotic security environment in the Palestinian territories. In 2007, the majority of al-Aqsa attacks were rocket and mortar attacks into southern Israel from HAMAS-ruled Gaza. Israel agreed to extend a conditional pardon to 178 West Bank al-Aqsa members, but did not expand the program to the rest of the organization. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed some dual U.S.-Israeli citizens.

**Strength:** Current strength is unknown, but most likely numbers a few hundred.

**Location/Area of Operation:** Al-Aqsa operates mainly in the West Bank but has conducted attacks inside Israel and Gaza. The group also has members in Palestinian refugee camps in southern Lebanon.

**External Aid:** Iran has exploited al-Aqsa's lack of resources and formal leadership by providing funds and other aid, mostly through Hizballah facilitators.

## Ansar al-Islam

a.k.a. Ansar al-Sunna; Ansar Al-Sunnah Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar Al-Sunnah; Jund Al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:** Ansar al-Sunnah (AS) is a Salafi terrorist group whose goals include expelling the U.S.-led Coalition from Iraq and establishing an independent Iraqi state based on Sharia law.  In 2003, AS announced its creation by posting a statement on the Internet calling all extremists in Iraq to unite under the new name. The bid to become an extremist umbrella organization failed, but the name AS remained in use until November, when it changed its name back to Ansar al-Islam (AI). AI has ties to the al-Qa'ida (AQ) central leadership and to al-Qa'ida in Iraq (AQI), although it has a competitive relationship with AQI, and did not join the AQI-dominated "Islamic State of Iraq." Some members of AI trained in AQ camps in Afghanistan, and the group provided safe haven to affiliated terrorists before Operation Iraqi Freedom (OIF). Since OIF, AI has become the second-most prominent group engaged in anti-Coalition attacks in Iraq behind AQI and has maintained a strong propaganda campaign. Despite AI's ties to AQ, the group does not seem to be interested in attacking targets outside Iraq.

**Activities:** AI continued to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures. AI has claimed responsibility for many high profile attacks, including the execution-style killing of nearly two dozen Yazidi civilians in Mosul in reprisal for the stoning death of a Muslim convert in April, the car-bombing of a police convoy in Kirkuk in July, the suicide bombing of Kurdistan Democratic Party offices in Khursbat in October, and numerous kidnappings, executions, and assassinations.

**Strength:** Precise numbers are unknown. AI is one of the largest Sunni terrorist groups in Iraq.

**Location/Area of Operation:** Primarily central, western, and northern Iraq.

**External Aid:** AI receives assistance from a loose network of associates in Europe and the Middle East.


# Armed Islamic Group (GIA)

a.k.a. Al-Jama'ah al-Islamiyah al-Musallah, Groupement Islamique Arme

**Description:** The Armed Islamic Group (GIA) aims to overthrow the Algerian regime and replace it with a state governed by Sharia law. The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Algerian Islamic opposition party.

**Activities:** The GIA engaged in attacks against civilians and government workers. The group began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians, alienating itself from the Algerian populace. Since announcing its campaign against foreigners living in Algeria in 1992, the GIA killed more than 100 expatriate men and women, mostly Europeans, in the country. Many of the GIA's members joined other Islamist groups or have been killed or captured by the Algerian government. The government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces. The GIA's most recent significant attacks occurred in August 2001. After the arrest of the GIA's last known emir and

subsequent counterterrorism operations, the Algerian government declared that the GIA network was almost entirely broken up. The last terror attack attributed to the GIA occurred in 2006.

**Strength:** Precise numbers are unknown, but the group continues to decline and probably numbers fewer than 40. The last known emir was Nourredine Boudiafi, who was arrested by Algerian authorities in November 2005.

**Location/Area of Operation:** Algeria, the Sahel, and Europe.

**External Aid:** GIA members in Europe provide funding, but most funding comes from the group members' criminal activity.


## Asbat al-Ansar

**Description:** Asbat al-Ansar is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to the al-Qa'ida (AQ) organization and other Sunni extremist groups. The group follows an extremist interpretation of Islam that justifies violence against civilian targets to achieve political ends. Some of the group's goals include thwarting perceived anti-Islamic and pro-Western influences in the country.

**Activities:** Asbat al-Ansar maintains close ties with the AQ network, with its base of operations in the Ain al-Hilwah Palestinian refugee camp near Sidon. Lebanese authorities detained a cell of al-Qa'ida in Iraq (AQI) extremists in June in the Bekaa Valley that had trained with Asbat al-Ansar and was possibly planning terrorist attacks throughout Lebanon against United Nations Interim Forces in Lebanon (UNIFIL) or other Western targets. Asbat al-Ansar has recently been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in Ain al-Hilwah. Various extremist web forums criticized Asbat al-Ansar for its failure to support fellow Sunni extremist group Fatah al-Islam (FAI) during the Lebanese Armed Forces campaign in summer 2007 that forced FAI out of Nahr al-Barid refugee camp in northern Lebanon, and severely damaged the group.

Members of Asbat al-Ansar were believed responsible for a Katyusha rocket attack on the Galilee region of Israel in December 2005. Asbat al-Ansar operatives have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations. Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of al-Qa'ida at the 'Ayn al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements. In 2007, Asbat al-Ansar remained focused on supporting jihad in Iraq and planning attacks against UNIFIL, Lebanese security forces, and U.S. and Western interests. Asbat al-Ansar-associated elements were implicated in the June 17 Katyusha rocket attack against northern Israel.

Asbat al-Ansar first emerged in the early 1990s. In the mid-1990s the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores. It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000. Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di, a.k.a. Abu Muhjin, remains at large despite being sentenced to death in

absentia for the 1994 murder of a Muslim cleric. In September 2004, operatives with links to the group were allegedly involved in planning terrorist operations targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices. In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for plotting to assassinate then U.S. Ambassador to Lebanon, David Satterfield, in 2000.

**Strength:** The group commands between 100 and 300 fighters in Lebanon. Its named leader is Ahmed Abd al-Karim al-Saadi.

**Location/Area of Operation:** The group's primary base of operations is the Ayn al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**External Aid:** It is likely the group receives money through international Sunni extremist networks.


# Aum Shinrikyo

a.k.a. A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:** Shoko Asahara established Aum Shinrikyo (Aum) in 1987, and the cult received legal status as a religious entity in 1989. Initially, Aum aimed to take over Japan and then the world, but over time it began to emphasize the imminence of the end of the world. Asahara predicted 1996, and 1999 to 2003, as likely dates and said that the United States would initiate Armageddon by starting World War III with Japan. The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995. In 1997, however, a government panel decided not to invoke the Operations Control Law to outlaw the group. A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns Aum might launch future terrorist attacks. Under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph in January 2000 and tried to distance itself from the violent and apocalyptic teachings of its founder. In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara. A growing divide between members supporting Joyu and Asahara emerged. In 2007, Joyu officially split and in May, established a splinter group called Hikari No Wa. Hikari No Wa is translated as 'Circle of Light' or 'Ring of Light.'  Japanese authorities continued to monitor both Aum (now called Aleph) and Hikari No Wa.

**Activities:** In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 persons and causing up to 6,000 to seek medical treatment. Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500. Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him to death for his role in the 1995 attacks. In September 2006, Asahara lost his final appeal against the death penalty.

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry. In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

**Strength:** Aum's current membership in Japan is estimated to be about 1,500 persons, according to a study by the Japanese government issued in December. At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.

**Location/Area of Operation:** Aum's principal membership is located in Japan, while a residual branch of about 300 followers live in Russia.

**External Aid:** None.


## Basque Fatherland and Liberty (ETA)

a.k.a. Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; K.A.S.; XAKI

**Description:** Basque Fatherland and Liberty (ETA) was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava, the autonomous region of Navarra, and the southwestern French territories of Labourd, Basse-Navarre, and Soule. Spain and the EU both have listed ETA as a terrorist organization; in 2002 the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group. In 2004, Spain and France formed a joint counterterrorism and judicial unit to combat ETA and Islamic terrorist groups. During 2005 and 2006, police in both countries together arrested around 100 individuals associated with ETA, dismantled several of the group's cells, and dealt a significant blow to its operational capability. Spanish and French prisons are estimated to hold a total of more than 500 ETA members. In March 2006, days after claiming responsibility for a spate of roadside blasts in northern Spain that caused no injuries, ETA announced that it would implement a "permanent" cease-fire. However, on December 30, 2006, ETA exploded a massive car-bomb that destroyed much of the covered parking garage outside the new Terminal 4 of Madrid's Barajas International Airport. Two individuals killed in the blast became ETA's first fatalities in more than three years. The Spanish Government suspended talks with ETA, and government officials later said political negotiations with the group had ended.

**Activities:** Since the beginning of 2007, the group has been suspected of conducting numerous arson and incendiary attacks against government, financial, and civilian targets using various youth organizations as a proxy. ETA claimed several bombings: one in late July, on a road targeting the Tour de France that caused no damage; a car bombing in late August targeting a police station that wounded two police officers and damaged the building; a bombing in early September on a road that caused no damage; an attempted car-bombing on a Defense Ministry building in early September that failed due to a technical fault; and a bombing in late September

at another police station that damaged the building but caused no injuries. ETA was also suspected of a car bombing in early October that wounded the bodyguard of a local government official, although the group has not yet claimed responsibility.

ETA formally renounced its "permanent" cease-fire in June, and in early September threatened a wave of attacks throughout Spain. Following indications in mid-2007 that the group may have expanded into Portugal its logistical operations, such as renting vehicles, Madrid and Lisbon agreed, in October, to intensify their cooperation against ETA by establishing a joint antiterrorism team based in Lisbon. In December, ETA murdered two Civil Guard officials in southern France, the first ETA killings in France since 1976. Several days later, the group threatened to open a new front in France against Spanish authorities. Also in December, Spanish and French authorities agreed to create a permanent joint police investigation team to fight ETA.

