# Country Reports on Terrorism 2009

**August 2010**

_____

United States Department of State Publication
Office of the Coordinator for Counterterrorism
Released August 2010

*Country Reports on Terrorism 2009* is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide to Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act.

# COUNTRY REPORTS ON TERRORISM 2009

## Table of Contents

**Foreword**

**Chapter 1.   Strategic Assessment**

**Chapter 2.  Country Reports**

**Africa Overview**

Trans-Sahara Counterterrorism Partnership
The African Union
Angola
Botswana
Burkina Faso
Burundi
Cape Verde
Comoros
Democratic Republic of the Congo
Cote D'Ivoire
Djibouti
Equatorial Guinea
Eritrea
Ethiopia
Gabon
Ghana
Kenya
Liberia
Madagascar
Mali
Mauritania
Niger
Nigeria

Rwanda
Sao Tome and Principe
Senegal
Somalia
South Africa
Tanzania
Uganda
Zambia
Zimbabwe

**East Asia and Pacific Overview**
Australia
Burma
Cambodia
China
o   Hong Kong
o   Macau
Indonesia
Japan
Republic of Korea (South Korea)
Democratic People's Republic of Korea (North Korea)
Laos
Malaysia
Micronesia, Federated States of
Mongolia
New Zealand
Palau
Philippines
Singapore
Taiwan
Thailand

**Europe Overview**
Albania
Armenia
Austria
Azerbaijan
Belgium

Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Kosovo
Latvia
Lithuania
Macedonia
Malta
Moldova
Montenegro
The Netherlands
Norway
Poland
Portugal
Romania
Russia
Serbia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Turkey
Ukraine
United Kingdom

o   Northern Ireland

**Middle East and North Africa Overview**

Algeria
Bahrain
Egypt
Iraq
Israel, West Bank, and Gaza
Jordan
Kuwait
Lebanon
Libya
Morocco
Oman
Qatar
Saudi Arabia
Tunisia
United Arab Emirates
Yemen

**South and Central Asia Overview**

Afghanistan
Bangladesh
India
Kazakhstan
Kyrgyzstan
Nepal
Pakistan
Sri Lanka
Tajikistan
Turkmenistan
Uzbekistan

**Western Hemisphere Overview**

Tri-Border Area
Argentina
Belize
Bolivia

Brazil
Canada
Chile
Colombia
Dominican Republic
Ecuador
El Salvador
Guatemala
Haiti
Honduras
Jamaica
Mexico
Nicaragua
Panama
Paraguay
Peru
Suriname
Trinidad and Tobago
Uruguay
Venezuela

**Chapter 3.  State Sponsors of Terrorism Overview**
Cuba
Iran
Sudan
Syria

**Chapter 4. The Global Challenge of  WMD Terrorism**

**Chapter 5. Terrorist Safe Havens**
Terrorist Safe Havens
Strategies, Tactics, Tools for Disrupting or Eliminating Safe Havens
International Conventions and Protocols Matrix

**Chapter 6.  Terrorist Organizations**
**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group (ASG)**
**Al-Aqsa Martyrs Brigade (AAMB)**

**Al-Shabaab (AS)**
**Ansar al-Islam**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo (AUM)**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)**
**Harakat ul-Mujahideen (HUM)**
**Hizballah**
**Islamic Jihad Union (IJU)**
**Islamic Movement of Uzbekistan  (IMU)**
**Jaish-e-Mohammed  (JEM)**
**Jemaah Islamiya (JI)**
**Kahane Chai**
**Kata'ib Hizballah (KH)**
**Kurdistan Workers' Party (PKK)**
**Lashkar e-Tayyiba (LT)**
**Lashkar i Jhangvi  (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**
**Mujahadin-e Khalq Organization  (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front – Abu Abbas Faction (PLF)**
**Palestinian Islamic Jihad – Shaqaqi Faction  (PIJ)**
**Popular Front for the Liberation of Palestine  (PFLP)**
**Popular Front for the Liberation of Palestine-General Command  (PFLP-GC)**
**Al-Qa'ida (AQ)**
**Al-Qa'ida in Iraq (AQI)**
**Al-Qa'ida in the Islamic Maghreb (AQIM)**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Organization 17 November  (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Revolutionary Struggle (RS)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia  (AUC)**

# Chapter 7. Legislative Requirements and Key Terms

**NCTC Statistical Annex**

**Supplement on Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens**

## Foreword

The Department of State's *Country Reports on Terrorism 2009* covers events from January 1 to December 31, 2009.  This publication, which fulfills a Congressional requirement, aims to enhance our collective understanding of the international terrorist threat.  The report also serves as a reference tool to inform policymakers, the general public, and our foreign partners about our efforts, progress, and challenges in the campaign against international terrorism.

The first chapter provides a strategic overview of the terrorist threat to the United States and U.S. interests abroad, as well as a description of the setbacks and advancements of al-Qa'ida and its affiliated groups.  The report also includes country-by-country discussions of foreign government counterterrorism cooperation as well as chapters on WMD terrorism, state sponsors of terrorism, terrorist safe havens, and designated Foreign Terrorist Organizations.

Transnational terrorism remains the foremost security threat the United States faces, and the Obama administration has been working to strengthen the nation's counterterrorism strategy.  An effective counterterrorism policy must go beyond the law enforcement, intelligence, and military efforts that thwart those who seek to harm the United States and its citizens.  Under the President's leadership, the administration is formulating policies that seek to shape and constrain the environments where terrorists operate.  Central to this approach is taking steps to undermine the appeal of al-Qa'ida's world view and to isolate violent extremists.  Our actions are guided by a recognition of the phenomenon of radicalization and the need to prevent more people from committing themselves to violence.  In every country where extremism has taken root, three questions guide our approach: Are our actions going to result in the creation of more terrorists? What can we do to shrink the potential pool of recruits? And what is necessary to minimize the near term as well as the long term threat to the United States?

As part of this effort, the administration is looking to address the "upstream" factors of radicalization.  We are working to confront the political, social, and economic conditions that our enemies exploit to win over recruits and funders.  We are also working to expand our foreign assistance to nations and communities where violent extremism has made inroads, such as Pakistan and Yemen.

As the six regional overviews in Chapter 2 show, each region possesses unique terrorist threats and radicalization dynamics.  Therefore, the State Department and other U.S. agencies are working on Regional Strategic Initiatives with our embassies to devise tailored and collaborative strategies to match the particular radicalization profiles of affected communities.  One-size-fits-all programs have limited appeal, while regional and trans-regional strategies have a better chance of succeeding and enduring.

Additionally, our counterterrorism strategy involves building a genuinely multilateral approach to this global threat.  The United States has been working hard to reinvigorate alliances and strengthen existing partnerships; this is especially true in the arena of counterterrorism.  Through consistent diplomatic engagement, we are seeking to boost the political will and strengthen the resolve of leaders around the world to confront terrorist threats.  That will is essential for our

long-term capacity building efforts.  Ultimately, our success will hinge on strengthening the ability of others around the world to deal with terrorism in their countries and regions.

--Daniel Benjamin
Coordinator of Counterterrorism

# Chapter 1
# Strategic Overview

In 2009, al-Qa'ida's core in Pakistan remained the most formidable terrorist organization targeting the U.S. homeland.  It has proven to be an adaptable and resilient terrorist group whose desire to attack the United States and U.S. interests abroad remains strong.  The U.S. intelligence community assessed that al-Qa'ida was actively engaged in operational plotting against the United States and continued recruiting, training, and deploying operatives, including individuals from Western Europe and North America.  Moreover, al-Qa'ida continued to try to expand its operational capabilities by partnering with other terrorist groups, with varying degrees of success.

Nevertheless, al-Qa'ida suffered several significant setbacks in 2009.  The group remained under pressure in Pakistan due to Pakistani military operations aimed at eliminating militant strongholds in the Federally Administered Tribal Areas (FATA).  Although al-Qa'ida has collaborated with the Taliban insurgency against the Pakistani government by providing technical know-how and disseminating propaganda, the group continued to suffer leadership losses.  As a result, al-Qa'ida found it tougher to raise money, train recruits, and plan attacks outside of the region.  In addition to these operational setbacks, al-Qa'ida continued to fail in its efforts to carry out the attacks that would shake governments in the Muslim world.

Finally, al-Qa'ida's core continued to suffer from popular Muslim disaffection due to recent and past indiscriminate targeting of Muslims by its operatives and allies in Algeria, Iraq, Saudi Arabia, Pakistan, Indonesia, and elsewhere.  Consequently, the number of conservative clerics and former militants speaking out against the organization increased.  Al-Qa'ida spokesmen responded ineffectively to this criticism by arguing that the organization does not target Muslims, demonstrating both their concern about its resonance and their inability to counter such criticism effectively.

Yet despite these setbacks, the al-Qa'ida threat was more dispersed than in recent years, which partially offset the losses suffered by al-Qa'ida's core.  The attempted December 25th bombing of a U.S. commercial airliner demonstrated that at least one al-Qa'ida affiliate has developed not just the desire but also the capability to launch a strike against the United States.  Al-Qa'ida in the Arabian Peninsula[1] has already shown itself to be a formidable threat to Yemen's internal

---

[1] On January 19, 2010, the Secretary of State designated al-Qa'ida in the Arabian Peninsula (AQAP) as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended (INA).  The Secretary also designated AQAP and its two top leaders Nasir al-Wahishi and Said al-Shihri under E.O. 13224.  AQAP is a Yemen-based terrorist organization that has claimed responsibility for numerous terrorist acts against

security, with attacks on the Yemeni security services, as well as a threat to Saudi Arabia, with an August 2009 attempted assassination against the head of counterterrorism in Saudi Arabia, Prince Mohammed bin Nayif. The attempted December 25 bombing provided a further reminder that un- or under-governed spaces can serve as an incubator for extremism and underscored that we cannot expect al-Qa'ida affiliates to be focused solely on the near enemy – the governments in their own countries and regions – or American facilities in their immediate surroundings.

Al-Qai'da's other most active affiliates were in Africa. In the sparsely populated Sahel, operatives from al-Qa'ida in the Islamic Maghreb kidnapped foreigners, sometimes working with individual local tribesmen and nomads. Its operations along under-governed borders posed challenges to coordinated state responses. In Somalia, al-Qa'ida's allies in al-Shabaab controlled significant tracts of territory and several al-Shabaab leaders have publically proclaimed loyalty to al-Qaida.

Despite their failure at broad mobilization, another respect in which al-Qa'ida and violent Sunni radicals continued to succeed was in persuading people to adopt their cause, even in the United States. Five Americans from Virginia were arrested in Pakistan on suspicion of terrorist ties. Some Americans have traveled to Somalia for one reason or another and ultimately joined al-Shabaab. Najibullah Zazi, a U.S. lawful permanent resident and airport shuttle driver, trained in Pakistan and now faces charges in federal court for allegedly planning to set off several bombs in the United States. An American citizen, David Headley, has pleaded guilty in a U.S. court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 160 people – including six Americans – and to crimes relating to a separate plot to bomb the Danish newspaper *Jyllands-Posten*. And there is also the case of Nidal Hasan who is facing charges for the Fort Hood attack that killed 13 people and wounded 30 others on November 5, 2009.

The Lashkar e-Tayyiba connection has added a further dimension to the terrorist threat landscape since its activities have made clear its deepening commitment to undertake bold, mass-casualty operations against American and other Western targets. Since the 2008 Mumbai attack, analysts have deepening concern that it could evolve into a genuine global threat. Headley and others indicate the diversity, mobility, and versatility of self-selecting recruits whom organizations can pick to meet strategic goals. Organizations may set these goals, but their training resources and recruits are increasingly modular and interchangeable.

Not only have there been more cases of Americans becoming operatives for foreign terrorist organizations, we have also seen U.S. citizens rise in prominence as proponents of violent extremism. The most notable is al-Qa'ida in the Arabian Peninsula's Anwar al-Aulaqi, who has become an influential voice of Islamist radicalism among English-speaking extremists. The

---

Saudi, Korean, Yemeni, and U.S. targets since its inception in January 2009. Such instances include a March 2009 suicide bombing against South Korean tourists in Yemen, the August 2009 attempt to assassinate Saudi Prince Muhammad bin Nayif, and the December 25, 2009 failed attack on a Northwest Airlines flight from Amsterdam to Detroit, Michigan.

alleged Ft. Hood attacker Nidal Hasan sought him out for guidance, and the December 25 bomber, Umar Farouk Abdulmutallab, visited him at least twice in Yemen.  Also popular among English-speaking extremists is Omar Hammami from Alabama, now one of the chief propagandists for al-Shabaab.

Compounding the threat of terrorist organizations is the active or tacit support of states.  Iran has long been the foremost state sponsor of terrorism, supporting Hizballah, HAMAS, and other rejectionist Palestinian groups as proxies for their own interests in the Arab world.  Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf, jeopardized the tenuous peace in southern Lebanon, and undermined the growth of democracy.  Syria also provided political and material support to Hizballah in Lebanon and allowed Iran to resupply this organization with weapons, and provided safe-haven as well as political and other support to a number of designated Palestinian terrorist groups, including HAMAS, Palestinian Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

Looking ahead, there is ample reason to be concerned about demographic and technological trends in countries where terrorism is already endemic.  The youth population throughout South Asia and the Middle East is rapidly expanding, bringing the prospect of increasing numbers of at risk young people.  Europe may continue to be a fertile recruitment ground for extremists if sizable numbers of recent immigrants and, in particular, second- and third-generation Muslims continue to experience integration problems and feel alienated by governments' domestic and foreign policies.  These prospects underscore the need to look beyond the immediate – and genuinely pressing – challenges of tactical counterterrorism toward the longer term developments shaping the threat environment of the future.

As for technological trends, terrorist groups and their sympathizers have expressed interest in using cyber means to target the United States.  They have not been successful to date.  Terrorists have used cyber means to transfer funds, but international action has made significant progress towards addressing this illicit activity.  Most major terrorist groups have propaganda websites and forums.  Al-Qa'ida continued its efforts to encourage key regional affiliates and jihadist networks to pursue a global agenda, using both the Internet as a means to distribute propaganda and telecommunications infrastructure to plan attacks and coordinate movements.  Going forward, this will be an area of continued focus for the United States.

# CHAPTER 2
# COUNTRY REPORTS

## AFRICA OVERVIEW

> "To succeed in the quest for Somali peace…we must take a more comprehensive approach in tackling the extremists, which includes encouraging the Transitional Federal Government to more aggressively pursue its commitment to a much more inclusive political process to bring into the government all forces which eschew violence."
>
>    –Raila Odinga, Prime Minister Of The Republic Of Kenya
>     64th Session of the United Nations General Assembly
>     September 25, 2009

Al-Shabaab's leadership was supportive of al-Qa'ida (AQ), and both groups continued to present a serious terrorist threat to American and allied interests throughout the Horn of Africa. Due to ongoing fighting between designated Foreign Terrorist Organization al-Shabaab, Hizbul Islam, other armed factions and militias and Somalia's Transitional Federal Government (TFG), Somalia remained highly unstable, and a permissive environment for terrorist transit and training. Foreign fighters, a small number of AQ operatives, and likeminded indigenous Islamic extremists continued to pose a threat to regional security. Fazul Abdullah Mohammed, aka Harun Fazul, one of several AQ leaders charged with carrying out the 1998 bombings of the U.S. embassies in Kenya and Tanzania, most likely remained in the region. Senior al-Qa'ida in East Africa leader Saleh Ali Saleh Nabhan was killed in al-Shabaab controlled territory in mid-September.

In the Trans-Sahara, al-Qa'ida in the Islamic Maghreb (AQIM) expanded its reach in the Sahel, conducting kidnappings of Spanish, French, German, and Italian citizens in Mauritania, Niger, and Mali. In June, AQIM murdered a British citizen in northern Mali and an American citizen in Mauritania, and assassinated a Malian military official. A small Malian military response to the assassination was subsequently defeated. In August, AQIM launched an unsuccessful suicide bomb attack in the vicinity of the French embassy in Mauritania.

The Financial Action Task Force (FATF), as the international standard-setting body to address threats of money laundering, terrorist financing, and other related crimes, has established a network of countries around the world. These FATF-Style Regional Bodies (FSRBs) have the potential to serve both as a disciplinarian and as a resource. In sub-Saharan Africa, there are two such bodies recognized by the FATF: the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) and the Intergovernmental Action Group against Money Laundering and Terrorist Financing (GIABA). Like FATF and the other FSRBs, they conducted mutual evaluations, worked on various framework and implementation issues, and provided training for their members. Despite the existence and activities of these groups, Africa remained the single region in the world without FSRB coverage over wide swaths of its countries. FATF has

attempted to organize an RSRB in Central Africa, where the majority of unsubscribed countries are located.

**The Trans-Sahara Counterterrorism Partnership (TSCTP)**

The Trans-Sahara Counterterrorism Partnership (TSCTP) is a multi-faceted, multi-year strategy designed to combat violent extremism, and contain and marginalize terrorist organizations by strengthening individual-country and regional counterterrorism capabilities, enhancing and institutionalizing cooperation among the region's security and intelligence organizations, promoting democratic governance, and discrediting terrorist ideology. The overall goals are to enhance the indigenous capacities of governments in the pan-Sahel (Mauritania, Mali, Chad, and Niger, as well as Nigeria, Senegal, and Burkina Faso); to confront the challenge posed by terrorist organizations in the trans-Sahara; and to facilitate cooperation between those countries and U.S. partners in the Maghreb (Morocco, Algeria, and Tunisia).

The TSCTP was developed as a follow-on to the Pan-Sahel Initiative, which focused solely on the Sahel. Ongoing concern that extremists continued to seek safe havens and support networks in the Maghreb and Sahel – as well as recognition that al-Qa'ida and others were seeking to impose radical ideologies on traditionally moderate Muslim populations in the region – highlighted the urgency of creating an integrated approach to addressing current threats and preventing conditions that could foster persistent threats in the future.

TSCTP has been successful in slowly building capacity and cooperation despite political setbacks over the years caused by coup d'etats, ethnic rebellions, and extra-constitutional actions that have interrupted progress and work with select countries of the partnership.

TSCTP's main elements include:

- Continued specialized Antiterrorism Assistance Training, Terrorist Interdiction Program, and Counterterrorist Finance activities in the Trans-Sahara region, and possible regional expansion of those programs as well as other law enforcement-capacity building efforts;

- Public diplomacy programs that expand outreach efforts in the Trans-Sahara region and seek to develop regional programming embracing the vast and diverse region. Emphasis is on preserving the traditional tolerance and moderation displayed in most African Muslim communities and countering the development of extremism, particularly in youth and rural populations;

- Democratic governance programs that strive to provide adequate levels of U.S. government support for democratic and economic development in the Sahel, strengthening those states to withstand internal threats;

- Military programs intended to expand military-to-military cooperation, ensure adequate resources are available to train, advise, and assist regional forces; and establish

institutions promoting better regional cooperation, communication, and intelligence sharing.

**The African Union**

The African Union (AU) has several counterterrorism legal instruments, including a 1999 Convention on the Prevention and Combating of Terrorism, a 2002 Protocol to the Convention, and a 2004 Plan of Action.  The Addis Ababa-based AU Commission provided guidance to the 53 member states and coordinated limited technical assistance to cover member states' counterterrorism capability gaps.

The AU worked with member states to eliminate redundancies between the Algiers-based African Center for Study and Research in Terrorism (ACSRT) and the Committee on Intelligence and Security Services in Africa, which was first established at the AU Summit in Abuja, Nigeria, in January 2005.

The Department of State and the Department of Defense's African Center for Strategic Studies have collaborated with the AU to run counterterrorism workshops for African civilian and military officials.  These workshops, as well as regional counterterrorism seminars, examined the nature of terrorism threats on the continent, the capacity of countries to counter terrorism, and their needs for technical assistance to strengthen that capacity.

Some AU member states maintained that Africa's colonial legacy made it difficult to accept a definition of terrorism that excluded an exception for "freedom fighters."  Nonetheless, the AU is on record strongly condemning acts of terrorism.  On several occasions, AU Commission Chairperson Jean Ping publicly condemned acts of terrorism, including:

- On February 16 after two deadly bombs in Algeria;
- On February 23 after a deadly blast in Cairo;
- On September 18 following a terrorist attack on the Force Headquarters of the AU Mission in Somalia (AMISOM) in Mogadishu; and
- On December 4 after a suicide bomb killed more than 50 people, including three Somali government ministers, at a graduation ceremony for medical students in Mogadishu.  AMISOM maintained several thousand Ugandan and Burundian troops in Mogadishu to protect the Somali Transitional Federal Government.

On July 3, at the AU's 13th Ordinary Session of the Assembly in Libya, AU heads of state adopted a decision to combat the payment of ransom to terrorist groups.

Although the AU Commission had the strong political will to act as an effective counterterrorism partner, AU staffing remained below requisite levels.  Consequently, capacity remained relatively weak.  The AU created a counterterrorism unit at its Addis Ababa headquarters to coordinate and promote member state counterterrorism efforts more effectively.  The AU welcomed technical and financial assistance from international partners and donors to

bolster both AU headquarters and ACSRT activities approved by member states.

**Angola**

Angola's borders remained porous and vulnerable to movements of small arms, diamonds, and other possible sources of terrorist financing.  That said, there is no evidence of a terrorist presence in Angola.  Angola's high rate of U.S. dollar cash flow made its financial system an attractive site for money laundering, and the government's capacity to detect financial crimes remained limited.  On December 14, however, the government agreed to allow for the placement of an advisor from the U.S. Treasury Department in the Angolan Ministry of Finance and Central Bank.  This advisor will help Angola promote transparency in its financial system.  Corruption, lack of infrastructure, and insufficient capacity continued to hinder Angola's border control and law enforcement capacities.  The government's limited law enforcement resources were directed towards border control and stemming the flow of illegal immigrants into the country.  In May, the U.S. Treasury Department designated Kassim Tajideen, an important financial contributor to Hizballah with extensive business interests in Angola, as a Specially Designated Global Terrorist under Executive Order 13224.

**Botswana**

Botswana has a National Counterterrorism Committee to address issues pertaining to terrorism and weapons of mass destruction.  Botswana established its first intelligence agency in 2008, with responsibility for both domestic and foreign intelligence gathering.  In April, Botswana's Parliament passed legislation to create a Financial Intelligence Unit (FIU), which will harmonize Botswana's anti-money laundering and counterterrorist financing regime.  While the legislation for this has been enacted, the FIU was not yet established at year's end.  Until the FIU is functioning, the Directorate on Corruption and Economic Crimes has a dedicated unit that will continue investigating suspicious transactions.  One goal of this legislation is to decrease the likelihood that terrorist financing could move through Botswana's financial institutions.  Terrorist financing is not criminalized as a specific offense in Botswana.  However, acts of terrorism and related offenses, such as aiding and abetting, can be prosecuted under the Penal Code and under the Arms and Ammunitions Act.

**Burkina Faso**

Despite its lack of resources, Burkina Faso was serious about countering terrorism. The government cooperated with the United States in its counterterrorism efforts where possible, and participated in training, seminars, and exercises, such as the regional Flintlock exercise held in Spain and Mali, and familiarization events offered by U.S. Africa Command and Special Operations Command Europe.  In December 2008, Burkina Faso was accepted as a member of the Trans-Sahara Counterterrorism Partnership and is now eligible for various programs aimed at improving the nation's capacity to combat terrorism.  Outside of U.S. cooperation, the government participated in regional efforts at combating terrorism, including with the Economic Community of West African States, the African Union, and other international organizations.

There is no formal method for tracking movement into and out of the country at border checkpoints, or at either of the country's two commercial airports.

**Burundi**

The United States has provided training and assistance to Burundi, and its recent contribution of troops to the African Union Mission in Somalia, brought threats from the Somalia-based terrorist group al-Shabaab.  Aware of its limited counterterrorism capabilities, Burundi has asked the international community for assistance and expertise in countering terrorism.

**Cape Verde**

Cape Verdean authorities continued to prosecute a case against Jean-Charles Mendes Da Silva, a French citizen and alleged member of the Algerian terrorist organization, the Armed Islamic Group.[2]  On March 10, 2007, Cape Verdean police arrested Da Silva on an Interpol warrant and unrelated forgery and weapons charges.  A Cape Verdean court convicted him of those crimes, as well as of certain criminal offenses related to his activities in France, but prosecutors declined to seek a conviction under Cape Verde's counterterrorism laws.  Moreover, Cape Verde refused the French government's request to extradite Da Silva, because he had claimed and obtained Cape Verdean citizenship prior to his arrest.[3]  At year's end Da Silva was awaiting sentencing.

With respect to counterterrorism legislation, Cape Verdean law specifically criminalizes terrorist activity, including the provision of material assistance to terrorists.  The code of criminal procedure gives police wide authority to perform wiretaps and warrantless searches in cases of suspected terrorism.  Additionally, in November Cape Verde's two major political parties informally agreed to amend the Cape Verdean constitution in order to allow nighttime searches and seizures in such circumstances.

Cape Verdean law enforcement has taken special measures to prevent terrorists from entering the country.  Immigration authorities check names of visitors against a database of actual and suspected terrorists, which includes data furnished by the U.S. government.  Cape Verde was in the process of obtaining access to certain data from the FBI's Integrated Automated Fingerprint Identification System, and also participated in the Economic Community Of West African States Warning and Response Network, an information sharing program addressing security issues.

**Comoros**

---

[2] In 2000, Da Silva escaped from a French prison where he had been incarcerated for participating in a Paris-area bombing.  According to media reports, the French Directorate-General for External Security believes Da Silva contacted terrorist organizations throughout North Africa after his escape and then sought refuge in Cape Verde, where he attempted to establish a terrorist cell.

[3] The Cape Verdean constitution forbids extradition of its citizens, and some speculate that Da Silva claimed citizenship when he arrived in Cape Verde specifically to obtain this protection.

Comoran security forces had limited resources and training in counterterrorism and maritime security, and remained vulnerable to terrorist transit.  However, Comoran authorities welcomed the visit of a U.S. Coast Guard International Port Security team in November, and Comoran police and security forces participated in U.S. counterterrorism assistance programs and cooperated with the Rewards for Justice Program.  International terrorism concerns in Comoros focused on Comoran national Fazul Abdullah Mohammed (a.k.a. Harun Fazul), who is suspected of involvement in the 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam.

President Sambi, democratically elected in 2006, reconfirmed Comoros' rejection of terrorism and, with Comoran religious leaders, publicly rejected religious extremism.

**Democratic Republic of Congo**

The Democratic Republic of the Congo (DRC) was cooperative on counterterrorism issues when resources were provided.  The Government of the DRC focused its limited fiscal, military, and diplomatic resources on trying to maintain a hard-fought, tenuous peace.  The fragile internal security situation was aggravated by foreign-based armed rebel groups operating with relative impunity in contested areas of the country.  The DRC's lack of capacity to secure its borders, monitor large tracts of sparsely populated and remote territory, and unfamiliarity with the issue of global terrorism could make it vulnerable as a staging ground for transnational criminal or terrorist groups; however, such activities would be hindered by the lack of transportation and telecommunications infrastructure, as well as a generally non-violent domestic population.  The Congolese national intelligence apparatus similarly lacked an ability to identify and disrupt any potential domestic terrorist threats.

**Cote D'Ivoire**

On August 6, Ivoirian authorities detained Imam Abd al Menhem Qubaysi, a Hizballah spiritual leader and U.S. designated terrorist financier, at the airport upon his arrival on a commercial flight from Lebanon.  Qubaysi, who lived in Cote d'Ivoire for a number of years, was denied entry at immigration and returned to Lebanon on the same flight.

The Ivoirian Ministry of Interior, in cooperation with the United States, uses the Personal Identification Secure Comparison and Evaluation System (PISCES) to enhance border security at its major airport and seaport.  The Financial Intelligence Unit (FIU), which was formed in 2008, received additional legal authority when Ordinance 637 on terrorism financing became law on November 12, 2009.  The law extends FIU activities to the receipt, analysis, and dissemination of information on transactions suspected of being terrorism-related.

**Djibouti**

Djibouti was one of the most forward-leaning Arab League members supporting ongoing counterterrorism efforts.  President Ismail Omar Guelleh and other top leaders in Djibouti repeatedly expressed their country's full and unqualified support for the international counterterrorism efforts.  Although the government's counterterrorism capabilities were limited,

Djiboutian counterparts were proactive, and were highly receptive and responsive to U.S. requests for counterterrorism cooperation. The Djiboutian National Security Services and law enforcement agencies took extraordinary measures with their limited resources to ensure the safety and security of American citizens, the U.S. Embassy, and the U.S. military base at Camp Lemonnier. Limited resources continued to hamper the government's ability to comprehensively control its porous borders, especially with Somaliland. Nevertheless, the government continued to support overall enhanced border security, notably by inviting the International Organization for Migration to set up an office in Djibouti, and by issuing machine-readable travel documents. More broadly, the government also played a constructive role in hosting regional initiatives addressing peace and security in the Horn of Africa.

**Eritrea**

In May 2009, the Department of State again certified Eritrea as a country that is "not cooperating fully" with U.S. antiterrorism efforts. The lack of Eritrean cooperation has constrained the ability of the United States and international partners to counter terrorist groups in the Horn of Africa and Somalia, particularly with respect to al-Shabaab leaders linked to al-Qa'ida. In late 2009, the UN Security Council created a sanctions regime on Eritrea that includes a territorial arms embargo and an asset freeze, travel ban, and arms embargo for those individuals and entities listed by the UN Somalia Sanctions Committee.

The Government of Eritrea has provided safe haven to political officials aligned with the now obsolete Alliance for the Re-Liberation of Somalia (ARS), including U.S. designated terrorist Sheikh Hassan Dahir Aweys, who resided in Asmara until May but is now in southern Somalia leading a faction of Hizbul Islam.

**Ethiopia**

The Ethiopian government remained concerned about terrorist-related activities in neighboring Somalia. The Ethiopian military's January 2009 withdrawal from Somalia reduced the rationale long used by Somalia-based extremists as grounds for targeting Ethiopia. By bolstering defensive forces along the Ethio-Somali border, the Ethiopians further reinforced defensive mechanisms to stem potential infiltration of extremists into Ethiopia. Ethiopia is a member state and was in the rotating chair of the Inter-Governmental Authority on Development (IGAD), and also participated actively in IGAD's Capacity Building Program Against Terrorism (ICPAT) to bolster the counterterrorism capacity of IGAD member states.

Ethiopia's National Intelligence and Security Service (NISS), with broad authority for intelligence, border security, and criminal investigation was responsible for overall counterterrorism management. The Ethiopian Federal Police (EFP) worked in conjunction with NISS on counterterrorism. Key among Ethiopia's counterterrorism objectives is combating terrorist groups like al-Shabaab and the United Western Somali Liberation Front.

Ethiopia has requested U.S. assistance to craft legislation and provide other technical assistance to establish a regime to combat terrorist financing, and is more focused on seeking prosecution of

counterterrorism suspects since the new Antiterrorism Law was passed in July.  Ethiopia was an active participant in African Union (AU) counterterrorism efforts, participating in the AU's Center for Study and Research on Terrorism, and in meetings of the Committee of Intelligence and Security Services of Africa (CISSA).

The United States continued to support Ethiopia's counterterrorism capabilities.  Antiterrorism Assistance Training participants included front line supervisors engaged in land border management at ports of entry and senior police leaders studying their role in combating terrorism on the strategic, regional, and national levels.  Students were taught to analyze terrorist activities including financing, confidential source handling, development and information management sharing.  This year's goal was to address the ability to disseminate information across agencies and countries, and to concentrate on the large issue of stabilizing the Horn of Africa by countering terrorism on a multilateral front.

Ethiopia's location within the Horn of Africa made it vulnerable to money laundering activities perpetrated by transnational criminal organizations, terrorists, and narcotics traffickers. On November 19, parliament passed anti-money laundering/combating the financing of terrorism (AML/CFT) legislation that had been supported through technical advice from the U.S. Department of Treasury.  This legislation formally created Ethiopia's first financial intelligence unit called the Financial Information Center.  This new Center is charged with implementing this new legislation.

**Gabon**

Despite its lack of resources, Gabon cooperated with the United States in its efforts to combat terrorism, where possible, and participated in numerous training programs, seminars, and exercises offered by U.S. Africa Command (AFRICOM).  Gabon lacked the resources necessary to protect its borders adequately and to monitor the movement of potential terrorists, especially along its unpatrolled land borders.  Airfields in Gabon are unsecured and generally in need of significant security infrastructure improvements.  The Government of Gabon made significant strides in improving its maritime security and restricting illegal access to the country via the Gulf of Guinea.  Gabon has taken steps to upgrade security at its port facilities in Owendo, Port Mole, and Port Gentil.

**Ghana**

In 2008, Ghana enacted the Counterterrorism Act, which called for implementation of a national identification card.  The cards will contain biometric data such as fingerprints and photos, but the national identification card has not yet been introduced.  Forms of identification with biometrics were not in widespread use, although the Ghanaian driver's license is issued with a fingerprint as part of the individual's application.  Most citizens use their voter registration card and a passport for identification.  In 2009, Ghanaian passports issued were machine readable but lacked biometric features.

Ghana passed an anti-money laundering law in 2008 that provided for the establishment of a Financial Intelligence Unit (FIU).  At the end of 2009, the FIU was not yet operational. However, six potential FIU members, including the Chief Executive Officer, were identified and sent to the United States for training.

U.S. Africa Command provided technical and training assistance to the Ghanaian Navy for the three "Defender" class patrol boats they received in 2008 and the additional four boats delivered in December. The patrol boats are intended to improve maritime interdiction capacity and to address Ghana's limited ability to patrol its porous borders.

The Governments of Ghana and Togo signed an agreement in October to cooperate on crime and security problems such as human trafficking, small weapons trafficking, money laundering, and counterterrorism.  The agreement is part of a larger strategy to accelerate regional integration and the free movement of persons, goods, and services; and to intensify trade and economic relations within the sub-region.

**Kenya**

Cross-border kidnappings and arms smuggling, reports of extremist recruiting within refugee camps and Kenyan cities, increased allegations of terrorist plotting, and public threats by al-Shabaab leaders led to a heightened recognition among government officials, the diplomatic community, and civil society that Kenya remained vulnerable to terrorist attacks.  Whereas Kenyans have traditionally perceived terrorism as primarily a 'foreign' problem, during the past year an increasing number of Kenyan citizens and government officials came to recognize that their own country and society were threatened by violent extremists.

Kenya did demonstrate increased political will to prevent infiltration into the country and apprehend suspected terrorists, although porous borders make that task extremely difficult.  The government took some steps to increase security along the long Kenya/Somalia border and to track down extremists operating inside the country.

Al-Shabaab's continued dominance of most of southern Somalia provided a permissive environment for a small number of al-Qa'ida operatives to conduct training and terrorist planning with sympathetic Islamic extremists, to include foreign fighters.  Although the Kenya-Somalia border officially remained closed, large numbers of Somali refugees continued to flee to refugee camps in Kenya in order to escape the fighting and drought.  Armed militants crossed the porous border into Kenya to obtain supplies, funding, medical care, and recruits.  There was a disturbing increase in incidents of armed Somalis crossing the border to kidnap foreigners inside Kenya.  In February, two Italian nuns who had been kidnapped from the Kenyan border town of El Wak in late 2008 were released.  In July, gunmen claiming to belong to al-Shabaab kidnapped three foreign aid workers, including one American, inside Kenya and took them back to Somalia. The militants released the hostages in October.  In mid-December, armed Somalis attempted to kidnap an Italian nun working in the northeastern town of Wajir but were driven off by Kenyan police.

Despite increased concern over security and Kenya's strong counterterrorism partnership with the U.S. government, the lack of counterterrorism and anti-money laundering legislation during most of 2009 hindered Kenya's efforts to combat violent extremism.  Existing laws did not permit police to detain terrorist suspects and prosecute them effectively.  The government did not submit a revised version of counterterrorism legislation that was defeated in 2006.  The Kenyan anti-money laundering bill was passed by parliament and signed into law at the end of the year.

The United States continued to enjoy close and productive ties with the Kenyan Armed Forces.  During the year the United States provided training and equipment to the Kenya Navy for coastal security and maritime domain awareness.  Equipment grants included six coastal radar sites and three Defender class patrol boats, plus training and spare parts for existing equipment.  The United States also assisted the Kenyan Army to train and equip two Infantry Battalions and one Ranger Strike Force company tasked with providing border security.

Kenyan law enforcement agencies also worked with the United States and other allies to increase their counterterrorism abilities. Security along Kenya's land and maritime borders remained a primary focus of these efforts.  The Kenyan Maritime Police Unit (MPU) and other agencies not only received equipment and training for coastal security from the State Department's Antiterrorism Assistance (ATA) program, but also demonstrated an increasing degree of self-sufficiency.  During the latest iterations of ATA's 11-week Comprehensive Maritime Security Training program, previous graduates of the course served as associate instructors.  ATA-trained Kenyan personnel also developed and presented a basic two-week maritime operations course to professionals from multiple security agencies at the Kenya Wildlife Service (KWS) Marine Camp in Malindi.  In December, the U.S. Ambassador formally donated three patrol boats for use by the MPU and Administrative Police (AP) coastal security forces.  Other ATA courses provided training in border control management, fraudulent travel documents, protecting digital infrastructure, and internet investigations.  ATA also provided digital forensic equipment and training to the Kenyan Police Service (KPS).

The U.S. Department of Justice, through the offices of the Resident Legal Advisor and Senior Law Enforcement Advisor, conducted a number of training activities aimed at building the capacity of police and prosecutors.  Courses included trial advocacy, witness protection, trafficking in persons, forensic and digital evidence, cyber crimes, and piracy.  In December, Kenya and 10 other regional countries participated in a U.S. Department of Justice-sponsored regional conference on combating criminal organizations, including terrorist organizations.  Conference topics included terrorist financing, cooperation between intelligence and law enforcement agencies, electronic evidence gathering, and legal regimes.  The FBI also provided training and equipment to the KPS, the AP, and the KWS.  Training activities included crime scene investigation and terrorist finance, and money laundering.  Equipment grants included fingerprint kits and gyro-stabilized binoculars for use in air surveillance operations.

In July and August, the Department of Homeland Security's Customs and Border Protection (CBP) provided specialized training and equipment to the newly established AP border patrol unit and the KWS.  In September, ATA funded a study tour for AP and KWS personnel to

observe CBP operations along the Mexican-American border and to meet with State Department and Department of Homeland Security officials in Washington, DC.

**Liberia**

Despite limited resources, inadequately trained personnel, and a weak judicial system – products of 14 years of civil war – the Government of Liberia demonstrated a willingness to cooperate with the United States and the international community to combat terrorism.  Through rule of law and security sector reform assistance programs, the United States supported a number of initiatives that addressed Liberia's vulnerabilities, which included porous borders, rampant identification document fraud, lax immigration controls, wide-scale corruption, and underpaid law enforcement, security, and customs personnel.

The Government of Liberia took steps to improve security at the Freeport of Monrovia, and the U.S. Coast Guard certified the port compliant under the International Port Security Program. The Transportation Security Administration worked with the Liberia Civil Aviation Authority to improve security at Roberts International Airport in order to make it compliant under the International Civil Aviation Organization (ICAO).  However, at year's end, RIA remained ICAO non-compliant.

**Madagascar**

Despite several steps taken in 2008 to counter terrorism, progress stalled in 2009 due to a political crisis that weakened government operations.  Following an unconstitutional change of government in March, the United States had limited engagement with the de facto authorities, who did demonstrate a willingness to cooperate in law enforcement matters, however.  The government budget suffered due to a suspension of foreign aid programs, negatively affecting public investment throughout the island.

To combat terrorist threats, the government previously created the Central Counterterrorism Service within the Ministry of Interior to work with INTERPOL and to provide information within the framework of regional and international cooperation.  It also created a special counterterrorism branch within the Central Intelligence Service.  These entities continued to function during the year, but did not fulfill their full roles.

The Financial Intelligence Unit (SAMIFIN) launched in June 2008 to combat money laundering, including terrorist finance, remained nominally operational, but its work was seriously limited by budget constraints.

Although the Malagasy government took steps to create a coast guard to improve maritime security and border control in 2008, no further progress was made in 2009, and the coast guard was not yet operational.  Parliament was disbanded after the March coup, so no action was taken on a draft 2008 bill that would have implemented the provisions of several universal counterterrorism instruments, including UN Security Council Resolution 1373.

Political unrest and limited resources severely constrained Madagascar's ability to confront a potential terrorist threat. The Malagasy authorities lacked the capacity to effectively monitor suspect organizations, control suspicious financial transactions, identify terrorist suspects, and control the movement of people and goods across its borders.

**Mali**

In contrast to 2008, 2009 saw increased terrorist activity on Malian soil, although at the end of the year it was unclear if this increased activity was indicative of a long-term change in the terrorist environment in Mali.

- On May 31, al-Qa'ida in the Islamic Maghreb (AQIM) executed a British citizen, Edwin Dyer, who had been kidnapped in Niger on January 22 and held in northern Mali along with several other western hostages.

- On June 10, AQIM elements assassinated Malian State Security officer Colonel Lamana Ould Bou at his residence in Timbuktu.

- On November 29, three Spanish aid workers were kidnapped by AQIM in Mauritania, but were brought to northern Mali, where they were still being held at year's end.

- On December 18, AQIM kidnapped two Italians in Mauritania, but brought them to northern Mali, where they were still being held at year's end.

Although the Malian government was aware that northern Mali was being used by AQIM as a safe haven, Mali's long, porous borders and a general lack of resources have hindered the country's ability to combat AQIM effectively.

Although the kidnapping of westerners is a continuation of AQIM's tactics of prior years, the execution of Edwin Dyer, the kidnapping of Pierre Camatte on Malian soil, and the attacks against Colonel Ould Bou and the Malian army represented a significant departure from AQIM's prior tactics in northern Mali.

Following the assassination of Colonel Ould Bou, the Malians launched a military operation in northern Mali targeting AQIM. The Malian military effort included extended patrols through areas where AQIM was thought to be present, and resulted in engagements on June 15 and in July. The beginning of the rainy season led to a lull in military action.

Mali continued to address terrorist financing issues. Mali's National Section for the Processing of Financial Information, which began operations in May 2008, received eight reports of suspicious financial activities during the year, although ongoing investigations have not yet revealed any links to terrorist financing or terrorist activity.

Mali has expressed a willingness to increase regional cooperation against AQIM and terrorism generally. Mali is a Trans-Sahara Counterterrorism Partnership country. Mali also works with

other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania. Malian President Amadou Toumani Toure has long called for a regional Heads of State Summit to be held in Bamako to discuss coordination of counterterrorism efforts, including improved border monitoring and security.  On August 12 in Algeria, Mali participated in a meeting with military chiefs of staff from Algeria, Mauritania, and Niger to draft a counterterrorism strategy for the Sahara.

Mali is an engaged and active member of the Trans-Sahara Counterterrorism Partnership.  It is also an active participant in U.S. programs including bilateral, joint combined exchange and regional military training, and the Antiterrorism Assistance Training program.

**Mauritania**

Al-Qa'ida in the Islamic Maghreb (AQIM) represented the primary terrorist threat to Mauritania. After two attacks in late December 2007 and two others in 2008, including the February attack against the Israeli embassy and the September attack in Tourine that cost the lives of 11 soldiers and their civilian guide, AQIM significantly increased its level of activity and severity of attacks.

- On June 23, American citizen Christopher Leggett was murdered by two gunmen upon arriving at his workplace in Nouakchott.  AQIM claimed responsibility for the murder, stating Leggett was targeted for Christian proselytizing activities.

- On August 8, a suicide bomber affiliated with AQIM detonated his explosive belt next to the French Embassy compound in Nouakchott.  There were no fatalities other than the attacker. This marks the first suicide bomber attack in Mauritania's history.

- On November 29, three Spanish aid workers traveling in a caravan from Nouadhibou to Nouakchott were kidnapped by gunmen in an attack claimed by AQIM.

- On December 18, AQIM kidnapped two Italians in Mauritania near the border with Mali who were believed to be held in Northern Mali at year's end.

The lawless eastern and northern regions of Mauritania were a haven for smugglers and terrorists. The porous borders with Algeria, Mali, and Western Sahara posed ongoing challenges for the ill-equipped and poorly funded Mauritanian security services.  In the case of the Leggett murder and the suicide bomber attack, terrorists entered Mauritania from outside the country with the sole intention of carrying out operations.  Through the year, there were specific threats against U.S. interests and citizens in Mauritania.

The August 6, 2008 coup d'etat against democratically elected President Sidi Ould Cheikh Abdallahi resulted in the suspension of all U.S. government non-humanitarian assistance, including most military cooperation and counterterrorism training to the junta-led government. Constitutional order was restored eleven months after the coup following Abdallahi's resignation and the naming of a transitional government of national unity that led the country to presidential

elections on July 18, won by Mohamed Ould Abdel Aziz and recognized by the international community.  The United States re-initiated its cooperation with the newly formed Mauritanian government in September.  Programs focusing on counterterrorism included the Counterterrorism Fellowship Program training of military counterterrorism units under the Joint Combined Exercise Training Program, and an Anti-Terrorism Assistance border security program.  Prior to the coup, the United States provided counterterrorism training to two Mauritanian units and plans to continue strengthening its military capacity.

In response to the increased terrorist threat in Mauritania, the government strengthened roadblocks and road security.  In November, authorities announced the creation of a new Road Security Agency in charge of monitoring terrorist activity and all forms of trafficking on Mauritanian roads.

The government has consistently exhibited a willingness to cooperate with the United States to prevent and deter future acts of terrorism.  Mauritanian authorities have been highly responsive to U.S. requests for security support, both for routine operations as well as special events, despite security forces' somewhat limited means.

The Mauritanian government has also displayed a willingness to both investigate and apprehend individuals involved in acts of terrorism against U.S. citizens or interests, as shown by the arrest of the entire terrorist cell responsible for planning and executing the Leggett murder.  Two members of the cell were apprehended on July 17 and the remaining members were taken into custody days later.

As of December 31, the Mauritanian government held in custody approximately 66 terrorist suspects.  Roughly thirteen of them have already been prosecuted and sentenced.  In July, the Nouakchott court sentenced Abdel Jelil Ould Biye and Teyeb Ould Saleck, two terrorists who participated in the 2005 Lemgheity attack, to eight and seven years respectively.  In November, the Government of Senegal extradited to Mauritania three Mauritanians allegedly implicated in the August 8 suicide bomber attack against the French Embassy.

Mauritania is a Trans-Sahara Counterterrorism Partnership country and also works with other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania.  In order to improve regional coordination in the fight against terrorism, Mauritania participated in an August 12 meeting in Tamanrasset, Algeria with military chiefs of staff from Algeria, Mali, and Niger to draft a counterterrorism strategy for the Sahara.  According to the agreement, Mauritania will deploy 4,000 soldiers to secure its borders with Mali and Algeria.  Mauritania has strong bilateral military and counterterrorism cooperation with France.

**Niger**

The Nigerien government's counterterrorism program has improved to include the use of updated terrorist watch lists, more consistent border patrols, and regular monitoring of mosques believed to espouse extremist views.  Border crossings were not automated and relied on

handwritten ledgers to record entry and exit.  The government has been receptive to Western and regional counterterrorism training and is a Trans-Sahara Counterterrorism Partnership country. Niger also works with other regional partners and organizations to support its counterterrorism efforts, notably the Algerian-led counterterrorism coalition comprised of Algeria, Niger, Mali, and Mauritania.

Al-Qa'ida in the Islamic Maghreb (AQIM) demonstrated a greater interest in Niger in 2009, with attempts to extend its influence into Nigerien territory from the largely ungoverned region bordering Mali and Algeria.  The porous borders and ungoverned spaces provide terrorist groups such as AQIM a potential environment for recruiting, people and contraband smuggling, undetected transit, and logistical facilitation.  Niger's severe resource constraints stemming from its status as one of the poorest countries in the world, and the ongoing political crisis, hampered the Nigerien government's ability to prevent AQIM intrusion.

On December 14, 2008, AQIM-affiliated persons kidnapped and held hostage UN Special Envoy, Robert Fowler, his colleague, Louis Guay, and a local Nigerien driver.  They were seized by AQIM within 40 kilometers of Niamey, taken across the Mali border and held hostage in the Sahara desert for 130 days before being released.  On January 22, 2009, along the Mali/Niger border, AQIM-affiliated persons kidnapped four European tourists near the Niger/Mali border and held them hostage in the Sahara desert.  Three of the European hostages were released months later, but one British hostage was killed.

In October, an AQIM-linked Mauritanian was captured in Niamey following his involvement in terrorist related activities outside Niger.

On November 14, AQIM associates armed with AK-47 assault rifles attempted to kidnap five U.S. Embassy personnel from a hotel in Tahoua.  The failed operation was believed to have been sanctioned by AQIM leaders.  The perpetrators of this attempted kidnapping have yet to be captured.

Although the rise of violent extremist organizations in northern Nigeria has yet to directly impact southern Niger, a very real threat exists.  Northern Nigeria and southern Niger share a common Hausa ethnicity, numerous economic and cultural links, and a long, porous border.  Immediately following the July 2009 Nigerien break-up of the Boko Haram[4] group, Nigerien ties to the group were revealed when dozens of Boko Haram members were deported from Nigeria to their home cities in southern Niger.

**Nigeria**

In 2009, the Government of Nigeria continued efforts to improve coordination, communication, and cooperation between the executive and legislative branches on counterterrorism matters. Progress on counterterrorism legislation in the National Assembly slowed, however, due to

---

[4] Boko Haram is Hausa for "education is sin."  The sinful or forbidden "education" is commonly understood to mean western education.

reconciliation and consolidation issues between two rival terrorism bills and general legislative lethargy.  The National Focal Point on Terrorism, an interagency task force formed in February 2007 composed of the State Security Service (SSS), the Nigerian Customs Service, the Ministries of Foreign Affairs (MFA) and Immigration, and other relevant authorities, has been on an extended hiatus since the transfer of its SSS and MFA coordinators.  Nigeria is a Trans-Sahara Counterterrorism Partnership country.

Subsequently, on July 26, around 70 Islamic militants from a group calling itself "Boko Haram", and which some refer to as the "Nigerian Taliban", attacked an Izala mosque and police station in the Dutsen Tanshi section of Bauchi town with firearms and hand grenades.  The attacks resulted in at least 55 deaths and up to 200 arrests.  The following day, Boko Haram carried out near-simultaneous attacks against police headquarters in Maiduguri, Borno State, and police stations in Potsikum, Yobe State; and Wudil, Kano State; provoking police and military sweeps in several states thought to harbor Boko Haram members and sympathizers.  Running clashes between security forces and militants reportedly resulted in around 700 deaths, including innocent bystanders.  The situation is reminiscent of the largely rural, anti-establishment, and radical movement known as Maitatsine which caused riots in Kano State in December 1980, in which over 4,000 people reportedly died.

The Nigerian military captured Maiduguri-based Boko Haram spiritual leader Mohammed Yusuf alive after a siege of his compound, and turned him over to Maiduguri police, whose colleagues had been killed by the group.  A local policeman summarily executed Yusuf in front of the station in full view of onlookers, after parading him before television cameras.  On August 17, al-Qa'ida in the Islamic Maghreb (AQIM) issued a "Statement of Consolation, Advice, and Condolences to our Brothers and Family in Nigeria."

Legislators merged a "private member" Senate bill based on the Commonwealth Secretariat's Model Legislative Provisions on Measures to Combat Terrorism, which passed its second reading on September 17, 2008, with an executive bill sponsored by the presidency.  The hybrid legislation, which resembles more the later executive bill, currently awaits a third and final reading in the Senate, before the President may sign it into law.  In an October 12, 2009 letter, Nigerian President Yar'Adua asked the National Assembly to pass the legislation to combat terrorism and kidnapping.  The bill stipulates a maximum jail term of only five years for those convicted of terrorism.

On December 25, Umar Farouk Abdulmutallab, who was associated with al-Qa'ida in the Arabian Peninsula, attempted to set off an explosive aboard a U.S.-flagged air carrier landing in Detroit, Michigan.  Abdulmutallab's flight originated in Nigeria and he changed planes in Amsterdam enroute to the United States.  The attack was unsuccessful and Abdulmutallab was charged by a U.S. court with offenses related to the attack.

The Nigerian government continued to operate USG-funded body scanners in all four international airports to detect explosives and drugs on passengers, with numerous successful interdictions of contraband, mainly drugs.  Despite repeated USG requests since 2007, the Nigerian government has yet to sign a memorandum of understanding sanctioning the use of

U.S. (and Nigerian) Federal Air Marshals on direct flights between Nigeria and the United States.  A Transportation Security Administration assessment team visited Nigeria from July 13-17 in conjunction with Delta Airlines' commencement of service from Abuja to New York.

The Nigerian government welcomes and actively participates in U.S. government-sponsored counterterrorism training and capacity building programs.  Progress continued on establishment of an additional Regional Maritime Awareness Capability (RMAC) radar station on the eastern coast to complement one already operational in Lagos.  The U.S. military assisted the Government of Nigeria with standing up a specialized counterterrorism unit within the Nigerian military.  The American Embassy's Office of Security Cooperation (OSC) conducted three Trans-Sahara Security Symposia in support of the Trans-Sahara Counterterrorism Partnership, addressing human development issues that may contribute to the spread of extremism and instability.  In addition, OSC sponsored the attendance of nine participants from various agencies at the Trans-Sahara Security Symposium at the Kofi Annan Peacekeeping Center in Accra, Ghana from December 14-18.

Nigerians participated in Antiterrorism Assistance (ATA) courses on: Terrorism Crime Scene Investigation, Airport Security Management, VIP Protection, VIP Protection Management, Fraudulent Documents, and Maritime Interdiction of Terrorism.

**Rwanda**

The Rwandan government worked to improve border control measures and prepared to create a financial investigations unit, in accordance with anti-money laundering/counterterrorist financing legislation adopted in 2008.  In November, Rwanda's parliament ratified the African Union protocol on the prevention and combating of terrorism.  In August, a U.S. Coast Guard team trained Rwandan security forces at Lake Kivu, bordering the Democratic Republic of the Congo (DRC), on maritime patrolling and law enforcement techniques.  During the year, Rwandan law enforcement officers participated in U.S.-sponsored training courses on criminal investigation techniques and small arms identification.

**Sao Tome and Principe**

Sao Tome and Principe has a lengthy coastline that remained porous and vulnerable to terrorist activities, smuggling, human trafficking, and other illegal activities.  While there have been no reports of terrorist activity, the country's capacity to monitor and disrupt terrorist threats was limited due to lack of resources, lack of adequate equipment and infrastructure, and insufficient administrative and financial capacity.

Despite the lack of resources and capabilities, Sao Tome and Principe cooperated with the United States and other partners in its efforts to counter terrorism.  Working with the United States, Sao Tome and Principe trained and equipped local security forces in counterterrorism and maritime security to build institutional capacity and knowledge.  The government created regulatory and management bodies in an effort to improve control of its border.  The Sao Tomean immigration service terminated or refused visas of individuals suspected of money

laundering, created a Maritime and Port Security Institute, funded the establishment of a Financial Intelligence Unit at the Central Bank, and supported the establishment of a radar and tracking systems program with the Sao Tomean Coast Guard.

## Senegal

The Government of Senegal cooperated with the United States to identify terrorist groups operating in Senegalese territory. Senegal lacked specific counterterrorism legislation and current laws made it difficult to prosecute terrorist suspects. More work remained to be done to develop first responder services, to facilitate the quick sharing of information between agencies, and to control porous borders where police and security services were undermanned and ill-equipped to prevent illicit cross-border trafficking. The Government of Senegal continued to welcome U.S.-assisted efforts to augment its border security. Although al-Qa'ida in the Islamic Maghreb did not launch attacks or secure safe haven in Senegal, it continued to be active in the neighboring countries of Mauritania and Mali and attempted to set up transit points and facilitation networks in Senegal. Senegal is a Trans-Sahara Counterterrorism Partnership country.

Senegal participated in regional efforts to combat terrorist finance. One of the first Financial Intelligence Units (FIUs) in the sub-region, Senegal's FIU, known as CENTIF, has been active in sponsoring and holding implementation and awareness workshops on anti-money laundering/terrorist finance issues for its own stakeholders as well as for counterparts from around the sub-region. Senegal is a member of the Intergovernmental Anti-Money Laundering Group in Africa.

## Somalia

The fragile hold on power of Somalia's Transitional Federal Government (TFG), a protracted state of violent instability, long unguarded coasts, porous borders, and proximity to the Arabian Peninsula, made Somalia an attractive location for international terrorists seeking a transit or launching point for operations there or elsewhere. Despite continuing peace efforts by the TFG and other moderate forces not formally aligned with the TFG, the terrorist and insurgent groups al-Shabaab and Hizbul Islam continued to exercise control over much of southern Somalia. The TFG and peacekeepers of the African Union Mission in Somalia (AMISOM) were confined to parts of Mogadishu. Foreign fighters were involved in al-Shabaab's fight against rival militias and the TFG. Several foreign extremists were involved in terrorist attacks in Somalia, including suicide bombings.

In January, the last Ethiopian troops withdrew from Somalia. On January 31, Somalia's newly expanded parliament, meeting in Djibouti under UN auspices, elected the former leader of the Islamic Courts Union, Sheikh Sharif Sheikh Ahmed, as president of Somalia. The move came just days after the Djibouti wing of the Alliance for the Re-Liberation of Somalia entered into a power-sharing deal with the TFG. Over the next several months Sharif announced the imposition of moderate sharia law in Somalia and made other efforts to reach out to the opposition, but al-Shabaab and other radical groups rejected these moves. Armed Islamist group

attacks in May through July left the TFG isolated in Mogadishu and reliant on AMISOM for protection.  The capability of the TFG and other Somali local and regional authorities to carry out counterterrorism activities was extremely limited.

Al-Shabaab's leadership has connections with al-Qa'ida (AQ); several senior al-Shabaab leaders have publicly proclaimed loyalty to al-Qa'ida.  Al-Shabaab consists of a disparate grouping of armed clan militias, many of whom do not adhere to the ideology that is held by the group's leaders.  These leaders have founded and support a number of training camps in southern Somalia for young national and international recruits to al-Shabaab.  In these camps, AQ-affiliated foreign fighters often lead the training and indoctrination of the recruits.  Al-Shabaab and other extremists conducted suicide attacks, remote-controlled roadside bombings, kidnappings, and assassinations of government officials, journalists, humanitarian workers, and civil society leaders throughout Somalia.  Al-Shabaab threatened UN and other foreign aid agencies and their staff.

On September 14, AQ senior leader and al-Shabaab trainer Saleh Ali Saleh Nabhan was killed in al-Shabaab controlled territory in southern Somalia.  Nabhan was an associate of Fazul Abdullah Mohammed, aka Harun Fazul, one of several al-Qa'ida leaders charged with carrying out the 1998 bombings of the U.S. embassies in Kenya and Tanzania.  In November, Fazul was reportedly named Nabhan's successor as AQ leader in Somalia.

Although AQ and al-Shabaab are not formally merged, they produce mutually supportive rhetoric.  In March, AQ released a video entitled "Fight on, Champions of Somalia" in which Usama bin Ladin urged al-Shabaab to overthrow the TFG.  On September 21, al-Shabaab proclaimed its allegiance to Usama bin Ladin in a video entitled "At Your Service, Osama."  The 48-minute film was posted on Islamist Internet forums while al-Shabaab fighters distributed DVD copies and organized public screenings in Mogadishu.

During the year there were numerous high profile terrorist attacks inside Somalia.  Some of these operations were conducted by al-Shabaab, others by insurgent or criminal groups:

- On February 22, a double suicide bombing on an AMISOM base killed 11 soldiers and wounded 15 others.

- On March 26, a roadside bomb injured Somalia's interior minister Sheik Abdulkadir Ali Omar and killed his secretary in Mogadishu.

- On April 19, gunmen kidnapped two foreigners working for Medecins Sans Frontieres (MSF) in Huddur, Bakool region.  They were released ten days later.  Shortly thereafter, MSF announced that deteriorating security was forcing it to close the Huddur health center and four others in Somalia.

- On May 17, four foreign fighters and 13 other al-Shabaab members reportedly died in Mogadishu when the vehicle bomb they were constructing detonated prematurely.

- On May 24, an al-Shabaab suicide bomber killed six policemen and a civilian at a police headquarters in Mogadishu.

- On June 18, an al-Shabaab suicide bomber killed 35 people in Beledweyne, including TFG Security Minister Omar Hashi Aden.

- On July 10, al-Shabaab militants in the city of Baidoa publicly beheaded seven people accused of being Christians or spies for the TFG.

- On July 14, al-Shabaab kidnapped two French security advisors from their hotel in Mogadishu.  One escaped and the second was still being held at year's end.

- On July 17, armed men possibly linked to al-Shabaab kidnapped three foreign aid workers, including one American citizen in Mandera, Kenya, and took them across the border into Somalia.  All were released in October.

- On July 21, the UN announced it had suspended humanitarian operations in Baidoa after al-Shabaab fighter's looted equipment and vehicles from the UN compound there and at the UN office in Wajid.

- On September 17, two al-Shabaab suicide bombers in stolen UN vehicles killed 21 people in an attack on an AMISOM base in Mogadishu.  The dead included the deputy AMISOM commander and 16 other peacekeepers.

- On November 1, a remote-controlled bomb killed five Somaliland military officers, including a division commander.

- On November 2, gunmen attempted to hijack a Daallo Airlines flight from Bosasso, Puntland, to Djibouti.  Other passengers overpowered the hijackers and the plane returned to Bosasso.

- On November 12, gunmen shot to death Puntland judge Sheikh Mohamed Abdi Aware, who had recently jailed four al-Shabaab members.

- On December 3, a suspected al-Shabaab suicide bomber disguised as a woman killed at least 23 people, including three government ministers, at a graduation ceremony for a university in Mogadishu.  Al-Shabaab denied responsibility for the attack.

- On December 13, Puntland Vice President Col Shire survived a bomb attack on his motorcade 30KM south of Bosasso, Puntland.

- On December 14, a roadside bomb killed three policemen on patrol in Bosasso.

- In mid-December, al-Shabaab militants reportedly killed more than ten people who were praying at the grave of a famous Sufi sheikh in Lower Shabelle region.

Western and regional nations worked to assist Somalia through training and support for TFG security forces.  On November 17, EU Ministers of Foreign Affairs and European Defense meeting in Brussels approved the concept of a European initiative to train the Somali security forces.

AMISOM continued to secure the air and sea ports and presidential compound in Mogadishu.  In November, AMISOM announced a total of 80 of its soldiers had died since deploying to the country in 2007.  Uganda had 37 troops killed and Burundi 43, mainly in suicide attacks and roadside bombings.

**South Africa**

South Africa supported efforts to counter international terrorism and shared financial, law enforcement, and limited intelligence information with the United States.  In advance of the 2010 World Cup, there has been closer cooperation between South African and U.S. law enforcement and intelligence agencies concerning recent terrorist threats against U.S. facilities in South Africa.  South Africa's direct international air links and its permeable land borders made it vulnerable to illegal immigration, trafficking, and international organized crime.  Recognizing these vulnerabilities, the Government of South Africa dramatically increased international cooperation on measures to prevent terrorist attacks; it also markedly increased training in anticipation of the 2010 World Cup.

Uneven border security and document fraud continued to hinder the government's ability to pursue counterterrorism initiatives.  Due to a lack of institutional capacity and corruption within the Department of Home Affairs, bona fide South African identity cards, passports, and work/residence permits were sometimes fraudulently issued to unqualified persons and sometimes denied to qualified individuals.  Under the leadership of new Minister Dlamini-Zuma, the Department of Home Affairs continued work on a turnaround strategy.  Department of Home Affairs initiatives included a counter-corruption strategy and a campaign aimed at accelerating documentation of all bona fide South Africans.  The South African government began implementing plans to provide more reliable border security.  In preparation for the 2010 World Cup, the government announced that the South African National Defense Force (SANDF) would relieve the South African Police Service (SAPS) and assume responsibility for patrolling major stretches of South Africa's land border.

The South African Revenue Service (SARS) has a Customs and Border Protection (CBP) Container Security Initiative team located in Durban that works with SARS to screen containers entering and leaving the port for contraband, currency, nuclear materials, and other WMD.  SARS is a member of the World Customs Organization and has worked closely with the Department of Homeland Security Customs and Border Protection to develop the SARS, Customs Border Control Unit (CBCU), which is modeled after the CBP, Antiterrorism

Contraband Enforcement Team (ATCET), and a dedicated corps of law enforcement officers focused on WMD issues.

South Africa cooperated with the United States in exchanging information related to terrorist financing. The two nations have mutual legal assistance and extradition treaties. In early 2009, the Financial Action Task Force (FATF) completed a review of South Africa's compliance with FATF standards for anti-money laundering and combating the financing of terrorism. The review was generally positive, and noted that the Financial Intelligence Center was functioning effectively. The FATF noted, however, that South Africa could do a better job of regulating trusts, monitoring financial institutions compliance with AML legislation, and enhancing the disclosure of cross-border transfers of cash. South Africa remains the only FATF member in Africa and has one of the three Egmont-member Financial Intelligence Units in the region. It is also a member of Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG), a regional organization of financial intelligence units, and as such, has served as a resource for other ESAAMLG members. Due in part to strict banking requirements and the cash-driven nature of the South African economy, South Africans sometimes use alternative remittance systems that bypass the formal financial sector.

**Tanzania**

Tanzania remained vulnerable to international terrorism. Al-Qa'ida elements responsible for the 1998 U.S. Embassy bombing remained active throughout East Africa. During the year, Tanzanian law enforcement and security forces made efforts to identify and monitor terrorist activities and deny use of Tanzanian territory as a safe haven. U.S.-Tanzanian cooperation has led to new training initiatives designed to strengthen Tanzania's border control and internal security capacity. Tanzania's National Counterterrorism Center continued its participation in several multi-year programs to strengthen its law enforcement and military capacity, improve aviation and border security, and combat money laundering and terrorist financing. The Financial Intelligence Unit (FIU), established in 2007 with the passage of the Anti-Money Laundering Act, is responsible for receiving, analyzing, and disseminating suspicious transaction reports and other information regarding potential money laundering or terrorist financing. With only three technical staff, however, the FIU has limited resources to investigate potential money laundering or terrorist financing activities. In an effort to build Tanzania's capacity to combat money laundering and terrorist financing, the U.S. Internal Revenue Service held a seminar on anti-money laundering and financial investigative techniques in November.

**Uganda**

Uganda remained vulnerable to international terrorism, with members of al-Qa'ida using Uganda as a transit point. Al-Qa'ida and the Somali-based al-Shabaab posed the most significant terrorist threats to Uganda. Uganda took tangible steps to track, capture, and hold individuals with suspected links to terrorist organizations. While in transit, al-Qa'ida members were believed to have procured government documents illegally and engaged in recruitment activities. In response, the Government of Uganda increased efforts to track, capture, and hold individuals with suspected links to terrorist organizations. Uganda's Joint Anti-Terrorism Taskforce

(JATT), composed of military, police, and intelligence entities, led Uganda's counterterrorism response.

In September, November, and December, the Ugandan government raised alert levels and increased security at government installations, popular shopping centers, hotels, and other soft targets due to threats from al-Qa'ida and al-Shabaab. Al-Shabaab identified Uganda as a potential target in retaliation for Uganda's participation in the African Union peacekeeping mission in Somalia.

The Ugandan military continued to track, in coordination with the Democratic Republic of Congo (DRC), Sudan, and the Central African Republic (CAR), remnants of the Lord's Resistance Army (LRA). The LRA has not carried out an attack in Uganda since mid-2006, but was responsible for killing, raping, and kidnapping hundreds of persons in southern Sudan, the DRC, and CAR. During the year, 255 LRA combatants surrendered to the government and were granted amnesty under the country's Amnesty Act of 2000.

The U.S. Antiterrorism Assistance Program (ATA) conducted an assessment of the Ugandan government's counterterrorism capabilities in June. While the Ugandan government was a strong advocate for cross-border solutions to persistent security concerns in the Great Lakes Region, resource limitations and corruption hampered more effective counterterrorism measures. The need to amend the 2002 Anti-terrorism Act, enact comprehensive anti-money laundering legislation pending before Parliament, and improve coordination and information sharing between security services remained at year's end.

**Zambia**

In 2007, the Zambian Government passed a counterterrorism bill, which criminalized acts of terrorism, including terrorist training, incitement, and financing, and granted the government significant authority to investigate, prevent, and prosecute acts of terrorism. Inadequate resources and training impeded Zambia's law enforcement agencies' counterterrorism capabilities, however. Zambia's long and porous borders continued to pose a challenge in terms of the monitoring and control of illegal immigrants attempting to enter the country. Its points of entry remained vulnerable to human trafficking and international crime. Instability in Zimbabwe, Somalia, and Congo resulted in an increase in migrants during 2009. With U.S. assistance, Zambia has sent a number of law enforcement officers to the International Law Enforcement Academy in Botswana to learn and understand better methods to challenge illegal border crossing.

The Zambian government does not have an internationally-compliant anti-money laundering or counterterrorist financing regime, but the Zambian government has announced its intentions to create a Financial Intelligence Unit (FIU) within the Bank of Zambia that meets international standards.

**Zimbabwe**

Zimbabwean government agencies routinely provided assistance by conducting investigative inquiries, traces, and border checks of individuals thought to be threats to U.S. government facilities or personnel.  Zimbabwe's continued economic decline, however, has had a detrimental impact on local law enforcement and national security elements responsible for implementing and coordinating counterterrorism efforts.  The Suppression of Foreign and International Terrorism Bill, enacted in August 2007 to combat terrorism and mercenary activities in Zimbabwe, was redirected to suppress opponents of Zimbabwe's political leaders and policies. Although generally cooperative, Zimbabwean law enforcement officials have been reluctant to take or recommend actions that would be seen as pro-American.  This has undermined efforts to foster greater cooperation.


## East Asia and Pacific Overview

"The challenge of terrorism demands the broadest possible coalition of nations to put an end to it — not only through sheer force of arms but mainly through a dialogue of faiths, cultures and civilizations that will put the merchants of hate out of business."

--N. Hassan Wirajuda, Foreign Minister of the Republic of Indonesia, Statement to the 64th Session of the UN General Assembly September 29, 2009

By 2009, Asia's combination of multilateral cooperation, capacity building, popular support, and political will had resulted in significant progress in countering terrorism and in developing the institutions necessary to deprive violent extremists of exploitable grievances.  Despite that on July 17, suicide bombers affiliated with the remnants of the terrorist organization Jemaah Islamiya (JI) struck two hotels in downtown Jakarta within five minutes, killing nine and injuring sixty more, ending a four year period without a major terrorist attack in Indonesia.  The attack was a reminder of the difficulty in eradicating the use of terrorism by those who are committed to violence.  The Indonesian government's counterterrorism efforts led to the arrests of 14 key operatives and the deaths of nine, including Noordin Muhammad Top, the Malaysian leader of a splinter JI group based in Indonesia.  Top was number one on Indonesia's most wanted list for several years and believed to have overseen the 2003 Jakarta J. W. Marriott bombing, the 2004 bombing of the Australian Embassy, the 2005 Bali bombings, and the 2009 Jakarta bombings.

Similarly, in 2009 the international community worked with the Philippines to find a peaceful resolution to the long-running insurgency in the Southern Philippines.  The insurgency contributed to the conditions of conflict and instability that provided both physical and ideological space to groups of violent extremists, including JI fugitives and Abu Sayyaf Group members.  Philippines security forces continued to make headway against extremist groups, killing 45 and arresting 18 individuals in the first half of the year.

The United States continued to work in partnership with countries in the region through diplomacy, bilateral security cooperation, multilateral organizations, and capacity building to

support counterterrorism efforts.  The United States and China held bilateral counterterrorism consultations in September, and the annual Trilateral Strategic Dialogue Counterterrorism Consultations with the U.S., Australia, and Japan, were held in Tokyo in December.  Also in December, South Korea hosted the Counterproliferation Working Group plenary, a U.S.-South Korea forum to discuss ways to build cooperative capacity to deter Chemical, Biological, Radiological and Nuclear (CBRN) attacks and manage consequences of a CBRN event.  The same month, South Korea hosted the second round of bilateral counterterrorism consultations.

Australia maintained its position as a regional leader in the fight against terrorism and worked to strengthen the Asia-Pacific region's counterterrorism capacity through a range of bilateral and regional initiatives in fora such as Asian Pacific Economic Cooperation, the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum, and the Pacific Island Forum. Japan also continued to assist counterterrorism capacity building in developing countries through seminars, workshops, and training.

**Australia**

Australia continued to play a leadership role in the fight against international terrorism through multilateral and bilateral fora, including the annual Trilateral Security Dialogue with Japan and the United States, and the Lombok Treaty with Indonesia that enhanced bilateral counterterrorism cooperation.

The Australian Security Intelligence Organization (ASIO) assessed that terrorism remained a serious and immediate threat to Australia; that extremist organizations in the Middle East, South Asia, and East Africa were the primary sources of inspiration and capabilities for extremists in Australia; and that the number of Islamist extremists willing to use violence in the country was very small and did not change substantially between July 2008 and June 2009.  The most serious terrorism case was the arrest of five men, some with alleged links to the Somali terrorist group al-Shabaab, for allegedly planning a suicide attack on an Australian military base.  The Australian National Counterterrorism Committee (NCTC) alert level remained at medium.

On August 12, the government announced proposed reforms to counterterrorism legislation, including expanding the definition of a "terrorist act" in the Criminal Code to include psychological, as well as physical harm; extending the expiration period of regulations proscribing a terrorist organization from two to three years; extending parliamentary oversight of the Australian Federal Police (AFP); and providing further limits on the period a suspect can be held without charge.

The government directed intelligence agencies – including the Australian Transaction and Reports Analysis Centre, which monitors financial transactions – to increase monitoring of small transactions sent abroad.

Eighteen groups were included on Australia's Listing of Terrorist Organizations.  In 2009, 10 groups were re-listed, including the Kurdistan Workers Party, Lashkar e-Tayyiba, Palestinian

Islamic Jihad, and the Islamic Movement of Uzbekistan.  On August 21, al-Shabaab was listed as a terrorist organization.

Several other terrorism-related arrests or convictions occurred in 2009:

- In February, seven men from Melbourne were sentenced to jail terms, ranging from four and a half to 15 years, for their involvement in planning terrorist activities.  They were arrested in November 2005, during concerted actions on suspected terrorist groups in Melbourne and Sydney.  An eighth, who trained in Afghanistan, was sentenced to five years in September.

- In October, five Sydney men, arrested as part of a series of raids in 2005, were found guilty of plotting terrorist attacks.  Sentencing hearings began in December 2009.  Soon after, it was revealed that four other men involved in the plot had pled guilty and had been sentenced to jail terms.  Two of them were eventually freed in exchange for cooperation with authorities.

- In September, a Lebanese-born Sydney man, Bilal Khazal, was sentenced to 12 years in jail for posting a terrorism handbook titled "Provisions on the Rules of Jihad" on the Internet.  In December 2003, Khazal and his brother were sentenced in absentia by a Lebanese military tribunal for financing an Islamist extremist group, which bombed U.S. businesses.

Australia assisted Indonesia in the investigation of the July hotel bombings in Jakarta.

Australian multilateral engagement continued in forums such as the United Nations, Association of Southeast Asian Nations (ASEAN), ASEAN Regional Forum, Asia Pacific Economic Cooperation, Pacific Island Forum, and G8 Counterterrorism Action Group, as well as in the Global Initiative to Combat Nuclear Terrorism.  Australia has counterterrorism memoranda of understanding with Indonesia, the Philippines, Malaysia, Cambodia, Thailand, Brunei, Fiji, Papua New Guinea, East Timor, India, Pakistan, Afghanistan, Turkey, and Bangladesh.  Australia continued to provide legal drafting assistance to regional states seeking to adopt international conventions and protocols against terrorism, and to bring their law codes into conformity with these conventions.  Australia continued to lead efforts within the Civil International Civil Aviation Organization to update two counterterrorism conventions on civil aviation.

In October, Australia participated in the Fifth Regional Interfaith Dialogue in Perth, Australia, sponsored by Australia, Indonesia, New Zealand, and the Philippines.  It aimed to promote peace and understanding through interfaith links.  Within Australia, the government funded projects encouraging tolerance of religious diversity, particularly focusing on strengthening goodwill between Muslims and non-Muslims.

Australia and the United States exchanged information using APEC's Regional Movement Alert System.

The Australian Defense Force boosted its contribution in Afghanistan to approximately 1550 personnel.

**Burma**

The Government of Burma defined almost all anti-regime activities as "acts of terrorism," making little distinction between peaceful political dissent and violent attacks by insurgents or criminals.  The government characterized dissident groups as aligned with terrorist organizations and has used this as justification to scrutinize and disrupt dissident activities.  In December 2009, bombs exploded in Rangoon and other parts of Burma.  The government attributed the bombings to subversives or insurgents intent on disturbing the stability of the state.  Authorities have not made public any evidence of a genuine investigation nor have they identified the specific perpetrator(s).  Requests by the U.S. Embassy to view either specific bomb scenes or remaining fragments of explosive devices were consistently denied.

 In October, a Government of Burma liaison informed U.S. officials that its Special Branch police had arrested three members of an anti-Burma group that was planning to set off explosives in Rangoon, including targeting the U.S. Embassy.  The Burmese liaison advised that the arrested persons were not members of a terrorist organization as defined by the U.S. government.  This was a departure from past practice, in which, as noted, the Government of Burma defined all groups allegedly engaged in bombings as terrorists.

**Cambodia**

Cambodia's political leadership demonstrated a strong commitment to legal action against terrorists and the Government of Cambodia remained committed to strengthening its counterterrorism capability through training and international cooperation.

In Cambodia, terrorists could attempt to exploit various local conditions – including endemic corruption, poverty, high unemployment, a poor education system, porous borders, and disaffection within the Cham Muslim population, which makes up approximately five percent of the population – to gain recruits, resources, and lines of operation.  Although the Cham are not generally politically active, the Cambodian government is aware that foreign terrorists might use Cham areas as safe havens.  For example, Hambali, a senior Jemaah Islamiya operative accused of involvement in the 2002 Bali nightclub bombings, took refuge in a Muslim school in Cambodia in 2002-2003.

With U.S. assistance, Cambodian authorities monitored computerized border control systems at Phnom Penh and Siem Reap airports, and at the land border crossings of Poipet and Koh Kong.  International ports employed the use of this computerized system, as well as E-passport for Cambodian nationals and VISPEC, which was provided, installed, and trained to Cambodia's immigration police by the United Kingdom.  Although biometric systems were not available in Cambodia, various officials received biometrics training from Singapore.  U.S. officials also provided training to Cambodian authorities on financial investigation, methods for countering

money laundering and terrorist financing, hostage release negotiations, and terrorist incident management.

In 2009, 70 Cambodian government officials participated in 17 separate Cambodia-based training and workshop sessions hosted by the Australian, German, Russian, and U.S. Embassies. Twenty officials participated in 15 separate overseas training and workshop sessions in the United States, Malaysia, Japan, Australia, Vietnam, Philippines, India, and Thailand, which covered a range of topics, including security, counterterrorism, and investigation of fraudulent documents.

In November, a counterterrorism exercise on Southeast Asian-Japan Maritime Security was conducted in Preah Sihanouk Province under the auspices of Australia, the United States, and the secretariat of the National Counterterrorism Committee.

The Cambodian government continued to make progress in strengthening its counterterrorist finance regime. The Financial Intelligence Unit (FIU), which operated within the framework of the National Bank of Cambodia, conducted on-site examinations of banks and financial institutions and signed Memorandums of Agreements on information exchanges concerning money laundering and terrorist financing with the Bank Nagara Malaysia FIU, the FIU of the Central Bank of Sri Lanka, and the Anti Money-Laundering Department of the Bangladesh Bank on information exchange concerning money laundering and terrorist financing.

**China**

China continued its counterterrorism cooperation with the United States and other nations throughout the year. In September, the United States and China held bilateral counterterrorism talks in Washington, DC. In June, China and Singapore conducted joint counterterrorism exercises in Guilin. Then in July, China held a joint Sino-Russian counterterrorism exercise in Jilin Province. Finally, in November, representatives from the Shanghai Cooperation Organization attended an international counterterrorism conference in Kyrgyzstan. Additionally, the implementation of the Yangshan Deep Water Megaports project was resumed on July 2.

China's anti-money laundering and counter-financing of terrorism (AML/CTF) system was significantly strengthened during 2009, although several key deficiencies have yet to be addressed. In July, at the U.S.-China Strategic and Economic Dialogue held in Washington, DC, the United States and China agreed to strengthen their cooperation on AML/CTF, including counterfeiting. In August, the Securities Association of China provided AML/CTF guidelines to securities firms in China, in an effort to cut off possible sources of funding to terrorists. In November, the Supreme People's Court released a judicial interpretation that further expands application of the law to specific non-banking/financial institutions and more widely covers terrorist financing activities.

Terrorist financing is a criminal offense in China. However, the government has yet to develop an asset freezing and confiscation regime that meets international standards or that adequately implements UN Security Council Resolutions 1267 and 1373, according to the Financial Action

Task Force (FATF).  In addition, China's cross-border declaration and disclosure system needs strengthening to better prevent terrorist financing activity.  China's Financial Intelligence Unit (FIU), housed within the People's Bank of China, worked closely with the Financial Crimes Enforcement Network in the United States to develop its capabilities.  In addition to its domestic collection and analysis activities, the FIU exchanged information with foreign FIUs.

China expanded its role in international efforts to combat terrorist finance and money laundering by becoming a full member of the FATF in June 2007.  Since 2004, China has also been a member of the Eurasian Group (EAG), a FATF-style regional body that includes China, Russia, and most Central Asian countries.  In December, China hosted the EAG's bi-annual plenary, providing China an opportunity to enhance its leadership role in AML/CFT issues.  Coordination in countering terrorist finance could be further enhanced through China's membership in the Egmont Group, an umbrella body that coordinates the activities of over 100 FIUs worldwide.  Though China has applied for membership in the Egmont Group, political concerns about Taiwan's participation in the organization have hampered membership discussions.

The East Turkistan Islamic Party (ETIP), also known as the East Turkistan Islamic Movement (ETIM), was added to the UN Security Council al-Qa'ida and Taliban Sanctions Committee's Consolidated List of individuals and entities associated with al-Qa'ida or the Taliban in 2002.  In April 2009, the Sanctions Committee added ETIP leader Abdul Haq to the Consolidated List.

Human rights organizations have accused China of using counterterrorism as a pretext to suppress Uighurs, a predominantly Muslim ethnic group that makes up a large percentage of the population within the Xinjiang Uighur Autonomous Region of western China.  After widespread rioting in urban areas of Xinjiang in July and September, police moved in and arrested more than 200 people according to official estimates, at least 26 of whom have been sentenced to death.  The Chinese government claimed that the riots were orchestrated from abroad and therefore terrorist attacks on China.

Formally established in 2002, the FBI Legal Attaché's Office in Beijing bolsters U.S.-China cooperation on counterterrorism investigations.  In 2009, FBI Counterterrorism Division personnel participated in a round table discussion on terrorism issues with the China Institute of Contemporary International Relations.  FBI personnel also provided a general overview to Ministry of Public Security Terrorism Department personnel on counterterrorism investigations.

<u>Hong Kong</u>

Hong Kong's position as a major transit point for cargo, international finance, and people, coupled with its open trade and financial regime, make it a potential site for money laundering and terrorist financing activities.  Hong Kong is a close partner with the United States in the fight against terrorism.  The Hong Kong government successfully participated in the Secure Freight Initiative pilot project through its conclusion on April 30.  The Container Security Initiative in Hong Kong remained effective, and cooperation with Hong Kong customs officials received continued praise from visiting U.S. government delegations.

Hong Kong law enforcement agencies provided full support and cooperation to their overseas counterparts in tracing financial transactions suspected of links to terrorist activities, and participated in U.S. government-sponsored training on financial crimes and strategic commodity identification, among other topics.

In October, Hong Kong's police, fire, health, and other government services held emergency response drills simulating chemical, biological, radiological, and nuclear attacks.  During the Hong Kong-hosted East Asia Games in December, Hong Kong deployed its newly established police Counter Terrorist Readiness Unit (CTRU).  In addition to providing a counterterrorist deterrent presence, the CTRU assisted police districts with counterterrorism strategy implementation and provided tactical and professional support to existing specialist units, such as the Special Duties Unit and its VIP Protection Unit.

Hong Kong actively participated in various anti-money laundering and counterterrorist financing initiatives, including the Financial Action Task Force (FATF) and the Asia/Pacific Group (APG) on Money Laundering.  Hong Kong is a member of the Egmont Group of Financial Intelligence Units, reporting through its Joint Financial Intelligence Unit operated by the Hong Kong Police and the Customs and Excise Department.

In response to recommendations stemming from the 2007 FATF and APG mutual evaluation of Hong Kong, authorities are drafting legislation to increase supervision of money changers and remittance agents; create statutory requirements for customer due diligence and record-keeping in the banking, securities, and insurance sectors; and establish civil penalties for these infractions.  Legislation to establish government oversight for non-financial professions and to create a cross-border currency reporting mechanism is needed to address additional FATF recommendations.

Macau

Macau's position as a major international gambling center makes it a potential site for money laundering and terrorist financing activities.  Macau's financial regulatory authorities directed banks and other financial institutions to search continuously for terrorist financing networks and accounts using lists of individuals and entities designated by the United States under relevant authorities, as well as the UN 1267 Sanctions Committee's consolidated list of individuals and entities associated with al-Qa'ida, the Taliban, and Usama bin Ladin.

Macau is a member of the Asia/Pacific Group (APG) on Money Laundering.  In response to recommendations of the APG evaluation, Macau authorities have taken steps to improve compliance with suspicious transactions reporting requirements in banks, casinos, and professional associations, but the threshold reporting limits remain well above international norms.  Macau does not have reporting requirements for cross-border currency movements.

In May, Macau joined the Egmont Group of Financial Intelligence Units through its Financial Intelligence Office (FIO), an independent government unit under Macau's Secretary for Economy and Finance.  The FIO played an essential role in Macau's Anti-Money Laundering

(AML) regime by collecting and analyzing suspicious transactions, providing AML assistance to local authorities, raising the public's AML awareness, and sharing information with overseas counterparts.

In September, the Macau Monetary Authority (AMCM) strengthened its AML guidelines for financial institutions, money changers, and remittance agents by mandating enhanced customer due diligence measures and the compulsory employment of AMCM-approved AML compliance officers.

Macau cooperated internationally in counterterrorism efforts through INTERPOL and other security-focused organizations within the Asia Pacific Region. Macau's law enforcement and customs agencies participated in U.S. government-sponsored training in bulk cash smuggling detection, weapons of mass destruction proliferation awareness workshops, and complex financial investigation techniques.

**Indonesia**

The Government of Indonesia reacted decisively to the July 17, 2009 bombings of the Jakarta Ritz Carlton and J.W. Marriott hotels, which killed nine people, including the two bombers, and injured more than 50 in the first attacks in Indonesia in almost four years.

The Indonesian government's counterterrorism efforts led to the arrests of 14 operatives and the deaths of nine, including Noordin Muhammad Top, the Malaysian leader of a splinter Jemaah Islamiya (JI) group based in Indonesia. Top was number one on Indonesia's most wanted list for several years and is believed to have overseen the 2003 Jakarta J. W. Marriott bombing, the 2004 bombing of the Australian Embassy, and the 2005 Bali bombings.

The Marriott suicide bomber entered a private dining room where a breakfast meeting of prominent business community representatives, primarily expatriates, was being held. The bomber set off an improvised explosive device (IED) that killed six people. Approximately five minutes later, a second bomber set off an IED in the Ritz Carlton restaurant, killing himself and two others. An undetonated bomb was later discovered in a J.W. Marriott guest room where one of the bombers stayed during the two days before the attacks.

The level of planning for the attacks, including the planting of a JI operative in the hotels and floral shops for at least two years prior to the bombings, indicated that Top's network had grown in sophistication. As the investigation developed, it became apparent the network was larger in number and geographical reach than previously thought. The ages of the Marriott bomber and other operatives indicate Top and his associates successfully recruited youths with no previous criminal records. Family links between operatives, including by marriage, were evident throughout the network.

Regarding terrorism legislation, the Parliamentary Commission on Security and Defense proposed revisions to the 2003 Terrorism Law. By the end of 2009, Parliament had not yet begun to review the revisions. It was not clear when they would begin to do so.

One proposed revision to the law would allow a suspect to be detained for two years without trial should his/her activities be deemed an endangerment to Indonesia's security. Under the current law, the Indonesian police must formally name a subject as a terrorism defendant within seven days after arrest and can then detain them for up to four months without charges.

Another proposed revision to the law would allow the police to crack down on individuals and groups that glorify terrorism and openly preach hatred against those of a different faith. This particular law would target radical clerics who support radical jihad, or war, in their religious lectures.

An additional proposed revision to the law would create a Counterterrorism Coordination Agency composed of governmental and social components, including representatives of most of the Ministries, the Attorney General's Office, the National Police, the State Intelligence Agency, and the Armed Forces.

The Coordinating Minister for Political, Legal, and Social Affairs would head the body and answer directly to the President. The agency would coordinate counterterrorism policy and activities, and serve as a central crisis center in the event of a terrorist attack. It has not yet been determined whether the agency would have operational capacities. Elements of the agency would also coordinate with the Religious, Education, and Information Affairs Ministries to implement counter- and de-radicalization programs.

A final proposed revision to the law would allow the Indonesian military (TNI) and the State Intelligence Agency (BIN) to work more closely with the police, directed by the Counterterrorism Coordination Agency, to counter terrorist acts.

Regarding developments in terrorist financing legislation, the Indonesian government made substantial efforts to draft effective terrorist financing legislation that meets FATF standards and creates an effective mechanism to freeze terrorist assets pursuant to UNSCRs 1267 and 1373.

An Indonesian interagency team headed by PPATK, the Indonesian Financial Intelligence Unit, drafted new terrorist financing legislation. This draft law addresses criticisms raised in the Asia Pacific Group on Money Laundering 2008 evaluation of Indonesia, which noted significant deficiencies in Indonesia's statutory and regulatory framework to combat money laundering and terrorist financing.

The draft legislation is a significant improvement over previous terrorist financing legislation, as it creates a mechanism to trace, freeze, seize, and confiscate terrorist assets pursuant to UNSCRs 1267 and 1373, and clarified and broadened the definition of support to a terrorist organization. The draft legislation does not specifically address the use of non-profit organizations (NPOs) and non-governmental organizations to finance terrorism, a sensitive topic. Although PPATK interlocutors assert the draft legislation will apply to non-profits, it is unclear whether there would be political will to apply the legislation to non-profits. The Government of Indonesia initiated a review of its domestic NPO sector in July 2009, as requested by the APG. The review

is a key part of the government's effort to improve regulation and oversight of the NPO sector. To date, there has been only one successful terrorist financing prosecution in Indonesia, a function of poorly drafted legislation and a lack of training for police and prosecutors.

The Victim and Witness Protection Agency LPSK is in the process of developing procedures to assist victims of crime, including terrorist activities, and to shelter witnesses from criminals including terrorist organizations.

The Indonesian government continued programs to counter violent extremism, but concrete, systemic information as to the effectiveness of the programs was not available.  The National Police and the Ministry for Political, Legal, and Security Affairs offered counter-violence programs to youth across the country, including sports events, television programs, and traditional puppet shows (a popular cultural practice in Indonesia).

The Indonesian National Police continued its prisoner assistance program to de-radicalize convicted terrorists, primarily with the assistance of two former terrorists, Ali Imron and Nasir Abas, who were convicted for their participation in the 2002 Bali bombings.  The program identified individuals who might be open to more moderate teachings and focused on providing spiritual support to the men and modest financial support to their families.

The United States and Indonesia continued to enjoy excellent cooperation on issues related to international terrorism.  The Indonesian government has worked closely with the United States on terrorism cases and indicated its interest in ongoing assistance and cooperation.  The Attorney General's Office of Terrorism and Transnational Crime Task Force, which the United States helps support, has successfully convicted more than 60 Indonesian terrorists to date, including more than 40 JI members.  Although there is no mutual legal assistance treaty in place, there is considerable sharing of information between Indonesia and the United States, and mechanisms exist for the formal transfer of evidence, with the first two mutual legal assistance requests being executed between Indonesia and the United States in 2009.

**Japan**

Japan bolstered border security and enhanced national counterterrorism measures in coordination with the United States.  Japanese immigration officials continued to strengthen their capability to identify suspicious travelers upon entry into Japan's international airports through fingerprinting and facial image technology.  Since the introduction of the Biometric Immigration Control System in November 2007 until October 31, 2009, officials denied entry to 1,465 foreign nationals who attempted to enter Japan using forged or altered passports or re-enter after being previously deported from Japan.  Japan's Immigration Bureau, National Police Agency (NPA), and the Ministry of Land, Infrastructure, Tourism, and Travel coordinated with Department of Homeland Security (DHS) on preventing terrorists and other high-risk travelers from boarding commercial aircraft bound for the United States.  Japanese officials see the program as a valuable tool to secure travel between Japan and the United States and as an effective way to share information and prevent suspected terrorists and improperly documented air passengers from boarding U.S.-bound flights.  During December 2009, DHS and the Japan Immigration Bureau

agreed to begin negotiations on an Immigration Mutual Assistance Agreement that would facilitate immigration cooperation between Japan and the United States.

Japan also took steps to strengthen port and shipping security. Under DHS' Container Security Initiative, Japanese authorities worked with U.S. officials to review ship manifests and to screen suspicious containers bound for the United States. In March, Japan installed radiation portal monitors and began screening containers for the presence of radiological material under the pilot Megaports Initiative Program. In June, Japan and the United States signed a Mutual Recognition Arrangement in Brussels, aligning security standards in both countries' trade partnership programs. Japan also continued collaboration with the United States on science and technology for homeland security through the U.S.-Japan Framework Initiative for a Safe and Secure Society.

The NPA and the Public Security Intelligence Agency (PSIA) continued to monitor the activities of Aum Shinrikyo, renamed Aleph, and splinter group Hikari no Wa, or "Circle of Light." In January, PSIA successfully filed a request to maintain surveillance of Aleph and Hikari no Wa for an additional three years. PSIA has monitored Aum since 2000 under the Organization Control Law, a measure that allows the Agency to conduct on-site facility inspection and to obtain quarterly operational reports from the cult.

Japan reached beyond its borders to fight terrorism as well. Japan is the second largest contributor to Iraq reconstruction with US$ 1.7 billion in grants, US$ 3.5 billion in concessionary loans, and US$ 6.9 billion in debt relief. Japan remained an active partner in Operation Enduring Freedom (OEF) and a key international contributor to Afghan stabilization and reconstruction. Japan has pledged more than US$ 2 billion in reconstruction aid since 2002 and continued construction on the 114 kilometer stretch of the southern ring road between Kandahar and Herat. In November, Japan announced a new five-year, US$ 5 billion assistance package that included, among other items, continued funding of Afghan National Police salaries, job training initiatives, and employment programs for former lower-echelon insurgents. The Japan Maritime Self Defense Force continued to conduct refueling operations in support of OEF in the Indian Ocean. In April, Tokyo pledged US$ 1 billion for a wide-range of assistance to Pakistan over the next two years.

In December, Japan hosted the fifth annual U.S.-Japan-Australia Trilateral Strategic Dialogue (TSD) Counterterrorism Consultations, as part of the broader TSD, which aimed to coordinate regional activities. Japanese officials chaired a specialist working group on border security and counter-radicalization and took part in discussions on law enforcement capacity building and on ways to prevent chemical, biological, radiological, and nuclear attacks. The TSD Consultations followed a TSD Counter-radicalization Workshop Japan hosted in July.

Japan continued to assist counterterrorism capacity building in neighboring countries through dialogue, seminars, workshops, and training. In July, Japanese officials took part in the third Japan-South Korea Counterterrorism Consultations. In August, Japan co-chaired the Fourth Japan-ASEAN Counterterrorism Dialogue in Vietnam. In December, Japanese officials took part in the first Japan-Singapore Counterterrorism Dialogue. The Japanese Counterterrorism

Ambassador reaffirmed the necessity of enhancing capacity building assistance to developing countries, strengthening counter-radicalization efforts, and promoting secure trade in the APEC region.  In March, Japan hosted the Seminar on Promotion of Accession to International Counterterrorism Conventions and Protocols for the sixth consecutive year.  Tokyo promoted information sharing and provided implementation guidance to participants including Fiji, Papua New Guinea, and several members of the Association of Southeast Asian Nations, among others.

Japan supported regional projects, such as counterterrorism research in Malaysia and terrorist rehabilitation programs in Indonesia, through the Japan-ASEAN Integrated Fund.  Over the past few years, Japan has invited roughly 60 teachers from 17 Indonesian provinces and 43 madrassas for the purpose of fostering "cultural understanding" and opening inter-faith dialogue.  Japan has expanded the pool of visitors to include Yemen and the Philippines.

Japan assisted third-country law enforcement personnel by dispatching experts and accepting trainees.  The Japanese Coast Guard (JCG), for example, provided capacity building services and training seminars to authorities from states that border the Straits of Malacca.  Since 2002, Japan has provided training to Coast Guard counterparts from the Philippines and has offered technical assistance to support local police in Indonesia by, in part, introducing the Japanese police box, or koban[5] system.

Japan contributed to counterterrorism capacity building through membership in multilateral fora. In July, Japan joined G8 counterparts in calls to bolster the role of the United Nations; improve information sharing; strengthen the security of land, sea, and air transportation; and support the G8 Counterterrorism Action Group.

Japan undertook measures to combat terrorist financing.  Japan cooperated on freezing assets of individuals and entities listed under UN Security Council resolutions to help stem the flow of terrorist financing to al-Qa'ida and the Taliban.  Japan expanded the scope of business practices and professions under the Law for Prevention of Transfer of Criminal Proceeds, which requires specified business operators, including financial institutions, to conduct customer identification and submit suspicious transaction reports.  Under the Foreign Exchange and Foreign Trade Law, Japanese financial institutions must confirm the identity of customers sending 100,000 yen or more overseas.  For domestic remittances, financial institutions must identify originators of wire transfers over 100,000 yen (US$ 1,000).  Japan's Banking Law also levies administrative sanctions on financial institutions that fail to comply with anti-money laundering and counterterrorist financing measures.  In addition, the Financial Services Agency and the NPA's Financial Intelligence Unit inspect financial institutions for compliance with counterterrorist financing laws and regulations.

---

[5]  Koban are often located near stations and busy entertainment areas and are supposed to act as a community policing center: a deterrent to criminal activity as well as providing a rapid response post in the case of actual wrongdoing.  Each koban is usually staffed by a group of 4 police - 3 officers under the command of a sergeant working on 3 shifts of 8 hours under the control of the city or ward police station.

In June, the Japanese Diet passed the Payment Services Act, which addresses October 2008 Financial Action Task Force (FATF) Mutual Evaluation recommendations pertaining to customer due diligence and money transfer services.  The evaluation had noted several deficiencies, including the low number of money laundering prosecutions, the absence of an established mechanism for freezing terrorist assets that covered domestic funds, and the absence of a requirement for financial institutions to establish and maintain procedures, policies, and internal controls to prevent illicit finance.  Japan's Financial Services Agency must still adopt implementing rules.  The Diet also amended Customs Act secondary legislation, which addressed in part the FATF recommendation pertaining to cross-border currency declaration and disclosure.

**Republic of Korea**

The Republic of Korea (South Korea) demonstrated excellent law enforcement and intelligence capabilities to combat terrorism.  South Korean immigration and law enforcement agencies had a strong record of tracking suspicious individuals entering their territory and reacting quickly to thwart potential terrorist acts.  Seoul also reviewed and strengthened its emergency response plan and, in accordance with UNSCR 1267 and 1373, further tightened its legislative framework and administrative procedures to combat terrorist financing.  For example, the Prohibition of Financing for Offenses of Public Intimidation Act took effect in December 2008 and was intended to implement the UN Convention for the Suppression of the Financing of Terrorism, to which the South Korea has been a party since 2004.  Under the Act, funds for public intimidation offenses are identified as "any funds or assets collected, provided, delivered, or kept for use in any of the following acts committed with the intention to intimidate the public or to interfere with the exercise of rights of a national, local, or foreign government."  An amendment expanding the government's ability to confiscate funds related to terrorism was enacted in March, enabling the government to confiscate not only the direct proceeds of terrorism, but also funds and assets derived from those proceeds.  In October, South Korea became a full member of FATF.  The accession to FATF will allow Korea, an observer since 2006, to actively participate in the process of setting and revising global Anti-Money Laundering and Counterterrorismm Financing Terrorism (AML/CTF) standards and increase international cooperation.

South Korea supported U.S. counterterrorism goals in Afghanistan by announcing the establishment of a Provincial Reconstruction Team.  In addition, South Korea worked closely with other foreign partners and played a constructive role in improving regional counterterrorism capabilities.  South Korea continued to participate in the counterterrorism activities of the Asia-Pacific Economic Cooperation forum, the ASEAN Regional Forum, and the Asia-Europe Meeting.  The Korea Overseas International Cooperation Agency hosted counterterrorism training and capacity-building programs for regional partners in forensic science, prevention of money laundering, and cyber security.

In March, the Counterterrorism Committee Executive Directorate of the United Nations visited South Korea to monitor its efforts to combat terrorism in accordance with UNSCR 1373.  The team found that Korea had made good progress with respect to AML/CFT laws and mechanisms

to criminalize terrorist financing and freeze funds and assets.  In October, the Korea Institute for Defense Analyses hosted the ninth Biannual Symposium of the Council for Asian Terrorism Research, with the theme "Korean Peninsula WMD Threats: Regional and Global Implications." In November, South Korea hosted the second APEC Cybersecurity Seminar on "Protection of Cyberspace from Terrorist Attacks and Use," which brought 13 countries together to discuss recent cyber attacks and ways to deal with the challenges of cyber terrorism.  In December, the Ambassador for International Counterterrorism Cooperation hosted the second round of South Korea-U.S. bilateral counterterrorism consultations, attended on the U.S. side by the Deputy Coordinator for Regional Affairs of the Office of the Coordinator for Counterterrorism.  Korea also held bilateral counterterrorism meetings with Indonesia, Japan, France, and Germany during the year.

The South Korean government has recently been concerned over the growing number of South Korean citizens abroad who have been victims of terrorist attacks.  In March, four South Korean tourists were killed and five were wounded in a suicide bombing in Yemen, for which al-Qa'ida later claimed responsibility.  In June, another South Korean civilian working for a medical NGO in Yemen was kidnapped and killed.  Although the Yemeni government did not find a conclusive connection to an established terrorist group in that incident, the South Korean government was put on alert and is now exploring various possibilities to prevent future attacks on its citizens.

**North Korea (DPRK)**

The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987.  On October 11, 2008, the United States removed the designation of the DPRK as a state sponsor of terrorism in accordance with criteria set forth in U.S. law, including a certification that the government of the DPRK had not provided any support for international terrorism during the preceding six-month period and the provision by the DPRK of assurances that it will not support acts of international terrorism in the future.

In May, the United States re-certified North Korea as "not cooperating fully" with U.S. counterterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Pursuant to this certification, defense articles and services may not be sold or licensed for export to North Korea from October 1, 2009 to September 30, 2010.  This certification will lapse unless it is renewed by the Secretary of State by May 15, 2010.

Four Japanese Red Army (JRA) members who participated in a jet hijacking in 1970 continued to live in the DPRK.  On June 13, 2008, the government of Japan announced that the DPRK had agreed to cooperate in handing over the remaining members of the JRA involved in the hijacking.  However, the DPRK has not yet fulfilled this commitment.

The Japanese government continued to seek a full accounting of the fate of 12 Japanese nationals believed to have been abducted by DPRK state entities in the 1970s and 1980s.  The DPRK admitted to abducting eight of these individuals, but claimed that they have since died; the DPRK has denied having abducted the other four individuals.  On August 12, 2008, Japan and

the DPRK agreed on steps towards the eventual resolution to this issue.  However, the DPRK has not yet fulfilled its commitment to reopen its investigations into the abductions.  Since 2002, five other abductees have been repatriated to Japan.

**Laos**

Since 2002, the Government of Laos has consistently denounced international terrorism and expressed a willingness to cooperate with the international community on counterterrorism. While domestic opposition elements have in the past employed terrorist tactics, such as ambushing civilian buses in 2003 and bombing civilian targets in 2004, Lao officials at many levels saw international terrorism as an issue of only marginal relevance to Laos.  They believed that Laos, as a small and neutral country, would not be targeted or exploited by international terrorists.

Laos does not have a separate counterterrorism law, but the Lao judicial system allows for the prosecution of acts of terrorism as crimes under the Lao criminal code, and Lao officials have amended the criminal code to strengthen counterterrorism sanctions.  Laos' border security was weak; border officials could not effectively control access to the country at any of the country's border checkpoints.  Crossing the border along the Mekong River into Burma, Thailand, and Cambodia could be accomplished easily and without detection.  Border delineation remained poor in more remote sections of the country, especially along its land borders with Vietnam and China.  It was likely that unmonitored border crossings by locals occurred on a daily basis. Since September 11, 2001, Lao authorities have strengthened airport security, and airport security forces have participated in U.S.-supported security seminars to raise their standards, but security procedures at land immigration points remained lax compared with those of most other countries in the region.  In addition, official Lao identity documents, including passports and ID cards, were easy to obtain.

Lao authorities have issued orders limiting the amount of cash that could be withdrawn from local banks or carried into or out of the country and strengthened reporting requirements of state and privately owned commercial banks.  Banking regulation remained extremely weak, however, and the banking system was vulnerable to money laundering and other illegal transactions.

**Malaysia**

The police forces in Malaysia, which fall under the authority of the Home Ministry, continued to conduct all counterterrorism investigations and operations in the country.  In 2009, the Prime Minister's Office created a new office, the Special Task Force (Operations/Counterterrorism), within the Royal Malaysian Police (RMP) to handle counterterrorism-related investigations, a function previously conducted by the RMP Special Branch.  By year's end, Malaysia had not initiated prosecution of any terrorist suspects using legislation amended in 2007 in order to accede to the UN International Convention for the Suppression of the Financing of Terrorism, but continued to rely on the Internal Security Act (ISA) to detain terrorist suspects.  Under the ISA, the authorities can detain suspects without trial for up to two years, a period the Home Minister can extend in two-year increments.

At year's end, five terrorist suspects linked to Jemaah Islamiya (JI) were held in ISA detention. This included one well-known JI operative, Mas Selamat bin Kastari, whom the Malaysian authorities detained in April.  Kastari had been on the run in Malaysia after escaping from prison in Singapore in February 2008.  The Malaysian government has held suspected terrorists and suspected terrorist supporters in ISA detention from one to six years.  While imprisoned, these terrorist suspects receive de-radicalization training from Malaysian authorities, and are only released after the government believes they are no longer a threat to society.  The authorities continued to monitor terrorist suspects after their release, and imposed restrictions on their activities and their travel.  Because of growing domestic and international pressure, the Malaysian government has become more cautious about employing the ISA to detain persons it suspects of terrorist activities, and has been slowly reducing the number of those detained under the ISA.  In 2009, the authorities released 39 ISA detainees, 29 of whom were alleged members of terrorist organizations JI or Darul Islam.

The Malaysian government allows travelers from many nations to enter the country without visas, to promote trade and tourism.  Persons from most Islamic countries can enter Malaysia without visas, although immigration authorities do scrutinize these travelers and screen for known terrorists.  Malaysian authorities will detain terrorist suspects if they become aware of their presence in the country, and have actively cooperated with other countries to deport these suspects.

The Malaysian government engaged with its neighbors, both bilaterally and in international fora such as the Association of Southeast Asian Nations, on issues related to counterterrorism and transnational crime.  It continued to operate the Southeast Asian Regional Center for Counterterrorism.  The Center has served to facilitate the training of Malaysian front-line officials, but has done less to identify forward-looking or regional counterterrorism priorities. The organization largely depends on initiatives from donor countries, including the U.S., Japan, Australia, and Canada, to sponsor its training program.

Malaysian mediators continued to work in the southern Philippines to help end the conflict between the Government of Philippines and the separatist Moro Islamic Liberation Front (MILF).  Malaysia played an active role in mediating negotiations between the two sides.  A Malaysian official served as a mediator between the Government of Philippines and the MILF, and Kuala Lumpur played host to meetings between the two sides as well as to the International Contact Group – a group of four countries, seen by both parties as neutral, which lend their weight to the negotiations.  Malaysia, along with Singapore, Indonesia, and Thailand, conducts the "Eyes in the Sky" program designed to provide enhanced security to the Strait of Malacca, the world's busiest shipping lane.  Malaysian authorities also cooperate with their Thai counterparts along the border to prevent insurgents from Southern Thailand from using Malaysia as a safe haven.

Malaysia's central bank has signed memoranda of understanding on the sharing of financial intelligence with the Financial Intelligence Units (FIUs) of many countries in the region. Malaysia is an active member of the Asia/Pacific Group Donor & Provider Group for Technical

Assistance and has worked with the World Bank, International Monetary Fund, Asian Development Bank, United Nation Counterterrorism Committee Executive Directorate, and the United Nations Office on Drugs and Crime.  Malaysia is working with the United States to help develop an effective FIU in Afghanistan.

**Micronesia, Federated States of**

The Micronesian Criminal Code contains no counterterrorism statutes.  Should the government ever prosecute someone for terrorist activity it would undoubtedly invoke its laws against murder, attempted murder, and destruction of property.  The country's statutes do not outlaw terrorist financing.  Law enforcement efforts against terrorism, limited as they are given the region's lack of capacity, fell within the purview of the Transnational Crime Unit (TCU). Reliant on American funding and Australian supervision since its opening in April 2008, the TCU brought officers from other Pacific island nations to Palikir, the Micronesian capital, to share information on such issues as narcotics, human trafficking, and terrorism.  The TCU also exchanged information with the FBI and the Australian Federal Police, making it the recipient of relevant terrorist-related intelligence.

**Mongolia**

Although there were no known terrorist groups operating in Mongolia and no known bases of support, Mongolian government officials cited more than 6,000 kilometers of porous borders and easy entry for foreign travelers as conditions that terrorists could exploit, and moved to increase awareness of terrorism and to consider new laws.  Throughout the year, eight senior personnel attended counterterrorism-related training at the Asian Pacific Center for Security Studies in Honolulu and at the Marshall Center in Germany.

The Mongolian police, the Ministry of Justice, and the General Intelligence Agency's counterterrorism branch cooperated with their U.S. counterparts on counterterrorism issues. As a result of resource and technical limitations, however, Mongolian counterterrorism law enforcement capacities remained modest.

Mongolia continued to contribute to international counterterrorism efforts.  In support of Operation Enduring Freedom, the 130 member Mongolian Expeditionary Task Force and 23-strong Mongolian Technical Training and Maintenance Team arrived in Afghanistan in November.  They will provide fixed site security at Camp Eggers in Kabul and artillery training and maintenance at Camp Phoenix.  In addition to supporting Operation Enduring Freedom, Mongolia also supported the NATO-led International Security Assistance Force.  On November 28, the Mongolian Armed Forces deployed an additional platoon of approximately 40 soldiers to support the German contingent in northern Afghanistan.  This brings the total number of Mongolians deployed to Afghanistan to almost 200.

**New Zealand**

The Government of New Zealand took a leadership role in the Asia-Pacific region in multilateral counterterrorism organization.  New Zealand worked closely with other Pacific Island Countries (PIC) to help them to build their capacity in all areas of counterterrorism and nonproliferation activity.  Finally, New Zealand expressed its strong desire to work cooperatively with the United States on the bilateral, regional, and global levels to fight terrorism and achieve mutual nonproliferation objectives.

New Zealand places considerable importance on its compliance with international counterterrorism instruments.  New Zealand uses the UN Global Counter-Terrorism Strategy as a key reference point and the government of New Zealand is working to ratify the remaining four of 16 international counterterrorism instruments to which New Zealand is not yet party - two of which concern maritime terrorism and two of which pertain to nuclear terrorism.

New Zealand designations of terrorist entities listed by the 1267 Committee occur automatically, by operation of law.  The Terrorism Suppression Act 2002 as amended provides that all individuals and groups designated by the Security Council under Resolution 1267 are automatically designated domestically in New Zealand.  New Zealand has yet to designate any individuals or entities pursuant to UN Security resolution 1373 that do not appear on the 1267 Committee list.

Under the Financial Transaction Reporting Act 1996, financial institutions are required to report transactions suspected of being linked to money laundering or proceeds of crime enforcement to the New Zealand Police Financial Intelligence Unit (FIU) based at Police National Headquarters in Wellington.  In 2009, the FIU processed 4963 Suspicious Transaction Reports and referred 976 of these to various law enforcement agencies and units for investigations.  Over the same period, the FIU filed one Suspicious Property Reports pursuant to the 2002 Terrorism Suppression Act.

New Zealand remained active in Operation Enduring Freedom in Afghanistan.  In September, New Zealand deployed 71 Special Air Service (SAS) troops to Afghanistan.  This was the first of three six-month rotations scheduled to take place between 2009 and 2011.  In addition to the deployment of troops, New Zealand continued to lead the Provincial Reconstruction Team in Bamyan and had some 140 New Zealand Defense Force (NZDF) personnel deployed there. NZDF also maintained personnel with the UN Assistance Mission in Jalabad, ISAF headquarters in Kabul, army training with the UK in Kabul and, until recently when it closed, two surgeons with the Canadian medical centre in Kandahar.  Three New Zealand Police officers (NZP) were also deployed to Bamyan, under the auspices of the European Union Police Mission to train and mentor Afghan National Police (ANP).  The focus of NZP's work in Afghanistan was on strengthening the capacity of the ANP.  While the focus was on Bamyan Province, two of the three staff worked primarily at the U.S.-funded Regional Training Centre, located within the Bamyan Provincial Reconstruction Team compound, which trained staff for several provinces.

New Zealand development assistance to Afghanistan totaled US$ 6.7 million in 2009.  It was delivered in Bamyan primarily through partners including the UN Food and Agricultural Organization, Aga Khan Foundation, and Bamyan University.  Supporting delivery of health and

education was a key part of New Zealand's development assistance program, which had a particular focus on women and children.

New Zealand assists Pacific Island Countries' (PIC) understanding of, and compliance with, the international counterterrorism agenda.  Strong focus is given to legislative and operational capacity-building projects many of which are funded through the Pacific Security Fund.  In 2009:

- New Zealand supported the running of a United Nations Workshop on Implementing Security Council Resolution 1540 for Pacific Island Countries in April in Port-Vila, Vanuatu.

- New Zealand provided funding for the Asia-Pacific Group on Money Laundering's technical assistance and training program with Pacific island countries.

- New Zealand and a representative from the Pacific Island Secretariat chaired the 2009 Pacific Islands Forum Working Group on Counterterrorism.  Funding for the event was provided by New Zealand drawing on the Pacific Security Fund.

New Zealand also promotes counterterrorism capacity building and a range of regional security initiatives in Southeast Asia through the Asia Security Fund.  Key projects over the last year included:

- A number of training programs for law enforcement officials in the region, including training in terrorism scene investigation for counterparts in Vietnam; a month-long study visit on investigating violent crime for police officers from Aceh; and a one-week workshop on international peacekeeping for police officers from Singapore and the Philippines, based at the New Zealand Police College.

- Continued support for the Indonesian National Police's community policing program, including providing country-wide "train the trainers" courses, a community policing study tour to New Zealand for key police officials, and support for the drafting of a community policing handbook.

- The provision of surveillance equipment to Special Detachment 88, the counterterrorism unit within the Indonesian National Police.

**Palau**

Palau worked closely with the United States on counterterrorism.  Local law enforcement officers from the Ministry of Justice, Ministry of Public Infrastructure, Industries and Commerce, and the Division of Customs continued to receive training on counterterrorism from U.S. counterparts.  In addition, the Federal Aviation Administration and the Transportation Security Administration regularly inspected airport facilities and trained airport officials on security procedures.

Responding to UN Security Council Resolution 1373, the national congress passed a Foreign Evidence Act, a Money Laundering and Proceeds of Crime Act, a Mutual Assistance in Criminal Matters Act, and an Extradition and Transfer Act in 2001. These laws are intended to regulate the banking system, criminalize money laundering, and provide a legal basis for international law enforcement cooperation. A Financial Intelligence Unit was established to detect money laundering and other financial crimes.

**Philippines**

Terrorist groups active in the Philippines included the Abu Sayyaf Group (ASG), Jemaah Islamiya (JI), the New People's Army (NPA), and the Rajah Solaiman Movement (RSM). Philippine security forces continued to make progress against terrorist groups. The Armed Forces of the Philippines (AFP) reported that it killed 10 ASG members and 165 NPA members in 2009. The Philippine National Police (PNP) claimed that its personnel killed 14 NPA members in 2009. Those apprehended included an RSM cofounder and two bomb makers in Mindanao. U.S. intelligence, reconnaissance, and surveillance continued to support AFP operations against terrorist elements in the southern Philippines. Additionally, U.S. Department of Justice criminal investigation, police development, and counterterrorism programs trained approximately 1,600 police, supported professional development efforts of the Philippines National Police at 12 sites throughout the country, and provided opportunities for cooperation between law enforcement officials of the Philippines, Malaysia, and Indonesia.

Data on terrorist incidents is limited and incomplete; many kidnappings or other acts of violence that indiscriminately target innocent people go unsolved, and some shootings and bombings occur in the course of criminal activity unrelated to terrorism. The Philippines estimated that the NPA began 2009 with 5,240 members, and the ASG began the year 400-strong. These organizations' memberships fell to an estimated 4,700 and 390, respectively, by the end of the year. Kidnappings, associated with both criminal and terrorist groups, continued during the year in Mindanao and the Sulu Archipelago. On January 15, ASG members kidnapped three International Committee of the Red Cross workers in Jolo, Sulu. All either escaped or were released. The ASG reportedly abducted numerous other individuals, including an Irish priest.

While the NPA continued to disrupt public security and business operations with intermittent attacks on communication and transportation infrastructure throughout the Philippines, it continued to decline in personnel and effectiveness. However, the NPA remained steadfast in its refusal to accept President Arroyo's broad amnesty overtures, turning down offers to negotiate unless its U.S. and international designations as a terrorist organization were rescinded. RSM maintained close links to ASG and JI, and was alleged to have participated in several attacks in the Philippines.

During the year the long-running separatist insurgency in Mindanao boiled over in violence, resulting in thousands of internally displaced persons. Subsequently the government and the insurgents agreed to renew negotiations and the violence waned. Late in the year an election-related violent episode involving two rival Mindanao clans resulted in the massacre of over fifty

civilians, including a number of journalists.  While not the activities of international terrorism, these developments are indicative of the instability and conflict in the southern Philippines that complicated the government's efforts during 2009 to combat the terrorist groups harboring there.

The U.S. strategy of offering development opportunities in areas at risk for terrorist recruitment continued to isolate the remaining ASG and JI terrorists in the southern Philippines.  Philippine military and law enforcement agencies conducted intensive civil-military and internal security operations to eliminate terrorist safe havens in the Sulu Archipelago and central Mindanao.

In the past year, the AFP conducted several key operations that disrupted the ASG and limited its ability to conduct organized attacks.  In accordance with Philippine government priorities, the U.S. Joint Special Operations Task Force-Philippines (JSOTF-P) provided advice and assistance, including training, intelligence, surveillance, and reconnaissance.  Terrorist groups in the region are also being countered by a robust AFP Information Operations and Civil Military Operations capability that has been bolstered by the JSOTF-P's Subject Matter Exchanges and training.

Law enforcement authorities continued to make little use of the 2007 Human Security Act, which provided additional counterterrorism tools for law enforcement because of key limitations in its application, including stiff fines levied on law enforcement personnel in cases where the suspect is later acquitted or the case dismissed.  The Act also provided for the establishment of an Antiterrorism Council to implement counterterrorism efforts in the country and ensure interagency cooperation.  According to experts, the newly established Council was not yet fully effective.

The United States continued to receive excellent cooperation from Philippine law enforcement officials in obtaining access to terrorist suspects and witnesses for FBI interviews, and access to criminal, immigration, financial, and biographic records via the mechanisms established in the U.S.-Philippine Mutual Legal Assistance Treaty.  The U.S. Embassy continued to achieve significant progress in supporting the counterterrorism efforts of the Philippine government, including well-coordinated Embassy programs aimed at strengthening security forces and promoting peace and development in Mindanao.  The FBI provided host-nation law enforcement and government authorities with vital information for counterterrorism purposes, including investigation of the financing of terrorism.  This proactive partnership with the Philippine government has yielded solid results in combating terrorist elements.  Two prominent Filipino fugitives indicted by the FBI were deported to the Philippines by Malaysia and Indonesia.  The Filipino fugitive from Malaysia was extradited by the Philippines to the United States.  The other Filipino fugitive from Indonesia arrived in the Philippines and was undergoing judicial proceedings for extradition to the United States.

The FBI continued to provide host-nation law enforcement and government authorities with vital information for counterterrorism purposes, including investigation of the financing of terrorism. The FBI conducted numerous judicial custodial interviews of counterterrorism subjects and leaders of the JI, ASG, RSM, as well as rogue members of the MILF.  All counterterrorism subjects were advised of their international United States Department of Justice advice of rights and afforded host nation Philippine legal counsel representation when requested.  Statements

were obtained and put on record for inclusion into FBI counterterrorism case files and investigations as appropriate.

The Antiterrorism Assistance (ATA) Program sustained its focus on Mindanao, where the terrorist threat and associated problems were most acute.  The program continued to provide training in a wide range of counterterrorism skills, including investigating terrorist incidents, vital infrastructure security, critical incident management, surveillance detection, and investigation and seizure of digital evidence.  ATA established the first Philippine National Police Cyber Forensic Unit, in Mindanao.  ATA also initiated an Antiterrorism Curriculum Development Project for the Philippine National Police Academy to assist in the development of a comprehensive antiterrorism curriculum.  In addition to enhanced capacity building efforts, ATA is fostering and enhancing interregional cooperation between the Philippine National Police and law enforcement agencies from Indonesia and Malaysia.

The U.S. Department of Justice/International Criminal Investigative Training Assistance Program (DOJ/ICITAP) trained 1,601 police personnel, including training PNP personnel in basic police operations and investigation techniques in Sulu Province.  DOJ/ICITAP also continued with implementation of the Maritime Police Project, which will equip maritime police in Palawan Province with special patrol boats to monitor the western Sulu Sea bordering Malaysia.

The FBI organized the visit of five senior Philippine police and prosecutors, along with 10 others from Malaysia and Indonesia, to key locations in the United States through the SE Asia Counterterrorism Regional Strategic Initiative.  The FBI sponsored seminars focused on counterterrorism issues, current procedures, and the development of future mutually enhancing law enforcement and judicial cooperation.

Other programs included the U.S. Department of Homeland Security Immigration and Customs Enforcement (DHS/ICE) development of the Philippine Biometrics Initiative (PBI), whereby fingerprints, photographs, and other information on suspected terrorists were collected and provided to the appropriate Philippine authorities.  The Philippine National Police is now the primary recipient of the Biometric Data Collection Kits and collector of the biometric data.  The intent of the PBI is to collect biometric information on individuals incarcerated in the Philippines who are associated with known suspected terrorist (KST) groups and to make this information available to U.S. authorities.

The government initially established its anti-money laundering/counterterrorist finance regime by passing the Anti-Money Laundering Act (AMLA) of 2001.  The AMLA established the Anti-Money Laundering Council (AMLC) as the country's financial intelligence unit (FIU).  The Council is composed of the Governor of the Central Bank, the Commissioner of Insurance Commission, and the Chairman of the Securities and Exchange Commission.  By law, the AMLC is an independent agency responsible for receiving, maintaining, analyzing, evaluating covered and suspicious transactions and investigating reports for possible criminal activity.  AMLC's role goes beyond traditional FIU responsibilities and includes the investigation and assisting the Office of the Solicitor General in the handling of civil forfeiture cases.

In 2009, the Philippines' Anti-Money Laundering Council (AMLC) received 82 official requests for counterterrorism action, many concerning groups on the UNSC Resolution 1267 Sanction Committee's consolidated list.  In nearly all cases, the AMLC's investigations responding to such requests showed no record of the entities concerned conducting financial transactions in the Philippines.

The Philippines is a member of the Asia/Pacific Group on Money Laundering (APG).  The APG conducted a comprehensive peer review of the Philippines AML/CFT regime in September 2008 and subsequently provided 45 pages of recommendations for improvement.  The Philippine legislature is now considering an amendment to the AMLA to address these issues.

**Singapore**

Singapore continued its strong bilateral and multilateral counterterrorism intelligence and law enforcement cooperation.  Since December 2001, more than 50 persons with links to terrorist groups were detained under Singapore's Internal Security Act (ISA) for involvement in terrorist-related activities.  At year's end, Singapore held in detention 17 persons with links to terrorist groups.  Detainees included members of Jemaah Islamiya (JI) who had plotted to carry out attacks in Singapore in the past and members of the Moro Islamic Liberation Front (MILF).

Under detention orders, the detainees were required to undergo a program of religious counseling with a group of volunteer religious counselors.  Singapore enlisted the support of religious teachers and scholars to study JI's ideology, to develop teachings to counter the group's spread within Singapore's Muslim community, and to provide counseling to detainees, which would continue after their release.  As of December, a total of 47 persons remained under Restriction Orders (RO).  Detainees released on ROs were monitored by the Singapore authorities and required to report to authorities on a regular basis.  Singapore authorities determined that all 47 persons released on ROs had cooperated in investigations and responded positively to rehabilitation, including religious counseling.  Among those subjected to religious rehabilitation, there are no reported cases of recidivism to date.

In April, Mas Selamat Kastari, the Singapore leader of JI, was recaptured by Malaysian authorities in Johor, Malaysia.  Kastari had been a fugitive since his escape from detention in Singapore in February 2008.  Kastari remains in Malaysian custody.  In June, Indonesian authorities captured two Singaporean JI fugitives, Husaini Ismail and Samad Subari.  Husaini was one of five Singaporean JI members involved in a failed 2002 plot to hijack a commercial airliner and crash it into Singapore's Changi International Airport. All five JI members involved in the plot are now in custody, with two in Singapore, one in Malaysia and two in Indonesia.

When Singapore held its annual counterterrorism exercise, Northstar VII, in July, the exercise simulated a series of coordinated, simultaneous Mumbai-style terrorist attacks on hotels and infrastructure in multiple locations.  More than 2,000 personnel from 15 civilian and military organizations participated in the exercise, including the Special Operations Task Force, the Ministry of Defense, the Singapore Police Force, the Singapore Civil Defense Force, the

Maritime and Port Authority, and the Ministry of Transportation.

Singapore hosted the Proliferation Security Initiative Exercise Deep Sabre II in October. Approximately 2,000 personnel from 21 countries participated, representing military, diplomatic, legal, customs, immigration, police, and civil defense agencies.  The exercise demonstrated Singapore's multi-layered, multi-agency commitment to deny terrorists the ability to move people or materials in Singapore.  Authorities made extensive use of advanced biometrics to verify the identity of all individuals arriving into Singapore.

The Royal Singapore Navy participated in the annual bilateral exercise "Cooperation Afloat Readiness and Training" with the U.S. Navy and U.S. Coast Guard, and also the multilateral "South East Asia Cooperation Against Terrorism" drill.  Singapore also conducted its own internal, annual exercise "APEX," which tested the government's multi-agency response to a maritime terrorism incident.

Singapore contributed to the international community's efforts in Afghanistan, including military personnel supporting a weapons locating radar unit, a medical team, and an engineering team. Singapore was also involved in training Afghan civilians in various capacities, including health care, civil aviation, and water/waste management.

**Taiwan**

Taiwan is not a member of the United Nations and, therefore, is not subject to UNSC Resolutions and cannot join UN counterterrorism conventions and protocols.  Nonetheless, Taiwan sought to implement, to the maximum extent possible, all UN resolutions related to combating terrorism and terrorist finance issues.  Taiwan continued to provide rapid and thorough responses on terrorist financing issues to the American Institute in Taiwan (AIT).  The "Antiterrorist Action Law" proposed in 2006 by Taiwan's Executive Yuan, is still awaiting action by the Legislative Yuan.  Taiwan revised its Money Laundering Control Act in 2009 to extend the law's coverage to the financing of crimes that intimidate the public or threaten "the government, a foreign government or institution, or international organization."

The Taiwan Office of Homeland Security (OHS) coordinated several large-scale training exercises among law enforcement and security agencies.  Taiwan sought ways to harden and protect its critical infrastructure, in order to maintain continuity of operations and government in the event of an attack or disaster.  OHS also coordinated counterterrorism exercises with Taiwan law enforcement and security agencies prior to the "2009 Kaohsiung World Games" and the "2009 Taipei Deaf Olympics."

**Thailand**

Counterterrorism cooperation with Thailand remained strong despite internal political conflict. While officials have long expressed concern that transnational terrorist groups could establish links with southern Thailand-based separatist groups, there have been no indications that transnational terrorist groups are directly involved in the violence in the south, and there is no

evidence of direct operational links between southern Thai insurgent groups and regional terrorist networks.

The ethno-nationalist separatist insurgency in Thailand's southernmost provinces of Songkhla, Pattani, Narathiwat, and Yala continued in 2009.  Some 4,000 people have been killed in the conflict since the violence escalated in 2004 with a campaign of assassinations, beheadings, and coordinated bombings using improvised explosive devices (IEDs).  Levels of violence rose in 2009 after a decrease in 2008, with larger explosive devices employed.  Thai press reports and security forces attributed nearly all the attacks in the south to insurgents; it is unclear, however, how much of the violence was attributable to crime and other political or business disputes.  It was reasonably clear that there were overlaps between the groups conducting criminal activities and those who were manufacturing IEDs.

A range of Thai government agencies, including the Ministries of Interior and of Social Development and Human Security, and the Thai military and police academies continued to organize outreach programs to ethnic Malay-Muslims to counter radicalization and violent extremism.

The porous nature of Thailand's southern border with Malaysia remained an issue of concern.  In April, Thai Supreme Commander Songkitti Jaggabatara and Malaysian defense forces chief Haji Zainal agreed to closer intelligence sharing to improve border security.  At the same time, cross-border law enforcement cooperation based on long association between Thai and Malaysian police officers was surprisingly good, even though it was conducted in a very low-tech manner. In a December meeting, Malaysian Prime Minister Najib Razak and Thai Prime Minister Abhisit Vejjajiva agreed to improve security in the border area by linking the Smart Card system of Thailand to MyKad system of Malaysia to prevent border residents from holding dual citizenship.  In early 2009, Thailand began conducting joint sea and air patrols of the Malacca Strait with Indonesia, Malaysia, and Singapore in a program that includes "Eyes in the Sky" and intelligence exchange programs.

Legal mechanisms to counter the southern Thai insurgency lagged behind security efforts, but showed signs of improvement.  Government prosecutors still struggled to develop cases that could stand up in court, relying chiefly on confessions as evidence.  Through a U.S. Embassy initiative, the Thai judiciary was soliciting consultations with judges from the U.S., Northern Ireland, and the Middle East, seeking to distill the experiences of judges working in areas of religious and ethnic conflict into new approaches to Thailand's Muslim population.

Police forensics and ballistics work often failed to produce viable evidence leading to convictions following separatist attacks.  There was an 80 percent acquittal rate in insurgency-related indictments in the south, chiefly due to poor evidence.  While this may have spoken to the integrity of the judiciary, it also spoke to the low capacity of police and prosecutors.  The security environment in the three insurgency-affected provinces in the south has resulted in some innovative police work, including specialized task forces and twice-weekly reviews of the character and quality of evidence in each ongoing terrorism-related case — something the Thai police would do well to emulate nationwide.  Because of the difficulties in bringing cases to

court, security forces engaging in operations to arrest militants relied on powers under martial law and the 2005 Emergency Decree to detain suspects, who can be held for a total of 37 days without being charged with a crime.  There were various legal means available to extend that period.

Thai security forces cooperated with the United States and with other countries to deny safe haven to terrorists.  In the past, Thailand has served as a transit point for regional terrorists, as evidenced by the 2003 capture in central Thailand of Nurjaman Riduan bin Isomuddin (a.k.a. Hambali), JI's operations chief, and the architect behind the 2002 Bali bombings.  Thai police, security officials, and court system personnel participated in a series of U.S. training programs sponsored through the Antiterrorism Assistance Program, the Force Protection Detachment (the criminal justice sector capacity-building programs for police, prosecutors, and judiciary mounted by the Transnational Crime Affairs Section), and the International Law Enforcement Academy (ILEA) in Bangkok.  Training modules included courses on post-blast investigations, interrogation and interview techniques, forensic science, law enforcement response to terrorism, community policing, humane crowd control, training in SWAT tactics, and the Antiterrorism Executive Forum.  The United States and Thai militaries cooperated in a series of training events and exchanges designed to build counterterrorism capacity.

The Thai Anti-Money Laundering Office (AMLO) is Thailand's official Financial Intelligence Unit.  Thailand has been a member of the Financial Action Task Force's Egmont Group since June 2001.  AMLO, the Bank of Thailand, and the Securities and Exchange Commission are empowered to supervise and examine financial institutions for compliance with anti-money laundering/counterterrorist financial laws and regulations.  Capacity-building for this office and the Ministry of Justice's Department of Special Investigations continued, with training in cyber-crime.

Ministry of Finance regulations governing cross border cash carrying are in line with the Financial Action Task Force Special Recommendation on Terrorist Financing.  The Bank of Thailand has issued instructions to financial institutions to comply with FATF recommendations on Anti-Money Laundering and Combating the Financing of Terrorism.

The Thai government continued to cooperate on the extradition case involving international arms trafficker Victor Bout, who is under federal indictment in New York for conspiring to kill U.S. nationals and officers; acquire and use anti-aircraft missiles; and provide material support to the Revolutionary Armed Forces of Colombia, a designated foreign terrorist organization.  Bout was arrested in Bangkok in March 2008, and formal extradition proceedings took place in the Thai Criminal Court from June 2008 until May 2009.  In August, the Criminal Court denied the extradition request based primarily on its conclusion that the U.S. indictment charged "political" rather than criminal offenses.  The Thai government has appealed this decision.  Bout remained in custody at a maximum-security prison in Bangkok.

Thailand participated actively in international counterterrorism efforts through the Asia Pacific Economic Cooperation, the Association of Southeast Asian Nations (ASEAN), the ASEAN Regional Forum, and other multilateral fora.

**Vietnam**

The Government of Vietnam, the Ministry of Public Security, and the Counterterrorism Department, assessed that there is no general terrorist threat against Vietnam from indigenous groups and individuals or from abroad.  Vietnamese police and security officials participated in a series of U.S. training programs sponsored by the State Department, Drug Enforcement Administration, and the International Law Enforcement Academy in Bangkok.

## EUROPE OVERVIEW

> "Because this is a fight for hearts and minds against violent extremism and those ideologies that would pervert the true Islamic faith, we have both stepped up our work with our allies to expose the damage that this extreme and violent ideologies do and to support those working across all faiths to uphold the common ground of dignity tolerance and respect for all."
>
> --Gordon Brown, Prime Minister, United Kingdom
> Speech to the House of Commons, November 30, 2009

European countries continued to enhance their abilities to combat the threat from terrorism by strengthening counterterrorism legislation, improving multilateral cooperation, and prosecuting and jailing terrorist suspects.  Several significant terrorist plots were foiled in 2009, as governments continued to focus both on foiling specific attacks and on understanding and countering the process of radicalization.  Toward that end, European governments continued their efforts at outreach to domestic Muslim communities and made attempts to gain support from those communities to counter the appeal of violent extremist ideology.  France trained police to recognize signs of incipient radicalization, Germany continued engagement through its German Islam Conference, the Netherlands Justice Ministry continued to focus on radicalization, and the United Kingdom continued to implement numerous counter-radicalization programs.

European nations worked in close partnership with the United States against a terrorist threat characterized by both external and, increasingly, internal components.  The abortive attempt on December 25 to blow up a trans-Atlantic flight resulted in even greater cooperation between U.S. security agencies and European ones, especially those of the United Kingdom and the Netherlands.  More broadly, the contributions of European countries in sharing intelligence, arresting members of terrorist cells, and interdicting terrorist financing and logistics remained vital elements in the global effort to combat terrorism.  The United States and European Union continued to cooperate closely on counterterrorism, although differences over standards for protection of data complicated efforts to agree on the sharing of bank data collected by the Society for Worldwide Interbank Financial Telecommunication (SWIFT).  In October 2009, the United States and EU exchanged instruments of ratification on the US-EU mutual legal assistance and extradition agreements.

European nations were active participants in a variety of multilateral organizations that contributed to counterterrorist efforts, including the G8, NATO, the Financial Action Task Force (FATF) and the Council of Europe's FATF-style regional body, the Committee of Experts on the Evaluation of Anti-Money Laundering Measures and Financing of Terrorism (MONEYVAL), the Global Initiative to Combat Nuclear Terrorism, the Organization for Security and Cooperation in Europe (OSCE), the International Maritime Organization (IMO), and the International Civil Aviation Organization (ICAO).  (See Chapter 5, *Terrorist Safe Havens (7120 Report)* for further information on the G8, NATO, FATF, OSCE, and ICAO.)

Terrorist activity and the presence of terrorist support networks in Europe remained a source of serious concern.  Judicial proceedings in countries across Europe resulted in the successful convictions of several terrorist suspects.  For example, Spanish courts convicted all 11 suspects linked to an alleged plot in Barcelona, and in April, the trial began in Germany of the Sauerland Islamic Jihad Union (IJU) cell connected to plotting against U.S. bases.  French authorities detained and prosecuted suspects tied to terrorist organizations ranging from Islamist groups to Corsican Nationalists to Basque Fatherland and Liberty (ETA), to the Liberation Tigers of Tamil Ealam (LTTE), and the Kurdistan Workers' Party (PKK).  However, efforts to combat the threat in Europe were sometimes slowed by legal protections that made it difficult to take firm judicial action against suspected terrorists, asylum laws that afforded loopholes, the absence of adequate legislation, or standards of evidence that limited the use of classified information in holding terrorist suspects.  Terrorists also sought to take advantage of the ease of travel among Schengen countries.  At times, some European states have not been able to prosecute successfully or hold some of the suspected terrorists brought before their courts – a product, in part, of insufficient measures to use intelligence information in judicial proceedings.  The EU as a whole remained reluctant to take steps to block the assets of charities associated with HAMAS and Hizballah.

Cooperation with and among European law enforcement agencies remained vital for counterterrorism successes.  U.S.- Danish cooperation helped foil an October plot to attack a Danish newspaper; Franco-Spanish cooperative efforts against ETA led to a series of arrests of senior ETA political and military leaders.  European countries continued to maintain pressure on the PKK, which raised funds, often through illicit activity, to fund violence in Turkey.

No major terrorist attacks took place in Western Europe in 2009, although ETA bombings, the attempted December 25 airline attack, an abortive suicide bombing in Milan, and arrests in countries across the continent brought home the scope of the challenge facing European governments and security forces – as did the public statement by the head of Britain's MI5 that some 2000 terrorism suspects are under constant surveillance in the UK.  Greece bore the brunt of a reinvigoration of domestic terrorism, with many attacks claimed by radical leftist-anarchist terrorist groups.  Swedes were arrested for suspicion of terrorism in the border area between the Northwest Frontier Province and the Punjab in Pakistan.  Italy arrested suspects linked to a terrorist network broken up in 2008 in France and Belgium, and persons connected to the November 2008 attacks in Mumbai, India who were also implicated in plots against Denmark and Italy.  The level of threat in Western Europe remained high, particularly in the Netherlands, Denmark, Germany, France, the United Kingdom, and Belgium.  The lead-up to the September elections in Germany saw a drumbeat of threats from persons linked to the IJU and the Islamic

Movement of Uzbekistan, with German-speakers repeatedly warning that the country would be attacked if its Afghanistan policy did not change; fortunately, nothing came of the threats. Nonetheless, German authorities expressed concern over their estimate that roughly 185 individuals have undergone paramilitary training over the past ten years at Islamist extremist training centers located primarily in the border regions of Afghanistan and Pakistan.

**Albania**

Albania pledged to increase its contribution of troops to Afghanistan, froze bank accounts related to money laundering and terrorist financing, and aggressively worked with the United States and other countries to combat terrorism. Albania made progress in identifying vulnerabilities at land and sea borders, but the government and police forces continued to face challenges to enforce border security fully and to combat organized crime and corruption.

On January 14, 2008, the criminal trial began against Hamzeh Abu Rayyan, the suspected administrator for UNSCR 1267 Committee-designated terrorist financier Yassin al-Kadi, who is charged with hiding funds used to finance terrorism. This marked the first-ever criminal terrorist finance-related trial in Albania. The trial continued throughout 2009. A civil suit filed by al-Kadi to release his assets from seizure was dismissed and refiled several times. It was later reviewed by higher courts on matters of jurisdiction and statute of limitations. After being dismissed in June, it was filed again and is now pending trial in Tirana District Court. In addition, al-Kadi's company, Loxhall, filed a lawsuit in April. It aimed to annul the Council of Ministers' decision, as well as the two orders of the Ministry of Finance related to the administration of seized terrorism assets. This lawsuit was rejected in October, and is now pending appeal.

On October 12, a local imam, Artan Kristo, was arrested in Durrës. Kristo, also known as Muhamed Abdullah, was accused of "publicly inciting and propagating terrorist acts" for allegedly calling for jihad in the AlbSelafi.net online forum. Previously, Kristo was named as a suspect in the murder of the Secretary General of the Albanian Muslim Community, Salih Tivari, in January of 2003. The Durrës court decided to detain Kristo pending trial.

As of October, the Ministry of Finance stated it maintained asset freezes against six individuals and 14 foundations and companies on the UNSCR 1267 list. No new assets were frozen this year under Albania's Terrorist Financing Freeze law. Despite this, the effectiveness of the government's counterterrorist financing effort was undermined by a lack of data-processing infrastructure and an inadequate capability to track and manage cases properly.

**Armenia**

Armenia's counterterrorism partnership with the United States included granting blanket over-flight clearance and ad hoc landing rights to U.S. military aircraft, deployment of a peacekeeping contingent to Iraq, and participation in bilateral assistance programs that strengthened the government's capacity to monitor illicit financial flows and confront trafficking in hazardous substances. Widespread corruption, however, continued to hamper full implementation and

enforcement of laws that would improve Armenia's counterterrorism posture and response capability.

In December, the Armenian parliament approved Ministry of Defense plans to send a 35-45 troop contingent to Kunduz, Afghanistan.  Armenian troops are expected to protect the Kunduz airport runway and other facilities near the airport.

In recent years, Armenia has achieved measured progress in implementing border security and combating trafficking in persons, drugs, and WMD materials.  This progress has included the installation of radiation portal alarms at all land ports of entry and its main airport, and the use of sensors for increased monitoring of Armenia's mountainous border with Georgia.  Additionally, the Armenian Border Guard Service now has full connectivity of its automated Border Management Information System with all points of entry, which should reduce the possibility of passport and visa fraud.

In 2008, Armenia revised its law on combating money laundering and terrorist financing.  The revision significantly expanded the range of reporting entities required to report suspicious transactions to the Financial Monitoring Center (FMC), a specialized intelligence unit within the Central Bank that is responsible for combating money laundering and terrorist financing.  In 2009, as a result of the work of the FMC, Armenia recorded its first successful money laundering prosecution.

**Austria**

According to Austria's counterterrorism agency, the Bureau for the Protection of the Constitution and Counterterrorism (BVT), there was a growing number of radicalized individuals among second- and third-generation Muslim immigrants and among converts to Islam.

Austria has a fairly comprehensive counterterrorism and anti-money laundering legislative framework in place.  In December, the government introduced a bill that would make it a crime to attend terrorist training camps abroad or to receive terrorism training on the Internet.

In August, Austria's Supreme Court upheld a prison sentence for a young couple jailed for terrorist threats conveyed through the Internet in late 2007.  In a related development, a Canadian court ruled in October 2009 that a Moroccan national, who had maintained close contact with the Austrian couple, was guilty of having planned bomb attacks against OPEC, UN sites, and German facilities in Austria and Germany in 2007.

There are believed to be 4,000 sympathizers of the PKK in Austria.  Some Turks in Austria supported Turkish extremist Metin Kaplan, who advocates replacement of the Turkish state by an Islamic regime and who has been linked to violent criminal acts.

Austria closely followed EU policies to counter terrorist financing and actively participated in the EU Clearinghouse mechanism, which designates terrorist financiers under UNSCR 1373.  Austria fulfilled its obligations to freeze assets, pursuant to UNSC resolutions and EU

Clearinghouse designations, but did not initiate any freezing actions independently.  Parliament passed two relevant laws in 2009.  The Administrative Assistance Implementing Act provides a new basis for handling foreign authorities' assistance requests for exchange of tax information.  Austrian authorities will provide information in tax proceedings, including data formerly blocked by bank secrecy regulations.  The Law on Payment Services integrates European Council Directive 2007/64/EC on payment services into domestic law and establishes a license requirement for money transmitters, which previously was regulated under the Banking Act for relevant businesses.  The FATF's 2009 Mutual Evaluation Report, which includes FATF assessment of Austria's anti-money laundering and counterterrorist financing (AML/CTF) regime, acknowledged that Austria has established a comprehensive AML/CTF system, but raises questions about its effective implementation.  In reaction, the Austrian government announced additional legal changes to bring its AML/CFT standards fully in compliance with the FATF's 40+9 recommendations.

The BVT continued to monitor a handful of mosques in Vienna suspected of preaching radicalism.  Likewise, it continued to follow the activities of the Egyptian Islamic Jihad movement, certain radicalized converts to Islam, and suspected Afghan and Chechen extremists entering Austria as asylum seekers.

Austria has about 23,000 Chechen refugees.  According to counterterrorism experts, a small Vienna-based Chechen group serves as the European arm of the Chechen separatist movement headed by Dokku Umarov.  The Vienna-based group is suspected of extorting money from the Chechen exile community in Austria.

In late 2008, domestic and international media reported a possible link between Austria and the terrorists responsible for the November 2008 attacks in Mumbai.  As reported by the Indian newspaper "Indian Express" in 2008, one of the SIM cards used by one of the terrorists had been issued by a Vienna-based telecommunications company.  An Austrian newspaper subsequently claimed the terrorists had communicated via a Voice-Over-Internet Server in Vienna.

As a non-permanent member of the UN Security Council, Austria chaired the al-Qa'ida and Taliban Sanctions Committee 1267.  In this capacity, Austria sought "to place particular focus on observance of rule of law and human rights with terrorism suspects."[6]

Vienna is the seat of the United Nations Office for Drugs and Crime (UNODC), and of the related Terrorism Prevention Branch (TPB).  In 2009, Austria contributed US$ 825,000 to the UNODC.  In October, together with a handful of other nations, Austria held a two-day counterterrorism networking workshop in Vienna, gathering representatives from 100 nations and 40 international organizations and UN units.  In Afghanistan, Austria supported criminal law

---

[6]  (See briefing by Austrian committee chairman Thomas Mayr-Harting to UN Security Council November 13. (http://www.un.org/sc/committees/1267/latest.shtml).

and criminal justice capacity building programs.  Austria worked with the UNODC and the EU to establish more effective border control checkpoints along the Afghan-Iranian border.

Austria continued its participation in the Salzburg Forum, a regular meeting platform of interior ministers from Austria, the Czech Republic, Slovakia, Poland, Hungary, Italy, Romania, and Bulgaria designed to fight terrorism and organized crime in the region.  Similarly, the Austrian government worked throughout the year to promote and expand the Pruem Treaty, under which the seven EU signatory states share information from their police databases.  The treaty, which involves the exchange of DNA, fingerprint, and vehicle data, was designed, in part, to identify terrorism suspects.

## Azerbaijan

Azerbaijan actively opposed terrorist organizations seeking to move people, money, and material through the Caucasus.  The country stepped up efforts and has had some success in reducing the presence of terrorist facilitators and hampering their activities.  At the end of 2009, Azerbaijan demonstrated an increasing level of seriousness and urgency in taking steps to combat terrorist financing, and is proceeding with efforts to implement its law on anti-money laundering and counterterrorist financing (AML/CTF) and to establish a Financial Investigative Unit (FIU).  The Central Bank, which houses the FIU, prepared an action plan in October to bring Azerbaijan's AML/FIU into conformity with the standards of the United Nations, the Financial Action Task Force (FATF), and other international organizations and conventions, and submitted the plan to MONEYVAL, the FATF-Style Regional Body (FSRB) hosted by the Council of Europe.  That institution, in turn, reviewed Azerbaijan's proposals in December and agreed to withdraw its advisory (on non-compliance) on Azerbaijan.  The FIU has requested technical assistance from the U.S. government to improve the legal framework in the AML/CTF area, establish information systems, build capacity for AML/CTF stakeholders, and develop a mid-term strategy plan for the FIU.  Azerbaijan continued to identify possible terrorism-related funding by distributing lists of suspected terrorist groups and individuals to local banks.

Azerbaijan has granted blanket overflight clearance, engaged in information sharing and law-enforcement cooperation, and has approved numerous landings and refueling operations at Baku's civilian airport in support of U.S. and International Security Assistance Force (ISAF) military operations in Afghanistan.  Azerbaijan maintained 90 soldiers in Afghanistan and cooperated with ISAF in medical and social services and civilian capacity-building.

In 2007, the Ministry of National Security (MNS) arrested 15 Azerbaijani citizens who were members of the "Mahdi Army Group," an extremist organization the government linked to the Iranian Revolutionary Guard Corps.  On June 18, 2009, the Military Court of Grave Crimes sentenced Lieutenant Kamran Asadov and 20 accomplices to prison terms from two to 15 years for their participation in an abortive plot to attack the United States and British embassies in Baku in late 2007.  Asadov and his co-conspirators stole weapons and ammunition from the army base where he was posted and committed an armed robbery at a Lukoil gas station.

On October 4, a Baku court sentenced two Lebanese nationals, Ali Muhammad Karaki and Ali Hussein Najmeddin, to 15 years each, and sentenced four Azerbaijani accomplices to terms of two to 14 years. The court found that the group was planning attacks on the Israeli Embassy. The investigation revealed that Karaki and Hussein were linked to Hizballah and others in Iran.

In two separate trials in October, the Court of Grave Crimes sentenced 15 Azerbaijani nationals to prison terms ranging from six months to 30 months for participating in illegally armed groups in Pakistan and Afghanistan. In the 11 cases where the accused received six months sentences, they were released, having already served that much time since their arrests. Depending on the individual combinations of charges proffered, each of the 15 defendants had been in jeopardy of a sentence of up to five or seven years.

On November 4, a Baku court sentenced 26 people – 23 Azerbaijanis, two Turkish nationals and a Russian national – to prison terms from two to 15 years for the August 17, 2008 attack on Baku's main Sunni mosque, known as Abu Bakr. The grenade attack killed three people and wounded eight others. The mosque has not reopened since the attack. The Azerbaijani government linked the Abu Bakr Mosque attackers to the "Forest Brothers" organization of the North Caucasus, whose leader Ilgar Mollachiyev was killed in Dagestan in September 2008.

**Belgium**

Belgian authorities are concerned with potential terrorist activities by domestic extremists, Islamic extremists, anarchists, and militant animal rights groups. International groups of concern to Belgium included extremists from al-Qa'ida and the Democratic People's Party of Kurdistan (DHKP/C). The Kurdistan Workers' Party (PKK) is a known presence in Belgium and has television production studios in Denderleeuw. A fine levied on the studio several years ago did not impact the production facility significantly.

The inter-ministerial College of Security and Intelligence meets regularly and makes reports and recommendations to the Belgian government. The College is chaired by the Prime Minister's Security Advisor. The Coordinating Body for Threat Analysis (OCAM/OCAD) develops common threat analyses that are discussed in the College. The College includes representatives from OCAM/OCAD, the State Security Service, the Federal Police, Customs, and the Ministries of Transport, Finance, Interior, Justice, and Foreign Affairs.

Belgian authorities have the ability to create a national list of terrorist entities, separate from UN and EU lists and coordinated by OCAM, including financiers and suspected financiers of terrorism. This information allowed Belgian authorities to develop and apply a national capacity to freeze assets, in addition to UN- and EU-mandated asset freezes that Belgium already implements. Belgium cooperated with the United States on security programs such as the Container Security Initiative, Megaports, and export controls.

Prosecutors continued to investigate the case of five suspected terrorists arrested in December 2008. Another nine persons taken into custody at the same time were released shortly thereafter due to lack of evidence. Belgium ratified the U.S.-EU Multilateral Legal Assistance and

Extradition Agreements in July 2009. Belgium's prosecutors are cooperating with the United States in the extradition of Nizar Trabelsi, who was convicted of plotting to attack American soldiers at Kleine Brogel Air Base in Belgium.

Belgium's troop commitment to NATO ISAF operations in Afghanistan increased from about 250 troops in 2008 to nearly 540 in 2009. Belgians provided security for Kabul airport, operated and maintained six F-16s in Kandahar, ran an Operational Mentoring and Liaison Team in Kunduz, and participated in a German-run Provincial Reconstruction Team (PRT).

## Bosnia and Herzegovina

Despite ethnic polarization, corruption, and disputes among Bosnian political leaders that hindered the functioning of state government, Bosnia and Herzegovina's law enforcement organizations cooperated with the United States on international counterterrorism issues. Bosnia remained a weak, decentralized state with poor interagency communication and competing security structures. Efforts by Republika Srpska officials to undermine state-level institutions slowed efforts to improve operational capabilities to combat terrorism and terrorist financing. These factors resulted in Bosnia being vulnerable to exploitation as a potential staging ground for terrorist operations in Europe.

The State Investigation and Protection Agency is the state-level Bosnian law enforcement agency with primary responsibility for counterterrorism operations. SIPA's capacity is limited, but it improved its cooperation with the entity-level police forces in the Federation and Republika Srpska on terrorism issues. In an effort to more effectively investigate and prosecute terrorism cases, the State Prosecutor's Office transferred responsibility for these cases to the Special Department for Organized Crime, which received technical assistance from the United States and other members of the international community. Politicization of the terrorism issue in Bosnia, including terrorism threat analysis, was less of a problem than in the past. The state-level intelligence service provided excellent cooperation, and Bosnian authorities were generally responsive to U.S. counterterrorism cooperation requests.

Some former members of the mujahideen brigade, whose citizenship was revoked by the Citizenship Review Commission, have pursued appeals of these decisions that remained unresolved. In the case of Abu Hamza al-Suri (Imad al-Husayn), the appeals process has lasted more than one year. The state-level Constitutional Court returned several portions of Hamza's appeal to the State Court, and the court had not adjudicated this case at year's end.

In July, Swedish citizen Misrad Bektasevic, who was convicted on terrorism charges in Bosnia in 2005, was transferred from Bosnia to Sweden, where he will serve the remainder of his prison sentence. Bektasevic was arrested by Bosnian Security Police in Sarajevo, when he was found in an apartment with explosives, weapons, and suicide bomb belts in 2005. A video with masked persons threatening to attack forces in Iraq and Afghanistan was found and a voice analysis proved that Bektasevic was one of the individuals in the video. In 2007, he was sentenced to eight years and four months imprisonment for terrorism-related crimes.

In November, four individuals with alleged ties to extremists, led by Rijad Rustempasic, were arrested for terrorism and weapons trafficking. One of the suspects wanted in this case remained at large at the end of 2009.

Bosnia has deployed 10 officers to augment Alliance military staffs operating under NATO's International Security and Assistance Force (ISAF) in Afghanistan.

**Bulgaria**

During 2009, 29 Bulgarians attended U.S. government-sponsored counterterrorism training courses within the context of the Combating Terrorism Fellowship Program, administered by the Embassy's Office of Defense Cooperation. This training had courses in intelligence, security, operations, legal processes, and civilian-military cooperation. In July, 15 analysts from the Defense Information Service received a two-day seminar on terrorist network analysis and terrorist finance.

Bulgaria participated in the International Security Assistance Force in Afghanistan with approximately 470 service members. At U.S. request, Bulgaria added its first Operational Mentor and Liaison Team in February and agreed to add a second. On a yearly basis since 2004, Bulgaria has deployed a frigate in support of the Mediterranean Operation Active Endeavor (OAE). OAE's mission is to conduct maritime operations in the OAE area of operations to demonstrate NATO's resolve to help deter, defend, disrupt, and protect against terrorist activity.

In November, the new center-right government achieved a major success with the passage of two bills designed to overhaul the structure and operation of the Ministry of Interior and the agency responsible for counterterrorism, the State Agency for National Security (DANS). The two pieces of legislation eliminate duplication of effort and unclear responsibilities, making it easier for them to cooperate and share information. The DANS amendments explicitly restored the powers of the Financial Intelligence Directorate (FID) to conduct on-site inspections of banks and other financial institutions, and collect "bank secret" information for money laundering and terrorist financing cases. The FID remained vigilant against terrorist financing and continued to cooperate with the U.S. government on identifying and investigating terrorist assets. The FID reliably distributed lists of individuals and organizations linked to terrorism to all of the banks in Bulgaria, the Ministry of Interior, Customs, and the Border Police. The FID has been responsive to all mandated UNSCR-designated terrorist organizations, and has also been supportive and cooperative on U.S. government designated individuals and organizations. The FID has advised the banking sector to use the Department of Treasury Office of Foreign Assets Control OFAC website as a reliable information resource for individuals and organizations associated with terrorism. The FID continued to provide feedback, including information on the response level of Bulgaria's banks, to the U.S. Treasury Department's Financial Crimes Enforcement Network, as well as to the U.S. Embassy.

**Croatia**

In 2009, Croatia started the drafting process for an action plan to implement its national strategy for the prevention and suppression of terrorism.  Croatia expanded its extensive counterterrorism legal framework by passing the Anti-Money Laundering and Terrorist Financing Act, which entered into force in January.

In 2009, Croatia chaired the UN Security Council's Counter-Terrorism Committee (CTC).  Croatia supported U.S. efforts in the 1267 Committee.  Croatia also advocated providing further financial support to the Counterterrorism Implementation Task Force.  The Croatian Interagency Working Group on Suppression of Terrorism amended its mandate adding UNSCR 1624 to the UNSC Resolutions it was already charged with implementing, such as UNSCRs 1267, 1373, and 1566.

Croatia is currently issuing biometric passports.  In addition, Croatia signed a number of agreements in 2009 with the United States that strengthened information sharing and cooperation between U.S. and Croatian immigration, law enforcement, and security agencies.  Croatia also worked with the State Department's Export Control and Border Security program to improve security along its 750 mile border with Serbia, Montenegro, and Bosnia, as well as to monitor the country's 6,000 miles of coastline.

The multinational Special Forces military exercise "Jackal Stone 09" held in September in Croatia had approximately 1,500 participants from 10 countries, including the United States, and developed the capabilities of the participants in countering terrorism.

During 2009, Croatia chaired the Council of Europe's Committee of Counterterrorism Experts (CODEXTER).  Following up on a Croatian initiative to develop cross-regional cooperation in counterterrorism, the Council, Spain, and the Organization of American States organized a Conference on Cyber Security in Spain in April.  Under CODEXTER's umbrella, Croatia kept an updated self-assessing Country Profile that summarized Croatia's counterterrorism activities.

Croatia worked closely with the OSCE's Action against Terrorism Unit.  This resulted in a joint Croatian-OSCE workshop addressing cyber-security issues such as terrorist use of the Internet, held in Zagreb in November.  More than 140 national representatives, as well as 20 internationally recognized experts from academia, business, and government, participated in this event.

As part of international efforts to counter violent extremists, Croatia participated in the International Security Assistance Force (ISAF) in Afghanistan, contributing approximately 300 troops.  Croatia joined NATO in April and began contributing to the Alliance's counterterrorism efforts.

**Cyprus**

Cyprus continued to stand as an ally of the United States in its counterterrorism efforts.  The government was responsive to efforts to block and freeze terrorist assets, implemented Financial Action Task Force (FATF) recommendations, and conformed to European Union

counterterrorism directives. Cyprus continued to allow blanket overflight and landing rights to U.S. military aircraft supporting operations in Iraq and Afghanistan. In January, Cypriot authorities detained the Cypriot-flagged MV Monchegorsk. The vessel, chartered by the Islamic Republic of Iran Shipping Lines, contained Iranian-origin weapons components allegedly headed for Hizballah that were confiscated by Cypriot customs officials after the Government of Cyprus determined the shipment was in violation of United Nations Security Council resolutions.

Cyprus's legal framework for investigating and prosecuting terrorist-related activity remained relatively weak. The United States and Cyprus cooperated closely on terrorist financing and money laundering issues. The Cypriot Anti-Money Laundering Authority implemented new UNSCR 1267 listings immediately and informally tracked suspect names listed under U.S. executive orders. The Cypriot government maintained a "Prevention and Suppression of Money-Laundering Activities Law" that contained provisions on tracing and confiscating assets.

Since 1974, the southern part of Cyprus has been under the control of the government of the Republic of Cyprus; the northern part, administered by Turkish Cypriots, proclaimed itself the "Turkish Republic of Northern Cyprus (TRNC)" in 1983. The United States does not recognize the "TRNC," nor does any country other than Turkey. This de facto division has precluded counterterrorism cooperation between the two communities' law enforcement authorities, and between Cyprus and Turkey. The largely porous, lightly-patrolled "green line" separating the two sides is routinely exploited for trafficking people, narcotics, and other illicit goods, and is vulnerable to penetration by terrorist groups. Since 2007, regular ferry service between Latakia, Syria, and Famagusta, in the area administered by Turkish Cypriots, has facilitated increased illegal migration into Cyprus and the wider EU. The opening in 2009 of a new route between Famagusta and Lebanon could further facilitate such migration.

In the Turkish Cypriot-administered area, issues of status and recognition inevitably restricted the ability of authorities to cooperate on counterterrorism. Turkish Cypriots cannot sign treaties, UN conventions, or other international agreements, and lack the legal and institutional framework necessary to combat money-laundering and terrorist financing effectively. Within these limitations, Turkish Cypriots cooperated in pursuing specific counterterrorism objectives. In 2008, pressure from the international community culminated in the Turkish Cypriot-administered area being included as a jurisdiction susceptible to money-laundering by FATF, the global anti-money laundering (AML) and anti-terrorism financing body. This designation galvanized Turkish Cypriot authorities and bankers, who quickly passed updated AML "laws" bringing offshore banks under the authority of the Central Bank. A financial investigation unit-equivalent was created and began operations.

The Kurdistan Workers' Party (PKK) has a presence in Cyprus. Its activities generally were fundraising and transit en route to third countries. Authorities on both sides believed there was little risk the group would conduct operations on the island. Cyprus maintained it was fulfilling all responsibilities with respect to the EU designation of the PKK as a terrorist organization.

**Czech Republic**

The Czech Ministry of Interior's office with primary responsibility for counterterrorism analysis, the National Contact Point for Terrorism (NCPT), concluded that there was no acute risk of a terrorist incident, but assessed that the overall security situation in the Czech Republic was unpredictable. The NCPT is the Ministry of Interior's lead office for collecting and analyzing law enforcement data related to terrorism. A relatively new organization, the NCPT continued to recruit and train needed personnel, and to establish reporting protocols within the Czech National Police to ensure effective and timely dissemination of information. The NCPT determined that the country's membership in NATO and the EU, and its military presence in Afghanistan, made it a potential target for an attack. Czech law enforcement officials also remained vigilant for signs that the country was being used as a logistical or staging base for potential terrorist attacks within Europe.

The NCPT perceived an emerging risk in a possible connection between increasingly violent right-wing extremism and terrorism. In October, a group of 10 individuals was arrested by the Czech National Police on suspicion of preparing to conduct a terrorist attack, possibly directed against an infrastructure facility such as a power plant. These individuals were members of the illegal right-wing extremist organization White Justice, which declared itself to be a militant neo-Nazi group. Evidence indicated that members of the group were conducting military training camps to teach small-unit military tactics. There were no other arrests related to terrorism in 2009.

The Czech government's overall efforts against terrorism are established in its "National Counterterrorism Action Plan for 2007-2009". This strategic document set goals in four areas: improving communication and coordination between intelligence and law enforcement agencies; protecting the public and critical infrastructure; preventing the isolation and radicalization of immigrant communities; and conducting foreign policy to counter international terrorism. In October, after receiving the Ministry of Interior's evaluation of the effectiveness of the 2007-2009 Plan, the Czech National Security Council tasked the Ministry of Interior to prepare a new plan for the period 2010-2011.

The Ministry of Finance's Financial Analysis Unit and the Customs Service cooperated with the NCPT to combat terrorist financing. The NCPT has a public website with an anonymous Internet hotline.

The Czech Republic actively participated in the counterterrorism and nonproliferation efforts of multilateral bodies such as NATO, the EU, and the UN. The country's bilateral cooperation with the United States was also close. The NCPT characterized the level and quality of cooperation it received from U.S. agencies and law enforcement offices as exceptionally good and very successful.

The Czech parliament approved an ongoing deployment of up to nearly 540 military personnel in Afghanistan. The Czech Ministry of Defense also slightly increased the size of its Provincial Reconstruction Team of civilian experts in Afghanistan's Logar Province.

**Denmark**

The Center for Terror Analysis of the Danish Security and Intelligence Service (PET) assessed that there is a general terrorist threat against Denmark, both from groups and individuals in Denmark as well as a threat against Danes and Danish interests abroad. The threat came primarily from networks, groups, and individuals who adhered to various forms of militant Islamist ideology, including al-Qa'ida-related groups and networks.

While there were no terrorist attacks in Denmark in 2009, a plot to attack the Danish newspaper *Jyllands-Posten* was disrupted through a cooperative effort of Danish and American authorities.

Denmark worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force, and in international nonproliferation groups, such as the Proliferation Security Initiative (PSI) and the Global Initiative to Combat Nuclear Terrorism.  Denmark cooperated closely with EU partners and institutions within the field of counter-radicalization.  Roj-TV, a Kurdistan Workers' Party (PKK)-affiliated media outlet, continued to operate in Denmark.

On October 3, the FBI arrested in Chicago U.S. citizen David Headley, formerly known as Daood Gilani.  Headley was charged with planning terrorist attacks in Denmark, most notably against the headquarters of *Jyllands-Posten*, the Danish newspaper whose 2005 publication of cartoons of the Prophet Mohammed outraged many Muslims around the world.  The joint investigation leading to Headley's arrest was conducted by the PET and the Federal Bureau of Investigation, with support from U.S. Immigration and Customs Enforcement.  Headley was also charged with planning the 2008 Mumbai terrorist attacks.  Headley, has since pleaded guilty in a U.S. court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 170 people – including six Americans – as well as to crimes relating to a separate plot to bomb *Jyllands-Posten*.

On June 11, the Danish parliament voted to maintain its troop level of up to 750 in Afghanistan until 2012.  Danish troops served as part of the International Security Assistance Force.  Most of these were engaged in Helmand Province in southern Afghanistan.

**Estonia**

Estonia actively enforced all EU laws regarding counterterrorism and cooperated fully with the United States in law enforcement matters.  Estonian passports issued since May 2007, including "gray" passports issued to stateless residents of Estonia, have the latest in biometric security features, including an embedded computer chip containing biometric information.

Participation in the International Security Assistance Force (ISAF) operation in Afghanistan was Estonia's highest priority international mission.  Estonia contributed an additional motorized infantry company in 2009, for a total of two companies plus staff officers and support elements, which equaled more than 280 soldiers.  One unit formed part of a U.K.-led provincial reconstruction team in Helmand Province, and the additional company, also in Helmand, operated side-by-side with U.S. Marines providing election security.  Although the second

company was withdrawn, Estonia still had approximately 155 troops in Afghanistan at the end of 2009.  Estonia participated in the European Police Mission to Afghanistan with two police officers and a political advisor.  It was projected to give a total of 1.3 million Euros in assistance for the period 2009-2011, which includes funding for the fight against narcotics; the Afghanistan Population and Housing Census project; and for human capital and infrastructure development of Helmand province's health care network, such as training of nurses, mid-wives, and other health professionals.  While no longer participating in combat operations in Iraq, Estonia continued to support the NATO Training Mission in Iraq with a staff officer.

On March 11, Estonia amended the Penal Code to criminalize the financing and support of acts of terrorism or actions leading to the perpetration of an act of terrorism, punishable by up to 10 years imprisonment or the liquidation of any entity used in such efforts.  The MLTFPA also harmonized Estonian law with EU standards and brought Estonia's money laundering regime into total compliance with Financial Action Task Force recommendations.

On October 12, the Government of Estonia began operating U.S. Department of Energy-funded radiation monitors at Luhamaa, on its southeastern border with Russia.  The Estonian Border Guard was in the process of constructing helicopter landing pads at entry control points at Narva, in the east, and Varska, in the southeast, with U.S. Department of Defense Counternarcotics and Terrorism funds.

**Finland**

Information sharing between Finnish and U.S. authorities regarding terrorism-connected cases was an effective tool for both countries.  Relevant Finnish agencies monitored potential threats closely and kept their international partners apprised of threats with connections outside the borders of Finland.

In a rare publicized case in November, a Finnish citizen was deported from Sweden to Finland because of suspected links to a terrorist organization.  Media reports confirmed by the government indicated that this individual was closely monitored by the Security Police (SUPO) after his return from Sweden.

Finland took additional steps to verify the identity of those seeking to enter the country and anticipated a further surge in immigration through family reunification.  The Government of Finland continued to exert significant efforts to assimilate newcomers into society and to avoid conditions that would lead to radicalization of minority groups.  These measures included social benefits, Finnish language training, and ombudsmen's offices to advocate on behalf of immigrants.

One new measure that Finland was considering to prevent the infiltration of terrorists or their facilitators into the country was the permanent stationing of SUPO officers at Finnish embassies abroad.  If approved, this would be the first foreign deployment of dedicated counterterrorism personnel.  The director of SUPO has publicly stated that these officers would be focused on "stop(ping) potential terrorists in the country of departure."  The government has made a request

to parliament for US$ 2.3 million to fund the 15-20 personnel who would be involved in the effort.

Finland continued its contributions towards building counterterrorism capacity with overseas partners.  It made donations, under its G8 Global Partnership pledge, of approximately US$ 14 to 21 million for the period 2004-2014, including about US$ 350,000 as part of the Nuclear Smuggling Outreach Initiative to provide equipment to the Kyrgyz Republic needed to prevent the smuggling of nuclear materials that might be sought by terrorist groups.  Finland also began a police-prosecutor training program in Afghanistan to facilitate investigation and prosecution of serious crimes there, including those related to terrorism, and it continued to be the third-largest contributor of trainers to the EUPOL training program for Afghan police.  On January 22, the government reached a decision to temporarily increase the strength of Finnish military crisis management personnel by approximately 50 soldiers from the current ceiling of 145, all expected to be deployed by the beginning of 2011.  Finland also aimed to allocate a larger proportion of its development cooperation funding to the northern provinces of Afghanistan, and to deepen its participation in the EU police mission in northern Afghanistan.

**France**

In 2009, France found itself grappling with an Islamist threat that reflected the nation's changing demographics.  Several public announcements by al-Qa'ida (AQ) and other groups reiterated that French interests remained key targets of al-Qa'ida in the Islamic Maghreb (AQIM).  In response to President Sarkozy's June comments calling for the banning of the burka in France, AQIM spelled out their intentions to attack France stating, "We will do everything in our power to avenge our sisters' and our daughters' honor, by striking France and its interests, wherever they may be."

Traditionally, local Corsican separatists, Basque Fatherland and Liberty (ETA) members, and ultra-left anarchist factions have been responsible for the majority of attacks and arrests classified as terrorism in France.  The number and violence of ETA and Corsican attacks in France have continued their downward trend, however.  In 2009, the French intelligence services recognized an elevated threat from an "international European network of radical Islamists with a strong presence in France."  In response to that threat, the French Ministry of interior created the National Police Intervention Force (FIPN) on December 1.  The FIPN brings together the Special Weapons and Tactics (SWAT) elements of multiple French Police units to form a 500-man SWAT team.  France remained on high alert and recognized that it is a target of AQIM and of other extremist groups in France and abroad.

France and Spain's concerted efforts against ETA operatives and leadership highlighted the benefits of close regional cooperation and demonstrated the effectiveness of the French counterterrorism program:

- On January 5, court proceedings began in Paris for the April 2002 suicide bombing of a Djerba Synagogue.  The attack killed 14 German and two French nationals.  Khalid

Sheikh Mohammed is a co-defendant, accused of being responsible for all AQ external operations during that time frame.

- In April, French President Sarkozy announced that France and Spain would set up a joint security committee to fight terrorism and drug trafficking.  The group, which is an expansion of existing police cooperation targeted at ETA, created a joint general staff headquarters on security to lead the fight against terrorism.

- On August 19, shortly after the creation of the joint staff, French police arrested three top members of the military arm of ETA: Alberto Machain, Aitzol Etxaburu, and Andono Sarasola.  Additionally, police found weapons and bombmaking materials.

- On October 11, French police in Montpellier arrested the deputy commander of ETA's military wing, Lurgi Mendinueta and another senior ETA member, Jones Larretxea.

- On October 19, French police arrested ETA's political chief, Aitor Lizan Aguilar, as well as ten other ETA members.

Although no terrorist attacks took place on French soil during 2009, French interests were targeted and attacked abroad:

- On July 14, two French security service personnel, reportedly in Somalia to train government forces in counterterrorism operations, were kidnapped and held by two separate groups–Hezb al-Islam and al-Shabaab.  On August 26, the hostage held by Hezb al-Islam was freed, although the circumstances of his release or escape remained unclear.  Initial reports suggested he killed his kidnappers and escaped.  Later reports intimated that a ransom had been paid to Hezb al-Islam and the hostage was freed.

- On August 18, AQIM claimed responsibility for the August 8 suicide bombing at the French Embassy in Mauritania that injured three people.

- On October 9, a suspected AQ operative was arrested with his brother in Paris.  The operative had been working on projects for a nuclear-research facility near Geneva.  French intelligence investigators said the physicist, a man of Algerian origin, was working on analysis projects at a "very high level" related to the Large Hadron Collider at the European Organization for Nuclear Research, or CERN.  Officials said the suspect had been in contact with people linked to AQIM about potential targets for terrorism in France, and he had expressed a desire to carry out such attacks but had "not committed material preparatory acts."  The interior minister determined that the brothers were enough of a threat to be arrested, ending the French government's 18-month-long surveillance of them.

- On November 26, a French citizen was kidnapped in Northern Mali.  On December 8, AQIM claimed responsibility for the kidnapping.[7]

French authorities detained and prosecuted a number of people with ties to various terrorist organizations, including Islamist terrorists (18 convictions), Corsican Nationalists (19 convictions), Basque Fatherland and Liberty (ETA) members (28 convictions), the Liberation Tigers of Tamil Ealam (LTTE) (22 convictions), and Kurds with links to the Kurdistan Workers' Party (PKK) (16 convictions).  It should be noted that the number of arrests of ultra-left anarchists dropped from 17 in 2008 to zero in 2009.  Additionally, the number of Corsican Nationalists convicted dropped from 46 in 2008 to 19 in 2009.  The number of LTTE members arrested, however, jumped from two in 2008 to 22 in 2009, which may be linked to the military crackdown in Sri Lanka during this same period.

The French government undertook several counterterrorism operations with other countries, including the United Kingdom, Belgium, Germany, Italy, Spain, and Portugal.  In addition to undertaking operations to arrest and prosecute terrorists, France continued programs to address radicalization and extremism through the use of social and economic incentives.  Of particular note, the French government went to great efforts to train police personnel to be aware of the signs of radicalization.  The French government is very concerned about Islamist radicalization in the French prison system.  In 2008, the governments of France, Austria, and Germany jointly commissioned a study to identify key indicators of radicalization in the prison system and offered suggestions on how to prevent or minimize radicalization within the penal system.  In 2009, the document was provided to all 27 members of the European Union and was requested by, and provided to nine non-EU states.  Within the EU, France hosted a conference on November 13 to help other EU-countries understand the benefits of a counterterrorism coordination center.

Preliminary detention for suspected terrorists in France is six days.  The state may thereafter place suspects under pre-trial detention for up to four years when the evidence is compelling or when the suspect is considered to present an imminent threat.  In conjunction with local government, the national government continued to increase video surveillance in major cities.  French law allows for seizing of assets, video and telephone surveillance, monitoring of public transport records, and provides other broad powers for official access to connection data held by internet cafes and to various personal data.  Notably, French nationality may be revoked, leading to expulsion from French territory, if the person in question was naturalized in the preceding 15 years.

France is actively engaged with the UN Security Council Counterterrorism Committee, the G8's Counterterrorism Action Group, the UNSCR 1267 Committee and the European Council's Antiterrorism Strategy action plan.  France is an original member of the Global Initiative to Combat Nuclear Terrorism and continued to participate actively.  France remained a member of,

---

[7] The French intelligence services were aware of a rise in the kidnapping of French citizens, yet remained hesitant about classifying them as terrorist activity (as opposed to criminal) until a specific group had claimed responsibility and they could investigate the circumstances leading up to the kidnapping.

and contributor to, both the Proliferation and Container Security Initiatives.  France continued to upgrade passports to the biometric standard.  On May 15 and December 1, in support of U.S. efforts to close the Guantanamo Bay facility, France accepted two former detainees and resettled them in France.

On the military front, France currently has more than 3,000 troops participating in operations in Afghanistan.  The French commitment included ground troops and air assets.

**Georgia**

Georgia continued to support U.S. efforts in the fight against terrorism, increasing its role by providing a battalion of Georgian soldiers, approximately 750 troops, to be trained by the United States in preparation for a deployment as part of the International Security Assistance Force (ISAF) in Afghanistan.  This is in addition to 173 Georgian troops already serving as part of ISAF with the French and one service member serving with Turkish forces.  Additionally, Georgia has granted blanket flight clearance for all U.S. military aircraft engaged in operations in Afghanistan and Iraq.

Russian claims of Georgian support for Chechen terrorists and harboring of such individuals in the Pankisi Gorge were unsubstantiated, and the Georgian government has transparent efforts to prove this to the international community.

Border security operations and anti-corruption efforts at border checkpoints remained high priorities for the Georgian government, with its continued focus on countering the smuggling of contraband such as laundered money, drugs, and weaponry that could support terrorism. Significant improvements to infrastructure at border crossing points and employment of the Department of Energy's Second Line of Defense Program to detect radiation continued. The new border crossing facility at Kazbegi/Larsi between Georgia and Russia was finished in September 2009, although due to the state of relations between Georgia and Russia, the border remained closed at the end of 2009.

Additionally, seven remote border posts were completed in 2009, enhancing the security of the Georgian- Azerbaijani border and further limiting illegal crossings.  The fifth and final radar station on the Black Sea coast was also completed, which will enhance Georgian capabilities to secure its maritime border and interdict potential smugglers and counter any terrorist threats from this direction.  The Georgian Border Police's capabilities significantly improved, including its ability to monitor, patrol, and interdict criminals along the green borders.  This was accomplished by the development of additional enforcement tools such as new communications equipment.

The situation in the separatist regions of Abkhazia and South Ossetia remained largely unchanged, and the Georgian government does not control its international borders located between these regions and Russia.  This lack of control allowed for unrestricted and unidentified flow of people, goods, and other potentially dangerous items from Russia into Abkhazia and South Ossetia.  The administrative boundary lines between Georgia and the conflict zones were

furthered militarized in 2009 when Russia tasked its Federal Security Service (FSB) border guards to take over control from de facto authorities in both territories. Movement over these boundary lines was strictly controlled, although formal customs checks, security inspections, or other counterterrorism procedures did not exist.

**Germany**

German security officials estimated that roughly 185 individuals – both German nationals and permanent residents – have undergone paramilitary training over the past ten years at Islamist extremist training centers located primarily in the border regions of Afghanistan and Pakistan. Approximately 90 of these individuals have returned to Germany and 15 of them were in custody in 2009. Germany investigated, arrested, and prosecuted numerous terrorism suspects and disrupted terrorist-related groups within its borders with connections to international Islamist, Kurdish nationalist, and Marxist-Leninist terrorist organizations. Two new legislative packages entered into force that strengthened Germany's counterterrorism legal framework and provided security officials with new powers of investigation.

Throughout the year, a number of Islamist-inspired terrorist organizations, including the Islamic Jihad Union (IJU), al-Qa'ida (AQ), and the Islamic Movement of Uzbekistan, released videos featuring German speakers who threatened terrorist attacks in Germany or against German interests abroad. Bin Ladin and Zawahiri also issued statements threatening Germany prior to the German federal elections in September. In a number of instances, the identities of the individuals appearing in the videos were known and included German-Moroccan dual citizens Bekkay Harrach, Mounir Chouka, and Yassin Chouka.

During the summer, the frequency of the extremist video and audio messages increased. The messages threatened Germany with attacks if the government did not withdraw its military forces from Afghanistan in what security officials interpreted as an attempt to influence the September 27 national elections. The threats led German police to take heightened security measures at airports, railway stations, and other public sites. On November 13, the Stuttgart district court sentenced an ethnic Turkish man to six months in jail for breach of the peace after he posted one of the extremist videos featuring Bekkay Harrach on *YouTube*.

On January 1, new legislation went into effect that broadened the powers of the Federal Office of Criminal Investigation (BKA) in counterterrorism investigations. The law provided the BKA with preventative investigatory powers, that is authority to carry out actions based either on a suspicion that individuals are planning a crime or potentially involved in criminal activity, and gave it lead responsibility in terrorism investigations in which the threat extends across multiple federal states, in which state-level competence is unclear, or in which state officials request federal assistance.

On August 4, a second legislative package entered into force that made significant amendments to the German Criminal Code and criminalized a range of terrorism-related preparatory actions such as participating in terrorist training or acquiring weapons and bombs with the intent to commit attacks that endanger the German state. The amendments also outlawed the distribution

and acquisition of bomb making and similar instruction materials if the intent is to motivate individuals to commit violent crimes.  Establishing contact with a terrorist group with the intent of receiving training to commit attacks is also outlawed.

A high-profile trial of the four individuals belonging to the IJU cell arrested in Sauerland in 2007 began on April 22.  The defendants were charged with membership in a foreign terrorist organization, preparation of a serious criminal offense involving explosives, and other violations. The defendants gave comprehensive testimony that included descriptions of their training at terrorist camps in North Waziristan, Pakistan.  The trial had not concluded by year's end.

German courts also began trials or reached verdicts in other notable counterterrorism cases:

- On October 13, the Frankfurt Higher Regional Court sentenced Omid Shirkani, a German citizen, to two years and nine months in prison, and co-defendant Huseyin Ozgun, a Turkish citizen, to one year and two months in prison on charges of supporting a foreign terrorist organization and violating the Foreign Trade Act.  The two participated in terrorism training in Pakistan and supported the IJU with financing and paramilitary equipment.

- On July 13, the Koblenz Higher Regional Court sentenced Aleem Nasir, a German citizen, to eight years imprisonment for membership in a foreign terrorist organization (AQ) and multiple counts of violating the Foreign Trade Act.  Nasir recruited personnel and provided money and military equipment to AQ.

- In July, the Dusseldorf Higher Regional Court found Hüseyin Acar, a leading member of the Kurdistan Workers' Party (PKK), guilty of being the ring-leader of a criminal organization and of coordinating PKK actions in Germany.  The Court sentenced Acar to three years and nine months in prison.

- On August 12, the Frankfurt Higher Regional Court found a Turkish citizen, guilty of membership in a terrorist organization and multiple cases of arson, sentencing him to four years imprisonment.  The individual was a PKK leader in southern Germany between 1993 and 1994 and ordered multiple arson attacks on Turkish targets in Germany in which one person died.

- On April 8, the Frankfurt Higher Regional Court upheld the 2008 sentencing of Muzaffer Ayata, a Turkish citizen, to three years and six months in prison on charges of being a leader of a criminal organization (PKK).

- On September 14, the Koblenz Higher Regional Court began the trial of Sermet Ilgen, a German citizen, and Ömer Özdemir, a Turkish citizen, who are charged with membership in a foreign terrorist organization and violations of the Foreign Trade Act.  The two were accused of having participated in terrorist training at camps in Pakistan and to have provided al-Qa'ida with funding and equipment.

- On January 15, the Dusseldorf Higher Regional Court began the trial of five individuals suspected of membership in the Revolutionary People's Liberation Party–Front (DHKP-C), a left-wing terrorist organization that seeks to overthrow the Turkish government and replace it with a Marxist-Leninist regime.

During the year, German law enforcement authorities arrested a number of individuals suspected of involvement in terrorism.  Prominent new actions and arrests included:

- The BKA arrested Adnan Vatandas, who is suspected of supporting AQ by distributing Internet propaganda and instructions on bomb-making.

- On December 9, prosecutors in Dusseldorf filed charges against a Turkish woman for membership in a terrorist organization (DHKP-C).

- On December 15, police arrested a German citizen of Turkish descent, on suspicion of attempted arson, membership in a terrorist organization (DHKP-C) and conspiracy to commit homicide.  He is alleged to have participated in the fire bombings of two Turkish banks in Germany in 1995.

Germany remained a strong advocate of the UNSCR 1267 al-Qa'ida/Taliban financial sanctions regime and proposed a number of individuals to the committee for designation.

Implementation discussions continued regarding a bilateral U.S.-German agreement to strengthen fingerprint and DNA information sharing to combat terrorism and serious crime.  The U.S. Embassy's Law Enforcement Working Group continued its ongoing engagement with state-level law enforcement contacts by organizing four security conferences throughout Germany that included terrorist themes.

The Department of Homeland Security (DHS) and the Federal Ministry of Interior continued their strategic dialogue and held a Deputies-chaired conference in June to strengthen cooperation across a range of counterterrorism-related issues.  Germany participated in the DHS Customs and Border Protection's Container Security Initiative in the ports of Hamburg and Bremerhaven and supported DHS Customs and Border Protection's Immigration Advisory Program operating at the Frankfurt Airport.  The DHS Transportation Security Administration's presence in Frankfurt, together with U.S. and German air marshals, formed key parts of bilateral efforts to provide air transport security for the seven German airports with flights to the United States.

**Greece**

Domestic terrorism increased significantly in Greece in 2009, following large-scale rioting in December 2008.  In 2009 there were more than 430 security incidents – defined to include incendiary and explosive attacks, as well as attacks involving small arms, grenades, and other infantry-style weaponry – far more than have been recorded in each of the previous 20 years.  Local extremists increasingly targeted businesses and Greek law enforcement, and there was an increasing use of infantry-style weaponry in terrorist attacks.

The leftist domestic terrorist group Revolutionary Struggle claimed responsibility for shooting police officers and bombing financial targets, including U.S.-affiliated banks and the Athens Stock Exchange, which was targeted in an ammonium nitrate car bomb attack on September 2. A previously unknown group, Sect of Revolutionaries, emerged during the year to claim responsibility for attacks on police and other targets, including the only such lethal attack during the year: the June 17 murder of a police officer on protective detail outside the apartment building of a government witness in Athens. On October 27, unknown assailants attacked the Aghia Paraskevi police station in suburban Athens with AK-47s, seriously wounding six officers and a civilian. Two groups, the Guerilla Group of Terrorists and the Conspiracy of Fire Nuclei (SPF), jointly claimed responsibility for the December 27 bombing of the National Insurance Company building in Athens.

The appeals of eight convicted members of the November 17 terrorist organization went before the Supreme Court in October. Prosecutors urged the court to sustain the convictions, but recommended consideration of reduced sentences for two of the convicts. On December 3, an appeals court threw out the convictions of three members of the People's Revolutionary Struggle terrorist organization who had initially been sentenced in 2004 to 25 years each for the 1994 murder of a police officer, 48 attempted murders by bombing, and 42 bomb attacks and attempted bombings, though they had been released for health reasons and on other grounds pending appeal in separate decisions in 2005 and 2006.

Throughout the year, self-styled anarchists attacked banks, police stations, the homes and offices of politicians, and other "imperialist-capitalist" targets with tools such as firebombs and Molotov cocktails. Since these attacks usually occurred outside normal business hours, few persons were seriously injured and there were no deaths. Several U.S. businesses were targeted. On January 10 , a rock-throwing group of pro-Palestinian demonstrators caused some physical damage to the U.S. Embassy during a protest against the Israeli operation in Gaza.

Greece is increasingly an EU entry point for illegal immigrants coming from the Middle East and South Asia and there was concern that it could be used as a transit route for terrorists travelling to Europe and the United States. The number of illegal immigrants entering Greece, especially through the Aegean Sea, increased dramatically in 2008 and 2009, with more than 100,000 illegal immigrants, nearly half of whom originated from North Africa, the Middle East, and South Asia, arrested each year. Greek authorities participated in the Container Security Initiative and cooperated with U.S. officials on information sharing, as well as the training of Greek security and customs officials, and judicial personnel. Greece sustained its participation in the International Security Assistance Force in Afghanistan by providing engineers and other support officers.

**Hungary**

Hungary remained a consistent and reliable counterterrorism partner. In addition to the continued leadership of a Provincial Reconstruction Team, Hungary sent 28 troops to Afghanistan as part of a new joint Operational, Mentoring, and Liaison team (OMLT). The

OMLT, which is commanded by a Hungarian Lieutenant Colonel, includes an equal number of troops from the Ohio National Guard. Additionally, Hungary deployed 40 troops to provide security during the national elections, as well as committing a Special Forces contingent, which operated with U.S. forces. At year's end, Hungary had a total of 324 troops serving in Afghanistan. In response to President Obama's calls for further allied support, Prime Minister Bajnai pledged in December 2009 to add a further 200 soldiers to the Hungarian contingent.

In September, the Prime Minister announced that Hungary would accept one detainee from the Guantanamo detention facility. This decision was controversial, but won cross-party support. In late November, the detainee was transferred to Hungary.

In a series of operations, Hungary arrested 19 of the approximately 20-member Hungarian Arrows National Liberation Army, a far-right extremist group suspected of committing or conspiring to commit terrorist acts. The remaining individual is still at large. Although Hungary's legal code does not provide for the designation of domestic terrorist organizations, Hungarian authorities nonetheless carefully monitored potential extremist groups and closely cooperated with U.S. law enforcement and other agencies.

As a Schengen zone country, Hungary continued to manage its border responsibilities, including the increased entry of foreigners seeking asylum.

**Iceland**

The Government of Iceland stated in its most recent terrorist threat assessment, conducted by the National Police Commissioner in 2008, that the likelihood of terrorist activities occurring in Iceland is low. In the same assessment, however, the government concluded that the potential consequences of such activities were severe enough to merit a high level of vigilance. The government, therefore, continued its efforts to strengthen domestic border security and counterterrorism capabilities during the year. Notably, the Government of Iceland passed legislation in December that clarified the legal definition of terrorism and strengthened penalties against money launderers.

The National Police Commissioner has primary responsibility for counterterrorism efforts in the country. The Viking Squad, Iceland's counterterrorism unit, is considered the first line of defense in Iceland's efforts against terrorism. The paramilitary unit is comprised of approximately 40-50 members who are trained in active counterterrorism response by U.S. and other European police and military counterterrorism units. The National Security Unit, which also falls under the jurisdiction of the National Police Commissioner, gathers intelligence, drafts threat assessments, and exchanges information with foreign counterparts with the aim to prevent or reduce the likelihood of terrorism.

The Icelandic Coast Guard (ICG) is responsible for Iceland's coastal defense and monitors the ocean around Iceland, both within and outside of territorial waters. The ICG served as the Chair of the North Atlantic Coast Guard Forum in 2009 and hosted the organization's annual conference in September. Also in September, the ICG hosted Northern Challenge 2009, a

NATO-supported exercise focusing on explosive ordnance disposal and counterterrorism scenarios.  The explosive ordinance team was called upon in December when a Lufthansa flight heading to Detroit made an emergency landing in Iceland after the aircraft was found to be carrying luggage for a passenger who had not boarded the plane.  The explosive ordinance team found nothing suspicious and the flight was released in short order.  The EOD team has served in international peacekeeping missions in Iraq and Afghanistan.

The Icelandic government supported multilateral counterterrorism efforts.  Iceland continued its deployment of personnel at Kabul International Airport and International Security Assistance Force (ISAF) Headquarters in Afghanistan in support of NATO operations.

**Ireland**

In 2009, increasing levels of Real Irish Republican Army (RIRA) and Continuity Irish Republican Army (CIRA) violence in Northern Ireland were traced back to elements in Ireland with the assumed objective of undercutting the formation of an integrated Police Service of Northern Ireland.  Counterterrorism measures implemented in previous years were sustained and relations between the U.S. government and Irish law enforcement officials were increasingly positive.  Over the past year, there has been increasing levels of cooperation with Irish authorities to deny Islamist extremists the opportunity to use Ireland as a base for facilitation of terrorist activity in Iraq, Afghanistan, and elsewhere.  Irish law enforcement authorities were focused on enhancing their coverage of what is assessed to be a small, ideologically dedicated group of Islamist radicals.

On October 10, the Irish National Liberation Army (INLA), an IRA splinter group responsible for some of the most notorious attacks of the Northern Ireland conflict, renounced armed struggle and agreed to disarm.  Although INLA remained opposed to the British presence, officials from their political wing stated that the renunciation of violence was based on political calculations.

In 2009, Ireland enacted the Criminal Justice (Surveillance) Act 2009, which provided a statutory framework for evidence obtained by means of covert surveillance to be used in criminal trials.

In 2009, Ireland resettled two former Guantanamo detainees.  Ireland continued a modest troop commitment to the International Security Assistance Force in Afghanistan.  It also worked closely with the United States on UN and other multilateral counterterrorism efforts, including the Financial Action Task Force, the Proliferation Security Initiative (PSI), and the Global Initiative to Combat Nuclear Terrorism.

**Italy**

Italy continued to aggressively investigate and prosecute terrorism suspects, dismantle terrorist-related cells within its borders, and maintain high-level professional cooperation with its international partners.  Italy was one of the largest troop contributors to the NATO mission in

Afghanistan and justified its commitment to "prevent it from becoming a launching pad for terrorists," according to the Italian Minister of Defense.  Italy immediately called for the EU to provide increased counterterrorism assistance to Yemen after the failed December 25 bombing attempt of Northwest Flight 253.

During the last two months of 2009, two detainees from Guantanamo and one from Afghanistan were transferred to Italy for prosecution in terrorism proceedings pending in Milan.  The transfers were made pursuant to a memorandum of understanding finalized between U.S. Attorney General Eric Holder and Italian Justice Minister Angelino Alfano in September.

Italy's law enforcement and judicial authorities had several noteworthy cases in 2009:

- In April, Italian prosecutors began investigating a group of North Africans and others in Venice on charges of international terrorism.  One was a former imam in the southern city of Caserta who reportedly controlled a network providing lodging, money, and false identity papers to migrants traveling to other European countries.

- In May, judicial authorities issued arrest warrants for Bassam Ayachi and Raphael Marcel Frederic Gendron, French citizens, on charges of international terrorism for promoting, managing, and funding an Islamic organization connected to the al-Qa'ida (AQ) network, and for recruiting terrorists locally and through the Internet for potential attacks in France, the UK, Iraq, and Afghanistan.  Both were already detained in Bari under 2008 charges of encouraging illegal migration.  They were reportedly connected to a dozen other international terrorists arrested in December 2008 in France and Belgium.  Ayachi, of Syrian origin, was a former imam in Belgium.  Gendron, a Muslim convert, was co-founder of the Belgium Islamic Center, Assabyle.  In July, a judge sentenced Ayachi and Gendron to 54 months in prison.

- In June, Tunisian citizen Houcine Tarkhani was arrested in Sicily.  His arrest had been sought since 2006 for his participation in the planning of a terrorist attack against the Church of San Petronio in Bologna, which contains a depiction of the Prophet Mohammed, and the Milan subway system.  Italian authorities expelled seven others in 2006 for the same incident.  The group had connections to Algeria, Morocco, Syria, France, Spain, and Denmark.

- In October, Libyan citizen Mohamed Game unsuccessfully attempted a suicide attack against an army barracks in Milan.  The explosive device partially malfunctioned, wounding him and a guard who tried to stop him.  Game and two alleged accomplices, Egyptian Mohmoud Abdelaziz Kol, and Libyan Mohamaed Imbaeya Israfel, were arrested for the incident.  Game reportedly had developed targeting profiles of Prime Minister Berlusconi and other senior Italian officials.  Interior Minister Maroni reported that Game and his accomplices were self-radicalized over the Internet by al-Qa'ida propaganda and had no connections to other terrorist cells.

- In November, Mohammad Yaqub Janjua and his son Aamer Yaqub, of Pakistan, were arrested in Brescia in a joint operation with the FBI and Indian intelligence services in connection with the November 2008 terrorist attacks in Mumbai. The two owned a money transfer agency in Brescia used to activate Voice Over Internet Protocol accounts online and to manage Hawala operations that transferred more than US$ 550,000 to Pakistan from 2006 to 2008. Italian authorities claimed the arrests confirmed the existence of a network in the northern Italian region of Lombardy that provided logistical support to international terrorism.

- Also in November, Italian Tax Police arrested six Algerian citizens on charges of producing false identity documents. Eleven others were arrested in Spain, Austria, Switzerland, France, and the United Kingdom in the same operation. According to Interior Minister Maroni, the group was also collecting funds for terrorist activities outside Italy.

Follow-ups to judicial proceedings initiated in 2008 included:

- In May, a Milan judge dismissed all terrorism charges against Maher Bouyahia and 19 others arrested in May 2008 for alleged drug trafficking and terrorism offenses. Prosecutors continued to pursue drug charges against the group.

- In October, a trial began in Bologna against five alleged terrorists arrested in August 2008 on charges of international terrorism. The cell allegedly sent tens of thousands of dollars to Bosnian groups linked to terrorist organizations in Iraq and Afghanistan to support suicide attacks.

- In October, a trial began in Milan against four Moroccan citizens on terrorism charges for their plans to attack targets in and around Milan.

Domestic anarchist-inspired and extreme-left terrorist groups continued to present a moderate threat despite Italian authorities' efforts to dismantle their organizations.

- In October, Red Brigade terrorist Massimo Papini was arrested near Salerno in connection with the 2003 killing by the Red Brigades in Bologna of Labor Ministry adviser Marco Biagi.

- Also in October, the Revolutionary Brigades for a Combatant Communism threatened the lives of Prime Minister Berlusconi and other senior officials in a letter to a daily newspaper.

- In December, a small explosive detonated in the underground walkways of Milan's private Bocconi University.

- Also in December, a letter bomb was sent to a government migrant and expulsion center near Gorizia.  Italy's major anarchist group, the Informal Federation of Anarchists, claimed responsibility for both incidents.

The Italian government continued to make use of reinforced counterterrorism legislation enacted in 2005, which facilitated the detention of suspects, mandated arrest for crimes involving terrorism, and expedited procedures for expelling persons who may be involved in terrorist activities.

In March, the European Court of Human Rights prevented the expulsion of eight Tunisians for association with terrorist organizations, ruling that it would violate Article 3 of the European Convention on Human Rights, which prohibits torture and inhumane or degrading treatment even in cases of serious threat to the community.  Despite the ruling, Italy expelled a number of individuals suspected of having ties to AQ, al-Qa'ida in the Islamic Maghreb, and Ansar al-Islam.

With respect to the financial aspects of fighting terrorism, Italy aggressively identified and blocked financial resources destined for suspected terrorist individuals and groups.  The Italian government worked closely with the United States on anti-money laundering and information sharing, and cooperated with other foreign governments as an active member of the Financial Action Task Force and the Egmont Group.  Italy also participated actively in the UNSCR 1267 process, both as a sponsor and as a co-sponsor nation.

As president and host of the 2009 G8 Summit, Italy played a leading role in the Roma-Lyon Group and the Counterterrorism Action Group, within which Italy led an initiative to enhance counterterrorism security measures in airports in the western Balkans.  Italy effectively used its role as G8 host to promote counterterrorism cooperation.

Italy was an important partner in the Proliferation Security Initiative and the Container Security Initiative.  In 2009, Italy appointed the Italian Customs Service to team with the U.S. Department of Energy to implement the Megaports program in Italy.

Italy participated in NATO's Active Endeavour naval mission against terrorism in the Mediterranean, and contributed to international military missions in Afghanistan, where it held Regional Command-West and offered an additional 1,000 troops and pledged 200 Carabinieri police trainers at the president's request.  In Iraq, Italy played a lead role in the NATO Training Mission, among others.

Italy contributed training personnel to various regional counterterrorism training centers, such as the South East Asia Regional Centre on Counterterrorism in Malaysia, the Joint Centre on Law Enforcement Cooperation in Indonesia, and the African Union's Antiterrorism Centre in Algeria.

**Kosovo**

In 2009, there were no direct acts of terrorism in Kosovo, although Islamist extremists were involved in domestic and international terrorism plots and extremists continued to maintain links to organized crime. The Kosovo government and the European Rule of Law Mission (EULEX) monitored suspected terrorist activity throughout the year. The recently-established Kosovo Intelligence Agency (AKI) and EULEX suspected that some of the many Islamic non-governmental organizations (NGOs) operating in Kosovo were involved in suspicious activities, particularly in laundering money for future terrorist acts in the Middle East. The government sought to prevent extremists from using NGOs to gain a foothold in Kosovo.

The Kosovo Police (KP) and EULEX Police Counterterrorism Units (CTUs) were primarily responsible for Kosovo's counterterrorism efforts. The KP's CTU continued to suffer from a lack of resources, training, and expertise. On July 22, the KP CTU became fully independent, with EULEX acting only in a monitoring, mentoring, and advising role.[8] The KP CTU focused on preventing terrorist attacks and training and equipping its officers.

Porous borders that were easily crossed by individuals trafficking in people, weapons, and narcotics hampered Kosovo's counterterrorism efforts. The Kosovo Border Patrol (KBP) and KFOR (NATO Kosovo Force) jointly patrolled the "Green Border" perimeter, the area where there are no official manned borders or border gates. The KBP and KFOR patrols along the "Green Border" were conducted with their cross national counterparts along the Macedonian, Montenegrin, and Albanian borders. Poorly paid border and customs officials were susceptible to bribery and corruption.

Still, the Ministry of Internal Affairs has made modest progress improving border security. Kosovo passports have a wide range of security features; including rainbow printing, optically variable ink, and UV light reflection.

The Kosovo Special Prosecutor's Office (KSPO), which was established in September 2006, conducted all governmental terrorism investigations in 2009. The KSPO reported that it had one case with terrorism charges in the trial phase and was pursuing an additional 10 active cases. Five cases, including holdovers from prior years, were inactive at year's end. On March 13, the Kosovo Supreme Court, consisting of a combined panel of three international and two local judges, overturned Florim Ejupi's June 2008 conviction on terrorism-related charges and acquitted him of all charges, citing a lack of evidence. Ejupi had been sentenced to 40 years imprisonment for the 2001 "Nis Express" bus bombing case near Podujeve/Podujevo that killed 11 Kosovo Serbs and injured 40 others.

The Government of Kosovo cooperated closely with the United States on combating terrorism. On September 23, it deported Betim Kaziu, a U.S. citizen, to the United States. On September 24, the Eastern District of New York charged Kaziu with conspiracy to commit murder in a foreign country and conspiracy to provide material support to terrorists. According to the

---

[8] Prior to that, EULEX's Police Executive Department (PED) exercised direct supervision over its KP counterparts. The KP and EULEX received information and analytical support from the Office of Criminal Intelligence, a division within EULEX's PED and the KP Department of Criminal Analysis.

indictment and other documents filed by the government, Kaziu traveled to Pakistan to obtain training for violent activities and then attempted to join al-Shabaab, a designated Foreign Terrorist Organization that operates in Somalia.  In addition, Kaziu attempted to travel to Afghanistan, Iraq, and the Balkans to fight against U.S. armed forces.  Ultimately, Kaziu traveled to Kosovo, where he was arrested by Kosovo law enforcement authorities in late August.

On July 27, FBI agents in North Carolina arrested Hysen Sherifi, along with six other men preparing for acts of terrorism.  Sherifi, a 24-year-old Kosovo native, was a legal U.S. resident living in North Carolina.  Sherifi was charged with multiple counts of conspiracy.  As part of the conspiracy, the indictment alleges Sherifi traveled to Kosovo in July 2008 to engage in violent extremist activities, then returned in April to raise support for the mujahedin.  Sherifi and the others were arrested before they could carry out any terrorist acts.

**Latvia**

In May, the Cabinet of Ministers approved an action plan for responding to terrorist threats and attacks on people or objects in Latvia's territory.  In September, Latvia established a working group to develop an action plan for terrorist or pirate attacks against Latvian ships anywhere in the world.  The Transportation Ministry is currently developing legislation to control hazardous cargo and is developing an action plan to respond to emergency situations related to hazardous cargo.  Latvia regularly participates in the European Union's Terrorism Working Group.

In October, the Counterterrorism Center of the Latvian Security Police and the Riga International Airport organized a counterterrorism exercise that simulated a plane hijacking and hostage situation.  Representatives from the Security Police, Riga International Airport, Civil Aviation Agency, State Border Guards, State Police, State Fire and Rescue Service, Center of Emergency and Disaster Medicine, and the Prosecutor General's Office participated.

As of December, Latvia was contributing 170 soldiers to support the International Security Assistance Force in Afghanistan, including an Operational Mentoring and Liaison Team.  Latvia's Financial Intelligence Unit maintained a terrorist financing database that it shared with local banks.

**Lithuania**

The Lithuanian military was an active participant in multinational operations against terrorist and insurgent elements.  In Iraq, Lithuania maintained four trainers serving in the NATO Training Mission-Iraq.  In Afghanistan, Lithuania led a Provincial Reconstruction Team in Ghor Province that is responsible for maintaining a stable environment throughout the province and coordinating reconstruction efforts.  Lithuania contributed approximately 215 personnel to NATO's International Security Assistance Force.

**Macedonia**

The Government of Macedonia continued its close counterterrorism coordination with the United States, which included intelligence sharing on potential terrorist groups operating in or transiting the country. The government also cooperated with its regional and European Union partners, and worked closely with INTERPOL and other international law enforcement agencies.

Macedonia provided adequate security for weapons generally sought by terrorists with annual inventories and worked to improve security on its weapons facilities. The Macedonian Ministry of Defense provided intelligence and other support to the Ministry of Interior for actions against domestic and regional terrorist groups.

The Ministry of Defense provided troop contributions to the International Security Assistance Force in Afghanistan. In 2009, the Macedonian troop contribution reached the level of 240.

The Macedonian government trained several hundred police and military personnel in counterterrorism techniques, technologies, and methods in 2009. Macedonia cooperated closely on preventing terrorist financing and money laundering through close coordination with the U.S. Embassy and in partnership with the banking sector.

**Malta**

The Maltese government continued to freeze the assets of those entities on the UN 1267 consolidated list. Malta actively participated in the EU Clearing House and cooperated with other Member States and third states to defeat terrorist activities and, by extension, to prevent financing acts of terrorism, to deny safe havens to terrorists, and to exchange information to stop the commission of terrorist acts. The Maltese government has historically supported sharing information with the United States on matters related to terrorism, and has demonstrated a commitment to interdiction operations and compliance with international requests.

The Maltese criminal code includes several specific provisions on terrorism. The law addresses "acts of terror" and "terrorism" and enumerates the actions constituting the offense. Malta criminalized terrorist financing through the Prevention of Money Laundering Act, which was expanded to include provisions for the funding of terrorism. Additionally, the act expanded the powers of the Maltese Financial Intelligence Unit to include terrorist financing. Since 2006, the Prevention of Money Laundering Regulations have been extended to financing terrorism and include controls that require proper record keeping, specific reporting requirements, and relevant training on the subject of terrorist financing.

**Moldova**

Moldova continued to work on implementation of its UN obligations related to terrorist financing. The Government of Moldova welcomed information regarding terrorist financing from the U.S. government and other bodies, and actively applied such information in its monitoring efforts through its Center for Combating Economic Crimes and Corruption.

A specific section in the Prosecutor General's Office handles terrorism-related cases. The primary investigative body in counterterrorism cases is the Information and Security Service, Moldova's intelligence service. In 2006, SIS was given the governmental lead to establish and manage a special counterterrorism center. In 2009, staffing and funding were minimal, as were its activities. The U.S. Embassy's law enforcement assistance programs aid Moldovan efforts to impede the ability of terrorists and other citizens without proper documents to cross national borders. The programs also facilitated automation at ports of entry to ensure greater security of passports and travel documents.

The separatist-controlled Transnistria region of Moldova remained a potential area of concern. Moldovan law enforcement worked hard to track the whereabouts and activities of individuals moving in and out of Transnistria, an area where central government police and security services were not able to operate. Some of the individuals moving in and out of Transnistria were foreign students who remained in Moldova illegally, as the government lacked the resources to deport them when their visas expired. Corruption was endemic, and it was easy to obtain false travel documents in both Transnistria and Moldova.

**Montenegro**

The Ministry of Interior, through the Police Directorate and the Agency for National Security, is primarily responsible for counterterrorism operations. In 2009, the Ministry of Interior continued work on a National Counterterrorism Strategy to foster better counterterrorism cooperation among its different institutions.

Seventeen individuals, including four Americans, were convicted and sentenced to prison in 2008 for an intended terrorist act referred to as the "Eagles Flight" case.[9] The individuals had appealed their conviction, and, in 2009, the appellate court dismissed their appeals, indicating that each was to serve the original sentence. During 2009, five of the individuals, including two U.S. citizens, completed their sentences, and were released from prison.

Montenegrin legislation on terrorism has been harmonized with EU standards and UN conventions.[10] In 2007, Parliament passed the Law on the Prevention of Money Laundering and Terrorist Financing. The FIU also publishes an international list of terrorists and terrorist organizations established pursuant to UN resolution 1267. In 2009, the FIU produced instructions for risk analysis for the Prevention of Money Laundering and Terrorist Financing.

---

[9] In September 2006, 17 ethnic Albanians, four of whom are U.S. citizens, were arrested and charged with planning terrorist acts to incite an ethnic Albanian rebellion. After a lengthy trial, in August 2008, the Higher Court in Podgorica convicted the defendants of plotting to disturb the constitutional order and security of Montenegro. Sentences ranged from three months to six years and six months in prison.
[10] Criminal acts of terrorism are defined by Montenegrin Criminal Code Article 365, which states that "anyone who, with the intention of endangering the constitutional order and security of Montenegro causes an explosion or fire or undertakes other dangerous measures or kidnaps a person or commits another act of violence or threatens to undertake some dangerous action or to use nuclear, chemical, biological or other dangerous substance and whereby may cause fear or feelings of insecurity among citizens shall be punished by imprisonment for a term of three to fifteen years."

These instructions set out risk factors which determine the level of risk of individual clients, groups, and business relations.

Montenegro contributed to international efforts supporting the government of Afghanistan, and prepared to deploy a military unit to Afghanistan. In July, the Parliament of Montenegro approved a plan to send 31 military personnel to join the NATO-led International Security Assistance Force mission in Afghanistan. This deployment is Montenegro's first participation in a NATO-led peacekeeping mission. Montenegrin troops operated within ISAF's Regional Command North.

Montenegrin police forces, including the "Special Anti-Terrorism Unit," (SAJ), have received international and U.S. training and equipment. Besides the SAJ, the Special Police Unit is also training and equipping a high-threat arrest team that can be used to augment the SAJ during larger counterterrorism operations. For example, the George Marshall European Center for Security Studies trained government officials, police, and military officers through two programs in 2009: the Combating Terrorism Language Program and the Terrorism and Security Studies Program. Also, the Department of Justice ICITAP program provided training for the police organized crime unit, which is also responsible for conducting terrorism investigations. Despite significant training and equipment from outside donors, implementation of the laws is weak, corruption and porous borders remain issues, and Montenegrin law enforcement and security agencies will require additional assistance to attain international standards.

**The Netherlands**

The Netherlands continued its response to the global terrorist threat with leadership and energy in the areas of border and transportation security, terrorist financing, bilateral counterterrorism cooperation, and Coalition efforts in Afghanistan. The Netherlands had 1,800 troops deployed in Afghanistan as part of the International Security Assistance Force. The Dutch led a Provincial Reconstruction team in Uruzgan province, commanded NATO's efforts in southern Afghanistan through November, and contributed approximately US$ 95 million in development aid for Afghanistan. The Netherlands maintained five trainers supporting the NATO Training Mission in Iraq, rotated officials for the EU rule of law mission in Iraq, and dedicated naval resources to the counter-piracy efforts off the coast of Somalia.

In its December 2009 quarterly terrorism threat analysis, the Dutch National Counterterrorism Coordinator (NCTb) lowered the national threat level to "limited" from "substantial," meaning chances of an attack in the Netherlands or against Dutch interests were relatively small but could not be ruled out entirely (The Netherlands has four threat levels: minimum, limited, substantial and critical). The NCTb attributed the reduced threat level to the fact that the Netherlands was less in the picture of international terrorist organizations as a specific "preferred target." The NCTb also noted that al-Qa'ida's (AQ) power to strike in Europe was less than a year ago. The NCTb believed that the threat of an attack against Dutch interests abroad was greater in countries and regions where groups affiliated with AQ were more active than in the Netherlands itself. According to the NCTb, the growth of domestic extremist networks seems to have decreased in

recent years as a result of increased resistance to extremists within Muslim communities in the Netherlands.

The NCTb also cited a report by the General Intelligence and Security Service (AIVD) showing that the growth of the Salafist movement in the Netherlands was stagnating, partly as a result of increased resistance by Muslims in the Netherlands to the anti-integration message of Salafist centers. Another factor that appeared to play a role was that, in the eyes of believers, some preachers are not sufficiently applying the doctrines they teach in their personal lives. According to the NCTb, the puritanical lifestyle, which demands considerable personal sacrifices and the limited scope for independent thinking, causes orthodox Muslims to leave the movement. The Justice Ministry's "Netherlands against Terrorism" campaign continued in 2009, with a particular focus on prevention of radicalization. A study commissioned by the City of Amsterdam concluded in October that the two-day training sessions given to professionals on how to recognize and handle radicalization were effective. The government's terrorism alert system, which became operational in June 2005, now includes fourteen economic sectors: the financial sector, seaports, airports, drinking water, railway, natural gas, oil, electricity, nuclear, chemical, municipal and regional transport, hotels, public events, and tunnels and flood defense systems.

In November, the Foreign Minister announced plans to establish an international counterterrorism institute in The Hague. The institute is to focus on ways to prevent terrorism; strengthen and supplement international legal architecture for countering terrorism; and the relationship between counterterrorism policy, human rights, the rule of law, and international humanitarian law. The institute is to become an independent hub in the international counterterrorism network that includes academics, policy makers, and law enforcers from Europe, the United States, Asia, and the Middle East. It will also be engaged in prevention research, training, and will organize international symposia.

One major terrorism-related appeal case was still pending a Supreme Court ruling at year's end. In February 2008, the public prosecutor's office in The Hague appealed the verdict by the appeals court of The Hague that acquitted the seven members of the Hofstad terrorist group of participating in a criminal and terrorist organization.

In November, the appeals court in The Hague sentenced two former associates of convicted terrorist Samir Azzouz to an unconditional prison sentence of 104 and 74 days, respectively, which is equal to the time they served in pre-trial detention.

In September, the national prosecutor's office released four men from The Hague who were arrested in Kenya in July on suspicion of preparing a terrorist attack. The four suspects allegedly were travelling in a rented truck to an al-Shabaab terrorist training camp in Somalia. According to the prosecutor's office, there was insufficient evidence to detain them any longer. However, the four – two Dutch nationals of Moroccan origin, one of Somali origin, and a Moroccan national with a Dutch residence permit – remained suspects and the police investigation continued.

In November, the Dutch police, at the request of U.S. law enforcement authorities, arrested Somali terrorist suspect Mahamud Said Omar in a center for asylum seekers.  Omar, a Somali citizen granted permanent U.S. resident status in 1994, is suspected of financing weapons for terrorists and helping young men travel from Minneapolis to Somalia to train with and fight for al-Shabaab.  U.S. authorities have requested Omar's extradition.

On December 25, Nigerian national Umar Farouk Abdulmutallab unsuccessfully attempted to detonate an explosive device on a Northwest Airlines flight from Schiphol Airport in Amsterdam to Detroit.  His attempt was foiled by an alert Dutch passenger, and he, the aircraft crew, and other passengers quickly subdued the suspect.  Abdulmutallab arrived at Schiphol from Lagos where, after spending roughly an hour in the transfer area, he was subjected to the standard U.S. government-required security screening for U.S.-bound flights.  Al-Qa'ida in the Arabian Peninsula later claimed responsibility for the failed attempt.

Dutch officials remained committed to active cooperation with the United States in designating known terrorist organizations and interdicting and freezing their assets, and supported the continued exchange of information on financial transactions.  The Dutch government worked with the United States to emphasize the importance of balancing security and the effectiveness of the financial system.  In July, the Netherlands assumed Presidency of the Financial Action Task Force for a one-year period.

In July, following the recommendations of a committee that investigated ways to improve the cohesion of Dutch counterterrorism legislation, the government decided to initiate an external investigation into the cohesion, legitimacy, effectiveness, and operational practicality of Dutch counterterrorism laws and regulations.  The committee concluded that many counterterrorism laws passed in recent years overlap and might even be in conflict with fundamental human rights.  The committee noted a general lack of guidelines for coordinating government action in the event of terrorist incidents and concluded that cooperation between departments was the vulnerable point.  In line with the committee's recommendations, Justice Minister Hirsch Ballin requested the Upper House of Parliament defer action on the Bill on Administrative National Security Measures, which would have allowed the Interior Minister to issue restraining orders to prohibit a terrorist suspect's physical proximity to specific locations or persons.

In June, a bill became effective making participation and cooperation in a terrorist training camp a serious punishable offense, even if the training takes place outside the Netherlands.

The Netherlands continued its strong commitment to effective cooperation with the United States on border security issues.  In April, Justice Minister Hirsch Ballin and U.S. authorities performed the opening of the new FLUX (Fast Low Risk Universal Crossing) system at JFK airport enabling registered travelers between Amsterdam and a number of U.S. airports to go straight through U.S. immigration controls using iris scanners.  FLUX was an initiative of the Dutch Justice Ministry and the Department of Homeland Security.

In December, the FBI hosted the Netherlands Police Agency (KLPD) for the second counterterrorism "Experts Meeting" in Washington, D.C.  During the meeting, experts from the

FBI and KLPD presented topics of mutual interest and concern to both the United States and the Netherlands.  The meeting was the result of recommendations from the 2007 "Agreed Steps" meeting.  The first "Experts Meeting" was hosted by the KLPD in the Netherlands in November 2008.

**Norway**

Norwegian authorities considered the threat of terrorist attacks in Norway low and the widespread belief among the general public was that Norway was not in danger of attack.  In December 2008, the parliament revised its counterterrorism laws in order to be able to ratify the Council of Europe Convention on the Prevention of Terrorism.  These revisions allowed incitement, recruiting, and training for terrorist acts to become punishable offenses independent of whether an attack is actually carried out.  They also require specific "intent" to commit an act that causes terrorism, whereas the prior standard had been "willfulness" to commit the act.  As of December 2009, the government still had not yet ratified the Convention, but was expected to do so shortly.

In October, the Norwegian Attorney General indicted Abdirahman Abdi Osman, a Norwegian citizen of Somali ancestry, for collecting in excess of US$ 35,000 for al-Shabaab.  Osman was charged with knowingly collecting money for a terrorist organization, knowingly contributing funds to a terrorist organization, and violating a UN Security Council resolution incorporated into Norwegian law that forbids the financing of arms deliveries to Somalia.  Osman is not in custody and retains his passport.  Osman is the only one of the six persons, three in Norway and three in Sweden, initially arrested in this matter who face charges.

In February, the jury in an appeals court affirmed a lower court's 2008 conviction of Arfan Bhatti for attempted murder and aggravated vandalism, and affirmed the sentence of eight years imprisonment.  In 2008, Bhatti had been acquitted of terrorism in connection with a plot to attack the United States and Israeli embassies; the vandalism charge was for the 2006 shooting of an automatic weapon at the Oslo synagogue.  In June, the Supreme Court threw out the conviction for attempted murder on the grounds that the requirement of intent was not correctly decided by the appeals court.  Bhatti was released from prison in June, and Norwegian authorities returned his passport.  In November, the appeals court announced that Bhatti's re-trial for attempted murder was delayed until May 2010.

Mullah Krekar (aka Najmuddin Faraj Ahmad), the founder of Ansar al-Islam, an organization on both the U.S. list of designated Foreign Terrorist Organizations and the UN list of entities linked to terrorist activities, resides in Norway.  He has been arrested on several occasions by Norwegian law enforcement, but they have been unable to collect sufficient evidence to convict him.  Norway has frozen his assets, restricted his movement to some degree, and ordered his deportation to Iraq.  As of December 2009, the Norwegian government stated that it had not yet received sufficient human rights assurances from the Iraqi government that would allow it to carry out the deportation order pending against him.

Norway contributed more than 500 troops to International Security Assistance Force efforts in Afghanistan.

**Poland**

The Polish Ministry of Internal Affairs and Administration assessed the terrorist threat level in Poland as low. However, the Polish government devoted significant resources to counterterrorism activities to ensure that the threat did not increase.

Poland continued to support international counterterrorism efforts through its participation in the International Security Assistance Force (ISAF) in Afghanistan. At the end of 2009, Polish ISAF troops represented the seventh-largest national contingent. Additionally, Poland deployed about 17 soldiers as part of the NATO Training Mission in Iraq.

Through participation in initiatives including the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism, Poland remained an active participant in various international undertakings to combat terrorist threats. Two years after integration into the Schengen zone, Poland maintained a close and growing collaboration with its European neighbors on counterterrorism.

The bilateral Counterterrorism Working Group (CTWG), formed in 2004 to further U.S.-Polish collaboration on counterterrorism by synchronizing counterterrorism policy and training counterterrorism specialists, continued to hold regular meetings. The CTWG identified specific areas of mutual interest, including critical infrastructure and terrorist financing, and developed further plans for training and cooperation.

**Portugal**

Portugal worked proactively with other nations to combat terrorism and disrupt funding for terrorist groups. Because Portugal does not have any indigenous terrorist groups, the legal system and law enforcement focus is on preventing international groups from establishing operations on its soil.

Portuguese and American officials shared counterterrorism information effectively, including information on threat assessments and terrorist operative activities. In cooperation with other European Union partners, the Portuguese government continued to participate actively in ongoing EU efforts to remove institutional barriers to cooperation on counterterrorism.

In September 2008, the Government of Portugal created a new Secretary General for Internal Security, a move designated to facilitate communication between the Judicial Police, Public Security Police, and the National Republican Guard. As a result, the distinct law enforcement agencies were able to share information about terrorism investigations more effectively.

In August 2009, Portugal accepted two Guantanamo detainees for resettlement.

Portugal contributed approximately 145 Portuguese troops that were deployed in Afghanistan in support of ongoing International Security Assistance Force and NATO operations, including a C-130 transport aircraft with a supporting crew of 42 personnel on a three-month mission to support Afghan elections in August.

**Romania**

The Romanian Intelligence Service (SRI) assessed that the terrorism threat in Romania was low, both in Romania and to Romanians and Romanian interests abroad. Romania also began implementation of the "National Anti-Terrorism Strategy," which proved an effective mechanism for preventing the use of Romanian financial institutions, including the national banking system, for the purpose of financing terrorist-related activities. The Romanian Supreme Council for National Defense (CSAT) viewed terrorism as a high priority and ensured political and material support for the National System for Preventing and Countering Terrorism (NSPCT), in particular by assigning the SRI as the national authority for counterterrorism and the technical coordinator of the NSPCT.

Romania continued to provide a wide array of public, military, and diplomatic support to global counterterrorism efforts. On July 1, Romanian President Traian Basescu declared that Romania's mission in Iraq was completed; from January through June, Romania was the third largest troop contributor in Iraq, by invitation of the Government of Iraq. Approximately five Romanian soldiers remained in Iraq after July 1, as part of the NATO training mission. As of December, approximately 1,050 Romanian troops were serving as part of coalition and NATO Alliance efforts in Afghanistan, primarily in the Zabul and Kandahar regions. Romania also continued to make airspace, ground infrastructure, and naval facilities available to U.S. and NATO forces.

**Russia**

On November 27, an explosion derailed the Moscow to St. Petersburg express train. As investigators combed the site of the attack for clues the following day, a second explosion occurred injuring the chief of the Investigative Committee. Chechen separatists were the primary suspects in these incidents, which killed 26 and wounded 90. It was the deadliest such incident in Russia outside the North Caucasus since 2004.

Attacks continued in the North Caucasus, where ongoing regional violence has been most significant in Chechnya, Dagestan, and Ingushetia. According to the U.S. Center for Strategic and International Studies, there were 16 suicide bombings in Chechnya alone in 2009, compared to four in 2008. According to President Medevdev's Political Representative for the Southern Federal District, almost 800 terrorist acts occurred in the North Caucasus in 2009, an increase of 30 percent compared to 2008. However, many attacks were often difficult to differentiate from criminal acts motivated by greed or revenge. The Federal Security Service (FSB) claimed to have prevented 80 terrorist attacks and killed more than 500 militants in 2009.

Throughout the North Caucasus, groups have, for the most part, moved away from mass attacks on civilians in favor of targeted attacks on police, local interior ministry officials, and departments responsible for combating the insurgency.  On June 5, a sniper killed the Dagestan Interior Ministry chief and on June 22, Ingush President Yevkurov was injured by a suicide bomber.  In August, an attack on an Ingush police station killed 20 and wounded 90.

The 1998 federal law "On Fighting Terrorism" and the 2006 federal law "On Countering Terrorism" remained the main counterterrorism legal authorities.  On January 11, President Medvedev signed amendments to the law "On Countering Terrorism" that abrogated jury trial for espionage and terrorism cases, although the law is now under review by the Constitutional Court.  In April, Russia lifted an almost 10-year counterterrorism regime in Chechnya, in which counterterrorist operations were under the direct authority of the FSB, that had severely restricted civil liberties.  When the regime was lifted, the local MVD under President Ramzan Kadyrov took over responsibility for counterterrorist operations.  In July, the Ministry of Justice drafted a law on compensation for civilian victims of counterterrorism operations.  The National Antiterrorism Committee, organized in 2006, is the main government body coordinating the Russian government's response to the terrorist threat.  Interagency efforts to combat terrorism through anti-narcotics enforcement remained a challenge, particularly the use of financial intelligence to interrupt narcotics sales that provided revenue to terrorists.

Russia is a member of the Financial Action Task Force on Money Laundering and Terrorist Financing (FATF).  It is also a leading member, chair, and primary funding source of a similar body known as the Eurasian Group on combating money laundering and financing of terrorism (EAG)[11].  Russia, through the EAG, provides technical assistance and funding towards improving legislative and regulatory frameworks and operational capabilities.

The United States and Russian Counterterrorism Coordinators met in November to advance cooperation within the context of the United States-Russia Counterterrorism Working Group. They agreed to work together in the multilateral arena to strengthen international counterterrorism norms and increase capacity building; focus on Afghanistan with particular regard to counterterrorism/terrorist finance issues; strengthen UNSCR 1267 sanctions; counter the ideological dimension of violent extremism; and work on improving the bilateral exchange of transportation security issues.  Cooperation continued on a broad range of counterterrorism issues.  U.S. and Russian law enforcement agencies shared substantive, concrete terrorism intelligence.

At the St. Petersburg G8 Summit in July 2006, the United States and Russia jointly announced the Global Initiative to Combat Nuclear Terrorism and invited other nations to join.  The Initiative demonstrated Russia's effort to take a leadership role to combat nuclear terrorism.  It now includes 75 partner nations that cooperate in a variety of ways, including safeguarding radioactive and nuclear materials, preventing nuclear smuggling, and sharing information.  In July, President Medvedev joined President Obama in a Joint Statement, which pledged enhanced

---

[11] The EAG members are Russia, China, Belarus, Kazakhstan, Kyrgyzstan, Uzbekistan, and Tajikistan.

efforts to prevent WMD terrorism through international cooperation, citing the fifth plenary meeting of the Initiative in the Netherlands in June.

In June, Russia hosted the Eighth International Meeting of the Heads of Special Services, Security Agencies, and Law-Enforcement Organizations, which the FBI, CIA, DOE, and NCTC attended.  The 2009 agenda included discussion of terrorist use of the Internet, efforts to counter radicalization, the development of an international counterterrorism database, and the prevention of WMD terrorism through UNSCR 1540 and other instruments.

Russia continued to work with regional groups to address terrorism, including the EU, NATO (through the NATO-Russia Council), the Shanghai Cooperation Organization, and the OSCE.

**Serbia**

Serbia's law enforcement and security agencies, particularly the Customs Administration, Criminal Police, Border Police, Security Information Agency, and other security services continued to improve intra-governmental cooperation.  Serbia has two police organizations that operated as counterterrorism tactical response units, the Special Antiterrorist Unit and the Counterterrorist Unit.  The Criminal Investigative Unit for Counterterrorist Investigation within the Interior Ministry's Criminal Investigation Directorate conducts terrorism-related investigations.

The Parliament passed new legislation that will aid in countering terrorism.  Parliament passed on March 19, and amended on September 3, the Law on the Prevention of Money Laundering and the Financing of Terrorism, which is compliant with international standards.  The law applies all provisions of the previous Anti-Money Laundering Law to terrorist financing and expands the entities required to collect information and file currency transaction reports.  It requires reporting of transactions suspected to be terrorist financing and creates mechanisms for freezing, seizing, and confiscating suspected terrorist assets.  On December 11, the Parliament passed a law specifying that non-biometric passports would not be valid after December 31, 2010.  On October 26, the Parliament passed the National Security Strategy and National Defense Strategy.  The strategies define terrorism and note that separatism and religious extremism are security risks.

On July 5, the trial of Islamist extremists charged with conspiracy to commit terrorism, illegal possession of firearms, and attempted murder concluded.  The Belgrade District Court's Special Department for Organized Crime convicted 12 individuals and acquitted two others.  Authorities found evidence that the group was planning attacks on infrastructure in the city of Novi Pazar, on a local religious leader, and on several sites in Belgrade, including the U.S. Embassy.  In a follow-up trial on September 8, an additional four individuals were convicted of planning attacks on police in Novi Pazar and storing large quantities of weapons and ammunition.

Bilateral cooperation continued to improve, and the United States provided counterterrorism training and assistance to the Serbian government.  In February, the Department of Justice International Criminal Investigative Assistance Training Program (ICITAP) conducted a

counterterrorism workshop for Serbian police officers. The workshop covered trends in international terrorism, the formation of a joint terrorist task force, investigative techniques, vulnerability assessments, crime scene management, case studies, and practical exercise problems. In May, ICITAP conducted an informant development course for Serbian counterterrorism and organized crime investigators. Also in May, ICITAP held an anti-corruption workshop bringing together for the first time Serbian and Montenegrin police and prosecutors to discuss terrorism and corruption. In September, ICITAP and the FBI's Hostage Rescue Team provided joint training to a SAJ-sponsored counterterrorism regional training initiative. This training involved specialized counterterrorism units from Serbia, Slovenia, Bosnia, Croatia, Romania, Greece, Bulgaria, and Montenegro.

**Slovakia**

The police unit responsible for investigating criminal offenses related to terrorism is the Counterterrorism Unit (CTU) of the Bureau for Combating Organized Crime. The CTU develops Slovakia's counterterrorism strategy, conducts criminal investigations, and makes arrests of suspected terrorists or extremists within Slovakia's borders. Slovakia's most recent strategy, approved in October 2007, focuses on developing the legislative and institutional framework to combat terrorism, as well as strengthening coordination, collaboration, and exchange of information among key institutional actors. The Financial Intelligence Unit (FIU) of the Bureau for Combating Organized Crime and the Slovak Information Service (SIS) provides support to CTU's counterterrorism mission. On December 16, President Ivan Gasparovic signed a law making the financing of terrorism a punishable criminal offense in Slovakia. According to the amended Penal Code, financing terrorism can be punished by 20 to 25 years imprisonment.

One suspected terrorist, Mustapha Labsi, has been held in Slovak custody since May 2007. In January 2008, the Supreme Court confirmed that he could be extradited to Algeria, where he was convicted in absentia to life in prison. In June, the Constitutional Court ruled that the Supreme Court must verify that Labsi will not face torture upon extradition. On October 28, the Regional Court in Bratislava decided again not to grant asylum to Labsi due to the serious threat he could pose to the security of Slovakia. On December 19, Labsi left a refugee detention center and fled to Austria, where he was apprehended by police. Labsi had not been returned to Slovakia at year's end.

Slovakia cooperated closely with a range of international partners in numerous fora. Slovak police participated in the Police Working Group on Terrorism, a consortium of 30 countries, including EU member states, Norway, Switzerland, Iceland, and Croatia. The SIS is engaged in the Club de Berne, which facilitates exchange of police and intelligence information on terrorism. Both CTU and SIS take a part in the EU's Joint Situation Center.

In August, Slovakia hosted a conference on "Legal Aspects of Combating Terrorism and handling extremism" under the auspices of the U.S. Office of Defense Cooperation – U.S. Embassy. A result of the conference was the creation of a forum for discussion between nine countries, the SIS, and the ministries of Defense, Interior, Justice, and Foreign Affairs.

In 2009, Slovakia increased its presence in Afghanistan from 51 soldiers to 319. This includes a substantial contingent in Uruzgan province, a very active operational area, as well as in Kandahar.

**Slovenia**

Slovenia is generally assessed as a low-threat country for terrorism and terrorist activity. The National Security Council, chaired by the president and including the defense, interior, justice, foreign affairs, and finance ministers, is the main body for counterterrorism policy. In the case of a terrorist incident, the NSC's secretariat, led by the prime minister's national security advisor, would lead the inter-ministerial working group tasked with a response, with subgroups focusing on specific threats. In 2005, the MOI and Slovene Police developed a response plan for a terrorist attack using weapons of mass destruction. Slovenia's national policy also has plans in place to assess threat levels and specific guidelines on measures police officers are to take based on the corresponding threat level. According to the MOI, Slovenia's counterterrorism plans follow EU security standards.

The Government of Slovenia actively participated in multilateral terrorism efforts, including the Global Initiative to Combat Nuclear Terrorism. The U.S. Office for Defense Cooperation facilitated counterterrorism training for officials from various Slovene ministries, which included regional conferences and Marshall Center seminars. In fall 2009, Slovenia's Ministry of Defense announced that it would host a regional counterterrorism conference in March 2010. Slovenia contributed 81 troops to the International Security Assistance Force in Afghanistan, including 15 sent specifically for security during the August 2009 presidential elections.

**Spain**

During 2009, Spain continued to confront and suffer from both radical Islamist terrorism and domestic Basque terrorists. Spain maintained close cooperation with the United States to investigate and prosecute acts of terrorism, prevent future attacks, and worked hard to disrupt terrorist acts that might be directed against U.S. interests.

The Government of Spain and its citizens recognized that their country remained a principal target of Islamist terrorist groups who routinely called for "recapture" of the Iberian Peninsula, "liberation" of Spain's North African enclaves in Ceuta and Melilla, and for the Spanish military's withdrawal from multilateral forces in Afghanistan and Lebanon. In October, al-Qa'ida in the Islamic Maghreb's (AQIM) decision to name its propaganda unit, "al Andalus", reinforced the Government of Spain's concern that Spain remains a priority target for AQIM. In late November, AQIM kidnapped three Spanish aid workers in Mauritania as a convoy from their Barcelona-based non-governmental organization traveled through West Africa to deliver humanitarian assistance. At year's end, two of the three were still being held; one had been released.

Spain's geographical location and large immigrant population from North Africa and South Asia,

combined with the ease of travel to other European countries, made it a strategic crossroads for international terrorist groups.  Spain remained an important transit, fundraising, and logistical base for terrorist organizations operating in Western Europe.  Spain continued to aggressively target terrorist recruiters and facilitators.  The Ministry of Interior arrested 14 suspected Islamist terrorists.

In order to implement the Council of Europe's Convention on the Prevention of Terrorism, Spain's Council of Ministers in November approved legislative reforms in the nation's counterterrorism laws.  These reforms criminalized such offenses as inciting terrorism as well as recruiting, training, indoctrinating, or financing terrorists. The proposal requires parliamentary approval to become a binding law.

Meanwhile, the Spanish judiciary remained active in combating Islamist terrorism.  In January 2008, authorities arrested members of an alleged terrorist cell for plotting to attack Barcelona's transportation system.  In December 2009, the National Court convicted all 11 defendants, primarily Pakistanis, for membership in a terrorist organization, with sentences ranging from 8.5 to 14.5 years.  In November 2009, a Spanish judge indicted seven additional persons for their alleged roles in the 2004 Madrid train bombings.

On the domestic front, 2009 marked the 50th anniversary of the founding of the terrorist group Basque Fatherland and Liberty (ETA), whose aim is to create an independent Basque state.  The group marked its anniversary with a series of high profile and deadly bombings.  ETA claimed its first victim of the year weeks earlier when it used a car bomb on June 19 to assassinate a national police officer in the Basque Region.  On July 29, ETA detonated an explosive-laden van outside a Civil Guard barracks in Burgos.  The blast injured more than 60 Civil Guards, spouses, and children.  The following day, ETA killed two Civil Guards in Mallorca with a car bomb.

2009 was also noteworthy for the change of administration in the Basque regional government.  The Socialist Party, under Patxi Lopez's regional leadership, assumed power as the first non-Basque nationalist government to administer the Basque Country since the restoration of democracy in Spain nearly 30 years ago.  Lopez's administration implemented a more unequivocal counterterrorism policy to confront ETA.

Building on strong results in 2008, Spain intensified its cooperation with the French government and continued to put considerable pressure on ETA.  Joint operations with France resulted in, among other successes, the detention of ETA's suspected military leader and its alleged political chief, who also reportedly served as the group's communications chief.  Each of these arrests – as well as numerous others – occurred in France with the participation of Spanish security forces.  As of mid-December, security services had arrested 124 alleged ETA members or associates, including 31 in France.  Joint operations also resulted in the seizure throughout August of more than a dozen arms caches.  The European Court of Human Rights in June upheld Spain's 2003 ban on the political party Batasuna for its ties to ETA.

Spain participated in the Megaports and Container Security Initiatives, and worked hard to deny terrorists access to Spanish financial institutions.  The Spanish government maintained a robust

law enforcement and intelligence posture against terrorist financing.  Spain was a member of the G8 Counterterrorism Action Group and provided technical assistance to other countries to help build their institutions to counter terrorist financing.  Spain is a longtime member of the intergovernmental Financial Action Task Force and its efforts to combat money laundering were considered comprehensive and effective.

During a visit to Washington in June, Spain's Interior Minister and U.S. Attorney General Eric Holder signed an Agreement on Preventing and Combating Serious Crime that allows for the exchange of fingerprints and other data on known terrorists and criminals while protecting individual privacy.  The Interior Minister also signed a Letter of Intent with Homeland Security Secretary Janet Napolitano to expand bilateral science and technology cooperation in order to enhance security and combat transnational threats.

In support of the International Security Assistance Force (ISAF) in Afghanistan, Spain increased its contingent of more than 750 troops to roughly 1,000.  President Zapatero voiced support for President Obama's strategy for increasing overall ISAF troop levels further.

**Sweden**

The Swedish Security Service (SAPO), which has responsibility for counterterrorism, distinguished between attack and activity threats in its terrorism assessment.  Attack threats, which included plans to carry out attacks in Sweden and/or against Swedish interests abroad, remained low.  SAPO noted, however, an increased activity threat from individuals who were planning, supporting, or financing terrorist attacks in areas of conflict.  A number of individuals with connections to radical and violent networks, primarily al-Qa'ida (AQ) and al-Shabaab, continued to depart Sweden for training camps in Afghanistan, Pakistan, Somalia, and Iraq. According to estimates, the number of persons who seek ideological education, weapons training, or other activity in training camps abroad is likely to increase, and these individuals have the potential to speed up radicalization in Sweden.  SAPO is responsible for trying to prevent such trips, but existing legislation leaves few possibilities to stop determined individuals from leaving Sweden.  SAPO, therefore, continued to work to identify individuals planning to travel to training camps and held dialogues with them to try to prevent their travel, and it also spoke with persons who were suspected of returning from such travel.  At least 20 Swedes were estimated to be active in camps around the world.  Somalia continued to be the destination that attracted most individuals, and SAPO confirmed that it was aware of a hand-full of casualties involving ethnic Somali Swedish citizens fighting in East Africa.

In July, Xasaan Xussen, a spiritual leader for the Somali terrorist organization al-Shabaab, spoke at a conference in the Bellevue Mosque in Gothenburg.  Xuseen's visit was controversial because of a widespread concern that he came to Sweden to recruit young people and collect money for al-Shabaab.  On July 15, the Somali Minister of Justice Abdirahman Janaqoo visited Sweden to discuss how to prevent young Somali-Swedes from traveling to Somalia and fight against the government.  Together with two Somali parliamentarians, Minister Janaqoo met with representatives from the Swedish government to discuss radicalization of Somali-Swedes.  In

November, the media reported that a Swedish-Somali youth leader had used a youth center in one of Stockholm's suburbs as a base for al-Shabaab recruitment.

Swedish authorities monitored individuals with connections to AQ, al-Shabaab, Ansar al-Islam, the Revolutionary Armed Forces of Colombia, Hizb Al-Tahrir, Hizballah, Islamic Jihad, and the Kurdistan Workers' Party (PKK).  According to Swedish terrorism experts, members of terrorist groups, such as Ansar al-Islam, and Hizballah, used funds earned in Sweden to finance terrorist activities elsewhere.  The al-Aqsa Foundation in Malmo was shut down in 2007 when it was suspected of financing HAMAS.  Its chairman, Khaled al-Yousef, went on trial for terrorist financing and violating international sanctions, though he was acquitted in November after the case had been reviewed in two different courts.

Swedish law does not provide the government with independent national authority to freeze or seize assets, unless in connection with an ongoing criminal investigation.  However, once the EU takes action, the government can and does freeze assets of entities and persons listed on the UN 1267 Sanctions Committee list.  This procedure is managed through the Sanctions Act (1995).  On October 26, the Swedish branch of the Somali bank network Al-Barakaat was delisted from the UN's sanctions list.  The Swedish branch of the organization was first designated in 2001 and about US$ 142,857 of frozen assets will now become accessible.  Sweden can also take action against entities designated by the EU clearinghouse process, although Sweden has not yet proposed individuals or entities for inclusion on such lists.

On March 15, a new law on money laundering and terrorist finance came into effect that covers a broader range of entities and requires companies to have better knowledge about customer transactions.  Suspicious transactions have to be reported to the Financial Police for further investigation.  A special unit at the Financial Supervisory Authority, which supervises and monitors companies operating on the financial market, has been established to oversee implementation of the new legislation.

In late 2008, the Swedish Parliament approved the new EU directive on counterterrorism, which was intended to harmonize the EU Member States' domestic laws and to criminalize public exhortation to terrorist crimes, recruitment and training for terrorism purposes, including actions performed over the Internet.  In order for Sweden to comply with the directive, changes in the current legislation and a new law have been drafted.  On December 21, the government introduced its proposed bill for action by the Parliament for voting.

Between July 2008 and June 2009, Sweden applied its Special Alien's Control Act once.  The act was established in 1991 to prevent presumptive terrorists from entering or residing in Sweden but also permits for control of individuals, who due to asylum reasons still have to be granted a stay in Sweden.  In this particular case, the government decided to deport the person from Sweden.

While there were no convictions for terrorism in Sweden during the reporting period, the following cases should be mentioned:

- In April, a 32 year-old Swedish citizen of Somali origin was arrested in the United Kingdom, where he currently faces allegations for terrorist financing in Somalia.

- In July, Swedish citizen Misrad Bektasevic, who was convicted on terrorism charges in Bosnia in 2005, was transferred from Bosnia to Sweden, where he will serve the remainder of his prison sentence.  Bektasevic was arrested by Bosnian Security Police in Sarajevo, when he was found in an apartment with explosives, weapons, and suicide bomb belts in 2005.  A video with masked persons threatening to attack forces in Iraq and Afghanistan was found and a voice analysis proved that Bektasevic was one of the individuals in the video.  In 2007, he was sentenced to eight years and four months imprisonment for terrorism-related crimes.

During Sweden's EU Presidency in the latter half of the year, Sweden arranged a conference on prison radicalization and prevention; a seminar on enabling local police officers to detect and prevent radicalization; chaired the Working Party meeting on Terrorism and Terrorist Financing between the EU and the United States; and led EU efforts for negotiating the interim Terrorist Financing Tracking Program Agreement between the EU and the United States.  Sweden also drafted and negotiated the EU's new five-year program within Justice and Home Affairs, which involves counterterrorism and law enforcement cooperation.  Sweden continued to contribute to counterterrorism capacity-building projects in third countries.

In November, the Swedish Parliament voted to extend the mandate for its troop contribution to the International Security Assistance Force in Afghanistan for another 12 months.  Troop numbers are expected to remain at 500 and Sweden will continue its engagement in northern Afghanistan.

**Switzerland**

The United States worked closely with the Swiss government, the Swiss Bankers' Association, the Swiss Interagency Counterterrorism Task Force, and cantonal law enforcement authorities on counterterrorism issues.  Swiss security services continued to monitor activities of terrorist groups with a presence in Switzerland and to coordinate with appropriate U.S. government officials, though the scope of the coordination is limited.  Swiss law severely restricts the level of information-sharing possible on banking issues.

On February 1, the Government of Switzerland implemented a bill incorporating recommendations of the Financial Action Task Force (FATF).  The legislation extended the scope of the federal law concerning the fight against money laundering in the financial sector to the fight against terrorist financing.

In 2008, the Government of Switzerland extended for the second time its ban against al-Qa'ida (AQ) and its associate organizations for three years. The ban includes not only all activities by the organization itself, but also all activities in support of the organization.  Approximately US$ 17 million in AQ and Taliban assets in 25 separate bank accounts remained frozen.

The Swiss government maintained a list of individuals and organizations connected with international terrorism or terrorist financing, in accordance with UN lists.  On October 13, Switzerland and other countries co-sponsored a UN workshop in Vienna to improve domestic and global efforts to prevent terrorism.  National representatives from more than 100 UN Member States, as well as counterterrorism experts from regional and international organizations took part in this two-day event.  They also exchanged information on national experiences, challenges, and lessons learned in order to more effectively link national and global counterterrorism efforts.

Swiss authorities have thus far blocked about 48 accounts totaling approximately US$ 20.6 million from individuals or companies linked to individuals or entities listed pursuant to relevant UN resolutions.  The Swiss Attorney General also separately froze 21 accounts representing about approximately US$ 20.5 million on the grounds that they were related to terrorist financing.

Counterterrorism activities were carried out by several police units: The Federal Criminal Police's Counterterrorism Division focused on AQ-related cases and employed approximately 20 investigators within two operational units.  Of the 130 employees who worked in the Department for Analysis and Prevention in the Federal Office for Police, approximately 12 concentrated on counterterrorism matters, in addition to the roughly 85 cantonal officers focusing on counterterrorism activities.

The Swiss government does not compile lists of prohibited organizations.  The sole recent exception has been AQ, which is banned on the basis of UN Security Council decisions.  However, terrorism and membership in a terrorist organization are illegal and subject to criminal penalties.[12]  Due in part to increased counterterrorism activities in neighboring EU countries, several terrorist organizations, including the Liberation Tigers of Tamil Eelam, the Kurdistan Workers' Party, and the Revolutionary Armed Forces of Colombia, had a presence in Switzerland.  Switzerland does not extradite persons based solely on their membership in a terrorist organization.

In May, the Swiss government announced it would take part in an IMF project aimed at providing technical assistance for developing countries in the global fight against money laundering and terrorist financing.

On September 7-8, the United States and Swiss governments co-hosted an International Bioterrorism Response Coordination Exercise (called "Black ICE II") in Montreux.  This two-day exercise was an opportunity for officials from numerous international and regional organizations and national governments to examine the critical cooperation and coordination

---

[12] Article 260 of the Swiss penal code defines a terrorist as someone who takes part in an organization that keeps its structure and membership secret and that has the purpose of committing violent crimes or of enriching itself by criminal means. Anyone who supports such an organization or participates in its criminal activities can be punished with up to five years in prison.  The penal code also provides for punishment of those who commit criminal acts outside of Switzerland if their organization conducts its criminal activities partly within Swiss boundaries or plans to do so.

issues that would be necessary to respond to an international bioterrorism attack.  Black ICE II built on the lessons learned through the original Black ICE I exercise, also held in Montreux, in September 2006.

**Turkey**

Domestic and transnational terrorist groups have targeted Turkish nationals and foreigners in Turkey, including, on occasion, U.S. government personnel, for more than 40 years.  Terrorist groups that have operated in Turkey have included Kurdish groups, al-Qa'ida (AQ), Marxist-Leninist, and pro-Chechen groups.  The past year may have been a watershed year for Turkey in countering the Kurdistan Workers' Party (PKK).

Turkish terrorism law defines terrorism as attacks against Turkish citizens and the Turkish state.  This definition may hamper Turkey's ability to interdict, arrest, and prosecute those who plan and facilitate terrorist acts to be committed outside of Turkey, or acts to be committed against non-Turks within Turkey.  Nonetheless, Turkish cooperation with the United States against terrorism is strong.

Most prominent among terrorist groups in Turkey is the PKK.  Composed primarily of Kurds with a nationalist agenda, the PKK operated from bases in northern Iraq and directed its forces to target mainly Turkish security forces.  In 2006, 2007, and 2008, PKK violence claimed hundreds of Turkish lives.  PKK activity was lower in 2009, but was still a constant throughout the year.

In 2009, the Turkish government and the Turkish General Staff agreed that military action against the PKK would not be sufficient to eliminate it as a terrorist threat.  The government began an initiative, now known as the National Unity Project, to address the social and economic inequalities in Turkish society that purportedly fuel Kurdish dissent and PKK recruitment.  Concrete steps within the scope of the Project were clearly devised to drain the PKK's support, by, for example, liberalizing laws governing the use of the Kurdish language in broadcasting, education, and state buildings; reducing the application of counterterrorism laws to non-violent crimes; and providing legal incentives to bring members of the PKK who have not engaged in violence back into civil society.

A court case against an alleged terrorist organization known as Ergenekon continued throughout the year.  Investigations into Ergenekon, a group allegedly composed of former military officials, bureaucrats, politicians, journalists, and underworld figures, began in 2007, and led to arrests beginning in the summer of 2008.  In 2009, the focus of the case gradually shifted away from terrorism aspects, such as investigating and prosecuting suspects for illegally stockpiling arms and attempting assassinations of prominent minority leaders, to alleged coup-plotting by senior military staff.  The responsible court may issue an interim decision on whether Ergenekon and its alleged members should be tried under counterterrorism laws or whether Ergenekon would be better classified as an organized crime ring and tried under laws against organized crime.

Terrorists associated with al-Qa'ida, the Islamic Jihad Union, and other Sunni extremist groups continued to have a logistical and operational presence in Turkey and used Turkey as a transit country.  Newspapers reported several raids on alleged AQ cells.

Other prominent terrorist groups in Turkey included the Revolutionary People's Liberation Party/Front (DHKP-C), a militant Marxist-Leninist group with anti-U.S. and anti-NATO views that seeks the violent overthrow of the Turkish state.  Newspapers reported several operations against the group throughout the year.  A DHKP-C suicide bomber failed in her April 29 attempt to assassinate former Justice Minister Hikmet Sami Turk.  The Marxist-Leninist Communist Party took responsibility for bomb attacks against a police station in Gaziantep in April.  On April 27, police raided a Revolutionary Headquarters cell in Istanbul, in an operation that resulted in the deaths of one suspected terrorist and one policeman.  The Turkish Workers' and Peasants' Liberation Army, though largely inactive, is still considered a potential threat by the Turkish government.

Turkey has consistently supported Coalition efforts in Afghanistan.  Turkey has more than 1,700 troops in Afghanistan, including four military training teams in Kabul and a civilian Provincial Reconstruction Team in Wardak Province.  In November, Turkey re-assumed command of Regional Command Capital (the new name given to the former Kabul Multinational Brigade) for the International Security Assistance Force in Afghanistan.  Turkey has undertaken training of Afghan military and police officials, politicians, and bureaucrats in Turkey.  It has pledged a total of US$ 200 million to reconstruction efforts in Afghanistan.  Turkey has provided significant logistical support to Coalition operations in Afghanistan and Iraq, authorizing the use of Incirlik Air Base as an air-refueling hub for Operation Enduring Freedom and Operation Iraqi Freedom, and as a cargo hub to transport non-lethal cargo to U.S. troops in Afghanistan and Iraq.

Almost 60 percent of air cargo for U.S. operations in Afghanistan and Iraq between 2005 and 2009 transited the Incirlik cargo hub.  Establishment of this hub allows six C-17 aircraft to transport the amount of goods it took nine to ten aircraft to move from Germany, and saves the United States almost US$ 160 million per year.  More than 16 percent of the fuel for Coalition and U.S. Forces transited from Turkey into Iraq via the Habur Gate border crossing in 2009.  Turkey was active in reconstruction efforts in Iraq, including providing electricity.  Turkey contributed headquarters personnel to the NATO Training Mission in Iraq (NTM-I) and completed military leadership training in Turkey for 89 Iraqi officers as a further contribution to the NATO NTM-I.

Pursuant to its obligations under UNSCR 1267 and subsequent resolutions, Turkish officials continued to circulate UN-designated names of terrorists to all law enforcement and intelligence agencies, and to financial institutions.  Turkish officials also circulated U.S.-designated names, although only UN-listed names were subjected to asset freezes enforced through a Council of Ministers decree.  This legal mechanism for enforcing sanctions under UNSCR 1267 was challenged in Turkish courts by UN-designated terrorist financier Yasin al-Kadi, whose assets had been frozen by the state.  Following a series of legal actions, the decree freezing his assets has been successfully challenged but was still in effect pending appeal.

**Ukraine**

There were no terrorist incidents in Ukraine in 2009, but the Ministry of Interior (MOI) claimed to have disrupted a domestic plot still in the planning stages.  The MOI detained five men accused of plotting to assassinate the leader of the Crimean Tatar Mejlis (the unofficial Muslim Crimean Tatar community representative body).  The men, some of whom are Crimean Tatars, claimed they are members of Egypt-based Al-Takfir wa al-Hijrah and had acquired weapons and explosives in preparation for the assassination attempt.  The men are charged with illegal possession of weapons and explosives.  The extent of the group's links to outside terrorist organizations remains unclear.

In December, President Yushchenko vetoed significant amendments to Ukraine's law on money-laundering and terrorist financing.  The law would have expanded the scope of current financial monitoring and would have been a demonstrable step toward bringing Ukraine's money-laundering and terrorist finance laws into compliance with international norms.

The Ukrainian government continues to contribute to the stabilization efforts in Afghanistan, with ten soldiers serving in Chaghcharan province under Lithuanian leadership.  On December 12, the Ukrainian National Security and Defense Council announced that the government plans to triple the size of its deployment to Afghanistan in 2010.

**United Kingdom**

In March, the UK government released its updated counterterrorism strategy, CONTEST TWO, which contains sections covering the risks of chemical, biological, radiological, and nuclear attacks, and highlights the threat from small terrorist groups.  Published by the Home Office but based on broad intergovernmental input, CONTEST TWO is more detailed than its previous iterations in 2003 and 2006.  The update focused more on isolating extremist voices who advocate violence and on encouraging moderate voices who advocate community cohesion.  Then-Home Secretary Jacqui Smith characterized the strategy as extremely broad-ranging, including proposals to tackle radicalization, support mainstream Muslim voices, prepare for attacks, and garner support from Islamic communities for investigations.  Government ministers have indicated that 60,000 workers, including shop assistants and hotel employees, were being trained to respond to terrorist attacks as part of the new strategy.  Since 2003, the number of police in the UK working counterterrorism issues has risen from 1,700 to 3,000.

Parliament's Intelligence and Security Committee published in May a review of intelligence concerning the London terrorist attacks of July 7, 2005.  The report cleared the police and security services of any blame for failing to track those responsible for the bombings.  The report noted that the UK's intelligence agencies and police had implemented operational changes and received increased resources from the government since the attacks, concluding that the government's ability to detect a similar plot in the future had been improved.

In July, the Joint Terrorism Analysis Center (JTAC) lowered the UK's terrorism threat level from Severe to Substantial. In announcing the change, the Home Secretary stressed that the overall terrorist threat had not dissipated and that the public should remain vigilant.

Since 2005, the UK has been able to ban foreigners who promote hatred, terrorist violence, or serious criminal activity from entering the country. In October, the government implemented more stringent rules for determining who could enter the UK.

Important counterterrorism legislation enacted in the UK in 2009 included:

- In January, the UK government announced new legislation that requires travelers by sea and air between Ireland and the UK to show a passport for the first time to prevent terrorists, criminals, and illegal immigrants from exploiting less stringent border controls between the UK and Ireland. (Ireland announced similar requirements for those arriving from the UK.)

- In March, the House of Commons renewed for another year the "control orders" program for terrorists. The program, which can impose up to 16-hour-a-day house arrest and other restrictions on terrorist suspects who cannot otherwise be brought to trial or deported back to their home countries, was part of the Prevention of Terrorism Act of 2005, enacted after the terrorist bombings on London's transport systems. The provision for control orders must be renewed every 12 months under the Act.

Prominent terrorism-related arrests included:

- In April, in counterterrorism raids in northwest England termed Operation Pathway, police and security services arrested 12 suspects on suspicion of planning terrorist attacks in Manchester and other locations. Some of those arrested were Pakistani nationals who were released without charges and transferred to the UK Border Agency for deportation. The remaining suspects were also released without charge.[13]

- In November, officers from the North West Counterterrorism Unit of the Greater Manchester Police arrested four men at addresses in Manchester and Bolton and a man at Heathrow airport in London in a coordinated operation under the Terrorism Act. A police spokesman said that three properties in Manchester and one in Bolton were searched. Media reported that police sources said that there was no imminent danger to the Greater Manchester area but that the arrests were related to an alleged overseas threat.

---

[13] The UK's independent reviewer of counterterrorism legislation, Lord Carlisle, undertook a review of Operation Pathway and the manner in which police and security services pursued it. Carlisle's report concluded that the police had no realistic alternative to arresting at least some of the suspects in the interest of public safety; that the arrests were made on the basis of the intelligence assessment; and that the need for early intervention based only on intelligence may result is some people being arrested and held in detention while the investigation continues, evidence is collected, and charges are considered. Carlisle's report made a number of recommendations to the police and the Crown Prosecution Service to improve operational performance and procedure.

In the judicial arena, several high-profile terrorism cases were decided in 2009, including:

- In April, a jury found Waheed Ali, Sadeer Saleem, and Mohammed Shakil not guilty of conspiring to cause explosions in the July 7, 2005 attacks on London transport that killed 52 passengers and four suicide bombers.  Ali and Shakil were found guilty of the lesser charge of plotting to travel to a terrorist training camp in Pakistan, after being arrested at Manchester Airport in 2007.  The two men were sentenced to seven years in prison, and are expected to serve 16 months after having already spent two years in Belmarsh high-security prison.  Sadeer Saleem was acquitted of all charges.

- Also in April, a Scottish court heard the appeal of Mohammed Atif Siddique, who was found guilty in 2007 of breaches of the Terrorism Act for possession of material connected with the commission, preparation, or instigation of a terrorist act.  By year's end, the case was still in appeal.

- On August 19, Scottish Cabinet Secretary for Justice Kenny MacAskill released Abdelbasset al-Megrahi, a Libyan national convicted by Scottish courts for his role in the 1988 bombing of Pan Am flight 103 over Lockerbie, Scotland, on compassionate grounds over his failing health due to prostate cancer.  MacAskill considered two legal questions on the case:  whether to transfer Megrahi to Libya as part of the UK-Libya Prisoner Transfer Agreement (PTA), or to release him on compassionate grounds given Megrahi's terminal illness.  MacAskill rejected Megrahi's request for transfer under the PTA, citing the clear understanding of the U.S. Government and families that Megrahi's sentence would be served in Scotland and he would not be transferred to Libya.  He instead released Megrahi on a clause and practice in Scottish criminal law that allows for prisoners to be released on compassionate grounds, typically if medical experts determine that the prisoner has three months or less to live.  At the end of 2009, Megrahi remained alive and free in Libya beyond the three months he was expected to live.

- Seven men were convicted in connection with the 2006 plot to blow up transatlantic flights with bombs disguised as soft drinks.  Abdulla Ahmed Ali, Tanvir Hussain, and Assad Sarwar were arrested in 2006 and convicted in a June 2008 trial of conspiracy to murder using home-made explosives; the jury, however, failed to determine whether the suspects' plans extended to detonating devices on airplanes.  During a September retrial, a second jury found that a terrorist plot targeting airplanes had existed and convicted the three men.  They were sentenced to life in prison with a minimum mandatory time to be served of between 32 and 40 years in prison.  A fourth man, Umar Islam, was found guilty in September of conspiracy to murder and sentenced to life in prison with a minimum of 22 years.  In December, Adam Khatib, Nabeel Hussain, and Mohammed Uddin were also convicted in connection with the plot.  Khatib was sentenced to life in prison and should serve a minimum of 18 years.

- In September, the Home Secretary lifted a control order on a Libyan-British terrorist suspect known as "AF," who had reportedly been linked to the Libyan Islamic Fighting Group, after a legal battle raised concern among government officials that secret evidence

might be revealed about the case if the control order was pursued.  Also in September, the Home Secretary lifted the control order of a second terrorist suspect, an Iraqi-Kurd known as "AE", rather than disclose secret evidence against him.  The moves by the Home Secretary came after a June Law Lords judgment that ruled that individuals subject to government control orders must be given sufficient disclosure about the case against them in order to advise their lawyers to prepare a defense.

The UK is the second largest contributor to NATO's International Security Assistance Force in Afghanistan, with more than 9,500 troops.

Northern Ireland

There was an escalation of terrorist activity in Northern Ireland, with more than 130 explosives, weapons, or ammunition finds attributed to dissident republican elements in the first half of the year.  In January, police discovered a 300-lb car bomb prior to its detonation at Castlewellan, County Down.  The bomb was placed in a car on Dublin Road, a mile from a primary school.  Real IRA splinter group Oglaigh na hEireann (OnH) claimed responsibility for the home-made explosives, which they said were intended for detonation at Ballykinler Army Base.

On March 7, British Army soldiers Mark Quinsey and Patrick Azimkar were shot dead by gunmen outside Masserene Army Barracks in Antrim.  Within 48 hours of that attack, Police Service of Northern Ireland constable Stephen Carroll was murdered in his vehicle in Craigavon as he supported a police response to a domestic violence call.  The Continuity IRA claimed responsibility for both attacks.  Throughout March, bomb disposal experts were called to 79 alerts, 28 of which were found to be viable devices.

In April, a 37-year-old man was shot in both legs in Rosemount Gardens in Londonderry in what appeared to be a paramilitary-style punishment shooting.  Also in April, four masked men shot a 26-year-old man in the thigh, knee, and ankle in a similar attack at a house in Londonderry's Creggan Heights.  In May, components for a bomb containing approximately 100-lb of explosives were found by police near Roslea, County Fermanagh.  In August, suspected dissident republican terrorists wearing balaclava masks set up an illegal roadblock in the south Armagh village of Meigh.

In June, some loyalist paramilitary groups decommissioned weapons.  General John de Chastelain, head of the Independent International Commission on Decommissioning and a number of independent witnesses, observed an act of decommissioning by the Ulster Volunteer Force.  A series of bombs were discovered in separate incidents in September, including a 600-lb bomb found near the south Armagh village of Forkhill.  Additionally, a dissident group also shot and injured a man in the Ballmagroarty area of Londonderry.

In November, the latest report of the International Monitoring Commission said that the dissident threat was at its highest in six years.  At least two paramilitary-style shootings occurred:  a 23-year-old man was shot in the legs in the Creggan area of Londonderry; a 27-year-old from Brandywell was also shot in the legs.  The Continuity IRA claimed responsibility for shooting a

man in the leg in west Belfast.  Four men were arrested in relation to an attempted gun attack on a police constable in the village of Garrison in County Fermanagh.  Dissident republicans were blamed for the attempted bombing of the Northern Ireland Policing Board headquarters in Belfast where a 400-lb bomb was discovered after it failed to detonate properly.

## MIDDLE EAST AND NORTH AFRICA OVERVIEW

> **"Terrorism is the enemy of all of us, and fighting it is a joint responsibility."**
>
> **- King Abdullah II, of the Hashemite Kingdom of Jordan**
> **May 16, 2009**

Most governments in the region cooperated with the United States in counterterrorism activities and undertook efforts to strengthen their counterterrorism capabilities.  These efforts included participating in U.S.-sponsored Antiterrorism Assistance (ATA) programs and taking steps to bolster banking and legal regimes to combat terrorist financing. Many countries continued to provide some form of assistance to Coalition efforts to bring peace and stability to Iraq and Afghanistan.

The Iraqi government made significant strides in mitigating the threat posed by Sunni militant organizations, including al-Qa'ida in Iraq (AQI), though AQI maintained some capability to conduct large-scale attacks across the country.  There was a sharp reduction in the number of security incidents throughout much of Iraq, including a decrease in civilian casualties, enemy attacks, and improvised explosive devices (IEDs) attacks in the last quarter of the year.  National reconciliation remained the focus of the Iraqi government.  The United States continued its focused efforts to reduce the threat posed by foreign fighters in Iraq.  Iran and Syria, both state sponsors of terrorism, continued to play destabilizing roles in the region. [See Chapter 3, *State Sponsors of Terrorism*.]

Israel completed Operation Cast Lead in January, which aimed to eliminate rocket and mortar stockpiles in Gaza.  While Israel remained vulnerable to rocket and mortar attacks launched from inside Gaza, it continued to be largely successful in confronting the threat posed by suicide bombers and rockets from the Palestinian territories.  The Israeli government also began some security withdrawals from portions of the West Bank as security improved in those areas, allowing for some ceding of control to the Palestinian Authority.

In Lebanon, the Lebanese government was able to strengthen its presence across the country, including stronger monitoring in and around Palestinian refugee camps.  Though Lebanon's border with Syria remained a problem related to arms smuggling, the Lebanese government stated its commitment to strengthen border security.  Sporadic rocket fire from southern Lebanon into Israel did occur throughout the year, with select Sunni militant groups responsible for most

of the attacks.  The U.S. government remained concerned with Hizballah's stated intent to retaliate for the 2008 killing of Hizballah official Imad Mughniyeh.  Hizballah continued its acquisition of smuggled arms, primarily via Iran and Syria, in violation of UN resolution 1701.

While Algeria experienced a marked decrease in high profile terrorist incidents, al-Qa'ida in the Islamic Maghreb (AQIM) continued to stage numerous attacks in suburban and rural areas, mostly targeting government installations.  AQIM also remained focused on kidnapping and ransom-taking as a primary tactic.  AQIM kidnapped three Spanish hostages in November in Mauritania, two Italian hostages in December in Mauritania, and one French hostage in December in Mali.

After the failed December 25 attempt on NWA Flight #253, in which Umar Farouk Abdulmutallab, who had trained in Yemen with al-Qa'ida in the Arabian Peninsula (AQAP), attempted to detonate explosives over the continental United States, the international community intensified its focus on Yemen's security situation, which continued to deteriorate in 2009.  The Yemeni government's response to the terrorist threat  improved dramatically in December, exemplified by the heightened pace of counterterrorism operations.  Still, the government's focus on other internal security challenges, including the "Sixth War" of the Houthi rebellion in the northern Sa'ada governorate, which began in August and had not ceased by year's end, often diverted it from broader counterterrorism activities.

While Saudi Arabia's efforts to address its internal terrorist threat remained strong and effective, it was affected by continued instability in Yemen and the involvement of some Saudi citizens in terrorist activity and training in Yemen.  The Saudi government continued to confront extremist ideology through government-funded education programs, official pronouncements from prominent clerics, and government-organized rehabilitation programs.

**Algeria**

The security situation in Algeria was marked by a decrease in the number of high-profile terrorist attacks throughout the country, although low-level terrorist activities continued in non-urban areas.  The Salafist Group for Preaching and Combat (GSPC), which formally merged with al-Qa'ida (AQ) in 2006 and now calls itself al-Qa'ida in the Islamic Maghreb (AQIM), previously focused on targeting Algerian government interests and had been more averse to suicide attacks and civilian casualties.  Some senior members of AQIM are former GIA insurgents.  Although Algerian government interests remained the primary focus of AQIM, the group was forced to resort to kidnappings for ransom and expanded operations against westerners in the Sahel region.  Algerian government counterterrorism operations, which included an increased security presence and the dismantling of support and recruitment networks, restrained AQIM's capacity to conduct high-profile attacks, particularly in major Algerian cities.

There were no suicide bombings after March.  The month of Ramadan, typically a period of frequent attacks, was quiet.  Nevertheless, AQIM carried out lethal operations, using ambushes and roadside bombs against government and civilian targets, particularly in the Kabylie region east of Algiers, and increased its terrorist activities along the Algerian-Malian border.

The year was punctuated by several terrorist attacks:

- On March 9, two people were killed when an AQIM suicide bomber attacked a communal guard post in Tadmait, 70km east of Algiers.

- On June 17, AQIM killed 18 officers in an attack against a police vehicle escorting a group of Chinese workers to a site near Bordj Bou Arreridj, east of Algiers.

- On August 4, terrorists injured 25 people, including four police officers, using a vehicle borne IED at a police station in Tizi Ouzou, east of Algiers.

- On October 22, terrorists killed seven and wounded three Algerian security guards working for a Canadian water project.

Roadside bombs and ambushes persist despite the efforts of the security forces. The combination of a population weary of civilian casualties from over a decade of Islamic terrorist violence and the growing availability and use of cell phones has made the terrorists more vulnerable to detection and targeting by the police. The majority of attacks occurred in rural and suburban areas. Terrorists have been very careful to establish remote bases, communicate sparingly, and carry out meticulously-planned attacks. AQIM does not have significant popular support and is not assessed as strong enough to bring down the Algerian government. When security forces are in the countryside, approaching terrorists often stand out and are intercepted before they can successfully complete their attacks.

Following massive suicide attacks in 2007, AQIM has issued directives to avoid civilian deaths, and operations have been concentrated more on military, police, and foreign national targets. AQIM is likely seeking to disrupt business and commercial activity and probably uses such attacks to discourage foreign investment. The overall civilian death toll from terrorist attacks has declined in recent years. During the civil war that began in 1992 and had largely subsided by 2000, Algerian Islamic terrorists killed on average more than 10,000 people a year, with the majority being civilians.

In the past, Algerian security services have expressed concern about AQIM using propaganda based on the call to fight in Iraq as a hook to recruit young people, many of whom never made it to Iraq but were redirected towards joining local groups. In previous years, AQIM propaganda videos originating in Algeria were of amateur quality and poorly produced. This began to change dramatically in 2008. It was evident that AQIM placed a greater emphasis on improving the quality of the videos, and these videos and communiqués were orchestrated to attract Algerian youth to the AQIM "cause." Several videos posted on the Internet, such as the series *Shadows of the Sword* and *Apostate Hell*, showed operations conducted against Algerian military and security targets that included preparations for the attacks and pre-briefings with the commanders that led the attacks. The ability to conduct an attack and claim responsibility via communiqué within hours demonstrated the importance AQIM placed in transmitting its message in an attempt to win the media war.

Criminal activities, such as holdups of motorists at roadblocks on remote roads (often disguised to look like security forces roadblocks), armed robbery, and the kidnapping of Algerian citizens remained critical to funding operations of the cash-strapped AQIM units located in northern Algeria. Besides relying heavily on kidnapping for ransom in Algeria and the Sahel, AQIM financed itself with extortion and smuggling in southern Algeria/northern Mali.

The counterterrorism successes of the Algerian services, combined with the public rejection of terrorism, appears to have reduced AQIM's overall effectiveness during the past two years. In August, the Algerian government hosted a meeting of the military chiefs of staff from Mali, Libya, Mauritania, and Niger to develop a regional counterterrorism strategy and establish a regional command center in the southern city of Tamanrasset. Algeria led efforts in international fora to condemn payment of ransom to terrorists. During 2008, the Government of Algeria instituted a program to hire 100,000 new police and gendarme officers, reinforce the borders, augment security at airports, and increase the overall security presence in major cities. The initiative was effective in reducing the impact of terrorist incidents and also demonstrated the Government of Algeria's determination to fight terrorism.

Partly because of high unemployment among Algerian youth, AQIM has had some success replenishing its numbers after the arrest or death of an estimated 1,300 terrorists. Those remaining appeared to be more hard-line and resistant to the government's amnesty offer. Despite continued AQIM attacks, the overall security situation remained greatly improved from the situation of the late 1990s. That said, the Algerian military and security forces must continuously adapt to AQIM's changing tactics and accept that an organization that had primarily been a local threat now has a reach that extends to the surrounding region and has international ties. Algerian security and military forces remained capable of handling a prolonged effort against internal terrorist threats.

**Bahrain**

The Government of Bahrain monitored suspected international terrorist facilitators in Bahrain and worked closely and cooperatively with international partners throughout the year. Bahraini law enforcement succeeded in jailing a man suspected of providing financial support of terrorism. The government also foiled an alleged attack plot that was in the early stages of planning.

Adel Saleh, a Bahraini citizen arrested in June 2008, was convicted February 4, 2009 on charges of maintaining links to al-Qa'ida (AQ) and financing terrorism. According to testimony offered during his trial, Saleh traveled to Iran three times to deliver approximately US$ 70,000 to AQ operatives. He received a one-year sentence with credit for time served since his arrest. Prosecutors appealed, seeking a longer sentence, but the appeal process ended when Saleh, along with 177 other prisoners and detainees, was pardoned by King Hamad bin Isa Al Khalifa on April 11. Two other defendants in the same case who were tried in absentia were convicted on similar charges and sentenced to five years' imprisonment. They were not pardoned.

Security forces monitored the activities of two Bahraini citizens and arrested them on April 26. During the arrest, the authorities discovered automatic weapons, ammunition, a pistol, hunting knives, and a sword, along with evidence indicating the accused were in the early stages of planning an attack against U.S. naval interests.  Prosecutors charged the men, one of whom was an employee of the Ministry of Interior Customs Directorate, with joining an international terrorist organization, plotting attacks in Bahrain and elsewhere in the Gulf, and various weapons charges.  Their trial began on June 30 and continued through the end of the year.

On December 16, Bahrain deployed a company of Special Security Forces to southern Afghanistan in support of Coalition operations in Helmand province.

Bahrain continued its cooperation with U.S. authorities on counterterrorist finance.  Its Financial Information Unit (FIU) resides in the Central Bank of Bahrain (CBB).  The CBB, FIU, and local banks worked cooperatively on counterterrorist finance and anti-money laundering issues.  The government worked with the U.S. Department of the Treasury to host a conference on the regulation of Islamic charities.  Bahrain also hosted the Middle East and North Africa Financial Action Task Force secretariat, and has cooperated actively with the Global Initiative to Combat Nuclear Terrorism since formally endorsing the initiative in March 2008.

**Egypt**

The Egyptian government's active opposition to terrorism, and its effective intelligence and security services, made Egypt an unattractive locale for terrorist groups, however Egypt's northern Sinai region was a base for the smuggling of arms and explosives into Gaza, and a transit point for Gazan Palestinians.  Palestinian officials from HAMAS have also carried large amounts of cash across the border.  The smuggling of humans, weapons, and other contraband through the Sinai into Israel and the Gaza Strip has created criminal networks that may be associated with terrorist groups in the region.  In April, Egypt announced it had discovered a 49-member Hizballah cell in Egypt that was supplying weapons to Gaza, and in July, government prosecutors said that 26 members of the cell had been detained and transferred to a State Security Court for trial.

In February, a bomb exploded in the popular Khan El Khalil market place, killing a young French tourist and wounding a number of other foreign tourists.  In May, Egyptian authorities announced the arrest of seven suspects but later ordered their release.  On May 10, a bomb exploded in a car parked near the Cathedral of the Virgin Mary in Cairo's Zeitoun neighborhood. There were no injuries, minimal property damage, and no claims of responsibility.

In the past six years, Egypt has tightened its terrorist finance regulations in keeping with relevant UN Security Council Resolutions.  In 2008, Egypt strengthened its anti-money laundering legislation by specifically adding terrorism financing to the list of punishable crimes.  Egypt regularly informed its own financial institutions of any individuals or entities that are designated by any of the UN sanctions committees.

Egypt maintained strengthened security measures in the Suez Canal and continued to institute more stringent port security.

The Egyptian judicial system does not allow plea bargaining, and terrorists have historically been prosecuted to the full extent of the law.  Terrorism defendants may be tried in military tribunals or emergency courts.  In terms of evidence for counterterrorism cases in the United States., Egypt's judicial system cooperated within the framework of the Mutual Legal Assistance Treaty.

Many of the Egyptian president's far-reaching counterterrorism powers come from the country's Emergency Law, which has been in force since 1981 and was renewed by Parliament for two years in June 2008.  President Mubarak has pledged to lift the Emergency Law and has called for new counterterrorism legislation to replace the Emergency Law, noting that Egypt should follow the example of other countries that have recently passed comprehensive laws to combat terrorism.  Such legislation reportedly has been drafted but not submitted or approved by Egypt's Parliament.

## Iraq

Iraq remained a committed partner in counterterrorism efforts.  As a result of the U.S.-Iraq Security Agreement, Iraqi security forces assumed primary responsibility for the security and stability of Iraq, with support from Multi-National Forces-Iraq.  Together, U.S. and Iraqi security forces continued to make progress in combating al-Qa'ida in Iraq (AQI) and affiliated Sunni terrorist organizations, as well as Shiite militia elements engaged in terrorism.  A significant reduction in the number of security incidents throughout much of Iraq, beginning in the last half of 2007, continued through 2009, with a steady downward trend in numbers of civilian casualties, enemy attacks, and improvised explosive device (IED) attacks.

Still, terrorist organizations and insurgent groups continued their attacks on Iraqi security forces, civilians, and government officials using IEDs, including vehicle-borne improvised explosive devices (VBIEDs), and suicide bombers.  Although a scattering of small scale attacks continued to hamper the country's progress toward broad-based security, terrorist elements focused their efforts on high-profile and deadly attacks in Baghdad, as demonstrated by attacks on August 19, October 25, and December 8.  The three sets of attacks targeted Iraqi government buildings with simultaneous, multiple suicide and/or remote-detonated VBIEDs in Baghdad.  While AQI claimed responsibility for the violence, some Iraqi government officials publicly blamed Syrian-based individuals with alleged ties to the former Baath Party.

U.S. forces conducted full spectrum operations with the Iraqi forces to defeat the evolving threats employed by AQI.  Their efforts to defeat AQI cells, in addition to an increasingly violence-weary Iraqi public, forced AQI elements to consolidate in Ninewa and Diyala provinces.  Despite being limited to smaller bases of operation within Iraq, AQI retained networks in and around Baghdad and in eastern Anbar.  In Ninewa, U.S. and Iraqi security forces focused efforts against AQI and other Sunni extremists through operations targeting warranted individuals and judicial detentions of senior leaders, and targeted the terrorists' operational support systems.  AQI, whose apparent goal in 2009 was to discredit the Iraqi government and erode its security and

governance capabilities, targeted primarily the Iraqi security forces, government infrastructure, Sons of Iraq (SOI) groups, and tribal awakening movement members.  Despite the improved security environment, AQI, fueled in part by former detainees, still possessed the capacity to launch high-profile attacks against Iraqi civilians and infrastructure.

In addition to reducing the strength of AQI and Sunni extremists, Iraq made progress in containing other terrorist groups with differing motives, such as Jaysh Rijal al-Tariqah al-Naqshabandiyah (a Sunni nationalist insurgent group with links to the former Baath Party that advocates the removal of occupation forces from Iraq) and Kata'ib Hizballah (a Shia militant group with ideological ties to the militant wing of Hizballah).

The flow of foreign terrorists from North Africa and other Middle Eastern countries greatly diminished, although they continued to enter Iraq, predominantly through Syria.  AQI and its Sunni extremist partners mainly used Iraqi nationals, including some females, as suicide bombers.  Terrorist groups receiving weapons and training from Iran continued to endanger the security and stability of Iraq; however, incidents of such violence were lower than in previous years.  Many of the groups receiving ideological and logistical support from Iran were based in Shia communities in central and southern Iraq.

Iraq, Turkey, and the United States continued their formal trilateral security dialogue as one element of ongoing cooperative efforts to counter the Kurdistan Workers' Party (PKK).  Iraqi leaders, including those from the Kurdistan Regional Government, continued to publicly state that the PKK was a terrorist organization and would not be allowed a safe haven in Iraq.  The trilateral discussions and other efforts continued through the end of the year, with a ministerial in late December.

The Iraqi government increased its efforts to garner regional and international support against terrorism.  The Expanded Neighbors Process continued to provide a forum for Iraq and its neighbors to address Iraq's political and security challenges in a regional context.  In October, the Iraqi government sent representatives to Egypt to participate in the sixth Neighbors Process working group on border security, in which the group sought ways to enhance and integrate border security systems in preparation for Iraq's 2010 parliamentary elections.  Iraq also became a more active voice at the UN in 2009.

The Iraqi government pressed senior Iranian leaders to end support for lethal aid to Iraqi militias, and the Iraqi army carried out operations against extremists trained and equipped by Iran in Basra, Baghdad, and other areas.  Although attacks by militants have sharply decreased, concerns remain that Iranian-supported Shia groups may be stockpiling weapons to influence the elections or the subsequent government formation.  Shia militant groups' ties to Iran remained a diplomatic and security challenge and a threat to Iraq's long-term stability.  National unity efforts to involve Iraqi Shia groups with Iranian ties, such as Asaib ahl al Haq (League of Righteousness) in the political process, decreased Shia-linked violence.

The Iraqi government faced internal and external pressure to relocate the Mujahadeen-e Khalq (MEK) organization, a U.S. designated foreign terrorist organization, from the group's current

location in eastern Iraq.  The Iraqi government committed to act with respect for human rights in any efforts to relocate the group, and UN and international observers monitored the situation.

The Iraqi government attributed security gains to Iraqi security force capability and proficiency, as well as to increasing popular support for Iraqi government actions against AQI and other extremist groups.  SOI and other groups provided U.S. and Iraqi forces with valuable information that helped disrupt terrorist operations and exposed large weapons caches.  The SOI began integration into Iraqi security forces in 2008, and many more transitioned to non-security ministries throughout 2009.  Sunni tribal awakening movements continued alliances with U.S. forces against AQI and extremist groups.  AQI targeting of Christian and other minority churches, schools, and institutions indicated that AQI pursued strategies that required the least resources and yielded the highest payoff in the media and minds of Iraq's citizens.  Despite this, ethno-sectarian violence continued to decline.

On June 30, U.S. combat troops pulled out of cities, villages, and localities, in accordance with the U.S.-Iraq Security Agreement[14], and after that conducted all kinetic operations in partnership with Iraqi security forces.  The focus of U.S. operations moved from urban to rural areas where international support will remain critical for the Iraqi government to build its capacity to fight terrorist organizations.  All U.S. military operations are conducted with the agreement of and in partnership with Iraqi authorities.

Iraq's intelligence services continued to improve in both competency and confidence but will require ongoing support and legislative authority before they will be able to adequately identify and respond to internal and external terrorist threats.

**Israel, West Bank, and Gaza**

Four Israeli citizens were killed in three separate terrorist attacks during the year, down from 13 attacks with 27 Israeli casualties in 2008.  Rocket and mortar fire emanating from the Gaza Strip was the predominant form of attack.  In response to an escalation of such attacks in 2008, Israeli forces conducted Operation Cast Lead from December 2008 to January 2009 to root out terrorist organizations' stockpiles of rockets and mortars in Gaza.  The IAF launched airstrikes on HAMAS security installations, personnel, and other facilities, as well as rocket and mortar launch teams.  On January 3, Israeli forces launched a ground invasion.  Hostilities between Israeli forces and HAMAS militants continued through January 18, and the Israeli withdrawal of troops was completed on January 21.  Israeli officials believed Operation Cast Lead helped achieve a level of deterrence, as rocket and mortar attacks from Gaza dropped precipitously following the conflict.  Since January 2009, HAMAS has actively enforced a unilateral cease-fire with Israel, stopping rocket attacks, arresting militants firing on Israel, and negotiating agreements with the other factions to prevent violence.  However, Israeli officials believed that Gaza-based terrorist organizations have used this relatively quiet period to rearm and reorganize in preparation for future conflict.  There were no incidents of Palestinian suicide bombing.

---

[14] The Security Agreement is the legal basis for continued security cooperation to help Iraq build its capacity to fight terrorist organizations and establish formal mechanisms for joint security operations.

In addition to Operation Cast Lead, Israel responded to terrorist threats with targeted operations directed at terrorist leaders, infrastructure, and activities such as rocket launching activities such as indirect fire into Israel. The Israel Defense Force (IDF), the Israel Security Agency (Shin Bet), and Palestinian Authority Security Services continued to conduct roundups and other military operations in the West Bank designed to increase pressure on terrorist organizations and their supporters. Construction of an extensive security barrier in the West Bank and Jerusalem continued in some areas. Israeli officials believed the security barrier has played an important role in making terrorist attacks more difficult to undertake. In some areas in the West Bank, such as Jenin and around Nablus, Israeli authorities eased curfews and reduced incursions to mitigate effects on the local population while maintaining a strong counterterrorism presence. Overall, Israeli security services reduced movement restrictions in the West Bank.

Given the drop in rocket/mortar fire and the absence of suicide bombing attacks, Israel security forces focused on a new trend in terrorist attacks that they dubbed "the lone terrorist." They defined "lone terrorist" incidents as those carried out by individuals typically lacking criminal records who have not previously communicated with or received support from terrorist organizations. The motivations behind these types of attacks varied from personal to political. These individuals were harder to identify and deter prior to committing attacks.

Terrorist attacks that resulted in injuries and Israeli responses included:

- On March 5, a Palestinian driving a bulldozer rammed into a police car and a bus in Jerusalem, injuring two Israeli police officers. Israeli police and a taxi driver shot and killed the assailant.

- On March 15, two police officers were killed in a shooting attack near Massua in the northern Jordan Valley. No suspects were identified in the attack. The "Imad Mughniyeh Group" claimed responsibility.

- On April 2, a Palestinian with an axe killed a 13-year old Israeli and seriously wounded a seven-year-old Israeli in the West Bank settlement of Bat Ayin. The assailant was later arrested. Islamic Jihad and the Martyrs of Imad Mughniyeh both claimed responsibility for the attack.

- On April 17, a Palestinian man infiltrated the Beit Hagai settlement and injured a member of the settlement's emergency squad with a knife. The infiltrator was shot and killed by another member of the emergency squad.

- On May 9, a 56-year old taxi driver was kidnapped and strangled to death by three Palestinians near Gan Yavne. The assailants were arrested and claimed they committed the murder as vengeance for the death of an Islamic Jihad operative killed by the IDF in 2007.

- On December 24, Rabbi Meir Avshalom Chai was killed in a drive-by shooting while driving his own vehicle near the town of Nablus.  The next day, the General Security Service and the IDF killed three terrorists reportedly responsible for Chai's death.  The three individuals were previously held on terrorism charges in Israeli prisons.

Throughout the year Israel's security services were able to keep terrorist planners and operators off balance and reported multiple foiled attempts:

- On March 21, a 40-kilogram explosive device concealed in the trunk of a car parked outside a shopping mall in Haifa was activated but failed to detonate.  Israel police defused the bomb; the previously unknown Galilee Free Brigades claimed responsibility.

- On June 16, 10 terrorists from Gaza staged a failed assault at the Karni crossing.  At least four terrorists and several horses loaded with explosives were killed in the ensuing firefight with the IDF.  Video footage released by the Jund Ansar Allah ("Soldiers Loyal to Allah") cell following the attack detailed preparations for the attack.

- On November 26, IDF reservists ordered an individual approaching the Israeli border from Egypt near Eilat to stop.  The individual fled the scene after dropping his bag containing a 15 kilogram explosive device.

- On December 9, Israel border guards arrested a Palestinian attempting to carry six pipe bombs through the Qalandiya checkpoint leading into Jerusalem from the West Bank.

- On December 24, Israeli police located and safely disarmed nine pipe bombs hidden near a bus station at the Ginaton Junction of Routes 443 and 40.

Israel security services assessed that the use of rockets and mortars reflected recognition by Palestinian terrorist groups that such indirect fire attacks stood the best chances of success, especially in light of the stringent physical security measures that limited the movement of potential suicide bombers into Green Line Israel.

Israel's security establishment remained concerned about the terrorist threat posed in the north by Hizballah and its Iranian and Syrian backers.  Israeli security officials argued that Iran, primarily through the efforts of the Iranian Revolutionary Guard Corps (IRGC), has established a sophisticated arms smuggling network from Iran through Syria to Hizballah in Lebanon.  Israeli security officials said Hizballah continued to provide support to select Palestinian groups to augment their capacity to conduct attacks against Israel.

Israeli politicians and security officials pointed to Hizballah's efforts to rebuild and re-arm following the 2006 conflict against the group as evidence that it remained a threat to Israel; these officials estimated that Hizballah possessed an arsenal of over 40,000 short- and medium-range rockets.  Israeli Prime Minister Netanyahu said on several occasions that Israel will hold the government of Lebanon accountable for any attack on Israel from Lebanon.

Israeli officials continued to claim that Hizballah has moved arms south of the Litani River in violation of UN resolution 1701 and pointed to several incidents to support this assertion:

- On July 14, between 1,000 and 1,550 kilograms of explosives detonated in the Shiite village of Khirbit Salim.  Hizballah blocked United Nations Interim Force in Lebanon (UNIFIL) access to the scene, preventing further inspection.

- On September 11, Palestinian terrorists claimed responsibility for firing two Katyusha rockets from southern Lebanon into northern Israel near Nahariya.

- On October 27, a Katyusha rocket was fired into northern Israel near Kirya Shmona.  IDF forces responded by firing artillery shells at the source of the rocket attack.

Despite these few security incidents, Israel's northern border remained relatively quiet during the course of the year.  The IDF continued a robust exercise schedule and military presence in the Golan Heights.  In April, Israeli media outlets reported that Egyptian security services foiled a Hizballah cell's plot to carry out terrorist attacks against Israeli tourists in Sinai.

HAMAS and Hizballah continued to finance their terrorist activities against Israel primarily through state sponsors of terrorism Iran and Syria, and fundraising networks in the Arabian Peninsula, Europe, the Middle East, the United States, and to a lesser extent, elsewhere.  Israel has adopted strong measures to prevent the financing of terrorism through its financial sector. Regulation and enforcement of Israel's domestic financial industry is equivalent in scope and effect to other highly industrialized and developed nations.  In 2009, several changes strengthened Israel's anti-money laundering and combating of terrorism financing (AML/CT) legislation, and significantly increased the number of reported seizures related to financial crime by the Israeli National Police (INP).

The smuggling of commodities, arms, explosives, and funds in support of HAMAS through tunnels between the Gaza Strip and Egypt, and Hizballah along smuggling routes in Lebanon, continued to prove problematic.  Israeli officials asserted that Egypt took steps to prevent arms smuggling from the Sinai into Gaza, but can do much more in terms of arresting, prosecuting, and incarcerating smugglers, destroying tunnel infrastructure, and providing socio-economic alternatives for Bedouin involved in smuggling activities.

The IAF carried out regular air strikes against smuggling tunnels along the Philadelphi Corridor. On November 4, the Israel Naval Forces detained the M/V Francop and seized the largest illicit arms shipment in Israeli history.  According to Israeli officials, the M/V Francop left Bandar-Abbas, Iran, bound for Latakia, Syria.

A high-profile case raised awareness regarding settler violence and acts of terrorism.  On October 7, Israeli security services arrested American-born settler Yaacov "Jack" Teitel in connection with a number of crimes and terrorist attacks over the past 12 years.  Teitel was arrested for posting anti-homosexual flyers, and later confessed to a number of crimes, including the murder of two Palestinians in 1997.  He also claimed responsibility for several attempted

bombings, including sending a parcel bomb to a Messianic Jewish family in Ariel in which a 15-year old Israeli-American boy was injured, and placing a pipe-bomb that injured Israel Prize laureate and peace activist Professor Zeev Sternhell in September 2008.

While Israeli officials praised the Israeli security services' arrest and investigation of Teitel, Israeli media outlets questioned whether the security services were sufficiently motivated or resourced to conduct investigations into settler violence.  Israel security services believed Teitel acted alone, and not as part of a larger settler terrorist organization.

Prime Minister Benjamin Netanyahu's November 25 decision to temporarily freeze settlement construction in the West Bank has the potential to incite further incidents of settler violence and terrorism.  On December 11, a mosque in the West Bank village of Yasuf was set afire, apparently in response to the moratorium.  Settlers repeatedly clashed with IDF and border security forces following Netanyahu's decision.  Israeli media reports on a leaked IDF plan to put down settler violence and enforce the settlement freeze further increased tensions.

The Israel Security Agency and INP cooperated with U.S. law enforcement agencies on cases involving U.S. citizens killed in terrorist attacks.  On December 7, the Israeli Parliament (Knesset) passed a controversial biometrics bill.  The law seeks to create a biometric database containing fingerprints and facial scans; corresponding biometric chips will be installed in Israeli identification cards and passports.  The law will not officially go into effect until the Ministry of Interior signs implementation regulations.  Once the law goes into effect, Israeli citizens can volunteer to participate in the program for a two-year trial period.  Israel will reassess the law following the trial period to determine if the law will be extended.

Israeli security services spent more time, attention, and resources focused on cyberterrorism. IDF leadership stressed the importance of creating a "cyber command" to combat cyber threats. Israel security officials highlighted new trends in terrorist activity on the Internet beyond collecting information posted by Israelis.  These included direct and concrete appeals and proposals to Israeli citizens, especially those active in social networks, to become involved in terrorist activity or pass along classified information in exchange for payment.  Concerns over such activity included divulging classified information, as well as luring Israeli citizens abroad with the promise of payment so that terrorist organizations could abduct them.  Security officials called on Israeli citizens to be alert to suspicious internet or telephone appeals by unfamiliar persons.

West Bank and Gaza

The Palestinian Authority (PA) continued its counterterrorism efforts in 2009, with an emphasis on controlling the activities of terrorist organizations, particularly HAMAS, in the West Bank. The PA remained unable to undertake counterterrorism efforts in the HAMAS-controlled Gaza Strip.

The number of rocket and mortar attacks into Israel from the Gaza Strip dropped from 2,048 in 2008 to 566 in 2009, although HAMAS and other armed groups in Gaza continued to smuggle

weapons, cash, and other contraband into the Gaza Strip through an extensive network of tunnels from Egypt.  Since the end of Operation Cast Lead, HAMAS has actively enforced a unilateral cease-fire with Israel, stopping rocket attacks, arresting militants firing on Israel, and negotiating agreements with the other factions to prevent violence.

HAMAS continued to consolidate its control over the Gaza Strip in 2009, eliminating or marginalizing potential rivals.  The Gaza Strip remained a base of operations for terrorist organizations besides HAMAS, such as Palestinian Islamic Jihad (PIJ); Salafi splinter groups, and clan-based criminal groups that engaged in or facilitated terrorist attacks.

HAMAS, PIJ, and the Popular Front for the Liberation of Palestine – General Command (PFLP-GC) remained present in the West Bank, although the improved capacity of PA security forces degraded those organizations' ability to carry out attacks inside or from the West Bank.  No suicide bombings took place inside or originated from either the Gaza Strip or the West Bank in 2009.  In May and June, PA security forces took direct action against HAMAS cells in the West Bank city of Qalqilya, resulting in the deaths of five militants and the arrest of a sixth.  At the end of 2009, the PA held approximately 240 suspected terrorists in custody in the West Bank.

The primary PA security forces in the West Bank were the Civil Police, the National Security Forces (NSF), the Preventive Security Organization (PSO), the General Intelligence Service (GI or Mukhabarat), the Presidential Guard (PG), and the Civil Defense.  They numbered approximately 27,500 in total.  PA security services are under the Interior Minister's operational control and follow the Prime Minister's guidance.  Israeli authorities, among others, identified the improved capacity and performance of PA security forces as a leading contributor to the improved security environment of the West Bank.

In the Gaza Strip, HAMAS relied on its internal intelligence, police, coastal patrol, border guard, and military-wing "Executive Force" bodies, numbering at least 15,000 in total.  In August, HAMAS security forces took direct action against the Salafi splinter group, Jund Ansar Allah, at a mosque in Rafah.  A total of 24 were killed and the group was decimated.

Terrorist organizations, particularly HAMAS and PIJ, continued to receive substantial foreign funding and support from foreign terrorist organizations and state sponsors of terrorism, particularly Iran.

There were no terrorist attacks against American citizens in the West Bank or Gaza in 2009.  No apparent progress was made in apprehending, prosecuting, or bringing to justice the perpetrators of the October 2003 attack on a U.S. Embassy convoy in Gaza that killed three U.S. government contractors and critically injured a fourth.

Security cooperation between the PA and the Israeli government was close and productive, although there were continued Israeli military incursions in Palestinian population centers in the West Bank, which the PA strongly criticized.  PA officials stressed the importance of close security cooperation with the Israeli government, but criticized what they considered slow and only partial Israeli recognition of the PA's improved security performance.  For their part, Israeli

officials, while noting the achievements of PA security forces against HAMAS in the West Bank, questioned the PA's willingness to deploy them against Fatah-affiliated militants.  PA officials rejected this criticism.

The United States continued to assist the PA's counterterrorism efforts through capacity building of PA security forces.  As of the end of the year, four NSF battalions had been trained and equipped under the auspices of the U.S. Security Coordinator (USSC).  USSC-run training of NSF battalions took place at the International Police Training Center in Jordan.

Limitations on PA counterterrorism efforts in the West Bank included restrictions on the equipment, movement, and activities of PA security forces in areas of the West Bank for which the Israeli government retained responsibility for security.  PA officials argued that Israeli incursions into Palestinian population centers in the West Bank eroded PA security forces' credibility.  The limited capacity of the PA's civilian criminal justice system also hampered PA counterterrorism efforts.  The PA continued to lack modern forensic capability.  Ongoing low-level violence between Israeli settlers and Palestinians in the West Bank tested the limited mandates of PA security forces.

PA President Mahmoud Abbas and Prime Minister Salam Fayyad repeatedly condemned terrorist tactics and stated the necessity of a solution to the Palestinian-Israeli conflict based on a political process and peaceful negotiations.  They continued to support a security program involving disarmament of fugitive militants, arresting members of terrorist organizations, and gradually dismantling armed groups.  PA efforts to end incitement to violence continued, using official monitoring of sermons given in West Bank mosques.  There were no such efforts against incitement in the Gaza Strip, where the de facto HAMAS authorities continued to support incitement in public statements.

The PA continued its efforts against terrorism financing in the West Bank and Gaza by increasing its capacity to detect, analyze, and interdict suspicious financial activity.  The Palestinian Monetary Authority (PMA) continued to build the analytical capability of its Financial Intelligence Unit.

The PMA maintained a staff of roughly 80 in the Gaza Strip to conduct on-site bank examinations, including audits of bank compliance with the PA's 2007 Anti-Money Laundering (AML) decree.  The PMA also licensed 90 percent of money service businesses in the West Bank and 45 percent in the Gaza Strip, under a new regulatory framework requiring moneychangers to comply with the AML law and conduct international transfers only through local banks rather than by phone or "hawala."  The PA Attorney General and Civil Police both formed specialized units that supported enforcement of the AML law, although limited technical expertise was a constraint.  The PA Interior and Waqf Ministries also continued to monitor the charitable sector for signs of abuse by terrorist organizations.

**Jordan**

Through both its public statements and its actions, the Jordanian Government demonstrated a solid commitment to countering terrorist groups and extremist ideologies. The Jordanian government continued its political and material support for the Palestinian Authority (PA) and for PA President Mahmoud Abbas. King Abdullah II routinely expresses backing for the peace process and for a negotiated settlement of the Israel-Palestine dispute. Jordan has facilitated the regional peace process by training five battalion-sized elements of the Palestine Security Forces at the Jordan International Police Training Center (JIPTC) outside of Amman, including two such training rotations in 2009. These Palestinian forces have since deployed throughout the West Bank, where their motivation and professionalism have earned praise from the different regional parties.

In late 2008, Jordan discontinued a short-lived and abortive attempt to engage HAMAS, which had begun a few months earlier. Although the government's relationship with HAMAS is cool, the organization continued to garner some popular support, particularly in the aftermath of the Israeli-conducted Operation Cast Lead from December 2008 to January 2009. Numerous street demonstrations took place throughout Jordan in protest of the Israeli operation. Although the King permitted HAMAS leader Khaled Meshal into the country briefly in the fall of 2009 to attend the funeral of Meshal's father, Jordanian security remained vigilant against any effort to establish cells or use Jordanian territory as a base of operations against Israel.

Jordan placed a strong emphasis upon countering violent extremism, fighting radicalization, and strengthening interfaith coexistence and dialogue. Building upon the foundations of the 2005 Amman Message, Jordanian officials, including King Abdullah II, strongly condemned extremist violence and the ideology that promotes it. The Royal Aal-al Bayt Institute for Islamic Thought under the leadership of Prince Ghazi bin-Talal continued its sponsorship of the "Common Word" series of ecumenical and interfaith conferences and lectures in the United States, the United Kingdom, and elsewhere. The "Common Word" program began as a response to the controversy caused by Pope Benedict XVI's 2006 address in Regensburg. In May 2009, Jordan hosted a successful papal visit. Jordanian government officials and media routinely reinforce the importance of interfaith dialogue and tolerance.

At the same time the government undertook concrete measures to address the threat of extremist ideology in the country. Recognizing the key role that incarceration has played in the radicalization of many terrorists (including the Jordanian-born Abu Musab al-Zarqawi), Jordanian authorities continued their 2008 program of theological engagement of suspected takfiris and other radical inmates. This program employs carefully selected and vetted religious scholars and jurists to introduce or reinforce more balanced and moderate views, based upon established Islamic jurisprudence and teachings. In the summer of 2009, Jordanian correctional authorities introduced a classification system for prisoners that allowed authorities to more readily identify and segregate adherents of violent extremist ideologies.

Jordan's security forces continued programs to prevent terrorist attacks in the country and to deny terrorists the use of its territory to launch attacks against its neighbors. For example, the first phase of the Joint Border Security Program (JBSP) was completed in September, including the installation of a suite of monitoring and communications equipment along a 50km stretch of

Jordan's border with Syria.  This border area has historically presented the highest risk of illicit infiltration and smuggling across Jordan's border and it accounted for the greatest number of interdictions by Jordanian law enforcement.  The completion of this portion of the JSBP program significantly enhanced Jordan's detection capabilities and allows Jordan to respond to incidents more quickly.

In August, Jordan, with U.S. government support, hosted a conference establishing the Regional Biometric Partnership Initiative, bringing together law enforcement, security, and forensic experts from twelve Middle Eastern countries.  Jordan presented a tailored biometric software package and proposed the creation of a regional biometric database for known and suspected terrorists in the region to allow the efficient sharing of data between governments.  The proposal won an endorsement in principal from other participants and could potentially do much to thwart terrorist travel.  Jordan welcomed U.S. training and assistance designed to strengthen security at its ports of entry.

Jordan's security services remained intensely engaged against domestic terrorist threats.  As a result of their vigilance, several planned attacks were disrupted prior to execution.  The State Security Court (SSC) has primary jurisdiction for terrorism cases and it maintained a substantial caseload during the year. For example:

- In March, three Jordanians were convicted and sentenced to 22 years each for plotting a suicide car bombing against a Roman Catholic Church in Marka.  The plotters had originally wanted to strike police facilities but shifted their focus to a Christian target after their surveillances revealed the difficulty of attacking the police.

- In April, four men were arrested and charged with plotting attacks in Israel in retaliation for the Israeli incursion into Gaza.  The men were reportedly in possession of firearms at the time of their apprehension.  The alleged leader of the cell, Usama Abu Kabir, had been released from U.S. custody at Guantanamo Bay in November 2007.

- In April, the SSC sentenced three men to five years' imprisonment for plotting and preparing attacks against Israeli targets on behalf of HAMAS.  Potential targets included the Israeli Embassy in Amman and border posts in Jordan Valley.

- In October, the SSC imposed sentences of 15 to 20 years each on twelve Jordanian al-Qa'ida (AQ) sympathizers for attempting to attack a Christian church in the northern city of Irbid, as well as a Christian cemetery in the same city.  This group was also reportedly affiliated with an individual who fired upon a visiting Lebanese Christian choir in Amman in 2008.

In November, the Court of Cassation reduced the sentence of Muamar Yusef al-Jaghbir to 15 years for his role in the 2002 assassination of USAID Officer Thomas Foley.  Al Jaghbir was convicted of playing a secondary role in the killing, and had been previously convicted and sentenced to death in July in the SSC, but the Court of Cassation reviewed the case and reduced

the sentence on appeal.  He was also credited with the six years al-Jaghbir had already served in U.S. or Jordanian custody following his 2003 apprehension in Iraq.  This ruling, however, is unlikely to result in al-Jaghbir's release in the future: he is also awaiting execution for his role in the August 2003 car bombing of the Jordanian Embassy in Baghdad that killed at least 14 people.

Despite the government's determination to battle radicalization, however, extremist messages still found a receptive audience with a small but significant proportion of the total population. According to polling data compiled by the Pew Research Center Global Attitudes survey for 2009, the percentage of Jordanians expressing "confidence" in Usama bin Ladin crept upwards to 28 percent in 2009 from 19 percent in 2008.  According to WorldPublicOpinion.org (affiliated with the University of Maryland) roughly 27% of Jordanians stated that they had "positive" feelings toward bin Ladin, and another 27% expressed mixed feelings toward him.

Although there were no successful AQ attacks in Jordan itself in 2009, a Jordanian national, Hammam al-Balawi, carried out a December 30 suicide attack in Khost, Afghanistan, that killed seven U.S. government employees, as well as one member of the Jordanian security forces.

Jordan's financial sector remained vulnerable to money-laundering and terrorist finance.  Jordan has an Anti-Money Laundering (AML) law and in 2008, the Jordanian Securities Commission Board of Commissioners issued AML regulations for securities activities, a positive step toward defining obligated entities falling under the regulatory purview of the Commission.

Furthermore, Jordan began steps to implement a cross-border currency declaration form. Despite these measures, however, a Middle East North Africa Financial Action Task Force (MENAFATF) review identified deficiencies in 14 of 16 core and key FATF recommendations for combating money laundering and terrorist financing.

**Kuwait**

The Government of Kuwait made measured progress in combating terrorism.  Despite a lack of legal provisions that deal specifically with terrorism, the government increased its efforts to counter terrorism, notably in the arrests and prosecutions of key terrorists and terrorism facilitators throughout the year.  Buttressing these actions were increased denunciations of terrorism by senior Kuwaiti officials.  In the past, the Kuwaiti government was more likely to take action against non-Kuwaiti residents involved in terrorist facilitation, but in 2009 it took steps against key local Sunni extremists perceived to pose a clear and direct danger to Kuwaiti or U.S. interests.

Kuwait was an effective and reliable partner in providing security for U.S. military installations and convoys, but the risk of a terrorist attack in Kuwait remained high.  In July, Kuwaiti security officials arrested and charged six men with planning attacks on the U.S. military base Camp Arifjan, as well as Kuwait State Security headquarters.

In July, the Government of Kuwait opened the al-Salam Center, a treatment facility modeled after the Kingdom of Saudi Arabia's rehabilitation center, to rehabilitate extremists including Kuwaitis repatriated from Guantanamo Bay Detention Center. The facility is located in a secured area within Kuwait's Central Prison and is governed by a board of government officials, medical experts, and a religious scholar. Al-Salam Center received its first residents from Guantanamo in October and December.

The Kuwaiti Armed Forces, National Guard, and Ministry of Interior, along with counterparts from the United States, UAE, Bahrain, and Jordan, conducted a number of exercises aimed at responding to terrorist attacks. In January 2009, Kuwaiti National Guardsmen participated jointly with U.S. Embassy officials and a Marine Expeditionary Unit in a large-scale simulated defense of the Embassy chancery and compound against a terrorist attack and subsequent treatment and evacuation of the wounded.

Although the Kuwaiti government lacked comprehensive legislation that criminalizes terrorist financing, Kuwait has made progress over the past year in its efforts to prosecute financial crimes. An amended law designed to bring Kuwait's anti-money laundering/terrorist finance regime in compliance with FATF requirements was passed to parliament in December 2009. Kuwait's Financial Intelligence Unit, which is under the direct supervision of the Bank of Kuwait, is not part of the Egmont Group.

The Ministry of Social Affairs and Labor (MoSAL) and the Ministry of Foreign Affairs (MFA) continued their monitoring and supervision of charities, including the ban on cash donations except during Ramadan. MoSAL reported a continued decline in the number of violations during their 2009 Ramadan audit. MFA and MoSAL officials also conducted site visits and audits of selected foreign projects funded by Kuwaiti charities.

Significant terrorism-related arrests and prosecutions took place during the year, notably, the July sentencing of a Kuwaiti citizen to seven years imprisonment on a combination of charges of holding weapons, carrying a false passport, and inciting hostile acts against a foreign country. A local imam also received a seven-year sentence in December for facilitating hostile acts against a foreign country. On December 21, the Criminal Court began the trial of the six Kuwaitis accused of planning attacks against U.S. military base Camp Arifjan and Kuwait State Security headquarters. There have also been convictions using existing criminal statutes to successfully prosecute two individuals, in January and August respectively, for "inciting youth to jihad" and facilitating terrorism in Iraq, and for "supporting and funding terrorist activities." The courts suspended, in both cases, sentences of three years imprisonment upon payments by the defendants of US$ 3,540.

In October and November, two of the remaining four Kuwaiti Guantanamo Bay Detention Facility detainees were repatriated to Kuwait. On November 23, one of the two was acquitted by Kuwait's Attorney General on all terrorism-related charges.

In October, the Kuwaiti Ministry of Interior submitted 17 security proposals to the government's four-year Action Plan, among which are the following counterterrorism initiatives:

- Border Security (US$ 602,000,000): Securing borders to deter illegal entry of foreigners into the country, to prevent smuggling, and to monitor and survey restricted areas.

- Terrorism (US$ 13,000,000): Counterterrorism and counter-radicalization project to secure the "internal front" against terrorism, achieve stability, and protect the Kuwaiti society against extremist messages.

- CCTV (US$ 475,000): CCTV network to secure vital installations, highways, land and marine borders, islands, and populous locations.

- Port Security (US$ 138,000,000): Securing air, sea, and land ports.

**Lebanon**

While the threat of terrorist activity kept Lebanese security agencies on high alert throughout the year, 2009 was characterized by increased governmental efforts to disrupt suspected terrorist cells before they could act. The Lebanese Armed Forces (LAF), in particular, were credited with capturing wanted terrorist fugitives and containing sectarian violence.

Several designated terrorist organizations remained active in Lebanon. HAMAS, The Popular Front for the Liberation of Palestine (PFLP), the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), Fatah al-Islam (FAI), al-Qa'ida (AQ), Jund al-Sham, the Ziyad al-Jarrah Battalions, and several other splinter groups all operated within Lebanon's borders. Hizballah, which is a legal entity and a major political party, is represented in Lebanon's cabinet and parliament.

In 2009, terrorist violence and counterterrorist activity included the following incidents:

- On five separate occasions, January 8 and 14, February 21, September 11, and October 27, Katyusha rockets were fired from southern Lebanon into Israel. No casualties were reported from any of the incidents. The AQ-inspired Ziyad al-Jarrah battalions claimed responsibility for several of the attacks.

- On March 24, the Internal Security Forces (ISF) defused an explosive device near the home of former Lebanese President Amin Gemayel and arrested a Syrian, Youssef Mohammad al-Mohammed, who remains imprisoned.

- On June 17, the Lebanese Army thwarted an attempt to drive a vehicle-borne improvised explosive device into the Ain al-Hilweh refugee camp in Sidon. Hasan Merhi, a FAI member was arrested in connection with the incident.

- In July, the Lebanese Army arrested Syrian citizen Mounjed al-Fahham at Beirut

International Airport.  Investigations revealed that al-Fahham intended to smuggle out of Lebanon FAI spiritual leader Oussama Chehabi, known as Abou Zahra; FAI leader Abdel Rahman Awad; and Abdel Ghani Jawhar, wanted for 2008 attacks against LAF soldiers in Tripoli.

- On August 19, an LAF intelligence unit arrested Lebanese citizen Wissam Tahbish, reported to be a key member of Jund al-Sham.  Tahbish was the primary suspect in the 1999 assassination of four Lebanese judges in Sidon.

- On September 17, a Lebanese military court convicted five Palestinians of armed attacks, including a January 2008 bombing aimed at United Nations Interim Force in Lebanon (UNIFIL) peacekeepers.  The one member in custody was sentenced to three years of hard labor while four fugitive members, convicted in absentia, were given life sentences.

The June 7 parliamentary elections, an event widely considered vulnerable to politically motivated violence, passed peacefully under the watch of international observers and a fully deployed LAF.  In these elections, the March 14 coalition led by Sunni leader Saad Hariri, defeated the March 8 opposition allied with Syria and Iran.  After six months of negotiations between the majority and opposition, Saad Hariri brokered agreement over the cabinet and was named prime minister.  He formed a national unity government, which included Hizballah.  The new government obtained a vote of confidence on December 10.

Incoming PM Hariri announced that strengthening the Lebanese Armed Forces (LAF) and the Internal Security Forces (ISF) would be a hallmark of his administration.  General Jean Kahwagi, LAF commander since 2008, publicly listed counterterrorism, internal security, and suppression of sectarian violence as his top priorities.  The U.S. government had an active security assistance program with the LAF and the ISF that included both training and equipment.

LAF commanders stressed that it has strengthened its surveillance capabilities over the 12 Palestinian camps and four Syrian-backed Palestinian military bases within its borders.  Nevertheless, a porous border with Syria, weak internal camp security, and LAF reluctance to enter the Palestinian refugee camps all contributed to fears of another confrontation with an armed group, similar to the 2007 Nahr al-Barid conflict.  The most widely predicted venue for such a clash is in Lebanon's most populous refugee camp, Ain al-Hilweh, near the southern city of Sidon.  The camp is well known for HAMAS-Fatah violence and as a suspected safe haven for fugitive FAI terrorists.

UN Security Council Resolution (UNSCR) 1559 called for respecting the sovereignty and political independence of Lebanon, the end of foreign interference in Lebanon, and the disarming and disbanding of all Lebanese and non-Lebanese militias.  While the Lebanese government was committed to fulfilling the provisions of UNSCR 1559, it maintained that Hizballah's disarmament should be accomplished through a National Dialogue, rather than by force. The new government's ministerial statement – similar to the policy statements of the last two governments – acknowledged the right of the Lebanese "resistance" (interpreted by many as

referring to Hizballah's militia), along with the army, to recover occupied territory and confront external aggression.

The dismantling of four Palestinian military bases controlled by Syrian-backed groups remained a concern for the LAF.  The Qousaya Base, which straddles the border with Syria and allows easy access for fugitives and smugglers, was of particular concern.  Activity in these bases reportedly remained quiet in 2009, although without political support to dismantle them, the LAF can do little more than monitor ththe camps.  However, Lebanon's political leaders had previously agreed at the 2006 National Dialogue to disarm Palestinian groups outside of the country's refugee camps.  The new ministerial statement also called for the elimination of Palestinian weapons outside the refugee camps and obliged the government to provide security for Palestinian refugees.

Security along the Syria-Lebanon border remained problematic.  The Government of Lebanon still does not exercise control over parts of the border.  Over the course of the year, conflicting reports surfaced of weapons smuggling from Syria and Iran to Hizballah and other militant groups in Lebanon.  Reports from UNIFIL and the LAF said there was no conclusive evidence of arms smuggling to Hizballah in the UNIFIL area of operations south of the Litani River. UNIFIL and the LAF described a suspected Hizballah arms cache that exploded in July in the southern village of Khirbet Selim as containing weapons that pre-dated the 2006 war and the establishment of UNSCR 1701.  Nevertheless, Hizballah officials publically stated that the organization is now more heavily armed than it was before the 2006 war with Israel.

In June, then-Prime Minister Fouad Siniora announced the government's intention to improve border security.  In July, an LAF-headed team produced a comprehensive border security management plan, for which the UN Special Coordinator on Lebanon (UNSCOL) is coordinating further technical evaluation with donor assistance.  The Lebanese security agencies lacked strong interagency cooperation, so progress on implementing the integrated border management plan moved slowly.  Some gains were achieved on port security through better radiological screening of incoming shipping containers, and upgraded customs inspection stations on the eastern border improved border inspections.

On March 1, the Special Tribunal for Lebanon was officially opened in The Hague.  The investigation into the assassination of former Prime Minister Rafik Hariri and others continued.

Lebanon has not yet become party to two important international counterterrorism conventions. The International Convention on the Suppression of Terrorist Bombing was before the Parliament, but was sent back to the parliamentary Foreign Affairs Committee for further study. The International Convention for the Suppression of the Financing of Terrorism was not submitted by the Foreign Ministry for cabinet approval due to reservations by the Finance Ministry.

Lebanon hosted the 2009 Middle East and North Africa Financial Action Task Force (MENA-FATF) and played a leadership role in the U.S.-MENA Private Sector Dialogue.  Lebanon's financial intelligence unit is the Special Investigation Commission (SIC), an independent legal

entity empowered to investigate suspicious financial transactions, lift banking secrecy, and freeze assets.  In 2009, it investigated 116 cases involving allegations of money laundering, terrorism, and terrorist financing activities.  The SIC referred requests for designation or asset freezes regarding Hizballah and affiliated groups to the Ministry of Foreign Affairs, but the Lebanese government does not require banks to freeze these assets because it does not consider Hizballah a terrorist organization.

Lebanese authorities maintained that the amnesty for Lebanese individuals involved in acts of violence during the 1975-90 civil wars prevented the government from prosecuting terrorist cases of concern to the United States.  These cases included the bombings of the U.S. Embassy in Beirut in 1983 and 1984 and the abduction, torture, and murder of U.S. hostages in Lebanon from 1984 to 1991.  Mohammad Ali Hamadi, convicted in a West German court in 1987 of air piracy, murder, and possession of explosives for his part in the 1985 TWA Flight 847 hijacking, spent 18 years in a German prison before he was paroled in December 2005 and was believed to be in Lebanon.  He remains under criminal indictment in the United States for his role in the hijacking, and the United States has previously sought his extradition from Lebanon.

**Libya**

The United States rescinded Libya's designation as a state sponsor of terrorism in June 2006.  Libya renounced terrorism and weapons of mass destruction in 2003 and has continued to cooperate with the United States and the international community to combat terrorism and terrorist financing.

On July 20, Malian President Amadou Toumani Toure confirmed to the Malian press that Libya, Algeria, and Mali planned to coordinate military and intelligence efforts to fight security threats linked to al-Qa'ida in the Islamic Maghreb (AQIM) in the Trans-Sahara region.

In November 2007, al-Qa'ida (AQ) leader Ayman al-Zawahiri announced a merger between AQ and the Libyan Islamic Fighting Group (LIFG).  In an audiotape, al-Zawahiri urged AQ fighters to topple the Government of Libya, describing Muammar al-Qadhafi as an "enemy of Islam" and criticizing the 2003 decision to renounce WMD and terrorism.

In late September, six leading members of the Libyan Islamic Fighting Group, being held in the Abu Salim prison, issued a document renouncing violence and claiming to adhere to a more sound Islamic theology than that of AQ and other jihadist organizations.  The 417-page, Arabic-language document, entitled "Revisionist Studies of the Concepts of Jihad, Verification, and Judgment of People," was the product of a two-year reconciliation project between the Government of Libya and the LIFG, facilitated by the Qadhafi Development Foundation.  The authors state that "The lack of religious knowledge, whether it was a result of an absence of 'ulama' (religious scholars) or the neglect of people in receiving it and attaining it, or due to the absence of its sources, is the biggest cause of errors and religious violations."

In the text, the authors directly challenged AQ, addressing the recantation to "anyone who we might have once had organizational or brotherly ties with."  The document gave detailed

interpretations of the "ethics and morals to jihad," which included the rejection of violence as a means to change political situations in Muslim majority countries whose leader is a Muslim and condemned "the killing of women, children, the elderly, monks/priests, wage earners, messengers, merchants and the like."  It claimed that "the reduction of jihad to fighting with the sword is an error and shortcoming."  According to press and government sources, at least 144 former LIFG members and 60 members of other jihadist groups have been released from prison after completing this rehabilitation effort.

**Morocco**

Morocco pursued a comprehensive counterterrorism approach that emphasized vigilant security measures, including international cooperation and innovation in the area of counter-radicalization policies.  Evidence gained from Moroccan authorities' disruption of certain groups, and the common characteristics of those groups, supported previous analysis that Morocco's threat of terrorist attack continued to stem largely from the existence of numerous small "grassroots" extremist cells.  These groups, sometimes referred to collectively as adherents of Moroccan Salafia Jihadia ideology, remained isolated from one another, small in size (less than 50 individuals each), and tactically limited.  Their international connections were also limited.  The Government of Morocco's counterterrorism efforts have effectively reduced the threat, but the existence of these groups points to the need for continued vigilance.

Although AQIM has been unable to mount a successful terrorist attack in Morocco to date, Moroccan authorities remained concerned about the inspiration and knowledge transfer that AQIM may have provided to Moroccan extremists.  AQIM repeatedly tried to incite Moroccans to commit violence against their government through internet propaganda.  The Moroccan government remained concerned about numbers of veteran Moroccan jihadists returning from Iraq to conduct terrorist attacks at home.  A further cause for concern is Moroccans who were radicalized during their stays in Western Europe, much like those who were involved in the 2004 Madrid train bombings.

The Moroccan government pursued a comprehensive counterterrorism approach that, building on popular rejection of terrorism, emphasized neutralizing existing terrorist cells through traditional intelligence work and preemptive security measures.  Morocco aggressively targeted and dismantled terrorist cells within the Kingdom by leveraging intelligence collection, police work, and collaboration with regional and other international partners.  These efforts resulted in the disruption of several terrorist groups:

- In February, Moroccan police arrested Abdelkebir Barka at the Mohammed V International Airport upon his return from Syria.  He was charged with forming a terrorist cell.

- In May, the Moroccan police arrested eight alleged members of the terrorist group "Jamaat al Mouslimoun al Joudoud."

- In June, Moroccan authorities arrested five members of a suspected terrorist cell operating in Morocco and Spain.

- In late June, the security services arrested eight individuals on charges of forming a terrorist group, bringing charges that included drug trafficking and corruption. The leader of the group was Abou Yassine, a former Salafia Jihadia prisoner who had been sentenced previously to two years in jail for his involvement in the "Ansar al-Mahdi" terrorist group. The cell operated between Morocco and Spain, according to press reports.

- In September, security services arrested 24 members of an alleged terrorist network linked to AQ that recruited volunteers for suicide bombings in Iraq, according to the Ministry of Interior. The Interior Ministry stated that the network had coordinated with terrorists in Sweden, Belgium, Iraq, and Syria and had also sought recruits to fight in Afghanistan and Somalia. Those arrested also intended to carry out terrorist acts in Morocco, according to the Ministry.

In addition to traditional security measures, Morocco's King Mohammed VI has promoted significant efforts to reduce extremism and dissuade individuals from becoming radicalized. Each Ramadan, for example, the King hosts a series of religious lectures, inviting Muslim speakers from around the world to promote moderate and peaceful religious viewpoints. In his Throne Day speech in July, the King highlighted the moderate and tolerant nature of the Sunni Malekite rite, which, he emphasized, forms an integral part of Moroccan identity. After the 2003 Casablanca bombings, Morocco increasingly focused on strengthening the Ministry of Endowments and Islamic Affairs (MOIA). Under the MOIA, the pioneering experiment, begun in 2007, of training and using women as spiritual guides continued. Morocco also formed a Council of Ulema for Europe to train and send Moroccan imams and women spiritual guides to counter extremist messages in Moroccan expatriate communities in Europe.

During the year, the Moroccan Government continued to implement internal reforms aimed at ameliorating the socio-economic factors that terrorists exploit. The National Initiative for Human Development, launched by the King in 2005, is a US$1.2 billion program designed to generate employment, combat poverty, and improve infrastructure, with a special focus on rural areas.

The Government of Morocco made public commitments that the struggle against terrorism would not be used to deprive individuals of their rights and emphasized as part of its approach adherence to human rights standards and increased law enforcement transparency. The government generally accorded terrorist suspects and convicts their rights and due process of law, with more access for defense lawyers and more transparent court proceedings than in previous years. Moroccan laws were effective in leading to numerous convictions and the upholding of convictions of multiple terrorism-related cases:

- In January, a Moroccan criminal court sentenced Abdelmajid Zerghout to five years in prison for forming a terrorist group. Zerghout had been an imam in Italy before he was extradited to Morocco for his alleged involvement in the terrorist attacks of May 16, 2003 in Casablanca.

- In February, a Moroccan counterterrorism court condemned Saad al-Husseini, the key plotter of the Casablanca attacks, to 15 years in prison. His five accomplices received between three and eight years. Then, in June, a Moroccan increased the jail terms of al-Husseini and his accomplices, who were sentenced for "undermining the national security of the State" and forming a terrorist group, to 20 and 10 years, respectively.

- In March, a Moroccan court condemned Hassan Haski to 10 years in prison for his involvement in the 2003 terrorist attack in Casablanca.

- In July, Abdelkader Belliraj was condemned to life in prison for terrorist activities, premeditated murder, attempted murder, and possession of illegal arms and explosives and other charges. The other 34 members of his cell were sentenced to between one and 30 years in prison. According to the police, the network was preparing to carry out acts of violence in Morocco and abroad including assassinations of political figures and Moroccan Jews. Belliraj was appealing the court's decision at year's end.

- In September, 38 people suspected of belonging to a network that recruited Moroccans to fight in Iraq and Algeria appeared before a counterterrorist court. Police said the suspects intended to join terrorist groups in desert camps run by AQIM before proceeding to Iraq.

As part of its comprehensive approach in combating terrorism, Morocco also addressed terrorist financing. Although Morocco is not a regional financial center, its financial sector is integrated into international markets. Money laundering is a concern due to the narcotics trade, vast informal sector, trafficking in persons, and large level of remittances from Moroccans living abroad. The extent of the money laundering problem in the country is unknown, but conditions exist for it to occur on a significant scale. In recent years, Morocco has taken a series of steps to address the problem, most notably with the enactment of a terrorist finance (CFT) law in May 2003; with a comprehensive anti-money laundering (AML) law in April 2007; and with the establishment of a Financial Intelligence Unit (FIU) in April 2009. These actions have provided the legal basis for the monitoring, investigation, and prosecution of illegal financial activities. The new laws allow for the freezing of suspicious accounts and permit the prosecution of terrorist finance-related crimes. U.S. and EU programs are providing Moroccan police, customs, central bank, and government financial officials with training to recognize money laundering methods. The FIU and its member organizations met with the U.S. Department of the Treasury and the Department of Homeland Security in early October to discuss possible U.S. technical assistance to develop the AML/CFT regime. A formal request from the FIU and the Central Bank followed in November. Morocco had a relatively effective system through the newly established FIU for disseminating U.S. government and UN Security Council terrorist freeze lists to its financial sector and legal authorities. Morocco froze some terrorist-related accounts.

Another key to Morocco's counterterrorism efforts was its emphasis on international cooperation. Moroccan authorities continued to disrupt plots to attack Moroccan, U.S., and other Western-affiliated targets, and aggressively investigated numerous individuals associated with international terrorist groups, often in collaboration with international partners. Morocco and the

United States worked together extensively on counterterrorism efforts at the tactical level. In the past years, Morocco has accepted prisoners formerly detained at Guantanamo Bay and prosecuted them under Moroccan law.  In May, a Moroccan criminal court reduced the sentence of former Guantanamo Bay detainee Mohammed Benmoujane from 10 to two years.

Morocco also forged solid cooperative relationships with European and African partners by sharing information and conducting joint operations.  Morocco is considered a Mediterranean Dialogue partner of the North Atlantic Treaty Organization and also cooperated with regional partners on a bilateral basis.  In March, Spanish police arrested a Moroccan on an international warrant issued by Morocco on suspicion of belonging to a terrorist group that had planned attacks on official and tourist targets in Morocco.  Morocco also worked closely with African partners such as Mauritania and Senegal.  The government used army and Ministry of Interior paramilitary forces to secure its borders as best it could but faced resource constraints and both a lengthy border and lengthy coastline.

**Oman**

Oman continued to be proactive in implementing counterterrorism strategies and cooperating with neighboring countries to prevent terrorists from entering or moving freely throughout the Arabian Peninsula.   The Omani government opposed the spread of extremist ideology by promoting religious moderation and tolerance.  To better coordinate efforts to prevent terrorist-related activities, the government continued development of a national terrorism operations and analysis center. In some cases, the country was resistant to sharing of specific information or its activities in this field with bilateral partners. Oman is not a major financial center and did not have a significant money laundering problem.

In this regard, an Omani businessman, Ali Abdul Aziz al-Hooti, was arrested, tried, and sentenced to life imprisonment in Oman for helping to fund Lashkar-e-Tayyiba, as well as helping plan terrorist attacks in Oman.  At the same time, al-Hooti's Indian-born accomplice, Sarfraz Nawaz, was returned to India where he is also serving a life term.

Oman's long coastline and relatively porous borders remained vulnerable to illegal transit by migrant workers, smugglers, terrorists and drug traffickers.  The government was concerned about the steady flow of illegal immigrants attempting to transit Oman to other destinations in the Arabian Peninsula, particularly the United Arab Emirates.  The majority of the illegal immigrants apprehended were from Pakistan and Afghanistan.  Somalis continued to attempt to cross the border illegally into Oman from Yemen.

The Omani government actively sought training and equipment from the United States and other countries and relevant commercial entities, to support its efforts to control its land and maritime borders.  It continued conceptual development of joint operations centers to be staffed and equipped by relevant ministries.  Oman used United States security assistance to enhance nighttime operational capabilities on its maritime and land borders.

**Qatar**

While Qatar and the United States cooperated on some counterterrorism issues, the United States continued to strive for increased cooperation – and particularly information sharing – with the Qatari government.  There has not been a terrorist attack in Qatar since the March 19, 2005 suicide vehicle-borne improvised explosive device attack at an amateur theater playhouse that killed a British citizen. Cooperation with U.S. law enforcement authorities continued to improve during and after the investigation of this case.  Press reports indicated that up to 19 people of various nationalities, including one Qatari, were apprehended during the ensuing investigation. There were no reports of criminal prosecution in the case; however, many of the third country nationals who were apprehended were deported subsequent to the investigation.

The Qatar Authority for Charitable Activities was responsible for overseeing all domestic and international charitable activities, including approving international fund transfers by charities and monitoring overseas charitable, development, and humanitarian projects.  The Authority reports annually to Qatari government ministries on their oversight and humanitarian activities.

Cooperation with U.S. authorities on counterterrorist finance continued to develop.  Qatar's Financial Information Unit (FIU) resides in the Qatar Central Bank.  Local banks worked with the Central Bank and the FIU on counterterrorist finance and anti-money laundering issues.

Qatar was one of two countries in the Gulf with an attorney general independent of the Ministry of Interior or Ministry of Justice and equivalent to a ministerial level position.  The Attorney General independently controlled and oversaw public prosecutions and appointed attorneys within the Public Prosecutors Office.

The United States provided law enforcement and counterterrorism training under various programs.  Exchanges and training have had helped sustain a good relationship with Qatari law enforcement agencies and improved their counterterrorism capabilities.

**Saudi Arabia**

The Saudi government continued to build its counterterrorism capacity and strengthened efforts to counter extremist ideology.  Over the course of the year, Saudi authorities arrested numerous suspected al-Qa'ida (AQ) militants, uncovered several AQ arms caches, continued to develop its new facilities security force, implemented improved border security measures, and tightened laws aimed at combating terrorist financing.  In addition, prominent officials and religious leaders publicly criticized extremist ideology.  Although Saudi Arabia's capacity to deal with internal threats remained strong, continued instability in Yemen gave al-Qa'ida in the Arabia Peninsula (AQAP) a base to continue targeting Saudi Arabia.

The country suffered a high profile attack on August 27 – the first since 2005 – when the Deputy Minister of the Interior for Security Affairs, Prince Mohammed bin Nayif, survived an assassination attempt.  The prince, who spearheads the Kingdom's counterterrorism operations, invited AQAP member Abdullah al-Asiri to his palace to personally accept his surrender.  As a show of good faith, Prince Mohammed asked that al-Asiri be excluded from the usual security

screening.  Approximately 40 minutes after his arrival at the palace, al-Asiri detonated explosives hidden on his person.  The prince suffered minor injuries and the would-be assassin was killed in the explosion.  There were no other casualties.  Following the attack, Second Deputy Prime Minister and Minister of Interior Prince Nayif bin Abdulaziz and other officials publicly re-affirmed the Kingdom's commitment to its counterterrorism strategy.

Saudi authorities focused public attention on a list of key extremists located outside the Kingdom and made several terrorism-related arrests.  On February 2, the Saudi Ministry of Interior (MOI) issued a list of the 85 most wanted suspects located outside of the Kingdom, 83 Saudi nationals and two Yemenis, including AQAP senior leaders and others tied to AQ across the Middle East and South Asia.  On August 19, the MOI announced the arrests of 44 AQ suspects throughout the country and the discovery of large weapon caches.  On October 13, police shot and killed two Saudis with links to AQ at a checkpoint in Jizan.  The men entered the country disguised in women's clothing and, according to police reports, the vehicle was loaded with weapons and explosives.  A third man in the car was also arrested.  On November 1, the MOI announced the discovery of another large weapons cache that was located using the information they obtained from interviews with the AQ-linked suspects arrested in August.

Saudi citizens were also arrested on terrorism charges in neighboring Yemen.  In February, Yemeni police arrested seven Saudi citizens with AQ links on suspicion of planning attacks against Saudi Arabia.  Also in February, Saudi citizen Mohammed al-Harbi, a former Guantanamo detainee and terrorist rehabilitation program graduate who later appeared in AQAP propaganda videos, surrendered to Yemeni authorities and was returned to Saudi Arabia.

Trials continued for more than 900 militants arrested from 2000-2008 on charges of terrorism.  In July, the Ministry of Justice announced that 270 of these suspects were convicted, with sentences ranging from a few months incarceration to death.[15]

The Saudi government focused on combating extremist ideology as a key part of its counterterrorism strategy.  The Ministry of Islamic Affairs (MoIA) continued its extensive media campaign to educate young Saudis on teachings of Islam in order to prevent them from becoming drawn to extremist doctrines.  The campaign included messages incorporated into Friday sermons at mosques, distribution of literature and tapes, and postings on the Internet.  In 2007, the Kingdom issued identification cards to imams and religious leaders to curb instances of unauthorized persons delivering Friday sermons.  In 2009, the government continued to monitor these licensed imams and identify instances of "illegal sermons."  On March 25, the MoIA announced that in the past five years they have dismissed 3,200 clerics for preaching intolerance.

Prominent Saudi officials and religious leaders also spoke out against extremism.  For example:

---

[15] The convicted suspects are in custody and serving jail terms, but U.S. Embassy Riyadh was not aware of any executions carried out.

- In a Friday sermon in Riyadh following the MoI's announcement of 44 AQ related arrests in August, the Grand Mufti strongly attacked the "deviant group" responsible for past extremist operations in the Kingdom and expressed surprise that highly-educated individuals would join such a network.

- In opening remarks delivered on behalf of King Abdullah at the Muslim World League conference held in Jeddah in November, Mecca Governor Prince Khaled al-Faisal urged Muslim scholars to "stand firm in the face of extremist ideology to prevent it from corrupting Muslim youth."

- In September, Prince Khalid bin Sultan, Assistant Minister of Defense, told the media that there would be no compromise with extremist groups who work under the pretext of following religious principles. He also stated that extremism surrounded Saudi Arabia, and required Saudis to be on maximum alert.

Saudi Arabia continued to operate a government-run rehabilitation center for extremists. Since its inception, the program has worked to reintegrate between 200 and 300 extremists, including former Guantanamo detainees, into Saudi society. In January, two of the program's graduates, Said Ali al-Shihri and Muhammad al-Harbi, appeared in a propaganda video announcing the formation of AQAP in Yemen. Both men were former Guantanamo detainees. Al-Harbi later surrendered to Yemeni authorities and was remanded to Saudi Arabia. The MoI estimates recidivism rates for former Guantanamo detainees to be 25% and for all other program participants to be less than 10%.

In addition to its rehabilitation effort, the MoI continued a program of counter-radicalization within the prison system aimed at exposing the violence that extremist ideology entails. The MoI worked with specialists, clerics, and teachers to stop extremist groups from being able to find recruits in the prison system. Since its inception, 3,200 detainees have participated in 5,000 counter-radicalization meetings.

The Government of Saudi Arabia continued to take measures to strengthen its physical borders and improve its security screening processes. The Ministry of the Interior worked to increase the overall safety and security of its land, sea, and air borders by upgrading infrastructure and tightening procedures. The MOI also instituted biometric screening at airports.

Saudi Arabia continued to make progress in combating money laundering and terrorist finance. Banks must report suspicious transactions to the Financial Investigations Unit (FIU), which is part of the Ministry of Interior, and provide the Saudi Arabia Monetary Agency's Department of Banking Inspection and the Anti-Money Laundering Unit with a copy of the report. In May, the FIU was accepted into the Egmont Group, an international group of financial intelligence units, which should improve its ability to cooperate and share information with FIUs around the world.

Also in May, the Saudi Arabian Monetary Agency hosted the sixth annual Gulf–European Symposium on Combating Terrorism Financing. Several government bodies, including the Ministries of Social Affairs, Interior, Islamic Affairs, and the central bank continued to advise

Saudis to be cautious when selecting charity groups to which they contribute.  The government has also banned cash contributions to charities, required charities to seek Ministry of Interior permission before opening a bank account, and required that charities' bank accounts be in the name of the organization.  Terrorist finance facilitators were among those convicted of supporting terrorism in June.  Although Saudi Arabia took important steps to address hawala remittances, further vigilance is required.  The United States urged the Government of Saudi Arabia to pursue and prosecute terrorist financiers vigorously.

**Tunisia**

The Government of Tunisia placed a high priority on combating extremism and terrorism.  In addition to using security and law enforcement measures, the Tunisian government also used social and economic programs, including health care and public education, to ameliorate the conditions that terrorists exploit for recruitment and propaganda purposes.  The government prohibits the formation of religious-based political parties and groups it believes could pose a terrorist threat.  Tunisia does not have a rehabilitation or reintegration program.  The Tunisian government puts a high priority on controlling the border regions.

On July 30, the Chamber of Advisors amended the 2003 anti-terrorism law to harmonize national legislation with UN resolutions related to terrorism financing and money laundering.  The amendments included measures to establish databases on terrorist financial transactions; protect the identities of magistrates, judicial police officers and civil servants involved in terrorism and money laundering cases; freeze funds belonging to people accused of terrorist activities; and extend from two to five days the period allowed for a public prosecutor to issue his judgment on investigations carried out by the Financial Analysis Commission.  The new legislation made a clear distinction between terrorism and resistance, with specific reference to the Palestinians.

The Government of Tunisia enforced the 2003 anti-terrorism law.  However, the government's application of the law was criticized by Tunisian and international organizations who maintained that too many individuals undergo extended pre-trial detention and face unfair trials that rely on weak evidence.  In response to a claim by Tunisian lawyers that 2000 people had been sentenced under the anti-terrorism law, the Minister of Justice stated on May 27 that 300 persons were being detained on terrorism charges.

On July 2, a private Tunisian lawyer announced in the press that the government was charging two military officers along with seven civilians for plotting to attack U.S. military personnel in country.  On July 14, Tunisian media reported that prosecutors dropped the charges against the two officers, citing lack of evidence.

Among the cases in which sentences were publicly announced:

- On March 26, the court in Grombalia, Nabeul sentenced a man to three years in prison for joining a terrorist movement.  He had been previously arrested in December 2006 and released 18 days later.

- May 14, a woman was sentenced to six years in prison for belonging to a terrorist organization, incitement to join terrorist organizations, funding terrorism, and traveling outside the country without official documents.

- May 20, a military court sentenced one person to three years in prison on terrorism-related charges.

- In June, the Tunisian Appeals Court sentenced 22 individuals to three to eight years in prison for belonging to a terrorist organization, obtaining supplies and equipment for the organization, and for calling for acts of terrorism.  One of the 22 individuals convicted was a non-commissioned military officer.

- On July 6, 19 individuals suspected of belonging to the Pan-Islamist "Party of Liberation", were given sentences ranging from 11-14 months in prison for belonging to a foreign terrorist organization.

- On August 2, a Tunisian was forcibly repatriated from Italy to Tunisia after completing a six year sentence for belonging to a terrorist organization.  He was arrested upon his arrival in Tunisia and then released on bail August 10.  The police informed him that he could not leave his house or receive visitors without their permission.

- On October 1, the Tunis court sentenced six individuals to one year in prison for holding an unauthorized meeting, and one person to ten years for belonging to a terrorist organization and inciting terrorist acts.

- On October 17, nine men were given sentences ranging from three to six years in prison on terrorist related charges.

**United Arab Emirates**

While there were no terrorist attacks in the UAE in 2009, seven Emiratis were charged with promoting and funding terrorism.  A U.S. citizen was convicted of supporting a foreign terrorist organization and subsequently deported to Lebanon, his country of birth.

The Government of the United Arab Emirates (UAE) repeatedly condemned terrorist acts in Iraq, Lebanon, Pakistan, and elsewhere in the region.  In order to prevent extremist preaching in UAE mosques, the General Authority of Islamic Affairs and Endowments provided guidelines for all Friday sermons and monitored compliance.  The UAE worked to keep its education system free of radical influences and emphasized social tolerance and moderation.

The Container Security Initiative (CSI), which became operational at Port Rashid and Jebel Ali Port in the Emirate of Dubai in 2005, reviewed approximately 250 bills of lading each week, resulting in about 20 non-intrusive inspections of U.S.-bound containers.  Examinations were

conducted jointly with Dubai Customs officers, who shared information on transshipments from high risk areas, including those originating in Iran.

The UAE has a cyber-crime law criminalizing the use of the Internet by terrorist groups to "promote their ideologies and finance their activities." The UAE has established a National Security Council charged with formulating and implementing a national strategic plan. Cooperation on law enforcement matters was hampered by the lack of a mutual legal assistance treaty between the United Arab Emirates and the United States.

The UAE continued efforts to strengthen its institutional capabilities to combat terrorist financing, but challenges remained. The Central Bank initiated memoranda of understanding with regional FIUs, and performed anti-money laundering training both locally and regionally. The 2008 MENA-FATF (Middle East North Africa Financial Action Task Force) Mutual Evaluation Report for the UAE made a recommendation to amend the federal anti-money laundering law and increase dedicated resources available to the Central Bank's Financial Intelligence Unit (FIU). Although the UAE took important steps to address hawala remittances, further vigilance is required, as hawalas are easily used for money laundering.

The UAE Central Bank provided training programs to financial institutions on money laundering and terrorist financing. The United States and the UAE worked together to strengthen efforts to combat Bulk Cash Smuggling (BCS), in particular from countries at higher risk of illicit finance activity. Immigration and Customs Enforcement provided Dubai Customs with BCS training for airport interdiction of contraband currency. The Department of Justice also provided BCS training for prosecutors in Dubai.

**Yemen**

The security situation in Yemen continued to deteriorate during 2009. Al-Qa'ida in Yemen (AQY) announced its merger with al-Qa'ida (AQ) elements in Saudi Arabia in January 2009, creating al-Qa'ida in the Arabian Peninsula (AQAP). This strategy of consolidation received significant publicity and demonstrated AQ's reinvigorated recruitment efforts and commitment to expand operations throughout the Peninsula. However, the creation of AQAP coincided with fewer attacks within Yemen. This was due in part to Yemeni security forces' disruptions of the group, but also may have reflected the desire of AQAP's leadership to reduce its attacks within Yemen and use the country – and particularly those regions that were largely outside government control -- as a safe haven for planning future attacks.

The government's response to the terrorist threat was intermittent, and its ability to pursue and prosecute suspected terrorists remained weak throughout most of the year. Draft counterterrorism legislation stalled in Parliament. The government's response, however, improved dramatically in December, exemplified by the heightened pace of counterterrorism operations. Still, the government's focus on other internal security challenges, including the "Sixth War" of the Houthi rebellion in the northern Sa'ada governorate, which began in August and had not ceased by year's end, often diverted it from broader counterterrorism activities.

On December 25, Nigerian citizen Umar Farouk Abdulmutallab attempted to blow himself up while on a flight into Detroit.  Abdulmutallab admitted to having been trained by AQAP in Yemen.

There were three terrorist attacks against foreign interests:

- On March 15, four South Korean tourists were killed in a suicide bomb attack in the city of Shibam in Hadramaut province.

- On March 18, a motorcade carrying South Korean government officials was attacked by a suicide bomber on the road to Sana'a International Airport.

- In June, nine foreigners were kidnapped in Sa'ada, resulting in three confirmed deaths. The remaining six were still missing at year's end.

There were a number of terrorist attacks against Yemeni interests, particularly Yemeni security and military targets.  Terrorist elements, either explicitly aligned with AQAP or related actors, attacked Yemeni targets of opportunity in Ma'rib and Hadramaut in June, July, October, and November; among these incidents was the assassination of three high-level security officials. AQAP showed signs of financial strain, and Yemeni authorities suspected them to have conducted the sophisticated robbery of a Yemeni bank truck in Aden on August 17 that resulted in the theft of US$ 500,000.

While attacks inside Yemen decreased from 2008, AQAP launched an attempt on Saudi counterterrorism chief Prince Mohammed bin Nayif's life in Riyadh on August 27.  A known AQAP member, Abdullah al-Asiri, claimed he was seeking a royal pardon during Ramadan and gained access to bin Nayif.  Al-Asiri detonated a bomb, killing himself but failing to inflict serious injury on the prince.  The suicide bomber was thought to have crossed into Saudi Arabia via the northern Yemeni border.

Despite these security challenges, there were counterterrorism successes in 2009, including:

- On January 19, the Counterterrorism Unit (CTU) conducted a raid on an AQ cell in Sana'a, which resulted in the death of two suspects, and the capture of another suspect and a weapons cache, including machine guns, mortars, and rocket-propelled grenades.

- In March, Abdullah Abdul-Rahman Mohammed al-Harbi, a Saudi AQAP member, was arrested in Ta'iz and later returned to Saudi Arabia.  Also in Yemen, Naif Duhais Yahya al-Harbi, another Saudi national AQAP member, surrendered and Hasan Hessian bin Alwan, a Saudi AQAP financier, was arrested in June.

- On December 17, strikes were conducted on two significant AQAP sites.  Similar strikes followed on December 24.  In the wake of these operations, Yemeni officials affirmed that they will continue to pursue AQAP operatives.

Throughout most of the year, prosecuting terrorists remained extremely difficult for Yemeni courts, largely because current law, as applied to counterterrorism and the financing of terrorism, remained weak.  Counterterrorism legislation sent to a Parliamentary committee for review in 2008 remained there at year's end.  The absence of effective counterterrorism legislation that criminalized the activities of those engaged in planning and facilitating acts of terrorism, both in Yemen and abroad, contributed to Yemen's appeal as a safe haven and potential base of operations for terrorists.  For this reason, the government was forced to apply other available laws, including fraudulent document charges or "membership in an armed gang" charges to thwart foreign fighters going to Iraq and Afghanistan.  Those who commit acts of terrorism in Yemen can face punishment for murder or assault under the criminal system, but terrorism itself is not a defined crime, and therefore not illegal.  On December 29, however, the Parliament passed long-stalled counterterrorist finance and anti-money laundering legislation that gave the government new powers to investigate and prosecute terrorist financial networks operating inside the country.  Legal, political, and logistical hurdles remained a hindrance to an effective detention and rehabilitation program for Guantanamo returnees.  The government lacked a secure facility to house Guantanamo returnees, a plan for rehabilitating the returnees, or the legal framework to hold returnees for more than a short amount of time.  The government's monitoring program of released Guantanamo returnees remained largely ineffective.

As Saudi security forces have clamped down on terrorism, and foreign fighters have returned from Afghanistan and Pakistan, Yemen's porous borders have allowed many terrorists to seek to base operations within Yemen.  The government lacked a strong security apparatus outside major cities and its Counterterrorism Unit and Yemen Special Operations Force, the state's two premier counterterrorism entities, required additional training and funding in order to effectively target terrorist elements.  The Department of State provided training and equipment to Yemen's security forces in the Ministry of Interior, including the Yemeni Coast Guard and the Central Security Forces Counterterrorism Units (CTU).  The United States also supported regional and multilateral efforts to help Yemen stop the flow of funding to terrorism, including regional training of Yemeni officials from the Central Bank, Ministry of Finance, and Financial Intelligence Unit.

## SOUTH AND CENTRAL ASIA OVERVIEW

**"Our struggle against terrorism must be fought not just on the battlefield, but in education, in health, in jobs, in trade, and above all for the hearts and minds of our people."**

**--Asif Ali Zardari, President of Pakistan**
**September 24, 2009**

Already plagued by terrorism, South Asia experienced more violence in 2009 as terrorists expanded their operations and networks across the region and beyond.  In response, the United States worked to increase counterterrorism cooperation with its partners in South Asia.  Progress was limited because of combination of political unrest in the region, weak governments, and competing factions within various South Asian governments.

In Afghanistan, the Taliban-led insurgency remained resilient in the south and east and expanded its presence into the north and west.  Although the insurgency absorbed heavy combat and leadership losses, its ability to recruit foot soldiers from its core base of rural Pashtuns remained undiminished.  Al-Qa'ida (AQ) provided some facilitation, training, and funding while maintaining its safe haven in Pakistan.

Pakistan continued to suffer from rising militancy and extremism. The Federally Administered Tribal Areas (FATA), Baluchistan, the North West Frontier Province, southern Punjab, and other parts of Pakistan continued to be used as safe havens for AQ terrorists, Afghan insurgents, and other terrorist groups.

India was the focus of numerous attacks from both externally and internally based terrorist organizations.  Although clearly committed to combating terrorism, the Indian government's counterterrorism efforts remained hampered by its outdated and overburdened law enforcement and legal systems.  In the wake of the Mumbai terrorist attacks of 2008, India's Parliament has introduced bills to restructure its counterterrorism laws and established a National Investigative Agency to create a national-level capability to investigate and prosecute acts of terrorism.

In Bangladesh, the Awami League, which won a landslide electoral victory in 2008, acted on its pledge to focus serious attention on Bangladesh's counterterrorism needs.  This resulted in the arrest of several high-profile terrorism-related figures in Bangladesh, including some from Lashkar-e-Tayyiba (LT).  The Bangladeshi government has also championed the creation of a South Asia counterterrorism task force that countries could use to work together regionally to stamp out the rise of violent extremism.

In spite of losing the war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected of surviving largely intact.  The Sri Lankan government was criticized for using former LTTE paramilitary organizations that relied on abduction, extra-judicial killings and other illegal tactics to combat the LTTE and their suspected sympathizers. As the military recaptured the remainder of the LTTE-held territory, the LTTE reverted increasingly to more asymmetrical tactics, including suicide bombers and other terrorist attacks, some of which caused serious civilian casualties.

In April, 2008, the Communist Party of Nepal (Maoists) won the national Constituent Assembly election and formed a Government under Maoist Prime Minister Pushpa Kamal Dahal. Following Dahal's May 2009 resignation, the Maoists continued in political opposition and remained a U.S.-designated terrorist entity under the Terrorism Exclusion List and Executive Order 13224.

Other significant terrorist organizations in Central Asia include the Islamic Movement of Uzbekistan (IMU) and a splinter group now known as the Islamic Jihad Union (IJU).  Extremist groups such as Hizb ut-Tahrir (HT) foment an anti-Semitic, anti-Western ideology that may indirectly generate support for terrorism.  HT, a political movement that advocates the establishment of a borderless, theocratic Islamic state throughout the entire Muslim world, has

followers in Kyrgyzstan, Kazakhstan, Tajikistan, Uzbekistan, and elsewhere. The United States has no evidence that HT has committed any acts of terrorism, but the group is sympathetic to acts of violence against the United States and its allies. HT has publicly called on Muslims to travel to Iraq and Afghanistan to fight Coalition Forces.

## Afghanistan

During a year in which it conducted a presidential election, Afghanistan continued to confront the challenges of building a stable, democratic government in the face of a sophisticated, multi-faceted insurgency that primarily relied on asymmetric tactics. The insurgency targeted coalition forces, the United Nations Assistance Mission to Afghanistan (UNAMA), international non-governmental organizations (NGOs), foreign diplomatic missions, Afghan government officials and security forces, and Afghan civilians.

Separate but intertwined and affiliated extremist organizations led by Mullah Omar (Taliban), Sirajuddin Haqqani (Haqqani Network), and Gulbuddin Hekmatyar (Hezb-e-Islami Gulbuddin - HIG) increased their use of improvised explosive devices (IEDs) and coordinated attacks using multiple suicide bombers, resulting in an increase from 2008 in overall casualties. The Taliban, in particular, stepped up the pace of its attacks and simultaneously increased its shadow government presence throughout the country. Al-Qa'ida (AQ) and the Taliban senior leadership maintained an operational relationship, but AQ's direct influence in Afghanistan has diminished over the past year due to effective counterterrorism operations.

With support from the international civilian and military community, the Government of the Islamic Republic of Afghanistan worked to build and strengthen its national security forces and establish effective law-enforcement mechanisms and improved governance to increase stability and counter Taliban presence and influence.

The International Security Assistance Force (ISAF) led the coalition forces' counterinsurgency campaign, using a combination of counterinsurgency means and methods, including synchronized use of combat (air and ground forces) and non-combat means (building civil governance and aiding reconstruction and development in conjunction with UNAMA) to fight extremism. Over the summer, General Stanley A. McChrystal issued a tactical directive which sought to reduce civilian casualties caused by military actions. A UN report on the protection of civilians in Afghanistan showed a 14 percent increase in civilian deaths compared to 2008, but credited ISAF with a 28 percent reduction in civilian deaths from pro-government forces.

The Commander, U.S. Central Command, maintained command and control of U.S. forces operating in Afghanistan. United States forces targeted insurgent leaders, facilitators, improvised explosive device (IED) networks, the narcotics-insurgent nexus, and insurgent training and logistics centers with the objective of eliminating terrorists and facilitating reconstruction and development. The Afghan National Army (ANA), and to a lesser extent, the Afghan National Police (ANP), continued to lead in the majority of counterterrorism operations, in close cooperation with coalition forces. The Afghan National Security Force (ANSF) continued to work in close partnership with ISAF to develop the capability necessary to assume

the lead in security across Afghanistan and take a greater role in planning and execution operations.  Partly in response to their growing inability to prevail against coalition and ANSF forces in conventional encounters, insurgents increasingly resorted to asymmetrical tactics to intimidate ordinary Afghans.  These tactics included increasingly sophisticated IEDs placed along key travel arteries, assassination attempts against Afghan government officials, and the use of suicide bombers and direct fire attacks in population centers where Afghan civilians are used as shields.

Integrated civilian-military counterinsurgency approaches in the eastern part of the country have continued to yield some successes.  Nonetheless, the anti-government insurgency remained a capable, determined, and resilient threat to stability and to the expansion of government authority, particularly in the south and east.  The insurgency continued to suffer heavy combat losses, including among senior leaders, but its ability to recruit soldiers remained undiminished.  Taliban information operations were aggressive and sophisticated, including, for example, Mullah Omar's injunctions on the Taliban website for Taliban fighters to avoid harming civilians and monitor local communities regarding their satisfaction with Taliban shadow government officials' performance.

Despite increased efforts by the international community against funding flows, streams of Taliban financing from abroad, along with funds gained from narcotics trafficking and kidnapping, criminal enterprises, and taxing the local population, have allowed the insurgency to strengthen its military and technical capabilities.  Narcotics trafficking in particular remained an important financing mechanism of terrorist/insurgent operations.

In addition to targeting Afghan and coalition military forces, insurgents and criminals attacked Afghan government officials and civil servants, Afghan police and army forces and recruits, humanitarian actors, and civilians.  Foreign civilians, including diplomats, were deliberately targeted.  Two high-profile terrorist attacks against foreign diplomats in Kabul City this year included the October 8 suicide car bombing of the Indian Embassy that killed at least 17 and the October 28 attack on a UNAMA guesthouse that killed five UN employees and three other Afghans.  The Taliban claimed responsibility for both attacks.

Throughout the year, insurgents targeted NGOs, Afghan journalists, government workers, UN workers, and recipients of NGO assistance.  They targeted teachers, pupils (especially girls), and schools.  Attacks on girls schools in the east and south increased.  Taliban militants were suspected in late April and early May of using an unidentified gas to sicken girls and teachers at two schools in the town of Charikar in Parwan Province and one school in Mahmud Raqi, a small town north of Kabul.  Insurgents coupled threats and attacks against NGOs with continued targeting of Provincial Reconstruction Teams (PRTs), de-mining teams, construction crews working on roads and other infrastructure projects.  Additionally, insurgents continued to kidnap foreigners and Afghans.  While insurgents conducted most abductions for ransom, presumably as a means of raising money to support their operations, they have also sought to use victims to negotiate with Afghanistan's government and the international community.

Taliban militants made a concentrated effort to thwart the August 20 Presidential and Provincial elections by intimidating voters and attacking election officials.  There were more than 1,000 insurgent attacks in August, approximately 20% of which occurred on Election Day.  Although there were few resulting casualties, voter turnout was notably lower than for the 2004 election, and, in some areas in the south and east, turnout was effectively shut down altogether as a result of Taliban intimidation.

**Bangladesh**

Immediately after taking office in January 2009, the Awami League-led government began a crackdown on domestic and transnational terrorist groups.  As a result, Bangladesh and India improved their counterterrorism cooperation during the year, which led to the arrest of several senior members of the United Liberation Front of Assam (ULFA), an anti-India insurgency group.  In November, Bangladesh arrested several extremists alleged to have ties to Lashkar-e Tayyiba (LT), the organization believed responsible for the November 2008 Mumbai attack, Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B), and other extremist groups.  The arrests were evidence of the government's efforts to deny transnational terrorists safe haven and targeting opportunities in Bangladesh.

Jamaatul Mujahedin Bangladesh (JMB), the banned domestic Islamist extremist group responsible for a wave of bombings and suicide attacks in late 2005, remained a threat.  During the first three months of 2009, authorities arrested several suspected JMB members and uncovered weapons caches that included grenades and chemicals that could be used to make explosives.

In February, the Awami League-led government adopted into law the Money Laundering Prevention Act (MLPA) and the Antiterrorism Act (ATA).  These laws formalized ordinances passed in 2008 under the caretaker government.  Although not fully compliant with international standards, the MLPA addressed many flaws in the 2002 money laundering law and antiterrorist financing into the Bangladeshi legal system for the first time.  The laws facilitated international cooperation and established a financial intelligence unit (FIU) at the Bangladesh Bank.  The new laws are part of the effort to enable Bangladesh to enter the Egmont Group, the international body of FIUs that plays a critical role in fighting terrorist financing.

U.S. and Bangladeshi law enforcement agencies cooperated well on several cases related to domestic and international terrorism.  Bangladesh worked with the United States to further strengthen control of its borders and land, sea, and air ports of entry.

**India**

India remained one of the countries most afflicted by terrorism with over 1,000 deaths attributed to terrorist attacks in 2009, primarily in Kashmir, the Northeast, and the Maoist affected "Red

Corridor."[16] India continued to face persistent and significant external threats from groups including LT, Jaish-e-Mohammad, and Harakat-ul-Jihad-i-Islami-Bangladesh. Although there were no large-scale assaults similar to the November 26, 2008 attacks in Mumbai, senior government officials warned that India remained at risk on the basis of the volume of credible threats the government continued to receive.  Terrorist attacks included:

- On January 1, the United Liberation Front of Assam (ULFA) detonated several bombs in Guwahati, Assam, killing five people and injuring 50.

- On February 1, Maoists/Naxalites killed and mutilated the bodies of 15 police officers in Maharashtra's eastern district of Gadchiroli, looting guns and ammunition.

- On October 7, Maoists/Naxalites beheaded Police Inspector Francis Induwar near Ranchi, Jharkhand, after the Indian Government refused to respond to a demand for the release of three jailed Maoist/Naxalite leaders.

- On October 8, Maoists/Naxalites ambushed a police patrol in Maharashtra killing 17 police.

- On December 2, Maoists/Naxalites in West Bengal beheaded school teacher Satya Kinkar Hansda following his earlier abduction.

Indian authorities made several terrorism-related arrests:

- On May 3, state police arrested approximately 20 sympathizers of the Liberation Tigers of Tamil Ealam (LTTE) for attacking an army camp in Coimbatore, Tamil Nadu.

- On June 4, police arrested Lashkar-e-Tayyiba (LT) operative Mohammad Omar Madini in New Delhi.

- On August 7, police arrested two suspected Hizb-ul-Mujahideen terrorists in New Delhi ahead of Independence Day celebrations.

The state of Jammu and Kashmir, historically victim to the largest number of foreign terrorist attacks, saw casualties decline significantly from previous years.  The Ministry of Home Affairs (MHA) reported that 71 civilians and 52 members of the security forces were killed in terrorist-related violence in the state through November.  Home Minister P. Chidambaram reported to Parliament in December that 700 foreign insurgents were active in the state, down from 800 earlier in the year.

---

[16] According to Home Minister Chidambaram, groups affiliated with the Communist Party of India (Maoist) had pockets of influence in 20 states, but were primarily active in 223 out of India's 545 Parliamentary districts across eight states known as the "Red Corridor", comprised of West Bengal, Bihar, Chhattisgarh, Jharkhand, Orissa, Andhra Pradesh, Maharashtra, and Karnataka.

Indian Prime Minister Manmohan Singh told Parliament that Maoists/Naxalites insurgent groups represented the most significant threat to domestic security.  Maoists/Naxalites conducted numerous attacks against police and local government officials and bombed railways, killing civilians and disrupting services.  No American citizens were victims of Maoist/Naxalite-related terrorism during the year.  Foreign companies were reportedly targeted for extortion.  In June, the central government banned Maoist/Naxalite groups under the Unlawful Activities Prevention Act of 1967.  Chief Ministers from the most affected states agreed to cooperate with the MHA to launch joint operations against the Maoists/Naxalites along inter-state borders.  MHA established counter-insurgency schools for police officials in Assam, Bihar, Chhattisgarh, Orissa, and Jharkhand.  The central government deployed additional security forces in Chhattisgarh and Orissa, and announced plans to deploy to eight additional states.

Ethno-nationalist insurgent groups remained active, particularly in the Northeast.  The ULFA, a domestic terrorist group banned by India in 1990, continued a campaign of bombings in Assam state resulting in 27 fatalities this year.  On December 2, security forces arrested ULFA Chairman Arabinda Rajkhowa near the Bangladesh border.  The Assam state government offered talks and free passage to ULFA leaders in a bid to make peace with the group.  Home Minister Chidambaram reported to Parliament that the central government would agree to hold talks with the ULFA, if the group "abjured violence."

Parliamentary elections in April and May returned the ruling Congress Party-led coalition government to power despite criticism that security and intelligence lapses failed to prevent the 26/11 attacks.  The new government instituted several reforms designed to augment its existing security structures and to develop new capabilities.  The MHA instituted regular meetings to improve communication among security agencies at the central and state levels, and it assigned senior officers to review counterterrorism and counter-Maoist/Naxalite operations.  The government implemented tighter immigration controls, and, in some areas.  It also implemented more effective border management through fencing and flood lighting and undertook a coastal security project that began issuing identity cards to villagers in some coastal areas.  The MHA instituted a mega-city police training program and, in coordination with the Ministry of Defense (MOD), established assistance programs to train state police.  The MHA increased resources for the National Security Guard (NSG), India's first responder paramilitary force, and established NSG hubs in Chennai, Kolkata, Hyderabad, and Mumbai.  It also reorganized the Multi-Agency Centers (MACs), which are tasked with collecting real-time intelligence and coordinating among agencies and began establishing subsidiary MACs in state capitals.  The new National Investigation Agency created in the wake of the Mumbai attacks registered several cases in 2009.  The trial of Ajmal Kasab, the alleged lone surviving gunman involved in the Mumbai attack, continued in Mumbai.

Amendments to the Prevention of Money Laundering Act (PMLA) came into force in June, furthering India's ability to combat the financing of terrorism.  Indian officials participated in the South Asian Regional Conference for Countering Terrorist Financing in the Charitable Sector in April.  The Asia/Pacific Group and the Financial Action Task Force (FATF) conducted a joint mutual evaluation in December to evaluate India's compliance with global anti-money laundering and counterterrorist finance standards in the context of India's candidacy for FATF

membership.  In December, India's Narcotics Control Bureau arrested Naresh Kumar Jain, allegedly a significant underground banker, as part of an operation to close a global network of illegal money transfers.

In the wake of the Mumbai attack, the government increased its bilateral and multilateral cooperation with foreign governments on counterterrorism.  Senior Indian government officials, including the Home Minister, visited the United States to advance bilateral counterterrorism cooperation, culminating in the conclusion of the U.S.-India Counterterrorism Cooperation Initiative during Prime Minister Singh's official state visit in November.

**Kazakhstan**

Kazakhstan continued to aggressively combat terrorism.  Kazakhstan's Ministry of Interior announced on January 10 that Ministry of Interior troops have new responsibilities related to the fight against terrorism under a new military doctrine, and the Ministry held a counterterrorism exercise in January.  In August the National Security Committee (KNB), and the Ministries of the Interior, Defense, and Emergency Situations held counterterrorism exercises at the international trade port in Aktau.[17]  On August 28, Kazakhstan's President Nursultan Nazarbayev signed two new laws to counter terrorist funding and money laundering.

Kazakhstan's cooperation with the United States included its hosting of a September 29-October 1 Legislative Drafting Expert Workshop on Counterterrorism.  During the seminar, Kazakhstani legal experts from both houses of the country's Parliament, the General Prosecutor's office, and the Customs Control Committee reviewed Kazakhstan's counterterrorism legislation, based on advice from U.S. and United Nations Office on Drugs and Crime (UNODC) experts.  During FBI Director Robert Mueller's November 17 visit to Astana, the Prosecutor-General's Office and the FBI signed a memorandum of understanding, stating that the parties intend to cooperate in the fight against organized crime and money laundering.  Mueller also met with then-KNB Chairman Amangeldy Shabdarbayev, who agreed to intensify cooperation in the fight against terrorism and extremism.  Kazakhstani government agencies have typically provided limited information on domestic terrorism cases and generally do not provide contextual information on cases reported by the press.

Kazakhstan has continued to detain and prosecute suspected terrorists. The press reported a number of cases in which individuals were detained or sentenced for suspected acts of terrorism, including the following:

- On September 22, local press reported that the Astana City police detained a 23-year-old Uzbek citizen.  After an investigation determined he was wanted by Uzbek law-enforcement agencies on suspicion of carrying out terrorist activities, the police arrested him, pending an extradition decision.

---

[17] Aktau is Kazakhstan's largest port on the Caspian Sea and an important shipping site in the transportation of oil from Kazakhstan to Azerbaijan and Russia.

- On September 24, national media published an article stating that an Aktobe Province court sentenced six local people to 12-17 years in prison for terrorism. According to the press, the group intended to punish foreign investors and announce a jihad against infidels. The six alleged terrorists reportedly planned to blow up oil company facilities in the region and possessed arms and explosives.

To prevent radicalization and support other domestic counterterrorism initiatives, Kazakhstan actively promoted intercultural and religious dialogues. Most notably, Kazakhstan hosted the third triennial Congress of World and Traditional Religions in Astana July 1-2, and it has stressed multi-confessional concord as a key element of a proposed "doctrine of national unity." During the October 26 opening session of the Kazakhstan People's Assembly (KPA), Nazarbayev also suggested the creation of a doctrine on national unity. Nazarbayev suggested that the doctrine focus on the shared priorities of Kazakhstan and the KPA and particularly emphasized multi-confessional concord.

Kazakhstan also continued to strengthen its engagement in international counterterrorism activities. On February 11, the Government of Kazakhstan ratified a 2007 Shanghai Cooperation Organization (SCO) agreement to actively advance cooperation in the fight against terrorism and extremism. The Collective Security Treaty Organization (CSTO) held a counterterrorism drill in Aktau in October, with participation from various Kazakhstani security forces.

## Kyrgyzstan

In 2009, the Government of Kyrgyzstan took political and law enforcement steps to disrupt and deter terrorism. Since 2001, Kyrgyzstan has actively supported U.S. counterterrorism efforts and Operation Enduring Freedom in Afghanistan.

The Government of Kyrgyzstan, with the financial support from the U.S. and other international organizations, continued efforts to improve border security throughout the country and particularly in the southern Batken region. These efforts included the construction of more modern border facilities, a program to create central communications between the dispersed border checkpoints and government agencies, the installation of radiation detection equipment at select crossings, and the establishment of a tracking system to monitor the transport of certain dual-use equipment throughout the country.

Kyrgyzstan's military and internal forces worked to improve their counterterrorism capabilities and to expand cooperation with regional partners. Kyrgyzstan continued to be an active member of the Shanghai Cooperation Organization and the Cooperative Security Treaty Organization (CSTO). With U.S. assistance, the Kyrgyz armed forces continue to improve their facilities and tactical capabilities. U.S. financial support has resulted in the training of dozens of Kyrgyz military and law enforcement personnel, and the establishment of more modern defense installations.

Kyrgyzstan's under-regulated borders, especially in the Batken region, remain highly problematic. Kyrgyz law enforcement still lacks the equipment, personnel, and funding to

effectively detect and deter terrorists or terrorist operations in the southern regions of the country.  In 2009, however, Kyrgyz law enforcement agencies conducted multiple raids in southern Kyrgyzstan against terrorist groups.

Supporters of the terrorist groups Islamic Jihad Union (IJU) and Islamic Movement of Uzbekistan (IMU) are believed to maintain a presence in Kyrgyzstan.  Hizb ut-Tahrir (HT), an extremist group banned in Kyrgyzstan, remained active, especially in the south.  In addition to law enforcement initiatives, the government, in particular the State Agency for Religious Affairs, was actively conducting outreach efforts to diminish support for extremist groups and reverse the growing trend toward religious extremism.

**Nepal**

While Nepal experienced no significant acts of international terrorism, several incidents of politically-motivated violence occurred in the country.  Maoist -affiliated Young Communist League (YCL) criminal activity continued, including intimidation and extortion.  In response to the YCL violence, other political parties condoned the use of violence by their youth wings.  Unrest in the southern Terai plains remained high with the proliferation of numerous armed groups and an inadequate police presence.  More than 100 armed groups are estimated to be operating in the Terai, some in pursuit of independence or autonomy, most composed of opportunistic criminal elements.  Competing factions clashed with each other, with the Maoists, with hill-origin Nepalese, and with police, instigating numerous strikes, demonstrations, and Indo-Nepal border road closures.  A Special Security Plan (SSP) was put in place in July to curb violence and end the culture of impunity.  Despite this program, police still do not have an active presence in many parts of the Terai.

Nepal experienced several acts of religiously-motivated violence, most prominently the bombing of a Catholic Church in May.  The attack was conducted by the Nepalese Defense Army (NDA), a Hindu extremist group that was responsible for shooting a Catholic priest and bombing a mosque in 2008.  The leader of this group has since been arrested and their activities appear to have ceased.

There were no indications that Nepal was a safe haven for international terrorists.  Given Nepal's continued instability, however, there is a possibility that members of extremist groups could transit Nepal, especially into India.  The large ungoverned space along the Nepal/Indian border exacerbates this vulnerability, as do security shortfalls at Tribhuvan Airport, Nepal's international airport.  In June, Lashkar-e Tayyiba (LT) member Muhammad Omar Madni traveled through Nepal enroute to New Delhi.

Nepal is not a regional financial center and there were no indications that the country was used as an international money laundering center.  There were no prosecutions or arrests for money laundering in 2009.  However, YCL illicit financial activities, including smuggling, extortion, and protection demands, increased in 2009.

The United States sponsored the attendance of Nepalese security force officers at various international counterterrorism events.

**Pakistan**

Foreign terrorist organizations, including al-Qa'ida (AQ) and its affiliates, continued to operate and carry out attacks in Pakistan.  Violence stemming from Sunni-Shia sectarian strife and ethnic tensions, limited to certain geographical areas, claimed civilian lives.  Similar to last year, attacks occurred with greatest frequency in the regions bordering Afghanistan, including Baluchistan, the Federally Administered Tribal Areas (FATA), and the North-West Frontier Province (NWFP).  Attacks targeting the country's major urban centers, including Lahore, Islamabad, Peshawar, Karachi, and Rawalpindi, continued to increase.

The coordination, sophistication, and frequency of suicide bombings continued to climb in 2009.  (See the NCTC Annex of Statistic Information or www.nctc.gov for precise figures).  These suicide attacks often resulted in large numbers of casualties, with about 50 percent of them occurring in Islamabad, Lahore, Peshawar, and Rawalpindi.  The terrorists launched complex attacks and chose high-value targets, coordinating their attacks with greater precision.  Additionally, there were several audacious and deadly attacks on key security forces targets in retaliation for Pakistani military operations in Swat and throughout the Federally Administered Tribal Areas:

- On October 10, terrorists attacked the Pakistan Army's General Headquarters in Rawalpindi.

- On October 15, terrorists targeted three different security forces locations in Lahore simultaneously with assault rifles, hand-grenades, and suicide vests.  Approximately 20 persons, mostly police personnel, were killed in these well-coordinated attacks.

- On December 4, militants attacked a mosque in Rawalpindi with assault rifles, hand-grenades, and suicide jackets.  Forty people, mostly members of the military and their families, were killed and more than 80 were injured.

- Other high profile suicide bombings targeted the only four-star hotel in Peshawar, the offices of the Inter-Services Intelligence Directorate (ISI) in Peshawar and Lahore, the office of the World Food Program (WFP), and the International Islamic University in Islamabad.

- On February 2, ethnic Baluch separatists were involved in the kidnapping of UNHCR official and American national John Solecki, who was released by his captors on April 4.

- On February 11, an ANP member of the NWFP provincial assembly, Alamzeb Khan, was killed in a remote-control bomb attack in Peshawar.  Seven others were injured in the attack.

- On March 3, militants attacked a bus transporting the visiting Sri Lanka cricket team and its accompanying police detail in Lahore.  At least seven police officers were killed and several cricketers were injured.

- On March 11, there was an unsuccessful suicide attempt against senior ANP leader and senior minister in NWFP government, Bashir Bilour.  Two suicide bombers and four other persons were killed in the attack.  (Bilour was also attacked in 2008.)

- Another ANP member of the NWFP assembly, Dr. Shamsher Ali Khan, was killed and 11 others, including his two brothers, were injured in a suicide bomb blast in his native Swat.  Khan's house was blown up by militants in May.

- Dozens of ANP activists across NWFP were also assassinated by terrorists.

Besides targeting security forces, government institutions and elected representatives, terrorists systematically targeted perceived adversaries, such as aid workers, religious scholars, journalists, diplomats, senior military officers, and educational institutions.

- On July 16, a Pakistani UNHCR official was killed along with his driver at the Katcha Garhi camp in a kidnapping attempt.

- On September 2, there was an attempt to assassinate the Federal Minister for Religious Affairs, Hamid Saeed Kazmi, in Islamabad.  He was injured in the attack, while his driver was killed and two guards were injured.

- On June 12, an important moderate religious scholar, Dr. Sarfaraz Naeemi, was assassinated in a suicide attack.  Five others were killed and seven injured in that bomb blast.

- On August 24, an Afghan journalist, Janullah Hashimzada, was killed in Jamrud Tehsil of Khyber Agency.

- The fate of Afghan and Iranian diplomats who were kidnapped from Peshawar last year remained unresolved this year, while another Pakistani working at the Iranian Consulate in Peshawar was shot and killed by terrorists on November 12.

- Terrorists also continued targeting schools --especially ones for girls -- in NWFP and FATA.  Approximately 100 schools were attacked with explosives or rockets this year.

While the terrorists continued their violence against the population in Pakistan, the government made significant gains, clearing several areas of their control after the insurgents failed to honor an agreement with the government.  On February 16, the NWFP government signed a peace agreement with Tehrik-i-Nifaz-i-Shariat-i-Mohammadi (TNSM) led by an elderly cleric, Sufi Mohammad, in the hope of restoring the writ of government in Malakand Division, including the

districts of Buner, Dir Lower, Dir Upper, Malakand, Shangla, and Swat.  While the government of NWFP acceded to all the demands of the TNSM, the latter refused to lay down its weapons. In a widely watched speech on April 19, Mohammad announced his disregard for the political system of Pakistan and asked government-appointed judges to leave Malakand Division.  This proved to be a turning point, provoking a full-scale military operation across Malakand Division, code-named "Raah-i-Raast" (the way of the truth).  Hundreds of terrorists were killed, injured, and arrested in the operation, which also resulted in the country's most extensive internal displacement crisis.  The military operation succeeded, and life has gradually returned to normal in Malakand Division.

Another major blow to the terrorists in Pakistan was the August 4 death of the leader of Tehrik-i-Taliban Pakistan (TTP), Baitullah Mehsud.  The top three leaders of the TTP, Hakimullah Mehsud, Wali-ur-Rehman Mehsud, and Qari Hussain, jockeyed for power after his death. Hakimullah Mehsud, a nephew of Baitullah Mehsud was eventually made the consensus leader and TTP increased its attacks.  This prompted the military to intensify operations against the TTP, finally culminating in a full-scale ground offensive in South Waziristan code-named "Raah-i-Nijaat" (the way of riddance) in mid-October.  As of December 7, the Pakistan army had cleared major towns and highways of the terrorists.  The local population, however, still remained internally displaced and many extremist organizations have not been dislodged.  At year's end, Pakistan's paramilitary Frontier Corps (FC) was engaged in fighting against a banned terrorist organization, Lashkar-i-Islam (LI), in the Bara subdivision of Khyber Agency, while the Pakistan Air Force and Army Aviation was striking the TTP in Orakzai Agency with aerial bombardment in advance of a possible ground assault.  The Government of Pakistan claimed to have made gains against the TTP and its affiliates in the tribal agencies of Bajaur and Mohmand, where there were frequent clashes, including airstrikes, against the terrorists.

Sectarian violence claimed over 200 lives in 2009, and several high-casualty bomb blasts targeted Shia.

- On February 5, 30 people were killed and 20 injured in a bomb blast near a Shia mosque in D.G. Khan in the Punjab.

- On April 5, there was a suicide bomb blast at a Shia mosque in Chakwal in which 24 people were killed and 140 injured.

- On December 28, a suicide bombing attack in Karachi during a Muharram procession killed at least 93 people, injured at least 75 others, triggering riots and arson.

- There was also an increase in ethnic violence in Baluchistan, especially the killing of Punjabi settlers in Quetta.

The November 2008 terrorist attacks in Mumbai, India were attributed to the Pakistan-based militant group Lashkar-e-Tayyiba (LT).  LT was a designated terrorist organization before the Mumbai attacks, as was its humanitarian front, the Jamaat ud-Dawa (JUD), which the Government of Pakistan banned after the attack.  The United Nations Sanctions Committee

agreed to list the group and several individuals associated with it.  In response to allegations of involvement by LT in the Mumbai attacks, Pakistani officials cracked down on an LT camp in Muzzafarabad and arrested or detained more than 50 LT or JUD leaders in Punjab and elsewhere in Pakistan, but it subsequently released many of them.  LT remained a serious threat to Western interests.

Pakistani officials pledged to prosecute all individuals in Pakistan found to be involved in the Mumbai attacks and offered to share intelligence regarding the attacks with the Government of India.  At year's end, however, peace talks between Pakistan and India remained frozen amid Indian allegations that Pakistan was not doing enough to bring the terrorists to justice.

Unlicensed informal hawalas (money changers) still operated illegally in parts of Pakistan.  The informal and secretive nature of the unlicensed hawalas made it difficult for regulators to effectively combat their operations.  Most illicit funds were moved through unlicensed operators, including through bulk cash smuggling.

**Sri Lanka**

The Sri Lankan government effectively dismantled much of the Liberation Tigers of Tamil Eelam (LTTE), after cornering remaining LTTE fighters and several hundred thousand civilians in the northeast of the island.  Though the government declared victory on May 18, in completing this military campaign, both sides suffered heavy losses.  Earlier in the year, the LTTE carried out a number of attacks, including suicide bombings and an air raid on Colombo, but no further attacks occurred following the end of the war.  On a number of occasions after May, the government announced the capture of suspected LTTE forces, often stating that those captured were intending to carry out violent attacks.  Military and Sri Lankan Police Service personnel discovered large caches of weapons, ammunition, and military grade explosives that had been abandoned and left uncontrolled throughout the country.  These items have been uncovered by government military forces, usually in the northern region most recently under LTTE control.  The Sri Lankan Army remained deployed across the country once the war was over.  Special Task Force (STF) police were deployed in the east, north, and in strategic locations in the west.

In 2009, there were over 40 attacks attributed to the LTTE, including:

- On January 2, a suicide bomber killed two people and injured 32 in an attack at the Air Force Admin Base less than two miles from the US Embassy in Colombo.

- On February 9, a female suicide bomber killed 30 people and injured 64 in an attack at a Mullaithivu IDP Rescue Center.

- On March 10, a suicide bomber killed 14 and injured 46 people after he blew himself up in a mosque in Matara during a religious procession.

- On April 20, a suicide bomber killed 17 people who were among thousands of Tamils fleeing the LTTE and who were seeking refuge with Sri Lankan military forces in Mullaithivu.

In spite of losing the war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected to have survived largely intact. However, the international network likely suffered a serious blow by the August arrest in Southeast Asia and rendition to Sri Lanka of Selvarajah Patmanathan (aka KP), the LTTE's principle financier and arms supplier. This network continued to collect contributions from the Tamil diaspora in North America, Europe, and Australia, where there were reports that some of these contributions were coerced by locally-based LTTE sympathizers. The LTTE also used Tamil charitable organizations as fronts for fundraising.

The Government of Sri Lanka cooperated with the United States to implement both the Container Security Initiative and the Megaports program at the port of Colombo.

## Tajikistan

Tajikistan's security forces confronted members of terrorist groups in the east-central district of Tavildara in spring and summer 2009. Government forces killed several suspected members of the terrorist group Islamic Movement of Uzbekistan (IMU), while other terrorists fled the area as a result of government counterterrorism operations from May to August. The terrorists had infiltrated Tajikistan from Afghanistan and, reportedly, from Russia. Tajikistani security forces also fought extremists near the capitol of Dushanbe and in northern Tajikistan, as well as on the Tajikistan-Kyrgyzstan border.

While security forces were able to defeat the incursion in Tavildara, they continued to suffer from lack of resources. Border Guards and other services lacked appropriate technical equipment, transportation, personnel, and training to interdict illegal border crossings, detect and analyze hazardous substances effectively and respond quickly to incursions. Pervasive corruption and low wages also undermined the motivation of security force members to interdict smugglers.

Tajikistan's 1,300 kilometer long border with Afghanistan is lightly guarded. Much of it runs through remote and difficult terrain, which allows smugglers, extremists, and terrorists to travel to and from Afghanistan. To address the transshipment of illicit goods and people across Tajikistan's borders, the United States and other donors assisted the Government of Tajikistan's efforts to secure its border with Afghanistan. The United States provided communication support to the Border Guards, built a commercial customs facility at the Nizhny Pyanj Bridge, and provided technical and scanning equipment at this location. The U.S. Department of Defense sponsored two Counter Narcoterrorism Training (formerly Joint Combined Exchange Training) events with Tajikistani security forces to improve their capacity to conduct counterterrorism operations. The U.S. Department of State's International Narcotics and Law Enforcement Bureau (INL) provided Tajikistan's State Committee for National Security with a Counter Narcotics/Counterterrorism Analytical Center which included space refurbishment,

computer hardware, analytical software, and training.  It also refurbished three Border Guard Service outposts on the border with Afghanistan.

Tajikistan hosted Exercise Regional Cooperation 10, sponsored by the U.S. Department of Defense. This exercise focused on regional responses to terrorism and strengthening cooperation among Central Asian countries.  The Tajikistani government participated in regional security alliances, including the Shanghai Cooperation Organization and the Collective Security Treaty Organization.

Tajikistan prohibited activities by groups it considered extremist, including the Tablighi Jamaat. It closely monitored groups it listed as terrorist organizations, including the IMU and Hizb ut-Tahrir (HT).

## Turkmenistan

Since the September 2008 violence in Ashgabat's Khitrovka neighborhood, the Turkmenistan government has not reported any other terrorist incidents.  The government maintains a military-style counterterrorism unit that is reported to have hostage rescue and explosives threat management capabilities.  There is also a Department for the Prevention of Terrorism and Organized Crime in the Ministry of Internal Affairs.  In May, the Turkmenistan government passed an Anti-Money Laundering and Counterterrorism Financing Law, which went into effect in August.  This law is understood to have aimed at creating a new state agency to collect information and uncover suspicious transactions.  Although Turkmenistan's law enforcement and security agencies exerted stringent control over society, Turkmenistan's border guards, customs services, and law enforcement were small in size and uneven in quality.  While the government strictly controlled official border crossings and along main roads, clandestine passage was still possible due to long and porous borders that stretch across mountain and desert terrain.  The United States worked with Turkmenistan's authorities to improve the quality of border checkpoints.  In October, a new checkpoint at Farap on the border with Uzbekistan was opened.

## Uzbekistan

The Government of Uzbekistan maintained tight control over internal security.  No large scale terrorist attacks were carried out on Uzbekistan's territory in 2009, although several assassinations and other incidents were believed to be linked to extremist groups.  Terrorist groups that originated in Uzbekistan, including the Islamic Movement of Uzbekistan (IMU) and the Islamic Jihad Union (IJU), were active in other countries, including Afghanistan and Pakistan.

On May 26, an armed group attacked a police outpost in Andijan province, near Uzbekistan's border with Kyrgyzstan.  At the same time, at least two suicide bombings took place in the city of Andijan.  The IJU claimed responsibility for the attacks.

On July 16, the deputy director of Tashkent's largest madrassa was murdered in front of his

home.  On July 31, three men attacked and stabbed the principal imam of Tashkent in front of his home, but the imam survived.

Although terrorist financing does not appear to be a significant problem in Uzbekistan, a large and robust black market functions outside the confines of the official financial system.  The unofficial, unmonitored cash-based market created an opportunity for small-scale terrorist money laundering.  In April 2009, the Government of Uzbekistan responded to international concerns and passed legislation to reestablish an anti-money laundering regime that had been suspended by Presidential decree.  The new legislation falls short of international standards in some areas, but represented a step forward in Uzbekistan's commitment to combat financial crimes.

Uzbekistan cooperated with foreign governments on general security issues, including border control.  Uzbekistan hosted the Central Asian Border Security Initiative (CABSI) meeting in October 2009, for the purpose of facilitating border security cooperation within the region.  Tashkent was the seat of the six-nation Shanghai Cooperation Organization's Regional Anti-Terrorism Structure.

## WESTERN HEMISPHERE OVERVIEW

"Terrorism cannot be ignored in the name of good international relations. On the contrary, multilateralism and diplomacy must lead to collaborative actions among States to overcome this drama and its accomplices like trafficking in arms, illicit drugs, money, asset laundering, and terrorist havens, among others."

--Alvaro Uribe Velez, President of the Republic of Colombia
Statement to the 64th Session of the UN General Assembly
September 23, 2009

Terrorist attacks within the Western Hemisphere in 2009 were committed primarily by two U.S.-designated Foreign Terrorist Organizations in Colombia – the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) – and other radical leftist Andean groups elsewhere.  The threat of a transnational terrorist attack remained low for most countries in the Western Hemisphere.  While the United States and Canada pursued prosecutions against suspected terrorists, there were no known operational cells of either al-Qa'ida- or Hizbollah-related groups in the hemisphere.   Ideological sympathizers in South America and the Caribbean, however, continued to provide financial and moral support to these and other terrorist groups in the Middle East and South Asia.

Overall, regional governments took modest steps to improve their counterterrorism capabilities and tighten border security, but corruption, weak government institutions, insufficient interagency cooperation, weak or non-existent legislation, and reluctance to allocate necessary resources limited progress.  Countries like Argentina, Colombia, and Mexico undertook serious prevention and preparedness efforts.  Others lacked urgency and resolve to address

counterterrorism deficiencies. Most countries began to look seriously at possible connections between transnational criminal organizations and terrorist organizations.

In May 2009, Venezuela was re-certified as "not cooperating fully" with U.S. antiterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Cuba continued to be listed as a state sponsor of terrorism.

Colombia continued vigorous military, law enforcement, intelligence, and economic measures through its "Democratic Security" strategy and especially the "National Consolidation Plan" to defeat and demobilize Colombia's terrorist groups, including the FARCand the ELN. The FARC continued to carry out asymmetrical attacks on soft targets and carried out several high profile operations, including the kidnapping and execution of the governor of Caqueta. While the number of demobilizations, captures, and kills of FARC members in 2009 were all below 2008 levels, Colombian security forces did capture or kill a number of mid-level FARC leaders, debriefed deserters for information, and continued to reduce the amount of territory where terrorists could freely operate. The military and police also destroyed major caches of weapons and supplies, and reduced the group's financial resources through counternarcotics and other security operations.

Mexico and Canada were key counterterrorism partners. Cooperation with them was broad and deep, involving all levels of government and virtually all agencies. The Mexican government remained a committed partner in its battle against organized crime and in efforts against terrorist threats. Counterterrorism cooperation between the United States and Canada occurred in a number of established fora, including the terrorism subgroup of the Cross Border Crime Forum, the Shared Border Accord Coordinating Committee, and the Bilateral Consultative Group on Counterterrorism (BCG). The BCG brings together U.S. and Canadian counterterrorism officials from over a dozen agencies to coordinate policy on bioterrorism, information sharing, and joint counterterrorism training on an annual basis.

The political will of Caribbean nations to combat terrorism remained strong, despite limited resources and capabilities. Primary counterterrorism objectives for the Caribbean included: preventing terrorists or terrorist organizations from entering or transiting the Caribbean en route to other countries, particularly the United States; increasing countries' awareness of the potential threat from terrorists or terrorist organizations; preventing terrorists or terrorist organizations from operating or developing safe havens in the Caribbean; and increasing countries' capabilities to prevent terrorists from attacking targets of opportunity.

The United States enjoyed solid cooperation on terrorism-related matters from most hemispheric partners, especially at the operational level, and maintained excellent intelligence, law enforcement, and legal assistance relations with most countries. An important regional focus for this cooperation was the Organization of American States' Inter-American Committee Against Terrorism, which is the only permanent regional multilateral organization focused exclusively on counterterrorism.

**Tri-Border Area**

The Governments of Argentina, Brazil, and Paraguay have long been concerned with arms and drugs smuggling, document fraud, money laundering, and the manufacture and movement of contraband goods in the border region where the three countries meet. In the early 1990s, they established a mechanism to address these illicit activities. In 2002, at the invitation of the three countries, the United States joined them in what became the "3+1 Group on Tri-Border Area Security" to improve the capabilities of the three to address cross-border crime and thwart money laundering and terrorist financing activities.

The United States remained concerned that Hizballah and HAMAS sympathizers were raising funds in the Tri-Border Area by participating in illicit activities and soliciting donations from sympathizers in the sizable Middle Eastern communities in the region. There was no corroborated information, however, that these or other Islamic extremist groups had an operational presence in the region.

**Argentina**

During 2009, Argentina continued to focus on the challenges of policing its remote northern and northeastern borders – including the tri-border area where Argentina, Brazil, and Paraguay meet – against threats including drug and human trafficking, contraband smuggling, and other international crime.

Argentina and the United States cooperated well in analyzing possible terrorist threat information. Argentine security forces received U.S. government training in terrorism investigations, special operations related to terrorist incidents and threats, and in explosive and drug-sniffing dog handling and dog training. In addition, Argentina hosted U.S. government-financed regional training on the role of police commanders in responding to terrorist threats. Argentina takes seriously its responsibility to protect its nuclear technology and materials; it has begun to provide training to other countries on best practices against illicit trade in nuclear materials.

The National Coordination Unit in the Ministry of Justice and Human Rights manages the government's anti-money laundering and counterterrorist finance efforts, and represents Argentina at the Financial Action Task Force, the Financial Action Task Force of South America, and the Group of Experts of the Inter-American Commission for the Control of the Abuse of Drugs (CICAD) of the Organization of American States' CICAD Group of Experts.

The Attorney General's special prosecution unit, set up to handle money laundering and cases, began operations in 2007. That same year, the Argentine Congress criminalized terrorist financing with the enactment of Law 26.268, "Illegal Terrorist Associations and Terrorism Financing." This statute amended the Penal Code and anti-money laundering law to criminalize terrorist financing and established it as a predicate offense for money laundering. To date, Argentina has not filed any charges under the law. In 2008, the Argentine Central Bank's Superintendent of Banks began specific anti-money laundering and counterterrorist finance inspections of financial entities and exchange houses. The Argentine government and Central

Bank remained committed to freezing assets of terrorist groups identified by the United Nations in Argentine financial institutions.

An Argentine judge in 2006 issued arrest warrants for eight current and former Iranian government officials and one member of Hizballah, who were indicted in the July 18, 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA) that killed 85 and injured more than 150 people.  Despite Iranian objections, the INTERPOL General Assembly voted in November 2007 to uphold the Executive Committee's decision and the Red Notices on six were issued.  At the 2009 UN General Assembly, President Cristina Fernández de Kirchner called on Iran to surrender the suspects to face charges in Argentina.  In June, an Argentine judge requested the capture of a Colombian citizen, Samuel Salman El Reda, after the AMIA Special Prosecutor identified him as having helped coordinate the 1994 attack.  El Reda had been named previously as a suspect and was presumed to no longer be in Argentina.

**Belize**

In 2009, the Government of Belize began receiving funding through the Merida Initiative.  While counterterrorism is not Merida's primary objective, Merida's work in Belize continued to improve Belize's border security.  Belize participated in an assessment of its northern and western borders by a team from U.S. Customs and Border Protection.  This assessment included training on how to identify suspicious vehicles and individuals, and on the use of contraband detection kits.  The United States gave Belize eight of these kits in 2009.

Belize's borders are extremely porous and there is a significant corruption problem among Immigration and Customs officers, particularly on the western and northern borders.  It remained easy to change identity by purchasing stolen passports.  Laws governing name changes were extremely lax.  The country is sparsely populated and has limited human and technological resources to monitor individuals and groups residing in or transiting through its borders.

The Belize Defense Force (1025 total personnel) has operated a Counterterrorism Platoon for three years to perform operations within Belize and its territorial waters.

**Bolivia**

The Government of Bolivia cooperated only minimally on counterterrorism.  It did not share its counterterrorism information with the U.S. government and we have no information that the Government of Bolivia has active counterterrorism measures.  The U.S. government has funds available to provide training opportunities to Bolivian counterterrorism forces, but as is the case with other training opportunities offered by the United States, the Government of Bolivia refused to send anyone on such programs.  The Financial Action Task Force has identified Bolivia as a jurisdiction with structural deficiencies in its anti-money laundering/countering terrorist finance (AML/CFT) regime and has agreed with the Government of Bolivia on an action plan to address these deficiencies.

Bolivia continued to expand its relationship with Iran, a state sponsor of terrorism.  On November 24, Iranian President Ahmadinejad visited Bolivia as part of a five-nation Latin America tour.

On April 16, a Bolivian National Police SWAT team raided a hotel in the eastern city of Santa Cruz, engaging in a firefight and killing three individuals from Hungary, Ireland, and Romania allegedly connected with a previously-discovered arms cache.  Two others, a Hungarian and a Bolivian, were arrested.  The Bolivian government alleged that police disrupted a terrorist cell bent on dividing the country, and thwarted a possible presidential assassination attempt. Some opposition members suggested that the incident was staged for political purposes or otherwise manipulated by authorities.

Various individuals affiliated with terrorist groups were reportedly present in Bolivia.  There were reports that relatively small numbers of individuals associated with the Revolutionary Armed Forces of Colombia were present.  Movimiento Revolucionario Tupac Amaru members were also believed to be present, as were members of the Shining Path.

**Brazil**

The Government of Brazil's counterterrorism strategy consisted of deterring terrorists from using Brazilian territory to facilitate attacks or raise funds, along with monitoring and suppressing transnational criminal activities that could support terrorist actions.  It accomplished this through actions between its law enforcement entities and through cooperation with the United States and other partners in the region.  For example, Brazilian authorities worked with other concerned nations to combat the significant and largely unchecked document fraud problem in the country. During the year, multiple regional and international joint operations with U.S. authorities successfully disrupted a number of document vendors and facilitators, as well as related human-trafficking infrastructures.

The Brazilian government investigated potential terrorist financing, document forgery networks, and other illicit activity.  Elements of the Brazilian government responsible for combating terrorism, such as the Federal Police, Customs, and the Brazilian Intelligence Agency, worked effectively with their U.S. counterparts and pursued investigative leads provided by U.S. and other intelligence services, law enforcement, and financial agencies regarding terrorist suspects. In July, the head of the Brazilian Federal Police intelligence division stated on the record during a Brazilian Chamber of Deputies hearing, that an individual arrested in April was in fact linked to al-Qa'ida.

Brazil's intelligence and law enforcement services were concerned that terrorists could exploit Brazilian territory to support and facilitate terrorist attacks, whether domestically or abroad, and have focused their efforts in Sao Paulo and on border areas with Argentina, Colombia, Paraguay, Peru, and Venezuela.

Brazil's intelligence and law enforcement forces also worked with regional and international partners.  Brazil was actively involved in both Mercosur's Permanent Working Group on

Terrorism (with Argentina, Brazil, Chile, Paraguay, and Bolivia) and its sub-working group on financial issues, which covers terrorist financing and money laundering issues.

Bilaterally, the U.S. government provided a variety of training courses throughout Brazil in counterterrorism, combating money laundering, detection of travel document fraud, container security, and international organized crime. The United States hosted a Major Crimes Conference that successfully brought together Brazil and neighboring countries' federal and state law enforcement communities, as well as judges and prosecutors, to share best practices and receive practical training.

President Luiz Inacio Lula da Silva has been critical of the FARC's use of violence and publicly called on the group to end its violence against the Colombian government.

Brazil monitored domestic financial operations and effectively used its financial intelligence unit, the Financial Activities Oversight Council (COAF), to identify possible funding sources for terrorist groups. Through COAF, Brazil has carried out name checks for persons and entities on the UNSCR 1267 and 1373 terrorist finance lists, but it has so far not found any assets, accounts, or property in the names of persons or entities on the UN lists.

The Brazilian government is achieving visible results from recent investments in border and law enforcement infrastructure that were carried out to control the flow of goods through the Tri-Border Area (TBA) of Brazil, Argentina, and Paraguay, the proceeds of which could be diverted to support terrorist groups. The inspection station at the Friendship Bridge in the TBA, which was completed by the Brazilian customs agency (Receita Federal) in 2007, reduced the smuggling of drugs, weapons, and contraband goods along the border with Paraguay. According to Receita Federal, from January to July 2009, the agency seized more than US$ 400 million in contraband goods, including drugs, weapons, and munitions, an increase of eight percent from 2007. The Federal Police had special maritime police units in Foz de Iguacu and Guaira that patrolled the maritime border areas.

Brazil's overall commitment to combating terrorism and the illicit activities that could be exploited to facilitate terrorism was undermined by the government's failure to strengthen its legal counterterrorism framework significantly. While Brazilian law criminalizes terrorist financing when connected to a money laundering offense, it does not criminalize terrorist financing itself as an independent crime. Although the 2005 National Strategy against Money Laundering (ENCLA) created a working group charged with drafting legislation to criminalize terrorism and terrorist financing, the draft legislation was never forwarded from the executive branch to the Brazilian Congress. At year's end, a long-delayed anti-money laundering bill was pending before the Brazilian Congress.

**Canada**

Canada was under a general threat from international and domestic terrorists, according to the country's Integrated Threat Assessment Centre's (ITAC) most recent "Biannual Update on the Threat from Terrorists and Extremists," published November 10. ITAC emphasized that al-

Qa'ida (AQ) "has specifically identified Canada as a target on several occasions," while also noting that "homegrown Islamist extremists remain a threat to Canada." Single and multi-issue domestic extremists "maintain the intent and capability to carry out attacks against property in Canada," according to ITAC.

International terrorists did not attack Canada in 2009. However, Canadian officials continued to investigate a "series of bombings [of gas pipelines] in British Columbia for possible connections to environmental extremism," according to ITAC. Two bombing attacks in July in British Columbia were the fifth and sixth attacks against energy infrastructure there since October 2008.

In June, the government introduced two new bills in Parliament (C-46 and C-47) that would strengthen law enforcement powers and that have specific counterterrorism implications. Collectively known as the "Investigative Powers for the 21st Century Act," the bills would amend the Criminal Code and the Mutual Legal Assistance in Criminal Matters Act. C-46 would give police new powers to obtain Internet and wireless telephone transmission data. C-47 would require telecommunications service providers to retain a law enforcement intercept capability for all new technology they deploy. In March, the government re-introduced bill C-19, which would amend the Anti-Terrorism Bill to restore lapsed powers to hold investigative hearings as well as a form of preventive arrest whereby police may bring an individual before a judge in the early stages of terrorist activity to disrupt a potential terrorist attack, authorities that lapsed in February 2008 but which Parliament did not succeed in renewing before its dissolution in September 2008.

On October 6, Canada's Federal Court released its written decision authorizing warrants permitting the Canadian Security Intelligence Service to track terrorism suspects electronically overseas. The decision significantly expanded the electronic surveillance powers of Canadian law enforcement and security agencies to monitor suspected "homegrown" extremists. Previously, the Federal Court had argued it lacked jurisdiction to issue warrants for activities taking place outside Canada's borders.

On December 13, then-Public Safety Minister Peter Van Loan announced that Canada was reviewing its national security certificate program following a series of court decisions that struck down certificates or ordered the government to provide more information in open court to defendants. In use since 1978, the security certificate system allows the government to detain non-citizens whom the government deems inadmissible to Canada under security-related provisions of the Immigration and Refugee Protection Act, pending deportation. On October 15 and December 17, the Federal Court of Canada revoked certificates, respectively, against Moroccan-born Adil Charkaoui and Syrian-born Hassan Almrei, which reduced the number of active certificates in suspected terrorist cases to three.

Canada worked closely with the United States and the UN and other multilateral counterterrorism efforts - including the G8's Roma-Lyon Group and Counterterrorism Action Group - and in international nonproliferation groups, such as the Proliferation Security Initiative and the Global Initiative to Combat Nuclear Terrorism. Canada and the United States cooperated bilaterally through the Cross Border Crime Forum sub-group on counterterrorism and the Bilateral Consultative Group on Counterterrorism.

On numerous occasions, Canadian and U.S. officials discussed how to enhance intelligence and information sharing related to counterterrorism and law enforcement efforts.  Despite Canada's strict privacy laws, Canadian Security Intelligence Service Director Richard Fadden argued publicly in October that information sharing is "vitally important to the protection of Canada."

On April 21, al-Qa'ida in the Islamic Maghreb (AQIM) released two Canadian diplomats working for the UN whom the group had kidnapped in December 2008.

On June 4, a Federal Court judge ordered the Canadian government to bring Abousfian Abdelrazik back to Canada from Khartoum, Sudan, where he had been since 2003.  Abdelrazik – whom the United States designated in 2006 as a terrorism supporter posing a significant risk to national security and who is also included on the UN Security Council's al-Qa'ida and Taliban Sanctions Committee's watchlist – returned to Canada on June 24.  The Canadian government had refused to issue a passport to Abdelrazik until the issuance of the court order, citing "national security" grounds.  The court ruled that the government's actions violated Adbdelrazik's freedom of mobility under the Charter of Rights and Freedoms and the government did not appeal the court's decision.

On December 9, freelance journalist Amanda Lindhout, whom a criminal group in Mogadishu, Somalia had kidnapped along with an Australian colleague in August 2008, returned to Canada.  An Australian businessman claimed publicly that he had paid US$ 600,000 to secure the pair's release on November 25.

Canadian prosecutors won a series of guilty pleas and convictions in terrorism cases.  Most of them related to the disrupted 2006 "Toronto 18" plot, which involved a conspiracy to bomb Parliament Hill, Royal Canadian Mounted Police headquarters, and nuclear power plants.

- On March 12, an Ottawa judge sentenced convicted terrorist Momin Khawaja to ten and one-half years in prison for financing and facilitating terrorism and two criminal code offenses related to building a remote-control device to trigger bombs.  Police had arrested Khawaja in 2004, accusing him of conspiring with a British AQ cell in a thwarted London bomb plot in that same year.  He is eligible for parole in 2014.

- Saad Khalid, a 23-year-old Toronto-area man, pled guilty on May 4 to one charge of intending to cause an explosion as part of the 2006 "Toronto 18" terrorism plot.  On September 3, an Ontario judge imposed a 14-year sentence with seven years credit for time served, making him eligible for parole in 2011.  Crown prosecutors originally asked for 18 to 20 years and on September 30 appealed the sentence, which was still pending at year's end.

- On May 22, Nishanthan Yogakrishnan, who was a minor when police arrested him, received a two and a half year prison sentence and three years of probation for his part in the "Toronto 18" plot.  In light of time served, the judge released Yogakrishnan the

day of the sentencing.  He was the first person convicted under Canada's terrorism laws.

- On September 22, another "Toronto 18" plotter, Ali Mohamed Dirie, pled guilty to one count of participating in the activities of a terrorist group.  Crown prosecutors and defense counsel agreed on a seven-year sentence.  On October 2, a judge granted Dirie five years of credit for his pre-trial confinement.

- On September 28, Saad Gaya, 21, pled guilty to trying to cause an explosion for a terrorist group as part of the "Toronto 18" plot.  Gaya faced a maximum 10 years in prison;

- On October 1, a Federal court judge in Quebec found Moroccan-born Said Namouh guilty of four terrorism charges, all related to disrupted plots to attack targets in Germany and Austria.  At the November 13 sentencing hearing, the prosecution asked for a minimum of 10 years in custody before parole eligibility.

- On October 8, Zakaria Amara, whom prosecutors had described as one of the "Toronto 18" "ringleaders," pled guilty to two counts: knowingly participating in a terrorist group and intending to cause an explosion for the benefit of a terrorist group.  As of December, the judge had yet to set Amara's sentencing date.

- On November 25, an Ontario court sentenced Justain Dillon to one year in jail for anonymously telephoning Toronto Police with threats to blow up a New Jersey shopping mall in November 2006.  Dillon pled guilty to causing a hoax regarding terrorist activity following his April 2008 arrest.

Canadian political leaders in both the ruling Conservative Party and the official Opposition Liberal Party remained firm in their March 2008 decision to withdraw Canadian combat forces from Afghanistan by the end of 2011.  Canada has maintained its military presence with a 2,800-person battle group in Kandahar province as part of the International Security Assistance Force's Regional Command South.  Canada continued to provide a Provincial Reconstruction Team for stabilization and development efforts and maintained its role in brokering improved Afghan and Pakistani police and military cooperation to enhance their mutual capacities to secure the border from insurgent and terrorist crossings.  At year's end, Canada had suffered the deaths of 139 soldiers, one diplomat, and two aid workers in Afghanistan.  It had suffered the highest proportion of casualties-to-troops deployed of any NATO member in country.

**Chile**

Chilean law enforcement agencies investigated a series of small bomb attacks in Santiago. Officials believed that small groups of anarchists were responsible for more than 60 attacks since 2004, which have targeted government buildings, banks, and health clubs.  The bombs were small and crudely built.  Most of the attacks took place late at night and did not appear to be designed to kill people.  On January 17, the government appointed a special prosecutor to

investigate the attacks.  On November 3, a small bomb exploded outside a Marriott hotel in the Las Condes neighborhood, injuring one person.  A group called the Movimiento Dinamitero Efrain Plaza Olmedo claimed responsibility for the bomb, but no arrests were made in this attack.

Chilean law enforcement agencies confronted sporadic low-level violence related to indigenous land disputes in the Araucania region.  The Coordinadora Arauco Malleco (CAM), a group seeking recovery of former Mapuche indigenous lands, sometimes through radical means, claimed responsibility for an October 20 attack in which seven trucks were seized and burned.  Several members of the CAM subsequently renounced their citizenship and declared war on the Chilean state.  Police arrested approximately 30 CAM members during the year and some were charged under Chile's counterterrorism law.  Critics challenged the use of the counterterrorism law, which was established by the Pinochet government and restricts the rights of alleged criminals.

Chilean officials continued to monitor the northern part of the country, particularly Iquique, for illicit activities, including terrorist financing and money laundering.

Chile participated in several U.S. training courses related to counterterrorism.  Chilean law enforcement officials attended FBI training courses on post-blast investigations and fingerprint collections.  Chile's national police, the Carabineros continued to participate in the FBI's South American Fingerprint Exchange initiative, a biometric exchange program wherein foreign governments provided and exchanged biometric information with the United States on violent criminal offenders.  Four Chilean officials attended a U.S.-sponsored counterterrorism assistance course in Buenos Aires.

Chile's counterterrorist reaction force is the Grupo de Operaciones Policiales Especiales (GOPE), a 300-person unit of the Carabineros.  The GOPE participates annually in Exercise Fuerzas Comando, a U.S. Special Operations Command South-sponsored special operations seminar designed to refine the tactics, techniques, and procedures used by counterterrorism forces.  Chile's National Intelligence Agency is a strategic, analytical organization that advises the Government of Chile on a variety of threats, including terrorism.

**Colombia**

The Government of Colombia maintained its focus on defeating and demobilizing Colombia's terrorist groups through the government's "National Consolidation Plan," which combines military, intelligence, and police operations including counternarcotics, with efforts to demobilize combatants, and the provision of public services and alternative development programs in rural areas that have historically seen high levels of narcotics trafficking and violence.  Efforts primarily targeted the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), along with operations against remaining elements of the demobilized United Self-Defense Forces of Colombia (AUC) – those few who never demobilized and those who rearmed – and newly emerging criminal organizations (BACRIM or bandas criminals in Spanish).

Colombia increased its international counterterrorism cooperation and training efforts. The threat of extradition to the United States remained a strong weapon against drug traffickers and terrorists. At year's end, Colombia extradited 186 defendants to the United States in 2009 for prosecution; most were Colombian nationals.

Colombia continued to expand its role as a regional leader in counterterrorism and provided training to several other countries, including on combating terrorist financing. The Colombian government sought enhanced regional counterterrorism cooperation to target terrorist safe havens in vulnerable border areas. Colombia and Mexico significantly increased joint training and operations against drug trafficking organizations operating in both countries.

The Colombian military's momentum against the FARC slowed somewhat in 2009. Unlike in 2008, the Colombian military did not kill or capture any of the FARC's Secretariat members. Fewer FARC members deserted in 2009 (2,058 as of December 10) than in 2008 (3,027).

However, Colombian security forces captured or killed a number of mid-level FARC leaders, continued to debrief deserters from the group for detailed information on their respective units, and reduced the amount of territory where terrorists could operate freely. The Colombian military and police also destroyed caches of weapons and supplies, and reduced the group's financial resources through counternarcotics and other security operations.

Despite the ongoing campaign against the FARC, the group continued a campaign of terrorist attacks, extortion, and kidnappings. The FARC continued narcotrafficking activities, bombed several military and civilian targets in urban areas, and targeted numerous rural outposts, police stations, infrastructure targets, and local political leaders in dozens of attacks.

- On January 14, the FARC attacked a police station in Narino using gas cylinders filled with explosives, killing four children and one adult.

- On January 27, the FARC bombed a Blockbuster video store in the heart of Bogota, killing two people.

- On February 4, the FARC killed 17 civilians in Barbacoas, Narino.

- On May 5, the FARC detonated a bomb in Valledupar, Cesar, near a police station, killing two and injuring 10 civilians.

- On May 20, the FARC bombed two electrical towers in Arauca, causing a blackout in three cities. Some 100,000 people were affected.

- On May 29, the FARC ambushed a Colombian army battalion in La Guajira, approximately two kilometers from the Venezuelan border, killing eight Colombian soldiers.

- On July 19, the FARC attacked a police station in Corinto, Cauca, killing two officers and injuring fifteen civilians.

- On August 25, a FARC bomb in San Vicente del Caguan, Meta, killed two and wounded 19 civilians in the middle of a crowded marketplace.

- On September 17, the FARC attacked a police checkpoint near the Buenaventura port in Valle del Cauca, injuring one civilian and two police officers.

- On November 20, the FARC stopped and burned a passenger bus in Barbacoas, Narino, killing four adults and two children.

- On December 21, the FARC kidnapped and subsequently killed the governor of Colombia's southern department of Caqueta.

The FARC continued a campaign of intimidation and violence against local leaders and communities. The Colombian Council Members' Federation reported that as of November 2009, 12 council members had been murdered, two had been kidnapped, and thousands had received threats. The FARC was also blamed for an August 19 attack that destroyed a U.S.-funded justice center in Cauca department. USAID had invested US$ 150,000 in the new justice house, which was designed to provide basic legal and social services to the community. In an August communiqué released in Narino department, the FARC announced it would treat all projects developed under Colombia's National Consolidation Plan (PNC) as legitimate military targets.

The ELN remained active with approximately 2,000 fighters but with diminished resources and reduced offensive capability. Still, the ELN continued to inflict casualties on the Colombian military through use of land mines and occasional attacks. It continued to fund its operations through narcotics trafficking. The ELN and FARC clashed over territory in northeastern and southern Colombia, although they cooperated in other areas. The ELN continued kidnapping and extortion.

The FARC and ELN in December issued a joint decree claiming the two groups planned to unite to fight the Colombian government. The communiqué claimed leaders of the two groups had met and forged an agreement to focus on cooperating to defeat the government and end U.S. influence in Colombia. Colombian Armed Forces Commander Freddy Padilla dismissed the announcement, pointing out that the two groups' longstanding ideological differences and ongoing confrontations over drug trafficking made such an alliance unlikely to succeed. Previous efforts to unify the two groups have failed.

The AUC formally remained inactive as the Colombian government continued to process and investigate demobilized AUC members under the Justice and Peace Law (JPL), which offers judicial benefits and reduced prison sentences for qualified demobilizing terrorists. The law requires all participants to confess fully to their crimes as members of a terrorist group and to return all illicit profits. More than 32,000 rank-and-file ex-AUC members who did not commit serious crimes have demobilized, and many were receiving benefits through the government's

reintegration program, including psychosocial attention, education, healthcare, and career development opportunities. More than 280,000 victims have registered under the JPL through December 2009, although Colombian government efforts to create measures to provide reparations to victims have not been as effective as hoped. Some former paramilitaries continued to engage in criminal activities after demobilization, mostly in drug trafficking.

Colombia kept up its close cooperation with the United States to block terrorists' assets. Financial institutions closed drug trafficking and terrorism-related accounts on Colombian government orders or in response to designation by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC). Aerial and manual eradication of illicit drugs in Colombia, which is key to targeting terrorist group finances, destroyed about 153,000 hectares of illegal drug crops as of December 7, thus depriving terrorist groups of potentially huge profits. OFAC carried out several designation actions against the financial assets and networks of narcotics traffickers and narcoterrorists. The FARC was first designated a Foreign Terrorist Organization in 1997 and OFAC has frozen assets of the FARC or its members when identified, pursuant to Executive Order 12978 and the Foreign Narcotics Kingpin Designation Act. The OFAC sanctions investigations targeted networks of money exchange businesses in Colombia that laundered narcotics proceeds for the FARC. In 2006, a Washington, D.C. grand jury indicted 50 leaders of the FARC on charges of importing more than US$25 billion worth of cocaine into the United States and other countries. The United States continued to support Colombia in its efforts to decrease the number of kidnappings and to support cyber security related investigations and forensics units.

On October 30, the United States and Colombian governments signed the Defense Cooperation Agreement (DCA). The DCA will facilitate effective bilateral cooperation on security matters in Colombia, including narcotics production and trafficking, terrorism, illicit smuggling of all types, and humanitarian and natural disasters. The DCA facilitates U.S. access for these purposes to three Colombian air force bases, located at Palanquero, Apiay, and Malambo. The agreement also permits access to two naval bases and two army installations, and other Colombian military facilities if mutually agreed. All these military installations are, and will remain, under Colombian control. Command and control, administration, and security will continue to be handled by the Colombian armed forces. All activities conducted at or from these Colombian bases by the United States will take place only with the express prior approval of the Colombian government. The presence of U.S. personnel at these facilities would be on an as needed, and as mutually agreed upon, basis.

**Dominican Republic**

The Dominican Republic continued to lack the ability to fully control its air, land, and sea borders but is making progress to do so. The Dominican Republic cooperated with U.S. law enforcement agencies under the Sovereign Skies agreement and negotiated a MOU for US$ 10 million to upgrade helicopters and train pilots for counternarcotics operations. In addition, in December 2009, the Dominicans received the first two Brazilian Super Tucano aircraft out of an order of eight that will be used to control its airspace. In another positive step, the Dominican Republic continued to work with the United States to create a nation-wide biometric database

base that incorporates and provides timely data from Dominican military, law enforcement, and judicial databases. Biometric equipment was maintained at the headquarters of the Dominican National Police and 16 other key locations, with another 20 sets to be installed. Positive steps were taken last year by the Dominican Republic to strengthen its legal regime and capabilities to combat terrorism.

The National Congress passed the General Counterterrorism Act, thereby creating the legislative framework that defines the behaviors that constitute acts of terrorism and other related acts.

Since the Dominican Republic is a strategic point for international trade and tourism, measures were implemented by the government in coordination with the United States to reinforce customs controls to prevent terrorist organizations from acquiring weapons, weapons delivery systems, and the technologies to manufacture them from persons and institutions located in the country.

The Dominican Republic, in coordination with the United States and other international agencies, organized and/or participated in efforts to strengthen training and international cooperation to combat terrorism. The Dominican Republic hosted a ministerial conference in February that engaged various entities of the UN Office on Drugs and Crime (UNODC) in dealing with issues related to illicit drugs, organized crime, and terrorism. This conference concluded with the adoption of the Political Declaration on Combating Illicit Drug Trafficking, Organized Crime and Other Serious Crimes in the Caribbean. The Office of the Attorney General for the Dominican Republic sponsored Specialized Training in the Prevention and Fight against Terrorism and Terrorist Financing. In November, law enforcement and high-level officials from the Dominican Republic took part in an UNODC Terrorism workshop in the Bahamas and examined trends and discussed the legal framework and mechanisms of international cooperation in the fight against terrorism. In March, the Dominican Republic's counterterrorism unit known as Secretaria de Las Fuerzas Armadas Commando Especial Contra Terrorismo was trained as part of U.S. Southern Command, Special Operations Command-South's Exercise Fused Response. Fused Response provided real world scenarios that tested the commandos' ability to perform counterterrorism type missions. In September, the Dominican Republic participated in a U.S.-sponsored military training exercise, PANAMAX. This particular exercise was designed by U.S. Southern Command to address teamwork and to strengthen the Country's ability to operate jointly against terrorism. As a means to improve border security, members of the specialized Border Security Force were trained by members of the U.S. Border Patrol.

While many land border, ports, and airline hubs remained permeable, the United States assisted the Dominican Republic on various initiatives to improve security, such as the Container Security Initiative. Port Caucedo was identified as a Megaport and its certification was part of the Customs Trade Partnership Against Terrorism Initiative.

**Ecuador**

Ecuador's greatest counterterrorism and security challenge remained the presence of Colombian narcotics, criminal, and terrorist groups in the extremely difficult terrain along the porous 450-mile border with Colombia.  The lack of adequate employment opportunities for Ecuadorians and Colombian refugees also made the area vulnerable to narco-terrorist influence and created a contraband economy.  To evade Colombian military operations, these groups, principally the Revolutionary Armed Forces of Colombia (FARC), regularly used Ecuadorian territory for recuperation, medical aid, weapons and explosives procurement, and coca processing.  These activities involved Ecuadorian and Colombian refugees in northern Ecuador in direct or indirect ways.  Some Ecuadorian officials along the border believed that the FARC's economic impact allowed it to buy silence and compliance among resident communities in the border area.

Ecuador responded to this threat, although it still faced resource constraints and limited capabilities.  The Correa Administration, while still maintaining that the Colombian conflict was mainly Colombia's problem, stated that it opposed armed encroachments across its borders.  Tensions between Ecuador and Colombia rose following the March 2008 Colombian bombing of a FARC camp in Ecuador, which killed the FARC's number two in command, Raul Reyes, plus 24 Colombians and one Ecuadorian associated with the FARC.  However, in September, the two countries embarked on a rapprochement and, in November, assigned charges d'affaires.  Although Ecuador-Colombia security mechanisms have been reactivated, the reestablishment of full diplomatic ties would be important to making further progress in disrupting and dismantling FARC-associated narcotics traffickers' operations in the region.

Ecuador's security forces continued their operations against FARC training and logistical resupply camps along the northern border.  The Ecuadorian military continued to increase the number of troops in the north.  The Ecuadorian government also increased its emphasis on protection of national sovereignty against illegal armed incursions and improved efforts to counter the perception that Ecuador was not shouldering its burden in fighting drug traffickers along its northern border.

While Ecuadorian security forces increased their presence, the pace of their operations remained roughly the same.  The Ecuadorian military reported that it conducted four counternarcotics operations at the brigade level, 219 battalion-level operations, and 159 patrols that led to the destruction of nine cocaine laboratories, 253 FARC base camps, houses and resupply facilities; the eradication of one hectare of coca; and the confiscation of weapons, communications equipment, and other support equipment.

The Ecuadorian military's operations netted information on FARC activities and infrastructure both inside and outside of Ecuador, and resulted in the detention of more than 75 narcotics traffickers, the killing of three FARC members, and the wounding of seven others during the year.  However, insufficient resources, corruption among members of the military and police, the challenging border region terrain, and a tense bilateral relationship with Colombia since the March 2008 raid made it difficult to thwart cross-border incursions.

Domestic terrorist groups present in Ecuador, although operationally inactive in the last few years, included the Popular Combatants Group, the Revolutionary Militia of the People, the

Page | 177

Marxist-Leninist Party of Ecuador, and the Alfarista Liberation Army.

The Ecuadorian government sought to strengthen controls over money laundering through the Financial Intelligence Unit (FIU), which it established under a 2005 Money Laundering Law. The FIU made some improvements in cooperating with the Anti-Narcotics Police Directorate, the Superintendent of Banks, the courts, and the private banker association to identify suspicious transactions and develop information for the prosecution of cases.  An important emphasis of the FIU was to monitor casinos for money laundering activities.  The National Police also set up an anti-money laundering unit to carry out investigations into financial crimes.

Ecuador has not criminalized terrorist financing, and the Financial Action Task Force and Financial Action Task Force of South America have encouraged the Ecuadorian government to adopt appropriate counterterrorism financing legislation and regulations.  Ecuador is not yet a member of the Egmont Group of Financial Intelligence units, as terrorist finance legislation is a requirement for Egmont membership.

Ecuador's judicial institutions remained weak, susceptible to corruption, and heavily backlogged with pending cases.  While the military and police made numerous arrests, the judicial system had a poor record of achieving convictions.

Ecuadorian immigration officials allowed almost all travelers to enter the country for 90 days without a visa, including travelers from countries of concern for terrorism, drug smuggling, and illegal immigration.  Ecuador's 2008 constitutional declaration of the rights of all to migrate eliminated the concept of illegal immigration in the country, and combined with the visa-free policy, removed effective screening to entry to the western hemisphere for travelers of all nationalities.  Consequently, official Ecuadorian immigration statistics showed dramatic increases – four-fold or higher – from 2007 to 2009 in the number of entries by travelers from state sponsors of terrorism.  Other U.S. government agencies have reported recently on active smuggling rings in Ecuador that focus on moving aliens who may raise terrorism concerns at ports of entry to the United States and Canada.

**El Salvador**

El Salvador hosts the U.S. government-funded International Law Enforcement Academy, which provided instruction on counterterrorism, transnational crime, alien trafficking, money laundering, and other topics of counterterrorism interest.  El Salvador also worked within the regional Central American Integration System to promote effective regional responses to transnational crime and other public security threats.

The Government of El Salvador was vigilant in its efforts to ensure that Salvadoran territory was not used for recruitment, training, or terrorist financing.

The principal Salvadoran counterterrorism entity, the National Civilian Police, worked in close cooperation with the Salvadoran Immigration Service, the Office of the Attorney General, and the Office of State Intelligence, and was well regarded by U.S. counterparts.  A 2006 statute

established strict criminal liability for engaging in terrorism, while other statutes outlawed money laundering and terrorist financing.

**Guatemala**

U.S. assistance supported Guatemala's anti-money laundering, anti-corruption, and border security efforts and Guatemala cooperated with the United States in investigating potential terrorism leads.  The U.S. Department of Defense continued to train the Guatemalan military's counterterrorist unit.  In addition to threats posed by transnational narcotics organizations, Guatemala was a major alien smuggling route from Central and South America, which made it a potential transit point for terrorists seeking to gain access to the United States.  Corruption, an ineffective criminal justice system, and a lack of resources have limited Guatemala's ability to combat transnational crime, especially in remote parts of the country.  Guatemala's borders are porous and lack adequate coverage by police or military personnel.

**Haiti**

The Financial Investigative Unit, within the Haitian National Police; and the Financial Intelligence Unit, within the Ministry of Justice, cooperated with the United States in anti-money laundering initiatives to improve the ability to detect funds acquired through criminal activity, including funds that could be acquired through terrorist networks.  The Haitian government drafted counterterrorism legislation in 2008 but it was not enacted by Parliament in 2009.  In addition, the country has accepted the terms of the International Convention for the Suppression of the Financing of Terrorism, but has not formally signed the Convention.

**Honduras**

The Honduran government continued to implement steps in accordance with its 2007 National Security Strategy, which included counterterrorism as an objective, and stressed regional and international cooperation.  For example, in November, the Honduran Armed Forces (HOAF) and the Honduran National Police (HNP) took steps towards the creation of a Joint Interagency Task Force.  This joint task force should improve inter-agency intelligence cooperation and should decrease illicit trafficking and minimize terrorist threats within the country.

Organized crime and illicit trafficking organizations and networks were strong and potentially ripe for exploitation by terrorists intent on entering and attacking the United States.  While there was no conclusive evidence that terrorist groups worked with illicit trafficking organizations, the United States continued to assist the HOAF and HNP with their counterterrorism efforts in order to prevent terrorist groups from exploiting illicit trafficking networks.  The Honduran military lacked sufficient resources, and the police and judiciary were spread thin, poorly trained, and susceptible to threats and corruption.  In the first half of the year, before a coup d'etat took place, the United States continued to provide the HOAF and HNP with training, equipment, and base construction, which dramatically improved their ability to interdict illicit trafficking and protect the country against terrorist threats.  In response to the June 28 coup, however, the U.S. government suspended all counterterrorism training pending restoration of the democratic,

constitutional order.

There were no known instances of terrorist organizations using Honduras's financial system to deposit or launder funds. Prior to the coup, Honduran cooperation with the United States on combating terrorist financing was strong. The Honduran Banking and Insurance Commission, instructed by the Ministry of Foreign Affairs, promptly sent freeze orders to the entire regulated financial sector every time the United States amended Executive Order lists. Financial entities, particularly the commercial banks, undertook the requested searches for accounts by terrorist entities. There were no amendments to the Executive Order lists after the coup that required notification of the Honduran government.

There was no indication of terrorist groups using illegal immigration networks. Over the past five years, however, smuggling rings have been detected moving people from East Africa (in particular Somalia in 2009), the Middle East, and Southwest Asia to Honduras or through its territory. Nationals of countries without Honduran visa requirements, especially Ecuador and Colombia, were involved in schemes to transit Honduras, often with the United States and Europe as their final destination. Foreign nationals have successfully obtained valid Honduran identity cards and passports under their own or false identities.

**Jamaica**

The United States and Jamaica cooperated on a variety of counterterrorism-related areas, including the Container Security Initiative; the provision of equipment and training to the Jamaica Defense Force and Constabulary Force; and law enforcement intelligence sharing. In 2007, following his imprisonment in the United Kingdom for inciting murder and for fomenting terrorism and racial hatred, British authorities deported the radical Jamaican-born cleric Sheik Abdullah El-Faisal back to Jamaica. Jamaican and U.S. authorities remained concerned about El-Faisal's plans, intentions, and influence. At year's end, El-Faisal was detained in Kenya pending deportation to Jamaica. Kenyan officials arrested El-Faisal for violating his visa terms by preaching in Kenyan mosques.

Jamaica's entry/exit computer system, controlled by the Passport, Immigration, and Citizenship Agency, had no more storage capacity and thus could only recall two years of entry/exit records; an inability to track inbound and outbound persons beyond those two years remained a vulnerability. Jamaican Customs' ability to target inbound/outbound/ transiting containers was limited to a paper-based system. All paper files that document entry and exit prior to 2004 were lost in a warehouse fire.

**Mexico**

The Mexican government remained highly committed to the fight against organized crime and remained vigilant against domestic and international terrorist threats. No known international terrorist organizations had an operational presence in Mexico and no terrorist incidents targeting U.S. interests and personnel occurred on or originated from Mexican territory. Mexico

continued to confront well-armed, organized crime elements in several regions of the country and traditional hot spots for narcotics trafficking saw record levels of violence.

Although incidents of domestic terrorism did not increase over the past year, Mexico received threats from a previously active group and witnessed the emergence of a new element. El Ejercito Popular Revolucionario (EPR) dissolved talks with the government in April and threatened to reemploy violent measures to force a response to its demands for a government investigation into the disappearance of two of its members. In 2009, no acts of terrorism were attributed to the EPR. From May to August, the Animal Liberation Front claimed responsibility for attacking banks and commercial sites throughout Mexico City, using propane tank bombs. Three bombs were discovered unexploded, while another three caused property damage but no casualties.

Levels of organized crime and narcotics-related violence rose significantly in places along the U.S. border and in marijuana cultivation regions. Cartels increasingly used military-style terrorist tactics to attack security forces. There was no evidence of ties between Mexican organized crime syndicates and domestic or international terrorist groups. The violence attributed to organized crime groups on the border, however, continued to strain Mexico's law enforcement capacities, creating potential vulnerabilities that terrorists seeking access to the United States could exploit.

There was no indication that terrorist organizations used Mexico as a conduit for illicit activities. Nevertheless, Mexico's nascent capacity to counter money laundering suggested a potential vulnerability. The Mexican Attorney General's Organized Crime Division's money laundering unit investigated and prosecuted money laundering crimes in Mexico with mixed results. The majority of its investigations were linked to organized crime and drug proceeds. In order to combat the illegal movement of funds, Mexican financial institutions followed international standards advocated by the Financial Action Task Force Recommendations. These institutions also terminated the accounts of individuals and entities identified on international country lists such as the Office of Foreign Asset Control Specially Designated National and Blocked Persons List. Furthermore, Mexican financial institutions follow the Law of Credit Institutions, as ordered by the Mexican Treasury and supervised by the National Bank and Securities Commission. This law requires banks to consult international and country lists of individuals involved in terrorism or other illicit activities and submit a "suspicious activities report" within 24 hours to the Mexican Department of Treasury's Financial Intelligence Unit on the activities of any individual on that list.

Mexico stepped up efforts to improve interagency coordination as part of its campaign to combat crime and prevent terrorism. It has created a national database designed to promote greater information exchange and overall interoperability across Mexico's disparate police entities. Tactical Intelligence Operations Units brought together all federal agencies in a state to coordinate intelligence and operations. The United States directly supported programs to help both the Secretariat for Public Security and the Attorney General's Office train federal investigators and facilitate greater operational coordination and effectiveness.

The United States and Mexico worked together to address a number of challenges in connection with Mexico's southern and northern borders. The United States deployed two teams to Mexico's southern border to conduct assessments. Its border with Guatemala and Belize remained very porous and could serve as a potential terrorist transit point. The United States worked with Mexico to address resource requirements and offered some best practices applied at other ports of entry. The two countries agreed to coordinate actions at the northern border ports of entry in order to obstruct the flow of illegal arms and currency. The United States supported the establishment of the Mexico Targeting Center, modeled after the CBP National Targeting Center-Cargo, which should strengthen Mexico's ability to target suspicious or illicit cargo. The Advance Passenger Information System (APIS) supported targeting efforts, increased information sharing, and enhanced intelligence capabilities in connection with efforts to identify aliens who may raise terrorism concerns at ports of entry. The United States and Mexico also commenced the Joint Security Program for Travelers, a pilot program that promotes exchanges of immigration officials as part of an effort to streamline the APIS referral process and seeks to identify and track suspected terrorists, fugitives, or smugglers.

In June 2008, President Calderon signed into law a number of security and justice reforms. The security reforms granted police greater investigative authorities and facilitated the ability of law enforcement officials to seize the assets of individuals implicated in criminal activity. The justice reforms effected constitutional changes that provide for a presumption of innocence in criminal and civil prosecutions and allow for evidence-based trials promoting greater transparency and more confidence in the judicial system. Although these measures were primarily aimed at organized crime groups, the legislation also supports investigations against domestic or international terrorists. The government has eight years to implement the justice reform legislation. At year's end implementation had been slow and uneven.

The United States and Mexico worked closely to implement a strong Anti-Terrorism Assistance (ATA) program; ATA programs provided training for 300 Mexican security officials in 18 courses on matters ranging from VIP protection to digital security and forensics.

**Nicaragua**

Nicaragua made no substantive progress towards establishing a Financial Intelligence Unit or passing the counterterrorism bill first proposed in 2004. Nicaragua's judiciary remained highly politicized, corrupt, and prone to manipulation by political elites and organized crime and therefore remained a vulnerability that could be exploited by international terrorist groups. President Daniel Ortega's 2007 decision to grant Iranian and Libyan nationals visa-free entry into Nicaragua remained in effect.

President Ortega maintained close relations with the Revolutionary Armed Forces of Colombia (FARC). He also continued to provide safe haven to Doris Torres Bohórquez and Martha Perez Gutiérrez, two suspected FARC associates and survivors of the March 2008 Colombian military operation against the FARC. Both were granted asylum in Nicaragua and welcomed by President Ortega as survivors of "state-sponsored terrorism by Colombia." On October 12, Nicaragua refused Ecuador's request to extradite Torres and Perez on the grounds that doing so

would violate their human rights.  Senior FARC official Nubia Calderon de Trujillo continued to have humanitarian asylum in Nicaragua.[18]

There was no new information in the case of Alberto Bermudez (aka Rene Alberto Gutierrez Pastran, or "Cojo"), the FARC emissary granted a false Nicaraguan identity by Nicaragua's Supreme Electoral Council (CSE).  However, in December, local media reported that the CSE provided official Nicaraguan identity documents for false identities to several suspected drug traffickers, including Amauri Paul (alias Alberto Ruiz Cano), a Colombian criminal who was involved in an attack against Nicaraguan counter-narcotics forces that killed two Nicaraguan Navy personnel.

No known terrorist groups operated openly in Nicaragua; however, both the FARC and the ETA (Basque Fatherland and Liberty) have retired or inactive members residing in Nicaragua.

 During 2009, the U.S. Embassy had increasing difficulty obtaining information from or access to civilian officials of the government.  In one instance, the government failed to comply with a routine evidence transfer request related to an arms-for-drugs case involving the FARC.  Despite this, there were several U.S.-Nicaragua military-to-military counterterrorism-related exchanges during the year.

**Panama**

The presence of the Revolutionary Armed Forces of Colombia (FARC) in Panama's remote Darien Region and potential actions against the Panama Canal remained the main terrorist concerns in Panama.  The Government of Panama continued to work with the United States in both areas.

A small, stable number of FARC 57th front members operated in Panama's Darien Province, using the area as a safe haven and drug trafficking base.  Darien's dense jungle, sparse population, and lack of significant infrastructure have historically limited the government's presence.  As the FARC's drug trafficking in the Darien province increasingly moved inland, new transit routes and logistical supply lines required greater interaction with the local populace, who were often coerced or paid to help.  The FARC 57th front was involved in the April 2008 kidnapping of a U.S.-Cuban citizen near Panama City who was held until his release in February 2009.  Subsequently, in April, several members of the FARC's 57th front were charged in New York with conspiring to take a U.S. citizen hostage.  The Government of Panama also turned over several FARC members to the United States for prosecution in 2009.

The United States and Panama continued to plan for incidents that could potentially shut down transit through the Panama Canal, one of the most strategically and economically important structures in the world.  Panama co-hosted the annual PANAMAX exercise, a multinational

---

[18] In 2008, the U.S. Department of Treasury's Office of Foreign Asset Control designated Calderon de Trujillo, along with seven other FARC international representatives, as significant narco-traffickers under the Kingpin Act. During 2009, Calderon, Torres, and Perez did not appear publicly in Nicaragua.

security training exercise tailored to the defense of the canal.  The exercise replicated real world threats, and included specific exercises designed to counter terrorist attacks.  Considered the largest operational and foreign military exercise of its kind, the event included 30 ships, a dozen aircraft, and 4,500 personnel from 20 nations.  In addition, Panama continued to provide force protection for U.S. military vessels, including submarines, during "high value transits" of the canal.

Panama's Ministry of Government and Justice utilized classroom training, tabletop exercises, and field visits to improve overall counterterrorism coordination among the Panamanian National Police (PPF) agencies.  Additionally, several PPF counterterrorism units benefited from the fourth year of counterterrorism training funded by the U.S. Southern Command and provided by U.S. Navy Special Warfare South personnel.

Panama is an important regional financial center and has had one of the fastest growing economies in the Western Hemisphere over the past 15 years.  However, the factors that have contributed to Panama's economic growth and sophistication in the banking and commercial sectors – the large number of offshore banks and shell companies, the presence of the world's second-largest free trade zone, the growth in ports and maritime industries, and the use of the U.S. dollar as the official currency – also provide the infrastructure for significant money laundering activity.  While Panama took extensive measures to combat money laundering in the banking system, the Colon Free Trade Zone's (CFTZ) significant revenue turnover and cash-intensive transactions left the area vulnerable to money laundering and terrorist financing.[19]  In 2009, the CFTZ Authority developed and prepared to launch two projects designed to increase transparency and accountability in the zone: an automated transactions system to replace a manual system that limited effective reporting and analysis; and a compulsory money laundering/terrorist financing on-line training module, required for all companies operating in the zone.  The Government of Panama was fully cooperative in reviewing terrorist finance lists.

Panama continued to participate in the Container Security Initiative (CSI) at three ports: Balboa, Manzanillo, and the Evergreen Colon Container Terminal, which was installed in 2009.  Additionally, the Department of Energy's Megaports Radiation Portals, which specifically scan for nuclear and other radioactive materials, became functional at the ports of Manzanillo and Balboa, and construction was nearly completed at the ports of Colon and Cristobel.

**Paraguay**

Although Paraguay was generally cooperative on counterterrorism and law enforcement efforts, a politicized judicial system, corrupt police force, and the absence of counterterrorist financing legislation continued to hamper the country's counterterrorism efforts.  The Paraguayan People's

---

[19] Articles 287-291 of the Terrorism Financing Act No. 14 of May 2007, which entered into force in 2008 by amending Panama's Criminal Code, set forth provisions for combating terrorism.  The act classified terrorism and terrorist financing as independent offenses, with terrorist financing included as a predicate offense to money laundering.  Subsequently, in April of 2008 Executive Decree No. 52, referred to as the "New Banking Law," stated that banks and other supervised entities are obliged to establish policies, procedures, and controls on the prevention of money laundering, terrorist finance, and related crimes.

Army (EPP), a small, leftist guerilla group seeking to destabilize the Paraguayan government, kidnapped rancher Fidel Zavala on October 15 in Concepcion Department.  When two police officers discovered Zavala's vehicle the following day, a car bomb exploded, critically injuring both officers.  In April, unidentified individuals placed an improvised explosive device (IED) at the Supreme Court building.  Although the device exploded in the building's courtyard,  no injuries occurred.  After that incident, anonymous callers reported dozens of bomb threats throughout Asuncion.  In some cases, police located mock IEDs made to look real.  Some of the devices contained trace levels of explosives, others did not.  No further explosions or injuries took place.

On July 2, the Paraguayan Congress passed a law that granted the rank of Minister to the Secretariat for the Prevention of Money-Laundering (SEPRELAD) director, who now reports directly to President Fernando Lugo.  The new law extends the range of financial institutions under SEPRELAD's surveillance and provides the tools to investigate institutions suspected of financing terrorism.  In August, the Egmont Group lifted sanctions against Paraguay following the new SEPRELAD bill.  Separately, on July 20, Paraguay implemented amendments to its current anti-money laundering regulations as part of a revised penal code.  A draft counterterrorist finance bill and a draft criminal procedure code were pending in Congress at year's end.

Paraguay did not exercise effective immigration or customs controls at its porous borders.  Efforts to address illicit activity occurring in the Tri-border Area with Argentina and Brazil were uneven due to a lack of resources and, more principally, corruption within customs, the police, the public ministry, and the judicial sector.

Phase I of the Millennium Challenge Corporation's Threshold Program, largely focused on anti-corruption, enabled Paraguay to issue updated national identity documents and passports beginning on September 21.  While the new documents exceeded the standards established by the International Civil Aviation Organization, and included fingerprints, machine readable text, and other anti-counterfeiting security measures; fraud involving purchase of the new documents continued.  Phase II of the Threshold Program includes assistance to both Paraguayan customs and the National Police.  Other U.S. government assistance included FBI training on money-laundering and terrorist financing in September for 35 members of the public ministry, judiciary, SEPRELAD, police, military, and customs.

**Peru**

Peru's primary counterterrorism concern remained fighting remnants of Sendero Luminoso (Shining Path or SL), a designated Foreign Terrorist Organization that wreaked havoc on the country in the 1980s and 1990s at a cost of more than 69,000 lives.  SL elements in the Upper Huallaga River Valley (UHV) sought to regroup and replenish their ranks following significant setbacks in 2007 and 2008.  Separately, the rival SL organization in the Apurimac and Ene River Valley (VRAE) maintained its influence in that area.  Both factions continued to engage in drug trafficking, and in 2009 carried out more than 100 terrorist acts that killed at least three police officers and 26 civilians.

Although Peru nearly eliminated SL in the 1990s, the organization, now entwined with narcotics trafficking, remained a threat. The two SL organizations combined are believed to have several hundred armed members. While SL possessed less revolutionary zeal than in the past, analysts believed that leaders continued to use Maoist philosophy to justify their illicit activities. Involvement in drug production and trafficking provided SL with funding to conduct operations, improve relations with local communities in remote areas, and to recruit new members. While SL in the UHV worked to recuperate from losses suffered in 2007 and 2008, insufficient government presence in the more remote VRAE allowed the organization there to continue operating.

- On August 1, about 40 SL terrorists attacked a police station in San Jose de Secce, outside the VRAE in the highlands of Ayacucho, killing three police officers and two civilians. Official reports indicated a highly coordinated attack with explosives and military grade weaponry.

- On September 2, SL forces downed a Peruvian air force MI-17 helicopter near the town of Sinaycocha in Junin department, killing the pilot, co-pilot, and one crewman.

The Army's 2008 offensive in the Vizcatan region, called "Operation Excellence 777," continued haltingly with the military maintaining a number of small provisional bases established in the area. Confrontations generally consisted of SL members attacking Peruvian patrols or incoming supply helicopters, but in several cases the SL attacked a military base. Several of the significant attacks perpetrated by the VRAE faction occurred in highland areas outside of the VRAE. Some analysts believed the attacks marked SL's attempts at expansion, while others said they were strictly aimed at protecting the group's stronghold in the VRAE and controlling drug routes.

Implementation of the government's Plan VRAE, which called for 2,000 troops and 19 counterterrorism bases under a central command, was still evolving. In August, the Garcia administration named Fernan Valer as the civilian head of Plan VRAE. Plans for new health, education, and infrastructure investment in these isolated communities were not fully implemented, but authorities made some improvements to roadways and rural electrification.

Government efforts to improve interagency cooperation, especially in intelligence, and to strengthen prosecutorial capacity were somewhat successful. Police units specializing in counterterrorism and counternarcotics conducted some joint operations with the Peruvian Army in the UHV where police captured one high-ranking SL terrorist.

President Garcia continued reauthorizing a 60-day state of emergency in parts of four departments where SL operated, suspending some civil liberties, and giving the armed forces additional authority to maintain public order. There was no movement on President Garcia's 2006 proposal calling for the death penalty for those convicted of acts of terrorism, but, in October, Congress passed a law removing parole and other benefits for convicted terrorists.

SL founder and leader Abimael Guzman and key accomplices remained in prison serving life sentences on charges stemming from crimes committed during the 1980s and 1990s.  In September, Guzman's attorney published a book of Guzman's handwritten manuscripts as compiled by Guzman's common-law wife, Elena Iparraguirre, who is also incarcerated for terrorism charges.

The Revolutionary Armed Forces of Colombia (FARC) continued to use remote areas along the Colombian-Peruvian border to regroup and make arms purchases.  Experts believed the FARC continued to fund coca cultivation and cocaine production among the Peruvian population in border areas.

The Tupac Amaru Revolutionary Movement (MRTA) has not conducted terrorist activities since the 1996 hostage taking at the Japanese Ambassador's residence in Lima.  Efforts to reconstitute an organizational structure were not in evidence in 2009, though former MRTA members established a political party called the Free Fatherland Party and sought alliances with other political parties.

**Suriname**

Suriname's lead agency for counterterrorism is the Central Intelligence and Security Agency. The Ministry of Justice and Police has a police Counterterrorist Unit and a 50-person "Arrest Team."  At the end of 2007, the Council of Ministers approved a new draft counterterrorism law that defined terrorism as a crime, and provided a framework for more effectively combating terrorism and the financing of terrorism.  This draft legislation was approved by the State Council and the President in 2008, and was presented to the National Assembly for discussion. As of 2009, the legislation has not been passed.  However, if the legislation is passed, it should bring Surinamese law in line with various international treaties dealing with terrorism and could help pave the way for Surinamese membership in the Egmont Group.  A draft criminal procedure law was approved by the Council of Ministers in February 2008, which provides the implementing legislation for the new counterterrorism law, as well as special investigative tools to assist law enforcement authorities in detecting and investigating terrorist activities.

In an effort to enhance its border security capabilities, as well as hamper potential terrorist transit, Suriname began issuing Caribbean Community-compliant machine-readable passports in 2004.  The United States provided watch lists of known terrorists to Surinamese police, but if any terrorists were present, the likelihood of apprehending them would be low because of the lack of border and immigration control, and because Suriname has no digitized system for registering and monitoring visitors.  According to police sources, the Revolutionary Armed Forces of Colombia (FARC) has conducted arms-for-drugs operations with criminal organizations in Suriname.

**Trinidad and Tobago**

In September, Trinidad and Tobago acceded to the International Convention for the Suppression of the Financing of Terrorism.  In a statement, the Ministry of Foreign Affairs said accession

obligated the country to take measures to criminalize the funding of terrorist activities and to identify, detect, seize, or freeze funds used or allocated for terrorist purposes. The government further stated that it was obligated under the convention to prosecute or extradite individuals suspected of unlawful involvement in the financing of terrorism and to cooperate with other states that are parties in the investigation.

In October, Trinidad and Tobago enacted two pieces of legislation and a set of rules that strengthened the government's ability to combat, deter, and prosecute organized criminal activity, money laundering, and terrorist financing. The laws and regulations established a financial intelligence unit, provided greater authority for the government to pursue the proceeds of crime, and enhanced banking regulations to detect suspicious transactions.

Also in October, the United States provided a report to Trinidad and Tobago that assessed vulnerabilities and recommended improvements to the country's infrastructure critical to liquefied natural gas (LNG) exports. Trinidad and Tobago remained the largest supplier of LNG to the United States, and the assessment was conducted in 2008 by U.S. government experts under the umbrella of the Inter-American Committee Against Terrorism of the Organization of American States. Canada also collaborated in the report, which was referred to the Office of Disaster Preparedness Management for action.

Trinidad and Tobago purchased three 90-meter offshore patrol vessels for delivery over the coming few years. These vessels, along with the expected delivery of helicopters and other patrol vessels, should improve the country's border security and its capacity to engage in regional security efforts.

Trinidad and Tobago hosted two major international events in its capital Port of Spain, each of which included dozens of world leaders and government ministers. The Summit of the Americas was held in April and involved more than 30 leaders of countries from the Western Hemisphere. The Commonwealth Heads of Government Meeting was held in November with more than 50 national leaders. The Government of Trinidad and Tobago cooperated with security and counterterrorism units from a variety of nations and regional organizations to provide security for the events, which occurred without incident.

**Uruguay**

Uruguay was a willing partner of the United States in counterterrorism efforts and improved its ability to fight international crime through legislation, better protection of its borders, and military training. The Government of Uruguay focused its efforts to promote global security through collective action within multinational organizations such as the U.N. and Organization of American States (OAS). Uruguay is a member of the MERCOSUR Permanent Working Group on terrorism, together with Argentina, Brazil, Chile, Paraguay, and Bolivia. The group facilitates cooperation and information sharing. Uruguay has also been active in a range of international counterterrorism efforts, particularly in the Rio Group and the OAS.

A new money laundering law passed in 2009 further defined money laundering, including as it relates to terrorist financing.

Uruguay's level of cooperation and intelligence sharing on counterterrorism-related issues improved.  The political leadership in the Ministries of Defense and Interior increasingly saw terrorism as a significant issue for Uruguay, and working level officers in law enforcement and security services recognized the importance of conducting pro-active investigations and intelligence sharing with the U.S. government and other Latin American countries.

## Venezuela

In May, the United States re-certified Venezuela as "not cooperating fully" with U.S. counterterrorism efforts under Section 40A of the Arms Export and Control Act, as amended. Pursuant to this certification, defense articles and services may not be sold or licensed for export to Venezuela from October 1, 2009 to September 30, 2010.  This certification will lapse unless it is renewed by the Secretary of State by May 15, 2010.

President Hugo Chavez persisted in his public criticism of U.S. counterterrorism efforts.   In October, he called the United States "the first state sponsor of terrorism" and has repeatedly referred to the United States as a "terrorist nation."  Since Colombia and the United States signed a Defense Cooperation Agreement, Venezuela's cooperation with the United States on counterterrorism has been reduced to an absolute minimum.  President Chavez continued to strengthen Venezuela's relationship with state sponsor of terrorism Iran.  Iran and Venezuela continued weekly Iran Airlines flights connecting Tehran and Damascus with Caracas.

It remained unclear to what extent the Venezuelan government provided support to Colombian groups such as the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN).  The FARC and ELN reportedly regularly crossed into Venezuelan territory to rest and regroup as well as to extort protection money and kidnap Venezuelans to finance their operations.  Colombia on various occasions has accused the Venezuelan Government of harboring and aiding top FARC leaders in Venezuelan territory.

Some weapons and ammunition from official Venezuelan stocks and facilities have turned up in the hands of these groups.  In July, Colombia announced that it had recovered five Swedish AT-4 anti-tank missiles from the FARC that were originally sold to Venezuela.  Chavez called the Colombian report "a dirty lie."  When Sweden confirmed the 1988 sale of the weapons, Venezuela then claimed the weapons had been stolen by the FARC from a Venezuelan base in 1995.  When local journalists showed 1995 news reports that said the rival ELN had carried out the attack, the government claimed the ELN had sold the weapons to their rivals.

In mid-December, local newspapers cited the report of the Ecuadorian "Transparency and Truth Commission on the Angostura Case" that claimed that FARC Secretariat member Iván Márquez has offices in Caracas, where he directs the agenda of the FARC-linked organization, the Continental Bolivarian Coordinator.

On December 4, President Chavez promoted Hugo Carvajal Barrios and Henry de Jesus Rangel Silva to the rank of Venezuelan Major General, a three-star equivalent.  Both Carvajal and Rangel had been designated Drug Kingpins by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) in 2008 for materially assisting the narcotics trafficking activities of the FARC.  Carvajal remained in his position as head of the Directorate of Military Intelligence.  Rangel Silva was named Commander of the Guayana Strategic Military Region in August.

There was some limited counterterrorism cooperation between Colombia and Venezuela, however.  On April 23, Zulia State police arrested Yainer Esneider Acosta Peña, alleged to be the second in command of the FARC 45th Front.  Local authorities transferred Acosta to the Colombian border where he was handed over to face charges of rebellion and terrorism.

Venezuela served as a safe haven for at least one alleged terrorist from a non-Colombian group.  On August 5, the Venezuelan Supreme Court denied Spain's extradition request of suspected ETA member Ignacio Echevarria Landazabal.  In April 2008, Echevarria was arrested in Valencia, Venezuela, based on an INTERPOL warrant and was subsequently released.

Self-proclaimed Islamic extremists José Miguel Rojas Espinoza and Teodoro Rafael Darnott remained in prison after being sentenced to 10 years each in 2008 for placing a pair of pipe bombs outside the American Embassy in 2006.

Venezuelan citizenship, identity, and travel documents remained easy to obtain through fraudulent means; thereby making these documents a potentially viable way for terrorists to travel internationally.  International authorities remained suspicious of the integrity of the Venezuelan document issuance process.

# Chapter 3
# State Sponsors of Terrorism

State sponsors of terrorism provide critical support to many non-state terrorist groups.  Without state sponsors, these groups would have greater difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations.  The United States will continue to insist that these countries end the support they give to terrorist groups.

**State Sponsor: Implications**

The designation of countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism carries with it four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.

2.  Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.

3.  Prohibitions on economic assistance.

4.  Imposition of miscellaneous financial and other restrictions, including:

- Requiring the United States to oppose loans by the World Bank and other international financial institutions;
- Exception from the jurisdictional immunity in U.S. courts of state sponsor countries, and all former state sponsor countries (with the exception of Iraq), with respect to claims for money damages for personal injury or death caused by certain acts of terrorism, torture, or extrajudicial killing, or the provision of material support or resources for such acts;
- Denial to companies and individuals tax credits for income earned in terrorist-list countries;
- Denial of duty-free treatment of goods exported to the United States;
- Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
- Prohibition of Defense Department contracts above US$ 100,000 with companies in which a state sponsor government owns or controls a significant interest.

## <u>Designated State Sponsors of Terrorism</u>

**CUBA**

The Cuban government and official media publicly condemned acts of terrorism by al-Qa'ida and affiliates, while at the same time remaining critical of the U.S. approach to combating international terrorism.  Although Cuba no longer supports armed struggle in Latin America and

other parts of the world, the Government of Cuba continued to provide physical safe haven and ideological support to members of three terrorist organizations that are designated as Foreign Terrorist Organizations by the United States.

The Government of Cuba has long assisted members of the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army of Colombia (ELN), and Spain's Basque Homeland and Freedom Organization (ETA), some having arrived in Cuba in connection with peace negotiations with the governments of Colombia and Spain. There was no evidence of direct financial support for terrorist organizations by Cuba in 2009, though it continued to provide safe haven to members of the FARC, ELN, and ETA, providing them with living, logistical, and medical support.

Cuba cooperated with the United States on a limited number of law enforcement matters. However, the Cuban government continued to permit U.S. fugitives to live legally in Cuba. These U.S. fugitives include convicted murderers as well as numerous hijackers. Cuba permitted one such fugitive, hijacker Luis Armando Peña Soltren, to voluntarily depart Cuba; Peña Soltren was arrested upon his arrival in the United States in October.

Cuba's Immigration Department refurbished the passenger inspection area at Jose Marti International Airport and provided new software and biometric readers to its Border Guards.

**IRAN**

Iran remained the most active state sponsor of terrorism. Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf and undermined the growth of democracy.

Iran remained the principal supporter of groups that are implacably opposed to the Middle East Peace Process. The Qods Force, the external operations branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. Iran provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ) and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC). Iran has provided hundreds of millions of dollars in support to Lebanese Hizballah and has trained thousands of Hizballah fighters at camps in Iran. Since the end of the 2006 Israeli-Hizballah conflict, Iran has assisted Hizballah in rearming, in violation of UN Security Council Resolution 1701.

Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons. Since at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives.

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups

that targeted U.S. and Iraqi forces.  The Qods Force continued to supply Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces, as well as civilians.  Iran was responsible for the increased lethality of some attacks on U.S. forces by providing militants with the capability to assemble explosively formed penetrators that were designed to defeat armored vehicles.  The Qods Force, in concert with Lebanese Hizballah, provided training outside of Iraq and advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members it continued to detain, and refused to publicly identify those senior members in its custody.  Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for trial; it is reportedly holding Usama bin Ladin's family members under house arrest.

Senior IRGC, IRGC Qods Force, and Iranian government officials were indicted by the Government of Argentina for their alleged roles in the 1994 terrorist bombing of the Argentine-Jewish Mutual Association (AMIA); according to the Argentine State Prosecutor's report, the attack was initially proposed by the Qods Force.  In 2007, INTERPOL issued a "red notice" for six individuals wanted in connection to the bombing.  One of the individuals, Ahmad Vahidi, was named as Iran's Defense Minister in August 2009.

**SUDAN**

The Sudanese government continued to pursue counterterrorism operations directly involving threats to U.S. interests and personnel in Sudan.  Sudanese officials have indicated that they view their continued cooperation with the U.S. government as important and recognize the potential benefits of U.S. training and information-sharing.  While the bilateral counterterrorism relationship remains solid, hard-line Sudanese officials continued to express resentment and distrust over actions by the United States and questioned the benefits of continued counterterrorism cooperation.  Their assessment reflected disappointment that Sudan's cooperation has not resulted in its removal from the list of State Sponsors of Terrorism.  Despite this, there was no indication that the Sudanese government will curtail its current level of counterterrorism cooperation despite bumps in the overall bilateral relationship.

Al-Qa'ida-inspired terrorist elements as well as elements of the Palestinian Islamic Jihad, and HAMAS, remained in Sudan in 2009.  In the early hours of January 1, 2008, attackers in Khartoum sympathetic to al-Qa'ida, calling themselves al-Qa'ida in the Land Between the Two Niles, shot and fatally wounded two U.S. Embassy staff members -- one American and one Sudanese employee, both of whom worked for the U.S. Agency for International Development. Sudanese authorities cooperated closely with agencies of the U.S. government in the investigation.  The five alleged conspirators were arrested in February 2008 and put on trial for murder on August 31, 2008.  On June 24, 2009 four men were sentenced to death by hanging for the killings.  A fifth man received a two-year prison term for providing the weapons used in the attack.  At least three other men allegedly involved in planning the attack were detained but have

not been charged.

With the exception of HAMAS, whose members the Sudanese government considers "freedom fighters," the government does not openly support the presence of extremist elements in this country. For example, Sudanese officials have welcomed HAMAS members as representatives of the Palestinian Authority, but have limited their activities to fundraising. The Sudanese government has also worked hard to disrupt foreign fighters from using Sudan as a logistics base and transit point for terrorists going to Iraq. However, gaps remain in the Sudanese government's knowledge of these individuals and its ability to identify and capture them. There was some evidence to suggest that individuals who were active participants in the Iraqi insurgency have returned to Sudan and are in a position to use their expertise to conduct attacks within Sudan or to pass on their knowledge to local Sudanese extremists. There was also evidence that Sudanese extremists participated in terrorist activities in Somalia.

The Lord's Resistance Army (LRA) led by Joseph Kony continued to operate in southern Sudan. Following Kony's repeated failure to sign a draft of the Final Peace Agreement, on December 14, 2008, the Ugandan People's Defense Force (UPDF), with cooperation from the Government of Southern Sudan and the Democratic Republic of Congo (DRC), launched Operation Lighting Thunder, attacking LRA bases along the border of Southern Sudan and the DRC. This operation destroyed the main LRA base camp and forcing LRA members to relocate elsewhere in the DRC, Southern Sudan, and the Central African Republic. The UPDF started withdrawing from the operation in mid-March, handing control over operations in DRC to the Armed Forces of the DRC. The operation was declared a success and was said to have significantly weakened the LRA's command structure. However, the official objectives -- to make Kony sign the Final Peace Agreement, or to destroy the LRA -- were only partially achieved, and it is unclear how much the LRA's central command has been hurt. Few senior LRA figures were captured and Kony's whereabouts were unknown at year's end. The UPDF continued to pursue the LRA in Central African Republic, and in southern Sudan, it received assistance from the Sudan Peoples Liberation Army. There was no reliable information to corroborate long-standing allegations that the Government of Sudan was supporting the LRA in 2009.

**SYRIA**

Syria is a signatory to nine of the 13 international conventions and protocols relating to terrorism. While Syrian officials have publicly condemned international terrorism, they continue to insist there is a distinction between terrorist attacks and attacks undertaken by "national liberation movements" engaged in legitimate armed resistance, including Palestinian groups, Lebanese Hizballah, and members of the Iraqi opposition. The United States does not agree with this characterization and has designated a number of these groups as Foreign Terrorist Organizations. During the reporting period, the United States raised concerns about Syria's support of these groups directly with the Syrian government.

Designated in 1979 as a State Sponsor of Terrorism, Syria continued to provide safe-haven as well as political and other support to a number of designated Palestinian terrorist groups, including  HAMAS, Palestinian Islamic Jihad (PIJ), and the Popular Front for the Liberation of

Palestine-General Command (PFLP-GC). Several of these terrorist groups have claimed responsibility for terrorist acts in the past, but none over the past year.  The operational leadership of many of these groups is headquartered or sheltered in Damascus, including Khaled Meshaal of HAMAS, Ramadan Shallah of PIJ, and Ahmed Jibril of PFLP-GC.  The Syrian government provided Meshaal with security escorts for his motorcades and allowed him to travel freely around Damascus, attending numerous public events such as national day celebrations for Arab states.  Though the Syrian government claimed periodically that it used its influence to restrain the activities of Palestinian groups, it allowed conferences organized by HAMAS to take place over the course of the year.  In addition, the Syrian government has made no attempt to restrict the operation, travel, or movement of these groups' leaders or members.  Syria allows terrorist groups resident in its territory to receive and ship goods, including weapons, in and out of the country.

Additionally, the Syrian government provided diplomatic, political and material support to Hizballah in Lebanon and allowed Iran to supply this organization with weapons.  Weapons flow from Iran through Syria, and directly from Syria, to Hizballah despite UN Security Council resolution 1701 of 2006, which imposes an arms embargo on Lebanon except with the consent of the Lebanese government.  Indeed, Hizballah claims to have a larger arsenal today than it did in 2006.  Underscoring links between the Syrian government and Hizballah, Israeli naval commandos intercepted a large cache of arms on November 3 on its way from Iran to Hizballah by way of the Syrian port of Latakia.  The arms shipment, which was found amidst civilian cargo on the Antiguan-flagged ship MV Francop, weighed over 500 tons.  While the Syrian government denied involvement in the shipment, Israeli officials stressed that the incident illustrates Syria's continued efforts to fight a proxy war with Israel through terrorist groups like Hizballah  The last attack across the internationally-recognized Israeli line of withdrawal (a.k.a. the Blue Line) occurred in 2006.  In the same year, a terrorist attack on the U.S. Embassy in Damascus was defeated by Syrian security forces.

Syria has maintained its ties with its strategic ally, and fellow state sponsor of terrorism, Iran.  In August, President al-Asad visited Tehran.  On December 3, the Syrian president met the Iranian National Security Advisor Said Jalili in Damascus.  On December 8, Iranian Defense Minister Ahmed Vahidi began a three-day visit to Syria, where he met with political and military leaders.  Vahidi and his Syrian counterpart announced a Syrian-Iranian defense cooperation agreement on December 11.  Frequent working-level visits between Iranian and Syrian officials took place regularly throughout 2009.  Syria also allowed leaders of HAMAS and other Palestinian groups to visit Tehran.  Al-Asad continued to be a staunch defender of Iran's policies, including Iran's nuclear ambitions.

The number of foreign fighters from extremist groups, including those affiliated with Al Qaeda in Iraq (AQI), transiting through Syrian territory into Iraq has decreased significantly from its peak flows in 2005-2007.  The existence of foreign fighter facilitation networks in Syria, however, remains troubling.  Bombings in Iraq in 2009 underscore the threat these networks continue to pose, but the United States recognizes Syrian efforts to decrease foreign fighter travel into Iraqi during the reporting period.  In 2009, Syria increased border monitoring activities, instituted tighter screening practices on military-age Arab males entering its borders, and agreed

to participate with the U.S. and Iraqi governments in a trilateral border security assessment of the Syrian side of the Syrian-Iraqi border.  Although preparatory meetings were held, the actual border assessment did not occur after the Iraqi government withdrew its support in August 2009. The Syrians have indicated a willingness to establish a border security mechanism if future Iraqi governments are supportive.

While Syria has long provided sanctuary and political support for certain former Iraqi regime elements (FRE), Damascus denied supporting terrorist attacks and urged Baghdad to include the FRE in the Iraqi political process.  In 2008, the United States designated several Iraqis and Iraqi-owned entities residing in Syria under Executive Order 13438 for providing financial, material, and technical support for acts of violence that threatened the peace and stability of Iraq, including Mish'an Al-Jaburi and his satellite television channel al-Rai.  Iraqi government officials criticized al-Rai for serving as a "platform for terrorists."  Additionally, the United States designated one Syria-based individual in 2007 under E.O. 13224 for providing financial and material support to AQI and six others under E.O. 13315 as FRE or family members of FRE, some of whom had provided financial assistance to the Iraqi insurgency.

Syria's financial sector remains vulnerable to terrorist financing.  An estimated 70 percent of all business transactions are conducted in cash and as many as 80 percent of all Syrians do not use formal banking services.  Despite Syrian legislation requiring money-changers to be licensed by the end of 2007, many continued to operate illegally in Syria's vast black market, which is believed to be as large as Syria's formal economy.  Regional "hawala" networks remained intertwined with smuggling and trade-based money laundering – facilitated by corrupt customs and immigration officials – raising significant concerns that the Syrian government and business elites could be complicit in terrorist financing schemes.

## Chapter 4
## The Global Challenge of WMD Terrorism

**Introduction**

The nexus of weapons of mass destruction (WMD) and terrorism poses one of the gravest threats to the national security of the United States and its global partners.  A successful major WMD terrorist attack could result in mass casualties and produce far-reaching economic and political consequences.  This chapter outlines:

- The key elements of the United States' National Strategy for Combating WMD Terrorism;
- The various types of materials terrorists may use in a WMD attack;
- The potential that the resources of a state could be directed or diverted to facilitate WMD terrorism;
- The emerging WMD terrorism threat presented by non-state facilitators
- Moving toward a world without nuclear weapons, and
- Transformational U.S. partnerships to combat this growing global risk.

The United States places the highest priority on working with a broad range of local governments, federal entities, domestic emergency responders, international organizations, foreign governments, and private sector organizations to develop effective partnerships to confront the global challenge of WMD terrorism.

**Diplomatic and Strategic Priorities for Combating WMD Terrorism**

U.S. diplomatic priorities for combating WMD terrorism build on the comprehensive approach set forth in the National Strategy for Combating Terrorism (**http://www.globalsecurity.org/security/library/policy/national/nsct_sep2006.pdf**). Specifically, the U.S. strategic approach hinges on the six objectives outlined in the National Strategy.  The USG works across all objectives simultaneously to maximize its ability to eliminate the threat.

- Determine terrorists' intentions, capabilities, and plans to develop or acquire WMD. Understand and assess the credibility of threat reporting and provide technical assessments of terrorists' WMD capabilities.

- Deny terrorists access to the materials, expertise, and other enabling capabilities required to develop WMD, with a particular focus on weapons-usable fissile materials, dangerous pathogens, and poisonous chemicals.  Denial efforts extend to the methods of transport, sources of funds, and other capabilities that could facilitate the execution of a WMD attack.  In addition to building upon existing initiatives to secure materials, develop innovative approaches that blend classic counterproliferation, nonproliferation, and counterterrorism efforts.

- Deter terrorists from employing WMD. A new deterrence calculus seeks to deter terrorists, facilitators, and supporters from contemplating a WMD attack and, failing that, to dissuade them from actually conducting an attack. Traditional deterrence by punishment may not work because terrorists generally show a wanton disregard for the lives of innocents and, in some cases, for their own lives. Accordingly, develop a range of deterrence strategies that are tailored to the various WMD threats and the individual actors who facilitate or enable those threats. Employ diplomatic strategies that seek to address extremism and defuse volatile conditions in order to discourage consideration of WMD as a tool to address real or perceived injustices.

- Detect and disrupt terrorists' attempted movement of WMD-related materials, weapons, and personnel. Expand our global capability for detecting illicit materials, weapons, and personnel transiting abroad. Utilize global partnerships, international agreements, and ongoing border security and interdiction efforts to promote detection capabilities. Continue to work with countries to enact and enforce strict penalties for WMD trafficking and other suspect WMD-related activities.

- Prevent a WMD-related terrorist attack and develop a response capability. Once the possibility of a WMD attack has been detected, work to contain, interdict, and eliminate the threat. Continue to develop requisite capabilities to eliminate the possibility of a WMD operation and to prevent a possible follow-on attack. Prepare ourselves for possible WMD incidents by developing capabilities to manage the range of consequences that may result from such an attack.

- Define the nature and source of a terrorist-employed WMD device. Should a WMD terrorist attack occur, the rapid identification of the source and perpetrator of an attack would facilitate response efforts and may be critical in disrupting follow-on attacks. Work to maintain and improve our capability to determine responsibility for the intended or actual use of WMD via accurate attribution, using the rapid fusion of technical forensic data with intelligence and law enforcement information.

In January 2009, the Commission on the Prevention of WMD Proliferation and Terrorism released a report card on the U.S. government's response to its December 2008 recommendations. This report highlighted several key observations including the high likelihood that a WMD would be involved in a terrorist attack within the next five years. The Commission concluded that the United States, and the world, must act quickly to slow the proliferation of WMD technologies and information to avoid such an act.

As the implementation of diplomatic strategic priorities for combating WMD terrorism move forward, special care must be taken to work closely with the full range of foreign partners to prioritize and tailor capacity-building approaches to the differing regional and local conditions that exist worldwide.

**THE MATERIAL THREATS**

Four categories of weapons of mass destruction (WMD) that terrorists may seek to acquire and use in a WMD terrorist attack are chemical, biological, radiological, and nuclear (CBRN).

**Chemical**

Chemical weapons represent a potentially dangerous tool in the hands of terrorists. Effectively dispersed and in sufficient dosages, chemical agents could cause mass casualties, as was demonstrated by the use of chemical weapons during World War I and the Iran-Iraq War (1980-1988). Today's chemical terrorism threat ranges from the potential acquisition and use of chemical warfare agents and military delivery systems, to the production and use of toxic industrial chemicals, such as industrial chlorine containers included in IED attacks in Iraq, or improvised dissemination systems, such as those used in the 1995 attack conducted by Aum Shinrikyo in the Tokyo subway system. Perpetrators of that attack used sharpened umbrellas to puncture plastic bags filled with the nerve agent sarin causing the sarin to spill out and evaporate – killing twelve and injuring thousands. Terrorists also have sought to acquire and use commercially-available materials, such as poisons and toxic industrial chemicals. The growth and sophistication of the worldwide chemical industry, including the development of complex synthetic and dual-use materials, may make the task of preventing and protecting against this threat more difficult. Preventing chemical terrorism is particularly challenging as terrorists can use toxic industrial chemicals and other commonly available chemical agents and materials as low-cost alternatives to traditional chemical weapons and delivery systems, though likely with more limited effects.

**Biological**

Bioterrorism, another deadly threat, is the deliberate dispersal of pathogens through food, air, water, or living organisms to cause disease. The 2009 Commission on the Prevention of WMD Proliferation and Terrorism concluded that it is more likely that terrorists would be able to acquire and use biological agents than nuclear weapons due to the difficulty in controlling the proliferation of biotechnologies and biological agent information. If properly produced and released, biological agents can kill on a massive scale and, if terrorists use a pathogen that can be transmitted from person to person, the disease could quickly spread through commercial air travel across oceans and continents before authorities realize their nations have been attacked.

Developing a bioterrorism capability presents some scientific and operational challenges. However, the necessary technical capabilities are not beyond the expertise of motivated scientists with university-level training. Unlike most other types of CBRN threats, the materials required to produce a biological weapon are available in laboratories worldwide, and many threat agents could be isolated from nature, though doing so may pose a challenge. International laboratories are often not safeguarded and secured up to preferred U.S. standards, making access to dual-use equipment and potentially dangerous pathogens possibly more accessible. Even the use of a badly-designed weapon that resulted in only a limited health impact could cause significant disruption. A small-scale bioterrorism attack such as the 2001 anthrax attacks in the United States, which resulted in five Americans killed and an additional 17 individuals infected, had a

substantial economic impact with the costs of decontamination, medical treatment for those exposed, decreased commercial activity, social distress, and lost productivity. The terrorists can often meet their objective of creating disruption and fear without causing large numbers of casualties.

Among present-day terrorist organizations that pose a threat to the United States, al-Qa'ida (AQ) is believed to have made the greatest effort to acquire and develop a bioterrorism program. The United States discovered a partially built biological laboratory near Kandahar after expelling the Taliban from Afghanistan. Although it was not conclusive that AQ succeeded in producing a biological weapon, the discovery demonstrated a concerted effort to acquire a biological attack capability.

**Radiological**

Some terrorists seek to acquire radioactive materials for use in a radiological dispersal device (RDD) or "dirty bomb." Radioactive materials are used widely in industrial, medical, and research applications and include devices used for power supply in remote locations, cancer therapy, food and blood irradiation, and radiography. Their widespread use in nearly every country makes these materials much more accessible than the fissile materials required for nuclear weapons. Most radioactive materials lack sufficient strength to present a significant public health risk once dispersed, while the materials posing the greatest hazard would require terrorists to have the expertise to handle them without exposure to incapacitating doses of radiation or detection during transit across international borders. Public panic and economic disruption caused by setting off an explosive radiological dispersal device, however, could be substantial, even if a weak radioactive source is used.

**Nuclear**

Some terrorist organizations, such as al-Qa'ida, have stated their desire to acquire nuclear weapons. The diffusion of scientific and technical information regarding the assembly of nuclear weapons, some of which is now available on the Internet, has increased the risk that a terrorist organization in possession of sufficient fissile material could develop its own crude nuclear weapon. The complete production of a nuclear weapon strongly depends on the terrorist group's access to special nuclear materials as well as engineering and scientific expertise. Certainly with recent nuclear proliferants including irresponsible countries, such as North Korea, the number of potential sources of an unsecured nuclear weapon or materials is challenging world-wide efforts to control and account for nuclear materials. Terrorists may, however, seek to link up with a variety of facilitators to develop their own nuclear capability. These facilitators include black market proliferators or transnational criminal networks that may seek to profit from the sale of nuclear material, a weaponized device, or technical knowledge gathered from nuclear experts currently or formerly involved in a national nuclear program.

**Dual-Use Materials, Equipment, Research, and Technologies of Concern**

Reducing the risk of terrorist acquisition of, access to, and use of dual-use materials, equipment,

research, and technologies remains a critical challenge. Terrorists have shown an interest in taking advantage of the availability of such material when developing improvised devices. Attacks in Iraq in 2006 and 2007 involving chlorine cylinders, a dual-use chemical used in water treatment facilities, offered a notable example. This challenge has only been compounded by the diffusion of dual-use information on the Internet and in academic venues.

The United States maintains dual-use export controls based on its multilateral commitments in the export control regimes, and it also maintains unilateral controls on a wide range of dual-use items predominantly for antiterrorism reasons. Effective partnerships with private sector organizations, industry, academia, and the scientific research community, as well as with local governments, will play an important role in mitigating the risk of dual-use capabilities falling into the wrong hands. Using alternative materials in technologies is one way to curtail the threat around the world. For example, recent technological developments allow the use of low enriched uranium as a substitute for highly enriched uranium for production of the medical isotope molybdenum-99.

In this era of globalization, control of exports cannot occur only at national borders, but also must be a concern for the knowledge sharing at U.S. research universities, laboratories, and industry. The reduced domestic pool of qualified scientists and engineers has driven many U.S. companies, universities and laboratories to recruit foreign nationals in order to remain competitive. The increased presence of talented foreign science and engineering staff and students carries the risk of WMD technology transfers by way of "deemed exports." (A deemed export is the release of information pertaining to the design and manufacturing of dual-use technology or source code to a foreign national within the confines of the United States borders.) In accordance with the Export Administration Regulations, several USG departments and agencies support a national effort to better control foreign access to sensitive dual-use technologies to prevent unauthorized transfers.

**STATE SPONSORSHIP OF TERRORISM: A KEY CONCERN**

A state that directs WMD resources to terrorists, or one from which enabling resources are clandestinely diverted, poses a grave WMD terrorism threat. Although terrorist organizations will continue to seek a WMD capability independent of state programs, the sophisticated WMD knowledge and resources of a state could enable a terrorist capability. State sponsors of terrorism and all nations that fail to live up to their international counterterrorism and nonproliferation obligations deserve continued scrutiny as potential facilitators of WMD terrorism.

**NON-STATE FACILITATORS: AN EMERGING THREAT**

State sponsors of terrorism with WMD programs represent just one facet of the overall risk of WMD terrorism. The non-governmental entities they use to facilitate their WMD programs have emerged as a growing proliferation threat in recent years that could eventually provide terrorists with access to materials and expertise that are particularly hard to acquire. In 2003, the United States and its international partners succeeded in interdicting a shipment of WMD-related

material destined for Libya's then-active nuclear weapons program.  The facts surrounding this shipment indicated a transnational nuclear proliferation network reaching from East Asia to Europe, developed by Pakistani nuclear scientist A.Q. Khan.  This network was making available sensitive technology and WMD-related materials to nations willing to pay.  There is a risk that such non-state facilitators and their networks could provide their services to terrorist groups.

The dismantling of the A.Q. Khan network revealed an uncomfortable truth about globalization.  The very trends driving globalization, improved communications and transportation links, can enable the development of extended proliferation networks that may facilitate terrorist acquisition of WMD.  Globalization requires that partner nations work together closely to prevent, detect, and disrupt linkages that may develop between terrorists and facilitators such as A.Q. Khan.

## ADDRESSING THE INTERNATIONAL NUCLEAR THREAT

On April 5, in Prague, President Obama presented an ambitious three-part strategy to address the international nuclear threat: 1) proposing measures to reduce and eventually eliminate existing nuclear arsenals; 2) strengthening the Non-Proliferation Treaty (NPT) and halting proliferation of nuclear weapons to additional states; and 3) preventing terrorists from acquiring nuclear weapons or materials.  He also announced an international effort to secure vulnerable nuclear materials within four years, break up black markets, detect and intercept materials in transit, and use financial tools to disrupt illicit trade in nuclear materials.

At the L'Aquila G-8 Summit on July 8, the President formally announced his plan to host a Global Nuclear Security Summit in March 2010.  The Summit would allow discussion on the nature of the threat and develop steps that can be taken together to secure vulnerable materials, combat nuclear smuggling and deter, detect, and disrupt attempts at nuclear terrorism.  The planned outcome of the Summit would be a communiqué pledging efforts to attain the highest levels of nuclear security, which is essential for international security as well as the development and expansion of peaceful nuclear energy worldwide.

At the United Nations on September 24, President Obama presided over the UN Security Council (UNSC) meeting which unanimously cosponsored and adopted UNSC Resolution (UNSCR) 1887.  UNSCR 1887 conveyed the Security Council's grave concern about the nuclear proliferation threat and the need for concerted international action to prevent it.  It demonstrated agreement on a broad range of actions to address nuclear proliferation, disarmament and the threat of nuclear terrorism.  UNSCR 1887 listed fourteen steps that the Security Council will pursue in reducing the nuclear proliferation and terrorism threat and further buttresses UNSCR 1540 in helping prevent WMD proliferation.

## PARTNERSHIPS TO COMBAT WMD TERRORISM

Since September 11, 2001, the international community has made significant strides in responding to the threat of WMD terrorism.  States are working together bilaterally and multilaterally to address these threats and protect their populations.  The United States has taken

concrete measures to build a layered defense against the WMD terrorism threat.  In 2003, the United States announced the first National Strategy to Combat Weapons of Mass Destruction. Through a variety of multinational initiatives such as the Global Threat Reduction Initiative, the Proliferation Security Initiative (PSI), and the Global Initiative to Combat Nuclear Terrorism, (GICNT), the United States has taken a leadership role in reducing the threat of WMD reaching the hands of non-state actors and terrorists.  On July 8, 2009, the G8 endorsed President Obama's three-part strategy to address the international nuclear threat by 1) proposing measures to reduce and eventually eliminate existing nuclear arsenals; 2) strengthening the Non-Proliferation Treaty and halting proliferation of nuclear weapons to additional states; and 3) preventing terrorists from acquiring nuclear weapons or materials.

**The Proliferation Security Initiative:**  Announced in 2003, the Proliferation Security Initiative deserves special mention as a particularly effective international initiative.  The PSI is a global effort that aims to stop the trafficking of WMD, its delivery systems, and related materials to and from states and non-state actors of proliferation concern worldwide.  The PSI relies on voluntary actions by states, using existing national and international legal authorities, to put an end to WMD-related trafficking.  PSI partners take steps to strengthen those legal authorities as necessary.  States that wish to participate in the PSI are asked to endorse its Statement of Interdiction Principles, which identifies specific measures participants commit to undertake for the interdiction of WMD and related materials.  As of December 31, 2009, 95 states have endorsed the Statement.  PSI participants conduct approximately four exercises per year to improve their operational capabilities to conduct interdictions and meet periodically to share information and develop new operational concepts.  The PSI has led to a number of important interdictions over the last six years and is an important tool in the overall U.S. strategy to combat WMD proliferation to state and non-state actors.

**The Global Initiative to Combat Nuclear Terrorism (GICNT):**  The Global Initiative to Combat Nuclear Terrorism (GICNT), which is co-chaired by the United States and Russia, is a cross-cutting strategic framework of 77 partners and four observers who are determined to strengthen individual and global capacity to prevent, detect, and respond to a nuclear terrorist event.  These partners have endorsed a set of core nuclear security principles encompassing the full spectrum of deterrence, prevention, detection, and response objectives.  Partners utilize multilateral activities and exercises to share best practices and lessons learned in order to strengthen individual and collective capacity to combat nuclear terrorism.  To date, partners have conducted 34 multilateral activities and five senior-level meetings in support of these nuclear security goals.  Through these activities, partners have improved international understanding in emerging detection technologies, emergency response and preparedness practices, and anti-smuggling assistance programs.  The Initiative is open to nations that share in its common goals and are committed to combating nuclear terrorism on a determined and systematic basis.

**The Global Threat Reduction Initiative (GTRI)**:  The goal of GTRI, announced by the United States on May 26, 2004, in Vienna, Austria, is to identify, secure, remove, or facilitate the disposition, as quickly and expeditiously as possible, of vulnerable nuclear and radioactive materials and equipment around the world that pose a potential threat to the international community.  One hundred international partners are key participants in this initiative, and GTRI

has undertaken cooperative activities in 100 countries.  In particular, GTRI seeks to facilitate globally the reduction or elimination of the use of highly enriched uranium in civilian nuclear applications and to remove or protect other vulnerable nuclear and radiological materials at civilian sites worldwide.  Specific activities include the conversion of reactors used for research, testing, and medical-isotope production from the use of highly enriched uranium (HEU) fuel to low enriched uranium (LEU); repatriation of fresh and spent HEU fuel to its country of origin (the United States or Russian Federation); enhancement of physical protection at sites utilizing such materials; and removal of unwanted radiological sources and other nuclear materials not otherwise covered by the fuel-return programs.

The **Export Control and Related Border Security Program (EXBS)** is the U.S. government's premier initiative to assist other countries in improving their strategic trade control systems. EXBS seeks to prevent the proliferation of weapons of mass destruction and irresponsible transfers of advanced conventional weapons by helping to build effective national export control systems in countries that possess, produce, or supply strategic items as well as in countries through which such items are most likely to transit.  EXBS provides extensive training on export control legislation, licensing, enforcement, government-industry outreach, and interagency cooperation, as well as providing inspection and detection equipment.  EXBS country programs complement DHS/CBP's Container Security Initiative, DOE's Second Line of Defense Program, and the Megaports Initiative, and improve partner countries' capabilities to fulfill their commitments as part of the Proliferation Security Initiative, the Global Initiative to Combat Nuclear Terrorism, and UNSCR 1540[20] EXBS currently has 21 Program Advisors stationed globally and is active in over 60 countries.  The EXBS program's comprehensive approach, flexibility, responsiveness, and interagency approach makes it a unique resource for addressing critical aspects of the United States' nonproliferation objectives.

**Second Line of Defense (SLD):**  Under its Second Line of Defense (SLD) Program, the Department of Energy's National Nuclear Security Administration (DOE/NNSA) cooperates with partner countries to provide radiation detection systems and associated training to enhance host nation capabilities to deter, detect, and interdict illicit trafficking of special nuclear and other radiological materials across international borders.  The SLD Program complements first line of defense threat reduction efforts, which ensure that protections are in place to lock down and protect material at the source in civilian and military facilities.  The second line of defense thus serves as a key component in a layered defense system, seeking to detect trafficking in material that may have been removed from these facilities as it is moved across international borders and through the maritime shipping network.  The SLD Program includes two components: the Core Program and the Megaports Initiative. The Core Program focuses on providing equipment to land border crossings, feeder seaports, and international airports.  This work originally began in Russia and has since expanded to include former Soviet states, the Caucasus, Eastern Europe, and other key areas.  Mobile detection equipment is also provided to selected countries for use at land borders and internal checkpoints.  The Megaports Initiative began in 2003 and provides equipment to scan cargo containers as they move through the global

[20] In 2004, the UN Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery.

maritime shipping network.  In identifying ports of interest for engagement under the Megaports Initiative, DOE/NNSA considers a number of factors, including volume of containers and regional terrorist threat.  To date, DOE/NNSA has completed deployments at over 230 sites around the world.

**Global Threat Reduction (GTR)**: GTR programs aim to prevent proliferators and terrorists, anywhere in the world, from acquiring WMD expertise, materials and technology.  GTR is actively engaged in a variety of countries including Pakistan and Afghanistan.  GTR programs have expanded to meet these emerging WMD proliferation threats worldwide and focus on promoting biological, chemical, and nuclear security in those countries where there is a high risk of WMD terrorism or proliferation.  The programs also engage and redirect former weapons scientists in the former Soviet Union, Iraq, and Libya.  By engaging biological, chemical, and nuclear scientists, and helping them to secure dangerous pathogens, improve chemical security, and adopt nuclear safety best practices, GTR seeks to keep WMD and dual-use materials, technology and expertise away from proliferators and terrorists.  GTR outreach has helped at-risk facilities deter attempted thefts of dangerous pathogens, and engaged WMD scientists worldwide, among other nonproliferation successes.

**National Strategy for Countering Biological Threats:**  In November 2009, President Obama approved a new national strategy which aimed to provide greater policy cohesion and coordination for U.S. efforts to prevent the acquisition and use of biological weapons.  The strategy aimed to build international capacity to detect and contain outbreaks of infectious disease regardless of cause; reinforce norms against the misuse of the life sciences; and pursue a coordinated suite of actions to identify, influence, inhibit, or interdict those pursuing a biological weapons capability.

**U.S. Efforts to Counter the Threat of a "Dirty Bomb":**  Since the terrorist attacks of 2001, the United States has played a central role in raising international attention and establishing systems of control for radioactive material that could be used in a radiological dispersal device, or "dirty bomb."  The United States was instrumental in the development of the first international export control framework for radioactive sources.  The IAEA *Guidance for the Import and Export of Radioactive Sources* was released in 2005 with strong G-8 backing.  Within the United States, export control measures consistent with the Guidance were incorporated into the 2005 Energy Policy Act and into new rules issued by the Nuclear Regulatory Commission.  The United States also took a lead role in revising the international standard for the control of radioactive materials, the IAEA *Code of Conduct on the Safety and Security of Radioactive Sources*, to better account for security concerns and in building international recognition and observance of this benchmark.  To date, 97 countries have made a political commitment to the IAEA Director General to follow the non-legally binding Code and it has been endorsed by leaders at G-8, U.S.-EU, APEC, and OSCE summits.  The United States provides substantial bilateral assistance, primarily through the NNSA Global Threat Reduction Initiative, and support for the IAEA to secure vulnerable radioactive materials, provide training, detect materials at border crossings, and improve regulatory infrastructures around the world.

**Additional U.S. Efforts Supporting a Global Layered Defense:**  The United States has also worked with partner nations through the UN and the IAEA to reduce the threat of WMD use by terrorists.  The UN Security Council has passed three important resolutions related to the prevention of terrorism and the proliferation of WMD.  In 2001, the Security Council adopted Resolution 1373, which requires all UN member states to refrain from providing any support, active or passive, to terrorists, and to work together to limit terrorist movement and safe haven. In 2004, the Security Council adopted Resolution 1540, which requires all UN member states to refrain from providing support to non-state actors that attempt to develop or acquire WMD and their means of delivery.  In 2009, the Security Council adopted Resolution 1887, committing all UN member states to work toward a world without nuclear weapons and endorsing a broad framework of actions to reduce global nuclear dangers.  The United States remains committed to full implementation of both UN Security Council Resolutions 1373, 1540, and 1887.

The Convention on the Suppression of Acts of Nuclear Terrorism (Nuclear Terrorism Convention) entered into force on July 7, 2007.  On September 25, 2008, the Senate passed resolutions of advice and consent to ratification of the Nuclear Terrorism Convention to the Senate, the Amendment to the Convention on the Physical Protection of Nuclear Material, the Protocol of 2005 to the Convention on the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, and the Protocol of 2005 to the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf.  Collectively, these treaties will enhance international cooperation with regard to the prevention of WMD terrorism and proliferation of WMD, as well as the investigation and prosecution of such acts.

**Conclusion:**  As the President stated in his Prague speech, nuclear terrorism is the most immediate and extreme threat to global security.  We should not wait for an act of nuclear terrorism before working together to collectively improve our nuclear security culture, share our best practices, and raise our standards for nuclear security.  During the past year, the USG has built on a range of activities and launched new efforts to prevent, protect against, and respond to the threat or use of WMD.  Together with partner nations and international organizations, the United States will continue to take the initiative to reduce the global risk of WMD terrorism.

For FY 2009, the following countries are Global Initiative Current Partner Nations:

1. Afghanistan
2. Albania
3. Armenia
4. Australia
5. Austria
6. Bahrain
7. Belgium
8. Bosnia
9. Bulgaria
10. Cambodia
11. Canada
12. Cape Verde
13. Chile
14. China
15. Cote d'Ivoire
16. Croatia
26. Hungary
27. Iceland
28. India
29. Ireland
30. Israel
31. Italy
32. Japan
33. Jordan
34. Kazakhstan
35. Kyrgyz Republic
36. Latvia
37. Libya
38. Lithuania
39. Luxembourg
40. Madagascar
41. Malta
51. Panama
52. Poland
53. Portugal
54. Republic of Korea
55. Republic of Macedonia
56. Romania
57. Russian Federation
58. Saudi Arabia
59. Serbia
60. Seychelles
61. Slovakia
62. Slovenia
63. Spain
64. Sri Lanka
65. Sweden
66. Switzerland

17. Cyprus
18. Czech Republic
19. Denmark
20. Estonia
21. Finland
22. France
23. Georgia
24. Germany
25. Greece

42. Mauritius
43. Montenegro
44. Morocco
45. Nepal
46. Netherlands
47. New Zealand
48. Norway
49. Pakistan
50. Palau

67. Tajikistan
68. Turkey
69. Turkmenistan
70. Ukraine
71. United Arab Emirates
72. United Kingdom
73. United States
74. Uzbekistan
75. Zambia
76. Belarus
77. Mexico
78. IAEA (Observer)
79. INTERPOL (Observer)
80. European Union (Observer)
81. UNODC (Observer)

**Chapter 5: Terrorist Safe Havens and Tactics and Tools for Disrupting or Eliminating Safe Havens**

**Terrorist Safe Havens**

Terrorists operate without regard to national boundaries.  To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships.  Denying safe haven is essential for undermining terrorists' capacity to operate effectively and is a central goal of U.S. counterterrorism strategy.

Terrorist safe havens are defined in this report as ungoverned, under-governed, or ill-governed areas of a country and non-physical areas where terrorists that constitute a threat to U.S. national security interests are able to organize, plan, raise funds, communicate, recruit, train, and operate in relative security because of inadequate governance capacity, political will, or both.  Physical safe havens provide security for terrorist leaders, allowing them to plan acts of terrorism around the world.

Global communications and financial systems, especially those created by electronic infrastructure such as the internet, global media, and unregulated economic activity, further allow terrorists to carry out activities, particularly the dissemination of propaganda and misinformation, without the need for a physical safe haven.  These "virtual" havens are difficult to track, difficult to control, and are not based in any particular state.  This part of the report, however, will not address virtual safe havens, and will focus instead on physical safe havens.

**AFRICA**

**Somalia.**  A small number of al-Qa'ida (AQ) operatives remained in East Africa, particularly Somalia, where they posed a serious threat to U.S. and allied interests in the region.  These elements were disrupted in late 2006 and early 2007 as a result of Ethiopian military actions and again by the death of AQ operative Saleh Nabhan in September 2009.   Somalia remained a concern given the country's long, unguarded coastline, porous borders, continued political instability, and proximity to the Arabian Peninsula, all of which provide opportunities for terrorist transit and/or safe haven and increased the regional threat level.  AQ remains likely to make common cause with Somali extremists, most notably al-Shabaab.  Al-Shabaab has expanded its area of control during its protracted insurgency against the Transitional Federal Government and particularly since the withdrawal of Ethiopian forces in early 2009.  The group controlled most of southern Somalia at year's end.

**The Trans-Sahara.**  The primary terrorist threat in this region was al-Qa'ida in the Islamic Maghreb (AQIM).  AQIM was based primarily in northeastern Algeria but factions also operated from a safe haven in northern Mali, from which they transited areas of the Maghreb and Sahel, especially Mali, Niger, and Mauritania.  AQIM continued to conduct small scale ambushes and attacks on Algerian security forces in northeastern Algeria, but in 2009 the group was not able to conduct the "spectacular" attacks that were more common a few years ago such as their bombing of the UN and Algerian government buildings.  AQIM factions in northern Mali used the safe

haven to conduct kidnappings for ransom and murder of Western hostages and to conduct limited attacks on Malian and Mauritanian security personnel. AQIM derived financial support from the ransoms it collected, which were used to sustain the organization and plan further terrorist operations. AQIM routinely demanded the release of their operatives in custody in the region and elsewhere as a condition of release of hostages. Regional governments sought to take steps to counter AQIM operations, but there was a need for foreign assistance in the form of law enforcement and military capacity building in order to do so.

## EAST ASIA AND PACIFIC

**The Sulu/Sulawesi Seas Littoral.** In Southeast Asia, the terrorist organizations Jemaah Islamiya (JI) and Abu Sayyaf Group (ASG) have sought safe haven in the vicinity of the Sulawesi Sea and the Sulu Archipelago, which encompasses the maritime boundaries of Indonesia, Malaysia, and the Philippines. The area's thousands of islands make it a difficult region for authorities to monitor, while a range of licit and illicit activities that occur there – worker migration, tourism, and trade, for example – pose another challenge to identifying and countering the terrorist threat. Although Indonesia, Malaysia, and the Philippines have improved their efforts to control their shared maritime boundaries, the expanse nevertheless remains difficult to control. Surveillance is improved but remains partial at best, and traditional smuggling and piracy groups have provided an effective cover for terrorist activities, such as movement of personnel, equipment, and funds.

**The Southern Philippines.** Terrorist operatives have sought safe haven in areas of the southern Philippines, specifically in the Sulu archipelago and Mindanao. Philippine government control and the rule of law in this area is weak due to rugged terrain, poverty, and local Muslim minority resentment of central governmental policies. In addition to Jemaah Islamiya (JI) fugitives and Abu Sayyaf Group (ASG) terrorists, the New People's Army and Rajah Solaiman Movement also operated in the southern Philippines.

## THE MIDDLE EAST

**Iraq.** Iraq was not a terrorist safe haven in 2009, but terrorists, including Sunni groups like al-Qa'ida in Iraq (AQI), and Ansar al-Islam (AI), as well as Shia extremists and other groups, viewed Iraq as a potential safe haven. Together, U. S. and Iraqi security forces continued to make progress against these groups. The significant reduction in the number of security incidents in Iraq that began in the last half of 2007 continued through 2009, with a steady downward trend in numbers of civilian casualties, enemy attacks, and improvised explosive device (IED) attacks.

AQI, although still dangerous, experienced the defection of members, lost key mobilization areas, suffered disruption of support infrastructure and funding, and was forced to change targeting priorities. A number of factors have contributed to the substantial degradation of AQI. The alliance of convenience and mutual exploitation between AQI and many Sunni populations has deteriorated. The Baghdad Security Plan, initiated in February 2007, along with assistance from primarily Sunni tribal and local groups, has succeeded in reducing violence to late 2005

levels and disrupted and diminished AQI infrastructure, driving some surviving AQI fighters from Baghdad and Anbar into the northern Iraqi provinces of Ninawa, Diyala, and Salah ad Din. New initiatives with tribal and local leaders in Iraq have led Sunni tribes and local citizens to reject AQI and its extremist ideology.  The continued growth, professionalism, and improved capabilities of the Iraqi forces have increased their effectiveness in rooting out terrorist cells. Iraqis in Baghdad, Anbar and Diyala Provinces, and elsewhere have turned against AQI and were cooperating with the Iraqi government and Coalition Forces to defeat it.

**Northern Iraq.**  The Kurdistan Workers' Party (PKK) maintained an active presence in northern Iraq, from which it coordinated attacks into Turkey, primarily against Turkish security forces, local officials and villagers who opposed the organization.  In October, the Turkish Parliament overwhelmingly voted to extend the authorization for cross-border military operations against PKK encampments in northern Iraq.  Iraq, Turkey, and the United States continued their formal trilateral security dialogue as one element of ongoing cooperative efforts to counter the PKK. Iraqi leaders, including those from the Kurdistan Regional Government, continued to publicly state that the PKK was a terrorist organization that would not be tolerated in Iraq.  Turkish and Iraqi leaders signed a counterterrorism agreement in October.

**Lebanon.**  Hizballah remained the most prominent and powerful terrorist group in Lebanon, with deep roots among Lebanon's large Shia community,, which comprises at least one third of Lebanon's population.  The Lebanese government continued to recognize Hizballah, a U.S.-designated Foreign Terrorist Organization, as a legitimate "resistance group" and political party. Hizballah maintained offices in Beirut and military-style bases elsewhere in the country and was represented by elected deputies in parliament.  (See **Chapter 3**, *State Sponsors of Terrorism*, for information on Iran and Syria, which provided safe haven to Hizballah and Palestinian terrorist groups and were used as safe havens by AQ-linked operatives and groups.)

AQ associated extremists also operated within the country, though their presence was small compared to that of Palestinian groups operating in Palestinian refugee camps who were not aligned with AQ.  The camps are officially controlled by the Lebanese government.  While the Lebanese Armed Forces do not have a day-to-day presence in the camps, they have at times conducted operations in the camps to combat terrorist threats.

**Yemen**.  The security situation in Yemen continued to deteriorate.  As Saudi security forces have clamped down on terrorism and foreign fighters have returned from Afghanistan and Pakistan, Yemen's porous borders have allowed many terrorists to seek safe haven within Yemen.  Al-Qa'ida in Yemen (AQY) announced its merger with al-Qa'ida (AQ) elements in Saudi Arabia in January 2009, creating al-Qa'ida in the Arabian Peninsula (AQAP).  The creation of AQAP coincided with fewer attacks within Yemen, possibly due to the desire of its leadership to use Yemen as a safe haven for planning of future attacks and recruitment because the central government lacks a strong presence in much of the country.

The absence of effective counterterrorism legislation contributed to Yemen's appeal as a safe haven and potential base of operations for terrorists.  The Yemeni government's response to the terrorist threat was intermittent, and its ability to pursue and prosecute suspected terrorists

remained weak for most of the year due to a number of shortcomings, including the stalling of draft counterterrorism in Parliament. The government's response improved dramatically in December with security forces taking strong action against a number of terrorist cells. Even with this turn of events, the government was often distracted by the "Sixth War" of the Houthi rebellion in the Sa'ada governorate in the north of the country and political unrest in southern Yemen.

**SOUTH ASIA**

**Afghanistan**. The Government of Afghanistan, in concert with the International Security Assistance Force and the international community, continued its efforts to eliminate terrorist safe havens and build security, particularly in the country's south and east where the main Taliban-based insurgents threatened stability. Many insurgent groups, including Taliban elements, the Haqqani Network, Hezb-e-Islami Gulbuddin, al-Qa'ida (AQ), and Lashkar-e-Tayyiba, continued to use territory across the border in Pakistan as a base from which to plot and launch attacks within Afghanistan and beyond. Narcotics trafficking, poppy cultivation, and criminal networks were particularly prevalent, constituting a significant source of funding for the insurgency as well as fueling corruption within Afghanistan. AQ leadership in Pakistan maintained its support to militants conducting attacks in Afghanistan and provided funding, training, and personnel to facilitate terrorist and insurgent operations. Anti-Coalition organizations continued to operate in coordination with AQ, Taliban, and other insurgent groups, primarily in the east.

**Pakistan.** Despite increased efforts by Pakistani security forces, al-Qa'ida (AQ) terrorists, Afghan militants, foreign insurgents, and Pakistani militants continued to find safe haven in portions of Pakistan's Federally Administered Tribal Areas (FATA), North-West Frontier Province (NWFP), and Baluchistan. AQ and other groups such as the Haqqani Network used the FATA to launch attacks in Afghanistan, plan operations worldwide, train, recruit, and disseminate propaganda. The Pakistani Taliban (under the umbrella moniker Tehrik-e-Taliban or TTP) also used the FATA to plan attacks against the civilian and military targets across Pakistan. Outside the FATA, the Quetta-based Afghan Taliban and separate insurgent organizations such as Hizb-e-Islami Gulbuddin used the areas in Baluchistan and the NWFP for safe haven. Islamist Deobandi groups and many local tribesmen in the FATA and the NWFP continued to resist the government's efforts to improve governance and administrative control. Despite the August death of the Pakistani Taliban's leader Baitullah Mehsud and Pakistani military operations throughout the FATA and NWFP, the Pakistani Taliban, AQ, and other extremist groups remained dangerous foes to Pakistan and the international community.

Despite international condemnation for its November 2008 attacks in Mumbai, Lashkar-e-Tayyiba (LT) continued to plan regional operations from within Pakistan. LT is an extremely capable terrorist organization with a sophisticated regional network. It continued to view American interests as legitimate targets. While the Government of Pakistan has banned LT, it needs to take further action against this group and its front organizations, which find safe haven within Pakistan.

**WESTERN HEMISPHERE**

Colombia's borders with Venezuela, Ecuador, Peru, Panama, and Brazil include rough terrain and dense forest cover.  These conditions, coupled with low population densities and historically weak government presence, create potential safe havens for insurgent and terrorist groups, particularly the Revolutionary Armed Forces of Colombia (FARC).  The FARC, retreating in the face of Colombian military pressures, thus operated with relative ease along the fringes of Colombia's borders, and also uses areas in neighboring countries along the border to rest and regroup, procure supplies, and stage and train for terrorist attacks with varying degrees of success.  The FARC elements in these border regions often engaged the local population in direct and indirect ways, including recruitment and logistical assistance.  This appeared to be less so in Brazil and Peru where potential safe havens were addressed by stronger government responses. Ecuador and Panama have responded with a mix of containment and non-confrontation with Colombian narco-terrorist groups, although some confrontations do occur depending on local decisions and cross-border relations

**Venezuela**.  Corruption within the Venezuelan government and military, ideological ties with the FARC, and weak international counternarcotics cooperation have fueled a permissive operating environment for narco-traffickers.  Other than some limited activities, such as the bombing of remote dirt airstrips on the border, there is little evidence that the government of Venezuela is moving to improve this situation in the near future.  The FARC, as well as Colombia's second largest rebel group, the National Liberation Army (ELN), regularly used Venezuelan territory to rest and regroup, engage in narcotics trafficking, as well as to extort protection money and kidnap Venezuelans to finance their operations.

**The Tri-Border Area (Argentina, Brazil, and Paraguay).**  No corroborated information showed that Hizballah, HAMAS, or other Islamic extremist groups used the Tri-Border Area (TBA) for military-type training or planning of terrorist operations, but the United States remained concerned that these groups use the region as a safe haven to raise funds.  Suspected supporters of Islamic terrorist groups, including Hizballah, take advantage of loosely regulated territory and the proximity of Ciudad del Este, Paraguay and Foz do Iguaçu, Brazil to participate in a wide range of illicit activities and to solicit donations from within the sizable Muslim communities in the region.  The Argentine, Brazilian, and Paraguayan governments have long been concerned with arms and drugs smuggling, document fraud, money laundering, trafficking in persons, and the manufacture and movement of contraband goods through the TBA.  Concerns about the region moved the three governments to invite the United States to participate in the Three Plus One Group on Tri-Border Area Security, which focuses on practical steps to strengthen financial and border controls and enhance law enforcement and intelligence sharing. Brazil, Argentina, and Paraguay have made notable strides in launching initiatives to strengthen law enforcement institutions and cooperation, including developing financial intelligence units, broadening border security cooperation, augmenting information sharing among prosecutors responsible for counterterrorism cases, and establishing trade transparency units.

## 5.1.a. International Conventions and Protocols Matrix

## 5.1.b. STRATEGIES, TACTICS, AND TOOLS FOR DISRUPTING OR ELIMINATING SAFE HAVENS

**The Regional Strategic Initiative.** Terrorists operate without regard to national boundaries. To effectively counter terrorists, we are working to strengthen our regional and transnational partnerships and to increasingly operate in a regional context. Denying safe haven plays a major role in undermining terrorists' capacity to operate effectively and forms a key element of U.S. counterterrorism strategy. For this reason, the State Department's Office of the Coordinator for Counterterrorism (S/CT) has developed the Regional Strategic Initiative (RSI) in key terrorist theaters of operation to collectively assess the threat, pool resources, and devise collaborative strategies, action plans, and policy recommendations. To implement these strategies, U.S. Ambassadors lead interagency Country Teams that recommend initiatives using all instruments of U.S. statecraft to help host nations understand the threat, and strengthen their political will and capacity to counter it. The RSI promotes cooperation between our counterterrorism partners; for example, between Malaysia, Indonesia, and the Philippines as they confront terrorist transit across the Sulawesi Sea; or among Mauritania, Algeria, Morocco, Niger, Chad, and Mali, to counter al-Qa'ida in the Islamic Maghreb (AQIM). Terrorists are highly adaptable and agile adversaries. Defeating them requires both centralized coordination and field authority. Resources and responses must be applied in a rapid, flexible, and focused manner. The RSI helps achieve this coordinated approach. In 2009, RSI groups were in place for South East Asia, Iraq and its neighbors, the Eastern Mediterranean, the Western Mediterranean, East Africa, the Trans-Sahara, South Asia, and Latin America.

## COUNTERING TERRORISM ON THE ECONOMIC FRONT

Since the terrorist attacks of September 11, 2001, the United States has acted to block funding of terrorists and their supporters, and to promote international cooperation against them. On September 23, 2001, President George W. Bush signed E.O. 13224, giving the United States a powerful tool to impede terrorist funding. This Executive Order (EO) provides a means to disrupt the financial support networks for terrorists and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism. The EO prohibits transactions between U.S. persons and designated individuals and entities. In addition, because of the breadth of the financial base of foreign terrorists, the order authorizes the U.S. government to block the assets of individuals and entities that provide support, offer assistance to, or otherwise associate with designated terrorists and terrorist organizations. The order also covers their subsidiaries, front organizations, agents, and associates.

The Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, has the authority to designate groups as Foreign Terrorist Organizations (FTOs), pursuant to Section 219 of the Immigration and Nationality Act, as amended. These designations play a critical role in U.S. counterterrorism efforts and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business. As a consequence of such a designation, it is unlawful for U.S. citizens or any persons subject to the

jurisdiction of the United States to provide material support or resources to a designated FTO. U.S. financial institutions are also required to freeze the funds of designated FTOs.

In 2009, the following designations were made under E.O. 13224:

- On January 6, the United States designated the Waad Project for providing support to Hizballah, a designated Foreign Terrorist Organization. The Waad Project was formed in 2007 and provides construction support for Hizballah in Beirut and Lebanon. Hizballah has used the Waad Project to rebuild its command headquarters in Beirut's southern suburbs, which was destroyed in the 2006 summer conflict with Israel. The Waad Project has built Hizballah's underground weapons storage facilities and parts of the group's military infrastructure in Lebanon. Additionally, the Waad Project's website has provided telephone numbers for those wishing to donate aid to Hizballah, Jihad al-Bina, and the Hizballah-controlled Martyrs Association.

- On February 4, the United States designated the Free Life Party of Kurdistan (PJAK) for supporting the Kurdistan Workers Party (PKK), a designated Foreign Terrorist Organization that has been involved in the targeting of the Turkish government for more than 20 years. PJAK was created in 2004 as a splinter group of the PKK to appeal to Iranian Kurds. Operating in the border region between Iraq and Iran, PJAK is controlled by the leadership of the PKK and receives orders and personnel from the main organization.

- On February 11, the United States designated the Tamil Foundation for supporting the Liberation Tigers of Tamil Eelam (LTTE), a designated Foreign Terrorist Organization. The LTTE sought an independent state in northeastern Sri Lanka. The LTTE employed conventional, guerrilla, and terrorist tactics in a civil war that led to the deaths of an estimated 80,000-100,000 people. Working with the Tamils Rehabilitation Organization, another front organization for the LTTE designated by the United States under E.O. 13224 in 2007, the Tamil Foundation has collected funds for the LTTE though fundraising activities by acting as a charitable organization.

- On April 20, the United States designated Abdul Haq for holding leadership positions in the Eastern Turkistan Islamic Movement (ETIM), a China-based group with links to Usama bin Ladin and the al-Qa'ida (AQ) network. In 2003, Haq became the top commander and leader of ETIM and has raised funds, recruited members, and otherwise contributed to the development of the organization. Since late 2007, Abdul Haq has sent operatives to the Middle East to raise funds and buy explosive materials for terrorist attacks against Chinese targets outside China. In early January 2008, Abdul Haq directed ETIM's military chief to attack cities in China, particularly focusing on the eight cities hosting the 2008 Olympic Games.

- On May 14, the United States designated Sa'ad Uwayyid 'Ubayd Mu'jil al-Shammari, also known as Abu Khalaf. Al-Shammari is a senior leader of al-Qa'ida in Iraq's Syria-

based facilitation network and is in charge of money, weapons, terrorist fighters, and other resources that flow through Syria to al-Qa'ida in Iraq. Heavily involved in the travel of foreign fighters, al-Shammari is also involved in the recruitment of suicide bombers and other operatives.

- On June 24, the United States designated Iraq-based Kata'ib Hizballah. Kata'ib Hizballah is an Iraqi extremist group active in and around the Baghdad area that has been responsible for numerous terrorist attacks since 2007. Kata'ib Hizballah has conducted numerous rocket propelled grenade and mortar attacks against U.S. bases and assets and routinely attacks U.S., Coalition, and Government of Iraq patrols in Baghdad. One such attack took place in November 2008, when a rocket attack killed two UN workers in the International Zone in Baghdad. In addition, Kata'ib Hizballah has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

- On July 1, the United States designated Fazeel-A-Tul Shaykh Abu Mohammed Ameen al-Peshawari, Nasir Javaid, Mohammed Yahya Mujahid, and Arif Qasmani for providing support to al-Qa'ida (AQ) and Lashkar-e Tayyiba (LT). Lashkar-e Tayyiba, a designated Foreign Terrorist Organization, is a Pakistan-based terrorist group with links to Usama bin Ladin and the AQ network.

    o Ameed al-Peshawari is the leader of the Ganj Madrassah in Peshawar, Pakistan. He provides assistance, funding, and recruits to the AQ network. He also provides funding, explosive suicide vests, and other resources to the Taliban. In order to continue his material and personnel contributions, al-Peshawari has begun a campaign to support AQ and Taliban militants in Pakistan and raises money for fighters in Afghanistan.

    o Nasir Javaid is a LT official involved in operations and in mid-2001, assumed command of an LT training center in Pakistan.

    o Mohammed Yahya Mujahid is the head of LT's media department and has served as a media spokesman since at least mid-2001. In that capacity, Mujahid has issued statements to the press on behalf of the organization on numerous occasions, including after the December 2001 LT attacks on the Indian Parliament, and following the November 2008 attacks in Mumbai.

    o Arif Qasmani is the chief coordinator of LT's dealings with other organizations and has provided significant support for LT terrorist operations. Qasmani has worked with LT to facilitate terrorist attacks, including the July 2006 train bombing in Mumbai and the February 2007 Samjota Express bombing in Panipat, India. Not only has Qasmani conducted fundraising activities on behalf of LT he has also provided financial and other support to AQ; facilitated the return of foreign fighters to their respective countries; and assisted in the movement of leaders in and out of Afghanistan.

- On July 31, the United States designated Revolutionary Struggle.  Revolutionary Struggle is a Greek terrorist organization responsible for numerous terrorist acts against Greek, U.S., and other targets since 2003, including the 2007 attack on the U.S. Embassy in Athens.  Revolutionary Struggle has also claimed responsibility for a May 2006 bomb blast meant to assassinate the Minister of Culture and former Minister of Public Order Georgos Voulgarakis, and for the March 9, 2009 detonation of a bomb outside a Citibank branch in Athens.

- On October 15, the United States designated Bekkay Harrach.  In early 2007, Harrach left Germany for the Afghan-Pakistani border region in order to join with an al-Qa'ida (AQ) training camp.  Harrach provides AQ with narration for media releases targeting German speakers.  In or before January 2009, Harrach provided the German narration for a video entitled "Das Rettungspaket für Deutschland" (The rescue package for Germany), in which Harrach stated that German troops serving under a Security Council mandate in Afghanistan should expect to be attacked by AQ and the Taliban.  In another German-language Internet release distributed via the AQ media office in February 2009, Harrach called for a complete overthrow of the constitutional democratic order in Germany.

**REWARDS FOR JUSTICE**:  The Rewards for Justice Program(RFJ), managed by the Bureau of Diplomatic Security, is one of the U.S. government's most valuable tools for collecting critical information on terrorist leaders and others who seek to harm U.S. interests.  Through the RFJ program, the Secretary of State offers and pays rewards for information that prevents or successfully resolves an act of international terrorism against U.S. persons or property.  Reward offers of up to US$ 25 million have been authorized for information leading to the capture of Usama bin Ladin and other key terrorist leaders.  Since its inception in 1984, RFJ has paid over US$ 82 million to more than 50 people who provided credible information.  In 2009, the Rewards for Justice website carried information in 27 languages.

Also in 2009, the RFJ program added the following five individuals to its *Wanted for Terrorism* list:

- Husayn Muhammed al-Umari, who is believed to be responsible for multiple bombings, including the 1982 bombing of Pan American World Airways flight 830, with a reward offer of up to US$ five million; and

- Wadoud Muhammad Hafiz al-Turki, Muhammad Ahmed al-Munawar, Muhammad Abdullah Khalil Hussain ar-Rahayyal, and Jamal Saeed Abdul Rahim, who were all charged for their roles in the hijacking of Pan American World Airways flight 73 in 1986 on the ground in Karachi, Pakistan, with reward offers of up to US$ five million each.

All of these reward offerings are listed in greater detail on www.rewardsforjustice.net.

**MULTILATERAL EFFORTS TO COUNTER TERRORISM**

International cooperation remained essential to effectively track funding, freeze assets, disrupt planning, and prevent future attacks, as well as to investigate, capture, and prosecute terrorists. Consequently, the United States worked hard to reinvigorate alliances around the world and deepen its engagement in multilateral fora concerned with counterterrorism at the United Nations and its specialized agencies, and at regional organizations worldwide.  The net effect of this work has included increasing the pool of donors for capacity building; strengthening international resolve against terrorism; and also strengthening global norms so that countries jointly do a better job to build security.

Throughout the year, for example, the United States worked closely with partners in many multilateral fora to combat and prevent the financing of terrorism, including the UN Security Council's Counter-Terrorism Committee (CTC)  and the al-Qa'ida and Taliban Sanctions Committee; the UN's Counterterrorism Implementation Task Force; the Egmont Group of Financial Intelligence Units; the Financial Action Task Force (FATF) and FATF-style regional bodies; the Group of Eight's (G8) Counterterrorism Action Group (CTAG); and various international financial institutions.  In addition, the United States continued its regular dialogue on terrorist financing with the European Union (EU).  Since its launch in September 2004, the dialogue has served as a framework for exchanges to promote information sharing and cooperation on joint issues of concern and on technical assistance issues.

The United States and its partners worked through these organizations to establish and promote best practices, build the counterterrorism and law enforcement capabilities of "weak but willing" states, and to institutionalize global counterterrorism norms and standards.  The World Bank and International Monetary Fund have pledged to provide countries with training to increase their capacity to combat money laundering and terrorist financing.

**The United Nations (UN)**.  Sustained and strategic engagement at the UN on counterterrorism issues is a priority for the United States for a number of reasons.  In most parts of the world, it is easier to convince a country to take action if one can point to a UN resolution or treaty calling for such action, rather than relying exclusively on bilateral or informal group pressure.  In addition, the UN has unique expertise it can bring to bear in a range of counterterrorism capacity building fields, which can supplement U.S.-led initiatives.  Working through UN agencies and programs can offer the United States the platform to help build counterterrorism coalitions and to overcome the stigma attached to bilateral relations between the United States and certain states. Such an approach may not only be more cost-effective, as existing expertise and programs can be leveraged, but also be viewed as more politically acceptable in the recipient country and thus more likely to be implemented.  With these comparative advantages in mind, the United States engaged with a wide range of UN actors on counterterrorism in 2009, including the three counterterrorism related committees of the Security Council: the Counter-Terrorism Committee; the 1267 Committee; and the 1540 Committee.

**The Counter-Terrorism Committee (CTC)** was established by Security Council Resolution (UNSCR) 1373 after September 11, 2001, with the goal of monitoring global efforts to implement the ability of UN member states to combat terrorism.   The work of the CTC is supported by the Counter-Terrorism Executive Directorate (CTED), a staff body of some 20

counterterrorism experts.  Among other things, CTED seeks to facilitate the delivery of capacity building and other technical assistance to member states, and to promote closer cooperation and coordination with international, regional, and sub-regional organizations.  It also conducts visits to member states to assess the implementation of Resolution 1373.  In 2009, CTED visited eight states: Australia, Azerbaijan, Bahrain, Ghana, Libya, New Zealand, Oman, and Uzbekistan.  It also organized a number of practical capacity building workshops in 2009, including one for South Asian prosecutors and police (in Bangladesh) and for Pakistani parliamentarians focusing on a draft anti-money laundering law.  In September 2009, the committee initiated a series of thematic discussions of all major areas of implementation of resolution 1373 (2001), including issues related to border security, arms trafficking, law enforcement, and best practices in the implementation of Resolution 1624 (2005).

**The United Nations Security Council 1267 Committee**.  The Security Council imposed sanctions against the Taliban in November 1999 for its support of Usama bin Ladin.  The sanctions - a travel ban, arms embargo, and assets freeze - have been modified and strengthened by subsequent resolutions, including 1333 (2000), 1390 (2002), 1455 (2003), 1526 (2004), 1617 (2005), 1735 (2006), 1822 (2008), and 1904 (2009), so that the sanctions measures now apply to individuals and entities associated with al-Qa'ida, Usama bin Ladin, and/or the Taliban wherever located.  On December 19, 2009, the UN Security Council adopted Resolution 1904, which further strengthens procedures to enhance fairness and transparency in the committee's listing and delisting processes.  The resolution also calls on the 192 U.N. member states to provide as much information as possible when proposing a new entry for the 1267 Consolidated List, and requires the committee to approve narrative summaries of reason for listing simultaneous to approving names for sanctions.

To ensure that current listings remain appropriate, the sanctions committee is implementing pursuant to UNSCR 1822 a review of all 488 individuals and entities on the list at the time of the adoption of that resolution (June 30, 2008), which mandated the committee complete this review by June 30, 2010.  Resolution 1904 further calls for the committee to conduct subsequent reviews every three years, and to commence special annual reviews with an eye to removing people who have died or cannot be adequately identified from the list.  The resolution also requested the Secretary-General, in close consultation with the committee, appoint an ombudsperson to assist the committee in its review of petitions received by or on behalf of individuals and entities seeking removal from the Consolidated List.

The United Nations Security Council 1540 Committee on non-proliferation was established after the adoption of Resolution 1540 "that all States shall refrain from providing any form of support to non-State actors that attempt to develop, acquire, manufacture, possess, transport, transfer or use nuclear, chemical, or biological weapons and their means of delivery."  The United States co-sponsored UN Security Council Resolution 1810, which extended the work of the 1540 Committee for three years until April 2011.

The Counterterrorism Implementation Task Force, which now includes 24 UN entities across the UN system and Interpol, was established by the Secretary-General in 2005 to improve the coordination and cooperation among the different entities involved in countering terrorism.  It

played a key role in the formulation of the Secretary-General's April 2006 report, which served as the basis for the UN Global Counterterrorism Strategy, which was agreed to by all UN member states in September 2006.  Since the strategy's adoption,  the Task Force has become the focal point for UN efforts to support implementation of the global framework, which includes four pillars: 1) measures to address the conditions conducive to the spread of terrorism; 2) measures to prevent and combat terrorism; 3) measures to build states' capacity to prevent and combat terrorism; and 4) measures to ensure respect for human rights for all and the rule of law as the fundamental basis of the fight against terrorism.

In December 2009, the United States voted in favor of a General Assembly resolution that provided the Task Force with the necessary UN regular budget funding to support the creation of seven positions in the UN Secretariat to support the group's work.  Until this point, the Task Force's work was funded exclusively by voluntary contributions from individual UN member states, including the United States.

The members of the Task Force comprise those UN offices and specialized agencies whose ongoing work contributes to global counterterrorism efforts.

 In 2009, the International Civil Aviation Organization (ICAO) instituted procedures on the control and screening of liquids in passenger carry-on baggage and providing specifications for the manufacture of tamper-evident duty free bags.  In cooperation with member state authorities and industry, it helped create a harmonized, international list of items prohibited from aircraft.  ICAO also continued the second cycle of its Universal Security Audit Program's security assessments of airports around the globe.

The UN Office on Drugs and Crime's (UNODC's) Terrorism Prevention Branch and Global Programme Against Money Laundering continued to provide assistance to countries in the legal and related aspects of counterterrorism.  UNODC's mandate in the area of counterterrorism is specifically focused on building the legal framework necessary for member states to become party to and implement the international counterterrorism conventions and protocols.  The Terrorism Prevention Branch also focused on strengthening the capacity of the national criminal justice systems to apply the provisions of these instruments in compliance with the principles of rule of law.

International organized crime networks and members can provide support to terrorist organizations and facilitate their activities.  The UN Convention on Transnational Organized Crime (UNTOC) is the main international instrument to counter international organized crime.  The UNODC supports member states' implementation of the UNTOC and its Protocols, specifically the Protocol on Human Smuggling, and thereby contributed to the global efforts to counter terrorism through the provision of technical assistance and training, and by strengthening countries' legal systems and law enforcement and border control capabilities.  Building the capacity of countries to control their borders is critical for reducing terrorist mobility.

The International Atomic Energy Agency (IAEA) continued to implement its Nuclear Security Plan (2006-2009) for combating the threat of terrorism involving nuclear and other radioactive

material.  IAEA promoted its member states' ratification and implementation of international instruments relating to nuclear security, including the Amendment to the Convention on the Physical Protection of Nuclear Material, and the non-binding IAEA Code of Conduct on the Safety and Security of Radioactive Sources.  The IAEA Nuclear Security Series is a framework of guidance documents designed to help states establish a coherent nuclear security infrastructure.

The United States has been working in the IAEA to enhance security over vulnerable nuclear and other radioactive materials within the IAEA's 144 member states to reduce the risk that such materials could be used in a terrorist event.

**Group of Eight (G8) Counterterrorism Actions.**  The G8, composed of Canada, France, Germany, Italy, Japan, Russia, the United Kingdom, and the United States, continued to develop and promote effective counterterrorism standards and best practices throughout the year.

Italy, who held the G8 presidency, hosted the 2009 annual G8 Summit in L'Aquila where G8 Leaders committed to take action on a range of counterterrorism issues, including:

- strengthening cooperation among the G8 and UN on capacity building for countries requiring assistance to meet international counterterrorism commitments; countering bulk cash smuggling, and the exploitation of charities that finance terrorism;
- countering violent extremism;
- continuing to develop measures to counter and prevent radicalization leading to violence;
- reinforcing efforts to tackle chemical, biological, radiological, and nuclear terrorism;
- protecting against attacks on energy infrastructure and transportation systems; and
- preventing abuse of information/communication technology.

G8 Leaders condemned all terrorist acts as criminal and unjustifiable, particularly the tactics of suicide bombings, the recruitment of the young or disadvantaged to carry out such bombings, and hostage taking.

**Counterterrorism Action Group (CTAG).**  At the June 2003 Evian Summit, G8 Leaders adopted a plan to build political will and capacity to combat terrorism globally, and established the Counterterrorism Action Group (CTAG) to implement this plan.  CTAG supports the UN Counter-Terrorism Committee's efforts to monitor and promote implementation of UNSCR 1373 by developing an active forum for donors to coordinate counterterrorism cooperation with, and assistance to, third countries.  It promotes counterterrorism by prioritizing needs and targeting and coordinating assistance to expand counterterrorism capacity in recipient countries; and encourages all countries to meet their obligations under UNSCR 1373 and, for states party to them, the 13 international counterterrorism conventions and protocols.

Under the leadership of the rotating G8 presidency, CTAG meets two times per year with the active participation of G8 member states, the European Commission, and other donor countries and organizations.  Coordination meetings hosted by the local embassy of the G8 presidency are also held among CTAG members' diplomatic missions in recipient countries, and in

coordination with the UN Counterterrorism Executive Directorate's (CTED) country visits. Italy, as G8 president, convened several CTAG meetings in New York and chaired 18 local CTAG meetings.  In November 2009, Italy launched discussions on the reform and revitalization of CTAG.

**Financial Action Task Force (FATF) and FATF-Style Regional Bodies (FSRBs).**  The United States continued to play a strong role in developing new initiatives within FATF, and within FATF-Style Regional Bodies, to meet evolving anti-money laundering and counterterrorism financing threats.  In 2009, the United States delegation continued its contributions to the Plenary on issues of policy as well as to the Working Groups on issues of implementation.  The United States continued its co-chair role, with Italy, on the International Cooperation Review Group to address jurisdictional anti-money laundering/counterterrorism financing (AML/CTF) systemic deficiencies and threats.  The United States also participated in major FATF work comprising examination, negotiation, and implementation of Special Special Recommendation IX (SRIX) on cash couriers for supranational entities.  This included spearheading a best practices paper for SRIX implementation, examination of proliferation finance, and ongoing discussion of making the FATF follow-up process more effective, including the processes of the FATF-style regional bodies in the FATF network.  In 2009, additional work contributed by the United States included evaluation of selected recommendations and criteria, outreach to the private sector, public-private partnerships, development of guidance for non-financial businesses and professions, and participating in FATF mutual evaluations and Expert Review Groups.  The United States has been focusing FATF's attention on trade-based money laundering and terrorist financing, and in 2009 worked with the FATF on a typologies project on the exploitation of free trade zones in money laundering and terrorist financing.  Throughout 2009, the United States promoted a Law Enforcement Working Group to better address AML/CFT issues specific to law enforcement, and was an active participant in projects on confiscation and corruption.  The United States played a similar and equally active role in the FATF-Style Regional Bodies (FSRBs), supporting FSRB-executed training and other workshops and providing technical assistance not only to members, but to the Secretariats themselves.  Additionally, the United States took part in Contact Groups, mutual evaluations, and Expert Review Groups, and provided advice with an eye to increasing the capacity and transparency of the Secretariats.

**European Union (EU).**  The United States and the European Union (EU) cooperated closely on combating terrorism.  In October 2009, the U.S. Attorney General, Secretary of Homeland Security, and EU Justice and Homes Affairs Ministers adopted a joint statement committing both sides to enhancing policy and operational cooperation in the areas of justice freedom and security.  U.S. and EU leaders at the November 2009 Summit highlighted the Ministerial statement and other efforts to deepen counterterrorism cooperation.  The EU Counterterrorism Coordinator, Gilles de Kerchove, coordinated the counterterrorism work of the Council of the European Union, composed of representatives from all 27 EU Member States.  De Kerchove participated in regular dialogues with U.S. counterterrorism officials.

The United States and EU have deepened cooperation in the area of domestic security, including reciprocally participating in each others' domestic response exercises.  The United States

recently participated in the European Council's review of its emergency and crisis coordination arrangements.  The United States and EU continued to collaborate on techniques for preventing terrorist travel.  U.S. experts have met with EU counterparts on a number of occasions to exchange lessons learned on the development of passenger prescreening systems, including the use of Passenger Name Records.

In September 2008, the European Court of Justice held that EU implementation of asset freezes required by the UN sanctions regime against al-Qa'ida, the Taliban, and their associates, violated procedural and property rights enshrined in European Community law.  The Court annulled the Regulation (insofar as it applied to the two plaintiffs), but gave the EU three months to revise it to rectify these defects.  There are several other similar challenges to the EU's implementation of counterterrorism sanctions pending before the European Court of Justice.  EU officials continued to remedy issues raised in the September 2008 and other rulings, while preserving a strong counterterrorism effort that complies with UN obligations.  In December 2009, the EU passed a new counterterrorism sanctions regulation, codifying many of the procedural changes that have been incorporated in response to evolving European jurisprudence.

EU Justice and Home Affairs Ministers approved a change to the existing EU Framework Decision on Terrorism. Among other changes, the Ministers added incitement and terrorist training as criminal offences under the EU legal framework. The United States and the EU's Judicial Cooperation Unit (Eurojust) have improved cooperation and information exchange among investigators and prosecutors. Pursuant to the U.S.-Eurojust Cooperative Agreement, a U.S. National Liaison Prosecutor, resident in Brussels, assists with operational cases that include several EU member states and assists in mutual legal assistance or extradition issues involving member states. The United States and the EU completed ratification of the U.S.-EU Extradition and Mutual Legal Assistance Agreements.

The United States and EU have established a roadmap toward mutual recognition between the EU Authorized Economic Operator provisions and the U.S. Customs-Trade Partnership Against Terrorism, which are based on a risk management approach to cargo security. A Secure Freight Initiative pilot project in Southampton, UK was concluded in 2008 and provided valuable lessons that will assist in determining how best to execute the 9/11 Implementation Act's requirement for 100 percent scanning of maritime cargo containers.

The United States and EU organized an experts seminar in December 2008 on enhancing the control of explosives. The forum focused on two high-priority shared challenges: improvised liquid or "home-made" explosives and response issues. Discussions are underway to expand existing transatlantic cooperation on research and development to include security research. Responding to the terrorist use of explosives as a threat to aviation security, the European Commission, Directorate General for Transportation and Energy, recommended the restrictions on liquid and gels in carry-on luggage remain in effect beyond the current April 2010 deadline to allow for development and deployment of suitable detection technologies.

In October 2009, the United States and the EU concluded work on a common set of data privacy principles uniting their approaches to protecting personal data while processing and exchanging

information, and agreed to move ahead with negotiation of a binding international agreement. The November 2009 U.S.-EU Summit welcomed the completion of this effort and agreement to move forward on a binding international agreement as a solid basis for our law enforcement authorities to enhance cooperation, while ensuring full protection for U.S. citizens.  Despite this progress, EU concerns about privacy protection in the United States continue to present an operational and political obstacle to further collaboration in the area of information sharing.

The United States and the EU continued to cooperate on combating terrorist financing, including:

- Improving implementation of Financial Action Task Force Special Recommendation III on developing effective, targeted sanctions regimes;
- Improving procedures for information sharing and for working with private sector financial institutions to strengthen the implementation of asset freezing measures;
- Discussing current terrorist financing risks, including terrorist abuse of the charitable sector and new payment methods (FATF SR III);
- Exchanging information and best practices in expert-level discussions; and
- Holding regular senior-level meetings and practitioner workshops between the United States and EU on counterterrorist financing issues.

**Organization for Security and Cooperation in Europe (OSCE).**  The United States worked with the OSCE through its Action against Terrorism Unit (ATU) to encourage cooperation among OSCE participating states on counterterrorism-related issues by facilitating events and activities, including capacity-building assistance programs, training, and contingency-preparedness workshops.  A comprehensive report by the Secretary General released in April highlighted the main areas of the OSCE's work on counterterrorism and emphasized its multidimensional aspects, including democracy and human rights concerns and media freedom. The OSCE hosted a major conference in September on terrorist financing, bringing together financial and counterterrorism experts from across Eurasia to discuss areas for further collaboration.  In October, a workshop, supported by Russia, highlighted the critical connection between a free and responsible media and efforts to counter terrorism, emphasizing the importance of information sharing and partnership between government and media.  At a regional workshop in Malta in December, the OSCE continued its efforts to provide technical capacity-building assistance to help participating states detect and prevent the use of counterfeit travel documents.

The OSCE Athens Ministerial in December approved several decisions to support counterterrorism efforts: urging a more consolidated approach to transnational threats; outlining specific steps to support OSCE participating state implementation of UN legal counterterrorism instruments; and encouraging OSCE participating state adoption of the ICAO Public Key Directory to support greater travel document security.  The evolving European security dialogue known as the Corfu Process includes a transnational threats component under which counterterrorism work remains prominent.

**North Atlantic Treaty Organization (NATO).**  NATO leads International Security Assistance Force stability operations against insurgents in Afghanistan.  NATO also conducts Operation

Active Endeavor, a naval mission that aims to counter terrorism by monitoring Mediterranean maritime traffic. The Alliance is engaged in a far-reaching transformation of its forces and capabilities to better deter and defend against 21st century threats, including terrorism, and is working closely with partner countries and organizations to ensure interoperability of forces, thus enhancing security and broadening cooperation.

NATO adopted its Military Concept against Terrorism in 2002; fielded a Chemical Biological Radiological and Nuclear defense battalion in 2004; and established a special Terrorist Threat Intelligence Unit. Efforts were underway to enhance Allied protection against the potential attempts to disrupt critical infrastructure (energy, cyber) systems. Through NATO's Defense Against Terrorism program, the Alliance is developing 10 cutting-edge technologies to protect troops and civilians against terrorist attacks.

In April 2009, at the NATO Summit in Strasbourg-Kehl, NATO leaders condemned all terrorist acts as unjustifiable and criminal, and deplored tactics such as suicide bombing and hostage taking; the recruitment of the young and disadvantaged to conduct terrorist activities; and terrorist abuse of freedoms inherent to democratic societies. Allies also committed to intensify efforts to deny terrorists access to weapons of mass destruction and their means of delivery. NATO's 28 Allies and 22 Euro-Atlantic Partnership Council Partners have all submitted initial reports as called for by UN Security Council Resolution 1540. NATO is also examining ways to help strengthen NATO Allies' and Partners' implementation of UNSCR 1540 commitments.

**Association of Southeast Asian Nations (ASEAN) and the ASEAN Regional Forum (ARF).**
In January 2007, the Heads of State of the 10-member ASEAN, comprising Brunei, Burma, Cambodia, Indonesia, Laos, Malaysia, Philippines, Singapore, Thailand, and Vietnam, signed a new convention on counterterrorism cooperation. The new ASEAN treaty recognized the importance of having a global legal framework to combat terrorism, as established by the universal conventions on terrorism. The treaty further recognized that terrorism offenses such as hijacking, hostage-taking, and bombing are not political offenses, and terrorists cannot hide behind political justifications to evade justice.

Under the new convention, ASEAN members agreed to cooperate to prevent terrorist attacks, terrorist financing, and terrorist movement across national borders. They also agreed to cooperate to enhance intelligence exchanges, promote public participation in counterterrorism efforts, and strengthen preparedness for dealing with chemical, biological, and nuclear terrorism.

The United States worked closely with ASEAN to enhance counterterrorism cooperation. The United States actively participated in counterterrorism-related activities of the 27-member ASEAN Regional Forum (ARF), including the annual meetings on counterterrorism and transnational crime. The United States has played a significant role in ARF's Counterterrorism and Transnational Crime (CTTC) area of engagement. The United States developed the CTTC Work Plan, which is a comprehensive and coordinated strategy that focuses ARF efforts on three priority areas: biological terrorism, cybersecurity and cyberterrorism, and narcotics trafficking. The United States is also committed to working with ARF partners on transnational maritime security.

**Asia Pacific Economic Cooperation (APEC).**  The 21 member economies of APEC (Australia, Brunei, Canada, Chile, China, Hong Kong, Indonesia, Japan, Republic of Korea, Malaysia, Mexico, New Zealand, Papua New Guinea, Peru, Philippines, Russia, Singapore, Chinese Taipei, Thailand, the United States, and Vietnam), are committed to creating a safe environment for the movement of goods, services, and people throughout the region.  Since 2001, APEC has worked to secure the region's economic, trade, investment, and financial systems from attack and/or abuse by terrorists.  The APEC Counterterrorism Task Force was established in 2003 to coordinate implementation of leaders' and ministers' statements on counterterrorism and non-proliferation, promote information sharing, and develop counterterrorism capacity in the region. APEC also leverages its relationship with the private sector to promote public-private partnerships in counterterrorism and secure trade.

In 2009, APEC leaders' recognized the importance of building capacity to counter terrorism and welcomed APEC's work in areas such as trade security, aviation security, protection of energy infrastructure, countering terrorism financing, fighting cyberterrorism, protecting the food supply against terrorist contamination, and emergency preparedness.  The United States also led capacity-building work to counter biological and chemical terrorism, completing a joint pilot project with Peru to implement the APEC Food Defense Principles.  The United States promoted APEC efforts to counter terrorist financing and to help member economies implement the Financial Action Task Force Special Recommendations on Terrorist Financing.  Lastly, the United States actively supported APEC initiatives to strengthen aviation, land, and maritime security, and support trade recovery following an attack.

**OAS Inter-American Committee against Terrorism (CICTE).**  CICTE operates as the counterterrorism policy body for the hemisphere, with its experts representing and advising the 34 member state governments on how to meet the requirements of the international conventions and protocols relating to terrorism, UN Security Council Resolutions (especially 1373, 1267, and 1540), and the Inter-American Convention against Terrorism (IACAT).

At the Ninth Regular Session of CICTE in March 2009 in Washington DC, the member states adopted the Declaration of Strengthening Border Controls and International Cooperation in the Fight Against Terrorism.  The declaration acknowledged that terrorism constitutes a grave threat to the lives, well-being, and fundamental freedoms of all people; threatens international peace and security; it undermines the values and principles underlying the inter-American system, democratic institutions, and the freedoms enshrined in and promoted by the Charter of the OAS, the Inter-American Democratic Charter, and other international instruments.  The CICTE Ministers also reaffirmed:

- the commitments and conclusions adopted in the Declaration of Panama on the Protection of Critical Infrastructure in the Hemisphere in the Face of Terrorism,
- the declarations adopted at the six previous regular sessions of CICTE,
- the importance of the United Nations Global Counterterrorism Strategy, and the relevance of the implementation of these in the fight against terrorism; and

- the importance of the efforts of the Financial Action Task Force and its commitment to implement and promote internationally its 40 Recommendations on Money Laundering and Nine Special Recommendations on Terrorism Financing.

In 2009, the Secretariat received more than US$ 3.9 million in voluntary contributions from member states.  It conducted 71 activities, training courses and technical assistance missions, which  benefited more than 2,800 participants through nine programs in five areas: border control, critical infrastructure protection, counterterrorism legislative assistance and terrorist financing, crisis management of emerging terrorist threats, and international cooperation and partnerships.  Key achievements included the development of new methodologies — workshops on best practices and crisis management exercises — and the expansion of international partnerships.

**LONG-TERM PROGRAMS/ACTIONS DESIGNED TO REDUCE CONDITIONS THAT ALLOW TERRORIST SAFE HAVENS TO FORM**

**The Antiterrorism Assistance Program (ATA)** provides partner nations with the training, equipment, and technology needed to increase their capabilities to find and arrest terrorists.  ATA training builds the kind of cooperation and interactivity between law enforcement officers that has a lasting impact.  During fiscal year 2009, the State Department delivered more than 412 training activities and technical consultations, and trained more than 5,900 participants from 75 countries.  Over the course of its 25-year existence, ATA has trained more than 66,800 students from 159 countries, providing programs tailored to the needs of each partner nation.

**ATA training subjects include**:
- Airport security
- Cyberterrorism
- Bomb detection
- Dignitary protection
- Border control
- Fraudulent document recognition
- Countering terrorist financing
- Interdiction of terrorist organizations
- Crisis management and response
- Kidnap intervention
- Crisis response teams
- Hostage negotiation and rescue
- Response to incidents involving weapons of mass destruction
- Critical antiterrorism skills at the tactical, operational, and strategic levels.

All courses emphasized advanced law enforcement techniques under the rule of law.  Successful ATA programs include:

**Afghanistan**:  ATA's success with the training of the Presidential Protective Service

(PPS), responsible for the safety of President Hamid Karzai, has lead to a request from Afghanistan to implement training for Detachment 10 (D-10). D-10 is responsible for the protection of VIPs outside of the scope of the PPS. ATA will begin teaching VIP techniques to D-10 in FY10.

In 2009, a notable example of a recent PPS program success was when President Karzai requested that a rescue team be sent to his brother-in-law's residence to rescue the brother-in-law and his family. An ATA trained and equipped counter-assault team (CAT) arrived at the site and observed an individual dressed in an Afghan National Police uniform on the rooftop. This individual was firing his weapon and the CAT team assumed he was firing at insurgents. Once the individual noticed the CAT team, he threw a grenade at them and began firing at the CAT team. A CAT team member engaged the target and the motorcade was repositioned in order to better protect Karzai's family, as they were moved to the motorcade and transported to a safe location. No members of Karzai's family or the CAT team were injured.

**Colombia**: The acting director of the Colombian Anti-Kidnapping School and the director of the Colombian National Police training facility acknowledged the support provided by DS/T/ATA in the establishment of the school. Both directors attributed much of the 90 percent reduction in kidnappings since 2003 to ATA training conducted at the Sibate training facility. The knowledge and techniques, as well as equipment donated, by the ATA Program were recognized as crucial elements in the Colombian government's successful campaign against kidnapping and extortion.

**Indonesia**: The ATA trained and equipped tactical units of Detachment 88 (Det 88), which have arrested and participated in the adjudication of more than 400 terrorist suspects. Det 88 units participated in a combined raid on a suspected terrorist safe house in Solo, Central Java. During the raid, Noordin M. Top, the most-wanted Jemaah Islamiya (JI) terrorist who had eluded capture for nine years, was killed. Top is considered the mastermind behind the July 17, 2009, hotel bombings of the J.W. Marriott and Ritz-Carlton Hotels in Jakarta, and for a string of other deadly attacks in Indonesia. Additional JI extremists were also arrested and 200 kilograms of explosives material was confiscated during the raid.

**Mexico:** Due to the increasing amount of violence against high-level Mexican government officials, ATA has provided a continuing series of VIP Protection courses in Mexico for the Office of the Attorney General, the Secretariat of Public Security, and other high-level Mexican officials. In 2009, ATA began increasing assistance to the Government of Mexico by hiring a Resident Program Manager who will oversee all aspects of the Mexico ATA program.

**Pakistan**: On September 12, ATA-trained Pakistani police officers from the Anti-Terrorist Squad (ATS) of the Peshawar Police were on routine patrol in a North West Frontier Province semi-tribal area. The officers stopped a pickup truck with four men and two women. Both women were wearing burkas but were observed to be wearing men's shoes. The ATS officers became suspicious and ordered the women to remove their burkas. Upon removing their burkas, the ATS officers found two police officers from the ATS Peshawar, who had been kidnapped by the Dara Adam Khel Taliban. The ATS officers arrested the four suspects in the vehicle, who

were attempting to transport the abducted police officers from the tribal area to a semi-tribal area.

**Philippines**:  Members of an ATA-trained Philippine National Police Explosive Ordinance Disposal Unit (EOD) responded to a report of abandoned hand grenades next to a children's playground in Central Mindanao, Philippines.  The EOD unit discovered three unexploded fragmentation hand grenades lying in a grassy area near the playground.  After the area was made safe, the ATA-trained EOD technician conducted a controlled destruction of the unexploded grenades using prescribed explosive/disposal materials.

**Terrorist Interdiction Program/Personal Identification Secure Comparison and Evaluation System Program (TIP/PISCES).**   TIP/PISCES FY2009 funding of US$ 10,000,000 sustained, upgraded, and expanded TIP/PISCES system capabilities in the following 17 countries:  Afghanistan, Cambodia, Cote D'Ivoire, Djibouti, Ethiopia, Ghana, Iraq, Kenya, Kosovo, Macedonia, Malta, Pakistan, Tanzania, Thailand, Uganda, Yemen and Zambia.  The program helped countries at risk of terrorist activity enhance their border security capabilities by providing a computerized watch-listing system and training that enable host nations to identify suspect travelers.  U.S. agreements for providing this equipment and training included provisions for sharing information gathered at borders and other international entry points.  TIP/PISCES processes an estimated 150,000 travelers every day.

In FY2009:

- In Iraq, two new sites were set up at Mosul and Najaf International Airports.
- In Pakistan, the number of sites equipped with the TIP/PISCES immigration system increased by four to 24 (13 international airports, five land borders, four seaports, and two rail stations).
- In Yemen, 24 sites are currently equipped with the TIP/PISCES immigration system with another four sites planned (three airports and a seaport).
- In Kosovo and Macedonia, TIP/PISCES expanded rapidly and by September 30, 2009, these countries had 10 and 21 sites respectively.

**Counterterrorist Finance Training (CTFT).**  The Deputy Coordinator for Programs of the Department of the State Department's Office of the Coordinator for Counterterrorism and the Deputy Assistant Secretary for Crime in the State Department's Bureau of International Narcotics and Law Enforcement Affairs co-chair the interagency Terrorist Finance Working Group (TFWG).  TFWG meets biweekly or on an ad-hoc basis to develop, coordinate, and review U.S. government global Counterterrorist Finance (CTF) capacity-building initiatives intended to deter, disrupt, and interdict the flow of funds to terrorist organizations and their allies in criminal syndicates.

TFWG has established CTF capacity building programs in countries in each of the Department's six regional bureaus, but the primary focus has been on countries where the illicit finance threat is highest.  Accordingly, in coordination with the interagency Illicit Finance Task Force (IFTF), which is led by the Department of Treasury under the guidance of the Special Representative for

Afghanistan and Pakistan, CTF programs are being expanded in Afghanistan and Pakistan.  Both countries currently lack the legal, regulatory, and institutional capacity to deal effectively with the growing threat of terrorist and other illicit financing being used to fund al-Qa'ida, the Taliban, and Lashkar e-Tayyiba.  TFWG and IFTF's Capacity-Building Working Group (CBWG) have also sought to partner with Gulf countries to further expand training and technical assistance in the legal, financial regulatory, financial intelligence, financial investigation, prosecutorial, judicial, and asset forfeiture fields.  The goal is to deny terrorists access to funding from donors and facilitators in the Gulf and restrict their use of the formal and informal financial systems of the region.

The roles and responsibilities of the five Department of Justice Resident Legal Advisors (RLAs) were expanded with bilateral and regional responsibilities.  The RLAs have conducted training workshops, assisted with the drafting of laws and regulations, and conducted outreach to parliamentarians.

TFWG has worked closely with the Department of Homeland Security and interagency partners to expand bulk cash smuggling training programs.  This included conducting a highly successful Regional Operational Cash Courier Training program in South East Asia and bulk cash smuggling training in a variety of countries, including Nigeria and Iraq.

## Countering Violent Extremism

To counter violent extremism, the U.S. government is developing a better understanding of the dynamics of the communities in which violent extremism has taken root.  Every at-risk community possesses unique "upstream" political, economic, and social factors that can contribute to the radicalization process.  For this reason, one-size-fits-all programs have limited appeal.  Instead, programs must be tailored to fit the characteristics of the audience.  "Micro-strategies" customized for specific communities, and even neighborhoods, have a better chance of succeeding and enduring.

The State Department is working to address the local drivers of radicalization that can lead large numbers of young people to be vulnerable to al-Qaida's ideology.  We are also working both to undermine the al-Qaida narrative and to address the political, economic, and social conditions that al-Qaida and other violent extremists exploit in their drive to recruit.  The State Department recognizes that violent extremism can flourish where there is marginalization, alienation, and perceived – or real – relative deprivation.  In recognition of this, the Office of the Coordinator for Counterterrorism has staffed a unit to focus on local communities most prone to radicalization.

In many cases, Muslims have more credibility than the U.S. government in addressing these issues in their own communities.  They are the ones best placed to convey effective counter-narratives capable of discrediting violent extremism in a way that makes sense to their local community, and only they have the credibility to counter the religious claims made by violent extremists.  The U.S. government is working to identify reliable partners and amplify those credible Muslim voices.  The United States can help empower these local actors through

programmatic assistance, funding, or by simply providing them with space – physical or electronic – to challenge violent extremist views.  Non-traditional actors such as NGOs, religious leaders, foundations, and private businesses are some of the most capable and credible partners in local communities.  Therefore, the U.S. government is boosting its outreach efforts to engage with such organizations.  The U.S. government and partner nations are also seeking to develop greater understanding of the linkages between diaspora communities and countries of ancestry. Through familial and business networks, events that affect one community have an impact in the other.

The State Department's Office of the Coordinator for Counterterrorism implements a number of innovative CVE programs.  The Ambassadors Fund for Counterterrorism marries law enforcement and public diplomacy approaches.  It supports projects proposed by Embassies that enhance the ability of local law enforcement personnel to deter terrorism, by applying the tools of soft power and supporting USG efforts to counter violent extremist ideology and recruitment. Up to US$ 100,000 is provided in micro-grants to embassies for projects. In FY2009, 17 projects were funded, including projects in Iraq, Afghanistan, Cambodia, the Philippines, Bosnia and Herzegovina, and Peru.

The International Information Programs Bureau in the Undersecretary's Office of Public Affairs and Public Diplomacy has enhanced and expanded its innovative Digital Outreach Team.  This team of native Arabic, Persian, and Urdu speakers actively engaged on highly-trafficked mainstream news sites and Internet discussion forums in those languages.  Identifying themselves as representing the State Department, they directly counter online arguments that defend goals and tactics of violent extremists, in particular al-Qa'ida and the Taliban.  They have found that in many if not most cases, their interlocutors even welcome the opportunity to engage with official U.S. representatives.  These discussions have generated thousands of hits at a time on popular websites such as *al-Jazeera Talk*.  In the last three years, the team has posted more than 6,000 online messages, including YouTube videos on U.S. foreign policy, religious freedom in America, and U.S. cooperation with Muslim communities around the world, which generated more than 500,000 hits.

In 2009, the Special Representative to Muslim Communities met with civil society leaders at the grassroots level in 11 countries in every region of the globe.  Focusing particularly on young people, she is working to create partnerships with civil society and seeking out those who are pushing back against violent extremism to amplify their voices and connect them to other like-minded thinkers who can inspire positive change.  Because reaching young people requires operating in the spaces that young people choose to occupy, the State Department is increasingly using online and mobile technology to empower credible Muslim voices who can provide an alternative, positive counter-narrative to the negative voices of extremism young people face online.

**The Middle East Partnership Initiative**

The Middle East Partnership Initiative (MEPI), which is located within the Department of State's Bureau of Near Eastern Affairs, seeks to build a vibrant partnership between the United States

and citizens of the Middle East to support the development of more prosperous, successful, participatory, pluralistic societies at peace within themselves and with their neighbors.  MEPI projects mainly support civil society, the private sector, and academic institutions in their efforts to enhance citizens' economic, social, and political empowerment; expand opportunities for women and youth; and help communities participate together with governments in shaping their own futures.  MEPI assists indigenous efforts to expand political participation, strengthen the rule of law, empower women and youth, expand educational opportunities, and foster entrepreneurship and economic reform throughout the Middle East and North Africa.   Through its Washington headquarters and Regional Offices in Abu Dhabi and Tunis, MEPI has contributed over US$ 530 million to more than 600 projects in 17 countries and territories since its establishment in 2002.

One third of the Middle East's population is under the age of 15 years.  Integrating this vast youth cohort into society as productive adults is a key challenge for regional stability, as well as regional prosperity.  Without education, employment and civic engagement that enable youth to become articulate, engaged, and productive members of society, the region will continue to be marked by limited economic prospects, high unemployment, illiteracy, and even less innovation and capital investment, with more youth potentially falling prey to the appeal of extremist rhetoric.  MEPI works to target this youth population through programming across a range of issue-areas, from English literacy to volunteerism programs, from vocational training to support for entrepreneurship.

MEPI is not a counterterrorism program, but a program dedicated to building effective partnerships with the citizens of the Middle East on behalf of a better future.  Its work to support local agents of change in the Middle East and North Africa helps contribute to improvements in social cohesion, economic development, civil discourse, and responsive governance.  These, in turn, help to address some of the underlying conditions that have been associated with violent extremism.

**Giving People a Voice In Their Future**

- MEPI supported programs to develop inclusive and representative political parties and more transparent electoral systems.
- Through training and technical assistance, MEPI supported independent media outlets and efforts to advance freedom of the press.
- Through hundreds of small grants to indigenous organizations, MEPI helped local civil society expand their impact, enhance their internal capacity, and improve their networking.
- MEPI projects helped local citizens advocate for laws and practices to protect basic rights and fundamental freedoms, including freedom of expression and association.
- By supporting the G8's BMENA Initiative and the participation of civil society from across the region in the Forum for the Future and associated BMENA activities, MEPI provided rare opportunities to reformers and activists to dialogue directly with government officials in multilateral settings.

- 2009 saw the continuation of MEPI assistance to legislatures.  Many countries held or planned for elections, including Algeria, Kuwait, Morocco, Lebanon, and Tunisia.  In Kuwait, the four female Members of Parliament, elected in May 2009, were all alumni of MEPI programs, and are now active and outspoken parliamentarians.
- A poll released by the Jordan Center for Strategic Studies, a MEPI local grant recipient, revealed public dissatisfaction with parliamentary performance, lending weight to the dissolution of Parliament and creating expectations for the newly formed government.
- In Yemen, a MEPI local grant provides a cadre of Yemeni women political leaders with assistance and training to establish and lead a parliamentary watchdog effort, including lobbying parliament and implementing public awareness and advocacy campaigns.

**Developing Economic Opportunity**

- MEPI provided technical and other assistance in support of both
- free trade agreements with Bahrain, Jordan, Morocco, and Oman; and WTO accession for Yemen, Algeria, and Lebanon.
- MEPI expanded the trade capacity of Arab countries with training and technical assistance; and assisted a number of Gulf and North African countries with revisions to their labor, intellectual property, and customs regulations and to their agricultural import/export standards.
- MEPI expanded efforts to strengthen indigenous labor and business organizations.  For example, the Private Sector Job Creation project trained 480 youth and 15 trainers.  More than 400 youth obtained employment as a result of their participation.
- MEPI created mechanisms to extend credit and other financial services to small- and medium-sized businesses through peer consultation and training for regional banks and financial organizations.
- MEPI's Women in Technology (WIT) project trained more than 6,000 low-income women, 565 trainers and partner organization staff.  More than 250 WIT participants obtained internships or employment and 45 women started their own businesses after completing training.
- MEPI also expanded commercial and legal reform efforts in the Gulf by working to update legal curricula at various law schools.  The MEPI-funded Commercial Law Development Program, implemented by the Department of Commerce, helped Saudi Arabian judges become better equipped at adjudicating transactions that directly impact the ability of the private sector to operate.  In a historic first, Saudi Arabian judges traveled to the United States for two weeks of judicial consultations.

**Increasing Opportunities For Youth**

- The Higher Education for Development (HED) project funds partnerships that improve quality of instruction and enhance universities' capacities.  HED has funded a number of partnerships between US- and MENA-based universities since 2008.

- Through the support of a MEPI local grant, the Palestinian non-governmental organization Basma Society for Culture and Arts is involving young people from UNRWA schools in theatrical productions designed to teach dialogue and forgiveness.
- Similarly, The Maccabim Association, an Israeli non-governmental organization, received a MEPI local grant to provide Arab children in a disadvantaged neighborhood with after-school soccer and academic assistance to improve their social and conflict resolution skills.
- With MEPI support, Embassy Doha sponsored a Youth Film Makers' Workshop. Approximately 75 Qatari men and women attended the final juried event, which was covered by Al Jazeera and local media.  The movie that won the Best Film category was a hard-hitting piece on the travails of foreign laborers in Qatar.  One of the films produced by a young filmmaker has been selected for the Al Jazeera Documentary Film Festival and a film festival in Beirut later this year.
- In Yemen, young leaders are learning the values and concepts of effective democratic leadership and civic engagement under a MEPI local grant.  The Democracy School project facilitates political empowerment for young leaders and demonstrates the potential for youth to help Yemen's fledgling democracy meet the local challenges Yemenis face.

**Empowering Women**

- MEPI supports a robust Business Women's Network across the region and strengthens the technology, business, and advocacy skills of women and supports aspiring entrepreneurs.
- MEPI established the first U.S.-Middle East Partnership for Breast Cancer Awareness and Research, which enabled women across the region to join together in private-public partnerships, civic engagement, and networking.  To date, the project has directly trained and engaged more than 2,500 community advocates, resulting in outreach to more than 25,000 community beneficiaries.
- Through its Women in Law program, MEPI created a regional network of more than 400 young Middle East women legal professionals.  The network fosters an exchange of expertise and information, provides professional development training and mentoring, and helps women secure equal rights under the law.
- MEPI also developed projects that encourage greater women's participation in politics through training and mentoring female electoral candidates, strengthening women's civil society membership, and providing leadership training to women.
- MEPI funded country-wide campaign training in Morocco for nearly 4,000 women candidates in preparation for June 2009's municipal elections.  Women candidates won 12.3 percent of the seats, marking a dramatic increase from the 0.5 percent of seats they held previously.
- In Jerusalem and the West Bank, MEPI supports several programs with direct impact on villages in the area.  For example, a community leadership empowerment program funds computer labs in women and youth centers, provides equipment for community halls, and promotes leadership and problem-solving skills in community participants.

## Chapter 6
## Terrorist Organizations

**Foreign Terrorist Organizations**

Foreign Terrorist Organizations (FTOs) are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA).  FTO designations play a critical role in the fight against terrorism and are an effective means of curtailing support for terrorist activities.

**Identification**

The Department of State continually monitors the activities of terrorist groups around the world in order to identify potential targets for designation.  When reviewing potential targets, the Department considers terrorist attacks that a group has carried out, whether the group has engaged in planning and preparations for possible future acts of terrorism, or whether it retains the capability and intent to carry out such acts.

**Designation**

Once a target is identified, a detailed "administrative record" is prepared.  This record demonstrates that the criteria for designation have been legally satisfied.  If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to designate an organization, Congress is notified of the Secretary's intent and given seven days to review the designation, as required by the INA.  Upon the expiration of the seven-day waiting period, and in the absence of Congressional action to block the designation, notice of the designation is published in the *Federal Register*, at which point the designation becomes law.  An organization designated as an FTO may seek judicial review of the designation in the U. S. Court of Appeals for the District of Columbia Circuit no later than 30 days after the designation is published in the *Federal Register*.

The Intelligence Reform and Terrorism Prevention Act of 2004 provides that a designated FTO may file a petition for revocation two years after its designation date  or two years after the determination date of its most recent petition for revocation.  In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation have sufficiently changed as to warrant revocation.  If no such petition has been filed within a five-year period, the Secretary of State is required to review the designation to determine whether revocation would be appropriate.  In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed, or that the national security of the United States warrants a revocation.  Revocations made by the Secretary of State must undergo the same administrative review and Congressional processes as that of designations.  A designation may also be revoked by an Act of Congress.

**Legal Criteria for Designation under Section 219 of the INA as amended**

1. It must be a *foreign organization.*

2. The organization must *engage in terrorist activity*, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)), or *terrorism*, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)), *or retain the capability and intent to engage in terrorist activity or terrorism.*

3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

| **U.S. Government Designated Foreign Terrorist Organizations** |
| --- |

**Abu Nidal Organization (ANO)**
**Abu Sayyaf Group (ASG)**
**Al-Aqsa Martyrs Brigade (AAMB)**
**Al-Shabaab (AS)**
**Ansar al-Islam**
**Armed Islamic Group (GIA)**
**Asbat al-Ansar**
**Aum Shinrikyo (AUM)**
**Basque Fatherland and Liberty (ETA)**
**Communist Party of Philippines/New People's Army (CPP/NPA)**
**Continuity Irish Republican Army (CIRA)**
**Gama'a al-Islamiyya (IG)**
**HAMAS**
**Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B)**
**Harakat ul-Mujahideen (HUM)**
**Hizballah**
**Islamic Jihad Union (IJU)**
**Islamic Movement of Uzbekistan  (IMU)**
**Jaish-e-Mohammed  (JEM)**
**Jemaah Islamiya (JI)**
**Kahane Chai**
**Kata'ib Hizballah (KH)**
**Kurdistan Workers' Party (PKK)**
**Lashkar e-Tayyiba (LT)**
**Lashkar i Jhangvi  (LJ)**
**Liberation Tigers of Tamil Eelam (LTTE)**
**Libyan Islamic Fighting Group (LIFG)**
**Moroccan Islamic Combatant Group (GICM)**

**Mujahadin-e Khalq Organization  (MEK)**
**National Liberation Army (ELN)**
**Palestine Liberation Front – Abu Abbas Faction (PLF)**
**Palestinian Islamic Jihad – Shaqaqi Faction  (PIJ)**
**Popular Front for the Liberation of Palestine  (PFLP)**
**Popular Front for the Liberation of Palestine-General Command  (PFLP-GC)**
**Al-Qa'ida (AQ)**
**Al-Qa'ida in Iraq (AQI)**
**Al-Qa'ida in the Islamic Maghreb (AQIM)**
**Real IRA (RIRA)**
**Revolutionary Armed Forces of Colombia (FARC)**
**Revolutionary Organization 17 November  (17N)**
**Revolutionary People's Liberation Party/Front (DHKP/C)**
**Revolutionary Struggle (RS)**
**Shining Path (SL)**
**United Self-Defense Forces of Colombia  (AUC)**

---

## ABU NIDAL ORGANIZATION

aka ANO; Arab Revolutionary Brigades; Arab Revolutionary Council; Black September; Fatah Revolutionary Council; Revolutionary Organization of Socialist Muslims

**Description:**  The Abu Nidal Organization (ANO) was designated as a Foreign Terrorist Organization on October 8, 1997.  The ANO was founded by Sabri al-Banna (aka Abu Nidal) after splitting from the Palestine Liberation Organization (PLO) in 1974.  The group's previous known structure consisted of various functional committees, including political, military, and financial.  In August 2002, Abu Nidal died in Baghdad, probably at the hands of Iraqi security officials.  Present leadership of the organization remains unclear.  ANO advocates the elimination of Israel and has sought to derail diplomatic relations efforts in support of the Middle East peace process.

**Activities:**  The ANO has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons.  The group has not staged a major attack against Western targets since the late 1980s.  Major attacks included those on the Rome and Vienna airports in 1985, the Neve Shalom synagogue in Istanbul, the hijacking of Pan Am Flight 73 in Karachi in 1986, and the City of Poros day-excursion ship attack in Greece in 1988.  The ANO is suspected of assassinating PLO Deputy Chief Abu Iyad and PLO Security Chief Abu Hul in Tunis in 1991.  In 2008, a Jordanian official reported the apprehension of an ANO member who planned to carry out attacks in Jordan.  The ANO did not successfully carry out attacks in 2009.

**Strength:** Current strength is unknown.

**Location/Area of Operation:** The group is largely considered dormant operationally, although former and possibly current ANO associates might be present in Iraq and Lebanon.

**External Aid:** The ANO's current access to resources is unclear, but it is likely that the decline in support previously provided by Libya, Syria and Iran has had a severe impact on its capabilities.

---

## ABU SAYYAF GROUP

a.k.a. al Harakat al Islamiyya

**Description:**  The Abu Sayyaf Group (ASG) was designated as a Foreign Terrorist Organization on October 8, 1997, operating in the southern Philippines.  Some ASG leaders allegedly fought in Afghanistan during the Soviet invasion and are students and proponents of radical Islamist teachings.  The group split from the much larger Moro National Liberation Front in the early 1990s under the leadership of Abdurajak Abubakar Janjalani, who was killed in a clash with Philippine police in December 1998.  His younger brother, Khadaffy Janjalani, replaced him as the nominal leader of the group.  In September 2006, Khadaffy Janjalani was killed in a gun battle with the Armed Forces of the Philippines.  Radullah Sahiron is assumed to be the ASG leader.

**Activities:**  The ASG engaged in kidnappings for ransom, bombings, beheadings, assassinations, and extortion.  The group's stated goal is to promote an independent Islamic state in western Mindanao and the Sulu Archipelago – areas in the southern Philippines heavily populated by Muslims.  In 2006, the Armed Forces of the Philippines began "Operation Ultimatum," a sustained campaign that disrupted ASG forces in safe havens on Jolo Island in the Sulu archipelago, and resulted in the killing of ASG leader Khadaffy Janjalani in September 2006 and his deputy, Abu Solaiman in January 2007.  In July 2007, the ASG, and Moro Islamic Liberation Front (MILF) engaged a force of Philippine military forces on Basilan Island, killing 14, 10 of whom were beheaded.

The group's first large-scale action was a raid on the town of Ipil in Mindanao in April 1995.  In April 2000, an ASG faction kidnapped 21 people, including ten Western tourists, from a resort in Malaysia.  In May 2001, the ASG kidnapped three U.S. citizens and 17 Filipinos from a tourist resort in Palawan, Philippines.  Several of the hostages, including U.S. citizen Guillermo Sobero, were murdered.  A Philippine military hostage rescue operation in June 2002 freed U.S. hostage Gracia Burnham, but her husband Martin Burnham, also a U.S. national, and Filipina Deborah Yap were killed.

U.S. and Philippine authorities blamed the ASG for a bomb near a Philippine military base in Zamboanga in October 2002 that killed a U.S. serviceman.  In February 2004, Khadaffy Janjalani's faction bombed SuperFerry 14 in Manila Bay, killing 132.  In March 2004, Philippine authorities arrested an ASG cell whose bombing targets included the U.S. Embassy in Manila. The ASG also claimed responsibility for the February 14, 2005 bombings in Manila, Davao City, and General Santos City, which killed eight and injured more than 150.  In November 2007, a motorcycle bomb exploded outside the Congress of the Philippines, killing a congressman and

three staff members. While there was no definitive claim of responsibility, three suspected ASG members were arrested during a subsequent raid on a safe house and tried for their respective roles in the bombing. During 2009, the ASG staged multiple kidnappings, beheadings, and assassinations, including the January kidnappings of three Red Cross workers in the southern Philippines who were later released.

**Strength**: ASG is estimated to have approximately 200 to 500 members.

**Location/Area of Operation:** The ASG was founded in Basilan Province and operates primarily in the provinces of the Sulu Archipelago, namely Basilan, Sulu, and Tawi-Tawi. The group also operates on the Zamboanga peninsula, and members occasionally travel to Manila. The group expanded its operational reach to Malaysia in 2000 with the abduction of foreigners from a tourist resort there. In mid-2003, the group started operating in Mindanao's city of Cotobato and on the provincial coast of Sultan Kudarat, Mindanao. The ASG was expelled from Mindanao proper by the MILF in mid-2005.

**External Aid:** The ASG is funded through acts of ransom and extortion, and may receive funding from external sources such as remittances from overseas Filipino workers and possibly Middle East-based extremists. In October 2007, the ASG appealed for funds and recruits on *YouTube* by featuring a video of the Janjalani brothers before they were killed.


## AL-AQSA MARTYRS BRIGADE

aka al-Aqsa Martyrs Battalion

**Description:** The al-Aqsa Martyrs Brigade was designated as a Foreign Terrorist Organization on March 27, 2002. The al-Aqsa Martyrs Brigade comprises an unknown number of small cells of Fatah-affiliated activists that emerged at the outset of the second Palestinian uprising, or al-Aqsa Intifada, in September 2000. Al-Aqsa's goal is to drive the Israeli military and West Bank settlers from the West Bank and establish a Palestinian state loyal to the secular nationalist Fatah.

**Activities:** Al-Aqsa employed primarily small-arms attacks against Israeli military personnel and settlers as the intifada spread in 2000, but by 2002 they turned increasingly to suicide bombings against Israeli civilians inside Israel. In January 2002, the group claimed responsibility for the first female suicide bombing inside Israel. Many al-Aqsa cells suspended anti-Israeli attacks as part of the broader unilateral Palestinian cease-fire agreement during 2005, though others did not, highlighting the group's absence of central leadership or control. After the June 2007 HAMAS takeover of the Gaza Strip, al-Aqsa Martyrs cells in Gaza stepped up rocket and mortar attacks against Israel. However, the group's attacks have largely diminished since the end of Israeli Operation CAST LEAD in January 2009 due to HAMAS' efforts to strictly enforce a ceasefire. West Bank Al Aqsa Martyrs Brigade members participated in 2007 and 2008 in an Israeli-Palestinian Authority amnesty program in which the fugitives promised to cease anti-Israeli violence and surrender their weapons. The program remained fragile and threatened to lose credibility with participants due to slow bureaucratic processes and escalating

Israeli incursions in the West Bank targeting al-Aqsa members – the most recent of these occurred in December 2009 in reaction to a fatal shooting of an Israeli settler in the West Bank. Al-Aqsa has not targeted U.S. interests as a policy, although its anti-Israeli attacks have killed dual U.S.-Israeli citizens.

**Strength:** Current strength is unknown, but most likely numbers a few hundred.

**Location/Area of Operation:** Most of al-Aqsa's operational activity is in the Gaza Strip but the group also planed and conducted attacks inside Israel and the West Bank. The group also has members in Palestinian refugee camps in Lebanon.

**External Aid:** Iran has exploited al-Aqsa's lack of resources and formal leadership by providing funds and guidance, mostly through Hizballah facilitators.

## AL-SHABAAB

aka The Harakat Shabaab al-Mujahidin; al-Shabab; Shabaab; the Youth; Mujahidin al-Shabaab Movement; Mujahideen Youth Movement; Mujahidin Youth Movement

**Description:** Al-Shabaab was designated as a Foreign Terrorist Organization on March 18, 2008. Al-Shabaab is the militant wing of the former Somali Islamic Courts Council that took over most of southern Somalia in the second half of 2006. In December 2006 and January 2007, Somali government and Ethiopian forces routed the Islamic Court militias in a two-week war. Since the end of 2006, al-Shabaab and disparate clan militias led a violent insurgency, using guerrilla warfare and terrorist tactics against the Ethiopian presence in Somalia and the Transitional Federal Government of Somalia, and the African Union Mission in Somalia (AMISOM) peacekeepers. Rank and file militia fighters from multiple clans that are aligned with al-Shabaab are predominantly interested in indigenous issues and have not shown a strong affinity for global jihad. However, al-Shabaab's core leadership is ideologically aligned with al-Qa'ida (AQ) and has made statements praising Usama bin Ladin and linking the Somali jihad movement to AQ's wider agenda and strategy. In September 2009, al-Shabaab's emir released a video titled "We Are at Your Command, Usama," in which he pledged the group's allegiance to Usama bin Ladin and AQ. Senior al-Shabaab leaders have also benefited from the training program that was created in southern Somalia by now deceased East African AQ operative Saleh Nabhan.

**Activities:** Al-Shabaab has used intimidation and violence to undermine the Somali government, forcibly recruit new fighters, and regularly kill activists working to bring about peace through political dialogue and reconciliation. The group has claimed responsibility for several high profile bombings and shootings throughout Somalia targeting Ethiopian and African Union troops and Somali government officials and allies. It has been responsible for the assassination of numerous civil society figures, government officials, and journalists. Al-Shabaab fighters or those who have claimed allegiance to the group have also conducted violent attacks and targeted assassinations against international aid workers and nongovernmental aid

organizations.  During 2009, al-Shabaab carried out multiple attacks, including a February double suicide car bomb attack against an African Union Mission in Somalia military base in Mogadishu that killed 11 soldiers; a May suicide bombing that killed six policemen and a civilian at a police headquarters in Mogadishu; and a September attack where two al-Shabaab suicide bombers in stolen UN vehicles killed 21 people at an African Union base in Mogadishu. In December, an al-Shabaab attack against a medical school graduation ceremony killed 23, including three members of the Transitional Federal Government.

Foreign AQ operatives operated in Somalia under al-Shabaab's protection.  These included Fazul Abdullah Mohammed (aka Harun Fazul) and Saleh Ali Saleh Nabhan, wanted for the 1998 embassy bombings in Kenya and Tanzania and a 2002 hotel bombing in Kenya.  On September 14, Saleh Nabhan was killed while he was traveling in a convoy of armed vehicles.

**Location/Area of Operation:**  The majority of Ethiopian troops left Somalia in late January 2008 and the subsequent security vacuum in parts of central and southern Somalia has led divergent factions to oppose al-Shabaab and its extremist ideology.  However, hardcore al-Shabaab fighters and allied militias conducted brazen attacks in Mogadishu and outlying environs, primarily in lower-Somalia.  In May, al-Shabaab launched a major offensive in Mogadishu, gaining control over parts of the capital.  Al-Shabaab also gained control over the southern port city of Kismayo in late 2009.  Al-Shabaab's victories can also be tied to their ability to play upon clan fissures and the military weakness of the Somali Government.

**Strength:**  Precise numbers are unknown.  Some of al-Shabaab's senior leaders are affiliated with AQ operatives, and it is believed that some al-Shabaab members have previously trained and fought with AQ in Afghanistan.

**External Aid:**  Because al-Shabaab is a multi-clan entity, it received significant donations from the global Somali diaspora; however, the donations were not all specifically intended to support terrorism.  Rather, the money is also meant to support family members.  Al-Shabaab leaders and many rank and file fighters have successfully garnered significant amounts of money from port revenues and through criminal enterprises.

## ANSAR AL-ISLAM

aka Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; Supporters of Islam in Kurdistan

**Description:**  Ansar al-Islam (AI) is a Salafist terrorist group whose goals include expelling the U.S.-led Coalition from Iraq and establishing an independent Iraqi state based on Sharia law.  It was designated as a Foreign Terrorist Organization on March 22, 2004.  AI was established in 2001 in Iraqi Kurdistan with the merger of two Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan.  In a probable effort to appeal to the broader Sunni jihad and expand its support base, AI changed its name to Ansar al-Sunna in 2003, in a bid to unite

Iraq-based extremists under the new name.  In December 2007, it changed its name back to Ansar al-Islam.  AI has ties to al-Qa'ida central leadership and to al-Qa'ida in Iraq (AQI).  Since Operation Iraqi Freedom, AI has become one of the most prominent groups engaged in anti-Coalition attacks in Iraq behind AQI, and has maintained a strong propaganda campaign.

**Activities:**  AI continued to conduct attacks against a wide range of targets including Coalition Forces, the Iraqi government and security forces, and Kurdish and Shia figures, including high profile attacks on U.S. and Coalition forces, as well as Iraqi private citizens in 2008 and 2009. AI has also conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians.  One of the more notable attacks was a March 2008 bombing at the Palace Hotel in As Sulamaniyah that killed two people.

**Strength:**  Precise numbers are unknown.  AI is one of the largest Sunni terrorist groups in Iraq.

**Location/Area of Operation:**  Primarily northern Iraq but maintained a presence in western and central Iraq.

**External Aid:**  AI received assistance from a loose network of associates in Europe and the Middle East.  AI has also been linked to AQ and Iran.

## ARMED ISLAMIC GROUP

aka GIA; al-Jama'ah al-Islamiyah al-Musallah; Groupement Islamique Arme

**Description:**  The Armed Islamic Group was designated as a Foreign Terrorist Organization on October 8, 1997.  The GIA aims to overthrow the Algerian regime and replace it with a state governed by Sharia law.  The GIA began its violent activity in 1992 after the military government suspended legislative elections in anticipation of an overwhelming victory by the Islamic Salvation Front, the largest Algerian Islamic opposition party.

**Activities:**  The GIA has engaged in attacks against civilians and government workers.  The group began conducting a terrorist campaign of civilian massacres in 1992, sometimes wiping out entire villages and killing tens of thousands of Algerians.  Since announcing its campaign against foreigners living in Algeria in 1992, the GIA has killed more than 100 expatriate men and women, mostly Europeans.  Almost all of the GIA's members have now joined other Islamist groups or have been killed or captured by the Algerian government.  The Algerian government's September 2005 reconciliation program led to an increase in the number of GIA terrorist suspects who surrendered to security forces, and the GIA has not conducted attacks since that time.  Some senior members of AQIM are former GIA insurgents.

**Strength:**  Almost all former GIA members have accepted amnesty or joined other terrorist groups; precise numbers are unknown.

**Location/Area of Operation:**  Algeria

**External Aid:**  Unknown.

---

## ASBAT AL-ANSAR

aka Asbat al-Ansar; Band of Helpers; Band of Partisans; League of Partisans; League of the Followers; God's Partisan's; Gathering of Supporters; Partisan's League; AAA; Esbat al-Ansar; Isbat al-Ansar; Osbat al-Ansar; Usbat al-Ansar; Usbat ul-Ansar

**Description:**  Asbat al-Ansar was designated as a Foreign Terrorist Organization on March 27, 2002.  Asbat al-Ansar is a Lebanon-based Sunni extremist group composed primarily of Palestinians with links to al-Qa'ida (AQ)  and other Sunni extremist groups.  Some of the group's goals include thwarting perceived anti-Islamic and pro-Western influences in the country.

**Activities:**  Asbat al-Ansar first emerged in the early 1990s.  In the mid-1990s, the group assassinated Lebanese religious leaders and bombed nightclubs, theaters, and liquor stores.  It was involved in clashes in northern Lebanon in December 1999, and carried out a rocket-propelled grenade attack on the Russian Embassy in Beirut in January 2000.  Asbat al-Ansar's leader, Ahmad Abd al-Karim al-Sa'di, a.k.a. Abu Muhjin, remains at large despite being sentenced to death in absentia for the 1994 murder of a Muslim cleric.  In September 2004, operatives with links to the group were allegedly involved in planning terrorist operations in Lebanon targeting the Italian Embassy, the Ukrainian Consulate General, and Lebanese government offices.  In October 2004, Mahir al-Sa'di, a member of Asbat al-Ansar, was sentenced in absentia to life imprisonment for his 2000 plot to assassinate then-U.S. Ambassador to Lebanon, David Satterfield.

Members of Asbat al-Ansar were believed responsible for a Katyusha rocket attack on the Galilee region of Israel in December 2005.  Asbat al-Ansar operatives have been involved in fighting Coalition Forces in Iraq since at least 2005 and several members of the group have been killed in anti-Coalition operations.  Al-Sa'di was working in cooperation with Abu Muhammad al-Masri, the head of AQ at the Ain al-Hilwah refugee camp, where fighting has occurred between Asbat al-Ansar and Fatah elements.  In 2007, Asbat al-Ansar remained focused on supporting extremists in Iraq and planning attacks against UNIFIL, Lebanese security forces, and U.S. and Western interests.  Asbat al-Ansar-associated elements were implicated in the June 17, 2007 Katyusha rocket attack against northern Israel.

Asbat al-Ansar maintained ties with the AQ network.  Asbat al-Ansar has recently been reluctant to involve itself in operations in Lebanon due in part to concerns over losing its safe haven in Ain al-Hilwah.  Various extremist web forums criticized Asbat al-Ansar for its failure to support fellow Sunni extremist group Fatah al-Islam (FAI) during the Lebanese Armed Forces campaign in summer 2007.  That campaign forced FAI out of Nahr al-Barid refugee camp in northern Lebanon, and severely damaged the group.

**Strength:**  The group commands between 100 and 300 fighters in Lebanon.  Its nominal leader is Ahmad Abd al-Karim al-Sa'di.

**Location/Area of Operation:**  The group's primary base of operations is the Ain al-Hilwah Palestinian refugee camp near Sidon in southern Lebanon.

**External Aid:**  It is likely that the group receives money through international Sunni extremist networks.

---

## AUM SHINRIKYO

aka A.I.C. Comprehensive Research Institute; A.I.C. Sogo Kenkyusho; Aleph; Aum Supreme Truth

**Description:**  Aum Shinrikyo (Aum) was designated as a Foreign Terrorist Organization on October 8, 1997.  Shoko Asahara established Aum in 1987, and the cult received legal status as a religious entity in 1989.  Initially, Aum aimed to take over Japan and then the world, but over time it began to emphasize the coming of the end of the world.  Asahara predicted in the late 1990s that the United States would initiate Armageddon by starting World War III with Japan. The Japanese government revoked its recognition of Aum as a religious organization following Aum's deadly sarin gas attack in Tokyo in March 1995.  In 1997, however, a government panel decided not to invoke the Operations Control Law to outlaw the group.  A 1999 law authorized the Japanese government to maintain police surveillance over the group because of concerns that Aum might launch future terrorist attacks.  In January 2000, under the leadership of Fumihiro Joyu, the chief of Aum's once thriving Moscow operation, Aum changed its name to Aleph and tried to distance itself from the violent and apocalyptic teachings of its founder.  In late 2003, however, Joyu stepped down under pressure from members who wanted to return fully to the worship of Asahara.  A growing divide between members supporting Joyu and Asahara emerged. In 2007, Joyu officially left the group and in May established a splinter group called Hikari No Wa, which is translated as 'Circle of Light' or 'Ring of Light.'  Japanese authorities continued to monitor both Aum (now called Aleph) and Hikari No Wa.

**Activities:**  In March 1995, Aum members simultaneously released the chemical nerve agent sarin on several Tokyo subway trains, killing 12 people and causing up to 6,000 to seek medical treatment.  Subsequent investigations by the Japanese government revealed the group was responsible for other mysterious chemical incidents in Japan in 1994, including a sarin gas attack on a residential neighborhood in Matsumoto that killed seven and hospitalized approximately 500.  Japanese police arrested Asahara in May 1995, and in February 2004 authorities sentenced him to death for his role in the 1995 attacks.  In September 2006, Asahara lost his final appeal against the death penalty and the Japanese Supreme Court upheld the decision in October 2007. The Supreme Court on December 10 upheld a high court decision that sentenced former AUM Shinrikyo cult member Yoshihiro Inoue to death for playing a key role in the deadly 1995 attack.  This would bring the number of AUM members on death row to nine for their crimes related to the sarin gas attack.

Since 1997, the cult has recruited new members, engaged in commercial enterprises, and acquired property, although it scaled back these activities significantly in 2001 in response to a public outcry.  In July 2001, Russian authorities arrested a group of Russian Aum followers who had planned to set off bombs near the Imperial Palace in Tokyo as part of an operation to free Asahara from jail and smuggle him to Russia.

Although Aum has not conducted a terrorist attack since 1995, concerns remain regarding their continued adherence to the violent teachings of founder Asahara that led them to perpetrate the 1995 sarin gas attack.

**Strength:**  According to a study by the Japanese government issued in December 2008, current Aum Shinrikyo/Aleph membership in Japan is approximately 1,500, with another 200 in Russia.  According to this study, Aum maintained 30 facilities in 15 Prefectures in Japan and continued to possess a few facilities in Russia.  At the time of the Tokyo subway attack, the group claimed to have as many as 40,000 members worldwide, including 9,000 in Japan and 30,000 members in Russia.  The group gets money from member contributions.

**Location/Area of Operation:**  Aum's principal membership is located in Japan, while a residual branch of about 200 followers live in Russia.

**External Aid:**  None.

## BASQUE FATHERLAND AND LIBERTY

aka ETA, Askatasuna; Batasuna; Ekin; Euskal Herritarrok; Euzkadi Ta Askatasuna; Herri Batasuna; Jarrai-Haika-Segi; Epanastatiki Pirines; Popular Revolutionary Struggle; K.A.S.; XAKI

**Description:**  Basque Fatherland and Liberty (ETA) was designated as a Foreign Terrorist Organization on October 8, 1997.  ETA was founded in 1959 with the aim of establishing an independent homeland based on Marxist principles encompassing the Spanish Basque provinces of Vizcaya, Guipuzcoa, and Alava; the autonomous region of Navarra; and the southwestern French territories of Labourd, Basse-Navarre, and Soule.  Spain and the EU have listed ETA as a terrorist organization.  In 2002, the Spanish Parliament banned the political party Batasuna, ETA's political wing, charging its members with providing material support to the terrorist group.  The European Court of Human Rights in June 2009 upheld the ban on Batasuna.  In September 2008, Spanish courts also banned two other Basque independence parties with reported links to Batasuna.  Spanish and French prisons together are estimated to hold a total of more than 750 ETA members.

**Activities:**  ETA primarily has conducted bombings and assassinations.  Targets typically have included Spanish government officials, security and military forces, politicians, and judicial figures, but the group also targeted journalists and tourist areas.  The group is responsible for

killing more than 800 and injuring thousands since it formally began a campaign of violence in 1968.

In March 2006, days after claiming responsibility for a spate of roadside blasts in northern Spain that caused no injuries, ETA announced that it would implement a "permanent" ceasefire.  On December 30, 2006, however, ETA exploded a massive car bomb that destroyed much of the covered parking garage outside the Terminal Four of Madrid's Barajas International Airport.  The two individuals killed in the blast became ETA's first fatalities in more than three years.  The Spanish government suspended talks with ETA, and government officials later said political negotiations with the group had ended.  ETA formally renounced its "permanent" cease-fire in June 2007 and three months later threatened a wave of attacks throughout Spain.

In March 2008, just days before the national election in Spain, ETA fatally shot a former city councilman within the Basque Autonomous Community outside his home in northern Spain.  In May 2008, a car bomb exploded outside a Civil Guard barracks in Legutiano, killing one policeman and wounding four others.  In July 2008, ETA was responsible for five bomb explosions in northern Spain, including four at popular seaside resorts.  In September 2008, an ETA car bomb killed an army officer and injured several other people in the northern town of Santona.  In October 2008, ETA members conducted a car bomb attack at a university in Pamplona that injured more than one dozen people.  The group also claimed responsibility for the December 2008 killing of a leading Basque businessman, for failing to pay extortion money to ETA and for his construction company's involvement in the building of high-speed train links in the Basque Country, which ETA opposed.

In 2009, ETA continued to carry out attacks resulting in extensive damage and casualties.  A police chief and two police officers were killed in car bomb explosions claimed by ETA in June and July.  Also in July, ETA conducted a car bomb attack outside a Civil Guard barracks that resulted in the injury of 64 people, including 32 officers, 12 children, and 20 other civilians.

Between 2007 and 2009, more than 365 ETA members were arrested.  In 2008, Spanish and French authorities apprehended ETA's top three leaders, beginning in May with the arrest of Francisco Javier Lopez Pena (a.k.a. Thierry).  In November 2008, French police arrested Garikoitz Aspiazu (a.k.a. Txeroki), who was suspected of ordering the December 2006 car bombing at the Madrid airport.  One month later, French police captured his alleged replacement, Aitzol Iriondo Yarza (a.k.a. Gurbitz).  In April 2009, ETA's military leader, Jurdan Martitegi, was also arrested in France.  In August 2009, French security seized 13 ETA arms caches containing more than 800 kilos of explosives, 15 complete limpet bombs, several weapons, and thousands of rounds of ammunition.  In October, Spanish and French authorities arrested the leader of ETA's political wing, which since the arrest of Thierry has held less clout than the military wing.

**Strength**:  ETA's exact strength is unknown, but estimates put membership at approximately 300.

**Location/Area of Operation:**  ETA operates primarily in the Basque autonomous regions of northern Spain and southwestern France, but has attacked Spanish and French interests elsewhere.  Most recently, ETA has sought to establish operational cells in Portugal.

**External Aid:**  ETA financed its activities primarily through bribery and extortion of Basque businesses.  It has received training at various times in the past in Libya, Lebanon, and Nicaragua.  Some ETA members allegedly fled to Cuba and Mexico, while others resided in South America.  ETA members have operated and been arrested in the past in other European countries, including France, Belgium, the Netherlands, the UK, Germany, and Portugal.

## COMMUNIST PARTY OF PHILIPPINES/NEW PEOPLE'S ARMY

aka CPP/NPA; Communist Party of the Philippines; the CPP; New People's Army; the NPA

**Description:**  The Communist Party of the Philippines/New People's Army (CPP/NPA) was designated as a Foreign Terrorist Organization on August 9, 2002.  The military wing of the Communist Party of the Philippines (CPP), the New People's Army (NPA), is a Maoist group formed in March 1969 with the aim of overthrowing the government through protracted guerrilla warfare.  Jose Maria Sison, the chairman of the CPP's Central Committee and the NPA's founder, reportedly directs CPP and NPA activity from the Netherlands, where he lives in self-imposed exile.  Luis Jalandoni, a fellow Central Committee member and director of the CPP's overt political wing, the National Democratic Front (NDF), also lives in the Netherlands and has become a Dutch citizen.  Although primarily a rural-based guerrilla group, the NPA had an active urban infrastructure to support its terrorist activities and, at times, used city-based assassination squads.

**Activities:**  The CPP/NPA primarily targeted Philippine security forces, government officials, local infrastructure, and businesses that refuse to pay extortion, or "revolutionary taxes."  The CPP/NPA charged politicians running for office in CPP/NPA-influenced areas for "campaign permits."  Despite its focus on Philippine governmental targets, the CPP/NPA has a history of attacking U.S. interests in the Philippines.  In 1987, CPP/NPA conducted direct action against U.S. personnel and facilities when three American soldiers were killed in four separate attacks in Angeles City.  In 1989, CPP/NPA issued a press statement taking credit for the ambush and murder of Colonel Rowe, chief of the Ground Forces Division of the Joint U.S.-Military Advisory Group.

For many years the CPP/NPA carried out killings, raids, acts of extortion, and other forms of violence.  In 2009, CPP/NPA's attacks continued unabated.  On January 11, 2009, CPP/NPA claimed responsibility for an attack that wounded the governor of Masbate.  According to the Philippines government, in 2009 the NPA killed 132 soldiers and 55 civilians and committee 360 violent incidents, such as acts of harassment, bombing, and arson.  In multiple 2009 public statements, CPP/NPA declared its intention to target western entities, particularly U.S. military forces conducting joint operations with the Philippine military.

**Strength**:  The Philippines government estimated that there were around 5,000 CPP/NPA members at the end of 2009.

**Location/Area of Operations:**  The CPP/NPA operated in rural Luzon, Visayas, and parts of northern and eastern Mindanao.  There were cells in Manila and other metropolitan centers.

**External Aid:**  Unknown.


## CONTINUITY IRISH REPUBLICAN ARMY

aka Continuity Army Council; Continuity IRA; Republican Sinn Fein

**Description:**  The Continuity Irish Republican Army (CIRA) was designated as a Foreign Terrorist Organization on July 13, 2004.  CIRA is a terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein, which split from Sinn Fein in 1986.  "Continuity" refers to the group's belief that it is carrying on the original Irish Republican Army's (IRA) goal of forcing the British out of Northern Ireland.  CIRA cooperates with the larger Real IRA (RIRA).

**Activities**:  CIRA has been active in Belfast and the border areas of Northern Ireland, where it has carried out bombings, assassinations, kidnappings, hijackings, extortion, and robberies.  On occasion, it provided advance warning to police of its attacks.  Targets have included the British military, Northern Ireland security forces, and Loyalist paramilitary groups.  CIRA did not join the Provisional IRA in the September 2005 decommissioning and remained capable of effective, if sporadic, terrorist attacks.  In early 2006, the Independent Monitoring Commission reported that two splinter organizations, Óglaigh na hÉireann and Saoirse na hÉireann, were formed as a result of internal disputes within CIRA.  Around the same time, CIRA claimed the firebomb attacks of B&Q home-supply stores, although RIRA also claimed such attacks.  CIRA activity largely decreased from previous levels seen in 2005.

By 2007, the group had become increasingly active in criminal activity in Northern Ireland and Ireland.  In April 2007, following the discovery of an improvised mortar adjacent to the railway line in Lurgan, three CIRA members were arrested and charged with conspiracy to murder, possession of explosives with intent to endanger life, and possession of articles for use in terrorism.  The Independent Monitoring Commission , which was established to oversee the peace process, assessed that CIRA was responsible for the June bombing of a police patrol car and an August 2008 attempted rocket attack in Lisnaskea.  In November 2008, CIRA publicly threatened to murder any Belfast Catholic community workers found to be cooperating with the police.  In March 2009, the CIRA claimed responsibility for the murder of a Police Service of Northern Ireland constable in Craigavon County, Northern Ireland.

**Strength:**  Membership is small, with possibly fewer than 50 hard-core activists.  Police counterterrorist operations have reduced the group's strength.

**Location/Area of Operation:**  Northern Ireland and the Irish Republic.  CIRA does not have an established presence in Great Britain.

**External Aid**:  Suspected of receiving funds and arms from sympathizers in the United States.  CIRA may have acquired arms and materiel from the Balkans, in cooperation with the RIRA.

## GAMA'A AL-ISLAMIYYA

aka al-Gama'at; Egyptian al-Gama'at al-Islamiyya; GI; Islamic Gama'at; IG; Islamic Group,

**Description:**  Gama'a al-Islamiyya (IG) was designated as a Foreign Terrorist Organization on October 8, 1997.  IG, once Egypt's largest militant groups, was active in the late 1970s, but is now a loosely organized network.  The majority of its Egypt-based members have renounced terrorism, although some located overseas have begun to work with or have joined al-Qa'ida (AQ).  The external wing, composed of mainly exiled members in several countries, maintained that its primary goal was to replace the Egyptian government with an Islamic state.

IG announced a cease-fire in 1997 that led to a split into two factions: one, led by Mustafa Hamza, supported the cease-fire; the other, led by Rifa'i Taha Musa, called for a return to armed operations.  IG announced another ceasefire in March 1999 that the majority of its leaders have held to through the end of 2009, but its spiritual leader, Sheik Umar Abd al-Rahman, sentenced to life in prison in January 1996 for his involvement in the 1993 World Trade Center bombing and incarcerated in the United States, rescinded his support for the cease-fire in June 2000.  IG has not conducted an attack inside Egypt since the 1997 Luxor attack, which killed 58 tourists and four Egyptians, and wounded dozens more.  In February 1998, a senior member signed Usama bin Ladin's fatwa call for attacks against the United States but may not have been acting as part of the IG.

In early 2001, Taha Musa published a book in which he attempted to justify terrorist attacks that cause mass casualties.  Musa disappeared several months afterward and the United States has no information about his whereabouts.  In March 2002, members of the group's historic leadership in Egypt declared the use of violence misguided and renounced its future use, prompting denunciations from much of the leadership abroad.  The Egyptian government continued to release IG members from prison as part of its rehabilitation program; approximately 900 were released in 2003 and most of the 700 persons released in 2004 at the end of the Muslim holy month of Ramadan were IG members.  In August 2006, Ayman al-Zawahiri announced that IG had merged with AQ, but the group's Egypt-based leadership quickly denied this claim which ran counter to their reconciliation efforts.  Supporters of Sheikh Abd al-Rahman still remain a possible threat to U.S. interests as both 'Abd al-Rahman and his supporters have previously called for reprisal attacks in case of his death in prison.

**Activities:**  Before the 1997 cease-fire, IG conducted armed attacks against Egyptian security and other government officials and Coptic Christians.  After the cease-fire, the faction led by Taha Musa launched attacks on tourists in Egypt, most notably the 1997 Luxor attack.  IG

claimed responsibility for the June 1995 assassination attempt on Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia. IG was dormant in 2009.

**Strength:** At its peak, IG probably commanded several thousand hardcore members and a similar number of supporters. Security crackdowns following the 1997 attack in Luxor, the 1999 cease-fire, and post-September 11 security measures and defections to AQ have probably resulted in a substantial decrease in what is left of an organized group.

**Location/Area of Operation:** The IG maintained an external presence in Afghanistan, Yemen, Iran, the United Kingdom, Germany, Austria, and France. IG terrorist presence in Egypt was minimal due to the reconciliation efforts of former local members.

**External Aid:** AQ and Afghan militant groups provide support to members of the organization to carry out support on behalf of AQ but not in conjunction with the IG. IG also may have obtained some funding through various Islamic non-governmental organizations.

---

### HAMAS

aka the Islamic Resistance Movement; Harakat al-Muqawama al-Islamiya; Izz al-Din al Qassam Battalions; Izz al-Din al Qassam Brigades; Izz al-Din al Qassam Forces; Students of Ayyash; Student of the Engineer; Yahya Ayyash Units; Izz al-Din al-Qassim Brigades; Izz al-Din al-Qassim Forces; Izz al-Din al-Qassim Battalions

**Description:** HAMAS was designated as a Foreign Terrorist Organization on October 8, 1997. HAMAS possesses military and political wings, and was formed in late 1987 at the onset of the first Palestinian uprising, or Intifada, as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The armed element, called the Izz al-Din al-Qassam Brigades, conducts anti-Israeli attacks, previously including suicide bombings against civilian targets inside Israel. HAMAS also manages a broad, mostly Gaza-based network of "Dawa" or ministry activities that include charities, schools, clinics, youth camps, fund-raising, and political activities. A Shura council based in Damascus, Syria, sets overall policy. After winning Palestinian Legislative Council elections in January 2006, HAMAS seized control of significant Palestinian Authority (PA) ministries in Gaza, including the Ministry of Interior. HAMAS subsequently formed an expanded, overt militia called the Executive Force, subordinate to the Interior Ministry. This force and other HAMAS cadres took control of Gaza in a military-style coup in June 2007, forcing Fatah forces to either leave Gaza or go underground.

**Activities:** Prior to 2005, HAMAS conducted numerous anti-Israeli attacks, including suicide bombings, rocket launches, improvised-explosive device attacks, and shootings. HAMAS has not directly targeted U.S. interests, though the group makes little or no effort to avoid soft targets frequented by foreigners. The group curtailed terrorist attacks in February 2005 after agreeing to a temporary period of calm brokered by the PA and ceased most violence after winning control of the PA legislature and cabinet in January 2006. After HAMAS staged a June 2006 attack on IDF soldiers near Kerem Shalom that resulted in two deaths and the abduction of Corporal Gilad

Shalit, Israel took steps that severely limited the operation of the Rafah crossing.  In June 2007, HAMAS took control of Gaza from the PA and Fatah, leading to an international boycott and closure of Gaza borders.  HAMAS has since dedicated the majority of its activity in Gaza to solidifying its control, hardening its defenses, tightening security, and conducting limited operations against Israeli military forces.

HAMAS fired rockets from Gaza into Israel in 2008 but focused more on mortar attacks targeting Israeli incursions. Additionally, other terrorist groups in Gaza fired rockets into Israel, most, presumably, with HAMAS support or acquiescence.  In June 2008, HAMAS agreed to a six-month cease-fire with Israel and temporarily halted all rocket attacks emanating from the Gaza Strip by arresting Palestinian militants and violators of the agreement.  HAMAS claimed responsibility for killing nine civilians, wounding 12 children and 80 other civilians in an attack at the residence of Fatah's Gaza City Secretary in the Gaza Strip in August 2008.  HAMAS also claimed responsibility for driving a vehicle into a crowd in Jerusalem, Israel, wounding 19 soldiers and civilians in September 2008.  HAMAS fought a 23-day war with Israel from late December 2008 to January 2009, in an unsuccessful effort to break an international blockade on the Gaza Strip and force the openings of the international crossings.  Since Israel's declaration of a unilateral ceasefire on January 18, 2009, HAMAS has largely enforced the calm, focusing on rebuilding its weapons caches, smuggling tunnels, and other military infrastructure in the Gaza Strip.

**Strength:**  HAMAS probably has several thousand operatives with varying degrees of skills in its armed wing, the al-Qassam Brigades, along with its reported 9,000-person HAMAS-led Palestinian Interior Ministry paramilitary group known as the "Executive Force."

**Location/Area of Operation:**  HAMAS has an operational presence in every major city in the Palestinian territories and currently focuses its anti-Israeli attacks on targets in the West Bank and within Israel.  HAMAS could potentially activate operations in Lebanon or resume terrorist operations in Israel.  The group retains a cadre of leaders and facilitators that conducts diplomatic, fundraising, and arms-smuggling activities in Lebanon, Syria, and other states.  HAMAS is also increasing its presence in the Palestinian refugee camps in Lebanon, probably with the mid-term goal of eclipsing Fatah's long-time dominance of the camps and long-term goal of seizing control of the Palestinian Liberation Organization.

**External Aid:**  HAMAS receives some funding, weapons, and training from Iran.  In addition, fundraising takes place in the Persian Gulf countries, but the group also receives donations from Palestinian expatriates around the world.  Some fundraising and propaganda activity takes place in Western Europe and North America.  Syria provides safe haven for its leadership.

## HARAKAT UL-JIHAD-I-ISLAMI/BANGLADESH

aka Harakat ul Jihad e Islami Bangladesh; Harkatul Jihad al Islam; Harkatul Jihad; Harakat ul Jihad al Islami; Harkat ul Jihad al Islami; Harkat-ul-Jehad-al-Islami; Harakat ul Jihad Islami Bangladesh; Islami Dawat-e-Kafela; IDEK

**Description:**  Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) was designated as a Foreign Terrorist Organization on March 5, 2008.  HUJI-B was formed in April 1992 by a group of former Bangladeshi Afghan veterans to establish Islamic rule in Bangladesh.  The group was banned by Bangladeshi authorities in October 2005.  In May 2008, HUJI-B members formed a political off-shoot of HUJI-B called the Islamic Democratic Party (IDP) in an effort to advance HUJI-B goals through Bangladeshi politics.  In November, government authorities rejected the IDP's application for registering as a party that could participate in national elections.  HUJI-B has connections to the Pakistani militant groups Harakat ul-Jihad-Islami (HUJI) and Harakat ul-Mujahedin (HUM), as well as Lashkar e-Tayyiba (LT), which advocate similar objectives in Pakistan, Jammu, and Kashmir.  The leaders of HUJI-B signed the February 1998 fatwa sponsored by Usama bin Ladin that declared American civilians legitimate targets for attack.

**Activities:**  HUJI-B may be responsible for numerous terrorist attacks in India, including an October 2008 attack in a shopping area in Agartala, Tripura that killed three and wounded more than 100 people.  The Agartala attack may have been conducted jointly with a local Indian separatist group.  HUJI-B has trained and fielded operatives in Burma to fight on behalf of the Rohingya, an Islamic minority group.  HUJI-B and its detained leader, Mufti Hannan, are also suspected in a 2000 assassination attempt on Bangladeshi Prime Minister Sheikh Hasina.  Three HUJI-B members were convicted in December 2008 for the May 2004 grenade attack that wounded  the British High Commissioner in Sylhet, Bangladesh.  Bangladeshi courts issued warrants in December 2008 for the arrest of eight HUJI-B members for the bombing at a festival in April 2001 that killed 10 and injured scores of people.  In May 2008, Indian police arrested HUJI-B militant Mohammad Iqbal, a.k.a. Abdur Rehman, who was charged with plotting attacks in Delhi, India.

**Strength:**  HUJI-B leaders claim that up to 400 of its members are Afghan war veterans, but its total membership is unknown.

**Location/Area of Operation:**  The group operates primarily in Bangladesh, India, and Burma.  HUJI-B has a network of madrassas and conducts trainings in Bangladesh.  HUJI-B members are also known train in Pakistan alongside Kashmir-focused groups such as LT, Jaish-e-Mohammed (JEM), HUJI, and HUM.

**External Aid:**  HUJI-B funding comes from a variety of sources.  Several international Islamic NGOs such as the South African-based Servants of Suffering Humanity may have funneled money to HUJI-B and other Bangladeshi militant groups.  HUJI-B also can draw funding from local militant madrassa leaders and teachers.

## HARAKAT  UL-MUJAHIDEEN

aka HUM; Harakat ul-Ansar; HUA; Jamiat al-Ansar; Al-Faran; Al-Hadid; Al-Hadith; Harakat ul-Mujahidin;

**Description:** Harakat ul-Mujahideen (HUM) was designated as a Foreign Terrorist Organization on October 8, 1997.  HUM, an Islamic militant group based in Pakistan, is aligned politically with the political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F), and operates primarily in Kashmir.  Reportedly under pressure from the Government of Pakistan, HUM's long-time leader Fazlur Rehman Khalil stepped down and was replaced by Dr. Badr Munir as the head of HUM in January 2005.  Khalil has been linked to Usama bin Ladin, and his signature was found on Bin Ladin's February 1998 fatwa calling for attacks on U.S. and Western interests.  HUM operated terrorist training camps in eastern Afghanistan until Coalition air strikes destroyed them in autumn 2001.  Khalil was detained by Pakistani authorities in mid-2004 and subsequently released in late December of the same year.  In 2003, HUM began using the name Jamiat ul-Ansar (JUA).  Pakistan banned JUA in November 2003.

**Activities:** HUM has conducted a number of operations against Indian troops and civilian targets in Kashmir.  It is linked to the Kashmiri militant group al-Faran, which kidnapped five Western tourists in Kashmir in July 1995; the five reportedly were killed later that year.  HUM was responsible for the hijacking of an Indian airliner in December 1999 that resulted in the release of Masood Azhar, an important leader in the former Harakat ul-Ansar, who was imprisoned by India in 1994 and then founded Jaish-e-Mohammed (JEM) after his release.  Ahmed Omar Sheik also was released in 1999 and was later convicted of the abduction and murder in 2002 of U.S. journalist Daniel Pearl.

HUM is still actively planning and carrying out operations against Indian security and civilian targets in Kashmir.  In 2005, such attacks resulted in the deaths of 15 people.  In November 2007, two Indian soldiers were killed in Kashmir while engaged in a firefight with a group of HUM militants.  Indian police and army forces have engaged with HUM militants in the Kashmir region, killing a number of the organization's leadership in April, October, and December 2008.  In February 2009, Lalchand Kishen Advani, leader of the Indian opposition Bharatiya Janata Party, received a death threat that was attributed to HUM.

**Strength:** HUM has several hundred armed supporters located in Azad Kashmir, Pakistan; India's southern Kashmir and Doda regions; and in the Kashmir valley.  Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war.  HUM uses light and heavy machine guns, assault rifles, mortars, explosives, and rockets.  After 2000, a significant portion of HUM's membership defected to JEM.

**Location/Area of Operation:** Based in Muzaffarabad, Rawalpindi, and several other cities in Pakistan, HUM conducts insurgent and terrorist operations primarily in Kashmir, but members have also been found operating in Afghanistan.  HUM trains its militants in Afghanistan and Pakistan.

**External Aid:** HUM collects donations from wealthy and grassroots donors in Pakistan, Kashmir, Saudi Arabia, and other Gulf states.  HUM's financial collection methods include soliciting donations in magazine ads and pamphlets.  The sources and amount of HUM's military funding are unknown.  Its overt fundraising in Pakistan has been constrained since the government clampdown on extremist groups and the freezing of terrorist assets.

| HIZBALLAH |
|---|

aka the Party of God; Islamic Jihad; Islamic Jihad Organization; Revolutionary Justice Organization; Organization of the Oppressed on Earth; Islamic Jihad for the Liberation of Palestine; Organization of Right Against Wrong; Ansar Allah; Followers of the Prophet Muhammed

**Description:**  Hizballah was designated as a Foreign Terrorist Organization on October 8, 1997. Formed in 1982, in response to the Israeli invasion of Lebanon, the Lebanese-based radical Shia group takes its ideological inspiration from the Iranian revolution and the teachings of the late Ayatollah Khomeini.  The group generally follows the religious guidance of Khomeini's successor, Iranian Supreme Leader Ali Khamenei.  Hizballah is closely allied with Iran and often acts at its behest, though it also acts independently.  Although Hizballah does not share the Syrian regime's secular orientation, the group has helped Syria advance its political objectives in the region.  Hizballah remains the most technically-capable terrorist group in the world.  It has strong influence in Lebanon's Shia community.  The Lebanese government and the majority of the Arab world still recognize Hizballah as a legitimate "resistance group" and political party.

Hizballah provides support to several Palestinian terrorist organizations, as well as a number of local Christian and Muslim militias in Lebanon.  This support includes the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support.

**Activities:**  Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s.  Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and on the Argentine-Israeli Mutual Association in Buenos Aires in 1994.  In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant.

Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily-armored vehicles.  A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants.  In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting a conflict with Israel that lasted into August.  Since the February 2008 killing in Damascus of Imad Mughniyah, the Hizballah terrorist and military chief suspected of involvement in many attacks, senior Hizballah officials have repeatedly made public statements blaming Israel for the killing and vowing retaliation.  In a two-week period in May 2008, Hizballah's armed takeover of West Beirut resulted in more than 60 deaths.  In November 2009, the Israeli navy seized a ship carrying an estimated 400-500 tons of weapons originating in Iran and bound for Hizballah, via Syria.

**Strength:**  Thousands of supporters, several thousand members, and a few hundred terrorist operatives.

**Location/Area of Operation:**  Operates in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon.  Receives support from Lebanese Shia communities in Europe, Africa, South America, North America, and Asia.  Support from these communities is primarily financial, although Hizballah can expect to receive logistic support if needed.

**External Aid:**  Receives training, weapons, and explosives, as well as political, diplomatic, and organizational aid from Iran.  Hizballah receives diplomatic, political, logistical, and material support from Syria.  Hizballah also receives funding from private donations and profits from legal and illegal businesses.


## ISLAMIC JIHAD UNION

aka Islomiy Jihod Ittihodi; formerly known as Islamic Jihad Group; al-Djihad al-Islami; Dzhamaat Modzhakhedov; Islamic Jihad Group of Uzbekistan; Jamiat al-Jihad al-Islami; Jamiyat; The Jamaat Mojahedin; The Kazakh Jama'at; The Libyan Society

**Description:**  The Islamic Jihad Union (IJU) was designated as a Foreign Terrorist Organization on June 17, 2005.  The IJU is a Sunni extremist organization that splintered from the Islamic Movement of Uzbekistan.  They oppose secular rule in Uzbekistan and seek to replace it with a government based on Islamic law.

**Activities:**  The IJU primarily operated against Coalition forces in Afghanistan but continued to plan and carry out attacks in Central Asia.  The group first conducted attacks in March and April 2004, targeting police at several roadway checkpoints and a popular bazaar.  These attacks killed approximately 47 people, including 33 IJU members, some of whom were suicide bombers.  The IJU's claim of responsibility, which was posted to multiple militant Islamic websites, denounced the leadership of Uzbekistan.  These attacks marked the first use of suicide bombers in Central Asia.  In July 2004, the group carried out near-simultaneous suicide bombings in Tashkent of the Uzbek Prosecutor General's office and the U.S. and Israeli Embassies.  The IJU again claimed responsibility via a radical Islamic website and stated that martyrdom operations by the group would continue.  The statement also indicated that the attacks were done in support of IJU's Palestinian, Iraqi, and Afghan "brothers" in the global insurgency.  The date of the July attack corresponded with the trial of individuals arrested for their alleged participation in the March and April attacks.

The IJU issued a statement in May 2005, fully supporting the armed attacks on Uzbek police and military personnel in Andijan, Uzbekistan, and called for the overthrow of the regime in Uzbekistan.  In September 2007, German authorities disrupted an IJU plot by detaining three IJU operatives.  Two of the three had attended IJU-run terrorist training camps in Pakistan and maintained communications with their Pakistani contacts after returning to Germany.  The

operatives had acquired large amounts of hydrogen peroxide and an explosives precursor that they stockpiled in a garage in southern Germany for possible use in multiple car bomb attacks. The IJU subsequently claimed responsibility for the foiled attacks.  The IJU claimed responsibility for attacks targeting Coalition forces in Afghanistan in 2008, including a March suicide attack against a U.S. military post.  IJU claimed responsibility for two May 2009 attacks in Uzbekistan.  The attacks, an armed assault on the police and National Security Service in the border town of Xonobod and a suicide bombing in nearby Andijon, killed a police officer and injured several people.

**Strength:**  Unknown.

**Location/Area of Operation:**  IJU members are scattered throughout Central Asia, South Asia, and Europe.

**External Aid:**  Unknown.


## ISLAMIC MOVEMENT OF UZBEKISTAN

aka IMU

**Description:**  The Islamic Movement of Uzbekistan (IMU) was designated as a Foreign Terrorist Organization on September 25, 2000.  The IMU is a group of Islamic extremists from Uzbekistan, other Central Asian states, and Europe, whose goal is to overthrow the Uzbek regime and to establish an Islamic state.  The IMU has a relationship with the Taliban and al-Qa'ida.

**Activities:**  The IMU primarily targeted Uzbek interests before October 2001 and is believed to have been responsible for several explosions in Tashkent in February 1999.  In August 1999, IMU militants took four Japanese geologists and eight Kyrgyz soldiers hostage.  In May 2003, Kyrgyz security forces disrupted an IMU cell that was seeking to bomb the U.S. Embassy and a nearby hotel in Bishkek, Kyrgyzstan.  In November 2004, the IMU was blamed for an explosion in the southern Kyrgyz city of Osh that killed one police officer and one terrorist.

Since the beginning of Operation Enduring Freedom, the IMU has been predominantly occupied with attacks on U.S. and Coalition soldiers in Afghanistan, and has also been active in terrorist operations in Central Asia.  In late 2009, NATO forces reported an increase in IMU-affiliated foreign fighters in Afghanistan.  There are conflicting reports regarding the possible demise of Tahir Yuldashev during an August 2009 airstrike in Pakistan.  Government authorities in Russia arrested three suspected IMU-affiliated extremists in November 2009.

**Strength:**  Approximately 500-600 members.

**Location/Area of Operation:**  IMU militants are located in South Asia, Central Asia, and Iran. Their area of operation includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, Kazakhstan, and Uzbekistan.

**External Aid:**  The IMU receives support from a large Uzbek diaspora, terrorist organizations, and patrons in the Middle East, Central Asia, and South Asia.

## JAISH-E-MOHAMMED

aka the Army of Mohammed; Mohammed's Army; Tehrik ul-Furqaan; Khuddam-ul-Islam; Khudamul Islam; Kuddam e Islami; Jaish-i-Mohammed

**Description:**  Jaish-e-Mohammed (JEM) was designated as a Foreign Terrorist Organization on December 26, 2001.  JEM is a terrorist group based in Pakistan that was founded in early 2000 by Masood Azhar, a former senior leader of Harakat ul-Ansar, upon his release from prison in India.  The group's aim is to unite Kashmir with Pakistan, and it has openly declared war against the United States.  It is politically aligned with the radical political party Jamiat Ulema-i-Islam's Fazlur Rehman faction (JUI-F).  Pakistan outlawed JEM in 2002.  By 2003, JEM had splintered into Khuddam ul-Islam (KUI), headed by Azhar, and Jamaat ul-Furqan (JUF), led by Abdul Jabbar, who was released from Pakistani custody in August 2004.  Pakistan banned KUI and JUF in November 2003.

**Activities:**  Operating under the umbrella of Tehrik-i-Taliban Pakistan (TTP), JEM continued to operate openly in parts of Pakistan despite then-President Musharraf's 2002 ban on its activities. The group was well-funded and supported attacks against Indian targets, the Pakistani government, sectarian minorities, and Coalition forces in Afghanistan.  Since Masood Azhar's 1999 release from Indian custody in exchange for 155 hijacked Indian Airlines hostages, JEM has conducted many fatal terrorist attacks in the region.

JEM claimed responsibility for several suicide car bombings in Kashmir, including an October 2001 suicide attack on the Jammu and Kashmir legislative assembly building in Srinagar that killed more than 30 people.  The Indian government has publicly implicated JEM, along with Lashkar e-Tayyiba, for the December 2001 attack on the Indian Parliament that killed nine and injured 18.  Pakistani authorities suspect that JEM members may have been involved in the 2002 anti-Christian attacks in Islamabad, Murree, and Taxila that killed two Americans.  In December 2003, Pakistan implicated JEM members in the two assassination attempts against President Musharraf.  In July 2004, Pakistani authorities arrested a JEM member wanted in connection with the 2002 abduction and murder of U.S. journalist Daniel Pearl.  In 2006, JEM claimed responsibility for a number of attacks, including the killing of several Indian police officials in the Indian-administered Kashmir capital of Srinagar.  Indian police and JEM extremists continued to engage in firefights throughout 2008 and 2009.  In August 2009, JEM was believed to have fired upon three police officers in two separate incidents, killing one.

**Strength**:  JEM has at least several hundred armed supporters – including a large cadre of former HUM members – located in Pakistan, India's southern Kashmir and Doda regions, and in the Kashmir Valley.  Supporters are mostly Pakistanis and Kashmiris, but also include Afghans and Arab veterans of the Afghan war.  The group uses light and heavy machine guns, assault rifles, mortars, improvised explosive devices, and rocket-propelled grenades.

**Location/Area of Operation:**  Pakistan, Afghanistan, and Kashmir.

**External Aid:**  Most of JEM's cadre and material resources have been drawn from the Pakistani militant groups Harakat ul-Jihad-i-Islami and the Harakat ul-Mujahadin.  In anticipation of asset seizures by the Pakistani government, JEM withdrew funds from bank accounts and invested in legal businesses, such as commodity trading, real estate, and production of consumer goods.  In addition, JEM collects funds through donation requests in magazines and pamphlets, and allegedly from al-Qa'ida.

---

### JEMAAH ISLAMIYA

aka Jemaa Islamiyah; Jema'a Islamiyah; Jemaa Islamiyya; Jema'a Islamiyya; Jemaa Islamiyyah; Jema'a Islamiyyah; Jemaah Islamiah; Jemaah Islamiyah; Jema'ah Islamiyah; Jemaah Islamiyyah; Jema'ah Islamiyyah; JI

**Description:**  Jemaah Islamiya (JI) was designated as a Foreign Terrorist Organization on October 23, 2002.  Southeast Asia-based JI is a terrorist group that seeks the establishment of an Islamic caliphate spanning Indonesia, Malaysia, southern Thailand, Singapore, Brunei, and the southern Philippines.  More than 400 JI operatives, including operations chief Hambali, have been captured since 2002, although many of these were subsequently released after serving short sentences, including former JI emir Abu Bakar Bashir.  Abu Bakar was released from prison in 2006 after serving a 25-month sentence for his involvement in the 2002 Bali bombings.  Indonesia's Supreme Court later that year acquitted him of the charges.  The death of top JI bomb maker Azahari bin Husin in 2005 and a series of high-profile arrests between 2005 and 2008, in combination with additional efforts by the Government of Indonesia, likely reduced JI's capabilities.  But the July 2009 Jakarta hotel bombings demonstrated that JI remained willing and capable of carrying out deadly operations.

Since 2006, many high profile JI operatives have been either captured or killed.  These include the 2006 arrests of several close associates of senior JI operative Noordin Mohammad Top; the 2007 arrests of former acting JI emir Muhammad Naim (a.k.a. Zarkasih) and JI military commander Abu Dujana; the 2008 arrests of two senior JI operatives in Malaysia; the mid-2008 arrest of a JI-linked cell in Sumatra; and the September 2009 death of Noordin Mohammad Top in a police raid.

**Activities:**  In December 2000, JI coordinated bombings of numerous Christian churches in Indonesia and was involved in the bombings of several targets in Manila.  In December 2001,

Singaporean authorities uncovered a JI plot to attack the U.S. and Israeli Embassies, and British and Australian diplomatic buildings in Singapore.  Other significant JI attacks included the September 2004 bombing outside the Australian Embassy in Jakarta, the August 2003 bombing of the J. W. Marriott Hotel in Jakarta, and the October 2002 Bali bombing, which killed more than 200.  In February 2004, JI facilitated attacks in Manila, Davao, and General Santos City.  JI operatives in the Philippines provide some operational support and training for indigenous Philippine Muslim insurgents.  JI's October 2005 suicide bombing in Bali left 26 dead, including the three suicide bombers.

A JI faction led by Noordin Mohammad Top conducted the group's most recent high-profile attack on July 17, 2009 at the J.W. Marriott and Ritz-Carlton hotels in Jakarta when two suicide bombers detonated explosive devices.  The attack killed seven and injured more than 50, including seven Americans.

**Strength:**  Estimates of total JI members vary from 500 to several thousand.

**Location/Area of Operation:**  JI is based in Indonesia and is believed to have elements in Malaysia and the Philippines.

**External Aid:**  Investigations indicate that JI is fully capable of its own fundraising through membership donations and criminal and business activities, although it also has received financial, ideological, and logistical support from Middle Eastern contacts and non-governmental organizations.

## KAHANE CHAI

aka American Friends of the United Yeshiva; American Friends of Yeshivat Rav Meir; Committee for the Safety of the Roads; Dikuy Bogdim; DOV; Forefront of the Idea; Friends of the Jewish Idea Yeshiva; Jewish Legion; Judea Police; Judean Congress; Kach; Kahane; Kahane Lives; Kahane Tzadak; Kahane.org; Kahanetzadak.com; Kfar Tapuah Fund; Koach; Meir's Youth; New Kach Movement; Newkach.org; No'ar Meir; Repression of Traitors; State of Judea; Sword of David; The Committee Against Racism and Discrimination (CARD); The Hatikva Jewish Identity Center; The International Kahane Movement; The Jewish Idea Yeshiva; The Judean Legion; The Judean Voice; The Qomemiyut Movement; The Rabbi Meir David Kahane Memorial Fund; The Voice of Judea; The Way of the Torah; The Yeshiva of the Jewish Idea; Yeshivat Harav Meir

**Description**:  Kach – the precursor to Kahane Chai – was founded by radical Israeli-American Rabbi Meir Kahane with the goal of restoring Greater Israel, which is generally used to refer to Israel, the West Bank, and Gaza Strip.  Its offshoot, Kahane Chai, (translation: "Kahane Lives") was founded by Meir Kahane's son Binyamin following his father's 1990 assassination in the United States.  Both organizations were designated as Foreign Terrorist Organizations on October 8, 1997 after they were declared terrorist organizations in 1994 by the Israeli Cabinet under its 1948 Terrorism Law.  This designation followed the groups' statements in support of

Baruch Goldstein's February 1994 attack on the Ibrahimi Mosque and their verbal attacks on the Israeli government.  Palestinian gunmen killed Binyamin Kahane and his wife in a drive-by shooting in December 2000 in the West Bank.  The group has attempted to gain seats in the Israeli Knesset over the past several decades, but has won only one seat, in 1984.

**Activities:**  Kahane Chai has harassed and threatened Arabs, Palestinians, and Israeli government officials, and has vowed revenge for the death of Binyamin Kahane and his wife. The group is suspected of involvement in a number of low-level attacks since the start of the First Palestinian Intifada in 2000.  Since 2003, Kahane Chai activists have called for the execution of former Israeli Prime Minister Ariel Sharon and physically intimidated other Israeli and Palestinian government officials who favored the dismantlement of Israeli settlements. Israeli authorities in May 2005 arrested Kahane Chai and other right-wing extremists planning attacks on the Temple Mount using a model aircraft, according to Israeli news services.  In August 2005, an Israeli Army deserter, affiliated with Kahane Chai, opened fire on a bus in the Israeli city of Shfaram, killing four Israeli Arabs and injuring 12.  In June 2006, an Israeli court charged an American born Israeli immigrant and Kahane Chai member with illegally importing and possessing weapons, ammunition, and additional equipment from the United States.  The indictment stated the immigrant intended to use the arms against Arabs for "ideological reasons." In an August 24, 2007 interview with Kuwaiti TV, a leading Kahane Chai member admitted that Kahane Chai had military equipment and weapons and had engaged in military training.

**Strength:**  Kahane Chai's core membership is believed to be fewer than 100.  The group's membership and support networks are overwhelmingly composed of Israeli citizens, most of whom live in West Bank settlements.  Kahane Chai has engaged in terrorist acts in various locations, including the Temple Mount, Hebron, and Shfaram.

**Location/Area of Operation:**  Israel and West Bank settlements, particularly Qiryat Arba' in Hebron.

**External Aid:**  Receives support from sympathizers in the United States and Europe.

## KATA'IB HIZBALLAH

aka Hizballah Brigades; Hizballah Brigades In Iraq; Hizballah Brigades-Iraq; Kata'ib Hezbollah; Khata'ib Hezbollah; Khata'ib Hizballah; Khattab Hezballah; Hizballah Brigades-Iraq Of The Islamic Resistance In Iraq; Islamic Resistance In Iraq; Kata'ib Hizballah Fi Al-Iraq; Katibat Abu Fathel Al A'abas; Katibat Zayd Ebin Ali; Katibut Karbalah

**Description:**  Kata'ib Hizballah (KH) was designated as a Foreign Terrorist Organization on July 2, 2009.  Formed in 2006, KH is a radical Shia Islamist group with an anti-Western outlook and jihadist ideology that has conducted attacks against Iraqi, U.S., and Coalition targets in Iraq. KH has ideological ties to Lebanese Hizballah and may have received support from that group. KH gained notoriety in 2007 with attacks on U.S. and Coalition forces designed to undermine the establishment of a democratic, viable Iraqi state.  KH has been responsible for numerous

violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations.  In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

**Activities:**  KH is responsible for numerous attacks on U.S. forces and Coalition forces, as well as Government of Iraq military, police, politicians, and civilians.  The group is particularly notable for its extensive use of media operations and propaganda by filming and releasing videos of attacks.

KH was particularly active in summer 2008, recording and distributing video footage of its attacks against U.S. and Coalition soldiers.  Using the alias "Hizballah Brigades in Iraq," KH filmed attacks on U.S. Stryker vehicles, Abram tanks, and Bradley armored personnel carriers.  In August 2008, in addition to these attacks, KH filmed seven separate attacks on U.S. and Coalition vehicles.  These recorded attacks carried on into September 2008, with KH targeting U.S. bases, U.S. and Coalition vehicles, and private contractors affiliated with Coalition forces.

KH's activity carried over into 2009 on a number of fronts.  For example, in March 2009, the group continued to record and distribute its attacks by utilizing an Iraqi video hosting website to promote its operational films.  In May 2009, KH displayed videos of its attacks, ranging in date from 2006 to 2008, showcasing operations against U.S. forces in and around Baghdad; and in July 2009 the group highlighted its use of rocket propelled grenades in more operational video footage.

**Strength:**  Membership is estimated at approximately 400 individuals.

**Location/Area of Operation:**  KH's operations are predominately Iraq-based.  KH currently conducts the majority of its operations in Baghdad but has been active in other areas of Iraq, including Kurdish areas such as Mosul.

**External Aid:**  KH is suspected of receiving support from Iran through links with Lebanese Hizballah.

## KURDISTAN WORKERS' PARTY

aka the Kurdistan Freedom and Democracy Congress; the Freedom and Democracy Congress of Kurdistan; KADEK; Partiya Karkeran Kurdistan; the People's Defense Force; Halu Mesru Savunma Kuvveti; Kurdistan People's Congress; People's Congress of Kurdistan; KONGRA-GEL

**Description:**  The Kurdistan Workers' Party (PKK) or Kongra-Gel (KGK) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PKK was founded by Abdullah Ocalan in 1978 as a Marxist-Leninist separatist organization.  The group, composed primarily of Turkish Kurds, launched a campaign of violence in 1984.  The PKK aspires to establish an independent

Kurdish state in southeastern Turkey, but in recent years has spoken more often about autonomy within a Turkish state that guarantees Kurdish cultural and linguistic rights.

In the early 1990s, the PKK moved beyond rural-based insurgent activities to include urban terrorism. In the 1990s, southeastern Anatolia was the scene of significant violence; some estimates place casualties at approximately 30,000 persons. Following his capture in 1999, Ocalan announced a "peace initiative," ordering members to refrain from violence and requesting dialogue with Ankara on Kurdish issues. Ocalan's death-sentence was commuted to life-imprisonment; he remains the symbolic leader of the group. The group foreswore violence until June 2004, when the group's hard-line militant wing took control and renounced the self-imposed cease-fire of the previous five years. Striking over the border from bases within Iraq, the PKK has engaged in terrorist attacks in eastern and western Turkey. The Turkish government in November 2009 announced a reform initiative aimed at giving Kurds more democratic rights in Turkey, in large part to establish a political resolution to the ongoing PKK insurgency.

**Activities:** Primary targets have been Turkish government security forces, local Turkish officials, and villagers who oppose the organization in Turkey. The PKK's reputed military wing, the People's Defense Force, has been responsible mainly for attacks against military and paramilitary targets in the southeastern area of Turkey. The PKK's reported urban terrorist arm, the Kurdistan Freedom Hawks (TAK), has attacked primarily tourist areas in Western Turkey, and in late February 2008, announced a new wave of terrorist actions against Turkey. The PKK did not claim credit for any attacks in 2009.

In an attempt to damage Turkey's tourist industry, the PKK has bombed tourist sites and hotels and kidnapped foreign tourists. In July 2008, PKK operatives kidnapped three German tourists on Mount Ararat in eastern Turkey in retaliation for Germany's tough stance against the group. In October 2008, PKK militants killed 15 Turkish soldiers at the Aktutun outpost on the Turkish-Iraqi border, and five days later the group killed several police officers and wounded 19 in an attack in the southeastern province of Diyarbakir. In 2006, 2007, and 2008, PKK violence killed or injured hundreds of Turks. PKK activity was lower in 2009, but was still a constant throughout the year. Despite Ankara's recent democratic initiative, PKK militants killed seven Turkish soldiers near Tokat in north-central Turkey in December 2009.

**Strength:** Approximately 4,000 to 5,000, of which 3,000 to 3,500 are located in northern Iraq.

**Location/Area of Operation:** Operates primarily in Turkey, Iraq, Europe, and the Middle East.

**External Aid:** In the past, the PKK received safe haven and modest aid from Syria, Iraq, and Iran. Syria ended support for the group in 1999 and since then has cooperated with Turkey against the PKK. Since 1999, Iran has also cooperated in a limited fashion with Turkey against the PKK. In 2008, Turkey and Iraq began cooperating to fight the PKK. The PKK continues to receive substantial financial support from the large Kurdish diaspora in Europe and from criminal activity there.

| LASHKAR E-TAYYIBA |
| --- |

aka al Mansooreen; Al Mansoorian; Army of the Pure; Army of the Pure and Righteous; Army of the Righteous; Lashkar e-Toiba; Lashkar-i-Taiba; Paasban-e-Ahle-Hadis; Paasban-e-Kashmir; Paasban-i-Ahle-Hadith; Pasban-e-Ahle-Hadith; Pasban-e-Kashmir; Jamaat-ud-Dawa, JUD; Jama'at al-Dawa; Jamaat ud-Daawa; Jamaat ul-Dawah; Jamaat-ul-Dawa; Jama'at-i-Dawat; Jamaiat-ud-Dawa; Jama'at-ud-Da'awah; Jama'at-ud-Da'awa; Jamaati-ud-Dawa; Idara Khidmat-e-Khalq

**Description:**  Lashkar e-Tayyiba (LT) was designated as a Foreign Terrorist Organization on December 26, 2001.  The group was responsible for the November 2008 Mumbai attacks.  LT is one of the largest and most proficient of the traditionally Kashmiri-focused militant groups.  LT formed in the late 1980s or early 1990s as the militant wing of the Islamic extremist organization Markaz Dawa ul-Irshad, a Pakistan-based Islamic fundamentalist mission organization and charity founded to oppose the Soviet presence in Afghanistan.  LT, which is not connected to any political party, is led by Hafiz Muhammad Saeed.  Shortly after LT was designated as an FTO, Saeed changed the name to Jamaat-ud-Dawa (JUD) and began humanitarian projects to avoid restrictions.  LT disseminates its message through JUD's media outlets.  Elements of LT and Jaish-e-Muhammad (JEM) combined with other groups to mount attacks as "The Save Kashmir Movement."  The Pakistani government banned the group and froze its assets in January 2002.  LT and its leader, Hafiz Muhammad Saeed, continued to spread ideology advocating terrorism, as well as virulent rhetoric condemning the United States, India, Israel, and other perceived enemies.

**Activities:**  LT has conducted a number of operations against Indian troops and civilian targets in Jammu and Kashmir since 1993, as well as several high profile attacks inside India.  LT claimed responsibility for numerous attacks in 2001, including a January attack on Srinagar airport that killed five Indians; an attack on a police station in Srinagar that killed at least eight officers and wounded several others; and an April attack against Indian border security forces that left at least four dead.  The Indian government publicly implicated LT, along with JEM, for the December 2001 attack on the Indian Parliament building.  LT is also suspected of involvement in the May 2002 attack on an Indian Army base in Kaluchak that left 36 dead.  India blamed LT for an October 2005 attack in New Delhi and a December 2005 Bangalore attack.  Senior al-Qa'ida (AQ) lieutenant Abu Zubaydah was captured at an LT safe house in Faisalabad in March 2002, which suggested that some members were facilitating the movement of AQ members in Pakistan.  Indian governmental officials hold LT responsible for the July 2006 train attack in Mumbai and several attacks since then in Hyderabad.

LT was behind the November 2008 attacks in Mumbai against luxury hotels, a Jewish center, a prominent train station, and a popular café that killed at least 183, including 22 foreigners, and injured more than 300.  India has charged 38 people in the case, including the lone surviving suspected terrorist who was captured at the scene.  While most of those charged are at large and thought to be in Pakistan, the suspected terrorist remains in Indian custody and is awaiting trial.  In 2009, the FBI charged Pakistani-American businessman David Headley (born Daood Sayed

Gilani) with plotting attacks against the employees of a Copenhagen, Denmark newspaper that published cartoons of the Prophet Muhammad in 2005.  Headley, has pleaded guilty in a U.S. court to crimes relating to his role in the November 2008 Lashkar e-Tayyiba attacks in Mumbai, which killed more than 170 people – including six Americans – as well as to crimes relating to a separate plot to bomb the Danish newspaper *Jyllands-Posten*.

**Strength:**  The actual size of the group is unknown, but LT has several thousand members in Azad Kashmir, Pakistan; in the southern Jammu, Kashmir, and Doda regions; and in the Kashmir Valley.  Most LT members are Pakistanis or Afghans and/or veterans of the Afghan wars, though the group is alleged to augment its strength through collaboration with terrorist groups comprised of non-Pakistanis.  The group uses assault rifles, light and heavy machine guns, mortars, explosives, and rocket-propelled grenades.

**Location/Area of Operation:**  Based in Muridke (near Lahore) and Muzaffarabad, Pakistan; maintains a number of facilities, including training camps, schools, and medical clinics.  It has a strong operational network through South Asia.

**External Aid:**  The precise amount of LT funding is unknown.  LT collects donations from the Pakistani expatriate communities in the Middle East and the United Kingdom, Islamic NGOs, and Pakistani and other Kashmiri business people.  LT coordinates its charitable activities through its front organization JUD and Falah-i-Insaniat Foundation, which spearheaded humanitarian relief to the victims of the October 2005 earthquake in Kashmir.

## LASHKAR I JHANGVI

**Description:**  Lashkar I Jhangvi (LJ) was designated as a Foreign Terrorist Organization on January 30, 2003.  LJ is the militant offshoot of the Sunni Deobandi sectarian group Sipah-i-Sahaba Pakistan.  LJ focuses primarily on anti-Shia attacks and was banned by then Pakistani President Musharraf in August 2001 as part of an effort to rein in sectarian violence.  Many of its members then sought refuge in Afghanistan with the Taliban, with whom they had existing ties.  After the collapse of the Taliban, LJ members became active in aiding other terrorists, providing safe houses, false identities, and protection in Pakistani cities, including Karachi, Peshawar, and Rawalpindi.

**Activities:**  LJ specializes in armed attacks and bombings and has admitted responsibility for numerous killings of Shia religious and community leaders in Pakistan.  In January 1999, the group attempted to assassinate former Prime Minister Nawaz Sharif and his brother Shabaz Sharif, Chief Minister of Punjab Province.  Pakistani authorities have publicly linked LJ members to the 2002 abduction and murder of U.S. journalist Daniel Pearl.  Media reports linked LJ to attacks on Christian targets in Pakistan, including a March 2002 grenade assault on the Protestant International Church in Islamabad that killed two U.S. citizens, but no formal charges were filed.  Pakistani authorities believe LJ was responsible for the July 2003 bombing of a Shia mosque in Quetta, Pakistan.  Authorities also implicated LJ in several sectarian incidents in

2004, including the May and June bombings of two Shia mosques in Karachi that killed more than 40 people.

In May 2006, Pakistani police arrested two LJ militants suspected of involvement in the March bombing outside the U.S. Consulate in Karachi that killed one U.S. official.  The Government of Pakistan claimed that the group was involved in the July 2006 assassination of Allama Turabi, an influential Shia leader.  In June 2008, Sindh authorities issued a statement attributing the April 2006 Mishtar Parking bombing in Karachi to a militant with ties to LJ.  In January 2008, the Interior Ministry ordered the arrest of three LJ militants suspected of being involved in a suicide bombing at a Shia religious procession in Peshawar that killed 15 people.  In February 2008, police arrested 20 LJ militants wanted for various terrorism attacks in the Punjab and Sindh provinces.  In October 2008, Afghan security forces claimed to have arrested four Pakistani suicide bombers in Kandahar who asserted that they belonged to LJ.

The group was active in 2009.  In January, Hussain Ali Yousafi, chairman of the Hazara Democratic Party, was shot dead by LJ in the southwestern city of Quetta.  Similarly, LJ claimed responsibility for a November attack on the vehicle of Shahid Nizam Durrani, Deputy Inspector General (Operations) of Quetta; one passerby was killed and six others injured.

**Strength:**  Probably fewer than 100.

**Location/Area of Operation:**  LJ is active primarily in Punjab and Karachi.  Some members travel between Pakistan and Afghanistan.

**External Aid:**  Unknown.

## LIBERATION TIGERS OF TAMIL EELAM

aka Ellalan Force; Tamil Tigers

**Description:**  The Liberation Tigers of Tamil Eelam (LTTE) was designated as a Foreign Terrorist Organization on October 8, 1997.  Founded in 1976, the LTTE became a powerful Tamil secessionist group in Sri Lanka.  The LTTE wants to establish an independent Tamil state in the island's north and east.  Since the beginning of its insurgency against the Sri Lankan government in 1983, it evolved its capability from terrorist and guerilla tactics to conventional warfare.  Although the LTTE nominally committed to a 2002 cease-fire agreement with the Sri Lankan government, it continued terrorist attacks against government leaders and dissident Tamils.  In spite of losing the 2009 war on the ground in Sri Lanka, the LTTE's international network of financial support was suspected of surviving largely intact.  However, the international network likely suffered a serious blow by the arrest in southeast Asia and rendition to Sri Lanka of Selvarajah Patmanathan (aka KP), the LTTE's principle financier and arms supplier.  This network continued to collect contributions from the Tamil diaspora in North America, Europe, and Australia, where there were reports that some of these contributions were coerced by locally-based LTTE sympathizers.  The LTTE also used Tamil charitable

organizations as fronts for its fundraising.  The Sri Lankan Navy sunk a number of LTTE supply ships during the war, and confiscated at least one such ship, the Princess Chrisanta, after the end of the war.

**Activities:**  LTTE integrated a battlefield insurgent strategy with a terrorist program that targeted key personnel in the countryside and senior Sri Lankan political and military leaders in Colombo and other urban centers.  It has conducted a sustained campaign targeting rival Tamil groups, and assassinated Prime Minister Rajiv Gandhi of India in 1991 and President Ranasinghe Premadasa of Sri Lanka in 1993.  Although most notorious for its cadre of suicide bombers, the Black Tigers, the organization included an amphibious force, the Sea Tigers, and a nascent air wing, the Air Tigers.  Fighting between the LTTE and the Sri Lanka government escalated in 2006 and continued through 2008.  The LTTE was blamed for a claymore mine on a crowded bus near Colombo on June 6, 2008, killing 22 civilians and wounding more than 50 others.  Political assassinations and bombings were commonplace tactics prior to the 2002 cease-fire and have increased again since mid-2005.  Most LTTE attacks targeted Sri Lankan military and official personnel but, as illustrated by the June 2008 bombing, the LTTE appeared to continue to target civilians.  In 2009, there were more than 40 attacks attributed to the LTTE, including: a February suicide bombing that killed 30 people and injured 64 in an attack at a Mullaithivu IDP Rescue Center; a February air raid in Colombo that killed three people and injured 45 after an LTTE plane, reportedly engaging in kamikaze-style tactics indicating a suicide attack, was hit by anti-aircraft gunfire and crashed into the Inland revenue Building; and a suicide bombing in March that killed 14 and injured 46 people during a religious procession at a mosque in Matara.  In early 2009, Sri Lankan forces re-captured the LTTE's key strongholds and killed LTTE's second in command.  As a result, the Sri Lankan government declared military victory over LTTE in May 2009.

**Strength:**  Exact strength is unknown.

**Location/Area of Operations:**  Sri Lanka

**External Aid:**  The LTTE uses its international contacts and the large Tamil diaspora in North America, Europe, and Asia to procure weapons, communications, funding, and other needed supplies.  The group employs charities as fronts to collect and divert funds for their activities.

## LIBYAN ISLAMIC FIGHTING GROUP

aka LIFG

**Description:**  The Libyan Islamic Fighting Group (LIFG) was designated as a Foreign Terrorist Organization on December 17, 2004.  In the early 1990s, the LIFG emerged from the group of Libyans who had fought Soviet forces in Afghanistan and pledged to overthrow Libyan  Leader Muammar al-Qadhafi.  In the years following, some members maintained a strictly anti-Qadhafi focus and targeted Libyan government interests.  Others, such as Abu al-Faraj al-Libi, who in 2005 was arrested in Pakistan, aligned with Usama bin Ladin, and are believed to be part of the

al-Qa'ida (AQ) leadership structure or active in the international terrorist network.  On November 3, 2007, AQ leader Ayman al-Zawahiri announced a formal merger between AQ and LIFG.  However on July 3, 2009, LIFG members in the United Kingdom released a statement formally disavowing any association with AQ.  In September 2009, six imprisoned LIFG members issued a 417-page document that renounced violence and claimed to adhere to more sound Islamic theology than that of AQ.  More than 100 LIFG members pledged to adhere to this revised doctrine and have been pardoned and released from prison in Libya as of September 2009.

**Activities:**  LIFG has been largely inactive operationally in Libya since the late 1990s when members fled predominantly to Europe and the Middle East because of tightened Libyan security measures.  To date, the November 3, 2007 merger with AQ, which many LIFG members in Europe and Libya did not recognize, has not resulted in a significant increase in LIFG activities within Libya.  LIFG engaged Libyan security forces in armed clashes during the 1990s and attempted to assassinate Qadhafi four times.  On July 3, 2009, the LIFG released a statement that the group would cease terrorist activities in Libya.  Although LIFG has not claimed responsibility for terrorist acts in recent years, in February 2006, the U.S. Treasury Department accused five suspected LIFG members residing in the UK of financing terrorism by providing false documents and financial assistance through front companies. The five were placed on the UN's al-Qa'ida and Taliban Sanctions Committee's consolidated terrorist list.

**Strength:**  Unknown.

**Location/Area of Operation:**  Since the late 1990s, many members have fled to various Asian, Arabian Gulf, African, and European countries, particularly the UK.

**External Aid:**  The LIFG has used Islamic charitable organizations as cover for fundraising and transferring money and documents.  LIFG also finances operations with criminal activity.

## MOROCCAN ISLAMIC COMBATANT GROUP

aka Groupe Islamique Combattant Marocain (GICM)

**Description:**  The Moroccan Islamic Combatant Group (GICM) was designated as a Foreign Terrorist Organization on October 11, 2005.  The GICM is a clandestine transnational terrorist group centered in the Moroccan diaspora communities of Western Europe.  Its goals include establishing an Islamic state in Morocco and supporting al-Qa'ida's (AQ) war against the West by assisting in the assimilation of AQ operatives into Moroccan and European society.  The group emerged in the 1990s and is composed of Moroccan recruits who trained in armed camps in Afghanistan, including some who fought in the Soviet Afghan war.  GICM members interact with other North African extremists, particularly in Europe.

**Activities:**  GICM members are believed to be among those responsible for the 2004 Madrid bombing.  GICM members were also implicated in the recruitment network for Iraq, and at least

one GICM member carried out a suicide attack against Coalition Forces in Iraq.  GICM individuals are believed to have been involved in the 2003 Casablanca attacks.  However, the group has largely been moribund since these attacks.

**Strength:**  Much of the GICM's leadership in Morocco and Europe has been killed, imprisoned, or are awaiting trial.  Alleged leader Mohamed al-Guerbouzi was convicted in absentia by the Moroccan government for his role in the Casablanca attacks but remains free in exile in the UK. Current strength of GICM is unknown

**Location/Area of Operation:**  Morocco, Western Europe, and Afghanistan.

**External Aid:**  The GICM has been involved in narcotics trafficking in North Africa and Europe to fund its operations.  Moroccan security officials believe money from drug trafficking largely financed the 2003 Casablanca attacks.  The Madrid attacks were financed mainly by the narcotics trafficking of Moroccan terrorist Jamal Ahmidan.

## MUJAHADIN-E KHALQ ORGANIZATION

aka MEK; MKO; Mujahedin-e Khalq (Iranian government name for group); Muslim Iranian Students' Society; National Council of Resistance; NCR; Organization of the People's Holy Warriors of Iran; the National Liberation Army of Iran; NLA; People's Mujahidin Organization of Iran; PMOI; National Council of Resistance of Iran; NCRI; Sazeman-e Mujahidin-e Khalq-e Iran

**Description:**  The MEK was originally designated as a Foreign Terrorist Organization on October 8, 1997.  The MEK is a Marxist-Islamic Organization that seeks the overthrow of the Iranian regime through its military wing, the National Liberation Army (NLA), and its political front, the National Council of Resistance of Iran (NCRI).

The MEK was founded in 1963 by a group of college-educated Iranian Marxists who opposed the country's pro-western ruler, Shah Mohammad Reza Pahlavi.  The group participated in the 1979 Islamic Revolution that replaced the Shah with a Shiite Islamist regime led by Ayatollah Khomeini.  However, the MEK's ideology – a blend of Marxism, feminism, and Islamism – was at odds with the post-revolutionary government and its original leadership was soon executed by the Khomeini regime.  In 1981, the group was driven from its bases on the Iran-Iraq border and resettled in Paris, where it began supporting Iraq in its eight year war against Khomeini's Iran. In 1986, after France recognized the Iranian regime, the MEK moved its headquarters to Iraq, which facilitated its terrorist activities in Iran.  Since 2003, roughly 3,400 MEK members have been encamped at Camp Ashraf in Iraq.

**Activities:**  The group's worldwide campaign against the Iranian government uses propaganda and terrorism to achieve its objectives.  During the 1970s, the MEK staged terrorist attacks inside Iran and killed several U.S. military personnel and civilians working on defense projects in Tehran.  In 1972, the MEK set off bombs in Tehran at the U.S. Information Service office, a U.S.

diplomatic facility staffed by internationally protected persons, the Iran-American Society, and the offices of several U.S. companies to protest the visit of President Nixon to Iran.  In 1973, the MEK assassinated the deputy chief of the U.S. Military Mission in Tehran and bombed several businesses, including Shell Oil.  In 1974, the MEK set off bombs in Tehran at the offices of U.S. companies to protest the visit of then U.S. Secretary of State Kissinger.  In 1975, the MEK assassinated two U.S. military officers who were members of the U.S. Military Assistance Advisory Group in Tehran.  In 1976, the MEK assassinated two U.S. citizens who were employees of Rockwell International in Tehran. In 1979, the group claimed responsibility for the murder of an American Texaco executive.

In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group.  The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar.  These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown that forced MEK leaders to flee to France.  For five years, the MEK continued to wage its terrorist campaign from its Paris headquarters.  Expelled by France in 1986, MEK leaders turned to Saddam Hussein's regime for basing, financial support, and training.  Near the end of the 1980-1988 Iran-Iraq War, Baghdad armed the MEK with heavy military equipment and deployed thousands of MEK fighters in suicidal, mass wave attacks against Iranian forces.

The MEK's relationship with the former Iraqi regime continued through the 1990s.  In 1991, the group reportedly assisted the Iraqi Republican Guard's bloody crackdown on Iraqi Shia and Kurds who rose up against Saddam Hussein's regime.  In April 1992, the MEK conducted near-simultaneous attacks on Iranian embassies and installations in 13 countries, demonstrating the group's ability to mount large-scale operations overseas.  In June 1998, the MEK was implicated in a series of bombing and mortar attacks in Iran that killed at least 15 and injured several others.  In April 1999, the MEK targeted key Iranian military officers and assassinated the deputy chief of the Iranian Armed Forces General Staff, Brigadier General Ali Sayyaad Shirazi.

In April 2000, the MEK attempted to assassinate the commander of the Nasr Headquarters, Tehran's interagency board responsible for coordinating policies on Iraq.  The pace of anti-Iranian operations increased during "Operation Great Bahman" in February 2000, when the group launched a dozen attacks against Iran.  One attack included a mortar attack against a major Iranian leadership complex in Tehran that housed the offices of the Supreme Leader and the President.  In 2000 and 2001, the MEK was involved in regular mortar attacks and hit-and-run raids against Iranian military and law enforcement personnel, as well as government buildings near the Iran-Iraq border.  Also in 2001, the FBI arrested seven Iranians in the United States who funneled US$ 400,000 to an MEK-affiliated organization in the UAE, which used the funds to purchase weapons.  Following an initial Coalition bombardment of the MEK's facilities in Iraq at the outset of Operation Iraqi Freedom, MEK leadership negotiated a cease-fire with Coalition Forces and surrendered their heavy-arms to Coalition control.  Since 2003, roughly 3,400 MEK members have been encamped at Ashraf in Iraq.

In 2003, French authorities arrested 160 MEK members at operational bases they believed the MEK was using to coordinate financing and planning for terrorist attacks. Upon the arrest of MEK leader Maryam Rajavi, MEK members took to Paris' streets and engaged in self-immolation. French authorities eventually released Rajavi. Although currently in hiding, Rajavi has made "motivational" appearances via video-satellite to MEK-sponsored conferences across the globe.

According to evidence which became available after the fall of Saddam Hussein, the MEK received millions of dollars in Oil-for-Food program subsidies from Saddam Hussein from 1999 through 2003. In addition to discovering 13 lists of recipients of such vouchers on which the MEK appeared, evidence linking the MEK to the former Iraqi regime includes lists, as well as video footage of both Saddam Hussein handing over suitcases of money to known MEK leaders, and of MEK operatives receiving training from the Iraqi military.

**Strength:** Estimates place MEK's worldwide membership at between 5,000 and 10,000 members, with large pockets in Paris and other major European capitals. In Iraq, roughly 3,400 MEK members are gathered at Camp Ashraf, the MEK's main compound north of Baghdad. As a condition of the 2003 cease-fire agreement, the MEK relinquished more than 2,000 tanks, armored personnel carriers, and heavy artillery. Between 2003 and 2006, a significant number of MEK personnel voluntarily left Ashraf, and an additional several hundred individuals renounced ties to the MEK and been voluntarily repatriated to Iran.

**Location/Area of Operation:** The MEK's global support structure remains in place, with associates and supporters scattered throughout Europe and North America. Operations target Iranian government elements across the globe, including in Europe and Iran. The MEK's political arm, the National Council of Resistance of Iran, has a global support network with active lobbying and propaganda efforts in major Western capitals. NCRI also has a well-developed media communications strategy.

**External Aid:** Before Operation Iraqi Freedom began in 2003, the MEK received all of its military assistance and most of its financial support from Saddam Hussein. The fall of Saddam Hussein's regime has led the MEK increasingly to rely on front organizations to solicit contributions from expatriate Iranian communities.

## NATIONAL LIBERATION ARMY

aka ELN, Ejercito de Liberacion Nacional

**Description:** The National Liberation Army (ELN) was designated as a Foreign Terrorist Organization on October 8, 1997. The ELN is a Colombian Marxist-Leninist group formed in 1964 by intellectuals inspired by Fidel Castro and Che Guevara. It is primarily rural-based, although it also has several urban units. Peace talks between the ELN and the Colombian government began in Cuba in December 2005 and continued as recently as August 2007. To

Page | 270

date, Colombia and the ELN have yet to agree on a formal framework for peace negotiations and talks stalled in early 2008, although sporadic efforts have been made to revive them.

**Activities**:  The ELN engages in kidnappings, hijackings, bombings, drug trafficking, and extortion activities.  Historically, the ELN has been one of the biggest users of anti-personnel mines in Colombia.  The ELN continues to attempt high profile attacks, but these have fallen off.  For example, in 2003, ELN murdered two mayors from the State of Cauca, Colombia.  In July 2004, ELN kidnapped a Catholic Archbishop while he was traveling in eastern Colombia.  In 2005, after the ELN removed 54 landmines it had placed in Bolivar province, the group promptly replaced them with 50 new ones.  In August 2006, the ELN was believed to be responsible for the kidnapping of three China National Petroleum Corporation contractors in the Colombian state of Choco near the Panamanian border.  In February 2008, ELN rebels kidnapped a Radio Delfin journalist near Dibuya.  In 2009, the ELN remained active but with diminished resources and reduced offensive capability.  Still, the ELN continued to inflict casualties on the Colombian military through use of land mines and occasional attacks.  It continued to fund its operations through narcotics trafficking, kidnapping, and extortion.

**Strength:**  Approximately 2,000 armed combatants and an unknown number of active supporters.

**Location/Area of Operation:**  Mostly in rural and mountainous areas of northern, northeastern, and southwestern Colombia, as well as the border regions with Venezuela.

**External Aid:**  Cuba provides some medical care and political consultation.  Nevertheless, Cuba has encouraged the Colombian government and the ELN to reach an agreement.

## PALESTINE LIBERATION FRONT- ABU ABBAS FACTION

aka PLF; PLF-Abu Abbas; Palestine Liberation Front

**Description:**  The Palestinian Liberation Front – Abu Abbas Faction (PLF) was designated as a Foreign Terrorist Organization on October 8, 1997.  In the late 1970s, the Palestine Liberation Front (PLF) splintered from the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), and then later split into pro-PLO, pro-Syrian, and pro-Libyan factions.  The pro-PLO faction was led by Muhammad Zaydan (a.k.a. Abu Abbas) and was based in Baghdad prior to Operation Iraqi Freedom.

**Activities:**  Abbas's group was responsible for the 1985 attack on the Italian cruise ship Achille Lauro and the murder of U.S. citizen Leon Klinghoffer.  In 1993, the PLF officially renounced terrorism when it acknowledged the Oslo accords, although it was suspected of supporting terrorism against Israel by other Palestinian groups into the 1990s.  In April 2004, Abu Abbas died of natural causes while in U.S. custody in Iraq.  The PLF took part in the 2006 Palestinian parliamentarian elections but did not win a seat.  In 2008, as part of a prisoner exchange between Israel and Hizballah, Samir Kantar, a PLF member, and purportedly the longest serving Arab prisoner in Israeli custody, was released from an Israeli prison.  After going approximately 16

years without claiming responsibility for an attack, PLF claimed responsibility for two attacks against Israeli targets on March 14, 2008, according to media reports.  One attack was against an Israeli military bus in Huwarah, Israel, and the other involved a PLF "brigade" firing at an Israeli settler south of the Hebron Mountain, seriously wounding him.  On March 28, 2008, shortly after the attacks, a PLF Central Committee member reaffirmed PLF's commitment to using "all possible means to restore" its previous glory and to adhering to its role in the Palestinian "struggle" and "resistance," through its military.

**Strength:**  Estimates have placed membership between 50 and 500.

**Location/Area of Operation:**  Based in Iraq from 1990 until 2003.  Current PLF leadership and membership appears to be based in Lebanon and the Palestinian territories.

**External Aid:** Unknown.

## PALESTINE ISLAMIC JIHAD - SHAQAQI FACTION

aka PIJ; Palestine Islamic Jihad; PIJ-Shaqaqi Faction; PIJ-Shallah Faction; Islamic Jihad of Palestine; Islamic Jihad in Palestine; Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis; Al-Quds Squads; Al-Quds Brigades; Saraya Al-Quds; Al-Awdah Brigades

**Description:**  Palestine Islamic Jihad (PIJ) was designated as a Foreign Terrorist Organization on October 8, 1997.  Formed by militant Palestinians in Gaza during the 1970s, PIJ is committed to both the the destruction of Israel through attacks against Israeli military and civilian targets and the creation of an Islamic state in all of historic Palestine, including present day Israel.

**Activities:**  PIJ terrorists have conducted numerous attacks, including large-scale suicide bombings against Israeli civilian and military targets.  The PIJ continued to plan and direct attacks against Israelis both inside Israel and in the Palestinian territories.  Although U.S. citizens have died in PIJ attacks, the group has not directly targeted U.S. interests.  PIJ attacks in 2008 and 2009 were primarily rocket attacks aimed at southern Israeli cities.  In March 2008, two IDF soldiers died as a result of an explosive device detonated near their jeep while patrolling the security fence in the central Gaza Strip, near Kissufim.  HAMAS and PIJ claimed responsibility for the attack.  In April 2008 alone, PIJ fired 216 rockets and mortar shells at Israeli towns.  In 2009, the number of PIJ attacks decreased, but rocket attacks on Israeli towns continued as the PIJ claimed that it had launched 12 rockets in January, one in February and another in September.  Attacks against the Israeli military continued as PIJ teamed up with the Popular Front for the Liberation of Palestine (PFLP) and the al-Aqsa Martyrs Brigade to attack military jeeps with explosives on at least two occasions in May and June.

**Strength:**  PIJ currently has less than 1000 members.

**Location/Area of Operation:**  Primarily Israel, the West Bank, and Gaza.  The group's senior leadership resides in Syria.  Other leadership elements reside in Lebanon and official representatives are scattered throughout the Middle East.

**External Aid:**  Receives financial assistance and training primarily from Iran.  Syria provides the group with safe haven.

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE

aka PFLP; Halhul Gang; Halhul Squad; Palestinian Popular Resistance Forces; PPRF; Red Eagle Gang; Red Eagle Group; Red Eagles; Martyr Abu-Ali Mustafa Battalion

**Description:**  The Popular Front for the Liberation of Palestine (PFLP) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PFLP, a Marxist-Leninist group founded by George Habash, broke away from the Arab Nationalist Movement in 1967.  The PFLP views the Palestinian struggle as a broader non-religious revolution against Western imperialism.  The group earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens.  A leading faction within the PLO, the PFLP has long accepted the concept of a two-state solution but has opposed specific provisions of various peace initiatives.

**Activities:**  The PFLP stepped up its operational activity during the Second Intifada.  This was highlighted by at least two suicide bombings since 2003, multiple joint operations with other Palestinian terrorist groups, and the assassination of Israeli Tourism Minister Rehavam Ze'evi in 2001 to avenge Israel's killing of the PFLP Secretary General earlier that year.  In March 2006, the PFLP's current Secretary General, Ahmed Sa'adat, then imprisoned by the Palestinian Authority for his involvement in the Ze'evi assassination, was seized from the Jericho prison compound by Israeli forces and sentenced to 30 years in prison by an Israeli military court in December 2008.  The PFLP was involved in several rocket attacks, launched primarily from the Gaza Strip, against Israel in 2008 and 2009.  PFLP also claimed responsibility for numerous attacks on Israeli forces in the Gaza Strip, including sniper attacks at border crossings and a December 2009 ambush of Israeli soldiers in central Gaza.

**Strength:**  Unknown.

**Location/Area of Operation:**  Syria, Lebanon, Israel, the West Bank, and Gaza.

**External Aid:**  Receives safe haven from Syria.

## POPULAR FRONT FOR THE LIBERATION OF PALESTINE - GENERAL COMMAND

aka PFLP-GC

**Description:**  The Popular Front for the Liberation of Palestine - General Command (PFLP-GC) was designated as a Foreign Terrorist Organization on October 8, 1997.  The PFLP-GC split from the PFLP in 1968, claiming it wanted to focus more on resistance and less on politics.  Originally, the group was violently opposed to the Arafat-led PLO.  Ahmad Jibril, a former captain in the Syrian Army whose son, Jihad, was killed by a car bomb in May 2002, has led the PFLP-GC since its founding.  The PFLP-GC is closely tied to both Syria and Iran.

**Activities:**  The PFLP-GC carried out dozens of attacks in Europe and the Middle East during the 1970s and 1980s.  The organization was known for cross-border terrorist attacks into Israel using unusual means, such as hot-air balloons and motorized hang gliders.  The group's primary focus is now on supporting Hizballah's attacks against Israel, training members of other Palestinian terrorist groups, and smuggling weapons.  The PFLP-GC maintained an armed presence in several Palestinian refugee camps and at its own military bases in Lebanon and along the Lebanon-Syria border.  The PFLP-GC has been implicated by Lebanese security officials in several rocket attacks against Israel in 2008.  In May 2008, the PFLP-GC claimed responsibility for a rocket attack on a shopping center in Ashkelon that wounded at least ten people.  A health clinic took the brunt of the attack.

**Strength:**  Several hundred to several thousand.

**Location/Area of Operation:**  Headquartered in Damascus, with bases in southern Lebanon and a presence in the Palestinian refugee camps in Lebanon and Syria.

**External Aid:**  Receives logistical and military support from Syria and financial support from Iran.

## AL-QA'IDA

Variant spelling of al-Qa'ida, including al Qaeda; translation "The Base"; Qa'idat al-Jihad (The Base for Jihad); formerly Qa'idat Ansar Allah (The Base of the Supporters of God); the Islamic Army; Islamic Salvation Foundation; the Base; The Group for the Preservation of the Holy Sites; The Islamic Army for the Liberation of the Holy Places; the World Islamic Front for Jihad Against Jews and Crusaders; the Usama Bin Ladin Network; the Usama Bin Ladin Organization; al-Jihad; the Jihad Group; Egyptian al-Jihad; Egyptian Islamic Jihad; New Jihad

**Description:**  Al-Qa'ida (AQ) was designated as a Foreign Terrorist Organization on October 8, 1999.  AQ was established by Usama bin Ladin in 1988 with Arabs who fought in Afghanistan against the Soviet Union.  The group helped finance, recruit, transport, and train Sunni Islamist extremists for the Afghan resistance.  AQ's strategic objectives include uniting Muslims to fight the United States and its allies, overthrowing regimes it deems "non-Islamic," and expelling Westerners and non-Muslims from Muslim countries.  Its ultimate goal is the establishment of a pan-Islamic caliphate throughout the world.  AQ leaders issued a statement in February 1998 under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders," saying

it was the duty of all Muslims to kill U.S. citizens, civilian and military, and their allies everywhere.  AQ merged with al-Jihad (Egyptian Islamic Jihad) in June 2001.

**Activities:** Even as AQ's top leaders continued to plot and direct terrorist attacks worldwide, terrorists affiliated with, but not necessarily controlled by AQ, have increasingly carried out high-profile attacks.  AQ, its affiliates, and those inspired by the group were involved in anti-U.S. and anti-Coalition attacks in Africa, Europe, the Middle East, and South Asia including suicide bombings and vehicle-borne improvised explosive devices in Iraq, Afghanistan, and Pakistan.

AQ is the most significant terrorist threat to the United States and is developing stronger operational relationships with affiliates in the Middle East, North Africa, and Europe.  AQ remained committed to attacking the United States and focused its planning on targets that would produce mass casualties, dramatic visual destruction, and economic dislocation.

AQ and its supporters claim to have shot down U.S. helicopters and killed U.S. servicemen in Somalia in 1993, and to have conducted three bombings that targeted U.S. troops in Aden in December 1992.  AQ also carried out the August 1998 bombings of the U.S. Embassies in Nairobi and Dar es Salaam, killing up to 300 individuals and injuring more than 5,000.  In October 2000, AQ conducted a suicide attack on the USS Cole in the port of Aden, Yemen, with an explosive-laden boat, killing 17 U.S. Navy sailors and injuring 39.

On September 11, 2001, 19 AQ members hijacked and crashed four U.S. commercial jets – two into the World Trade Center in New York City, one into the Pentagon near Washington, DC; and a fourth into a field in Shanksville, Pennsylvania – leaving over 3,000 individuals dead or missing.

In October 2002, AQ directed a suicide attack on the French tanker MV Limburg off the coast of Yemen that killed one and injured four.  The group also carried out the November 2002 suicide bombing of a hotel in Mombasa, Kenya that killed 15.  AQ probably provided financing for the October 2002 Bali bombings by Jemaah Islamiya that killed more than 200.

In 2003 and 2004, Saudi-based AQ operatives and associated extremists launched more than a dozen attacks, killing at least 90 people, including 14 Americans in Saudi Arabia.  AQ may have been connected to the suicide bombers and planners of the November 2003 attacks in Istanbul that targeted two synagogues, the British Consulate, and the HSBC Bank, and resulted in the deaths of more than 60 people.  Former Pakistani President Musharraf blamed AQ for two attempts on his life in December 2003.  Bin Ladin's deputy al-Zawahiri claimed responsibility on behalf of AQ for the July 7, 2005 attacks against the London public transportation system.  The extent of senior leadership involvement in planning the July 2005 attacks was unclear.

The Government of Pakistan accused AQ, along with the Pakistani Taliban, of being responsible for the October 2007 suicide bombing attempt against former Pakistani Prime Minister Benazir Bhutto that killed at least 144 people in Karachi, Pakistan.  On December 27, 2007, the

Government of Pakistan stated that Baitullah Mehsud, a now-deceased Pakistani Taliban leader with close ties to AQ, was responsible for Bhutto's assassination.

In January 2008, militants attacked a convoy of Belgian tourists in Hadhramout, Yemen, killing two Belgian women and two Yemeni drivers.  AQ claimed responsibility for the attack.  In June 2008, a suicide car bomber attacked the Danish Embassy in Islamabad, killing six people, including a Danish citizen.  The blast was so powerful that it damaged windowpanes of buildings in a four kilometer radius and left a three-foot crater at impact.  In a press interview, an AQ commander in Afghanistan claimed responsibility for the attack, on behalf of AQ.

In January 2009, Bryant Neal Vinas – a U.S. citizen who traveled to Pakistan, allegedly trained in explosives at AQ camps, and was eventually captured in Pakistan and extradited to the United States – was charged with providing material support to a terrorist organization and conspiracy to commit murder.  Vinas later admitted his role in helping AQ plan an attack against the Long Island Rail Road in New York and confessed to having fired missiles at a U.S. base in Afghanistan.

In September 2009, Najibullah Zazi, an Afghan immigrant and naturalized U.S. citizen, was charged with conspiracy to use weapons of mass destruction as part of an AQ plot to attack the New York subway system.  Zazi later admitted to contacts with AQ senior leadership, which suggests they took an interest in his plans.  U.S. officials have described the alleged bombing plot as one of the most serious terrorism threats to the United States since the 9/11 attacks.

**Strength:**  AQ's organizational strength is difficult to determine in the aftermath of extensive counterterrorist efforts since 9/11.  The arrests and deaths of mid-level and senior AQ operatives have disrupted some communication, financial, and facilitation nodes and some terrorist plots.  Additionally, supporters and associates worldwide who are "inspired" by the group's ideology may be operating without direction from AQ central leadership; it is impossible to estimate their numbers.  AQ serves as a focal point of "inspiration" for a worldwide network that is comprised of many Sunni Islamic extremist groups, including some members of the Gama'at al-Islamiyya, the Islamic Movement of Uzbekistan, the Islamic Jihad Group, Lashkar i Jhangvi, Harakat ul-Mujahadin, the Taliban, and Jemaah Islamiya.  Pakistani Taliban, separate from the Taliban in Afghanistan, also appear to have strengthened their ties to AQ.

**Location/Area of Operation:**  AQ worldwide networks are augmented by ties to local Sunni extremists.  The group was based in Afghanistan until Coalition Forces removed the Taliban from power in late 2001.  While the largest concentration of senior AQ members now resides in Pakistan's Federally Administered Tribal Areas, the network incorporates members of al-Qa'ida in Iraq (AQI), Yemen, Algeria, and other associates throughout the Middle East, Southeast Asia, Africa, Europe, and Central Asia.

**External Aid:**  AQ primarily depends on donations from like-minded supporters and individuals who believe that their money is supporting a humanitarian or other cause.  Some funds are diverted from Islamic charitable organizations.  In addition, parts of the organization raise funds through criminal activities; for example, AQI raises funds through hostage-taking for ransom,

and members in Europe have engaged in credit card fraud.  U.S. and international efforts to block AQ funding have hampered the group's ability to raise money.

## AL-QA'IDA IN IRAQ

aka al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; al-Qa'ida of Jihad Organization in the Land of The Two Rivers; al-Qa'ida of the Jihad in the Land of the Two Rivers; al-Tawhid; Jam'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network

**Description:**  Al-Qa'ida in Iraq was designated a Foreign Terrorist Organization on December 17, 2004.  In the 1990s, Abu Mus'ab al-Zarqawi, a Jordanian-born militant, organized aterrorist group called al-Tawhid wal-Jihad as an opposition to the presence of U.S. and Western military forces in the Islamic world and also the West's support for and the existence of Israel.  He traveled to Iraq during Operation Iraqi Freedom and led his group against U.S. and Coalition forces  there until his death in June 2006.  In late 2004 he joined al-Qaeda and pledged allegiance to Usama bin Laden. After this al-Tawhid wal-Jihad became known as al-Qaeda in Iraq (AQI), and al-Zarqawi was given the Al-Qaeda title, "Emir of al-Qa'ida in the Country of Two Rivers."

In January 2006, in an attempt to unify Sunni extremists in Iraq, al-Qa'ida in Iraq (AQI) created the Mujahidin Shura Council (MSC), an umbrella organization meant to encompass the various Sunni terrorist groups in Iraq.  AQI claimed its attacks under the MSC until mid-October, when Abu Mus'ab al-Zarqawi's successor, Abu Ayyub al-Masri, took the first step toward al-Qa'ida's (AQ's) goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" (ISI), under which AQI now claims its attacks.  Although Iraqis comprise at least 90 percent of the group's membership, a disproportionate percentage of AQI's senior leadership is foreign-born.  In an attempt to give AQI a more Iraqi persona, the AQI-led ISI was created with Iraqi-national Abu Umar al-Baghdadi named its leader.

Abu Ayyub al-Masri, Zarqawi's successor, issued a statement pledging to continue what Zarqawi began, and AQI has continued its strategy of targeting Coalition Forces, Iraqi government groups, anti-AQI Sunni tribal and security elements, and Shia civilians to provoke violence and undermine perceptions that the Iraqi central government can effectively govern.  AQI has claimed joint attacks with both Ansar al-Islam (AI) and the Islamic Army in Iraq (IAI); however, ideological differences have prevented these groups from merging.  More recently, IAI and the 1920 Revolution Brigades cooperated with Coalition Forces in targeting AQI.

**Activities:**  AQI's predecessor group, led by al-Zarqawi, was established in 2003 and swiftly gained prominence,  striking numerous Iraqi, Coalition, and relief agency targets such as the Red Cross.  In August 2003, AQI carried out major terrorist attacks in Iraq when it bombed the Jordanian Embassy in Baghdad, which was followed 12 days later by a suicide vehicle-borne improvised explosive device (VBIED) attack against the UN Headquarters in Baghdad that killed 23, including the Secretary-General's Special Representative for Iraq, Sergio Vieira de Mello. That same month the group conducted a VBIED attack against Shia worshippers outside the Imam Ali Mosque in al Najaf, killing 85, including the leader of the Supreme Council for the Islamic Revolution in Iraq.

AQI conducted VBIED attacks against U.S. military personnel and Iraqi infrastructure throughout 2004, including suicide attacks inside the Green Zone perimeter in Baghdad.  The group successfully penetrated the Green Zone in the October 2004 bombing of a popular café and market.  It also claimed responsibility for the videotaped execution by beheading of Americans Nicholas Berg (May 11, 2004), Jack Armstrong (September 22, 2004), and Jack Hensley (September 21, 2004).  AQI was likely involved in other hostage incidents as well.  In 2005, AQI largely focused on conducting multiple high-profile, coordinated suicide attacks. AQI claimed numerous attacks primarily aimed against civilians, the Iraqi government, and security forces, such as the coordinated attacks against polling sites during the January elections and the coordinated VBIED attacks outside the Sheraton and Palestine hotels in Baghdad on October 24.  The group also continued assassinations against Shia leaders and members of the Shia militia groups Jaysh al-Mahdi and Badr Corps.

AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against three hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August, which resulted in limited damage in Jordan and in Eilat, Israel; and the firing of several rockets into Israel from Lebanon in December.  In August 2005, an AQI operative was arrested in Turkey while planning an operation targeting Israeli cruise ships.  Prior to 2005, AQI planned and conducted limited attacks in Jordan, including the assassination of USAID official Laurence Foley in 2002.  AQI was implicated in the February 2006 Samarra' al-Askari Mosque bombing that precipitated the escalation in sectarian violence. In October 2006, AQI declared the ISI would become a platform from which AQI would launch terrorist attacks throughout the world.  Following the announcement, AQI members marched through cities they considered to be part of their new state as a show of force.  AQI attack claims, which the group released under the auspices of the Mujahidin Shura Council and now the ISI, increased in 2006 but decreased significantly starting in late 2007.

High-profile attacks in 2007 included the suicide car-bombing attack of a mosque in Al Habbaniyah in February; the multiple suicide bombing attack of Shia pilgrims in Al Hillah in March; several chlorine gas canister bombings from January through June; the suicide truck bombing of a market in Tall 'Afar in March; the suicide truck bombings of a market and Patriotic Union of Kurdistan (PUK) party offices in Amurli and Kirkuk in July; and the multiple suicide truck bombings of two Yazidi villages near Sinjar in August – the single deadliest attack of the Iraq war.

279 of 292

Although a series of setbacks since late 2007 have diminished its strength, AQI remained the largest violent extremist group in Iraq.  It is still capable of high profile attacks that negatively affect public perceptions of stability in Iraq.  The group garnered significant media attention  in 2009 with a series of high-profile bombings focused on Government of Iraq targets such as ministry buildings and police stations.  Three of the biggest attacks, in April, October, and December, killed more than 380 people and injured approximately 1,500.  The attacks were designed to highlight the Iraqi government's inability to provide security in Baghdad.  Prime Minister Maliki condemned the bombings as a "cowardly" attempt to "cause chaos and hinder the election" taking place at the time.  This focus on fewer, better-planned attacks is evidence of the group's shift in strategy and designed to counter its waning influence in 2008 by focusing on the Shia-led Iraqi Government in an effort to heighten sectarian tensions.

**Strength:**  Membership is estimated at 1,000-2,000, making it the largest, most potent Sunni extremist group in Iraq.  AQI perpetrates the majority of suicide and mass casualty bombings in Iraq, using foreign and Iraqi operatives.  The selection of civilian targets, particularly in large urban areas, generates widespread media coverage, but garners public backlash against the group.

**Location/Area of Operation:**  AQI's operations are predominately Iraq-based, but it has perpetrated attacks in Jordan.  The group maintains a logistical network throughout the Middle East, North Africa, Iran, South Asia, and Europe.  In Iraq, AQI currently conducts the majority of its operations in Ninawa, Diyala, Salah ad Din, and Baghdad provinces and is re-establishing its capabilities in Al Anbar.

**External Aid**:  AQI probably receives most of its funding from a variety of businesses and criminal activities within Iraq, although it likely also receives some funds and other international extremists.

## AL-QA'IDA IN THE ISLAMIC MAGHREB

aka AQIM; formerly known as Group for Call and Combat; GSPC; Le Groupe Salafiste Pour La Predication Et Le Combat; Salafist Group for Preaching and Combat

**Description**: The Salafist Group for Call and Combat (GSPC)  was designated as a Foreign Terrorist Organization on March 27, 2002.  The GSPC officially merged with al-Qa'ida (AQ) in September 2006 and subsequently changed its name to al-Qa'ida in the Islamic Maghreb (AQIM) in January 2007.

Despite its affiliation, AQIM remains largely a regionally-focused terrorist group.  It has adopted a more anti-Western rhetoric and ideology and has aspirations of overthrowing "apostate" African regimes and creating an Islamic Caliphate.  AQIM numbers under a thousand fighters and is significantly constrained by its poor finances and lack of broad general appeal to Sufi Muslims in the region.  Some senior members of AQIM are former GIA insurgents.

**Activities**:  AQIM has not been able to conduct spectacular attacks in over two years since it bombed the UN building and Algerian government buildings in 2007.  AQIM continued to conduct small scale attacks and ambushes in northeastern Algeria against Algerian security forces and regularly used improvised explosive devices there.  AQIM in northeastern Algeria was under significant pressure by Algerian security forces.  AQIM's goals of expanding into Morocco, Tunisia, Libya, and Europe have failed thus far.

AQIM factions in the northern Sahel (northern Mali, Niger and Mauritania) conduct kidnap for ransom operations and can conduct small scale attacks and ambushes on security forces there. The target for kidnap for ransom is usually Western citizens from governments or third parties that have established a pattern of making concessions in the form of payment of money or release of operatives in custody.  Last year, one citizen from the United States and the United Kingdom were murdered in Mauritania and Mali respectively.

**Strength:**  AQIM has under a thousand  fighters operating in Algeria with a smaller number in the Sahel.  Abdelmalek Droukdel, aka Abu Mus'ab Abd al-Wadoud, is the leader of the group.

**Location/Area of Operation:**  Northeastern Algeria (the Kabylie region) and northern Mali, Niger, and Mauritania.  AQIM aspires to expand into Europe but its efforts to do so thus far have failed.

**External Aid:**  Algerian expatriates and AQIM members abroad, many residing in Western Europe, provide some limited financial and logistical support.  AQIM members also engage in hostage-taking for ransom and criminal activity to finance their operations.

## REAL IRA

aka RIRA; Real Irish Republican Army; 32 County Sovereignty Committee; 32 County Sovereignty Movement; Irish Republican Prisoners Welfare Association; Real Oglaigh Na Heireann

**Description:**  The Real IRA (RIRA) was designated as a Foreign Terrorist Organization on May 16, 2001.  The RIRA was formed in 1997 as the clandestine armed wing of the 32 County Sovereignty Movement, a "political pressure group" dedicated to removing British forces from Northern Ireland and unifying Ireland.  The RIRA also seeks to disrupt the Northern Ireland peace process and did not participate in the September 2005 weapons decommissioning.  The 32 County Sovereignty Movement opposed Sinn Fein's adoption in September 1997 of the Mitchell principles of democracy and non-violence.  It also opposed the amendment in December 1999 of Articles 2 and 3 of the Irish Constitution that laid claim to Northern Ireland.  Despite internal rifts and calls by some jailed members, including the group's founder Michael "Mickey" McKevitt, for a cease-fire and disbandment, the RIRA has pledged additional violence and continued to conduct attacks.

**Activities:**  Many RIRA members are former Provisional Irish Republican Army members who left the organization after that group renewed its cease-fire in 1997.  These members brought a wealth of experience in terrorist tactics and bomb-making to the RIRA.  Targets have included civilians (most notoriously in the Omagh bombing in August 1998), British security forces, police in Northern Ireland, and local Protestant communities.  The RIRA's attack in August 2002 at a London army base killed a construction worker.  The RIRA continued to attract new members, and its senior members were committed to launching attacks on security forces.  In November 2007, the RIRA claimed two armed attacks that wounded two Police Service of Northern Ireland (PSNI) officers that same month.  The RIRA claimed responsibility for a May 2008 improvised explosive device that injured a PSNI officer in Belfast and the firebombing of two stores.  The Independent Monitoring Commission, which was established to oversee the peace process, assesses that RIRA members were likely responsible for the majority of the shootings and assaults that occurred in Northern Ireland in 2008.  In November 2008, Lithuania arrested a RIRA member for attempting to arrange a shipment of weapons to Northern Ireland.  In March 2009, the group claimed responsibility for an attack that killed two British soldiers outside a British Army barracks in County Antrim, Northern Ireland.

**Strength:**  According to the Irish government, the RIRA has approximately 100 active members.  The organization may receive limited support from IRA hardliners and Republican sympathizers who are dissatisfied with the IRA's continuing cease-fire and with Sinn Fein's involvement in the peace process.  Approximately 40 RIRA members are in Irish jails.

**Location/Area of Operation:**  Northern Ireland, Great Britain, and the Irish Republic.

**External Aid**:  The RIRA is suspected of receiving funds from sympathizers in the United States and of attempting to buy weapons from U.S. gun dealers.  The RIRA also is reported to have purchased sophisticated weapons from the Balkans and also occasionally collaborates with its sister organization, the Continuity Irish Republican Army.

## REVOLUTIONARY ARMED FORCES OF COLOMBIA

aka FARC; Fuerzas Armadas Revolucionarias de Colombia

**Description:**  The Revolutionary Armed Forces of Colombia (FARC) was designated as a Foreign Terrorist Organization on October 8, 1997.  The FARC is Latin America's oldest, largest, most capable, and best-equipped terrorist organization, and remains so in spite of recent losses at the hands of the Colombian government.  It began in the early 1960s as an outgrowth of the Liberal Party-based peasant self-defense leagues, but took on Marxist ideology.  Today, it only nominally fights in support of Marxist goals.  The FARC is responsible for large numbers of ransom kidnappings in Colombia and in some years have held more than 700 hostages.  In 2008, the FARC experienced several significant setbacks.  A continuing Colombian military offensive targeting key FARC units and leaders succeeded in capturing or killing a number of FARC senior and mid-level commanders.

**Activities**:  The FARC has carried out bombings, murder, mortar attacks, kidnapping, extortion, and hijacking, as well as guerrilla and conventional military action against Colombian political, military, and economic targets.  The FARC has also used landmines extensively.  Foreign citizens are often targets of abductions that the FARC carried out to obtain ransom and political leverage.  The FARC has well-documented ties to the full range of narcotics trafficking activities, including taxation, cultivation, and distribution.  Over the years, the FARC has perpetrated a large number of high profile terrorist acts, including the 1999 murder of three U.S. missionaries working in Colombia, which resulted in a U.S. indictment of the FARC in 2002.   In 2001, the FARC kidnapped and killed a former Colombian minister of culture.  In 2002, the group kidnapped presidential candidate, Ingrid Betancourt and hijacked a domestic commercial flight, kidnapping a Colombian senator on board.  In 2004, the group kidnapped eight Colombian tourists at a spa in San Rafael, Antioquia Department, the mayors of Toribio, Cauca Department and Ricaurte, Narino Department.  In January 2005, authorities attributed to the FARC the murder of the governor of the indigenous reserve of La Ciria in Cauca Department, and the FARC accepted responsibility for the kidnapping and death of the governor of the Kuambi Yalasbi indigenous reserve in Narino Department and a mayor in Quindio Department.

During 2005, the FARC also targeted politicians, assassinating a congressional representative from Caldas Department and four town councilors in Caqueta Department.  In August 2005, a suspected FARC member shot and killed a parish priest in Tolima Department.  A taped conversation of a FARC deserter indicated that a FARC commander ordered the killing.  In 2007, the FARC assassinated eleven state assemblymen and executed a well-known mayor near the Pacific coast.  Also, in 2007, the FARC murdered two town councilmen and another person in Caqueta.  In July 2008, the Colombian military made a dramatic rescue of 15 high-value FARC hostages including three U.S. Department of Defense contractors and former Colombian presidential candidate Ingrid Betancourt.

Significant FARC attacks in 2009 included a May bombing near a police station in Valledupar, Cesar that killed two and injured 10 civilians; an August bombing in the middle of a crowded marketplace in San Vicente del Caguan, Meta that killed two and wounded 19 civilians; and a November incident in which the FARC stopped and burned a passenger bus in Barbacoas, Narino, killing four adults and two children.  On November 11, FARC fighters killed nine Colombian soldiers during an offensive in a southwestern region of Colombia.  In late December, the FARC kidnapped and killed the Governor of Caqueta.  He was the first governor to be kidnapped since President Uribe took office in 2002.

**Strength:**  Approximately 9,000 to 12,000 combatants, with several thousand more supporters.

**Location/Area of Operation:**  Primarily in Colombia with some activities, such as extortion, kidnapping, weapons sourcing, and logistics in neighboring countries.

**External Aid:**  Venezuela provided some logistical, financial, and lethal aid to the FARC.  Cuba provided some medical care, safe haven, and political consultation.  The FARC often used the Colombia/Venezuela, Colombia/Panama, and Colombia/Ecuador border areas for incursions into Colombia and also used Venezuelan and Ecuadorian territory for safe haven, although the degree

of government acquiescence was not always clear.  In 2008, based on captured computer documents, the Colombian government accused the Venezuelan government of funding and providing weapons to the FARC.

## REVOLUTIONARY ORGANIZATION 17 NOVEMBER

aka Epanastatiki Organosi 17 Noemvri; 17 November

**Description:**  The Revolutionary Organization 17 November (17N) was designated as a Foreign Terrorist Organization on October 8, 1997.  17N is a radical leftist group established in 1975 and named for the student uprising in Greece in November 1973 that protested the ruling military junta.  17N is opposed to the Greek government, the United States, Turkey, and NATO and seeks the end of the U.S. military presence in Greece, the removal of Turkish military forces from Cyprus, and the severing of Greece's ties to NATO and the European Union (EU).

**Activities:**  Initial attacks consisted of assassinations of senior U.S. officials and Greek public figures.  Five U.S. Embassy employees have been murdered since 17N began its terrorist activities in 1975.  The group began using bombings in the 1980s.  In 1990, 17N expanded its targets to include Turkish diplomats, EU facilities, and foreign firms investing in Greece; the group also added improvised rocket attacks to its methods.  The group supported itself largely through bank robberies.  After a failed 17N bombing attempt in June 2002 at the port of Piraeus in Athens, excellent detective work led to the arrest of 19 members.  These were the first 17N operatives ever arrested and among them was  a key leader of the organization.  In December 2003, a Greek court convicted 15 members, five of whom were given multiple life terms while four other alleged members were acquitted for lack of evidence.  In May 2007, two of the 15 convicted members were acquitted on appeal due to doubts surrounding the charges against them.  The convictions of the other 13 were upheld.

**Strength:**  Unknown but presumed to be small.

**Location/Area of Operation:**  Athens, Greece.

**External Aid:**  Unknown.

## REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT

aka DHKP/C; Dev Sol; Dev Sol Armed Revolutionary Units; Dev Sol Silahli Devrimci Birlikleri; Dev Sol SDB; Devrimci Halk Kurtulus Partisi-Cephesi; Devrimci Sol; Revolutionary Left

**Description:**  The Revolutionary People's Liberation Party/Front (DHKP/C) was designated as a Foreign Terrorist Organization on October 8, 1997.  The DHKP/C originally formed in 1978 as Devrimci Sol, or Dev Sol, a splinter faction of Dev Genc (Revolutionary Youth).  It was

renamed in 1994, after factional infighting.  "Party" refers to the group's political activities, while "Front" is a reference to the group's militant operations.  The group espouses a Marxist-Leninist ideology and vehemently opposes the U.S., NATO, and Turkish establishment.  Its goals are the establishment of a socialist state and the abolition of  harsh "F-type" Turkish prisons.  DHKP/C finances its activities chiefly through donations and extortion.

**Activities:**  Since the late 1980s, the group has primarily targeted current and retired Turkish security and military officials.  It began a new campaign against foreign interests in 1990, which included attacks against U.S. military and diplomatic personnel and facilities.  In order to protest perceived U.S. imperialism during the Gulf War, Dev Sol assassinated two U.S. military contractors, wounded an Air Force officer, and bombed more than 20 U.S. and NATO military, commercial, and cultural facilities.  In its first significant terrorist act as DHKP/C in 1996, the group assassinated a prominent Turkish businessman and two others.  The perpetrators fled to Belgium, where legal cases continue.  DHKP/C added suicide bombings to its repertoire in 2001, with successful attacks against Turkish police in January and September.  Since the end of 2001, DHKP/C has typically used improvised explosive devices against official Turkish targets and soft U.S. targets of opportunity.  Attacks against U.S. targets beginning in 2003 were probably a response to Operation Iraqi Freedom.

Operations and arrests against the group have weakened its capabilities.  In late June 2004, the group was suspected of a bus bombing at Istanbul University, which killed four civilians and 21 other people.  In July 2005, in Ankara, police intercepted and killed a suicide bomber who attempted to attack the Ministry of Justice.  In June 2006, the group killed a police officer in Istanbul; four members of the group were arrested the next month for the attack.  In June 2007, a plot to assassinate Turkish Defense Minister Vecdi Gonul by detonating an improvised explosive device as his car passed under a bridge near Izmir was only foiled when security officials noticed DHKP/C militants attaching the explosives to the bridge.

The DHKP/C was dealt a major ideological blow when Dursun Karatas, leader of the group, died in August 2008 in the Netherlands.  Throughout 2008, several DHKP/C members were arrested in Turkey and Europe, and several members stood trial for previous terrorist activity.  In early March, Turkish authorities arrested three DHKP/C members preparing bombings.  German authorities in late July indicted a DHKP/C senior leader, and in November, German authorities arrested several individuals suspected of serving as high-ranking DHKP/C functionaries.  In addition, Belgian authorities reviewed the acquittal of several DHKP/C members and began retrials to reach final judgment.  After the loss of their leader, the DHKP/C used 2009 to reorganize and was reportedly competing with the Kurdistan Workers Party for influence in Turkey and Europe.  In April, a female DHKP/C member conducted an unsuccessful suicide bomb attack against former Justice Minister Hikmet Turk during a visit to Bilkent University when the device failed to detonate.  She then fired a gun at him but was blocked by Turk's bodyguards.  In December, a 29-year-old case against 1,243 accused members of the organization came to a close in Turkey, resulting in the handing down of 39 life sentences.

**Strength:**  Probably several dozen terrorist operatives inside Turkey, with a limited support network throughout Europe.

**Location/Area of Operation:** Turkey, primarily in Istanbul, Ankara, Izmir, and Adana.

**External Aid:** Widely believed to have training facilities or offices in Lebanon and Syria. DHKP/C raises funds in Europe.

---

## REVOLUTIONARY STRUGGLE

aka RS; Epanastatikos Aghonas; EA

**Description**:  Revolutionary Struggle (RS) was designated as a Foreign Terrorist Organization on May 18, 2009.  RS is a radical leftist group with a Marxist ideology that has conducted attacks against both Greek and U.S. targets in Greece.  RS emerged in 2003 following the arrests of members of the Greek leftist groups 17 November and Revolutionary People's Struggle.

**Activities**:  RS first gained notoriety when it claimed responsibility for the September 5, 2003, bombings at the Athens Courthouse during the trials of 17 November members who were later convicted.  In March 2004, RS claimed responsibility for placing an improvised explosive device (IED) outside of a Citibank office in Athens.  In June 2005, RS claimed responsibility for IEDs detonated in front of the Ministry of Labor and Social Welfare.  In December 2005, RS claimed responsibility for an IED attack in Syntagma Square, outside the Ministry of Economy in central Athens.  RS also claimed responsibility for a  failed May 2006 IED attack against then Greek Minister of Public Order George Voulgarakis.

RS claimed responsibility for the January 12, 2007 attack on the U.S. Embassy in Athens.  A rocket propelled grenade struck the front of the Embassy, damaging the facility but causing no injuries.  In 2009, RS increased the number and sophistication of its attacks on police, financial institutions, and other targets.  RS successfully bombed a Citibank branch in Athens in March 2009, but failed in its vehicle-borne IED attack in February 2009 against the Citibank headquarters building in Athens.  In September, RS claimed responsibility for a car bomb attack on the Athens Stock Exchange, which caused widespread damage and injured a passerby.

**Strength**:  Unknown but presumed to be small.

**Location/Area of Operation**:  Athens, Greece.

**External Aid**:  Unknown.

---

## SHINING PATH

aka SL; Sendero Luminoso; Ejercito Guerrillero Popular (People's Guerrilla Army); EGP; Ejercito Popular de Liberacion (People's Liberation Army); EPL; Partido Comunista del Peru (Communist Party of Peru); PCP; Partido Comunista del Peru en el Sendero Luminoso de Jose

Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui); Socorro Popular del Peru (People's Aid of Peru); SPP

**Description:** Shining Path (SL) was designated as a Foreign Terrorist Organization on October 8, 1997. Former university professor Abimael Guzman formed SL in Peru in the late 1960s; his teachings created the foundation of SL's militant Maoist doctrine. SL's stated goal is to destroy existing Peruvian institutions and replace them with a communist peasant revolutionary regime. It also opposes any influence by foreign governments. In the 1980s, SL became one of the most ruthless terrorist groups in the Western Hemisphere. The Peruvian government made dramatic gains against SL during the 1990s, capturing Guzman in 1992 and killing a large number of militants. More recently, SL members have attempted to influence the local populace through indoctrination. SL responded to the government's stepped up counterterrorism efforts with a series of bloody counterattacks in late 2008 and throughout 2009.

**Activities:** In the past, SL has conducted indiscriminate bombing campaigns, ambushes, and selective assassinations. However, in the past five years, SL activities have included intimidation of U.S.-sponsored nongovernmental organizations involved in counternarcotics efforts, the ambushing of counternarcotics helicopters, and attacks against Peruvian police perpetrated in conjunction with narcotics traffickers. For example, in 2005, SL targeted the U.S.-Peruvian counternarcotics program by ambushing and murdering three highway police officers, attacking three counter narcotics helicopters, and killing three police officers with an electronically-detonated explosive device. Also in 2005, SL kidnapped 10 Peruvian employees of a USAID economic development contractor in the Huallaga valley region. SL released all of the hostages but reportedly threatened to kill them if they returned to the area.

In 2008, SL killed at least 34 people and conducted over 64 attacks in remote coca growing areas. In one of its most devastating attacks, on October 10, 2008, Peru's military command said a bomb killed 12 soldiers and seven civilians in the country's southeastern mountains. In April 2009, SL fired rocket propelled grenades at the helicopter carrying the chief of the Peruvian armed forces and several other high-ranking officers. The helicopter was on its way to the town of Sanabamba, where SL killed 14 soldiers in ambushes earlier that month. In early September 2009, SL shot down an MI-17 helicopter operated by Peru's Air Force in the country's main coca-growing region, killing three members of the military and wounding five.

**Strength:** Unknown but estimated to be between 300 and 500 armed militants.

**Location/Area of Operation:** Peru, with most activity in rural areas, specifically the Huallaga Valley, the Ene River, and the Apurimac Valley of central Peru.

**External Aid:** None.

## UNITED SELF-DEFENSE FORCES OF COLOMBIA

aka AUC; Autodefensas Unidas de Colombia

**Description:** The United Self-Defense Forces of Colombia (AUC) was designated as a Foreign Terrorist Organization on September 10, 2001.  The AUC, commonly referred to as the paramilitaries, was formed in April 1997.  AUC was designed to serve as an umbrella group for loosely affiliated, illegal paramilitary groups retaliating against leftist guerillas, which in turn were fighting the Colombian government and the landed establishment.  However, as the Colombian government increasingly confronted Foreign Terrorist Organizations including the AUC, the group's counter-guerilla activities decreased.  After a large-scale demobilization process, most of the AUC's centralized military structure had been dismantled, and all of the top paramilitary chiefs had stepped down.  Despite AUC's overall demobilization, the group's Cacique Pipinta Front refused to demobilize.  The Cacique Pipinta Front was described as being engaged in a struggle with the FARC for political and territorial control of the western Colombian  region of Caldas, and is still considered a risk to the political stability of the Embera Chami region of Colombia.  According to the Office of the Colombian Ombudsman, the Cacique Pipinta Front has coordinated criminal gangs and hired guns to seize land, accumulate capital, and maintain a hold on power in Caldas and Embera Chami.

**Activities:**  The AUC has carried out political killings and kidnappings of, among others, human rights workers, journalists, teachers, and trade unionists.  As much as 70 percent of the AUC's paramilitary operational costs were financed with drug-related earnings.  Some former members of the AUC never demobilized or are recidivists, and these elements have continued to engage heavily in criminal activities.

**Strength:**  Unknown.

**Location/Areas of Operation:**  Paramilitary forces were strongest in northwest Colombia in Antioqua, Cordoba, Sucre, Atlantico, Magdelena, Cesar, La Guajira, and Bolivar Departments, with affiliate groups in the coffee region, Valle del Cauca, and Meta Department.

**External Aid:**  None.

**Chapter 7**
**Legislative Requirements and Key Terms**

***Country Reports on Terrorism 2009*** is submitted in compliance with Title 22 of the United States Code, Section 2656f (the "Act"), which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act. Statutory excerpts relating to the terms used in this report and a discussion of the interpretation and application of those terms in this report are included below.

Excerpts and Summary of Key Statutory Terms

Section 2656f(a) of Title 22 of the United States Code states as follows:
(a) … The Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by April 30 of each year, a full and complete report providing -

*(1) (A) detailed assessments with respect to each foreign country -*

*(i) in which acts of international terrorism occurred which were, in the opinion of the Secretary, of major significance;*

*(ii) about which the Congress was notified during the preceding five years pursuant to Section 2405(j) of the Export Administration Act of 1979; and*

*(iii) which the Secretary determines should be the subject of such report; and*

*(B) detailed assessments with respect to each foreign country whose territory is being used as a sanctuary for terrorist organizations;*

*(2) all relevant information about the activities during the preceding year of any terrorist group, and any umbrella group under which such terrorist group falls, known to be responsible for the kidnapping or death of an American citizen during the preceding five years, any terrorist group known to have obtained or developed, or to have attempted to obtain or develop, weapons of mass destruction, any terrorist group known to be financed by countries about which Congress was notified during the preceding year pursuant to section 2405(j) of the Export Administration Act of 1979, any group designated by the Secretary as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), and any other known international terrorist group which the Secretary determines should be the subject of such report;*

*(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on-*

*(A) the extent to which the government of the foreign country is cooperating with the United*

*States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and*

*(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and*

*(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B).*

Section 2656f(d) of Title 22 of the United States Code defines certain key terms used in Section 2656f(a) as follows:

*(1) the term "international terrorism" means terrorism involving citizens or the territory of more than one country;*

*(2) the term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by subnational groups or clandestine agents; and*

*(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism.*

**Interpretation and Application of Key Terms.** For purposes of this report, the terms "international terrorism," "terrorism," and "terrorist group" have the definitions assigned to them in 22 USC 2656f(d) (see above). The term "non-combatant," which is referred to but not defined in 22 USC. 2656f(d)(2), is interpreted to mean, in addition to civilians, military personnel (whether or not armed or on duty) who are not deployed in a war zone or a war-like setting.

It should be noted that 22 USC 2656f(d) is one of many U.S. statutes and international legal instruments that concern terrorism and acts of violence, many of which use definitions for terrorism and related terms that are different from those used in this report. The interpretation and application of defined and related terms concerning terrorism in this report is therefore specific to the statutory and other requirements of the report, and is not intended to express the views of the U.S. government on how these terms should be interpreted or applied for any other purpose. Accordingly, there is not necessarily any correlation between the interpretation of terms such as "non-combatant" for purposes of this report and the meanings ascribed to similar terms pursuant to the law of war (which encapsulates the obligations of states and individuals with respect to their activities in situations of armed conflict).

**Statistical Information.** Pursuant to 22 USC § 2656f(b), this report must contain "to the extent practicable, complete statistical information on the number of individuals, including United States citizens and dual nationals, killed, injured, or kidnapped by each terrorist group during the preceding calendar year." This requirement is satisfied through the inclusion of a statistical annex to the report that sets out statistical information provided by the National Counterterrorism Center (NCTC). The statistical annex includes a discussion of the methodology employed by

NCTC in compiling the relevant data. This report does not contain statistical information specifically concerning combatants. The focus of the terrorism report, as is clear from the definition of terrorism, is on violence against noncombatant targets. Further, it would not be practicable to provide such statistics, as the government does not maintain - and would have great difficulty maintaining - statistics that distinguish between incidents against combatants by terrorist groups and by others, including insurgents, in Iraq and Afghanistan.

**Contextual Reporting.** Adverse mention in this report of individual members of any political, social, ethnic, religious, or national population is not meant to imply that all members of that population are terrorists. Indeed, terrorists rarely represent anything other than a tiny fraction of such larger populations. It is terrorist groups--and their actions--that are the focus of this report.

Furthermore, terrorist acts are part of a larger phenomenon of violence inspired by a cause, and at times the line between the two can become difficult to draw. This report includes some discretionary information in an effort to relate terrorist events to the larger context in which they occur, and to give a feel for the conflicts that spawn violence.

Thus, this report will discuss terrorist acts as well as other violent incidents that are not necessarily "international terrorism" and therefore are not subject to the statutory reporting requirement.


Terrorism Deaths, Injuries, Kidnappings of Private U.S. Citizens, 2009


*Provided by the Bureau of Consular Affairs, U.S. Department of State*

The term "Private U.S. Citizen" refers to any U.S. citizen not acting in an official capacity on behalf of the U.S. Government; therefore these figures do not include, for example, U.S. military personnel killed or injured in a terrorism-related incident while on active duty or employees of the Department of State and other federal agencies. Members of U.S. Government employees' households are considered private U.S. citizens.

Although every effort was made to include all terrorism-related deaths and injuries involving private U.S. citizens, the figures below reflect only those cases reported to, or known by, the U.S. Department of State, and may not reflect actual numbers of injured, which may not always be reported depending on their severity. As NCTC also notes, in the cases of Iraq and Afghanistan, it is particularly difficult to gather comprehensive information about all incidents and to distinguish terrorism from the numerous other forms of violence. The deaths, injuries, and kidnappings to U.S.

citizens in this report occurred outside the United States. US based casualties can be found in the *NCTC Report on Terrorism*.

**U.S. citizens worldwide killed as a result of incidents of terrorism: 9**
**U.S. citizens worldwide injured as a result of incidents of terrorism: 14**
**U.S. citizens worldwide kidnapped as a result of incidents of terrorism: 4**

**TERRORISM DEATHS OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)**

| Country | Date of Death | Number | Location |
|---|---|---|---|
| **Afghanistan** | August, 13, 2009 | 1 | Kabul, Afghanistan |
| | August 15, 2009 | 3 | Kabul, Afghanistan |
| | August 16, 2009 | 1 | Kabul, Afghanistan |
| | October 28, 2009 | 1 | Kabul, Afghanistan |
| **Iraq** | May 22, 2009 | 1 | Baghdad, Iraq |
| **Mauritania** | June 23, 2009 | 1 | Nouakchott, Mauritania |
| **Somalia** | December 3, 2009 | 1 | Mogadishu, Somalia |

**TERRORISM INJURIES OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)**

| Country | Date of Injury | Number | Location |
|---|---|---|---|
| **Indonesia** | July 17, 2009 | 8 | Jakarta, Indonesia |
| **Iraq** | October 25, 2009 | 4 | Baghdad, Iraq |
| **Pakistan** | October 7, 2009 | 1 | Islamabad, Pakistan |
| **Somalia** | September 17, 2009 | 1 | Mogadishu, Somalia |

**TERRORISM KIDNAPPINGS OF PRIVATE U.S. CITIZENS IN 2009 (BY COUNTRY)**

| Country | Date of Kidnapping | Number | Location / Date Released or Rescued |
|---|---|---|---|
| **Columbia** | February 6, 2009 | 1 | Cali, Colombia – April 2009 |
| | May 25, 2009 | 1 | Bogota, Colombia - May 28, 2009 |

| | | | |
|---|---|---|---|
| **Kenya** | July 17, 2009 | 1 | Luuq, Somalia – October 3, 2009 |
| **Pakistan** | February 2, 2009 | 1 | Quetta, Pakistan – April 4, 2009 |