United Nations

**A**/72/178



# General Assembly

Distr.: General
20 July 2017

Original: English

---

**Seventy-second session**
Item 73 (b) of the provisional agenda*
**Promotion and protection of human rights: human
rights questions, including alternative approaches
for improving the effective enjoyment of human rights
and fundamental freedoms**

## Extra-custodial use of force and the prohibition of torture and other cruel, inhuman or degrading treatment or punishment

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the General Assembly the report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Nils Melzer, submitted in accordance with Human Rights Council resolution 34/19.

---

* A/72/150.

17-12326 (E)   050917



Please recycle 

# Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment

*Summary*

    In the present report, the Special Rapporteur examines whether and in which circumstances the extra-custodial use of force by State agents amounts to torture or other cruel, inhuman or degrading treatment or punishment and how the prohibition of torture and other cruel, inhuman or degrading treatment or punishment applies to the development, acquisition, trade and use of weapons in law enforcement.

17-12326

# Contents

*Page*

I. Background, rationale, scope and process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  B. Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  C. Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  D. Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
II. Legal principles governing the use of force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  A. Principle of legality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  B. Principle of necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  C. Principle of proportionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  D. Principle of precaution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  E. Policing of assemblies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  F. Application in custodial settings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
III. Prohibition of torture and "other" cruel, inhuman or degrading treatment or punishment . . . . 9
  A. Status of the prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  B. Definition of torture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  C. Distinction between torture and "other" cruel, inhuman or degrading treatment or
     punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  D. Extra-custodial scope of the prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  E. Extra-custodial interpretation of the prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
IV. Application of the prohibition to the extra-custodial use of force . . . . . . . . . . . . . . . . . . . . 17
  A. Extra-custodial use of force as cruel, inhuman or degrading treatment or punishment . . . 17
  B. Extra-custodial use of force as aggravated cruel, inhuman or degrading treatment or
     punishment or torture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
V. Application of the prohibition to weapons and other means and methods . . . . . . . . . . . . . . . 18
  A. Relevance of the prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  B. Inherently cruel, inhuman or degrading weapons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  C. Weapons involving a high risk of torture and other cruel, inhuman or degrading
     treatment or punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  D. Duty to regulate and review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
VI. Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
VII. Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  A. National law and regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  B. Equipment, training and instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  C. Weapons reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  D. Monitoring, investigation, redress and rehabilitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.   Background, rationale, scope and process

### A.   Background

1.     In the past, the Special Rapporteur and other mechanisms against torture, including some of the most important treaty-based monitoring mechanisms,[1] have focused predominantly on preventing the use of torture and other cruel, inhuman or degrading treatment or punishment in "custodial" settings, that is, once persons have been arrested, interned, imprisoned or otherwise deprived of their liberty. The extent to which and how the prohibition of torture and other cruel, inhuman or degrading treatment or punishment is applied to the use of force by State agents outside custodial settings ("extra-custodial" use of force) has not yet been systematically examined. This question is particularly relevant where State agents resort to unnecessary, excessive or otherwise unlawful force without necessarily infringing the right to life, for example, during arrest, stop and search or crowd control operations. While States must be in a position to use all lawful and appropriate means, including necessary and proportionate force, with a view to maintaining public security and law and order, experience shows that the use of force in insufficiently controlled environments carries a significant risk of arbitrariness and abuse. In his most recent report to the Human Rights Council (A/HRC/34/54), the Special Rapporteur expressed his intention to examine how the prohibition of torture and other cruel, inhuman or degrading treatment or punishment should be applied and interpreted in extra-custodial settings, particularly in view of potential justifications such as law enforcement, public security, crowd control or self-defence and the defence of others. The Special Rapporteur also expressed his intention to examine the extent to which the use of certain types of weapons, riot control devices or other means and methods of law enforcement would have to be considered intrinsically cruel, inhuman or degrading in the light of their immediate to long-term consequences.

### B.   Rationale

2.     In examining the relationship between the prohibition of torture and other cruel, inhuman or degrading treatment or punishment and the international legal principles governing the use of force by State agents, and in developing concrete recommendations on the matter, the Special Rapporteur hopes to strengthen the capacity of States to ensure the effective prevention of and accountability for torture and other cruel, inhuman or degrading treatment or punishment, including in extra-custodial settings. Moreover, as a complement to existing international standards governing the use of force, the present report is aimed at contributing to the development of seamless guidance on the entire spectrum of the use of force, from non-lethal to deliberately lethal and from custodial to extra-custodial, and therefore at supporting States in complying with their relevant human rights obligations. The report is also aimed at facilitating synergies, both at the national and the international levels, between mechanisms tasked with protection against

---

[1]   Most notably, both the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment foresee the oversight competences for the monitoring bodies established under the treaties (the Subcommittee on Prevention of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the national preventive mechanisms and the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment) only with regard to places where persons are deprived of their liberty (see Optional Protocol, arts. 1 and 19; Subcommittee guidelines on national preventive mechanisms, para. 28; and European Convention, art. 2).

torture and other cruel, inhuman or degrading treatment or punishment and those involved in overseeing and regulating the use of force more generally.

## C.   Scope

3.    While the present report is focused on the extra-custodial use of force by State agents, its conclusions generally will also be relevant, mutatis mutandis, for non-physical forms of coercion and for ill-treatment committed by non-State actors. Owing to constraints of time and space, the Special Rapporteur intends to more systematically consider those issues in subsequent thematic reports. Moreover, in the present report the extra-custodial use of force under the law enforcement paradigm both in peacetime and in armed conflict is covered, but the use of force as a means of warfare under the hostilities paradigm is not examined. The terms "State agent" and "law enforcement official" will be used interchangeably to denote any person exercising, de jure or de facto, public authority on behalf of the State, whether of military or civilian status and whether appointed, elected, employed or contracted, including private security personnel.[2] Finally, the implications of the extra-custodial use of force are examined in the present report under human rights law only, and not under potentially applicable international humanitarian law.

## D.   Process

4.    Building on the work undertaken by his predecessors and other mandate holders and mechanisms, the Special Rapporteur conducted extensive research and broad stakeholder consultations with academic experts and representatives of governments, international organizations and civil society organizations, including through a multi-stakeholder expert meeting held in Geneva on 1 and 2 May 2017 and a general call for submissions in response to a thematic questionnaire posted on the website of the Office of the United Nations High Commissioner for Human Rights from 29 May to 30 June 2017.[3] The present report reflects the resulting conclusions and recommendations of the Special Rapporteur.

## II.   Legal principles governing the use of force

5.    Apart from prohibiting the arbitrary deprivation of life and providing a few principles on the lawful use of lethal force, human rights treaties do not expressly regulate the extra-custodial use of force.[4] Instead, the contemporary legal principles governing the use of force by law enforcement officials ("use of force principles") have been derived primarily from State practice and the application and interpretation of these very general treaty provisions in case law. The principles have been restated in two soft law instruments, namely, the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the Code of Conduct for Law Enforcement Officials, and today can be regarded as general principles of

---

[2] Code of Conduct for Law Enforcement Officials, art. 1, and Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, endnote, albeit without mention of private security providers (on that matter, see A/HRC/32/39).

[3] See www.ohchr.org/EN/Issues/Torture/SRTorture/Pages/ExtraCustodialUseForce.aspx.

[4] International Covenant on Civil and Political Rights, art. 6; American Convention on Human Rights, art. 4; African Charter on Human and Peoples' Rights, art. 4; and European Convention on Human Rights, art. 2.

law.[5] In particular, the use of force by State agents is governed by the following cumulative principles:

- Legality: any use of force must have a legal basis and pursue a lawful purpose.[6]

- Necessity: force must only be used when, and to the extent, strictly necessary for the achievement of a lawful purpose.[7]

- Proportionality: the harm likely to be inflicted by the use of force must not be excessive compared to the benefit of the lawful purpose pursued.[8]

- Precaution: law enforcement operations must be planned, prepared and conducted so as to minimize, to the greatest extent possible, the resort to force and, whenever it becomes unavoidable, to minimize the resulting harm.[9]

6.     In order for the use of force by State agents to be lawful, full adherence to all of the above principles is required.

