**UNITED
NATIONS**

**E**



**Economic and Social
Council**

Distr.
GENERAL

E/CN.4/2004/3/Add.1
26 November 2003

Original:  ENGLISH/FRENCH/
                   SPANISH

COMMISSION ON HUMAN RIGHTS
Sixtieth session
Item 11 (b) of the provisional agenda

## CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTION OF TORTURE AND DETENTION

### Opinions adopted by the Working Group on Arbitrary Detention

The present document contains the opinions adopted by the Working Group on Arbitrary Detention at its thirty-fifth, thirty-sixth and thirty-seventh sessions, held in November/December 2002, May 2003 and September 2003, respectively.  A table listing all the opinions adopted by the Working Group and statistical data concerning these opinions are included in the report of the Working Group to the Commission on Human Rights at its sixtieth session (E/CN.4/2004/3).

GE.03-16900  (E)   291203   090104

E/CN.4/2004/3/Add.1
page 2

# CONTENTS

*Page*

Opinion No. 15/2002 (China) ........................................................................... 3

Opinion No. 16/2002 (United Arab Emirates) ................................................. 7

Opinion No. 17/2002 (Syrian Arab Republic) ................................................. 10

Opinion No. 18/2002 (Central African Republic) ........................................... 14

Opinion No. 19/2002 (Peru) ........................................................................... 16

Opinion No. 20/2002 (Tunisia) ...................................................................... 19

Opinion No. 21/2002 (United States of America) .......................................... 20

Opinion No. 1/2003 (Viet Nam) ..................................................................... 23

Opinion No. 2/2003 (China) ........................................................................... 26

Opinion No. 3/2003 (Egypt) ........................................................................... 30

Opinion No. 4/2003 (Algeria) ........................................................................ 32

Opinion No. 5/2003 (United States of America) ............................................ 33

Opinion No. 6/2003 (Tunisia) ........................................................................ 36

Opinion No. 7/2003 (China) ........................................................................... 39

Opinion No. 8/2003 (Islamic Republic of Iran) ............................................. 45

Opinion No. 9/2003 (Cuba) ............................................................................ 47

Opinion No. 10/2003 (China) ......................................................................... 58

Opinion No. 11/2003 (Syrian Arab Republic) ............................................... 64

Opinion No. 12/2003 (China) ......................................................................... 67

Opinion No. 13/2003 (China) ......................................................................... 71

Opinion No. 14/2003 (Maldives) ................................................................... 75

Opinion No. 15/2003 (Tunisia) ...................................................................... 79

Opinion No. 16/2003 (Cuba) .......................................................................... 83

Opinion No. 17/2003 (Cuba) .......................................................................... 87

Opinion No. 18/2003 (Syrian Arab Republic) ............................................... 92

## OPINION No. 15/2002 (CHINA)

Communication addressed to the Government on 11 July 2002.

Concerning:  Yao Fuxin.

**The State has signed but not ratified the International Covenant on Civil and Political Rights**

1.      The Working Group on Arbitrary Detention was established by resolution 1991/42 of the Commission on Human Rights.  The mandate of the Working Group was clarified and extended by resolution 1997/50, and reconfirmed by resolution 2000/36.  Acting in accordance with its methods of work, the Working Group sent to the Government the above-mentioned communication.

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      The Working Group regards deprivation of liberty as arbitrary in the following cases:

   (i)      When it manifestly cannot be justified on any legal basis (such as continued detention after the sentence has been served or despite an applicable amnesty act) (category I);

   (ii)     When the deprivation of liberty is the result of a judgement or sentence for the exercise of the rights and freedoms proclaimed in articles 7, 13, 14, 18, 19, 20 and 21 of the Universal Declaration of Human Rights and also, in respect of States parties, in articles 12, 18, 19, 21, 22, 25, 26 and 27 of the International Covenant on Civil and Political Rights (category II);

   (iii)    When the complete or partial non-observance of the international standards relating to a fair trial set forth in the Universal Declaration of Human Rights and in the relevant international instruments accepted by the States concerned is of such gravity as to confer on the deprivation of liberty, of whatever kind, an arbitrary character (category III).

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which made comments on it.  The Working Group is now in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the information submitted to the Group by the source, Mr. Yao Fuxin, a Chinese citizen was arrested on 17 March 2002 in Liaoyang city, Liaoning province, less than 1 km from his home, by plain clothes security officers belonging to the Liaoyang Public Security Bureau, who did not show any arrest warrant.  However, the Public Security authorities denied they had detained Yao Fuxin until 21 March 2002.  Yao Fuxin was held secretly in detention at an unknown location.  Subsequently, he was transferred to Tieling Detention Centre in Liaoyang.

E/CN.4/2004/3/Add.1
page 4

6.      On 30 March 2002, Yao Fuxin was formally charged with "organizing illegal demonstrations" and "gathering a crowd to disrupt social order", a crime punishable with imprisonment of three to seven years according to article 290 (1) of the Chinese Criminal Code.

7.      A former employee of the Ferroalloy Factory in Liaoyang City, Yao Fuxin had helped to organize an independent inquiry into the company accounts after the factory directors declared bankruptcy and were widely accused of involvement in corruption scandals with the local authorities.  He also led the workers in multiple drives to petition the Liaoyang city government, the Liaoning provincial government and the Central Government in Beijing. On 11 and 12 March 2002, he led a demonstration in front of the local government offices, made up of thousands of disaffected workers from the Ferroalloy Factory as well as from other local factories (Liaoyang Textile Factory, Liaoyang Leather Factory; Liaoyang Precision Tool Factory; Liaoyang Instruments Factory and Liaoyang Piston Factory).  The demonstrators, who were angry about unpaid wages and benefits, demanded the resignation of the Chairperson of the Liaoyang People's Congress, claiming he had failed to effectively represent workers' interests with the Government.  Liaoyang's State-controlled television station announced that the workers had violated China's laws on demonstrations and that some of them had "colluded with foreign hostile elements".

8.      The source further reports that on 18 March 2002, workers from more than 20 local and regional factories protested Yao Fuxin's detention and demanded his immediate release. On 11 April 2002, authorities allowed his wife, Guo Xiujing, to visit him in Tieling Detention Centre.  She reported that Yao Fuxin's health had rapidly deteriorated.  Prison authorities advised his daughter, Yao Dan, that Yao Fuxin was in a very serious condition after having suffered a heart attack and that he had been taken to a hospital.  Police reportedly sent the hospital 10,000 yuan (US$ 1,205) to cover his treatment, but did not allow his relatives to visit him at the hospital, raising speculation that he had been severely beaten in custody.  According to Mr. Yao Fuxin's relatives, he was in a perfect state of health prior to his arrest and had never had a history of heart problems.

9.      According to the source, Yao Fuxin has been detained only because he has peacefully exercised his rights to freedom of expression, to freedom of association and to freedom of assembly, rights guaranteed by the Universal Declaration of Human Rights.

10.     In its reply to the allegations of the source the Government stated that Mr. Yao Fuxin was employed at the rolled steel plant in Liaoyang city.  Because of operating losses sustained over several years, in October 2001 the general meeting of employees' representatives of the Liaoyang city Ferroalloy Factory, following consultations, decided to file for bankruptcy and proceedings were officially instituted.  From 11 to 21 March 2002, more than 500 employees and retirees of the Liaoyang city Ferroalloy Factory applied to the city government for an increase in their relocation subsidies and economic compensation rates, and demanded that the corrupt managers and other staff at the enterprise should be punished.  The Liaoyang city government gave extremely careful attention to their demands and promptly set up a board of inquiry to conduct a thorough and detailed investigation into the issues raised by the employees, and adopted the following measures to resolve the issue:

        (a)      Punishment, in accordance with the law, of the corrupt officials.  The judicial authorities investigated the unlawful and criminal activities conducted by the corrupt officials

and took the following action:  one person has been convicted; one person is being prosecuted; one person has been taken into criminal detention; three people are out on bail awaiting trial; and cases have been opened against a further seven people;

(b)    All possible means are being deployed to raise funds to maintain the basic living conditions of the factory employees;

(c)    Assistance is being mobilized to redeploy the staff laid off to other jobs.  Thanks to efforts by the local government, the situation was quickly calmed.

11.    Yao Fuxin is not in fact an employee of the Liaoyang city Ferroalloy Factory.  In the course of the events alluded to above, however, Mr. Yao colluded with employees of the Liaoyang city Ferroalloy Factory, taking advantage of their discontent to plan, instigate and carry out a number of destructive activities.  Mr. Yao and his accomplices burst into the local government building, throwing the offices into turmoil, smashing public vehicles, blocking traffic and disrupting public order.  The unlawful activities conducted by Mr. Yao and his accomplices seriously disrupted production activities in the city, as well as the inhabitants' daily lives and work routine, endangered public safety and property and provoked the strong disapproval of the general public.  As Mr. Yao's conduct was in breach of relevant provisions of the Chinese regulations on the organization of assemblies and marches, on 27 March the public security authorities, acting in accordance with the provisions of article 296 of the Chinese Criminal Code, took him into criminal detention on suspicion of the crime of organizing an unlawful assembly, march or demonstration.  Since Mr. Yao has been taken into detention, all his rights and interests have been fully protected, his state of health remains good and he has not been subjected to any form of torture.

12.    As is evident from the circumstances described above, Mr. Yao was arrested because his activities breached the country's criminal law.  Faced with criminal activities of this kind, no country governed by the rule of law will stand idly by and do nothing.  The measures taken by the judicial authorities against Mr. Yao are entirely consistent with the law and do not in any way constitute arbitrary detention.

13.    Commenting on the reply of the Government, the source pointed out that the actions taken by Yao Fuxin and his companions had been, throughout the events referred to in the communication, peaceful, and the Government's reference to Mr Yao's and others' wrongdoing and various violent acts is devoid of any factual basis.  The source adds that on 20 March, three days after Yao Fuxin was arrested, a representative of the Ferroalloy workers presenting a petition at the municipal government offices ran into the building during a sudden rainstorm.  That was the only time that anyone "burst into a local government building".  The source goes on to state that according to Yao Fuxin's wife, far from inciting violence or disrupting public transport, Mr. Yao and the other labour leaders on several occasions dissuaded workers from blocking railway lines.

14.    The source asserts that the arrest and detention of Yao Fuxin result from his merely exercising his right to freedom of assembly and association.  The constant practice of the Working Group on Arbitrary Detention has been to regard detention carried out just to punish the

E/CN.4/2004/3/Add.1
page 6

exercise of rights protected by international instruments as arbitrary.  In fact, the relevant international instruments protect only the *peaceful* exercise of freedom of assembly and association.

15.     In assessing whether the detention of Yao Fuxin is arbitrary, it is decisive to establish whether Mr. Yao exercised on the occasion in question his right to freedom of peaceful assembly, or, on the contrary, was engaged in violent acts.  The presentation of the events by the source and the Government coincide in that the bankruptcy of the plant and its ensuing difficulty in paying wages to its employees caused tension in the locality; the versions of the source and the Government are completely contradictory, however, as to the peaceful or violent nature of Mr. Yao's acts.

16.     It is the position of the Working Group that the Government did not support with convincing arguments its view that Yao Fuxin's acts were violent.  The turmoil, and the violent role that Yao Fuxin allegedly played in it could - and in the Working Group's view, should - have been recorded in various ways.  But the Government failed to support its allegation with convincing documents - such as copies of official records, witness statements in the criminal proceedings conducted against Yao Fuxin, or court decisions pronounced against him.  Therefore, the Working Group concludes that Yao Fuxin's exercise of his right to assembly and association cannot be regarded prima facie as not peaceful.

17.     In the light of the foregoing, the Working Group renders the following opinion:

>      The deprivation of liberty of Yao Fuxin is arbitrary, being in contravention of article 19 of the Universal Declaration of Human Rights and article 21 of the International Covenant on Civil and Political Rights, to which China is a signatory, and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

18.     The Working Group requests the Government to remedy the situation in order to bring it into conformity with the norms and principles incorporated in the Universal Declaration of Human Rights and to consider ratifying, as soon as possible, the International Covenant on Civil and Political Rights.

Adopted on 28 November 2002

**OPINION No. 16/2002 (UNITED ARAB EMIRATES)**

<u>Communication</u> addressed to the Government on 16 August 2002.

<u>Concerning</u>:  George Atkinson, a British citizen, businessman and landscape engineer.

**The State has not ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requisite information.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.      According to the source, George Atkinson, a British citizen, born on 16 May 1951, a businessman and landscape engineer, was arrested on 1 March 1997 in Dubai shortly before he was due to return to the United Kingdom.  Only on 5 April 1998, was he charged with having paid unlawful commissions to a certain Stephen Trutch, who at the time was working as an engineer for Sheikh Mohammed.  Mr. Atkinson, who had been involved in the building of three golf courses and other landscaping activities between 1982 and 1993, denied the charges.

6.      On several occasions, judges ordered his release on bail, but their orders were not implemented.  Instead, his detention was extended on several occasions, although it should not have been extended more than three times, in accordance with the relevant legal provisions that would have been applicable to his case.

7.      On 17 September 1998, the Working Group on Arbitrary Detention issued opinion No. 17/1998 (United Arab Emirates).  At that time, the Working Group considered that the deprivation of liberty of Mr. Atkinson was arbitrary, as it was in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and principles 36 to 39 of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, and fell into category III of the categories applicable to cases submitted to the Working Group (see E/CN.4/1999/63/Add.1).

8.      Despite the opinion issued by the Working Group, Mr. Atkinson was finally sentenced in February 1999 to a term of imprisonment of six years and to pay compensation of Dh 7,820,144.  On 28 February 2000, he completed half of his sentence and one year later, on 28 February 2001, two thirds of his sentence (i.e. four years of effective imprisonment).  On 28 February 2002, he had spent five years in custody, or three quarters of his sentence, plus an additional period of six months.  According to the source, the relevant laws and customs in Dubai provide for the discretionary release of a prisoner at any time after he/she has served half of the sentence, and for mandatory release after he or she has served three quarters of the sentence provided that he or she has demonstrated good behaviour while in custody and was not determined to be a danger to

E/CN.4/2004/3/Add.1
page 8

the national security or to the public.  The source further alleges that the prison records conclusively prove that prison authorities concurred that Mr. Atkinson had fulfilled these criteria.

9.      However, Mr. Atkinson was requested to pay an "outstanding compensation order" of Dh 99,822 - a substantial amount - by the same court which had sentenced him.  Officials repeatedly assured him that if he paid this amount he would be released.  On 19 March 2002, he paid the exact sum of Dh 99, 822 to the court and was provided with a receipt.  On the same day, the prison authorities wrote to the Attorney-General confirming that Mr. Atkinson had completed his sentence, had paid "all outstanding financial penalties" and requested his release and the return of his passport, so that he could be deported.  On 15 June 2002, Mr. Atkinson's records at the Attorney-General's Office (Ref. 1462-97) showed that his case had been concluded and his file closed.  However, he was not released.

10.      The source further reports that Mr. Atkinson has never been a threat to the public order and his alleged crimes did not involve violence, nor were they serious crimes such as drug trafficking.  Other prisoners convicted of crimes such as murder, rape, robbery and very serious financial crimes and given harsher sentences than his (including the death penalty and life imprisonment) have been released early as a result of the above-mentioned provisions of Dubai's domestic law.

11.      In its reply dated 13 November 2002, the Government stated that following his conviction by the Dubai Criminal Court on 13 December 1998, Mr. Atkinson was sentenced to six years' imprisonment and ordered to pay Dh 7,820,144, consisting of a fine of Dh 7,720,322 (about £1.3 million) and compensation of Dh 99,822 (about £16,000).  Emirates law provides for the release of a prisoner after he has served three quarters of his sentence provided the prisoner is of reformed character.

12.      As of the date on which Mr. Atkinson had completed serving three quarters of his prison sentence (31 August 2001), he had not paid any of the amount ordered by the court despite his substantial assets, which was considered to be an obviously obstructive decision.  Accordingly, no determination was made to reduce his sentence.  However, in his letter of 12 November 2000 to the Amir of Dubai seeking clemency, Mr. Atkinson stated that he had assets available to him, totalling some Dh 7,695,600.  Mr. Atkinson's lawyer was told that his client would have to provide an up-to-date, detailed and truthful list of all his assets and those of his immediate family, as well as those he had transferred to others since his arrest in March 1997.

13.      Mr. Atkinson did not provide that information, but on 19 March 2002 he paid Dh 99,822 towards the amount adjudged.  The law states that if an amount paid by a convicted person is insufficient to cover the total amounts ordered, the payment shall be applied first towards payment of the fine and then towards payment of the compensation.

14.      In case of non-payment of monies ordered by the court, the law provides for additional days (up to a maximum of six months) to be added to the sentence.  Owing to the size of the amount ordered by the court, the additional period in Mr. Atkinson's case would be the full six months.  In the view of the Government, the additional period starts on 1 March 2003 at the end of the full six-years term of imprisonment and will end on 31 August 2003.

E/CN.4/2004/3/Add.1
page 9

15.     The Government added that the matter would be given consideration if Mr. Atkinson would, as requested, provide a truthful statement of his assets.  Alternatively, he can pay the outstanding amount of the fine and the compensation ordered by the court.

16.     In its response to the Government's reply, the source reiterated the allegations which, according to the source, made the detention of Mr. Atkinson arbitrary.

17.     It appears from the above that the communication raises the question of the interpretation of a domestic regulation concerning procedures for the execution of a custodial sentence and, in particular, on the right to early release.  The source invokes the violation of domestic legislation to support the claim that the continued detention of Mr. Atkinson after 28 February 2002 is arbitrary.

18.     The Working Group recalls that, in accordance with its methods of work and mandate, it may be called upon to examine domestic legislation in order to ensure that the law of the country has been applied and, if so, to verify whether this law is in conformity with international standards.  In the case in point, in which it is a question not of the implementation but of the interpretation of a piece of domestic legislation dealing with early release, the Working Group considers that the file as it stands does not contain the information it would need to reach a decision.  The Working Group nevertheless wishes to point out that if a convicted prisoner who meets the requirements for conditional or early release is deprived of the opportunity to claim his or her rights or is wrongly kept in detention, his or her continued detention can be considered as tantamount to arbitrary detention.

19.     In the light of the above, the Working Group renders the following opinion:

        With regard to the detention of George Atkinson from the date of his arrest to that of his sentencing on 13 December 1999, the Working Group stresses that it was of an arbitrary nature, in accordance with the Working Group's opinion No. 17/1998, adopted on 17 September 1998 (see E/CN.4/1999/63/Add.1).  In that opinion, the Working Group also requested the Government to remedy the situation, in accordance with the standards and principles set forth in the Universal Declaration of Human Rights.

        In this respect, the Working Group recalls that the Commission on Human Rights, in its resolution 1997/50, requested Governments to take account of the Working Group's views and, where necessary, to take appropriate steps to remedy the situation of persons arbitrarily deprived of their liberty and to inform the Working Group of the steps they took.  The Working Group regrets that the Government did not take account of the recommendation that it should remedy the situation.

        With regard to the present period of detention, dating from the sentence handed down on 13 December 1999, the Working Group considers that it does not have sufficient information to give an opinion on whether the continued detention is of an arbitrary nature, which would involve interpreting a domestic regulation on the granting of early release.

Adopted on 29 November 2002

E/CN.4/2004/3/Add.1
page 10

**OPINION No. 17/2002 (SYRIAN ARAB REPUBLIC)**

<u>Communication</u> addressed to the Government on 17 June 2002.

<u>Concerning</u>:  Joseph Amine Houeiss, and Ayoub Chalaweet.

**The State has not ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requisite information.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.      According to the source, the case concerns two Lebanese nationals who were arrested in Lebanon and transferred to the Syrian Arab Republic, where they are now detained.

6.      Joseph Amine Houeiss, born in 1960, living in Bolonia, Mont-Liban, Lebanon, was reportedly arrested on 2 June 1992 on the Dhour Choueir road in Bolonia, by members of the Syrian army after an accident in which his car, collided with a Syrian military vehicle. Two Syrian soldiers died as a result and a third was injured.

7.      Mr. Houeiss was reportedly transferred to Syria, where he was accused of voluntary homicide.  During his trial in 1994 before a military tribunal in Syria, he testified that he was having an epileptic fit when the car accident occurred.  The court apparently did not take his testimony into account and sentenced him to 20 years of forced labour in Syria.

8.      In 1998, the medical doctor who was treating him in prison confirmed that Mr. Houeiss was in fact suffering from epilepsy.  Recent reports indicate that his health has been deteriorating.  According to the source, the Lebanese authorities have never requested the repatriation of their citizens in detention in Syria.

9.      The source considers the detention of Mr. Houeiss to be arbitrary because he was arrested in Lebanon by the Syrian army and then transferred, tried and sentenced in Syria for events that occurred in Lebanon and without any form of extradition procedure.

10.     Georges Ayoub Chalaweet, born in 1962, and, living in Ashrafieh, Beirut, was reportedly arrested on 30 March 1994 at the Ministry of Health in Beirut where he had gone with his father. He was then taken for interrogation to some unknown location and his father never saw him again.  Only six months later did his father learn that Mr. Chalaweet was detained in Syria.

E/CN.4/2004/3/Add.1
page 11

11.     According to the source, Mr. Chalaweet was first detained at the Palestine Section Prison in Damascus and then transferred to the Mazzé Prison in Damascus, where he had been receiving visits from his family.  Four years ago, Mr. Chalaweet was transferred to Saydnaya Prison and has not been allowed visits since.

12.     The source considers the detention of Mr. Chalaweet to be arbitrary because he was arrested in Lebanon and then transferred and detained in Syria without any charges having been laid against him nor any trial, and without any form of extradition procedure.

13.     In its reply, the Government of the Syrian Arab Republic states that the two individuals indicated by the source in the communication were arrested in 1992 following a car accident in which their vehicle collided with a Syrian military vehicle, killing two soldiers and seriously injuring a third.  They were sentenced by the court to 20 years' imprisonment for deliberately causing the accident.  The Government adds that in 1998 the two above-mentioned individuals claimed that the person driving the vehicle at the time of the accident, Mr. Joseph Houeiss, had suffered a shock that induced a nervous fit.  The relevant authorities are currently looking into this claim and the Working Group will be notified of the results promptly once they are available.

14.     In its reply, the source continues to challenge the legality of the detention of Joseph Amine Houeiss in Syria, since the events for which he is blamed took place in Lebanon, adding that he suffered an epileptic fit which led to the accident and that his medical condition was officially recognized by the doctor who treated him for several years at the central prison in Damascus (medical certificate dated 5 August 1998 attached).  The source says that Georges Ayoub Chalaweet was arrested in Lebanon in 1994, not in 1992 as claimed by the Government, and that it did not know he was linked to the Houeiss case, as his name had not come up at the trial.  The source challenges his detention in Syria for the reasons mentioned above and adds that it is also protesting the failure to respect Mr. Houeiss' right to a public trial and the fact that he has been allowed no family visits since 1998.

15.     In the light of the foregoing and of the documents provided by the source, the Working Group believes that each case should be dealt with separately.

16.     With regard to the case of Joseph Amine Houeiss, the Working Group, in order to express an opinion on whether the detention is arbitrary, must first determine whether the case is covered by one of the three categories of arbitrary detention defined in its methods of work and, consequently, whether it comes within the scope of the Working Group's mandate.  With regard to category I, it is clear that Mr. Houeiss' deprivation of liberty has a legal basis, namely, a judgement.  With regard to category II, there is no doubt that the deprivation of liberty is not the result of the legitimate exercise of the human rights referred to.  This leaves category III.  In the case in point, the source does not claim that Mr. Houeiss' right to a fair trial was violated, but challenges the legality of his detention on the ground that he was arrested by the Syrian army in Lebanon and taken to, tried and sentenced in Syria for events that took place in Lebanon.

17.     On this point, the Working Group does not believe that the unauthorized transfer of the person from one country to another for trial in a court that may not have territorial jurisdiction is sufficient in this case to classify the detention as arbitrary.  In order for the Working Group to

find the detention arbitrary, it must establish that the court's total or partial failure to respect international standards on the right to a fair trial was of such gravity as to confer on the deprivation of liberty an arbitrary character.

18.     With regard to the claim that the court that tried Joseph Amine Houeiss did not take account of the fact that the accident had been caused by his having had an epileptic fit, it should be pointed out that although the Working Group, as it has repeatedly stated, has always refrained from evaluating the evidence on which a court's decision to deprive a person of liberty is based, the situation in this case is different, since Mr. Houeiss was taken to Syria, tried by a military court and sentenced to 20 years' imprisonment because it was believed that he had deliberately caused the collision with a Syrian military vehicle that led to the death of two soldiers and seriously injured a third.  Therefore, if his medical condition is confirmed, and it turns out that, as he has always maintained, the cause of the accident was an epileptic fit, his case should be reconsidered.

