

**Freedom from Torture**

# Turning a blind eye:
Why the international
community must no longer
ignore torture in Iran

December 2017


**Freedom from Torture**

# Freedom from Torture

Freedom from Torture is the only UK-based human rights organisation dedicated to the treatment and rehabilitation of torture survivors. We do this by offering services across England and Scotland to around 1,000 torture survivors a year. Including psychological and physical therapies, forensic documentation of torture, legal and welfare advice, and creative projects.

Since our establishment in 1985, more than 60,000 survivors of torture have been referred to us, and we are one of the world's largest torture treatment centres. Our expert clinicians prepare medico-legal report that are used in connection with torture survivors' claims for international protection, and in research reports, such as this, aimed at holding torturing states to account.

Through our Torture Accountability Programme, we work to expose torture in order in support of efforts to strengthen prevention, secure justice and ensure international protection for survivors. Survivor voices and expertise are at the heart of this work.

We are the only human rights organisation in the UK that systematically uses evidence from in-house clinicians, and the torture survivors they work with to work towards a world free from torture.

## Survivors Speak OUT network

Survivors Speak OUT (SSO) is the UK's only torture survivor-led activist network and is actively engaged in speaking out against torture and about its impacts. Set up by survivors of torture, for survivors of torture, SSO uses first-hand experience to speak with authority for the rights of torture survivors. The network is supported and facilitated by Freedom from Torture and all network members are former Freedom from Torture clients.

To find out more about Freedom from Torture and the Survivors Speak OUT network please visit www.freedomfromtorture.org

Follow us on Twitter @FreefromTorture and @SSOonline
Or join us on Facebook https://www.facebook.com/FreedomfromTorture



# Turning a blind eye

## Why the international community must no longer ignore torture in Iran

## Thinking of you

*The torture is over*

*I told them nothing about you.*

*Blindfolded, now*

*I lay on the hard floor*

*thinking of you*

*and our little room*

*and the tulips*

*you bought me on my birthday.*

*I think of our last kiss*

*and how much I regret now*

*I hurried away to work.*

Nasrin

# FOREWORD

Torture, like many other measures in Iran especially if you are a woman, is meant to silence you. For those of us who escape the country we face a long struggle to regain our voices. Over the years I have discovered poetry and painting as a way to make sense of my experiences and to try to tell people about torture and my detention in Iran.

Freedom from Torture helped me to find my voice and I welcome the spotlight they are shining on the use of torture in Iran through this report. I hope it will give confidence to survivors that they are not alone.

I also want to remind governments around the world, and the people who vote for them, why they should not ignore my country's appalling abuses of its people, while they secure political or other gains.

In 1990, when I was in Evin Prison in Tehran, United Nations human rights inspectors visited. Our families all wanted to know what we had said to the inspectors and what they had said back to us. They could not quite believe us when we explained that we had not met the inspectors and that a new wall had been built across corridor 216, to conceal us from them, and if the inspectors had asked for us by name, they must have been fobbed off. The inspection had been a piece of political theatre.

Since my detention, Evin Prison has repeatedly been in the news. There are so many stories of mistreatment and other horrors but it is also the prison that the regime has opened the doors to in the face of international criticism of human rights abuses; usually with a coat of paint and a similar sense of performance to the one I experienced. On a tour of Ebrat Museum, which is open to tourists as an example of repression and control by the Shah, there is no mention of its more recent history as a place of torture. I spent five months in a cell and one month in a corridor there.

The Iranian government is a master of such deceptions. While President Rouhani publicly promises reform, behind closed doors there are still too many stories of prisoners dying in detention.

Women are oppressed at every turn, they struggle for freedom and equality and the prisons are full of women as well as men who fight for civil rights. Too many ordinary people have learnt that questioning how or why the regime operates is a dangerous act. As the evidence in this report highlights, repeated arrests and harassment are part of people's lives. Activists in particular are arrested many times and often spend years in prison.

Hassan Rouhani was first elected president in 2013, but human rights are still being violated despite his promises for reforms. Under President Rouhani, the gap between poor and rich has widened. The roads into the cities are lined with children selling flowers, cleaning car windows, or begging, when they should be at school.  These are the children who are visible; there are many more suffering out of view. The government would like you to believe that this is a result of sanctions and underlines the need for economic progress. I worry that the drive for economic prosperity is masking the darker side of life in Iran, and unless we continue to shine a light on torture, even the limited reforms that are being put forward will be built on weak foundations.

This report describes the torture and its impact on 69 people and this is a tiny percentage of those who have had similar experiences in Iran. I hope it will help to bring these experiences out of the shadows and remind people around the world, governments, the UN, the EU and others, why they need to demand that the Iranian government ends such human rights abuses.


Nasrin Parvaz
A member of the Survivors Speak OUT network
December 2017

3

# ACKNOWLEDGEMENTS

This report was researched and written by Emily Wilbourn, with policy input from Tania Baldwin-Pask and research assistance from May Robson.

Freedom from Torture's country reports rely on the participation and support of survivors of torture who are willing to share their medico-legal reports with us for the purpose of research. We would like to acknowledge the contribution of our Iranian clients, including those who shared their medico-legal reports and those who gave their time to help us understand the context in which torture takes place in Iran.

We would also like to acknowledge and thank members of Survivors Speak OUT network for their collaboration with Freedom from Torture on this project and in the development of survivor participation approaches in our research and advocacy work.

These reports rely on the hard work of colleagues from across Freedom from Torture's centres and in all departments of the organisation. We would like to thank all of those at Freedom from Torture who supported this project.

We are particularly grateful to the staff of the Medico-Legal Report Service, including our doctors who prepare the medico-legal reports, the lawyers who support them and our interpreters.

In addition we were able to consult and discuss our findings with a number of organisations who have long campaigned for improvements to human rights in Iran. We would particularly like to thank Amnesty International, Baha'i International Community, Boroumond Foundation, Center for Human Rights in Iran, Convention Against Torture Initiative, Human Rights Activists in Iran, Human Rights Watch, Impact Iran, International Bar Association and Partners for Rights for generously sharing their expertise with us.

Drawings by a former Freedom from Torture client from Iran. Not to be reproduced without permission.

Poems by Nasrin Parvaz. You can read more of Nasrin's work at http://www.nasrinparvaz.org.

# GLOSSARY

**Body of Principles** – UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment

**EU** – European Union

**Istanbul Protocol** – Manual on the Effective Investigation and Documentation of Torture and Other Cruel or Degrading Treatment or Punishment

**JCPOA** – Joint Comprehensive Plan of Action or the "Nuclear Deal"

**The Nelson Mandela Rules** – The United Nations Standard Minimum Rules for the Treatment of Prisoners

**OHCHR** – UN Office of the High Commissioner for Human Rights

**SSO** – Survivors Speak OUT network

**UK** – United Kingdom of England, Wales and Northern Ireland

**UN** – United Nations

**PTSD** – Post-traumatic Stress Disorder

# CONTENTS

Key points                                          9

Introduction                                       11

Survivor Voices                                    13

Our research findings                              15

Research methodology                               17

Who has been tortured and why?                     19

Detention context                                  27

Evidence of torture                                37

Impacts of torture                                 47

Conclusions                                        53

Recommendations                                    55



TEHRAN

The findings of this study indicate that torture has long been allowed to thrive in state detention facilities under the control of Iranian security agencies, including the police, intelligence, Basij and Revolutionary Guard. We cannot say with certainty whether people were tortured in the same area where they were arrested as many of them were prevented from knowing where they were detained.



**IRAN**

## Arrests were reported across ten provinces of Iran

- East Azerbaijan
- West Azerbaijan
- Zanjan
- Kurdistan
- Kermanshah
- Mazandaran
- Alborz
- Tehran
- Esfahan
- Khuzestan
- Fars
- Bushehr



> *When you are thirsty, you drink water; when you need freedom and equality you have to stand up for it.*

Iranian survivor of torture in treatment at Freedom from Torture

# KEY POINTS

Torture, and the threat of it, is deliberately used by the Iranian government to control a wide array of activities associated with religious, ethnic or political dissent. As a result, large sections of the population are at risk of torture.

In 2009 the Iranian government carried out a brutal crackdown in response to protests connected to the Green Movement. Our evidence shows that the torture perpetrated in this context was not a one-off event. The abuses described in this report are both recent and stretch back decades.

The use of torture at the hands of the Iranian police, intelligence and security services and in prisons demonstrates the widespread use and acceptance by the government of these interrogation and intimidation tactics. Our evidence of these practices is especially important in light of the lack of access to Iranian detention facilities by international monitors.

All of the people who feature in this case set described horrific physical abuses including high levels of sexual torture amongst both men and women, but a distinctive feature of torture in Iran is the level of psychological torture.

Survivors are threatened with retribution against family members or themselves if they speak out about torture. This is coupled with aggressive harassment in Iran, and even in the UK survivors report that the threat of surveillance by Iranian security agents is ever present. This makes speaking about their experiences terrifying for many survivors but the high numbers who leave the country each year and claim asylum in the UK are a reminder that silence does not signify an absence of abuses.

Torture in Iran is invisible in many international discussions relating to human rights abuses in Iran. It has fallen down or off the agenda for governments and even civil society groups who focus on other abuses. For survivors of torture this is devastating. For the sake of survivors who continue to live in fear and for those in Iran who live with a daily threat of torture, this has to change.

As the UK and other governments negotiate trade deals and improve political relations with Iran, they also have an opportunity to call for concrete measures to deliver much promised social reform including an end to torture and a range of other human rights abuses.



Torture is banned under international law, at all times and without exception. This report shows that torture has been used in Iran over decades to crush dissent and persecute minorities. It analyses 69 cases of torture in Iran.

By drawing on in-depth analysis of Freedom from Torture clinicians in our Medico-Legal Report service, we can demonstrate clear evidence of physical, sexual, environmental and psychological torture in Iran. Often the person was targeted for torture simply for exercising freedoms enshrined in international law, sadly not all of which are protected by Iranian law.

> "When you are thirsty, you drink water; when you need freedom and equality you have to stand up for it." - Iranian survivor of torture in treatment at Freedom from Torture

## Iran: "endemic" torture

Iran has a poor record when it comes to human rights. Death penalty cases and/or judicially administered punishments are well documented and publicised by the state as a form of deterrence and by campaigners who call for an end to their use. Indeed, they have come to form the basis of human rights campaigns globally. But there are other abuses that remain hidden. Torture, which by its nature takes place behind closed doors, has slipped even further into the shadows as the international community has largely focused its limited attention on egregious use of the death penalty. However, torture cannot continue to be ignored. Every year, thousands of Iranians are forced to flee their country to seek sanctuary elsewhere. Our research highlights how the state uses torture to silence and create a culture of fear. Without action to end the use of torture the government of Iran's promises to start social reform and its tentative steps to greater openness are hollow promises that belie continued repressive practices designed to destroy individuals and communities.

In 2013 we published research exposing the use of torture to crush dissent in the lead up to and in the weeks, months and years following Iran's presidential election in 2009.[1] This formed the basis of a hard-hitting report by the then UN Special Rapporteur on Iran[2], followed by extensive criticism of Iran at the UN Human Rights Council.[3] Confronted with our forensic evidence, a senior Iranian diplomat conceded that torture might be happening in the country.[4] According to the Special Rapporteur, this was the first time Iran had admitted this in such a forum.

Five years on from our last report, we provide further insight into the way in which the Iranian state has used torture systematically to control its people. Our research demonstrates that the 2009 torture was not a one-off. We have forensically documented torture over decades and can show that it has continued. At a time when there is significant media coverage of the detention of Iranian-British nationals and in the context of a lack of access to Iranian detention facilities for international monitors or UN representatives, our report also provides an important window into shocking detention practices.

Our research uses medico-legal reports prepared between 2012 and 2017 which document torture dating back to 1985. In over three decades of our work, we have received more than 6,000, referrals (for medico-legal reports and clinical services including therapy) for Iranians.

> For the past 21 years Iran has been the **second highest country of origin** for survivors who are referred to Freedom from Torture for forensic documentation of torture and/or rehabilitation. In 2016 alone, 140 Iranians were referred to us.

Iran is not currently a party to the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. However, that does not mean it is not bound by the absolute torture ban in international law. For example, torture is prohibited under Article 7 of the International Covenant on Civil and Political Rights, to which Iran has been a party for over 40 years.[5] Domestically, the Constitution of Iran prohibits torture and ill-treatment – but this constitutional protection is failing the Iranian people.[6]

## An absence of basic legal rights

The reality is that torture is not defined in Iranian law and there is a lack of adequate provision for the investigation and punishment of those who perpetrate torture.[7] Basic legal rights (for example, the right to a lawyer or doctor) are seldom upheld.

In her 2017 oral report to the Human Rights Council, Asma Jahangir, the current UN Special Rapporteur on the Human Rights Situation in Iran, described torture as "endemic".[8] She also noted in her written report the high levels of fear of reprisal against family members, felt by those coming forward to report abuses to her.[9] The UN High Commissioner for Human Rights Zeid bin Ra'ad, also referred to the widespread ill-treatment of prisoners in Iran in his remarks at the opening of the March 2017 Human Rights Council.[10]

And yet, the international community has become less vocal in its condemnation of torture in Iran. After the High Commissioner's opening comments, there was scant reference to torture during Council discussions on Iran. Despite being a priority country in the UK Foreign and Commonwealth Office's annual Human Rights and Democracy report in 2016, there was no mention of torture[11], or in a recent UK parliamentary debate focused solely on human rights in Iran.[12]

## An end to the silence?

In 2016 a new British Ambassador to Iran was appointed, the first since 2011. At that time the Foreign Secretary, Boris Johnson, said the appointment would enable discussions on a range of issues including human rights.[13] Sadly, we are yet to see effective political pressure on Iran to improve its record on torture. Aside from statements on abuses relating to consular cases there have been very few public calls for action to improve human rights in Iran.[14] We want to see an end to this silence.

The re-election of President Rouhani of Iran in May 2017 came after a campaign that included promises on rights reforms.[15] He announced a Charter on Citizens' rights – a first for Iran. The pressure to deliver economic reform for the country should be a chance to address issues like torture, as part of a package of negotiations on new economic and political relationships with other countries.

