IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mehrangiz Kar and Azadeh Pourzand, *Plaintiffs*, vs. The Islamic Republic of Iran et al.; *Defendants*. | Case Number: 1:19-cv-02070-JDB |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**

**Introduction**

Plaintiff Mehrangiz Kar and Plaintiff Azadeh Pourzand (collectively, "Plaintiffs"), filed the Complaint in the above-captioned matter on November 26, 2019, pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"). Defendants the Islamic Republic of Iran, Iran's Supreme Leader Ali Hosseini Khamenei, and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or "Defendants") failed to appear within the statutory time period after service, and default was entered on October 19, 2020. ECF No. 19. Plaintiffs subsequently moved for default judgment by filing the Motion for Default Judgment ("MDJ") with supporting exhibits on September 2, 2021. ECF No. 20. The Motion for Default Judgment is currently pending. On January 4, 2022, the Court ordered Plaintiffs to submit this Supplemental Brief to answer the following four (4) questions:

> (1) the Court's ability to grant plaintiffs damages for injuries they suffered before becoming U.S. nationals,
> (2) whether the injuries Mr. Pourzand suffered would constitute pain or suffering arising only from, inherent in, or incidental to lawful sanctions,
> (3) whether the actions of Iran that allegedly caused Mr. Pourzand's death were authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples, and

1

(4) whether Plaintiff Pourzand's lost financial opportunities are too speculative for the Court to award her economic damages.

This Brief addresses the Court's questions, answering questions (1) and (4) under the "Damages" section and questions (2) and (3) under the "Unlawful sanctions and judgment" section.

## I.   QUESTIONS RELATED TO DAMAGES

### 1. THE COURT MAY GRANT DAMAGES TO PLAINTIFFS FOR INJURIES THEY SUFFERED BEFORE BECOMING U.S. NATIONALS.

#### a. Continuing-Tort Doctrine

The Court may grant damages to Plaintiffs for injuries they suffered before becoming U.S. nationals if the same act was continuous from the time before Plaintiffs became US nationals to the time after that date under the continuing tort doctrine. Mr. Siamak Pourzand was a hostage of and tortured by Defendants from November 2001 until his extrajudicial killing by Defendants in April of 2011. *See* MDJ. During this time, Plaintiff Kar became a U.S. national on June 20, 2007, and Plaintiff Pourzand became a U.S. national on January 8, 2009. *Id*. Plaintiffs have brought claims to recover for solatium and economic damages. *Id.* Plaintiffs request economic damages solely for the economic harm they endured while U.S. nationals, and solatium damages for the entirety of the harm they endured relating to the continuous acts of torture and hostage taking. *See Id*, p. 37.

Section 1605A(c) does not specify the substantive bases for liability that determine Plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24, 29 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F.

Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).

The "continuing tort" doctrine is instructive in this case. The doctrine states that "[w]here a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct." 54 C.J.S. Limitation of Actions § 204 (2005). Under District of Columbia law, this Court has found that the doctrine requires a plaintiff to allege:

> "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 729 (D.C.C. 2008) (quoting *Beard v. Edmondson Gallagher*, 790 A.2d 541, 547-48 (D.C. 2002)).

The spirit of this doctrine is to ensure that, where a continuing tort has a cumulative effect, "such that the injury might not have come about but for the entire course of conduct …, then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period." *Beard*, supra, at 548. Courts have routinely applied the continuous tort doctrine to findings of torture and intentional infliction of emotional distress in various contexts, including cases concerning denying prisoners medical care and hostage taking. *See, e.g., Hernandez v. Arpaio*, 2018 U.S. Dist. LEXIS 229759 (D. Ariz. 2018)*; Lucero-Nelson v. Washington Metro. Area Transit Auth.*, 1 F. Supp. 2d 1 (D.D.C. 1998); *Von Dardel v. Union of Soviet Socialist Republics*, 623 F. Supp. 246, 246-50 (D.D.C. 1985); and *Page v. United States,* 729 F.2d 818, 821 (D.C.C. 1984). The principle of indivisible pain and suffering from continuous torts supports the conclusion that Plaintiffs are entitled to all damages for their pain and suffering caused by Defendants' tortious acts against Mr. Pourzand, including that which they suffered prior to becoming U.S. nationals.

