**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MEHRANGIZ KAR, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 19-2070 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN, et al.** | |
| **Defendants.** | |
| **BANAFSHEH ZAND,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 19-2602 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN, et al.** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Mehrangiz Kar, Azadeh Pourzand, and Banafsheh Zand are, respectively, the spouse and two daughters of Siamak Pourzand ("Siamak"). Kar Mot. for Default J. [ECF No. 20] at 5–6; Decl. of Mehrangiz Kar [ECF No. 20-11] ("Kar Decl.") ¶ 3; Decl. of Azadeh Pourzand [ECF No. 20-12] ("Azadeh Decl.") ¶ 3; Zand Mot. for Default J. [<u>Zand</u> ECF No. 13] at 5; Decl. of Banafsheh Zand [<u>Zand</u> ECF No. 13-6] ("Zand Decl.") ¶ 3.[1] Plaintiffs allege that Iran is liable for the hostage taking, torture, and extrajudicial killing of Siamak, and they have filed suit under the terrorism exception to sovereign immunity in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. <u>See</u> Kar Compl. [ECF No. 1] ¶¶ 1, 4; Zand Compl. [<u>Zand</u> ECF No. 1] ¶¶ 1, 4.

---

[1] Unless otherwise indicated, all docket entry citations will refer to the filings in <u>Kar v. Islamic Republic of Iran</u>, No. 19-cv-2070. The Court will cite filings in <u>Zand v. Islamic Republic of Iran</u>, 19-cv-2602, as "<u>Zand</u> ECF No. #."

1

Plaintiffs have filed two substantively identical motions for default judgment. See generally Kar Mot. for Default J.; Zand Mot. for Default J. For the reasons that follow, the Court will grant plaintiffs' motions in part and deny them in part.

## Background

### I.    Factual Background

Siamak Pourzand was "a renowned Iranian journalist, cultural figure, and recipient of numerous awards from international institutions." Kar Mot for Default J. at 2; see also Iran Human Rights Documentation Center, Mockery of Justice: The Framing of Siamak Pourzand 8–9 (2008) [ECF No. 20-42] ("The Framing of Siamak Pourzand") (describing Siamak's career as a journalist and film critic)[2]; Drewery Dyke, Siamak Pourzand: Persecuted to Death, Harassed After Death, Amnesty Int'l, May 6, 2011, at 1 [ECF No. 20-43] ("Siamak Pourzand: Persecuted to Death").[3] He was married to plaintiff Mehrangiz Kar, a prominent human rights lawyer and activist working to empower women and democracy in Iran. Kar Mot. for Default J. at 2; Kar Decl. ¶¶ 3, 5–7; see Mehrangiz Kar Bar License [ECF No. 20-5]. Siamak and Kar had two daughters: Lily Pourzand ("Lily") and plaintiff Azadeh Pourzand ("Azadeh"). Kar Mot. for Default J. at 5; Kar Decl. ¶ 3; Azadeh Decl. ¶ 3; Azadeh Pourzand Birth Certificate [ECF No. 20-7]. Plaintiff Banafsheh Zand is Siamak's daughter from an earlier marriage. Zand Mot. for Default J. at 5; Zand Decl. ¶ 3.

Siamak became a target of Iran due to, among other things, his public criticism of the government and the interviews he conducted with prominent Americans. Kar Mot. for Default J. at 2; The Framing of Siamak Pourzand 8–9 (stating Iran was skeptical of Siamak because he had interviewed U.S. President Richard Nixon, he had served briefly as the deputy of the General

---

[2] Available at https://iranhrdc.org/mockery-of-justice-the-framing-of-siamak-pourzand/ (last accessed Sept. 21, 2022).

[3] Available at https://www.amnesty.org/en/latest/campaigns/2011/05/siamak-pourzand-persecuted-to-death-harassed-after-death/ (last accessed Sept. 21, 2022).

Manager of the Ministry of Education, and his brother had been a colonel in the Shah's armed forces). Kar's activism also put her and Siamak at risk of persecution. See Kar Mot. for Default J. at 2, 12; The Framing of Siamak Pourzand 9. After Kar publicly criticized the Iranian government while presenting at a conference in Germany in 2000, she was arrested and charged with crimes such as "acting against national security" and "spreading propaganda." Kar Decl. ¶ 10; Kar Mot. for Default J. at 2; The Framing of Siamak Pourzand 9 & n.32. Kar was sentenced to four years imprisonment in January 2001, but, due to international pressure, she was released after 54 days so that she could obtain medical treatment for her breast cancer. Kar Mot. for Default J. at 2; Kar Decl. ¶¶ 10–11; The Framing of Siamak Pourzand 9. Kar and her daughter Azadeh traveled to the United States in late summer or early fall of that year. Kar Mot. for Default J. at 2–3; Kar Decl. ¶ 11; Azadeh Decl. ¶¶ 16–17 (stating Azadeh arrived in the United States in the fall of 2001); The Framing of Siamak Pourzand 9 (stating Kar left Iran in August 2001). Siamak remained in Iran. See Kar Mot. for Default J. at 3; Azadeh Decl. ¶ 17; The Framing of Siamak Pourzand 10.

In November 2001, while Kar and Azadeh were still in the United States, Siamak was arrested outside his sister's apartment in Iran. Kar Mot for Default J. at 3; Kar Decl. ¶ 16; The Framing of Siamak Pourzand 11; Nov. 27, 2001 Appeal from Amnesty Int'l [ECF No. 20-30] at 1. His captors took him to his apartment, searched it, and seized property. Kar Mot for Default J. at 3, 39; Kar Decl. ¶ 16; The Framing of Siamak Pourzand 11. For at least two weeks, Siamak's family did not receive any news about him. Kar Decl. ¶ 17; The Framing of Siamak Pourzand 11. On December 7, Siamak's sister received an anonymous phone call instructing her to bring a change of clothes for Siamak to the office of Amaken, an Iranian institution responsible for investigating moral crimes. Kar Mot for Default J. at 11–12; Kar Decl. ¶ 18; The Framing of

Siamak Pourzand 12.  Siamak's sister asked for information about his location and the charges against him, but she was told that was none of her business.  Kar Decl. ¶ 18.  For months, Siamak's family did not know where he was being held or what crimes he was accused of committing.  Kar Mot for Default J. at 3; Kar Decl. ¶ 20; Zand Decl. ¶ 18; Azadeh Pourzand, Tell Me, Where Is My Father?, Wash. Post, Dec. 30, 2001 at B7 [ECF No. 20-25].[4]

Siamak's detention received substantial international attention.  See The Framing of Siamak Pourzand 12 (explaining that the Legal Director of the Islamic Human Rights Commission of Iran requested information about Siamak's case); Feb. 1, 2002 Appeal from Amnesty Int'l [ECF No. 20-31] at 1 ("Amnesty International is concerned that Siamak Pourzand is being ill treated and possibly tortured in custody, possibly with the aim of obtaining a 'confession' in advance of a trial. No charges have been made against him and he has been denied the right to legal representation."); Feb. 2, 2002 Letter to the Secretary-General of the United Nations from Associate Professors of the Woodrow Wilson International Center for Scholars [ECF No. 20-36]; Kar Decl. ¶ 27 (stating that the United Nations Working Group on Arbitrary Detention asked Iran about Siamak's detention on February 14, 2002).  After "intense international pressure," Siamak was permitted to briefly meet with his sister at the Amaken office.  Feb. 2, 2002 Letter from the Woodrow Wilson International Center to the Secretary-General of the United Nations; Feb. 1, 2002 Appeal from Amnesty Int'l at 1.  During one of their few meetings, Siamak told her that "Iranian authorities wanted to 'blackmail,' 'humiliate,' and 'disgrace' the family."  Kar Decl. ¶ 21; accord The Framing of Siamak Pourzand 14.  Kar also received a voicemail from Siamak one day that stated: "Please, please with no one . . . .  You do not know, I do not know . . . so do not talk with anyone."  Kar Decl. ¶ 28; see also The Framing of Siamak Pourzand 17 (describing a similar call with Lily).

---

[4]    Available    at    https://www.washingtonpost.com/archive/opinions/2001/12/30/tell-me-where-is-my-father/d174f88d-32e3-4642-ac5f-cfaa3fcc9fe0/ (last accessed Sept. 21, 2022).

Judicial proceedings against Siamak began in March 2002.  Kar Decl. ¶ 31; The Framing of Siamak Pourzand 21.  On March 9, "the conservative newspaper Iran" announced that Siamak's trial had begun on charges related to crimes against national security and that Siamak had confessed.  The Framing of Siamak Pourzand 21.  Siamak's family claims that he was denied an adequate defense during his trial in violation of the Iranian constitution.  See Kar Suppl. Br. [ECF No. 21] at 13; Kar Decl. ¶ 31 (describing the trial as a "sham" in "flagrant breach of international and domestic legal standards" and stating that Siamak was denied counsel of his choice and never presented with formal charges); The Framing of Siamak Pourzand 22; see also July 31, 2002 Appeal from Amnesty Int'l [ECF No. 20-33] at 1 ("Amnesty International considers that the trial proceedings did not meet the minimum international standards for a fair trial [and] that there was a lack of adequate legal representation . . . .").  In May 2002, Siamak was sentenced to 11 years in prison for several crimes including spying for a foreign country, provoking and deceiving the masses, and encouraging and persuading others to commit acts of corruption and moral turpitude. Kar Mot. for Default J. at 3; The Framing of Siamak Pourzand 25.  To this day, the full terms of Siamak's charges remain unknown.  Kar Mot. for Default J. at 3; The Framing of Siamak Pourzand 23 ("The newspaper, however, still did not detail all nine charges brought against [Siamak], and four of these charges remain a mystery to this day.").  Furthermore, after he was convicted, Iran maintained a charge against Siamak for "apostasy," which was punishable by death.  Kar Mot. for Default J. at 3; Kar Decl. ¶ 32; The Framing of Siamak Pourzand 27.

In July 2002, Iranian state television broadcasted a press conference with Siamak and other government officials, during which Siamak publicly confessed to his crimes and condemned family and friends.  Kar Mot. for Default J. at 3; Kar Decl. ¶ 33; The Framing of Siamak Pourzand 29–30.  In his confession, Siamak denied that he had been subjected to torture, but his family and

others have questioned the willingness and truth of his confession.  Kar Mot. for Default J. at 3; Kar Decl. ¶¶ 33–35; The Framing of Siamak Pourzand 29–30; July 31, 2002 Appeal from Amnesty Int'l at 1 ("[T]he circumstances in which the 'confessions' were obtained are a cause for concern.").  As a result of Siamak's confession, Iran opened many cases against other critics of Iran's government, including a new case against Kar.  Kar Mot. for Default J. at 13–14; Kar Decl. ¶¶ 35–36.

In fall 2002, the European Union pressured Iran to release Siamak amidst broader political negotiations.  Kar Mot. for Default J. at 3; Decl. of Lily Pourzand [ECF No. 20-13] ("Lily Decl.") ¶ 19; The Framing of Siamak Pourzand 34.  Siamak was released on medical furlough in November 2002.  Kar Mot. for Default J. at 3; Lily Decl. ¶ 19; Zand Decl. ¶ 29; The Framing of Siamak Pourzand 34.  In December, Iran permitted E.U. delegates to visit Siamak at his sister's house to persuade the European Union that he was being treated well.  Kar Mot. for Default J. at 3; The Framing of Siamak Pourzand 34.  Within a few months, however, Siamak was rearrested and sent to Evin Prison, a facility "notorious for the torture of its prisoners."  Kar Mot. for Default J. at 3; accord The Framing of Siamak Pourzand 34–35.