ETA primarily conducts bombings and assassinations; targets are typically Spanish government officials, security and military forces, politicians, and judicial figures, but the group also has targeted journalists and tourist areas. The group is responsible for killing more than 800 and injuring thousands more since it began its lethal attacks in the late 1960s. Security service scrutiny and a public outcry after the Islamic extremist train bombings in Madrid in March 2004, have limited ETA's capability and willingness to inflict casualties. In February 2005, ETA detonated a car bomb in Madrid at a convention center where Spanish King Juan Carlos and then Mexican President Vicente Fox were scheduled to appear, wounding more than 20 people. ETA also detonated an explosive device at a stadium constructed as part of Madrid's bid to host the 2012 Olympic Games; there were no injuries in that attack. ETA's late 2006 attack at Madrid's airport is the group's first fatal attack since March 2003.

**Strength:** According to Spanish security forces quoted in the press in mid-2007, ETA has about 100 active members; this number was reduced in 2007 as a result of the number of arrested by Spanish and French authorities.

**Location/Area of Operation:** ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but also has attacked Spanish and French interests elsewhere.

**External Aid:** ETA finances its activities primarily through bribery and extortion of Basque businesses. It has received training at various times in the past in Libya, Lebanon, and Nicaragua. Some ETA members allegedly fled to Cuba and Mexico, while others reside in South America. ETA members have operated and been arrested in other European countries, including France, Belgium, the Netherlands, the UK, Germany, and Portugal.


## Communist Party of Philippines/New People's Army (CPP/NPA)

a.k.a. Communist Party of the Philippines; CPP; New People's Army; NPA

**Description:** The military wing of the Communist Party of the Philippines (CPP), the New People's Army (NPA), is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare. Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from

the Netherlands, where he lives in self-imposed exile. Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen. Although primarily a rural-based guerrilla group, the NPA has an active urban infrastructure to support its terrorist activities and at times uses city-based assassination squads.

In September, Sison was briefly arrested in the Netherlands but was released on a judge's order a few days later. In November, the Armed Forces of the Philippines announced the capture of Elizabeth Principe, a suspected member of the Central Committee of the Communist Party of the Philippines.

**Activities:** The NPA primarily targets Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes." The NPA charges politicians running for office in NPA-influenced areas for "campaign permits." The group opposes any U.S. military presence in the Philippines and has attacked U.S. military interests; it killed several U.S. service personnel before the U.S. base closures in 1992. The NPA claimed responsibility for the assassination of two congressmen, one from Quezon in May 2001 and one from Cagayan in June 2001, among other killings. Periodic peace talks with the Philippine government stalled after these incidents. In December 2005, the NPA publicly expressed its intent to target U.S. personnel if they were discovered in NPA operating areas.

**Strength**: Estimated at less than 9,000, a number significantly lower than its peak strength of approximately 25,000 in the 1980s.

**Location/Area of Operations:** Operates in rural Luzon, Visayas, and parts of northern and eastern Mindanao. There are cells in Manila and other metropolitan centers.

**External Aid:** Unknown.


# Continuity Irish Republican Army (CIRA)

a.k.a. Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:** The Continuity Irish Republican Army (CIRA) is a splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland. CIRA cooperates with the larger Real IRA (RIRA).

**Activities:** CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups. CIRA did not join the Provisional IRA in its September 2005 decommissioning and remained capable of effective, if sporadic, terrorist attacks. In late 2006, CIRA members issued a list of up to 20 individuals they were targeting for paramilitary attacks, several of whom were wounded in

subsequent shootings. In early 2006, the Independent Monitoring Commission reported that two splinter organizations, Óglaigh na hÉireann and Saoirse na hÉireann, were formed due to internal disputes within CIRA. In mid-October 2006, CIRA claimed the firebomb attacks of B&Q home-supply stores. CIRA activity has largely decreased from previous levels seen in 2005 and by 2007, the group had become increasingly active in criminal activity. In April, following the discovery of an improvised mortar adjacent to the railway line in Lurgan, three CIRA members were arrested and charged with conspiracy to murder, possession of explosives with intent to endanger life, and possession of articles for use in terrorism.

**Strength:** Membership is small, with possibly fewer than 50 hard-core activists. Police counterterrorist operations have reduced the group's strength.

**Location/Area of Operation:** Northern Ireland and the Irish Republic. CIRA does not have an established presence in Great Britain.

**External Aid:** Suspected of receiving funds and arms from sympathizers in the United States. CIRA may have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

## Gama'a al-Islamiyya (IG)

a.k.a. Al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI, Islamic Gama'at, IG; Islamic Group

**Description:** Gama'a al-Islamiyya (IG), Egypt's largest militant group, has been active since the late 1970s, but is now a loosely organized network. The external wing, composed of mainly exiled members in several countries, maintains its primary goal is to overthrow the Egyptian government and replace it with an Islamic state. The IG announced a cease-fire in 1997 that led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations. The IG announced another ceasefire in March 1999, but its spiritual leader, Shaykh Umar Abd al-Rahman, sentenced to life in prison in January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000. IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists and four Egyptians, and wounded dozens more. In February 1998, a senior member signed Usama bin Ladin's fatwa calling for attacks against the United States.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that cause mass casualties. Musa disappeared several months afterward, and we have no information about his whereabouts. In March 2002, members of the group's historic leadership in Egypt declared the use of violence misguided and renounced its future use, prompting denunciations by much of the leadership abroad. The Egyptian government continued to release IG members from prison; approximately 900 were released in 2003, and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members. In August 2006, Ayman al-Zawahiri announced that IG had merged with al-Qa'ida, but the group's Egypt-based leadership quickly denied this claim.

**Activities:** Before the 1997 cease-fire, IG conducted armed attacks against Egyptian security and other government officials, Coptic Christians, and Egyptian opponents of Islamic extremism. After the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack. IG claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia. IG was dormant in 2007.

**Strength:** Unknown. At its peak IG probably commanded several thousand hardcore members and a like number of supporters. Security crackdowns following the 1997 attack in Luxor, the 1999 cease-fire, and post-September 11 security measures have probably resulted in a substantial decrease in the group's membership and extremist activities.

**Location/Area of Operation:** IG operates mainly in the Al-Minya, Asyut, Qina, and Sohaj Governorates of southern Egypt. It also appears to have support in Cairo, Alexandria, and other urban locations, particularly among unemployed graduates and students. The IG maintains an external presence in Afghanistan, Yemen, the United Kingdom, and other locations in Europe.

**External Aid:.** Al-Qa'ida and Afghan militant groups support the organization. IG also may obtain some funding through various Islamic non-governmental organizations.


## The Islamic Resistance Movement (HAMAS)

a.k.a. Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units ; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions; Izz al-Din al Qassam Forces

**Description:** HAMAS, which includes military and political wings, was formed at the onset of the first Palestinian uprising or Intifada in late 1987, as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, including suicide bombings against civilian targets inside Israel. HAMAS also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fund-raising, and political activities. A Shura council based in Damascus, Syria, sets overall policy. After winning Palestinian Legislative Council elections in January 2006, HAMAS took control of significant Palestinian Authority (PA) ministries, including the Ministry of Interior. HAMAS subsequently formed an expanded, overt militia called the Executive Force, subordinate to the Ministry. This force and other HAMAS cadres took control of Gaza in a military-style coup in June 2007, forcing Fatah forces to either leave Gaza or go underground there.

**Activities:** Prior to 2005, HAMAS conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised explosive device (IED) attacks, and shootings. HAMAS, however, has not directly targeted U.S. interests, although the group makes little or no effort to avoid soft targets frequented by foreigners. The group curtailed terrorist attacks in February 2005, after agreeing to a temporary period of calm brokered by the PA, and ceased most violence after winning control of the PA legislature and cabinet in January 2006. After HAMAS staged a June 2006 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the

abduction of Corporal Gilad Shalit, Israel took steps that severely limited the operation of the Rafah crossing. HAMAS maintained and expanded its military capabilities in 2007. In June 2007, HAMAS took control of Gaza from the PA and Fatah in a military-style coup, leading to an international boycott and closure of Gaza borders. HAMAS has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, tightening security, and conducting limited operations against Israeli military forces.

HAMAS fired rockets from Gaza into Israel in 2007 but focused more mortar on attacks targeting Israeli incursions. Additionally, other terrorist groups in Gaza fired rockets into Israel, most, presumably, with HAMAS support or acquiescence. HAMAS internal security efforts have centered on confronting threats to the group's hold on power, including arrest operations against Fatah. In June 2007, HAMAS took control of Gaza, leading to a drawn-out struggle between HAMAS and supporters of Fatah. The majority of HAMAS activity in Gaza is directed at solidifying their control over Gaza and weakening Fatah through kidnappings, torture, and the use of the "Executive Force" as a de-facto security apparatus. The continued international boycott and perceived efforts to destroy HAMAS have increased anti-U.S. sentiment on the Palestinian street, a development that could lead cells affiliated with HAMAS to launch attacks, including suicide bombings, without the sanction of HAMAS' senior leadership.

**Strength:** HAMAS probably has several hundred operatives in its armed wing, the al-Qassam Brigades, along with its reported 9,000-man Executive Force and tens of thousands of supporters and sympathizers.

**Location/Area of Operation:** HAMAS has an operational presence in every major city in the Palestinian territories and currently focuses its anti-Israeli attacks on targets in the West Bank and within Israel. HAMAS could potentially activate operations in Lebanon or resume terrorist operations in Israel. The group retains a cadre of leaders and facilitators that conducts diplomatic, fundraising, and arms smuggling activities in Lebanon, Syria, and other states. HAMAS is also increasing its presence in the Palestinian refugee camps in Lebanon, probably with the goal of eclipsing Fatah's long-time dominance of the camps.

**External Aid:** HAMAS receives some funding, weapons, and training from Iran. In addition, fundraising takes place in the Gulf countries, but the group also receives donations from Palestinian expatriates around the world and private benefactors in Arab states. Some fundraising and propaganda activity takes place in Western Europe and North America.