## A.   Principle of legality

7.     According to the principle of legality, any use of force by State agents must pursue a lawful purpose and must be based on and regulated by national law.[10] Lawful purposes typically include effecting the arrest or preventing the escape of a person suspected of having committed a crime, self-defence or defence of others against an unlawful threat of death or serious injury, or dispersing violent assemblies. A further parameter of legality is the equal treatment of all persons before the law in accordance with the principle of non-discrimination (see A/HRC/26/36, para. 74, and A/HRC/31/66, para. 15). States must provide express authority for the use of force in their national law and must regulate the matter in line with their obligations under international law.

## B.   Principle of necessity

8.     The principle of necessity requires that any use of force by State agents must be restricted to the least harmful means that can reasonably be expected to achieve the purpose pursued. Thus, law enforcement officials must apply non-violent means whenever possible and may use force only when, and only to the extent, strictly necessary to achieve a lawful purpose.[11]

9.     The principle of necessity has a qualitative, a quantitative and a temporal aspect. In qualitative terms, any use of force must be "unavoidable" in the sense that non-violent or other less harmful means remain ineffective or without any promise of achieving the desired purpose.[12] In quantitative terms, whenever the use of force

---

[5] For an in-depth analysis of the use of force principles in law enforcement, see Nils Melzer, *Targeted Killing in International Law* (Oxford, Oxford University Press, 2008), pp. 83-239. See also A/HRC/26/36, paras. 59-73; A/HRC/31/66, paras. 50-66; International Committee of the Red Cross (ICRC), "Violence and the use of force", September 2015, chap. 2; and Stuart Casey-Maslen and Sean Connolly, *Police Use of Force under International Law* (Cambridge, United Kingdom, Cambridge University Press, 2017), chap. III.

[6] Code of Conduct, art. 8, and Basic Principles, principle 1. See also ICRC, "Violence and the use of force", p. 17.

[7] Code of Conduct, art. 3, and Basic Principles, principle 4.

[8] Code of Conduct, art. 3, and Basic Principles, principle 5 (a).

[9] Basic Principles, principles 2, 3 and 5 (a) and (b).

[10] Ibid., principle 1. See also A/HRC/26/36, para. 56.

[11] Code of Conduct, art. 3, and Basic Principles, principle 4.

[12] Basic Principles, principles 4 and 5.

is unavoidable, the degree to which and the manner in which force is employed may not be more harmful than strictly necessary.[13] Finally, in temporal terms, the use of force is unlawful if, at the moment of its application, it is not yet or no longer unavoidable to achieve the desired lawful purpose. Therefore, any law enforcement operation involving the use of force requires a constant reassessment of its necessity to achieve the desired purpose. Should the circumstances evolve so as to permit the achievement of that purpose through less harmful means, force may no longer be used.

## C.   Principle of proportionality

10.   While the principle of necessity requires a factual assessment of the least harmful means that can be expected to achieve the desired purpose, the principle of proportionality involves an additional and separate value judgment as to whether the harm expected to result from the use of force can be justified in the light of the benefit of the desired purpose. Even if force is necessary for the achievement of that purpose, it can only be permissible if the resulting harm remains proportionate compared to the seriousness of the offence and the importance of the desired purpose.[14] Thus, irrespective of considerations of necessity, the requirement of proportionality defines an absolute upper limit for the force that might be permissible to achieve a specific lawful purpose (A/HRC/26/36, para. 66). The "harm" to be weighed in the proportionality assessment does not necessarily have to be of physical nature, but can also involve mental suffering and emotions of humiliation and distress.

11.   A proportionality assessment must always be made in the light of the circumstances of each case. As a general rule, potentially lethal force must not be used except where strictly necessary to: (a) defend any person against the imminent threat of death or serious injury; (b) prevent the perpetration of a particularly serious crime involving grave threat to life; or (c) arrest a person presenting such a danger or prevent their escape. Intentionally lethal force may only be used when strictly unavoidable in order to protect life from an unlawful attack.[15] For example, even the aim of lawful arrest cannot justify the use of firearms to stop a thief or pickpocket not otherwise posing a threat to life and limb. In such cases, considerations of proportionality require that the risk of the suspect escaping arrest is to be preferred over the risk of causing the suspect's death or serious injury. Other factors that may be relevant in evaluating the degree of force that is proportionate include the individual's behaviour, age, gender and health.

## D.   Principle of precaution

12.   Even if the use of force is necessary and proportionate in the immediate circumstances of a case, it may nonetheless be unlawful if it results from a failure to plan, organize and control operations so as to minimize harm, respect and preserve human life and avoid any excessive use of force.[16]

13.   In particular, States should thoroughly train their police forces to avoid situations in which the use of force will become inevitable and equip them with various methods and types of weapons and ammunition allowing for a differentiated use of force, including "less lethal" incapacitating weapons and self-defensive

---

[13] Ibid., principle 5 (b).
[14] Ibid., principle 5 (a).
[15] Basic Principles, principle 9, and European Convention on Human Rights, art. 2 (2).
[16] Basic Principles, principles 2, 3 and 5 (a) and (b).

equipment such as shields, helmets, bulletproof vests and bulletproof means of transportation.[17] Moreover, law enforcement officials must constantly re-evaluate the situation with a view to avoiding unnecessary or excessive use of force. Whenever the use of force becomes unavoidable, law enforcement officials must ensure that assistance and medical aid is provided to any injured or affected persons at the earliest possible moment.[18]

14.    In practice, the required standard of precaution does not impose an unrealistic burden but always relates to what is reasonably possible in the circumstances.

## E.    Policing of assemblies

15.    Applying the principles of legality, necessity, proportionality and precaution to the particular context of policing assemblies, any decision to forcibly disperse a peaceful assembly or protest must be taken with due regard to the freedoms of assembly and of expression. In particular, article 21 of the International Covenant on Civil and Political Rights provides that "no restrictions may be placed on the exercise of [the right to peaceful assembly] other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others". Moreover, it must be emphasized that individuals cannot lose their protection against torture and other cruel, inhuman or degrading treatment or punishment under any circumstances whatsoever, including in the context of violent riots or unlawful protests.[19]

## F.    Application in custodial settings

16.    It should be noted that the above-mentioned principles govern the use of force, not only in extra-custodial settings, but also where riots, unrest or other violent incidents occur within places of detention.[20] Depending on the circumstances, they may also be relevant in determining the permissibility of invasive health and security procedures, such as the taking of bodily samples or a strip search.[21] In their relations with persons deprived of their liberty, law enforcement officials may not use force, except when strictly necessary for the maintenance of security and order within the institution or when personal safety is threatened, and they may not use firearms, except in self-defence or in the defence of others against the immediate threat of death or serious injury or when strictly necessary to prevent the escape of an inmate presenting a threat of death or serious injury.

---

[17] Ibid., principles 2 and 18-20. See also Inter-American Court of Human Rights, *Nadege Dorzema et al. v. Dominican Republic*, Judgment of 24 October 2012, para. 85.

[18] Ibid., principle 5 (c).

[19] Ibid., principles 12-14. See also A/HRC/31/66, paras. 18-27 and 60-63; A/HRC/17/28, para. 42; Organization for Security and Cooperation in Europe (OSCE) Office for Democratic Institutions and Human Rights, *Human Rights Handbook on Policing Assemblies* (Warsaw, 2016); OSCE Office for Democratic Institutions and Human Rights, *Guidelines on Freedom of Peaceful Assembly* (Warsaw, 2007); and Ralph Crawshaw, Stuart Cullen and Tom Williamson, *Human Rights and Policing*, 2nd revised ed. (Leiden, Martinus Nijhoff 2006), part II, chap. 4.