19.     The source has provided a medical certificate signed by the doctor of the central prison in Damascus confirming that Joseph Amine Houeiss has epilepsy, and the Government has informed the Working Group that the relevant authorities are currently looking into this claim and that the Working Group will be notified of the results promptly once they are available.  In the light of this, the Working Group decides to keep the case of Joseph Amine Houeiss under consideration while awaiting further information, in accordance with paragraph 17 (c) of its methods of work.

20.     With regard to the case of Georges Ayoub Chalaweet, the Working Group notes the discrepancies between the source's allegations and the Government's reply.  The source states that he was arrested at the Lebanese Ministry of Health on 30 March 1994, questioned at a secret location and then taken to Syria, where he is currently being detained without trial and without having been informed of any charge against him (at least that was the case until 1998, since when his family has not been permitted to visit him).  In its reply, the Government maintains that he was arrested in 1992 with Joseph Amine Houeiss, tried in the same case and sentenced to 20 years' imprisonment.  While the Government has submitted no documents to back up its argument, the source has provided a copy of the sentence passed on Mr. Houeiss.  The Working Group notes that this sentence, which was handed down on 7 February 1994 by the First Military Court of Damascus, refers only to Joseph Amine Houeiss and makes no mention of Mr. Chalaweet or anyone else who might have been involved with Mr. Houeiss in this case.  If Mr. Chalaweet was arrested with Mr. Houeiss in 1992 for his involvement in the same case, why was he not tried with him?

21.     The Working Group therefore concludes that Georges Ayoub Chalaweet has been deprived of liberty since 30 March 1994 without having been informed of any charge against him, without a court ruling on the legality of his detention and with no contact whatsoever with his family since 1998, which constitutes a series of violations of such gravity as to confer on the deprivation of liberty an arbitrary character.  Such deprivation of liberty is in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and of principles 10 to 12 of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.

E/CN.4/2004/3/Add.1
page 13

22.     In the light of the foregoing, the Working Group renders the following opinion:

        With regard to Joseph Amine Houeiss, the Working Group decides to keep the case under consideration while awaiting further, more recent information, in accordance with paragraph 17 (c) of its methods of work.

        With regard to Georges Ayoub Chalaweet, the Working Group believes that the deprivation of liberty is arbitrary, being in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and principles 10 to 12 of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, and falls within category III of the categories applicable to the consideration of cases submitted to the Working Group.

23.     The Working Group, having rendered this opinion, requests the Government to take the necessary steps to remedy the situation, in accordance with the standards and principles set forth in the Universal Declaration of Human Rights, and to take appropriate steps with a view to ratifying the International Covenant on Civil and Political Rights.

Adopted on 29 November 2002

## OPINION No. 18/2002 (CENTRAL AFRICAN REPUBLIC)

<u>Communication</u> addressed to the Government on 19 August 2002.

<u>Concerning</u>:  Lieutenant Colonel Bertrand Mamour.

**The State is not a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group regrets the failure of the Government to reply within the 90-day deadline.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group would have welcomed the cooperation of the Government.  In the absence of any information from the Government, the Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, especially since the facts and allegations contained in the communication have not been challenged by the Government.

5.      Lieutenant Colonel Bertrand Mamour, born in 1946 at Ouadja, the National Coordinator of the Central African Republic Technical Disarmament Committee, and a networks and telecommunications engineer, was arrested on 16 May 2002 for having committed a disciplinary offence in that he left military installations on 11 and 12 May 2002 without authorization.  The authorities placed him under close arrest in the buildings of the gendarmerie command at Bangui.  He was to have received authorization to leave on 16 June 2002, but he remains in detention.  The Working Group has been informed that his family is obliged to provide him with food and care on a daily basis, as his health has been affected by being kept in detention.  Information received indicates that Lieutenant Colonel Mamour played no part in the two mutinies in the Central African Republic in 1996, or in the attempt made on 28 May 2001, led by General Kolingba, to overthrow the Government.  He has always been considered a good and loyal officer.

6.      The source adds that his detention may have been motivated by his differences with General Xavier Sylvestre Yagongo, Defence Minister responsible for the restructuring of the armed forces, who reportedly told the Prime Minister that Lieutenant Colonel Mamour was now part of a group of officers whose conduct was unsatisfactory and that the high command must reprimand him.  He is said to have accused Lieutenant Colonel Mamour of having made false comments about him and of having misappropriated the salary of a colleague.  Lieutenant Colonel Mamour's continued detention was thus the result of a conflict with General Yagongo.

7.      The Working Group reiterates that individuals are protected by international law against any deprivation of liberty, whether ordered in the context of criminal or any other legal proceedings.  In this case, and without comment as to the arbitrary nature or otherwise of the 30-day disciplinary detention, detention of military personnel for up to 30 days for disciplinary reasons being provided for by law in the Central African Republic, the

Working Group notes that the continued detention of Lieutenant Colonel Mamour beyond that period has no legal basis whatsoever.  The Working Group thus considers that from 15 June 2002 to date the detention of Lieutenant Colonel Mamour is arbitrary and falls within category I of the categories applicable under its working methods.

8.      In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Lieutenant Colonel Bertrand Mamour from 15 June 2002 on is arbitrary and falls within category I of the categories applicable to the consideration of cases submitted to the Working Group.

9.      The Working Group, having rendered this opinion, requests the Government to take the necessary steps to remedy the situation, in order to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights, and to take appropriate steps to become a State party to the International Covenant on Civil and Political Rights.

Adopted on 29 November 2002

**OPINION No. 19/2002 (PERU)**

Communication addressed to the Government on 21 August 2002.

Concerning:  Rolando Quispe Berrocal.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for its reply but regrets that it was sent after the 90-day deadline provided for in the Working Group's methods of work.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      According to information transmitted by the source, on 8 July 2002 Private Rolando Quispe Berrocal, a regular soldier performing his military service as a recruit at the Domingo Ayarza barracks (formerly "Los Cabitos"), Ayacucho, was on guard at the barracks storehouse, which was under his charge, when he was attacked by three soldiers wearing ski masks. He recognized the voices of two of his assailants.  The assailants stuffed a rag into his mouth impregnated with a substance that made him fall asleep and then lose consciousness.

5.      On the following morning, when he failed to turn up for drill and breakfast, he was awakened by a superior who, as a punishment for his absence, made him do 20 press-ups. The recruit could do no more than 10, and had to be taken to the barracks infirmary, whence his transfer was ordered to the regional hospital at Huamanga, Ayacucho.  At the hospital a specialist found, inserted in his rectum, a container of talcum powder, to which a light bulb, approximately five centimetres in diameter, had been attached.  The object measured 18 centimetres overall.

6.      The source affirms that while Private Quispe Berrocal was hospitalized he was placed under military custody, which hindered or prevented contact with his family members, lawyers, members of human rights organizations and journalists.  Thus isolated, he was interrogated by military personnel and compelled to sign and to record his fingerprints on blank sheets and on written sheets which he was not allowed to read beforehand.  It is also reported that a military attorney, to whom, strangely, the guards allowed access to the detainee, sought to impose himself as defence counsel, which the recruit refused.

7.      Rolando Quispe Berrocal filed a criminal complaint for torture and injury before the ordinary court.  In response, an inquiry was opened under military jurisdiction for filing false complaints.  It was claimed that Private Quispe Berrocal was in fact a homosexual who had infiltrated the army, and that he himself had introduced the object found in his body.

8.      It is alleged that subsequently Rolando Quispe Berrocal and his family members have suffered from various acts of harassment and coercion, including death threats.  Military personnel have reportedly sought to persuade him to withdraw and retract his complaint and modify his version of events.  Reportedly he has even received death threats.

9.      On 15 July 2002 local media reported as true a false rumour that Private Quispe Berrocal had died.  It was claimed that military officers had offered money to his father "to go to Lima to enjoy himself" in exchange for convincing his son to change his version of events and withdraw his complaint.  When he refused the offer, military personnel tried to remove him from the hospital by force.  A priest, named Zegarra, an army chaplain, and an army lieutenant colonel, named Bernales, rebuked Quispe Berrocal and his family members for making "complaints damaging to the army" that "might cause fathers to leave the army".

10.     On 17 July 2002 a prosecutor denied two military officers access to the hospital room occupied by Private Quispe Berrocal.  The private was undergoing psychological evaluation to provide expert judicial testimony.  The officers, who represented themselves as lawyers from the Military Legal Service, withdrew, insulting and threatening Private Quispe Berrocal in the presence of the prosecutor, and shouting praises such as "kill the dog and have done with the rabies".  In the circumstances the prosecutor had no choice but to suspend the judicial proceedings.

11.     The judicial authorities, on an application for habeas corpus lodged in favour of Private Quispe Berrocal, ordered suspension of his military service.  Notwithstanding that, on 2 August 2002 the Ayacucho standing military court found that Private Quispe Berrocal was guilty of falsehood and that he had inflicted wounds on himself; the court sentenced him to 30 days' imprisonment and a fine of 1,500 soles (approximately 420 United States dollars).  Meanwhile, those responsible for the acts of torture and bodily harm suffered by Rolando Quispe Berrocal are free and benefiting from impunity.

12.     The source adds that in addition to the detention and sentencing of the victim, who was accused of inflicting wounds on himself, no protective measures have been taken to guarantee the life or physical and psychological integrity and safety of Rolando Quispe Berrocal or of his family members, notwithstanding the death threats made by members of the army regardless of the presence of a prosecutor and even while judicial proceedings were being conducted.  Lastly, it is alleged that despite the provisions of Act No. 26999, no judicial proceedings have been initiated before the ordinary courts in respect of the torture suffered by the individual in question.

13.     In its reply, the Government of Peru states that this person was convicted by the Supreme Council of Military Justice for the offence of falsehood in that it was held that he himself had caused the injuries.  The military prosecutor had sought a sentence of six months' military imprisonment and payment of 2,000 soles in civil damages.  Falsehood is a crime under article 301.4 of the Code of Military Justice.

14.     The Government also states that notwithstanding the sentencing of Rolando Quispe Berrocal, the ordinary court has been carrying out the necessary investigations to determine whether any criminal responsibility exists on the part of the three persons named by him as possible authors of an offence against humanity, in the form of torture, and against the system of justice, in the form of material complicity.

E/CN.4/2004/3/Add.1
page 18

15.     The Working Group, on the basis of the information available to it, which has not been challenged by the Government, finds that Private Quispe Berrocal had to be taken to hospital and admitted as a result of being subjected to torture and ill-treatment, events which he reported to the ordinary court while in military custody and while the trial begun by the military legal authorities against him for falsehood was under way.

16.     It is noted that during the trial Rolando Quispe Berrocal was subjected to serious impediments in exercising his right to defence, and that he was prevented from communicating, among others, with counsel of his choice, and from having adequate means for the preparation of his defence, in that he was threatened, coerced, and forced to sign blank documents and documents that he was not able to read.  He was also prevented from exercising his rights as a complainant in a case of aggravated torture.

17.     The Working Group has also noted that, notwithstanding express provisions of the law, he was prevented from enjoying access to the benefits of the ordinary system of justice.

18.     In the light of these considerations, the Working Group considers that the detention of Private Quispe Berrocal is a serious contravention of international standards relating to an impartial trial of such gravity that it confers on his deprivation of liberty an arbitrary character.

19.     In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Rolando Quispe Berrocal is arbitrary, being in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and of articles 9 and 14 of the International Covenant on Civil and Political Rights, to which the Republic of Peru is party, and falls within category III of the categories applicable to the consideration of cases submitted to the Working Group.

20.     The Working Group, having rendered this opinion, requests the Government to take the necessary steps to comply fully with its obligations as a State party to the International Covenant on Civil and Political Rights and to study the possibility of amending its military legislation so as to bring it into conformity with the Universal Declaration of Human Rights and the other relevant international norms accepted by the State.

Adopted on 2 December 2002

**OPINION No. 20/2002 (TUNISIA)**

Communication addressed to the Government on 16 July 2002.

Concerning:  Hamma Hamami, Abdeljabar Madouri and Sammir Taamallah.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      The Working Group notes with satisfaction that the Government has informed it that the above persons are no longer deprived of liberty.  The information has been communicated to the source, which has confirmed it.

5.      The Government has stated that Mr. Hamma Hamami was sentenced by the Court of Appeal of Tunis to three years and two months' imprisonment, and that the court also sentenced Mr. Abdeljabar Madouri and Mr. Samir Taamallah to one year and nine months' imprisonment respectively.  The Government has also indicated that on 4 September 2002 Hamma Hamami and Samir Taamallah were conditionally released on humanitarian grounds after serving seven months and that, on 5 November 2002, Abedljabar Madouri was also freed after having served nine months in prison.  The source maintains that the deprivation of liberty was arbitrary and contests the release for humanitarian reasons.

6.      The Working Group, without prejudging the arbitrary nature of the detention, decides to file the case of Mr. Hamma Hamami, Mr. Abdeljabar Madouri and Mr. Samir Taamallah, in accordance with paragraph 17 (a) of its methods of work.

Adopted on 3 December 2002

E/CN.4/2004/3/Add.1
page 20

**OPINION No. 21/2002 (UNITED STATES OF AMERICA)**

Communication addressed to the Government on 1 May 2002.

Concerning:  Ayub Ali Khan and Azmath Jaweed.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having submitted information concerning the case.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government, but regrets that it did not provide the Group with all the information it sought and did not facilitate its task by investigating the specific points of the case that were cited in a letter dated 1 May 2002 from the Working Group's Chairman-Rapporteur.  The Working Group transmitted on 22 November 2002 the reply provided by the Government to the source.  To date, the latter has not provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the information submitted to the Working Group by the source, Ayub Ali Khan (alias Syed Gul Mohammed Shah), born in 1967, of Indian nationality and Azmath Jaweed, also of Indian nationality, were residing in New Jersey and looking for employment before their arrest on 13 September 2001 at the Amtrak Railroad Station in San Antonio, Texas, by agents of the Federal Bureau of Investigation in relation to the events that took place on 11 September 2001 in the United States.

6.      It was reported that the two persons are detained without any charges or accusations levelled against them at the Metropolitan Detention Center in Brooklyn, New York, in solitary confinement.  It was also alleged that they are detained on mere presumption and baseless suspicion relating to the 11 September 2001 attacks and that all the required investigations have been completed.  Ayub Ali Khan and Azmath Jaweed were not found to have been involved in the said events at any point.

7.      The source further reports that Ayub Ali Khan and Azmath Jaweed are the only sources of income for their families in India.  The elderly mother of Ayub Ali Khan is suffering from high blood pressure and diabetes and could not have any contact with her son.  It was also reported that the family contacted the Secretary of State and the Secretary of Defence to discover whether they were the subject of any judicial proceedings and requested an entry visa to the United States, but did not receive any response.

8.      In its reply, which did not provide any specific information about the cases at issue, the Government addresses the general concerns identified in the communication and stresses that all detentions by federal, state and local authorities must be consistent with United States substantive and procedural protections.

9.      The Government also noted that in order for any individual to be deprived of his or her liberty through placement into federal, state or local custody, such detention may only occur on the basis of an authorized warrant and subsequent order justifying his or her continued detention. Moreover, in general, detainees, whether detained on criminal or immigration-related charges, are entitled to an administrative or judicial hearing to determine the lawfulness of such detention. There are some exceptions to this rule in the immigration context that the Government claims are not pertinent to the present case.

10.     At such hearings, individuals have the right to contest the charges that are brought against them and to seek release from custody. In criminal proceedings, individuals will be notified of their right to be represented by court-appointed counsel if they cannot afford their own lawyer. In immigration proceedings, individuals will be notified that they have the privilege of being represented by counsel at no expense to the Government and are provided with a list of pro bono counsel. Furthermore, in both criminal and immigration proceedings, all detainees are notified of the charges that have been lodged and given the opportunity to seek release on bond, continuances to prepare their cases, the opportunity to examine and confront evidence against them and the right to appeal their cases.

11.     For the foregoing reasons, the Government considers that the communication should not be considered by the Working Group because it fails to establish that Mr. Khan and Mr. Jaweed have been subjected to arbitrary detention.

12.     In the light of the foregoing, the Working Group would have appreciated more cooperation from the Government, which has had over seven months, rather than the 90 days provided for under paragraph 15 of the methods of work of the Working Group, to clarify the situation of the above-named persons. In that regard, the Working Group recalls that the Government requested additional time, which it was granted in accordance with paragraph 16 of the methods of work, but notes that, in its response, it merely described the current procedure under United States law without providing any information on the individuals in question. Indeed, the Government began its reply with the words "Without providing any specific information about the cases reported …"

13.     The Working Group would have appreciated more information on the specific cases under consideration in order to enable it to ensure that the guarantees established in the relevant international standards and in United States legislation were being observed, particularly as the source claims that the families of the above-mentioned persons have attempted to contact the detainees, without success, and have approached the United States authorities to find out the reasons for their continued detention, again without success.

14.     In that regard, the documents at the Working Group's disposal show that the mother of Ayub Ali Khan received a letter dated 14 November 2001 from a lawyer appointed by the United States Government to assist her son. The letter confirmed that Mr. Khan had been arrested as a material witness in the FBI investigations into the 11 September 2001 attacks and that he was being held in detention with another person, without charge or indictment.

E/CN.4/2004/3/Add.1
page 22

15.     In the light of the foregoing, the Working Group considers that Mr. Khan and Mr. Jaweed have been detained for more than 14 months, apparently in solitary confinement, without having been officially informed of any charge, without being able to communicate with their families and without a court being asked to rule on the lawfulness of their detention.

16.     This series of violations is of such gravity as to confer an arbitrary character on their detention, which constitutes a violation of articles 9 and 10 of the Universal Declaration of Human Rights and articles 9 and 14 of the International Covenant on Civil and Political Rights, to which the United States is a party and which guarantee, respectively, the right to a review of the lawfulness of detention by a competent judicial authority and the right to a fair trial, as well as principles 10 to 12 of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.

17.     In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Mr. Ayub Ali Khan and Mr. Azmath Jaweed is arbitrary, being in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and articles 9 and 14 of the International Covenant on Civil and Political Rights, to which the United States is a party, and principles 10 to 12 of the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, and falls within category III of the principles applicable to the consideration of cases submitted to the Working Group.

18.     Consequently, the Working Group requests the Government to take the necessary steps to remedy the situation and to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

Adopted on 3 December 2002

## OPINION No. 1/2003 (VIET NAM)

Communication addressed to the Government on 21 January 2003.

Concerning:  Le Chi Quang.

**The State is a party to the International Covenant on Civil and Political Rights**

1.    (Same text as paragraph 1 of opinion No. 15/2002.)

2.    The Working Group conveys its appreciation to the Government for having submitted information concerning the case.

3.    (Same text as paragraph 3 of opinion No. 15/2002.)

4.    In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.    According to the information submitted to the Working Group by the source, Mr. Le Chi Quang, a Vietnamese lawyer and computer scientist born on 30 June 1970, was arrested by the security forces on 21 February 2002 at around 9.50 a.m. while he was sending an e-mail in an Internet café in Hanoi.  Security forces reportedly took Le Chi Quang to his home where they confiscated documents and his computer.

6.    According to the information received, Le Chi Quang was arrested for having published on the Internet several articles calling for political reforms and criticizing government policy, notably with regard to land and sea border agreements between China and Viet Nam. On 24 September 2002, after eight months in detention, Le Chi Quang was reportedly charged with calling for pluralism and a multiparty system, disseminating documents that opposed the Vietnamese Communist Party and taking part in activities of the Association against Corruption.

7.    On 8 November 2002, following a three-hour trial, the Hanoi People's Court reportedly sentenced Le Chi Quang to four years' imprisonment followed by three years of house arrest on the charge of disseminating propaganda against the State, in accordance with section 88 of the Penal Code.  According to the information received, Le Chi Quang's parents were the only observers allowed into the courtroom.  Foreign lawyers were reportedly not permitted to represent Le Chi Quang, thus depriving him of the right to legal assistance of his own choosing.

8.    According to the information received from the source, Le Chi Quang is currently incarcerated in B14 prison.  He and another prisoner reportedly share a $6m^2$ cell, where they sleep on the dirt floor and relieve themselves in a bucket.

9.    The source further reports that Le Chi Quang suffers from serious kidney dysfunction and stomach inflammation.  Fears have been expressed that he may not be allowed to receive appropriate medical treatment in prison.

E/CN.4/2004/3/Add.1
page 24

10.     In its reply dated 17 March 2003, the Government stated that in Viet Nam, there has never been a case where a person was detained, prosecuted and tried for writing press articles calling for reforms or criticizing the Government's policy.  The Constitution, laws and regulations of Viet Nam clearly stipulate that all Vietnamese citizens are entitled to freedom of information, of expression, of the press, of association, of assembly and demonstration.

11.     It is further submitted that Mr. Le Chi Quang has committed acts in violation of article 88 of the Civil Code of the Socialist Republic of Viet Nam.  All activities concerning his arrest, investigation, prosecution and trial have been carried out in full conformity with the laws and regulations of Viet Nam, i.e. the Code on Criminal Procedures promulgated on 30 June 2000 and subsequently amended on 9 June 2002.  Mr. Le's family had been fully informed in a timely manner of his arrest, prosecution and trial.  The trial was publicly conducted in conformity with legal procedures and the accused was ensured of his right to legal defence and self-defence, and it should be noted that he eventually chose not to appeal.  The Government further reports that under the Code on the Organization of the People's Court and the Code on Criminal Procedure, the People's Court is the sole authority that decides whether to allow foreign lawyers to be present in court for the defence of the accused.

12.     The Government stated that Le Chi Quang is currently serving his sentence and receiving treatment equal to that of other inmates who committed similar offences and if he were sick, he would receive adequate care and appropriate medical treatment without any discrimination.

13.     In response, the source points out that in its reply the Government makes no mention of what crimes Le Chi Quang is actually accused and added that according to the Procuracy's indictment, Le Chi Quang is charged with "collecting, writing, distributing documents containing distortions of the political situation inside the country, [and] distortions of the internal situation of the Party and Government".

14.     It is apparent from the foregoing that the communication contains a number of allegations, some of which do not fall within the mandate of the Working Group.  Among these allegations, those relating to conditions of detention will be transmitted to the Special Rapporteur against torture.  The opinion of the Working Group is limited to the legal aspects of detention, the only ones falling within its mandate.

15.     As to the legal aspects of the detention in question, according to the source, Le Chi Quang was arrested, tried and sentenced to four years' imprisonment, to be followed by three years of house arrest, for having published on the Internet articles criticizing the Government's policy and the frontier treaties concluded between the Governments of Viet Nam and China, called for reforms, and participated in the activities of an anti-corruption association. In its reply, the Government stated that Le Chi Quang had been arrested not for having expressed opinions, but for having perpetrated acts in breach of article 88 of the Vietnamese Penal Code. The Government does not specify the nature of the charge provided for under article 88 and does not say what acts gave rise to that charge.

16.     The Working Group accordingly assumes that the acts of which Le Chi Quang was accused were indeed those described in the communication, namely, writing, expressing and disseminating opinions.  The Working Group concludes that those actions merely represent the

peaceful exercise of the right to freedom of expression and opinion, which is guaranteed under article 19 of the Universal Declaration of Human Rights and article 19 of the International Covenant on Civil and Political Rights, to which Viet Nam is a party.

17.     On the question of the violation of national legislation mentioned by the Government, the Working Group recalls that, in conformity with its mandate, it must ensure that national law is consistent with the relevant international provisions set forth in the Universal Declaration of Human Rights or in the relevant international legal instruments to which the State concerned has acceded.  Consequently, even if the detention is in conformity with national legislation, the Working Group must ensure that it is also consistent with the relevant provisions of international law.  However, in the case in question, and given that the Government does not appear to have charged Le Chi Quang with acts other than those mentioned in the communication from the source, the national law which gave rise to his indictment cannot be regarded as consistent with the relevant provisions of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

18.     In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Le Chi Quang is arbitrary, being in contravention of article 19 of the Universal Declaration of Human Rights and article 19 of the International Covenant on Civil and Political Rights, and falls within category II of the categories applicable to the consideration of the cases submitted to the Working Group.

19.     Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation and bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and to study the possibility of amending its legislation in order to bring it into line with the Universal Declaration and the other relevant international standards accepted by that State.

Adopted on 6 May 2003

**OPINION No. 2/2003 (CHINA)**

<u>Communication</u> addressed to the Government on 27 January 2003.

<u>Concerning</u>:  Yang Jianli.

**The State has signed but not yet ratified the International Covenant on Civil and Political Rights**

1.    (Same text as paragraph 1 of opinion No. 15/2002.)