As this report goes to press we do not know the impact of the United States' refusal in October 2017 to certify Iranian compliance with the Joint Comprehensive Plan of Action (JCPOA or the "Iran Nuclear Deal"). There is a significant risk that the fragile confidence of all parties will be undermined and that the deal could unravel. If the other parties to the deal, including the Iranian government, successfully navigate this period and maintain the agreement this should also strengthen relations.  Both scenarios will likely result in arguments that these events make conversations on controversial issues like human rights even more difficult but it should not be used as an excuse to claim that they are impossible.

A key objective of our Torture Accountability Programme is ensuring that survivor voices are at the heart of both the design and delivery of our advocacy. As part of our preparation for this report we held a number of focus groups and individual discussions with Iranian survivors of torture to discuss accountability for torture in Iran, their experiences and what they would like to see as our advocacy priorities. These conversations have helped to shape this report and also our multi-year project on Iran and we will continue to work with the groups to develop activities to call for greater recognition of torture and action to hold those responsible to account.

We held group discussions in two of our centres and interviews in three centres. We have not disclosed where survivors are based in the UK because of safety concerns. The views we collated are from eight Iranian survivors of torture. Seven men and one woman. We tried to engage with other female Iranian torture survivors but, despite an interest in participation, they were unable to contribute.

The survivors who were part of these conversations are all therapy clients at Freedom from Torture. One of them has a medico-legal report which is also included in the research case set. The focus groups and individual discussions took place over a number of months and across Freedom from Torture centres. Most of the group conversations were facilitated by Survivors Speak OUT (SSO), an activist network set up and run by and for former treatment clients of Freedom from Torture to speak out against torture and its impacts. Contributing to these reports is a means for these survivors to demand justice for themselves and other human rights abuse survivors and to stand up against torturers who sought to make them silent.

The survivors who have helped us to shape this report expressed extremely high levels of anxiety and fear for both themselves and their families back in Iran due to active surveillance in the UK and the threat (sometimes actual and at other times tacit) of retribution if they speak out about the torture they have faced. A number of them spoke about past harassment and arrest of family members and their fears were in no way alleviated by being in a "safe country" such as the UK.

We know from many of the survivors we work with and speak to that the psychological impact of the torture they have endured leaves them with a legacy of fear, especially when they are in the process of claiming asylum and are uncertain about whether they will be returned, but the Iranian survivors were especially fearful of engagement. For many speaking in a group, even when we assured them that they would be in constant control of how much or little they contributed of any element of their experiences, was unthinkable. Their concerns that the group could be infiltrated by Iranian intelligence highlights the levels of fear that the government has managed to instil in society. For some this fear was offset by a stronger desire to speak out and ensure what happened to them does not continue to happen to others.

## Holding the Iranian government to account

A striking feature of these conversations with Iranian torture survivors was the sense of hopelessness that commitments to reform by the government of Iran are meaningful. The participants spoke about political prisoners being detained in theory for other offences (drug crime and "activity against public order" were two examples provided) so that they do not attract external attention and criticism.

The sense that there is no real commitment to reform within Iran was accompanied by a feeling that the international community is prepared to look the other way when it comes to human rights abuses because of economic interests. One survivor commented:

> "Because Iran is a rich country, the other countries close their eyes. Then Iran does not mind if people see how they behave." - Iranian survivor of torture in treatment at Freedom from Torture.

They described this as Iran "bribing" the international community.

## The experience of torture

One survivor commented, "All families have experience of torture. Fear is rooted in them." Nearly all survivors described a process of ongoing

harassment by the authorities, following detention and torture, either directed toward them or of their family and friends. A number spoke about a sense of inevitability that eventually the authorities would "gather" enough information from this harassment to put them at risk of some form of charge and/or arrest which would result in being tortured again. All of this contributed to a sense of ongoing intimidation compounding the physical and mental torture they had already suffered in detention. A number spoke of the feelings of hopelessness that this created in them and a sense that, having gone on to the government's radar, that they would never be able to escape the authorities' attentions.

## What needs to happen now?

The following recommendations capture the survivors' views of what they thought would need to happen to influence the government of Iran to uphold human rights, and try to prevent torture.

## Survivor recommendations:

- The UN has influence through the Special Rapporteur on Iran - and also through other mechanisms - on the government of Iran, but needs to put greater and consistent pressure on the regime. Highlighting human rights abuses is key but the UN needs to be mindful of welcoming improvements (for example in the criminal system) that mask continued abuses.

- The long-term political pressure on human rights from countries who have, for example economic interests should continue and be consistent. Iran wants to develop stronger trade ties and shake off sanctions. This is an opportunity for countries that are engaging with Iran to insist that economic links have to be accompanied by reforms including on human rights.

# OUR RESEARCH FINDINGS

## Who and why?

Torture has been used against people on the basis of their ethnicity, religion, political beliefs, or for behaviour that transgresses Iranian social or moral norms.

*See pages 18-26*

## When?

The year in which the largest number of people were detained was 2009 (20, 29%), and most detentions in this period were related to political activities or perceived dissent, reflecting violent crackdowns connected with the presidential elections that year. A number of people were detained before 2009, but over half were detained more recently, between 2010 and 2015.

*See pages 27-29*

## Where?

In all cases where detail was available, survivors reported that state actors were the detaining authority. The largest number of people were arrested in Tehran (30, 43%). Over half were arrested in a public place and many were detained at unspecified security facilities. Most experienced very poor detention conditions including small or overcrowded cells, with little access to adequate food, water or sanitation.

*See pages 29-36*

## Methods of torture

Methods of torture used in the 69 cases reviewed included beating or other blunt force trauma (100% of cases), positional torture (75%), burns (29%) and sharp force (22%). Electric shocks (19%), use of water (14%), crushing (12%), pharmacological torture (10%), asphyxiation (6%) and amputation (3%) were also reported.

Over half of the people in the case set reported some form of sexual torture (55%), including 55% of the 64 male cases and 60% of the 5 female cases. A third of

people in the case set disclosed rape, including 31% of all male cases and 60% of all female cases.

Psychological/environmental forms of torture were widespread within the case set, including threats (75%), solitary confinement (72%) and humiliation (64%).

*See pages 37-45*

## Impacts of torture

Evidence of a wide range of physical and/ or psychological consequences of torture was documented across the 69 cases. Physical evidence in the form of scars or other lesions arising from particular methods of torture, found to be "consistent" or higher, according to Istanbul Protocol standards, was documented in 86% of cases. Psychological evidence of torture was documented in all 69 cases, including symptoms of Post-Traumatic Stress Disorder and/or depression, which in the majority of cases reached the diagnostic level.

*See pages 47-51*

## What next?

On the basis of this evidence, we make recommendations to the governments of Iran and the United Kingdom, as well as member states of the European Union and United Nations.

See pages 58 - 60

By analysing and sharing evidence that we have recorded, in line with our holistic approach to rehabilitation, this report ultimately seeks to protect and promote the rights of survivors of torture.

While the primary purpose of our medico-legal reports is to assist decision-makers in individual asylum applications, collectively they also represent an invaluable source of evidence that can be used to hold perpetrating states to account via UN and other human rights processes.

## Research process

This report looks at 69 medico-legal reports produced for Iranians since our previous report in 2013.[16] The new case set was not limited according to date of detention, and therefore both updates and expands our published evidence on torture in Iran.

The criteria for inclusion in the case set for this study were: i) the medico-legal report had been prepared by the Medico-Legal Report Service at Freedom from Torture, ii) the medico-legal report had been prepared since those reported on in our 2013 report, and iii) there was consent from the person for the medico-legal report to be used for research purposes. Two medico-legal reports were excluded from the case set because consent for this use was not provided.

Information was collected through a systematic review of the individual medico-legal reports in the identified case set, and recorded on a bespoke database. The data were anonymised, aggregated and systematically analysed. Further analysis of sub-sets of data was carried out where potentially relevant factors were identified.

In reporting our research findings, we have included a description of findings observed across all cases, and a description of findings in relation to particular sub-sets of cases, where relevant.

## Our sources

Medico-legal reports are detailed forensic reports documenting physical and psychological evidence of torture. They are the main source of data for this report. Medico-legal reports are considered to be a primary data source, since they provide first-hand testimony of torture and clinical evidence related to that testimony.

Medico-legal reports are commissioned by the person's legal representative and prepared by specialist doctors according to the standards set out in the UN Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, known as the 'Istanbul Protocol'.[17] Each is subject to a detailed clinical and legal review process.

## Medico-Legal Reports - Documenting torture

The torture documentation process for the purposes of a medico-legal report consists of reviewing an individual's history as presented in documents relating to the application for asylum, taking a history as narrated by the individual, and assessing it in relation to clinical findings, in accordance with the Istanbul Protocol and Freedom from Torture's own methodology.[18]

Where there are physical and/or psychological signs of torture, full clinical examinations observe, assess and document symptoms. Physical examinations require the documentation of all lesions, and the differentiation of those attributed to torture - by the individual themselves and then independently by the doctor – from those with a non-torture attribution, such as accidental injury, self-harm, or medical intervention. Previous clinical diagnoses and treatment of physical and psychological ill-health arising from torture, where known, are also considered as part of the overall clinical assessment.

In all cases, clinicians will seek to establish the degree of congruence between what is reported and the clinical findings, while also considering other available evidence (such as previous diagnoses or treatment) and the possibility of fabrication.[19]

> The **Istanbul Protocol** emphasises that while evidence helps support an account of torture, its absence or limitation does not rule out that torture occurred.[20] Similarly, the "strength" of evidence of torture does not necessarily correlate to the "severity" of the torture that was perpetrated or to the extent of its impact on the individual.[21]

It should be noted that the Medico-Legal Report Service at Freedom from Torture has been accepted by the UK Home Office as "having recognised expertise in the assessment of the physical, psychological, psychiatric and social effects of torture".[22] A specific policy instruction to Home Office decision makers states that our clinicians who produce medico-legal reports are "objective and unbiased", with the necessary expertise to assess medical evidence of torture.

### Level of detail available

The level of detail about any particular aspect of the experience of detention and torture requested by the clinician, or reported by the individual, will vary. This is due to the nature of torture itself and the distress experienced when a person is asked to recall traumatic memories.

Psychological responses such as avoidance and dissociation that can occur at the time of torture or during recall, as well as the way that traumatic memories are stored and recalled, will affect a person's retelling of their experience. The nature of torture, including whether a person was subjected to forms of sensory deprivation or manipulation, or rendered unconscious at any point, will also affect their memory of key events.

Current health issues, including depression, and specifically sleep deprivation and poor diet, can negatively affect a person's concentration and ability to recall.[23]

> "Culturally determined attitudes to taboo topics, culturally determined expectations regarding confidentiality…feelings of shame and corresponding assumptions about other people's judgements…and lack of trust are all factors that may make disclosure more difficult for survivors of torture, especially sexual torture."
> - From The Psychology of Seeking Protection, J. Herlihy & S.W. Turner.[24]

The process of human rights documentation is often a difficult and traumatic experience for survivors of torture, however, clinicians at Freedom from Torture also acknowledge its therapeutic value.

> "It has been observed in numerous instances that thoughtful, careful testimony taking and examination has a major therapeutic effect on victims of torture. For many it is the first time that they find the words to describe their ordeals. Putting unspeakable torture into words is an important step in rehabilitation." - From Freedom from Torture, *Methodology*, 2006.[25]

Our evidence shows the use of torture to control the activities of a wide range of people. People reported being tortured on the basis of their ethnicity, religion, political views or for having transgressed expected social or moral norms.

## Age

As shown at Figure 1, the majority of people were aged between 26-40 years at the time of their clinical examination (43, 62%). A fifth of people were 41-60 years (14, 20%), while smaller numbers were aged between 16-18 (2, 3%) or 19-25 years (10, 15%).

*Country context:* the high proportion of people between 26-40 years old observed in this case set reflects the age pattern found in the general Iranian population.[26]

## Sex and sexual orientation

Of the 69 medico-legal reports reviewed, 64 were for men (93%), and five for women (7%). In most cases, sexual orientation was not specifically reported. Iranians who are gay or lesbian may be subjected to discrimination, and persecution amounting to torture by the authorities, however no significant pattern of torture on the basis of sexuality was observed in this case set.

*Country context:* in Iran, homosexuality can be punishable by death or lashes.[27]

## Place of origin

The largest number of people in the case set were born in Tehran (28, 41%). Other common places of origin were the southern province of Fars, where most came from Shiraz (11, 16 %), and Khuzestan, where most came from the city of Ahwaz (10, 14%). Seven people were born in one of the three main Kurdish provinces (10%): Kermanshah, Kurdistan or West Azarbaijan. Eight people originated from other provinces in Iran (12%), including Bushehr, East Azarbaijan, Esfahan, Markazi, Mazandaran and Zanjan. In five cases there was no information on place of origin in the medico-legal report.

## Previous residence in the UK

Five people reported residence in the UK prior to their detention and torture in Iran (7%). Two were resident in the UK on a student visa, and were detained having returned to Iran for a visit. While neither was detained on the grounds of previous residence in the UK, both were subjected to intimidating questioning or actions related to their time in the UK. For example, in one case the person was interrogated about why they chose to study in the UK, and in the other, family funds to support studies in the UK were frozen.

Three people came to the UK intending to seek asylum prior to their most recent detention in Iran. None gained asylum and all three were detained in Iran having returned either voluntarily, or following removal from the UK. One was arrested some months after returning to Iran for political activities but was not questioned by the authorities about previous residence in the UK. The remaining two were arrested at the airport in Tehran on return from the UK and both were questioned by the authorities on their links to the UK and accused of working with, or spying for, the UK government.



*Figure 1: age at time of clinical examination*

## Ethnicity

Just over half of people reported being of Persian ethnicity (36, 52%) and just over a third reported belonging to an ethnic minority (24, 35%). The most commonly reported minority ethnicities were Arab (8, 12%) and Kurdish (7, 10%). Nine people reported other ethnic minority identities (13%), including Azeri, Bakhtiari, Lur and Quashqai. There was no information on ethnicity in the medico-legal report in nine cases.