In *National Telephone Coop. Assn. v. Exxon Corp.,* this Court heard the 1998 case involving a telephone company and a gasoline distributor with adjacent properties. The telephone company alleged that the gasoline distributor was liable for gasoline contamination that migrated from the gasoline distributor's underground storage tanks and onto the telephone company's property, damaging its resale value. The telephone company reported these leaks first in 1990, and again beginning in 1995. *National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F. Supp 2d 1, 1-4 (1998). In response to the gasoline distributor's claim that the complaint was time-barred due to an applicable statute of limitations of five years, this Court applied the above definition of the continuous tort doctrine, finding in favor of the telephone company. Specifically, this Court found that a continuous tort was present, and the complaint was timely, because: (1) the gasoline leaks were continuous and repetitive; (2) damages, namely to resale value, flowed from the act as a whole rather than from each individual leak; and (3) at least one injurious act, or leak, occurred within the limitation period. Therefore, the telephone company may be able to recover for the entire course of conduct, including the leaks that occurred prior to the limitation period. *Id*., at 7-11.

Here, Defendants' acts against Mr. Pourzand also constitute continuous torts, satisfying this Court's three-pronged test. First, Defendants' wrongful acts were continuous and repetitious, as Mr. Pourzand was unceasingly held hostage and tortured by Defendants. Second, damages flow from Defendants' act as a whole rather than from each individual act. While numerous acts committed by Defendants against Mr. Pourzand between November 2001 and April 2011 constitute discrete acts of hostage taking and torture, Plaintiffs' Motion for Default Judgment demonstrates the likelihood that Mr. Pourzand's extrajudicial killing was not a discrete act but instead the result of continuing violations having a cumulative effect, such that the extrajudicial killing might not have come about but for the entire course of misconduct against him. *See* MDJ, p. 28-9. Further, Plaintiffs' resulting

4

suffering during these nearly ten years have cumulatively and permanently injured Plaintiffs. Third, at least one injurious act occurred within the period during which Plaintiffs were U.S. nationals. Mr. Pourzand was a hostage of and tortured by Defendants from November 2001 until his extrajudicial killing by Defendants in April 2011, during which time Plaintiff Kar because a U.S. national in 2007 and Plaintiff Pourzand in 2009. *Id.*

Given the continuous and related nature of the violations against Mr. Pourzand – his hostage taking and torture, amounting to his extrajudicial killing – "all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period," or, here, the period in which Plaintiffs were U.S. nationals. *See Beard*, supra, at 548.

### i. FSIA §1605A Does Not Limit the Period of Recoverable Damages Available under the Continuing Tort Doctrine

The continuing tort doctrine is applicable to claims brought under FSIA §1605A. In the District of Columbia, courts will not interpret statutes to derogate from the common law unless the legislature expressly repeals or modifies the particular element of the common law. *See United States v. Jackson*, 528 A.2d 1211, 1215 (D.C. 1987); *O'Connor v. United States*, 399 A.2d 21, 26 (D.C. 1979). Moreover, under Maryland law, "the source of the District's common law and an especially persuasive authority when the District's common law is silent," *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983), mandates that a legislature must expressly declare its intent to depart from well-recognized common-law principles:

> It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common [**11] law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.

*Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147, 1152 (Md. 1994) (quoting *Lutz v. State*, 167 Md. 12, 172 A. 354, 356 (Md. 1934)).

Here, FSIA §1605A is entirely silent with respect to the continuing tort doctrine. The FSIA's terrorism exception, 28 U.S.C. § 1605A, references a claimant's nationality in two subsections relevant here: (1) subsection 1605A(a)(2)(A)(ii)(I) concerning the court's subject matter jurisdiction to hear a claim under this section, and (2) subsection 1605A(c)(1) concerning the private right of action requirements.

In FSIA §1605A(c), the statute discusses a nationality requirement in the context of private cause of action, stating:

> "A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
> (1) a national of the United States". 28 U.S.C. § 1605A(c)(1).

Here, the statute does not provide any explicit or implicit requirement that limits the applicability of the continuing tort doctrine, or the period for the calculation of damages. Instead, the statute places a temporal limitation only on the elements of the private cause of action; once the Court finds that a claim may be heard by satisfying all of the elements under § 1605A(c), then the issue of the damages is governed by the tort law, as stated above. This allows for a scenario in which the Court finds Plaintiffs, pursuant to § 1605A(c), have the ability to bring an action against Defendants for acts of hostage taking, torture, and extrajudicial killing that occurred while they were U.S. nationals, and does not limit the recoverable damages under the continuing tort doctrine.