Siamak suffered a heart attack in 2004 and, after being detained in hospitals, was placed under house arrest.  Kar Mot. for Default J. at 4; Kar Decl. ¶¶ 39–40; The Framing of Siamak Pourzand 37–38.  Plaintiffs maintain that even though Siamak was "released" to home detention, he remained a prisoner and his torture continued.  Kar Mot. for Default J. at 4; Kar Decl. ¶¶ 40–41; Azadeh Decl. ¶¶ 25–26; Lily Decl. ¶¶ 28–31; Decl. of Lohrasb Pourzand ("Lohrasb Decl.") [ECF No. 20-20] ¶¶ 13–15; Zand Decl. ¶¶ 39–44.  Authorities reportedly told Siamak: "You are not physically in jail, but you will face such a hard condition that you will wish to die, and you will."  Kar Mot. for Default J. at 4; Lohrasb Decl. ¶ 14.  He was under constant surveillance, was

required to report all of his interactions to his interrogator and prosecutor on an hourly basis, and was twice admitted to a psychiatric center between 2009 and 2011. Kar Mot. for Default J. at 4, 18; Azadeh Decl. ¶ 26; (stating Siamak was kept in near-total isolation and received frequent calls and visits from his torturers at random times of the day and night); Zand Decl. ¶¶ 41–42 ("The Iranian authorities did everything possible to make sure he was miserable at all times."); see also Psychiatric Report [ECF No. 20-22] at 1 (stating Siamak suffered from depressed mood, anxiety, insomnia, and incontinence).

On April 29, 2011, Iran informed Siamak's family that he had committed suicide by jumping off his balcony. Kar Mot. for Default J. at 4; Kar Decl. ¶ 42; see also Death Certificate [ECF No. 20-10] (indicating April 29, 2011 as date of death). Siamak's family was forced to accept that Siamak's death was a suicide in order to bury his body, but they maintain different views about the accuracy of that description. See Kar Mot. for Default J. at 4; Kar Decl. ¶ 46 ("I know Siamak's death was not a simple suicide" and that Iran murdered him, "directly or indirectly."); Azadeh Decl. ¶ 32 ("We will never find out [whether Siamak committed suicide.] . . . I consider his death as essentially a murder by the authorities even if it was truly a suicide."); Zand Decl. ¶ 46 ("I do not believe he committed suicide.").

## II.   Procedural Background

Plaintiffs filed suit in Kar in July 2019, Kar Compl. at 18, and in Zand in August 2019, Zand Compl. at 17.[5] 28 U.S.C. § 1608(a) outlines four ways to effect service on a foreign nation: (1) delivery of the summons and complaint "in accordance with any special arrangement" between the plaintiff and foreign nation, (2) delivery of the summons and complaint "in accordance with an applicable international convention," (3) sending a copy of the summons and complaint and a

---

[5] Plaintiffs filed an amended complaint in Kar in August 2019, Kar First Am. Compl. [ECF No. 5] at 19, and a second amended complaint in January 2020, Kar Second Am. Compl. [ECF No. 8] at 27.

notice of suit, as well as translations "by any form of mail requiring a signed receipt," and (4) by sending the relevant documents to the Secretary of State, who then transmits them "through diplomatic channels."  28 U.S.C. § 1608(a).  "A plaintiff must move through the four service methods sequentially and may use the fourth method only if the first three methods fail or are impossible."  Cabrera v. Islamic Republic of Iran, Civ. A. Nos. 19-3835, 18-2065 (JDB), 2022 WL 2817730, at *2 (D.D.C. July 19, 2022) (citing Barot v. Embassy of the Republic of Zambia, 785 F.3d 26, 27 (D.C. Cir. 2015)).

Plaintiffs could not rely on any special arrangement or international convention to serve Iran.  See Kar Mot. for Default J. at 7; Zand Mot. for Default J. at 6–7; Cabrera, 2022 WL 2817730, at *2; Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 15 (D.D.C. 2019).  Plaintiffs attempted service through certified mail, return receipt requested, in January 2020, see Kar. Aff. Requesting Foreign Mailing Under § 1608(a)(3) [ECF No. 9]; Zand Aff. Requesting Foreign Mailing Under § 1608(a)(3) [Zand ECF No. 3], but both attempts failed, see Kar Request for Service of Process [ECF No. 11-1] at 1; Zand Request for Service of Process [Zand ECF No. 6-1] at 1.  Plaintiffs then turned to the diplomatic channels route in March 2020.  Kar. Aff. Requesting Foreign Mailing Under § 1608(a)(4) [ECF No. 11]; Zand Aff. Requesting Foreign Mailing Under § 1608(a)(4) [Zand ECF No. 6].  Plaintiffs filed proof in September 2020 that the relevant documents were transmitted to Iran, through the Iranian Ministry of Foreign Affairs, via diplomatic channels.  Kar Return of Service [ECF No. 14]; Zand Return of Service [Zand ECF No. 9].

Iran did not respond to the complaints in either case, and plaintiffs sought default judgment in January 2021 in Zand, see generally Zand Request for Entry of Default [Zand ECF No. 11], and in August 2021 in Kar, see generally Kar Request for Entry of Default [ECF No. 17].  The Clerk of Court entered default against Iran in January 2021 in Zand, Zand Clerk's Entry of Default [Zand

ECF No. 12], and in August 2021 in <u>Kar</u>, Kar Clerk's Entry of Default [ECF No. 19].  Plaintiffs

filed their motions for default judgment in <u>Zand</u> in August 2021, <u>see generally</u> Zand Mot. for

Default J., and in <u>Kar</u> in September 2021, <u>see generally</u> Kar Mot. for Default J.

      The Court held a status conference with plaintiffs' counsel in <u>Kar</u> in December 2021 and

discussed issues such as plaintiffs' claims against defendants other than Iran.  <u>See</u> Rough Tr. of

Status Conference at 2:3–21.[6]  The Court ordered plaintiffs' counsel to file a supplemental brief

by not later than February 4, 2021, Min Order, Jan. 4, 2022, and plaintiffs timely complied, <u>see</u>

Kar Suppl. Br. at 15.  Plaintiffs' motions are now ripe for this Court's decision.

### Legal Standard

      Section 1608(e) provides that a plaintiff in an FSIA case must establish his claim "by

evidence satisfactory to the court."  The D.C. Circuit has described this standard as a "rather

modest burden of production."  <u>Owens v. Republic of Sudan</u>, 864 F.3d 751, 784 (D.C. Cir. 2017),

<u>vacated & remanded on other grounds sub nom.</u> <u>Opati v. Republic of Sudan</u>, 140 S. Ct. 1601

(2020); <u>see also</u> <u>id.</u> at 785 ("[I]ndeed, 'the quantum and quality of evidence that might satisfy a

court can be less than that normally required.'"  (citation omitted)).  Although a court must

generally draw its "findings of fact and conclusions of law from admissible testimony in

accordance with the Federal Rules of Evidence," <u>Han Kim v. Democratic People's Republic of</u>

<u>Korea</u>, 774 F.3d 1044, 1049 (D.C. Cir. 2014) (citation omitted), "courts have the authority—

indeed, we think, the obligation—to adjust evidentiary requirements to differing situations," <u>id.</u> at

1048 (citation omitted) (cleaned up).  "Section 1608(e) does not require a court to step into the

shoes of the defaulting party and pursue every possible evidentiary challenge," and plaintiffs may

"prove their claims using evidence that might not be admissible in a trial."  <u>Owens</u>, 864 F.3d at

---

[6] This document is on file with the Court.  The pagination of the rough version of this transcript may be different from that in any later-filed official version.

785; see also id. at 787 ("With a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception.").  "[O]nly where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion.  This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems."  Id. at 785–86.

## **Analysis**

Plaintiffs have confirmed that they are seeking relief against only Iran, Kar Plaintiffs' Resp. [ECF No. 23] at 1; Zand Plaintiff's Resp. [Zand ECF No. 18] at 1, and the Court will analyze plaintiffs' claims against only that defendant.  The Court has not held an evidentiary hearing in this case and will determine the validity of plaintiffs' claims on the basis of their written submissions.  Section 1608(e) does not require a Court to hold an evidentiary hearing before granting a plaintiff's motion for default judgment.  Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 157 (D.D.C. 2017).  In this case, the motions for default judgment each contain over 2,000 pages of exhibits.[7]  These submissions are sufficiently comprehensive for the Court to decide

---

[7] Plaintiffs' supporting exhibits include personal documents such as birth and naturalization certificates, affidavits from family members and experts, medical reports, letters and appeals, media and other reports, and procedural documents.  See Kar Index to Exhibits [ECF No. 20-2]; Zand Index to Exhibits [Zand ECF No. 13-2].  The proposed experts in Kar are Payam Akhavan and Ali Arab.  Akhavan is currently a Senior Fellow at Massey College and a Distinguished Visiting Professor at the Faculty of Law, University of Toronto, Canada.  Akhavan Expert Statement [ECF No. 20-14] at 1.  Akhavan has served as a Legal Advisor to the Office of the Prosecutor of the International Criminal Tribunal for the former Yugoslavia at The Hague and is a co-founder of the Iran Human Rights Documentation Centre.  Id.  Akhavan has testified about the human rights situation in Iran on many occasions, including before the U.S. Commission on International Religious Freedom.  Id. at 1–2.  Akhavan's opinion in this case relates to the prosecution, detention, and treatment of Siamak.  See id. at 21.

Arab is an Associate Professor of Statistics at Georgetown University.  Decl. of Professor Ali Arab [ECF No. 20-15] ("Arab Expert Statement") at 3; see also Ali Arab CV [20-16].  Arab is the current Deputy Treasurer for the Board of Directors of Amnesty International USA and is a founding member of the Board of Directors of Hostage Aid Worldwide, an organization formed by former hostages with the mission of assisting hostage victims and their families.  Arab Expert Statement at 4.  He has advised several organizations on conducting surveys and analyzing data to better understand human rights issues.  Id. at 6.  Arab's testimony focuses on "the conditions of human rights in Iran as it pertains to [plaintiffs'] case."  Id. at 3.  The Court considers both these individuals sufficiently qualified by knowledge, skill, experience, training, and education to meet the requirements of Federal Rule of Evidence 702.

plaintiffs' claims in the absence of a hearing. See Colvin v. Syrian Arab Republic, 363 F. Supp. 3d 141, 146–47 & n.4 (D.D.C. 2019); Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 73 & n.2 (D.D.C. 2017).

## I.     The Court's Jurisdiction and Iran's Liability to Plaintiffs

### A.     Personal Jurisdiction

28 U.S.C. § 1330(b) provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."   "In other words, 'under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction."'"   GSS Grp. Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002) (citation omitted)).   As explained above, plaintiffs served Iran via diplomatic channels in accordance with § 1608(a).   See Kar Return of Service; Zand Return of Service.   Hence, if the Court has subject-matter jurisdiction over plaintiffs' claims, it also has personal jurisdiction over Iran.

### B.     Subject-Matter Jurisdiction

"A foreign state is typically immune from jurisdiction in U.S. courts."   Colvin, 363 F. Supp. 3d at 152 (citing 28 U.S.C. § 1604).   But the FSIA provides limited exceptions to that immunity. See 28 U.S.C. § 1330(a); see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S.