# Harakat ul-Mujahadin (HUM)

a.k.a. Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Ansar; Harakat ul-Mujahideen; HUA; Jamiat ul-Ansar

**Description:** Harakat ul-Mujahadin (HUM), an Islamic militant group based in Pakistan, is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir. Reportedly under pressure from the Government of Pakistan, HUM's long time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir as the head of HUM in January 2005. Khalil has been linked to Usama bin Ladin, and his signature was found on Bin Ladin's fatwa in February 1998, calling for attacks on U.S.

279

and Western interests. HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001. Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December. In 2003, HUM began using the name Jamiat ul-Ansar (JUA). Pakistan banned JUA in November 2003.

**Activities:** HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir. It is linked to the Kashmiri militant group al-Faran that kidnapped five Western tourists in Kashmir in July 1995; one was killed in August, and the other four reportedly were killed in December of the same year. HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release. Ahmed Omar Sheik also was released in 1999, and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

**Strength:** HUM has several hundred armed supporters located in Azad Kashmir, Pakistan, India's southern Kashmir and Doda regions, and in the Kashmir valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets. In 2000, HUM lost a significant share of its membership in defections to the JEM.

**Location/Area of Operation:** Based in Muzaffarabad, Rawalpindi, and several other towns in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan. HUM trains its militants in Afghanistan and Pakistan.

**External Aid:** HUM collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf and Islamic states. HUM's financial collection methods include soliciting donations in magazine ads and pamphlets. The sources and amount of HUM's military funding are unknown. Its overt fundraising in Pakistan has been constrained since the government clampdown on extremist groups and the freezing of terrorist assets.


# Hizballah

a.k.a. Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar alla; Followers of the Prophet Muhammed

**Description:** Formed in 1982, in response to the Israeli invasion of Lebanon, this Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini. The group generally follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei. Hizballah is closely allied with Iran and often acts at its behest, though it also acts independently. Although Hizballah does not share the Syrian regime's secular orientation, the group has helped Syria advance its political objectives in the region. The Majlis al-Shura, or Consultative Council, is the group's highest governing body and has been led by Secretary General Hasan Nasrallah since 1992.

Hizballah remains the most technically capable terrorist group in the world. It has strong influence in Lebanon's Shia community, which comprises about one-third of Lebanon's population. The Lebanese government and the majority of the Arab world, still recognize Hizballah as a legitimate "resistance group" and political party. Hizballah claimed 14 elected officials in the 128-seat Lebanese National Assembly and was represented in the Cabinet for the first time, by the Minister of Water and Electricity Mohammed Fneish, until his resignation, along with other Shia ministers and Hizballah members of Parliament on November 11, 2006.

Hizballah has reduced its overt military presence in southern Lebanon in accordance with UNSCR 1701, although it likely maintains weapons caches in southern Lebanon. It justifies its continued armed status by claiming to act in defense of Lebanon against acts of Israeli aggression. Hizballah alleges that Israel has not withdrawn completely from Lebanese territory because, in its view, the Shebaa Farms and other areas belong to Lebanon. Hizballah provides support to several Palestinian terrorist organizations that reject peace between Israel and its neighbors. This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

**Activities:** Hizballah is known to have been involved in numerous anti-U.S. and anti-Israeli terrorist attacks and prior to September 11, 2001, was responsible for more American deaths than any other terrorist group. In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting the conflict with Israel that lasted into August. Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily armored vehicles, which it developed in southern Lebanon in the late 1990s. A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants.

Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983, and the U.S. Embassy annex in Beirut in 1984, and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and the Argentine-Israeli Mutual Association (AMIA) in Buenos Aires in 1994. In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

**Strength:** Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

**Location/Area of Operation:** Operates in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon. Has established support cells in Europe, Africa, South America, North America, and Asia.

**External Aid:** Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran, and diplomatic, political, and logistical support from Syria.

Hizballah also receives funding from private donations, and profits from legal and illegal businesses.


## Islamic Jihad Group (IJG)

a.k.a. Al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jama'at al-Jihad; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahadin; The Kazakh Jama'at; The Libyan Society

**Description:** The Islamic Jihad Group (IJG) is an extremist organization that splintered from the Islamic Movement of Uzbekistan (IMU). They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law. They adhere to an anti-Western global agenda.

**Activities:** In September, German authorities disrupted an IJG plot by detaining three IJG operatives involved in the operation. Two of the three had attended IJG run terrorist training camps in Pakistan and maintained communications with their Pakistani contacts after returning to Germany. The operatives had acquired large amounts of hydrogen peroxide and an explosives precursor that they stockpiled in a garage in southern Germany. The group had acquired large amounts of hydrogen peroxide for possible use in multiple car bomb attacks. The IJG subsequently claimed responsibility for the foiled attacks.

The IJG issued a statement in May 2005, fully supporting the armed attacks on Uzbek police and military personnel in Andijon, Uzbekistan, and called for the overthrow of the regime in Uzbekistan. The group first conducted attacks in March-April 2004 targeting police at several roadway checkpoints and a popular bazaar. These attacks killed approximately 47 people, including 33 terrorists, some of whom were suicide bombers. The IJG's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan. These attacks marked the first use of suicide bombers in Central Asia.

In July 2004, the group carried out near-simultaneous suicide bombings in Tashkent of the U.S. and Israeli Embassies, and the Uzbekistani Prosecutor General's office. The IJG again claimed responsibility via an Islamic website and stated that martyrdom operations by the group would continue. The statement also indicated that the attacks were done in support of IJG's Palestinian, Iraqi, and Afghan brothers in the global insurgency. The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March-April attacks.

**Strength:** Unknown.

**Location/Area of Operation:** IJG members are scattered throughout Central Asia, South Asia, and Europe.

**External Aid:** Unknown.


## Islamic Movement of Uzbekistan (IMU)

**Description:** The Islamic Movement of Uzbekistan (IMU) is a group of Islamic militants from Uzbekistan and other Central Asian states. The IMU's goal is to overthrow Uzbekistani President Islam Karimov and to establish an Islamic state in Uzbekistan. The IMU is affiliated with al-Qa'ida (AQ) and under the leadership of Tohir Yoldashev, has embraced Usama bin Ladin's anti-Western global terrorist ideology.

**Activities:** Since Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan. The IMU also was active in terrorist operations in Central Asia. Government authorities in Tajikistan arrested several IMU members in 2005. In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist. In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan. The IMU was also responsible for explosions in Bishkek in December 2002, and Osh in May 2003, that killed eight people. The IMU primarily targeted Uzbekistani interests before October 2001, and is believed to have been responsible for several explosions in Tashkent in February 1999. In August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage, and in August 2000, they took four U.S. mountain climbers hostage.

**Strength:** Approximately 500 members.

**Location/Area of Operation:** IMU militants are located in South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, Kazakhstan, and Uzbekistan.

**External Aid:** The IMU receives support from a large Uzbek Diaspora, Islamic extremist groups, and patrons in the Middle East, Central Asia, and South Asia.


## Jaish-e-Mohammed (JEM)

a.k.a. Army of Mohammed; Jaish-i-Mohammed; Khudamul Islam; Khuddam-ul-Islam; Kuddam e Islami; Mohammed's Army; Tehrik ul-Furqaan

**Description:** Jaish-e-Mohammed (JEM) is an Islamic extremist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India. The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States. It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F). Pakistan outlawed JEM in 2002. By 2003, JEM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004.  Pakistan banned KUI and JUF in November 2003.

**Activities:** JEM continued to operate openly in parts of Pakistan despite President Musharraf's 2002 ban on its activities. The group was well-funded, and was said to have tens of thousands of followers who supported attacks against Indian targets, the Pakistani government, and sectarian minorities. Since Masood Azhar's 2000 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the area.

JEM continued to claim responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people. The Indian government has publicly implicated the JEM, along with Lashkar e-Tayyiba (LT), for the December 2001 attack on the Indian Parliament that killed nine and injured 18. Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans. In December 2003, Pakistan implicated elements of JEM in the two assassination attempts against President Musharraf. In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl. In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.

**Strength**: JEM has at least several hundred armed supporters, including a large cadre of former HUM members, located in Pakistan, in India's southern Kashmir and Doda regions, and in the Kashmir Valley. Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war. The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

**Location/Area of Operation:** Pakistan and Kashmir. Prior to autumn 2001, JEM maintained training camps in Afghanistan.

**External Aid:** Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami (HUJI-B) and the Harakat ul-Mujahadin (HUM). In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods. In addition, JEM collects funds through donation requests in magazines and pamphlets, and allegedly from AQ.

# Jemaah Islamiya (JI)

**Description:** Southeast Asia-based Jemaah Islamiya (JI) is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines. More than 300 JI operatives, including operations chief Hambali, have been captured since 2002, although many are free after serving short sentences, including former JI emir Abu Bakar Bashir. Abu Bakar was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings. Indonesia's Supreme Court later that year acquitted him of the charges. The death of top JI bomb maker Azahari bin Husin in November 2005, the arrests of several close associates of senior JI operative Noordin Mat Top in 2006, and the 2007 arrests of former acting JI emir Muhammad Naim (a.k.a. Zarkasih), JI military commander Abu Dujana, and several of their associates, coupled with additional efforts by the Government of Indonesia, likely disrupted JI's anti-Western attacks that had occurred annually from 2002-2005.
.
**Activities:** The group's most recent high-profile attack occurred in Bali on October 1, 2005, which left 26 persons dead, including the three suicide bombers. Other major JI attacks include the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003

bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing. The 2002 Bali attack, which killed more than 200, was one of the deadliest terrorist attacks since 9/11. In December 2001, Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies, and British and Australian diplomatic buildings in Singapore. In December 2000, JI coordinated bombings of numerous Christian churches in Indonesia and was involved in the bombings of several targets in Manila. In February 2004, JI facilitated attacks in Manila, Davao, and General Santos City. In 2007, the group staged an improvised explosive device (IED) attack in Sultan Kudarat that killed two civilians and injured thirty others. JI associates in the Philippines provide operational support and training for indigenous Philippine Muslim violent extremists.

**Strength:** Exact numbers currently are unknown. Estimates of total JI members vary from the hundreds to one thousand.

**Location/Area of Operation:** JI is based in Indonesia and is believed to have cells in Indonesia, Malaysia, and the Philippines.