[20] Basic Principles, principles 15-17, and United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), rule 82 (1).

[21] See, on this dimension of article 3 of the European Convention on Human Rights, Nelson Mavronicola, "Crime, punishment and article 3 ECHR: puzzles and prospects of applying an absolute right in a penal context", *Human Rights Law Review*, vol. 15, No. 4 (December 2015), p. 721.

## III.  Prohibition of torture and "other" cruel, inhuman or degrading treatment or punishment

### A.  Status of the prohibition

17.   The absolute and non-derogable prohibition of torture and cruel, inhuman or degrading treatment or punishment has been codified in a wide range of universal and regional instruments[22] and today is universally recognized as a core principle of customary international law.[23] The prohibition of torture is also one of the few norms of customary international law that is universally recognized as having attained peremptory status (jus cogens). Furthermore, the prohibition of torture, cruel, humiliating and degrading treatment "at any time and in any place whatsoever" is also included in article 3 common to the Geneva Conventions of 12 August 1949, which the International Court of Justice has held to reflect a general principle of law, namely, "elementary considerations of humanity".[24]

18.   The absolute and non-derogable character of the prohibition entails that any use of force amounting to torture or other cruel, inhuman or degrading treatment or punishment is conclusively unlawful and cannot be justified under any circumstances,[25] whereas the peremptory character of the prohibition of torture means that any contradicting national administrative act or legislation, international agreement or judicial decision is automatically devoid of any legal effect.

19.   States have a corollary obligation to take effective legislative, administrative, judicial or other measures to prevent acts of torture and cruel, inhuman or degrading treatment or punishment within their jurisdiction.[26] Wherever there is reasonable ground to believe that extra-custodial force amounting to torture or other cruel, inhuman or degrading treatment or punishment has been used, States have a duty to conduct a prompt and impartial investigation in order to ensure full accountability for any such act, including, as appropriate, administrative, civil and criminal accountability, and to ensure that victims receive adequate redress and rehabilitation.[27]

---

[22] See, inter alia, the International Covenant on Civil and Political Rights, art. 7; the European Convention on Human Rights, art. 3; the American Convention on Human Rights, art. 5; the African Charter on Human and Peoples' Rights, art. 5; the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of 1975; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of 1984; the Inter-American Convention to Prevent and Punish Torture of 1985; and the Rome Statute of the International Criminal Court, art. 7. See also the prohibition of torture in the Geneva Conventions of 12 August 1949 and the Additional Protocols thereto of 1977.

[23] See International Court of Justice, *Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Judgment of 30 November 2010, 50 ILM 37 (2011), para. 87; International Court of Justice, *Questions relating to the Obligation to Prosecute or Extradite (Belgium v. Senegal)*, Judgment of 20 July 2012, para. 99; Human Rights Council resolution 8/8; and General Assembly resolution 70/146.

[24] International Court of Justice, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, ICJ Reports 1986, pp. 14 and 112, with reference to International Court of Justice, *Corfu Channel* case *(United Kingdom of Great Britain and Northern Ireland v. Albania)*, ICJ Reports 1949, pp. 4 and 22.

[25] See Human Rights Committee, general comment No. 20 (1992) on the prohibition of torture or other cruel, inhuman or degrading treatment or punishment, para. 3; and Council of Europe, *Guidelines on human rights and the fight against terrorism* (Strasbourg, Council of Europe Publishing, 2002), art. IV.

[26] Convention against Torture, arts. 2 and 16.

[27] Ibid., arts. 4-9 and 12-14. On positive obligations, see also Association for the Prevention of Torture and Centre for Justice and International Law, *Torture in International Law: a guide to jurisprudence* (Geneva, 2008); and Human Rights Committee, general comment No. 31 (2004) on the nature of the general legal obligation imposed on States parties to the Covenant, paras. 6-8.

## B.   Definition of torture

20.    Torture has been defined in many universal and regional instruments, albeit not always in precisely identical terms.[28]

21.    A definition of torture was set out in article 1 of the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of 1975, as follows:

> 1.    ... torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons. It does not include pain or suffering arising only from, inherent in or incidental to, lawful sanctions to the extent consistent with the Standard Minimum Rules for the Treatment of Prisoners.
>
> 2.    Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.

22.    Article 1 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of 1984 provides that:

> The term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

23.    Article 2 of the Inter-American Convention to Prevent and Punish Torture of 1985 provides that:

> Torture shall be understood to be any act intentionally performed whereby physical or mental pain or suffering is inflicted on a person for purposes of criminal investigation, as a means of intimidation, as personal punishment, as a preventive measure, as a penalty, or for any other purpose. Torture shall also be understood to be the use of methods upon a person intended to obliterate the personality of the victim or to diminish his physical or mental capacities, even if they do not cause physical pain or mental anguish.
>
> The concept of torture shall not include physical or mental pain or suffering that is inherent in or solely the consequence of lawful measures, provided that they do not include the performance of the acts or use of the methods referred to in this article.

24.    Article 7 (2) (e) of the Rome Statute of the International Criminal Court provides that:

> "Torture" means the intentional infliction of severe pain or suffering, whether physical or mental, upon a person in the custody or under the control of the

---

[28]  See Nigel Rodley, "The definition(s) of torture in international law", *Current Legal Problems*, vol. 55, No. 1 (December 2002), p. 467.

accused; except that torture shall not include pain or suffering arising only from, inherent in or incidental to, lawful sanctions.[29]

Torture has not been given a definition within the text of article 7 of the International Covenant on Civil and Political Rights or any of the main regional human rights instruments, but has been applied and interpreted extensively by the respective oversight bodies.[30]

## C.  Distinction between torture and "other" cruel, inhuman or degrading treatment or punishment

25.   Although all major universal and regional human rights treaties expressly prohibit cruel, inhuman and degrading treatment or punishment, none of them offers a definition of the term as a whole or of its components (namely, "cruel", "inhuman" and "degrading").[31] The concept has been interpreted and applied in a wide range of cases before judicial and quasi-judicial bodies, albeit with varying precision. Thus, for example, the Inter-American Commission on Human Rights indicated that "inhumane treatment includes unjustifiable conduct that causes severe physical, mental or psychological pain or suffering, and that treatment or punishment of an individual may be degrading if he is severely humiliated in front of others or he is compelled to act against his wishes or conscience",[32] whereas the Human Rights Committee did not "consider it necessary to draw up a list of prohibited acts or to establish sharp distinctions between the different kinds of punishment or treatment; the distinctions depend on the nature, purpose and severity of the treatment applied".[33]

26.   While the distinction between torture and other cruel, inhuman or degrading treatment or punishment will always depend on the applicable treaty definition, the generic observations set out in the paragraphs below can be made.

27.   First, both torture and any other form of cruel, inhuman or degrading treatment or punishment are absolutely prohibited and therefore cannot be justified under any circumstances. The broad scope of this prohibition covers a wide variety of more or less aggravated forms of inflicting pain or suffering, all of which are conclusively unlawful but only some of which qualify as torture. The term "pain or suffering" encompasses both physical and mental pain and suffering, including humiliation and emotional anguish.

---

[29] See also International Criminal Court, *Elements of Crimes* (The Hague, 2011), on the crime against humanity of torture, art. 7 (1) (f); note, however, the elements concerning the war crime of torture in respect of international armed conflict (art. 8 (2) (a) (ii)-1) and of non-international armed conflict (art. 8 (2) (c) (i)-4).

[30] For an overview, see, for example, Association for the Prevention of Torture and Centre for Justice and International Law, *Torture in International Law*. See also Office of the United Nations High Commissioner for Human Rights (OHCHR), "Interpretation of torture in the light of the practice and jurisprudence of international bodies", 2011.

[31] See Convention against Torture, art. 16, International Covenant on Civil and Political Rights, art. 7, European Convention on Human Rights, art. 3 (omits the word "cruel"), American Convention on Human Rights, art. 5 (2), and African Charter on Human and Peoples' Rights, art. 5.