2.    The Working Group conveys its appreciation to the Government for having forwarded the requested information in good time.

3.    (Same text as paragraph 3 of opinion No. 15/2002.)

4.    In the light of the allegations made, the Working Group welcomes the cooperation of the Government. The Working Group regrets, however, that the Government has not addressed all the important issues raised by the source.  The Working Group transmitted the reply provided by the Government to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.    According to the information submitted to the Group, Yang Jianli, 39 years old, a citizen of China and a legal resident of the United States of America, was arrested on 26 April 2002 at the Kunming airport by members of the Kunming City Public Security Bureau, reportedly for entering China with false or incomplete identity documents.  The forces that carried out the arrest did not show any arrest warrant or other decision by a public authority.

6.    It was reported that Mr. Yang was brought to a hotel near the airport.  He was able to speak by telephone with his wife, Fu Xiang, who was at their home in Brookline, Massachusetts, on the evening of 26 April 2002.  Mr. Yang informed his wife that he had been detained and was being held in a hotel room guarded by police officers.  He spoke to his wife again the next morning.  Since then, he has been detained incommunicado.  It is believed that he was being held at the Beijing Public Security Bureau Detention House.

7.    According to the information received, Yang Jianli was born in China and remains a Chinese citizen.  In June 1989 he was reportedly forced to flee China owing to his involvement in the events known commonly as the "Tiananmen Square uprising of 1989".  In 1992 he received a resident alien card ("green card") from the Government of the United States.  In 1991, he obtained a PhD in mathematics from the University of California at Berkeley.  Ten years later, he received a PhD in political economy and government from Harvard University's Kennedy School of Government.  Yang Jianli is the founder and president of the organization called Foundation for China in the 21st Century and has been active in the movement to promote democratization since the 1980s.

8.      Authorities have allegedly refused to allow members of his family to visit Mr. Yang or to arrange to provide him with legal counsel.  No formal charges have been presented against him. It was further reported that authorities informally acknowledged Mr. Yang's detention after approximately two months when, on 21 June 2002, police authorities in the city of Linyi in Shandong Province informed Mr. Yang's brother, Yang Jianjun, by telephone that Mr. Yang had been formally arrested on 2 June 2002.

9.      It was alleged that the failure of the authorities to provide a copy of the formal detention notice to Mr. Yang's family deprives them under Chinese law of the authority to retain legal counsel on Mr. Yang's behalf.  It was argued that lawyers cannot take up the case without a copy of the detention notice.

10.     It was said that article 64 of the Criminal Procedure Law of the People's Republic of China states that within 24 hours after a person has been detained, the detaining authority must notify the family or employer of the detainee of the reasons for the detention and the place of custody, except in such circumstances where such notification would hinder the investigation. The authorities failed to do this.

11.     It was further stated that article 69 of the Criminal Procedure Law permits detention without a warrant in certain emergency circumstances.  There is ordinarily a time limit of 37 days for such detention.  It was alleged that the authorities failed to release him within the 37-day time limit.

12.     The source pointed out that although the law requires that the detainee be permitted rapid access to legal counsel, Mr. Yang has not been provided with access to a lawyer.  The authorities have failed to provide Mr. Yang's family with a copy of the detention notice so that his family might arrange legal representation for him, effectively denying Mr. Yang access to legal counsel.

13.     The source further reports that Mr. Yang's wife travelled to China from the United States in an attempt to learn where her husband was being held and the reasons for his detention and to arrange for legal representation.  She arrived in China on 23 May 2002 and was forcibly expelled from China on the same day.

14.     In its observations on the allegations of the source, the Government stated that Yang Jianli was apprehended by the Chinese public security authorities in April 2002 for unlawfully entering the country on another person's passport.  On 21 June 2002, after obtaining due approval from the Beijing city procurator's office, he was taken into custody by the Beijing public security authorities on suspicion that his activities were in breach of the provisions of article 322 of the Chinese Criminal Code, relating to the offence of illegally crossing the State frontier, and, in accordance with due legal process, his relatives living in the country were notified.  In the course of the investigation into Mr. Yang's case, the judicial authorities ascertained that he might also have committed other offences and his case is currently still under investigation, in accordance with the law.

15.     China is a signatory or party to the Universal Declaration of Human Rights, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and other international human rights instruments and unfailingly respects their universal

provisions on human rights.  At the same time, China has set in place comprehensive domestic legislation to safeguard human rights.  Under the Chinese Constitution, citizens enjoy freedom of speech, of the press, of assembly and of association and other extensive freedoms, and the Constitution stipulates that no citizen may be arrested except with the approval or by decision of the procurator's office and that arrests may only be made by the public security authorities.  As for the prevention of torture, the Chinese Criminal Code and the Chinese Code of Criminal Procedure, together with the Police Act and other statutes, all contain strict provisions to that effect.  Yang Jianli was taken into custody solely because he was suspected of having breached Chinese law.  In the case in question, the Chinese public security authorities have acted in strict accordance with due legal process; the lawful rights of the person concerned have been fully protected.  The action taken against Yang Jianli does not constitute an instance of arbitrary detention.

16.     In its reply to the observations of the Government, the source contended that the Government failed to refute or deny most of the allegations concerning the detention of Yang Jianli.

17.     Bearing in mind that the criminal procedure in the case of Yang Jianli is ongoing, the Working Group points out that its task is not to evaluate facts and evidence in a particular case; this would be tantamount to replacing the national courts, which falls outside the Working Group's remit.  The Working Group is called upon to assess whether the international norms and standards have been observed in the criminal procedure during which Yang Jianli has been and is being deprived of his liberty.

18.     In this respect, the Working Group found that the Government did not contest or refute the allegation that the authorities only informally acknowledged his detention after approximately two months, when they told Mr. Yang's brother by telephone that he had been arrested on 2 June 2002, whereas in fact he was apprehended at the airport on 26 April and has been in detention since.  The Government did not challenge the contention of the source that the silence of the authorities was contrary to article 64 of the Criminal Procedure Law of the People's Republic of China, which provides that within 24 hours after a person has been detained, the detaining authority must notify the family for the reason of the detention and the place of custody, except in such circumstances where the notification would hinder the investigation. Such circumstances were not invoked by the Government.  It was not contested either that the failure of the authorities to provide a copy of a formal detention notice to Mr. Yang's family deprived them from the authority to retain legal counsel on Mr. Yang's behalf.  Furthermore, the Government did not deny that despite article 69 of the Criminal Procedure Act, which permits detention for 37 days without a warrant in certain emergency circumstances, Mr. Yang was not released after the 37-day time limit had expired.

19.     Therefore, the Working Group cannot but conclude that to keep Yang Jianli in detention for more than two months without an arrest warrant and without enabling his family to hire a lawyer to defend him constitute an infringement of the basic international norms relating to the right to a fair trial.

E/CN.4/2004/3/Add.1
page 29

20.     In the light of the foregoing the Working Group expresses the following opinion:

       The failure to observe Yang Jianli's right to a fair trial is of such gravity as to give his deprivation of liberty an arbitrary character.  Therefore, his arrest and detention are arbitrary, being in contravention of article 9 of the Universal Declaration of Human Rights and of article 9 of the International Covenant on Civil and Political Rights, and falls within category III of the categories applicable to the consideration of cases submitted to the Working Group.

21.     Consequent upon this opinion, the Working Group requests the Government to take the necessary steps to remedy the situation of Yang Jianli in order to bring it into conformity with the provisions and principles of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, and encourages it to ratify the International Covenant on Civil and Political Rights.

Adopted on 7 May 2003

E/CN.4/2004/3/Add.1
page 30

OPINION No. 3/2003 (EGYPT)

Communication addressed to the Government on 4 February 2003.

Concerning:  Mu'awwadh Mohammad Youssef Gawda.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group deplores the fact that the Government has not provided information concerning the communication of the source.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group deplores the lack of cooperation of the Government despite reiterated invitations by the Working Group to present its observation on the allegation of the source.  The Working Group believes, nevertheless, that it is in a position to render an opinion on the facts and circumstances of the case.

5.      According to the information submitted to the Group, Mu'awwadh Mohammad Youssef Gawda (or Moawed Mohamed Yousif Goda), who is a lawyer, was arrested on 18 May 1991 in his home in Cairo.  He was allegedly beaten up in his house by State Security Intelligence (SSI) officers before being transferred to the SSI headquarters in Lazoghly Square, Cairo, where he was reportedly tortured during interrogation.  He was then transferred to Istiqbal Tora Prison. A petition was submitted on his behalf by his wife to the Supreme State Security Court, which ordered his release on 17 June 1991.  The Ministry of the Interior objected on 29 June 1991.

6.      On 7 July 1991, a second court decided that he should be released.  However, it is alleged that he was taken secretly by SSI officers to the SSI headquarters where he was again tortured. On 13 July 1991, he was issued with a new detention order and taken back to Istiqbal Tora Prison.  His wife again challenged the detention.  On 28 August 1991, a court ordered his release, but the Ministry of the Interior objected on 9 September 1991.  A second court overruled this objection on 15 September 1991 and issued a new order for the detainee's release.  The detainee was then taken to the SSI headquarters for a few days, and later returned to prison with a new detention order.

7.      As of March 1996, Mr. Gawda had been issued with more than 21 release orders.  He remained in Istiqbal Tora Prison for nearly two years, during which he was taken back to Lazoghly Square on many occasions and was allegedly tortured each time.  He was then transferred to Al-Marg Prison, then Abu Za'bal Penitentiary, Abu Za'bal Industrial Prison, the High Security Prison, Al-Wadi Al-Gadid Prison and, in the summer of 1995, to Istiqbal Tora Prison, where he was held without charge or trial.

8.      It has been alleged that in January 2001, Mu'awwadh Mohammad Youssef Gawda, who was then in the Al-Fayoum Prison, had not been seen by a medical doctor.  He reportedly was suffering from kidney problems, high blood pressure, a burst eardrum in his right ear and haemorrhoids.

9.      According to the source, he has been subjected to administrative detention, without charges, trial or conviction, for more than 11 years and in spite of the fact that there have been more than 21 release orders issued by competent courts.  His continued detention is said to be contrary not only to the Universal Declaration of Human Rights and international norms, but also to Egyptian law which states that nobody can be held in administrative detention for more than six months.

10.     In the absence of any comments on the part of the Government, the Working Group cannot but conclude that to hold Mu'awwadh Mohammad Youssef Gawda in detention for almost 12 years without charge, trial or conviction and despite more than 21 release orders issued by competent courts amounts to a most serious violation by the Government of Egypt of Mr. Gawda's right to liberty.

11.     According to the foregoing, the Working Group renders the following opinion:

        The deprivation of liberty of Mu'awwadh Mohammad Youssef Gawda is arbitrary, being in contravention of article 9 of the Universal Declaration of Human Rights and article 9 of the International Covenant on Civil and Political Rights, and falls within category I of the categories applicable to the consideration of cases submitted to the Working Group.

12.     Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation and to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.  In the view of the Working Group, the appropriate remedy under the circumstances would be his immediate release and compensation for the arbitrary detention.

Adopted on 7 May 2003

### OPINION No. 4/2003 (ALGERIA)

Communication addressed to the Government on 26 September 2002.

Concerning:  Karim Abrica, Chabane Adryen, Kader Belaidi, Kamel Bendou, Khadir Benouareth, Karim Benseddouk, Azeddine Ikane, Hocine Kaci, Farès Ouedjdi, Hacène Saleh, Abderrahmane Si-Yahia, Kamel Soufi, Kamel Talbi, Chabane Tiza.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requisite information concerning the above cases, within the 90-day deadline from the transmission of the letter by the Working Group.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      The Working Group notes that the Government has informed it of the conditional release of the persons concerned, by order of the investigating judge on 5 August 2002.

5.      Having examined all the information submitted to it and without prejudging the arbitrary nature of the detention, the Working Group decides, to file the cases, pursuant to paragraph 17 (a) of its methods of work.

Adopted on 7 May 2003

**OPINION No. 5/2003 (UNITED STATES OF AMERICA)**

<u>Communication</u> addressed to the Government on 8 January 2003.

<u>Concerning</u>:  Mourad Benchellali, Khaled Ben Mustafa, Nizar Sassi and Hamed Abderrahaman Ahmed.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group regrets that the Government has not provided it with the requested information.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group deplores the lack of cooperation of the Government despite reiterated invitations by the Working Group to present its observations on the allegations of the source.  The Working Group believes, nevertheless, that it is in a position to render an opinion on the facts and circumstances of the cases.

5.      The communication submitted to the Working Group concerns Mourad Benchellali, Khaled Ben Mustafa, Nizar Sassi and Hamed Abderrahaman Ahmed:

        (a)      Mourad Benchellali, born in 1981, a French national, resident in Vénissieux, France, was reportedly arrested during the fall of 2001 during the United States-led intervention against the Taliban regime and al-Qua'idah organization in Afghanistan.  He was allegedly arrested by Pakistani police or military forces in Pakistan, handed over to United States forces and then transferred to the United States military base in Guantánamo Bay;

        (b)      Khaled Ben Mustafa, born in 1972, a French national, resident in Malakoff, France, was reportedly captured during the fall of 2001 during the United States-led intervention in Afghanistan.  He was reportedly arrested by United States forces at the border between Afghanistan and Pakistan, and transferred in January 2002 to Guantánamo Bay;

        (c)      Nizar Sassi, born in 1979, a French national, resident in Vénissieux, France, was also allegedly captured by United States forces in Afghanistan during the fall of 2001 and transferred to Guantánamo Bay;

        (d)      Hamed Aderrahaman Ahmed, born in 1974, a Spanish national, resident in Ceuta, Spain, was also reportedly arrested during the United States-led intervention in Afghanistan.  He was allegedly arrested in Pakistan, handed over to United States forces and then transferred to Guantánamo Bay.

E/CN.4/2004/3/Add.1
page 34

6.      According to the information received, no charges have been brought against these four persons.  They have not been able to consult or obtain legal assistance from an attorney, and have not been arraigned by a judge in a competent court.  Furthermore, they have not been allowed any communication, except visits by representatives of the International Committee of the Red Cross (ICRC) and letters to their families via ICRC.

7.      The source of the communication believes that international human rights law should be applied given that the Government has denied prisoner-of-war status and the application of the Geneva Conventions of 12 August 1949 to the persons captured during the intervention in Afghanistan and detained at Guantánamo Bay.

8.      In conformity with paragraph 15 of its revised methods of work, the Chairman-Rapporteur of the Working Group, in a letter dated 8 January 2003, brought the communication to the attention of the Permanent Representative of the United States of America to the United Nations Office at Geneva.  He invited the Government to provide any information it deemed appropriate both concerning the facts alleged by the source and the applicable legislation governing the arrest and detention of the above-mentioned persons.  The deadline for reply, in conformity with the revised methods of work, was 90 days from the date of transmittal of the letter.  Since neither was a reply provided nor a request for an extension of the 90-day time limit, on 10 April 2003 a note verbale was sent to the Permanent Mission of the United States advising it that at the thirty-sixth session of the Working Group, which would take place from 5 to 9 May 2003 in Geneva, the Working Group would consider the cases of detention of the above-mentioned persons.  No reply to the note verbale was received.

9.      Since its establishment in 1991, the constant endeavour of the Working Group has been to dispose of cases within its mandate through a dialogue conducted with both authors of individual communications and Governments.  Such dialogue is particularly important in combating international terrorism in view of the sensitive issue of how to strike a fair balance between the interests of the international community and the restriction of individual rights and freedoms which, sometimes inevitably, accompanies the fight against terrorism (see, in this regard, the Working Group's legal opinion regarding the deprivation of liberty of persons detained in Guantánamo Bay, in E/CN.4/2003/8, paras. 61-64).  It is for this reason that the Working Group deplores the Government's failure to make any observation whatsoever on the communication.

10.      Despite the lack of information from the Government, the Working Group is duty bound to render an opinion.  It must rely on the provision of paragraph 16 of its revised methods of work which stipulates that "… even if no reply has been received upon expiry of the time limit set, the Working Group may render an opinion on the basis of all the information it has obtained".

11.      On the basis of the information provided by the source, which appears to the Working Group to be factually accurate and consistent, the Working Group cannot but conclude that there is no legal basis for the deprivation of liberty of Mourad Benchellali, Khaled Ben Mustafa, Nizar Sassi and Hamed Abderrahaman Ahmed.

E/CN.4/2004/3/Add.1
page 35

12.     In accordance with the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Mourad Benchellali, Khaled Ben Mustafa, Nizar Sassi and Hamed Abderrahaman Ahmed is arbitrary, being in contravention of article 9 of the Universal Declaration of Human Rights and article 9 of the International Covenant on Civil and Political Rights, to which the United States of America is a party, and falls within category I of the categories applicable to the consideration of cases submitted to the Working Group.

13.     Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation and to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

Adopted on 8 May 2003

**OPINION No. 6/2003 (TUNISIA)**

Communication addressed to the Government on 12 December 2002.

Concerning:  Abdallah Zouari.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which made comments thereon.  The Working Group is now in a position to render an opinion on the facts and circumstances of the case in the context of the allegations made and the response of the Government thereto and the comments by the source.  The case was referred to the Working Group on arbitrary detention as indicated below.

5.      According to the source, Mr. Abdallah Zouari, born on 15 June 1956, of Tunisian nationality, a journalist, and a manager at the banned weekly *Al Fajr*, an organ of the Islamic movement Ennahada, arrested on 19 August 2002 in Tunis by the State security police and sentenced to eight months' imprisonment, is currently detained in an unknown location.

6.      Mr. Zouari was arrested by plain-clothes State security police officers while in the office of his attorney, Samir Ben Amor, in Tunis, for violation of an administrative surveillance order pursuant to a judgement delivered on 27 August 1992 by the Tunis military court.

7.      Mr. Zouari had just been released (on 6 June 2002) after having served an 11-year prison sentence for "membership of an illegal organization" (he had been arrested on 12 April 1991).  Mr. Zouari had also been sentenced to five years' administrative surveillance on the completion of his term of imprisonment, and had been notified, on 15 July 2002, of an order banishing him to Zarzis (Hassi Jerbi region in the Sahara), whereas his home and family are in Tunis.

8.      Mr. Zouari had undertaken annulment proceedings for abuse of authority before the administrative court against the banishment order issued by the Ministry of the Interior.  He was arrested and then sentenced to eight months' imprisonment by the Zarzis regional court for violating the banishment order, although the administrative court had not yet rendered a decision.

9.      Mr. Zouari was incarcerated in Harboub prison (governorate of Médenine) then in Houareb (prison governorate of Kairouan).  On 29 October 2002 Mr. Zouari's support group went to Houareb prison with a member of his family, but the prison authorities told them that he had moved to another prison, without indicating where.

10.     The source considers the arrest and detention of Mr. Zouari arbitrary since they were the result of political opinions that he expressed as both a journalist for a banned weekly and as a member of an illegal opposition political movement, although he had served 11 years in prison for the same reasons.

11.     The source also asserts that the administrative surveillance measure that allowed the Minister of the Interior to banish a convicted person who had served his sentence from his town of residence is an arbitrary measure aimed at prolonging detention illegally, and that the arrest and current detention of Mr. Zouari are a consequence of this administrative surveillance measure.

12.     Further, the source states that the change of prison without specifying the location is a violation of the regulation indicating that the family of the detainee must be informed of any change in the place of detention.

13.     In its reply, the Government affirms that Mr. Zouari was involved in a criminal case relating to membership of a fundamentalist terrorist organization, Ennahada, an illegal movement which, the Government states, advocates fanaticism and religious and racial hatred, and perpetrates violence and terrorism.  This organization, having formulated a plan of subversion intended to change the form of government by violent means, mobilized its members, including Mr. Zouari, who is one of its main instigators.  Based on the accused's confessions and the results of the inquiry conducted, and having established his complicity in the preparation and execution of a terrorist plot, on 27 August 1992 the court sentenced him to 11 years' imprisonment and 5 years' administrative surveillance on the charges brought against him.

14.     The Government adds that Mr. Zouari was released on 6 June 2002 after having served his prison sentence.  The competent authority, on 15 July 2002 and pursuant to the judgement of 27 August 1992, issued an order establishing the place of residence of Mr. Zouari as the region of Kasusiba Hassi Jebri in Zarzis for the period of administrative surveillance.  The order was issued pursuant to article 23 of the Criminal Code, as an additional sentence of administrative surveillance, to be carried out once the convicted person had served his prison sentence, and conferred on the competent administrative authorities the right to determine the place of residence of the convicted person.  In response to the refusal of Mr. Zouari to conform to the order, the Zarzis cantonal court sentenced him to eight months' imprisonment.  The Government concludes that the detention of Mr. Zouari is in no way arbitrary, as he was sentenced pursuant to a judicial decision by a competent court following a fair trial, at which all the guarantees provided for by law were respected.

15.     The source reiterates the complaints made in its communication, specifies that the communication does not relate to the first conviction, even though detention was arbitrary pursuant to the first verdict as well as the second.  The source adds that the release of Mr. Zouari for "humanitarian reasons" does not alter the arbitrary nature of his detention.

16.     From the foregoing, it appears that Mr. Zouari was first arrested on 12 April 1991 and sentenced by the Tunis military court to 11 years' imprisonment and 5 years' administrative surveillance.  He served the prison sentence in full and was released on 6 June 2002.
On 15 July 2002 the Ministry of the Interior informed him of a banishment order issued pursuant to the administrative surveillance order.  On 19 August 1992 he was again arrested, for violation

E/CN.4/2004/3/Add.1
page 38

of the banishment order, and was sentenced on 22 August 2002 to 8 months' imprisonment.  It is this most recent arrest and current detention which are challenged by the source and which are submitted to the Working Group for its consideration.

17.     With reference to the date of arrest and sentencing, by 22 April 2003 at the latest, Mr. Zouari had served the full 8-month prison sentence and, in principle, was subject only to the order banishing him from his town of residence.  The source acknowledges that Mr. Zouari was released, but indicates that this release was ordered on humanitarian grounds.  Was this an early release?  The source does not specify.

18.     In the light of the foregoing, the Working Group renders the following opinion:

> Having examined all the information before it and without prejudging the arbitrary nature of the detention, the Working Group decides to file the case of Mr. Zouari, in accordance with paragraph 17 (a) of its methods of work.

Adopted on 9 May 2003

**OPINION No. 7/2003 (CHINA)**

Communication addressed to the Government on 28 August 2002.

Concerning:  Chen Gang, Zhang Wenfu, Zhong Bo, Liu Li, Wu Xiaohua, Gai Suzhi, Liu Junhua, Zhang Jiuhai, Zhu Xiaofei.

**The State has signed but not yet ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having forwarded the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the information transmitted by the source, Chen Gang, male, 28 years old, resident of Tianshui city, Gansu province, was arrested in April 2002 by members of the Lanzhou city police, who beat and ill-treated him.  He is detained in the Luergou Detention Centre, Tianshui city, Gansu province, and is reportedly in critical condition.  The source further reports that Chen Gang was detained in November 1999 for 15 days when he went to Beijing to ask the Government to stop its persecution of Falun Gong.  In January 2000, the Chief of the Politics and Law Committee of Tianshui city detained him for one month.  Later, he was sent to the Ping'antai Labour Camp in Lanzhou city for one year of forced labour.  While in detention in this camp, he was tortured severely.  According to the reports received, guards bounded his arms and legs, sealed his mouth and nose, shoved him under a board bed and then stomped on it.  In March 2001, he was released but the police did not allow him to go back to work and his salary was stopped by the work unit.  It was further said that the police often went to his residence to harass him, which caused him to leave his home to live on the streets.

6.      Zhang Wenfu, male, resident of Dalian city, Liaoning province, was reportedly arrested on 19 January 2002 and sent to Pulandian Detention Centre for 50 days.  It was alleged that on 8 March 2002, without any legal procedure, he was transferred to the No. 5 Division of Dalian Labour Camp where he was put under strict supervision for over 40 days.  He was not allowed to wash his face or brush his teeth, and was forced to do heavy labour for long periods each day.  On 18 April 2002, he was transferred to the No. 8 Division of Dalian Labour Camp.  On 28 April 2002, he started a hunger strike to protest the conditions of his detention.  In response, he was allegedly tortured by three team leaders, Li Xuezhong, Li Shaofu and Peng Dahua, and by an inmate, Chi Diandong.  His mouth and eyes were sealed with tape, his

E/CN.4/2004/3/Add.1
page 40

hands were handcuffed and his head was beaten with a rubber baton.  He was also beaten with a
wooden board.  Torturers used chopsticks to poke inside his mouth, causing it to bleed profusely.
Later, he was locked in a compartment, handcuffed and forced to lie on a wooden board for
a day.