**Nine** people reported that their ethnic minority profile and activities led to their detention (13%).

*Country context:* people of Persian ethnicity constitute the majority of the wider Iranian population (over 60%) though there are a number of ethnic minority groups, the largest of which include Azeri (16%), Kurd (10%), Lur (6%) and Arab (2%) populations.[28] Discrimination against and persecution of these ethnic minority groups has been widely reported.[29] Those with an ethnic minority profile who are actively speaking out on ethnic minority issues continue to be at heightened risk of targeting and detention by the Iranian authorities.[30]

Five of the nine who reported that their ethnic minority profile and activities were linked to their detention and torture were of **Arab** ethnicity, and the remaining four were of **Kurdish** ethnicity. All nine were **active on ethnic minority issues** in Iran, and some also cited support for, or membership of, organisations deemed separatist groups by the Iranian government.

*Actions*

- Distributing leaflets and literature
- Attending demonstrations or public meetings
- Raising the Kurdish flag in public
- Advising a strike of Arab workers
- Supporting Kurdish political prisoners

*Affiliations*

- Kurdish Democratic Party of Iran
- Komala Party of Iranian Kurdistan
- Ahwaz Arab People's Democratic Front

*Case Study -  Hamid\**

All his life, Hamid had experienced discrimination on the grounds of his Arab ethnicity. One day at university, he joined a small gathering of Arab students, where people were making speeches calling for freedom of speech and for the Arab culture to be respected. Suddenly police appeared. They started insulting the Arab students and rounding them up, using handcuffs and blindfolds. They were taken to an unknown place, and held together initially, all in one room.

Hamid was then taken and kept in solitary confinement in a small, foul-smelling cell, with no toilet. If he asked to go to the toilet, he was severely beaten. Interrogators asked questions about whom he was taking orders from and for the names of his friends. They tried to force him to sign an unseen document, but he refused. This made the interrogators very angry, and they threatened him with further torture. They suspended him by his wrists and ankles, and used a pipe to beat him on the soles of his feet.

After a few days, Hamid was transferred to prison. It was a year before he was taken before a judge, but he received neither a sentence, nor bail, and was returned to prison for years. He was detained amongst serious offenders, who harassed him, and made his time in prison especially difficult. Eventually his father managed to bribe an official for his release, on condition that the deeds to the family home were handed over. Fearing for Hamid's future, his father arranged for his escape from Iran. Travelling via an agent he eventually arrived in the UK. Hamid's legal representative commissioned Freedom from Torture to prepare a medico-legal report documenting evidence of his torture. The report was included in his claim for asylum and Hamid was eventually granted refugee status.

**\*Names have been changed and other specific details omitted to protect anonymity.**

## Religion

The majority of people in this case set identified themselves as Muslim (45, 65%). Where further detail was available in the medico-legal report, most specified that they were Shi'a Muslim, though a small number reported following the Shahmaghsoudi branch of Sufi Islam. Eleven identified as Christian (16%) and eight as atheist (12%). Three reported following the Zoroastrian or Baha'i faiths (4%). In two cases, no specific religion was documented.

Ten people described converting from Islam to a minority religion (14%), four of whom converted while still living in Iran and six after leaving. A further five reported pursuing an interest in religious conversion (7%), two while living in Iran and three after leaving the country.

Four people reported that their religious beliefs led directly to their detention (6%).

*Country context:* 89% of Iranians are Shi'a Muslims. Sunni Muslims represent 9% of the population. The remaining 2% of the population comprises other religious minorities including Sufi Muslims, Baha'is (thought to be the largest religious minority), Christians, Jews and Zoroastrians. The Iranian constitution permits Christian, Jew and Zoroastrian minorities to practice their religions. However, in reality this is strictly regulated, especially Christian worship, and followers of minority religions are discriminated against by the authorities.[31] While "ethnic" Christians may be tolerated, those who convert from Islam to Christianity are persecuted.[32] Baha'is are not recognised by the Iranian Constitution and are systematically discriminated against in public life. The Iranian authorities consider Baha'is as well as those who convert from Islam to another religion to be apostates, a crime punishable by death.

It is notable that the number of people in this case set who reported belonging to a religious minority is proportionately high in comparison with the general

Iranian population. Although only a small number were detained in relation to their religious beliefs (4, 6%), each of the cases analysed reflected the "at risk" categories outlined above.

> Factors that led to **detention on the basis of religion** included:
>
> Being a follower of the Baha'i faith
>
> Pursuing an interest in conversion from Shi'a Islam
>
> Conversion from Shi'a Islam to a minority religion

## Occupation

Occupations as reported to our clinicians were reviewed for this research and further analysed if the person held an occupation considered to heighten their risk of targeting at the time of their detention. Many of the occupations reported did not appear to give rise to a greater risk of detention (50, 72%).

*Country context:* Certain occupations are understood to attract the attention of Iranian authorities, particularly if individuals in those occupations express critical or dissenting views.[33] These include journalists (social media and print)[34], teachers, students, academics[35]; artists, film makers, musicians and lawyers.

> Nineteen people reported having an "at risk" occupation at the time of their detention (28%), over half of whom were students (11 of 19).

The remaining eight reported having other occupations that had raised their risk of targeting and detention, including journalist, blogger, musician, civil servant, and internal security agent. Most of the 19 were detained for political or perceived dissenting activity.

## Activism and political engagement

Patterns of activism or political engagement were reviewed across all 69 cases, including those who reported being active on issues relating to their religious or ethnic identities or who had "at risk" occupations. It is important to note that for the purposes of this study, **"activism" and "political engagement" were defined broadly** to encompass a wide range of levels of engagement, from public expression of support for values, to organising public meetings, protests or demonstrations.

Many who were politically engaged or active on issues reported that this was a factor that led to their detention and ill-treatment. However, most activity represented low-level engagement and not all of those who were active on an issue were detained on this basis.

Reported activism or political engagement was categorised according to thematic areas which attract the attention of the Iranian authorities and may put people at greater risk of detention.[36]

*1)  Oppositional political activity or activity
      perceived to be dissenting*

> **Forty-two** people were active in
> oppositional politics or involved perceived
> dissenting activity (61%).

As Figure 2 shows, much of the activity described
by the 42 people who reported being active in
oppositional politics or perceived dissenting activity
constituted low level engagement, for example,
attending one or several protests (19 of 42, 45% of the
sub-set), or public expression of support for values
(18 of 42, 43% of the sub-set).

Though low-level engagement was most commonly
reported, many individuals described more than one
form of involvement, for example, they may have
expressed support for values, attended a protest,
and distributed leaflets. A significant number became
involved in oppositional politics for the first time in
2009, when the contested result of the presidential
election gave rise to protests under the banner of
the 'Green Movement', and others became active
more recently in 2013 or 2014. A small number
described long personal or family histories of political
engagement.

> **Over half** of the people in this case set
> were detained on the basis of oppositional
> political or perceived dissenting activity
> (35, 51%).

The largest number of people were detained for
oppositional political activity or perceived dissent
(35, 51%). Many of these were detained at a
demonstration, though a number were detained
following participation in other kinds of oppositional
activity or perceived dissent. A number also cited
affiliation with organisations or movements, most
of whom described supporting the values or aims
of organisations, although some reported greater
involvement.



*Figure 2: incidence of oppositional political /perceived dissenting activities (of 42)*

*Examples of oppositional, or perceived dissenting activity:*

- Demonstrating in 2009, 2011 and 2013, on dates of significance for protesters, including in support of the so-called Arab Spring
- Distributing leaflets critical of the government
- Making graffiti, or defacing symbols of the regime
- Speaking out in a public meeting on issues related to rights and equality
- Blogging on current affairs

*Examples of oppositional affiliations:*

- Green Movement
- Third Line Movement
- Independent Reformist Party
- The People's Mojahedin of Iran

## *Case Study – Marjan\**

Marjan was born into a politically active family, which had a history of involvement in oppositional politics. She was proud of the lineage of strong women in her family.  Though she had not previously been involved in politics, after the 2009 election she attended a peaceful demonstration. Later in 2009 she attended another demonstration in outrage at the killing of peaceful protesters by state security. Security agents violently attacked the crowd and Marjan, along with many others, was arrested.

She was held in an overcrowded and dirty cell with many other women. One by one women were released but she, with a few others, was kept there. Eventually they were transferred to another place of detention. Marjan and other women were stripped naked on many occasions and subjected to searches. Guards touched them inappropriately and insulted their personal hygiene, though their access to washing facilities had been restricted. She was detained with other women in an overcrowded and filthy cell with only two blankets and a lightbulb kept on 24 hours a day, making sleep almost impossible. Then they moved Marjan to solitary confinement. They interrogated her on several occasions, beating her severely each time, and raping her. She was made to sign papers that she was not allowed to see, and sentenced to prison.

After serving her sentence, she was eventually released. She knew that the authorities would be watching her from now on. Following her experiences in detention, re-building family relationships was very difficult. One of the torturers from her time in detention continued to harass her, threatening to tell her husband of the rape she had suffered, which would have caused her unbearable shame. Fearing that Marjan would come to further harm, her family arranged for her escape from Iran. Marjan claimed asylum in the UK, but the Home Office refused her claim. She lodged an appeal, which included a medico-legal report prepared for her by Freedom from Torture, and was eventually granted refugee status in 2017.

**\*Names have been changed and other specific details omitted to protect anonymity.**

*2)  Ethnic minority issues or politics*

Ten people reported being active on ethnic minority issues (14%). A range of levels of engagement were described in each case including distributing leaflets and literature, attending demonstrations occasionally or regularly, making graffiti, and actively organising meetings. Nine people reported being detained in relation to their ethnic minority profile and activity on ethnic minority issues (13%) (see Ethnicity, p20).

*3)  Religious freedom*

Five people reported showing public support for or publicly exercising freedom of religion (7%). Activities included supporting a minority or banned faith, including Zoroastrianism and Bahai'sm, public conversion from Islam to Christianity and the worship of a banned faith, including Bahaism, Christianity, and the banned Shamaghsoudi branch of Sufi Islam.

Four people reported being detained in relation to their religious beliefs (6%) (see Religion, p21).

*4)  Other social justice issues*

Engagement on a range of other social justice issues was reported by a small number of people (9, 13%), and included workers' rights, human rights, freedom of cultural and artistic expression, freedom of speech, environmental justice, prisoners' rights, sexual rights

and students' rights. Activities included distributing leaflets and literature, attending demonstrations and organising protests. The majority were also active on other issues, including oppositional politics and ethnic minority issues, and were detained in connection with these activities.

## Transgressions of expected social or moral behaviour

Six people reported being detained for various transgressions of expected social or moral behaviour in Iran (9%). These included drinking alcohol in public, being partially dressed in public, or other violations of Islamic dress-code, listening to Western music and hosting a private party with music and alcohol.

## Imputed activity or beliefs

Twelve people reported that they were detained on the basis of imputed activity or beliefs (17%). They described that violations - generally in relation to political activism, though some relating to religious dissent or criminal behaviour – were wrongly attributed to them.

When documenting torture, it is important to understand when detention took place, who the detaining authorities were, the location and conditions of detention, violations of due process, and circumstances of release or escape.

These details help build a picture that reveals the structures – or lack of – that allow torture to thrive in particular country contexts. This report provides a unique insight into appalling conditions in detention in a country that rarely allows access to international representatives to carry out any form of inspection.[37]

This section also explores cases in which the person reported a history of repeated detentions, to understand when, where and by whom the individual was detained on previous occasions; whether the reason for detention differed and whether the detaining authorities indicated that they had kept a record of previous detentions.

## When detention occurred

The year of detention was recorded in each case, with the exception of one case where this detail was not available in the medico-legal report. As Figure 3 shows, the year during which the largest number of people were detained was 2009 (20, 29%). However, over half were detained after 2009 (37, 54%), the most recent recorded detention being in 2015. A number of people were detained and tortured prior to 2009 (11, 16%), including two detentions that dated back to the 1980s.

Data on year of detention was also disaggregated by the reported reason for detention. Figure 4 shows that most detentions in 2009 were on the basis of oppositional political or perceived dissenting activity (16 of 20, 80% of the sub-set). This reflects the context of the 2009 presidential elections. In more recent years, reasons for detention were more varied and included activity on ethnic minority issues or politics, transgressions of social or moral norms, or imputed activity or beliefs. In two cases the reason for detention was not available in the medico-legal report.



*Figure 3: number of people detained, by year (of 69)*



*Figure 4: number of people detained, by year and reported reason for detention (of 69)*

It is notable that while reasons for detention by year may indicate patterns that reflect the country context at a given time, statistical inferences cannot be made in relation to why others in the wider population may have been detained in a given year. Furthermore, where the number of recorded detentions and torture in a given year is low or absent, it cannot be inferred that it has not occurred.[38] It may take many months for a survivor of torture to flee from Iran, travel to the UK, and make an application for asylum and then for the legal representative to commission a medico-legal report. On the basis of continued referrals at a similar rate, it is likely that our evidence of torture in Iran will grow.

**While findings relating to patterns of torture in particular years are based only on the medico-legal reports in this case set, they nevertheless do demonstrate that people have been detained and tortured in these years, and the reported reasons for their detention. Furthermore, the treatment described in these cases may indicate what happened to others also detained during these years.**

## Repeat detentions

While most people were detained once (51, 74%), over a quarter reported a history of repeated detentions (18, 26%), amounting to a total of over 100 reported episodes of detention across the 69 cases. Eleven people were detained twice (16%), three were detained on three occasions (4%), one person on four occasions (1%), and three on more than five occasions. In these cases, torture was reported to have occurred in many, though not all, prior detentions.

Where information was available in the medico-legal report, people reported that Tehran was the most common location of prior arrests (11 of 32 prior episodes), most often in public places, for example, at demonstrations or places of work or study. Unspecified security or intelligence agencies were the most commonly reported detaining authority (12 and 9 respectively of 32 reported prior detentions). Only three of the 18 who were detained on multiple occasions reported that they were arrested by the same authority each time. Unspecified state-run or intelligence facilities were the most commonly reported places of prior detentions (21 of 32 reported prior detentions).

**Why were people detained more than once?**

Half of those who reported being detained on multiple occasions were arrested for similar reasons each time (9, 50% of the sub-set). These were generally related to participation in oppositional politics, often in support of reformist presidential candidates, though two cited ongoing involvement in Kurdish or Arab issues. Notably, two reported that they had sought asylum in the UK following an earlier detention in Iran but both asylum claims were rejected and the individuals were detained again on return to Iran.