Thus, in the absence of any explicit or implicit language, Plaintiffs may recover damages under the continuing tort doctrine for the continuous acts of hostage taking and torture, which began prior to them becoming U.S. nationals and continued during and after, even though they were not U.S. nationals when the acts initiated. The Court should hold Defendants liable to Plaintiffs for the totality

of the harm they endured due to Defendants' continuous acts. Neither the black letter law of the FSIA §1605A nor precedential case law suggests or demands otherwise.

## 2. PLAINTIFF POURZAND'S LOST FINANCIAL OPPORTUNITIES ARE NOT TOO SPECULATIVE FOR THE COURT TO AWARD HER ECONOMIC DAMAGES.

The FSIA provides for economic damages. 28 U.S.C. § 1605A(c). Under the statute, Plaintiff Pourzand may recover damages for any economic losses, such as lost financial opportunities and income, directly caused by Defendants' hostage taking, torture, and extrajudicial killing of her father. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010). Courts have routinely awarded similar economic damages under section 1605A(c) and uniformly agree that "lost earnings—past and future—are compensable economic damages" under the FSIA. *See Rezaian v. Islamic Republic of Iran*, 422 F.Supp. 3d 164, 181 (D.D.C. 2019); *Azadeh v. Islamic Republic of Iran*, Civil Action No. 1:16-cv-1467 (KBJ), at 51 (D.D.C. 2018); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 149, 164 (D.C. Cir. 2017); and *Warmbier v. Democratic People's Republic of Korea*, 365 F.Supp 3d 30, 55 (D.D.C. 2017). Courts have further found that neglecting professional obligations to advocate for a loved one merits an award for economic damages. *Rezaian*, supra, at 182-83. However, these damages must be proven "by a reasonable estimate" and supported by corroborative evidence. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C.2012). Further, as state sponsors of terrorism, such as Defendant Iran, have "made all but certain that that evidence does not exist," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014), plaintiffs may establish proof by affidavit, and finders of fact "may accept Plaintiffs' uncontroverted evidence as true." *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013); *See also Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002)

(In the context of the FSIA, "courts have never doubted the veracity of the factual information attested to in the affidavits.").

In *Rezaian v. Iran*, this Court granted plaintiffs Ali and Mary, who are the siblings of plaintiff Jason, their requests for economic damages. This Court found that Jason, who was living in Iran and working as a correspondent for the Washington Post, was taken hostage by Iran and held for 544 days, during which time he was tortured. Ali was working as the CEO of his consulting firm in the U.S. when Jason was arrested. Ali's life was upended, and he chose to stop focusing on his career and dedicate his time to advocating for his brother's release. His absence from work prevented him from building his clientele and increasing profitability. Similarly, Mary was working as an English language teacher in Istanbul when Jason was arrested, and she stopped teaching and moved to Iran to advocate for his release. This decision resulted in her loss of income. This Court found Iran liable for these losses, awarding Ali and Mary their requested economic damages awards of $1,149,539 and $8,761, respectively. *Rezaian*, supra, at 170-74, 182-84.

Plaintiff Pourzand received a Master's in Public Policy from Harvard Kennedy School of Government – during her father's detention but prior to his death. She then enrolled in a Master's in Business Administration (MBA) program in September 2010. She decided to pursue a career that could financially support her struggling family. Azadeh Pourzand Declaration, Ex. 10, ¶68. In this program, she and her now-husband Gleb both intended to focus on entrepreneurship and profitable business ideas. However, Mr. Pourzand's death during the program in April 2011 halted that possibility for Plaintiff Pourzand. *See* Gleb Zukhov Declaration, Ex. 15, ¶6-7; Ex. 10, ¶5. While Gleb went on to become a business consultant, working as a risk management advisor at a U.S.-based consulting firm, Plaintiff Pourzand was paralyzed by her grief. Ex. 15, ¶3. She concluded the MBA program, but "[n]ot knowing how to throw [herself] back into the business world within a week, [she]

decided to write a business model for a nonprofit named Siamak Pourzand Foundation", which she now runs. Ex. 10, ¶68. Her commitment to building a career through which she could financially support her family became untenable upon her father's death as she, like the plaintiffs in *Rezaian*, gave up her previous life to seek justice for her father. The amount of pain she suffered forced her to dedicate her life to her father and what he stood for.