---

In both Kar and Zand, plaintiffs also submitted a declaration from Drewery Dyke. See Decl. of Drewery Dyke [ECF No. 20-17] ("Dyke Decl."); Zand Decl. of Drewery Dyke [Zand ECF No. 13-14].  It is not entirely clear whether plaintiffs propose Dyke as an expert, but there is some support for that conclusion. See Kar Mot. for Default J. at 43 ("As experts have testified . . . .  As Mr. Drewery Dyke chronicles in his statement, . . . .").  Dyke worked as a researcher in Amnesty International's International Secretariat for nearly two decades and has published commentary on political and human rights issues in Iran and other countries. Dyke Decl. ¶ 2.  Due to his role "as the Iran Researcher at Amnesty International," Dyke was "well-acquainted with Siamak Pourzand's plight and experience," id. ¶ 5, and Dyke visited Siamak while he was in the hospital, id. ¶ 4.  Dyke offers an "assessment of individual and state conduct towards Siamak Pourzand and others." Id. at 2; see also id. ¶¶ 9–10.  Given his many years of experience chronicling human rights violations in Iran, the Court considers Dyke sufficiently qualified to meet the requirements of Rule 702 as well.

428, 439 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court . . . ."). The relevant exception in this case—the anti-terrorism exception—states that "[a] foreign state shall not be immune . . . [in any case] in which money damages are sought against [it] for personal injury or death that was caused by," among other wrongs, "an act of torture, extrajudicial killing, . . . [or] hostage taking, . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). Thus, to successfully invoke § 1605A(a)'s anti-terrorism exception, plaintiffs must show that (1) they are seeking monetary damages for personal injury or death; (2) Iran caused the personal injury or death; and (3) the personal injury or death was the result of hostage taking, torture, or extrajudicial killing.

Plaintiffs' allegations clearly establish the first and second of these requirements. The FSIA "is understood to encompass claims by family members of those injured or killed for the distress caused by their relative's injuries," Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 359 (D.D.C. 2020), and plaintiffs have sued Iran to recover monetary damages for the injuries they incurred due to Siamak's alleged hostage taking, torture, and extrajudicial killing, see Kar Mot. for Default J. at 1; Kar Second Am. Compl. ¶¶ 87–92; Zand Mot. for Default J. at 1; Zand Compl. ¶¶ 84–89. And unlike in many FSIA cases where the plaintiffs claim that the foreign sovereign merely provided material support for other actors who committed terrorist acts, see, e.g., Cabrera, 2022 WL 2817730, at *34; Braun, 228 F. Supp. 3d at 76, plaintiffs have alleged that Iran, through its own officials and agencies acting within the scope of their employment, acted directly against Siamak, Kar Mot. for Default J. at 10 ("Iranian agents of the [Iranian Revolutionary Guard Corps], Ministry of Intelligence, and/or Judiciary were the direct cause of injuries to [Siamak] and Plaintiffs."); Kar Second Am. Compl. ¶¶ 42–43; Zand Mot. for Default J. at 8; Zand Compl. ¶¶ 39–

40; see also Rezaian v. Islamic Republic of Iran, 422 F. Supp. 3d 164, 177 (D.D.C. 2019) ("The injuries that they allege—physical and emotional distress stemming from Jason's detention in Iran—are a direct result of Iran torturing Jason and taking him hostage.").

Plaintiffs assert that Siamak was the victim of hostage taking, torture, and extrajudicial killing. Kar Mot. for Default J. at 10; Zand Mot. for Default J. at 8. The Court will analyze each of these alleged wrongs in turn.

### i.   Hostage taking

Under the FSIA, "the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages." 28 U.S.C. § 1605A(h)(2). That document states:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

International Convention Against the Taking of Hostages art. 1, ¶ 1, Dec. 17, 1979, 1316 U.N.T.S. 205. "Hostage taking thus has two elements: the abduction or detention and the purpose of accomplishing 'the sort of third-party compulsion described in the [C]onvention.'" Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 135 (D.D.C. 2021) (alteration in original) (quoting Simpson v. Socialist People's Libyan Arab Jamahiriya (Simpson II), 470 F.3d 356, 359 (D.C. Cir. 2006)). "There must be some 'quid pro quo' arrangement whereby the hostage would have been released 'upon performance or non-performance of any action by that third party,'" Simpson II, 470 F.3d at 359 (citation omitted), and a plaintiff must identify a "nexus between what happened to [the victim] and any concrete concession that [the foreign nation] may have hoped to extract from the outside world," Price, 294 F.3d at 94. But the plaintiff need not demonstrate "that the

13

hostage taker had communicated its intended purpose to the outside world." Simpson II, 470 F.3d at 360.

Regarding the first element, plaintiffs have submitted sufficient evidence that Iran abducted and detained Siamak. In fact, as the Court will explain, plaintiffs' evidence indicates that there were two separate periods of detention with a break between them. The first period began "[o]n November 24, 2001, approximately three months after Ms. Kar left Iran for treatment abroad, [when] plainclothes security officials abducted 71-year-old Siamak Pourzand outside of his sister's home in Tehran." Akhavan Expert Statement at 5; accord Kar Decl. ¶ 16; The Framing of Siamak Pourzand 11. "[S]ecurity officials detained [Siamak] in a number of undisclosed and illegal detention facilities . . . . The authorities eventually transferred [Siamak] to Evin Prison after his conviction in May 2002." Akhavan Expert Statement at 6; see also The Framing of Siamak Pourzand 18–21 (describing the prison facilities where Siamak was possibly detained). Given Siamak's ultimate conviction by Iran, it is likely that the officials and agencies who abducted and detained him were acting within the scope of their official duties. See Dyke Decl. ¶ 7 ("A detailed timeline of the Government of Iran's . . . arbitrary arrest and detention, unfair trial, torture and ill treatment of Siamak Pourzand can be built upon the documents I wrote at the time for Amnesty International, but also upon other, credible, well-documented and sourced human rights research . . . ."); cf. The Framing of Siamak Pourzand 24 (reporting that the former President of Iran reportedly told Kar that "other forces inside the regime" besides his administration were responsible for the arrest and detention of Siamak).

This first period of detention ended, temporarily, on November 30, 2002. The Framing of Siamak Pourzand 34. Iran released him from custody and then granted E.U. envoys permission to visit him to assuage their concerns about Siamak's treatment. Id. According to an interview the

Iran Human Rights Documentation Center conducted with Siamak's daughter, Lily, "[Siamak] was told that he was free and he could go home."  Id.; Azadeh Decl. ¶ 23 ("At some point in November of 2002, my father was 'let go' for a few weeks without any paperwork . . . ."). Plaintiffs have not argued that Iran imposed any conditions of confinement on Siamak upon his release in November 2002, and the Court consequently cannot conclude that Siamak was a victim of hostage taking during this time.

But a few months later, sometime in March 2003,[8] Iran rearrested Siamak and transferred him to Evin Prison, thus starting Siamak's second period of detention.  Zand Decl. ¶ 30; The Framing of Siamak Pourzand 34–35.  Siamak was detained in Evin Prison until he suffered a heart attack in April 2004.  Akhavan Expert Statement at 8; The Framing of Siamak Pourzand 37.  He was then transferred to a hospital where he was chained and watched by guards.  The Framing of Siamak Pourzand 37.  Although the timeline at this point is not entirely clear, in 2006 Siamak was placed under home confinement.  Akhavan Expert Statement at 8; Kar Compl. ¶ 28.  While in home confinement, he remained under Iran's control even though he had some limited freedom. Akhavan Expert Statement at 8 ("Though he was serving his sentence at home, . . . [Siamak] was still under continued detention and surveillance."); Kar Decl. ¶ 40 ("Siamak was still a prisoner, serving his time during his years of medical leave."); Lily Decl. ¶ 28 ("During my father's house arrest he was under constant control, [and] his communications and whereabouts always had to be reported to his prosecutors and interrogators constantly."); The Framing of Siamak Pourzand 38 ("[Although on home confinement, Siamak] has not completed his sentence and continues to live under the constant threat of being returned to Evin to serve out his term.").  These facts are

---

[8] Plaintiffs do not specify the exact date on which Iran rearrested Siamak, but there is evidence indicating the rearrest occurred in March 2003.  E.g., Zand Decl. ¶ 30; Siamak Pourzand: A Case Study of Flagrant Human Rights Violations, Amnesty Int'l (May 2004) [ECF No. 20-34] at 1.

sufficient for the Court to conclude that Iran detained Siamak for a second time from his re-arrest in 2003 until his death in 2011.

It is a more difficult question whether Iran detained Siamak during these two periods for the purpose of exerting compulsion on a third party, but the Court ultimately concludes that plaintiffs' evidence is sufficient on this point as well.  Plaintiffs claim that Iran detained and continued to detain Siamak in order to exert pressure on two different groups: (1) the European Union and (2) plaintiff Kar and other political dissidents.  Kar Mot. for Default J. at 12.  With regards to the first group, plaintiffs state that "Iran used [Siamak]'s detention as political leverage to influence negotiations with the European Union," id., and highlight that the European Union condemned the human rights situation in Iran in 2002 and stated that it would not sponsor U.N. resolutions on Iran until progress was made, id. at 12–13 (citing European Parliament Resolution on the Human Rights Dialogue with Iran, Oct. 24, 2002, available at https://www.europarl.europa.eu/doceo/document/TA-5-2002-0522_EN.html?redirect); see also The Framing of Siamak Pourzand 34 (stating that the E.U. reportedly discussed Siamak's case with Iran during a meeting in August 2002).  Plaintiffs claim that this pressure led to Siamak's temporary release from custody.  Kar Mot. for Default J. at 3, 13; Lily Decl. ¶ 19 ("In fall 2002, the EU and Iran wanted to make a political and financial deal.  As part of the deal, Iran agreed to temporarily release my father from prison on medical furlough in November 2002.").

It is not clear to the Court that these facts demonstrate that Iran detained Siamak for the purpose of coercing the European Union.  If anything, the evidence indicates that Iran detained Siamak for a purpose unrelated to the European Union and then released him to regain the European Union's favor.  Releasing a prisoner to coerce a third party does not constitute hostage taking.  But the Court need not decide whether plaintiffs' evidence is sufficient to support their

first theory of hostage taking because plaintiffs have submitted much more compelling evidence that Iran detained Siamak to pressure Kar to stop publicly criticizing the Iranian regime.

Iran began Siamak's first period of detention a few months after Kar was released from Iran's custody on medical leave.  See Akhavan Expert Statement at 5; The Framing of Siamak Pourzand 9, 11.  While detained, Siamak "reportedly called Ms. Kar and the family in the United States on several occasions and begged them to stop their continued advocacy and press efforts on his behalf."  Akhavan Expert Statement at 5–6; accord Kar Decl. ¶ 28; Lily Decl. ¶ 12.  Plaintiffs' expert Arab states that "given Mehrangiz Kar's activities as a lawyer and human rights activist, it is clear that Siamak Pourzand was targeted and harassed at least partially due to the regime's issues with Ms. Kar."  Arab Expert Statement at 29.  Akhavan also noted that "plaintiffs' claim that [Siamak] was detained in an effort by government officials to undermine and coerce his wife is consistent with other instances of blackmail against family members of political dissidents in the Islamic Republic."  Akhavan Expert Statement at 21; see also id. at 20 (describing reported instances of Iran convicting individuals to place pressure on family members).  This evidence is sufficient to conclude that there was a "nexus" between both periods of Siamak's detention and Iran's attempts to compel Kar.  Price, 294 F.3d at 94.  And having found that plaintiffs have produced satisfactory evidence to establish both Siamak's detention and Iran's purpose of compulsion, the Court concludes that plaintiffs have demonstrated Siamak was a victim of hostage taking from November 24, 2001 to November 30, 2002 and from early 2003 until his death on April 29, 2011.

    ii.  Torture

The term "torture" has the same meaning under the FSIA as under the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1605A(h)(7).  The TVPA defines torture as:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind . . . .

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992). Accordingly, to establish that Siamak was a victim of torture, plaintiffs must show that Iran intentionally inflicted severe pain or suffering on Siamak while he was under Iran's custody or physical control and that the severe pain or suffering was both for the type of purpose described in the TVPA and not inherent in or incidental to lawful sanctions. See id.