**External Aid:** Investigations indicate that JI is fully capable of its own fundraising, although it also receives financial, ideological, and logistical support from Middle Eastern contacts and non-governmental organizations.

## Al-Jihad

Egyptian Islamic Jihad; Egyptian al-Jihad; New Jihad; Jihad Group

**Description**: In 2001, this Egyptian Islamic extremist group merged with al-Qa'ida (AQ). Usama bin Ladin's deputy, Ayman al-Zawahiri, was the former head of Al-Jihad (AJ). Active since the 1970s, AJ's primary goal has been the overthrow of the Egyptian government and the establishment of an Islamic state. The group's targets, historically, have been high-level Egyptian government officials as well as U.S. and Israeli interests in Egypt and abroad. Regular Egyptian crackdowns on extremists and Cairo's deradicalization measures aimed at imprisoned AJ members have greatly reduced AJ's capabilities in Egypt.

**Activities:** The original AJ was responsible for the 1981 assassination of Egyptian President Anwar Sadat. It claimed responsibility for the attempted assassinations in 1993 of Interior Minister Hassan al-Alfi and Prime Minister Atef Sedky. AJ has not conducted an attack inside Egypt since 1993 and has never successfully targeted foreign tourists there. The group was responsible for the Egyptian Embassy bombing in Islamabad in 1995, and a disrupted plot against the U.S. Embassy in Albania in 1998. AJ was dormant in 2007.

**Strength:** Believed to have several hundred hard-core members inside and outside Egypt.

**Location/Area of Operation:** Most AJ members today are outside Egypt in countries such as Afghanistan, Pakistan, Lebanon, the United Kingdom, and Yemen. AJ activities have been centered outside Egypt for several years under the auspices of AQ.

**External Aid:** Since 1998, AJ has received most of its funding from AQ; these close ties culminated in the eventual merger of the groups in June 2001. Some funding may come from various Islamic non-governmental organizations, cover businesses, and criminal acts.

## Kahane Chai (Kach)

a.k.a. American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description**: Kahane Chai's (Kach) stated goal was to restore the biblical state of Israel. The group disbanded in 2005. Kach was founded by radical Israeli-American rabbi Meir Kahane. Its offshoot, Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States. Both Kach and Kahane Chai were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law. This designation followed the groups' statements in support of Dr. Baruch Goldstein's attack in February 1994 on the Ibrahimi Mosque and their verbal attacks on the Israeli government. Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank. The group has attempted to gain seats in the Israeli Knesset over the past several decades, but has won only one seat, in 1984.

**Activities:** Kach has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. Kach is suspected of involvement in a number of low-level attacks since the start of the al-Aqsa Intifada in 2000.

**Strength:** Unknown.

**Location/Area of Operation:** Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

**External Aid:** Receives support from sympathizers in the United States and Europe.

## Kongra-Gel

Kurdistan Workers' Party (PKK); Freedom and Democracy Congress of Kurdistan (KADEK); Halu Mesru Savunma Kuvveti (HSK); Kurdistan Freedom and Democracy Congress; Kurdistan People's Congress (KHK); Partiya Karkeran Kurdistan; People's Congress of Kurdistan; The People's Defense Force

(**Note**: Despite name changes, the group is still most commonly referred to as the PKK; for the purposes of this report we use the name Kongra-Gel/Kurdistan Workers Party or KGK/PKK.)

**Description:** The Kongra-Gel/Kurdistan Worker's Party was founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization. The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984. The KGK/PKK aspired to establish an independent Kurdish state in southeastern Turkey, but in recent years has spoken more often about autonomy within a Turkish state that guaranteed Kurdish cultural and linguistic rights.

In the early 1990s, the KGK/PKK moved beyond rural-based insurgent activities to include urban terrorism. In the 1990s, southeastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons. Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues. Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group. The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years. Striking over the border from bases within Iraq the KGK/PKK engaged in terrorist attacks in eastern and western Turkey.

**Activities:** Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey. KGK/PKK's reputed military-wing, the People's Defense Force (HPG), has been responsible mainly for attacks against military and paramilitary targets in the southeastern area of Turkey. The group conducted attacks on Turkish diplomatic and commercial facilities in West European cities in 1993 and again in spring 1995.

In an attempt to damage Turkey's tourist industry, the KGK/PKK bombed tourist sites and hotels and kidnapped foreign tourists in the early-to-mid-1990s. KGK/PKK-initiated attacks rose from just five in 2000 to more than 70 in 2007. Last year was the most violent year for Turkish security forces since the 1990s, with more than 140 deaths attributed to counterterrorism related operations in eastern Turkey.

**Strength:** Approximately 4,000 to 5,000; 3,000 to 3,500 are currently located in northern Iraq.

**Location/Area of Operation:** Operates primarily in Turkey, Iraq, Europe, and the Middle East.

**External Aid:** In the past, KGK/PKK has received safe haven and modest aid from Syria, Iraq, and Iran. Since 1999, Syria and Iran have cooperated in a limited fashion with Turkey against the KGK/PKK. The group maintains a large extortion, fundraising, and propaganda network in Europe.


# Lashkar e-Tayyiba (LT)

a.k.a. Al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir

**Description:** Lashkar e-Tayyiba (LT) is one of the largest and most proficient of the Kashmiri-focused militant groups. LT formed in the late 1980s or early 1990s as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad (MDI), a Pakistan-based Islamic fundamentalist mission organization and charity founded to oppose the Soviet presence in Afghanistan. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad combined with other groups to mount attacks as "The Save Kashmir Movement. LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed. Elements of LT and Jaish-e-Muhammad (JEM) combined with other groups to mount attacks as "The Save Kashmir Movement." The Pakistani government banned the group and froze its assets in January 2002. LT and its leader, Hafiz Muhammad Saeed, continue to spread ideology advocating terrorism, as well as virulent rhetoric condemning the United States, India, Israel, and other perceived enemies.

**Activities:** LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993, as well as several high profile attacks inside India itself. LT claimed responsibility for numerous attacks in 2001, including an attack in January on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an attack in April against Indian border security forces that left at least four dead. The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building, although concrete evidence is lacking. LT is also suspected of involvement in May 2002 attack on an Indian Army base in Kaluchak that left 36 dead. India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack. Senior al-Qa'ida (AQ) lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of AQ members in Pakistan. Indian governmental officials hold LT responsible for the July 11, 2006 train attack in Mumbai and several attacks since then in Hyderabad.

**Strength:** The actual size of the group is unknown but LT has several thousand members in Azad Kashmir, Pakistan, in the southern Jammu and Kashmir and Doda regions, and in the Kashmir Valley. Most LT members are Pakistanis from madrassas across Pakistan or Afghan and/or veterans of the Afghan wars, though the group is alleged to augment its strength through collaboration with terrorist groups comprised of non-Pakistanis. The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

**Location/Area of Operation:** Based in Muridke (near Lahore) and Muzaffarabad, Pakistan; maintains a number of facilities, including training camps, schools, and medical clinics.

**External Aid:** Collects donations from the Pakistani expatriate communities in the Middle East and the United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people. LT coordinates its charitable activities through its front organization Jamaat ud-Daawa (JUD), which spearheaded humanitarian relief to the victims of the October 2005 earthquake in Kashmir. The precise amount of LT funding is unknown.

## Lashkar i Jhangvi (LJ)

**Description:** Lashkar i Jhangvi (LJ) is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan. LJ focuses primarily on anti-Shia attacks and was banned by Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence. Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties. After the collapse of the Taliban, LJ members became active in aiding other terrorists with safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.

**Activities:** LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan. In January, the Interior Ministry ordered the arrest of three LJ militants suspected of being involved in a suicide bombing at a Shia religious procession in Peshawar that killed 15 people. In February, police arrested 20 LJ militants who were wanted for various terrorism attacks in the Punjab and Sindh provinces. In June, Sindh authorities issued a statement attributing the April 2006 Mishtar Parking bombing in Karachi to a militant with ties to LJ. The government claimed that the group was involved in the April 2006 assassination attempt and the July 2006 assassination of Allama Turabi, an influential Shia leader. In October, Afghan security forces claimed to have arrested four Pakistani suicide bombers in Kandahar who asserted that they belonged to LJ.

In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the March bombing outside the U.S. Consulate in Karachi that killed one U.S. official. Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl. Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed. Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shia mosque in Quetta, Pakistan. Authorities also implicated LJ in several sectarian incidents in 2004, including the May and June bombings of two Shia mosques in Karachi that killed more than 40 people. In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province.

**Strength:** Probably fewer than 100.

**Location/Area of Operation:** LJ is active primarily in Punjab and Karachi. Some members travel between Pakistan and Afghanistan.

**External Aid:** Unknown.

## Liberation Tigers of Tamil Eelam (LTTE)
a.k.a. Ellalan Force; Tamil Tigers

**Description:** Founded in 1976, the Liberation Tigers of Tamil Eelam (LTTE) is a powerful Tamil secessionist group in Sri Lanka. The LTTE wants to establish an independent Tamil state

in the island's north and east. Since the beginning of its insurgency against the Sri Lankan government in 1983, it has evolved its capability from terrorist and guerilla tactics to conventional warfare. Although the LTTE nominally committed to a 2002 cease-fire agreement with the Sri Lankan government, it continued terrorist attacks against government leaders and dissident Tamils.

**Activities:** LTTE has integrated a battlefield insurgent strategy with a terrorist program that targets key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers. It has conducted a sustained campaign targeting rival Tamil groups and figures, and assassinated Prime Minister Rajiv Gandhi of India in 1991, and President Ranasinghe Premadasa of Sri Lanka in 1993. Although most notorious for its cadre of suicide bombers, the Black Tigers, the organization also features an amphibious force, the Sea Tigers; and a nascent air wing, the Air Tigers. Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2007. Political assassinations and bombings were commonplace tactics prior to the cease-fire and have increased again since mid-2005. After a period of targeting Sri Lankan military and official personnel throughout 2007, the LTTE appears to have recently resumed its targeting of civilians.