[32] Inter-American Commission on Human Rights, report No. 92/05, case 12.418, "*Michael Gayle v. Jamaica*, Merits, 24 October 2005", para. 61.

[33] Human Rights Committee, general comment No. 20 (1992), para. 4.

28.    Second, torture constitutes an aggravated form of cruel, inhuman or degrading treatment or punishment.[34] "Aggravation" here refers to aggravated wrong, which does not necessarily require aggravated pain and suffering. As pointed out by the Inter-American Court of Human Rights, "the violation of an individual's right to physical and mental integrity has different levels that range from torture to other types of abuse or cruel, inhuman or degrading treatment, the physical and mental consequences of which vary in intensity according to factors that are endogenous and exogenous to the individual (such as, duration of the treatment, age, sex, health, context, and vulnerability), which must be analysed in each specific situation".[35]

29.    Third, while the notion of cruel, inhuman or degrading treatment or punishment may include a wide range of actions amounting to unlawful infliction of pain or suffering, the aggravated threshold of torture requires a number of additional criteria that may vary slightly depending on the applicable treaty definition and its interpretation by the relevant oversight bodies. Thus, according to the Inter-American Court of Human Rights, "an act constitutes torture when the ill-treatment: (a) is intentional; (b) causes severe physical or mental suffering, and (c) is committed with a specific purpose or objective".[36] Similarly, the African Commission on Human and Peoples' Rights has interpreted torture as "the intentional and systematic infliction of physical or psychological pain and suffering in order to punish, intimidate or gather information" and usefully pointed out that torture could be carried out by "State or non-State actors at the time of exercising control over such person or persons".[37] According to the European Court of Human Rights, torture, as opposed to other inhuman and degrading treatment, involves "deliberate inhuman treatment causing very serious and cruel suffering".[38] Both the European Court and the African Commission have used article 1 of the Convention against Torture as a reference point for defining torture for the purposes of the European Convention on Human Rights and the African Charter on Human and Peoples' Rights,[39] whereas inter-American bodies have tended to refer to the Inter-American Convention to Prevent and Punish Torture.[40]

30.    As a previous mandate holder has clarified, "torture constitutes such a horrible assault on the dignity of a human being because the torturer deliberately inflicts severe pain or suffering on a powerless victim for a specific purpose, such as extracting a confession or information from the victim" (A/HRC/13/39, para. 60; see also A/63/175, para. 50). The distinguishing factor between torture and other cruel, inhuman or degrading treatment or punishment "is not the intensity of the

---

[34] Convention against Torture, art. 16, and Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1 (2). See also Inter-American Commission on Human Rights, report No. 92/05, case 12.418, para. 62; and European Court of Human Rights, *Selmouni v. France* (application No. 25803/94), Judgment of 28 July 1999, para. 96.

[35] Inter-American Court of Human Rights, *Lysias Fleury et al. v. Haiti*, Judgment of 23 November 2011, para. 73.

[36] Ibid., para. 72. See also Inter-American Commission on Human Rights, "*Gayle v. Jamaica*, Merits", para. 62.

[37] African Commission on Human and Peoples' Rights, communication No. 279/03-296/05, "Sudan Human Rights Organization and Centre on Housing Rights and Evictions v. Sudan", 27 May 2009, para. 156.

[38] European Court of Human Rights, *Selmouni v. France*, Judgment of 28 July 1999, para. 96.

[39] See, for example, European Court of Human Rights, *Salman v. Turkey* (application No. 21986/93), Judgment of 27 June 2000, para. 114, and *Selmouni v. France*, Judgment of 28 July 1999, para. 97; and African Commission on Human and Peoples' Rights, communication No. 279/03-296/05, para. 156.

[40] See, for example, Inter-American Court of Human Rights, *Fernández Ortega et al. v. Mexico*, Judgment of 30 August 2010, paras. 77 and 120, and *Bueno-Alves v. Argentina*, Judgment of 11 May 2007, para. 78.

suffering inflicted, but rather the purpose of the conduct, the intention of the perpetrator and the powerlessness of the victim" (A/HRC/13/39, para. 60).[41] Indeed, "all purposes listed in Article 1 CAT, as well as the TP [*travaux préparatoires*] of the Declaration and the Convention, refer to a situation where the victim of torture is a detainee or a person 'at least under the factual power or control of the person inflicting the pain or suffering', and where the perpetrator uses this unequal and powerful situation to achieve a certain effect, such as the extraction of information, intimidation, or punishment".[42]

31.    Building and further elaborating on these observations, the Special Rapporteur concludes that it is the deliberate instrumentalization of the pain or suffering inflicted on a powerless person as a vehicle for achieving a particular purpose, even if exclusively for the sadistic gratification of the perpetrator, which is the essence of torture. For the purposes of the present report, "powerlessness" means that someone is overpowered, in other words, has come under the direct physical or equivalent control of the perpetrator and has lost the capacity to resist or escape the infliction of pain or suffering. Even though the text of article 1 of the Convention against Torture suggests that the range of purposes capable of qualifying an act as torture is limited, the specifically listed purposes — interrogation, punishment, intimidation, coercion or discrimination of any kind — are phrased so broadly that it is difficult to envisage a realistic scenario of purposeful ill-treatment against a powerless person that would escape the definition of torture. As a matter of generic concept, therefore, the definition of torture does not necessarily depend on the precise purpose or intensity of the inflicted pain or suffering, but on the intentionality and purposefulness of that infliction in conjunction with the powerlessness of the victim.

32.    Thus, while torture always requires the intentional and purposeful infliction of pain or suffering on a powerless person, other forms of cruel, inhuman or degrading treatment or punishment can also comprise the infliction of pain or suffering without deliberate intention (for example, as an expected or unexpected incidental effect) or without instrumentalizing such pain and suffering for a particular purpose, and can include the unnecessary, excessive or otherwise unlawful use of force against persons who are not powerless, for example, in situations of self-defence, arrest or crowd control.[43] The transition from "other" cruel, inhuman or degrading treatment or punishment to torture is illustrated in *Corumbiara v. Brazil*, in which the Inter-American Commission on Human Rights first noted that "the police used excessive, unnecessary, and disproportionate force against the workers, thereby injuring over fifty of them" and then pointed out that "after bringing the situation entirely under control, the State agents submitted the workers to beatings, humiliation, and inhuman and degrading treatment", concluding that, once Brazil had "gained full control of the situation", its use of force against the workers amounted to torture.[44]

33.    In sum, in the view of the Special Rapporteur, while the notion of cruel, inhuman or degrading treatment or punishment includes essentially any unlawful

---

[41] See also Manfred Nowak and Elizabeth McArthur, *The United Nations Convention against Torture: a Commentary* (Oxford, Oxford University Press, 2008), pp. 76-77.

[42] Manfred Nowak, "What practices constitute torture? US and UN standards", *Human Rights Quarterly*, vol. 28, No. 4 (November 2006), p. 832, citing J. Herman Burgers and Hans Danelius, *The United Nations Convention against Torture: a Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (Leiden, Martinus Nijhoff, 1988), p. 120. See also Rome Statute of the International Criminal Court, art. 7 (2) (e).

[43] Nowak and McArthur, *The United Nations Convention against Torture: a Commentary*, p. 558. See also E/CN.4/2006/6, para. 38.