7.      Zhong Bo, female, 42 years old, employee of the Anda Chemistry Factory, resident of
Anda city, Heilongjiang province, was reportedly arrested at her home on 31 May 2002 at 9 a.m.
by six policemen led by Liu Yingshan, an officer from the 610 Office, an agency reportedly
created specifically to persecute Falun Gong.  At the compound of the Politics and
Administration Department in Anda city, she was beaten with a wooden stick by six policemen
led by Wang Jun, the Vice-Director of the Anda City Police Station.  At the 610 Office she was
subjected to electric shocks on her back.  Her eyes bled and her face became black and swollen.
That evening, she jumped from a second-floor window.  The examination at Daqing City
Hospital in Heilongjiang province showed that two of her right ribs and her teeth were broken.
She lost all memory of what happened and cannot take care of herself.

8.      Liu Li, female, resident of Taonan city, Jilin province, blind in one eye, was reportedly
arrested at her home on 28 July 2002 together with 11 other Falun Gong practitioners and taken
to the Taonan City Police Bureau.  The Chief of the Department of Politics and Security,
Liu Jinwei, told her that she would be sent to the Heizuizi Labour Camp in Changchun city or to
re-education classes in Daan city.  He told her that she would not be released unless she
renounced Falun Gong.

9.      Wu Xiaohua, female, 47 years old, an associate professor of the Environmental Art
Department at Anhui Civil Construction Engineering College at Hefei city, Anhui province, was
reportedly placed under house arrest in October 2001, during the Asia Pacific Economic
Cooperation Summit held in Shanghai.  Later, she was sent to a labour camp for women.  She
was allegedly tortured at the camp in a variety of ways, including having her mouth stuffed with
rags and tissues soaked in urine and menstrual blood.  In mid-October 2001, on the tenth day of a
hunger strike she had initiated to protest against her detention, she was sent to the No. 4 People's
Hospital at Hefei city, Anhui province.  At the hospital she was stripped of her clothes and
shocked with electric needles and an electric baton all over her body.  She was threatened by a
medical doctor, Dr. Li, with electric shocks until she became unconscious.  She was also forcibly
given injections and force-fed drugs.  It was further reported that Professor Wu was first arrested
in December 1999 for appealing in Beijing to the Government to put an end to its persecution of
Falun Gong.  She was allegedly tortured at the Anhui Female Detention Centre in Anhui
province.  Later she was transferred to the No. 4 People's Hospital of Hefei city where she also
was tortured, including by being locked in a bathhouse full of mosquitoes for one night and
being forced to use a pigpen full of spider webs as a toilet.  At the end of April 2001, she was
again arrested.

10.      Gai Suzhi, female, 63 years old, a retired employee of the No. 2 Petrochemical Factory at
Fushun city, Liaoning province, was reportedly arrested in August 2001 and sent to the
Wujiabao Labour Camp at Fushun city, in spite of the fact that by law, the labour camp is not
allowed to detain anyone who is older than 60.  To protest her illegal detention, she has gone on
hunger strike several times at the camp.  She only weighs about 35 kg now and she has become

extremely sick.  It was alleged that she has been cursed, beaten and tortured very often at the camp.  It was further reported that Ms. Gai was first arrested in December 2000, when she went to Beijing to protest against the persecution of Falun Gong.  She was detained for more than two months.  Subsequently, she was arrested twice more.

11.     Liu Junhua, male, aged 36, employee of Sanjiang Food Company at Jiamusi city, Heilongjiang province, was reportedly arrested on 9 April 2002 at his home at Jiamusi city by members of the Nanwei Police Station for his belief in Falun Gong.  He is imprisoned in Xigemu Forced Labour Camp, Heilongjiang province.  His wife was forced to leave home to avoid further harassment and persecution from local police.  He had previously been detained and sentenced to two years of re-education through forced labour.  At the end of October 2001, he was re-arrested in Mishan city and released after he went on hunger strike for 44 days.

12.     Zhang Jiuhai, male, aged 35, from Liudian town, Pinggu district, Pinggu county, Beijing city, was reportedly arrested at his home on 6 August 2002 and sent to re-education classes in Pinggu county.  It was further reported that he was previously detained from August 2000 to February 2002 in Tuanhe Labour Camp, Beijing, where he was severely tortured, reportedly because he refused to renounce Falun Gong.  In April 2002, he was arrested again and administered shocks with electric batons at the Haidian District Police Bureau, Beijing.  The local police ransacked his home six times and detained his father twice.

13.     Zhu Xiaofei, male, former employee of Lushun 4810 Factory, resident of Lushunkou district, Dalian city, Liaoning province, was reportedly arrested on 26 November 2001 at his workplace by police.  He was sent directly to Dalian Forced Labour Camp, in Liaoning province, where the guards allegedly ordered other inmates to monitor him and physically torture him by shocking him with electric batons.  He was later transferred to Guanshan Forced Labour Camp in Changtu city, Liaoning province, where he is forced to do hard labour.  It was further reported that Mr. Zhu had been previously detained twice at the Lushunkou District Police Station, where police officer Ye Qiang tortured him, choking him with a rope and shocking him with electric batons.

14.     According to the source, the nine above-mentioned persons are being held in detention illegally solely because of their belief in Falun Gong.  Many of them have been sent for re-education through forced labour without trial because they refuse to renounce their belief.  The source adds that their activities were always peaceful.

15.     The Government provided the Working Group with the following information.

16.     Chen Gang, male, aged 25, resident of Tianshui city, Gansu province, was ordered by the Tianshui city labour rehabilitation committee in February 2000, to serve one year's re-education through labour for repeatedly disturbing the peace.  In September 2002, the Tianshui city labour rehabilitation committee ordered Mr. Chen to serve three years' labour re-education for once again having disturbed the peace.  While serving his term of labour re-education, Mr. Chen has not been subjected to any harassment or ill-treatment.

E/CN.4/2004/3/Add.1
page 42

17.     Zhang Wenfu, male, aged 40, resident of Dalian city, Liaoning province, was ordered by
the Dalian city labour rehabilitation committee to serve two years and six months' labour
re-education, to run from 20 January 2002 to 19 July 2004, for disturbing the peace.  While
serving his term of labour re-education, Zhang has never embarked on any hunger strikes.

18.     Zhong Bo, female, aged 42, resident of Anda city, Heilongjiang province, was taken into
criminal detention on 21 October 2002 for repeatedly disturbing the peace.  On 11 November,
she was granted medical parole.  She has never been subjected, as alleged, to any harsh beatings,
nor did she jump from a second-floor window and break two ribs.

19.     Liu Li, female, aged 46, resident of Taonan city, Jilin province.  On 3 February 2001,
Ms. Liu was ordered by the local labour rehabilitation committee to serve one year's labour
re-education for disturbing the peace, but, because she is blind in one eye, the order was
amended to allow her to serve the term of labour re-education outside the custodial facility.
While serving her term, Ms. Liu was once again ordered, in April 2002, to serve one year's
labour re-education for disturbing the peace, which again was to be served outside the custodial
facility.  Ms. Liu is currently leading a normal life at home.

20.     Wu Xiaohua, female, aged 48, formerly an associate professor at the Anhui Construction
Industry College, was ordered on 28 January 2000 by the labour rehabilitation authorities to
serve one year's labour re-education for causing a serious disturbance of the peace.  While
serving her term of labour re-education, the facility employees noticed that her mental state was
very distracted and observed that she displayed other abnormal symptoms, such as a tendency to
injure herself without cause or reason, to refuse food and other aberrations.  On 17 July 2000,
she was diagnosed by the Anhui psychiatric appraisal committee to be suffering from
schizophrenia (of the paranoid variety), and incapable of responding to labour re-education.  The
labour re-education facility promptly took steps for her to receive medical attention outside the
facility and she was thereupon discharged from her term of labour re-education.  After
undergoing treatment, Ms. Wu's state of health improved, but she once again conducted
activities which seriously disturbed the peace.  On 2 June 2001, the Hebei municipal labour
rehabilitation committee ordered her to be examined by the expert appraisal committee of the
provincial psychiatric hospital, with a view to identifying her psychiatric disorder.  The diagnosis
was that, during the period while her schizophrenia was in full remission, she was capable of
responding to labour re-education, whereupon she was ordered to serve two years' labour
re-education.  While Ms. Wu was undergoing her term of labour re-education, the responsible
authorities, acting on humanitarian grounds, frequently arranged prompt medical treatment for
her and she was not subjected, as alleged, to any cruel treatment or insults or made to endure any
electric shocks or physical beatings.

21.     Gai Suzhi, female, aged 62, resident of Fushun city, Liaoning province, was ordered in
October 2000 by the Fushun city labour rehabilitation committee to serve two years' labour
re-education, to run from 19 October 2000 to 18 October 2002, for disturbing the peace.  In view
of her age, her poor physical condition and her many ailments, the labour re-education facility,
following the relevant regulations, decided to allow her to serve her term of labour re-education
outside the custodial facility.  While serving her term, Ms. Gai once again caused a breach of the
peace and was ordered to serve a further three months' labour re-education.  Ms. Gai completed
her term of labour re-education on 8 January 2003.

22.     Liu Junhua, male, aged 36, resident of Jiamusi city, Heilongjiang province, was ordered by the Jiamusi city labour rehabilitation committee to serve two years' labour re-education, to run from 23 October 1999 to 22 October 2001, for disturbing the peace.  While serving his term of labour re-education, Mr. Liu caused breaches of the facility rules and regulations and, on 3 November 2000, he conspired with other inmates to escape.  On 28 September 2001 he was reapprehended by the public security authorities and returned to the facility to continue serving his term.  On 9 June 2002, the Jiamusi City People's Court, acting in accordance with the law, sentenced him to 10 years' fixed-term imprisonment for the offence of sabotaging implementation of State law.

23.     Zhang Jiuhai, male, aged 35, resident of Beijing, was ordered in July 2000 to serve one year's labour re-education for causing a disturbance of the peace.  On 1 April 2002, the Beijing city labour rehabilitation authorities ordered him to serve two years' labour re-education, for having once again disturbed the peace.  He is currently serving his term.

24.     Zhu Xiaofei, male, aged 26, resident of Dalian city, Liaoning province, was ordered on 1 October 2001 by the Dalian city labour rehabilitation committee to serve two years and six months' labour re-education, to run from 26 November 2001 to 25 May 2004, for causing a disturbance of the peace.  He is currently serving his term in Guanshan labour re-education facility in Liaoning province.

25.     In its observations, the Government states that China is a country governed by the rule of law.  Chinese law fully safeguards the lawful rights and interests of persons undergoing labour re-education.  Where persons undergoing labour re-education are concerned, the basic policy followed by the labour re-education facility is that they should be re-educated, guided by persuasion and thus reformed; that they should be accorded the same solicitude as parents accord their children, teachers accord their students and doctors accord their patients; that they should receive consideration, assistance and education; and that their lawful rights and interests should be protected in accordance with the law.  At the same time, in the actual practice of labour re-education, full use is made of such procedures as the remission of terms, the granting of parole for terms to be served outside the facility and early release from detention in the facility, so that those undergoing labour education are reformed to the maximum extent.  Once released from the labour re-education facility, students may return to their studies, employees and workers may resume employment and their rights to a normal life and job are fully upheld.

26.     In its reaction to the reply from the Government, the source states that the Government of China used "disruption of social order" as the pretext for detaining Zhong Bo, Liu Li, Wu Xiaohua, Gai Suzhi, Chen Gang, Zhang Wenfu, Liu Junhua, Zhang Jiuhai and Zhu Xiaofei. According to the source, the Government failed to name the specific offences with which they had been charged.  The source notes how strange it is that people of different ages (from 25 to 62), different professions (workers, professors, retirees) and from different locations suddenly develop the same tendency to "disrupt social order", many even repeatedly.  According to the source, Zhong Bo, Liu Li, Wu Xiaohua, Gai Suzhi, Chen Gang, Zhang Wenfu, Liu Junhua, Zhang Jiuhai and Zhu Xiaofei are all Falun Gong practitioners and were persecuted for exercising the freedom of belief guaranteed by China's Constitution.  They were repeatedly detained and tortured for refusing to renounce Falun Gong.

E/CN.4/2004/3/Add.1
page 44

27.     The Working Group notes that the Government of China has informed it that Zhong Bo, Liu Li and Gai Suzhi are no longer being detained.  When this information was transmitted to the source, it was not disputed.

28.     The Working Group further observes that the Government has not denied that Chen Gang, Zhang Wenfu, Wu Xiaohua, Liu Junhua, Zhang Jiuhai and Zhu Xiaofei are Falun Gong practitioners, or that they were detained in connection with the practice of this discipline.

29.     As there is no evidence that Falun Gong is a violent belief, as far as the cases under consideration are concerned, its free exercise should be protected by article 18 on freedom of belief and article 19 on freedom of opinion and expression of the Universal Declaration of Human Rights.

30.     Even though the sentence of re-education through labour is, as claimed by the Government, a more favourable measure offering better possibilities to the person concerned than a prison sentence imposed by a court judgement, it still constitutes, in the opinion of the Working Group, administrative deprivation of liberty that may be arbitrary in character, as found by the Group in its deliberation 04 of 1993 (see E/CN.4/1993/24, chap. II).

31.     In its report on its visit to China (E/CN.4/1998/44/Add.2, para. 95), the Working Group stated that the measure of re-education through labour should not be applied to any person exercising his or her fundamental freedoms as guaranteed by the Universal Declaration of Human Rights.  In the cases at hand, detention does constitute a coercive measure designed to undermine the freedom of those persons to adopt beliefs of their own choosing.

32.     The Working Group therefore deems that these persons were prosecuted and sentenced to the administrative measure of re-education through labour, and therefore deprived of their liberty, mainly for exercising fundamental rights which are set out in articles 18 and 19 of the Universal Declaration of Human Rights:  the right to freedom of conscience and religion (art. 18) and the right to freedom of opinion and expression (art. 19).

33.     In the light of the foregoing, the Working Group issues the following opinion:

        Since Zhong Bo, Liu Li and Gai Suzhi have been released in the meantime, the Working Group decides, pursuant to paragraph 17 (a) of its methods of work, to file their case, without taking position as to whether their detention was arbitrary.

        The detention of Chen Gang, Zhang Wenfu, Wu Xiaohua, Liu Junhua, Zhang Jiuhai and Zhu Xiaofei is arbitrary, being in contravention of articles 18 and 19 of the Universal Declaration of Human Rights, and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

34.     Consequently, the Working Group requests the Government to take the necessary steps to remedy the situation of these persons and to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights, and encourages it to ratify the International Covenant on Civil and Political Rights.

Adopted on 9 May 2003

**OPINION No. 8/2003 (ISLAMIC REPUBLIC OF IRAN)**

Communication addressed to the Government on 14 February 2002.

Concerning:  Syamak Pourzand.

**The State has ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2000.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information.

3.      (Same text as paragraph 3 of opinion No.15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which made comments on it.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the information submitted by the source, Syamak Pourzand, aged 72, is a journalist and manager of the *Majmue-ye Farhangi-ye Honari-ye Tehran* (Tehran Cultural Centre) and is married to Mehranguiz Kar, a lawyer.  Mr. Pourzand was arrested on 24 November 2001, at the residence of Mahin Pourzand (his sister), in Tehran, by four militiamen who presented no warrant or explanation.  On 7 December 2001, Ms. Pourzand was allegedly requested to take him a change of clothes.  Mr. Pourzand was at the time the communication was submitted and is at present detained on the orders of the Islamic Revolutionary Court of Tehran.

6.      On 12 or 13 January 2002, Ms. Pourzand was permitted to meet with her brother at the *Edare-ye Amaken*, or Bureau of Premises, also known as the Committee for the Propagation of Virtue and Prohibition of Vice, for a meeting that lasted 10 minutes.  Mr. Pourzand's wife, who is undergoing medical treatment in the United States, and his sister in Tehran have reportedly filed complaints with police and judicial authorities and have written to the Presidency of the Republic, to no avail.

7.      The Government provided the Working Group with the following information. Mr. Pourzand was arrested following a complaint submitted by Ms. Venus Farimer, who claimed that she had been the victim of abuse and sexual harassment by him, and charged with several offences:  infractions against morality and abuses according to articles 637 and 639 of the Penal Code; propaganda against the Islamic Republic of Iran (art. 500); spying against the State (arts. 501 and 505); and undermining State security (art. 512).  The arrest was ordered on 22 November 2001 by the General Court of Tehran.  On 24 November 2001, he was presented before the court.  On the same date, the court ordered a preliminary investigation and returned the file to the police.  Later, the court ordered the release of the accused on bail.  Not having been able to pay bail, Mr. Pourzand was kept in detention and sent to a prison under the authority of the Organization of Prisons.  On 27 May 2002, Mr. Pourzand was transferred to Evin prison in Tehran.  Once the investigations were finished, Mr. Pourzand's trial started and

E/CN.4/2004/3/Add.1
page 46

several hearings took place in the presence of the accused and his defence lawyer.  The court determined the accusations to be true and on 13 April 2002, issued verdict No. 10, finding Mr. Pourzand guilty of the above-mentioned offences sentencing him to 11 years' imprisonment (the sentence to take into account the time already spent in prison); payment of a fine of 1 million rials and 80 lashes.  Mr. Pourzand appealed, but on 21 May 2002, the Tehran Appeal Court confirmed the judgement.

8.      The Working Group deplores the fact that the Government has failed to provide it with the text of the penal legislation applicable in the case against Mr. Pourzand, despite having been requested to do so by the Chairman-Rapporteur in his letter of 14 February 2002.  Nor was the judgement of 13 April 2002 of the General Court of Teheran convicting Syamak Pourzand submitted.  The Working Group notes that the text of the criminal law provisions - which was not produced, and only referred to by the Government in very general terms - was the basis for the conviction of Mr. Pourzand.  The reference to "propaganda against the Islamic Republic of Iran" gives rise to serious doubts about the real nature of and the motivation for the charges brought against him.  It should be borne in mind that, according to information available to the Working Group, Mr. Pourzand, a journalist and manager of the Teheran Cultural Centre, has the reputation of being critical of the Government.

9.      Therefore, in the absence of any argument to the contrary submitted by the Government, the Working Group cannot but conclude that Mr. Pourzand was prosecuted, convicted and sentenced to a prison term because of his convictions and the expression of his opinions.

10.     In the light of the foregoing, the Working Group expresses the following opinion:

> The detention of Syamak Pourzand, being in contravention of article 19 of the Universal Declaration of Human Rights and of article 19 of the International Covenant on Civil and Political Rights, is arbitrary and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

11.     Consequent upon this opinion, the Working Group requests the Government of the Islamic Republic of Iran to take the necessary steps to remedy the situation of Syamak Pourzand in order to bring it into conformity with the provisions and principles incorporated in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, to which the Islamic Republic of Iran is a party.

Adopted on 9 May 2003

### OPINION No. 9/2003 (CUBA)

Communication addressed to the Government on 8 April 2003.

Concerning:  Nelson Aguiar Ramírez and 78 others.

**The State is not a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which formulated its comments and observations thereon.  The Working Group is now in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      The communication, a summary of which was sent to the Government, refers to the cases of:

        (a)     Nelson Aguiar Ramírez, a member of the Assembly for the Promotion of Civil Society, city of Havana, arrested at 6 a.m. on Thursday, 20 March 2003;

        (b)     Osvaldo Alfonso, president of the Liberal Democratic Party, a member of the rapporteur committee of All United, and of the Varela Project Citizens Committee, arrested on Tuesday, 18 March 2003.  On 7 April 2003 he was reportedly sentenced to 18 years' imprisonment;

        (c)     Pedro Pablo Álvarez Ramos, general secretary of the Unified Council of Cuban Workers (CUTC).  His home was entered and searched.  Books from the Emilio Máspero trade union library were seized.  Charges are reported to have been formulated under articles 9.1, 6.1 and 6.3 of Act No. 88 on the Protection of the National Independence and Economy of Cuba;

        (d)     Pedro Argüelles Morán, director of the Ciego de Ávila Cooperative of Independent Journalists press agency;

        (e)     Víctor Rolando Arroyo, a journalist in the Union of Independent Cuban Journalists and Writers (UPECI), and an activist in the Reform Forum in Pinar del Río.  Member of the rapporteur committee of All United;

        (f)     Mijail Bárzaga Lugo, a member of the 30 November Movement, arrested on Thursday, 20 March;

        (g)     Alfredo Domínguez Batista, a member of the Varela Project Citizens Committee in Puerto Padre;

(h)     Margarito Broche, a member of the Association for Peace, Democracy and Freedom, in Caibarién, Villa Clara, arrested on Tuesday, 18 March;

(i)     Marcelo Cano Rodríguez, an activist with the Cuban Human Rights and National Reconciliation Commission, Havana.  On 7 April 2003 he was reportedly sentenced to 18 years' imprisonment;

(j)     Carmelo Díaz Fernández, a member of CUTC;

(k)     Eduardo Díaz Fleites, a dissident in Pinar del Río, arrested on Tuesday, 18 March;

(l)     Antonio Díaz Sánchez, a member of the executive of the Christian Liberation Movement, city of Havana;

(m)     Alfredo Domínguez Batista, a member of the Christian Liberation Movement in Las Tunas, arrested on Wednesday, 19 March;

(n)     Mario Enríquez Mayo, a journalist in Camagüey, with the independent Félix Varela press agency, arrested on Wednesday, 19 March;

(o)     Oscar Espinosa Chepe, an independent journalist in the city of Havana, arrested on Wednesday, 19 March.  He was reportedly charged under articles 7 and 11 of Act No. 88, and on 7 April 2003 sentenced to 20 years' imprisonment;

(p)     Alfedo Felipe Fuentes, a member of the Varela Project Citizens Committee in Artemisa;

(q)     Efrén Fernández Fernández, a member of the national executive of the Christian Liberation Movement, arrested on Tuesday, 18 March;

(r)     Adolfo Fernández Saínz, an independent journalist and member of the Democratic Solidarity Party;

(s)     José Daniel Ferrer Castillo, a member of the national executive of the Christian Liberation Movement, Santiago de Cuba, arrested on Wednesday, 19 March.  He has reportedly been charged under articles 4.1 and 6.1 of Act No. 88;

(t)     Luis Enrique Ferrer García, Varela Project coordinator in Las Tunas, arrested on Wednesday, 19 March;

(u)     Orlando Fundora Álvarez, a member of the Pedro Luis Boitel Association, city of Havana, arrested on Tuesday, 18 March;

(v)     José Ramón Gabriel Castillo, a member of the Independent Institute for Culture and Democracy and an independent journalist in Holguín, arrested on Wednesday, 19 March;

(w)     Próspero Gaínza Agüero, a member of the National Civic Resistance Movement, Holguín, arrested on Wednesday, 19 March;

(x)      Miguel Galván Gutiérrez, a journalist with the independent press agency Havana Press in Güines, province of Havana;

(y)      Julio César Gálvez, an independent journalist in Havana;

(z)      Edel José García Díaz, an independent journalist with the Norte Central Press, who reportedly took part in the recent national workshop on ethics;

(aa)    José Luis García Paneque, director of the Libertad independent press agency in the province of Las Tunas, all of whose communication equipment and some medical equipment was reportedly confiscated;

(bb)    Ricardo González Alfonso, president of the Manuel Márquez Esterling Society of Journalists, and editor of *De Cuba* magazine in Havana;

(cc)    Diosdado González Marrero, a political activist in Matanzas;

(dd)    Léster González Pentón, an independent journalist in Villa Clara, arrested on Tuesday, 18 March;

(ee)    Alejandro González Raga, an independent journalist in Camagüey, member of the Christian Liberation Movement, arrested on Tuesday, 18 March;

(ff)     Jorge Luis González Tanquero, a member of the Carlos Manuel de Céspedes Independence Movement, in Amancio, Las Tunas, arrested on Wednesday, 19 March;

(gg)    Leonel Grave de Peralta, a member of the Varela Project Citizens Committee in Palma Soriano, reportedly charged under articles 4.1 and 6.1 of Act No. 88;

(hh)    Normando Hernández González, an independent journalist, member of the Camagüey College of Journalists in Vertientes, reportedly charged under article 91 of Act No. 62, embodying the Criminal Code;

(ii)     Iván Hernández Carrillo, a journalist with the Patria independent press agency, in Colón, Matanzas;

(jj)     Juan Carlos Herrera Acosta, an independent journalist in Guantánamo, arrested on Wednesday, 19 March;

(kk)    Regis Iglesias, a spokesman for the Christian Liberation Movement, city of Havana;

(ll)     José Ubaldo Izquierdo Hernández, an activist in the city of Havana;

(mm)  Reinaldo Labrado Peña, a dissident in Las Tunas, arrested on Wednesday, 19 March;

(nn)    Librado Linares García, president of the Cuban Reflection Movement, in Camajuaní, Villa Clara, arrested on Tuesday, 18 March;

E/CN.4/2004/3/Add.1
page 50

(oo)    Marcelo López, spokesman for the Cuban Human Rights and National Reconciliation Commission, who allegedly distributed press releases describing arrests to the foreign press, arrested on 24 March.  On 7 April 2003 he was reportedly sentenced to 10 years' imprisonment;

(pp)    Héctor Maceda Gutiérrez, an independent journalist in the city of Havana, arrested on Wednesday, 19 March.  On 7 April 2003, he was reportedly sentenced to 20 years' imprisonment;

(qq)    José Miguel Martínez Hernández, an activist in the province of Havana;

(rr)    Luis Milán Fernández, an activist in Santiago de Cuba;

(ss)    Rafael Millet Leyva, an activist on Isla de la Juventud;

(tt)    Roberto de Miranda Hernández, a journalist and president of the College of Independent Educators, city of Havana;

(uu)    Rafael Mollet Leyva, an activist on Isla de la Juventud;

(vv)    Nelson Molinet Espino, a member of the Assembly for the Promotion of Civil Society, arrested at 6 a.m. on Thursday, 20 March;

(ww)    Félix Navarro Rodríguez, a member of the Pedro Luis Boitel Party for Democracy, Mantanzas, member of the rapporteur committee of All United;

(xx)    Jorge Olivera Castillo, director of the independent Havana Press agency in the city of Havana;

(yy)    René Oñate, member of the project on plastic arts for interior spaces, Pinar del Río, arrested on Tuesday, 18 March.  Reportedly under house arrest;

(zz)    Héctor Palacio Ruiz, director of the Centre for Social Studies and member of the rapporteur committee of All United, arrested at 6 p.m. on Thursday, 20 March.  Charges have reportedly been brought under article 91 of Act No. 62, of the Criminal Code.  Reportedly sentenced on 7 April 2003 to 25 years' imprisonment.