The remaining nine people were detained for different or unknown reasons on each occasion. For example, four were detained in 2009 for reasons including oppositional political activity or transgressions of expected social or moral behaviour, but had been detained on prior occasions for reasons generally relating to family histories of conflict with the authorities.

A number of people reported that the detaining authorities held information on their personal or family history, which documented previous detentions. Some said that they were treated more harshly during their most recent detention when the detaining authorities discovered that they had been previously detained.

## Where arrests took place

Tehran was the most common place of arrest across the 69 cases (30, 43%). After this were the provinces of Fars - most in the city of Shiraz (12, 17%), and Khuzestan - most in the city of Ahwaz (9, 13%). Eight were arrested in other provinces (12%), including East Azarbaijan, Esfahan, Mazandaran, Alborz and Zanjan. In five cases, there was no information on location of arrest in the medico-legal report.

The largest numbers of people were arrested while attending demonstrations and protests (20, 29%) or while in a public place (18, 26%), for example on the street, in the park, while travelling by road, or at the airport. A significant minority were arrested at their home address (14, 20%) and some were detained at their place of work or study (7, 10%), for example, a university or shop. Small numbers of people reported being detained in other places, including at a checkpoint (4, 6%) or the home of family or friends (3, 4%). There was no information on the place of arrest in the medico-legal report in three cases.

## Detaining authorities

As Figure 5 shows, the police were the detaining authority reported by the largest number of people (20, 29%), four of whom reported police officers to be plain-clothed. Eighteen people identified the detaining authority as belonging to state security (26%), but were unable to specify which agency and 10 of these reported that the people who detained them were in plain clothes.

Others reported being detained by the Basij state militia (14, 20%), including one case in which the militia arrived in plain clothes, or by Etela'at state intelligence officials (11, 16%), seven of whom were reportedly in plain clothes. A further two people described being detained by the Revolutionary Guard (3%), including one case in which they appeared plain-clothed. A third of people overall reported that the detaining authority was in plain clothes and did not identify themselves by other means (23, 33%), meaning that an essential safeguard at arrest - identification of the detaining authority - was compromised in those cases.[39] Detail on the detaining authority was not available in four medico-legal reports.



Figure 5: number of people detained, by detaining authority

## Conditions of transit

The majority of people described being transported to detention in conditions that may be considered to amount to "unnecessary physical hardship" (54, 78%), and therefore in breach of Rule 73 of The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules).[40]

As shown at Figure 6, over half reported being restrained (37, 54%), mostly by use of handcuffs, many of whom were subjected to concurrent forms of physical force or sensory deprivation. A similar proportion described being blindfolded (36, 52%). Physical force or violence during transit was reported in 42% of cases (29 people), and ranged from being kicked, slapped and punched by captors, to violent beatings with hard objects, being attacked with electric-shock weapons and being urinated on.

In some cases violence was reportedly concurrent with verbal abuse, including humiliation and threats (12, 17%). For example, in one case a member of Etela'at threatened to shoot the individual unless they were compliant.

In over a quarter of cases the transit vehicle was described as unmarked (18, 26%), some of whom also described dark or tinted windows.



*Figure 6: incidence of reported conditions of transit (of 69)*

## Place of detention

As shown in Figure 7, the majority of people reported being held at unspecified security facilities (41, 59%), indicating they were not informed of their place of detention. This constitutes a breach of Principle 12 of the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment (Body of Principles), which state that information including the place of custody, should be communicated to the detainee.[41]

Nine people were held in police stations (13%), seven were held in intelligence facilities (10%), and five were held in prisons (7%). Others reported being held in other kinds of facilities in small numbers, including military facilities (3, 4%) and public places (2, 3%). In one case there was no information on place of detention in the medico-legal report.

| Place of detention | Incidence | number of people |
|---|---|---|
| unspecified security facility | 59% | 41 |
| police station | 13% | 9 |
| intelligence facility | 10% | 7 |
| prison | 7% | 5 |
| military facility | 4% | 3 |
| public place | 3% | 2 |
| private address | 1% | 1 |

*Figure 7: place of detention*

**Being held in more than one place of detention**

Individuals who are detained are often moved to another/other place(s) of detention. Twenty-nine of the 69 cases reviewed reported this (42%). Of these cases, 22 were detained in two places, five in three places, one in four places, and one was moved on ten occasions over almost three decades.

People were detained initially at a range of types of facilities, including police stations, unspecified detention facilities, Basij or Revolutionary Guard units. After this, most were moved to prisons. In the majority of cases, there was no reported observance of due process rights in the first place of detention but in subsequent places of detention, accordance of some aspects of due process was reported.

Nine reported that they were tortured in their initial place(s) of detention only, while eleven reported that they were tortured at each place. A further eight people reported that they were tortured in the final place of detention only, and in one case, this detail was not available in the medico-legal report.

| Prison | Basij/Revolutionary Guard facilities |
|---|---|
| Dizelabad Prison, Kermanshah | Sepah building in Enghelab Avenue, Tehran |
| Evin Prison, Tehran | Basij Headquarters, Tehran |
| Ghezel Hesar Prison, Karaj, near Tehran | Police station |
| Karoon Prison, Ahwaz, Khuzestan | Syed Ali Khan station, Esfahan |
| Nadamatgah Prison, Karaj, near Tehran | Other detention facilities |
| Rajai Shahr Prison, Tehran | Mohamed Abad detention centre, Fars province |
| Sepidar Prison, Ahwaz, Khuzestan | Kahrizak detention centre, Tehran |
| Intelligence facility | |
| Etela'at Headquarters, Paweh City, Kermanshah province | |
| Etela'at Office in  Zanjan Road, Tehran | |
| Etela'at Building, Ahwaz, Khuzestan | |

*Figure 8: places of detention identified by name*

Most places of detention were not identified by name but where this detail was provided, prisons were most commonly cited. Figure 8 shows named facilities where detention and torture was reported to have occurred.

## Violation of due process rights

Observance of due process rights can provide essential safeguards for people who have been detained. Rights and norms that should be upheld are enshrined in various international standards and include notification to the individual of the nature of the accusations; keeping records of arrest and detention;  formal notification of arrest to the family; the right to defend oneself at a hearing before a judicial authority; access to legal counsel; and access to medical attention.[42]

The **overwhelming majority** of people were not accorded full due process rights (67, 97%), and of these 28 reported no due process at all (40%).

## Records of arrest - registration at the detention facility

In the majority of cases no registration of the individual's presence at the detention facility was reported (50, 72%). In the minority of cases where some form of registration was reported to have occurred (19, 28%), records included photographs and/or fingerprints being taken, and a small number reported that their family members were formally notified.

## Formal charge, access to legal counsel

The overwhelming majority received neither a formal charge (63, 91%), nor had access to legal counsel (65, 94%). Of the four who were given access to legal counsel (6%) this had invariably been arranged by their family. Furthermore, in three of these cases, release was still conditional upon payment of a surety or bribe.

## Hearing before a judicial authority

The majority of people neither went to court nor had their cases heard by a judicial authority at

any point during detention (48, 70%); however 21 people described some form of court hearing before a judicial authority (30%), including at Revolutionary Courts or in their place of detention. Twenty of the 21 had no access to legal counsel before or during their hearing (95% of the sub-set). Sixteen were not informed of the charges before their hearing (76% of the sub-set), and only 13 of those who attended a hearing received a formal sentence such as prison time, flogging or fines (62% of the sub-set).

> A **third** of people in the sub-set were forced to sign documents (7, 33%), including forced confessions, declarations of future behaviour or unseen documents either before or during their hearing.

Evidence obtained under torture was accepted by the judge in a number of cases; indeed two people reported that the judge refused to acknowledge the explicit claim that their confessions had been extracted under torture.

## Medical attention

Most people did not receive medical attention while in detention (47, 68%). Of the 22 who did (32%), most were treated in the detention facility, though in some cases this was provided at clinics or hospitals outside.

> The **majority** of people had no access to medical attention during detention (47, 68%), and of those who did, most required urgent medical attention to treat injuries arising from torture.

In 21 of the 22 cases, medical attention was required to treat injuries arising from torture, including cuts, burns, fractures, suspected internal bleeding, paraplegia, testicular torsion and gangrene. Two individuals reported that wounds arising from torture were sutured with no anaesthetic and another described doctors being forbidden to answer any of their questions following an operation.

## Interrogation

The majority described being interrogated and tortured concurrently, either during all or some incidences of torture (54, 78%), amounting to a breach of Principle 21 of the Body of Principles, which states that "it shall be prohibited to take undue advantage of the situation of a detained or imprisoned person for the purpose of compelling him to confess, to incriminate himself otherwise or to testify against any other person".[43]

> Over **three-quarters** of people described being interrogated and tortured concurrently (54, 78%), either during all or some incidences of torture.

The identity of the interrogators was often unknown, which is consistent with testimony that the person was blindfolded throughout, or at various points during detention. Deliberate attempts by interrogators to conceal their own identity were reported including keeping the detainee blindfolded, the interrogator wearing a mask or facing the individual away from them.

People reported that interrogation under torture was used to attempt to extract information about them, as well as third parties including family and friends (44, 64%). Interrogators often sought information on who had organised demonstrations, which parties or organisations individuals belonged to, where political materials had been sourced and who their associates were.

Attempts to force a confession, often under torture or threat of further torture, were also commonly reported (35, 51%). In many cases, interrogators sought admissions of involvement in perceived anti-government activity, for example, handing out leaflets or other materials at demonstrations, or making graffiti slogans critical of the government. A small number of people reported attempts to force a confession from them in relation to imputed activities or beliefs, including related to criminal activity, membership of or affiliation with a banned organisation, or illegal religious practice.

## Forced signature

Nearly a third of individuals overall were forced to sign "confessions", statements regarding future conduct and unseen documents (22, 32%). In some cases, documents were signed under threat of further torture, while in other cases signing was a condition of release. A number of those who were forced to sign unseen documents were threatened with further torture or death if they asked to know what was written.

**Forced signature of statements regarding future conduct committed individuals to:**

- Refrain from taking part in demonstrations
- Abstain from participation in any political activities
- Adhere to travel bans
- Abide by the Islamic dress code
- Refrain from disclosing what had happened in detention to the media

## Detention conditions

Adequate accommodation, sanitation, and personal hygiene, provision of food and water and appropriate separation of detainees are set out in the Nelson Mandela Rules.[44] Analysis of the 69 cases indicates that these standards were largely unmet.

The **majority** of people were detained in very poor conditions, including in small or overcrowded cells, with little or no access to adequate food or water and restricted access to toilet facilities.

### Cells

More than half reported being kept in cramped conditions in a small cell (35, 51%), for example rooms measuring 2x1 metres or rooms so small that there was only space to squat or stand. A small number were held in overcrowded cells, which were unsanitary and had no room to lie down. Many described bare rooms, with no furniture or bedding and some remarked on temperature changes in their cell, for example extremes by time of day or season.

### Access to food and water

A significant proportion of people in the case set reported inadequate access to food (30, 43%), with irregular meals only, for example once a day or every other day. Food was often of low nutritional value and poor quality (e.g. meals of stale bread, rice, cheese or potatoes) and in some cases mouldy or contaminated, sometimes leaving people unable to eat. A small number were given no food at all. Some described inadequate daily allocations of water or being forced to drink unsanitary or contaminated water. At least three people had no access to water at all.

### Sanitation

Twenty-eight people reported restricted access to toilet facilities (41%). Of these, some described being made to wait to go to the toilet for extended periods, sometimes forcing them to urinate or defecate in their cells. A small number were not given access to a toilet at all. Over a third of people described highly unhygienic conditions (24, 35%), including cells being kept constantly wet; foul smells such as faeces, urine and blood; heavy soiling in overcrowded cells, and infestations of vermin.

### Exposure to violence from other detainees

A small number of people reported exposure to violence from other detainees (3, 4%). For example, one person reported being tattooed by other detainees while they were unable to move, and one woke to find another detainee attacking them with a sharp blade.

## Duration of detention

As Figure 9 shows, most people were detained for less than a month but a number were detained for longer periods. Four people were detained over very long periods (6%), of more than four years. In five cases, detail on length of the most recent detention was not available in the medico-legal report.

## Circumstances of release or escape

The majority of people were granted some form of conditional release upon the guarantee of various bail conditions (42, 61%), the most common being payment of surety (22, 32%), which in many cases

involved putting up the deeds to the family home or business; being forced to sign a declaration regarding future behaviour (or other unseen documents) as a condition of release (20, 29%), or being put under reporting restrictions (9, 13%). Other bail conditions were reported in a small number of cases, for example handing over a family member suspected of anti-government activity, payment of fines, travel bans, bans on entry to higher education and bans on employment in public services.

Nine individuals escaped (13%), seven without assistance, for example from a hospital where they had been transferred for treatment, or while being transferred to court or another place of detention. The remaining two escaped with assistance from

family members who were able to bribe guards or security officials. A further nine reported being released without explanation (13%), for example they were taken from the detention facility unexpectedly and without information, and driven to a location where they were released, or in some cases dumped unconscious in an unknown location. Three people were released unconditionally (4%), either for lack of evidence or after serving prison time. In six cases, there was no detail in the medico-legal report relating to the circumstances of release.

| Duration of detention | Incidence | Number of individuals |
| --- | --- | --- |
| < week | 26% | 18 |
| < month | 28% | 19 |
| ≤ 3 months | 12% | 8 |
| ≤ 6 months | 9% | 6 |
| ≤ 9 months | 1% | 1 |
| ≤ 12 months | 1% | 1 |
| 1-2 years | 9% | 6 |
| 3-4 years | 1% | 1 |
| > 4 years | 6% | 4 |

*Figure 9: places of detention identified by name*

## Harassment after detention

Over half reported that they or their families experienced harassment by the authorities following release (36, 52%). As shown in Figure 10, the most prevalent forms of harassment included continuing surveillance of individuals – and in some cases, their families – by the authorities following release from detention (21, 30%); raids on family homes, and in some instances, seizure of personal property (16, 23%), and in a number of cases, family members being detained (10, 14%).

Since arrival in the UK, one person explained that his family lost their house as a result of his escape: *"Nearly every day, the police come and ask - 'where is he?' They threaten his family by saying 'We took the house from you and if you don't tell us where he is, we will do worse to you'"* – Medico-Legal Report excerpt*

*All excerpts are taken from medico-legal reports prepared by Freedom from Torture clinicians and included in this study. Where necessary potentially identifying details have been omitted and/or wording changed to preserve anonymity. Medico-legal reports from which excerpts have been taken are identifiable to the researcher only.