Plaintiff Pourzand took active steps to achieve this career path and earn an average of $90,000 per year. However, as for the plaintiffs in *Rezaian*, the impact of Defendants' conduct made this untenable, and she devoted herself to human rights activism, earning an average of $60,000 per year since gaining full-time employment in 2014. Ex. 10, ¶69. Given this $30,000 per year loss of income over seven years, amounting to $210,000, and the prejudgment interest for this lost income of $6,825, $216,825 is both a conservative and reasonable estimate for a total economic damages award for Plaintiff Pourzand. *See* J.P. Morgan prime rate chart, Ex. 54.

Plaintiff Pourzand has provided a "reasonable estimate", via affidavit-testimony, of both her forced career change and the resulting lost income that would not have occurred but for Defendants' conduct. This reasonable estimate is corroborated by calculations of average salaries.[1]

## II. QUESTIONS RELATED TO UNLAWFUL SANCTIONS AND JUDGMENT

The Court has asked Plaintiffs to answer two questions: (1) whether the injuries Mr. Pourzand suffered would constitute pain or suffering arising only from, inherent in, or incidental to lawful sanctions, and (2) whether the actions of Iran that allegedly caused Mr. Pourzand's death were authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. The answer to both questions

---

[1] *See* Glassdoor, Business Consultant Salaries in Washington, D.C., https://www.glassdoor.com/Salaries/washington-dc-business-consultant-salary-SRCH_IL.0,13_IM911_KO14,33.htm.; Glassdoor, Risk Management Advisor, https://www.glassdoor.com/Salaries/us-risk-management-advisor-salary-SRCH_IL.0,2_IN1_KO3,26.htm.

is in the negative, as Defendants' hostage taking and torture of Mr. Pourzand were unlawfully sanctioned, and their extrajudicial killing of him was never judicially authorized.

A previous judgment pronounced by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people" means that the judgment has the approval of "a regularly constituted court that affords the full panoply of due process protections".[2] Similarly, "lawful sanctions" by a judiciary must also meet this threshold. Due process protections are outlined in both international instruments and domestic laws.

The judicial system in charge of Mr. Pourzand's case was the Iranian judiciary. The Iranian judiciary – as both an institution and the courts that constitute it – is domestically and internationally regarded as a "mockery of justice", systematically lacking due process protections.[3] *See* "Mockery of Justice" Report, MDJ, Ex. 37. The Iranian judiciary failed to uphold both domestic and international due process requirements, causing Mr. Pourzand's unlawful imprisonment, unfair trial, forced self-incrimination, pain and suffering, and death. For this reason, Defendants' hostage taking, torture, and extrajudicial killing of Mr. Pourzand could not have been lawfully sanctioned or authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples because the judiciary does not, and did not in this specific case, "afford the full panoply of due process protections".

1. **The injuries Mr. Pourzand suffered as a result of his hostage taking and torture by Defendants do not constitute pain and suffering arising only from, inherent in, or incidental to lawful sanctions.**

---

[2] William J. Aceves, *When Death Becomes Murder: A Primer On Extrajudicial Killing*, 50 COLUM. HUM. RTS. L. REV. 116, 147 (2018).; *See generally* William A. Schabas, *The European Convention on Human Rights: A Commentary* 126-27 (2015) (explaining that the positive obligation on States to protect life includes a duty to have appropriate legal and administrative frameworks in place to deter the commissions of offences against persons).
[3] *See* Human Rights Watch, Iran: "Trial" a Mockery of the Law (Mar. 12, 2002), https://www.hrw.org/news/2002/03/12/iran-trial-mockery-law.

In *Rezaian v. Iran*, this Court found that plaintiff Jason Rezaian had been taken hostage and tortured by Defendant Iran for 544 days. In making this finding, the Court found that Jason's resulting pain and suffering did not arise from, was not inherent in, and was not incident to lawful sanctions by the Iranian judiciary. *Rezaian*, supra, at 176-77. The Court found that Jason endured:

> "[…] squalid living conditions, solitary confinement, malnutrition, physical ailments, and tenth-rate medical care—all suffered while imprisoned by Iran's Revolutionary Guard, and all causes of both immediate and persisting pain. And there is likewise little doubt that the pain and suffering was inflicted on Jason "for [the] purpose[] [of] obtaining … a confession. […] Jason testified that his captors repeatedly sought—often by threatening additional pain and suffering—a videotaped confession to crimes that he did not commit." *Id*., at 176.

This Court further found that "'Jason's story is, 'if nothing else, … a living example of how brutal and how lacking in any sense of due process' Iran can be." *Id*., at 177.