The Court has already concluded that plaintiffs can demonstrate many of these requirements. As described above, there is ample evidence that Iran, through its agents and agencies, intentionally detained Siamak and committed the alleged abuses against him. See, e.g., The Framing of Siamak Pourzand 3–4; see also U.N. Comm'n on Hum. Rts., Working Grp. on Arbitrary Det., Opinion No. 8. 2003 (Islamic Republic of Iran), U.N. Doc. E/CN.4/2004/3/Add.1, at 45 (2003) [ECF No. 20-63] ("U.N. Working Grp. Rep.") ("Mr. Pourzand was . . . and is at present detained on the orders of the Islamic Revolutionary Court of Tehran."). Siamak was under Iran's custody and control for almost the entire period from November 24, 2001 to April 29, 2011. He was under Iran's control both when Iran held him in various detention facilities and while he was detained on home confinement as his freedom was severely limited. See Kar Decl. ¶ 40; Lily Decl. ¶ 28; Zand Decl. ¶ 44. And any abuses Siamak suffered were inflicted upon him for the purposes recognized in the TVPA such as punishment for his actions and to coerce Kar to abandon her advocacy. See Arab Expert Statement at 29.

The remaining elements plaintiffs must demonstrate are (1) that the pain Siamak suffered was sufficiently severe to constitute torture and (2) that the pain was not inherent in lawful sanctions.  Regarding the first of these elements, "[t]he severity requirement is crucial to ensuring that the conduct . . . is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes."  Price, 294 F.3d at 92.  "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim.  The more intense, lasting, or heinous the agony, the more likely it is to be torture."  Id. at 93; see also Simpson v. Socialist People's Libyan Arab Jamahiriya (Simpson I), 326 F.3d 230, 234 (D.C. Cir. 2003) ("[T]orture is a label that is 'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'"  (quoting Price, 294 F.3d at 92–93)).

Plaintiffs have submitted sufficient evidence for the Court to conclude that Siamak endured severe pain and suffering while he was held at the various Iranian detention facilities.  Plaintiffs have provided evidence indicating that before Siamak was convicted, he was "kept in something that resembled a horribly dirty toilet, a hole in the ground," where he would eat, sleep, and use the bathroom.  Azadeh Decl. ¶ 20; see also Zand Decl. ¶ 28 ("For the first few months of his imprisonment, my father was kept in solitary confinement.  In solitary confinement, my father was kept in a dark two-meter box, where they would place boiling, scalding water, so that he would have to retreat into the corner of the cell.").  Moreover, throughout Siamak's imprisonment at the various detention facilities, "he suffered various forms of physical torture and intimidation including beatings, freezing, burning, hanging from the ceiling, and daily interrogations."  Kar Decl. ¶ 38; see also Dyke Decl. ¶¶ 4, 8 (recalling a 2004 visit with Siamak after his release to the

19

hospital following his heart attack where he was suffering from numerous physical ailments due to the abuses he suffered while detained).

In addition, the pain and suffering inflicted upon Siamak was cruel and depraved.  For instance, "[h]e was forced to write his confessions for more than 12 hours per day in an uncomfortable chair, to the point that his fingers were in pain and his old body was aching and his feet were swollen."  Lohrasb Decl. ¶ 9.  Another particularly gruesome allegation is that after Siamak's family publicly complained about his diet while incarcerated, "authorities force fe[d] him cucumbers" as his only food intake for "ten days" while guards sat on his chest; if he refused to eat them, "they beat him up."  Lily Decl. ¶¶ 13–14; accord Lohrasb Decl. ¶ 9; The Framing of Siamak Pourzand 30–31.

The Court is also aware that it "can assume that [Iran] probably tortured" Siamak on the basis of compelling, admissible evidence that Iran routinely tortures the people it abducts, see Kim, 774 F.3d at 1049, and plaintiffs have provided such evidence here, e.g., Arab Expert Statement at 21–24 (describing Iran's use of torture); Akhavan Expert Statement at 15–17 ("[P]olitical dissidents of the Islamic Republic are routinely subject to torture . . . ."); The Framing of Siamak Pourzand 17, 20 (noting Siamak was detained at facilities notorious for torture).  This evidence is sufficient for the Court to conclude that the pain and suffering Siamak endured while being held in Iranian detention centers was severe enough to constitute torture.  See Rezaian, 422 F. Supp. 3d at 176 ("Iran's treatment of Jason [constitutes torture.]  There is no doubt that Jason experienced pain and suffering while in Iran's custody.  He described squalid living conditions, solitary confinement, malnutrition, physical ailments, and tenth-rate medical care—all suffered while imprisoned by Iran's Revolutionary Guard . . . .").

But the Court reaches a different conclusion regarding the pain and suffering Siamak endured while on home confinement from at least 2006 untill his death in 2011.  Siamak's family has stated that while on home confinement, Siamak was "under constant control" and had to report his actions to prosecutors and interrogators constantly.  Lily Decl. ¶ 28.  Plaintiffs have also asserted that Iran harassed Siamak, made him feel unsafe, and psychologically tormented him through actions such as calling him at random times of day and night.  Azadeh Decl. ¶ 28; see also Kar Decl. ¶ 40 ("[Siamak's] private life was under constant surveillance, so Siamak lived in constant fear and paranoia."); Zand Decl. ¶ 42 ("The Iranian authorities did everything possible to make sure he was miserable at all times.").  But plaintiffs have acknowledged that Siamak did have some freedoms during his home confinement; he could speak on the phone with loved ones, meet with some friends, and was occasionally allowed to visit a limited number of other locations. Azadeh Decl. ¶ 26; Kar Decl. ¶ 41; Zand Decl. ¶ 43; Lily Decl. ¶¶ 23–24, 28; Lohrasb Decl. ¶ 13. There is also no indication that Siamak was physically abused during his home confinement.

These facts do not establish that Siamak was tortured while he was under home confinement.  Though the TVPA does recognize that purely mental pain or suffering can constitute torture in certain cases, § 3(b)(1)–(2), 106 Stat. at 73–74, the mental suffering must still be sufficiently severe to constitute torture.  In Simpson I, the D.C. Circuit concluded that the mental anguish a plaintiff experienced while being "interrogated and then held incommunicado, threatened with death if she moved from the quarters" where she was being held, and "forcibly separated from her husband" did not constitute torture.  326 F.3d at 234 (citation omitted) (cleaned up); see also id. ("Although these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the Act.").  If the mental anguish the

plaintiff experienced in <u>Simpson I</u> while being physically detained and threatened with death did not constitute torture, the Court cannot conclude that the mental anguish Siamak experienced while on home confinement and allowed to communicate with friends and family constitutes torture.

Similarly, although Iran may have wanted to frighten Siamak and make him feel anxious and uncomfortable, that abuse is not inherently torture.  In <u>Mohammadi v. Islamic Republic of Iran</u>, 782 F.3d 9 (D.C. Cir. 2015), the D.C. Circuit held that plaintiffs were not victims of torture even though Iran allegedly harassed them while they were in the United States "by making threatening phone calls, hacking certain of plaintiffs' online accounts, and disseminating doctored, sexually explicit photographs."  782 F.3d at 16 ("[T]hose alleged acts, while certainly harassing and objectionable, fail to amount to 'torture' within the meaning of the terrorism exception.").  The D.C. Circuit has further held that simply alleging that plaintiffs experienced "kicking, clubbing, and beatings" during their detention does not constitute torture.  <u>Price</u>, 294 F.3d at 93–94.  These cases strongly suggest that the abuses Siamak suffered for several years, while terrible, do not pass the high bar for identifying torture.

Plaintiffs' evidence regarding Siamak's poor mental health disorders during his home confinement, <u>e.g.</u>, Psychiatric Report at 1 (report from 2009 stating Siamak was "a 79-year-old man with 6 months of feeling absurd especially with depressed mood, loss of energy, anhedonia, anxiety, insomnia[, i]solation and lack of social activity, sometimes staring at a point and in some cases urinary and fecal incontinence"), does not change the Court's conclusion.  Siamak's mental health problems, though serious, cannot be attributed solely to the pain and suffering he endured while on home confinement and instead simply provide further evidence for the conclusion that the pain and suffering Siamak experienced while being held in detention centers was torture which led to lasting consequences.  <u>See</u> Kar Decl. ¶ 37 ("Over the years, Siamak suffered unspeakable

torture while in detention, which culminated in severe physical and mental health problems . . . ."); Lily Decl. ¶¶ 20–21 (describing Siamak's extremely poor mental state while he was on temporary release after his initial detention and before he was placed on home confinement).  Hence, the Court concludes that while the pain and suffering Siamak endured while being held in detention centers from November 24, 2001 to November 30, 2002 and from early 2003 until he was placed on home confinement no later than 2006 was severe enough to constitute torture, Siamak was not a victim of torture during his home confinement from 2006 to April 29, 2011.[9]

The final element plaintiffs must show is that the pain and suffering Siamak suffered while being held in detention facilities was not inherent in or incidental to lawful sanctions.  See Nikbin v. Islamic Republic of Iran, 517 F. Supp. 2d 416, 425–26 (D.D.C. 2007).  Plaintiffs have provided sufficient evidence to satisfy this element even if the Court were to conclude that Siamak's sentence was lawfully imposed.[10]  Siamak's charges reportedly resulted in him being sentenced to 11 years of imprisonment.[11]  The Framing of Siamak Pourzand 25; U.N. Working Grp. Rep. at 45–46 (stating that the sentence also included a fine and "80 lashes").  This sentence did not require that Siamak endure the extent of the abuses he allegedly suffered.  While some amount of physical discomfort, such as that stemming from the 80 lashes, could have been considered pain and suffering inherent in Siamak's sentence, the allegations here go far beyond what Siamak or any

---

[9] Plaintiffs have not specified the exact date that Siamak was placed on home confinement.

[10] This assertion would certainly be debatable.  See U.N. Working Grp. Rep. at 46 (concluding that Siamak's convictions were "arbitrary" and "because of his convictions and the expression of his opinions"); The Framing of Siamak Pourzand 38–41 (describing many alleged violations of Iranian and international law throughout Siamak's trial and detention); July 31, 2002 Appeal from Amnesty Int'l at 1 ("Amnesty International considers that the trial proceedings did not meet the minimum international standard for a fair trial, that there was a lack of adequate legal representation and that the circumstances in which the 'confessions' were obtained are a cause for concern.").

[11] As noted previously, however, some of the charges against Siamak are unknown to this day and there were pending charges against him even after he was sentenced.  The Framing of Siamak Pourzand 23, 25–28; U.N. Working Grp. Rep. at 46 ("The Working Group deplores the fact that the Government has failed to provide it with the text of the penal legislation applicable in the case against Mr. Pourzand . . . .").

detainee should be expected to endure.  See, e.g., Kar. Decl. ¶ 38; Lily Decl. ¶ 14 (stating Iranian agents sat on Siamak's chest and force fed him cucumbers for 10 days "to the point that he almost suffocated" and beat him if he refused to eat).  The fact that Iran convicted Siamak of certain crimes does not mean that it is immune from being held liable for the pain and suffering it inflicted upon Siamak when much of that pain and suffering was completely independent of his sentence.  See Warmbier v. Democratic People's Republic of Kor., 356 F. Supp. 3d 30, 39, 49 (D.D.C. 2018) (concluding that an individual who was tried and sentenced in North Korea was nonetheless a victim of torture); Hekmati, 278 F. Supp. 3d at 153, 159–62 (concluding that an individual who was tried and sentenced in Iran was nonetheless a victim of torture).