**Strength:** Exact strength is unknown, but LTTE is estimated to have 8,000 to 10,000 armed combatants in Sri Lanka, with an elite cadre of 5,000 to 7,000. LTTE also has a significant overseas support structure for fundraising, weapons procurement, and propaganda activities.

**Location/Area of Operations:** LTTE controls portions of the northern areas of Sri Lanka, where it has set up a de facto administrative structure, but over the past year, the LTTE has lost control of its eastern bases to the Sri Lankan military. LTTE also has conducted operations throughout the island and has established an extensive network of checkpoints and informants to keep track of any outsiders who enter the group's area of control.

**External Aid:** The LTTE uses its international contacts and the large Tamil Diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies. The group employs charities as fronts to collect and divert funds for their activities. In May 2007, Australian police arrested two individuals with ties to LTTE. The two were also accused of collecting money for tsunami relief and sending the funds to the LTTE in Sri Lanka instead. In November, the United States designated the Tamils Rehabilitation Organization (TRO) — a charitable organization with offices in seventeen countries worldwide —as an LTTE front organization that facilitates fundraising and procurement for the group.

## Libyan Islamic Fighting Group (LIFG)

**Description:** In the early 1990s, the Libyan Islamic Fighting Group (LIFG) emerged from the group of Libyans who had fought Soviet forces in Afghanistan and the Qadhafi regime in Libya. The LIFG declared Libyan President Muammar Qadhafi un-Islamic and pledged to overthrow him. In the years following, some members maintained a strictly anti-Qadhafi focus and targeted Libyan government interests. Others, such as Abu al-Faraj al-Libi, who in 2005 was arrested in Pakistan, aligned with Usama bin Ladin and are believed to be part of the al-Qa'ida (AQ)

leadership structure or active in the international terrorist network. On November 3, 2007, senior AQ leaders announced that LIFG had officially joined AQ.

**Activities:** Libyans associated with the LIFG are part of the broader international terrorist movement. The LIFG is one of the groups believed to have planned the Casablanca suicide bombings in May 2003. Spanish media in August 2005 linked Ziyad Hashem, an alleged member of the LIFG's media committee, as well as the imprisoned amir Abdallah al-Sadeq, with Tunisian Islamist Serhane Ben Abdelmajid Fakhet, the suspected ringleader in the 2004 Madrid attacks. The LIFG continued to target Libyan interests, and attempted to assassinate Qadhafi four times; the last attempt was in 1998. The LIFG engaged Libyan security forces in armed clashes during the 1990s. However, the LIFG has been largely operationally inactive in Libya since the late 1990s when members fled predominately to Europe and the Middle East because of tightened Libyan security measures. To date, the November 3 merger with AQ has not resulted in a significant increase in LIFG activities within Libya.

**Strength:** The LIFG probably has several hundred active members or supporters, mostly in the Middle East or Europe.

**Location/Area of Operation:** Since the late 1990s, many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the UK. It is likely that LIFG maintained a limited presence in eastern Libya.

**External Aid:** Unknown. The LIFG has used Islamic charitable organizations as cover for fundraising and transferring money and documents; it may have also financed operations with criminal activity.


## Moroccan Islamic Combatant Group (GICM)
a.k.a. Groupe Islamique Combattant Marocain

**Description: :** The Moroccan Islamic Combatant Group (GICM) has disintegrated, and it is likely that the few remaining former members no longer operate on behalf of any single group. Much of the leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. There is no indication that new leaders have emerged or additional members have been recruited to fill the ranks of arrested cell members, although individual extremists still pose a threat.

The Moroccan Islamic Combatant Group (GICM) was a clandestine transnational terrorist group centered in the Moroccan Diaspora communities of Western Europe. Its goals included establishing an Islamic state in Morocco and supporting al-Qa'ida's (AQ 's) war against the West by assisting in the assimilation of AQ operatives into Moroccan and European society. The group emerged in the 1990s and was comprised of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war. GICM members interact with other North African extremists, particularly in Europe.

**Activities:** GICM members were among those responsible for the 2004 Madrid bombing, and Moroccans associated with the GICM are part of the broader international terrorist movement.

GICM members were implicated in the recruitment network of individuals for Iraq, and at least one GICM member carried out a suicide attack against Coalition Forces in Iraq. GICM individuals are believed to have been involved in the 2003 Casablanca attacks.

**Strength:** Much of the GICM's leadership in Morocco and Europe have been killed, imprisoned, or are awaiting trial. Alleged leader Mohamed al-Guerbouzi was convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remained free in exile in the UK.

**Location/Area of Operation:** Morocco, Western Europe, Afghanistan, and Canada.

**External Aid:** The GICM was involved in narcotics trafficking in North Africa and Europe to fund its operations. Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks. The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan terrorist Jamal Ahmidan.


## Mujahadin-e Khalq Organization (MEK)

a.k.a. MKO; Mujahadin-e Khalq (Iranian government name for group); Muslim Iranian Students' Society; National Council of Resistance (NCR); Organization of the People's Holy Warriors of Iran; The National Liberation Army of Iran (NLA); The People's Mujahadin Organization of Iran (PMOI); National Council of Resistance of Iran (NCRI); Sazeman-e Mujahadin-e Khalq-e Iran

**Description:** The Mujahadin-e Khalq Organization (MEK) advocates the violent overthrow of the Iranian regime and was responsible for the assassination of several U.S. military personnel and civilians in the 1970s. The MEK's armed wing is known as the National Liberation Army of Iran (NLA). In December 2006, the European Court of Justice ruled to overturn the designation of the MEK as a terrorist organization but was not supported by the Council of the European Union (EU).

The MEK emerged in the 1960s as one of the more violent political movements opposed to the Pahlavi dynasty and its close relationship with the United States. MEK ideology has gone through several iterations and blends elements of Marxism, Islam, and feminism. The group has planned and executed terrorist operations against the Iranian regime for nearly three decades from its European and Iraqi bases of operations. Additionally, it has expanded its fundraising base, further developed its paramilitary skills, and aggressively worked to expand its European ranks. In addition to its terrorist credentials, the MEK has also displayed cult-like characteristics.

Upon entry into the group, new members are indoctrinated in MEK ideology and revisionist Iranian history. Members are also required to undertake a vow of "eternal divorce" and participate in weekly "ideological cleansings." Additionally, children are reportedly separated from parents at a young age. MEK leader Maryam Rajavi has established a "cult of personality." She claims to emulate the Prophet Muhammad and is viewed by members as the "Iranian President in exile."

**Activities:** The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives and has been supported by reprehensible regimes, including that of Saddam Hussein. During the 1970s, the MEK assassinated several U.S. military personnel and U.S. civilians working on defense projects in Tehran and supported the violent takeover in 1979 of the U.S. Embassy in Tehran.

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group. The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar. These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown which forced MEK leaders to flee to France. For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters. Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training. Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s. In 1991, the group reportedly assisted the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime. In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas. In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq. The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran. One attack included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President. In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border. Also in 2001, the FBI arrested seven Iranians in the United States who funneled $400,000 to an MEK-affiliated organization in the UAE, which used the funds to purchase weapons. Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and voluntarily surrendered their heavy-arms to Coalition control. Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq, under the protection of Coalition Forces.

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks. Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation. French authorities eventually released Rajavi. Although currently in hiding, Rajavi

has made "motivational" appearances via video-satellite to MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003. In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of Saddam Hussein handing over suitcases of money to known MEK leaders, and video of MEK operatives receiving training from the Iraqi military.

**Strength:** Estimates place MEK's worldwide membership at between 5,000 and 10,000 members, with large pockets in Paris and other major European capitals. In Iraq, roughly 3,400 MEK members are gathered under Coalition protection at Camp Ashraf, the MEK's main compound north of Baghdad, where they have been treated as "protected persons" consistent with provisions of the Fourth Geneva Convention. This status does not affect the group's members outside of Camp Ashraf or the MEK's designation as a Foreign Terrorist Organization.

As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks, armored personnel carriers, and heavy artillery. A significant number of MEK personnel have voluntarily left Ashraf, and an additional several hundred individuals have renounced ties to the MEK and been voluntarily repatriated to Iran.

**Location/Area of Operation:** The MEK maintains its main headquarters in Paris and has concentrations of members across Europe, in addition to the large concentration of MEK located at Camp Ashraf in Iraq. The MEK's global support structure remains in place, with associates and supporters scattered throughout Europe and North America. Operations target Iranian regime elements across the globe, including in Europe and Iran. MEK's political arm, the National Council of Resistance of Iran (NCRI), has a global support network with active lobbying and propaganda efforts in major Western capitals. NCRI also has a well-developed media communications strategy.

**External Aid:** Before Operation Iraqi Freedom began in 2003, the MEK received all of its military assistance and most of its financial support from Saddam Hussein. The fall of Saddam's regime has led MEK increasingly to rely on front organizations to solicit contributions from expatriate Iranian communities.

# National Liberation Army (ELN)

a.k.a. Ejercito de Liberacion Nacional

**Description:** The National Liberation Army (ELN) is a Colombian Marxist-Leninist terrorist group formed in 1964 by urban intellectuals inspired by Fidel Castro and Che Guevara. It is primarily rural-based, although it possesses several urban units. Peace talks between the ELN and the Colombian government began in Cuba in December 2005 and continued as recently as August 2007. To date, Bogota and the ELN have yet to agree on a formal framework for peace negotiations.

**Activities**: The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities. It has minimal conventional military capabilities. The group conducts kidnappings for ransom, often targeting foreign employees of large corporations, especially in the petroleum industry. In August, ELN leadership discussed the possibility of ending kidnapping as a means of financing insurgent operations as a government-proposed precondition for formal peace talks. However, the organization has yet to renounce kidnapping. ELN derives some revenue from taxation of the illegal narcotics industry, and its involvement may be increasing. It attacks energy infrastructure and has inflicted major damage on oil and natural gas pipelines and the electrical distribution network, but has lost much of its capacity to carry out these types of attacks in recent years.