[44] Inter-American Commission on Human Rights, report No. 32/04, case 11.556, "*Corumbiara v. Brazil*, Merits, 11 March 2004", paras. 226 and 228.

infliction of pain and suffering by State agents, the aggravated threshold of torture is always reached when, additionally, severe pain or suffering is intentionally and purposefully inflicted on a powerless person. Depending on the applicable treaty definition and its contemporary interpretation by the relevant bodies, either the aggravated threshold of torture may not require that the inflicted pain and suffering be "severe", or the interpretation of the requirement of severity may have evolved to significantly lower the relevant threshold.[45]

## D.   Extra-custodial scope of the prohibition

34.   Mandate holders have consistently maintained that, conceptually, the prohibition of torture and other cruel, inhuman or degrading treatment or punishment is not confined to acts carried out against persons deprived of their liberty, but also covers excessive police violence, such as during arrest and the policing of assemblies, or even torture and other cruel, inhuman or degrading treatment or punishment by acquiescence, namely, when States violate their due diligence obligation to combat ill-treatment at the hands of non-State actors, including harmful traditional practices, such as female genital mutilation, domestic violence and trafficking in human beings (A/HRC/13/39, summary. See also A/HRC/28/68/Add.4, para. 27 (protests); A/HRC/31/57, paras. 51-53 (sexual violence); E/CN.4/2006/6, para. 38 (police powers); A/HRC/13/39, para. 61 (arrests); and E/CN.4/1997/7, paras. 122-123 (police brutality)). Similarly, in reference to extra-custodial settings, the Human Rights Council has expressed concern about the use of torture and cruel, inhuman or degrading treatment or punishment against persons exercising their freedoms of peaceful assembly, of expression and of association in all regions of the world (see Human Rights Council resolution 25/38).

35.   Indeed, none of the universal or regional human rights treaties prohibiting torture and other cruel, inhuman or degrading treatment or punishment require deprivation of liberty as a requisite element of torture or other ill-treatment. Even article 7 of the Rome Statute of the International Criminal Court (crimes against humanity), which in its definition of torture refers to the victim as being "in the custody or under the control of the accused", makes no such requirement in relation to other ill-treatment. Similarly, the *travaux préparatoires* to the Convention against Torture suggest that "detention and similar direct control was meant only to constitute a precondition for the qualification of torture" and not in relation to other cruel, inhuman or degrading treatment or punishment.[46]

36.   Thus, while the generic concept of cruel, inhuman or degrading treatment or punishment clearly is not limited to ill-treatment inflicted on persons deprived of their liberty, the concept of torture requires that the perpetrator exercise direct physical or equivalent control over the victim and that the victim is incapable of resisting or escaping the infliction of pain or suffering ("powerlessness"). In principle, therefore, the universal customary prohibition of cruel, inhuman or degrading treatment or punishment and, in situations of powerlessness, of torture are fully applicable to the extra-custodial use of force by State agents.

---

[45] See OHCHR, "Interpretation of Torture", 2011, p. 8; European Court of Human Rights, *Selmouni v. France*, Judgment of 28 July 1999, para. 101; and Inter-American Court of Human Rights, *Cantoral-Benavides v. Peru*, Judgment of 18 August 2000 (Merits), para. 99.
[46] Nowak and McArthur, *The United Nations Convention against Torture: a Commentary*, pp. 566-567.

## E.   Extra-custodial interpretation of the prohibition

37.   As the below examples illustrate, the jurisprudence of universal and regional oversight mechanisms confirms the applicability of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment to the extra-custodial use of force and provides guidance as to how the prohibition interrelates with the use of force principles.

### Committee against Torture

38.   The Committee against Torture has repeatedly held that police brutality and excessive use of force outside the context of detention can fall within its purview (for example, A/50/44, para. 126, CAT/C/VEN/CO/3-4, para. 12, CAT/C/TUR/CO/4, para. 15, and CAT/C/KOR/CO/3-5, para. 13).[47] In *V.L. v. Switzerland*, a case involving multiple rapes, the Committee noted that "the complainant was clearly under the physical control of the police even though the acts concerned were perpetrated outside formal detention facilities" (CAT/C/37/D/262/2005, annex, para. 8.10). It found that State agents had inflicted severe pain and suffering on her, for purposes such as interrogation, intimidation, punishment, humiliation and discrimination based on gender, and concluded that "the sexual abuse by the police in this case constitutes torture even though it was perpetrated outside formal detention facilities" (ibid.).

### Inter-American Court of Human Rights and Inter-American Commission on Human Rights

39.   Similarly, in the case of *Rosendo Cantú et al. v. Mexico*, the Inter-American Court of Human Rights considered "that rape may constitute torture even when it consists of a single act or takes place outside State facilities … because the objective and subjective elements that define an act as torture do not refer to the accumulation of acts or to the place where the act is committed, but rather to the intention, the severity of the suffering and the purpose of the act".[48] The Inter-American Commission on Human Rights also regarded as torture the intentional, violent beating of a person prior to arrest.[49]

### European Court of Human Rights

40.   In *Cestaro v. Italy* and *Bartesaghi Gallo and Others v. Italy*, the European Court of Human Rights found that the violent punching, kicking and beating with rubber truncheons of antiglobalization protestors amounted to torture. The Court noted that although none of the victims showed violence or resistance, and although all of them were manifestly unarmed, asleep or sitting with their hands raised above their heads, the police systematically and indiscriminately subjected each of them to violent beatings, intentionally inflicting severe physical and psychological suffering for purposes of retaliation and humiliation through the use of excessive, indiscriminate and manifestly disproportionate force.[50]

---

[47] See also Nowak and McArthur, *The United Nations Convention against Torture: a Commentary*, pp. 567-568.

[48] Inter-American Court of Human Rights, *Rosendo Cantú et al. v. Mexico*, Judgment of 31 August 2010, para. 118.

[49] Inter-American Commission on Human Rights, "*Gayle v. Jamaica*, Merits", paras. 59-64.

[50] European Court of Human Rights, *Cestaro v. Italy* (application No. 6884/11), Judgment of 7 April 2015, paras. 170-190; and *Bartesaghi Gallo and Others v. Italy* (application Nos. 12131/13 and 43390/13), Judgment of 22 June 2017, paras. 114 and 117.

41.   The Court has also made numerous findings of inhuman or degrading treatment in cases involving the unnecessary or excessive use of force in the context of demonstrations.[51] In *Abdullah Yaşa and Others v. Turkey*, the Court found the launch of a tear gas grenade along a direct flat trajectory aimed towards protestors to be contrary to article 3 of the European Convention on Human Rights because it was not "proportionate to the aim pursued, namely to disperse a non-peaceful gathering" and because the severity of the resulting injuries to the applicant's head were not "commensurate with the strict use by the police officers of the force necessitated by his behaviour".[52]

42.   Similarly, in the case of *Anzhelo Georgiev and Others v. Bulgaria*, involving the use of electrical discharge weapons in a police raid, the Court found that the use of such weapons had not been shown to be necessary and proportionate in the circumstances and therefore violated article 3 of the European Convention on Human Rights.[53] The Court indicated that "Article 3 does not prohibit the use of force in certain well-defined circumstances. However, such force may be used only if indispensable and must not be excessive", labelling this a "strict proportionality" test.[54]

43.   In *Rizvanov v. Azerbaijan*, the Court held that "when a person is confronted by the police or other agent of the State, recourse to physical force which has not been made strictly necessary by the person's own conduct diminishes human dignity and is in principle an infringement of the right set forth in Article 3 of the Convention".[55] It is not entirely clear how this approach would apply to the use of force that, while being necessary and proportionate for a lawful purpose, might inflict incidental harm on innocent bystanders. In cases in which innocent bystanders had been harmed by force that was otherwise deemed necessary and proportionate in the circumstances, the Court does not appear to have contemplated a qualification as cruel, inhuman or degrading treatment or punishment.[56]

44.   In *Selçuk and Asker v. Turkey*, the Court found the unjustified destruction of private homes to be inhuman treatment because it was "premeditated and carried out contemptuously and without respect for the feelings of the applicants", who "had to stand by and watch the burning of their homes" while inadequate precautions were taken to ensure their safety and no subsequent assistance was provided.[57]

45.   Finally, the Court repeatedly found States to have violated their duty to protect persons from torture and other inhuman or degrading treatment by, for example, failing to provide an adequate legal framework against rape [58] or to protect

---

[51]   See, for example, European Court of Human Rights, *Muradova v. Azerbaijan* (application No. 22684/05), Judgment of 2 April 2009; *Güler and Öngel v. Turkey* (application Nos. 29612/05 and 30668/05), Judgment of 4 October 2011; *Tahirova v. Azerbaijan* (application No. 47137/07), Judgment of 3 October 2013; and *Rizvanov v. Azerbaijan* (application No. 31805/06), Judgment of 17 April 2012.