(aaa)    Pablo Pacheco Ávila, an independent journalist, and member of the Ciego de Ávila Cooperative of Independent Journalists (CAPI);

(bbb)    Arturo Pérez de Alejo, an activist in the Independent Human Rights Organization, Escambray, Manicaragua, arrested on Tuesday, 18 March;

(ccc)    José Antonio Pérez Moré, a dissident in Pinar del Río, arrested on Tuesday, 18 March.  Reportedly under house arrest;

(ddd)    Omar Pernet Hernández, member of the Mario Manuel de la Peña National Human Rights Movement, Placetas, Villa Clara, arrested on Wednesday, 19 March;

(eee)   Horacio Julio Piña Borrego, member of the Varela Project Citizens Committee in Sandino, Pinar del Río, arrested on Wednesday, 19 March;

(fff)   Fabio Prieto Llorente, independent journalist on Isla de Pinos, arrested on Wednesday, 19 March;

(ggg)   Alfredo Pulido López, member of the Christian Liberation Movement in Camagüey, arrested on Tuesday, 18 March;

(hhh)   José Gabriel Ramos Castillo, an activist in Santiago de Cuba;

(iii)   Arnaldo Ramos Lausirique, a member of the Cuban Institute of Independent Economists;

(jjj)   Blas Giraldo Reyes Rodríguez, coordinator of the Christian Liberation Movement in Sancti Spiritu, arrested on Wednesday, 19 March;

(kkk)   Raúl Rivero Castañeda, director of CubaPress, representative of Cuba in the Inter-American Press Society, arrested at 6 p.m. on Thursday, 20 March.  He has reportedly been charged under Act No. 88, and sentenced on 7 April 2003 to 20 years' imprisonment;

(lll)   Alexis Rodríguez Fernández, coordinator of the Christian Liberation Movement in Palma Soriano, reportedly charged under articles 4.1 and 6.1 of Act No. 88;

(mmm) Omar Rodríguez Saludes, director of the independent New Press agency in Havana and member of the Christian Liberation Movement, arrested on Wednesday, 19 March;

(nnn)   Marta Beatriz Roque Cabello, director of the Cuban Institute of Independent Economists and coordinator of the Assembly for the Promotion of Civil Society, arrested at 6 a.m. on Thursday, 20 March.  She has reportedly been charged under article 6.3 of Act No. 88;

(ooo)   Claro Sánchez Altariva, a dissident in Santiago de Cuba, arrested on Wednesday, 19 March;

(ppp)   Miguel Sigler Amaya, Alternative Choices activist from Pedro Betancourt, Matanzas, arrested on Tuesday, 18 March;

(qqq)   Guido Sigler Amaya, Alternative Choices activist from Pedro Betancourt, Matanzas, arrested on Tuesday, 18 March;

(rrr)   Ariel Sigler Amaya, Alternative Choices activist from Pedro Betancourt, Matanzas.  The home of the three brothers was reportedly raided in a joint police operation involving members of the rapid reaction brigades.  The mother of the Sigler brothers, Dr. Gloria Amaya, reportedly had to be taken to Jovellanos hospital with signs of a heart attack. Ariel Sigler Amaya was arrested on Tuesday, 18 March;

E/CN.4/2004/3/Add.1
page 52

(sss)   Ricardo Silva Gual, member of the Christian Liberation Movement in Palma Soriano, Santiago de Cuba, arrested on Tuesday, 18 March and reportedly charged under articles 4.6 and 6.1 of Act No. 88;

(ttt)   Fidel Suárez Cruz, a dissident in Pena del Río;

(uuu)   Manuel Uval González, a dissident in Guantánamo, arrested on Thursday, 20 March;

(vvv)   Julio Antonio Valdés Guerra, an activist from the province of Granma;

(www)   Miguel Valdés Tamayo, a dissident in Pinar del Río, arrested on Wednesday, 19 March;

(xxx)   Héctor Raúl Valle Hernández, an activist in the province of Havana;

(yyy)   Manuel Vásquez Portal, a journalist with the Decoro Group independent press agency in the city of Havana, arrested on Wednesday, 19 March.  Reportedly tried under Act No. 88;

(zzz)   Antonio A. Villarreal Acosta, an activist in Villa Clara;

(aaaa)   Ortlando Zapato Tamayo, a member of the Assembly for the Promotion of Civil Society, city of Havana, arrested at 6 a.m. on Thursday, 20 March.

6.      According to information received, between 18 and 26 March 2003 security forces arrested and detained the 79 persons named above, as a result of their activities as human rights defenders, journalists, writers, leaders of opposition political movements, dissident social leaders or trade union leaders.  It is stated that a common element linking many of the detainees was participation in the so-called Varela Project, which was merely the dissemination of a petition for the holding of a referendum on reform of the Cuban electoral and political systems.

7.      The source reports that in many of the arrests excessive force was used.  The homes of the persons arrested were raided and many of their personal possessions, in particular books, notebooks, diskettes and files, were confiscated.  It is claimed that these persons were accused of participating in conspiracies with James Cason, director of the United States Government Interests Section in Havana.  The Government of Cuba has reportedly stated that all the detainees will be tried.  According to information received, they may face sentences of up to 30 years' imprisonment under, among other legal provisions, Act No. 88 on the Protection of the National Independence and Economy of Cuba.

8.      The source reports that 33 of these persons were sentenced on 7 April 2003 to sentences of 15 to 27 years' imprisonment, after having been found guilty of imperilling State security and collaborating with a foreign Power.  On 7 April 2003 Héctor Palacios was reportedly sentenced to 25 years' imprisonment.  Oscar Espinosa Chepe, Héctor Maseda and Raúl Rivero have reportedly been sentenced to 20 years' imprisonment.  Osvaldo Alfonso and Marcelo Cano have reportedly been sentenced to 18 years imprisonment, and Marcelo López to 10 years.  The source states that this is the first time that the Public Prosecutor's Office has sought, and the judges imposed, such severe sentences for political or social activities.

9.      The source also considers that these persons are being tried in summary judicial proceedings, in which the principles of due legal process have not been or are not being respected.  It is claimed that these persons were not duly informed of the charges against them; that there was no proper contact with their families or lawyers; and that counsel had no access to the evidence submitted by the Public Prosecutor's Office against their clients or time to prepare their defence.  It is also alleged that these persons were unable to call witnesses on their behalf or object to evidence submitted by the prosecution.

10.     The Government, in its reply, which includes a statement in connection with these cases given at a press conference by the Minister for Foreign Affairs maintains that the description of the professions and alleged commitment to the defence of human rights of the persons in question is utterly false and that none of these persons is in actuality a journalist, human rights defender, political dissident or opposition figure, or exercises any other profession of interest or utility to society or the community.  Of the 37 accused who for years had claimed to be "independent journalists" only 4 had actually studied journalism and had worked as journalists at some point; most of them deliberately avoided work, receiving support and personal enrichment from the Government of the United States of America and the Cuban-American terrorist mafia operating in United States territory; the persons were responsible for and the direct authors of mercenary acts aimed at subverting and overthrowing the constitutional and institutional order created by a referendum of the Cuban people, and reaffirmed by more than 99 per cent of Cubans with the right to vote.

11.     With regard to the detentions, the Government states that on 24 February and on 12 and 14 March 2003 the head of the Interests Section of the United States of America in Havana, Mr. Cason, in activities organized by him, held conspiratorial meetings with a group of mercenaries.  On 18 March 2003 the Government decided to arrest a group of 32 mercenaries who had attended meetings with him, and on the following day arrested a further 33 mercenaries who had been involved in providing disinformation, for which they were paid, to further the application of the Helms-Burton Act on the application of the embargo against Cuba.

12.     With regard to the proceedings as such, the Government states that 29 trials were held in practically every province of the country.  There were 75 accused, 74 of them men, and the courts handed down sentences of 6 to 28 years' deprivation of liberty.

13.     The Government maintains that there was absolute respect for due process, as follows:

        (a)     They were informed of the charges against them and had an opportunity to make comments thereon before the trial was held;

        (b)     They exercised their right to defence counsel, which, under Cuban legislation, may be chosen by the accused, failing which counsel is assigned.  Fifty-four defence counsel participated, 44 of them appointed by the accused or their families;

        (c)     They exercised their right to be heard in a trial conducted by previously constituted courts.  In each case there was an oral hearing in which the accused took part, and exercised his right to intervene at various points in the proceedings, and which concluded with answers to questions put by the defence and prosecution, and at which witnesses and experts testified.  Almost 3,000 people were called in the 29 trials, essentially family members and

E/CN.4/2004/3/Add.1
page 54

hundreds of witnesses and experts, giving an average of some 100 people for each trial.  As for attendance by foreign diplomats in Havana, the Government affirms that there is no reason for such attendance where the accused is not a national of their country.  The courts themselves decided that there would be no access by the press, for reasons of security.  In order to avoid any incidents, access was also denied to the thousands of revolutionaries who, indignant at the attitude of these individuals, wished to be present at the trials and were not;

(d)       All the accused and their defenders exercised the right to submit in their favour the evidence that they selected, in addition to that submitted by the police investigators and prosecution, and to call witnesses.  Of 28 witnesses not previously called by the prosecution, 22 were authorized by the courts while proceedings were being held to testify.  All the defence counsel had prior access to the files of the accused;

(e)       All have a right, as they were informed at the trials, to appeal sentences before a higher court than that in which they were sentenced, in this case, the Supreme Court; this is a right respected under Cuban legislation;

(f)       There was the most transparent and scrupulous respect for the physical security and physical and psychological integrity of each of the accused at every stage of the trials.  There is absolutely no evidence whatsoever of coercion, pressure or threats.

14.       The Government states that application was made of article 92 of the Cuban Criminal Code, Act No. 62 of 1987, derived from the Spanish colonial Criminal Code, which provides that "a person who, in the interest of a foreign State, commits an act with intent to cause damage to the independence of the Cuban State or the integrity of its territory shall be punished by 10 to 20 years' imprisonment or by death".  Further, application was made of various articles of Act No. 88 on the Protection of the National Independence and Economy of Cuba, including article 5.1:  "Anyone who seeks information that may be used in application of the Helms-Burton Act and the embargo and prosecution of the economic war against our people intended to undermine the domestic order, destabilize the country and end the socialist State and independence of Cuba shall be liable to imprisonment"; article 6.1:  "Anyone who accumulates, reproduces or disseminates subversive material from the Government of the United States of America or its agencies, offices, representatives or officials, or from any other foreign entity in support of the objectives of the Helms-Burton Act, the embargo and the war, is liable …", and article 7:  "Anyone who with the purpose of achieving the objectives of the Helms-Burton Act supports the embargo and the economic war, collaborates in any way with radio or television stations, newspapers, magazines or other foreign media".

15.       The Government concludes that the Varela Project is part of the strategy of subversion against Cuba, conceived, funded and directed from abroad, with the active participation of the Interests Section of the United States of America in Havana; it forms part of the attempts at subversion, has absolutely no basis in Cuban legislation, and is a crude manipulation of the Constitution and laws of Cuba.

16.       The source, in its comments on the reply by the Government, states that the 79 persons detained include members of the Cuban Human Rights and National Reconciliation Commission (an internationally recognized association, awarded the human rights prize of the French Republic in 1996, and a member of the International Federation of Human Rights) such as

Marcelo Cano Rodríguez and Marcelo López; members of the Cuban Institute of Independent Economists, such as Marta Beatriz Roque Cabello (director) and Arnaldo Ramos Lausirique; members of the Assembly for the Promotion of Civil Society, such as Marta Beatriz Roque Cabello (coordinator), Orlando Zapata Tamayo, Nelson Aguiar Ramírez and Nelson Molinet Espino a member of the Centre for Social Studies, Héctor Palacio Ruiz (director); a member of the Unified Council of Cuban Workers (CUTC), Pedro Pablo Álvarez Ramos (general secretary); independent journalists such as Ricardo González Alfonso, president of the Manuel Márquez Esterling Society of Journalists and director of *De Cuba* magazine in Havana, Raúl Rivero Castañeda, director of CubaPress Oscar Espinosa Chepe and Héctor Maceda Gutiérrez, independent journalists in the city of Havana; civil society activists involved in the Varela Project, including Osvaldo Alfonso, Alfredo Domínguez Batista, Alfredo Felipe Fuentes, Luis Enrique Ferrer García, Leonel Grave de Peralta and Horacio Julio Piña Borrego.

17.     The source indicates that the arrest of a large number of persons for having taken part in the Varela Project, a campaign to obtain democratic change by constitutional means through the circulation of a petition calling for a referendum on political and electoral reform, constitutes a violation of the right to participate in political life.  The proposal has reportedly been signed by 11,000 Cubans.

18.     The source states that there have been violations of international norms of due process, since both the investigation and the oral hearings were rushed through considering the complexity of the cases, and the sentences handed down (15 to 25 years' imprisonment). Further, most of the lawyers were not able to meet their clients other than in the hearings, and as a result could not reasonably prepare and mount a defence; the sentences handed down were disproportionate for violations involving political and social views.

19.     The Working Group recalls that on 9 April 2003 the United Nations High Commissioner for Human Rights issued a public statement of concern in connection with these cases as to the transparency and expedited nature of the trials in which these persons were convicted.  Similarly, the Special Rapporteurs on freedom of expression of the United Nations and the Organization of American States issued a joint statement on 3 May 2003 in which they expressed their concern regarding the freedom of opinion and expression of these journalists, human rights defenders and opposition political activists, which indicates a high degree of interest in these cases.

20.     Although the Government has stated that not all these persons are journalists or human rights defenders, or exercise any profession whatsoever, the Working Group notes that the exercise of rights recognized in the Universal Declaration of Rights is independent of such status, so that their non-status as such does not deprive them of the free exercise of their rights.

21.     The Working Group observes that the Government has not denied the assertion by the source that all these individuals were arrested between 18 and 26 March in connection with the Varela Project.  The Government in its reply states that it is part of the strategy of subversion against Cuba and reaffirms that these individuals had been arrested for having attended meetings with the Interests Section of the United States of America in Havana on 24 February and 12 and 14 March 2003.

E/CN.4/2004/3/Add.1
page 56

22.     It is not clear how the link represented by these meetings and the seeking of resources by the persons mentioned in the communication constitutes incitement to violence.  Article 13 of the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, adopted by the General Assembly in its resolution 53/144 of 9 December 1998, provides that "everyone has the right, individually and in association with others, to solicit, receive and utilize resources for the express purpose of promoting and protecting human rights and fundamental freedoms through peaceful means, in accordance with article 3 of the present Declaration".

23.     The Working Group considers that the Government has not contested the fact that the Varela Project concerns circulation of a petition for the holding of a referendum on reform of the Cuban electoral and political systems.  The peaceful exercise of such activities is protected under articles 19 and 20 of the Universal Declaration of Human Rights, on freedom of expression, opinion and assembly, and article 21 on freedom of political participation.

24.     As to whether in the proceedings followed in respect of these 79 individuals the total or partial inobservance of the norms of international law relating to an impartial trial was of such gravity that it would make these deprivations of freedom arbitrary, the Working Group, in the light of the information supplied by both the Government and the source, is not in a position to render an opinion.  Nevertheless, it notes that the summary nature of the trials, which has been confirmed, must be proportionate to the offence and to the sentence imposed.

25.     Independently of whether domestic law has or has not been respected, the Working Group considers that the legislation applied contravened the provisions of articles 19, 20 and 21 of the Universal Declaration of Human Rights, in that it limits the free exercise of the rights of opinion and expression, not to be harassed for holding opinions, to research and receive information and opinions, and to disseminate them, without limitation by national borders, by any means of expression, as well as the right of peaceful assembly and association and the right to participate directly in the government of the country.

26.     In the light of the foregoing the Working Group renders the following opinion:

            The deprivation of liberty of Nelson Aguiar Ramírez, Osvaldo Alfonso, Pedro Pablo Álvarez Ramos, Pedro Argüelles Morán, Víctor Rolando Arroyo, Mijail Bárzaga Lugo, Alfredo Domínguez Batista, Margarito Broche, Marcelo Cano Rodríguez, Carmelo Díaz Fernández, Eduardo Díaz Fleites, Antonio Díaz Sánchez, Alfredo Domínguez Batista, Mario Enríquez Mayo, Oscar Espinosa Chepe, Alfredo Felipe Fuentes, Efrén Fernández Fernández, Adolfo Fernández Saínz, José Daniel Ferrer Castillo, Luis Enrique Ferrer García, Orlando Fundora Álvarez, José Ramón Gabriel Castillo, Próspero Gaínza Agüero, Miguel Galván Gutiérrez, Julio César Gálvez, Edel José García Díaz, José Luis García Paneque, Ricardo González Alfonso, Diosdado González Marrero, Léster González Pentón, Alejandro González Raga, Jorge Luis González Tanquero, Leonel Grave de Peralta, Normando Hernández González, Iván Hernández Carrillo, Juan Carlos Herrera Acosta, Regis Iglesias, José Ubaldo Izquierdo Hernández, Reinaldo Librada Peña, Librado Linares García, Marcelo López, Héctor Maceda Gutiérrez, José Miguel Martínez Hernández, Luis Milán Fernández, Rafael Millet Leyva, Roberto de Miranda Hernández, Rafael Mollet Leyva,

Nelson Molinet Espino, Félix Navarro Rodríguez, Jorge Olivera Castillo, René Oñate, Héctor Palacio Ruiz, Pablo Pacheco Ávila, Arturo Pérez de Alejo, José Antonio Pérez Moré, Omar Pernet Hernández, Horacio Julio Piña Borrego, Fabio Prieto Llorente, Alfredo Pulido López, José Gabriel Ramos Castillo, Arnaldo Ramos Lausirique, Blas Giraldo Reyes Rodríguez, Raúl Rivero Castañeda, Alexis Rodríguez Fernández, Omar Rodríguez Saludes, Marta Beatriz Roque Cabello, Claro Sánchez Altariva, Miguel Sigler Amaya, Guido Sigler Amaya, Ariel Sigler Amaya, Ricardo Silva Gual, Fidel Suárez Cruz, Manuel Uval González, Julio Antonio Valdés Guerra, Miguel Valdés Tamayo, Héctor Raúl Valle Hernández, Manuel Vázquez Portal, Antonio A. Villarreal Acosta and Orlando Zapata Tamayo, is arbitrary, being in contravention of articles 19, 20 and 21 of the Universal Declaration of Human Rights, and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

27.     The Working Group, having rendered this opinion, requests the Government to take the necessary steps to remedy the situation, in accordance with the standards and principles set forth in the Universal Declaration of Human Rights, to study the possibility of amending its legislation to bring it into conformity with the Declaration and other relevant international norms accepted by the State, and to take appropriate steps with a view to becoming a State party to the International Covenant on Civil and Political Rights.

Adopted on 9 May 2003

### OPINION No. 10/2003 (CHINA)

Communication addressed to the Government on 16 September 2002.

Concerning:  Wang Bingzhang, Yue Wu and Zhang Qi.

**The State has signed but not yet ratified the International Covenant on Civil and Political Rights**

1. (Same text as paragraph 1 of opinion No. 15/2002.)

2. The Working Group conveys its appreciation to the Government for having forwarded the requisite information in good time.

3. (Same text as paragraph 3 of opinion No. 15/2002.)

4. In the light of the allegations made, the Working Group welcomes the cooperation of the Government. The Working Group transmitted the reply provided by the Government to the source, which provided the Working Group with its comments. The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5. The communication, a summary of which was forwarded to the Government, concerns

     (a)     Dr. Wang Bingzhang, male, born on 30 December 1947, a Chinese national living in New York City, United States of America, a human rights and pro-democracy activist. The United States of America has granted him political asylum;

     (b)     Yue Wu, male, born on 7 August 1947, a Chinese national living in Paris with a refugee travel document; also a human rights, pro-democracy activist. According to the source, he is an internationally recognized labour leader. He participated in the 1989 Tiananmen Square demonstrations; and

     (c)     Zhang Qi, female, born on 29 December 1962, a Chinese human rights activist and Zhong Gong leader. It was reported that she was wanted by the Government and that she escaped to Thailand in 2000. At the end of 2001, she was granted political asylum in the United States of America.

6. It was reported that these persons were arrested on or about 26 June 2002 on the border between China and Viet Nam near northern Quang Ninh province, by members of the Chinese Public Security Bureau or by members of the Chinese People's Liberation Army. They were initially held near the border and then transferred to Beijing, where they were being held. No arrest warrants were allegedly presented at the time of their arrest.

7. The Government, in its response, maintains that Wang Bingzhang is under investigation by the Chinese State security authorities on suspicion of the offence of espionage. In May 1999, a warrant was issued for his arrest on suspicion of violent terrorist activities.

8.      The Government adds that at about 10 p.m. on 3 July 2002, the public security authorities in Fangchenggang city in the Guangxi Zhuang Autonomous Region received reports of a kidnapping and promptly raised the alarm.  Three persons were discovered, tied up, in the Baihu temple in the northern suburbs of the city.  According to statements by the three persons, they had been abducted on 27 June in Quang Ninh province in Viet Nam and a ransom of US$ 10 million had been demanded.  As the ransom was not paid, they were blindfolded and moved around from place to place until 3 July 2002, when they were rescued by the Chinese police.

9.      Following investigation, the local public security authorities were able to identify the three abducted persons as Wang Bingzhang, Yue Wu, and Zhang Qi.

10.     The Government states that in view of the fact that Wang Bingzhang was suspected of having committed an offence, and in accordance with the rules of law establishing jurisdiction in this case, Wang Bingzhang was handed over by the Guangxi public security authorities to their counterparts in Guangdong for investigation.  As Mr. Wang was suspected of involvement in the offences of espionage and the organization and conduct of violent terrorist activities, the Guangdong public security authorities, acting in accordance with the law, ordered him to be kept in his home under surveillance.  On 5 December 2002, with the approval of the procuratorial authorities, the Guangdong police, acting in accordance with the law, took Mr. Wang into custody.  His case is still undergoing further investigation.

11.     With respect to the cases of Yue Wu and Zhang Qi, the Government states that they have been cleared of any involvement in the offences of espionage and the organization of violent terrorist activities of which Mr. Wang is suspected.  The public security authorities have lifted the orders placing them under surveillance in their homes.

12.     In its explanatory remarks, the Government states that this case is a criminal matter of great seriousness involving the suspected endangering of Chinese State security and public safety.  According to an investigation of the facts conducted by the Chinese State security authorities, Mr. Wang had established close ties with the Taiwanese espionage and intelligence authorities, who had paid him to collect and steal Chinese State secrets for them.