*Figure 10: incidence of reported harassment by the authorities following detention (of 69)*

## Flight from Iran

Nearly a third of people left Iran within three months of their release or escape (22, 32%) and over half of the total number of individuals in the case set had left Iran within a year (36, 52%). In 12 cases, this information was not available in the medico-legal report.

Of those who left Iran within three months of release from detention, most fled as soon as practicably possible, with arrangements for travel made either by

themselves or by family, who feared that they would be subjected to further persecution if they remained in Iran.

Many of those who did not leave Iran immediately were eventually forced to do so after renewed attention from the authorities heightened their risk of further detention. Triggers included a family member or associate being detained, raids on homes and seizure of personal property.



Number of people (of 69)

■ ≤ 3 months  ■ 4-12 months  ■ 1-2 years  ■ 2-3 years  ■ > 3 years

*Figure 11: length of time from most recent detention to flight, number of people*

All 69 individuals reported forms of violence and ill-treatment that are defined as torture, and breach their fundamental human rights.

While we distinguish between physical, sexual and psychological/environmental torture, it is important to note that these labels are, to an extent, artificial.[45] This is because forms of physical torture often have a strong psychological component, for example sexual assault, while psychological or environmental torture may have physical components.

It must also be noted that disaggregation by methods of torture cannot convey the uniqueness of each individual's history, experience of detention, the combination of torture methods used and the short and long term physical and psychological impacts. However, taken together, the reports of multiple forms of torture, some of which are widespread in the case set, present an overall picture of extensive use of torture among the 69 cases reviewed.

### Use of blindfolds or hooding

Over half of the 69 people were blindfolded or hooded during torture (38, 55%). Some were blindfolded when taken out of their cell for interrogation and torture, and others only during certain incidences of torture.

### Perpetrator(s)

In all cases where detail was available in the medico-legal report, perpetrators were reported to have been state actors. In the majority of cases, the specific identity of the perpetrator was unknown or not stated, including for some of the reasons already outlined. However, some identified the security service to which the perpetrator(s) belonged, including the Basij, Etela'at, the Revolutionary Guard or the police. Most people described more than one perpetrator.

### Frequency and duration

The overwhelming majority of people described being subjected to multiple incidences of torture throughout detention (64, 93%), with the reported duration ranging from 30 minutes to four hours. In a third of cases the pattern of torture was consistent (23, 33%), for example people described being taken for interrogation and torture once or several times

a day, once every 2-3 days, or once a week. Some reported that they were tortured at regular intervals but the frequency reduced over time. However, in over half of the 69 cases (38, 55%), torture occurred at random intervals.

### Physical torture

*Beating, assault and other forms of blunt force trauma*

All 69 people reported **blunt force trauma** (100%), through violent physical assaults, beatings with blunt objects and/or forced impact on hard surfaces such as floors and walls.

Most people described being subjected to physical assaults, many on multiple occasions (61, 88%). This included being punched, kicked and stamped on with heavy boots, and slapped on a range of body parts including the head, face, ribs, hands and legs. Some reported heavy bleeding, and for others, loss of teeth or fractures as a result. A third were pushed or slammed against a hard surface (23, 33%), including having their head slammed against the floor, being dragged across an uneven floor, stamped on and/or pushed off a chair onto the floor. Over half of people received blows to the head (35, 51%), a number of whom lost consciousness as a result.

*"Every session began with what were called 'the easy things' by his interrogators. He was beaten, punched and kicked. He would lie on his side on the floor, covering his face with his hands whilst being beaten with a thick wooden stick or kicked. On one occasion the stick broke over his left side, causing lacerations"* – Medico-Legal Report excerpt



*Figure 12: incidence of blunt force trauma (of 69)*

Figure 12 shows that many people were beaten with rigid blunt instruments (45, 65%); this was often while suspended or in a stress position. Objects used included wooden planks, batons, tyre levers, rifle butts and metal chains or bars. Twenty-eight people were beaten with some kind of flexible instrument (41%), including plastic pipes, cables, cords or whips. Fourteen people described being whipped or beaten on the soles of the feet (20%), a form of torture known as falaka.

Six people were pushed or dropped from a height (9%), including being pushed down the stairs or falling from a chair or pedestal following a mock execution. In a small number of cases people reported being beaten on the ears (3, 4%), which in one case resulted in a ruptured eardrum. Deliberate fracturing was described in two cases (3%), for example, fingers being twisted and bent until they broke.

### Positional torture

Positional torture was a prevalent method of physical torture, reported by three quarters of people in the case set (52, 75%).

This method aims to induce stress in tendons, joints and muscles, and may also lead to neurological and musculoskeletal injury, as well as weakness and severe pain symptoms, which could persist for years.

> *"During the suspension his shoulders were dreadfully painful – 'as if they were coming off' – and then they became so painful they were going numb"* – Medico-Legal Report excerpt

In many cases, positional torture, including forced positioning and suspension, caused individuals to feel extreme pain – in several cases to the point of loss of consciousness - and left them in a position of total vulnerability. Often, other forms of torture were concurrently inflicted, including beatings, electric shocks and sexual torture including rape.

## Prolonged binding

As shown in Figure 14, prolonged binding was commonly reported (37, 54%). Those who were subjected to prolonged binding were bound in different ways, including through use of plastic ties, ropes, handcuffs and shackles, and were tied to various objects, including metal pipes, chairs and beds. Some were bound in stress positions, for example, their hands behind their back. In one case, a person was tied to a chair and spun around as captors slapped and punched them.

## Suspension

Nearly a third of people were suspended from the ceiling (22, 32%), by the wrists or fingers, in some cases with the toes just touching the ground, or upside down by the ankles. One person described being suspended by one leg, while others had their wrists tied behind their back, and still others were suspended by arms stretched along a pole, or attached to metal wrings secured to the wall, described in one case as a 'crucifix' position. The "chicken kebab" stress position was also referred to in a number of cases.

A number of forms of suspension are identified in the Istanbul Protocol, all of which were observed in this case set, and listed below:

"Butchery" and "reverse butchery suspension" – where the person is tied by the wrists or the ankles and suspended either upright or upside down.

"Parrot's perch" (often described by people in this case set as "chicken kebab") – the person is suspended from a bar or pole passed between the back of their knees and in front of their elbows which are in a flexed position, the wrists are sometimes tied to the ankles.

"Palestinian suspension" or "strappado" –the wrists are tied behind the back and the person is then suspended from the wrists.

"Cross suspension" – the arms are spread and tied along a horizontal bar before the person is suspended. [46]

## Forced stress position

Over a quarter of people reported being forced into stress position for prolonged periods (18, 26%), including standing with feet and arms bound with arms outstretched; kneeling; lying down with legs "locked" in an upright position; the head being clamped in a vice, or being handcuffed with one arm over the shoulder and the other around the waist and behind the back.

## Stretching

A small number of people reported that their limbs were stretched (3, 4%). In one case a person was made to lie face down on the ground with their wrists hand-cuffed behind, while captors repeatedly placed a heavy boot on their back and pulled their arms up behind them as far as they would stretch.



*Figure 13: incidence of positional torture (of 69)*

## Burning

Twenty people described being burned with an instrument or object (29%). Cigarette burns were most commonly reported (9, 13%), but other instruments used to inflict burns included heated metal (5, 7%), scalding liquid (4, 6%), and caustic substances (2, 3%). In a small number of cases people described other kinds of objects used to burn them, including a cigarette lighter, a car radiator and a bar electric fire. Some described being restrained or hooded while the burns were inflicted, and in a few cases burning was reportedly concurrent with the infliction of other methods of torture, including beating and rape.

## Use of water

A quarter of people described different forms of water torture (17, 25%). Dousing was the most commonly reported form of water torture (10, 14%), where cold water is deliberately thrown over the person, keeping their clothes and surroundings wet and cold. A further two people described being forced to stand in containers of ice-cold water for prolonged periods (3%) – two days in one case. Four people reported water – in some cases ice-cold water - being dripped onto their forehead or body for extended periods of time (6%), while suspended or restrained in a vice. Individuals who reported this described it as excruciatingly painful. Two people were forced to consume large quantities of liquid (3%), causing their bladders to fill but urination was prevented by various means.

## Sharp force trauma

Fifteen people reported sharp force trauma (22%), including biting, cutting and puncturing. Thirteen described being cut (19%), in most cases purposefully, with extremely sharp blades on different body parts, including the abdomen, the back of the neck, under the eye and the finger. People described the terror caused by this experience, in some cases leading to loss of consciousness. Puncturing of the skin was reported in a small number of cases (3, 4%).

## Electric shock

A fifth of people reported being subjected to electric shocks on different parts of the body (14, 20%), including the back, limbs, torso, neck, wrists and digits. Instruments included electric shock weapons,

and electric prongs or batons. Electric shocks were often reported to have been applied repeatedly, and in some cases while blindfolded, or while being held in a stress position.

## Crush injuries

Eight people reported deliberate crushing (12%). One person described how perpetrators pushed a metal filing cabinet onto their ankle, resulting in a fracture. Another reported that their hands were placed deliberately between the hinges of a fold-out bench while the interrogator sat on it, crushing them. Others reported being stood or stamped on, crushing their hands and toes.

## Pharmacological torture

Seven people reported some form of pharmacological torture (10%), including forced administering of unknown substances, withholding medication and forced medication. Two described being denied medication for serious pre-existing conditions, including diabetes and hypertension. Others described being given medication without their consent either through forced vaccinations or ingestion of pills and in most instances, without information on the nature of the substance. The substances administered had varying effects including causing them to talk excessively, dizziness and confusion, memory loss, thirst, gastrointestinal upsets, skin infections, abscesses and mood swings.

## Asphyxiation

Four people reported being subjected to asphyxiation (6%). Two reported that their heads were submerged in water, in one case by tying a bag over the head, cutting a hole in the top of the bag and pouring water into the top of it. Others reported smothering by bags being placed over their head. One person described a tear gas canister being thrown into the cell that they shared with others and the door being closed.

## Traumatic removal or amputation

Two people reported being subjected to traumatic removal or amputation (3%). One person developed gangrene in their feet due to poor detention conditions, for which they were denied treatment, and the untreated areas eventually had to be amputated. Another reported that their toenail was pulled out.

## Sexual torture

As shown in Figure 14, over half of the men and women in the case set disclosed some form of sexual torture to the examining clinician (38, 55%), and of these 23 disclosed rape (33%). Given the well-documented shame and stigma attached to sexual assault in Iran and elsewhere, under-disclosure of sexual torture in this case set is possible.

A **third** of people disclosed being raped (23, 33%)

The most common form of sexual torture was rape (anal, vaginal, and penetration with an instrument), followed by forced nakedness or forced partial nakedness, trauma inflicted on the genitalia (including by beatings) and sexual assault by touching.[47] These were often concurrent with deliberate sexual humiliation in the form of verbal insults and threats.

Figure 15 shows that reports of sexual torture were particularly prevalent among women, with three of the five reporting forms of sexual torture, all three of which included disclosure of rape (60% of all female cases). This compared to 35 of the 64 men in the case set who reported forms of sexual torture (55% of the sub-set), including nearly a third of male cases that disclosed rape (20, 31%). The prevalence of sexual torture disclosures, and rape in particular, among men in the case set is high given that under-disclosure of sexual assault may be especially likely among Iranian men, due to cultural taboos in Iran.[48]

### Rape of males

Methods reported included penile anal rape, and penetration of the anus with instruments, such as plastic or glass bottles, wooden sticks and batons. Some men described being raped in their cell, while others were raped in an interrogation room. Most described being restrained at the time, either by handcuffs, or another person holding them down. Some reported multiple perpetrators, or being raped on multiple occasions.



*Figure 14: number of men and women who disclosed sexual torture (including rape), and disaggregated number of men and women who disclosed rape*



*Figure 15: incidence of disclosed sexual torture (including rape) and disaggregated incidence of rape, among 5 women and 64 men*

Threats, including death threats and verbal humiliation during rape was described in a number of cases. For example, perpetrators told one man that they would rape his mother and sister in front of him. Another reported that perpetrators said "we baptise you with our water" as they ejaculated over his body. A small number reported being questioned or attempts to force a confession being made during rape.

> "'*Are you going to talk? ... just sign this paper then we won't touch you anymore.'*" -  Medico-Legal Report excerpt

A small number reported being subjected to other torture during rape, including beating, being forced to sexually touch the perpetrators, and in one case, being raped while fellow detainees were also raped in full view of each other. Most men described feelings of intense humiliation immediately after the rape. One man stated to our clinician that the humiliation was worse than the physical assault. In most cases, the medico-legal report documents high levels of distress evoked by recalling these events during the course of the clinical examination.

> His rapists had told him "'*if you mention this to anyone, we will find you and kill you.'*" – Medico-Legal Report excerpt

## Rape of females

In all three cases of reported rape, women described being taken from their cells to an interrogation or separate room and all were restrained by handcuffs and blindfolded. All reported verbal humiliation or threats concurrent with rape, described by one woman as "unbearable". Verbal abuse included swearing, sexual obscenities and in one case, a death threat if they disclosed what had happened to them. Two women described being violently beaten just before being raped and one woman reported being burnt on the breast with a cigarette during rape.

> He then took her blindfold off. She opened her eyes and saw his face...he said "'*you'll never do it again, you'll remember this till the end of your life'*"- Medico-Legal Report excerpt

All three women described feeling as if they wanted to die, or as if they were already dead immediately after being raped. Furthermore, in all three medico-legal reports, the clinician documents evidence of intense psychological distress at the moment of disclosure.

## Other sexual torture

Fifteen people reported forced partial nakedness (22%) and fourteen reported forced nakedness (20%), with two of five women, and 13 of 64 men reporting one or both of these. As noted in the Istanbul Protocol, nakedness heightens the person's sense of complete vulnerability and can induce fear that other forms of sexual torture, particularly rape, are imminent.[49] In some cases, the person reported that forced nakedness or forced partial nakedness was concurrent with interrogations or torture. In other cases, people described being forced to stand naked in the sun or in the freezing cold for prolonged periods.