Mr. Pourzand was under similar, if not worse, conditions as Jason, as a man in his seventies taken hostage and tortured by Defendant Iran for over 3,400 days, enduring similar or worse treatment as Jason by the same regime and judiciary. Thus, the following illustrates the specific ways in which the Iranian judiciary lacked "any sense of due process" in authorizing Mr. Pourzand's hostage taking and torture, which were therefore not lawfully sanctioned:

   a) <u>Mr. Pourzand was arbitrarily and unlawfully arrested and detained.</u>

On November 24, 2001, Mr. Pourzand was arrested and detained by armed, plainclothes men who did not identify themselves, a warrant, or the charges against him. He was not handed over to any court with any charging document. *See* Mehrangiz Kar Declaration, Ex. 9, ¶16-20; Ex. 37, p. 39. Mr. Pourzand was also arrested at night, which is prohibited by Article 121 of Iran's Code of Criminal Procedure.[4]

   b) <u>Mr. Pourzand was held in "incommunicado detention".</u>

---

[4] Iran's Code of Criminal Procedure, *supra* note 5, at art. 121 ("Accused should be summoned during the day, except in the case of an emergency.").

11

Articles 7 and 10 of the ICCPR, respectively, prohibit torture and cruel, inhuman and degrading treatment, and require states to treat persons in detention with humanity and dignity.[5] The Iranian judiciary violated these articles by holding Mr. Pourzand in incommunicado detention. The U.N. Human Rights Council has identified incommunicado detention, in which one is denied access to others, as a potential breach of Articles 7 and 10. Article 33 of Iran's Code of Criminal Procedure also requires a court order to authorize a suspect's pre-trial detention beyond one month.[6] Ex. 37, p. 40. Mr. Pourzand was held in an undisclosed location for almost four months prior to his trial without the required court authorization or communication with family. Even after this period, his family was not yet informed of where he was being detained. *Id.*, at 14, 21, 40.

c)  Mr. Pourzand was mistreated and tortured.

If sanctioned by the Iranian judiciary, the judiciary further violated Articles 7 and 10 of the ICCPR through Defendants' numerous acts of torture against Mr. Pourzand and Article 38 of the Iranian Constitution, which prohibits all forms of mistreatment and torture carried out for the purposes of extracting a confession or acquiring information.[7] These acts include: forcing him to remain in solitary confinement in a small bathroom, where he was forced to eat and sleep; spraying him and filling the floor of his cell with scalding hot water; denying him showers for extended periods; giving him a chemical shower cream that severely burned his skin; beating him, hanging him from the ceiling, and forcing him to stand with his arms raised facing a wall for hours; holding him in cold "freezer" rooms for hours until fainting; depriving him of nutritious food, and then force-feeding him cucumbers

---

[5] ICCPR, *supra* note 4**,** at arts. 7, 10.
[6]  Iran's Code of Criminal Procedure, *supra* note 5, at art. 33 ("The arrest shall be ordered by a judge and approved by the head of the district court or his deputy. The arrest could be appealed in the provincial court within 10 days. This review will be conducted immediately. Either way, the status of the accused must be determined within a month. If the judge deems it necessary to hold the accused in custody any longer, he must have the case reviewed as specified above.").
[7] Constitution of Iran, *supra* note 6, at art. 38 ("All forms of torture for the purpose of extracting confession or acquiring information are forbidden. Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid.").

as his only food intake for 10 days while guards sat on his chest, and beating him when he refused to eat; interrogating him daily; threatening his life; forcing him to write false confessions for over 12 hours per day, causing his body to ache and swell; injecting him with an undisclosed drug without his consent 24 hours prior to his televised force confession in July 2002; forcing him to watch the torture of other detainees; and keeping him in home confinement under constant psychological torture. *See* MDJ, p. 18-21. The extent of Defendants' torture of Mr. Pourzand is presented in greater detail in the MDJ with supporting documents. See *Id*. These acts caused Mr. Pourzand lasting physical and psychological illnesses. *Id*., at 20-1. In the event that these actions by Defendants against Mr. Pourzand were not sanctioned by the judiciary, then they were patently unlawful.

    d) <u>Mr. Pourzand's trial and due process rights were violated.</u>

Additionally, the Iranian judiciary violated Article 14 of the ICCPR, which states that "everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law", in numerous instances.[8] For example, Mr. Pourzand was denied his lawyer of choice, and eventually appointed an attorney partial to the government, violating rights enshrined in Article 14(3)(d) of the ICCPR,[9] Article 35 of the Iranian Constitution,[10] and Article 185 of Iran's Code of Criminal Procedure.[11] *See* Ex. 9, ¶20, 31; Ex. 37, p. 21. He was also denied an adequate defense during his trial and the right to an open and public trial with a jury, which are rights enshrined in Article 14(3)(e) of the ICCPR,[12] and in Article 14 of the ICCPR and Article 168 of the