In sum, plaintiffs have provided compelling evidence indicating that—for the periods of time during which Siamak was held in various detention facilities—Iran and its agents intentionally inflicted severe pain or suffering on Siamak while he was under their custody or physical control, and that the abuse was both for the type of purpose described in the TVPA and not inherent in or incidental to lawful sanctions.  The Court accordingly concludes that Siamak was a victim of torture while he was held in detention centers from November 24, 2001 to November 30, 2002 and from early 2003 until he was placed on home confinement no later than 2006.

### iii.  Extrajudicial killing

The FSIA incorporates the definition of "extrajudicial killing" from the TVPA, 28 U.S.C. § 1605A(h)(7), which defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," § 3(a), 106 Stat. at 73.  "There are three elements to this definition: '(1) a killing; (2) that is deliberated; and (3) is not authorized by

a previous judgment pronounced by a regularly constituted court.'"  <u>Cabrera</u>, 2022 WL 2817730, at *36 (quoting <u>Owens</u>, 864 F.3d at 770).  Plaintiffs must also show that Iran was the proximate cause of Siamak's extrajudicial killing, whether directly or through the provision of material support.  <u>See</u> <u>Owens</u>, 864 F.3d at 793–94; 28 U.S.C. § 1605A(a)(1).

Plaintiffs present two theories to explain the events of Siamak's death.  <u>See</u> Kar Mot. for Default J. at 29–30.  Their first theory is that Iranian agents directly killed Siamak by throwing him off his balcony.  <u>See id.</u>; <u>see also</u> Lily Decl. ¶ 36 (asserting that Iran killed Siamak so he could not leave Iran and expose the torture he endured).  The second theory, on which plaintiffs place more emphasis, is that Siamak committed suicide, but his death should nonetheless be considered an extrajudicial killing because Iran's bad acts led Siamak to make this decision.  Kar Mot. for Default J. at 30; <u>see also</u> Arab Expert Statement at 31 ("[Siamak]'s death is directly related and caused by the acts of the government of Iran."); <u>Siamak Pourzand: Persecuted to Death</u> at 1 ("In truth, [Siamak] was killed by the repeated human rights violations he endured, which [led] to chronic ill health, at the hands of a judicial system in which human dignity had been lost.").  The Court is not convinced that either theory is sufficiently supported to conclude that Siamak was a victim of extrajudicial killing.

Regarding the first theory of liability, plaintiffs have submitted very little evidence indicating that Iranian agents directly murdered Siamak.  Indeed, because Iran has prevented plaintiffs from conducting any official investigation, virtually no direct evidence of Siamak's true cause of death exists.  <u>See</u> Kar Mot. for Default J. at 29 (admitting that "the details of [Siamak's] death remain unclear"); Azadeh Decl. ¶ 32 ("Many ask us if it truly was a suicide or instead a murder plotted by the Islamic Republic.  We will never find out.").  The evidence plaintiffs have submitted can largely be grouped into two categories: opinions expressing doubt that Siamak

would have committed suicide, see, e.g., Zand Decl. ¶ 46 (opining that Siamak "loved life much too much" to commit suicide); Lily Decl. ¶ 33 ("It was so beyond my imagination for [Siamak] to commit suicide when we had a normal conversation only a few hours earlier."), and evidence suggesting that Iran has murdered other critics of its regime, Akhavan Expert Statement at 16–17, 21 (concluding that Siamak's death was "more likely than not" murder given other Iranian cover-ups).

The Court acknowledges it has an obligation to adjust evidentiary requirements to different situations, Kim, 774 F.3d at 1048, but adjusting the evidentiary requirements to permit plaintiffs' murder theory to succeed would essentially eliminate the requirement that plaintiffs prove their claims "by evidence satisfactory to the court," 28 U.S.C. § 1608(e).   As plaintiffs' evidence thoroughly demonstrates, Siamak's mental health was extremely poor in his final years.   See Lily Decl. ¶ 32 (noting that in her last call with Siamak, shortly before his death, he said "he had terrible anxiety"); Psychiatric Report at 1 (describing Siamak's poor mental health conditions in 2009). Siamak was also on home confinement when he died, meaning he would have had more opportunity to commit suicide than an individual in a detention facility.   This evidence suggests that Siamak's death was a suicide, not a murder.[12]   Because of these distinctions, the Court does not consider Siamak's case similar to those of individuals who die under mysterious circumstances while being held in detention facilities in countries that are state sponsors of terrorism.   E.g., Kim, 774 F.3d at 1049 (stating that a court could assume that a detainee in a labor camp was a victim of extrajudicial killing if a plaintiff produced "compelling, admissible evidence" that the foreign sovereign "routinely tortures and kills" the people it abducts).   In those cases, there is very little

---

[12] Plaintiffs have also offered evidence indicating that Iranian agents told Siamak they would not kill him, which would further undermine plaintiffs' first theory of liability.  Kar Decl. ¶ 46.  As the Court will explain shortly, however, this statement is almost certainly inadmissible, and it is not essential to the Court's determination that Siamak's death was most likely a suicide.

evidence supporting any theory of the detainee's death. <u>See, e.g.</u>, <u>id.</u> at 1046.  In this case, accepting plaintiffs' direct murder theory would require the Court to turn a blind eye to the many pieces of evidence supporting the conclusion that Siamak's death was a suicide.[13]  Hence, the Court concludes that plaintiffs have not submitted sufficient evidence to support a finding that Iran directly murdered Siamak.

The Court also concludes that if Siamak did commit suicide, which appears to be the case given the submitted evidence, his death cannot be considered an extrajudicial killing.  An extrajudicial killing must be "deliberated."  <u>Cabrera</u>, 2022 WL 2817730, at *36.  A deliberated killing is "one undertaken with careful consideration, not on a sudden impulse."  <u>Fritz v. Islamic Republic of Iran</u>, 320 F. Supp. 3d 48, 83 (D.D.C. 2018) (quoting <u>Owens v. Republic of Sudan</u>, 174 F. Supp. 3d 242, 263 (D.D.C. 2016)).  This deliberation element does not require a defendant to know the identities of the individuals it will kill before the killings occur.  <u>See Owens</u>, 174 F. Supp. 3d at 263.  But it does require the defendant to act "with the goal and expectation of killing," or at the very least, grievously physically wounding.  <u>Id.</u>; <u>see also Colvin</u>, 363 F. Supp. 3d at 158 ("In cases where attacks were found to have resulted in extrajudicial killings, courts have noted the foreign state's . . . intention in carrying out those attacks.").  This intent requirement is necessary to separate extrajudicial killings from accidental and even wrongful deaths that are the product of state action but nonetheless do not constitute extrajudicial killings under the TVPA.

Plaintiffs have not submitted compelling, admissible evidence demonstrating that Iran acted with the intent to kill Siamak.  The strongest piece of evidence in plaintiffs' favor is their

---

[13] The Court further notes that Akhavan's conclusion that Iran more likely than not murdered Siamak appears to be based primarily upon evidence of a potential cover-up involving a critic of Iran's regime who died roughly a month after being taken into Iran's custody. <u>See</u> Akhavan Expert Statement at 16–17, 21.  As indicated above, the Court considers those circumstances very different from Siamak's circumstances given Siamak's many years of home confinement and well-documented poor mental health.

assertion that, at one point, Iranian authorities told Siamak that he would die while in home confinement.  Plaintiffs have offered two different recollections of this conversation.  Kar states that "[y]ears before, while [Siamak] was still detained, the authorities told him, 'We will not kill you; we will even release you, but we will do something to you so that you kill yourself during the pleasant period of freedom.'"  Kar Decl. ¶ 46.  Kar does not state the source of this information.  Siamak's brother, Lohrasb, states that Siamak told Lohrasb that "when [Siamak] was moved to house arrest, his interrogator said 'you are not physically in jail, but you will face such a hard condition that you will wish to die, and you will.'"  Lohrasb Decl. ¶ 14.  One critical difference between these two recollections is that while Kar believes that Iranian agents explicitly told Siamak that he would kill himself during his home confinement, Lohrasb remembers only that Siamak was told he would die.  Lohrasb's retelling is thus a less explicit indication of Iran's intent to kill Siamak than Kar's, and the Court is wary of forming conclusions about Iran's intent on the basis of an alleged conversation with amorphous details.

Moreover, one characteristic both recollections share is that, in a normal case, they would almost certainly be inadmissible hearsay.  See Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted).  While it is possible that the unnamed Iranian authorities' statement to Siamak could be considered non-hearsay as a statement of a party-opponent, see Fed. R. Evid. 801(d)(2)(D), or could be excluded from the rule against hearsay as a statement of the declarant's then-existing state of mind, see Fed. R. Evid. 803(3), Siamak's retelling of the statement to Lohrasb (and Kar, assuming Siamak told her this information) does not fall within any obvious exception.  A court abuses its discretion in an FSIA case by relying upon evidence that is "clearly inadmissible and essential to the outcome," Owens,

864 F.3d at 785–86, and concluding that Iran intended for Siamak to kill himself on the basis of these statements would violate that limitation.

Regardless, even if the alleged conversations were admissible, the Court would still struggle to conclude that they provide sufficient evidence of Iran's intent to kill Siamak. The statement to Siamak was allegedly made by unnamed individuals years before Siamak died. It is also unclear whether these individuals had any control over Siamak's conditions of confinement. At best, the evidence would be weak support of Iran's intent to commit an extrajudicial killing.

And when the Court considers all the evidence in this case, it concludes there is more persuasive evidence indicating Iran did not intend to kill Siamak during his incarceration. Iran certainly intended to detain him and punish him. But Iran would have this intent towards any of its prisoners, and it cannot be the case that an extrajudicial killing exists whenever an individual dies while under the control of a state sponsor of terrorism.

Admittedly, Iran tortured Siamak while he was held in various detention centers, and that torture undoubtedly contributed to Siamak's fragile mental state at the time of his death. But Siamak's torture ended years before he ultimately died, and while his conditions under home confinement were certainly unpleasant, they were not so severe as to suggest Iran acted with the intention of killing him. In fact, Iran moved Siamak to home confinement due to his poor health and then permitted him to receive both physical and mental treatment during his home confinement. See Kar Decl. ¶ 40 (describing Siamak's home confinement as "years of medical leave" and stating that "Siamak had to send his medical report to the prison on a weekly basis"); Lily Decl. ¶ 30 (noting Siamak had a nurse and caregiver); Hospital Certification [ECF No. 20-21] at 2 (indicating Siamak was admitted to a hospital several times during his home confinement); Psychiatric Report at 1 (indicating Siamak received mental health treatment and prescription

medication while on home confinement).  This evidence provides strong support for the conclusion that Iran did not place Siamak on home confinement with the intention of forcing him to kill himself.

In sum, plaintiffs have failed to show that Siamak was a victim of extrajudicial killing. There is virtually no evidence that Iran directly murdered Siamak, and there is not sufficient evidence to conclude that Iran imposed conditions of confinement on Siamak with the intention of forcing him to commit suicide.[14]  But because plaintiffs have demonstrated that Siamak was a victim of hostage taking and torture, and because they are seeking monetary damages for personal injuries suffered as a result of this hostage taking and torture, they have established the jurisdictional requirements in § 1605A(a)(1) for certain of their monetary claims.

### iv.  Additional requirements

Plaintiffs must also meet the requirements in § 1605A(a)(2) for the Court to assert jurisdiction over Iran.  That section provides that a court "shall hear a claim" if (1) "the foreign state was designated as a state sponsor of terrorism at the time the act described in [§ 1605A(a)(1)] occurred," 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time the act described in [§ 1605A(a)(1)] occurred[,] a national of the United States," id. § 1605A(a)(2)(A)(ii); and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate," id. § 1605A(a)(2)(A)(iii).

Iran has been designated as a state sponsor of terrorism since 1984, well before the events of this case.  Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 395–96 (D.D.C. 2015) (citing

---

[14] The Court need not, and does not, conclude that a suicide can never constitute an extrajudicial killing to conclude that the suicide in this case cannot be considered an extrajudicial killing due to the lack of evidence that Iran intended to kill Siamak.

Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984)); see also U.S. Dep't of State, Country Reports on Terrorism 2011 6 (2012) [ECF No. 20-57] (describing Iran as "the world's leading state sponsor of terrorism"). Skipping to § 1605A(a)(2)'s third requirement, plaintiffs were required to offer Iran a reasonable opportunity to arbitrate their claims in accordance with the accepted international rules of arbitration since the wrongs against Siamak occurred inside Iran's borders.   28 U.S.C. § 1605A(a)(2)(A)(iii).  In 2020, plaintiffs sent offers to arbitrate the claims in their complaints by certified mail to the Iranian Interests Section of the Pakistan Embassy in Washington, D.C.[15]  See Kar. Mot for Default J. at 33; Kar Offer to Arbitrate [ECF No. 20-67]; Kar Offer to Arbitrate Mailing Label [ECF No. 20-68]; Zand Mot. for Default J. at 30–31; Zand Offer to Arbitrate [Zand ECF No. 13-65]; Zand Offer to Arbitrate Mailing Label [Zand ECF No. 13-66]; see also Hekmati, 278 F. Supp. 3d at 150 (noting the Interests Section of the Islamic Republic of Iran is a part of the Pakistan Embassy).  Plaintiffs' arbitration offers were delivered, but Iran never responded.  Kar. Mot for Default J. at 33; Kar Offer to Arbitrate Delivery Receipt [ECF No. 20-69]; Zand Mot. for Default J. at 31; Zand Offer to Arbitrate Delivery Receipt [Zand ECF No. 13-67].  Plaintiffs have thus satisfied § 1605A(a)(2)'s first and third requirements.  See Levison v. Islamic Republic of Iran, 443 F. Supp. 3d 158, 167–68 (D.D.C. 2020) (concluding that an arbitration offer similar to plaintiffs' was sufficient under the FSIA); Asemani v. Islamic Republic of Iran, 266 F. Supp. 2d 24, 25 (D.D.C. 2003) (concluding that sending an arbitration offer to the Interests Section of the Islamic Republic of Iran was sufficient under the FSIA).

As for the second requirement, all plaintiffs are currently U.S. citizens.  Kar Mot. for Default J. at 32; Zand Mot. for Default J. at 30.  Zand became a U.S. citizen in 1990, Zand Mot.

---

[15] Plaintiffs also claim to have sent their arbitration offers to Iran's U.N. ambassador, Kar. Mot for Default J. at 33; Zand Mot. for Default J. at 31, but plaintiffs have not filed proof that these offers were successfully delivered.

for Default J. at 30; Banafsheh Zand Naturalization Certificate [Zand ECF No. 13-3], but Kar and Azadeh did not become citizens until 2007 and 2009, respectively, Kar Mot. for Default J. at 32; Mehrangiz Kar Naturalization Certificate [ECF No. 20-4]; Azadeh Pourzand Naturalization Certificate [ECF No. 20-8]. As the Court explained above, there is sufficient evidence to conclude that Iran held Siamak hostage from November 24, 2001 to November 30, 2002 and from early 2003 until April 29, 2011. There is also sufficient evidence to conclude that Siamak was a victim of torture from November 24, 2001 to November 30, 2002 and from early 2003 until he was placed on home confinement no later than 2006. Hence, the Court has subject-matter jurisdiction over all Zand's damages claims stemming from Siamak's hostage taking and torture as Zand was a U.S. citizen during the entirety of the relevant time periods. The Court, however, lacks jurisdiction over Kar's and Azadeh's claims for damages stemming from Siamak's torture since his torture ended before they became U.S. citizens. See Mohammadi, 782 F.3d at 15–16. Finally, the Court has subject-matter jurisdiction over Kar's and Azadeh's claims for damages stemming from the hostage taking of Siamak that continued after they became U.S. citizens, but it is less clear whether the Court has jurisdiction to grant Kar and Azadeh damages related to the hostage taking of Siamak that occurred before they became U.S. citizens.

The Court ordered supplemental briefing on this issue. Min. Order, Jan. 4, 2022. In their supplemental brief, plaintiffs argue that the Court can grant them damages for acts that occurred before they became U.S. citizens under the continuing-tort doctrine. Kar Suppl. Br. at 2–7. Under the continuing-tort doctrine, "all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period" if "the continuing tort has a cumulative effect, such that the injury might not have come about but for the [e]ntire course of conduct." John McShain, Inc. v. L'Enfant Plaza Props., Inc., 402 A.2d 1222, 1231 n.20 (D.C.

1979).  Under D.C. law, the continuing-tort doctrine applies when there is "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act [occurred] within the limitation period."  DeKine v. District of Columbia, 422 A.2d 981, 988 n.16 (D.C. 1980) (citation omitted).

Plaintiffs' argument is unconvincing.  As the above description of the continuing-tort doctrine makes clear, this doctrine allows courts to award damages for certain bad acts that are older than the applicable statute of limitations would otherwise allow.  But statutes of limitations do not necessarily limit a court's jurisdiction to award damages for untimely wrongs; indeed, the D.C. Circuit has held that the limitations period in the FSIA is not jurisdictional.  See Owens, 864 F.3d at 804.  A doctrine that is used to determine when a claim accrues and whether it is timely is of little use to the Court in deciding the limits of its jurisdiction under 28 U.S.C. § 1330(a) and the FSIA.

Section 1330(a) grants the Court subject-matter jurisdiction over claims for which a foreign state is not entitled to immunity under the FSIA, and the only applicable exception to sovereign immunity relevant in this case is the terrorism exception in § 1605A(a).  Hence, if § 1605A(a) does not waive Iran's sovereign immunity as to any portion of plaintiffs' claims, then the Court has no power to award plaintiffs damages for that portion.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute . . . .  It is to be presumed that a cause lies outside this limited jurisdiction . . . ." (internal citations omitted)).  Section 1605A(a)(2)(ii)'s plain text requires the claimant or victim to be a U.S. national (or fall within other groups not relevant here) "at the time the [hostage taking, torture, extrajudicial killing, etc.] occurred." Section 1605A(a)(2)(ii)'s limit is jurisdictional, see Braun, 228 F. Supp. 3d at 75–76, and it

prohibits this Court from awarding plaintiffs damages for wrongs that occurred before they became citizens even if those wrongs continued after plaintiffs obtained citizenship.

The D.C. Circuit's opinion in <u>Mohammadi</u> further supports this conclusion.  The plaintiffs in that case were allegedly tortured in Iran during the early 2000s and then settled in the United States by late 2006.  782 F.3d at 12–13.  The plaintiffs alleged that while they were in the United States, Iran continued torturing them by, among other things, making threatening phone calls.  <u>Id.</u> at 16; <u>see also</u> <u>Mohammadi v. Islamic Republic of Iran</u>, 947 F. Supp. 2d 48, 57 (D.D.C. 2013) ("[Plaintiffs] testified that they have experienced ongoing harassment from the Iranian regime since relocating to the United States.").  The plaintiffs were not citizens while they were tortured in Iran, <u>Mohammadi</u>, 782 F.3d at 14, but two of the plaintiffs became citizens in 2009 and 2011, after they had left Iran, <u>id.</u> at 15.  The issue in <u>Mohammadi</u> was whether the district court had jurisdiction to award plaintiffs damages for the alleged torture "occurring <u>after</u> [they] became United States citizens."  <u>Id.</u> (emphasis added).  The D.C. Circuit answered this question in the negative because it concluded that the harassment plaintiffs suffered after becoming citizens did not constitute torture.  <u>Id.</u> at 16.   But what is relevant here is that the D.C. Circuit never so much as suggested that the district court would have had jurisdiction to award damages for the torture plaintiffs allegedly endured before becoming United States citizens even if it found that plaintiffs' torture was ongoing.  Thus, although not directly on point, <u>Mohammadi</u>'s analysis provides some additional support for this Court's interpretation of § 1330(a) and § 1605A(a).

Plaintiffs' last argument that the Court has jurisdiction to award them damages for wrongs that occurred before they became U.S. citizens is that the private right of action outlined in 28 U.S.C. § 1605A(c) does not contain any requirement that the claimant be a U.S. national at the time of the alleged wrong.  <u>See</u> Kar Suppl. Br. at 6–7 ("Here, the statute does not provide any

explicit or implicit requirement that limits the applicability of the continuing tort doctrine, or the period for the calculation of damages."). But this argument reverses the order of analysis. The Court must first assure itself it has jurisdiction before it can consider plaintiffs' claims, and if the Court lacks jurisdiction over any portion of plaintiffs' claims, it lacks power to award damages for that portion, even if the claim is otherwise valid. See W.A. v. Islamic Republic of Iran, 427 F. Supp. 3d 117, 124 (D.D.C. 2019) (noting a court "must satisfy itself of its jurisdiction" before entering any default).

Hence, for the reasons explained above, the Court concludes that it has subject-matter jurisdiction to decide plaintiffs' claims for monetary damages stemming from the hostage taking and torture of Siamak. The Court has identified when Siamak was a victim of hostage taking and torture and has concluded that it possesses subject-matter jurisdiction to award Zand damages for injuries that occurred throughout the entirety of these time periods. But the Court lacks jurisdiction to award Kar and Azadeh damages for injuries that occurred before they became U.S. nationals. And because the Court has subject-matter jurisdiction in this case and plaintiffs have complied with the FSIA's service requirements, the Court has personal jurisdiction over Iran as well. See GSS Grp. Ltd., 680 F.3d at 811.

C.   Cause of Action

"Section 1605A not only 'provides federal courts with jurisdiction over, and withdraws sovereign immunity from' certain suits, but 'also creates a federal cause of action directly against foreign governments.'" Warmbier, 356 F. Supp. 3d at 54 (citations omitted). "Under § 1605A(c), 'national[s] of the United States' may sue certain foreign governments—those designated by the U.S. government as state sponsors of terrorism—for the acts described in § 1605A(a)(1) causing 'personal injury or death.'" Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir.

2018) (alteration in original) (citation omitted).  This cause of action in § 1605A(c)  was enacted in 2008 but operates retroactively.  Force, 464 F. Supp. 3d at 369.  Plaintiffs, who are all currently U.S. nationals, have sued Iran under this provision, see Kar Second Am. Compl. ¶¶ 41–45; Kar Mot. for Default J. at 33–34; Zand Compl. ¶¶ 38–42; Zand Mot. for Default J. at 31–32, and meet the requirements for its application, see Warmbier, 356 F. Supp. 3d at 54–55 (noting that § 1605A(c)'s requirements will generally be met "whenever the jurisdictional requirements of section 1605A are met" (citation omitted)).

"But although the FSIA 'provides a private right of action, it does not provide guidance on the substantive bases for liability to determine [p]laintiffs' entitlement to damages.'"  Cabrera, 2022 WL 2817730, at *41 (alteration in original) (quoting Est. of Hirshfeld v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 137 (D.D.C. 2018)).  Plaintiffs must prove a separate theory of liability which justifies holding defendants liable for plaintiffs' injuries, Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 62–63 (D.D.C. 2021), and district courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)," Fraenkel, 892 F.3d at 353.