**Strength:** Approximately 3,000 armed combatants and an unknown number of active supporters.

**Location/Area of Operation:** Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, and Venezuelan border regions.

**External Aid:** Cuba provides some medical care and political consultation.

## Palestine Liberation Front (PLF)
a.k.a. PLF-Abu Abbas; Palestine Liberation Front – Abu Abbas Faction

**Description:** In the late 1970s the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and later split into pro-PLO, pro-Syrian, and pro-Libyan factions. The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:** Abbas's group was responsible for the 1985 attack on the Italian cruise ship *Achille Lauro* and the murder of U.S. citizen Leon Klinghoffer. In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s. In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq. Current leadership and membership of the relatively small PLF appears to be based in Lebanon and the Palestinian territories. The PLF took part in the 2006 Palestinian parliamentary elections but did not win a seat.

**Strength:** Estimates have placed membership between 50 and 500.

**Location/Area of Operation:** Based in Iraq from 1990 until 2003. The group currently is based in Lebanon and Syria.

**External Aid:** Unknown.

## Palestine Islamic Jihad (PIJ)
a.k.a. Palestine Islamic Jihad-Shaqaqi Faction; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic

Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya Al-Quds; Al-Awdah Brigades

**Description:** Formed by militant Palestinians in Gaza during the 1970s, Palestine Islamic Jihad (PIJ) is committed to both the creation of an Islamic state in all of historic Palestine, including present day Israel, and the destruction of Israel through attacks against Israeli military and civilian targets.

**Activities:** PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets. In 2006, the group conducted two suicide bombings and launched numerous homemade rockets from Gaza into neighboring Israeli towns. PIJ continues to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories. Although U.S. citizens have died in PIJ mounted attacks, the group has not directly targeted U.S. interests. All but one of PIJ's attacks in 2007 consisted of rocket attacks aimed at southern Israeli cities.

**Strength:** Unknown.

**Location/Area of Operation:** Primarily Israel, the West Bank, and Gaza. The group's senior leadership resides in Syria. Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**External Aid:** Receives financial assistance and training primarily from Iran. Syria provides the group with safe haven.


## Popular Front for the Liberation of Palestine (PFLP)

a.k.a. Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles

**Description:** The Popular Front for the Liberation of Palestine (PFLP), a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967. The PFLP does not view the Palestinian struggle as religious, seeing it instead as a broader revolution against Western imperialism. The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens. A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:** The PFLP stepped up its operational activity during the al-Aqsa intifada. This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year. In March 2006, the PFLP's current Secretary General, Ahmed Sa'adat, who had been imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and is now awaiting trial. The PFLP-GC is suspected in several rocket attacks against Israel in 2007.

**Strength:** Unknown.

**Location/Area of Operation:** Syria, Lebanon, Israel, the West Bank, and Gaza.

**External Aid:** Receives safe haven and some logistical assistance from Syria.


## Popular Front for the Liberation of Palestine-General Command (PFLP-GC)

**Description:** The Popular Front for the Liberation of Palestine-General Command (PFLP-GC) split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics. Originally, the group was violently opposed to the Arafat-led PLO. Ahmad Jibril, a former captain in the Syrian Army, whose son Jihad was killed by a car bomb in May 2002, has led the PFLP-GC since its founding. The PFLP-GC is closely tied to both Syria and Iran.

**Activities:** The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s. The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders. The group's primary focus now is on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and weapons smuggling. The PFLP-GC maintains an armed presence in several Palestinian refugee camps and its own military bases in Lebanon. The PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel in 2007.

**Strength:** Several hundred to several thousand.

**Location/Area of Operation:** Headquartered in Damascus with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.

**External Aid:** Receives logistical and military support from Syria and financial support from Iran.


## Al Qaʾida

a.k.a. al Qaeda; International Front for Fighting Jews and Crusaders; Islamic Army; Islamic Army for the Liberation of Holy Sites; Islamic Salvation Foundation; The Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; The World Islamic Front for Jihad Against Jews and Crusaders; Usama bin Ladin Network; Usama bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:** Al-Qaʾida (AQ) was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union. The group helped finance, recruit, transport, and train Sunni Islamic extremists for the Afghan resistance. AQ's near-term goal is uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries. Its ultimate goal is the

establishment of a pan-Islamic caliphate throughout the world. AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders" saying it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere. AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.

**Activities:** Even as AQ's top leaders continue to plot and direct terror attacks worldwide, terrorists affiliated with but not necessarily controlled by AQ have increasingly carried out high-profile attacks. AQ, its affiliates, and those inspired by the group were involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices.

AQ has reconstituted some of its pre-9/11 operational capabilities through the reestablishment of a safe haven in the Federally Administered Tribal Areas (FATA) of Pakistan, replacement of captured or killed operational lieutenants, and the restoration of some central control by its top leadership, in particular Ayman al-Zawahiri. Although bin Ladin remains the group's ideological figurehead, Zawahiri has emerged as AQ's strategic and operational planner.

AQ is assessed to be the top terrorist threat to the United States and is developing stronger operational relationships with affiliates in the Middle East, North Africa, and Europe. It is through these "franchises" that AQ has conducted its recent attacks. AQ remains committed to attacking the United States and focuses its planning on targets that would produce mass casualties, dramatic visual destruction, and economic dislocation. In a 1999 interview with the press, bin Ladin's response to a question about chemical and nuclear weapons was, "Acquiring weapons for the defense of Muslims is a religious duty."

The Government of Pakistan accused AQ, along with the Taliban, of being responsible for the October suicide bombing attempt against former Pakistani Prime Minister Benazir Bhutto that killed at least 144 people in Karachi, Pakistan. On December 27, the Government of Pakistan stated that Baitullah Mahsud, a leading Pakistani Taliban commander with close ties to AQ, was responsible for the assassination of Benazir Bhutto.

In 2006, AQ and affiliated organizations continued major efforts to attack the West and its interests. For example, in mid-August, UK and U.S. authorities foiled a plot to blow up several aircraft. AQ may have been complicit in the plot but the group has made no public statement claiming its involvement. Additionally, al-Qa'ida in the Arabian Peninsula claimed responsibility for the February 24, 2006 attack on the Abqaiq petroleum processing facility, the largest such facility in the world, in Saudi Arabia. The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida in September 2006, subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM), and attacked a U.S. contractor bus in December 2006 in greater Algiers, marking its first attack against a U.S. entity. On December 11, 2007, AQIM conducted a near-simultaneous double suicide bombing that hit both the Algerian Court building and a UN office building. The Libyan Islamic Fighting Group (LIFG) also officially merged with AQ in November 2007, although no significant LIFG activities have occurred since the merger.

Bin Ladin's deputy Ayman al-Zawahiri claimed responsibility on behalf of AQ for multiple attacks on July 7, 2005 against the London public transportation system. The extent of senior

leadership involvement in planning the July 2005 attacks was unclear. Some suspects in the attacks included homegrown United Kingdom-based extremists who were "inspired" by AQ. In 2003 and 2004, Saudi-based AQ operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia. AQ may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people. Pakistani President Musharraf blames AQ for two attempts on his life in December 2003.

In October 2002, AQ directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four. The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya that killed 15. AQ probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC, and a fourth into a field in Shanksville, Pennsylvania – leaving nearly 3,000 individuals dead or missing. In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39. AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam killing at least 301 individuals and injuring more than 5,000 others. AQ and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.

**Strength:** AQ's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11, but several thousand members and associates comprise the AQ-associated movement. The arrests and deaths of mid-level and senior AQ operatives have disrupted some communication, financial, and facilitation nodes and disrupted some terrorist plots. Additionally, supporters and associates worldwide who are "inspired" by the group's ideology may be operating without direction from AQ central leadership; it is impossible to estimate their numbers. AQ also serves as a focal point of "inspiration" for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahadin, Ansar al-Sunnah, the Taliban, and Jemaah Islamiya.

**Location/Area of Operation:** AQ worldwide networks are augmented by ties to local Sunni extremists. The group was based in Afghanistan until Coalition Forces removed the Taliban from power in late 2001. While the largest concentration of senior AQ members now resides in Pakistan's Federally Administered Tribal Areas, the network incorporates members of al-Qa'ida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia who are working to carry out future attacks against U.S. and Western interests.

**External Aid:** Al-Qa'ida primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause. Some funds are diverted from Islamic charitable organizations. In addition, parts of the organization raise funds through criminal activities; for example, al-Qa'ida in Iraq raises funds through

hostage-taking for ransom, and members in Europe have engaged in credit card fraud. U.S. and international efforts to block al-Qa'ida funding have hampered the group's ability to raise money.

## Al-Qa'ida in Iraq

a.k.a. al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; Al-Qa'ida of Jihad Organization in the Land of The Two Rivers; Al-Qa'ida of the Jihad in the Land of the Two Rivers; Al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network

**Description:** In January 2006, in an attempt to unify Sunni extremists in Iraq, al-Qa'ida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni terrorist groups in Iraq. AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qa'ida's goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks. Although Iraqis compose 90 percent of the group's membership, it is probable that the majority of AQI's leadership is foreign-born. In an attempt to give AQI a more Iraqi persona, the Islamic State of Iraq umbrella organization was created and headed by "Abu Omar al-Baghdadi."

Abu Ayyub al-Masri, Zarqawi's successor, issued a statement pledging to continue what Zarqawi began, and AQI has continued its strategy of targeting Coalition Forces, Iraqi government groups, and Shia civilians to provoke sectarian violence and undermine perceptions that the Iraqi central government can defend them.