[52]   European Court of Human Rights, *Abdullah Yaşa and Others v. Turkey* (application No. 44827/08), Judgment of 16 July 2013, paras. 48 and 50.

[53]   European Court of Human Rights, *Anzhelo Georgiev and Others v. Bulgaria* (application No. 51284/09), Judgment of 30 September 2014, para. 78.

[54]   Ibid., para. 66.

[55]   European Court of Human Rights, *Rizvanov v. Azerbaijan*, Judgment of 17 April 2012, para. 49. See also *Anzhelo Georgiev and Others v. Bulgaria*, Judgment of 30 September 2014, paras. 66 and 78.

[56]   See, for example, European Court of Human Rights, *Finogenov and Others v. Russia* (application Nos. 18299/03 and 27311/03), Judgment of 20 December 2011; and *Andronicou and Constantinou v. Cyprus* (application No. 25052/94), Judgment of 9 October 1997.

[57]   European Court of Human Rights, *Selçuk and Asker v. Turkey* (application Nos. 23184/94 and 23185/94), Judgment of 24 April 1998, paras. 77-78.

[58]   European Court of Human Rights, *M.C. v. Bulgaria* (application No. 39272/98), Judgment of 4 December 2003.

applicants from a real and immediate risk of ill-treatment at the hands of an abusive family member.[59]

## IV. Application of the prohibition to the extra-custodial use of force

### A. Extra-custodial use of force as cruel, inhuman or degrading treatment or punishment

46.   Case law thus suggests that the criteria determining whether the extra-custodial use of force amounts to cruel, inhuman or degrading treatment or punishment are closely aligned with the use of force principles. In principle, any use of force by State agents exceeding what is necessary and proportionate in the circumstances to achieve a lawful purpose is regarded as an attack on human dignity amounting to cruel, inhuman or degrading treatment or punishment, irrespective of whether that excess occurred intentionally or inadvertently. The precise characterization of the relevant ill-treatment as cruel, inhuman, degrading or a combination thereof will depend on the particular characteristics and circumstances of the case but cannot prevent the unlawfulness of the act. Moreover, failure to take all precautions practically possible in the planning, preparation and conduct of law enforcement operations increases the risk of unnecessary or disproportionate force being used and, in principle, breaches the State's obligation to prevent cruel, inhuman or degrading treatment or punishment.[60]

### B. Extra-custodial use of force as aggravated cruel, inhuman or degrading treatment or punishment or torture

47.   The legal equation changes fundamentally when it comes to intentional and purposeful infliction of pain or suffering on a powerless person. Intentionality and purposefulness involve the deliberate instrumentalization of the pain or suffering inflicted on a powerless person as a vehicle for achieving a particular purpose (for example, coercion, intimidation, punishment, discrimination or sadistic gratification), as opposed to the infliction of pain and suffering as an inevitable side effect of an act pursuing a different purpose (for example, a medical intervention, effecting an arrest or repelling an attack). Powerlessness means that the victim is under the direct physical or equivalent control of the perpetrator and has lost the capacity to resist or escape the infliction of pain or suffering. In such circumstances, there can be no justification for the intentional and purposeful infliction of pain or suffering, regardless of whether, under the relevant treaty definition, it qualifies as torture or "other" cruel, inhuman or degrading treatment or punishment. In the view of the Special Rapporteur, the deliberate instrumentalization of pain or suffering, in conjunction with the powerlessness of the victim, are the very essence of torture and of the fundamental attack on human dignity it represents. Thus, notwithstanding any additional elements that may be required for a formal qualification as "torture" under the applicable treaty definition, any extra-custodial use of force that involves the intentional and purposeful infliction of pain or suffering on a powerless person as a vehicle for achieving a particular purpose will always amount to an aggravated form of cruel, inhuman or degrading treatment or punishment, irrespective of

---

[59] European Court of Human Rights, *Opuz v. Turkey* (application No. 33401/02), Judgment of 9 June 2009.

[60] On positive obligations, see Association for the Prevention of Torture and Centre for Justice and International Law, *Torture in International Law*.

considerations of lawful purpose, necessity or proportionality and irrespective of its qualification as torture under the applicable treaty definition.

# V. Application of the prohibition to weapons and other means and methods

## A. Relevance of the prohibition

48.    While the lawfulness of specific weapons and other means of warfare has long been regulated in international humanitarian law, it has more recently also become an issue of consideration under human rights law with regard to the wider context of law enforcement.[61] It is increasingly recognized that certain weapons and other means of law enforcement may be inherently cruel, inhuman or degrading by nature or design and, accordingly, that their use, production and trade would be incompatible with the prohibition of torture and other cruel, inhuman or degrading treatment or punishment (General Assembly resolution 66/150, para. 24, and resolution 68/156, para. 30).[62] Ever since the establishment of the mandate of the Special Rapporteur, mandate holders have expressed concern in this respect, starting in the very first report of the Special Rapporteur to the Commission on Human Rights, in 1986 (E/CN.4/1986/15, paras. 120-121), but most notably in a report prepared at the express request of the Commission in 2003 (E/CN.4/2003/69).

49.    Building on this body of work, the focus of the present report is on the relevance of the prohibition of torture and other cruel, inhuman or degrading treatment or punishment for the extra-custodial use of weapons and other means of employing force in law enforcement (hereafter "weapons"). Given that any weapon can be used in an unlawful manner and that the lawfulness of such use depends on the use of force principles outlined above, a distinction should be made between weapons that have to be regarded as inherently cruel, inhuman or degrading and those carrying an increased risk of being used for torture and other cruel, inhuman or degrading treatment or punishment. States' obligations under human rights law relating to the legal review of weapons will also be considered in the present report.

## B. Inherently cruel, inhuman or degrading weapons

50.    It would exceed the scope of the present report to try to provide a comprehensive list of weapons that would have to be regarded as inherently cruel, inhuman or degrading. Nevertheless, on the basis of the extensive and progressive work produced by previous mandate holders, other United Nations mechanisms, States, academic experts and civil society, the below generic observations can be made.

51.    In the view of the Special Rapporteur, a weapon has to be considered as inherently cruel, inhuman or degrading if it is either specifically designed or of a nature (that is, of no other practical use than) to: (a) employ unnecessary, excessive or otherwise unlawful force against persons; or (b) inflict pain and suffering on

---

[61]  See Basic Principles, principles 1-3. See also Stuart Casey-Maslen, ed., *Weapons Under International Human Rights Law* (Cambridge, United Kingdom, Cambridge University Press, 2014).

[62]  See also European Council Regulation No. 1236/2005 of 27 June 2005 concerning trade in certain goods which could be used for capital punishment, torture or other cruel, inhuman or degrading treatment or punishment, notably articles 3 and 4; and Omega Research Foundation and Amnesty International, "The human rights impact of less lethal weapons and other law enforcement equipment", April 2015.

powerless individuals. In extra-custodial settings governed by the law enforcement paradigm, examples of inherently cruel, inhuman or degrading weapons include: (a) spiked batons or shields, and any other type of weapon or ammunition specifically designed or of a nature to unnecessarily aggravate wounds and suffering; (b) stun belts and any other type of body-worn device capable of delivering electric shocks through remote control, given that they cause not only physical pain but also constant emotions of extreme anguish and humiliation, as well as the complete subjugation of the victim irrespective of physical distance; and (c) certain unnecessarily painful, injurious or humiliating devices designed to restrain persons in the process of arrest, such as thumb- and finger-cuffs and -screws.[63]

## C. Weapons involving a high risk of torture and other cruel, inhuman or degrading treatment or punishment

52.   Weapons that might not be inherently cruel, inhuman or degrading may nonetheless carry significant risks of being used in a manner contrary to the prohibition of torture and cruel, inhuman or degrading treatment or punishment, thus placing particular emphasis on the requirement of precautions.