13.     The Government also reported that for a long time, Mr. Wang has openly advocated violence and terrorism, asserting that violent methods, kidnapping and explosives must be used and claiming that he himself had plotted, organized and carried out many violent terrorist activities.  It adds that the measures adopted by the police against him are exclusively in response to his suspected commission of criminal offences.

14.     The Government concludes that the authorities have acted in accordance with the law and that Wang Bingzhang is suspected of having conducted activities which constitute the offence of imperilling State security and public safety.  In accordance with the provisions of articles 6 and 7 of the Chinese Criminal Code, Chinese judicial jurisdiction extends to any persons committing offences within the territory of China and to Chinese citizens committing the offences specified in the Code outside the territory of the country.  At the same time, the home surveillance orders placed on Mr. Wang and his two companions were in compliance with the stipulations of articles 51 and 57 of the Chinese Code of Criminal Procedure and with the relevant provisions of international human rights instruments.

E/CN.4/2004/3/Add.1
page 60

15.      In its comments and observations, the source reacted to the Government reply by stating that on 27 June 2002, Wang Bingzhang, Yue Wu and Zhang Qi were accosted in the lobby of their hotel in Mongcai, Viet Nam, by a group of about 10 men dressed in plain clothes.  Claiming to be Vietnamese police officers, they demanded that the trio accompany them to the local police station for questioning.  Initially resisting, Mr. Wang was physically assaulted in the lobby and the trio finally relented.  They possessed all the required travel documents, including Vietnamese visas, and had done nothing wrong.

16.      An hour earlier Mr. Wang had met with a Chinese labour activist from Guangxi province who had come across the border.  The meeting had been set up two months earlier and had focused on the labour movement in China, workers' discontent and rising unemployment; the situation of the Falun Gong and its campaign to win religious freedom; and the corruption of some Guangxi governmental officials.

17.      The three persons were kidnapped by Vietnamese, taken across the border and handed over to Chinese officers.  They were put in separate rooms in a motel where they stayed for three days, bound.  During this time, the leader of the kidnappers demanded a US$ 10 million ransom.  He asked for family contact information from the trio, and all three provided addresses and telephone numbers.  However, no family member was ever contacted by the kidnappers.  After Mr. Yue accused his captors of being Chinese agents, he was beaten and gagged.

18.      On 3 July 2002, the trio was taken to another motel, where they stayed for three additional days until they were driven to a Buddhist temple in Fangchenggang city in southern Guangxi province.  They were left at the temple for a few minutes, until local Guangxi policemen arrived in cars.  The police delivered them to the local police station, where they were detained until about 7 p.m. the next evening.  They told the police that they had been kidnapped by robbers in Viet Nam and requested to go back.  Although believing that in fact their abductors were Chinese agents, they were afraid to raise this with the local police who, they hoped, would permit them to go back to Viet Nam.

19.      On the evening of 4 July 2002, the trio was transported to Nanning, the capital of Guangxi province.  On the way, Mr. Yue asked the police, "What happened to the kidnappers?"  The police refused to answer.  For the next 12 or 13 days, they were detained at a police training academy in Nanning.

20.      During Mr. Wang's initial six months in detention, during Mr. Yue's six months in detention, and Ms. Zhang's nine months in detention, they were never charged with any crime nor were warrants issued for their arrest and detention.  No judicial hearings were held on the legality of their detention and no judicial order of detention was ever issued in their names.  According to the source, they were denied access to a lawyer and were never informed that they had the right to the assistance of a legal counsel.  They were denied permission to contact their families - except Zhang Qi, later in house arrest in her mother's house - to inform them of their detention or of the places where they were being detained and held incommunicado.

21.     The source further considers that the Government denied any knowledge of the whereabouts of Wang Bingzhang, Yue Wu and Zhang Qi until international interest in the cases made the Government reverse itself.  Only on 4 December 2002 did the Government admit that it had been holding them since 3 July 2002.  The source pointed out that their "rescue" from abduction was a cover-up by the Government.

22.     The source confirmed the assertion of the Government that Yue Wu and Zhang Qi were released in late December 2002.

23.     The source adds that on 5 December 2002, Wang Bingzhang was finally charged with "offences of espionage" and "the conduct of terrorist activities".  He was tried on 22 January 2003 by the Intermediate People's Court in the city of Shenzhen in Guangdong province.  Mr. Wang claimed that he was innocent of all charges levelled against him.  The trial only lasted half a day.  It was closed to the public.  The Government cited "State secrets" as the justification for the closed trial.  No family members, supporters or reporters were permitted to attend.  While the court charged Wang Bingzhang with the most serious of crimes, including terrorism and espionage, it refused to release any evidence of his wrongdoing.

24.     On 10 February 2003, Wang Bingzhang was convicted and sentenced to life in prison.  His lawyers stated that there was not enough evidence to convict him.  Mr. Wang appealed the court's verdict and sentence promptly.  The appeal was rejected on 28 February 2003.

25.     The source states that in light of the court's denial of Mr. Wang's right to the presumption of innocence; his right to adequate time and facilities to prepare for his own defence; his right to a fair trial before an independent and impartial tribunal; his right to call witnesses on his own behalf; his right to cross-examine witnesses testifying against him and, in general, the lack of any guarantee whatsoever that would ensure his adequate defence and a full hearing, Mr. Wang's trial was in contravention of internationally recognized standards for judicial proceedings.

26.     The source adds that the accusations were wrongfully fabricated against him.  It says it is common knowledge that the definition of terms like "espionage" and "endangering State security" are quite elastic and are therefore generally at variance with the narrower definitions employed by other countries to define these types of crime.  It states that Wang Bingzhang's case represents the first time the Government has levelled terrorism charges against a pro-democracy dissident under its new anti-terrorism laws.  It is also one of the harshest prison sentences ever imposed on any pro-democracy dissident by the Government.

27.     After examining the communications from the source and the Government's response, the Working Group finds that:

     (a)     According to the Government, Wang Bingzhang, together with Yue Wu and Zhang Qi, were kidnapped by unidentified persons on 27 June 2002.  Chinese officers rescued them when they found them in Baihu temple on 3 July 2002;

E/CN.4/2004/3/Add.1
page 62

(b)      Immediately after being rescued, Wang Bingzhang, Yue Wu and Zhang Qi were arrested by the authorities who had found them.  The Government has not specified whether the authorities had a warrant to do so.  Its response does not explain why kidnapping victims should suddenly become suspects accused of other crimes.  Nor does it make it clear whether those responsible for the kidnapping have yet been sought, found or indicted;

(c)      The three individuals, especially Wang Bingzhang, are, according to the source, internationally recognized activists in pro-democracy movements.  The Government, on the other hand, speaks of Mr. Wang's advocating violence and the use of methods such as kidnapping and bombings, and claims that he has boasted of having organized and carried out many violent terrorist activities;

(d)      Even so, the Government does not specify if, in fact, Mr. Wang ever carried out his intentions, and offers no evidence of any specific occasion on which Mr. Wang made the alleged calls to violence.  Other than the kidnapping of which Mr. Wang himself was a victim, as the Government itself acknowledges, no information has been given about other kidnappings or acts of violence initiated by Mr. Wang;

(e)      It seems clear that Mr. Wang, during his first five months in detention, did not have knowledge of the charges, the right to legal counsel, or the right to judicial review of the arrest and detention and that, after that date, he did not benefit from the right to the presumption of innocence, the right to adequate time and facilities for defence, the right to a fair trial before an independent and impartial tribunal, the right to a speedy trial and the right to cross-examine witnesses;

(f)      This constitutes a series of violations serious enough to make his deprivation of liberty arbitrary, in violation of articles 9, 10 and 11 of the Universal Declaration of Human Rights;

(g)      With regard to Yue Wu and Zhang Qi, the Working Group notes the Government's statement that they are no longer in detention, a fact confirmed by the source.  It must, however, point out that the Government has not denied the fact that they were never charged with any crime and no warrant was ever issued for their arrest or detention during their nine- and six-month detentions, respectively.  They were detained secretly and were not informed of any charges, and consequently it can be established that the detentions had no legal basis.

28.      In the light of the foregoing, the Working Group renders the following opinion:

It declares, pursuant to paragraph 17 (a) of its methods of work, that even though Yue Wu and Zhang Qi are no longer in detention, the deprivation of liberty in both cases was arbitrary, being manifestly without any legal basis and being in contravention of article 9 of the Universal Declaration of Human Rights, and falls within category I of the categories applicable to the consideration of cases submitted to the Working Group.

It declares that the detention of Wang Bingzhang is arbitrary, being in contravention of articles 9, 10 and 11 of the Universal Declaration of Human Rights, and falls within category III of the categories applicable to the consideration of cases submitted to the Working Group.

29.     Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation of Wang Bingzhang and bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights.  At the same time, it once again urges the Government to ratify the International Covenant on Civil and Political Rights.

Adopted on 9 May 2003

**OPINION No. 11/2003 (SYRIAN ARAB REPUBLIC)**

<u>Communication</u> addressed to the Government on 16 August 2002.

<u>Concerning</u>:  Jaramani Najib Youcef.

**The State has ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requisite information.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.      According to the source, Najib Yousef Jaramani, born in 1956, of Lebanese nationality, living in Baabdat/Metnanon, Lebanon, was reportedly arrested on 24 January 1997 at his house by Lebanese security officers in plain clothes.  The security forces who conducted the arrest did not identify themselves, nor did they present an arrest warrant.  Mr. Jaramani was then reportedly transferred to the Syrian Arab Republic, where he was accused of spying for the Zionist enemy, convicted and he was reportedly sentenced to the death penalty by the Syrian authorities.  According to the source, the Lebanese authorities have never requested the repatriation of their citizens in detention in Syria.  The source considers the detention of Mr. Jaramani to be arbitrary because he was arrested in Lebanon, then transferred and sentenced in Syria without any form of extradition procedure.

6.      In its reply, the Government of the Syrian Arab Republic maintains that Mr. Jaramani was arrested and charged with spying for Israel.  He was tried and sentenced to death in a legal trial and in accordance with the law.

7.      Commenting on the Government's reply, the source stands by the allegations made in its initial communication and requests the Working Group to take urgent action to ensure the suspension of the death sentence.  It adds that Mr. Jaramani was tried in camera and that, according to his family, he was not allowed to appoint a lawyer and no appeal could be lodged against the judgement by which he was sentenced to death.  The source states that some months after his arrest, Mr. Jaramani was put in incommunicado detention and his family was no longer permitted to visit him.

8.      On 12 May 2003, the Working Group wrote to Government asking it to provide details concerning the court that tried Mr. Jaramani - civil or military - and the procedure that had been followed:  Was he assisted by a lawyer appointed by the court or of his own choosing?  Was his family authorized to visit and communicate with him?  Was he able to appeal his sentence and, if

so, has the higher court issued a judgement in the case?  A reminder was sent to the Government on 19 August 2003.  In its reply, the Government confined itself to stating that it had forwarded the Working Group's letter to the relevant authorities and had not yet received the information requested.

9.      Given the above, the Working Group considers that, in order to express an opinion on whether the detention is arbitrary, it must determine whether the case is covered by one of the three categories of arbitrary detention defined in its methods of work and, consequently, whether it comes within the scope of the Working Group's mandate.  With regard to category I, it would appear that the deprivation of liberty has a legal basis, namely, a judicial ruling.  With regard to category II, the source has at no time claimed that Mr. Jaramani's arrest is the result of the legitimate exercise of his human rights.  This leaves category III.  In the case under consideration, the source challenges the legality of Mr. Jaramani's arrest, his illegal transfer to Syria, his trial by an incompetent court and the violation of his right to a fair trial.

10.     On these points, the Working Group does not consider that the unauthorized transfer of a person from one country to another is sufficient in this case to categorize the detention as arbitrary.  If the Working Group is to find the detention arbitrary, it must establish that the court's total or partial failure to respect international standards on the right to a fair trial was of such gravity as to confer on the deprivation of liberty an arbitrary character.

11.     With regard to the lack of a public hearing, while there is no doubt that the public nature of hearings is an important guarantee, it is nonetheless recognized in article 14, paragraph 1, of the International Covenant on Civil and Political Rights, to which Syria is a party, that courts have the power to exclude the press and the public from all or part of a trial for the reasons given therein.  In the case under consideration, a case of espionage, the non-public nature of the trial cannot in itself be considered a violation of the right to a fair trial.

12.     In respect of the source's remaining allegations, namely that Mr. Jaramani did not have legal assistance and was unable to appeal against the death sentence - allegations that, were they to be substantiated, would constitute violations of the standards on fair trial of such gravity as to confer on the deprivation of liberty an arbitrary character - the Government has confined itself to stating that the trial was conducted in accordance with the rules and principles established in law, and failed to provide the information requested by the Working Group in order to refute those allegations, despite the fact that it has had more than four additional months in which to do so.

13.     The Working Group considers that the fact that Mr. Jaramani was sentenced to death without the Government being able to demonstrate that the sentence was pronounced by a competent, independent and impartial court, duly constituted under the law, or that Mr. Jaramani was assisted by a lawyer of his choice and had the opportunity to have his conviction and sentence reviewed by a higher court, constitutes a violation of the standards on fair trial of such gravity as to confer an arbitrary character on the deprivation of liberty, which is in contravention of articles 9 and 10 of the Universal Declaration of Human Rights and articles 9 and 14 of the International Covenant on Civil and Political Rights, to which the Syrian Arab Republic is a party.

E/CN.4/2004/3/Add.1
page 66

14.     In the light of the foregoing, the Working Group renders the following opinion:

        The deprivation of liberty of Najib Youcef Jaramani is arbitrary, being in
contravention of articles 9 and 10 of the Universal Declaration of Human Rights and
articles 9 and 14 of the International Covenant on Civil and Political Rights, to which the
Syrian Arab Republic is a party, and falls within category III of the categories applicable
to the consideration of cases submitted to the Working Group.

15.     The Working Group, having rendered this opinion, requests the Government to take the
necessary steps to remedy the situation, which could have irreparable consequences, in order to
bring it into conformity with the standards and principles incorporated in the Universal
Declaration of Human Rights and the International Covenant on Civil and Political Rights.

Adopted on 3 September 2003

### OPINION No. 12/2003 (CHINA)

<u>Communication</u> addressed to the Government on 31 January 2003.

<u>Concerning</u>:  Liu Xianbin and Li Bifeng.

**The State has signed but not ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having submitted an information concerning the case.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.      According to the source, Liu Xianbin, a Chinese national born on 25 August 1968 and residing in Suining city, Sichuan province, is a leading member of the China Democratic Party (CDP) in Sichuan province and the acting director of China Human Rights Observer, an unofficial organization.

6.      For several years, Liu Xianbin has written open letters to the authorities and participated in nationwide campaigns promoting democracy and human rights in China.  He reportedly spent two years in prison for his participation in the 1989 democracy movement.

7.      On 7 July 1999, Liu Xianbin was reportedly arrested without a warrant at his home by Suining city State security officers and taken into custody.  He was formally arrested on 13 July 1999.

8.      On 6 August 1999, the Suining City Intermediate Court reportedly sentenced Liu Xianbin to 13 years' imprisonment for "incitement to subvert State power" under article 105 of the March 1997 provisions of the Chinese Criminal Procedure Law.  According to the information received, Liu Xianbin did not have the opportunity to have a defence lawyer and spoke in his own defence at the trial.  His wife reportedly attempted to hire a lawyer but was unsuccessful as a series of lawyers withdrew from the case following pressure from Chinese authorities.

9.      According to the information received, the public security authorities presented the following evidence during the trial:  holiday telegrams to organizations overseas were cited as evidence of Liu Xianbin's collusion with overseas groups and a plot to establish the CDP abroad; comments taken out of context from an article Liu Xianbin had written for the China Human Rights Monitor were cited as evidence of this propagation of anti-Communist Party views; Liu Xianbin's essays were categorized as attacks on China's rural responsibility system and

E/CN.4/2004/3/Add.1
page 68

population planning policy; and Liu Xianbin's open letters to Chinese leaders were considered attacks on the socialist judicial system and humanitarian aid.  Liu Xianbin is reportedly serving his sentence at the Sichuan No. 3 Prison.

10.     Li Bifeng, a Chinese national born in 1965 and residing in Mianyang city, Sichuan, is a labour activist and a representative of an unofficial organization called Chinese Conscience and Care Action which publishes information about laid-off workers' protests and their living conditions.  He is also a poet and a writer who edited a dissident magazine in the mid-1980s and was imprisoned for five years for his involvement in the 1989 democracy movement.

11.     In June 1997, Li Bifeng allegedly wrote an open letter to the international press containing information on a workers' protest in Mianyang city where 100,000 laid-off workers from three bankrupt textile factories demonstrated against factory managers' embezzlement of their unemployment-relief money.  The protest reportedly culminated with a crackdown by the People's Army in which over 100 workers were wounded and more than 80 arrested.

12.     In 1997, Li Bifeng also reportedly wrote to the Central Committee of the Chinese Communist Party to urge them "to free all political prisoners … and end one-party rule". In 1998, he further reportedly published a survey showing that 98 per cent of redundant workers surveyed felt that lay-offs were not implemented on an equitable basis and that the Government needed to reform the social security system.

13.     On 8 March 1998, while en route to visit his two-year-old daughter in Mianyang, Li Bifeng was reportedly detained without a warrant at a tollbooth by officers of the Mianyang City State Security Bureau.

14.     He was reportedly formally arrested on 6 April 1998 and charged with "fraud" on 24 August 1998.  According to the information received, the charge was related to the sale of a safe deposit box from his place of work.

15.     On 24 August 1998, after a one-day trial, Li Bifeng was sentenced to seven years' imprisonment for fraud under article 193 (3) of the Chinese Criminal Law.  No witnesses reportedly testified against him.  The only evidence was an "IOU slip" allegedly linking Li Bifeng to a suspect transaction.  According to the information received, his lawyer was strongly advised not to defend him.

16.     Li Bifeng is reportedly serving his sentence at the Chuandong prison in Sichuan province where he has been detained since April 1998.  Prior to this date, he was reportedly detained at Jiangyou City Detention Centre.

17.     The Government of China, in its reply stated that it has carefully investigated the matters alleged in the communication and informed the Working Group that

        (a)     Li Bifeng has been arrested and taken into custody by the Beijing city public security authorities with due approval from the Beijing city people's procurator's office on suspicion of fraud.  His family was notified in accordance with prescribed legal procedure. On 28 April 1998, the Mianyang city people's court sentenced him to seven years' fixed-term imprisonment for the offence of fraud and he is currently serving his sentence in Ya' an prison;

(b)      Liu Xianbin was sentenced on 7 August 1999, by the Suining city intermediate level people's court to 13 years' fixed-term imprisonment and stripped of his political rights for three years for the offence of subverting the authority of the State and he is currently serving his sentence in Chuandong prison.

18.      The Government added that the arrests of Mr. Li and Mr. Liu were carried out exclusively because they were suspected of having breached Chinese law.  In handling the above cases, the Chinese public security authorities also complied strictly with legal procedure; the lawful rights of the persons concerned have been fully protected and neither is a case of arbitrary detention.

19.      Acting in accordance with its methods of work, the Working Group forwarded the information supplied by the Government to the source, so that it could make additional comments, which it has done.  The source stated that the Government's response failed to supply facts or additional information to support its assertion regarding compliance with Chinese laws and procedures and also failed to provide any supporting documentation and information regarding such compliance.  The source concluded that the Government detained Mr. Li and Mr. Liu in connection with the peaceful expression of their human rights and has failed to afford them the procedural protections guaranteed by Chinese law and international treaties.

20.      Accordingly, in the view of the Working Group, the Government has merely stated that in both cases Chinese law has been correctly applied and the proper procedure scrupulously followed, and has not provided any information whatsoever concerning the nature of the charges against Mr. Li and Mr. Liu; the Government has also failed to present any evidence or arguments to refute the source's detailed allegations to the effect that the detention and conviction of Li Bifeng and Liu Xianbin were the result of the peaceful pursuit of trade union and/or political activities.

21.      The Government does not contest the fact that Li Bifeng and Liu Xianbin have been imprisoned in the past, the former for five years and the latter for two years, for their involvement in the 1989 pro-democracy movement, or that Mr. Liu is the leader of the China Democratic Party, an unrecognized political party, and that Mr. Li is active in China Human Rights Observer, an unofficial trade union organization.  The Government merely draws attention to the fact that, before their arrests, Mr. Liu and Mr. Li were unemployed.

22.      The Government has failed to adduce convincing arguments to refute the allegations of the source, which maintains that Liu Xianbin was sentenced to 13 years' imprisonment for publishing articles critical of the Government and the Chinese Communist Party and that Li Bifeng was found guilty of fraud, without any evidence and without benefit of a fair trial, because he had conducted an investigation into the laying-off of 20,000 workers in Sichuan province, and after having written an open letter to the authorities and published information on disturbances said to have occurred in that province.

23.      Consequently, the Working Group can only conclude that Mr. Li and Mr. Liu were arrested and deprived of their liberty for having peacefully exercised their right to freedom of opinion and expression, as guaranteed under article 19 of the Universal Declaration of Human Rights.  As to the allegations of violations of the right to a fair trial, the Working Group considers that it does not have sufficient information to give an opinion on the matter.

E/CN.4/2004/3/Add.1
page 70

24.      In the light of the foregoing, the Working Group renders the following opinion:

          The detention of Li Bifeng and Liu Xianbin is arbitrary, being in contravention of
          article 19 of the Universal Declaration of Human Rights, and falls within category II of
          the categories applicable to the consideration of cases submitted to the Working Group.

25.      The Working Group, having rendered this opinion, requests the Government to take the
necessary steps to remedy the situation in respect of the above-mentioned persons, in order to
bring it into conformity with the provisions and principles set forth in the Universal Declaration
of Human Rights, and encourages it to ratify the International Covenant on Civil and Political
Rights.

                                                                    Adopted on 4 September 2003

**OPINION No.  13/2003 (CHINA)**

<u>Communication</u> addressed to the Government on 2 November 2001.

<u>Concerning</u>:  Tenzin Choewang, Sey Khedup, Tserin Lhagon, Yeshi Tenzin, Thraba Yeshi, Ngawang Tsultrim, Nyima Dhakpa, Gyurmey.

**The State has signed but not ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having forwarded the requisite information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which provided it with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the source, on 19 March 2000, at approximately 2 a.m., seven men in masks arrived at Sog Tsendhen monastery and arrested Tenzin Choewang, caretaker monk, and four other Tibetan monks.  The men had ransacked Mr. Choewang's room and discovered cassettes of the Dalai Lama.  It was alleged that a police vehicle parked outside made it possible to identify the masked man, who acted without a warrant.

6.      According to the source, the systematic fashion in which the detainees were arrested and the fact that the masked man knew where each of the monks was were clear indications that the authorities had kept a close watch on the movements and activities of the monks with the tacit cooperation of someone inside Sog Tsendhen monastery.  The monastery is said to be a "breeding ground" for political activities and has therefore been under strict surveillance; the monks are closely monitored and their freedom of movement restricted.

7.      In accordance with the information received, Tenzin Choewang, 64 years old, caretaker of Sog Tsendhen monastery, Sey Khedup, 27 years old, and Yeshi Tenzin, 36 years old, monks at the monastery, Thraba Yeshi, 45 years old, an employee of the Hydroelectricity Power Station of Sog county and carpenter at the monastery, and Tserin Lhagon, 41 years old, farmer, from Yakla township in Sog city, were arrested by officers of the Nagchu Public Security Bureau and held in custody at the TAR (Tibet Autonomous Region) Intelligence Bureau in Lhasa.

8.      They were reportedly sentenced in December 2000 under China's Criminal Law on the following grounds:  Mr. Choewang and Mr. Yeshi to seven years' imprisonment for the offences of supporting "splittist activities" and for activities "endangering national security", under paragraph 103 of China's Criminal Law, and supporting "splitting activities of the Dalai clique", respectively; Mr. Lhagon and Mr. Tenzin to 15 years' imprisonment for activities "endangering national security" and "supporting splittist activities of the Dalai clique"; and Mr. Khedup to life

E/CN.4/2004/3/Add.1
page 72

imprisonment for activities "endangering national security" and "supporting splittist activities of the Dalai clique". They were all reportedly transferred to Drapchi prison, where they are all now detained.

9.      Ngawang Tsultrim, 24 years old, a monk from Sagang township, Dyokhang county, was apparently arrested in October 1999 in Lhasa, shortly after his return from Drepung monastery in India, by officials of the Public Security Bureau. He was reportedly held in custody at Gutsa Detention Centre, sentenced in early 2000 to three years' imprisonment for "acting to split the country" or "undermining national unification" under China's Criminal Law, and is reportedly detained at Drapchi prison.