Twelve people reported trauma to the genital area (17%), all of whom were male. This included beating the genital area, for example the testicles being punched and kicked (in one case this happened daily) or heavy weights being hung from the testicles. Five people reported being inappropriately sexually touched (7%), two of whom were female and three male. Reported forms of sexual assault by touching included being touched, squeezed and slapped in intimate areas and on the genitalia.

# Psychological/environmental torture

The overwhelming majority of people reported psychological/environmental torture (67, 97%). Figure 16 shows that the most prevalent forms of psychological/environmental torture included threats (52, 75%), solitary confinement (50, 72%) and humiliation (44, 64%).

## Threats

Three quarters of people described one or more threats against them or their families (52, 75%). Threats of death in detention or execution were commonly reported (25, 36%), for example by shooting or beheading. In a number of cases, the threat was made in an attempt to force a confession, or extract information. For example, people reported

that they were told they would not get out of detention alive if they did not tell the "truth". In other cases people were told that their execution was imminent.

Nine people reported being subjected to a mock execution (13%). Some described being blindfolded or hooded, forced to stand on a chair and a noose being placed over their neck. At some point the chair would be kicked away and they would fall to the ground instead of hanging, or the noose would be removed and they would be told that it was not yet their time. Others described being taken to a room, shown a noose hanging from a beam and being told that this was where they were to be executed. One person reported that interrogators gave them a choice between being shot and taking a cyanide pill.

Threats of rape directed at the individual, or at the individual's family or friends, were reported in a third of cases (23, 33%). Threats to rape family were most often directed at female family members, including mothers, sisters and wives, causing particular anger and distress. One individual reported that they were threatened with the same fate as Taraneh Mousavi, a young Iranian woman who reportedly died after being sexually abused while in custody during the 2009 post-election protests.[50] Another described

resisting threatened rape through repeatedly banging their head on a metal bedstead until they lost consciousness and were taken back to their cell. Seventeen of those threatened with rape described experience of some form of sexual torture in detention, eight of whom reported rape.

Nearly a third of people described being threatened with further torture or ill-treatment, often if they did not give the answers required or "confess" (22, 32%). Threats of further torture included beating, humiliation, forced consumption of excrement, attack by an animal, maiming, electric shocks and rape. In two cases, people were threatened with prolonged imprisonment.

Threats of harm against family members, including attacks, torture or killing "by accident", were reported by over a quarter of people (18, 26%). In two cases, people were told that family members were being tortured at that moment. Being informed of harm or potential harm to family members was often described as a particularly distressing aspect of ill-treatment.



*Figure 16: incidence of psychological/environmental torture (of 69)*

### Solitary confinement

The majority of people were kept in solitary confinement (50, 72%), either for the duration or parts of their detention. This was often in small cells, described as "box-like", or "grave-like". The duration varied from less than a week to months and in one case 18 months.

> "He was in solitary confinement in a small cell with a high ceiling and a single electric light which was kept on all the time. He was unable to tell night from day." Medico-Legal Report excerpt

### Humiliation

Feelings of humiliation may arise from many methods of torture, sexual torture in particular. However, the Istanbul Protocol highlights that humiliation can be used as a method of torture in itself and points specifically to humiliating verbal abuse and forced performance of humiliating acts as possible methods.[51] A significant proportion of people reported being subjected to humiliating verbal abuse, forced humiliating acts, or other forms of humiliation (44, 64%).

Thirty-nine people reported humiliating verbal abuse (57%)**.** This was commonly sexually obscene in nature, often directed at female family members as well as the individual and induced feelings of intense shame, anger and distress. In other cases, verbal abuse was used to denigrate the individual by, for example, calling them animal names, telling them they would have to perform naked for the guards and insulting their family, appearance, ethnicity, religion or sexuality. Many reported that they suffered humiliating verbal abuse while other methods of torture were inflicted, including beating, suspension, forced nakedness and rape.

A small number of people were forced to perform humiliating acts (3, 4%), for example, being forced to make animal sounds to attract the attention of the guards, or being forced to eat excrement. Other forms of humiliation were described in a number of cases, for example, being urinated on by guards; facial hair being shaved off; being spat on, and

various forms of sexual torture that were used for the purposes of humiliation, for example being kept naked during interrogation.

### Light deprivation

Lack of natural light in cells was commonly reported (32, 46%). Indeed, a fifth of people in the case set described being kept in constant darkness throughout their detention (14, 20%), some of whom were also blindfolded whenever taken from their cell. The lack of light was described by some as having a disorienting effect.

### Forced to witness the torture of others

Twenty people described hearing or seeing others being tortured (29%), causing profound and, in some cases, enduring psychological distress in those who reported it. Sixteen individuals reported hearing others being tortured (23%), including the abuse of perpetrators, the crying, shouts, and screams of others being tortured, and people begging not to be killed. One person was told that they could hear the crying and screams of the women in their family being tortured; another was told that the screams they could hear were those of their brother. Four people were forced to watch others being tortured (6%), including being beaten, electrocuted, maimed and raped. One person described regularly witnessing friends and other detainees die as a result of torture.

### Sleep deprivation

A fifth reported sleep deprivation (14, 20%). In some cases this was inflicted deliberately, through suspension at night, the guards constantly kicking and banging on cell doors, or playing religious verses loudly outside the cell. In other cases very poor detention conditions led to sleep deprivation, including the dousing of cell floors so they were too wet to sleep on, or the constant sounds of others being tortured nearby.

### Prolonged exposure to light

Nine people described prolonged exposure to light as a result of lightbulbs left on constantly in the cell (13%). One person reported that their cell was lit by an intermittently flashing lightbulb, while another described the light being turned on and off at random times. Some reported that prolonged exposure to light left them unable to tell night from day.

*Temperature manipulation*

Eight people reported deliberate and, in some cases, extreme temperature manipulation (12%). For example, one person was taken from their cell, tied up outside in freezing temperatures and doused in cold water. Another described the heating in the cell being deliberately turned up during hot periods, and down during cold periods.

*Behavioural coercion*

Five people reported being subjected to behavioural coercion (7%), such as forced ingestion of excrement, or other unsavoury or toxic mixtures. Forced betrayal of others was also reported, including forced incrimination of a family member or associates.

## Love

*You were the finest man I'd ever known*

*but I was in love with someone else.*

*That day you told me you loved me*

*my heart sank*

*I stayed silent, I felt miserable.*

*How did I know*

*two days later you would be arrested*

*for organising workers?*

*And in a month the crack of gunfire*

*would stop your loving heart?*

*How could you know*

*thirty years on*

*in my mind's eye*

*you're still the same fine young man*

*being shot again and again?*

*I see you in that final moment endlessly.*

Nasrin

In all 69 cases, our clinicians documented forensic evidence attributed to the physical and/or psychological impacts of the torture described by survivors.

The nature and severity of the physical and psychological consequences of torture for an individual will vary from one person to the next, depending on prior life experiences, the context in which they were tortured, the conditions of detention, the forms and combinations of methods of torture endured and their degree of personal resilience.

As already outlined, physical, psychological and environmental tortures are not always easily distinguishable. Furthermore, the extent of evidence of torture that can be documented varies, depending on the type of torture method used. Methods of torture described as physical are often designed to have both physical and psychological impacts. Physical torture may not leave an observable physical trace, but can have lasting psychological impacts, and conversely methods of torture described as psychological may also have physical impacts. Some methods of torture are designed to inflict maximum pain and psychological distress, while leaving minimal lasting physical marks.[52]

It is important to note that in the majority of cases, psychological symptoms were ongoing at the time of clinical examination. This may impact the ability to recall in detail the experience of detention and torture and the person's willingness or ability to disclose, even in a clinical setting, severely traumatic experiences.

The following questions, noted in the Istanbul Protocol, are addressed by clinicians in the formation of a clinical opinion for the purpose of reporting physical and psychological evidence of torture:

Are the psychological findings consistent with the alleged report of torture?

What physical conditions contribute to the clinical picture?

Are the psychological findings expected or typical reactions to extreme stress within the cultural and social context of the individual?

Where is the individual in the course of recovery?

What other stressful factors are affecting the individual (e.g. ongoing persecution, forced migration, exile, loss of family and social role etc.)? Does the clinical picture suggest a false allegation of torture? [53]

## Physical impacts

### Scars and other lesions

Each scar or other lesion is examined and a description of it and its attribution – whether torture or non-torture - is recorded in the medico-legal report. Our Freedom from Torture doctors will assess the scars and other lesions, taking into consideration other information, including the type of implement said to have been used (or likely to have been used if this is not known), the position and distribution of scarring on the body, the situation in which the injury was said to have been inflicted, other physical evidence attributed to the torture method and the circumstances in which the injury would have healed (factoring in detention conditions and access to medical help, for example).

The doctor will also consider relative likelihood of other possible causes, taking into account what is known of the individual's life history and experiences. Based on this assessment, they will determine the level of consistency of the physical finding with the

attributed cause based on schema set out in the Istanbul Protocol.[54] Scars or other lesions that are assessed to be at least "consistent", or at a higher degree of consistency, with the attributed method of torture according to the schema, constitute evidence of torture. As noted in our *Proving Torture* report, "even lesions that are assessed to be 'consistent' with torture according to the Istanbul Protocol schema are evidence of torture that should be given due consideration".[55]

The Istanbul Protocol reminds doctors that while the forensic documentation of torture requires that individual scars and groups of scars are assessed for their level of consistency with the attributed cause "…it is the overall evaluation of all lesions and not the consistency of each lesion, with a particular form of torture that is important in assessing the torture story".[56]

## Physical evidence attributed to torture methods

**Physical evidence** in the form of scars or other lesions arising from particular methods of torture, found to be "consistent" or higher, according to Istanbul Protocol standards was documented in the majority of cases (59, 86%).

Physical evidence in the form of scars and other lesions, as well as other physical findings found to be congruent with the history of torture are described by method of torture.

### Burning

All twenty of those who reported burning had scars or other lesions that were consistent or higher according to Istanbul Protocol standards, with this form of torture. Figure 17 shows that burning and sharp force trauma were the methods that produced the highest proportion of lesions found to be consistent or higher, according to Istanbul Protocol standards, with their attribution (100% of each sub-set).

### Sharp force trauma

All fifteen people who reported sharp force trauma had scars or other lesions that were assessed to be consistent or higher, according to Istanbul Protocol standards, with this attribution (100%).

### Blunt force trauma

All 69 people described beating and other blunt force trauma, 47 of whom had enduring scars or other lesions that were found to be consistent or higher, according to Istanbul Protocol standards, with this method of torture (68%).

In a further seven cases, no lesions attributed to beating were found, but other physical findings congruent with the attribution of beating were documented by the doctor, including continued tenderness in the area hit.



*Figure 17: incidence of physical evidence in the form of scars or other lesions attributed to particular methods of torture*

Blunt force trauma predominantly causes bruising and abrasions that tend to heal without lasting physical traces. This method of torture would not necessarily be expected to, and very often does not, produce lasting physical evidence in the form of scars or other lesions. Whether it does depends on factors including the force of the blow, the part of the body hit and whether soft tissue or bone, the length of time since infliction, whether the skin was broken, and the conditions of recovery.

### Crush injuries

Over a third of people who reported crush injuries had enduring scars or other lesions, assessed as consistent or higher, according to Istanbul Protocol standards, with this attribution (3, 38% of the sub-set). Lesions were caused by stamping with intent to crush fingers or hands, or in one case, applying a pincer instrument to the hand area with varying degrees of force.

### Positional torture

Nine of the 52 people who reported some form of positional torture had enduring physical evidence, in the form of scars or other lesions assessed as consistent or higher, according to Istanbul Protocol standards, with this form of torture (17% of the sub-set). Lesions had mostly arisen from damage to wrists from handcuffs or injury from suspension by the wrists, ankles or elbows. Thirteen people had other physical evidence in keeping with a history of positional torture, five of whom also had scars and other lesions assessed as consistent with or higher, according to Istanbul Protocol standards, with this attribution. Other physical evidence associated with this form of torture and documented among these cases included tenderness, pain and decreased range of movement.

The use of positional torture was reported in 75% of all cases, however lasting physical evidence of this method of torture in the form of scars or other lesions was proportionately low (17% of the sub-set). Positional torture is designed to cause immense physical pain and psychological distress at the time, but does not necessarily leave lasting physical marks. Whether there is lasting physical evidence will depend on many factors, including the exact nature of suspension or forced positioning, the length of time endured in that position, concurrence with other forms of torture and pre-existing factors including body structure and levels of fitness.

### Electric shock

Of the 14 people who reported electric shocks, two had enduring physical evidence in the form of scars or other lesions found to be consistent or higher, according to Istanbul Protocol, with this method of torture (14% of the sub-set). The proportionately low rate of physical evidence in the form of scars or other lesions among those who were subjected to electric shocks is to be expected with this form of torture, which may not result in lasting physical marks, particularly if perpetrators used water or gel at the point where the electric current was applied.[57]

### Rape and other sexual torture

Forensic examination in relation to an allegation of rape for the preparation of a medico-legal report is as rigorous as possible but doctors must always balance the benefit of an intrusive examination with the high risk of re-traumatisation.[58] Furthermore, it is widely acknowledged that identifiable injury resulting from rape, for example lesions on the genitalia or anus, is less likely to be found the longer the time elapsed after the assault. In fact, any physical traces can be gone as little as 72 hours after. The absence of physical evidence cannot be taken as evidence that rape did not occur.

Four people (all male) of the 38 who reported some form of sexual torture (including rape) had enduring physical evidence in the form of scars or other lesions assessed to be consistent or higher according to Istanbul Protocol standards, with this attribution (10% of the sub-set). Only one (male) of the 23 people who reported rape had enduring physical evidence in the form of scars or other lesions, assessed as consistent or higher, according to Istanbul Protocol standards, with the attribution of rape. The remaining three (all male) had scars or other lesions assessed as consistent or higher, according to Istanbul Protocol standards, with the attribution of other sexual tortures, including violent sexual assault to the genitalia.

Five of the 23 (four male, one female), who reported rape had enduring physical evidence other than scars or other lesions associated with rape, including genitourinary problems and perianal or pelvic pain.

## Pain symptoms

A significant proportion of people reported chronic pain symptoms associated with torture (29, 42%). This included musculoskeletal pain in the back, torso, joints, limbs and/or fingers/toes. These symptoms were associated with various torture methods, including beating, suspension and crush injuries.