---

[8] ICCPR, *supra* note 4, at art. 14(1).
[9] *Id*., at art. 14(3)(d).
[10] Constitution of Iran, *supra* note 6, at art. 35 ("Both parties to a lawsuit have the right in all courts of law to select an attorney, and if they are unable to do so, arrangements must be made to provide them with legal counsel.").
[11] Iran's Code of Criminal Procedure, *supra* note 5, at art. 185 ("All parties to a criminal dispute have the right to select and introduce their own legal counsel(s) to a court of law. The date and the time of the court appearance will be announced to the accused, plaintiffs, defendants and their attorneys. If the disputing parties have multiple lawyers, presence of one lawyer from each side is sufficient for the court to proceed.").
[12] ICCPR, *supra* note 4, at art. 14(3)(e).

Iranian Constitution, respectively.[13] Ex. 37, p. 21-8, 39.; *See* Ali Arab Declaration, Ex. 13, p. 30. Further, he was forced to falsely confess to crimes he did not commit and condemn his family and friends for false crimes, in violation of Article 14(3)(g) of the ICCPR and Article 38 of the Iranian Constitution."[14] *See* Ex. 37, p. 22, 29-30, 39; and Ex. 9, ¶35-6.

In conclusion, if any of Defendants' intentional injuries against Mr. Pourzand, such as those discussed above, which caused Mr. Pourzand physical and mental pain and suffering, were authorized by the Iranian judiciary, such actions could not have arisen only from, inherent in, or incidental to lawful sanctions, because neither these actions nor the pain and suffering they caused Mr. Pourzand were purely lawful, inherently lawful, or incidentally lawful.

**2. The actions of Defendant Iran that caused Mr. Pourzand's death were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.**

As argued in the Motion for Default Judgment, Defendants deliberately killed Mr. Pourzand, either directly or by planning and creating the circumstances that drove him to his death. *See* MDJ, p. 27-28. Mr. Pourzand was never lawfully charged, tried, or sentenced to death by an Iranian court. Defendant Iran claims to this day that they neither directly nor indirectly caused Mr. Pourzand's death. Instead, they maintain that Mr. Pourzand committed suicide. *See* Ex. 9, ¶46; Ex. 10, ¶35; Ex. 12, p. 9. In maintaining these claims, the Iranian government concedes that no court within the Iranian judiciary

---

[13] Constitution of Iran, *supra* note 6, at art. 168 ("Political and press offenses will be tried openly and in the presence of a jury, in courts of justice. The manner of the selection of the jury, its powers, and the definition of political offenses, will be determined by law in accordance with the Islamic criteria.").; *See also* Human Rights Watch, Iran: "Trial" a Mockery of the Law (Mar. 12, 2002), https://www.hrw.org/news/2002/03/12/iran-trial-mockery-law.

[14] ICCPR, *supra*, note 4, at art. 14(3)(g); Constitution of Iran, *supra* note 6, at art. 38 ("All forms of torture for the purpose of extracting confession or acquiring information are forbidden. Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid of value and credence. Violation of this article is liable to punishment in accordance with the law.").

authorized any actions causing Mr. Pourzand's death. Thus, Defendants' extrajudicial killing of Mr. Pourzand was not pronounced by any authorized judgment.

## Conclusion

In conclusion, in response to the Court's questions, (1) the Court may grant damages to Plaintiffs for injuries they suffered before becoming U.S. nationals because Defendants' acts were continuous from the time before Plaintiffs became U.S. nationals to the time after that date under the continuing tort doctrine; (2) the injuries Mr. Pourzand suffered do not constitute pain or suffering arising only from, inherent in, or incidental to lawful sanctions; (3) the actions of Iran that caused Mr. Pourzand's death were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples; and (4) Plaintiff Pourzand's lost financial opportunities are not too speculative for the Court to award her economic damages.

Respectfully submitted.

February 4, 2022

    /s/   *Ali Herischi*
Ali Herischi, Esq.
MD0024
Herischi & Associates LLC
7201 Wisconsin Ave. Ste. 440
Bethesda, MD 20814
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
Fax: 301.363.4538

*Counsel for Plaintiffs*