Here, plaintiffs have sued Iran for many separate torts including intentional infliction of emotional distress ("IIED").  See Kar Second Am. Compl. ¶¶ 47–79; Zand Compl. ¶¶ 44–76. "Courts have applied the Restatement (Second) of Torts to these claims."  Selig, 573 F. Supp. 3d at 63.  Under the Second Restatement, plaintiffs are entitled to recover against Iran for IIED if "(1) they are members of a victim's immediate family" and "(2) they are present at the time, or 'the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present.'"  Rezaian, 422 F. Supp. 3d at 179 (alteration in original) (quoting Braun, 228 F. Supp. 3d at 81).  As Siamak's spouse and daughters, Kar, Azadeh, and Zand qualify

as Siamak's immediate family members.  See Cabrera, 2022 WL 2817730, at *42.  "And both hostage taking and torture have been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present."  Rezaian, 422 F. Supp. 3d at 179.  Hence, for the reasons outlined above, the Court concludes that plaintiffs have established Iran's liability to them for their emotional distress under § 1605A(c).[16]

## II.    Damages

### A.    Types of Damages Available

The available damages under the FSIA's cause of action include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c); accord Warmbier, 356 F. Supp. 3d at 55.  "Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'"  Fraenkel, 892 F.3d at 353 (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)).  "In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injury."  Warmbier, 356 F. Supp. 3d at 55 (citation omitted).  Plaintiffs have requested solatium, economic, and punitive damages.  Kar Mot. for Default J. at 34; Kar Second Am. Compl. ¶¶ 88, 90, 93; Zand Mot. for Default J. at 31; Zand Compl. ¶¶ 85, 87, 90.  The Court will assess plaintiffs' entitlement to these separate categories of damages in turn.

---

[16] Discussion of plaintiffs' other state-law claims is unnecessary as they "would give rise to no more damages than those available under the FSIA's private right of action," Warmbier, 356 F. Supp. 3d at 54 n.5, "and are therefore 'subsumed in the FSIA claims,'" id. (quoting Kaplan v. Cent. Bank of the Islamic Republic of Iran, 896 F.3d 501, 508 (D.C. Cir. 2018)); accord Fritz, 320 F. Supp. 3d at 89 (concluding that most plaintiffs' state-law claims were redundant of the plaintiffs' claims under § 1605A(c)).

B.  Amount of Damages Available

i.  Solatium

"Solatium is awarded to compensate . . . 'the mental anguish, bereavement, and grief that those with a close personal relationship to a [victim] experience as the result of the [victim]'s death [or injury] . . . ."  Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 78 (D.D.C. 2010) (quoting Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)) (cleaned up); see also Abedini v. Gov't of Islamic Republic of Iran, 422 F. Supp. 3d 118, 140 (D.D.C. 2019) (awarding solatium damages to the sibling of an individual who survived torture and hostage taking).  "'Mental anguish, bereavement and grief resulting from' an immediate family member's death or injury 'constitutes the preponderant element of a claim for solatium.'"  Warmbier, 356 F. Supp. 3d at 58 (quoting Fraenkel, 892 F.3d at 356–57).

Plaintiffs are entitled to solatium damages for the emotional distress they endured as a result of Siamak's detention and torture.  Plaintiffs' mental anguish was a "reasonably certain" consequence of Iran's actions.  Fraenkel, 892 F.3d at 353.  And not only may this Court "presume" that plaintiffs suffered compensable mental anguish by virtue of their direct lineal relationship, Cabrera, 2022 WL 2817730, at *47; Kim v. Democratic People's Republic of Korea, 87 F. Supp. 3d 286, 290 (D.D.C. 2015), plaintiffs have also submitted evidence documenting the anxiety and grief they endured, e.g., Kar Decl. ¶¶ 41, 45, 50–54; Azadeh Decl. ¶¶ 19, 33, 38–39, 41–48, 58; Decl. of Gleb Zhukov [ECF No. 20-18] ¶¶ 9–13; Decl. of Ali Hamedani [ECF No. 20-19] ¶¶ 9, 14–15, 20; Zand Decl. ¶¶ 27, 47–49; Decl. of Anthony Haden-Guest [Zand ECF No. 13-7] ¶¶ 9–10; Decl. of Barba Ledeen [Zand ECF No. 13-8] ¶¶ 6–9, 11; Decl. of Daiush Yazadan-Panah [Zand ECF No. 13-9] ¶ 8.  This evidence is more than sufficient.

"Solatium damages 'are by their very nature unquantifiable.'" Cabrera, 2022 WL 2817730, at *47 (quoting Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 72 (D.D.C. 2015)). To bring some uniformity to these cases, however "[j]udges in this District have established two primary frameworks, sometimes called the 'Peterson II'[17] or 'Heiser'[18] frameworks, for evaluating solatium damages for terrorist victims and their family members." Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 270 (D.D.C. 2020). "Under both the Peterson II and Heiser frameworks, the standard damages awards for the immediate family members of a deceased victim are $5 million for parents, $2.5 million for siblings, $8 million for spouses, and $5 million for children." Id. "Those awards are typically halved for family members of an injured victim." Id. (citing Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 44–45 (D.D.C. 2014)).

While Siamak died in Iran's custody, the Court has concluded that he was not a victim of an extrajudicial killing. Thus, under the Peterson II and Heiser frameworks, Kar is entitled to $4 million in solatium damages, and Azadeh and Zand are each entitled to $2.5 million. Plaintiffs have requested much larger awards. Kar Mot. for Default J. at 36, 38 (requesting $20 million in solatium damages for Kar and $15 million for Azadeh); Zand Mot. for Default J. at 34 (requesting $15 million in solatium damages for Zand). In support of their claims, plaintiffs have cited cases from this District that did not apply the Peterson II or Heiser frameworks. See Kar Mot. for Default J. at 34, 36–38 (citing Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62 (D.D.C. 1998), Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107 (D.D.C. 2000), and Kim v. Democratic People's Republic of Korea, 87 F. Supp. 3d 286 (D.D.C. 2015)); Zand Mot. for Default J. at 32–34 (same). Cicippio and Anderson pre-date the Peterson II and Heiser frameworks, cf. Cabrera,

---

[17] Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007).

[18] Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20 (D.D.C. 2009).

39

2022 WL 2817730, at *45 ("More recent decisions hew closer to the Peterson II framework,"), and Kim determined the appropriate amount of damages in part by referring to Cicippio and Anderson, see Kim, 87 F. Supp. 3d at 290.  The Court recognizes that the Peterson II and Heiser damages frameworks are not mandatory, but it is also "mindful of the importance of providing similar solatium awards to similarly situated plaintiffs."  Cabrera, 2022 WL 2817730, at *48.  For that reason, "this Court has 'previously endorsed' [the Peterson II] framework, and it will do so in this case."  Id. at *47 (quoting Kinyua v. Republic of Sudan, 446 F. Supp. 3d 1, 10–11 (D.D.C. 2020)).

"The values in the Peterson II framework 'are not set in stone,'" Cabrera, 2022 WL 2817730, at *47 (quoting Murphy, 740 F. Supp. 2d at 79), and an individual plaintiff's circumstances may justify deviations, see Mwila, 33 F. Supp. 3d at 45.  But "departures are usually relatively small."  Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 86 (D.D.C. 2010); accord Cabrera, 2022 WL 2817730, at *47 n.39.  The Court sees no reason for deviating from the framework in this case.  Although plaintiffs' emotional trauma is undoubtedly severe, their suffering is comparable to that of family members of the victims of other tragic cases brought under the FSIA.  Plaintiffs have not, for instance, claimed that they required hospitalization due to their emotional distress.  See Valore, 700 F. Supp. 2d at 86 (granting a 25% upward deviation to individual who "suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered").[19]  The several million dollars that plaintiffs will be entitled to is a fair—if inherently unsatisfying—sum to compensate them for the pain they have endured.

---

[19] The Court is aware that plaintiffs have asserted that their trauma impacted their physical health negatively. E.g., Azadeh Decl. ¶ 41 (arguing that Azadeh now suffers from an autoimmune disease due to the emotional distress she endured).

The Court also does not see any need in this case to deviate from the Peterson II framework due to the different times at which plaintiffs became citizens. The Peterson II framework provides a baseline set of damages that courts may award to family members of victims of the wrongs prohibited by the FSIA; the framework generally does not differ substantially based on factors such as how many years a victim was subject to hostage taking. See Cabrera, 2022 WL 2817730, at *47–54 (applying the Peterson II framework to several different plaintiffs whose family members were injured in many different ways). While the Court could envision a future case where plaintiffs' different dates of citizenship justify deviations from the Peterson II framework— for instance, if a victim were subject to torture for 20 years and one plaintiff was a U.S. citizen for all 20 years of that torture but another plaintiff was a U.S. citizen for only 20 days—that is not this case. The last of the three plaintiffs to become a U.S. citizen, Azadeh, became a U.S. citizen on January 8, 2009. Azadeh Pourzand Naturalization Certificate. Siamak did not die until more than two full years later on April 29, 2011. The Court concludes that all plaintiffs are entitled to the full amount of damages outlined in Peterson II in these circumstances. The Court accordingly will award Kar $4 million and Azadeh and Zand $2.5 million each in solatium damages.

ii.  Economic Damages

Plaintiffs' requested economic damages can be grouped into two separate categories. The more significant category requests damages for "lost financial opportunities." See Kar Mot. for Default J. at 38. Plaintiffs claim that the trauma they suffered due to Siamak's detention and torture negatively impacted their potential earnings. See, e.g., Azadeh Decl. ¶ 57 ("Even within international development and human rights work, I struggled to find my place as a result of the trauma from my father's case."); Zand Decl. ¶ 51 ("I became unemployable because my emotional situation was in turmoil and because of the political situation."). Plaintiffs also argue that they felt

41

compelled to pursue less lucrative employment in order to advocate for Siamak and others similarly situated. See, e.g., Kar Decl. ¶ 58 ("[T]he stipends attached to fellowships did not compare to what a stable legal career would have provided in the United States."); Azadeh Decl. ¶ 56 ("Not knowing how to throw myself back into the business world . . . I decided to write a business plan for a nonprofit named Siamak Pourzand Foundation (SPF) which is now an organization that I have co-founded and run."); Zand Decl. ¶ 50 ("Because my father had become a target of the Iranian regime, I decided to work where I felt I could help advocate for political change and the promotion of human rights.").[20]  Plaintiffs are seeking a total of nearly three million dollars of economic damages under this theory.  Kar Mot. for Default J. at 40, 42 ($1,330,000 economic damages for Kar and $210,000 economic damages for Azadeh); Zand Mot. for Default J. at 36 ($1,400,000 economic damages for Zand).

The Court has several concerns about granting this request.  As an initial matter, it appears much of the harm plaintiffs allegedly have suffered would have occurred without Siamak's detention.  For instance, Kar bases her damages request in part on the fact that she has not been able to return to Iran to renew her bar license and continue the career she previously enjoyed as a human rights lawyer.  Kar Mot. for Default J. at 39–40; Kar Decl. ¶¶ 55–56.  But Kar and Azadeh fled Iran before Siamak was arrested due to Kar's own arrest by the Iranian government.  See Kar Mot. for Default J. at 2–3; Kar Decl. ¶ 11.  Iran's mistreatment of Kar and hostility toward her work does not entitle plaintiffs to recover damages in this lawsuit.  Moreover, although "'[a]s a general rule, lost earnings—past and future—are compensable economic damages' in FSIA cases," Rezaian, 422 F. Supp. 3d at 182 (citation omitted), the Court has serious doubts about whether all

---

[20] Azadeh also suggests that Iran's mistreatment of Siamak made her less employable.  See, e.g., Azadeh Decl. ¶ 57 ("[M]y name would trigger inconvenience for the more internationally known human rights and civil society organizations that either had Iran as their member state or had hopes to engage the various factions of the Iranian government in their advocacy efforts.").

of plaintiffs' claimed economic damages are recoverable under the FSIA.  Plaintiffs' decisions to pursue less lucrative public-interest careers are not necessarily a "reasonably certain" consequence of the abuse their father suffered, Fraenkel, 892 F.3d at 353, and plaintiffs' situations are arguably different than those of the plaintiffs in Rezaian, who lost income by directly advocating for the relevant victim's release from Iran, see 422 F. Supp. 3d  at 182–83.  Regardless, the Court need not resolve these doubts now because plaintiffs' claims fail for a more fundamental reason— plaintiffs have not submitted sufficient supportive evidence.

"Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."  Moradi, 77 F. Supp. 3d at 71.  "The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case."  Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 214 (D.D.C. 2012).  But plaintiffs have not submitted a report from a forensic economist or any other expert in support of their claims.  Instead, they have relied almost exclusively on their own declarations to estimate the salaries they claim they would be earning if not for Iran's actions.[21]  Nor have plaintiffs submitted any financial documents to substantiate their declarations.  Courts have regularly rejected plaintiffs' claims for economic damages in FSIA cases in similar circumstances, and this Court will do the same.  See, e.g., Kaplan v. Hezbollah, 213 F. Supp. 3d 27, 46 (D.D.C. 2016) ("[P]laintiffs ask the Court to award almost $2 Million in lost economic opportunities based on unconfirmed testimony and a 'salary summary' from [many years after the terrorist attacks].  The Court declines plaintiffs' invitation . . . ."); Braun, 228 F. Supp. 3d at 83; Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d

---

[21] In their motions for summary judgment, plaintiffs also cite to websites such as ZipRecruiter to bolster their claims for economic damages.  E.g., Kar Mot. for Default J. at 40 n.11.  But "[s]tatements that appear in plaintiffs' memorandum in support of the motion for default judgment are not evidence," Moradi, 77 F. Supp. 3d at 71 n.10, and the Court has no means of determining the accuracy of the data on these websites.

1, 24 (D.D.C. 2016); Moradi, 77 F. Supp. 3d at 71 ("[Plaintiff]'s declaration is the only evidence supporting his claim for lost earnings, and it is insufficient to support any award of economic damages.").

The second category of economic damages that plaintiffs seek are damages they incurred as a direct result of Siamak's detention.  For instance, Kar claims that when Iran arrested Siamak in 2001, they seized her computer hard drive and 400 Swedish kronor, Kar Decl. ¶ 16, and that she contributed money to pay for Siamak's living expenses while he was on home detention, Kar Decl. ¶ 58.  These damages could entitle Kar to economic relief under the FSIA, but again, plaintiffs have not sufficiently supported their claims with evidence.  Plaintiffs refer to these damages in their motion for default judgment, Kar Mot. for Default J. at 39, but they do not quantify the amount of damages they are seeking under this theory and instead focus only on their claims for damages stemming from their reduced salaries, see, e.g., Kar Mot. for Default J. at 40–41 (requesting a damages amount that includes only the damages Kar allegedly suffered due to her lower salary).  The Court "will not excuse plaintiffs' failure" to adequately support their claims for economic damages under the FSIA.  Moradi, 77 F. Supp. 3d at 71.  Hence, for the reasons explained above, plaintiffs' claims for economic damages will be denied.

iii.   Prejudgment Interest

Plaintiffs also ask the Court to award them prejudgment interest on their claims for compensatory damages.  E.g., Kar Mot. for Default J. at 41; Zand Mot. for Default J. at 36. "Whether to award prejudgment interest 'is a question that rests within this Court's discretion, subject to equitable considerations.'"  Cabrera, 2022 WL 2817730, at *54 (quoting Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 58 (D.D.C. 2012)).  "This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs'

awards, including pain and suffering and solatium." Id. (quoting Ewan v. Islamic Republic of Iran, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (collecting cases)).  Although there is some disagreement about this practice, see id. (noting that some judges have concluded that prejudgment interest should not be applied to damages awarded under the Heiser or Peterson II frameworks), "the Court concludes—as it has done in the past—that an award of prejudgment interest is appropriate," id. at *55 (citation omitted).  "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." Ewan, 466 F. Supp. 3d at 250 (citation omitted). "A solatium award is therefore best viewed as fixed at the time of the loss," id. (citation omitted), and failing to award plaintiffs prejudgment interest would permit Iran to profit from the use of the money in the time between plaintiffs' injuries and the damages award, id.

The Court will calculate the prejudgment interest amount by following the D.C. Circuit's recommendation in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996).  In Forman, the D.C. Circuit compared separate rates that could be used to determine pre-judgment interest, 84 F.3d at 450–51, and explained that using the prime rate is "more appropriate" than the Treasury Bill rate because the prime rate is "a market-based estimate" of what a victim would have had to pay to borrow money at the time of the relevant attack, id. (citation omitted).  As it has done previously, e.g., Cabrera, 2022 WL 2817730, at *55–56; Ewan, 466 F. Supp. 3d at 250–51, the Court will use the Federal Reserve's data for the average annual prime rate in each year from the date when Siamak's detention began—November 24, 2001—through 2022, Cabrera, 2022 WL 2817730, at *55.[22]  The Court will not grant prejudgment interest for any years in which plaintiffs

---

[22] This data is available on the Federal Reserve's website.  Bd. of Governors of Fed. Rsrv. Sys., Data Download Program, https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=8193c9482419 2497563a23e3787878ec&filetype=spreadsheetml&label=include&layout=seriescolumn&lastObs=50 (last accessed Sept. 21, 2022).  The prime rate for year 2022 is not yet available, so the Court approximated this rate by averaging the prime rates for the past six years—roughly 4.10%.

were not U.S. citizens.  Using the prime rates for the years from the date of Siamak's detention, and discounting for the percentage of the year elapsed at the time of his detention and when Kar and Azadeh became citizens, yields the following multipliers:[23]

| Plaintiff | When Interest Began Accruing | Multiplier |
|---|---|---|
| Banafsheh Zand | November 24, 2001 | 2.44540307 |
| Mehrangiz Kar | June 20, 2007 | 1.797776948 |
| Azadeh Pourzand | January 8, 2009 | 1.639379016 |

Applying those multipliers, the Court concludes that plaintiffs are entitled to the following amounts as compensatory damages (solatium damages plus prejudgment interest):

| Plaintiffs | Solatium Damages | Solatium Damages Plus Prejudgment Interest |
|---|---|---|
| Banafsheh Zand | $2,500,000 | $6,113,507.68 |
| Mehrangiz Kar | $4,000,000 | $7,191,107.79 |
| Azadeh Pourzand | $2,500,000 | $4,098,447.54 |

---

[23] The Court will explain how it calculated these multipliers using Zand and Kar as examples. Zand has been a citizen since 1990, Banafsheh Zand Naturalization Certificate, so her claim began accruing on the day that Siamak's hostage taking began—November 24, 2001. Kar did not become a citizen until June 20, 2007, Mehrangiz Kar Naturalization Certificate, so that is when her right to collect against Iran solidified and her interest began accruing. The Court first discounted the prime rates from 2001 to 2022 to reflect that plaintiffs' claims began accruing in the middle of some of these years. For instance, Zand's claim began accruing in November 2001, meaning she had a valid claim for roughly only 10% of 2001. Kar, on the other hand, did not have a valid claim until 2007, and her claim was valid for roughly 53% of 2007. The Court also discounted plaintiffs' claims for 2022 to recognize that only roughly 75% of 2022 has passed.

The Court then used these prime rate and date numbers to calculate the appropriate multiplier for each plaintiff. For Zand, for instance, the Court multiplied $1.00 by the prime rate in 2001 (6.91%), multiplied that number by roughly 10% to represent the amount of that year remaining when her entitlement to damages began to accrue, and then added that amount to $1.00, for a result of $1.007004658. The Court then multiplied $1.00 by the prime rate in 2002 (4.67%), added 1 to that number, and then multiplied the sum by the figure it calculated previously, $1.007004658, to produce the new figure $1.054031775. The Court continued this iterative process through September 30, 2022, resulting in a total multiplier of 2.44540307. The Court used a similar process for Kar, but it began calculating her multiplier by multiplying the prime rate in 2007 (8.05%) by $1.00, multiplying that figure by roughly 53% to represent the portion of the year remaining at the time of her naturalization, and then adding that amount to $1.00, for a result of 1.042786301. The Court's process mirrored the process it used for calculating prejudgment interest in <u>Cabrera</u>, 2022 WL 2817730, at *55–56 & n.46.

iv.  Punitive Damages

"Punitive damages 'serve to punish and deter the actions for which they [are] awarded.'"
Sheikh, 485 F. Supp. 3d at 272 (alteration in original) (quoting Valore, 700 F. Supp. 2d at 87).
"Courts calculate the appropriate amount of punitive damages by weighing four factors: '(1) the
character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the
defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the
defendants.'"  Id. (quoting Oveissi, 879 F. Supp. 2d at 56).  All these factors weigh in favor of
awarding plaintiffs punitive damages.  Iran's mistreatment of Siamak was horrific; plaintiffs
suffered severe psychological trauma as a result of Iran's wrongful conduct; "there is a significant
need to deter further such [wrongs]; and defendant is a sovereign nation that can be presumed to
possess significant wealth."  Id. at 273; see also Rezaian, 422 F. Supp. 3d at 183 ("Courts have
repeatedly held, in Section 1605A cases, that Iran's actions were outrageous, and imposed
substantial punitive damages awards as a result.").

But even with the guidance these factors provide, courts in this District have varied in how
they award punitive damages in FSIA cases.  Sheikh, 485 F. Supp. 3d at 273; accord Warmbier,
356 F. Supp. 3d at 59 ("[S]everal approaches have been articulated for calculation of the
appropriate amount of punitive damages in state-sponsored terrorism cases.").  Under one
approach, the Court determines the amount of funds the defendant expended in material support
of the relevant terrorist attack and then multiplies that sum in order to calculate an award sufficient
to deter future misconduct.  See Sheikh, 485 F. Supp. 3d at 273 (summarizing Estate of Doe v.
Islamic Republic of Iran, 943 F. Supp. 2d 180, 189–90 (D.D.C. 2013)).  This approach would not
be appropriate here given that Iran directly injured Siamak.

In cases where the "expenditure-times-multiplier method" has been inapplicable, "this Court has previously found it appropriate 'to award punitive damages in an amount equal to the total compensatory damages awarded in th[e] case.'" Sheikh, 485 F. Supp. 3d at 273 (citation omitted). Other courts have also employed this approach in similar cases where Iran has directly wronged the victims. See, e.g., Saberi v. Gov't of Islamic Republic of Iran, 541 F. Supp. 3d 67, 87 (D.D.C. 2021); Abedini, 422 F. Supp. 3d at 142; Hekmati, 278 F. Supp. 3d at 167; Moradi, 77 F. Supp. 3d at 73. This approach thus has the virtue of producing punitive damages awards that are consistent with the awards in analogous cases and are "a forceful deterrent" against Iran's continued wrongful acts. Sheikh, 485 F. Supp. 3d at 273. To that end, the Court will award plaintiffs punitive damages in an amount equal to their total compensatory damages, $17,403,063.01, which shall be distributed in accordance with the compensatory damages to which each plaintiff is entitled.[24]

## Conclusion

For the foregoing reasons, the Court concludes that plaintiffs have established that the Court has jurisdiction over their claims and that they are entitled to compensatory and punitive damages under the FSIA. The Court will award compensatory damages totaling, with prejudgment interest, $17,403,063.01. The Court will also award punitive damages of $17,403,063.01. Plaintiffs' total award shall be $34,806,126.02. A separate Order specifying each plaintiff's award will issue on this date.

---

[24] Plaintiffs' complaints also contain cursory requests for costs and attorney's fees. See Kar Second Am. Compl. ¶ 94; Zand Compl. ¶ 91. Plaintiffs do not pursue these requests in their motions for default judgment, however, and the Court has no basis upon which to grant their requests. See Sheikh, 485 F. Supp. 3d at 275. The Court will thus deny the plaintiffs' requests for costs and attorney's fees.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  September 30, 2022