AQI has claimed joint attacks with both Ansar Al-Sunnah (AS) and the Islamic Army in Iraq (IAI); however, ideological differences have prevented these groups from merging. More recently, IAI and the 1920 Revolution Brigades cooperated with Coalition Forces in targeting AQI.  *(See Chapter 2, Country Reports, Middle East and North Africa, for further information on U.S. efforts to counter AQI.)*

**Activities:** High-profile attacks in 2007 included the suicide car-bombing attack of a mosque in Al Habbaniyah in February, the multiple suicide bombing attack of Shia pilgrims in Al Hillah in March, several chlorine gas canister bombings from January through June, an orchestrated bridge bombing campaign throughout Iraq aimed at isolating Baghdad Shia population concentrations and disrupting ground transportation from January through October, the suicide truck bombing of a market in Tall 'Afar in March, the suicide truck bombings of a market and Patriotic Union of Kurdistan (PUK) party offices in Amurli and Kirkuk in July, and the single deadliest attack of the Iraq war, the multiple suicide truck bombings of two Yazidi villages near Sinjar in August.

In August 2003, Zarqawi's group carried out major terrorist attacks in Iraq when it bombed the Jordanian Embassy in Baghdad, which was followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq (SCIRI). The group kept up its attack pace throughout 2003, striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross. Zarqawi's group conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad. The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market. It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004). AQI was likely involved in other hostage incidents as well. In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24. The group also continued assassinations against Shia leaders and members of the Shia militia groups Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December. In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships. Prior to 2005, Zarqawi planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002. In October 2006, AQI declared the ISI would become a platform from which AQI would launch terrorist attacks throughout the world. Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force. AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006 but decreased significantly in 2007. AQI was implicated in the February 2006 Samarra' al-Askari Mosque bombing that precipitated the escalation in sectarian violence.

AQI senior leaders in Iraq may have had advance knowledge of terrorist attacks in Iraq that incorporated chlorine into vehicle-borne improvised explosive devices (VBIEDs). However, the use of chlorine in suicide attacks probably represents an opportunistic evolution of conventional VBIED attacks.

**Strength:** Membership is estimated at 5,000 to 10,000, making it the largest Sunni extremist group in Iraq. AQI perpetrates the majority of suicide and mass casualty bombings in Iraq with foreign operatives constituting the majority of these bombers. The selection of civilian targets, particularly in Baghdad, generates widespread media coverage.

**Location/Area of Operation:** AQI's operations are predominately Iraq-based, but it has perpetrated attacks in Jordan. The group maintains an extensive logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe. In Iraq, AQI currently conducts the majority of its operations in Ninawa, Diyala, Salah ad Din, and Baghdad provinces and to a lesser extent Al Anbar.

**External Aid**: AQI probably receives funds from donors in the Middle East and Europe, local sympathizers in Iraq, from a variety of businesses and criminal activities, and other international extremists throughout the world. In many cases, AQI's donors are probably motivated to support terrorism rather than an attachment to any specific terrorist group.

## Al-Qa'ida in the Islamic Maghreb (AQIM)

a.k.a.  Tanzim al-Qa'ida fi Bilad al-Maghrib al-Islamiya; Le Groupe Salafiste pour la Predication et le Combat; Salafist Group for Call and Combat; Salafist Group for Preaching and Combat

**Description:** The Salafist Group for Preaching and Combat (GSPC) officially merged with al-Qa'ida (AQ) in September 2006 and subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM). The GSPC formed in 1998 when its members left the Armed Islamic Group (GIA) over disagreements about leadership, tactics, and indiscriminant targeting of Algerian civilians. In contrast to the GIA, it has pledged to avoid attacks on civilians inside Algeria, but civilians have died in numerous GSCP/AQIM attacks. The GSPC retained GIA's mission of overthrowing the Algerian government and installing an Islamic regime. AQIM is the most effective and largest armed group inside Algeria. AQIM and AQ have used the merger extensively in their propaganda.

**Activities**:  On April 11, 2007, AQIM for the first time employed suicide tactics. The attacks on that date, near-simultaneous bombings of multiple targets inside Algiers including the office of Algeria's prime minister, claimed more than 30 lives. Shortly thereafter, AQIM vowed to continue to use suicide tactics, and the organization carried out five further suicide attacks in Algeria during 2007. On December 11, AQIM carried out two near-simultaneous suicide vehicle-borne improvised explosive device (VBIED) attacks that struck two UN offices and the headquarters of Algeria's Constitutional Council, killing 41 people, (including 17 UN employees), and wounding at least 170 others. AQIM had previously attacked vehicles belonging to foreign corporations several times during the year, beginning in December 2006 with an attack in Algiers on a bus belonging to a U.S.-Algeria joint venture and carrying several expatriate workers.

Outside Algeria, in December 2007, multiple AQIM-linked attacks in Mauritania were the first terrorist incidents since 2005, when the GSPC had claimed responsibility for an attack on a remote Mauritanian military outpost that killed 15; this appeared to indicate an AQIM shift towards a more regional terrorist campaign. Also during 2007, police in France, Italy, and Spain arrested several individuals from Algeria and other Maghreb countries suspected of providing support to AQIM. French officials announced that AQIM had issued an Internet call-to-action against France, declaring France "public enemy number one."

**Strength:** AQIM has several hundred fighters operating in Algeria and the Sahel. Abdelmalek Droukdel, a.k.a. Abu Mus'ab Abd al-Wadoud is the leader of the group.

**Location/Area of Operation:** Algeria and the Sahel, with affiliates and logistics/fundraisers in Western Europe.

**External Aid:** Algerian expatriates and AQIM members abroad, many residing in Western Europe, provide financial and logistical support. AQIM members also engage in criminal activity to finance their operations.

# Real IRA (RIRA)

a.k.a. 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Irish Republican Army; Real Oglaigh Na Heireann

**Description:** Like the Continuity IRA, the Real IRA (RIRA) did not participate in the September 2005 weapons decommissioning. RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland. RIRA also seeks to disrupt the Northern Ireland peace process. The 32 County Sovereignty Movement opposed Sinn Fein's September 1997 adoption of the Mitchell principles of democracy and non-violence; it also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland. Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, RIRA pledged additional violence and continued to conduct attacks.

**Activities:** Many RIRA members are former Provisional Irish Republican Army members who left that organization after it renewed its cease-fire in 1997. These members brought a wealth of experience in terrorist tactics and bomb-making to RIRA. Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities. RIRA's most recent fatal attack was in August 2002 at a London army base, killing a construction worker. The organization seeks to improve its intelligence-gathering ability, engineering capacity, and access to weaponry; it also trains members in the use of guns and explosives. RIRA continues to attract new members, and its senior members are committed to launching attacks on security forces. Three suspected RIRA members that engaged in cigarette smuggling were arrested in Spain in 2006. From 2006 to November 2007, terrorist activity in the form of successful and attempted attacks by RIRA slightly decreased. Notably, between August and November 2006, throughout Northern Ireland, RIRA targeted B&Q home-supply stores and other retail businesses in successful and attempted firebombings, although a handful of these attacks were also claimed by the Continuity Irish Republican Army (CIRA). In November 2007, RIRA claimed two armed attacks that wounded two Police Service of Northern Ireland (PSNI) officers.

**Strength:** According to the Irish government, RIRA has approximately 100 active members. The organization may receive limited support from IRA hardliners and Republican sympathizers

dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process. Approximately 40 RIRA members are in Irish jails.

**Location/Area of Operation:** Northern Ireland, Great Britain, and the Irish Republic.

**External Aid:** RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers. RIRA also is reported to have purchased weapons from the Balkans.

## Revolutionary Armed Forces of Colombia (FARC)
a.k.a. Fuerzas Armadas Revolucionarias de Colombia

**Description:** The Revolutionary Armed Forces of Colombia (FARC) is Latin America's oldest, largest, most capable, and best-equipped insurgency. It began in the early sixties as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology, although it only nominally fights in support of Marxist goals today. The FARC is governed by a general secretariat led by co-founder Antonio Marin (a.k.a. Manuel Marulanda or "Tirofijo") and six others, including senior military commander Victor Suarez (a.k.a. Jorge Briceno or "Mono Jojoy"). The FARC is organized along military lines and includes some specialized urban fighting units. A Colombian military offensive targeting FARC fighters in southern Colombia has experienced some success, with a number of FARC mid-level leaders killed or captured. Colombian military operations in September and October resulted in the deaths of Thomas Median Caracas (a.k.a. "Negro Acacio") and Gustavo Rueda (a.k.a. "Martin Caberllero"), two senior FARC military commanders, respectively.

**Activities**: The FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets. In February 2003, when a U.S. plane crashed in a FARC-held area, the FARC murdered a U.S. citizen and a Colombian; it continues to hold hostage the three other U.S. citizens that were on the plane. In late 2007, the Colombian government granted Venezuelan President Hugo Chavez permission to negotiate with the FARC to secure the release of the three U.S. citizens and 42 other so-called "political" hostages, some held as long as a decade. Colombia ended Chavez' role after he repeatedly ignored Colombian positions, however, the FARC did release two hostages. Foreign citizens were often targets of abductions that the FARC carried out to obtain ransom and political leverage. The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.

**Strength:** Approximately 9,000 to 12,000 combatants and several thousand more supporters.

**Location/Area of Operation:** Primarily in Colombia with some activities such as extortion, kidnapping, weapons sourcing, and logistics in neighboring countries.

**External Aid:** Cuba provided some medical care, safe haven, and political consultation. Venezuela supplied some lethal aid to the FARC, although this may be a result of individual

corruption rather than official policy; available information is not conclusive. The FARC often used the Colombia/Venezuela and Colombia/Ecuador border areas for incursions into Colombia and also used Venezuelan and Ecuadorian territory for safe haven, although the degree of government acquiescence was not clear and may vary depending on cross-border relations.

## Revolutionary Nuclei

a.k.a. Revolutionary Cells; ELA; Epanastatiki Pirines; Epanastatikos Laikos Agonas; June 78; Liberation Struggle; Organization of Revolutionary Internationalist Solidarity; Popular Revolutionary Struggle; Revolutionary People's Struggle; Revolutionary Popular Struggle

**Description:** Revolutionary Nuclei (RN) emerged from a broad range of anti-establishment and anti-U.S./NATO/EU leftist groups active in Greece between 1995 and 1998. The group is believed to be the successor to or offshoot of Greece's most prolific terrorist group, Revolutionary People's Struggle (ELA), which has not claimed an attack since January 1995. Indeed, RN appeared to fill the void left by ELA, particularly as lesser groups faded from the scene. RN's few communiqués show strong similarities in rhetoric, tone, and theme to ELA proclamations.