53.   In the view of the Special Rapporteur, such weapons include certain types of firearms and ammunition, such as fully automatic weapons and high-calibre and high-energy expanding bullets, all of which carry a significant risk of causing unnecessary or excessive injury. They also include a range of "less lethal" weapons, such as certain types of kinetic impact projectiles, electrical discharge weapons, chemical irritants, water cannons and disorientation devices.[64]

54.   In principle, the current trend towards replacing firearms with "less lethal" incapacitating weapons is positive in that it promotes a differentiated use of force and aims to minimize harm.[65] At the same time, the widespread availability of incapacitating weapons also tends to lower the threshold for the use of force and entails a significant risk of "overuse" in situations in which the desired purpose could reasonably have been achieved through less coercive, less dangerous and less harmful means. Moreover, although "less lethal" weapons are designed to incapacitate while avoiding lethal outcomes, they are also specifically designed to inflict pain or suffering as a means of repelling or otherwise coercing the targeted persons. For example, several bodies and specialized organizations have specifically highlighted the risk of cruel, inhuman or degrading treatment or punishment associated with the extra-custodial use of electrical discharge weapons delivering electric shocks through projectiles (for example, tasers), or upon direct physical contact (for example, batons, shields or helmets).[66]

55.   Another issue arising with regard to certain "less lethal" weapons is their indiscriminate effects, which make it difficult to restrict the use of force and the resulting harm as required by the principles of necessity and proportionality, particularly in the presence of innocent bystanders (for example, in crowd control or hostage-taking).[67] While the indiscriminate nature of a weapon alone does not

---

[63]  See European Council Regulation No. 1236/2005 and amendments. See also Omega Research Foundation and Amnesty International, "The human rights impact of less lethal weapons", pp. 8-9.

[64]  See Physicians for Human Rights and International Network of Civil Liberties Organizations, "Lethal in disguise: the health consequences of crowd-control weapons", 2016.

[65]  Basic Principles, principle 2.

[66]  CAT/C/AUS/CO/4-5, para. 13; CAT/C/USA/CO/3-5, para. 27; Council of Europe, "20th general report of the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment", 2010, paras. 69-73; and Neil Corney, "Less lethal systems and the appropriate use of force", paper prepared for the Omega Research Foundation, March 2011, p. 6.

[67]  See also Omega Research Foundation and Amnesty International, "The human rights impact of less lethal weapons", pp. 17-18 and 26; and Human Rights Council resolution 25/38, para. 9.

necessarily make it cruel, inhuman or degrading, it may do so in conjunction with the gravity of its effects (for example, certain kinetic impact projectiles) or with the circumstances in which it is being used (for example, tear gas in closed confinements).

56.   Furthermore, certain "less lethal" weapons may have foreseeable long-term or other effects, which must be considered when assessing the proportionality of their use, such as the high risk of serious head injury arising when persons collapse uncontrollably after being targeted with electrical discharge weapons or the humiliating effect of the use of dyes or malodorants.[68]

57.   Finally, any extra-custodial use of an otherwise permissible weapon, irrespective of its lethal or less lethal design, in order to intentionally and purposefully inflict pain or suffering on a powerless person, always amounts to an aggravated form of cruel, inhuman or degrading treatment or punishment or even torture.

## D.   Duty to regulate and review

58.   States must take effective legislative, administrative, judicial or other measures to prevent acts of torture and other cruel, inhuman or degrading treatment or punishment from occurring within their jurisdiction.[69] In the present context, this means that States must regulate the extra-custodial use of force and establish other adequate mechanisms to ensure that State agents are trained, equipped and instructed so as to prevent torture and other cruel, inhuman or degrading treatment or punishment in law enforcement operations.[70]

59.   Given that States must prevent the use of inherently cruel, inhuman or degrading weapons and of lawful weapons in a manner contrary to the prohibition of torture and other cruel, inhuman or degrading treatment or punishment, they necessarily have a derived duty, irrespective of treaty obligations, to regulate and review the development, acquisition, trade and use of weapons. Most notably, this includes an obligation to determine whether the employment of a weapon would, in some or all circumstances, violate the absolute prohibition of torture and other cruel, inhuman or degrading treatment or punishment.[71] This duty is particularly significant in the light of the constant emergence and deployment of new technologies for use in law enforcement operations, including "less lethal", remotely controlled and increasingly autonomous systems.

60.   The duty to conduct legal reviews applies to weapons in the broadest sense, as well as the manner in which they are intended or reasonably expected to be used. A meaningful weapons review involves experts from various disciplines, given that it requires an examination of all relevant information regarding the weapon, such as its technical description, its performance and reliability, its environmental and medical impact and, most importantly for the present context, the nature and

---

[68]   On the use of dyes or malodorants, see Physicians for Human Rights and International Network of Civil Liberties Organizations, "Lethal in disguise", pp. 57-61.

[69]   Convention against Torture, arts. 2 and 16.

[70]   See Association for the Prevention of Torture and Centre for Justice and International Law, *Torture in International Law*.

[71]   See also African Commission on Human and Peoples' Rights, Robben Island Guidelines, 2002, art. 14; and Stuart Casey-Maslen, Neil Corney and Abi Dymond-Bass, "The review of weapons under international humanitarian law and human rights law", in Casey-Maslen (ed.), *Weapons Under International Human Rights Law*, pp. 424-425. See also, mutatis mutandis, the customary obligation codified in article 36 of Additional Protocol I to the 1949 Geneva Conventions, on means and methods of warfare, and, in this context, ICRC, "A guide to the legal review of new weapons, means and methods of warfare: measures to implement article 36 of Additional Protocol I of 1977", January 2006.

severity of the physical, mental and emotional injury, pain or suffering likely to be inflicted.[72]

61.    Finally, it has become apparent that an international response is required with respect to the human rights issues raised by "less lethal" weapons, with a view to bringing about detailed, practical guidance on the human rights-compatible use of such weapons. Accordingly, in their joint report issued in 2016 on the management of peaceful protest, the Special Rapporteur on the rights to freedom of peaceful assembly and of association and the Special Rapporteur on extrajudicial, summary or arbitrary executions recommended that the United Nations High Commissioner for Human Rights "convene an expert group to examine the application of the international human rights framework to less-lethal weapons and unmanned systems for law enforcement purposes, including with a focus on their use in the context of assemblies" (A/HRC/31/66, para. 67 (i)).

# VI.    Conclusions

62.    **In the present report, the Special Rapporteur examined whether and in which circumstances the extra-custodial use of force by State agents amounts to torture or other cruel, inhuman or degrading treatment or punishment. The Special Rapporteur's substantive conclusions can be summarized as follows:**

(a)    **Today, the absolute and non-derogable prohibition of torture and other cruel, inhuman or degrading treatment or punishment is universally recognized as a core principle of international law that is binding upon all States, irrespective of their treaty obligations. The prohibition of torture is also one of the few norms of customary international law that is universally recognized as having attained peremptory status (jus cogens);**

(b)    **The prohibition of torture and other cruel, inhuman or degrading treatment or punishment not only protects persons deprived of their liberty, but also applies in extra-custodial settings;**

(c)    **Any extra-custodial use of force that does not pursue a lawful purpose (legality), or that is unnecessary for the achievement of a lawful purpose (necessity), or that inflicts excessive harm compared to the purpose pursued (proportionality) contradicts established international legal principles governing the use of force by law enforcement officials and amounts to cruel, inhuman or degrading treatment or punishment. Moreover, failure to take all precautions practically possible in the planning, preparation and conduct of law enforcement operations with a view to avoiding the unnecessary, excessive or otherwise unlawful use of force contravenes the State's positive obligation to prevent acts of cruel, inhuman or degrading treatment or punishment within its jurisdiction;**