10.     Nyima Dhakpa, 27 years old, a monk at Tawu Nyitso monastery, Karze prefecture, Sichuan province, was apparently arrested in May 2000 in Lhasa by officials of the Public Security Bureau and held in custody at Tawu Detention Centre. He was reportedly severely beaten. He was reportedly sentenced on 5 October 2000 by the county court to nine years' imprisonment on charges of propaganda and incitement against the masses, and detained at Tawu Detention Centre.

11.     According to the source, Mr. Dhakpa had pasted pro-independence posters on the gates of a memorial garden in Tawu county at the end of 1999. The posters carried slogans like "Free Tibet", "Tibetans in Tibet have no freedom" and "Tibet is not a part of China", and he had signed his name on the bottom. The county officials arrested another Nyima Dhakpa from Sog Tsendhen monastery the next day. This gave Mr. Dhakpa time to flee until he was finally arrested in May 2000.

12.     The Government in its response states that Mr. Choewang, Mr. Yeshi, Mr. Lhagon and Mr. Tenzin, having set up a separatist group, the "Xuecheng Youth Council", posted and distributed separatist leaflets and engaged in many illegal separatist activities. The four men were found guilty, under the Chinese Penal Code, of fomenting separatism by the Nagchu District Intermediate People's Court on 10 November 2000 and sentenced as follows: Tenzin Choewang, to 3 years' imprisonment and deprivation of political rights for 2 years; Thraba Yeshi, to 5 years' imprisonment and deprivation of political rights for 3 years; Tserin Lhagon, to 15 years' imprisonment and deprivation of political rights for 10 years; and Yeshi Tenzin, to 10 years' imprisonment and deprivation of political rights for 5 years. All four men are currently serving their sentence at the TAR prison.

13.     The Government further states that Ngawang Tsultrim, a male ethnic Tibetan born in 1975, was detained on 13 October 1999 by the Lhasa public security organs for fomenting separatism; on 23 November that year the Lhasa Municipal People's Procuratorate authorized his arrest. On 2 April 2000, the Lhasa Municipal Intermediate People's Court found that his propagandizing of separatism in the Tibet Autonomous Region constituted criminal separatism, sentenced him to three years' imprisonment and stripped him of his political rights for two years. He is now serving his sentence at the TAR prison.

14.     As for Nyima Dhakpa, the Government states that between 1998 and 2000, he was frequently engaged in activities in Dawn county town designed to incite separatism and to undermine State unity, which were serious breaches of article 103 and other relevant provisions of the Chinese Criminal Code. In May 2000, with the approval of the Karze prefecture

procuratorial office acting in accordance with the law, took him into custody.  On 20 October, the Karze Prefecture Intermediate People's Court, in accordance with the law, sentenced Nyima Dhakpa to nine years' fixed-term imprisonment, stripping him of his political rights for four years.  He is currently serving his sentence.  The officials in charge of supervising him act in strict accordance with the law and no corporal punishment has ever been applied against him.

15.     The Government explains that the Chinese Constitution clearly stipulates that citizens have the right to the freedoms of speech, of the press, of religious belief and other freedoms, of association, of assembly, of movement and of demonstration, and that they are entitled to criticize and make suggestions about any State organ or its employees.  The Government adds that in accordance with the law, it protects the exercise by citizens of these rights and freedoms; for their part, in giving effect to their right to freedom of speech, Chinese citizens may not harm the interests of the State, society or collectives.  While protecting the enjoyment by citizens of all their lawful freedoms, the Government of China, acting in accordance with the law, adopts measures against activities that break the law or infringe the lawful interest of the State, of collectives and of citizens.  This is consistent with the relevant provisions of international human rights instruments.  The persons mentioned above have been sentenced to imprisonment because they conducted activities which endangered State security and the territorial integrity of the country and violated Chinese criminal law.

16.     The Government notes that any country would investigate and punish, in accordance with its law, conduct of this kind.  In the process of ordering the arrest of these persons and putting them on trial, their lawful rights were fully protected:  approval was obtained from the procuratorial authorities, and the public security authorities acted in compliance with the law in taking them into custody; the judgements handed down by the courts were based on clear facts, the evidence was ample and conclusive, the convictions were correct, the sentences were commensurate with the offences and the trial proceedings followed due process.

17.     The source replies that all the prisoners have been detained merely for exercising their fundamental rights under international law.  It states that the Government's response reveals that none of the prisoners had committed violent acts and in all the cases the individuals were imprisoned for the peaceful expression of religion, association or opinion.  The Government states that it "guarantees all civic freedoms in accordance with the law".  However, it then goes on to say that all such guarantees are subject to the "lawful interest of the State".  According to the Government, "any State would punish" people who acted in the same manner as the named prisoners.

18.     The source states that this interpretation by the Government of international law regarding rights and responsibilities is simply wrong.  Democratic States do not imprison people for 3 to 15 years merely because they are members of a political organization, practised their religion peacefully or expressed dissent concerning government policies.

19.     The Government has not given a response in the case of Sey Khedup, and does not contest the facts that he was a monk who was arrested with the group on 19 March 2000 and is now serving a sentence of life imprisonment for "endangering national security" and "supporting splittist activities of the Dalai clique".

E/CN.4/2004/3/Add.1
page 74

20.     The Government has not given information about Gyurmey, stating that despite extensive investigations by the Chinese authorities, it has still not been possible to trace this person and requesting the Group to provide more details.

21.     The Government states that Tenzin Choewang, Yeshi Tenzin, Sey Khedup, Thraba Yeshi and Tserin Lhagon were organizing a youth group.  It has not been disputed, however, that their purpose was to associate peacefully, or express their beliefs peacefully, without inciting or resorting to violence.  These persons were also posting and distributing leaflets, exercising their freedom of opinion and expression which includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media.  On those grounds, they were tried for endangering national security and supporting separatist activities, sentenced to 3 to 15 years' imprisonment (in the case of Mr. Khedup, even life imprisonment) and stripped of their political rights, although the Government's reply makes no specific reference to the articles of the Criminal Code concerning the breaches of State security under which they were charged.

22.     The Working Group emphasized, in the report on its visit to China (E/CN.4/1998/44/Add.2, para. 43) that "unless the application of these crimes is restricted to clearly defined areas and in clearly defined circumstances, there is a serious risk of misuse". That appears to be the case in the present instance, inasmuch as the Government, in its reply, does not specify the nature of the activities of which the men were accused - other than founding a peaceful association and distributing leaflets - and mentions no evidence in support of the charges, or if they used violence in their activities.

23.     As for Ngawang Tsultirm and Nyima Dhakpa, while they were also charged with propagandizing for separatism, albeit in different circumstances, the charges also concern the exercise of the freedom of expression, a right guaranteed by article 19 of the Universal Declaration of Human Rights.  That their activities were peaceful has not been contested.

24.     In the light of the foregoing, the Working Group renders the following opinion:

        The Working Group declares the deprivation of liberty of Tenzin Choewang, Sey Khedup, Tserin Lhagon, Yeshi Tenzin, Thraba Yeshi, Ngawang Tsultrim and Nyima Dhakpa to be arbitrary as being contrary to articles 18, 19, 20 and 21 of the Universal Declaration of Human Rights, and falls within category II of the principles applicable in the consideration of the cases submitted to the Working Group.

        In view of the situation concerning the case of Gyurmey, and subject to the possibility of receiving relevant information and details at a later date, the Working Group believes it cannot render an opinion on whether his detention is arbitrary and decides, in accordance with paragraph 17 (c) of its methods of work, to keep the case pending until that information is received.

25.     Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation and to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights, and to complete as soon as possible the process of ratification of the International Covenant on Civil and Political Rights.

                                                                Adopted on 4 September 2003

## OPINION No. 14/2003 (MALDIVES)

Communication addressed to the Government on 3 February 2003.

Concerning:  Mohammed Zaki, Ibrahim Moosa Luthfee, Ahmed Ibrahim Didi and Fathimath Nisreen.

**The State has not ratified, nor signed the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having forwarded to it the requested information.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      The communication concerns Mohammed Zaki, resident of Kuala Lumpur, owner of the "Nazaki" company, involved in shipping and trading, aluminium manufacture, sea transportation and construction; Ibrahim Moosa Luthfee, resident of Malé, businessman, who runs a computer business called "Viuga" with offices in Malé; Ahmed Ibrahim Didi, also a businessman; and Fathimath Nisreen, personal secretary to Ibrahim Moosa Luthfee.

6.      According to information submitted to the Working Group, these four persons were arrested because of their alleged involvement in writing and contributing to an Internet bulletin called "Sandhaanu" which carries articles deemed critical of the Government of Maldives. Mohamed Zaki, who normally resides in Kuala Lumpur, was visiting Malé on business.  He was arrested on 30 January 2002.  Ibrahim Moosa Luthfee was arrested on 31 January 2002 from his residence in Malé.  They were both arrested without a warrant by police from the National Security Service (NSS).

7.      Ahmed Ibrahim Didi was arrested on 31 January 2002 at the Bandaranaike International Airport in Colombo by Sri Lankan Interpol officers and was taken back to Malé.  He was about to board a plane to Bangkok where he was going for medical treatment for a heart problem. Fathimath Nisreen was arrested, without a warrant, from the offices of "Viuga" in Malé on 1 February 2002, also by police from the NSS.

8.      The four were taken to Malé Police Headquarters where they were held in solitary confinement for two weeks.  They were then transferred to Dhoonidhoo detention centre, located on a small island approximately 5 km from Malé.  They were not permitted visits from relatives or friends.  On 2 May 2002, after a number of appeals, Mohamed Zaki was taken back to Police Headquarters in Malé where relatives were permitted to see him for a few hours.

E/CN.4/2004/3/Add.1
page 76

9.      On 29 May 2002, the detainees were brought to the criminal court in Malé for the first time.  They were reportedly charged under section 29 of the Maldivian Penal Code with "committing acts that were hostile to the Government" and under article 163 of the Penal Code with "defamation".  On 26 June 2002, a second hearing took place.

10.     On 26 June 2002, Ahmed Ibrahim Didi and Fathimath Nisreen were transferred to an island prison called Mafushi, 18 miles from Malé.  On 27 June, Mohamed Zaki and Ibrahim Moosa Luthfee were transferred to Mafushi prison.  It was alleged that their conditions of imprisonment at Mafushi prison amounted to cruel, inhuman or degrading treatment or punishment.  They were kept in solitary confinement, in cells measuring 4x4 feet, and had to sleep on the concrete floor on a piece of plywood.  They were not permitted visits from family members.

11.     It was alleged that at no time were the detainees allowed to be represented by a lawyer.  On 7 July 2002, all four detainees were brought back to court in Malé for sentencing.  Mohamed Zaki, Ibrahim Luthfee and Ahmed Didi were sentenced to life imprisonment, which is 25 years in the Republic of Maldives.  They were given a document which listed the charges as follows:

        (a)      Insulting the President and his Government;

        (b)      Trying to overthrow the Government by calling on the people to come forward and fight;

        (c)      Causing hatred in the people's minds towards the Government by means of a newsletter called "Sandhaanu";

        (d)      Spreading false news; and

        (e)      Forwarding the "Sandhaanu" newsletter to others through email.

12.     Fathimath Nisreen was sentenced to 10 years' imprisonment.  She was given a document which listed the charges as follows:

        (a)      Writing false information in articles in "Sandhaanu";

        (b)      Expressing her dissatisfaction with the Government's policies;

        (c)      Trying to overthrow the Government by calling on the people to come forward and fight; and

        (d)      Supporting the "Sandhaanu" originators.

13.     After sentencing, the four detainees were returned to Mafushi island prison where they are currently serving their sentences.

14.     It was said that in cases where the nature of the charges is considered by the Government to be political, prisoners may not be given leave to appeal to the High Court.  It is not clear if the prisoners will have the right to appeal against their sentences.  Relatives of the detainees have

sent numerous letters with appeals to the President of the Republic and to the Ministry of Defence, raising their concerns.  As of 25 October 2002 (date of submission of the communication) they had not received any response.

15.     It was further alleged that although "Sandhaanu" uses strongly critical language, it does not in fact advocate violent political opposition to the Government.  Even if the four detainees had been involved in the publication and distribution of the magazine, any such involvement would amount to no more than their exercise of the right to freedom of expression.

16.     The source further reports that in January 2002, Malaysian police searched Mohamed Zaki' s home in Kuala Lumpur and took away his computer.

17.     On 10 July 2002, the authorities brought Mohamed Zaki to Malé for further questioning by the police about his businesses activities, in particular asking for information about a ship named *Mazeena* which he had owned in 1995.  They asked him for details about the ship's captain and about a shipment of cement to Viet Nam that was made around that time.  According to the source, this additional interrogation appears to have been designed to harass and intimidate him, since he had already been sentenced to life imprisonment.

18.     In its reply the Government denied, in general terms, all the allegations made by the source.  It pointed out that the procedure conducted against the four persons is in keeping with the Constitution and the laws of the Republic of Maldives.

19.     In its comments on the Government's reply the source, on the one hand, reiterated its earlier allegations.  On the other hand, it admitted that there have been calls in "Sandhaanu" to a jihad against the Government.  According to the source however, "… the use of the word jihad does not necessarily imply a call to violence.  While there are different interpretations of the meaning of jihad (ranging from non-violent opposition to violent uprising), there has not been … any violent political activity in the Maldives arising from such a call in the magazine."

20.     As to the allegation of the source that during the criminal proceedings against the four people their basic rights to a fair hearing were not guaranteed, the Working Group observes that the Government does not contest the allegation of the source that Mohammed Zaki and Ibrahim Moosa Luthfee were arrested without any warrant of arrest, that all four people have been detained for approximately four months without being charged or brought before a tribunal, that none of them has been allowed to be represented by a lawyer, and that no appeal against conviction and sentence was available to them.

21.     The Working Group does not find convincing the allegation of the source that the four persons have been prosecuted exclusively for the peaceful expression of their political conviction.  The information provided by the source - in particular its reference to calls for a jihad - support the assumption that some articles in "Sandhaanu" or other publications did incite readers to violent actions.

E/CN.4/2004/3/Add.1
page 78

22.     In the light of the foregoing the Working Group expresses the following opinion:

>       The deprivation of liberty of Mohammed Zaki, Ibrahim Moosa Luthfee,
>       Ahmed Ibrahim Didi and Fathimath Nisreen is arbitrary, being in contravention of
>       articles 9 and 10 of the Universal Declaration of Human Rights, and falls within
>       category III of the categories applicable to the consideration of cases submitted to the
>       Working Group.

23.     Consequent upon the opinion rendered, the Working Group requests the Government to
take the necessary steps to remedy the situation and to bring it into conformity with the standards
and principles set forth in the Universal Declaration of Human Rights, and encourages the
Government to sign and ratify the International Covenant on Civil and Political Rights.

Adopted on 4 September 2003

**OPINION No. 15/2003 (TUNISIA)**

Communication addressed to the Government on 11 December 2002.

Concerning:  Mr. Yahyaoui.

**The State is a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source and received its comments thereon.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case.

5.      The case was referred to the Working Group on arbitrary detention as indicated below.

6.      Mr. Zouhair Yahyaoui, born on 8 December 1967, of Tunisian nationality, the founder and webmaster of the TUNeZINE Internet site, was arrested at Ben-Arous at around 7 p.m. on 4 June 2002 by six plain-clothes members of the criminal investigation police in the cybercafé where he worked and managed his Internet site.  He was then taken to his home, some 100 metres from the cybercafé, where the police officers conducted a search, and seized and confiscated his computer equipment.

7.      On 20 June 2002 Mr. Yahyaoui was sentenced by the Fourth Criminal Chamber of the Tunis Court of First Instance to two years and four months' imprisonment under article 306 of the Criminal Code (dissemination of false information) and article 84 of the Telecommunication Code (unauthorized use of telephone lines).  On 10 July 2002 the conviction was upheld by the Fourth Chamber of the Tunis Court of Appeal (two years' imprisonment).

8.      Mr. Yahyaoui was first incarcerated in a holding cell in the basement of the Ministry of the Interior, and then at the El Gourjani detention centre, followed by the civilian prison on the boulevard 9 avril in Tunis, and lastly in the prison at Borj El Amri, where he remains in custody.

9.      The source considers the arrest and detention of Mr. Yahyaoui arbitrary since they were the result of the exercise of the freedoms of expression and political opinion as editor and webmaster of the TUNeZINE web site, which disseminates information on the situation of human rights in Tunisia and runs two chat rooms.  This web site has been censored in Tunisia.

10.     The source also indicates that Mr. Yahyaoui was sentenced in first instance by a court that was not competent, namely the Tunis court, rather than the court at Ben-Arous, to a custodial sentence, without any of the 50 or so lawyers who organized in his defence being able to speak or file written submissions.  The lawyers were denied the right to visit, and their application before the Court of Appeal for the right to visit has not been acted on.  Further, no

one has been able to attend the trial, not even Mr. Yahyaoui's family.  The appeals for annulment filed immediately after the most recent judgement have also met with no response.  According to the source, the infringements of the right to due process taken together represent a very serious violation of the principle of equity.

11.     The source also reports on the torture suffered by Mr. Yahyaoui after his arrest, while he was held at the Ministry of the Interior from 4 to 6 June 2002 and on 8 September 2002, when, complaining of severe kidney pain, as he was being taken to the sick bay two guards beat him severely.  Mr. Yahyaoui filed a complaint, which was not recorded until 17 September 2002, and to which there has been no response.

12.     The source also indicates that Mr. Yahyaoui's uncle, Judge Mokhtar Yahyaoui, was stricken off by the judicial disciplinary council in December 2001 for having denounced the lack of independence of the Tunisian justice system; the source also states that he has been subjected to intimidatory measures for some months.  The source is concerned lest the arrest and conviction of Mr. Yahyaoui result in further harassment of his uncle and family.

13.     In its reply, the Tunisian Government notes that a complaint for theft was lodged with the criminal investigation police by the owners of a cybercafé to the effect that their office telephone lines had been used without their knowledge by their employee Zouhair Yahyaoui, which had resulted in additional costs having an unanticipated and significant impact on their budget. Investigations revealed that the employee was indeed responsible for the fraudulent use of the special telephone lines.  The investigation established that the individual concerned made fraudulent use of the Internet network to set up a site to disseminate flagrant disinformation, this constituting the offence of dissemination of false information such as to undermine public order.

14.     The disinformation included a report of a foreign commando raid on a strategic site in the country which supposedly led to the deaths of seven police officers.  Another false report alleged that there had been attacks on individuals and buildings in certain tourist sites, including a bombing of a hotel in Sousse, and appeals for the boycotting of tourism in Tunisia and Tunisian products.

15.     The Public Prosecutor's Office attached to the Tunis Court of First Instance, before which the case was brought, issued a warrant for the arrest of the accused.  On 8 June 2002 he appeared before the Tunis Criminal Court to answer two separate charges under article 84 of the Telecommunication Code and article 264 of the Criminal Code in respect of the first charge, and article 49 of the Press Code and article 306 bis of the Criminal Code in respect of the second. On the first charge (fraud) the court convicted the accused to one year and four months' imprisonment, and on the second (undermining public order) to one year in prison.  Both the accused and the public prosecutor appealed, pursuant to which the court, on 10 July 2002, reduced the sentence handed down on the first count to one year's imprisonment, and confirmed the sentence handed down on the second count.

16.     The Government notes that the accused's family was immediately informed of his arrest and place of detention, pursuant to article 13 of the Code of Criminal Procedure, and that his lawyers, in accordance with the law, were authorized to visit him.

17.     In conclusion, the Government asserts that the detention of Mr. Zouhair Yahyaoui is not arbitrary, as he was prosecuted as a result of his involvement in criminal activities and not for the exercise of his right to freedom of expression, which is guaranteed under Tunisian legislation, and as his conviction was by means of a judicial decision rendered by a competent court at the conclusion of a fair trial, at which all the guarantees provided for by law were respected.

18.     Commenting on the Government's reply, the source specified that the complaint of fraud by the owners of a cybercafé referred to by the Government does not appear in any of the documentation in the file, and that the two owners of the Internet café at which the arrest took place on 4 June 2002 were also arrested and tortured at the headquarters of the Ministry of the Interior.  The source adds that the two reports (Nos. 648 and 649) on the two counts on which Yahyaoui was sentenced clearly state that the initiation of proceedings was the result of "information concerning connections by an unknown party under the pseudonym Ettounsi managing a site for the dissemination of information … who was tracked down and arrested and proved to be the accused Zouhair Yahyaoui".

19.     Regarding the dissemination of disinformation, the source rejects the Government complaints and states that no mention of these facts was contained in the records of the trial, adding that the call for a boycott was not made on the web site but by Tunisian youngsters who had taken part in a debate in the chat room.  The source also reiterates its comments regarding the conditions of arrest, the acts of torture, the failure to respect the legal duration of police custody, the poor conditions of detention and the violations of the norms relating to a fair trial which on three occasions induced Zouhair Yahyaoui to begin a hunger strike as a protest against the deplorable conditions under which he was held.

20.     It is clear from the foregoing that the allegations by the source and those made by the Government are flatly contradictory.  For the source, the conviction of Zouhair Yahyaoui was in violation of the norms relating to a fair trial and was intended to punish him for exercising freedom of expression on a web site, which he operated in secret.  For the Government, the inquiry that led to the conviction of Zouhair Yahyaoui was launched following a complaint of fraudulent use of telephone lines filed by his employers against him, and it was that investigation that revealed the use by the party concerned of a web site propagating disinformation such as to undermine public order.  The source asserts that there was never any complaint and that the so-called complainants were themselves arrested and tortured, and that their premises remain closed to this day.

21.     On this point, the Government's reply lacks conviction.  On the one hand, it asserts that the inquiry was undertaken pursuant to the filing of a commonplace complaint of fraudulent use of telephone lines while, on the other hand, it maintains that Zouhair Yahyaoui operated a web site propagating false information, announcing bombings, raids by foreign commandos and other events that allegedly created false alerts, sowed panic and seriously undermined public order.  The Working Group has received press releases and urgent appeals from several non-governmental organizations that confirm the allegations by the source and testify that the TUNeZINE site disseminates information on the situation of fundamental freedoms in Tunisia and has two chat rooms.  Moreover, PEN American Center awarded Zouhair Yahyaoui the PEN/Barbara Goldsmith Freedom to Write Awards prize.  It is also alleged that

E/CN.4/2004/3/Add.1
page 82

Zouhair Yahyaoui was tortured to reveal the password for the TUNeZINE web site, and that the site disappeared after his arrest, and that it was subsequently censored in Tunisia. These allegations have been completely ignored in the Government's reply.

22.     As for exercise of the freedom of expression via the Internet, the Working Group reaffirms that the right to freedom of opinion and expression, guaranteed in article 19 of the Universal Declaration of Human Rights and article 19 of the International Covenant on Civil and Political Rights, encompasses the freedom to disseminate ideas of all kinds, in any form and by all means, unless, in exercising this right, the person or persons concerned instigate crime or racial hatred, resort to violence, or threaten, in violation of the law, national security, public safety, public order, or public health or morality, as well as the rights or reputation of others, which, in the present case, does not seem to be so.

23.     The Working Group also notes with regard to the violation of the right to a fair trial that whereas the source affirms that no one was able to attend the trial and that Zouhair Yahyaoui's lawyers were not authorized to visit him and were unable to make statements or written submissions, either before the court handing down the sentence, or before the court of appeal, or before the court of cassation, the Government simply described the conduct of proceedings and maintained that the conviction was a result of a judicial decision rendered by a competent court at the conclusion of a fair trial at which all guarantees provided for by law were respected, without adducing any arguments to counter the allegations by the source.

24.     The Working Group considers that in the present case a public hearing and the right to have the necessary time and facilities to prepare a defence and communicate with counsel chosen by the defendant are fundamental guarantees, the violation of which makes the deprivation of liberty arbitrary in that it contravenes the provisions of article 14 of the International Covenant on Civil and Political Rights.

25.     From these various circumstances the Working Group concludes that Zouhair Yahyaoui is in reality being detained for having exercised his right to freedom of expression and opinion, in violation of article 19 of the Universal Declaration of Human Rights and article 19 of the International Covenant on Civil and Political Rights, to which Tunisia is a party.

26.     In the light of the foregoing, the Working Group renders the following opinion:

        The deprivation of liberty of Zouhair Yahyaoui is arbitrary, being in contravention of article 19 of the Universal Declaration of Human Rights and of articles 14 and 19 of the International Covenant on Civil and Political Rights, to which Tunisia is a party, and falls within categories II and III of the categories applicable to the consideration of cases submitted to the Working Group.

27.     The Working Group, having rendered this opinion, requests the Government to take the necessary steps to remedy the situation and bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

                                                            Adopted on 5 September 2003

**OPINION No. 16/2003 (CUBA)**

Communication addressed to the Government on 19 July 2002.