Torture survivors commonly experience pain symptoms that can have either physical or psychological origins. Pain that has no obvious physical cause is known as "somatic" pain, and may be a symptom of severe psychological trauma. Somatic pain can indicate ongoing psychological distress and commonly manifests in headaches or back pain. Doctors examining torture survivors will, as far as is possible, distinguish between somatic pain and neuropathic pain (pain due to nerve damage), as a consequence of injury to the musculoskeletal system.[59]

## Psychological impacts

The main psychiatric disorders associated with torture are Post Traumatic Stress Disorder (PTSD) and depression, which though present in the general population, are much more prevalent among torture survivors. It is important to recognise that not every torture survivor develops a diagnosable mental illness even though many experience "profound emotional reactions and psychological symptoms".[60]

The purpose of the psychological evaluation is to "assess the degree of overall consistency between an individual's account of torture and the findings during the course of the evaluation".[61] Medico-legal reports prepared by Freedom from Torture clinicians routinely include a psychological evaluation; indeed independent psychological reports focus solely on the evaluation of psychological evidence. The psychological evaluation is conducted in accordance with Istanbul Protocol guidance and our own methodology, with reference to the World Health Organisation Classification of Mental and Behaviour disorders and psychological research on memory and recall.[62]

### What happens in a psychological assessment?

In accordance with the Istanbul Protocol, clinicians carrying out a psychological examination will assess past and current health history, conduct a full mental state examination and assess social functioning. Presenting symptoms and objective signs such as the behaviours and emotional affect of the individual throughout clinical examinations are recorded and described in detail in the medico-legal report.

The individual's reported experience of detention and torture and presentation of ongoing psychological symptoms is considered in light of their current behaviour, life circumstances and views of their past and present life and of their future. In forming a clinical impression of how psychological symptoms relate specifically to the individual's history of torture, other possible causes will be considered. Evidence of any psychiatric diagnoses made by other health care professionals, including GPs or National Health Service psychiatrists, will also be considered. In reporting a clinical opinion, Freedom from Torture clinicians will fully explain any psychiatric diagnosis they have made, how it relates to an individual's history of torture and/or other possible causes, while also assessing the possibility of fabrication.

## PTSD and depression

Psychological evidence of torture, including symptoms of PTSD and depression, was documented in all 69 cases (100%).

The overwhelming majority of people in this case set were found to have symptoms of **PTSD** that were directly related to the history of torture (65, 94%), fifty-three of whom had symptoms reaching the diagnostic threshold for PTSD according to the ICD-10 Classification of Mental and Behavioural Disorders (77%).

In a similarly high proportion of cases people were found to have symptoms of **depression** (62, 90%), fifty-five of whom had symptoms of depression reaching the diagnostic threshold for depression

according to the ICD-10 Classification of Mental and Behavioural Disorders (80%).

## Psychological symptoms documented included:

- *Re-experiencing trauma:* recurrent nightmares (91%); recurrent intrusive memories or flashbacks while the individual is awake (83%); intense distress at events that trigger associations with the trauma, including sights, sounds and figures that remind them of the perpetrator (54%).

- *Avoidance and emotional numbing:* avoidance of thoughts, people or activities associated with the trauma (54%).

- *Hypervigilance:* difficulty falling or staying asleep (93%); symptoms of anxiety such as hyperventilation or panic attacks (68%); difficulties in concentrating (75%); and difficulties with memory (54%).

- *Depression:* low mood (83%); difficulties in concentrating (75%); loss of pleasure in previously enjoyable activities (65%); ideas of self-harm or suicide (59%); diminished appetite (57%); difficulties with memory (54%).

- *Self-harm and suicide:* over half reported ideas of self-harm or suicide (59%), and eleven people reported having attempted suicide (16%).

## Damaged self-image

> "…following detention and torture…everything he believed to be true in the world has altered catastrophically…he asks 'Why did it happen to me?...How could it have been prevented?'…he finds no 'peace' – there is nothing he is able to enjoy or look forward to…he has a constant feeling of emptiness".– Medico-Legal Report excerpt

According to the Istanbul Protocol, torture aims to: "disintegrate the individual's personality. The torturer attempts to destroy a victim's sense of being grounded in a family and society as a human being with dreams, hopes and aspirations for the future… the victim has a sense of having been irreparably damaged". [63]

A number of people expressed that their view of themselves and their sense of their place in the world was profoundly altered following torture. People described feeling complete incomprehension at what they had suffered, irreparably damaged or soiled, incomplete and that their life would never be the same again.

## Psychological impacts of sexual torture

**Psychological responses to sexual torture were explored and documented in the medico-legal reports, and included:**

- Involuntary nightmares, flashbacks and/or intrusive memories of the perpetrators and the sexual torture to which they were subjected;

- Intense feelings of shame and humiliation and loss of self-esteem;

- Intense fear of being naked or being seen naked;

- Sexual dysfunction, loss of sexual desire;

- Fear of rejection by partners or the wider community;

- Intense anxiety, triggered by people/sounds that recall the abuser;

- Avoidance, including being unable to disclose fully what happened;

- Labile emotions, including weeping, anger, intense distress;

- Bleak or pessimistic view of the future; and

- Suicidal ideation.

> *"He saw himself as dirty because of the rape and could not bear to look at his naked body ….he no longer had any sexual desires…and has felt completely emasculated since the rape… 'They killed me mentally and I can never lift my head again because of the shameful thing they did to me'".* - Medico-Legal Report excerpt



# CONCLUSIONS

## Congruence of clinical evidence and attribution of torture

In the clinical opinion and concluding observations of the 69 medico-legal reports reviewed for this report, our examining clinicians drew together the salient elements of the account of detention and torture and the clinical evidence that may or may not have supported this history. This included:

- Summary of the history and torture methods described;

- Physical findings including lesions and their consistency with the attributed cause of torture, or lack of physical findings, with clinical reasons;

- Presence of lesions attributed by the person to other non-torture causes, demonstrating no attempt to embellish the account;

- Psychological findings, including symptoms of PTSD and depression, related or unrelated to the history of detention and torture, with clinical reasons;

- Mode of narration of the history including demeanour and affect, level of detail and consistency of the account or lack of these with clinical reasons; and

- Possibility of fabrication or embellishment of the account of torture, or of alternative explanation for the clinical causes.

In all 69 cases, Freedom from Torture clinicians found there to be sufficient physical and/or psychological evidence to support the account given, and overall congruence between the clinical findings and the history provided by the individual of detention and torture in Iran.

## Night

*Time froze*

*at the call of the first name.*

*The names always began*

*being called at noon*

*when the air was dank*

*with hundreds of women*

*confined*

*breathing each other's breath*

*longing for the darkness*

*for no one was ever called*

*for execution at night.*

---

Nasrin

## To the Islamic Republic of Iran government:

1) In line with the political commitment made by President Rouhani during his 2017 election campaign to deliver social reforms, the Iranian government should adopt and implement the absolute ban on torture in international law, including through:

a)  Ratifying without reservation the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and its Optional Protocol; and

b)  Amending Constitutional and other domestic legal provisions so that Iranian law fully reflects the absolute ban on torture in international law, including by removing restrictions that limit the prohibition in domestic law to torture aimed at extracting confessions or information.

2) To end the prevalence of torture in security facilities including prisons and deliver accountability, the government should take immediate steps to implement the concluding observations of the UN Human Rights Committee, following its last review of Iran in 2011, in particular by:

a)  Opening an inquiry into each case of alleged torture and ill-treatment in detention facilities, bringing alleged perpetrators to justice and ensuring that victims are granted effective reparation;

b)  Ensuring that no one is coerced into testifying against themselves or others or confessing guilt and that no such confession is accepted as evidence in court;

c)  Establishing a full, impartial and independent investigation into allegations of human rights violations, including torture and ill-treatment, during and following the 2009 president elections and prosecuting those officials found responsible; and

d)  Setting up a system of regular and independent monitoring of places of detention and ensuring conditions of detention conform to international law and standards.

3) The government should also participate in regular international human rights monitoring processes in order to demonstrate to the people of Iran and torture survivors who have been forced to flee its genuine commitment to ending the use of torture and improving conditions for those held in detention, in particular by:

a)  Submitting a fourth periodic report to the UN Human Rights Committee, which was originally due in November 2014;

b)  Given the evidence in this report of torture and appalling treatment of detainees in centres around Iran, the government should allow immediate and unrestricted access to the UN Special Rapporteur on the human rights situation in the Islamic Republic of Iran and heed her recommendations about how to end torture;

c)  Giving full effect to the Standing Invitation to UN thematic special procedures issued by the government of Iran in 2002 by responding positively to other outstanding requests to visit,  including by the:

- UN Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment; and

- UN Special Rapporteur on the independence of judges and lawyers.

## To the UK government:

1) Ensure that concerns about human rights including torture are raised in all bilateral and multilateral discussions on human rights with Iran and encourage the government to ratify the UN Convention against Torture and its Optional Protocol.

2) In line with recommendations made by torture survivors in treatment with Freedom from Torture (see Survivor voices section), use trade negotiations and discussions on strengthening political relations to call for concrete measures to deliver the Iranian government's promises of social reforms, and call for an end to human rights abuses including torture.

3) Ensure that Freedom from Torture's evidence of ongoing torture forms a basis for concerns about the use of torture in Iran in future Foreign and Commonwealth Office annual Human Rights and Democracy Reports.

## To member states of the UN:

1) In line with recommendations made by torture survivors in treatment with Freedom from Torture (see Survivor voices section), use the UN to continue to apply pressure on the Iranian government and adopt caution in welcoming progress unless the Iranian government can demonstrate reforms (e.g. to the criminal justice process) do not mask other abuses. Member states should do this through:

   a) Supporting the renewal of the mandate by the UN Human Rights Council of the Special Rapporteur on the human rights situation in the Islamic Republic of Iran and urging the government of Iran to cooperate fully with her; and

   b) Strengthening the focus on torture and ill-treatment in the annual General Assembly resolution on the human rights situation in Iran.

## To the European Union:

1) EU member states and the EU High Representative, Federica Mogherini, should make good on opportunities for renewed dialogue with Iran about human rights by raising stronger concerns about continuing torture and encouraging Iran to take concrete measures to eradicate its practice.

2) In the absence of significant progress on human rights, including effective steps to end the use of torture, the EU should maintain restrictive measures on Iran including asset freezes and visa bans for perpetrators of grave human rights abuses and a ban on exports to Iran of equipment which might be used for internal repression.

3) Ensure that Freedom from Torture's evidence of ongoing torture is discussed at the next EU/Iran Inter-parliamentary meeting as part of an agenda item on torture prevention. Pressure should be placed on Iran to ratify the UN Convention against Torture and its Optional Protocol.

# ENDNOTES

1 - Freedom from Torture, *"We will make you regret everything" Torture in Iran since the 2009 elections*, March 2013, available at: https://www.freedomfromtorture.org/sites/default/files/documents/iran%20report_A4%20-%20FINAL%20web.pdf (last accessed 21/11/2017).

2 - United Nations Human Rights Council, *Report of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, 28 February 2013, A/HRC/22/56 at paras 30-33 and paras 36-37 of Annex 1.

3 - United Nations Human Rights Council, *Interactive dialogue with:- Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, 12 March 2013, A/HRC/22/56, A/HRC/22/56/Add.1, 29th meeting - 22nd Regular Session of the Human Rights Council, available at: http://webtv.un.org/search/id-iran-special-rapporteur-contd-29th-meeting-22nd-regular-session-human-rights-council/2220097243001/?term=&lan=english&cat=Regular%2022nd%20session&sort=popular&page=2 (last accessed 28/11/2017).

4 - United Nations Human Rights Council, *Interactive dialogue with:- Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, 11 March 2013, A/HRC/22/56, A/HRC/22/56/Add.1, 28th meeting - 22nd Regular Session of the Human Rights Council, available at: http://webtv.un.org/meetings-events/watch/id-iran-special-rapporteur-28th-meeting-22nd-regular-session-human-rights-council/2220097237001/?sort=popular (last accessed 28/11/2017).

5 - Iran ratified the International Covenant on Civil and Political Rights in 1975.

6 - Iran Human Rights Documentation Center, *The Constitution of the Islamic Republic of Iran*, available at: http://www.iranhrdc.org/english/english/human-rights-documents/iranian-codes/3017-the-constitution-of-the-islamic-republic-of-iran.html?p=1 (last accessed 25/11/2017). Article 38 of the Constitution of the Islamic Republic of Iran forbids "all forms of torture the purpose of extracting confession or acquiring information" and the "compulsion of individuals to testify, confess, or take an oath." It also states that "any testimony, confession, or oath obtained under duress is devoid of value and credence." In reality these Constitutional protections are deficient and fall short of international law standards for a number of reasons, for example, the failure to recognise severe pain or suffering that is inflicted as punishment or to intimidate as torture. Iranian law also allows for judicial punishments such as flogging, amputation, blinding and stoning all of which are forms of torture and other cruel, inhuman or degrading treatment or punishment.

7 - See Amnesty International, *Flawed Reforms: Iran's New Code of Criminal Procedure*, 11 February 2016, (Index: MDE 13/2708/2016), available at: https://www.amnesty.org/en/documents/mde13/2708/2016/en/ (last accessed 21/11/2017).

8 - United Nations Human Rights Council, *Interactive dialogue with:
- Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, 13 March 2017, A/HRC/34/65, Item:4 - Human rights situations that require the Council's attention 34th Regular Session of the Human Rights Council,  Ms Jahangir stated "People continue to be harassed, people continue to be arrested, and all, almost everyone taken into custody are tortured and torture is endemic", available at: http://webtv.un.org/search/id-contd-sr-on-human-rights-in-iran-32-meeting-34th-regular-session-human-rights-council-/5357499868001/?term=&lan=english&cat=Human%20Rights%20Council&sort=date&page=42 (last accessed 22/11/2017).

9 - United Nations Human Rights Council, *Report of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, March 2017, A/HRC/34/65, available at: http://www.ohchr.org/EN/HRBodies/SP/CountriesMandates/IR/Pages/SRIran.aspx (last accessed 21/11/2017). (United Nations Human Rights Council, *Report of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran*, 2017).