**Activities:** Since it began operations in January 1995, the group has claimed responsibility for some two dozen arson attacks and low-level bombings against a range of U.S., Greek, and other European targets in Greece. In its most infamous and lethal attack to date, the group claimed responsibility for a bomb it detonated at the Intercontinental Hotel in April 1999 that resulted in the death of a Greek woman and injury of a Greek man. RN's modus operandi includes warning calls of impending attacks, attacks targeting property instead of individuals, use of rudimentary timing devices, and strikes during the late evening to early morning hours. RN may have been responsible for two attacks in July 2003 against a U.S. insurance company and a local bank in Athens. RN's last confirmed attacks against U.S. interests in Greece came in November 2000, with two separate bombings against the Athens offices of Citigroup and the studio of a Greek-American sculptor. Greek targets have included judicial and other government office buildings, private vehicles, and the offices of Greek firms involved in NATO-related defense contracts in Greece. Similarly, the group has attacked European interests in Athens.

**Strength:** Group membership is believed to be small, probably drawing from the Greek militant leftist or anarchist milieu.

**Location/Area of Operation:** Primary area of operation is the Athens metropolitan area.

**External Aid:** Unknown but believed to be self-sustaining.

## Revolutionary Organization 17 November

a.k.a. Epanastatiki Organosi 17 Noemvri; 17 November

**Description:** Revolutionary Organization 17 November (17N) is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that

protested the ruling military junta. 17N is an anti-Greek, anti-U.S., anti-Turkey, and anti-NATO group that seeks the ouster of U.S. bases from Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

**Activities:** Initial attacks were assassinations of senior U.S. officials and Greek public figures. Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975. The group began using bombings in the 1980s. In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece, and added improvised rocket attacks to its methods. The group supported itself largely through bank robberies. A failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, coupled with robust detective work, led to the arrest of 19 members, the first 17N operatives ever arrested, including a key leader of the organization. In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms. Four other alleged members were acquitted for lack of evidence. In December 2005, against the backdrop of a sympathetic press, a group appeals trial opened for the 15 convicted members and two of the previously acquitted members. The appeals trial essentially represents a new trial for the convicts because new evidence and facts can be introduced under Greek law. At the conclusion of the appeals trial in May 2007, 13 of the 17 members of 17N were found guilty of terrorism. Two members already released from prison for medical reasons in July 2006 and 2005 were cleared of their charges since the crimes they were suspected of committing were outside of the Greek twenty-year statute of limitations. Two others were also acquitted due to doubts surrounding the charges against them. The last suspected attack by 17N occurred in May 2004, at a courthouse in Larissa, Greece, wounding one civilian and causing minor damage to the facility. Although no group claimed responsibility for the attack, authorities believed 17N was responsible.

**Strength:** Unknown but presumed to be small.

**Location/Area of Operation:** Athens, Greece.

**External Aid:** Unknown.


## Revolutionary People's Liberation Party/Front (DHKP/C)

a.k.a. Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:** The Revolutionary People's Liberation Party/Front (DHKP/C) originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth). It was renamed in 1994, after factional infighting. "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations. The group espouses a Marxist-Leninist ideology and is vehemently anti-U.S., anti-NATO, and anti-Turkish establishment. Its goals are the establishment of a socialist state and the abolition of F-type prisons, which contain one to three-man prison cells. DHKP/C finances its activities chiefly through donations and extortion.

**Activities:** Since the late 1980s, the group has targeted primarily current and retired Turkish security and military officials. It began a new campaign against foreign interests in 1990, which

included attacks against U.S. military and diplomatic personnel and facilities. To protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities. In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others; the perpetrators fled to Belgium, where legal cases continue. DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September. Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity. Attacks against U.S. targets beginning in 2003 probably came in response to Operation Iraqi Freedom.

Operations and arrests against the group have weakened its capabilities. In late June 2004, the group was suspected of a bus bombing at Istanbul University, which killed four civilians and 21 other people. In July 2005, in Ankara, police intercepted and killed a suicide bomber who attempted to attack the Ministry of Justice. In June 2006, in Istanbul, the group fired upon and killed a police officer; four members of the group were arrested the next month for the attack.

In January 2007, authorities raided DHKP/C safe-houses in Duinbergen, Belgium, and in Istanbul, Turkey, resulting in the confiscation of weapons, bomb-making material, documents, and propaganda material, and in the arrest of several members of DHKP/C. In the spring of 2007, the Belgian Supreme Court overturned, on procedural grounds, the conviction of several DHKP/C operatives, including the DHKP/C spokesman in Belgium, Bahar Kimyougur, and key figure Musa Asoglu, who had been convicted of membership in a terrorist organization, arms possession, and using forged documents.

**Strength:** Probably several dozen terrorist operatives inside Turkey, with a large support network throughout Europe.

**Location/Area of Operation:** Turkey, primarily Istanbul, Ankara, Izmir, and Adana.

**External Aid:** Widely believed to have training facilities or offices in Lebanon and Syria. DHKP/C raises funds in Europe.


# Shining Path (SL)

a.k.a. Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:** Former university professor Abimael Guzman formed the Shining Path (SL) in Peru in the late 1960s, and his teachings created the foundation of SL's militant Maoist doctrine. In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere. The Peruvian government made dramatic gains against SL during the 1990s, but recent SL attacks against Peruvian counternarcotics police underscore that SL continues to be a threat. In

response to SL's bloody attacks in late 2005, Peruvian authorities stepped up counterterrorism efforts against the group. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments. More recently, SL members have attempted to influence the local populace through indoctrination versus violence.

**Activities:** In the past, SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations. Remnants of SL now focus on drug-trafficking activities to obtain funds to carry out attacks.

**Strength:** Unknown but estimated to be between 200 and 300 armed militants.

**Location/Area of Operation:** Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

**External Aid:** None.


## United Self-Defense Forces of Colombia (AUC)
a.k.a. Autodefensas Unidas de Colombia

**Description:** The United Self-Defense Forces of Colombia (AUC), commonly referred to as the paramilitaries, was an umbrella group formed in April 1997 to organize loosely affiliated illegal paramilitary groups that had emerged to retaliate against leftist guerillas fighting the Colombian government and the landed establishment. The AUC increasingly discarded its counterguerilla activities, electing instead to involve itself in the illegal drug trade. By 2007, as the result of a large demobilization process, most of the AUC's centralized military structure had been dismantled, and all of the top paramilitary chiefs had stepped down with the majority being held in a maximum security facility. More than 31,000 paramilitary members and support personnel demobilized bloc by bloc from 2003 to 2006. Colombia now faces criminal gangs formed by demobilized paramilitaries and other individuals, and one minor paramilitary group that refused to disarm. Unlike the AUC, the new criminal groups make little claim to fighting insurgents and are more clearly criminal enterprises focused primarily on drug trafficking, other lucrative illicit activities, and influencing local politics to facilitate their criminal ventures. These new criminal groups are not a reconstituted AUC, but they recruit heavily from the pool of former AUC members. A large part of their leadership appears to be former mid-level paramilitary commanders who did not participate in demobilization.

**Activities:** Paramilitary operations varied from assassinating suspected insurgent supporters to engaging insurgent combat units. As much as 70 percent of the paramilitary operational costs were financed with drug-related earnings, with the rest coming from "donations" from sponsors and government corruption. These groups generally avoided actions against U.S. personnel or interests. Traditional paramilitary operations are largely nonexistent as a result of the demobilization of all AUC groups, although some individuals are violating their demobilization commitments by continued participation in criminal activities.

**Strength:** The Colombian government has determined that the AUC no longer exists. The Colombian government and Organization of American States estimate that 22 new criminal groups have emerged in the wake of AUC demobilization. According to Colombian government figures, approximately 10 to 15 percent of the 3,000 to 4,000 members of these groups are former members of paramilitary groups, including the AUC.

**Location/Areas of Operation:** Paramilitary forces were strongest in northwest Colombia in Antioquia, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

**External Aid:** None.

Chapter 7
Legislative Requirements and Key Terms

***Country Reports on Terrorism 2007*** is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act. Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

Excerpts and Summary of Key Statutory Terms

Section 2656f(a) of Title 22 of the United States Code states as follows:

(a) … The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing –

*(1) (A) detailed assessments with respect to each foreign country –*

*(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;*

*(ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and*

*(iii) which the Secretary determines should be the subject of such report; and*

*(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;*

*(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;*

*(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on-*

*(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and*

*(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and*

*(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).*

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;
(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and
(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.

**The "7120 Report."** Title 22 USC Section 2656f(b) requires the Department of State, to the extent feasible, to provide to Congress an update of the information contained in the report required to be transmitted to Congress under Section 7120(b) of the 9/11 Commission Implementation Act of 2004 (also known as the Intelligence Reform and Terrorist Prevention Act of 2004 or "IRTPA"). The "7120 Report" forms a part of the annual *Country Reports on Terrorism*, and the terrorist sanctuary reporting required under Sections 22 USC 2656f(a)(1)(B) and (b)(2) is integrated with the information required under Section 7120(b)(1) of IRTPA.

**Interpretation and Application of Key Terms.** For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC. 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the USG on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

**Statistical Information.** Pursuant to 22 USC § 2656f(b), this report must contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This requirement is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Counterterrorism Center (NCTC). The statistical annex includes a discussion of the methodology employed by NCTC in compiling the relevant data.

This report does not contain statistical information specifically concerning combatants. The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets. Further, it would not be practicable to provide such statistics, as the government does not maintain - and would have great difficulty maintaining - statistics that distinguish between incidents against combatants by terrorist groups and by others, including insurgents, in Iraq and Afghanistan.

**Contextual Reporting.** Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists. Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations. It is terrorist groups, and their actions, that are the focus of this report. Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw. This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence. Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily "international terrorism" and therefore are not subject to the statutory reporting requirement.