(d)    **Any extra-custodial use of force that is intended to inflict pain or suffering on a "powerless" person (that is, a person who is under direct physical or equivalent control and is unable to escape or resist) as a vehicle for achieving a particular purpose amounts to an aggravated form of cruel, inhuman or degrading treatment or punishment, irrespective of considerations of lawful purpose, necessity and proportionality and irrespective of what else, if**

---

[72] See Defence Scientific Advisory Council Subcommittee on the Medical Implications of Less-Lethal Weapons, "Statement on the medical implications of use of the Taser X26 and M26 less-lethal systems on children and vulnerable adults", amended, 27 January 2012; Abi Dymond, "Police use of taser in England and Wales, 2004-2014", unpublished PhD thesis, 2016; and Aaron Sussman, "Shocking the conscience: what police tasers and weapon technology reveal about excessive force law", *UCLA Law Review*, vol. 59 (2012), p. 1,344.

anything, might be required for such use of force to constitute torture under the respective treaty instruments;

(e)   States must regulate the extra-custodial use of force and must ensure that all of their agents are trained, equipped and instructed so as to prevent any act of torture and cruel, inhuman or degrading treatment or punishment within their jurisdiction. This includes not only the development of sufficiently clear guidance on the use of force and weapons, but also the systematic legal review of weapons, including other means of deploying force and "less lethal" weapons;

(f)   A weapon must be considered as inherently cruel, inhuman or degrading and, therefore, as absolutely prohibited if it is either specifically designed or of a nature (that is, of no other practical use than): (a) to employ unnecessary, excessive or otherwise unlawful force against persons; or (b) to intentionally and purposefully inflict pain and suffering on powerless individuals. Weapons that might not be inherently cruel, inhuman or degrading may nonetheless carry significant risks of being used in a manner contrary to the prohibition of torture and other cruel, inhuman or degrading treatment or punishment, thus placing particular emphasis on the requirement of precautions;

(g)   Wherever there is reasonable ground to believe that extra-custodial force amounting to torture or other cruel, inhuman or degrading treatment or punishment has been used, States have a duty to conduct a prompt and impartial investigation in order to ensure full accountability for any such act, including, as appropriate, administrative, civil and criminal accountability, and to ensure that victims receive adequate redress and rehabilitation.

# VII.   Recommendations

63.   On the basis of the above conclusions, the Special Rapporteur offers the below recommendations to States with a view to strengthening their capacity to ensure the effective prevention of and accountability for torture and other cruel, inhuman or degrading treatment or punishment, not only in custodial settings, but also in extra-custodial settings.

## A.   National law and regulations

64.   States should ensure that their national law prohibits torture and other cruel, inhuman or degrading treatment or punishment in all circumstances, including extra-custodial settings. Thus, the definition of torture and other cruel, inhuman or degrading treatment or punishment in national criminal law and other relevant laws and regulations should not be confined to acts carried out against persons deprived of their liberty, but should also apply in extra-custodial settings.

65.   In particular, as far as the extra-custodial use of force is concerned, States should ensure that their laws and regulations, including rules of engagement and similar instruments guiding and constraining the use of force in operational practice:

(a)   Absolutely prohibit and prevent any extra-custodial use of force by State agents intentionally and purposefully inflicting pain or suffering on powerless persons, irrespective of considerations of lawful purpose, necessity or proportionality;

(b)   Absolutely prohibit and prevent the development, production, trade and use of weapons and other means of deploying force that are inherently cruel, inhuman or degrading;

(c)   Require that any other extra-custodial use of force by State agents: (i) pursue a lawful purpose; (ii) be strictly necessary for the achievement of that purpose; (iii) cause no harm that would be disproportionate to the benefit of achieving that purpose and (iv) be planned, prepared and conducted so as to minimize, to the greatest extent possible, the causation of harm.

## B.   Equipment, training and instructions

66.   States should ensure that all law enforcement officials are trained, equipped and instructed so as to prevent any extra-custodial use of force amounting to torture and other cruel, inhuman or degrading treatment or punishment. In particular, States should:

(a)   Provide mandatory initial and recurring training and instructions for all law enforcement officials, in both classroom and scenario-based settings, concerning the lawful use of force, weapons and other equipment, as well as in the effective implementation of alternative, non-violent methods and tactics, with a particular focus on preventing any act of torture or other cruel, inhuman or degrading treatment or punishment;

(b)   Regularly monitor the effectiveness of such training in preventing torture and other cruel, inhuman or degrading treatment or punishment and other human rights violations;

(c)   Equip law enforcement officials with communication devices and protective equipment such as shields, helmets, bulletproof vests and bulletproof means of transportation, with a view to prioritizing the de-escalation of any potential violence and decreasing the need to use weapons of any kind;

(d)   Equip law enforcement officials with various types of weapons, ammunition and other means, including "less lethal" incapacitating weapons, with a view to allowing for the differentiated use of force aimed at avoiding or, in any event, minimizing harm and injury.

## C.   Weapons reviews

67.   In the development, procurement or trading of weapons, including other means of deploying force and "less lethal" weapons, States should conduct systematic legal reviews with a view to determining whether the use of such weapons, in some or all circumstances, would violate the prohibition of torture and other cruel, inhuman or degrading treatment or punishment, or any other obligation under international law, or would significantly increase the risk of such violations occurring.

68.   The Special Rapporteur specifically welcomes prohibitions and restrictions introduced on the trade in certain goods that could be used for capital punishment, torture or other cruel, inhuman or degrading treatment or punishment by European Council Regulation No. 1236/2005 of 27 June 2005 and encourages other States to take similar initiatives.

69.   The Special Rapporteur supports and reiterates the joint recommendation made by the Special Rapporteur on the rights to freedom of peaceful assembly and of association and the Special Rapporteur on extrajudicial, summary or

arbitrary executions that the United Nations High Commissioner for Human Rights convene an expert group to examine the application of the international human rights framework to "less lethal" weapons and unmanned systems for law enforcement purposes, including with a focus on their use in the context of assemblies.

## D.  Monitoring, investigation, redress and rehabilitation

70.   States should establish effective systems for monitoring and reporting on the use of force, and relevant information should be made accessible to the public, including statistics on when, against whom and through which means force is used and on the resulting harm.

71.   For States parties to the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, a key role in that respect could be assumed by national preventive mechanisms. Although the Optional Protocol does not require States to provide national preventive mechanisms with powers of oversight outside places where persons are deprived of their liberty, nothing in the relevant instruments prevents the extension of their monitoring responsibilities, as a matter of national law, to the use of force in extra-custodial settings.[73]

72.   States should systematically include the extra-custodial use of force in their regular reports to international mechanisms, such as the Committee against Torture and the Human Rights Committee (universal periodic review), and encourage international mechanisms, such as the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment and other special procedures, to examine the issue in their work.

73.   Wherever there is reasonable ground to believe that extra-custodial force amounting to torture or other cruel, inhuman or degrading treatment or punishment has been used, States should conduct a prompt and impartial investigation in order to ensure full accountability for any such act, including, as appropriate, administrative, civil and criminal accountability, and to ensure that victims receive adequate redress and rehabilitation (General Assembly resolution 70/146, paras. 28-31). The Istanbul Protocol is a key resource on best practice in conducting such investigations.[74]

---

[73] Examples of national preventive mechanisms monitoring the extra-custodial use of force are those of Austria (Austrian Ombudsman Board, "Annual report on the activities of the Austrian national preventive mechanism, 2014", international version, June 2015, p. 2, and "Annual report, 2015", international version, October 2016, pp. 208, 218 and 235, on police conduct during demonstrations and raids) and Brazil (2014 investigation into the use of force during a demonstration, available from http://apt.ch/en/blog/world-cup-preventing-torture-in-rio-de-janeiro/#.WU1CmpDyvIW).

[74] *Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol)*, Professional Training Series No. 8/Rev.1 (United Nations publication, Sales No. E.04.XIV.3).