Concerning:  Léster Téllez Castro, Carlos Brizuela Yera, Carlos Alberto Domínguez y Bernardo Arévalo Padrón.

**The State is not a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group transmitted the reply provided by the Government to the source, which made comments thereon.  The Working Group is now in a position to render an opinion on the facts and circumstances of the cases, in the context of the allegations made and the response of the Government thereto.

5.      The following cases were referred to the Working Group on arbitrary detention:

(a)      Léster Téllez Castro, a journalist and editor with the Avileña Free Press agency, was arrested on 4 March 2002 on a visit to Ciego de Ávila to see Mr. Jesús Álavarez Castillo, a correspondent from the CubaPress agency.  Force was used in the arrest, and the law enforcement officers did not produce an arrest warrant.  On 19 April he was moved to Canaleta prison, in Ciego de Ávila.  No charges have been brought against him.  Nevertheless he has been unofficially informed that he would be accused of "disturbing the peace in a medical institution", of "refusal to obey" and "disparagement";

(b)      Carlos Brizuela Yera, a journalist, and member of the Camagüey College of Independent Journalists, was arrested in the same way and in the same circumstances as Mr. Téllez Castro.  On 11 March 2002 he was moved to a detention centre in the province of Holguín.  No charges have been brought against him either, although he has been informed unofficially that he will be accused of the same offences;

(c)      Carlos Alberto Domínguez, a journalist, and employee of the Cuba Verdad agency, director of the Law Institute, and member of the 30 November Democratic Party, was arrested on 23 February 2002 in the city of Havana by four State security agents.  On 29 March 2002 he was moved to Valle Grande prison in Havana.  He is accused of having participated in the organization of political demonstrations that were to be held on 24 February 2002 to commemorate the death of four pilots from Brothers to the Rescue, based in Miami, Florida.  Officially charges have been brought against him for the offences of "disturbing the peace" and "refusal to obey".  It is alleged that he is prevented from meeting with his lawyer and that the length of visits by family members has recently been reduced.  It is also claimed that his health has undergone considerable deterioration;

E/CN.4/2004/3/Add.1
page 84

(d)     Bernardo Arévalo Padrón, a journalist and founder of the Línea Sur press agency, was arrested in 1997 and sentenced to six years' imprisonment in November of that year for disparagement of the President and Vice-President of the Councils of State and Government.  In October 2002 he earned the right to apply for conditional release by virtue of having served half his sentence.  Nevertheless, his application was rejected.

6.     The source considers that these persons were arrested and are in detention essentially for political reasons; mainly for having engaged in the peaceful exercise of their right to freedom of expression, recognized by the Constitution of the Republic of Cuba, and for having stated their ideological differences.

7.     The Government, in its reply, maintains that:

(a)     Mr. Téllez Castro went to the hospital where Mr. Álvarez Castillo, together with other people, was being examined, and caused a serious disturbance of the peace which paralysed the public services of the hospital for over an hour.  The people awaiting treatment in the hospital reacted immediately to the offensive actions of Mr. Téllez Castro and his companions, defending their legitimate right to access to the medical services they required with varying degrees of urgency.  In view of the breach of the peace and public nuisance caused by the actions of Mr. Téllez and his companions, it was necessary for police officers to intervene to re-establish medical services and prevent physical attacks.  Léster Téllez Castro is an antisocial element, impulsive, disrespectful, provocative in his attitude towards the authorities.  He has been involved in several attempts to leave the country illegally, and in 1992 was jailed for theft; he was tried for robbery with violence in 1993 and, also in 1993, for theft;

(b)     Carlos Brizuela Yera served four years in prison from 1994 to 1998 for an attempt on the life of a police officer.  Léster Téllez Castro and Carlos Brizuela Yera are in pre-trial detention for aggravated disorderly conduct, resistance and contempt.  These offences are duly defined in the Cuban Criminal Code and the trial will be conducted with full guarantees of due process, in accordance with the rule of law;

(c)     Carlos Alberto Domínguez embarked on migration formalities in 1994 in order to travel to the United States of America for family reunification.  His application was rejected by the Interests Section of the United States of America in Havana.  Mr. Domínguez was responsible for various acts that constitute offences under the criminal law in force. On 23 February 2002, in view of his premeditated recidivism, he was arrested.  He is being held in the Valle Grande prison in the city of Havana.  Mr. Domínguez is not a journalist; he holds a licence to work as a self-employed watchmaker.  There is no Cuba-Verdad press agency in Cuba. His arrest has no connection with the free exercise of religion or opinion and expression. Mr. Domínguez acted with the clear and premeditated objective of causing public disorder and preventing the proper conduct of activities in the public interest;

(d)     Mr. Arévalo Padrón is serving a sentence of six years' imprisonment for contempt, as provided for and punished under current criminal legislation.  In each phase of the criminal proceedings, Mr. Arévalo Padrón enjoyed all necessary guarantees of due process. Mr. Arévalo Padrón is not a journalist, and is not the director of a press agency. Mr. Arévalo Padrón has organized and participated in actions clearly aimed at subverting the constitutional order freely decided on by the Cuban people in exercise of its sovereignty, and his

acts, in addition to constituting clear violations of legality, have posed a manifest threat to the life and safety of other citizens.  With other citizens, he attempted to found a covert cell to carry out terrorist activities in Cuba, promoted and funded by the so-called Independent Democratic Cuba terrorist organization, based in the United States of America.  He was placed under a minimum-security regime, as a preliminary step to conditional release.  However, taking advantage of the placement in an open centre, he repeatedly violated the disciplinary regulations, so that as a result that privilege was revoked in June 2002.

8.      With respect to these cases the source has replied that Léster Téllez Castro had been engaged in journalism and the defence of human rights for the past two-and-a-half years.  The source acknowledges that he then left prison, after being convicted to six years' imprisonment for robbery with violence, but maintains that at that time he was a vulnerable adolescent, under bad influences, and that, according to family and friends, he has led an exemplary life since finishing his sentence.  The source adds that the Cuban authorities harp on this background to discredit his activities and justify his current imprisonment to the international community.  The source has admitted that Carlos Brizuela Yera, like his friend Téllez, has a criminal record.  Reportedly he was arrested for displaying a poster reading "Down with Fidel" in a street demonstration, whereas the Government accused him, in the judgement handing down the sentence that he served from 1994 to 1998, of an attempt on the life of a police officer.  The source asserts that on that occasion both were arrested with many other activists in a demonstration when they went to visit Mr. Álvarez Castillo, hospitalized after being assaulted by police officers.

9.      On Carlos Alberto Domínguez, the source maintains that his political militancy has also earned him several detentions and a prohibition on leaving the country, even though he has held, as have his wife and three children, a United States visa since June 2000.

10.     As for Bernardo Arévalo Padrón, the source asserts that he was sentenced to six years' imprisonment largely for having called the Cuban authorities liars for not respecting the final declaration of an Ibero-American summit.

11.     The Working Group, on the basis of the observations of both the Government and source, considers that in the cases of Léster Téllez Castro and Carlos Brizuela Yera, both Government and source agree that their detention followed a demonstration opposite a hospital, and that others were also arrested.  The Government, other than stating that hospital services were disrupted for an hour owing to the demonstration, does not convincingly refute the fact that this was a peaceful demonstration to protest a beating by the police.  The exercise of the rights of opinion and demonstration is protected by the Universal Declaration of Human Rights.  As for the criminal records of these two individuals, noted by the Government and acknowledged by the source, the Working Group considers that the submission before the Group relates to the current situation of the detention of these persons and not their prior judicial situation.

12.     In the case of Carlos Alberto Domínguez, there is no denial of the fact that he was arrested after having organized political demonstrations, in which no use of violence is alleged.  The Government did not specify the charges relating to public disorder or the interruption of activities in the public interest, and in any event it is apparent that the demonstrations were organized to commemorate certain events and to express a political opinion that differs from that of the Government, a right protected by the Universal Declaration of Human Rights.

E/CN.4/2004/3/Add.1
page 86

13.      Bernardo Arévalo Padrón was arrested on charges of contempt for having publically criticized the country's highest authorities.  The Government alleges that by his activities he threatened the life and safety of citizens, and funded an organization for the perpetration of terrorist acts.  Nevertheless, it does not indicate how those acts have been carried out, and does not refute the fact that public criticism of the authorities led to six years' imprisonment for him.  The Working Group maintains with regard to exercise of freedom of expression that it does not admit of greater restrictions, and that in any event any restrictions must meet the requirements of legality and legitimacy, and be necessary to a democratic society.  Such restrictions would apply to use of violence, incitement to racial or religious hatred, or to commit crimes.  In this case such circumstances do not apply, either with regard to Mr. Arévalo's activities or his public criticisms of the authorities.  Accordingly the Working Group considers that he has been detained merely for having peacefully exercised the right to freedom of opinion.

14.      In the light of the foregoing, the Working Group renders the following opinion:

        The deprivation of liberty of Léster Téllez Castro, Carlos Brizuela Yera, Carlos Alberto Domínguez and Bernardo Arévalo Padrón is arbitrary, being contravention of articles 9, 10, 19, 20 and 21 of the Universal Declaration of Human Rights, and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

15.      The Working Group, having rendered this opinion, requests the Government of Cuba to take the necessary steps to remedy the situation of these four persons, to bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights, and to take appropriate steps with a view to becoming a State party to the International Covenant on Civil and Political Rights.

                                                              Adopted on 5 September 2003

**OPINION No. 17/2003 (CUBA)**

Communication addressed to the Government on 6 February 2003.

Concerning:  Leonardo Miguel Bruzón Ávila, Juan Carlos González Leyva and Oscar Elías Biscet González.

**The State is not a party to the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having provided the requested information in good time.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government.  The Working Group submitted the reply provided by the Government to the source and received its comments thereon.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to information received by the Working Group, Leonardo Miguel Bruzón Ávila, an independent bookseller and president of the 24 February Movement, was arrested on 22 February 2002 by police officers while organizing a peaceful demonstration to commemorate 24 February 1895, the date of the beginning of the war of independence, and 24 February 1996, the date on which two light aircraft belonging to the Brothers to the Rescue organization were shot down.  Since that time he has been held in Quivican prison, province of Havana.  It is reported that he has not been tried, and that no charges have been brought against him.

6.      Juan Carlos González Leyva, 37 years old, resident of Ciego de Ávila, married to Maritza Calderín Columbie, the president of the Cuban Foundation for Human Rights and member of the Corriente Agramontista organization of independent lawyers, and who is sightless, was arrested on 4 March 2002 when participating in a peaceful demonstration in the vicinity of the Antonio Luaces Iraola provincial hospital in Ciego de Ávila, in protest at the arrest and admittance to the hospital of Jesús Álvarez Castillo, a journalist.  While he was being arrested he was reportedly struck on the head.  It is claimed that he was not given the requisite medical attention or the care required by his blindness.  On occasions he was stopped from using his dark glasses, his stick and a Braille bible.  González Leyva also reportedly complained of intestinal problems attributable to the introduction of foreign substances into his food.  The source also states that his wife, father and brothers suffered a series of acts of intimidation and reprisal, including short periods of arrest.

7.      Oscar Elías Biscet González, founder of the Friends of Human Rights organization, was arrested, together with 16 other persons, on 16 December 2002, when on his way to participate in a meeting of his organization in the Lawton district of Havana.  While being arrested he was beaten by the police.  The source indicates that on 6 November 2002 this person reportedly

participated in a press conference in Havana on conditions for prisoners and on prisons in Cuba. Mr. Biscet González had formerly been held in Holguín prison, where he spent three years, and had been released on 31 October 2002.

8.      The source considers that these persons have been arrested only for having exercised the right to freedom of association and expression and for having expressed, peacefully, political opinions at variance with those of the authorities.

9.      The Government, in its replies on these cases, maintains that Mr. Leonardo Miguel Bruzón Ávila was arrested for committing acts constituting offences under criminal legislation in force before the commission of the acts.  Mr. Bruzón Ávila enjoyed all the benefits of due process.

10.     Mr. Juan Carlos González Leyva was responsible for acts constituting offences under the national legislation in force, acts which could never have been termed "a peaceful protest opposite the Antonio Luaces Iraola hospital" as stated in the communication containing the allegations.  On 4 March 2002 serious disturbances of the public order, acts of resistance and of contempt for the public authorities in the discharge of their functions took place, leading to the arrest of various citizens, including Mr. Juan Carlos González Leyva.

11.     On the morning of 4 March 2002 Mr. Jesús Álvarez Castillo was taken to the hospital, in accordance with standard police procedures, after he had made a complaint to the effect that he had been injured at the time of his arrest.  It should be noted that Mr. Álvarez Castillo violently resisted arrest.  It was ascertained that the report was completely unfounded, in that the doctors ascertained that Mr. Álvarez Castillo had no injuries of any kind.  For his part, Mr. González Leyva and the other citizens mentioned in the communication, alerted to the presence of Mr. Álvarez Castillo in the hospital guardroom, went to the guardroom with the aim of engaging in disorderly conduct and fabricating a false image of arbitrary action by the police authorities when arresting Mr. Álvarez Castillo.

12.     In the company of the citizens mentioned in the complaint, Mr. González Leyva threatened and harassed medical and paramedical hospital staff in the building, as well as patients and family members present, occasioning serious disturbances within the hospital centre facility.  For almost two hours the group of citizens, including Mr. González Leyva, obstructed the delivery of important medical services in the hospital, including emergency services, thereby imperilling the lives of many patients, including a number of children.

13.     As a consequence of these actions, a patient receiving treatment for arterial hypertension took fright and left the hospital centre, and as a result suffered a heart attack, from which the patient is still recovering.  A number of children awaiting emergency tests had to wait until the situation had been brought under control by the police.  At the request of hospital management, police officers intervened to restore order and medical services, and in particular to put an end to a situation that was growing worse as a result of the increasing irritation and concern of patients and their family members, owing to the fact that it was impossible for them to receive the medical services they needed.

14.     Mr. González Leyva inflicted an injury on himself, requiring five stitches on the forehead.  He struck his head hard against the frame of a metal door, evidently intending to blame the resulting injury on the police authorities.  The prosecutor's office conducted a rigorous investigation of the facts, which offered irrefutable corroboration of the true situation as indicated above.  During the investigation unequivocal voluntary testimony was obtained from eyewitnesses, who confirmed the above events.

15.     This is not the first occasion on which Mr. González Leyva has injured himself with the intent of blaming the ill-treatment on the authorities concerned.  In each case, following investigation, the falseness of his accusations has been established.  Those responsible for the events described are in pre-trial detention, for the offences of public disorder, resistance and contempt.  The Government asserts that on each occasion without exception due process was respected.  Mr. González Leyva, in view of his physical disability, has not been moved to prison, and is still at the facilities of the judicial investigation service in the province of Holguín, which has better facilities for providing proper treatment.

16.     According to the Government, with respect to the case of Mr. Oscar Biscet González, on the evening of 6 December 2002, a group of individuals went to the Raúl Arencibia apartment building to take part in a disturbance of the public order and safety of the citizen organized by Oscar Elías Biscet.  None of these people were participating in a "peaceful meeting" of any kind, neither were they attending any kind of class in human rights.  Far from a teaching or academic activity, that day the citizens were openly challenging the public order, causing a serious incident which provoked an angry response by more than 100 people who felt attacked by Mr. Biscet.  The events caused a violent interruption in the teaching activities taking place in an educational institution in the locality, besides obstructing traffic for more than an hour.

17.     The Government asserts that Mr. Biscet was the principal instigator and culprit, openly engaging in incitement to commit an offence.  From the outset Mr. Biscet acted aggressively, with the clear intention of escalating the disorder that he had caused until the situation was out of control.  Those responsible for the public disorder refused to show their identification documents.  Mr. Biscet and various other people mentioned resisted arrest and assaulted law enforcement agents.  The citizens mentioned were arrested for violating the criminal legislation in force in the country.

18.     The Government asserts that the inquiries conducted regarding arrest, transfer and detention at the police station indicated that the police officers did not beat or inflict physical harm on any of the persons referred to in the complaint.  At all time the requirements of due process were respected and the criminal procedure provisions in force were strictly observed.  Mr. Biscet González remained in prison on confirmation of his responsibility as a principal instigator of the offences described, was punished by the competent courts to 20 years' imprisonment for instigation to commit offences, and for other criminal offences directly intended to undermine the sovereignty and constitutional order of the nation.

19.     The Government concludes by stating that Mr. Biscet González is not a "peaceful advocate" of human rights.  The Government asserts that it has abundant evidence of subversive activities carried out over many years by this person against the constitutional order adopted by the Cuban people, activities directed and funded by a foreign Government and by terrorist organizations of Cuban origin based in the territory of another country.

E/CN.4/2004/3/Add.1
page 90

20.    The source has reacted to this reply by the Government, stating that Leonardo Miguel Bruzón had been arrested on his way to celebrate mass and commemorate a patriotic holiday with a peaceful group of dissidents.  Mr. Bruzón is still awaiting trial on charges, made known unofficially, of "enemy propaganda", "contempt", "public disorder" and "incitement to commit an offence".

21.    With regard to the case of Juan Carlos González Leyva, the source asserts that he has so far been held for more than 15 months without trial, which suggests that the authorities have had difficulty in bringing charges against him.  He was arrested for having gone with other dissidents to a local hospital to protest the beating of a journalist.  The group of demonstrators, according to the source, was engaged in a peaceful protest, praying and chanting slogans such as "long live human rights" and "long live Christ the King", and had not blocked the patients' entrance, but, on the contrary, had sought treatment for a patient.  One hour later the group was surrounded by State security forces, who took them away under arrest.  Their resistance was peaceful.  Mr. González Leyva has always rejected violence.  Further, the source states that the Government's suggestion that the totally blind Mr. González Leyva inflicted serious injuries on himself on more than one occasion is an effort to discredit him, is false, and does not accord with his personal commitment to peaceful activism.  As for his conditions of detention, the source reaffirms that he is in a court building, but sharing a cell with a common prisoner, and that both he and his spouse have complained about the poor conditions, which make no accommodation to his blindness.

22.    With regard to Dr. Biscet González, the source states that his career as a doctor and activist shows in his public actions that he is a man of peace, who has established in Havana the Lawton Human Rights Foundation as a humanitarian organization for the promotion and defence of fundamental rights through non-violence; that he considers the right to life as the foundation for other human rights, as a follower of Ghandi and Martin Luther King; that the foundation motto is "Truth and Freedom"; and that its members, who oppose abortion, euthanasia and all acts of violence, are committed to implementing their ideas peacefully through civil disobedience.  The source adds that Dr. Biscet has never made any public statement in support of military action against his own country, or promoted military invasion of Cuba; that the Government's attempts to link Dr. Biscet's contacts with Cuban exiles to terrorism have no foundation; that on 6 December Dr. Biscet planned to meet a dozen or so activists to discuss human rights when the State security forces prevented them from entering his house.  In protest, the activists lay down on the ground, shouting "long live human rights", at which point they were arrested.

23.    The Working Group, having analysed the foregoing, considers that Mr. Leonardo Miguel Bruzón Avila is under arrest for having attempted to organize a demonstration to express his political opinions on the commemoration of a date; the peaceful nature of the demonstration has not been contested.

24.    As for Juan Carlos González Leyva, he too has been arrested for exercising his right to freedom of expression, in a manner in which there was no suggestion of violence.  The charges brought against him are ambiguous and have not clearly identified offences which could justify his detention.  The Working Group considers that his was a political protest, in which resisting arrest could have caused the disturbances at the hospital.

25.     Regarding the detention of Oscar Elias Biscet, the Working Group considers that this occurred when a peaceful meeting on political dissent was about to be held by his foundation, this constituting a freedom recognized in the Universal Declaration of Human Rights, and which must be guaranteed.

26.     In the three cases, and under different circumstances, the Working Group considers that the events which occurred fell within the confines of the peaceful exercise of recognized rights, such as freedom of opinion, expression and assembly, these three persons having been arrested for having exercised these freedoms in opposition to the Government.

27.     In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Leonardo Miguel Bruzón Avila, Juan Carlos González Leyva and Oscar Elías Biscet Gonzáles is arbitrary, being in contravention of articles 9, 10, 19, 20 and 21 of the Universal Declaration of Human Rights, and falls within category II of the categories applicable to the consideration of cases submitted to the Working Group.

28.     The Working Group, having rendered this opinion, requests the Government of Cuba to take the necessary steps to remedy the situation and bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and to take appropriate steps with a view to becoming a State party to the International Covenant on Civil and Political Rights.

Adopted on 5 September 2003

E/CN.4/2004/3/Add.1
page 92

**OPINION No. 18/2003 (SYRIAN ARAB REPUBLIC)**

Communication addressed to the Government on 22 May 2003.

Concerning:  Tanious Kamil El-Habr.

**The State has ratified the International Covenant on Civil and Political Rights**

1.      (Same text as paragraph 1 of opinion No. 15/2002.)

2.      The Working Group conveys its appreciation to the Government for having submitted information concerning the case.

3.      (Same text as paragraph 3 of opinion No. 15/2002.)

4.      In the light of the allegations made, the Working Group welcomes the cooperation of the Government, but regrets that it did not provide the Working Group with the information it sought and did not facilitate, in practice, its task of examining the case.  The reply of the Government was forwarded to the source, which provided the Working Group with its comments.  The Working Group believes that it is in a position to render an opinion on the facts and circumstances of the case, in the context of the allegations made and the response of the Government thereto.

5.      According to the source, Tanious Kamil El-Habr, born in 1965, a Lebanese citizen and former sergeant in the Lebanese army, living in Dekwaneh, Lebanon, was arrested on 13 October 1990 in Aain Saadé city, Lebanon, by members of the Syrian intelligence forces.  No arrest warrant was shown at the moment of his arrest.  He was initially taken to the Syrian Intelligence Services Centre of Anjar, Lebanon.  Later, he was transferred to the Palestine Branch Detention Centre in Damascus, Syria, without following any formal extradition procedure.  Mr. El-Habr was first imprisoned in Mazzé prison in Syria, where his father was authorized to visit him.

6.      According to the source, although Mr. El-Habr was not charged with any offence, Colonel Ahmad An Naasan, First Military Judge, ordered that he be held in detention.  Subsequently, he was transferred to Palmyre prison, where he was denied the right to receive visits.  The source further reports that Mr. El-Habr has been held incommunicado for long periods.  He has been held in detention for more than 12 years without charges, trial or sentence.

7.      The Government of the Syrian Arab Republic, in its reply, stated that the authorities concerned have no information about the detention of Mr. El-Habr.

8.      In its comments on the Government's reply, the source indicated that Mr. El-Habr had received visitors while being held at the Syrian military prison of Mazzé and that his family had been informed by former political prisoners in Syria that he had been imprisoned with them in September 1993 at the air force intelligence prison near the Mazzé airport.  According to the source, the two pieces of information confirmed Mr. El-Habr's presence in Syria.

E/CN.4/2004/3/Add.1
page 93

9.      The source maintains that Mr. El-Habr was arrested by the Syrian army together with 200 other Lebanese when it entered the eastern area of Beirut on 13 October 1990; he was subsequently transferred to Syria and placed in a detention facility under Syrian authority.  The source provides information on the locations where Mr. El-Habr's relatives were able to visit him and where other prisoners say they saw him, while the Government maintains that the authorities concerned do not have any information about Mr. El-Habr's detention.

10.     The Working Group, which has received other complaints alleging that the Syrian authorities have imprisoned persons who were arrested in Lebanon without legal basis and transferred in the same circumstances as Mr. El-Habr to Syria, where they continue to be held, believes that the information and evidence collected by the source are reliable enough for it to conclude that Mr. El-Habr is either being detained in Syria following his transfer there or was detained there for an extended period from 1990 to September 1993, the date on which he was last seen in a Syrian prison, without having been charged or sentenced and without any legal justification having been given to Mr. El-Habr or to his family for his arrest, transfer to Syria and prolonged detention.

11.     It follows from the above considerations that the detention of Mr. El-Habr is arbitrary, given that there is absolutely no legal basis for it, and that it comes under category I of the categories applicable to the examination of cases submitted to the Working Group.

12.     In the light of the foregoing, the Working Group renders the following opinion:

> The detention of Tanious Kamil El-Habr is arbitrary as it is contrary to article 9 of the Universal Declaration of Human Rights and article 9 of the International Covenant on Civil and Political Rights, to which the Syrian Arab Republic is a party, and comes under category I of the categories applicable to the examination of cases submitted to the Working Group.

13.     Having issued this opinion, the Working Group requests the Government to adopt the necessary measures to remedy the situation in order to bring it into line with the provisions and principles embodied in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

Adopted on 5 September 2003

-----