10 - United Nations Human Rights Council, *Human Rights Council 36th session*

*Opening Statement by Zeid Ra'ad Al Hussein, United Nations High Commissioner for Human Rights*, 11 September 2017, available at: http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22041 (last accessed 21/11/2017).

11 - Foreign & Commonwealth Office, *Human Rights and Democracy: the 2016 Foreign and Commonwealth Office Report*, 20 July 2017, available at:  https://www.gov.uk/government/publications/human-rights-and-democracy-report-2016 (last accessed 21/11/2017).

12 - House of Commons Hansard, *Iran: Human Rights*, Volume 629, 11 October 2017, available at: https://hansard.parliament.uk/commons/2017-10-11/debates/54656615-7C21-4941-B7D0-900A5EBDE780/IranHumanRights (last accessed 21/11/2017).

13 - Foreign & Commonwealth Office and The Rt Hon Boris Johnson, *UK Upgrades Diplomatic Relations with Iran*, 5 September 2016, available at:  https://www.gov.uk/government/news/uk-upgrades-diplomatic-relations-with-iran (last accessed 21/11/2017).

14 - BBC, *Boris Johnson statement after Nazanin Zaghari-Ratcliffe comments*, 13 November 2017, available at: http://www.bbc.co.uk/news/av/uk-politics-41974299/boris-johnson-statement-after-azanin-zaghari-ratcliffe-comments (last accessed 25/11/2017).

15 - Human Rights Watch, *Rouhani Win Matters for Human Rights: In Second Term Should Move on Rights Reform*, 20 May 2017, available at: https://www.hrw.org/news/2017/05/20/rouhani-win-matters-human-rights (last accessed 21/11/2017)

16 - The case set is derived from medico-legal reports produced by Freedom from Torture for Iranians between September 2012 and April 2017.

17 -  Freedom from Torture will only accept a referral for a medico-legal report, and proceed to full documentation, where the client is deemed to fall within the organisation's remit and where they meet other intake criteria. For further information, see our website: https://www.freedomfromtorture.org/make-a-referral  (last accessed 21/11/2017).

18 - Office of the United Nations High Commissioner for Human Rights, *Istanbul Protocol, Manual on the Effective Investigation and Documentation of Torture and Other Cruel or Degrading Treatment or Punishment*, United Nations, 2004, available at: http://www.ohchr.org/Documents/Publications/training8Rev1en.pdf (last accessed 21/11/2017) (United Nations, *Istanbul Protocol*, 2004). For Freedom from Torture's own methodology, see Freedom from Torture (formerly Medical Foundation for the Care of Victims of Torture), *Methodology Employed in the Preparation of Medico-Legal  Reports on Behalf of the Medical Foundation*, June 2006, available at: https://www.freedomfromtorture.org/sites/default/files/documents/methodology%20medico-legal report.pdf (last accessed 21/11/2017). (Freedom from Torture, *Methodology*, 2006).

19 -  United Nations, *Istanbul Protocol*, 2004, para 287 (vi). See also UK Home Office, Asylum Policy Instruction: *Medico-Legal Reports from the Helen Bamber Foundation and the Medical Foundation Medico-Legal Report Service*, Version 4.0, July 2015, para 3.3 "Foundation clinicians can be assumed to have considered the possibility of 'a false allegation' of torture in forming a clinical view as this is required by the Istanbul Protocol: Paras 105(f) and 287(vi) require the report writer to consider whether the clinical picture suggests a false allegation of torture." available at: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/444410/MEDICO-LEGAL REPORT_Foundation_Cases__External_v4_0.pdf (last accessed 21/11/2017). (Home Office, Asylum Policy Instruction, *Medico-Legal Reports*, 2015). Until 2011, Freedom from Torture was known as the Medical Foundation for the Victims of Torture. After this date, our Medico-Legal Report Service retained "Medical Foundation" in its title due to the high level of recognition of this name among specialist legal service providers and decision-makers at the Home Office and the Tribunal.

20 - United Nations, *Istanbul Protocol*, 2004, para 161.

21 - United Nations, *Istanbul Protocol*, 2004, paras 157-159.

22 - Home Office Asylum Policy Instruction, *Medico-Legal reports*, 2015, 3.1.

23 - For discussion of mental and physical impacts of poor living conditions on survivors of torture, see Freedom from Torture, *The Poverty Barrier: The Right to Rehabilitation for Survivors of Torture in the UK*, July 2013, available at: https://www.freedomfromtorture.org/sites/default/files/documents/Poverty%20report%20FINAL%20a4%20web.pdf (last accessed 21/11/2017).

24 - Herlihy J., and Turner S.W., "The Psychology of Seeking Protection", International Journal of Refugee Law, (2009) 21 (2): 171-192, page 184 at para 4.4.

25 - Freedom from Torture, *Methodology*, 2006, page 2, *Testimony taking*.

26 - United Nations, Department of Economic and Social Affairs, Population Division (2017), *World Population Prospects: The 2017 Revision, Iran (Islamic Republic of)*, 2017, available at:  https://esa.un.org/unpd/wpp/Graphs/DemographicProfiles/ (last accessed 21/11/2017).

27 - UK Home Office. *Country Information and Guidance, Iran: Sexual Orientation and Gender Identity*, September 2016, Version 2.0, available at: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/565824/CIG-Iran-SOGI-v2-September-2016.pdf (last accessed 21/11/2017). Also see Human Rights Watch, *World Report 2016, Iran Events of 2015*, 2016, available at: https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/565824/CIG-Iran-SOGI-v2-September-2016.pdf (last accessed 21/11/2017).

28 - World Population Review. *Iran Population 2017*, 2017, available at: http://worldpopulationreview.com/countries/iran-population/ (last accessed 21/11/2017).

29 - United Nations Human Rights Council, *Report of the Special Rapporteur on the*

*situation of human rights in the Islamic Republic of Iran*, 2017. Also see Human Rights Watch, *Iran: No Accountability for Abuses*, 27 January 2016, available at: https://www.hrw.org/news/2016/01/27/iran-no-accountability-abuses (last accessed 21/11/2017).

30 - Amnesty International, *Iran 2016/2017*, 2017, available at: https://www.amnesty.org/en/countries/middle-east-and-north-africa/iran/report-iran/ (last accessed 21/11/2017). (Amnesty International, *Iran 2016/2017*, 2017).

31 - U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Iran: 2015 Report on International Religious Freedom*, 10 August 2016, available at: https://www.state.gov/j/drl/rls/irf/2015/nea/256265.htm (last accessed 21/11/2017).

32 - 'Ethnic' Christians are considered to be those of Armenian, Assyrian or Chaldean ethnicity. See International Federation for Human Rights, *Discrimination against ethnic and religious minorities in Iran*, July 2010, available at: http://www.refworld.org/docid/4c8622f72.html (last accessed 21/11/2017).

33 - See Amnesty International, *Iran 2016/2017*, 2017.

34 - Freedom House, *Iran: Freedom of the Press 2016*, 2016, available at: https://freedomhouse.org/report/freedom-press/2016/iran (last accessed 21/11/2017).

35 - Canada: Immigration and Refugee Board of Canada, *Iran: Student protests, including treatment of protestors by authorities (2013-January 2017)*, 16 January 2017, IRN105716.E, available at: http://www.refworld.org/docid/589455784.html (last accessed 21/11/2017).

36 - See Amnesty International, *IRAN 2016/2017*, 2017, para on Freedoms of expression, association and assembly. Also see Freedom House, *Iran: Freedom in the World 2016*, 2016, available at: https://freedomhouse.org/report/freedom-world/2016/iran (last accessed 21/11/2017).

37 - See Amnesty International, *Iran: Foreign diplomats tour of Evin prison a 'crude PR stunt'*, 2017, available at: https://www.amnesty.org/en/latest/news/2017/07/iran-foreign-diplomats-tour-of-evin-prison-a-crude-pr-stunt/ (last accessed 25/11/2017). A visit by foreign diplomats to Evin Prison in July 2017, orchestrated by the government of Iran to counter allegations of human rights abuses, was widely criticised as a PR stunt where access was tightly controlled, prisoners were transferred from the areas of the visit and those who remained were threatened if they expressed any criticism.

38 - It is impossible to make statistical inferences based on the number of medico-legal reports available to Freedom from Torture for research. Furthermore, the lack of reliable information relating to detention in Iran and the lack of statistics for people seeking asylum in the UK disaggregated by those who have been tortured and the year in which they were detained also makes it difficult to make statistical inferences from these cases to the wider population.

39 - Amnesty International, *Combating Torture and Other Ill-Treatment: A Manual for Action*, 2016, 3.2.1 *Grounds and Procedures for Arrest*, available at: https://www.amnesty.org/en/documents/pol30/4036/2016/en/ (last accessed 21/11/2017).

40 - United Nations Office on Drugs and Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules)*, 2015, available at: http://www.unodc.org/documents/justice-and-prison-reform/GA-RESOLUTION/E_ebook.pdf (last accessed 21/11/2017). (United Nations, *Mandela Rules*, 2015).

41 - United Nations General Assembly, *Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment*, 1988, A/RES/43/173, available at: http://www.un.org/documents/ga/res/43/a43r173.htm (last accessed 21/11/2017). (United Nations, *Body of Principles*, 1988).

42 - United Nations, *Mandela Rules*, 2015, see Rule 41 on notification of the nature of the accusations, the right to defend oneself at a hearing and access to legal counsel; see Rules 6-10 on keeping records of arrest & detention; Rule 68 on notification of the family, and Rule 27 on access to a medical attention.

43 - United Nations, *Body of Principles*, 1988, Principle 21.

44 - United Nations, *Mandela Rules*, 2015, Rules 12-22.

45 - United Nations, *Istanbul Protocol*, 2004, para 145.

46 - United Nations, *Istanbul Protocol*, 2004, para 206.

47 - The definition of rape here conforms to the accepted international definition that requires the penetration of the anal or genital opening of the victim with an object or otherwise the penetration of any part of the body with a sexual organ. See for example *Definitions of Crimes of Sexual Violence in the ICC (as contained in the Elements of Crimes Annex and the Rome Statute)*, available at: http://iccwomen.org/resources/

crimesdefinition.html (last accessed 21/11/2017). It should be noted that the definition of "rape" differs in UK law, which differentiates "sexual assault by penetration" and "rape". See The Crown Prosecution Service, *Prosecution Policy Guidance, Legal Guidance: Rape and Sexual Offences, Chapter 3*: Consent, Sexual Offences Act 2003, available at: http://www.cps.gov.uk/legal/p_to_r/rape_and_sexual_offences/consent/#a01 (last accessed 22/11/2017).

48 - Ed. Peel, M, *Rape as a Method of Torture*, Freedom from Torture (formerly known as the Medical Foundation for the Care of Victims of Torture), 21/04/2004, page 64-65, available at: https://www.freedomfromtorture.org/sites/default/files/documents/rape_singles2.pdf (last accessed 22/11/2017).

49 - United Nations, *Istanbul Protocol*, 2004, para 215.

50 - U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *2009 Human Rights Report: Iran*, 11 March 2010, available at: https://www.state.gov/j/drl/rls/hrrpt/2009/nea/136068.htm (last accessed 22/11/2017).

51 - United Nations, *Istanbul Protocol*, 2004, para 145, (o).

52 - For examples see United Nations, *Istanbul Protocol*, 2004, paras 206 and 214.

53 - United Nations, *Istanbul Protocol*, 2004, para 105.

54 - See United Nations, *Istanbul Protocol*, 2004, para 187, for terms designating degree of consistency between the physical examination and the attribution of a particular torture method.

55 - Freedom from Torture, *Proving Torture: Demanding the impossible. Home Office mistreatment of expert medical evidence*, November 2016, available at: https://www.freedomfromtorture.org/sites/default/files/documents/proving_torture_a4_final.pdf (last accessed 22/11/2017).

56 - United Nations, *Istanbul Protocol*, 2004, para 188.

57 - United Nations, *Istanbul Protocol*, 2004, para 212.

58 - Burnett A., and Adlington, A., "Sexually Transmitted Infections as a Consequence of Rape", in Peel, M. (ed), *Rape as a Method of Torture*, Freedom from Torture, 2004, page 155 "…It cannot be over-emphasised that the benefit to the patient of any investigation or aspect of examination must be weighed against the risk of exacerbating or prolonging the patient's distress, and should not be performed without their full, unhurried consent".

59 - United Nations, *Istanbul Protocol*, 2004, para 245 notes that "Somatic symptoms such as pain, headache or other physical complaints, with or without objective findings, are common problems among torture victims. Pain may be the only manifest complaint and may shift in location and vary in intensity. Somatic symptoms can be a direct consequence of physical torture or of psychological origin…"

60 - United Nations, *Istanbul Protocol*, 2004, para 236.

61 - United Nations, *Istanbul Protocol*, 2004, para 261.

62 - United Nations, *Istanbul Protocol*, 2004, paras 234-315; Freedom from Torture, *Methodology*, 2006, and also World Health Organisation, *The ICD-10 Classification of Mental and Behavioural Disorders: clinical descriptions and diagnostic guidelines*, Geneva: The World Health Organisation, 1994, available at: http://apps.who.int/iris/bitstream/10665/37958/8/9241544228_eng.pdf (last accessed 22/11/2017).

63 - United Nations, *Istanbul Protocol*, 2004, para 235.



Please visit our website to find out more:

www.freedomfromtorture.org/iran

## Freedom from Torture

Freedom from Torture is the only UK-based human rights organisation dedicated to the treatment and rehabilitation of torture survivors. We do this by offering services across England and Scotland to around 1,000 torture survivors a year, including psychological and physical therapies, forensic documentation of torture, legal and welfare advice, and creative projects.

Since our establishment in 1985, more than 60,000 survivors of torture have been referred to us, and we are one of the world's largest torture treatment centres. Our expert clinicians prepare medico-legal reports (MLRs) that are used in connection with torture survivors' claims for international protection, and in research reports, such as this. We are the only human rights organisation in the UK that systematically uses evidence from in-house clinicians,and the torture survivors they work with, to hold torturing states accountable internationally; and to work towards a world free from torture.

Tel: 020 7697 7777
Fax: 020 7697 7799
www.freedomfromtorture.org
freefromtorture
freedomfromtorture

Freedom from Torture
111 Isledon Road
London
N7 7JW

Registered charity no: England 1000340, Scotland SC039632